## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC*., et al.,*   *

    *Plaintiffs,*   *

    v.   *   Civil Case No. 16-cv-3311-MJG

LAWRENCE HOGAN, *et al.,*   *

    *Defendants.*   *

*   *   *   *   *   *   *   *   *   *   *   *   *   *

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS AMENDED COMPLAINT

BRIAN E. FROSH
Attorney General

JENNIFER L. KATZ (Fed. Bar #28973)
MATTHEW J. FADER (Fed. Bar # 29294)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.)
410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: January 20, 2017    Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 2

    A.    The HQL Requirement of the Firearm Safety Act of 2013 ......................... 2

    B.    The HQL Implementing Regulations ........................................................... 4

    C.    The Plaintiffs ................................................................................................ 5

STANDARD OF REVIEW .................................................................................... 7

ARGUMENT .......................................................................................................... 8

I.      THE PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL REQUIREMENT IS REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF FIREARMS VIOLENCE. ......................................................................... 8

    A.    The Second Amendment Framework ........................................................... 8

    B.    To the Extent the HQL Requirement Burdens Conduct Falling Within the Scope of the Second Amendment, Intermediate Scrutiny Is the Applicable Standard of Review .................................................................... 9

    C.    Plaintiffs' Facial Challenge to the HQL Requirements Set Forth in the Firearm Safety Act Fails to State a Claim for Relief Because Those Requirements Have a Plainly Legitimate Sweep. ..................................... 11

        1.    The Fingerprint, Background Check, and Firearms Safety Training Provisions of the HQL Law Are Constitutional. ............... 12

        2.    The Costs Associated with the HQL Requirement and the Application Period Are Constitutional. ........................................... 17

    D.    Plaintiffs' Facial Challenge to the HQL Requirements Set Forth in the Implementing Regulations Fails to State a Claim for Relief Because Those Requirements Have a Plainly Legitimate Sweep ............................ 19

E.      Plaintiffs' As-Applied Challenges Fail to State a Claim for Relief Because None of the Plaintiffs Has Alleged that the Law Has Been Applied to Her in an Unconstitutional Manner. .......................................... 21

II.     THE PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE THE STATUTE DOES NOT GIVE PRIVATE HANDGUN INSTRUCTORS AUTHORITY TO DENY SECOND AMENDMENT RIGHTS AND THE WORDS "RECEIVE" AND "RECEIPT" ARE NOT VAGUE. ................................................................................................. 23

A.      The Firearm Safety Act Does Not Give Private Handgun Instructors Authority to Grant or Deny Second Amendment Rights. ........................... 23

B.      The Terms "Receive" and "Receipt" Are Not Void for Vagueness. .......... 26

III.    THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF MARYLAND LAW UPON WHICH RELIEF CAN BE GRANTED IN COUNT III. ............. 30

A.      The HQL Law Does Not Require the Maryland State Police to Offer Background Check and Fingerprinting Services. ........................................ 31

B.      None of the Challenged Regulations Concerning Firearms Safety Training Are Beyond the Scope of the HQL Law. .................................... 31

C.      The Plaintiffs' Remaining Challenges Fail for Lack of Standing and Because the Challenged Requirements Do Not Contradict the HQL Statute's Language or Purpose. ................................................................. 34

CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................. 7, 23, 30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 7

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)................................................. 22

*Carandola v. Bason*, 303 F.3d 507 (4th Cir. 2002)........................................... 14

*Center for Auto Safety Inc. v. Athey*, 37 F.3d 139 (4th Cir. 1994) ................................... 18

*Christ by Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427 (1994)............................. 31

*Chow v. State*, 393 Md. 431 (2006)................................................... 28, 29, 30

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ........................................ 13

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ................................................. 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................. 8, 9, 12, 16, 17

*Federal Commc'n Comm'n v. Fox TV Stations*, 132 S. Ct. 2307 (2012)........................... 26

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................ 26

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004)............................................. 7, 13

*Heller v. District of Columbia*, 45 F. Supp. 3d 35 (D.D.C. 2014) ................................. 21

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...................................... 10

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) .......... 12, 13, 16, 17, 18, 21

*Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138 (4th Cir. 2009) .............................................................. 24

*Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835 (N.D. Ill. 2011) ........................ 10, 18

*Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 621 (4th Cir. 2016) ........................... 7

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ...................................... 10, 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).......................................... 21, 22, 34

*Macke Co. v. State Dep't of Assessments and Taxation*, 264 Md. 121 (1972) ................ 29

*Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012) .................................................... 26

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................... 9, 17

*Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1 (2003) .......................... 30

*Papasan v. Allain*, 478 U.S. 265 (1986) .......................................................... 7

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) ....................... 17

*Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013) ................................ 24, 25

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................... 26

*Smith v. State*, 425 Md. 292 (2012) .............................................................. 27

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ................................... 11, 15

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ................................... 9, 10

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) ........................................ 26

*United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) ................................. 11

*United States v. Lanning*, 723 F.3d 476 (4th Cir. 2013) ...................................... 26

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................................... 10

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ................................ 9, 10, 22

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................. 13

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................................ 22

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) ........................................ 11

*United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014) ................................................................. 7

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1983) ................................................................................................ 26

*Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012) ................................ 7, 26

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) .................................................................................................. 11

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.) ........................................ 9, 10, 11, 12,

**Constitutional Provisions**

U.S. Const., amend. I............................................................................ 18

U.S. Const., amend. II. ................................................................. *passim*

U.S. Const., amend. XIV. ...................................................................... 24

**Statutes**

2007 Laws of Md., Ch. 427 ...................................................................... 2

Conn. Gen. Stat. § 29-36(f) .................................................................. 15

Conn. Gen. Stat. § 29-36(g) ............................................................ 15, 18

Md. Code Ann., Pub. Safety § 5-101(q) ................................................. 32

Md. Code Ann., Pub. Safety § 5-101(r) .................................................... 1

Md. Code Ann., Pub. Safety § 5-101(s) ................................................. 28

Md. Code Ann., Pub. Safety § 5-105 .................................................. 4, 30

Md. Code Ann., Pub. Safety § 5-117.1 ........................................... 2, 27, 29

Md. Code Ann., Pub. Safety § 5-117.1(b) .......................................... 2, 27

Md. Code Ann., Pub. Safety § 5-117.1(c) ........................................... 2, 27

Md. Code Ann., Pub. Safety § 5-117.1(d) ........................................... 2, 25

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) ........................................ 3, 25

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(i) ........................................ 32

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) ...................................... 32

Md. Code Ann., Pub. Safety § 5-117.1(e) ................................................. 3

Md. Code Ann., Pub. Safety §  5-117.1(e)(2) .......................................... 23

Md. Code Ann., Pub. Safety § 5-117.1(f) ................................................. 3

Md. Code Ann., Pub. Safety § 5-117.1(g) ............................................ 3, 34

Md. Code Ann., Pub. Safety § 5-117.1(g)(1) ...................................................... 34

Md. Code Ann., Pub. Safety § 5-117.1(g)(2) ............................................... 18, 34

Md. Code Ann., Pub. Safety § 5-117.1(h) ........................................................ 3

Md. Code Ann., Pub. Safety § 5-117.1(h)(1) .................................................. 18

Md. Code Ann., Pub. Safety § 5-117.1(i) ..................................................... 3, 14

Md. Code Ann., Pub. Safety § 5-117.1(l) ..................................................... 3, 14

Md. Code Ann., Pub. Safety § 5-117.1(l)(1) ................................................... 25

Md. Code Ann., Pub. Safety § 5-117.1(l)(3) ..................................................... 3

Md. Code Ann., Pub. Safety § 5-117.1(n) .................................................... 4, 30

Md. Code Ann., Pub. Safety § 5-118(b) .......................................................... 14

Md. Code Ann., Pub. Safety § 5-144 .............................................................. 27

Md. Code Ann., State Gov't § 10-117 .............................................................. 4

Md. Code Ann., State Gov't § 10-125 ............................................................ 30

Md. Code Ann., State Gov't § 10-125(d) ........................................................ 30

N.Y. Penal Law § 400.00(4-a) ....................................................................... 18

**Rules**

Fed. R. of Civ. P. 12(b)(6) ..................................................................... 1, 7, 23

**Regulations**

COMAR 12.04.02.03 − .05 ......................................................................... 16

COMAR 12.04.02.03.10(D) ........................................................................ 16

COMAR 29.03.01.01(B)(36) ...................................................................... 32

COMAR 29.03.01.26 − .41 .......................................................................... 4

COMAR 29.03.01.28(B) ............................................................................. 4

COMAR 29.03.01.29 .................................................................................. 25

COMAR 29.03.01.29(C) .......................................................................... 4, 32

COMAR 29.03.01.29(C)(4) ................................................................ 4, 19, 32

COMAR 29.03.01.36 ................................................................................ 25

COMAR 29.03.01.37 ................................................................................ 25

COMAR 29.03.01.37(A)(3) ...................................................................... 33

COMAR 29.03.01.37(B) ........................................................................... 33

**Miscellaneous**

40 Md. Reg. 1568-83 (Sept. 20, 2013) ...................................................... 4

40 Md. Reg. 1772 (Oct. 18, 2013) ............................................................. 4

40 Md. Reg. 2072-73 (Dec. 13, 2013) ....................................................... 4

Federal Bureau of Investigation, 2015 Crime in the United States, Table 20,
    Murder by State, Types of Weapons, 2015, *available at*
    https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables
    /table-20 (last visited Nov. 30, 2016) ................................................. 13

U.S. Government Accountability Office, GAO-01-427, *Firearms Purchased
    from Federal Firearm Licensees Using Bogus Identification* (2001) ......................... 13

Daniel Webster *et al.*, *Preventing the Diversion of Guns to Criminals through
    Effective Firearm Sales Laws*, in *Reducing Gun Violence in America:
    Informing Policy with Evidence and Analysis* 109-22 (Webster, *et al.*,
    eds., Johns Hopkins Univ. Press 2013) ............................................... 14

Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-
    Purchase Handgun Law and Homicides*, 105 Am. J. of Public Health 8
    (Aug. 2015) ....................................................................................... 15

Daniel Webster, *et al.*, *Effects of the Repeal of Missouri's Handgun
    Purchaser Licensing Law on Homicides*, 91 J. of Urban Health 2 (2014) ................. 15

Cassandra K. Crifasi, *et al.*, *Effects of Changes in Permit-to-Purchase
    Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79
    Preventive medicine 43 (2015). ......................................................... 15

**INTRODUCTION**

Defendants Governor Lawrence J. Hogan, Jr. and Superintendent of State Police Colonel William M. Pallozzi, sued in their official capacities, move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  All three counts of the complaint challenge Maryland's requirement that most individuals wishing to purchase a handgun in Maryland first obtain a Handgun Qualification License ("HQL").  In Count I, the plaintiffs allege that certain aspects of Maryland's HQL requirement violate the Second Amendment to the United States Constitution.  Count I fails to state a claim because the HQL requirement easily satisfies the most stringent test that might apply, intermediate scrutiny, as it is a reasonable fit to the State's compelling interest in public safety and reducing handgun violence.

In Count II, the plaintiffs allege that two aspects of the HQL requirement violate the their due process rights:  (1) a reliance on private handgun instructors to provide required training, which the plaintiffs claim violates their procedural due process rights; and (2) the HQL requirement's application to individuals who "receive" a handgun, which the plaintiffs contend is void for vagueness.  Count II fails because the plaintiffs have failed to identify any actual deprivation of a constitutionally-protected right, and because the term "receive" is not vague, especially in context and in light of controlling Maryland law.

In Count III, the plaintiffs allege that various aspects of the regulations implementing the HQL requirement are ultra vires under Maryland law.  Count III fails for

---

[1] Governor Hogan is named as a defendant only because he is a state official required to implement the statutory scheme.

several reasons, including:  (1) several of the plaintiffs' claims rely on misstatements of the regulations; (2) the challenged requirements are clearly within the scope of the authority delegated to the Maryland State Police; and (3) the statute does not require the Maryland State Police to offer any of the services that the plaintiffs complain it is not offering.

## FACTUAL BACKGROUND

### A.      The HQL Requirement of the Firearm Safety Act of 2013

The Firearm Safety Act of 2013, Chapter 427 of the 2007 Laws of Maryland (the "Firearm Safety Act"), was a comprehensive effort to enhance public safety.  The plaintiffs in this case challenge the Act's requirement that most purchasers of handguns in Maryland have a valid HQL.  The HQL requirement, which incorporates a robust background check and a safety training requirement, is found in § 5-117.1 of the Public Safety Article, which is reproduced as Exhibit 2.  Subject to certain exemptions, the HQL requirement provides that one person may not "sell, rent, or transfer a handgun" to a second person, and the second person may not "purchase, rent, or receive a handgun" from the first person, unless the second person presents a valid HQL.  Md. Code Ann., Pub. Safety § 5-117.1(b) & (c).

Section 5-117.1(d) requires the Secretary of State Police to issue an HQL to an applicant who:  (i) is at least 21 years old; (ii) is a Maryland resident; (iii) has completed a firearms safety training course meeting certain criteria within three years of applying for an HQL; and (iv) based on an investigation by the Maryland State Police, is not prohibited from owning a firearm.  The required firearms safety training course must include at least four hours of instruction by a qualified handgun instructor, including, among other

elements, classroom instruction on home firearm safety and the mechanisms and operation of handguns and "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." Pub. Safety § 5-117.1(d)(3).[2]

The required investigation of whether an individual may lawfully possess a firearm must include a state and national criminal history check that utilizes fingerprints required to be submitted as part of the HQL application. Pub. Safety § 5-117.1(f).

The statute requires an applicant for an HQL to submit: (1) "an application in the manner and format designated by the Secretary"; (2) an application fee "to cover the costs to administer the program of up to $50"; (3) proof of completion of the training requirement; (4) any other information or documentation required by the Secretary; and (5) a statement under oath that the individual is not prohibited from possessing a handgun. Pub. Safety § 5-117.1(g). Within 30 days of receiving a complete application, the Secretary is charged with either issuing an HQL or providing a written denial accompanied by a statement of the reason for the denial and notice of appeal rights. Pub. Safety § 5-117.1(h).

An HQL is valid for 10 years from its issuance. Pub. Safety § 5-117.1(i). A person who is denied an HQL for any reason, or whose HQL is revoked for any reason, may request a hearing from the Secretary within 30 days of the denial or revocation. Pub. Safety § 5-117.1(l)(1). A party still aggrieved after such a hearing may pursue judicial review in the Maryland state courts. Pub. Safety § 5-117.1(l)(3).

---

[2] The training course requirement is waived for an individual who, among other exemptions, has completed certain other training courses or already lawfully owns a "regulated firearm." Pub. Safety § 5-117.1(e). A regulated firearm includes any handgun. Pub. Safety § 5-101(r).

### B.        The HQL Implementing Regulations

The General Assembly has authorized the Secretary to adopt regulations to carry

out the HQL provisions.  Pub. Safety §§ 5-105, 5-117.1(n).  Effective December 23, 2013,

the Maryland State Police adopted such regulations, which appear at 29.03.01.26 – .41 of

the Code of Maryland Regulations ("COMAR"), attached as Exhibit 3.  Among others:

- COMAR 29.03.01.28(B) prescribes the required elements to include in an application for an HQL, including identifying and contact information, proof of completion of or exemption from the training requirement, fingerprints, and authorization for release of mental health records; and

- COMAR 29.03.01.29(C) provides further detail on the elements of the required training course that are identified in the statute, including aspects of state firearm law, home firearm safety, and handgun mechanisms and operation that must be covered.  Implementing the statute's requirement that the training component include a demonstration of "the person's safe operation and handling of a firearm," the regulations require that the training must include "a practice component in which the applicant safely fires at least one round of live ammunition."  COMAR 29.03.01.29(C)(4).

The regulations were published in draft form in the Maryland Register on September

20, 2013, at Volume 40, Issue 19, Pages 1568-83, and granted emergency status on October

18, 2013, as reflected in the Maryland Register at Volume 40, Issue 21, Page 1772.   On

November 26, 2013, the Maryland State Police adopted the final regulations, which were

then published in the Maryland Register on December 13, 2013, at Volume 40, Issue 25,

Pages 2072-73.  In accord with § 10-117 of the State Government Article, the regulations

became effective on December 23, 2013.

The Maryland State Police maintains a public website that includes the HQL

application itself, information about the application and the training requirement, and

information about becoming a qualified handgun instructor.  *See*

4

http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/HandgunQualificationLicense.aspx (last visited Jan. 20, 2017). The website also includes a search engine to allow individuals to locate and access contact information for more than 1,100 qualified handgun instructors, *see* https://emdsp.mdsp.org/verification/ (last visited Jan. 20, 2017), and additional information about fingerprinting services, including a link to a map of fingerprint vendors maintained by the Department of Public Safety and Correctional Services, *see* http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Fingerprinting.aspx (last visited Jan. 20, 2017).

### C.    The Plaintiffs

Plaintiff Maryland Shall Issue, Inc. ("MSI"), is an organization of "approximately 772 members" that is "dedicated to the preservation and advancement of gun owners' rights in Maryland." ECF No. 14, Am. Compl. ¶ 25. MSI contends that the HQL requirement causes it direct harm "by undermining its message and acting as an obstacle to [its] objectives and purposes." *Id.* MSI also contends that its membership includes "individuals who have been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts." *Id.*

Plaintiff Atlantic Guns, Inc. is a Maryland-based, federally-licensed firearms dealer. Atlantic Guns contends that its rights are violated by the HQL requirement and that it is also representing the interests of its customers. *Id.* ¶ 26.

Plaintiff Ana Sliveira holds a security clearance in connection with her employment as a contractor to the Department of Defense, does not currently own a firearm or possess

an HQL, but would like to purchase a handgun for protection of herself and her family.  *Id.* ¶¶ 6-9.  "Ms. Sliveira has been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts."  *Id.* ¶ 9.  Ms. Sliveira was one of the millions of individuals whose personal information was potentially accessed in the Office of Personnel Management ("OPM") data breach revealed in early 2015.  *Id.* ¶ 10.

Plaintiff Deborah Kay Miller is an MSI member who does not currently possess an HQL, but would like to purchase a handgun.  *Id.* ¶¶ 12-14.  "Ms. Miller has been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts."  *Id.* ¶ 14.  The complaint does not state whether Ms. Miller currently owns any handguns or other firearms.

Plaintiff Susan Brancato Vizas has taken a hunter safety training class, does not have an HQL, would like to purchase a handgun, but believes that the remaining steps to obtain an HQL are "sufficiently burdensome that she has not moved forward."  *Id.* ¶¶ 16-19.  "Ms. Vizas has been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts."  *Id.* ¶ 19.  The complaint does not state whether Ms. Vizas currently owns any handguns or other firearms.

Plaintiff Christina Bunch does not currently possess an HQL, would like to purchase a handgun, but "cannot afford the time or excessive cost of acquiring an HQL" and, thus, "has been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts."  *Id.* ¶¶ 20-24.  The complaint does not state whether Ms. Bunch currently owns any handguns or other firearms.

6

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual allegations "must be enough to raise a right to relief above the speculative level." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 71 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 555).  Although the Court is required to "'take the facts in the light most favorable to the plaintiff,'" the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citations omitted).  Nor may the Court credit "'naked assertions devoid of further factual enhancement.'" *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

This Court is "not confined to the four corners of the complaint" and "may properly take judicial notice of matters of public record," *Oberg*, 745 F.3d at 136, including "publicly available" statistics, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (citing *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986)).  This Court also may consider "documents incorporated into the complaint by reference, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Oberg*, 745 F.3d at 136 (internal citations and quotation marks omitted).

**ARGUMENT**

**I.    THE PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL REQUIREMENT IS REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF FIREARMS VIOLENCE.**

In Count I, the plaintiffs bring a Second Amendment challenge to certain statutory and regulatory requirements of the HQL, centered on the cost and time required to acquire an HQL.  The plaintiffs' challenges to these requirements fail as a matter of law.

**A.    The Second Amendment Framework**

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   U.S. Const., amend. II.   The Supreme Court interpreted the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*") as having codified a pre-existing individual right, *id.* at 592, that "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635.  Accordingly, the Court struck down a District of Columbia law that imposed a "complete prohibition" on the possession of handguns within the home.  *Id.* at 628-29.

The Court emphasized, however, that "nothing in [its] opinion should be taken to cast doubt" on "presumptively lawful regulatory measures" such as (i) longstanding bans on "the possession of firearms by felons and the mentally ill"; (ii) bans on "the carrying of firearms in sensitive places such as schools and government buildings"; or (iii) "laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27 & n.26.  The Court's list of "examples" of presumptively lawful regulations did "not purport

to be exhaustive." *Id.* at 627 n.26.  In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the individual Second Amendment right is "fully applicable to the States," *id.* at 748, but promised that "[s]tate and local experimentation with reasonable firearms regulation will continue under the Second Amendment," *id.* at 784.

Post-*Heller I* and *McDonald*, the United States Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing Second Amendment challenges. *Woollard v. Gallagher*, 712 F.3d 865, 874-75 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Chester*, 628 F.3d at 680 (internal quotation marks omitted).  If not, the challenged law is valid.  *Id.*  If, on the other hand, the burdened conduct is found to be within the scope of the Amendment, then the second prong requires the application of "an appropriate form of means-end scrutiny."  *Id.*

**B.    To the Extent the HQL Requirement Burdens Conduct Falling Within the Scope of the Second Amendment, Intermediate Scrutiny Is the Applicable Standard of Review.**

The Fourth Circuit has adopted intermediate scrutiny as the appropriate test for regulations that implicate the Second Amendment right but that do not substantially burden the core right of in-home self-defense by responsible, law-abiding citizens.  *Woollard*, 712 F.3d at 878-79; *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011); *Chester*, 628 F.3d at 683.  Intermediate scrutiny is the appropriate standard of review in this case because the challenged provisions "'do[] not severely limit the possession of firearms' . . . [and] none of the [statutory or regulatory] requirements prevents an individual from

possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose.'" *Heller v. District of Columbia*, 670 F.3d 1244, 1257-58 (D.C. Cir. 2011) ("*Heller II*") (holding intermediate scrutiny was the appropriate standard of review to apply to the District's firearm registration law, which includes fingerprint and firearm safety training requirements) (quoting *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010)); *see also Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) (explaining that "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right" and holding that New York's $350 firearm licensing fee "easily survives 'intermediate scrutiny'"), *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014); *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835, 845 (N.D. Ill. 2011) (applying a form of intermediate scrutiny to registration requirement that was "merely regulatory" and, thus, "[did] not place a categorical limit on [the plaintiff's] possession of firearms").

Under the intermediate scrutiny test, the government bears the burden of demonstrating that the challenged regulation "is reasonably adapted to a substantial government interest," *Masciandaro*, 638 F.3d at 471, meaning that there is a "'reasonable fit' between the challenged regulation and a 'substantial' government objective," *Chester*, 628 F.3d at 683. "[T]he State must show a fit that is reasonable, not perfect," and makes this showing by demonstrating that its "interests are substantially served" by the challenged law. *Woollard*, 712 F.3d at 878 (citations omitted).

To meet its burden, the State may "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as

circumstances and context require." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012); *see also United States v. Staten*, 666 F.3d 154, 163-67 (4th Cir. 2011) (government satisfied its burden under intermediate scrutiny through submission of scholarly social science evidence). A court's role is not to determine whether the legislature made the correct policy decision; rather, it is "to ensure that the legislature's policy choice substantially serves a significant governmental interest." *Woollard*, 712 F.3d at 881.

### C. Plaintiffs' Facial Challenge to the HQL Requirements Set Forth in the Firearm Safety Act Fails to State a Claim for Relief Because Those Requirements Have a Plainly Legitimate Sweep.

To be successful in their facial challenge, the plaintiffs "'must establish that no set of circumstances exists under which the [law] would be valid.'" *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "Because of this stringent standard, a facial challenge is perhaps 'the most difficult challenge to mount successfully.'" *Id.* (quoting *Salerno*, 481 U.S. at 745). The Supreme Court "disfavor[s]" facial challenges because they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008).

The plaintiffs' facial challenge fails to state any claim for relief because, as a matter of law, they cannot demonstrate that "no set of circumstances exists under which the [law] would be valid." *Hosford*, 843 F.3d at 165. On the contrary, the HQL statutory requirements have a "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at

11

449 (quotation marks and citation omitted).  The HQL law easily satisfies the first prong of the intermediate scrutiny analysis, which requires that the State's interest be substantial, as advancing public safety and reducing the negative effects of firearms violence are substantial, indeed compelling, government interests.  *Woollard*, 712 F.3d at 877-78. Under the second prong, publicly-available empirical evidence, case law, and common sense all demonstrate that the HQL law is "reasonably adapted" to these interests.

### 1. The Fingerprint, Background Check, and Firearms Safety Training Provisions of the HQL Law Are Constitutional.

The plaintiffs challenge the fingerprint, background check, and firearm safety training provisions of the HQL law, all of which are reasonably adapted to the State's substantial interests.  First, Maryland's requirement that HQL applicants obtain a set of fingerprints for purposes of conducting enhanced background checks substantially serves the State's interest in promoting public safety by making it more difficult for a prohibited person to obtain access to a firearm.  *See Heller v. District of Columbia*, 801 F.3d 264, 276-77 (D.C. Cir. 2015) ("*Heller III*") (holding the District could reasonably conclude that the fingerprint requirement would "advance public safety by preventing at least some ineligible individuals from obtaining weapons").  Robust background checks animate the State's policy of keeping firearms out of the possession of felons, a "presumptively lawful" and longstanding firearms restriction.  *Heller I*, 554 U.S. at 626-27 & n.26.

The State's interest is particularly acute when it comes to keeping handguns out of the hands of criminals.  Handguns are the firearms most frequently used by criminals in Maryland.  *Woollard*, 712 F.3d at 877.  According to data collected by the FBI, there were

12

372 murders in Maryland in 2015, 279 of which involved a firearm.  Of those 279, 266 involved handguns.  Federal Bureau of Investigation, 2015 Crime in the United States, Table 20, Murder by State, Types of Weapons, 2015, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-20 (last visited Nov. 30, 2016).  Thus, murders with handguns comprised more than 95% of murders with firearms and more than 71% of all murders in Maryland.  *Id.*

The greater utility of background checks using fingerprints than those conducted without them is well established through case law and public reports, and is thus subject to judicial notice.  *See Hall*, 385 F.3d at 424 n.3 (courts may take judicial notice of publicly-available statistics).  For example, in *Heller III*, the D.C. Circuit credited the District's evidence demonstrating that "background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more susceptible to fraud." 801 F.3d at 276.  The court highlighted an investigation conducted by the U.S. Government Accountability Office ("GAO"), in which undercover agents using counterfeit driver's licenses succeeded, without exception, in purchasing firearms from federally-licensed firearms dealers.  *Id.*  The report "concluded that federal background checks conducted by the firearm dealers [without fingerprinting] 'cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful.'"  *Id.* (quoting GAO–01–427, Firearms Purchased from Federal Firearm Licensees Using Bogus Identification 2 (2001)).  These findings provide ample justification for dismissing plaintiffs' facial challenge to the HQL law's fingerprint and background check requirements.  *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S.

41, 51-52 (1986) (explaining that the State may rely on evidence "already generated" by other jurisdictions); *see also Carandola v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002) (government may rely on evidentiary foundation set forth in other cases).

The D.C. Circuit's conclusion, based on publicly-available evidence, belies the plaintiffs' erroneous allegation that the fingerprinting and background check requirements of the HQL law are "completely unnecessary" because handgun purchasers in Maryland must pass the background check mandated by federal law when purchasing a firearm.  ECF No. 14, Am. Compl. ¶ 3.  The plaintiffs' contention that "every handgun purchaser is subjected to the same background check required for a [HQL] for every purchase of every handgun, including purchases taking place immediately after receipt of the [HQL]," *id.*, is a misstatement of the law.  The more robust HQL background check, which includes fingerprints, is conducted only once every 10 years.  Pub. Safety § 5-117.1(i).  The more routine background check conducted prior to every handgun purchase is based only on state-issued identification, not fingerprints.  Pub. Safety § 5-118(b).

Further, empirical studies of the effects of laws that require individuals to obtain a license to purchase a firearm and pass a background check based on fingerprints, of which this Court may also take judicial notice, have found that these laws are associated with a reduction in the flow of guns to criminals.[3]  A study of Connecticut's law – which includes requirements for enhanced background checks with fingerprints and completion of an

---

[3] Ex. 4, Daniel Webster *et al.*, *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 109-22 (Webster, *et al.*, eds., Johns Hopkins Univ. Press 2013).

approved handgun safety course, Conn. Gen. Stat. § 29-36(f), (g) – found that the licensing requirement to purchase a firearm was associated with a statistically significant reduction in Connecticut's firearm homicide rates during the first decade that the law was in place, with no similar reduction in non-firearm homicides.[4]

Similarly supportive is the experience of Missouri, which went in the opposite direction after it repealed its handgun licensing requirement. After repeal, firearm-related homicide rates increased abruptly, with no similar increase in surrounding states or the nation, and the state experienced an increase in the percentage of crime guns recovered by police that had been originally sold by in-state retailers.[5] Studies of Missouri's and Connecticut's experiences also have found the presence of firearm licensing laws to be associated with lower rates of firearm-related suicides.[6]

Second, common sense supports the General Assembly's conclusion that Maryland's requirement that HQL applicants receive training in the proper and safe operation, handling, and storage of a handgun, will lead to a decrease in accidental deaths by firearm. *See Carter*, 669 F.3d at 418 (common sense is one source on which the State may rely to carry its burden under intermediate scrutiny). Handguns are necessarily and purposely dangerous, and requiring minimal training in how to avoid unintended harm

---

[4] Ex. 5, Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Public Health 8, e49 (Aug. 2015).

[5] Ex. 6, Daniel Webster, *et al.*, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. of Urban Health 2, 293 (2014).

[6] Ex. 7, Cassandra K. Crifasi, *et al.*, *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventive medicine 43 (2015).

from their ownership easily satisfies intermediate scrutiny.  *See Heller III*, 801 F.3d at 278-79 (holding District's mandatory firearms safety training was constitutional based on the District's presentation of "substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms").  Indeed, in Maryland, law enforcement officers are required to receive extensive training on the operation, handling, and storage of handguns, including in the home.  *See* COMAR 12.04.02.03 − .05; 12.04.02.03.10(D).  These longstanding training requirements strongly support the utility of the relatively brief, four hours of training that civilian handgun purchasers must receive.  *See Heller III*, 801 F.3d at 279 & n.3 (relying on "anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training").  Given the popularity of handguns for in-home self-defense, *see Heller I*, 554 U.S. at 628, and the potential dangers that arise when handguns are improperly stored or handled in the home, Maryland's requirement of a four-hour training course is reasonably adapted to the State's goal of reducing firearm-related deaths.

Finally, the plaintiffs' conclusory allegation that firearms safety instructors are not accessible in all areas of the State, ECF No. 14, Am. Compl. ¶ 46, does not state a claim for relief.  None of the individual plaintiffs (and in the case of MSI, none of its members) has alleged that qualified instructors for these services are not accessible to her.  Thus, even if *some* individuals might lack access to an instructor, that cannot support a facial challenge or, indeed, any challenge by these plaintiffs.

### 2. The Costs Associated with the HQL Requirement and the Application Period Are Constitutional.

The plaintiffs also challenge the costs associated with the statutory fingerprint, background check, and training requirements.  However, because these provisions of the HQL law are constitutional, the "additional requirement" that applicants bear the cost of complying with them "is but a corollary necessary to implement those requirements" and, thus, also constitutional.  *Heller III*, 801 F.3d at 277.  Nothing in *Heller I* or *McDonald* suggests that presumptively lawful regulations on the commercial sale of firearms or a state's enactment of reasonable regulation to protect public safety cannot impose some costs on consumers of firearms.  "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it."  *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 874 (1992).  Moreover, the plaintiffs' facial challenge to the costs associated with fulfilling these requirements fails for the additional reason that they have not alleged facts to support their claim that these costs impose an unconstitutional burden in every circumstance.[7]

The plaintiffs specifically challenge the $50 administrative cost of the HQL application set forth in the statute.  This facial challenge fails because "reasonable fees associated with the constitutional requirements" of firearm registration and licensing "are

---

[7] Indeed, although plaintiff MSI "has approximately 772 members statewide," ECF No. 14, Am. Compl. ¶ 25, the pleadings identify only one specific member who has "been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application and its constituent parts," ¶¶ 12-14.

also constitutional." *Heller III*, 801 F.3d at 278 (finding registration fees of $13 per firearm and $35 for fingerprinting were constitutional); *see also Kwong*, 723 F.3d at 165-67 (approving $350 licensing fee); *Justice*, 827 F. Supp. 2d at 842 (approving $25 application fee). Just as in the First Amendment context, the State may impose licensing fees when the fees are designed "to meet the expense incident to the administration" of the licensing statute. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (internal quotation marks omitted) (upholding parade licensing statute that imposed a sliding fee); *see also Center for Auto Safety Inc. v. Athey*, 37 F.3d 139, 145 (4th Cir. 1994) (holding that charitable registration fees furthered legitimate government purpose in "enabl[ing] the state to prevent fraud by charities soliciting funds in Maryland"). Here, the statute limits the allowable fee only to the amount "to cover the costs to administer the program." Pub. Safety, § 5-117.1(g)(2). Because the $50 fee, which amounts to only $5 per year, is associated with a licensing scheme that is facially constitutional, the fee also is constitutional.

Finally, the plaintiffs challenge the length of time it takes for the State to issue the HQL after an application is submitted, which is statutorily capped at 30 days. Pub. Safety § 5-117.1(h)(1). The 30-day statutory period has a plainly legitimate sweep, however, because it advances Maryland's substantial interest in ensuring that an HQL is not improperly granted to a prohibited person. Notably, the 30-day statutory limit is significantly shorter than the time limit adopted in some other states. *See, e.g.*, N.Y. Penal Law § 400.00(4-a) (providing for a six-month application period); Conn. Gen. Stat. § 29-36g (90-day period). Moreover, the statute merely sets an outer limit of 30 days, during which applicants are not prohibited from purchasing a firearm other than a handgun

18

or from using handguns they already own.  Thus, the plaintiffs' have not stated a facial claim that the application period imposes an unconstitutional burden in every circumstance.

### D.   Plaintiffs' Facial Challenge to the HQL Requirements Set Forth in the Implementing Regulations Fails to State a Claim for Relief Because Those Requirements Have a Plainly Legitimate Sweep.

In addition to the requirements set forth by statute, the plaintiffs also challenge regulatory provisions implemented by the Secretary.  These challenges also fail.

First, the plaintiffs challenge the regulatory requirement that fingerprints be obtained via "livescan" technology, challenging both the cost and alleged inconvenience of this requirement.  As discussed above, because the statutory fingerprint requirement is itself constitutional, the costs associated with that requirement also are constitutional.  The plaintiffs have not alleged that these costs, which they allege amount to approximately $50, ECF No. 14, Am. Compl. ¶ 37(f), impose an excessive burden in every circumstance, as required for a facial claim.  Further, for reasons set forth above, the plaintiffs' conclusory allegations that live-scan fingerprint vendors are not accessible in all areas of the State, ECF No. 14, Am. Compl. ¶ 46, cannot state a claim for relief, because none of the individual plaintiffs (and in the case of MSI, none of its members) has alleged that vendors for these services are not accessible to her.  Thus, the plaintiffs both lack standing to bring that challenge and have failed to allege adequate facts to state a facial challenge.

Second, the plaintiffs challenge the regulatory requirement that the four-hour firearms training include "a practice component in which the applicant safely fires at least one round of live ammunition," COMAR 29.03.01.29(C)(4), again alleging that the cost and inconvenience of this regulatory requirement imposes unconstitutional burdens on the

19

Second Amendment right.  However, as discussed above, the handgun safety training requirement of the law easily satisfies intermediate scrutiny, and the requirement to demonstrate the baseline competency to safely fire a single live round of ammunition is reasonably adapted to the State's substantial interest in promoting firearm safety.

Moreover, the plaintiffs again have failed sufficiently to allege that the costs and inconvenience of the live fire requirement are unconstitutional as to every potential applicant.  Although the plaintiffs allege that the live fire requirement imposes an unconstitutional burden on "disadvantaged citizens of Maryland who live in urban areas, where access to a public shooting range is effectively non-existent, such as the City of Baltimore," ECF No. 14, Am. Compl. ¶ 46, none of the plaintiffs (or, in the case of MSI, none of its identified members) lives in the City of Baltimore or any other such area.  *See* ECF No. 14, Am. Compl. at 1 (plaintiffs live in California, Crownsville, Frederick, and Eldersburg).  Thus, none of the plaintiffs has standing to bring this facial challenge.

Third, to the extent that the plaintiffs bring a facial challenge to the alleged regulatory requirements that applicants (1) have a fixed address and telephone number, (2) file an application online that includes scanned documentation,[8] and (3) have a credit or debit card, these easily survive a facial challenge.  None of the plaintiffs (or, in the case of MSI, none of its identified members) alleges that she lacks a fixed address or phone

---

[8] Although the plaintiffs allege that the HQL application necessitates access to a scanner, the HQL application instructions clearly state that "SUPPORTING DOCUMENTATION IS NOT REQUIRED FOR THE STANDARD APPLICATION."  A copy of the standard HQL application instructions publicly available through the MSP website is attached as Exhibit 8.

number, access to a credit or debit card, or access to a computer with an Internet connection

or an electronic document scanner.  Thus, as discussed above, the plaintiffs cannot show

that these alleged requirements are unconstitutional in every circumstance.  For the same

reason, these plaintiffs also lack standing to challenge these requirements.  *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring a "concrete and

particularized" injury to establish standing); *see also Heller v. District of Columbia*, 45 F.

Supp. 3d 35, 71 (D.D.C. 2014) (dismissing for lack of standing a challenge to the District's

requirement that a firearm registrant "not [be] blind," because none of the plaintiffs in that

case was blind), *aff'd in part, rev'd in part on other grounds*, *Heller III*, 801 F.3d 264.

The plaintiffs' facial challenge to the HQL implementing regulations thus fails to

state any claim for relief, and should be dismissed.

### E.   Plaintiffs' As-Applied Challenges Fail to State a Claim for Relief Because None of the Plaintiffs Has Alleged that the Law Has Been Applied to Her in an Unconstitutional Manner.

To the extent the plaintiffs' complaint could be interpreted to challenge how the

HQL statutory or regulatory requirements have been applied to them, those claims also fail

to state a claim for relief.  The plaintiffs have failed to allege with sufficient specificity

how the provisions of the HQL law have prevented them from exercising their Second

Amendment rights, other than to allege generally that the expense and inconvenience of

complying with the requirements has "deterred" them from obtaining an HQL. ECF No.

14, Am. Compl. ¶¶ 9, 14, 19, 24.

First, as discussed above, none of the plaintiffs (or, in the case of MSI, none of its

identified members) alleges that she lacks access to a computer, the Internet, an electronic

document scanner, a qualified handgun instructor, a live-scan fingerprint vendor, or a shooting range, and, thus, the plaintiffs lack standing to challenge the associated requirements. *See Lujan*, 504 U.S. at 560.  Nor may the plaintiffs "'challenge [those requirements] on the ground that [they] may conceivably be applied unconstitutionally to others, in other situations not before the Court.'" *Masciandaro*, 638 F.3d at 474 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)); *see also United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present.").

Second, only one plaintiff, Ms. Sliveira, alleges that she does not already own a firearm, and she has not alleged that she sought an HQL at any time after she learned, in early 2015, that her personal information was hacked.  Thus, she cannot demonstrate that the alleged application period imposed any burden as applied to her.  Nor do the plaintiffs have standing to challenge the application period as it may be applied to "people who hunt for food, require a firearm to earn a living, are elderly, terminally ill[,]. . . live in a high crime area or have been threatened," ECF No. 14, Am. Compl. ¶ 44, because none of the plaintiffs alleges that she fits in any of these categories.

Third, although the individual plaintiffs have alleged generally that they have been deterred from purchasing a handgun because of the "expense and inconvenience" of obtaining an HQL, none of them alleges facts sufficient to state a claim for relief.  Neither Ms. Sliviera nor Ms. Miller has alleged that she lacks the resources to comply with the HQL requirements, nor alleges with any specificity how any of the particular HQL requirements challenged in this lawsuit has deterred her from obtaining an HQL and, thus,

each of them has failed to allege how any of the requirements are "unconstitutional because of the way [they were] applied to the particular facts of [her] case." *Salerno*, 481 U.S. at 745 n.3.  General allegations that a statutory or regulatory scheme imposes some expense and inconvenience are the sort of "'naked assertions devoid of further factual enhancement'" that fail to satisfy the Rule 12(b)(6) pleading standard. *Oberg*, 745 F.3d at 136 (quoting *Iqbal*, 556 U.S. at 678).   The remaining plaintiffs' allegations suffer from the same infirmity.   Ms. Vizas, although alleging that she already "has taken (and passed) Hunter Safety Training," and thus would be exempted from the HQL firearms safety training course, Pub. Safety §  5-117.1(e)(2), alleges generally that "the subsequent steps for obtaining an HQL are sufficiently burdensome that she has not moved forward."  ECF No. 14, Am. Compl. ¶ 16.  Ms. Vizas has not specified which "steps" have kept her from moving forward, nor has she alleged how they are "sufficiently burdensome" for her.  Similarly, Ms. Bunch alleges, without any specific factual allegations, that she "cannot afford the time or excessive cost of acquiring an HQL." *Id.* ¶ 24.

For all of these reasons, Count I should be dismissed.

## II.   THE PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE THE STATUTE DOES NOT GIVE PRIVATE HANDGUN INSTRUCTORS AUTHORITY TO DENY SECOND AMENDMENT RIGHTS AND THE WORDS "RECEIVE" AND "RECEIPT" ARE NOT VAGUE.

### A.   The Firearm Safety Act Does Not Give Private Handgun Instructors Authority to Grant or Deny Second Amendment Rights.

In Count II, the plaintiffs contend that the State has violated their procedural due process rights by giving private handgun instructors the "absolute authority to grant or

deny" their Second Amendment rights without providing any right to appeal to a court. ECF No. 14, Am. Compl. ¶¶ 59-61.   The premise of the plaintiffs' claim is false and unsupported by necessary factual allegations, as neither the statute nor the implementing regulations give private handgun instructors the authority to grant or deny a Second Amendment right, the plaintiffs have failed to identify any actual deprivation of a protected right, and the right to appeal an adverse decision on an HQL application is always available.

The procedural due process requirement of the Fourteenth Amendment "simply ensures a fair process before the government may deprive a person of life, liberty, or property." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).   A procedural due process claim requires a plaintiff to satisfy three elements.   First, the plaintiff "must demonstrate that he had a constitutionally cognizable life, liberty, or property interest." *Id.* at 540.   Second, the plaintiff "must show that the deprivation of that interest was caused by 'some form of state action.'" *Id.* (quoting *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)).   Third, the plaintiff "must prove 'that the procedures employed were constitutionally inadequate.'" *Id.* (quoting *Patterson*, 566 F.3d at 145).

The plaintiffs have identified their Second Amendment right as the relevant constitutionally-protected interest.   However, the plaintiffs' procedural due process claim fails on both the second and third elements.   Indeed, not only have the plaintiffs failed to identify *any* actual deprivation of their Second Amendment rights by a qualified handgun instructor, none of them even alleges *any* relevant action, or even inaction, by a qualified handgun instructor.

In *Sansotta*, the Fourth Circuit considered whether the owners of beach properties in North Carolina who had been fined for violation of public nuisance laws had stated a procedural due process claim for deprivation of the money they would have to pay pursuant to the fine. However, the Court held that because the owners had not actually paid the fine, they had not yet been deprived of anything, and their procedural due process claim thus failed. 724 F.3d at 540. In this case, the complaint does not contain even a suggestion that the plaintiffs, or anyone else, have actually been deprived of their Second Amendment right by the action of a qualified handgun instructor. Their claim thus fails.

Moreover, the plaintiffs' claim, which is entirely speculative, originates in the requirement that an individual applicant for an HQL demonstrate that he or she has completed the firearms training course that is required by § 5-117.1(d)(3). ECF No. 14, Am. Compl. ¶¶ 59-60. A qualified handgun instructor's role is solely to provide the safety training course required by the statute, not to grant or deny an HQL license, or to make any discretionary determination of any kind. Pub. Safety § 5-117.1(d); COMAR 29.03.01.29, .37. For that reason as well, the plaintiffs have not stated a procedural due process claim.

In addition, the plaintiffs cannot demonstrate the third prong of a due process claim, as a matter of law, because any denial of an HQL, for any reason, is subject to judicial review. Statute and regulation both set forth an appeal process including an initial appeal to the Secretary followed by judicial review in state court. Pub. Safety § 5-117.1(l); COMAR 29.03.01.36.

The plaintiffs' procedural due process claim must be dismissed.

**B.      The Terms "Receive" and "Receipt" Are Not Void for Vagueness.**

The plaintiffs have similarly failed to state a claim upon which relief might be granted that the statutory terms "receipt" and "receive" are void for vagueness.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 107 (1972). The "void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Federal Commc'n Comm'n v. Fox TV Stations*, 132 S. Ct. 2307, 2317 (2012). Thus, "'a legislature [must] establish minimal guidelines to govern law enforcement.'" *United States v. Lanning*, 723 F.3d 476, 482 (4th Cir. 2013) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

However, courts "do not hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges." *Wag More Dogs*, 680 F.3d at 371. "'A statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds.'" *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (citation omitted). A statute "'must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'" *Id.* at 183 (citation omitted). Thus, before finding a statute vague, a "federal court must 'consider any limiting construction that a state court or enforcement agency has proffered.'" *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1983)).

26

Under § 5-117.1 of the Public Safety Article, a person may not "purchase, rent, or receive a handgun" without an HQL.  Section 5-144 of the Public Safety Article thus makes unlawful the purchase, rental, or "receipt" of a regulated firearm (including a handgun) in violation of that subtitle.  The plaintiffs contend that the use of "receive" and "receipt" in these provisions is unconstitutionally vague.  They are incorrect.

First, the plaintiffs' very allegations demonstrate a central deficiency in their claim, which is their acknowledgment that their proffered interpretation of these terms is not reasonable.  The plaintiffs contend that reading "receive" and "receipt" as broadly as they posit would lead to "absurd results," such as "criminalizing conduct that no reasonable person would believe or understand to be wrongful."  ECF No. 14, Am. Compl. ¶ 66.  However, it is only the plaintiffs who posit these interpretations that "no reasonable person" would accept.  *Id.*  It is a "well-established canon[] of statutory construction" that "a statute must be given 'a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.'"  *Smith v. State*, 425 Md. 292, 299 (2012) (citation omitted).  That "principle applies even when the statute is ambiguous."  *Id.*

Second, the terms at issue, considered in context, are not vague or ambiguous.  Section 5-117.1(b) addresses the transfer of handguns from the perspective of the transferor, and prohibits a transferor to "sell, rent, or transfer" a handgun to someone without an HQL.  Section 5-117.1(c) then addresses the transaction from the transferee side, forbidding an individual to "purchase, rent, or receive" a handgun without an HQL.  These provisions are mirror images of each other.  "Sell" and "purchase" are two sides of a permanent transfer for consideration of ownership.  "Rent" is used in both provisions to

27

refer to a "temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm."  Pub. Safety § 5-101(s).

"Transfer," as used in subsection (b), and "receive," as used in subsection (c), are two sides of a permanent, non-commercial transfer of a firearm.  That natural meaning is confirmed by controlling Maryland law.  The Maryland Court of Appeals considered the scope of Maryland's regulated firearms laws – then covered in § 442 of the former Article 27 – in *Chow v. State*, 393 Md. 431 (2006).  In *Chow*, the court specifically addressed the meaning of the term "transfer" as used in a statute making it unlawful for a person who is not a regulated gun owner to "sell, rent, transfer, or purchase any regulated firearm" without complying with the application process and waiting period.  *Chow*, 393 Md. at 442 (quoting former art. 27, § 442(d)(1)).

The Court of Appeals observed that the word "transfer" can have different meanings in different contexts, and so it was required to "look to the context in which the word is used." *Id.* at 448.  The court therefore looked to the definitions of the other terms that were paired with "transfer" in the statute.  *Id.* at 448-49.  In those statutes, the court concluded, all of the terms used except "rent" contemplated a permanent exchange of title or possession of the firearm.  *Id.*  "Rent," by contrast, was (and still is) expressly defined in the statute to be "the temporary transfer of a regulated firearm for consideration where the firearm is taken from the firearm owner's property." *Id.*  Thus, the court concluded that the statute covered only three different types of transactions:  (1) permanent commercial transfers, covered by the terms "sell" and "purchase"; (2) temporary commercial transfers where the firearm leaves the owner's property, covered by the defined term "rent"; and

28

(3) permanent gratuitous transfers, covered by the term "transfer." *Id.* at 454-55. Thus, the Court concluded that the statute did not regulate a "*temporary* gratuitous exchange of a regulated firearm between persons legally permitted to possess firearms." *Id.* at 463 (emphasis in original). Notably, the provision establishing the penalty for a violation of the regulated firearms laws applied, then as now, to the "*receipt* of a regulated firearm" in violation of the statute. *Id.* at 434-35 & n.3, 463 (emphasis added).

The analysis in *Chow* is equally applicable to the use of the term "receive" in § 5-117.1(c). "[R]eceive" and "transfer" address two sides of the same transaction – the permanent, gratuitous transfer of ownership of a regulated firearm. Moreover, the General Assembly, acting seven years after the *Chow* decision defined the scope of the regulated firearms laws, placed § 5-117.1 squarely within that portion of the Public Safety Article addressing regulated firearms, subtitle 1 of Title 5 of the Public Safety Article. In doing so, the General Assembly is deemed to have acquiesced to the earlier interpretation of the Court of Appeals. *Macke Co. v. State Dep't of Assessments and Taxation*, 264 Md. 121, 132-33 (1972) (when the General Assembly legislates in light of a prior judicial construction without disturbing that construction, the General Assembly "is deemed to have acquiesced in the prior judicial interpretation as expressing the legislative intent"). These provisions thus do not cover the temporary, gratuitous transfer of a handgun.

An additional reason the terms "receive" and "receipt" cannot reasonably be construed as broadly as plaintiffs proffer is that they would render superfluous all of the other statutory terms defining the transactions that are covered by the regulated firearms laws. If, as the plaintiffs posit, "receive" and "receipt" cover *any* exchange of physical

29

possession of a firearm, they would necessarily cover any sale, purchase, rental, or other transfer of a firearm, rendering those terms superfluous.  Statutes must be read so as not to render superfluous any of their terms.  *Chow*, 393 Md. at 442.

For all of these reasons, Count II must be dismissed.

### III.   THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF MARYLAND LAW UPON WHICH RELIEF CAN BE GRANTED IN COUNT III.

In Count III, the plaintiffs allege a violation of Maryland law through the Maryland State Police's adoption of implementing regulations and application requirements.  The plaintiffs thus seek a declaratory judgment, pursuant to § 10-125 of the State Government Article, that finds various aspects of the implementing regulations invalid as exceeding the Maryland State Police's statutory authority or as failing "to comply with statutory requirements for the adoption of the provision."  Md. Code Ann., State Gov't § 10-125(d).

In enacting the HQL law, the General Assembly expressly authorized the Secretary to "adopt regulations to carry out the provisions of this section."  Pub. Safety § 5-117.1(n); *see also* Pub. Safety § 5-105 (requiring the Secretary to adopt regulations "to carry out this subtitle").[9]  When assessing whether regulatory action is "consistent with the letter and the spirit of the law under which the agency acts," *Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1, 20 (2003), courts accord substantial deference to the action, with their

---

[9] Although the plaintiffs make the bald, conclusory allegation that the Maryland State Police failed to comply with "statutory requirements" for adopting regulations, ECF No. 14, Am. Compl. ¶ 84, they fail to identify any alleged noncompliance.  Such legal conclusions, absent supporting factual allegations, fall far short of what is required to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.

review "'limited to assessing whether the agency was acting within its legal boundaries,'" *id.* at 20-21 (citation omitted); *see also id.* at 21 (explaining that courts examining regulations adopted under Maryland law are generally required to "'defer to the agencies' decisions,'" especially with respect to "agencies working in the area of health and safety") (citation omitted).   Thus, Maryland courts have "'upheld [an] agency's rules and regulations as long as they did not contradict the language or purpose of the statute." *Id.* (quoting *Christ by Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427, 437 (1994)).

Count III must be dismissed because the plaintiffs have failed to identify any aspect of the challenged regulatory action that contradicts the language or purpose of the HQL statute.

### A.    The HQL Law Does Not Require the Maryland State Police to Offer Background Check and Fingerprinting Services.

The plaintiffs complain that the Maryland State Police "has chosen not to" provide background check and fingerprinting services, even though it is not precluded from doing so.   ECF No. 14, Am. Compl. ¶ 78.   In noting only that the Maryland State Police is not precluded from offering those services, the plaintiffs implicitly concede that nothing in the statute's text requires the Maryland State Police to offer these services, and the plaintiffs have not identified any other source of an alleged obligation to do so.   Thus, the plaintiffs have failed to state any claim that not providing these services contradicts Maryland law.

### B.    None of the Challenged Regulations Concerning Firearms Safety Training Are Beyond the Scope of the HQL Law.

The plaintiffs also challenge four components of the Secretary's regulations and policies concerning the firearms training component of the HQL law.   Because none of

31

these components is inconsistent with the statute – to the contrary, some are mandated by the statute – the plaintiffs' claim fails.  First, the plaintiffs challenge as beyond the statutory authority of the Maryland State Police the regulatory actions "requiring training by a private State certified instructor, and refusing to provide any training by the Maryland State Police."  ECF No. 14, Am. Compl. ¶ 80(f).  However, it is the statute, in the first instance, that imposes the requirement that the training be provided by a qualified handgun instructor.  Pub. Safety § 5-117.1(d)(3)(i).  The regulation is not in contradiction.  *See* COMAR 29.03.01.29(C).  Further, the statute does not require the State Police to offer training courses, nor does it even contemplate that the State Police might do so. To the contrary, the term "qualified handgun instructor" is defined by *statute* as a certified handgun instructor who:  (1) is recognized by the Maryland Police and Correctional Training commissions; (2) holds a license issued by the Secretary; or (3) holds a "certification issued by a nationally recognized firearms organization."  Pub. Safety § 5-101(q); *see* COMAR 29.03.01.01(B)(36) (deferring to statutory definition).

Second, the plaintiffs challenge the "practice component in the training requirement in which the applicant fires at least one round of live ammunition, thereby requiring access to a shooting range." ECF No. 14, Am. Compl. ¶ 80(g).  In § 5-117.1(d)(3)(iii), the General Assembly required that one component of the training required of HQL applicants is "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm."  In further elucidating that requirement by regulation, the Secretary requires "a practice component in which the applicant safely fires at least one round of live ammunition."  COMAR 29.03.01.29(C)(4).  The plaintiffs' challenge must fail because

there is no plausible reading of the statute's requirement that an applicant "demonstrate[] the . . . safe *operation* . . . of a firearm" (emphasis added) that is contradicted by the requirement that an applicant do so by firing at least one round of live ammunition.

Third, the plaintiffs make the conclusory allegation that the Secretary has "refus[ed] or fail[ed]" to approve alternative firearms training courses. ECF No. 14, Am. Compl. ¶ 81. However, because the statute clearly places with the Secretary the authority to approve alternative firearm trainings courses, the plaintiffs' allegations, even if true, are insufficient to demonstrate that the Secretary's actions contradict the terms of the statute. Moreover, the plaintiffs allege merely that "fully sufficient training is readily available from National Rifle Association ("NRA") certified instructors" through certain NRA courses. *Id.* The plaintiffs do not allege that such courses actually satisfy the minimum requirements of the HQL statute or that the Secretary has been asked to approve any of them. Notably, the applicable regulations identify as a qualified handgun instructor anyone who has been issued a "valid instructor certificate issued by a nationally recognized firearm organization." COMAR 29.03.01.37(A)(3). As a result, if any of the courses identified by the plaintiffs meet the minimum requirements of Maryland law, and are taught by an NRA-certified instructor who has submitted proof of that certification to the Secretary (COMAR 29.03.01.37(B)), then they already meet the requirements of the HQL law.

Fourth, the plaintiffs' claim that the Secretary has impermissibly shifted the burden of paying for a training course to individual applicants, ECF No. 14, Am. Compl. ¶ 86, is without merit. The plaintiffs' contention that the General Assembly intended the costs of obtaining training from a qualified handgun instructor (as required by the statute, Pub.

33

Safety § 5-117.1(d)(3)) to be covered as part of the "nonrefundable application fee to cover the costs to administer the program of up to $50," Pub. Safety, § 5-117.1(g)(2), is without merit.  An individual's training costs are not "costs to administer the [HQL] program."

### C. The Plaintiffs' Remaining Challenges Fail for Lack of Standing and Because the Challenged Requirements Do Not Contradict the HQL Statute's Language or Purpose.

The plaintiffs lack standing to challenge the remaining aspects of the regulations about which they complain.  As discussed above, none of them alleges that she lacks access to a computer with an Internet connection, lacks access to an electronic document scanner, lacks a fixed address and telephone number, lacks access to the network of live-scan fingerprint vendors throughout the State, or lacks access to a credit card or debit card.  *See* ECF No. 14, Am. Compl. ¶ 80(a)-(e).  Thus, the plaintiffs have failed to articulate that they have suffered an injury in fact such that they have been injured "in a personal and individual way" by these regulatory requirements.  *Lujan*, 504 U.S. at 560-61 & n.1.

Beyond standing, many of the plaintiffs' complaints relate to the electronic format of the HQL application and information required on that application.  However, § 5-117.1(g) expressly requires submission of "an application in the manner and format designated by the Secretary," and requires an applicant to provide, in addition to information expressly required by the statute, "any other identifying information or documentation required by the Secretary."  Pub. Safety § 5-117.1(g)(1), (4).  Given that express grant of discretion, the Secretary's selection of an electronic format for the application, selection of an approved format for fingerprints, and request for information such as address and telephone number, cannot be said to contradict the HQL statute.

34

Moreover, many of the plaintiffs' claims about what the regulations require are unsupported and incorrect. For example, the plaintiffs provide no factual allegations to support their claim that the State Police mandate "having access to an electronic document scanner," ECF No. 14, Am. Compl. ¶ 80(b), nor is there any such requirement. *See* footnote 8 above. And although the application must be submitted electronically, and include a form of payment that can be accepted electronically, it is within the scope of judicial notice that public libraries provide access to computers with an Internet connection to every Marylander, and prepaid debit cards are ubiquitous at convenience stores and grocery stores, among other venues.

For all of these reasons, Count III must be dismissed.

## CONCLUSION

The Court should dismiss the complaint.

Respectfully Submitted,

BRIAN E. FROSH
Attorney General

_____/s/_____
JENNIFER L. KATZ (Fed. Bar #28973)
MATTHEW J. FADER (Fed. Bar # 29294)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.); 410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: January 20, 2017                    Attorneys for Defendants

35

**TABLE OF EXHIBITS TO**
**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Exhibit No.   Title

1.   Intentionally left blank

2.   Md. Code Ann., Pub. Safety § 5-117.1

3.   Code of Maryland Regulations (COMAR) 29.03.01.26 - .41

4.   Daniel Webster *et al.*, *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 109-22 (Webster, *et al.*, eds., Johns Hopkins Univ. Press 2013)

5.   Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Public Health 8 (Aug. 2015)

6.   Daniel Webster, *et al.*, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. of Urban Health 2 (2014)

7.   Cassandra K. Crifasi, *et al.*, *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventive medicine 43 (2015)

8.   Maryland State Police, HQL Standard Application Instructions