# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., et al.; | ) ) ) ) | |
| Plaintiffs, | ) ) | **Case No.: 16-cv-3311-MJG** |
| v. | ) ) | |
| LAWRENCE HOGAN, et al.; | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs


John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
JSweeney@bradley.com

Dated: February 27, 2017          Counsel for Plaintiff Atlantic Guns, Inc.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

FACTS ................................................................................................................... 2

STANDARD OF REVIEW .................................................................................... 5

ARGUMENT .......................................................................................................... 5

I.    THE ALLEGATIONS IN THE AMENDED COMPLAINT STATE PLAUSIBLE
      CLAIMS FOR RELIEF. ............................................................................... 5

      A.    The State does not argue that the Amended Complaint fails to meet
            *Twombly* and *Iqbal* pleading standards. ............................................... 5
      B.    Plaintiffs have alleged facts sufficient to establish standing on all their
            claims. ......................................................................................................... 9
      C.    The State relies upon documents that are not appropriately before this
            Court. ........................................................................................................ 12

II.   EVEN IF THE COURT WERE TO EVALUATE THE MERITS OF
      PLAINTIFFS' CLAIMS, THE HQL IS SUBJECT TO STRICT SCRUTINY… .......... 15

      A.    The State asserts an improper framework for analyzing Second
            Amendment challenges. ............................................................................ 15
      B.    Even if the law were subject to intermediate scrutiny, the State fails to
            satisfy that burden. .................................................................................. 22

III.  THE HQL TRAINING REGULATIONS FAIL TO PROVIDE DUE PROCESS
      OF LAW BY VESTING PRIVATE "QUALIFIED HANDGUN
      INSTRUCTORS" WITH THE AUTHORITY TO DENY APPLICANTS'
      SECOND AMENDMENT RIGHTS. ............................................................ 25

IV.   THE WORDS "RECEIVE" AND "RECEIPT" IN THE HQL STATUTE ARE
      IMPERMISSIBLY VAGUE. ....................................................................... 26

V.    THE HQL TRAINING REGULATIONS ARE INCONSISTENT WITH THE
      HQL STATUTE AND ARE OTHERWISE INVALID. ................................ 31

CONCLUSION ..................................................................................................... 35

CERTIFICATE OF SERVICE ............................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Chiropractic v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ................................................................12

*Arundel Corp. v. Marie*,
  860 A.2d 886 (Md. 2004) .....................................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................5, 8

*Benisek v. Lamone*,
  --- F.Supp.3d ---, 2017 WL 412490 (D. Md. 2017)...........................6, 7

*Blankenship v. Manchin*,
  471 F.3d 523 (4th Cir. 2006) ................................................................12

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)..............................................................................25

*Board of Liquor License Commissioners v. Hollywood Productions, Inc.*,
  684 A.2d 837 (Md. 1996) .....................................................................32

*Bonidy v. U.S. Postal Service*,
  790 F.3d 1121 (10th Cir. 2015) ............................................................24

*Bowsher v. Synar*,
  478 U.S. 714 (1986)..............................................................................10

*Broderick v. Rosner*,
  294 U.S. 629 (1935) (Brandeis, J.) .......................................................31

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962)..............................................................................30

*Carey v. Population Services International*,
  431 U.S. 678 (1977)..............................................................................10

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936)..............................................................................25

*Chow v. State*,
    903 A.2d 388 (Md. 2006) ...............................................................................27, 28, 29, 30

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010).....................................................................................................16

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986).......................................................................................................13

*Clinton v. City of New York*,
    524 U.S. 417 (1998)................................................................................................10, 32

*Craig v. Boren*,
    429 U.S. 190 (1976).....................................................................................................10

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999).....................................................................................................10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................................. *passim*

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ...................................................................................16

*Doe v. Cooper*,
    842 F.3d 833 (4th Cir. 2016) .......................................................................................26

*Eubank v. City of Richmond*,
    226 U.S. 137 (1912).....................................................................................................26

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..................................................................................10, 31

*Ezell v. City of Chicago*,
    846 F.3d 888 (7th Cir. 2017) .......................................................................................21

*Fangman v. Genuine Title, LLC*,
    136 A.3d 772 (Md. 2016) ............................................................................................30

*Gay v. Wall*,
    761 F.2d 175 (4th Cir. 1985) ...............................................................................8, 12, 13

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997).......................................................................................................9

*Geo-Tech Reclamation Indus., Inc. v. Hamrick*,
    886 F.2d 662 (4th Cir. 1989) .......................................................................................25

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ...............................................13

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) .........................................12, 13

*Harvey v. Marshall*,
    884 A.2d 1171 (Md. 2005) ...............................................34

*Hawaii Housing Authority v. Midkiff*,
    467 U.S. 229 (1984)........................................................29

*Heller v. D.C.*,
    670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) .................6, 14, 22

*Heller v. D.C.*,
    801 F.3d 264 (D.C. Cir. 2015) (*Heller III*) ................. *passim*

*Hope Clinic v. Ryan*,
    195 F.3d 857 (7th Cir. 1999) (Posner, J., dissenting), *cert. granted, judgment vacated*, 530 U.S. 1271 (2000) ...................................................7

*Hunt v. Wa. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977)........................................................11

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)........................................26, 27, 31

*Kolbe v. Hogan*,
    --- F.3d ---, 2017 WL 679687 (4th Cir. 2017) (en banc) ......................16, 20, 23, 26

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014)................................................22, 23

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).........................................................1

*Medstar Health v. Maryland Health Care Comm'n*,
    827 A.2d 83 (Md. 2003) .................................................32

*Murphy v. Yates*,
    348 A.2d 837 (Md. 1975) ............................................30, 31

*United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. 2014) .........................................12, 13

*Perez v. Mortgage Bankers Ass'n*,
    135 S.Ct. 1199 (2015).................................................31, 34

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) .................................................................22, 23, 24

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2485 (2016).........................10

*State of Washington ex rel. Seattle Title Trust Co. v. Roberge*,
    278 U.S. 116 (1928).........................................................................................26

*Shapiro v. McManus*,
    --- F.Supp.3d ---, 2016 WL 4445320 (D. Md. 2016)...........................................6

*Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*,
    288 F.3d 621 (4th Cir. 2002) .............................................................................21

*State Bd. of Elections v. Snyder ex rel. Snyder*,
    76 A.3d 1110 (Md. 2013) ..................................................................................29

*Thanner Enterprises, LLC v. Baltimore County*,
    995 A.2d 257 (Md. 2010) ..................................................................................32

*Tobey v. Jones*,
    706 F.3d 379 (4th Cir. 2013) ....................................................................5, 6, 7, 8

*U.S. v. Masciandaro*,
    638 F.3d at 470 (4th Cir. 2011)..........................................................................19

*United States v. Adkins*,
    196 F.3d 1112 (10th Cir. 1999) .........................................................................27

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) ..........................................................14, 15, 18, 19

*United States v. Casteel*,
    717 F.3d 635 (8th Cir. 2013) .............................................................................27

*United States v. Chester*,
    628 F.3d 673, 680 (4th Cir. 2010).") ........................................................... *passim*

*United States v. Edge*,
    No. 3:11-CR-301, 2012 WL 404868 (W.D.N.C. Feb. 8, 2012) ............................16

*United States v. Gilbert*,
    430 F.3d 215 (4th Cir. 2005) .............................................................................27

*United States v. Hosford*,
    843 F.3d 161 (4th Cir. 2016) ....................................................................16, 17, 20

*United States v. Lane*,
    267 F.3d 715 (7th Cir. 2001) ........................................................27

*United States v. Mahin*,
    668 F.3d 119 (4th Cir. 2012) ........................................................16

*United States v. Moore*,
    666 F.3d 313 (4th Cir. 2012) ........................................................17

*United States v. Scales*,
    599 F.2d 78 (5th Cir. 1979) ........................................................27

*United States v. Turnmire*,
    574 F.2d 1156 (4th Cir. 1978) ........................................................27

*Wag More Dogs, LLC v. Cozart*,
    680 F.3d 359 (4th Cir. 2012) ........................................................5, 25

*Washington Suburban Sanitary Com'n v. Phillips*,
    994 A.2d 411 (Md. 2010) ........................................................33

*Williams v. Rhodes*,
    393 U.S. 23 (1968) ........................................................21

*Wood v. Meadows*,
    207 F.3d 708 (4th Cir. 2000) ........................................................21

*Woollard v. Gallagher*,
    712 F.3d at 878 ........................................................19, 20

*Zwickler v. Koota*,
    389 U.S. 241 (1967) ........................................................29

**Statutes**

18 U.S.C. § 922(g) ........................................................27

18 U.S.C. § 922(g)(8) ........................................................16

18 U.S.C. § 922(g)(9) ........................................................14, 16, 24

18 U.S.C. § 922(h) ........................................................26

Federal Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ........................................................34

Firearms Registration Amendment Act of 2008 ........................................................14

Firearms Safety Act of 2013 ........................................................2

2013 Laws of Maryland Chapter 427 ........................................................................33

Maryland Administrative Procedure Act ..................................................................34

Maryland Code (1957, 1996 Repl. Vol., 2002 Supp.), Art. 27, § 442 .........................28

Maryland Code (1957, 1996 Repl.Vol.,2002 Supp.), Art. 27, § 449(f) .......................28

Md. Code, Pub. Safety § 5-117.1 ..................................................................... *passim*

Md. Code, Pub. Safety § 5-118 ................................................................................2, 3

Md. Code, Pub. Safety § 5-122 ....................................................................................3

Md. Code, Pub. Safety § 5-123 ....................................................................................2

Md. Code, Pub. Safety § 5-144 ............................................................................28, 29

Md. Code, Pub. Safety, § 5-124 ..........................................................................18, 28

Md. Code Regs. 29.03.01.29 *et seq.* ................................................................ *passim*

Md. Code, State Gov. § 10-222(h)(3)(vii) ................................................................34

Md. Reg. Text 338193 (NS) (Dec. 13, 2013) ............................................................34

Voting Rights Act of 1965 ........................................................................................12

## Rules

Fed. R. Civ. P. 10(c) ................................................................................................12

Fed. R. Civ. P. 12(b)(6) ................................................................................. *passim*

## Other Authorities

Maryland State Police, *Fingerprinting* (last visited Jan. 30, 2017)
   http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/L
   icensingDivision/Fingerprinting.aspx ...............................................................4

Maryland State Police, Handgun Qualification License FAQ (last accessed
   February 16, 2017) *available at*
   http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/L
   icensingDivision/Firearms/HandgunQualificationLicense.aspx ..............................7

General Assembly of Maryland, *2013 Regular Session Proceedings – House
   Audio, April 2, 2013, Session 2,* at 19:05 (April 2, 2013) *available at*
   http://mgaleg.maryland.gov/webmga/frmlegislation.aspx?id=2013rs_house_a
   udio&stab=02&pid=legisnlist&tab=subject3&ys=2013rs ....................................33

http://rkba.org/research/curran/guns.pdf ........................................................................7

Maryland Attorney General J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America* (Oct. 20, 1999) *available at* http://rkba.org/research/curran/guns.pdf. ...............................................6

Maryland Constitution Art. V, § 7 ........................................................30

Metropolitan Police Department, Firearm Registration in the District of Columbia, https://mpdc.dc.gov/service/firearm-registration-district-columbia .....................18

U.S. Const., amend. I ................................................................................6, 23

U.S. Const., amend. II.................................................................... *passim*

U.S. Const., amend. XIV ....................................................................1, 21

**INTRODUCTION**

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), Atlantic Guns, Inc., Ana Sliveira, Deborah Kay Miller, Christine Bunch, and Susan Brancato Vizas (collectively, "Plaintiffs"), by and through undersigned counsel, hereby submit this memorandum in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion").

Maryland places a severe and unconstitutional burden on Plaintiffs' Second Amendment rights by requiring, with limited exceptions, all law-abiding, responsible citizens to obtain a Handgun Qualification License ("HQL") before they may purchase handguns for self-defense in the home. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that citizens have the right to possess operative handguns in the home. The rights guaranteed by the Second Amendment are fundamental and are, therefore, applicable to the States by incorporation under the Due Process Clause of the 14th Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) ("[C]itizens must be permitted to use handguns for the core lawful purpose of self-defense.") (internal brackets and quotations omitted). In striking down a law burdening that core right, the Supreme Court recognized "the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. The HQL application process imposes a lengthy and expensive burden on the exercise of core Second Amendment rights and is redundant of the background check one must undergo at the time a handgun is purchased.

In its Rule 12(b)(6) motion, the State has moved to dismiss Plaintiffs' Amended Complaint ("Complaint") for failure to state a claim on which relief can be granted. The State does not argue, however, that Plaintiffs have failed to state a claim upon which relief can be granted. Rather, the State prematurely argues the merits of the case and relies upon documents not attached to the Complaint, nor integral to it. The State's merits arguments have no place in a motion to dismiss and are better suited to a motion for summary judgment, after the completion of discovery. As

1

other Second Amendment cases have demonstrated—including those cited by Defendants—a robust record is needed to select and apply an appropriate form of means-end scrutiny to constitutional challenges like this.

## FACTS

Prior to the enactment of the HQL Statute,[1] a person wishing to purchase a handgun was required to submit a firearm application, undergo a thorough Maryland background check, and wait a statutorily-required seven days before taking possession of a handgun. Md. Code, Pub. Safety §§ 5-118, 5-123. That application was, and is, known as a "77R." Furthermore, every handgun purchaser must also pass a "NICS" background check under federal law as part of the 77R process. Complaint ¶ 50 n.1.

The Firearms Safety Act of 2013 implemented one of the most restrictive handgun purchasing processes in the nation: the HQL. The HQL Statute requires Marylanders to obtain an HQL before they can even submit a 77R form to purchase a handgun. To obtain that HQL, Marylanders must first submit an online application that includes "a nonrefundable application fee to cover the costs to administer the program of up to $50," proof of completion of a firearms safety training course, any other identifying information or documentation required by the MSP, and "a statement made by the applicant under the penalty of perjury that the applicant is not prohibited under federal or State law from possessing a handgun." Md. Code, Pub. Safety § 5-117.1(g).

The HQL Statute requires that the "firearms safety training course" include: "(i) a minimum of 4 hours of instruction by a Qualified Handgun Instructor; (ii) classroom instruction on: 1. State firearm law; 2. home firearm safety; and 3. handgun mechanisms and operation; and

_____

[1] The statutory requirement for an HQL, its exceptions, and the requirements for applying for an HQL are contained in Section 5-117.1 of the Public Safety Article of the Maryland Code. Plaintiffs will refer to this section as the "HQL Statute," except in citations.

(iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." Md. Code, Pub. Safety § 5-117.1(d)(3).

The HQL Statute further requires an investigation to ensure an applicant is not prohibited by federal or state law from purchasing or possessing a handgun. Md. Code, Pub. Safety § 5-117.1(d)(4). The MSP is required to submit an applicant's fingerprints for a state and national criminal history records check and to conduct the same background check that occurs during the 77R application review. Md. Code, Pub. Safety § 5-117.1(f). The MSP is required to approve or deny an HQL application within thirty days of receiving it. Md. Code, Pub. Safety § 5-117.1(h). An HQL expires ten years from the date of issuance, forcing Marylanders to renew their licenses. Md. Code, Pub. Safety § 5-117.1(i).

Despite the background investigation conducted during the HQL application process, Maryland still requires prospective purchasers of handguns to submit a 77R application, to undergo the same background check they underwent during the HQL application process, and to wait another seven days from the date they submit a 77R application—all before they can lawfully acquire a handgun. Md. Code, Pub. Safety §§ 5-118, 5-122.

In addition to the detailed and burdensome process mandated by the HQL Statute, the MSP has added additional requirements to the application process by adopting regulations. These include: submitting a Firearms Safety Training Certificate issued by a Qualified Handgun Instructor,[2] a nonrefundable payment of $50, and submission of other identifying information (the

---

[2] The statute only requires "proof of satisfactory completion" of the firearms safety training course, Md. Code, Pub. Safety § 5-117.1(g)(3)(i), but, by regulation, the MSP mandated "a Firearms Safety Training Certificate issued by a Qualified Handgun Instructor." Md. Code Regs. 29.03.01.29.A. The State argues that the Certificate, as well as other supporting documents are not required when submitting the "standard application." State's Motion at 20 n.8. The regulations, however, clearly require these documents to be submitted in order to obtain an HQL, and the MSP could deny the issuance of an HQL if they were not submitted. *See* Md. Code, Pub. Safety § 5-117.1(h)(1) (allowing the MSP to issue a denial of an application if it is not "properly completed"). These and the other factual disputes can only be resolved after discovery. Of course, all factual

applicant's name, address, driver's license or photographic identification soundex number, place and date of birth, height, weight, race, sex, eye and hair color, occupation, and home and work telephone numbers). Md. Code Regs. 29.03.01.29.

Despite the HQL Statute's specific enumeration of what must be included in the firearm safety training course, the MSP's regulations additionally require that the course include a "practice component in which the applicant safely fires at least one round of live ammunition." Md. Code Regs. 29.03.01.29.C. Qualified Handgun Instructors are free to charge a fee in any amount for providing instruction, and this fee is in addition to the nonrefundable payment of a $50 application fee (the maximum fee allowed by the HQL Statute). *See* Md. Code Regs. 29.03.01.37.

While the HQL Statute requires only that a complete set of fingerprints be submitted with the application, MSP policy permits submission of fingerprints only if they are taken via "livescan" technology by a State-certified vendor and requires that an application be submitted within 72 hours of the time the prints are taken.[3] The fingerprinting process requires an additional fee, paid to the vendor, above and beyond the fees discussed above. Finally, an HQL application can only be submitted on-line, including scanning and attaching all required supporting documentation, and the HQL application fee must be paid via credit or debit card.

The Complaint alleges facts sufficient to support Plaintiffs' claim that Maryland's restrictive and redundant HQL requirements unconstitutionally restricts Plaintiffs' fundamental right to acquire handguns for self-defense in the home and other lawful purposes. Assuming these well-pled facts to be true, the HQL requirements, separately and collectively, cannot withstand any level of heightened scrutiny.

---

averments in the Complaint must be accepted as true for purposes of this Motion.
[3]  *See* Maryland State Police, *Fingerprinting* (last visited Jan. 30, 2017) http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Fingerprinting.aspx.

**STANDARD OF REVIEW**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a court accepts all well-pled facts from the complaint as true and draws all inferences and views the facts in the light most favorable to the plaintiffs. *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* A "Rule 12(b)(6) motion to dismiss does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (internal quotations omitted). A complaint need not spell out every possible fact needed to be proven or contain "detailed factual allegations," but must state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim satisfies *Iqbal* "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**ARGUMENT**

I.  **THE ALLEGATIONS IN THE AMENDED COMPLAINT STATE PLAUSIBLE CLAIMS FOR RELIEF.**

   A.  **The State does not argue that the Amended Complaint fails to meet *Twombly* and *Iqbal* pleading standards.**

The State does not argue that Plaintiffs' Complaint falls short of the standard announced in *Twombly* and *Iqbal*. Rather, the State argues the merits of Plaintiffs' claims. These arguments are inappropriate in a motion to dismiss, which only tests the sufficiency of the pleadings. *Tobey*, 706 F.3d at 387. Thus, the State's Motion must be denied with respect to the Second Amendment Claims in Count I because, as the State concedes by arguing the applicability of heightened scrutiny, the challenged laws burden the Second Amendment. Motion at 9-23 (arguing the merits

5

of an intermediate scrutiny analysis and relying upon documents not before this Court). The State's Motion centers on the fact-intensive selection and application of an appropriate level of means-end scrutiny, which cannot be accomplished prior to discovery. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (remanding Second Amendment challenge to afford both parties "an opportunity to present their evidence and their arguments"); *Heller v. D.C.*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*) (remanding Second Amendment challenge to further develop the factual record); *Tobey*, 706 F.3d at 389 (finding that the question of reasonableness of restrictions on constitutional rights is "a fact-intensive inquiry, going directly to the heart of the case" that should not be decided until after discovery is completed).

The Complaint specifically alleges that "[t]he HQL requirement, facially and as implemented by the Maryland State Police in its regulations and practices, acts and was intended to act, as a rationing of Second Amendment rights by discouraging and burdening the exercise of a law-abiding citizen's right to purchase or acquire a handgun." Complaint ¶ 57. A three judge panel of this Court recently held that allegations that redistricting legislation enacted with the intent to burden the exercise of First Amendment rights were sufficient to state a claim. *See Shapiro v. McManus*, --- F.Supp.3d ---, 2016 WL 4445320 (D. Md. 2016). Most recently, this Court ordered discovery into those allegations, rejecting claims of legislative immunity asserted by Maryland officials. *Benisek v. Lamone*, --- F.Supp.3d ---, 2017 WL 412490 (D. Md. 2017).

For analogous reasons, legislation supported by little more than a hostility to Second Amendment rights is a violation of the Second Amendment. The HQL Statute is simply a recent manifestation of the State's long standing hostility to firearms, and to handguns in particular. *See* Maryland Attorney General J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America* at 6, 63 (Oct. 20, 1999) (advocating that Maryland should force handgun owners to "give them up" and asserting that "[o]ur goal, then, must be to eliminate widespread handgun

ownership through restrictive handgun licensing.").[4] Legislation designed to discourage or burden the exercise of a constitutional right is never legitimate. As in *Benisek*, Plaintiffs are entitled to discovery on this allegation. At a minimum, such an intent to burden is at least relevant to the Second Amendment claims advanced by plaintiffs. As stated by Chief Judge Posner, "if a statute burdens constitutional rights and all that can be said on its behalf is that it is the vehicle that legislators have chosen for expressing their hostility to those rights, the burden is undue." *Hope Clinic v. Ryan,* 195 F.3d 857, 881 (7th Cir. 1999) (Posner, J., dissenting), *cert. granted, judgment vacated*, 530 U.S. 1271 (2000), quoted in *Stenberg v. Carhart*, 530 U.S. 914, 952 (2005) (O'Connor, J., concurring).

With respect to Plaintiffs' Due Process claims related to Qualified Handgun Instructors in Count II, the State asserts that "[t]he premise of the plaintiffs' claim is false . . . ." Motion at 24. But this argument necessarily asks the Court to find that well-pled facts are false, which is inappropriate in a motion to dismiss. *Tobey*, 706 F.3d at 387. The State cannot deny it relies on private instructors for the training required by the HQL. *See* Maryland State Police, Handgun Qualification License FAQ (last accessed February 16, 2017) *available at* http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/HandgunQualificationLicense.aspx. The State likewise ignores the allegations of facts supporting the claim that the administrative regulations are "arbitrary and capricious." Complaint ¶¶ 63-65, 75-87. Plaintiffs' allegations are sufficient to withstand challenge at the pleadings stage.

Furthermore, Plaintiffs are entitled to discovery that may lead to the production of evidence that Qualified Handgun Instructors have improperly refused to issue certificates of completion. Plaintiffs have addressed the issue of judicial remedies directly, alleging that the statutory right to an appeal of a denial of an HQL application does not extend to the wrongful refusal to issue a

---

[4] Available at http://rkba.org/research/curran/guns.pdf.

certificate of completion of the mandatory training course because the right to appeal can only be triggered after an application is filed, and an application cannot be filed without a certificate of completion. Complaint ¶ 61.

With respect to Plaintiffs' statutory vagueness challenge in Count II, the State argues that Plaintiffs' "proffered interpretation of [the challenged] terms is not reasonable." Motion at 27. The State then argues that Maryland law defining the word "transfer" somehow ameliorates the properly-alleged vagueness inherent in the words "receive" and "receipt." *Id.* at 30. This legal argument on the merits does not address whether the Complaint states a claim for which relief may be granted, which it plainly does.

Finally, the State's arguments with respect to Count III similarly focus on the merits of Plaintiffs' claim, with one exception. The State asserts that "plaintiffs have failed to identify any aspect of the challenged regulatory action that contradicts the language or purpose of the HQL [S]tatute." Motion at 31. This assertion, however, ignores the allegations in paragraph 87 of the Complaint, which identify both "shifting the costs of training to applicants" and "a one-shot live-fire" requirement as regulations that are inconsistent with the HQL Statute. Complaint ¶ 87. The remaining arguments made by the State are directed at the merits of Plaintiffs' claims, *i.e.* whether the challenged regulations are outside the authority granted to MSP under the HQL Statute. These arguments are premature merits arguments. *Tobey*, 706 F.3d at 387.

In sum, the State does not argue that the Complaint fails to give notice of plausible claims and the grounds upon which those claims rest. *Twombly*, 550 U.S. at 555. Rather, the State attempts to argue the merits of Plaintiffs' case before Plaintiffs have been able to pursue discovery to which they are entitled. *See, e.g., Gay v. Wall*, 761 F.2d 175, 177-78 (4th Cir. 1985) ("It was the lack of a reasonable opportunity for discovery which made the conversion of the Rule 12(b)(6) motion 'wholly inappropriate.'").

**B.      Plaintiffs have alleged facts sufficient to establish standing on all their claims.**

The Complaint sets forth sufficient facts to establish standing for all Plaintiffs. Plaintiff Silveira has alleged that she is a citizen of Maryland and of the United States who is employed in a national security position. Complaint ¶¶ 5-6. She has further alleged that she wishes to purchase a handgun for self-defense, in part because her personal information was compromised in a government security breach, but that she has been deterred from doing so because of the burdensome HQL requirements. Complaint ¶¶ 7-10.

Plaintiff Miller has alleged that she is a citizen of Maryland and of the United States who would like to purchase a handgun for self-defense and target practice. Complaint ¶¶ 11-12. She has further alleged that she has been deterred from doing so because of the burdensome HQL requirements. Complaint ¶ 14.

Plaintiff Vizas has alleged that she is a citizen of Maryland and the United States who wishes to purchase a handgun for self-defense and target practice. Complaint ¶¶ 15, 17. She has taken Hunter Safety Training, but has not proceeded further in applying for an HQL because of the burdensome process. Complaint ¶ 16.

Plaintiff Bunch has alleged that she is a citizen of Maryland and the United States who would like to purchase a handgun for self-defense and target practice. Complaint ¶¶ 20-22. She has been deterred from doing so because she cannot afford the time or excessive cost of the HQL application. Complaint ¶ 24.

Atlantic Guns has alleged both that it loses business because "[m]any of [its] customers are deterred from completing the HQL application process because of the expense and inconvenience of the HQL application process and its constituent parts," and that it is bringing claims on its own behalf and on behalf of its prospective customers. Complaint ¶ 26; *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) (sellers have standing where "customers of that class may also

9

be injured"); *Carey v. Population Services International*, 431 U.S. 678, 682-84 (1977) (permitting contraceptive distributers to assert the interests of their customers); *Craig v. Boren*, 429 U.S. 190, 192-97 (1976) (permitting beer vendors to assert the interests of their customers); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (permitting firing ranges to assert Second Amendment claims on behalf of their customers). These allegations, unchallenged by the State, are sufficient to establish Atlantic Guns' standing.

This suit is properly before this Court even if only one of the plaintiffs has standing. *Clinton v. City of New York*, 524 U.S. 417, 431 n. 19 (1998) ("Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that one union member had standing, and therefore the Court "need not consider the standing issue as to the Union or Members of Congress"). When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999). Accordingly, this Court need not go further in its examination of standing. Should the Court scrutinize further, however, it is clear that each Plaintiff has independent standing to bring this suit.

Despite the well-pled facts set forth in the Complaint and recounted above, the State argues that MSI has not identified any members who have standing to assert certain allegations such as the lack of handgun instructors, fingerprint vendors, and firing ranges in certain areas. *See* Motion at 16, 19, 20. MSI need not do so at this stage of the proceedings, where the allegations of the Complaint must be taken as true and all inferences resolved in favor of plaintiffs. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425–26 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2485 (2016) (determining a motion to dismiss alleging insufficient factual allegations should be denied because "a plaintiff may only have so much information at his disposal at the outset" and "can

10

hardly expect it to have built its entire case so early on."). Indeed, the State ignores that MSI itself has organizational standing to bring this suit because "Maryland's HQL requirements directly harm MSI as an organization by undermining its message and acting as an obstacle to the organization's objectives and purposes." Complaint ¶ 25. The allegations are well-pled and, in any event, the State has not denied that protection of Second Amendment rights is germane to MSI's purposes and that MSI's interests are injured by the HQL Statute.

Furthermore, an "association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wa. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (finding that an organization had standing to assert the rights of its members where the injury was "central to the Commission's purpose"). The Complaint properly alleges that MSI members have standing and that MSI has representational standing to sue on behalf of its members. Complaint ¶ 25 ("The membership of MSI includes individuals who do not possess an HQL and who are subject to the HQL requirements and the implementing regulations and practices issued by the Maryland State Police and individuals who have been deterred from purchasing a handgun because of the expense and inconvenience of the HQL application process and its constituent parts.").

The Complaint's factual allegations regarding organizational standing and the standing of MSI's members are sufficient to support standing. These allegations, which are not contested, are sufficient to withstand the State's Motion with respect to MSI's representational standing to sue on behalf of its members as well as itself. *Hunt*, 432 U.S. at 343.

**C.      The State relies upon documents that are not appropriately before this Court.**

In reviewing a motion under Rule 12(b)(6), a court may consider only documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), and documents attached to the motion to dismiss that are integral to the complaint and whose authenticity has not been questioned. *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Am. Chiropractic v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). Where a motion to dismiss introduces other matters outside the pleadings, it can be converted to a motion for summary judgment, but such a converted motion is not properly considered until after the parties are afforded an opportunity for discovery. *Gay*, 761 F.2d at 177.

Despite this clear law, the State asks this Court to take judicial notice of numerous academic studies that it has submitted. Motion at 12-14 & n.3, 15 n.4-6. To support its request, the State relies upon two Fourth Circuit cases discussing judicial notice in the context of a motion under Rule 12(b)(6): *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014), and *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004). Neither of these cases supports the State's position. In *Oberg*, the Fourth Circuit remarked only that it "may properly take judicial notice of matters of public record, including statutes." *Oberg*, 745 F.3d at 136 (internal quotations omitted). The court did not address, much less approve, taking judicial notice of academic studies.

Similarly, the State cannot find solace in *Hall*. That case involved a consideration of whether a redistricting plan violated the Voting Rights Act of 1965. *Hall*, 385 F.3d at 423. The Fourth Circuit noted that "the complaint provides only the total population statistics for the relevant congressional districts." *Id.* at 424 n.3. The Fourth Circuit concluded that because "Voting-age population statistics . . . are publicly available on the official redistricting website of the Virginia Division of Legislative Services," the court could take "judicial notice of [that]

12

information." *Id.* This case does not support the State for two reasons. First, the "statistics" of which the Fourth Circuit took judicial notice in *Hall* were not academic studies asserting positions subject to reasonable dispute (as the material offered by the State in this case is); rather, they were facts about a segment of the population that could not be disputed. Second, the statistics were integral to the complaint, as voting-age population statistics were the relevant data to establish Plaintiffs' claims. *Id.* at 424-425.

The studies of which the State asks this Court to take judicial notice are not statutes or undisputable facts as in *Oberg* and *Hall*. Rather, they are disputed evidence that the State is trying to introduce under the guise of judicial notice. The State cannot assert facts and conclusions without providing Plaintiffs discovery and an opportunity to refute those factual conclusions and provide evidence to the contrary, as even the cases cited by the State demonstrate. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) (allowing a State to justify an ordinance by relying on evidence generated by other jurisdictions, but only doing so on summary judgment); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002) (upholding the denial of a preliminary injunction and permitting the government to justify a law with reference to the "evidentiary foundation" in other cases but only after the plaintiff had an opportunity to produce "evidence to the contrary").[5]

Plaintiffs dispute the facts asserted by the State, as contained in the studies on which the State's arguments are based, and will adduce evidence through discovery contradicting Defendants' assertions and studies. *See, e.g., Gay*, 761 F.2d at 177 (explaining that dismissal is

---

[5] The State appears to misapprehend the holdings of both *Playtime Theatres* and *Carandola*, as those cases allow for a government to rely on the evidentiary foundation established in other cases *for the purpose of enacting a new law*, not to justify a motion to dismiss for failure to state a claim. It is axiomatic that a plaintiff would have the right to adduce her own evidence that would rebut an evidentiary foundation established in another case, on a separate issue, in a different jurisdiction.

inappropriate when the parties had not been afforded a reasonable opportunity for discovery). The State's evidence in support of its Rule 12(b)(6) motion is not properly before this Court.

In addition to the material not before this Court, the State purports to rely upon *Heller II*, 670 F.3d at 1253, and *Heller v. D.C.*, 801 F.3d 264, 272 (D.C. Cir. 2015) (*Heller III*), to support its arguments on the merits of Plaintiffs' claims. Motion at 13-14. Both of these cases, however, were decided at the summary judgment phase after those plaintiffs were afforded discovery. The fact-intensive nature of that court's analyses in both cases demonstrates the need to develop a factual record prior to resolution of the issues in this case. Even though the record already contained "the Committee Report on the [Firearms Registration Amendment Act of 2008], along with testimony and written statements submitted to the Committee at public hearings," the *Heller II* court concluded that the "record is inadequate for us confidently to hold the registration requirements are narrowly tailored." *Heller II*, 670 F.3d at 1258. Highlighting the "importance of the issues at stake," the court remanded "to develop a more thorough factual record." *Id.* at 1259-60 (internal quotations omitted).

The Fourth Circuit has stressed the importance of developing a factual record in cases asserting challenges under the Second Amendment. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010). The court concluded that, while "[t]he government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal . . . it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal." *Id.* (emphasis in original). The Fourth Circuit has likewise made clear that any such showing will require real evidence, not mere conjecture or supposition. *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (citations omitted) (stating that State may not "rely upon mere 'anecdote and supposition'" in attempting to meet its burden, under intermediate scrutiny, to demonstrate "(1) that it has an

14

important governmental 'end' or 'interest' and (2) that the end or interest is 'substantially served

by enforcement of the regulation.'") (quoting *United States v. Playboy Entertainment Group, Inc*.,

529 U.S. 803, 822 (2000)); *see also Chester,* 628 F.3d at 682 (requiring a "strong showing"). Thus,

in *Chester*, the court determined the most prudent course of action was to remand the case "to

afford the government an opportunity to shoulder its burden and Chester an opportunity to respond.

Both sides should have an opportunity to present their evidence and their arguments to the district

court in the first instance." *Id.* In the present case, while the State has asserted several reasons to

justify the HQL, Plaintiffs must be afforded discovery to contest those assertions and to support

their well-pled allegations that the HQL unconstitutionally burdens their rights.

## II.   EVEN IF THE COURT WERE TO EVALUATE THE MERITS OF PLAINTIFFS' CLAIMS, THE HQL IS SUBJECT TO STRICT SCRUTINY.

### A.   The State asserts an improper framework for analyzing Second Amendment challenges.

The Fourth Circuit has developed a two-step framework for resolving challenges under the

Second Amendment. The first step requires a determination of "whether [the challenged law]

burdens or regulates conduct that comes within the scope of the Second Amendment—*i.e.*, whether

the [challenged law] is protected by the Second Amendment." *Chester*, 628 F.3d at 680. The

second step requires a court to select the appropriate level of heightened scrutiny based upon the

extent of the burden on the Second Amendment interests at stake and to apply that level of scrutiny

to the government's proffered justification for the law. *Id.* at 682.

The State seeks to avoid the applicable two-step analysis set forth in *Chester*, and applied

by the Fourth Circuit in *Carter* and numerous other cases, by arguing that, as a facial challenge,

the two-step inquiry is not applicable. Rather, it argues that plaintiffs must establish that no set of

circumstances exists under which the law would be valid and that the statute has no "plainly

legitimate sweep." Motion at 11 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987);

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (analyzing a facial challenge to voting laws)). The reliance upon this standard is unavailing.

The HQL Statute and the implementing regulations simply do not have a "plainly legitimate sweep." First, the State misstates that test. In *Citizens United v. Fed. Election Comm'n*, the Supreme Court stated that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." 558 U.S. 310, 331 (2010). When considering facial challenges, the Supreme Court has simply applied the relevant constitutional test to the challenged statute without reference to other circumstances. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) (collecting Supreme Court cases).

Fourth Circuit Second Amendment precedent consistently has applied the two-step analysis developed in *Chester* in facial challenges under the Second Amendment. *See, e.g.*, *Chester*, 628 F.3d at 677 (creating the two-step analysis in response to both facial and as-applied challenges); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) (applying *Chester*'s two-step analysis to a facial challenge to 18 U.S.C. § 922(g)(8)); *see also United States v. Edge*, No. 3:11-CR-301, 2012 WL 404868, at *2 (W.D.N.C. Feb. 8, 2012) ("Considering a facial constitutionality challenge to § 922(g)(9), the Fourth Circuit outlined a two-part standard for deciding post-*Heller* Second Amendment claims. *See United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).") (unpublished). Sitting en banc, the Fourth Circuit recently reaffirmed the *Chester* two-step approach in *Kolbe v. Hogan*, --- F.3d --, 2017 WL 679687 (4th Cir. 2017) (en banc) Slip op. at 38.

The only Second Amendment case upon which the State relies, Motion at 11, for its erroneous standard, *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016), involved a unique analysis not applicable here. In *Hosford*, the defendant challenged his indictment for dealing firearms without a license, both facially and as-applied, under the Second Amendment. Addressing

16

the facial challenge first, the court explained that it would ordinarily apply the two-step analysis from *Chester* to facial challenges, but need not do so where the challenged law is deemed "longstanding" and thus "presumptively lawful." *Hosford*, 843 F.3d at 165, *citing Heller*, 554 U.S. at 626-27. The court upheld the law because the prohibition against unlicensed firearm dealing was both longstanding and presumptively lawful. *Id.* at 166; *see also United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012) ("[T]he *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review."). In the present case, the State does not argue, and could not argue, that the HQL Statute is longstanding or presumptively lawful; the "streamlining" of the two-step analytical framework is therefore unavailable to the State in this instance. Accordingly, the State's reliance on *Hosford* is misplaced.

Third, Plaintiffs have alleged that the HQL Statute and the implementing regulations do not have a "legitimate sweep" because they facially bar a person from exercising his or her Second Amendment right to purchase a handgun until or unless that person has successfully borne all the burdens imposed by the HQL Statute and navigated all the obstacles, detailed in the Complaint, that the State has placed in that person's path. As *Hosford* confirms, this sort of facial attack requires the State to justify that "sweep" under the two-step test applied in *Chester w*ith facts and proof. *See Hosford,* 843 F.3d at 165 ("courts generally engage in the above-mentioned two-pronged analysis for facial Second Amendment challenges"). For example, in *Heller,* the Supreme Court struck down the District of Columbia's total ban on handguns, even though such a ban would have had a "plainly legitimate sweep" for felons and otherwise disqualified persons. Instead, the Court held that the ban was facially invalid under any standard of review. The same analysis applies to the State's ban on purchases at issue here. The question presented here is whether Maryland's interest in public safety is sufficiently related to its interests or, stated differently whether a legitimate interest "substantially served by enforcement of the regulation."

17

In this respect, the State's desire to suppress handgun ownership is simply not "legitimate" under *Heller*, as "that reasoning would justify a total ban on firearms kept in the home." *Heller III*, 801 F.3d at 280. Under *Chester* and *Carter,* the burden falls on the State not only to articulate a genuine legitimate justification, but also to show that there is a close fit between that interest and the regulations at issue. That question simply cannot be answered in the abstract or by reference to the various and different "permit to purchase" schemes enacted by other jurisdictions. For example, the State argues that crime increased when Missouri repealed its permit to purchase scheme. Motion at 15. After that Missouri repeal, prospective purchases of handguns being sold by private individuals no longer had to pass a background check, and sellers were no longer required to document the sale. *See* Mo. L. 2007, S.B. Nos. 62 & 41. That result is legally impossible under Maryland law, which independently requires that all private handgun sales must include an application (State Form 77R) and a full background check conducted by the State Police. *See* Md. Code, Pub. Safety, § 5-124.

The State also fails to note that the DC Circuit in *Heller III* struck down a training requirement that mandated instruction in the law, a requirement that is virtually identical to the same requirement imposed by the HQL statute, Section 5-117.1(d)(3)(ii)(1). *See Heller III*, 801 F.3d at 278-79 (holding that DC had "presented no evidence from which it could conclude that passing a test of knowledge about local gun laws" sufficiently "fit" the DC's justification and that "the test of legal knowledge" was therefore unconstitutional). That holding obtained even though the training required by DC consisted of merely watching a 1-hour video on-line. *Id.* at 279.[6] The State has not attempted to justify the sweep of the much more burdensome training requirements at issue here.

---

[6] Metropolitan Police Department, Firearm Registration in the District of Columbia, https://mpdc.dc.gov/service/firearm-registration-district-columbia.

The State also seeks to justify the "sweep" of the HQL Statute and regulations by asserting that the background check conducted for every handgun purchase is inadequate because that background check is conducted on the basis of state-issued identification, rather than fingerprints, as required by the HQL Statute once every 10 years. Motion at 18. First, that argument only goes to the fingerprinting requirement, not the rest of the burdens imposed by the HQL Statute and regulations. Second, even as to the fingerprinting requirement, the burden is on the State to demonstrate, with evidence, that the obstacles imposed by that requirement are justified in light of the State's pre-existing and ongoing requirement of background checks for every purchase or transfer of a handgun. The State has not done so.

Application of the two-step analysis outlined above requires a fact intensive analysis of the extent of the burden on the Second Amendment right. The Complaint sets forth well-pled allegations of the burden on Plaintiffs' rights, which must be taken as true on review of a motion to dismiss under Rule 12(b)(6). The Fourth Circuit has confirmed that "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *see also Woollard*, 712 F.3d at 878 (determining that "the right to arm oneself at home[] necessitat[es] that we apply strict scrutiny" and determining that concealed carry regulations, applying outside the home, were subject to intermediate scrutiny); *Carter*, 669 F.3d at 416 ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller* . . . ."); *Chester*, 628 F.3d at 682. The court in *Masciandaro* explained that, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." 638 F.3d at 470. Thus, "[a] severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central

19

self-defense concern of the Second Amendment, may be more easily justified." *Chester*, 628 F.3d at 682.

The Fourth Circuit's decision in *Kolbe* confirms that Plaintiffs' challenge must be analyzed under strict scrutiny. The court noted that "[n]othing in our decisions today affects or calls into question the Second Amendment protection of . . . *Heller*'s handguns," *Kolbe*, Slip op. at 68. The court called a handgun "'the quintessential self-defense weapon,'" *id.* at 52 (quoting *Heller*, 554 U.S. at 629), and stressed "the relevance of the handgun's status as 'the quintessential self-defense weapon' — a status that was obviously and unquestionably important to the *Heller* Court." *Id.* at 70 (quoting *Heller*, 554 U.S. at 628-29). The Fourth Circuit held that the restrictions on the long guns at issue in that case, if protected by the Second Amendment, would warrant only intermediate scrutiny, "in part because the [challenged law] leaves citizens free to protect themselves with handguns . . . ." *Id.* at 69. In this case, however, Plaintiffs challenge a complete restriction on their ability to acquire and possess the "quintessential self-defense weapon," and only strict scrutiny can apply under Fourth Circuit precedent. *See Hosford*, 843 F.3d at 168 (stating that intermediate scrutiny applies to laws that regulate rather than restrict).

As alleged in the Complaint, the HQL Statute restricts rather than regulates the "central self-defense concern of the Second Amendment," self-defense in the home. Complaint ¶¶ 54-57. Plaintiffs, and all Maryland citizens, are prohibited from acquiring what *Heller* and *Kolbe* recognized to be the "quintessential self-defense weapon" for self-defense in the home unless they undertake the onerous and redundant HQL application process. The HQL requirement reaches into the homes of law-abiding, responsible citizens to prevent them from arming themselves with these protected firearms. Under the two-part test adopted by the Fourth Circuit, as reaffirmed in *Kolbe*, the State's restrictive HQL scheme must be tested under the strict scrutiny standard of review. *Woollard*, 712 F.3d at 878.

Strict scrutiny requires the State to establish that a law "is the least restrictive means available" to serve a compelling government interest. *Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 621, 626 (4th Cir. 2002) (explaining the strict scrutiny standard in the context of viewpoint-based restrictions on speech). The State does not even attempt to argue that the HQL requirements meet this test.[7] As the Complaint alleges, an examination of the process that must be undertaken by a handgun purchaser demonstrates that the HQL Statute cannot satisfy strict scrutiny because a less restrictive alternative exists. Complaint ¶ 55. Despite the numerous background checks, fingerprinting, and training, possession of an HQL alone does not entitle a citizen to purchase a handgun. Rather, she must undergo the same background checks again at the time of purchase (the 77R process). Complaint ¶ 50 n.1. The requirement to undergo these background checks at the time of sale proves that the HQL application process is not related to the government's interest in public safety because the HQL background checks are not sufficient, in the government's view, to ensure handgun purchasers are law-abiding, responsible citizens. Instead, the 77R background check—a less restrictive alternative in place for decades before the HQL Statute was enacted—is what ensures that individuals are eligible to purchase handguns. Thus, there is a less restrictive alternative already provided for in the law, which is fatal to the HQL Statute under strict scrutiny.[8]

---

[7] Relatedly, the State never addresses, let alone refutes, the allegations that the requirements of the HQL Statute, "taken as a whole," amount to a severe burden on the core right, mandating strict scrutiny. Complaint ¶ 56. Courts routinely evaluate the constitutionality of a burden imposed by the totality of a regulatory scheme. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 34 (1968) ("[H]ere the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause."); *Wood v. Meadows*, 207 F.3d 708, 714 (4th Cir. 2000) (stating that the determination of State law requires examination of the "scheme in its entirety"); *Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017) (holding that the district court erred by not considering the totality of the burden on Second Amendment rights imposed by multiple zoning regulations).

[8] The State has not argued that the requirements of Maryland's registration scheme individually are the least restrictive alternatives either. For example, the State asserts only that the thirty day timeline to issue HQLs has a "plainly legitimate sweep." Motion at 18. The State does not, and

**B.      Even if the law were subject to intermediate scrutiny, the State fails to satisfy that burden.**

Intermediate scrutiny requires that a law impacting fundamental liberties be "narrowly tailored." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014); *Reynolds v. Middleton*, 779 F.3d 222, 225–26 (4th Cir. 2015); *Heller II*, 670 F.3d at 1258. While narrow tailoring in the intermediate scrutiny context does not require a law to be the least restrictive means of accomplishing the government's interest, it does require that the law be a tight fit to the asserted interest. *Heller II*, 670 F.3d at 1258. Part of the determination of whether a law is properly tailored requires the consideration of less restrictive alternatives. *McCullen*, 134 S. Ct. at 2530. The rationale behind this requirement is that if there is a less restrictive alternative that would accomplish the government's asserted interests, then the fit between the challenged law and the interest is likely not sufficiently "tight." *Id*. at 2534. In this vein, the D.C. Circuit applied the "tight fit" standard under intermediate scrutiny in *Heller II*, 670 F.3d at 1258. The "tight fit" standard is also true to the Supreme Court's intermediate scrutiny holdings, which require "a close fit between ends and means." *McCullen*, 134 S. Ct. at 2534. Importantly, a regulation is *per se* invalid even under intermediate scrutiny where it is justified only as an attempt "to limit the number of firearms present in a home." *Heller III*, 801 F.3d at 280. As the D.C. Circuit explained, such a justification fails because if "taken to its logical conclusion, that reasoning would justify a total ban on firearms

---

cannot, argue that the delay in issuing HQLs is the least restrictive means available or even that the 30-day delay is a "close fit" to the state's objectives. As Plaintiffs allege and the State does not deny, "[i]n the vast majority of cases, database searches required by the HQL take mere minutes. In cases of such approvals without further review, there is no technological or practical reason why the State Police could not perform the statutorily-mandated collection and processing of HQL applications within 24 hours." Complaint ¶ 43. Yet, "[t]he average time reported by the State Police to process a completed HQL is 27 to 28 days." Complaint ¶ 39. The State does not contest these allegations and makes no attempt to factually justify the extra time as necessary to accomplish any legitimate state goal.

kept in the home." *Id.* Plaintiffs have alleged that the HQL Statute was motivated by precisely this rationale. *See* Complaint ¶ 57.

The Fourth Circuit has recently clarified the burden a law must meet to survive intermediate scrutiny in the First Amendment context, stating that "the restrictions must be narrowly tailored to serve a significant government interest and . . . [a law] is narrowly tailored if it does not burden substantially more speech than is necessary to further the government's legitimate interests." *Reynolds,* 779 F.3d at 225–26 (internal quotations omitted). The Fourth Circuit in *Reynolds* explained that "our cases have not been entirely clear," *id.* at 227, but "*McCullen v. Coakley* clarifies what is necessary to carry the government's burden of proof under intermediate scrutiny." *Id.* at 228. The court in *Reynolds* determined that intermediate scrutiny requires narrow tailoring such that the government must "*prove* that it actually *tried* other methods to address the problem." *Id.* at 232 (emphasis in original). That holding is directly applicable here because, as *Kolbe* reaffirmed, "[i]n pinpointing the applicable standard of review, we may 'look[] to the First Amendment as a guide.'" *Kolbe*, Slip op. at 39 (quoting *Chester*, 628 F.3d at 680).

The State has not argued that the 77R application process, which is substantially less burdensome and which is applicable to every handgun purchase in Maryland, is inadequate in any way. As alleged in the Complaint and explained above with respect to strict scrutiny, the current requirement to undergo the 77R process at the time of purchase demonstrates that there is a less restrictive alternative that accomplishes the government's interest. Complaint ¶ 54. Accordingly, even under intermediate scrutiny, the HQL requirement is unconstitutional because there is an alternative that is less restrictive and that still accomplishes the government's interest. *See McCullen*, 134 S. Ct. at 2534-2541.

Even in the absence of a pre-existing, less restrictive alternative, the law is still not narrowly tailored to advance the government's interest in public safety. The State has not even

attempted to prove that the public safety is served by each of the many and varied HQL requirements challenged here, much less justified the burden imposed taking all these requirements as a whole. Indeed, many of these burdensome requirements appear to be justifiable only as a matter of administrative convenience, which is not sufficient. *See Chester*, 698 F.3d at 692 (noting that "Section 922(g)(9) is not merely intended to accomplish bureaucratic shortcuts or administrative convenience") (Davis, J., concurring); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1127 (10th Cir. 2015) ("Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny."); *Heller III*, 801 F.3d at 287 (Henderson, J., concurring in part and dissenting in part) (same). As the Fourth Circuit stated in *Reynolds* "'the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Reynolds*, 779 F.3d at 226 (quoting *Coakley*, 134 S. Ct. at 2535). While it is the State's burden to demonstrate that each element of the requirements has a tight fit with that interest (a burden they have so far failed to carry), *id.*, discovery and development of the factual record will affirmatively show that there are a nearly limitless number of ways to advance public safety with respect to the prevention of violent crime that are less restrictive than the scheme posed by the HQL Statute and regulations.

The factual disputes regarding the extent of the burden imposed by the HQL requirement and the availability (and effectiveness) of less-restrictive alternatives demonstrate the need for discovery in this case and render dismissal inappropriate. Furthermore, it is clear that the HQL Statute cannot survive any level of heightened scrutiny as the requirements, taken together, represent a substantial burden on the core right of self-defense in the home while simultaneously failing to be narrowly tailored to advance the ostensible governmental interest. The State has advanced no argument that overcomes these manifest failings in the HQL Statute.

24

III.   **THE HQL TRAINING REGULATIONS FAIL TO PROVIDE DUE PROCESS OF LAW BY VESTING PRIVATE "QUALIFIED HANDGUN INSTRUCTORS" WITH THE AUTHORITY TO DENY APPLICANTS' SECOND AMENDMENT RIGHTS.**

The State mischaracterizes the role Qualified Handgun Instructors play in the HQL process by arguing that "[a] qualified handgun instructor's role is solely to provide the safety training course required by the statute, not to grant or deny an HQL license, or to make any discretionary determination of any kind." Motion at 25. The State disputes the well-pled fact that instructors must issue a certificate of completion to allow an applicant to submit an HQL application. Complaint ¶ 60; Md. Code Regs. 29.03.01.29 ("A. Except as provided in §B of this regulation, an applicant shall complete a Firearms Safety Training Course and submit a Firearms Safety Training Certificate issued by a Qualified Handgun Instructor."). But Rule 12(b)(6) requires the Court to accept the facts from the Complaint as true. *Wag More Dogs*, 680 F.3d at 365. Thus, Plaintiffs have alleged facts to support a claim that their ability to obtain an HQL and, therefore, a handgun, depends on the action of private instructors. If an instructor refuses to issue the certificate, there is no recourse because applicants can only appeal from the denial of an application—they cannot appeal from the inability to submit an application because a firearm instructor will not issue them a certificate. *See* Md. Code, Pub. Safety § 5-117.1(l).

The Complaint clearly alleges that an individual's exercise of Second Amendment rights can be prevented by the action of a private instructor whose denial of a certificate cannot be appealed. This is a textbook example of denial of due process of law. *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (holding that a cognizable constitutional claim may exist when a state delegates a public function to a private entity); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) ("[O]ne person may not be intrusted [sic] with the power to regulate the business of another . . . . And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property."); *Geo-Tech Reclamation Indus., Inc. v.*

*Hamrick*, 886 F.2d 662, 667 (4th Cir. 1989) (striking down a permitting scheme because it impermissibly made the issuance of the permit contingent on "irrational public sentiment or whim"); *State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121–22 (1928) (holding delegation of power repugnant of due process clause where "[t]here [was] no provision for review under the ordinance; [and] failure to give consent is final[, the private actors] [were] not bound by any official duty, but [were] free to withhold consent for selfish reasons or arbitrarily . . . ."); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912) (finding a regulation violated the Due Process clause where it conferred "power on some property holders to virtually control and dispose of the property rights of others"). In short, the State cannot delegate to private parties the authority to regulate the constitutional rights of others. Complaint ¶ 2.

## IV. THE WORDS "RECEIVE" AND "RECEIPT" IN THE HQL STATUTE ARE IMPERMISSIBLY VAGUE.

As the Supreme Court recently stated in *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015), "[o]ur cases establish that the Government violates [the due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." In *Johnson,* the Court also made clear that the Court's "holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 2561; *see also Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) ("where a statute specifies no standard, the fact that it has one or more clearly constitutional applications cannot save it"); *Kolbe*, Slip op. at 77 n.19 (same).

As alleged in the Complaint, ¶ 65, MSI submitted comments to the proposed HQL regulations specifically requesting that the regulations include a definition of the statutory words "receive" and "receipt." In those comments, MSI noted that these terms were undefined and inherently vague. MSI further noted that, under federal law, 18 U.S.C. § 922(h), a prohibited

"receipt" means mere possession, temporary or not. *See, e.g.*, *United States v. Turnmire,* 574 F.2d 1156, 1157 (4th Cir. 1978) (approving the instruction that "since one cannot possess something without having received it, [then] receipt of a firearm may be shown circumstantially by proving possession."). Similarly, the courts of appeals are unanimous in holding that even a temporary possession by a disqualified person is criminal under 18 U.S.C. § 922(g). *See United States v. Gilbert,* 430 F.3d 215, 218 (4th Cir. 2005) (holding § 922(g) "in no way invites investigation into why the defendant possessed a firearm or how long that possession lasted"); *United States v. Lane*, 267 F.3d 715, 719 (7th Cir. 2001) (felon's temporary possession and purchase of a firearm for another person's lawful sporting use violated § 922(g)); *United States v. Adkins*, 196 F.3d 1112, 1115, 1117-18 (10th Cir. 1999) (same); *United States v. Scales*, 599 F.2d 78, 80 (5th Cir. 1979) (same); *United States v. Casteel*, 717 F.3d 635, 644 n.4 (8th Cir. 2013) (collecting cases). MSP ignored MSI's request, and there are no definitions, in either the statute or the regulations, of these critical words.

The State does not deny that, on their face, the words "receipt" and "receive" as used in the HQL Statute do not give "fair notice of the conduct it punishes," and are "so standardless that it invites arbitrary enforcement" within the meaning of *Johnson*. Similarly, the State makes no attempt to argue that banning temporary possession or receipt is somehow legitimate or an otherwise defensible state objective. Rather, the State relies on *Chow v. State*, 903 A.2d 388, 407 (Md. 2006), to argue that there is an established meaning of the words "receive" and "receipt" that does not include mere temporary possession. *Chow*, however, does not discuss either of these words. Instead, *Chow* was limited to a discussion of the word "transfer." *Id.* Chow was charged with illegally transferring a regulated firearm because he had given a handgun to his friend temporarily. The statute under which he was charged stated: "[a] person who is not a licensee may not **sell, rent, transfer, or purchase** a regulated firearm until after 7 days following the time a

27

firearm application is executed by the firearm applicant, in triplicate, and the original is forwarded by a licensee to the Secretary." Md. Code, Pub. Safety § 5-124 (emphasis added).[9] The court interpreted the word "transfer" as used in that statute to require a "permanent exchange of title or possession," and held that a temporary exchange would not support a conviction. *Chow*, 903 A.2d at 402.[10]

*Chow* simply does not remedy the vagueness at issue here. The State points out that subsection 5-117.1(b) of the HQL Statute states that "[a] dealer or any other person may not sell, rent, or transfer a handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person a valid handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary under this section." Motion at 29. But subsection 5-117.1(c), the subsection at issue here, does not use "transfer" (or "transferee") at all. Rather, Section 5-117.1(c) states that "[a] person may purchase, rent, or receive a handgun" only if they have an HQL. Any definition of the word "transfer" as it is used in Md. Code, Pub. Safety § 5-124, the statute at issue in *Chow,* has no obvious bearing on the meaning of the different word "receive" as used in subsection 5-117.1(c). A court decision interpreting a word in one statute can hardly relieve the vagueness of a different word in a different statute.

The State nonetheless argues, without citation, that *Chow*'s construction of "transfer" as used in Section 5-124, must be read as also applicable to the meaning of "transfer" as used in

---

[9] At the time of Chow's arrest, the statute was codified as Maryland Code (1957, 1996 Repl. Vol., 2002 Supp.), Art. 27, § 442, Section 442 is currently codified (without substantive change) as § 5-124 of the Public Safety Article. *Chow* referred to the older iteration of the code in its analysis. *Chow*, 903 A.2d at 389 n.2.

[10] Chow also was charged with "knowingly participat[ing] in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subtitle." Maryland Code (1957, 1996 Repl.Vol.,2002 Supp.), Art. 27, § 449(f), recodified as Md. Code, Pub. Safety § 5-144 (emphasis added). In a separate discussion, the court held that the term "knowingly" imposed a specific intent *mens rea* under which "the actor must know that he or she is committing an 'illegal sale.'" *Chow*, 903 A.2d at 412.

28

subsection 5-117.1(b). Motion at 29. The State then argues, again without citation, that if "transfer" must be permanent under Section 5-117(b) under *Chow*, then "receive" as used Section 5-117.1(c) must also mean a permanent "receipt." Yet, the State's *ipse dixit* fails, as the prohibition on a "receipt" in subsection 5-117.1(c) does not cross-reference subsection 5-117.1(b) and the criminal provisions in subsection 5-117.1(c) are not in any way dependent on a violation of subsection 5-117.1(b). Nothing in Maryland case law or the HQL Statute supports Defendants' tortured argument. The State may not evade this Court's adjudication of a constitutional claim by relying on such a fanciful construction of "receive" and "receipt," especially where that construction of these words is not embodied in state case law or in a binding state administrative interpretation. *See, e. g., Zwickler v. Koota*, 389 U.S. 241, 251 n.14 (1967) (abstention held inappropriate where the state statute was not "obviously susceptible of a limiting construction"); *see also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237 (1984) (same).

The speculative nature of the State's argument is confirmed by the provisions of Section 5-144 of the Public Safety Article. Section 5-144 makes it a crime to "knowingly participate" in an illegal "sale, rental, transfer, purchase, possession, or receipt," thereby suggesting, as a matter of textual analysis, that each of these words have different meanings. "Participating" in a "transfer" (including acting as the "transferee") must therefore mean something different than "participating" in a "receipt." In short, it is perfectly possible for a "receipt" to take place without a "transfer" as defined in *Chow*. It is well established that "if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *State Bd. of Elections v. Snyder ex rel. Snyder*, 76 A.3d 1110, 1126 & n. 28 (Md. 2013). Had the General Assembly intended the HQL Statute to apply only to a permanent or otherwise non-temporary receipt of a handgun, it would have defined the word or would have used only the word "transfer" in its mandate, which it did

not do. The legislature is presumed to have knowledge of all judicial decisions interpreting its laws. *Fangman v. Genuine Title, LLC*, 136 A.3d 772, 791 n.18 (Md. 2016). If, as the State insists, the word "transfer" has a particular meaning as determined by the *Chow* court, then the General Assembly's use of a different word ("receipt") in addition to "transfer" must have a different meaning, because "the Legislature is presumed to have meant what it said and said what it meant." *Arundel Corp. v. Marie*, 860 A.2d 886, 894 (Md. 2004) (citation omitted).

The State also argues that a vagueness claim may be defeated by an interpretation of a statute by an administrative agency. Motion at 26. That argument does not help the State. Here, the State Police refused to respond to MSI's specific request to define the term "receive" and "receipt" during rulemaking proceedings. Accordingly, there is no administrative interpretation to apply. One can only assume that refusal was purposeful. Certainly, the requisite administrative interpretation cannot now be supplied by the State's lawyers. The State is represented here by the Attorney General's Office, and that Office is not the state agency that enforces § 5-117.1 or prosecutes violations. The regulatory rulemaking authority is given to the State Police by Section 5-117.1(n), but the State Police refused to define the terms in rulemaking. Similarly, the prosecution authority lies with the State's Attorneys. *See Murphy v. Yates*, 348 A.2d 837 (Md. 1975) (noting that the power to prosecute belongs to the State's Attorneys and holding unconstitutional a statute that created the office of state prosecutor as an independent unit in the executive branch). The State's Attorneys are independent of the Attorney General under the Maryland Constitution. *See* Maryland Constitution Art. V, § 7. Without a definition in the regulations, we are left with just the State's lawyers' *post hoc* rationalizations and legal speculations in a brief. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ("the integrity of the administrative process requires that 'courts may not accept appellate counsel's post hoc rationalizations for agency action . . . .'"). Certainly, the Attorney General's litigation

30

arguments could not bind the State's Attorneys from instituting prosecutions on the theory that "receive" means temporary receipt. *See Murphy*, 348 A.2d at 848 (stating that the State's Attorney's "most awesome discretionary power [is] to determine whether or not to prosecute.").

As alleged in the Complaint, ¶ 66, that the words "receive" and "receipt" may include temporary possession, as under federal law, not only makes the statute vague, it creates a further constitutional violation under the Second Amendment. A Maryland citizen cannot exercise his or her Second Amendment right to purchase a handgun without an HQL and, unless training exempt, may not obtain an HQL without training. Yet, the HQL regulations, challenged here, require live fire of a handgun as part of that training. Live fire is obviously impossible without at least the temporary receipt of a handgun. It is, therefore, impossible for MSI's members who are private instructors, Complaint ¶ 25, to provide the required training — or for citizens to receive it — without risking "arbitrary enforcement" of these vague terms. *Johnson*, 135 S.Ct. at 2256. That risk is even greater for other types of temporary receipts, such as loans among friends or temporary use at a range or possession in the home. At a minimum, a state may not impose a requirement and then make it impossible to satisfy that requirement within its jurisdiction. *See Broderick v. Rosner,* 294 U.S. 629, 639 (1935) (Brandeis, J.) (invalidating a statute, in part, because it "imposes a condition which, as here applied, is legally impossible of fulfillment"); *Ezell v. City of Chicago*, 651 F.3d 684, 710-11 (7th Cir. 2011) (holding that regulations on firing ranges were incompatible with the Second Amendment and instructing the district court to preliminarily enjoin the regulations).

## V.   THE HQL TRAINING REGULATIONS ARE INCONSISTENT WITH THE HQL STATUTE AND ARE OTHERWISE INVALID.

The State argues that the "live" fire requirement imposed by the training regulations is within MSP's statutory authority because there "is no plausible reading of the statute's requirement that an applicant 'demonstrate[] the . . . safe operation . . . of a firearm' that is contradicted by the

requirement that an applicant do so by firing at least one round of live ammunition." Motion at 33. The statute, however, requires only "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." Public Safety § 5-117.1(d)(3)(iii). This "orientation" requirement neither mandates nor authorizes a live fire "practice" requirement.

"While reliance upon the broad statutory authority conferred by the Legislature generally will be sufficient to justify an agency's regulation/rule making authority, logic compels the self-evident conclusion that there is an outer limit to an agency's authority." *Medstar Health v. Maryland Health Care Comm'n*, 827 A.2d 83, 96 (Md. 2003). Accordingly, "[a]n agency's authority extends only as far as the General Assembly prescribes." *Thanner Enterprises, LLC v. Baltimore County*, 995 A.2d 257, 263 (Md. 2010); *see also Board of Liquor License Commissioners v. Hollywood Productions, Inc.*, 684 A.2d 837, 841 (Md. 1996) ("[R]egardless of any rule making authority that the Liquor Board may enjoy, it may not impose a sanction that exceeds the confines of its expressly or impliedly delegated powers."). Thus, an "agency's rule or regulations cannot "contradict the language or purpose of the statute." *Medstar Health*, 827 A.2d at 96. The HQL regulations fail this test.

Although the HQL Statute provides that "[t]he Secretary may adopt regulations to carry out the provisions of this section," § 5-117.1(n), it does not allow the MSP to add *new* "provisions," such as adding "a practice component" to the statutorily required "orientation component." Contrary to the State's assertion, the objective of teaching safe handling of a firearm can be accomplished without a "practice" component. The regulations already accomplish that objective with another requirement that the course include an "[o]verview of the proper operation and safe handling of a handgun, including cleaning and maintenance, the loading and unloading of ammunition, and the differences between revolvers and semi-automatic handguns." Md. Code Regs. 29.03.01.29.C(3). Plaintiffs will be able to produce expert handgun instructors who will

32

testify that an instructor need only make use of dummy rounds to provide the "orientation" required by the statute. Live fire is not needed to provide an "orientation" or a "demonstration."

The legislative history of the HQL Statute also contradicts the State's argument. As originally proposed, the HQL provisions required a safety training course that included "a firearms qualification component that demonstrates the person's **proficiency and use** of the firearm." 2013 Leg. Sess. SB 281 (First Reader) at 17 (emphasis added).[11] The proposed language was changed to its current language by amendment in the House of Delegates. Chapter 427 of the 2013 Laws of Maryland. The debate on the floor of the House of Delegates confirms that the amendment was intended to eliminate a live fire requirement that would have been associated with the "proficiency and use" language. General Assembly of Maryland, *2013 Regular Session Proceedings – House Audio, April 2, 2013, Session 2*, at 19:05 (April 2, 2013).[12] The General Assembly's rejection of this language in the law as passed necessitates the conclusion that requiring such training exceeds the scope of the statutory grant.

Reading the statute as limiting the training requirements to those statutorily enumerated is also necessary to avoid rendering the law unconstitutional. *See Washington Suburban Sanitary Com'n v. Phillips*, 994 A.2d 411, 420 (Md. 2010) ("a construction of a provision which casts doubt on its constitutionality should be avoided"). As alleged in the Complaint, the live fire component imposes severe burdens on the ability of Maryland citizens to obtain an HQL. Training without a live fire requirement can take place anywhere, while training that must include live fire can only take place at a firing range, the availability of which is highly limited (there are none in Baltimore City, for example). Complaint ¶ 46. As alleged in the Complaint, the live fire requirement acts as

---

[11] Available at http://mgaleg.maryland.gov/2013RS/bills/sb/sb0281f.pdf.
[12] Available at
http://mgaleg.maryland.gov/webmga/frmlegislation.aspx?id=2013rs_house_audio&stab=02&pid
=legisnlist&tab=subject3&ys=2013rs.

a complete barrier to the acquisition of an HQL by the poor and disadvantaged citizens of Maryland, as well as those who live in areas where access to a public shooting range is non-existent. Plaintiffs allege, and the State does not dispute, that the underlying intent and practical effect of these requirements is to disenfranchise the poor and disadvantaged. *Id.*

The regulations fail for other reasons. Count III of the Complaint, ¶ 87, alleges that the State Police regulations are arbitrary and capricious under State law. *See* Md. Code, State Gov. § 10-222(h)(3)(vii) (providing that under the Maryland Administrative Procedure Act a reviewing court may set aside any agency action that "is arbitrary or capricious."). Under the federal Administrative Procedure Act, 5 U.S.C. § 706(2)(A), it is hornbook law that "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n.,* 135 S.Ct. 1199, 1204 (2015) (collecting cases). A failure to do so is arbitrary and capricious agency action. *Id.* The same result obtains under the Maryland Administrative Procedure Act and under the "inherent power" of the Maryland courts to review discretionary decisions of Maryland agencies under the same "arbitrary and capricious" standard. *See, e.g., Harvey v. Marshall*, 884 A.2d 1171, 1203 (Md. 2005). Here, MSI argued in its Comments submitted to the State Police during the rulemaking proceedings that the terms "receive" and "receipt" were undefined and ambiguous and specifically requested a regulatory definition. Those Comments also objected to and specifically detailed the problems arising from the one live round of ammunition requirement. While accepting, *sub silentio*, other MSI comments, the State Police never responded to these comments in issuing the final rules. Complaint ¶ 65; *see* 2013 MD REG TEXT 338193 (NS) (Dec. 13, 2013). That failure was arbitrary and capricious.

Similarly, the HQL Statute authorizes the State Police to charge "a nonrefundable application fee to cover the costs to administer the program of up to $50;" it does not allow the State Police to impose additional fees. Public Safety § 5-117.1(g)(2). Plaintiffs have alleged that

the State Police have impermissibly shifted the costs of the HQL program to applicants by imposing training and other costs on the applicant in addition to charging a $50 application fee. Complaint ¶¶ 86, 87. The State does not deny the shift, but asserts, in still another *ipse dixit*, that these costs are irrelevant because they are supposedly not "costs to administer the program." Motion at 34. Yet, the HQL "program" expressly mandates training and fingerprinting and thus the "costs" of those aspects are certainly part of the "program." The costs of "administering" training and fingerprinting are thus necessarily included within the $50 cap imposed by the HQL Statute. That the State Police have chosen to ignore the cap and impose these costs on applicants illustrates once again that the underlying objective of these regulations is simply to make it more difficult and expensive for a person to obtain an HQL and thus further obstruct a law-abiding citizen's Second Amendment right to purchase a handgun in Maryland.

## CONCLUSION

Plaintiffs have alleged facts sufficient to support their causes of action. The State's Motion does not articulate any deficiency in Plaintiffs' pleading. Instead, the State asks this Court to consider evidence not properly before it and to rule on the merits of Plaintiffs' claims before discovery has even begun. This Court should deny the State's Motion in its entirety.

Respectfully Submitted,

*/s/ Cary J. Hansel*

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs

February 27, 2017

John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III, (Bar No. 19416)
Marc A. Nardone, (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Phone: 202 393 7150
Facsimile: 202 347 1683
JSweeney@bradley.com

Counsel for Plaintiff Atlantic Guns, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 27th day of February, 2017, Plaintiffs'
Memorandum in Opposition to Defendants' Motion to Dismiss was served, via electronic delivery
to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.


<u>/s/ Cary J. Hansel</u>
Cary J. Hansel, No. 14722

36