# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,      *

     *Plaintiffs,*                *

     v.                          *         Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.*,       *

     *Defendants.*            *

*     *     *     *     *     *     *     *     *     *     *     *     *     *

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General

JENNIFER L. KATZ (Fed. Bar #28973)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.)
410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: August 17, 2018          Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 2

    Maryland's Enactment of the Firearm Safety Act of 2013 to Enhance Public
    Safety and Deter Crime ........................................................................................... 2

    The HQL Law and Implementing Regulations ....................................................... 4

    Plaintiffs ................................................................................................................... 7

    Procedural History ................................................................................................... 9

STANDARD OF REVIEW ............................................................................................ 10

ARGUMENT .................................................................................................................. 11

I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS
       HAVE FAILED TO DEMONSTRATE STANDING TO CHALLENGE THE HQL LAW ....... 11

    A.    Neither Individual Plaintiff Has Applied for an HQL or Put Forth Any
         Evidence that an Application Would Be Futile ............................................ 12

    B.    MSI Failed to Identify Any Members Who Have Been Injured by the
         HQL Law, Its Members Have Conflicting Interests, and the Law Does
         Not Harm MSI's Mission. .......................................................................... 13

    C.    Atlantic Guns Failed to Demonstrate How Its Business Suffered or
         How Its Customers Were Harmed Due to the HQL Law. .......................... 15

II.    PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL LAW IS
       REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN
       ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF
       FIREARMS VIOLENCE. ................................................................................................ 16

    A.    Plaintiffs Have Failed to Create Any Issue for Trial that the HQL Law
         Burdens Their Second Amendment Rights, and to the Extent the HQL
         Law Burdens Conduct Falling Within the Scope of the Second
         Amendment, Intermediate Scrutiny Is the Applicable Standard of
         Review. ....................................................................................................... 17

B.  The HQL Law Satisfies Intermediate Scrutiny Because It Is Reasonably Adapted to a Substantial Government Interest. ...................... 20

1.  The Fingerprint and Background Investigation Provisions of the HQL Law Are Constitutional. ..................................................... 21

2.  The Firearm Safety Training Provision of the HQL Law Is Constitutional. ................................................................................. 25

3.  The Costs Associated with the HQL Law and the Application Period Are Constitutional. ............................................................... 28

III.  PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE THE WORDS "RECEIVE" AND "RECEIPT" ARE NOT VAGUE. .......................................................... 30

IV.  THERE IS NO GENUINE ISSUE FOR TRIAL TO SUPPORT PLAINTIFFS' CLAIM THAT THE SECRETARY ACTED ULTRA VIRES IN PROMULGATING ANY OF THE CHALLENGED REGULATIONS. ................................................................. 33

CONCLUSION ........................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 12

*Center for Auto Safety Inc. v. Athey*, 37 F.3d 139 (4th Cir. 1994) .................................... 32

*Chow v. State*, 393 Md. 431 (2006) ................................................................................... 35

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ................................................................... 32

*Craig v. Boren*, 429 U.S. 190 (1976) ................................................................................ 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................... passim

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................................... 34

*Heller v. District of Columbia*, 45 F. Supp. 3d 35 (D.D.C. 2014) .................................... 14

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...................................... 21

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ................................... passim

*Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...................................... 15

*Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835 (N.D. Ill. 2011) ........................ 21, 32

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.) (en banc), *cert. denied*,
    138 S. Ct. 469 (2017) .................................................................................................. passim

*Kwong v. Bloomberg*, 876 F. Supp. 2d 246 (S.D.N.Y. 2012) ........................................... 13

*Kwong. V. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), *cert. denied sub nom.*
    *Kwong v. de Blasio*, 134 S. Ct. 2696 (2014) ..................................................... 14, 21, 32

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ........................................................... 14, 20

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................... 13

*Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012) ................................................................. 35

*Maryland Highways Contractors Ass'n, Inc.*, 933 F.2d 1246 (4th Cir. 1991) .................. 16

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................... 18, 33

*Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1 (2003) ........................... 38

*Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992) ................. 20, 33

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ...................................................................... 12

*Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001) ..................... 23

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................. 12

*Smith v. State*, 425 Md. 292 (2012) ............................................................................... 36

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .................................................. 23

*U.S. v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .............................................................. 13

*U.S. v. Williams*, 553 U.S. 285 (2008) .......................................................................... 37

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ................................................... 22

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) ................................................... 34

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ........................................ 22

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
     455 U.S. 489 (1983) ................................................................................................ 35

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .............................................. 22, 25

## Constitutions

U.S. Const. amend. I ........................................................................................................ 32

U.S. Const. amend. II ................................................................................................... 1, 18

U.S. Const. amend. XIV ................................................................................................... 10

## Statutes

2007 Laws of Md., Ch. 427 ............................................................................................... 2

Conn. Gen. Stat. § 29-36(f) ............................................................................................ 24

Conn. Gen. Stat. § 29-36(g) ........................................................................................... 24

iv

Conn. Gen. Stat. § 29-36g(b)(2) ...................................................................................... 30

Md. Code Ann., Pub. Safety § 5-101(r) ............................................................................. 5

Md. Code Ann., Pub. Safety § 5-105 ............................................................................ 6, 33

Md. Code Ann., Pub. Safety § 5-117.1 ...................................................................... passim

Md. Code Ann., Pub. Safety § 5-117.1(b) ..................................................................... 4, 30

Md. Code Ann., Pub. Safety § 5-117.1(c) ..................................................................... 4, 30

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) ................................................................ 5, 28

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(i) ................................................................ 34

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) .............................................................. 34

Md. Code Ann., Pub. Safety § 5-117.1(e) ........................................................................... 5

Md. Code Ann., Pub. Safety § 5-117.1(f)(2) ....................................................................... 5

Md. Code Ann., Pub. Safety § 5-117.1(f)(3)(i) .................................................................... 5

Md. Code Ann., Pub. Safety § 5-117.1(f)(7) ........................................................................ 5

Md. Code Ann., Pub. Safety § 5-117.1(g) ............................................................................ 6

Md. Code Ann., Pub. Safety § 5-117.1(g)(1) ..................................................................... 35

Md. Code Ann., Pub. Safety § 5-117.1(g)(4) ..................................................................... 35

Md. Code Ann., Pub. Safety § 5-117.1(h) ............................................................................ 6

Md. Code Ann., Pub. Safety § 5-117.1(h)(1) ..................................................................... 29

Md. Code Ann., Pub. Safety § 5-117.1(i) ............................................................................. 6

Md. Code Ann., Pub. Safety § 5-117.1(l)(1) ........................................................................ 6

Md. Code Ann., Pub. Safety § 5-117.1(l)(3) ........................................................................ 6

Md. Code Ann., Pub. Safety § 5-117.1(n) ....................................................................... 6, 33

Md. Code Ann., Pub. Safety § 5-118(b) .............................................................................. 22

Md. Code Ann., Pub. Safety, § 5-117.1(g)(2) ............................................................... 29, 34

N.Y. Penal Law § 400.00(4-a) ........................................................................ 30

## Rules

Fed. R. Civ. P. 56 ................................................................................... 1, 11

Fed. R. Civ. P. 56(a) ................................................................................... 10

Fed. R. Civ. P. 56(c) ................................................................................... 10

Fed. R. Civ. P. 56(e) ................................................................................... 11

## Regulations

COMAR 12.04.02.03—.05 ............................................................................ 27

COMAR 12.04.02.03.10(D) ......................................................................... 27

COMAR 29.03.01.26—.41 ............................................................................. 6

COMAR 29.03.01.28(C) ................................................................................ 7

COMAR 29.03.01.29(C) ........................................................................... 7, 34

COMAR 29.03.01.29(C)(4) ...................................................................... 7, 34

## Miscellaneous

Federal Bureau of Investigation, 2016 Crime in the United States, Table 12,
  Murder by State, Types of Weapons, 2016 ................................................ 22

Gregor Aisch & Joshua Keller, *What Happens After Calls for New Gun Restrictions?
  Sales Go Up*, N.Y. Times (last updated June 13, 2016) ................................ 15

Justin George, *Gun sales spike amid talk of restrictions*, Baltimore Sun
  (Dec. 21, 2012) ...................................................................................... 15

U.S. General Accounting Office, GAO-01-427, *Firearms Purchased
  from Federal Firearm Licensees Using Bogus Identification* (2001) ........................ 3, 22

## INTRODUCTION

Defendants Governor Lawrence J. Hogan, Jr. and Superintendent of Maryland State Police Colonel William M. Pallozzi, sued in their official capacities, move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs have failed to create a genuine issue of material fact to support any of their claims, all of which challenge Maryland's requirement that most individuals wishing to purchase a handgun in Maryland first obtain a Handgun Qualification License ("HQL").

At the outset, plaintiffs failed to meet their burden to establish standing.  Neither of the remaining individual plaintiffs has applied for an HQL or shown that an application would be futile.  Neither has been deterred from obtaining an HQL due to cost, and neither has researched or taken any steps to initiate the process.  Similarly, Maryland Shall Issue, Inc. ("MSI") failed to identify a single member who has been unable to obtain an HQL due to expense and has produced no evidence that the HQL law has harmed MSI's mission. Finally, Atlantic Guns, Inc. failed to produce any evidence that it has lost business due to the HQL requirement; indeed, Atlantic Guns failed to identify even a single customer who has been deterred from purchasing a handgun because of the HQL law.

Further, plaintiffs have failed to create any issue for trial as to the substance of their allegations.  As to Count I, alleging that certain aspects of the HQL law violate the Second Amendment to the United States Constitution, plaintiffs have failed to produce any evidence that the HQL law burdens their Second Amendment rights.  Moreover, the HQL law easily satisfies intermediate scrutiny because the challenged requirements—that applicants be fingerprinted and receive four hours of firearm safety training—have been

shown through empirical, peer-reviewed research to reduce crime and further the State's compelling interest in promoting public safety.  Experts in law enforcement and firearm safety have concluded that the fingerprinting and firearms safety training requirements will deter crime and reduce the risk of accidental shootings in Maryland.

Plaintiffs also have produced no evidence to support their claim in Count II that the HQL requirement's application to individuals who "receive" a handgun is void for vagueness.  On the contrary, since the inception of the HQL law, the State has consistently interpreted the term "receive" to be synonymous with "transfer," a term clearly defined under Maryland law and capable of consistent application.  Finally, plaintiffs have produced no evidence to support their claim in Count III that various aspects of the regulations implementing the HQL requirement are ultra vires under Maryland law.  For all of these reasons, the defendants are entitled to summary judgment.

## FACTUAL BACKGROUND

### Maryland's Enactment of the Firearm Safety Act of 2013 to Enhance Public Safety and Deter Crime

The Firearm Safety Act of 2013, Chapter 427 of the 2007 Laws of Maryland (the "FSA"), was a comprehensive effort to enhance public safety.  Most relevant to this case, the FSA requires that most purchasers of handguns in Maryland have a valid HQL.  In order to obtain a valid HQL, most applicants are required to submit their fingerprints for a robust background investigation and take a four-hour firearms safety training course.  These and the other HQL requirements are set forth in § 5-117.1 of the Public Safety Article, which is reproduced as Exhibit 2.

2

In legislative hearings concerning the FSA, the General Assembly heard testimony from various public policy and law enforcement experts advocating for the HQL requirements, in particular the fingerprinting and training requirements.  The Director of the Johns Hopkins Center for Gun Policy and Research, Daniel W. Webster, ScD, testified that under the State's prior regulatory regime that did not require a fingerprint background check, Maryland's "system [was] especially vulnerable to illegal straw purchases and individuals using false identification in their applications to purchase regulated firearms." (Ex. 3, Test. of Daniel W. Webster in Support of HB 294 at 1.)  Professor Webster relayed the findings of a study conducted by the United States General Accounting Office ("GAO"), concluding that background checks based on photographic identification were inadequate to "ensure that the prospective purchaser [of firearms] is not a felon."  (*Id.* (quoting U.S. GAO, GAO-01-427, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification* 2 (2001) (attached as Ex. 4).)  Professor Webster further outlined his peer-reviewed research showing the positive effects on public safety of state laws with requirements similar to Maryland's HQL law.  (Ex. 3, Webster Test. 1-4.)

The General Assembly also heard testimony from then-Baltimore County Police Chief James W. Johnson, who testified that the HQL requirement "will reduce the number of non-intentional shootings by ensuring that gun owners know how to safely use and store firearms"; "will decrease illegal gun sales and purchases by ensuring that all licensees are eligible to possess firearms under Federal and State law"; and "will reduce murder rates" as such laws have done in other states.  (Ex. 5, Test. of James W. Johnson 3 (Mar. 1, 2013).) Chief Johnson expressly advocated for the fingerprinting requirement of the HQL, which

"will help law enforcement to identify people involved in gun crimes" but not be "an inconvenience" for law-abiding Marylanders. (*Id.*)  Chief Johnson further testified that the four-hour training course would deter straw purchasers and was an improvement over the "insufficient" prior requirement that handgun purchasers view a 30-minute video.  (*Id.* at 4.)  Similarly, then-Baltimore City Police Commissioner, Anthony Batts, testified before the General Assembly that the fingerprint requirement would allow for a comprehensive background investigation, thus, "ensuring that the applicant is not prohibited from possessing a handgun" and that both the fingerprinting and training requirements would deter straw purchasers.  (Ex. 6, Test. of Anthony W. Batts 1-2 (Feb. 6, 2013).)

### The HQL Law and Implementing Regulations

Subject to certain exemptions, the HQL law provides that one person may not "sell, rent, or transfer a handgun" to a second person, and the second person may not "purchase, rent, or receive a handgun" from the first person, unless the second person presents a valid HQL.  Md. Code Ann., Pub. Safety § 5-117.1(b), (c).  Under the law, the Secretary of the Maryland Department of State Police ("MSP") must issue an HQL to an applicant who:  (i) is at least 21 years old; (ii) is a Maryland resident; (iii) has completed a firearms safety training course meeting certain criteria within three years of applying for an HQL; and (iv) based on an investigation by MSP, is not prohibited from owning a firearm.  The required firearms safety training course must include at least four hours of instruction by a qualified handgun instructor ("QHI"), including, among other elements, classroom instruction on home firearm safety and the mechanisms and operation of handguns and "a firearms

4

orientation component that demonstrates the person's safe operation and handling of a firearm." Pub. Safety § 5-117.1(d)(3).[1]  The training course requirement is waived for a person who, among other exemptions, has completed certain other training courses or already lawfully owns a "regulated firearm," Pub. Safety § 5-117.1(e), which includes a handgun, Pub. Safety § 5-101(r).

The FSA requires the Secretary of MSP to apply to the Maryland Department of Public Safety and Correctional Services ("DPSCS") for a State and national criminal history records check for each HQL applicant. Pub. Safety § 5-117.1(f)(2). The application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" DPSCS and the Federal Bureau of Investigation.  Pub. Safety § 5-117.1(f)(3)(i).  In accordance with fingerprint rules promulgated by DPSCS in 2012, HQL applicants must submit their fingerprints to DPSCS via livescan technology.[2] (Ex. 7, Decl. of Andy Johnson ¶ 23 & Decl. Ex. 5.)

If DPSCS receives criminal history information "after the date of the initial criminal history records check," it must provide that information to MSP's Licensing Division.  Pub. Safety § 5-117.1(f)(7).  This updated criminal history information enables MSP to revoke the HQLs of persons who become ineligible to possess them and, where necessary, to

---

[1]  MSP maintains a searchable database of licensed QHIs on its website, at https://emdsp.mdsp.org/verification/.

[2]  The fingerprint policy is available on MSP's website at http://mdsp.maryland.gov/Organization/Documents/NewFingerprintRules.2.pdf, and MSP provides a link to a DPSCS website listing commercial fingerprinting services, at http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Fingerprinting.aspx.

retrieve firearms from disqualified persons.  (Ex. 7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6.)

The FSA requires an applicant for an HQL to submit:  (1) "an application in the manner and format designated by the Secretary"; (2) an application fee "to cover the costs to administer the program of up to $50"; (3) proof of completion of the training requirement; (4) any other information or documentation required by the Secretary; and (5) a statement under oath that the individual is not prohibited from possessing a handgun. Pub. Safety § 5-117.1(g).  Within 30 days of receiving a complete application, the Secretary is charged with either issuing an HQL or providing a written denial accompanied by a statement of the reason for the denial and notice of appeal rights.  Pub. Safety § 5-117.1(h). All properly completed applications received by MSP are processed within the statutorily-mandated 30-day timeframe.  (Ex. 7, A. Johnson Decl. ¶ 12.)

An HQL is valid for 10 years from its issuance.  Pub. Safety § 5-117.1(i).  A person who is denied an HQL for any reason, or whose HQL is revoked for any reason, may request a hearing from the Secretary within 30 days of the denial or revocation, and thereafter may seek judicial review in State court.  Pub. Safety § 5-117.1(l)(1), (3).

The General Assembly has authorized the Secretary to adopt regulations to carry out the HQL provisions.  Pub. Safety §§ 5-105, 5-117.1(n).  Effective December 23, 2013, the MSP adopted such regulations, which appear at 29.03.01.26—.41 of the Code of Maryland Regulations ("COMAR"), attached as Exhibit 8.  The regulations further detail the statutory elements of the required training course, including aspects of State firearm law, home firearm safety, and handgun mechanisms and operation that must be covered.

6

COMAR 29.03.01.29(C).   Implementing the FSA's requirement that the training component include a demonstration of "the person's safe operation and handling of a firearm," the regulations require that the training must include "a practice component in which the applicant safely fires at least one round of live ammunition."   COMAR 29.03.01.29(C)(4).  MSP has approved the use of alternative ammunition in the form of non-lethal, marking projectiles to satisfy the live-fire requirement that do not require access to a firing range.  (*See* Ex. 7, A. Johnson Decl. ¶¶ 27-29 & Decl. Exs. 9, 10.)

In accordance with MSP's estimates of the cost to process each HQL application, the Secretary set the HQL application fee at the statutory cap of $50.   COMAR 29.03.01.28(C).   The processing and production costs associated with each HQL application exceeds $50 and does not account for other costs associated with administering the HQL program.  (Ex. 7, A. Johnson Decl. ¶¶ 15-18 & Decl. Exs. 3, 4.)

**Plaintiffs**[3]

Plaintiff Deborah Kay Miller can afford to obtain an HQL but has not taken any steps to initiate the process.  (Ex. 9, Tr. of Dep. Deborah Kay Miller 25-26, 28.)  Although she contends that a back injury would make it difficult for her to sit through the safety training, Ms. Miller has not sought an accommodation from MSP, nor has she contacted a QHI to inquire as to whether she can periodically stand during the training, as she does at work where she sits for many hours a day.  (*Id.* at 33-36.)  Ms. Miller's husband owns

---

[3] Two original plaintiffs, Ana Sliviera and Christine Bunch, voluntarily dismissed with prejudice their claims in this lawsuit.  ECF 44.

handguns that he keeps in the home and that Ms. Miller used for target shooting up through and including 2017.  (*Id.* at 15-17, 22.) Ms. Miller has not decided on what caliber or brand of handgun she wishes to purchase, a price that she is willing to spend, or done any research to determine what handgun would best serve her needs.  (*Id.* at 20-22.)

Plaintiff Susan Brancato Vizas has taken a hunter safety training class and, thus, is exempt from the HQL training requirement (ECF 14 ¶ 16), but has taken no steps to obtain an HQL (Ex. 10, Tr. of Dep. Susan Brancato Vizas 32-33).  Ms. Vizas became interested in purchasing a handgun for target practice when her daughter expressed interest in shooting rifles but does not know what type of handgun she would purchase or whether she could afford to purchase a handgun.  (*Id.* 18, 25-29, 33.)  Ms. Vizas identified only the cost of training, from which she is exempt, as a potential deterrent to obtaining an HQL but had done no research on the subject and incorrectly believed the training course was 12-hours long and required proficiency in firing.  (*Id.* at 32, 43-45.)

Plaintiff MSI is an organization of "approximately 772 members" that is "dedicated to the preservation and advancement of gun owners' rights in Maryland" and "seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public."  (ECF 14 ¶ 25.)  MSI identified only three members, aside from Ms. Miller, who purportedly have been deterred from obtaining an HQL.  (Ex. 11, MSI Answers to Interrogs. at 1-2.)  However, two have been deterred solely on the principle that they do not want to comply with the HQL requirement (Ex. 12, Tr. of Dep. Scott Miller 24; Ex. 13, Tr. of Dep. John Clark 20), and

the third had taken no steps to initiate the application process despite being able to afford it (Ex. 14, Tr. of Dep. Dana Hoffman 26-28, 32).

Plaintiff Atlantic Guns is a Maryland-based, federally-licensed firearms dealer. (ECF 14 ¶ 26.)  Despite alleging that it has lost sales due to the HQL requirement, Atlantic Guns could not provide any "factual basis" to support this allegation (Ex. 15, Tr. of Dep. Stephen Schneider 23-24) or identify a single customer who has been deterred by the HQL requirement from purchasing a handgun (*id.* at 21-22, 61-62; Ex. 16, Atlantic Guns Answers to Interrogs. at 7).

### Procedural History

Plaintiffs filed their initial complaint on October 3, 2016 (ECF 1) and an amended complaint on December 28, 2016 (ECF 14), alleging (1) that the HQL law violates the Second Amendment; (2) that the HQL law violates the Due Process Clause of the Fourteenth Amendment because of the law's reliance on private handgun instructors to provide the firearm safety training, and because the HQL law's application to individuals who "receive" a handgun is void for vagueness; and (3) that various aspects of the regulations implementing the HQL law are ultra vires under Maryland law.  The defendants moved to dismiss the complaint in its entirety on standing grounds and for failure to state a claim on which relief can be granted.  (ECF 18.)

In a memorandum opinion, this Court allowed plaintiffs discovery to prove standing, explaining that "[u]ltimately, to prevail, Plaintiffs must prove the identity of specific individuals who are personally injured or deterred by each contested aspect of the

challenged requirements in order to have standing." (ECF 34 at 16.)  As to the Second Amendment claim, resolving all inferences in favor of plaintiffs, this Court found that "Plaintiffs allege adequate facts to present a plausible claim that the HQL Provision and regulations have deprived them (or their members or customers) of the Second Amendment right to possess a handgun in the home for self-defense." (*Id.* at 20.)  With regard to the vagueness challenge, this Court found it sufficient at the motion to dismiss stage that MSI had alleged that its members were confused as to whether they could allow temporary possession of their handguns to individuals who do not possess an HQL. (*Id.* at 26.)  This Court also found that plaintiffs had sufficiently pled an ultra vires claim under Maryland law, because the sufficiency of the complaint depends solely on whether plaintiffs are "entitled to a declaration at all" and not necessarily one in their favor. (*Id.* at 29 (citation omitted).)  This Court dismissed plaintiffs' due process claim as to the law's reliance on private handgun instructors, concluding that, in addition to not being ripe, the claim was wholly speculative because plaintiffs had not alleged the deprivation of any right and the regulations did not vest QHIs with discretionary power. (*Id.* at 24-25 & n.13.)

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "facts must be viewed in the light most favorable to the non-moving party," but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A dispute about a material fact

is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE FAILED TO DEMONSTRATE STANDING TO CHALLENGE THE HQL LAW.

Plaintiffs have failed to "prove the identity of specific individuals who are personally injured or deterred by each contested aspect of the challenged requirements" (ECF 34 at 16), and, thus, have failed to establish standing to challenge the HQL law.  At the summary judgment stage, plaintiffs cannot rely on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'" to demonstrate standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing Fed. R. Civ. P. 56(e)). Plaintiffs have failed to provide any such evidence demonstrating that they have suffered a concrete injury that is fairly traceable to the HQL law. *Lujan*, 504 U.S. at 590.

11

### A.   Neither Individual Plaintiff Has Applied for an HQL or Put Forth Any Evidence that an Application Would Be Futile.

Neither of the remaining individual plaintiffs has standing to challenge the HQL requirement, because neither Ms. Vizas nor Ms. Miller has applied for an HQL and neither has identified how applying for an HQL would be futile.  *See U.S. v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (finding plaintiff did not have standing to challenge gun licensing law because he had not applied for a license); *cf. Kwong v. Bloomberg*, 876 F. Supp. 2d 246, 251 (S.D.N.Y. 2012) (holding plaintiffs had standing to challenge $340 residential handgun license fee as unconstitutional because they had paid the fee), *aff'd on other grounds*, 723 F.3d 160 (2d Cir. 2013), *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014).  "[M]inor inconveniences" associated with "additional costs and logistical hurdles" to firearm possession are insufficient to establish standing.  *Lane v. Holder*, 703 F.3d 668, 672-73 (4th Cir. 2012).

Neither Ms. Miller nor Ms. Vizas identified any financial hardship that has deterred her from obtaining an HQL.  (Ex. 9, D. Miller Dep. 20-21; Ex. 10, Vizas Dep. 43 (identifying only cost of training, from which she is exempt).)  Neither plaintiff has contacted a QHI or any fingerprint vendor to investigate or initiate the process.  (Ex. 9 at 25-26, 28; Ex. 10 at 32-33.)  And while Ms. Miller testified that a back injury would make it difficult for her to sit through a four-hour training course, she admitted that she sits for hours at work with only occasional breaks to stand and that she never contacted MSP or any QHI to request an accommodation.  (Ex. 9 at 33-36.)  Finally, both plaintiffs testified that they have an address and telephone number, a State-issued driver's license, and access

to a computer, the internet, a document scanner, and a credit or debit card (Ex. 9 at 13; Ex. 10 at 14-15), and neither plaintiff asserted that she lacked access to a livescan fingerprint vendor or a QHI. *See Heller v. District of Columbia*, 45 F. Supp. 3d 35, 71 (D.D.C. 2014) (dismissing for lack of standing a challenge to the District's requirement that a firearm registrant "not [be] blind," because none of Plaintiffs in that case was blind), *aff'd in part, rev'd in part on other grounds*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*).

**B.**   **MSI Failed to Identify Any Members Who Have Been Injured by the HQL Law, Its Members Have Conflicting Interests, and the Law Does Not Harm MSI's Mission.**

MSI cannot satisfy the elements of associational standing because it has failed to identify individual members who have suffered any injury from the HQL requirement. *See Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (setting forth associational standing requirements).  In response to an interrogatory, MSI identified only three individual members, in addition to plaintiff Deborah Miller, that it claims have been deterred from purchasing a handgun by the HQL requirement.  The undisputed facts show that none of these four has even applied for an HQL and MSI has put forth no evidence that doing so would be futile.  (*See* Ex. 10, D. Miller Dep. 20-21, 25-26, 28; Ex. 12, S. Miller Dep. 18-19, 21-24 (conducted no research to determine the cost or time required, and has not obtained an HQL because as "a matter of principle . . . I don't want to . . . waste my time and money"); Ex. 13, Clark Dep. 20, 22 (exempt from the training requirement but has not obtained an HQL because he believes requirement "to be unconstitutional");

Ex. 14, Hoffman Dep. 26, 32 (fees not a hardship but has done nothing to initiate process and unfamiliar with the HQL requirements and their associated costs).[4]

MSI has not identified any members who lack access to a shooting range, a livescan fingerprint vendor, or a QHI (*see* ECF 14 ¶ 46); nor any members for whom the approval period would be burdensome (*id.* ¶ 44); nor any members who cannot satisfy the remaining application requirements (*id.* ¶ 80(a)-(e)).   Moreover, some MSI members are qualified handgun instructors (Ex. 11, MSI Answer to Interrog. 3; Ex. 17, Tr. of Dep. Mark Pennak 39-40), and thus personally benefit from the HQL training requirement, creating "conflicting interests" among MSI members and making associational standing inappropriate.  *See Maryland Highways Contractors Ass'n, Inc.*, 933 F.2d 1246, 1253 (4th Cir. 1991) (holding association failed to meet *Hunt* test where some members benefitted from the challenged statute).

Nor has MSI established that the HQL requirement impedes its mission to preserve and advance gun owners' rights, except to vaguely assert that MSI's membership increases only so long as more individuals possess handguns.  (Ex. 17, Pennak Dep. 44-45.)  Notably, MSI has not alleged, let alone produced any evidence, that its membership has decreased as a result of the FSA. On the contrary, MSI member Scott Miller was prompted to join the organization mainly as a result of the HQL law. (Ex. 12, S. Miller Dep. 10.)

---

[4] MSI member Dana Hoffman has a sensitivity to sounds that she alleges would make it difficult to fire a handgun at a firing range, but Ms. Hoffman never contacted MSP to request an accommodation or inquire about the use of quieter alternative ammunition, and incorrectly believed she would have to fire 20 rounds of ammunition.  (Ex. 14, Hoffman Dep. 23-24, 26-28.)  Further, despite her auditory condition, Ms. Hoffman acknowledged she had attended a gun show in the fall of 2017.  (*Id.* at 21.)

### C.   Atlantic Guns Failed to Demonstrate How Its Business Suffered or How Its Customers Were Harmed Due to the HQL Law.

Unlike in *Craig v. Boren*, 429 U.S. 190 (1976), where the Supreme Court held that a vendor had standing to challenge a statute that prohibited the sale of a certain alcoholic beverage to men under the age of 21 because the vendor necessarily experienced a "constriction of her buyers' market," *id.* at 194-95, Atlantic Guns in this case is free to continue selling handguns to the same customers that it had prior to the implementation of the FSA, so long as those customers acquire an HQL.   Indeed, Atlantic Guns cannot identify a *single customer* who has been deterred from purchasing a handgun because of the HQL requirement.   (Ex. 15, Schneider Dep. 21-22, 61-62, 63-64 (customer obtained HQL and purchased handgun).)   Nor has Atlantic Guns produced any evidence linking the implementation of the HQL requirement to a decline in sales of handguns.   (*See id.* at 23-24.).[5]   Atlantic Guns has, thus, failed to create any genuine dispute that its customer base has decreased or that there is a causal link between the HQL law and any purported decline in its sales of handguns.

Defendants are entitled to summary judgment given plaintiffs' lack of standing to challenge the HQL law.

---

[5] Notably, there was a considerable spike in the sale of handguns in 2012 and 2013 after the 2012 Sandy Hook mass shooting and during the run-up to the enactment of the FSA. *See* Ex. 18, Justin George, *Gun sales spike amid talk of restrictions*, Baltimore Sun (Dec. 21, 2012) (Maryland gun sellers reporting "run on guns" including handguns after Newtown shooting); Ex. 13, Clark Dep. 16 (testifying he bought a handgun in 2013 to "beat[] the clock for all the laws that were being enacted"); Gregor Aisch & Joshua Keller, *What Happens After Calls for New Gun Restrictions? Sales Go Up*, N.Y. Times, https://www.nytimes.com/interactive/2015/12/10/us/gun-sales-terrorism-obama-restrictions.html (last updated June 13, 2016).

II.  **PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL LAW IS REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF FIREARMS VIOLENCE.**

As discussed above, plaintiffs have failed to demonstrate how they have been harmed by the HQL law.  Moreover, plaintiffs' Second Amendment challenge to the HQL law fails because substantial evidence in the summary judgment record supports the General Assembly's judgment that the law is reasonably related to advancing the State's compelling interest in public safety.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court has made clear that "reasonable firearms regulation" is permissible under the Second Amendment.  *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010).  Further, the Court has identified "presumptively lawful regulatory measures" that do not violate the Constitution, including bans on "the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms," among others.  *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26. (2008) (*Heller I*).

The United States Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing Second Amendment challenges.  *Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir.) (en banc), *cert. denied,* 138 S. Ct. 469 (2017).   Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Id.* at 133 (quotation

omitted).  If not, the challenged law is valid.  *Id.* at 133.  "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment," courts "apply[ ] an appropriate form of means-end scrutiny."  *Id.* (quotation omitted).  The level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."  *Id.* (quotation omitted).

A.    **Plaintiffs Have Failed to Create Any Issue for Trial that the HQL Law Burdens Their Second Amendment Rights, and to the Extent the HQL Law Burdens Conduct Falling Within the Scope of the Second Amendment, Intermediate Scrutiny Is the Applicable Standard of Review.**

Although the HQL law imposes conditions on individuals seeking to purchase, rent, or receive handguns, including that they pass a fingerprint-based background check and receive four hours of firearm safety training, the plaintiffs have failed to demonstrate how these requirements impose a burden on their Second Amendment-protected conduct.  The HQL law does not deprive any law-abiding person of the right to possess a handgun for in-home self-defense.  "[N]ot every law which makes a right more difficult to exercise is, *ipso facto,* an infringement of that right."  *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 873 (1992) (noting as an example that the Court has "held that not every ballot access limitation amounts to an infringement of the right to vote").

As discussed above, Atlantic Guns failed to identify even a single customer deterred from purchasing a handgun due to the HQL law, and neither the individual plaintiffs nor any MSI member has produced any evidence that she or he has been deprived of the right to purchase a handgun for in-home self-defense due to any inability to comply with the HQL law.  Rather, they simply have failed to obtain an HQL either on principle or because

17

of "minor inconveniences" associated with "costs and logistical hurdles" that are insufficient to establish injury under the Second Amendment. *Lane*, 703 F.3d at 672-73.[6] The reasonable conditions that the HQL law imposes on commercial and other transactions involving handguns, that do not impose any significant burden on the exercise of the Second Amendment right, fall within the presumptively lawful regulations identified in *Heller I*, 554 U.S. at 626-27 & n.26. Plaintiffs' Second Amendment challenge, thus, fails as a matter of law.

Even assuming that plaintiffs had adduced evidence that the HQL requirement imposes a burden on their Second Amendment rights that is distinct from the logistical burdens associated with any regulation governing firearms transactions, their claims would still fail. Intermediate scrutiny would be the appropriate test because the HQL requirement "does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding responsible citizens to use arms for self-defense in the home." *Kolbe*, 849 F.3d at 138. The challenged provisions "'do[] not severely limit the possession of firearms' . . . [and] none of the [statutory or regulatory] requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose.'" *Heller v. District of Columbia*, 670 F.3d 1244, 1257-58 (D.C. Cir. 2011) (*Heller II*) (holding intermediate scrutiny was the appropriate standard of review to apply to the District's firearm registration law, which includes fingerprint and firearm

---

[6] Although Ms. Miller and Ms. Hoffman both claimed that injuries would make it difficult to comply with the training requirement, notably neither of them had done any research to determine whether their disability would actually prevent them from fulfilling the HQL requirements or sought any accommodation from MSP or a qualified handgun instructor.

18

safety training requirements (citation omitted)); *see also Kwong v. Bloomberg*, 723 F.3d at 167-68 (explaining that "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right" and holding that New York's $350 firearm licensing fee "easily survives 'intermediate scrutiny'"); *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835, 845 (N.D. Ill. 2011) (applying a form of intermediate scrutiny to registration requirement that was "merely regulatory" and, thus, "[did] not place a categorical limit on [the plaintiff's] possession of firearms").

"The less onerous standard of intermediate scrutiny requires the government to show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011)). Intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Id.* (quoting *Masciandaro*, 638 F.3d at 474). "In other words, there must be 'a fit that is 'reasonable, not perfect.'" *Id.* (quoting *Woollard v. Gallagher*, 712 F.3d 865, 878 (4th Cir. 2013)).

To meet its burden, the State may "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). A court's role is not to determine whether the legislature made the correct policy decision; rather, it is "to ensure that the legislature's policy choice substantially serves a significant governmental interest." *Woollard*, 712 F.3d at 881. As the Fourth Circuit

19

recently explained, "[t]he judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court." *Kolbe*, 849 F.3d at 140.   "That is, '[i]t is the legislature's job, not [the courts'], to weigh conflicting evidence and make policy judgments.'"  *Id.* (quoting *Woollard*, 712 F.3d at 881 (citation omitted)).  This Court's "obligation is simply 'to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."  *Kolbe*, 849 F.3d at 140 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)).  And in conducting this analysis, this Court "must 'accord substantial deference to the predictive judgments of [the legislature].'"  *Kolbe*, 849 F.3d at 140 (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001) (quoting *Turner*, 512 U.S. at 666)).

### B.   The HQL Law Satisfies Intermediate Scrutiny Because It Is Reasonably Adapted to a Substantial Governmental Interest.

The HQL law easily satisfies the first prong of the intermediate scrutiny analysis, because as the Fourth Circuit has recognized in rejecting a challenge to other provisions enacted under the FSA, "Maryland's interest in the protection of its citizenry and the public safety is not only substantial, but compelling."  *Kolbe*, 849 F.3d at 139.

Under the second prong, expert testimony, empirical evidence, case law, and common sense all demonstrate that the HQL law's fingerprint-based background check and firearm safety training provisions are "reasonably adapted" to these interests.   In support of its motion for summary judgment, Maryland submits the declarations of (1) Daniel W. Webster, ScD, the Director of the Johns Hopkins Center for Gun Policy and

Research and a leading expert in the academic study of the effects of firearms laws on public safety (Ex. 19, Daniel W. Webster Decl. ¶¶ 1, 4-5); (2) Captain James P. Russell of MSP, an active member of law enforcement for over 20 years and a firearms safety trainer for 13 years (Ex. 20, James Russell Decl. ¶¶ 1-2, 3-4, 6-10); and (3) James W. Johnson, former Chief of the Baltimore County Police Department with nearly 40 years of law enforcement experience and a former Chairman of the National Law Enforcement Partnership to Prevent Gun Violence (Ex. 21, James W. Johnson Decl. ¶¶ 2, 4).

### 1. The Fingerprint and Background Investigation Provisions of the HQL Law Are Constitutional.

Maryland's requirement that HQL applicants submit a set of fingerprints serves three critical public safety functions.  First, the fingerprint requirement enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information.  (Ex. 7, A. Johnson Decl. ¶ 20; Ex. 3, Webster Test. 1; Ex. 21, J. Johnson Decl. ¶ 8.)  This enhanced identification requirement makes it more difficult for a prohibited person to obtain access to a firearm.  (Ex. 19, Webster Decl. ¶ 9; Ex. 21, J. Johnson Decl. ¶¶ 8-9); *see also Heller III*, 801 F.3d at 276-77 (holding the District could reasonably conclude that its fingerprint requirement would "advance public safety by preventing at least some ineligible individuals from obtaining weapons").  Robust background checks based on proper identification of an applicant animate the State's policy of keeping firearms out of the possession of felons, a "presumptively lawful" and longstanding firearms restriction.  *Heller I*, 554 U.S. at 626-27 & n.26.

The State's interest is particularly acute when it comes to keeping handguns out of the hands of criminals.  Handguns are the firearms most frequently used by criminals in Maryland.  *Woollard*, 712 F.3d at 877.  According to data collected by the FBI, there were 430 murders in Maryland in 2016, 328 of which involved a firearm.  Of those 328, 309 involved handguns.  Federal Bureau of Investigation, 2016 Crime in the United States, Table 12, Murder by State, Types of Weapons, 2016, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/tables/table-12 (last visited August 2, 2018).  Thus, murders with handguns comprised nearly 95% of murders with firearms and more than 71% of all murders in Maryland.  *Id.*

Although handgun purchasers must undergo a background check prior to purchase, that background check is based only on state-issued identification, not fingerprints.  Pub. Safety § 5-118(b).  Thus, prior to the HQL requirement, Maryland lacked sufficient tools to ensure that prohibited persons were not prevented from obtaining handguns.  (Ex. 3, Webster Test. 1.)  The General Assembly heard testimony from Professor Webster about the GAO investigation in which undercover agents using counterfeit driver's licenses succeeded, without exception, in purchasing firearms from federally-licensed firearms dealers in five states.  (*Id.*)  The GAO report concluded that federal background checks conducted by the firearm dealers without fingerprinting "cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful."   (Ex. 4 at 2.)  The D.C. Circuit relied on this report to credit the District's evidence demonstrating that "background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more

susceptible to fraud." *Heller III*, 801 F.3d at 276.  This Court should credit Maryland's evidence showing the same.

Second, the fingerprint requirement, although not an inconvenience for Marylanders generally (Ex. 5, J. Johnson Test. 3), acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes.  (Ex. 19, Webster Decl. ¶ 8; Ex. 21, J. Johnson Decl. ¶¶ 8-9, 11.)  Empirical studies of the effects of laws that require individuals to obtain a license to purchase a firearm and pass a background check based on fingerprints have found that these laws are associated with a reduction in the flow of guns to criminals.  (Ex. 19, Webster Decl. ¶¶ 8-9, 13-15, 18-20 & Decl. Exs. 2 at 6-14; 3-8). Permit-to-purchase laws, like Maryland's HQL law, are associated with a statistically significant 11 percent reduction in firearm homicide rates.  (Ex 19 ¶ 17 & Decl. Ex. 7.)  In Maryland, the FSA's HQL requirement is estimated to have led to drastically reduced firearm homicide rates in large urban counties, with the exception of Baltimore City where homicide rates increased after the death of Freddie Gray in 2015 and the ensuing unrest. (Ex. 19 ¶ 17.)[7]  Further, the HQL requirement has been shown to be associated with a significant reduction in the number of handguns that have been diverted to criminals in Baltimore soon after retail purchase.  (Ex. 19 ¶ 18 & Decl. Ex. 8.)  A recent study showed

---

[7] The well-documented riots and civic unrest in Baltimore City in late April and May 2015 following the in-custody death of Freddie Gray, occurred 18 months after the HQL requirement went into effect in October 2013.  According to Professor Webster, "[i]t is commonly known and well-documented that dramatic civil unrest prompted by actions taken by police are often followed by sharp increases in violent crime" that have been "attributed to 'de-policing' and to a crisis in the legitimacy of law enforcement in alienated minority communities where gun violence is concentrated."  (Ex. 19, Webster Decl. Ex. 2 at 16.)

that a significant percentage of surveyed criminals in Baltimore believe that the FSA has made it more difficult for criminals to obtain handguns.  (Ex. 19 ¶ 19 & Decl. Ex. 8.)  This evidence strongly supports the legislature's predictive judgment that the HQL requirement would reduce straw purchases and other diversion of guns to criminals.

A study of Connecticut's law—which includes requirements for enhanced background checks with fingerprints and completion of an approved handgun safety course, Conn. Gen. Stat. § 29-36(f), (g)—similarly found that the licensing requirement to purchase a firearm was associated with a statistically significant reduction in Connecticut's firearm homicide rates during the first decade that the law was in place, with no similar reduction in non-firearm homicides.  (Ex. 19 ¶ 14 & Decl. Ex. 4.)  Also supportive is the experience of Missouri, which went in the opposite direction after it repealed its handgun licensing requirement.  After repeal, firearm-related homicide rates increased abruptly, with no similar increase in surrounding states or the nation, and the state experienced an increase in the percentage of crime guns recovered by police that had been originally sold by in-state retailers.  (Ex. 19 ¶ 15 & Decl. Ex. 5.)  Studies of Missouri's and Connecticut's experiences also have found the presence of firearm licensing laws to be associated with lower rates of firearm-related suicides.  (Ex. 19 ¶ 16 & Decl. Ex. 6.)

Third, unlike with a background check based solely on photographic identification, a fingerprint record can be used to identify if a holder of an HQL is convicted of a disqualifying offense subsequent to passing the initial background investigation.  That identification enables MSP to revoke the disqualified person's HQL and, where necessary, retrieve unlawfully possessed firearms.  (Ex. 7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6.)

24

This aspect of the HQL requirement promotes public safety by enhancing the State's ability to identify and disarm individuals who are not eligible to possess firearms.  (Ex. 19, Webster Decl. ¶ 10 & Decl. Ex. 2 at 5; Ex. 22, Tr. of Dep. Gary Kleck 49 (plaintiffs' expert agreeing that this advantage of the fingerprint requirement benefits public safety).)

As described above, the summary judgment record provides "substantial evidence" to support the General Assembly's "reasonable inferences" that the HQL fingerprint requirement enhances public safety.  *Kolbe*, 849 F.3d at 140.

### 2.    The Firearm Safety Training Provision of the HQL Law Is Constitutional.

Empirical evidence, expert testimony, case law, and common sense also support the General Assembly's conclusion that requiring HQL applicants to receive four hours of firearms safety training promotes public safety.  Handguns are necessarily and purposely dangerous, and requiring minimal training in how to avoid unintended harm from their ownership easily satisfies intermediate scrutiny.  *See Heller III*, 801 F.3d at 278-79 (holding District's mandatory firearms safety training was constitutional based on the District's presentation of "substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms").  The regulatory requirement that applicants demonstrate the baseline competency to safely fire a single live round of ammunition likewise is reasonably adapted to the State's substantial interest in promoting firearm safety.

Empirical evidence demonstrates that training on the proper storage of firearms reduces the likelihood that a member of a household who is not eligible to possess a firearm

will gain access to one, which is particularly critical because the majority of school shootings are committed by minors with guns brought from their homes. (Ex. 19, Webster Decl. ¶ 11 & Decl. Ex. 2 at 5; *see also* Ex. 21, J. Johnson Decl. ¶ 15 (describing such incidents in Maryland).) Surveys of gun owners show that unsafe gun storage is common, but that gun owners who complete firearms safety training are more likely to store their guns locked and unloaded. (Ex. 19 ¶ 11 & Decl. Ex. 2 at 5.) Further, requiring that applicants receive four hours of firearm safety training may deter straw purchasers who, unlike law-abiding citizens seeking to possess handguns for in-home self-defense, are seeking only to engage in illegal transactions. (Ex. 19 ¶ 9 & Decl. Ex. 2 at 4.)

Further, based on their extensive law enforcement and firearms safety training experience, both Captain Russell and former Chief Johnson conclude that the HQL firearms safety training contemplated by § 5-117.1 encourages responsible gun ownership and has numerous public safety benefits. (Ex. 20, Russell Decl. ¶ 13; Ex. 21, J. Johnson Decl. ¶ 10.) Together, Captain Russell and former Chief Johnson have over 60 years of combined law enforcement experience. Based on this experience, they have concluded that the HQL firearms safety training contemplated by § 5-117.1 enhances knowledge of and compliance with State laws that are designed to promote public safety and reduce access of firearms to children and persons who are prohibited by law from possessing firearms (Ex. 20 ¶ 17; Ex. 21 ¶¶ 11, 15); promotes safe handling and operation of firearms, which reduces the risk of accidental discharges and, thus, the risk of potentially fatal accidents (Ex. 20 ¶ 19; Ex. 21 ¶ 14); reduces the likelihood of theft, thus, reducing access of firearms to criminals and reducing the risk of injury or death by gunshot (Ex. 20 ¶¶ 18;

26

21; Ex. 21 ¶ 15); and enhances effective law enforcement by reducing access of firearms to prohibited persons (Ex. 20 ¶ 21; Ex. 21 ¶ 12).  Further, these law enforcement experts conclude that the requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, promotes public safety by reducing accidental discharges. (Ex. 20 ¶ 20; Ex. 21 ¶ 14.)

Captain Russell and former Chief Johnson also both conclude that the four-hour classroom training contemplated by § 5-117.1 is superior to the former training by which handgun purchasers had to watch an instructional video.  (Ex. 20 ¶¶ 22-23, 26; Ex. 21 ¶ 17.) They both have concluded that watching a video is not sufficient training on the safe handling and operation of a handgun, and that the addition of the requirement that applicants safely fire one round of live ammunition improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon.  (Ex. 20 ¶¶ 24, 25; Ex. 21 ¶¶ 17-18.)

Common sense further supports the State's judgment in enacting the firearm safety training requirement.   In Maryland, law enforcement officers are required to receive extensive training on the operation, handling, and storage of handguns, including in the home.  *See* COMAR 12.04.02.03—.05; 12.04.02.03.10(D).  These longstanding training requirements strongly support the utility of the relatively brief, four hours of training that civilian handgun purchasers must receive.  *See Heller III*, 801 F.3d at 279 & n.3 (relying on "anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional

consensus in favor of safety training").  Given the popularity of handguns for in-home self-defense, *see Heller I*, 554 U.S. at 628, and the potential dangers that arise when handguns are improperly stored or handled in the home, Maryland's requirement of a four-hour training course is reasonably adapted to the State's goal of reducing firearm-related deaths.

The summary judgment record provides "substantial evidence" to support the General Assembly's "reasonable inferences" that requiring a four-hour firearm safety training course with "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm," Pub. Safety § 5-117.1(d)(3), enhances public safety. *Kolbe*, 849 F.3d at 140.

### 3.    The Costs Associated with the HQL Law and the Application Period Are Constitutional.

As set forth above, Maryland's HQL law is constitutional.  Because "reasonable fees associated with the constitutional requirements" of firearm licensing "are also constitutional," plaintiffs' challenge to the $50 application fee to cover the costs of administering the HQL program also fails.  *Heller III*, 801 F.3d at 278 (finding registration fees of $13 per firearm and $35 for fingerprinting were constitutional); *see also Kwong*, 723 F.3d at 165-67 (approving $350 licensing fee); *Justice*, 827 F. Supp. 2d at 842 (approving $25 application fee).  Just as in the First Amendment context, the State may impose licensing fees when the fees are designed "to meet the expense incident to the administration" of the licensing statute.  *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (citation omitted) (upholding parade licensing statute that imposed a sliding fee); *see also Center for Auto Safety Inc. v. Athey*, 37 F.3d 139, 145 (4th Cir. 1994) (holding that

charitable registration fees furthered legitimate government purpose in "enabl[ing] the state to prevent fraud by charities soliciting funds in Maryland"). Here, the statute limits the allowable fee only to the amount "to cover the costs to administer the program," Pub. Safety, § 5-117.1(g)(2), and the record demonstrates that the costs to administer the program actually exceed $50 per application. (Ex. 7, A. Johnson Decl. ¶¶ 15-18.)

Similarly, because the fingerprinting and training provisions are constitutional, the "additional requirement" that applicants bear the cost of complying with them "is but a corollary necessary to implement those requirements" and, thus, also constitutional. *Heller III*, 801 F.3d at 277. Nothing in *Heller I* or *McDonald* suggests that presumptively lawful regulations on the commercial sale of firearms or a state's enactment of reasonable regulation to protect public safety cannot impose some costs on consumers of firearms. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it." *Casey*, 505 U.S. at 874. Moreover, plaintiffs have produced no evidence that these costs have deterred them, their members, or their customers.

Finally, plaintiffs challenge the length of time it takes for the State to issue the HQL after an application is submitted, which is statutorily capped at 30 days. Pub. Safety § 5-117.1(h)(1). The record demonstrates that all properly completed HQL applications are acted upon within 30 days of submission, and in the first quarter of 2018, no completed applications took longer than 15 days to process. (Ex. 7, A. Johnson Decl. ¶¶ 12-13 & Decl. Ex. 1.) Notably, the 30-day statutory limit is significantly shorter than the time limit

adopted in some other states.  *See, e.g.*, N.Y. Penal Law § 400.00(4-a) (providing for a six-month application period); Conn. Gen. Stat. § 29-36g(b)(2) (90-day period).

For all of these reasons, defendants are entitled to summary judgment on Count 1 of the Amended Complaint.

## III.   PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE THE WORDS "RECEIVE" AND "RECEIPT" ARE NOT VAGUE.

Plaintiffs similarly have failed to create any issue for trial that the statutory terms "receipt" and "receive" are void for vagueness, and, thus, defendants are entitled to summary judgment on Count II.  Although due process requires that a statute's prohibitions be "clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 107 (1972), "[a] statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds," *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (citation omitted).  Here, plaintiffs mistakenly alleged that MSI members who seek to *temporarily* handle a handgun at home or at a shooting range are exposed to the threat of arbitrary prosecution due to the ambiguous meaning of "receive" and "receipt."  (*See* ECF 34 at 25.)  That allegation is belied, however, by the law's use of "transfer" and "receive" as the flip sides of the same transaction, *see* Pub. Safety §§ 5-117.1(b), (c) (providing that one person may not "sell, rent, or transfer a handgun" to a second person, and the second person may not "purchase, rent, or receive a handgun" from the first person, unless the second person presents a valid HQL), given that "transfer" has been defined by the Court of Appeals of Maryland as a "*permanent* gratuitous exchange of title or possession," *Chow v. State*, 393 Md. 431, 455 (2006) (emphasis in original).

30

Moreover, the summary judgment record makes clear that even prior to the enactment of the FSA, the State had interpreted the terms "receive" and "receipt" in § 5-117.1 to be synonymous with "transfer," i.e., a "*permanent* gratuitous exchange," *Chow*, 393 Md. at 455 (emphasis in original). That is how the Office of the Attorney General interpreted the terms in March 2013 (Ex. 7, A. Johnson Decl. Ex. 8); how MSP has consistently interpreted the terms as set forth in a formal Advisory HQL-17-003 (Ex. 7, A. Johnson Decl. ¶¶ 25-26 & Decl. Ex. 7); and how the State has consistently interpreted the terms in this litigation (ECF 18-1 at 26-30). The Court of Appeals' ruling in *Chow* along with the consistent interpretation of the terms by the Attorney General of Maryland and MSP contradict plaintiffs' mere allegations about the ambiguity of the terms' application to the temporary possession of a handgun by non-licensees. *See Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (explaining that federal courts "must 'consider any limiting construction that a state court or enforcement agency has proffered'" before finding a statute's terms vague (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1983)); *see also Kolbe*, 849 F.3d at 148-49 (relying on interpretations of the Office of the Attorney General and MSP to find terms in the FSA were not void for vagueness).

The only evidence produced by plaintiffs to support their vagueness challenge is the testimony of Ms. Miller, who testified that after reading the FSA, she believed that using her husband's handguns to defend herself in her home would subject her to prosecution for illegally receiving a handgun. (Ex. 9, D. Miller Dep. 19, 38.) Notably, however, Ms. Miller testified that she repeatedly used her husband's handguns for target practice at

a nearby firing range without fear of prosecution up through and including 2017 (*id.* at 14-15, 22, 44), *after this lawsuit was filed* (ECF 1).  Her self-serving testimony that although she has used her husband's handguns for target practice without any threat of prosecution for years after the FSA was enacted, but that she is confused as to whether she can use those same handguns to defend herself in her home, do not create a genuine issue for trial.  Nor does Ms. Miller's alleged confusion even after being shown Advisory HQL-17-003 (*id.* at 39-40) defeat summary judgment.  It simply is not "a reasonable interpretation" of the FSA, *Smith v. State*, 425 Md. 292, 299 (2012), to be concerned that using her husband's handguns to defend herself during a home invasion constitutes a "permanent gratuitous exchange."  It is a "well-established canon[] of statutory construction" that "a statute must be given 'a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.'"  *Smith*, 425 Md. at 299 (citation omitted).

Moreover, as the Fourth Circuit has made clear, "the vagueness inquiry . . . focuses on the intractability of identifying the applicable legal standard, not on the difficulty of ascertaining the relevant facts in close cases," *Kolbe*, 849 F.3d at 149.  Indeed, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  *U.S. v. Williams*, 553 U.S. 285, 306-07 (2008).  Here, the "incriminating fact" is not characterized by "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* On the contrary, the Attorney General's and MSP's interpretation of "receive" and "receipt" as a "permanent gratuitous exchange" is capable of objective fact-finding into a person's conduct, motives and beliefs.

*See Williams*, 553 U.S. at 306-07 (holding that a statute's requirement "that the defendant hold, and make a statement that reflects, the belief that . . . material is child pornography; or that he communicate in a manner intended to cause another so to believe" are "clear questions of fact" that require a "true-or-false determination, not a subjective judgment"). As a matter of law, the challenged statutory terms are not vague, and defendants are entitled to summary judgment on Count II.

## IV.   THERE IS NO GENUINE ISSUE FOR TRIAL TO SUPPORT PLAINTIFFS' CLAIM THAT THE SECRETARY ACTED ULTRA VIRES IN PROMULGATING ANY OF THE CHALLENGED REGULATIONS.

In Count III, plaintiffs allege a violation of Maryland law through MSP's adoption of implementing regulations and application requirements.  Defendants are entitled to summary judgment on Count III because plaintiffs have failed to identify any aspect of the challenged regulatory action that contradicts the language or purpose of the FSA.  On the contrary, the FSA expressly authorizes the Secretary broad discretion to "adopt regulations to carry out the provisions of this section."  Pub. Safety § 5-117.1(n); *see also* Pub. Safety § 5-105 (requiring the Secretary to adopt regulations "to carry out this subtitle").

When assessing whether regulatory action is "consistent with the letter and the spirit of the law under which the agency acts," courts accord substantial deference to the action, with their review "'limited to assessing whether the agency was acting within its legal boundaries.'"  *Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1, 20-21 (2003) (citation omitted).  Thus, Maryland courts have "upheld [an] agency's rules and regulations as long as they did not contradict the language or purpose of the statute."  *Id.*

Plaintiffs complain that MSP "has *chosen* not to" provide background check and fingerprinting services, even though it is not precluded from doing so.  (ECF 14 ¶ 78 (emphasis added).)  Plaintiffs, thus, implicitly concede that nothing in the FSA *requires* MSP to offer these services.  Plaintiffs also challenge MSP's decision not to provide firearm safety training and to require training by a private State-certified instructor (ECF 14 ¶ 80(f)); however, the FSA does not require MSP to provide the training and instead imposes the requirement that the training be provided by a QHI.  Pub. Safety § 5-117.1(d)(3)(i).  The regulation is not in contradiction with the statutory directive.  *See* COMAR 29.03.01.29(C).  Plaintiffs also make the conclusory allegation that the Secretary has "refus[ed] or fail[ed]" to approve alternative firearms training courses (ECF 14 ¶ 81), but have produced no evidence to support this claim.  Moreover, the FSA clearly grants the Secretary the authority to approve alternative firearm trainings courses, and there is no evidence that the Secretary has contradicted the terms of the statute.

Plaintiffs challenge to the regulatory requirement of "a practice component in which the applicant safely fires at least one round of live ammunition," COMAR 29.03.01.29(C)(4), also must fail, because there is no plausible reading of the FSA's requirement that an applicant "demonstrate[] the . . . safe *operation* . . . of a firearm," Pub. Safety § 5-117.1(d)(3)(iii) (emphasis added), that is contradicted by the regulation's practice component.  And plaintiffs' contention that the General Assembly intended the costs of firearm safety training to be covered as part of the "application fee to cover the costs to administer the program," Pub. Safety, § 5-117.1(g)(2), is likewise without merit, because an individual's training costs are not "costs to administer the [HQL] program."

Finally, plaintiffs challenge various aspects of the application set forth by regulation—including the electronic format, submission of fingerprints via livescan, payment by credit or debit card, and request for information such as address and telephone number (ECF 14 ¶ 80(a)-(e))—none of which is inconsistent with the FSA, given the express grant of discretion to the Secretary to adopt these regulations.  *See* Pub. Safety § 5-117.1(g)(1), (4) (requiring submission of "an application in the manner and format designated by the Secretary," and the submission of "any other identifying information or documentation required by the Secretary").

For all of these reasons, the defendants are entitled to summary judgment on Count III, and this Court should declare that all of the challenged regulations are valid.

## CONCLUSION

For the reasons set forth above, the defendants are entitled to summary judgment on all counts in the Amended Complaint.

Respectfully Submitted,

BRIAN E. FROSH
Attorney General

  /s/ Jennifer L. Katz
JENNIFER L. KATZ (Fed. Bar #28973)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.); 410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: August 17, 2018                    Attorneys for Defendants

35

**TABLE OF EXHIBITS TO DEFENDANTS' MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Exhibit No.   Title

1.     Intentionally left blank

2.     Md. Code Ann., Pub. Safety § 5-117.1

3.     Testimony of Daniel W. Webster in Support of H.B. 294

4.     U.S. General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification*, GAO–01–427 (2001)

5.     Testimony of James W. Johnson (Mar. 1, 2013)

6.     Testimony of Anthony W. Batts (Feb. 6, 2013)

7.     Declaration of Captain Andy Johnson

8.     Code of Maryland Regulations (COMAR) 29.03.01.26—.41

9.     Excerpts of deposition transcript of Deborah Kay Miller

10.    Excerpts of deposition transcript of Susan Brancato Vizas

11.    Maryland Shall Issue, Inc., Answers to Interrogatories

12.    Excerpts of deposition transcript of Scott Miller

13.    Excerpts of deposition transcript of John Clark

14.    Excerpts of deposition transcript of Dana Hoffman

15.    Excerpts of deposition transcript of Stephen Schneider, designee of Atlantic Guns

16.    Atlantic Guns, Inc., Answers to Interrogatories

17.    Excerpts of deposition transcript of Mark Pennak, designee of MSI

18.    Justin George, *Gun sales spike amid talk of restrictions*, Baltimore Sun (Dec. 21, 2012)

19.    Declaration of Daniel W. Webster, ScD

20.    Declaration of Captain James Russell

21.    Declaration of James W. Johnson

22.    Excerpts of deposition transcript of Gary Kleck

23.    Declaration of Angela Maggitti