# EXHIBIT 9

```
1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3    - - - - - - - - - - - x

4   MARYLAND SHALL ISSUE,    :

5   INC., et al.,            :

6            Plaintiffs,     :   Civil Action No.

7      v.                    :   16-cv-3311-MJG

8   LAWRENCE HOGAN, et       :

9   al.,                     :

10           Defendants.     :

11   - - - - - - - - - - - x

12

13           CONFIDENTIAL INFORMATION REDACTED

14           Deposition of DEBORAH KAY MILLER

15                Baltimore, Maryland

16              Tuesday, February 27, 2018

17                     1:27 p.m.

18

19

20    Job No.:  178304

21    Pages:  1 - 47

22    Reported By:  Sandra A. Slater, RPR, CSR
```

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    13

```
1        Q  So it's just you and your husband at the
2   house; is that correct?
3        A  Correct.
4        Q  And do you have a computer in the house?
5        A  Yes.
6        Q  Do you have internet access?
7        A  Yes.
8        Q  Do you have a credit or debit card?
9        A  Yes.
10       Q  Do you have a Maryland driver's license or
11  Maryland State ID?
12       A  Yes.
13       Q  Do you have access to a scanner?
14       A  Yes.
15       Q  Do you own any firearms?
16       A  No, I do not.
17       Q  Have you ever owned any firearms?
18       A  No.
19       Q  Have you ever rented any firearms?
20       A  No.
21       Q  Have you ever fired a handgun?
22       A  Yes.
```

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    14

1        Q   When was the first time you did that?

2        A   I don't remember the date.

3        Q   Approximate year?

4        A   A few years ago.

5        Q   More than 10?

6        A   No.

7        Q   So within the last 10 years was the first

8    time you fired a handgun?

9        A   Yes.

10       Q   And how many times, how many instances

11   have there been where you have fired a handgun?

12       A   Just a few times.

13       Q   Have you ever gone to a shooting range?

14       A   Yes.

15       Q   When was the first time you did that?

16       A   I don't remember the date.

17       Q   Was it within the last 10 years?

18       A   Yes.

19       Q   How many times would you estimate you've

20   been to a shooting range?

21       A   I don't know exactly.  I can just

22   approximate.  Five or six times.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                              15

1        Q   When was the most recent time to the best
2    of your recollection?
3        A   To the best of my recollection, about a
4    year ago.
5        Q   Have you always been to the same firing
6    range or have you gone to more than one?
7        A   No, I've been to different ones.
8        Q   All of them in Maryland?
9        A   I went to one in Virginia also.
10       Q   And when you go to the shooting range have
11   you gone by yourself or have you gone with other
12   people?
13       A   No, gone with other people.
14       Q   Who do you typically go with?
15       A   With my husband.
16       Q   Does he go to the firing range more often
17   than you?
18       A   Yes.
19       Q   How often would you say he goes?
20       A   It depends on his work schedule.
21       Q   More than once a week?
22       A   Maybe every few months.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    16

1        Q   When you've been to the shooting range

2    have you fired handguns or long guns or both?

3        A   Handguns.

4        Q   Have you ever fired a handgun outside of a

5    shooting range?

6        A   No.

7        Q   Have you ever taken any firearm safety

8    training?

9        A   No, I have not.

10       Q   Does your husband own any firearms?

11       A   Yes.

12       Q   How many?

13       A   I don't know the exact number.

14       Q   More than five?

15       A   I don't know.

16       Q   More than 10?

17           MR. HANSEL:  Don't guess, just if you

18   know.

19       A   I don't know.

20       Q   Does he own handguns, long guns or both?

21       A   Both.

22       Q   Do you know if he has a Maryland Handgun

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    17

1   Qualification License?

2        A   Yes, he does.

3        Q   How are the guns stored in the home?

4            MR. HANSEL:  If you know.

5            THE WITNESS:  Oh.

6            MR. HANSEL:  I just said if you know.

7   Sorry.

8            THE WITNESS:  I heard you say something.

9        Q   That goes for every question I'm asking by

10  the way.  I'm only asking you what you know.

11       A   So they are locked.

12       Q   Where are they locked?

13       A   In a lock box.

14       Q   In the Complaint that's filed in this case

15  which is -- I'll show it to you, it's been

16  previously marked.  Before I get to that -- the

17  notice for your deposition is marked as Exhibit 14

18  and there's a copy of it there for you to see if

19  you need to, but I want to ask you about what was

20  previously marked as Exhibit 2 in Ms. Vizas'

21  deposition, and that's a copy of the Amended

22  Complaint filed in this case.  And I have some

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    18

1    questions about some of the allegations in here.

2    Have you seen this before, Exhibit 14?  Excuse me,

3    Exhibit 2?

4        A  Yes.

5        Q  On page 3, paragraph 12, there's an

6    allegation that says that you would like to

7    purchase a handgun for self defense, target

8    practice and other lawful purposes.  Do you see

9    that?

10       A  Yes.

11       Q  Is that true?

12       A  That is true.

13       Q  When did you decide that you wanted to

14   purchase a handgun?

15       A  It was last year.

16       Q  2017?

17       A  Um-hum.

18       Q  Is that yes?

19       A  Yes.

20       Q  And what prompted that decision, if

21   anything?

22       A  Because I wanted to be able to defend

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                              19

1    myself in my home.

2        Q   All right.  Your husband already has guns

3    in the house, correct?

4        A   Yes.

5        Q   Why did you feel you needed to have one

6    for yourself?

7        A   Because of the new law, I was concerned

8    that if I used his gun it would be considered

9    receiving the handgun and that I could be

10   prosecuted.

11       Q   And how did you find out about that part

12   of the law?

13       MR. HANSEL:  Objection.  Give me a second

14   to think about that.  Go ahead.  I stated an

15   objection but you can answer.

16       A   Oh.  I read the law.

17       Q   Did you talk to anybody about the law?

18       A   No, I read it for myself.

19       Q   And you became concerned that the law

20   would not permit you to take possession of a

21   handgun that belonged to your husband?

22       A   Yes, it was unclear.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    20

1      Q   The allegation in the Complaint says that

2   you would like to purchase a handgun for self

3   defense, which you've just testified to.  What

4   about target practice; is that correct, you also

5   want to use it for target practice?

6      A   Yes.

7      Q   And then it says other lawful purposes.

8   What are those?

9      A   For anything that the law would allow for.

10     Q   Can you think of anything specifically

11  sitting here right now other than target practice

12  and self defense that you would like to use it

13  for?

14     A   No, nothing specifically.

15     Q   What type of handgun do you want to

16  purchase?

17     A   Something small that would fit in my hand.

18     Q   What type of -- what brand, do you know?

19     A   I haven't decided on a brand.

20     Q   What about caliber, have you decided on

21  the caliber?

22     A   No, I have not.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    21

1        Q   Have you ever shopped for handguns?

2        A   I've looked at them, but that's about it.

3        Q   Have you looked at them at a gun store or

4    on the internet?

5        A   At a gun store.

6        Q   Which gun store?

7        A   I don't remember the name of it.

8        Q   When did you visit the gun store to look

9    at the handguns?

10       A   It was about a year ago.

11       Q   And how much were you planning to spend on

12   this handgun?

13       A   I don't know.  I hadn't thought about the

14   price.

15       Q   You have the financial wherewithal to

16   purchase a handgun?

17       A   Yes.

18       Q   Have you thought about a price range that

19   you're willing to spend?

20       A   No, I have not.

21       Q   Have you done any research to determine

22   what type of handgun would best suit your needs?

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    22

1        A   No.

2        Q   What features do you believe a handgun

3   should have to best suit your needs?

4        A   Just that it be small and not too heavy.

5        Q   What type of handguns have you fired when

6   you've gone to the range?

7        A   A Beretta.

8        Q   Do you know what caliber that is?

9        A   I don't.

10       Q   Is that the only handgun that you've fired

11   at a range?

12       A   Yes.

13       Q   Does that belong to your husband?

14       A   Yes.

15       Q   How did you learn that you needed a

16   Handgun Qualification License to purchase a

17   handgun in Maryland?

18       A   I read the law.

19       Q   And how did the law come to your

20   attention?

21       A   I heard about it on the news.

22       Q   So that would have been what, 2013 that

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                         23

1  you learned about the law or was it at some other

2  time?

3      A  It was some other time.

4      Q  Before 2013?

5      A  It was after 2013.

6      Q  Do you remember the year?

7      A  About a year ago.

8      Q  2017?

9      A  Um-hum.

10     Q  Is that yes?

11     A  Yes.

12     Q  What is your understanding of what you

13  would need to do to obtain a Handgun Qualification

14  License?

15     A  I would need to take the training.  I

16  would need to be fingerprinted.

17     Q  Anything else?

18     A  Not to my recollection.  I don't have my

19  notes in front of me.

20     Q  And what is your source of that

21  understanding?  How did you come to the

22  understanding that you would need to take training

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    24

1    and become fingerprinted in order to get an HQL?

2        A   I read the law that had the requirements.

3        Q   Where did you access the law?

4        A   On the computer.

5        Q   On the internet?

6        A   On the internet.

7        Q   What is your understanding of how much it

8    would cost to obtain -- it would cost you to

9    obtain an HQL?

10       A   I understand it would be several hundred

11   dollars with all the different fees.

12       Q   What specific fees exist for the HQL that

13   you would have to pay?

14       A   The fees for the training, the fees for

15   the fingerprinting.

16       Q   How much is the fees for the training?

17       A   I don't know exactly.

18       Q   How much is the fee for the

19   fingerprinting?

20       A   I think it was approximately $70.  I don't

21   know exactly.

22       Q   Have you done any research to determine

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller
Conducted on February 27, 2018                      25

1    how much it would cost to obtain an HQL?

2         A   I've looked at it.

3         Q   Where did you look?

4         A   On the internet.

5         Q   What website were you on?

6         A   I'm not sure which website it was.

7         Q   Are there any other fees that you believe

8    you would have to pay to get an HQL other than the

9    training and the fingerprinting?

10        A   No, I don't think.  I think that's all of

11   it, to the best of my recollection.

12        Q   And what is your understanding of how much

13   time it would take to complete the training?

14        A   The training would be about four hours.

15        Q   And what is your understanding of how long

16   it would take you to be fingerprinted?

17        A   I don't know how long it would take.

18        Q   Have you done any research to determine

19   how long it would take?

20        A   No.

21        Q   Have you contacted any fingerprinting

22   facility to find out how long it would take?

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    26

1      A   No.

2      Q   What are your hours at work?

3      A   I generally work 10 to 6.

4      Q   And where is the office located?

5      A   It's in Columbia.

6      Q   And is that Monday through Friday, 10 to

7   6?

8      A   Yes.

9      Q   So you don't work on weekends?

10     A   No.

11     Q   And do you get personal days at work?

12     A   Yes.

13     Q   And how many personal days do you get a

14   year?

15     A   I don't know exactly.

16     Q   Five approximately?

17     A   It's a few weeks approximately.

18     Q   Does that include vacation days?

19     A   Yes.

20     Q   So personal days and vacation days consist

21   of a few weeks per year?

22     A   I don't know exactly.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                           27

1     Q   But approximately?

2     A   Yeah, to the best of my recollection.

3     Q   What is your understanding of how long it

4  would take you to obtain an HQL if you completed

5  the application?

6     A   I don't know exactly how long it would

7  take.

8     Q   Do you have an understanding of

9  approximately how long it would take?

10     A   I'd have to estimate a few weeks.

11     Q   And what's the basis of that estimate?

12     A   To take the training, get the

13  fingerprinting and then you have the application

14  process.  I don't know how long that takes.

15     Q   So you don't know how long the application

16  process takes?

17     A   No.

18     Q   Have you ever hunted for food using a

19  handgun?

20     A   No.

21     Q   Do you have any plans to do that?

22     A   No.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    28

1      Q   Have you ever been fingerprinted?

2      A   Yes, for my job.

3      Q   For your current job?

4      A   Yes.

5      Q   When was that done?

6      A   In 2012.

7      Q   And was that done at your work location or

8   did you have to go to some third party to do it?

9      A   No, it was done at my work.

10     Q   Have you conducted any research to

11   determine the nearest location where you could get

12   fingerprinted for an HQL?

13     A   No.

14     Q   Have you conducted any research to

15   determine the nearest location where you could get

16   the required live fire safety training for an HQL?

17     A   No.

18     Q   Have you ever begun an application for an

19   HQL but not completed it?

20     A   No, I have not.

21     Q   Have you ever had a background check run

22   to purchase a gun?

1      A   No, I have not.

2      Q   Are you a member of any gun rights

3  organizations?

4          MR. HANSEL:  Objection.  Go ahead.

5          THE WITNESS:  Go ahead?

6          MR. HANSEL:  Yep.  I'll be real clear when

7  you're not supposed to answer.  I'm pretty good at

8  making myself known, so you'll be all right until

9  I let you know.  Thank you.

10     A   I am currently a member of Maryland Shall

11  Issue, MSI.

12     Q   Any others?

13     A   No.

14     Q   How long have you been a member of MSI?

15     A   Last year.

16     Q   2017?

17     A   Yes.

18     Q   Do you participate in any activities in

19  connection with your membership at MSI?

20          MR. HANSEL:  Objection.  Go ahead.  Go

21  ahead.

22     A   Oh.  I attend some of the meetings.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    30

1       Q   Anything else?

2       A   Not currently.

3       Q   Is your husband a member of MSI?

4       A   Yes.

5       Q   Is he a member of any other gun rights

6   organizations?

7           MR. HANSEL:   Objection.   Go ahead.

8       A   He's a member of the Berwyn Rod and Gun

9   Club.

10      Q   Does that club have a shooting range?

11      A   Yes.

12      Q   Is that where he goes generally to target

13  practice?

14      A   Yes.

15      Q   Have you been to that range as well?

16      A   Yes.

17      Q   Are you aware of the identity of any

18  specific individual other than yourself who hunts

19  for food and is in need of a handgun but due to

20  the expense and inconvenience of the HQL

21  requirements have been deterred from purchasing a

22  handgun?

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                    31

1        A   No.

2        Q   Are you aware of the identity of any

3   specific individual who lives in an urban area

4   with no access to Maryland State Police handgun

5   trainers or shooting ranges who has been deterred

6   from purchasing a handgun by the HQL live fire

7   requirement?

8        A   No.

9        Q   Are you aware of the identity of any

10  specific individual who lives in an area with no

11  access to Maryland State Police approved

12  fingerprint vendors and have been deterred from

13  purchasing a handgun by the fingerprint

14  requirement?

15       A   No.

16       Q   Are you aware of the identity of any

17  specific individuals who wish to purchase a

18  handgun but lack access to the internet and,

19  therefore, have been deterred from purchasing a

20  handgun by the HQL requirements?

21       A   No.

22       Q   Are you aware of the identity of any

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    32

1   specific individuals who wish to purchase a

2   handgun but lack access to a scanner and,

3   therefore, have been deterred from purchasing a

4   handgun by the HQL requirements?

5       A  No.

6       Q  Are you aware of the identity of any

7   specific individuals who lack a credit card or

8   debit card and have, therefore, been deterred from

9   purchasing a handgun by the HQL requirements?

10      A  No.

11      Q  Are you aware of any -- of the identity of

12  any specific individuals who lack a fixed address

13  and wish to purchase a handgun but have been

14  deterred from purchasing a handgun by the HQL

15  requirements?

16      A  No.

17      Q  Are you aware of any individuals who lack

18  a Maryland State driver's license or Maryland

19  State identification card who wish to purchase a

20  handgun but who have been deterred by the HQL

21  requirements?

22      A  No.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    33

1      Q   Can you describe for me the inconvenience

2    that has deterred you from obtaining an HQL?

3      A   The training, the time for the training.

4    I have back issues so sitting still for four hours

5    would be a burden on me.

6      Q   Anything else?

7      A   Taking the time off work.

8      Q   Anything else?

9      A   No.

10      Q   So it's not the cost?

11      A   The cost is a burden but the important

12    thing is my back issues for the training.

13      Q   So you have the financial wherewithal to

14    pay the fees that are required to get an HQL if

15    you want to, correct?

16          MR. HANSEL:  Objection.  Asked and

17    answered.  Irrelevant.  Go ahead.  You can answer.

18      A   It is a burden but it is -- I can do it.

19      Q   And you said your understanding was that

20    the training would take approximately four hours,

21    correct?

22      A   Yes.

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller
Conducted on February 27, 2018                          34

```
1        Q   All right.  Do you know whether that would
2   need to be during the day or during the week or
3   whether you could do it on a Saturday or in the
4   evening?
5        A   No, I don't.
6        Q   So you don't know whether you would need
7   to take off time from work to complete the
8   training or not, correct?
9        A   Correct.
10       Q   And you said you have back issues.  When
11  did those start?
12       A   It started in around 2001.
13       Q   And is it ongoing, you suffer from it
14  today?
15       A   Yes.
16       Q   And what specifically is the problem?
17       A   I have the disc in my back.
18       Q   What do you do at work, you have to sit at
19  a desk?
20       A   Yes.
21       Q   All day?
22       A   I have to get up.  When my back gets
```

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                          35

1    uncomfortable, I get up.

2         Q   But most of the time when you're at work

3    you are seated at a desk; is that correct?

4         A   Yes.

5         Q   Have you done any research to determine

6    whether during the training that's required to

7    obtain a HQL you would have the opportunity to get

8    up and move around?

9         A   No, I haven't.

10        Q   Have you made any inquiries of any

11   Maryland State Police approved firearm safety

12   trainers or instructors as to whether or not you

13   could get an accommodation for your back problems

14   if you took the training?

15        A   No, I have not.

16        Q   Did you have to submit to a background

17   check when you got your current job?

18        A   Yes.

19        Q   Do you need a handgun for your work?

20        A   No.

21        Q   Do you have any other physical

22   disabilities other than your back that affect your

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                    36

1    ability to obtain an HQL or take the training

2    that's required to get an HQL?

3         A   No.

4         Q   Are you currently receiving treatment for

5    your back?

6         A   Yes.

7         Q   From who?

8         A   I have a doctor.

9         Q   What's the doctor's name?

10        A   Dr. Bands.

11        Q   B-a-n-z?

12        A   No, B-a-n-d-s.

13        Q   And where is his office?

14        A   Down in Annapolis.

15        Q   What type of doctor is he?

16        A   He's an orthopaedic surgeon.

17        Q   Have you had any verbal communications

18   with anybody at the Maryland State Police about

19   HQL requirements?

20        A   No.

21        Q   Have you had any communications with

22   anybody at Atlantic Guns?

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    37

1        A   No.

2        Q   Have you talked to anybody at MSI about

3    the HQL requirements?

4        A   No.

5        Q   Have you talked to any of the other

6    plaintiffs in this lawsuit?

7        A   No.

8        Q   Do you know John Matthew Clark?

9        A   No.

10        Q   Do you know Dana Hoffman?

11        A   No.

12        Q   Do you know Scott Miller?

13        A   No.

14        Q   So to the best of your recollection, you

15    have not talked to any of those folks?

16        A   No.

17        Q   Other than what you've already told us, is

18    there anything else that prompted you to decide

19    you wanted to purchase a handgun?

20        A   Just the fact that I felt that if I needed

21    to protect myself in my home with my husband's gun

22    that I could be prosecuted.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    38

1      Q  You said you were confused by the receive

2  and receipt portion of the HQL law?

3         MR. HANSEL:  Objection.  She didn't say

4  that.  She said it was ambiguous.

5      Q  Did it confuse you?

6      A  I felt it was vague.

7      Q  What about it did you find to be vague?

8      A  It just -- it didn't define what it meant

9  to receive.

10     Q  And did you do any research into that

11  issue?

12     A  No, I just read the law.

13     Q  Are you aware of any Maryland State Police

14  guidance on that question?

15     A  No.

16        (D. Miller Deposition Exhibit 15 was

17  marked for identification and retained by

18  counsel.)

19     Q  Ms. Miller, let me ask you to look at

20  what's been marked as Exhibit 15.  This is an

21  advisory from the Maryland State Police concerning

22  the interpretation of "received" in the HQL law.

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    39

1    Have you seen this before?

2         A  No, I haven't seen this.

3            MR. HANSEL:  They issue a lot of

4    advisories.  Just for the record, this is

5    LD-HQL-17-003 dated November 17th, 2017.  I just

6    put it on the record because there's the issue of

7    a lot of advisories.

8         Q  At the bottom you'll see where it says

9    therefore, an individual not otherwise prohibited

10   from owning or possessing regulated firearms is

11   not required to possess an active HQL in order to

12   borrow a regulated firearm from another individual

13   on a temporary basis.  Do you see that?

14        A  Yes.

15        Q  In light of that do you still believe that

16   you have a need to purchase a handgun?

17        A  Yes.

18        Q  Why?

19        A  After reading the law, I felt I could be

20   prosecuted.

21        Q  All right.  So even under this

22   interpretation, you feel you could still be

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    40

1    prosecuted?

2          MR. HANSEL:  Would you like to stipulate

3    that no one can be prosecuted?

4          MR. SCOTT:  I'm not going to stipulate to

5    anything, Counsel, and the question remains

6    pending.

7          MR. HANSEL:  I'll happily stipulate, if

8    you would like, and then that would solve the

9    issue.

10          MR. SCOTT:  Can you read back the last

11    question, please?

12          (Pending question read.)

13      A   Yes.

14      Q   Have you had any surgery for your back?

15      A   Yes.

16      Q   How many times?

17      A   Twice.

18          (D. Miller Deposition Exhibit 16 was

19    marked for identification and retained by

20    counsel.)

21      Q   I've had marked as Exhibit 16 the Answers

22    to Interrogatories that we received from your

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    44

1   this lawsuit?

2       A   No, I decided it was important.

3       Q   Is your husband a member -- yeah, I

4   already asked you that.

5           MR. SCOTT:  Let's take a short break.

6           (A recess was taken.)

7   BY MR. SCOTT:

8       Q   I just have a few more follow ups and we

9   will pretty much be done.  I just want to go back

10  and clarify some of -- I have some follow-ups

11  about some of the answers you gave with respect to

12  shooting at the range.  I think you said the last

13  time you shot at the range with your husband was

14  in 2017; is that right?

15      A   Yes.

16      Q   All right.  And you used his Beretta at

17  the range, correct?

18      A   Um-hum.

19      Q   Yes?

20      A   Yes.

21      Q   All right.  And was that after or before

22  you found out about the HQL requirement?