# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,

Plaintiffs,

v.

LAWRENCE HOGAN, in his capacity
as GOVERNOR OF MARYLAND, *et al.*,

Defendants.

Case No. 1:16-cv-03311-ELH

## BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Mark Anthony Frassetto
William J. Taylor,  Jr.
EVERYTOWN FOR GUN SAFETY
SUPPORT FUND
132 E. 43rd St., #657
New York, NY 10017

GIBSON, DUNN & CRUTCHER LLP
Thad A. Davis (Bar No. 18806)
Andrea N. Hadjiyianni (*Pro Hac Vice*)
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

Brian A. Rosenthal (*Pro Hac Vice*)
Kimberly L. Friedman (*Pro Hac Vice* )
Laura F. Corbin (*Pro Hac Vice*)
200 Park Avenue
New York, NY 10166-0193

*Counsel for Amicus Curiae
Everytown for Gun Safety*

August 24, 2018

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Everytown for Gun Safety states that it has no parent corporations and has no stock.  Accordingly, no publicly held company owns 10% or more of its stock.

*/s/ Thad A. Davis*
THAD A. DAVIS (Bar No. 18806)
GIBSON DUNN & CRUTCHER LLP
TDavis@gibsondunn.com

*Counsel for Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF *AMICUS CURIAE* ................................................................. 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ............................................................................................. 3

    A.    TRAINING REQUIREMENTS AND BACKGROUND CHECKS FOR PERMITS TO PURCHASE ARE PRESUMPTIVELY LAWFUL, LONGSTANDING REGULATIONS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT .............................. 4

        1.    Firearms Training Was Required by Law in Nearly All of the States at the Time of the Second Amendment's Ratification. .................. 6

        2.    Background Checks for Permits to Purchase Are Among the Longstanding Regulations Identified in *Heller I* and Are Consistent with More than a Century of Legal Tradition. ............................ 9

    B.    SOCIAL SCIENCE EVIDENCE SUPPORTS THE CONSTITUTIONALITY OF MARYLAND'S PERMIT-TO-PURCHASE LAW ........................................ 13

        1.    The Applicable Intermediate Scrutiny Standard and the State's Submissions. ......................................................................... 13

        2.    In-Person, Hands-On Firearms Training Improves the Ability of Applicants to Competently and Safely Use Their Firearms. .................. 14

CONCLUSION ........................................................................................ 17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Colo. Outfitters Ass'n v. Hickenlooper*,
  Nos. 14-1292, 14-1290, 2015 WL 1955140 (10th Cir. Apr. 29, 2015) .....................................1

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..........................................................................3, 4, 5, 6, 8, 9, 12

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) .............................................................................5

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) ..........................................................................16

*Kolbe v. Hogan*,
  No. 14-1945, 2016 WL 1572325 (4th Cir. April 18, 2016)...............................1, 13

*Malpasso v. Palozzi*,
  No. 1:18-cv-01064-MJG (D. Md. June 15, 2018) ....................................................1

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...........................................................................................4

*NRA v. BATF*,
  700 F.3d 185 (5th Cir. 2012) .............................................................................5

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) .............................................................................9

*Silvester v. Harris*,
  No. 14-16840, 2015 WL 1606313 (9th Cir. Apr. 1, 2015)......................................1

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ..........................................................................3, 4

*United States v. Masciandro*,
  638 F.3d 458 (4th Cir. 2011) ...........................................................................13

*United States v. Salerno*,
  481 U.S. 739 (1987)........................................................................................13

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) .............................................................................5

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ...........................................................................13

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

**Statutes**

18 Pa. Cons. Stat. § 6111(b), (c), (f)(2) ...................................................................12

1778 N.J. Sess. Laws 21 ..............................................................................................7

1779 Vt. Sess. Laws .....................................................................................................7

1782 Del. Sess. Laws ....................................................................................................7

1791 S.C. Sess. Laws ....................................................................................................7

1792 Conn. Sess. Laws 423 .........................................................................................8

1792 N.H. Sess. Laws ...................................................................................................8

1794 R.I. Sess. Laws .....................................................................................................8

1919 Hawaii Sess. Laws 166 ......................................................................................10

1935 S.D. Sess. Laws 208 ...........................................................................................12

1786 New York Sess. Laws 25 .....................................................................................7

1923 Cal. Stat. 339 ......................................................................................................12

1936 Ala. Laws 82 .......................................................................................................12

1923 Ark. Acts 430 ......................................................................................................11

Cal. Penal Code § 27545 .............................................................................................12

Cal. Penal Code § 27850 .............................................................................................12

Colo. Rev. Stat. 18-12-112 ..........................................................................................12

Conn. Gen. Stat. § 29-33(c) .........................................................................................12

Conn. Gen. Stat. § 29-36l(f) ........................................................................................12

Conn. Gen. Stat. § 29-37a(e) .......................................................................................12

1923 Conn. Pub. Acts 252 ...........................................................................................12

D.C. Code Ann. § 7-2505.02 .......................................................................................12

Del. Code tit. 11, § 1448B, tit. 24, § 904A ................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Haw. Rev. Stat. Ann. § 134-2 ................................................................................12

Haw. Rev. Stat. Ann. § 134-13 ..............................................................................12

Ill. Comp. Stat. 5/24-3(k) .......................................................................................12

Ill. Comp. Stat. 65/1 – 65/15a ...............................................................................12

1925 Ind. Acts 207 ..................................................................................................12

Iowa Code §§ 724.15 – 724.20 ..............................................................................12

1793 Mass. Acts at 172 .............................................................................................8

1927 Mass. Acts 325-26 .........................................................................................12

Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P .............12

Md. Code Ann., Pub. Safety §§ 5-101(t), 5-124 ...................................................12

Md. Code Regs. §§ 12.04.02 et seq. (2018)...........................................................16

Md. Code Regs §§ 29.04.01 ...................................................................................16

Mich. Comp. Laws §§ 28.422, 28.422a .................................................................12

1925 Mich. Pub. Acts 313 ......................................................................................12

1927 Mich. Pub. Acts 372...............................................................................11, 13

Militia Act of 1792 § 1 .............................................................................................8

1921 Mo. Laws at 691 § 2 ........................................................................10, 11, 12

1918 Mont. Laws 2 .................................................................................................10

N.C. Gen. Stat. §§ 14-402 – 14-404 ......................................................................12

1786 N.C. Sess. Laws ...............................................................................................7

1919 N.C. Sess. Laws 197 ......................................................................................11

1919 N.C. Sess. Laws 397, § 3 ..............................................................................10

1923 N.D. Laws 226 ...............................................................................................12

1923 N.D. Laws 266 ...............................................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

1923 N.H. Laws 118 ....................................................................................................12

1927 N.J. Laws ..........................................................................................................10

N.J. Stat. Ann. § 2C:58-3 ............................................................................................12

N.Y. Gen. Bus. Law § 898 ..........................................................................................12

1911 N.Y. Laws 195 ....................................................................................................9

1913 N.Y. Laws 1627, c. 608 ......................................................................................9

1931 N.Y. Laws 792 ..................................................................................................11

Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409 ................................................12

Nev. Rev. Stat. § 202.254 ..........................................................................................12

1913 Or. Laws ............................................................................................................10

1925 Or. Laws 260 .....................................................................................................12

Or. Rev. Stat. §§ 166.435, 166.436 ...........................................................................12

1931 Pa. Laws 158 .....................................................................................................12

R.I. Gen. Laws §§ 11-47-35 – 11-47-35.2 .................................................................12

Rev. Code Wash. § 9.41.113 ......................................................................................12

1931 Tex. Gen. Laws 267 ...........................................................................................12

Vol. 26 Del. Laws 15 ...................................................................................................9

Vol. 30 Del. Laws 28 (1919) ......................................................................................11

Vt. Stat. Ann. § 4019 ..................................................................................................12

1935 Wash. Sess. Laws 172 .......................................................................................12

**Other Authorities**

Ali Rowhani-Rahbar, *et al.*, Formal Firearm Training among adults in the USA:
Results of National Survey, 10 Inj. Prev. 116, 164 (2018), *available at*
https://www.ncbi.nlm.nih.gov/pubmed/28698176 ...............................................15

TABLE OF AUTHORITIES
(continued)

**Page(s)**

Bernard D. Rostker, Evaluation of the New York City Police Department Firearm
    Training and Firearm-Discharge Review Process, RAND (2008), *available at*
    http://www.nyc.gov/html/nypd/downloads/pdf/public_information/RAND_Fir
    earmEvaluation.pdf......................................................................................................16

Brady Campaign: Key Gun Violence Statistics, *available at*
    http://www.bradycampaign.org/key-gun-violence-statistics .....................................2

Brenda VonRueden, *et al.*, Fifty Years of Hunter Safety, Wisconsin Natural
    Resources (June 2017), *available at*
    https://dnr.wi.gov/wnrmag/2017/06/Safety.PDF ....................................................14

Center for Disease Control and Prevention, Injury Prevention and Control,
    WISQARS Injury Report, *available at*
    https://www.cdc.gov/injury/wisqars/index.html......................................................14

Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767 (1926).......................11

David Hemenway, *et al.*, Firearm Training and Storage, 273 J. Am. Med. Ass'n
    46 (1995).....................................................................................................................15

Everytown for Gun Safety, Report: *Gun Violence in America*, dated August 8,
    2018, *available at* https://everytownresearch.org/wp-
    content/uploads/2018/08/Gun_Violence-America-REPORT-080818C.pdf ............2

H. M. Karim, Comparison of Effectiveness of Class Lecture Versus Workshop-
    Based Teaching of Basic Life Support on Acquiring Practice Skills Among
    the Health Care Providers, Int'l J. Crit. Illn. Inj. Sci. (Apr-Jun 2016), *available
    at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4901828/ .................................15

How to Buy a Gun in 15 Countries, N.Y. Times, March 2, 2018, *available at*
    https://www.nytimes.com/interactive/2018/03/02/world/international-gun-
    laws.html...............................................................................................................9, 14

Joseph Vince Jr., *et al.*, Firearms Training and Self-Defense, Mount St. Mary's
    University, The National Gun Victims Action Council (2015), *available at*
    https://www.gunvictimsaction.org/downloads22/FirearmsTrainings%20_Stud
    yDocument_F_062115.pdf .................................................................................14, 16

Joshua Holland, *Tactical Experts Destroy NRA's Heroic Gunslinger Fantasy*, The
    Nation, October 5, 2015, *available at*
    https://www.thenation.com/article/combat-vets-destroy-the-nras-heroic-
    gunslinger-fantasy/......................................................................................................16

Katie Ash, Hands on Learning v. Lecturing, Educationweek.com (Jan. 30, 2009),
    *available at* https://bit.ly/2fmkajM ........................................................................15

<u>**TABLE OF AUTHORITIES**</u>
(continued)

<u>**Page(s)**</u>

Licensing, Giffords Law Center, *available at* http://lawcenter.giffords.org/gun-
   laws/policy-areas/gun-owner-
   responsibilities/licensing/http://lawcenter.giffords.org/gun-laws/policy-
   areas/gun-owner-responsibilities/licensing/..........................................................................9, 14

National Rifle Association, NRA Gun Safety Rules, *available at*
   https://gunsafetyrules.nra.org/...........................................................................................14

Scott Freeman, *et al.*, Active Learning Increases Student Performance in Science,
   Engineering, and Mathematics, 111 National Academy of Sciences 23 (June
   10, 2014), *available at* http://www.pnas.org/content/111/23/8410 ...........................................15

Second Amendment Foundation, Millions of New Gun Owners Need the Right
   Kind of Training, *available at* https://www.saftd.org/saftd-training-
   blog/firearms-training-blog/millions-of-new-gun-owners-need-right-kind-of-
   training ...................................................................................................................................14

*Sportsmen Fight Sullivan Law*, 23 J. Criminology 665 (1932) .......................................................11

**Constitutional Provisions**

Md. Const. (1776) art. 28...............................................................................................................6

U.S. Const. amend. II.....................................................................................................................6

U.S. Const. art. I, § 8, cl. 16...........................................................................................................6

U.S. Const. art. I, § 8, cl. 17...........................................................................................................6

## INTEREST OF *AMICUS CURIAE*

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over five million supporters spread across all fifty states, including tens of thousands of Maryland residents and the mayors of fourteen Maryland cities.  It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Everytown also includes a large network of gun violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown's mission includes defending gun-safety laws through the filing of *amicus* briefs providing historical context, social science, and doctrinal analysis that might otherwise be overlooked.  Everytown has filed such briefs in several recent cases, including in the Fourth Circuit and the District of Maryland.  *See, e.g.*, *Kolbe v. Hogan*, No. 14-1945, 2016 WL 1572325 (4th Cir. April 18, 2016); *Malpasso v. Palozzi*, No. 1:18-cv-01064-MJG (D. Md. June 15, 2018); *see also*, *e.g.*, *Colo. Outfitters Ass'n v. Hickenlooper*, Nos. 14-1292, 14-1290, 2015 WL 1955140 (10th Cir. Apr. 29, 2015); *Silvester v. Harri*s, No. 14-16840, 2015 WL 1606313 (9th Cir. Apr. 1, 2015).  Everytown respectfully submits this *amicus* brief to address the historical antecedents and relevant social science concerning the challenged legislation and regulations, enacted under Maryland law, that are before this Court.

## INTRODUCTION

This case is about the right of the people of Maryland to be free from gun violence and a state's power to pass laws to protect that freedom.  *Every day*, 96 Americans are killed and 246 are injured by gunshot.[1]  The legislation and regulations enacted by Maryland to address gun violence at issue in this litigation are neither drastic nor novel.  Indeed, requirements to purchase firearms, such as background checks and mandated training, are longstanding, widely accepted measures adopted by many states.  They are deeply embedded in our nation's history—in some cases, pre-dating the ratification of the Second Amendment—and have proven to be effective in reducing public harm and saving lives.  Quite simply, Maryland's common-sense gun regulations are not subject to a viable Second Amendment challenge.

Plaintiffs challenge several aspects of Maryland's Firearm Safety Act of 2013 (the "FSA"), in particular, the provision mandating that most individuals obtain a Handgun Qualification License (an "HQL") before acquiring a firearm.[2]  This brief will focus on Plaintiffs' challenges to two of the HQL Law's provisions, *i.e.*, the requirements that an applicant receive live-fire training and undergo an enhanced background check in order to receive a permit to purchase a firearm.[3]  This brief will show that: (1) the HQL Law's training

---

[1]  *See* Everytown for Gun Safety, Report: *Gun Violence in America*, dated August 8, 2018, *available at* https://everytownresearch.org/wp-content/uploads/2018/08/Gun_Violence-America-REPORT-080818C.pdf; *see also* Brady Campaign: Key Gun Violence Statistics, *available at* http://www.bradycampaign.org/key-gun-violence-statistics.

[2]  This provision of the FSA, along with the implementing regulations, are referred to herein as the "HQL Law." For a full and complete list of the HQL Law's requirements, and exceptions, we respectfully refer the Court to Exhibit 2 of Defendants' Motion for Summary Judgment, DKT 59, at Ex. 2 (§ 5-117.1 of the Public Safety Article of Maryland Code Annotated), DKT 59-2.

[3]  Plaintiffs challenge several other aspects of the HQL Law, such as the cost of an application for a HQL and the alleged 30-day "waiting period" to obtain a gun.  *See* First Am. Compl., DKT 13 ("Compl."), at ¶¶ 3, 40.  While this brief focuses on the constitutionality of the HQL Law's requirements for live training, § 5-117.1(d), and background check, § 5-117.1(f), the other challenged aspects of the law plainly pass constitutional muster as well, for the reasons set forth by the State in Defendants' Memorandum in Support of Summary Judgment, DKT. 59-1 ("Defs'. Br."), at 20-29.  And, as the State's memorandum also shows, Plaintiffs' standing to maintain this suit is highly doubtful.  *Id.* 11-16.

requirement is consistent with the original understanding of the Second Amendment because, at the time of the ratification, government training mandates were nearly universal; (2) the HQL Law's requirement that those seeking to purchase a firearm undergo a thorough identification and background check process is longstanding and was, in fact, specifically identified as lawful by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008); and (3) live, in-person training, like that mandated by the HQL Law, reduces the risks of mishandling or irresponsibly storing firearms.

## **ARGUMENT**

The Second Amendment question here is not complicated. The Fourth Circuit, like most circuits, applies a two-step approach when analyzing Second Amendment challenges. First, it assesses "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" as historically understood, and, if it does, then it applies a form of heightened, means-end scrutiny. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). The training and background check requirements of the HQL Law easily pass constitutional muster at both of these steps.

*First*, the American historical tradition supports the constitutionality of a firearms training requirement and a requirement that those seeking to purchase firearms undergo a thorough identification and background check process. The historical record demonstrates that mandatory firearms training was widespread at the time of the founding and ratification of the Second Amendment. Moreover, laws requiring a thorough identification and background check process, many of which are well over a century old, are precisely the kind of "longstanding" restrictions—prohibiting "the possession of firearms by felons and the mentally ill" and regulating "the commercial sale of arms"—that the Supreme Court emphasized in *Heller* as "presumptively lawful." *District of Columbia v. Heller* ("*Heller I*"), 554 U.S. 570, 626, 635

3

(2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).  Accordingly, the

training and background check requirements of the HQL Law fall outside the scope of the

Second Amendment and do not conflict with any Second Amendment-protected rights.

*Second*, social science research and empirical evidence demonstrate that even if the

challenged training and background check requirements of the HQL Law fall within the scope of

the Second Amendment, each would readily satisfy intermediate scrutiny and thus, for that

reason too, be held constitutional.  The State has presented such voluminous research and

evidence in its motion papers, *see* Defs.' Br. 20-27, which the additional findings presented

herein further support, on the efficacy of firearms training.  As set forth below, studies

overwhelmingly show that firearms training results in safer gun use.  Further, even beyond the

firearms context, studies show that the type of hands-on training required by the HQL Law is

substantially preferred and arguably the most effective.  This evidence further supports the

constitutionality of the HQL Law.

### A. TRAINING REQUIREMENTS AND BACKGROUND CHECKS FOR PERMITS TO PURCHASE ARE PRESUMPTIVELY LAWFUL, LONGSTANDING REGULATIONS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT

The first step of the Second Amendment analysis often requires courts step into the role

of a historian.  As the Supreme Court found in *Heller I*, the Second Amendment did not *create* a

new right, but rather *codified* a pre-existing one.  554 U.S. at 592-94 ("[I]t has always been

widely understood that the Second Amendment . . . codified a *pre-existing right*.").  Therefore,

as a general matter, the scope of the Second Amendment—and critically the *limits* to that

scope—are determined by evaluating the right to bear arms as that right was historically

understood.  *See Chester*, 628 F.3d at 678. ("[D]etermining the limits on the scope of the

[Second Amendment] right is necessarily a matter of historical inquiry.").

In *Heller I*, the Supreme Court identified examples of "presumptively lawful regulatory

measures" that do not impinge on the Second Amendment right, such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626-27, 627 n.26, 635.[4]  *Heller I* provides the framework for lower courts to analyze Second Amendment challenges.  Lower courts must determine, using historical evidence and the clues provided by the Supreme Court, whether a particular regulation is "longstanding" such that it falls outside the scope of the Second Amendment.  And as several courts have recognized post-*Heller I*, a law need not "mirror limits that were on the books in 1791" to be considered longstanding, *Skoien*, 614 F.3d at 641, and can even qualify as longstanding where it "cannot boast a precise founding-era analogue," *NRA v. BATF*, 700 F.3d 185, 196 (5th Cir. 2012).

Here, the historical evidence is substantial and unambiguous.  Laws mandating training as part of militia service were nearly universal during the founding period.  Similarly, laws requiring background checks and analogous identification for permits to purchase firearms date back over a century.  In fact, as held by the Supreme Court, regulations on "the commercial sale of arms" intended to prevent "the possession of firearms by felons and the mentally ill" are "longstanding," "presumptively lawful," and "permissible."  *Heller I*, 554 U.S. at 626-27, 627 n.26, 635.  Given this backdrop, summary judgment in favor of the State is warranted at step one of the Fourth Circuit's Second Amendment framework on history alone.

---

[4] *See United States v. Skoien*, 614 F.3d 638, 639-41 (7th Cir. 2010) (en banc) (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by all felons was not enacted until 1961"); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934).

### 1.    Firearms Training Was Required by Law in Nearly All of the States at the Time of the Second Amendment's Ratification.

The Second Amendment clearly was not originally understood to prohibit state governments from mandating firearms training.  At the time of this country's founding, firearm ownership went hand-in-hand with membership in a militia.  *Id.* at 595-96 (collecting sources showing that "the ordinary definition of the militia" at the time of the founding was "all able-bodied men").  Membership in a militia, in turn, went hand-in-hand with mandatory participation in firearms training.  As the constitutions of the United States and Maryland make clear, militias were meant to be "well regulated"—or in other words, *trained*.  *See* U.S. Const. amend. II ("A *well regulated* Militia, being necessary to the security of a free State . . . ." (emphasis added)); Md. Const. (1776) art. 28 ("[A] *well-regulated* militia is the proper and natural defense of a free government." (emphasis added)).  "[T]he adjective 'well-regulated' implies nothing more than the imposition of proper discipline and *training*."  *Heller I*, 554 U.S. at 597 (emphasis added). The militia clauses of the Constitution contemplate that states would train their militia before arming them.  *See* U.S. Const. art. I, § 8, cl. 16 (Congress has the power to call forth, organize, arm, and discipline the militia); U.S. Const. art. I, § 8, cl. 17 (states have the "Authority of training the Militia").

In the years leading up to the ratification of the Constitution in 1788 and the Second Amendment in 1791, many states enacted laws regulating their militias that required militia members be trained on the proper use of firearms.  State laws in effect at the time of ratification define the membership of the militia (generally able-bodied men under the age of fifty), the weapons a militiaman must own, and *the regular training a militiaman must undergo*.  For example:

> In 1778, **New Jersey** enacted "An Act for the Regulating, Training and Arraying of the Militia," which required militiamen "assemble, properly armed and accoutered" on the

first Monday seven months of the year, at a location designated by the commanding officer, and "spend the Remainder of the Day in Training and Exercise." 1778 N.J. Sess. Laws 21, at 42, 46 §§ 14-15.[5]

In 1779, **Vermont** enacted "An Act for Forming and Regulating the Militia; and For Encouragement of Military Skill, for the Better Defen[s]e of This State," which required its militia (defined as "all male persons, from sixteen years of age to fifty") to "bear arms and duly attend all musters, and military exercise of their respective troops." 1779 Vt. Sess. Laws, at 57, 59.

In 1782, **Delaware** enacted legislation requiring every company in its militia (defined as "every able-bodied effective Male white Inhabitant between the Ages of eighteen and fifty Years") to "be exercised and instructed once in every Month" save three, and that every battalion "be properly trained and disciplined" bi-annually. 1782 Del. Sess. Laws, at 1, 3 §§ 1, 5-6.

In 1783, **Pennsylvania** supplemented its militia law to require all companies "be exercised." *See* Statutes at Large of Pennsylvania from 1682 to 1801, Volume 11, at 93-94.

In 1784, **Georgia** revised its militia law to require militia companies assemble to "train and exercise" up to six times per year. *See* The Colonial Records of the State of Georgia, Volume 19, Part 2, at 350-51.

In 1786, both **North Carolina** and **New York** passed legislation requiring militiamen assemble and train. In **North Carolina**, each captain was required to "instruct [his militia company] in the necessary exercises and maneuvers" four times per year, as each colonel was, but once per year. *See* 1786 N.C. Sess. Laws, at 407, 411 § 11. In **New York**, militiamen were required to "rendezvous four times in every year, for the purpose of training, disciplining, and improving in martial exercises," and officers were required to attend the trainings of multiple companies "in order to introduce uniformity in the manoeuvers and discipline of the regiment." 1786 New York Sess. Laws 25, at 220, 222.

In 1791, the **South Carolina** legislature amended its 1784 "Act for the Regulation of the Militia of this State," noting in the law's preamble that "[d]oubts have arisen" as to whether its militia law was "rendered ineffective" by the ratification of the Constitution of 1788, and declared it "shall continue to be in full force and effect." 1791 S.C. Sess. Laws at 16. The law required "regimental or battalion musters or training" lasting no more than one full day, held not more than three times per year. *Id.*

When Congress exercised its power under the Militia Clauses and enacted the Militia Act in 1792, it made clear that all militiamen were expected to train with their firearms. The Act

---

[5] All of the historical materials referenced herein are included in the Appendix submitted herewith.

required all "free, able-bodied white male citizens" of the ages of eighteen to forty-five to enroll in the militias, equip themselves with, among other tools of the trade, "a good musket or firelock," and "appear so armed, accoutered and provided, *when called out to exercise* or into service." Militia Act of 1792 § 1 (emphasis added). To implement the Act, **Connecticut**, **New Hampshire**, **Massachusetts**, and **Rhode Island** all enacted laws requiring militia training.[6]

At the time the Second Amendment was ratified, the federal government, the states, and the citizenry thus understood and accepted that the right to own firearms did not prohibit the government from mandating that gun owners receive training to use their weapons safely and proficiently. That is because, as the Supreme Court found in *Heller I*, the Second Amendment codified the right to bear arms as it already existed and was understood at the time of ratification. *Heller I*, 554 U.S. at 592 (noting that "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."). The far more extensive training required during the founding means that Maryland's training requirement does not impinge on the scope of the Second Amendment right as originally understood. Maryland's training, in contrast to the extensive historical training, is limited to four hours and firing one round of ammunition—rather than an obligation to appear, musket in tow, at whatever location selected by one's commanding officer, to train multiple times per year. Because laws requiring gun owners to receive training clearly comport with the original public meaning of the Second Amendment, the Court need not reach the second prong of the Second Amendment analysis with respect to plaintiffs' challenge

---

[6] *See* 1792 Conn. Sess. Laws 423, 428 (mandating training three days per year, at which the commanding officer would instruct the troops "in the use of arms and discipline of war"); 1792 N.H. Sess. Laws at 441-42 ("instruction in military discipline" to occur twice per year); 1793 Mass. Acts at 172, 185 § 25 ("every Captain or Commanding Officer of a company, shall call his company together three days in each year for company discipline"); 1794 R.I. Sess. Laws at 14, 22 § 12 (meetings twice per year "for the Purpose of training, disciplining and improving them in martial Exercise" with senior ranks meeting once every two years for the same purpose).

to the firearms training requirement of the HQL Law.[7]

**2.** **Background Checks for Permits to Purchase Are Among the Longstanding Regulations Identified in *Heller I* and Are Consistent with More than a Century of Legal Tradition.**

Laws requiring that persons seeking to purchase firearms undergo a background check also have a lengthy historical pedigree, tracing back more than a century. Indeed, these laws are among those that the Supreme Court specifically identified in *Heller I* as "longstanding," "presumptively lawful," and "permissible." *See Heller*, 554 U.S. at 626-27, 627 n.26 (noting the decision did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," or "conditions and qualifications on the commercial sale of arms."); *id*. at 635 (describing such laws as "exceptions" to the right to bear arms).[8]

The relevant history here dates back to at least the early twentieth century. State legislatures began to pass laws requiring background checks for permits to purchase guns in 1911. In that year, **Delaware** forbade sales of firearms to minors or "any intoxicated person," and required that the purchaser be "positively identified" prior to the sale. Vol. 26 Del. Laws 15, at 28-29 §§ 3-4. Also in 1911, **New York** passed the Sullivan Act, requiring permits to possess firearms, which function much like the HQL Law. 1911 N.Y. Laws 195, at 442 § 1914 (seller must, before delivering the firearm to the purchaser, "require such purchaser to produce a permit"); *see also* 1913 N.Y. Laws 1627, c. 608 (establishing requirement that magistrate be

---

[7] Several states, including California, Connecticut, Hawaii, Massachusetts, Rhode Island, and the District of Columbia, continue to require gun safety training in order to possess a firearm. *See* Licensing, Giffords Law Center, *available at* http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing/http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing/. Many other countries require training, including a practical assessment to prove one can use a firearm safely, in order to obtain a gun. *See* How to Buy a Gun in 15 Countries, N.Y. Times, March 2, 2018, *available at* https://www.nytimes.com/interactive/2018/03/02/world/international-gun-laws.html.

[8] *Cf., e.g.*, *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring) ("On its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun.")

"satisfied of the good moral character of the applicant and provided that no good cause exists for the denial of such application").

Other states soon followed suit, passing laws requiring that a person attempting to procure a firearm first obtain a permit from a municipal judge or sheriff following a determination that the individual was not prohibited by law from possessing a firearm and was of good moral character.  *See*, *e.g.*, 1918 Mont. Laws 2, at 6 § 3 (**Montana:** "No permit shall be given by the sheriff until he is satisfied that the person applying for such permit is of good moral character and does not desire such fire arm or weapon for any unlawful purpose."); 1919 Hawaii Sess. Laws 166 (**Hawaii**: prohibiting the sale of handguns "unless the person desiring to purchase the same shall first have obtained from the sheriff . . . a written permit for such purchase"); 1919 N.C. Sess. Laws 397, § 3 (**North Carolina:** "before the clerk . . . shall issue any such license or permit, he shall fully satisfy himself . . . as to the good moral character of the applicant"); 1921 Mo. Laws at 691 § 2 (**Missouri:** "Such permit shall be issued . . . if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that granting of the same will not endanger the public safety."); 1927 N.J. Laws at 742, 746 §§ 7, 9 (**New Jersey:** permit should be granted to persons of "good character" and "good repute" who are not subject to exclusions due to age, insanity, drug use, and criminal convictions).

Many of these laws required the prospective purchaser to affirmatively *prove* his identity and good moral character by providing *evidence*—for example, sworn affidavits of sponsors—in order to receive a permit to possess a firearm.  *See* 1913 Or. Laws, at 497 § 2 (**Oregon:** "[N]o judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from the at least two reputable freeholders as to the applicant's

good moral character.").[9]  Some of these laws, including **New York**'s Sullivan Act as amended

in 1931, required that the fingerprint of the purchaser be taken, to be kept on file with the police

or to serve as identifying information on the licensee's license.  1931 N.Y. Laws 792, at 2391

§ 5.10 (requiring that "the officer to whom the application is made shall ascertain if the applicant

has been convicted of [a] crime and shall cause the finger prints of such applicant . . . to be

taken" and kept on file with the state authorities and police); 1927 Mich. Pub. Acts 372, at 887-

88 § 6 (**Michigan:** "Every license issued hereunder shall bear the imprint of the right thumb of

the licensee, or, if that not be possible, of the left thumb or some other finger of such licensee.").

Another approach commonly adopted by state legislatures in the early twentieth century

was implementing a mandatory "waiting period" between the time of purchase and delivery of a

firearm wherein records were collected by the purchaser and submitted to law enforcement for

review as part of its background check on the purchaser.  For example, in 1923, the United States

Revolver Association ("U.S.R.A.") drafted a proposed uniform law setting forth certain

categories of individuals prohibited from purchasing firearms, and the National Conference of

Commissioners on Uniform State Laws approved a revised version of this law as the Uniform

Firearms Act in 1926.  *See* Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767

(1926).  The restriction set forth by the Uniform Firearms Act were supported by influential

firearms organizations, including the National Rifle Association, which fiercely lobbied for its

adoption.  *See Sportsmen Fight Sullivan Law*, 23 J. Criminology 665 (1932).  Almost

---

[9]  *See also* Vol. 30 Del. Laws 28, at 55-56 (1919) (**Delaware:** requiring "two freeholders resident in the County wherein the sale is made [to] positively identify the purchaser before the sale can be made"); 1919 N.C. Sess. Laws 197, at 398 § 3 (**North Carolina:** "[B]efore the clerk of the Superior Court shall issue any such license or permit, he shall fully satisfy himself by affidavits, oral evidence, or otherwise, as to the good moral character of the applicant therefor."); 1923 Ark. Acts 430, at 379-80 § 2 (**Arkansas:** permit to be issued "if the applicant be a person of good moral character, whose conduct, past record and occupation is such as to prove . . . that he is a person of good character").

immediately, several states enacted variations of the restrictions on prohibited persons set forth

in the U.S.R.A. model law.[10]   Under these laws, felons, minors, non-citizens, drug addicts,

"habitual drunkards," and mentally ill persons were expressly prohibited from owning firearms.

In order to obtain a firearm, a prospective purchaser had to provide a firearms seller with

information sufficient to prove that he was not prohibited by law from owning a firearm, which

was shared with law enforcement and, coupled with a mandatory waiting period, allowed local

officials to run a simple background check and object to the sale if needed.   These laws have

remained largely in effect since their enactment in the early twentieth century.   Currently, twenty

states and the District of Columbia have laws on the books similar to Maryland's, requiring all

firearms purchasers to first undergo a background check.[11]

In sum, the background check requirement of the HQL Law is clearly "longstanding,"

with historical antecedents reaching back to the early 1900s.   And, as the Supreme Court

emphasized in *Heller I*, such laws regulating the sale of firearms in order to prevent them from

falling into the hands of felons and other dangerous people, are "presumptively lawful" and

"permissible."   *Heller*, 554 U.S., at 626-27, 627 n.26, 635; *see, e.g.*, 1923 Cal. Stat. 339, at 695-

96 (**California**); 1923 N.D. Laws 226, at 379-80 (**North Dakota:** background checks coupled

with felon dispossession); *see also* 1927 Mass. Acts 325-26, at 413, 415-16 (**Massachusetts**);

---

[10] *See, e.g.*, 1923 Cal. Stat. 339, at 696-97 § 2 (**California**); 1923 Conn. Pub. Acts 252, at 3707; 1923 N.D. Laws 266 (**North Dakota**); 1923 N.H. Laws 118 (**New Hampshire**); 1925 Ind. Acts 207 (**Indiana**); 1925 Mich. Pub. Acts 313 (**Michigan**); 1925 Or. Laws 260 (**Oregon**); 1931 Tex. Gen. Laws 267 (**Texas**); 1931 Pa. Laws 158, at 497, 499 § 9 (**Pennsylvania**); 1935 S.D. Sess. Laws 208, at 355-56 § 9 (**South Dakota**); 1935 Wash. Sess. Laws 172, at 599, 601 § 9 (**Washington**); 1936 Ala. Laws 82, at 51, 53 § 9 (**Alabama**).

[11] *See* Cal. Penal Code §§ 27545, 27850-28070; Colo. Rev. Stat. 18-12-112; Conn. Gen. Stat. §§ 29-33(c), 29-36l(f), 29-37a(e)-(j); Del. Code tit. 11, § 1448B, tit. 24, § 904A; D.C. Code Ann. § 7-2505.02; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 Ill. Comp. Stat. 65/1 – 65/15a, 720 Ill. Comp. Stat. 5/24-3(k); Iowa Code §§ 724.15 – 724.20; Md. Code Ann., Pub. Safety §§ 5-101(t), 5-124; Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; Mich. Comp. Laws §§ 28.422, 28.422a; Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409; Nev. Rev. Stat. § 202.254; N.J. Stat. Ann. § 2C:58-3; N.Y. Gen. Bus. Law § 898; Or. Rev. Stat. §§ 166.435, 166.436; N.C. Gen. Stat. §§ 14-402 – 14-404; 18 Pa. Cons. Stat. § 6111(b), (c), (f)(2); R.I. Gen. Laws §§ 11-47-35 – 11-47-35.2; Rev. Code Wash. § 9.41.113; Vt. Stat. Ann. § 4019.

1927 Mich. Pub. Acts 372, at 887-88 (**Michigan:** permit to purchase requirements coupled with felon dispossession).  Accordingly, the HQL Law is strongly supported by history and, under the biding precedent of the Supreme Court and the Fourth Circuit, does not infringe upon or fall into the scope of the Second Amendment.

### B.    SOCIAL SCIENCE EVIDENCE SUPPORTS THE CONSTITUTIONALITY OF MARYLAND'S PERMIT-TO-PURCHASE LAW

Even assuming, solely for the purposes of argument, that the challenged provisions of the HQL Law fall into the scope of the Second Amendment, they satisfy the applicable level of intermediate scrutiny and are thereby constitutional.  The State has demonstrated this thoroughly in its summary judgment papers, including through the use of social science research and empirical evidence.  *See* Defs.' Br. 20-27.  Set forth below for the consideration of this Court is additional such research and evidence concerning the live-training requirement of the HQL Law which support its constitutionality.

### 1.    The Applicable Intermediate Scrutiny Standard and the State's Submissions.

As the State has explained, intermediate scrutiny is the appropriate standard at step two of the Court's Second Amendment analysis in this case.  *See* Defs.' Br. 18-19.  Intermediate scrutiny requires the challenged law be "reasonably adapted to a substantial government interest."  *Kolbe*, 849 F.3d at 133, 139 (quoting *United States v. Masciandro*, 638 F.3d 458, 471 (4th Cir. 2011).  It cannot be questioned that Maryland has a substantial—and, indeed, compelling—interest in the public safety of its citizens and reducing the toll of gun violence.  *See id*; *see also United States v. Salerno,* 481 U.S. 739, 755 (1987); *Woollard v. Gallagher*, 712 F.3d 865, 878, 882 (4th Cir. 2013).  Further, the HQL Law is "reasonably adapted" to "substantially serve" this critical interest.  *Woollard*, 712 F.3d at 881-82.

13

### 2.   In-Person, Hands-On Firearms Training Improves the Ability of Applicants to Competently and Safely Use Their Firearms.

Even beyond what is set forth by the State, there exists substantial evidence supporting

the reasonableness of the HQL Law's firearms training requirement.  In the United States,

approximately 500 people die from unintentional gunshot wounds every year, and 17,737 are

unintentionally injured.[12]  It should come as no surprise that quantitative, qualitative, and

anecdotal evidence show that training and unintentional shootings are inversely related.  In short,

more firearm training yields fewer unintentional shootings.  For example, in a 2015 study, when

volunteers with different levels of firearm experience and training participated in simulations

requiring decisions about firearm use, volunteers with less training were more likely to engage in

unsafe practices, such as placing a finger immediately on the trigger after receiving the

weapon.[13]  Conversely, when Wisconsin adopted mandatory hunter safety training, the number

of hunting-related injuries and fatalities declined.[14]  This is why multiple states, including

California, Connecticut, Hawaii, Massachusetts, Rhode Island, and the District of Columbia,

require gun safety training in order to possess a firearm.[15]  And even the gun lobby supports

firearm education and training.[16]

---

[12] *See* Center for Disease Control and Prevention, Injury Prevention and Control, WISQARS Injury Report, *available at* https://www.cdc.gov/injury/`rs/index.html (data reflecting five-year average for 2012 through 2016).

[13] *See* Joseph Vince Jr., *et al.*, Firearms Training and Self-Defense, Mount St. Mary's University, The National Gun Victims Action Council (2015) at 26, 32, *available at* https://www.gunvictimsaction.org/downloads22/FirearmsTrainings%20_StudyDocument_F_062115.pdf.

[14] *See* Brenda VonRueden, *et al.*, Fifty Years of Hunter Safety, Wisconsin Natural Resources (June 2017), at 18, *available at* https://dnr.wi.gov/wnrmag/2017/06/Safety.PDF.

[15] *See* Licensing, Giffords Law Center, *available at* http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing/http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing/. Many other countries require training, including a practical assessment to prove one can use a firearm safely, in order to obtain a gun.  *See* How to Buy a Gun in 15 Countries, N.Y. Times, March 2, 2018, *available at* https://www.nytimes.com/interactive/2018/03/02/world/international-gun-laws.html.

[16] *See* National Rifle Association, NRA Gun Safety Rules, *available at* https://gunsafetyrules.nra.org/; Second Amendment Foundation, Millions of New Gun Owners Need the Right Kind of Training, *available at*

Studies also show that gun owners in states that do not mandate training often do not receive any training at all.  It is estimated that only about sixty percent of gun owners have received any formal training on firearm use and safety.[17]  Researchers in this study did not exclude gun owners who receive training as part of their jobs, such as law enforcement, so this statistic likely far overstates how many gun owners voluntarily receive firearm training.  Finally, the "live-fire" component of the HQL Law requires individuals attend live, in-person training on gun safety.  Maryland's decision to require in-person attendance is amply supported by a wide range of non-firearm studies showing that hands-on learning more broadly results in higher levels of retention and achievement than lecture-based classes across a variety of topics and among all ages groups.[18]  Notably, studies show the significant impact of hands-on training and active learning on participants receiving *movement*-related instruction.  For example, among medical professionals administering CPR, those who received hands-on training significantly outperform those who received the same instruction, but passively by lecture.[19]

Training is also an unquestioned professional requirement of being armed in both the public and private sectors.  For example in Maryland, law enforcement officers and armed

---

https://www.saftd.org/saftd-training-blog/firearms-training-blog/millions-of-new-gun-owners-need-right-kind-of-training.

[17] *See* Ali Rowhani-Rahbar, *et al*., Formal Firearm Training among adults in the USA: Results of National Survey, 10 Inj. Prev. 116, 164 (2018) (61 percent had received training), *available at* https://www.ncbi.nlm.nih.gov/pubmed/28698176; David Hemenway, *et al*., Firearm Training and Storage, 273 J. Am. Med. Ass'n 46, 47 (1995) (56 percent had received training).

[18] *See* Scott Freeman, *et al.*, Active Learning Increases Student Performance in Science, Engineering, and Mathematics, 111 National Academy of Sciences 23 (June 10, 2014), *available at* http://www.pnas.org/content/111/23/8410 (college students test scores improved with active learning); Katie Ash, Hands on Learning v. Lecturing, Educationweek.com (Jan. 30, 2009), *available at* https://bit.ly/2fmkajM (middle school students performed better when learning through hands-on projects).

[19] *See* H. M. Karim, Comparison of Effectiveness of Class Lecture Versus Workshop-Based Teaching of Basic Life Support on Acquiring Practice Skills Among the Health Care Providers, Int'l J. Crit. Illn. Inj. Sci. (Apr-Jun 2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4901828/.

security guards are required to complete firearm training programs before receiving a license to work.[20]  Hands-on instruction is the preferred training approach for federal workers who carry firearms such as court deputies, TSA and USPS workers, law enforcement officials, and members of the military, navy, air force, and national guard.[21]  Law enforcement officers agree that training is critical to know how to handle a gun safely—and to be able to use a weapon effectively in defense of one's self and others.[22]  As the D.C. Circuit noted, such "anecdotal evidence showing the adoption of training requirements in most every law enforcement profession that requires the carrying of a firearm," and "a professional consensus in favor of safety training" support the common-sense conclusion that training can improve firearm safety practices and reduce unintentional shootings.  *Heller v. District of Columbia* ("*Heller II*"), 801 F.3d 264, 279 (D.C. Cir. 2015) (relying on such evidence in upholding D.C.'s firearm safety training requirement as constitutional).

Accordingly, for all these reasons as well as those set forth in the State's motion, the HQL Law's adoption of a live-training requirement is reasonably tailored to advance the government's compelling interest of advancing public safety.

---

[20] *See* Md. Code Regs. §§ 12.04.02 et seq. (2018) (law enforcement); §§ 29.04.01 et seq. (security guards).  *See also* Defs.' Br. at 27-28.

[21] *See, e.g.*, Bernard D. Rostker, Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process, RAND (2008) at 25-26 (NYPD rookie program), *available at* http://www.nyc.gov/html/nypd/downloads/pdf/public_information/RAND_FirearmEvaluation.pdf.

[22] Joseph Vince Jr., *et al.*, *Firearms Training and Self-Defense*, Mount St. Mary's University, The National Gun Victims Action Council (2015), at 15 (interviewing police officers on importance of firearm training), *available at* https://www.gunvictimsaction.org/downloads22/FirearmsTrainings%20_StudyDocument_F_062115.pdf; Joshua Holland, *Tactical Experts Destroy NRA's Heroic Gunslinger Fantasy*, The Nation, October 5, 2015, *available at* https://www.thenation.com/article/combat-vets-destroy-the-nras-heroic-gunslinger-fantasy/ (interviewing former ATF SWAT agent on importance of practical firearm training).

## CONCLUSION

For the foregoing reasons, *amicus* Everytown for Gun Safety respectfully urges this Court to grant the Defendants' Motion for Summary Judgment.

Respectfully submitted,

Dated: August 24, 2018

*/s/ Thad A. Davis*
Thad A. Davis (Bar No. 18806)

Mark Anthony Frassetto
William J. Taylor,  Jr.
EVERYTOWN FOR GUN SAFETY
SUPPORT FUND
132 E. 43rd St., #657
New York, NY 10017
mfrassetto@everytown.org
wtaylor@everytown.org

Andrea N. Hadjiyianni (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8251
Fax: (415) 374-8414
tdavis@gibsondunn.com
ahadjiyianni@gibsondunn.com

Brian A. Rosenthal (*Pro Hac Vice*)
Kimberly L. Friedman (*Pro Hac Vice*)
Laura F. Corbin (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Fax: (212) 351-4035
barosenthal@gibsondunn.com
kfriedman@gibsondunn.com
lcorbin@gibsondunn.com

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

17

## <u>CERTIFICATE OF SERVICE</u>

I, Thad Davis, hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system.  All participants are registered CM/ECF users, and will be served by the CM/ECF system.

*/s/ Thad A. Davis*
Thad A. Davis (Bar No. 18806)
