**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. 16-cv-3311-ELH** |
| | ) |
| **LAWRENCE HOGAN, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**Plaintiffs' Memorandum in Support of Cross-Motion for Summary Judgment
and in Opposition to Defendants' Motion for Summary Judgment**

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs


John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: October 5, 2018          Counsel for Plaintiff Atlantic Guns, Inc.

**Table of Contents**

Table of Contents ...................................................................................................... ii

Table of Authorities ................................................................................................... v

Introduction ............................................................................................................... 1

Statement of Undisputed facts ................................................................................. 2

    A.    Plaintiffs ................................................................................................... 2

    B.    The 77R Handgun Registration process (effective October 1, 2003 – present) .................................................................................................... 5

    C.    The Handgun License requirement (effective October 1, 2013 – present) ........... 7

        1.    The Handgun License statute (Section 5-117.1) ...................................... 7

        2.    The Handgun License's implementing regulations ................................. 9

    D.    The Handgun License's purpose and effect are to prevent law-abiding Marylanders from acquiring and possessing handguns. ..................... 11

    E.    The Handgun License requirement is burdensome. ........................... 13

        1.    The Handgun License requirement is time-consuming. ...................... 13

        2.    The Handgun License requirement is inconvenient. ........................... 13

        3.    The Handgun License requirement is expensive. ................................ 15

    F.    The Handgun License requirement is unnecessary and ineffective. ............. 16

        1.    The additional 30-day delay is unnecessary. ...................................... 16

        2.    The fingerprint requirement is unnecessary. ...................................... 16

        3.    The classroom training with live-fire requirement is unnecessary. ......... 17

        4.    The Handgun License requirement is ineffective. ............................... 17

    G.    The statutory terms "receive" under Section 5.117.1(c) and "receipt" under Section 5-144 are facially vague. ................................................ 19

Argument in support of Plaintiffs' Cross-motion for Summary Judgment ............... 20

    A.    The Handgun License requirement violates the Second Amendment. ............... 20

        1.    The Handgun License requirement is unconstitutional per se under the text, history, and tradition standard of *Heller* because it bans handgun acquisition. ............................................................................ 20

2.      The Handgun License requirement is a pretext to reduce the exercise of a constitutional right. ............................................................ 22

3.      The Handgun License requirement is unconstitutional under the two-part approach used by the Fourth Circuit. ...................................... 25

  a.      The Handgun License requirement burdens conduct within the scope of the Second Amendment's guarantee. ...................... 25

  b.      Strict scrutiny is necessary because the Handgun License requirement severely burdens the Second Amendment's core right. .................................................................................. 26

  c.      Defendants cannot meet their burden under strict scrutiny because the Handgun License requirement is not the least restrictive alternative to achieve a compelling interest. ............... 28

    1.      The additional 30-day delay is not the least restrictive alternative to achieve a compelling interest. ......................................................................... 28

    2.      The fingerprint requirement is not the least restrictive alternative to achieve a compelling interest. ......................................................................... 29

    3.      The classroom training with live-fire requirement is not the least restrictive alternative to achieve a compelling interest. ......................................................... 31

B.      The Handgun License requirement violates the Due Process Clause of the Fourteenth Amendment. ............................................................................ 31

C.      The Maryland State Police acted *ultra vires* in implementing the Handgun License regulations. ............................................................................................ 32

Argument in Opposition to Defendants' Motion for Summary Judgment ................................. 33

A.      Plaintiffs have standing to challenge the Handgun License requirement. ........... 33

  1.      Maryland Shall Issue has standing, as do the individual Plaintiffs. ......... 33

  2.      Atlantic Guns has standing because its business has suffered from the loss of handgun sales and its customers were delayed or denied from acquiring a handgun due to the Handgun License requirement. ............................................................................................ 41

B.      The Handgun License requirement violates the Second Amendment. ................ 43

  1.      The Handgun License requirement burdens conduct within the scope of the Second Amendment's guarantee. ........................................ 44

  2.      Defendants cannot meet their burden under intermediate scrutiny. ........ 45

a.  Defendants cannot establish that the recited harms exist or that the Handgun License will alleviate these harms in a direct and material way.................................................48

1.  Defendants cannot establish that the additional 30-day delay alleviates a demonstrated harm in a direct and material way.................................................48

2.  Defendants cannot establish that the fingerprint requirement alleviates a demonstrated harm in a direct and material way.................................................49

3.  Defendants cannot establish that the additional half-day classroom training with live-fire requirement alleviates a demonstrated harm in a direct and material way.................................................51

b.  Defendants cannot establish that the Handgun License is narrowly tailored to serve a substantial government interest.......52

1.  The additional 30-day delay is not narrowly tailored to serve a substantial government interest. .....................53

2.  The fingerprint requirement is not narrowly tailored to serve a substantial government interest. .....................53

3.  The classroom training with live-fire requirement is not narrowly tailored to serve a substantial government interest.................................................53

c.  Defendants enacted the Handgun License without substantial evidence. .................................................55

C.  The Handgun License requirement violates the Due Process Clause of the Fourteenth Amendment. .................................................57

1.  The terms "receive" and "receipt" are fatally vague. .............58

2.  *Chow* does not save this statute from vagueness invalidation. ...............60

3.  The Maryland State Police Advisory is entitled to no weight or deference. .................................................62

D.  The Maryland State Police regulations and application practices are void because they are inconsistent with Section 5-117.1.................................................64

1.  The live-fire requirement is not authorized by law.................................64

2.  The Maryland State Police has illegally shifted its duties under Section 5-117.1(f) to the applicants and private vendors and eliminated NRA instructors as a separate category of "qualified handgun instructors." .................................................67

Conclusion .................................................69

**Table of Authorities**

## Cases

*A.N.S.W.E.R. Coal. v. Salazar*, 915 F. Supp. 2d 93 (D.D.C. 2013)..............................................36

*Arundel Corp. v. Marie*, 860 A.2d 886 (Md. 2004)......................................................................62

*Aston v. Brown*, 660 A.2d 447 (Md. 1995)...................................................................................57

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ......................................................29

*Bowsher v. Synar*, 478 U.S. 714 (1986).........................................................................................33

*Broderick v. Rosner*, 294 U.S. 629 (1935).....................................................................................59

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) .....................................................63

*Caetano v. Mass.*, 136 S. Ct. 1027 (2016) ....................................................................................21

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)..................................................................41

*Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) .............................................28

*Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331 (4th Cir. 1996) ..................................................47

*Chow v. State*, 903 A.2d 388 (Md. 2006) .........................................................................58, 60, 61

*City of Chi. v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086 (7th Cir. 1992).............34

*City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ...........................................................23

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ................................................................................33

*Craig v. Boren*, 429 U.S. 190 (1976)......................................................................................41, 43

*Crawford v. Washington*, 541 U.S. 36 (2004) ..............................................................................21

*D.C. v. Heller*, 554 U.S. 570 (2008) .....................................................................................passim

*Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005)..................................39

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011)..................................................................36, 37

*Doe v. Bolton*, 410 U.S. 179 (1973)..............................................................................................43

*Ellis v. Dyson*, 421 U.S. 426 (1975) .............................................................................................41

*Ezell v. City of Chi. Ill.*, 651 F.3d 684 (7th Cir. 2011)..................................................................42

*Fangman v. Genuine Title, LLC*, 136 A.3d 772 (Md. 2016) ....................................... 61

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ................................................. 45

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ...................................................... 41

*Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016), *aff'd sub nom. Wrenn v. Dist. of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .......................................................... 23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................ 34, 35

*Heartwood 88, Inc. v. Montgomery Cty.*, 846 A.2d 1096 (Md. Ct. App. 2004) ......................... 63

*Heller v. D. C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ................................... 21, 54, 55, 67

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*") .......... 23, 29, 54, 55

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (9th Cir. 1977) ......................................... 45

*Huffman v. State*, 741 A.2d 1088 (Md. 1999) ........................................................... 58

*Johnson v. United States*, 135 S. Ct. 2551 (2015) .......................................... 31, 57, 59

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), *cert denied*, 138 S. Ct. 469 (2017) ........................................................................................ passim

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) ............................................... 33

*Kolender v. Lawson*, 461 U.S. 352 (1983) ............................................................... 57

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ................................................ 34, 39, 40

*Lewis v. Alexander*, 685 F.3d 325 (3d Cir. 2012), *cert. denied,* 568 U.S. 1123 (2013) .............. 63

*Lovell v. City of Griffin, Ga.*, 303 U.S. 444 (1938) ................................................... 36

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................... 33

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) ..................................................... 40

*Matter of Reese for Howard County*, 2018 WL 3642142 (Md. July 31, 2018) ...................... 58

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ..................................................... 46, 47

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ............................................................... 47

*McDonald v. Chi.*, 561 U.S. 742 (2010) ........................................................... 20, 21

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) ................................................. 63

*Md. Highways Contractors Ass'n., Inc. v. Md.*, 933 F.2d 1246 (4th Cir. 1991) .......................... 35

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)........................................................ 37

*Medstar Health v. Md. Health Care Comm'n*, 827 A.2d 83 (Md. 2003 ...................................... 63

*Murdock v. Com. of Pa.*, 319 U.S. 110 (1943) ......................................................................... 22

*Murphy v. Yates*, 348 A.2d 837 (Md. 1975) .............................................................................. 62

*N.Y.Civil Liberties Union v. Grandeau*, 528 F.3d 122 (2d Cir. 2008)........................................ 36

*NRA v. Magaw*, 132 F.3d 272 (6th Cir. 1997) ........................................................................... 41

*NRA, Inc. v. ATF*, 700 F.3d 185 (5th Cir. 2012), *cert. denied*, 571 U.S. 1196 (2014) ................ 38

*Packingham v. N.C.*, 137 S. Ct. 1730 (2017)............................................................................. 47

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)................................................... 44

*Prayze FM v. FCC*, 214 F.3d 245 (2d Cir. 2000) ........................................................................ 36

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766 (D. Md. 2008)
    *aff'd*, 368 Fed. App'x 370 (4th Cir. 2010)........................................................................ 45

*Saenz v. Roe*, 526 U.S. 489 (1999) .......................................................................................... 22

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)............................................................................ 57

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147 (1969)............................................... 36

*Sierra Club v. United States Dept. of the Int.*, 899 F.3d 260 (4th Cir. 2018) ....................... 42, 62

*Silvester v. Becerra*, 138 S. Ct. 945 (2018) ............................................................................. 45

*Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014) ......................................................... 26

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 945 (2018)............... 26

*Sons of Confederate Veterans, ex rel. Griffin v. Comm'r of the Va. Dept. of Motor
    Vehicles*, 288 F.3d 610 (4th Cir. 2002)........................................................................... 28

*State Bd. of Elections v. Snyder ex rel. Snyder*, 76 A.3d 1110 (Md. 2013) ................................ 61

*State v. Reid*, 1 Ala. 612 (1840)............................................................................................... 22

*Steffel v. Thompson*, 415 U.S. 452 (1974) ............................................................................... 41

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014)...................................................... 41

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 1988 (2018) ................................................................................................................ 20

*Thanner Enters., LLC v. Balt. Cty.*, 995 A.2d 257 (Md. 2010) .................................... 64

*The Equal Rights Center v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510 (D. Md. 2010) ............................................................................................................................ 33

*Turner Broad Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ("*Turner I*") ...................................... passim

*Turner Broad Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ("*Turner II*") ...................................... 47, 48

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) .................................................. 27

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ........................................................ passim

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) ......................................... 36, 37

*United States v. Jackson*, 390 U.S. 570 (1968) ............................................................. 22

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ...................................... 27

*United States v. Nat'l Treasury Empls. Union*, 513 U.S. 454 (1995) .......................... 45

*United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803 (2000) ............................... 28

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................................. 63

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................... 46

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................... 33, 39, 40

*Washington Suburban Sanitary Com'n v. Phillips*, 994 A.2d 411 (Md. 2010 ............ 65

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002) .............. 44

*White Tail Park v. Strouble*, 413 F.3d 451 (4th Cir. 2005) .......................................... 39

*Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) .............................. 63

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ............................................. 27, 28

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018) ........................................................ 48

**Statutes**

18 U.S.C. § 922(a)(3) ...................................................................................................... 6

18 U.S.C. § 922(a)(5) ...................................................................................................... 6

18 U.S.C. § 922(b)(3) ................................................................................................ 6

COMAR 12.15.05 ........................................................................................... 10, 56

COMAR 12.15.05.03 ......................................................................................... 10

COMAR 12.15.05.07 ......................................................................................... 10

COMAR 12.15.05.07D ....................................................................................... 68

COMAR 29.03.01.29 .......................................................................................... 54

COMAR 29.03.01.29C(4) ............................................................................ 1, 9, 64

Md. Code Ann., Pub. Safety § 5-101(q) ................................................................. 9

Md. Code Ann., Pub. Safety § 5-101(q)(2) .......................................................... 68

Md. Code Ann., Pub. Safety § 5-101(q)(3) .......................................................... 68

Md. Code Ann., Pub. Safety § 5-117 ..................................................................... 4

Md. Code Ann., Pub. Safety § 5-117.1 .......................................................... passim

Md. Code Ann., Pub. Safety § 5-117.1(a) ............................................................ 12

Md. Code Ann., Pub. Safety § 5-117.1(b) ....................................... 19, 43, 58, 61

Md. Code Ann., Pub. Safety § 5-117.1(c) .............................................................. 7

Md. Code Ann., Pub. Safety § 5-117.1(d) ..................................................... 13, 31

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) ......................................................... 7

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) .......................................... passim

Md. Code Ann., Pub. Safety § 5-117.1(e)(6) ....................................................... 31

Md. Code Ann., Pub. Safety § 5-117.1(f) .............................................. 8, 10, 67

Md. Code Ann., Pub. Safety § 5-117.1(g) .............................................................. 7

Md. Code Ann., Pub. Safety § 5-117.1(g)(1) ....................................................... 10

Md. Code Ann., Pub. Safety § 5-117.1(h) .............................................................. 8

Md. Code Ann., Pub. Safety § 5-117.1(n) ..................................................... 32, 60

Md. Code Ann., Pub. Safety § 5-118 ........................................... 1, 5, 16, 48

Md. Code Ann., Pub. Safety § 5-118(a) ................................................................. 5

Md. Code Ann., Pub. Safety § 5-118(b) ................................................................. 7

Md. Code Ann., Pub. Safety § 5-118(b)(1) ............................................................. 6

Md. Code Ann., Pub. Safety § 5-123 ..................................................................... 9

Md. Code Ann., Pub. Safety § 5-123(a) ............................................................ 6, 53

Md. Code Ann., Pub. Safety § 5-124 ................................................................... 58

Md. Code Ann., Pub. Safety § 5-133.1(a) ............................................................ 66

Md. Code Ann., Pub. Safety § 5-143(a) ............................................................... 24

Md. Code Ann., Pub. Safety § 5-144 ................................................................... 19

Md. Code Ann., Pub. Safety § 5-144(a) .......................................................... 19, 58

Md. Code Criminal Proc. 10-221(b)(7) ................................................................ 67

Md. Code, Criminal Law § 4-209(d)(2) ............................................................... 66

Md. Code, Criminal Law, § 4-209(b)(2) ............................................................... 66

**Other Authorities**

4 J. Health Care L. & Pol'y 1 (2000), available at:
    http://digitalcommons.law.umaryland.edu/jhclp/vol4/iss1/2 ........................... 11

6 C.F.R. 37.15(a)(b) ........................................................................................... 6

6 C.F.R. 37.15(c) .............................................................................................. 6

ATF, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download ..................... 51

Cassandra K. Crifasi et al., The initial impact of Maryland's Firearm Safety Act of 2013
    on the supply of crime guns in Baltimore, 3(5) The Russel Sage Foundation
    Journal for the Social Sciences 128–40 (2017) ................................................ 50

Dept. Homeland Sec., *REAL ID Enforcement: Maryland*, https://www.dhs.gov/real-
    id/maryland ................................................................................................ 6

Firearm Safety Act, 2013 Maryland Laws Ch. 427 (S.B. 281) ....................... 12, 23, 50

Handgun Qualification License, *Maryland State Police*,
    https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/Lice
    nsingDivision/Firearms/HandgunQualificationLicense.aspx ........................... 15

J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America*, at 6, 63 (Oct. 20, 1999) ........................................................................................................... 11

Luke Broadwater and Ian Duncan, *'Neighborhoods are crying out': Baltimore has highest homicide rate of U.S. big cities*, The Baltimore Sun, Sept. 25, 2018, *available at http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-fbi-data-20180924-story.html* ................................................................................................... 18

Maryland Shall Issue, *About Us*, available at https://www.marylandshallissue.org/jmain/index.php ....................................................... 3

Maryland State Police, *Qualified Handgun Instructor,* https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/Lice nsingDivision/Training/QualifiedHandgunInstructor.aspx .................................... 8, 10, 11

Md. Const. Art. V, § 7 .................................................................................................... 62

Md. Dept. Of Pub. Safety, *Fingerprinting Services/Fingerprinting Courses*, https://www.dpscs.state.md.us/publicservs/fingerprint.shtml ......................................... 14

*Receipt*, Merriam-Webster, available at https://en.oxforddictionaries.com/definition/receipt ........................................................ 59

*Receive,* Merriam-Webster, available at https://www.merriam-webster.com/dictionary/receive ...................................................................................... 59

*Receive,* The Law Dictionary, https://thelawdictionary.org/receive/ ........................................... 58

The Hyperacusis Network, *What is Hyperacusis*, http://www.hyperacusis.net/what-is-it/ .......... 38

*Transfer*, The Law Dictionary, https://thelawdictionary.org/transfer-n/ ..................................... 58

**Introduction**

Maryland recently enacted a "permit-to-purchase" law, banning its law-abiding, responsible citizens from acquiring a handgun without first applying for and obtaining a handgun license (the "Handgun License"). To apply for a Handgun License, Marylanders must submit their fingerprints to the Maryland State Police and complete a half day of classroom instruction as well as a live-fire exercise. Md. Code Ann., Pub. Safety § 5-117.1 ("Section 5-117.1"); COMAR 29.03.01.29C(4). Marylanders must wait up to 30 days (and oftentimes longer) for the Maryland State Police to conduct a background check and approve or deny the Handgun License application. During this waiting period, Maryland completely bans its law-abiding, responsible citizens from purchasing, renting, or receiving a handgun. After obtaining a Handgun License, Marylanders may then apply to purchase a handgun by undergoing Maryland's pre-existing and still continuing handgun registration process (the "77R Handgun Registration"). Md. Code Ann., Pub. Safety § 5-118; *id*. at § 123(a). This process requires purchasers to register their firearm, undergo another, redundant background check, and then wait another seven business days before finally acquiring their handgun. *Id*. This social experiment is a ban on handgun acquisition for self-defense in the homes of law-abiding, responsible citizens who do not undertake the Handgun License's onerous requirements. It is precluded by the Second Amendment.

This ban has no historical antecedent and is inconsistent with the understanding of the right to keep and bear arms at the time of the founding. Maryland's Handgun License is unconstitutional under *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."). *Heller* made clear that a handgun ban extending "to the home, where the need for defense of self, family, and property is most acute" simply cannot survive constitutional scrutiny. *Id*. at 628–29 ("Under any of the standards of scrutiny that we have applied to enumerated

constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,' would fail constitutional muster."). The Handgun License does precisely this, and it is therefore unconstitutional.

Maryland's Handgun License requirement is also unconstitutional under the two-part approach adopted by the United States Court of Appeals for the Fourth Circuit to adjudicate Second Amendment claims. Under the first part, the Handgun License indisputably burdens the fundamental right of law-abiding, responsible Maryland citizens to acquire a handgun for self-defense in the home. Under the second part, strict scrutiny is appropriate because the Handgun License burdens conduct at the Second Amendment's core. Defendants cannot demonstrate that the Handgun License requirement is appropriately tailored to meet a compelling interest. To the contrary, the undisputed facts show that the Handgun License requirement adds a burdensome, wholly-unnecessary, and ineffective burden to Maryland's pre-existing 77R Handgun Registration requirement. It therefore is not appropriately tailored, and summary judgment for the Plaintiffs is appropriate.

## Statement of Undisputed facts

### A.      Plaintiffs

Plaintiff Atlantic Guns, Inc. is a family-owned firearms retailer founded in 1950 by the current owner's father. *See* Declaration of Stephen Schneider ("Schneider Decl."), Ex. 1, at ¶ 2. Atlantic Guns is a licensed Maryland regulated firearms dealer with locations in Silver Spring and Rockville, Maryland. *Id*. at ¶¶ 3–4. It buys, sells, receives, and transfers firearms including handguns within and without Maryland. *Id*. at ¶ 3. Atlantic Guns' customers and prospective customers are law-abiding, responsible Maryland citizens who wish to possess handguns for self-defense in their homes but are prevented and deterred from doing so by Maryland's Handgun License requirement. *Id*. at ¶ 5. Handguns are the most popular firearm choice of Atlantic Guns'

customers for self-defense in the home. *Id*. at ¶ 6. The Handgun License causes Atlantic Guns to turn away would-be handgun customers every week. *Id*. at ¶ 8. Since the Handgun License took effect five years ago, Atlantic Guns has turned away hundreds of customers who wished to purchase handguns but lacked a Handgun License. *Id*. In addition to delaying or denying its customers' acquisition of handguns, this has severely impacted Atlantic Guns' business. *Id*. at ¶ 7. According to the Maryland State Police records, Atlantic Guns' handgun sales and revenue are down substantially since the Handgun License requirement was imposed. *Id*. at ¶ 9.

Plaintiff Maryland Shall Issue, Inc. ("MSI") is a non-profit membership organization incorporated under the laws of Maryland with its principal place of business in Annapolis, Maryland, with over 1,100 members, statewide. "MSI is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public." Maryland Shall Issue, *About Us*, available at https://www.marylandshallissue.org/jmain/index.php (last visited October 5, 2018). MSI promotes and defends the exercise of the right to keep and bear arms in and outside the home. As part of its mission, MSI actively encourages law-abiding, adult citizens of Maryland, members and non-members alike, to acquire handguns for lawful self-defense in and outside the home. The Handgun License requirement and the implementing Maryland State Police regulations burden the exercise of the right of law-abiding residents of Maryland, including MSI members, to acquire handguns for lawful self-defense in and outside the home and thus frustrates MSI's mission. Declaration of Mark Pennak ("Pennak Decl."), Ex. 2, at ¶¶ 2–3, 6. The membership of MSI includes each of the named Individual Plaintiffs in this suit as well as numerous other individuals who do not possess a Handgun Qualification License and who are faced with the

obstacles created by Section 5-117 and the implementing regulations of the Maryland State Police, which infringe upon their constitutional right to purchase a handgun in Maryland. *Id*. at ¶ 3. MSI brings this suit on its own behalf as an organization and on behalf of its members who do not have a Handgun License or who are threatened with arbitrary or discriminatory enforcement of the vague provisions of the Handgun License requirements. MSI has many such members. *Id*.

This burden has adversely impacted the ability of MSI to attract new members, as MSI membership is largely composed of individuals who have or seek to have handguns in the home for lawful self-defense. *Id*. at ¶ 6. As individuals acquire handguns, they are more likely to join MSI so as to defend their Second Amendment rights. *Id*. Loss of potential members, with the consequent loss of membership dues and contributions, have reduced the ability of MSI to promote its agenda and achieve its purposes. *Id*.

Plaintiff Susan Brancato Vizas is a Maryland resident and a MSI member who has been negatively impacted by the newly enacted Handgun License requirements. Deposition of Susan Vizas ("Vizas Dep."), Ex. 3, at 9:20–10:4. Ms. Vizas has never owned a firearm, however, in 2015, Ms. Vizas decided that she wanted to purchase a handgun when her daughter expressed an interest in shooting. *Id*. at 18:13–16. She also wanted to purchase a handgun for self-defense, target practice, the ability to inherent her father's gun, and other lawful purposes. *Id*. at 18:4–12, 24:14–25:10. Ms. Vizas has taken and passed the hunter safety training in the State of Maryland but because of the additional costs and time commitment of acquiring a handgun pursuant to the Handgun License laws, she has been dissuaded from further pursuing purchase of a handgun. *Id*. at 36:20–37:3, 43:6–17. These additional burdens have significantly impacted Ms. Vizas' ability to purchase a handgun. *Id*.

Plaintiff Deborah Kay Miller is a Maryland resident and MSI member. She is employed by the Department of Defense. Deposition of Deborah Miller ("Miller Dep."), Ex. 4, at 8:8–12, 9:18–21, 29:10–11. Ms. Miller has never owned a firearm, however, in 2017 she decided that she wanted to purchase a handgun so that she would be able to defend herself in her own home. *Id.* at 13:17–18, 18:5–19:1. Ms. Miller understands the financial burden of purchasing a handgun and despite the financial ability to do so, she has been discouraged from acquiring a handgun due to physical limitations which negatively impact her ability to complete the required training under the Handgun License laws. *Id.* at 21:15–17, 33:1–5, 34:10–17. Because Ms. Miller does not possess a Handgun Qualification License, she is faced with the obstacles created by Section 5-117.1 and the regulations of the Maryland State Police, through implementation, concerning her constitutional right to purchase a handgun in Maryland. *Id.* at 33:1–7.

B.     **The 77R Handgun Registration process (effective October 1, 2003 – present)**

Since 2003, Maryland has required prospective handgun purchasers to undergo the 77R Handgun Registration process. Md. Code Ann., Pub. Safety § 5-118 (effective Oct. 1, 2003). The 77R Handgun Registration process applies to all handgun transactions in Maryland, whether through a firearms dealer, private, or otherwise. Md. Code Ann., Pub. Safety § 5-118; Deposition of Daniel Webster ("Webster Dep."), Ex. 5, at 70:18–21. This process has ensured that individuals prohibited from possessing firearms do not acquire or possess a handgun in Maryland. *See* Deposition of Andy Johnson ("A. Johnson Dep."), Ex. 6, at 116:1–11. The 77R Handgun Registration process requires applicants to submit "a firearm application on the form that the Secretary [of the Maryland State Police] provides" and pay a $10 fee at the point of purchase. Md. Code Ann., Pub. Safety § 5-118(a).

The 77R Handgun Registration allows Defendants to positively identify handgun applicants because applicants provide their "name, address, Social Security number, place and date

of birth, height, weight, race, eye and hair color, signature, driver's [license] or photographic identification soundex number, [and] occupation." Md. Code Ann., Pub. Safety § 5-118(b)(1); *see also* A. Johnson Dep., Ex. 6, at 112:8–15. Maryland's compliance with the federal REAL ID Act, *see* Dept. Homeland Sec., *REAL ID Enforcement: Maryland*, https://www.dhs.gov/real-id/maryland, (last visited October 5, 2018). further ensures that the Maryland "driver's or photographic identification" is authentic, *see* 6 C.F.R. 37.15(a)(b), because the REAL ID Act requires Maryland to "include document security features on REAL ID driver's licenses and identification cards designed to deter forgery and counterfeiting."[1] *Id*. Moreover, under federal law, no Maryland resident may purchase a handgun in any state other than Maryland. 18 U.S.C. §§ 922(a)(3), (a)(5), (b)(3).

Defendants use information from the 77R Handgun Registration to conduct a background check on the prospective firearms purchaser, including a National Instant Background Check. *See* Webster Dep., Ex. 5, at 73:1–15; Deposition of James Johnson ("J. Johnson Dep."), Ex. 7, at 19:5–21:20. The 77R Handgun Registration process also requires Marylanders to wait seven business days (at least nine days total) after purchasing a handgun before taking possession of it. Md. Code Ann., Pub. Safety § 5-123(a). The 77R Handgun Registration process further requires applicants to register the purchased firearm with the Maryland State Police, Md. Code Ann., Pub. Safety § 118(a), allowing Defendants to locate and disarm individuals who subsequently become prohibited from handgun ownership. Webster Dep., Ex. 5, at 19:14–22:12.

---

[1] 6 C.F.R. 37.15(a)(b) (such ID cards "must contain at least three levels of integrated security features that provide the maximum resistance to persons' efforts to – (1) Counterfeit, alter, simulate, or reproduce a genuine document; (2) Alter, delete, modify, mask, or tamper with data concerning the original or lawful card holder; (3) Substitute or alter the original or lawful card holder's photograph and/or signature by any means; and (4) Create a fraudulent document using components from legitimate driver's licenses or identification cards." Moreover, "States must employ security features to detect false cards," including at a level of "[c]ursory examination, without tools or aids involving easily identifiable visual or tactile features, for rapid inspection at point of usage." 6 C.F.R. 37.15(c).

The 77R Handgun Registration safety course covered state firearm law, home firearm safety, and handgun mechanisms and operation in an online presentation that lasted approximately one hour. Deposition of James Russell ("Russell Dep."), Ex. 8, at 83:7–11.[2] The Police Training Commission created this presentation and provided it to applicants without charge. Md. Code Ann., Pub. Safety § 5-118(b)(3)(x) (2003). Ex. 10.

## C.   The Handgun License requirement (effective October 1, 2013 – present)

### 1.   The Handgun License statute (Section 5-117.1)

Maryland enacted Section 5-117.1 on October 1, 2013. Section 5-117.1 requires all handgun purchasers to apply for and obtain a Handgun License before Defendants allow law-abiding Marylanders to undertake the 77R Handgun Registration process. Section § 5-117.1(c). To apply for a Handgun License, Marylanders must submit: (1) an online application and "a nonrefundable application fee to cover the costs to administer the program of up to $50"; (2) proof of completion of a qualifying safety course within three years prior to submitting a Handgun License application; (3) a complete set of fingerprints; and (4) "a statement made by the applicant under the penalty of perjury that the applicant is not prohibited under federal or State law from possessing a handgun." Section 5-117.1(f)–(g).

This Handgun License safety course requirement replaces the 77R Handgun Registration online presentation and covers the same subject areas: state firearm law, home firearm safety, and handgun mechanisms and operation. Russell Dep., Ex. 8, at 83:7–11. Unlike the 77R Handgun Registration safety course, which could be taken in an hour, the Handgun License safety course requirement must take place in a classroom and last four hours. Section 5-117.1(d)(3). Defendants do not control or attempt to control the content of any course. Instead, each of the hundreds of

---

[2] The 77R Handgun Registration safety course is attached hereto as Ex. 9 in CD-Rom format and can be viewed via Windows Media Player.

private instructors throughout Maryland may create their own course curriculum, and the Maryland State Police does not monitor any course to ensure that the required material is being taught. A. Johnson Dep., Ex. 6, at 66:21–68:21; Russell Dep., Ex. 8, at 114:11–19; *see also* Maryland State Police, *Qualified Handgun Instructor,* https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/ Training/QualifiedHandgunInstructor.aspx ("Instructors will be responsible for the specific course and will attest/certify that they instructed the minimum criteria required in SB281."); *see also* Search for a Qualified Handgun Instructor, Maryland State Police, https://emdsp.mdsp.org/verification/ (hundreds of instructors).

Like the 77R Handgun Registration process, the Handgun License requires applicants to positively identify themselves. The Handgun License application requires "a complete set of the applicant's legible fingerprints taken in a format approved by the Director of the Central Repository and the Director of the Federal Bureau of Investigation." Section 5-117.1(f)(3)(i). The express terms of Section 5-117.1(f) require that "the Secretary [of the Maryland State Police] shall submit" the Handgun License applicant's fingerprints, placing the burden directly on the Secretary of the Maryland State Police, not the applicant, to make these required submissions. The Maryland State Police submits these fingerprints for a state and national criminal history records check and conduct a background check. Section 5-117.1(f). This is the same background check applicants underwent during the 77R Handgun Registration process, the only exception being that the 77R application does not require the resubmission of fingerprints. Webster Dep., Ex. 5, at 38:11–39:3.

The Maryland State Police must approve or deny a Handgun License application within 30-days of receiving it. Section 5-117.1(h). After the Maryland State Police approves the Handgun License application, the Maryland State Police mails the Handgun License to the applicant.

Deposition of Diane Armstrong ("Armstrong Dep."), Ex. 11, at 220:20–22. At this point, Plaintiffs may begin the 77R Handgun Registration process, including undergoing another background check and waiting an additional seven business days to take possession of the handgun. Webster Dep., Ex. 5, at 38:18–39:3; Md. Code Ann., Pub. Safety § 5-123. Throughout the Handgun License and 77R Handgun Registration processes, Defendants ban Marylanders from purchasing, renting, or receiving a handgun.

### 2. The Handgun License's implementing regulations

The Maryland State Police has added requirements to the Section 5-117.1 application process by adopting regulations. First, in addition to the "firearms orientation component that demonstrates the person's safe operation and handling of a firearm" of Section 5.117.1(d)(3)(iii), the regulations, COMAR 29.03.01.29C(4), tack on "a practice component in which the applicant safely fires at least one round of live ammunition." Section 5.117.1 makes no mention of a "practice component," much less any component in which the applicant must fire "one round of live ammunition." Such a practice component is a distinctly different requirement from the classroom requirement mandated by Section 5-117.1. Pennak Decl., Ex. 2, at ¶ 9.

Second, while Section 5-117.1 proscribes certain requirements regarding the curriculum of the safety course, COMAR 29.03.01.29A adds the requirement of a certificate of completion "issued by a Qualified Handgun Instructor." A qualified handgun instructor is defined in Md. Code Ann., Pub. Safety § 5-101(q), to include a person "recognized by the Maryland Police and Correctional Training commissions," or a person who "has a qualified handgun instructor license issued" by the Maryland State Police, or person who "has a certification issued by a nationally recognized firearms organization," but the Maryland State Police only accepts certificates from private instructors to whom it has issued licenses as qualified handgun instructors.

https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/

Training/QualifiedHandgunInstructor.aspx.

Third, while Section 5-117.1 requires only that a complete set of fingerprints be submitted

with the application, the Maryland State Police permits submission of fingerprints only if they are

taken via "live-scan" technology by a State-certified vendor (and submitted by the vendor, not the

applicant), COMAR 12.15.05, and requires that an application be submitted within 72 hours of the

time the prints are taken. Maryland State Police, *Fingerprinting* (last visited Oct. 5, 2018)

http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/F

ingerprinting.aspx. Contrary to Section 5-117.1(f)(3)(i), the Maryland State Police does not

"submit" the fingerprints to the Central Repository, the certified live-scan vendor does under

COMAR 12.15.05.03. Under this Maryland State Police-imposed process, the Maryland State

Police does not "submit" the required $30 fee for the background checks to the Central Repository,

as expressly required by Section 5-117.1(f)(3)(ii),(iii). Rather, the Maryland State Police requires

the applicant to pay that fee to the State-certified vendor directly, plus any additional fee that the

private, certified vendor is free to charge. *See* COMAR 12.15.05.07. The vendor then submits the

required fees to the Central Repository. Md. Dept. Of Pub. Safety, *Fingerprinting*

*Services/Fingerprinting Courses*, https://www.dpscs.state.md.us/publicservs/fingerprint.shtml,

(last visited October 5, 2018). In this manner, the Maryland State Police has avoided the statutory

tasks assigned to the Maryland State Police under Section 5-117.1(f) and imposed upon Handgun

License applicants the additional fees charged by State-certified private vendors.

Fourth, while Section 5-117.1(g)(1) requires an applicant to submit an application "in the

manner and format designated by the Secretary," the Maryland State Police has adopted an

application procedure that is entirely online and that places the entire burden on the applicant. *See*

Maryland      State      Police,   *Fingerprinting*   (last   visited   Oct.   5,   2018)

http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/F

ingerprinting.aspx. None of these procedures are set forth in Section 5.117.1 or in the regulations

but may be found only online at various State web sites and Advisories.

### D.      The Handgun License's purpose and effect are to prevent law-abiding Marylanders from acquiring and possessing handguns.

Defendants' expert Professor Daniel Webster admitted that Maryland implemented the

Handgun License to "intimidat[e]" Marylanders to prevent them from exercising their

constitutional right to acquire a handgun. Webster Dep., Ex. 5, at 30:1–33:16. Professor Webster's

view of this legislation is particularly relevant here because he was the lead "expert" witness

proffered by then-Senator Brian Frosh, the Handgun License's primary sponsor, in testimony

before the Maryland General Assembly in support of the legislation that became this law. *Id*. at

165:19–175:2.

Maryland's goal of preventing handgun possession in Maryland is not new. In 1999, then-

Maryland Attorney General Joseph Curran published a special report with the stated "goal" of

"eliminat[ing] widespread handgun ownership through restrictive handgun licensing." J. Joseph

Curran, *A Farewell To Arms The Solution to Gun Violence in America*, at 6, 63 (Oct. 20, 1999).

Ex. 12. He reiterated those views in a speech delivered on March 9, 2000, to the "Symposium:

'Guns as a Consumer Product: New Public Health and Legal Strategies to Reduce Gun Violence,'"

4   J.     Health    Care    L.   &    Pol'y   1    (2000),    available    at:

http://digitalcommons.law.umaryland.edu/jhclp/vol4/iss1/2, explaining that this goal "means" that

"we should restrict the future sale of handguns to those who can show a real, law enforcement

need for one." *Id*. at 5. In 2013, then-Governor O'Malley signed Senate Bill 281 into law "For the

purpose of . . . prohibiting a certain person from selling, purchasing, renting, transferring, or

receiving a certain regulated firearm unless the person presents or possesses a certain handgun qualification license issued by the Secretary or certain credentials or identification." *See* Firearm Safety Act, 2013 Maryland Laws Ch. 427 (S.B. 281). Ex. 13. That "certain person" Maryland intended to ban from obtaining a handgun includes every law-abiding, responsible citizen without a Handgun License except active law enforcement and military. Section 5-117.1(a). The Handgun License requirement implements Attorney General Curran's view that restrictive licensing should be used to restrict handguns to only law enforcement personnel.

The Handgun License requirement is well on its way to accomplishing this goal. From October 1, 2013 through 2017, the Handgun License requirement discouraged at least one-quarter of Marylanders who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin a Handgun License application from completing it and obtaining their Handgun License. *Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No. 5 (from October 1, 2013 through 2017, 30,877 Marylanders started a Handgun License application but stopped before completing it) *with* Collective Ex. 15, Dep. Ex. 48, 105, 106,[3] (Maryland issued 93,155 Handgun Licenses during this same time). Atlantic Guns' handgun sales decreased substantially in that same period compared to the years prior to the Handgun License requirement, confirming the Handgun License requirement is a barrier to handgun acquisition by law-abiding citizens. Schneider Decl., Ex. 1, at ¶¶ 7–9. The number of law-abiding citizens who wish to exercise their Second Amendment rights but who never even start a Handgun License application because of the Handgun License requirement's burdens is incalculable, but is certainly substantial. It includes both Individual Plaintiffs.

---

[3] The parties numbered all deposition exhibits sequentially. Because these exhibits were used in multiple depositions, they are simply referred to as "Dep. Ex."

**E.     The Handgun License requirement is burdensome.**

**1.     The Handgun License requirement is time-consuming.**

The Handgun License imposes an additional statutorily-permissible 30-day waiting period, tacked on to the 77R Handgun Registration process and mandatory seven day post-purchase waiting period. Section 5-117.1(d), (h). But Defendants' review often takes much longer than 30-days. *See* Armstrong Dep., Ex. 11, at 59:15–60:8. Since the Handgun License requirement took effect, more than 1,900 Marylanders have had their Handgun License application denied at the 30-day mark as incomplete. A. Johnson Dep., Ex. 6, at 123:7–124:7, 127:19–128:14, 139:4–140:18. These Handgun License applications were denied not because the applicant submitted an incomplete application but because the safety course instructor or fingerprint vendor failed to timely submit the Firearms Safety Training Certificate to the Maryland State Police or live-scan fingerprints to the Central Repository. *Id*.; Armstrong Dep., Ex. 11, at 187:2–190:20. In these instances, Defendants' review took longer than 30 days, through no fault of the Handgun License applicants. Armstrong Dep., Ex. 11, at 187:2–190:20.

**2.     The Handgun License requirement is inconvenient.**

In addition to the statutory delay, completing a Handgun License application takes time, requiring prospective handgun purchasers to begin an application, find a firearms instructor, complete a half day of firearms instruction and live-fire, locate a live-scan fingerprint vendor, obtain fingerprints, and complete their application online.

The safety course with live-fire requirement is inconvenient. Handgun License applicants must locate, schedule, travel to, and attend a safety course. Deposition of Dana Hoffman ("Hoffman Dep."), Ex. 16, at 22:16–23:1, 24:6–14. The Handgun License safety course alone requires at least a half day of classroom instruction. Section 5-117.1(d)(3)(i). Then, the applicant must ensure that the Handgun License instructor submits the training verification to the Maryland

State Police. Armstrong Dep., Ex. 11, at 47:1–48:12, 187:2–190:20. The live-fire requirement imposes upon Handgun License applicants the burden to locate, schedule, and travel to a shooting range. There are no ranges in Baltimore City or other urban areas accessible by mass transportation, requiring urban residents to travel outside their cities for this training. *See* A. Johnson Dep., Ex. 6, at 53:1–14; *see also* Russell Dep., Ex. 8, at 128:22–129:16; Pennak Decl., Ex. 2, at ¶¶ 15–19. The live-fire requirement also requires the applicant to secure a firearm and ammunition. *See* Russell Dep., Ex. 8, at 176:16–177:14, 182:18–183:6.

The fingerprint requirement is inconvenient. The applicant must locate a fingerprint live-scan vendor approved by the Maryland State Police, travel to that vendor, and have his or her fingerprints taken. Armstrong Dep., Ex. 11, at 91:8–92:19. In contrast to shooting ranges that cannot be found in urban areas, these private fingerprinting vendors are located almost entirely in urban areas of the State, with hardly any vendors in rural areas, including no vendors at all in small towns and even some entire counties, thus necessitating long drives.[4]

Once all of these steps are completed, the applicant must then log back online to complete his or her application. The inconvenience and daunting complexity of all this are self-evident and are confirmed by the volume of Handgun License-related complaints and questions received by the Maryland State Police, totaling more than 40 phone calls and 50 emails per day. Armstrong Dep., Ex. 11, at 101:22–103:13, 139:18–140:12. They are also confirmed by the fact that nearly 25 percent of Marylanders who initiate a Handgun License application do not complete it.

---

[4] *See* Md. Dept. Of Pub. Safety, *Fingerprinting Services/Fingerprinting Courses*, https://www.dpscs.state.md.us/publicservs/fingerprint.shtml. For example, there are no private vendors at all in Somerset County or Kent County or Caroline County and only one vendor in Queen Anne's County in Centreville. *Id.* There is no vendor north or east of Centreville until one reaches Elkton in Cecil County on the Eastern Shore. West of the Chesapeake, there is only one vendor in all of St. Mary's County and only two in Calvert County. *Id.* Western Maryland is similarly poorly served, with only one vendor located in Cumberland, in Allegany County, and no vendors at all between Cumberland and McHenry in Garrett County to the west and between Cumberland and Hagerstown in Washington County to the east. *Id.*

*Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No. 5 (from October 1, 2013 through 2017, 30,877 Marylanders started a Handgun License application but stopped before completing it) *with* Collective Ex. 15 (Maryland issued 93,165 Handgun Licenses during this same time). In these instances, Defendants have significantly delayed, if not outright deprived, a law-abiding Marylander of his or her Second Amendment right to acquire a handgun. Many more law-abiding citizens like the individual Plaintiffs are too daunted by the Handgun License requirement's burdens to even start a Handgun License application.

### 3.  The Handgun License requirement is expensive.

A Handgun License application costs over $200. This includes $50 to submit the application, Handgun Qualification License, *Maryland State Police*, https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/ Firearms/HandgunQualificationLicense.aspx (last visited Oct. 5, 2018), $75 or more to complete the safety course and live-fire requirement, Deposition of Mark Pennak ("Pennak Dep."), Ex. 17, at 21:15–22:14, about $50 or more for live-scan fingerprints, a $30 fee for fingerprint background check, and service fees charged by the vendor. Pennak Dep., Ex. 17, at 22:15–19 & Ex. 18; Schneider Dep., Ex. 19, at 17:7–18. This does not include the cost of renting a firearm and purchasing ammunition to complete the live-fire requirement. Nor does it include the transportation costs in traveling to the fingerprint vendor and to the shooting range. By way of comparison, the average cost of a new handgun in Maryland is between approximately $500 and $600. Schneider Decl., Ex. 1, at ¶ 10. The $200+ out-of-pocket costs of obtaining a Handgun License, plus the costs of time off from work and travel, is a disproportionate financial burden on the exercise of a constitutional right. Under the 77R Handgun Registration process, the cost was only $10 and required no time off from work or travel costs.

### F.     The Handgun License requirement is unnecessary and ineffective.

#### 1.     The additional 30-day delay is unnecessary.

Prior to the Handgun License requirement, Defendants investigated all potential handgun purchasers in seven days. Md. Code Ann., Pub. Safety § 5-118; *id*. at § 123(a). Defendants have not provided any support to justify a 30-day delay to process a Handgun License application, and the record does not support the need for any such delay. Defendants even concede that some "Handgun License applications have been processed the same business day that they are received." Col. Pallozzi Interrog. Resp., Ex. 20, No. 7. But the complexity of the Handgun License application process under Section 5-117.1 and its implementing regulations is fraught with potential for significant delay up to and beyond the statutory 30-day mandate. Many applications do not get processed within 30 days, over 1,900 ending up on an "administrative log" in a two-and-a-half year period because a vendor did not submit required paperwork. *See* Administrative Log, Ex. 21; *E.g.*, Armstrong Dep., Ex. 11, at 187:2–190:20. With such significant delay incumbent upon processing and providing Handgun Licenses, Defendants' failure to justify the necessity is a critical failure in carrying their burden of proof.

#### 2.     The fingerprint requirement is unnecessary.

The Handgun License fingerprint requirement is unnecessary to positively identify handgun purchasers because it is redundant of the pre-existing 77R Handgun Registration identification requirement. Defendants admit that both processes require applicants to positively identify themselves with REAL ID compliant photographic identification. *See above* at pages 5– 6; A. Johnson Dep., Ex. 6, at 111:19–112:19, 116:1–11. Moreover, the fingerprint requirement is unnecessary for Defendants to locate and disarm handgun owners who are subsequently disqualified from handgun ownership because the 77R Handgun Registration process provided this ability. Webster Dep., Ex. 5, at 19:14–20:14, 21:17–22:14.

The fingerprint requirement is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government-issued photographic identification of another individual who does not have a criminal record. Maryland has no evidence that anyone in Maryland fitting this description has ever attempted to purchase a handgun. A. Johnson Dep., Ex. 6, at 114:4–117:7. Because Maryland is now a REAL ID compliant state, there no likelihood that false Maryland identification will be used for such a purchase. The fingerprint requirement is unnecessary.

### 3.    The classroom training with live-fire requirement is unnecessary.

The Handgun License classroom training requirement adds an additional half day of classroom training to the 77R Handgun Registration course requirement without expanding the curriculum, which is the same as the 77R Handgun Registration prior course requirement. Under both the 77R Handgun Registration and Handgun License requirements, all prospective handgun purchasers must complete a safety course on state firearm law, home firearm safety, and handgun mechanisms and operation. *Compare* Russell Dep., Ex. 8, at 83:7–11, 124:9–125:6 & Ex. 9, *with* Section 5-117.1(d)(3)(i),(ii). Defendants concede that there is no difference between the old and new courses' curricula, Russell Dep., Ex. 8, at 80:6–83:11, except of course, the additional burden of the live-fire requirement.

The live-fire requirement is also unnecessary. Two of Defendants' experts, Capt. James Russell and former Baltimore County Police Chief James Johnson, conceded that firing a single round with a handgun is not helpful to acquire skills of safe operation and handling of a firearm. J. Johnson Dep., Ex. 7, at 52:14–53:2; *see* Russell Dep., Ex. 8, at 106:8–108:7.

### 4.    The Handgun License requirement is ineffective.

The Handgun License has not improved public safety. Comparing Maryland crime data for the four years prior to the four years since the Handgun License took effect in 2013, the following

have all increased: homicides, shooting homicides, handgun homicides, shooting homicide rates, the handgun homicide rates, and the number of recovered handguns used in crime. *See* Md. Criminal Statistical Data, Ex. 22.

Moreover, Maryland has not experienced a slower rate of growth in firearm homicide rates compared to states that do not have permit-to-purchase laws like the Handgun License. Moody Decl., Ex. 23, at ¶¶ 4, 12–14, 16–17. Similarly, the Handgun License has not reduced firearm homicides. *See* A. Johnson Dep., Ex. 6, at 98:7–99:10; Moody Decl., Ex. 23, at ¶ 8. Broadly speaking, permit-to-purchase laws, like the Handgun License requirement, are not associated with any reduction in a state's firearm homicide rate. Moody Decl., Ex. 23, at ¶¶ 4, 17; *See* Kleck Decl., Ex. 24, at ¶ 5–23. In Baltimore, the homicide rate has skyrocketed since the Handgun License took effect, topping all other major cities in 2017. *See* Luke Broadwater and Ian Duncan, *'Neighborhoods are crying out': Baltimore has highest homicide rate of U.S. big cities*, The Baltimore Sun, Sept. 25, 2018, *available at* http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-fbi-data-20180924-story.html.

The fingerprint requirement, specifically, is ineffective. It does not deter straw purchasing or purchasing with a false identification. J. Johnson Dep., Ex. 7, at 24:4–12. In fact, Defendants have no evidence that the Handgun License requirement has stopped or deterred even a single straw purchaser. *Id*. at 25:10–16. Defendants have not even attempted to determine the prevalence of straw purchasers in Maryland. *Id*. at 28:6–14; A. Johnson Dep., Ex. 6, at 76:16–22. Likewise, Defendants have no information regarding the number of purchases effectuated with a false identification. A. Johnson Dep., Ex. 6, at 117:3–7. Additionally, Defendants have no information demonstrating that the Handgun License has reduced the number of handguns recovered in crime or that the Handgun License requirement has reduced the number of firearms it recovers from

prohibited individuals each year. *Id.* at 78:3–79:4, 88:21–89:2, 109:17–110:11, 110:22–111:9. Instead, Maryland implemented the fingerprint requirement, under the guise of deterring straw purchasers, to "intimidat[e]" Marylanders and keep them from exercising their constitutional right to acquire a handgun. Webster Dep., Ex. 5, at 30:1–33:16; *see also* J. Johnson Dep., Ex. 7, at 24:14–25:3.

The classroom training with live-fire training requirement also is ineffective. The undisputed facts confirm that the live-fire training has had no positive effect on public safety in Maryland. Defendants have no information regarding the number of unintentional accidental shootings in Maryland each year. A. Johnson Dep., Ex. 6, at 75:17–76:11. Defendants have no evidence demonstrating that accidental shootings are a problem, and Defendants' expert admits that the live-fire requirement is not adequate. J. Johnson Dep., Ex. 7, at 52:14–53:2. Nor do Defendants have any information demonstrating that the Handgun License has effected gun storage practices in Maryland or that gun storage is a problem in Maryland. A. Johnson Dep., Ex. 6, at 109:17–110:11.

**G.     The statutory terms "receive" under Section 5.117.1(c) and "receipt" under Section 5-144 are facially vague.**

The prohibitions imposed by Section 5-117.1 are broad. On the seller's end, a dealer (or other person) may not "sell, rent or transfer" a handgun to a person who lacks a Handgun License, while a purchaser (or other person) may "purchase, rent or receive a handgun only" if they have a Handgun License or fall within one of the exceptions. Section 5-117.1(b), (c). Neither "transfer" nor "receive" is defined as used in subsections 5-117.1(b) and (c), respectively. Enforcement of Section 5-117.1 is under Md. Code Public Safety § 5-144. Neither "transfer" nor "receipt" is defined in Section 5-144(a), which criminalizes "participation" in a "receipt" or a "transfer" that is in violation of Section 5-117.1.

**Argument in support of Plaintiffs' Cross-motion for Summary Judgment**

**A.    The Handgun License requirement violates the Second Amendment.**

Maryland's Handgun License requirement violates Marylanders' fundamental right to acquire a handgun in the home for self-defense. *Heller*, 554 U.S. at 628–29; *McDonald v. Chi.*, 561 U.S. 742, 750 (2010); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quotation omitted, collecting cases), *cert. denied*, 138 S. Ct. 1988 (2018). The Handgun License requirement is unconstitutional per se under *Heller*'s holding and analysis. It is also independently unconstitutional under the two-part analysis employed by the Fourth Circuit.

**1.    The Handgun License requirement is unconstitutional per se under the text, history, and tradition standard of *Heller* because it bans handgun acquisition.**

Handgun bans are unconstitutional per se. *Heller*, 554 U.S. at 635. In *Heller*, the Supreme Court struck down as unconstitutional a handgun ban, and in doing so engaged in an extensive text, history, and tradition analysis that established a process for determining whether a challenged law offends the Second Amendment. *See id*. at 576–625. The Court established that a ban of a category of firearms that are commonly possessed by law-abiding citizens (*i.e.*, handguns) is so clearly unconstitutional that the Court need not resort to applying any further standard of review. *Id*. at 636. Because there is no textual or historical support for a handgun ban, it is a policy choice that is simply "off the table," and is unconstitutional per se. *Id*.

*Heller* precludes interest-balancing of "future legislatures or [ ] even future judges." *Id*. at 634–35 (declining to adopt either Justice Breyer's explicit interest-balancing inquiry or the enhanced intermediate or strict scrutiny often applied in the First Amendment arena). The Court

held that such interest-balancing is inappropriate because the Second Amendment was "the very *product* of interest balancing" at the time of its enactment, and the right of law-abiding, responsible citizens to use arms is elevated above all other interests. *Heller*, 554 U.S. at 635 (emphasis in original).[5] Consistent with this approach, the Court struck down a handgun ban notwithstanding evidence that handgun violence presents a serious problem in the United States. *Heller*, 554 U.S. at 634–35.

The Supreme Court's subsequent *McDonald* and *Caetano* decisions that affirmed *Heller's* text, history, and tradition standard is the only proper analysis for evaluating the constitutionality of bans like the Handgun License requirement. *McDonald*, 561 U.S. at 790–91 (rejecting the notion that judges will be forced to make difficult empirical judgments because doing so is precluded by the Court's holding and analysis in *Heller*); *Caetano v. Mass.*, 136 S. Ct. 1027, 1027–28 (2016) (vacating and remanding where state supreme court failed to apply *Heller's* reasoning and analysis to a stun gun ban). In both cases, the Supreme Court stayed true to *Heller's* text, history, and tradition analysis and chose not to engage in any form of interest balancing. Taken together, *Heller*, *McDonald*, and *Caetano* are unequivocal. The only analysis for a handgun ban is *Heller's* text, history, and tradition approach, which demonstrates that such a ban is unconstitutional per se.

Maryland bans its law-abiding citizens from acquiring handguns unless they first obtain a Handgun License. Section 5-117.1's plain language makes clear that this is a ban, prohibiting with narrow exception all Marylanders from "purchas[ing], rent[ing], or receiv[ing] a handgun" unless they "possess[] a valid handgun qualification license issued to the person by the Secretary in

---

[5] Like the Second Amendment, several other individual rights are subject to "categorical constitutional guarantees" rather than open-ended balancing tests. *See Heller v. D. C.*, 670 F.3d 1244, 1283 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) (citing *Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) (recognizing a categorical constitutional guarantee under the Sixth Amendment for the accused to be confronted with the witness against him)).

accordance with this section." Section 5-117.1(c). Maryland added to its already-effective 77R Handgun Registration requirement the complex and burdensome requirements of the Handgun License application that impose an additional delay of 30 days or more upon a law-abiding citizen seeking to acquire a handgun. Burdening the acquisition of a handgun with an unnecessary regulatory scheme is a ban plain and simple. Under *Heller*, the inquiry ends here and the Handgun License requirement cannot stand.

>  **2.      The Handgun License requirement is a pretext to reduce the exercise of a constitutional right.**

Defendants' purported interest (public safety) is a disingenuous pretext for preventing law-abiding Marylanders from acquiring and possessing handguns, which is plainly improper. Maryland enacted the Handgun License requirement to "intimidate" the citizens of Maryland from acquiring a handgun as part of a restrictive licensing scheme designed to impede handgun purchases. Webster Dep., Ex. 5, at 30:1–33:16; *see also* J. Johnson Dep., Ex. 7, at 24:14–25:3. Second Amendment jurisprudence makes clear that this is unconstitutional. *State v. Reid*, 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretense of regulating, amounts to a destruction of the right . . . [is] clearly unconstitutional.") (cited in *e.g.*, *Heller*, 554 U.S. at 629).

The Supreme Court stated in *Saenz v. Roe*, 526 U.S. 489 (1999), that "[i]f a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'" *Id.* at 499 n.11 (quoting *United States v. Jackson*, 390 U.S. 570, 581 (1968) (brackets and ellipsis the Court's)); *see also Murdock v. Com. of Pa.*, 319 U.S. 110–11 (1943) (the state may not enact a law for the purpose of reducing the exercise of a constitutional right). Nor may a state suppress adverse secondary effects of a constitutional right by suppressing the right itself. *See, e.g.*, *City of L.A. v. Alameda Books, Inc.*,

535 U.S. 425, 449–50 (2002) ("It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech").

This principle applies with equal force in the Second Amendment context. For instance, in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*"), the United States Court of Appeals for the District of Columbia Circuit struck down the District's ban on registering more than one pistol per month. *Id.* at 280. The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* But the court rejected that defense because "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Id.*; *see also Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. Dist. of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ("it is not a permissible strategy to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right" (quotation marks omitted)).

The Handgun License statute made clear its goal was to reduce Marylanders' exercise of their Second Amendment constitutional rights. *See* Firearm Safety Act, 2013 Maryland Laws Ch. 427 (S.B. 281) (Handgun License requirement implemented "For the purpose of . . . prohibiting a certain person from . . . purchasing . . . a certain regulated firearm unless the person presents or possesses a certain handgun qualification license issued by the Secretary or certain credentials or identification."); *see also* J. Joseph Curran, A Farewell To Arms The Solution to Gun Violence in America, at 6, 63 (Oct. 20, 1999) (Maryland has long had the stated "goal" of "eliminat[ing] widespread handgun ownership through restrictive handgun licensing."). Maryland enacted the Handgun License with no evidence that it was necessary, and Defendants have not even bothered

to determine if Maryland's public safety has improved. The Handgun License is intended to intimidate Marylanders from exercising their constitutional rights, *see* Webster Dep., Ex. 5, at 30:1–33:16, and it has indisputably had this effect. Defendants' interests are pretextual, and the Handgun License fails any level of scrutiny for this reason alone.

For example, Defendants claim that fingerprints could be used to identify Handgun License holders who subsequently become disqualified from possessing a firearm, but the Maryland State Police does not actually do this. A. Johnson Dep., Ex. 6, at 136:11–16. The undisputed facts demonstrate that this interest is a pretext to further burden and deter law-abiding Marylanders from acquiring a handgun.

Similarly, Defendants concede that they do not monitor, control, or govern the Handgun License safety course's content. *E.g.*, *id.*, at 66:21–68:21. Defendants instead allow individual Handgun License instructors to create their own curricula, allowing for substantial variation between courses. Russell Dep., Ex. 8, at 67:18–68:2, 69:18–71:8. The exceptions to the safety course with live-fire requirement further illustrate the pretextual nature of Defendants' claimed interests. For example, those who move to Maryland are required to register their handgun within 90 days of establishing residency, but are not required to take any safety course. Md. Code Ann., Pub. Safety § 5-143(a). Likewise, applicants with a hunting license from any jurisdiction are exempted from the live-fire requirement, without regard to whether the hunting training involved live-fire of a handgun. A. Johnson Dep., Ex. 6, at 68:17–21. Defendants concede that this requirement is specious at best because "firing one round is not adequate." A. Johnson Dep., Ex. 6, at 52:9–53:2; *see also* Pennak Decl., Ex. 2, at ¶¶ 7–19. This requirement is designed to erect a barrier to access for those living in urban areas like Baltimore City where no ranges can be found or reached by mass transportation. The undisputed facts demonstrate that the Handgun License

and its requirements are a pretext to further burden and thus discourage law-abiding Marylanders from acquiring a handgun.

### 3. The Handgun License requirement is unconstitutional under the two-part approach used by the Fourth Circuit.

The Handgun License requirement is also independently unconstitutional under the two-part analysis employed by the Fourth Circuit. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *see also Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir. 2017) (en banc), *cert denied*, 138 S. Ct. 469 (2017). Under this analysis, a court must first determine whether the challenged law burdens conduct protected by the Second Amendment as it was historically understood. *Chester*, 628 F.3d at 680. If it does, the court must then apply "an appropriate form of means-end scrutiny." *Id*. The Handgun License burdens conduct within the Second Amendment's guarantee. Strict scrutiny is the only appropriate level of scrutiny because the Handgun License burdens the Second Amendment's core right. And the Handgun License requirement cannot survive strict scrutiny because it is not the least restrictive alternative to achieve a compelling interest.

### a. The Handgun License requirement burdens conduct within the scope of the Second Amendment's guarantee.

The Handgun License requirement satisfies the first part of the two-part analysis because it burdens conduct that comes within the scope of the Second Amendment as it was historically understood. On this there can be no dispute. *Heller* is clear: "Whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The Handgun License requirement burdens precisely this right and thus falls squarely within the scope of the Second Amendment.

The Handgun License requirement is not presumptively constitutional. It does not fit within the longstanding regulations noted in *Heller*. *Id*. at 626–27 n.26 (noting as "presumptively

constitutional lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms"). The Handgun License requirement affects law-abiding and responsible citizens and is not a longstanding prohibition or condition on the commercial sale of arms. Nothing in the Second Amendment's language, history, jurisprudence, or commentary suggests that it is. Both courts to address government-imposed delays on handgun acquisition agree. In *Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal. 2014), the United States District Court for the Eastern District of California stated that "in terms of *Heller's* longstanding presumptively lawful regulations, Defendant has not established that the 10-day waiting period is a presumptively lawful longstanding regulatory measure that imposes a condition and qualification on the commercial sale of a firearm." The United States Court of Appeals for the Ninth Circuit confirmed this, finding that historical "[d]elays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business." *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 945 (2018).

Because the Handgun License requirement burdens conduct well-within the scope of the Second Amendment and is not presumptively constitutional, the Court must progress to the second part of the analysis and determine the level of heightened scrutiny to apply in reviewing the Handgun License requirement.

### b. Strict scrutiny is necessary because the Handgun License requirement severely burdens the Second Amendment's core right.

Should the Court engage in a means-end analysis, Fourth Circuit precedent requires strict scrutiny. From the time that it adopted the two-part analysis in *Chester*, the Fourth Circuit has stated repeatedly that if a challenged law implicates the core right of a law-abiding, responsible citizen to possess a firearm in his or her home, the law is subject to a strict scrutiny analysis. For

instance, in *Chester*, the defendant, a misdemeanant, unsuccessfully moved to dismiss his indictment on the grounds that the Supreme Court had identified only the mentally ill and felons as classes of persons that could be denied the right to possess firearms. *Chester*, 628 F.3d at 673. The Fourth Circuit declined to apply strict scrutiny to the prohibition on ownership of firearms by misdemeanants, explaining:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id*. at 682–83 (emphasis in original).

The undisputed facts demonstrate that Plaintiffs possess the critical characteristic lacking in defendant Chester: they are law-abiding, responsible citizens who seek to acquire a handgun for self-defense in the home. They do not fall into any less-protected category, and a ban on their ability to acquire a handgun for self-defense in their home is subject to strict scrutiny.

Subsequently, the Fourth Circuit opined that a ban on possession of firearms in the home is subject to strict scrutiny: "As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *see also United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*[.]"). The court in *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) agreed, adding that intermediate scrutiny applies to bearing arms outside the home, rejecting the view that would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny . . ." *Id*. at 878. In

*Kolbe*, 849 F.3d at 138, the court applied intermediate scrutiny rather than strict scrutiny because the challenged law left "citizens free to protect themselves with . . . most importantly – handguns." Thus, applicable Fourth Circuit law mandates that strict scrutiny is the proper standard of review when a law like the Handgun License requirement infringes on the right of a law-abiding, responsible citizen "to arm oneself at the home." *Woollard*, 712 F.3d at 878.

### c. Defendants cannot meet their burden under strict scrutiny because the Handgun License requirement is not the least restrictive alternative to achieve a compelling interest.

To satisfy strict scrutiny, Defendants must establish that the challenged laws are narrowly tailored to promote a compelling government interest. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 189 (4th Cir. 2013). To be narrowly tailored, the law must employ the least restrictive means to achieve the interest. *See United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 813 (2000); *see also Sons of Confederate Veterans, ex rel. Griffin v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 610, 626 (4th Cir. 2002). Thus, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Entm't Grp.*, 529 U.S. at 813. Defendants do not have a legitimate interest in discouraging the exercise of the right itself, so the only conceivable interest is to protect public safety and deter crime. The Handgun License requirement does neither. It certainly is not the "least restrictive" means of achieving those goals. Rather, the Handgun License requirement imposes redundant and unnecessary burdens, over and above the existing 77R Handgun Registration process, on law-abiding Marylanders' constitutional right to acquire a handgun. It necessarily fails strict scrutiny.

### 1. The additional 30-day delay is not the least restrictive alternative to achieve a compelling interest.

Maryland allows Defendants up to 30 days to approve or deny a Handgun License application (in addition to the time it takes to complete a Handgun License application and

subsequent 77R Handgun Registration process), explicitly banning law-abiding Marylanders from exercising their Second Amendment right to acquire a handgun during this period. Defendants have not articulated any interest this delay achieves, though it is presumably to ease Defendants' administrative burden in reviewing Handgun License applications. Defendants' administrative burden is not a compelling interest. *See Chester*, 628 F.3d at 692 (noting that "Section 922(g)(9) is not merely intended to accomplish bureaucratic shortcuts or administrative convenience") (Davis, J., concurring); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) ("Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny."); *Heller III*, 801 F.3d at 287 (Henderson, J., concurring in part and dissenting in part) (same). The undisputed fact that Defendants processed 77R Handgun Registration applications within seven business days prior to the Handgun License requirement, and still do every time a licensee purchases a handgun, demonstrates that the Handgun License cannot be the least restrictive means to achieve whatever Defendants' unidentified interest may be.

### 2. The fingerprint requirement is not the least restrictive alternative to achieve a compelling interest.

Defendants claim the fingerprint requirement allows them to positively identify Handgun License applicants, allowing them to "mak[e] it more difficult for a prohibited person to obtain access to a firearm." Col. Pallozzi Interrog. Resp., Ex. 20, No. 20; A. Johnson Dep., Ex. 6, at 111:19–112:7. Defendants also claim that the fingerprint requirement allows them to disarm those who become prohibited after legally purchasing a handgun. *See* A. Johnson Dep., Ex. 6, at 40:1–3, 65:7–13.

But Defendants admit that the 77R Handgun Registration requirement already allowed Defendants to accomplish this interest. Maryland State Police's corporate designee testified that:

Q: Under the 77R process then and now individual purchasers of handguns are checked to see whether or not they are legally able to possess a handgun; correct?

A. Yes.

Q. And if they are legally able to possess a handgun under the 77R process, presumably they would also pass the [Handgun License] application process and obtain a[] [Handgun License]; correct?

A. Yes.

A. Johnson Dep., Ex. 6, at 116:1–11; *see also* Webster Dep., Ex. 5, at 38:9–39:3 (Handgun License background check is "not materially different" from subsequent 77R background check). Defendants positively identified with certainty all 77R Handgun Registration applicants without requiring fingerprints. *Id.*

Further, Defendants admit that the 77R Handgun Registration process already allowed them to locate and disarm handgun owners who were subsequently disqualified from handgun ownership. Professor Webster testified:

Q: . . . When I purchase a handgun in Maryland, it's registered with the Maryland State Police; am I correct?

A. That's correct.

Q. And the Maryland State Police has a registry of handgun ownership such that, if I were to be convicted of a disqualifying offense, they could readily look me up, determine if I owned a handgun, and dispossess me of that handgun; correct?

A. That's correct.

Webster Dep., Ex. 5, at 19:14–20:3. Professor Webster confirmed that Defendants have "always been able to do that." *See id.* at 20:4–14. Because the 77R Handgun Requirement was less restrictive and accomplished Defendants' interest, the Handgun License's fingerprint requirement is necessarily not the least restrictive alternative.

### 3. The classroom training with live-fire requirement is not the least restrictive alternative to achieve a compelling interest.

The safety course required under the Handgun License requirement is not the least restrictive means to achieve Defendants' interest because it is, at best, redundant of the training course required under the 77R Handgun Registration process. The safety courses' curricula are substantively identical. *Compare* Md. Code Ann., Pub. Safety § 5-117.1(d) *with* Ex. 9. Defendants cannot dispute this fact because they concede that they do not control or even have the ability to monitor the content of the safety course's instruction. *E.g.*, A. Johnson Dep., Ex. 6, at 66:21–68:21. Further, by exempting those who happen to "lawfully own a [handgun]" before the Handgun License went into effect, Section 5-117.1(e)(6), Defendants tacitly admit that the 77R Handgun Registration's safety course already achieved Defendants' interest because these individuals watched only the 77R Handgun Registration video safety presentation. Because the 77R Handgun Requirement was less restrictive and accomplished Defendants' interest, the Handgun License's safety course with live-fire requirement is necessarily not the least restrictive alternative.

### B. The Handgun License requirement violates the Due Process Clause of the Fourteenth Amendment.

Plaintiffs establish in Plaintiffs' Opposition to Defendants' Cross Motion at pages 57–63 below, incorporated herein by reference, the words "receipt" and "receive" as used in the Handgun License requirement do not give "fair notice of the conduct it punishes," and are "so standardless that it invites arbitrary enforcement" within the meaning of *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "The Government violates [the due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id*.

C.      **The Maryland State Police acted *ultra vires* in implementing the Handgun License regulations.**

Plaintiffs establish in Plaintiffs' Opposition to Defendants' Cross Motion at pages 63–68 below, incorporated herein by reference, the Maryland State Police acted *ultra vires* in implementing the Handgun License regulations. Although the Handgun License requirement provides that "[t]he Secretary may adopt regulations to carry out the provisions of this section," § 5-117.1(n), it does not allow the Maryland State Police to add *new* "provisions," such as the live-fire requirement, by requiring all Handgun License instructors to obtain "a qualified handgun license issued by the Secretary," and by requiring the applicant, not the Secretary, to submit fingerprints to the Central Repository.

**Argument in Opposition to Defendants' Motion for Summary Judgment**

**A.      Plaintiffs have standing to challenge the Handgun License requirement.**

This suit is properly before this Court even if only one of the Plaintiffs has standing. *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 775 (D. Md. 2014) ("As Kolbe and Turner have standing, jurisdiction is secure, and the court may adjudicate this dispute whether or not the additional plaintiffs have standing."), aff'd on other grounds, 813 F.3d 160 (4th Cir. 2016); *see also Clinton v. City of N.Y.*, 524 U.S. 417, 431 n. 19 (1998); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that when one party has standing to bring a claim, the same claims brought by other parties to the same lawsuit are justiciable). Each Plaintiff has independent standing to bring this lawsuit, and this suit is properly before the Court in its entirety even if the Court finds that only one has standing.

**1.      Maryland Shall Issue has standing, as do the individual Plaintiffs.**

MSI has standing to bring this suit under two independent principles: (1) organizational standing and (2) representative standing. As explained in *The Equal Rights Center v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510 (D. Md. 2010), "organizational standing[] permits a group to allege standing on its own behalf for injuries directly inflicted upon the organization." *Id.* at 518 (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). An organization has standing to sue on its own behalf where it satisfies the three elements of Article III standing: (1) "the plaintiff . . . suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted).

The first element (the injury in fact requirement) is satisfied where the challenged actions have worked to "frustrate" achievement of the organization's purposes and objectives. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) (explaining that a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests"). Under this test, "[a]n organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012).

MSI satisfies this test because MSI's mission is to "endorse[], promote[] and encourage[] law-abiding adults . . . to acquire and to become proficient in the use of handguns for lawful self-defense purposes," Pennak Decl., Ex. 2, at ¶¶ 2, 6, and the Handgun License requirement impedes these purposes by making it much more difficult for law-abiding adults to acquire handguns. It also requires "legal action to defend the constitutional rights of MSI members to acquire handguns[,] [which] consumes valuable resources of MSI, including time and money." *Id.* MSI also vigorously opposed enactment of this legislation and the Maryland State Police regulations and instituted this case in furtherance of that opposition so as "to defend the constitutional rights of MSI members to acquire handguns." *Id*., at ¶¶ 2, 5-6. *City of Chi. v. Matchmaker Real Estate Sales Ctr., Inc*., 982 F.2d 1086, 1095 (7th Cir. 1992) (conferring standing upon City of Chicago who initiated suit as an advocate for its residents). Moreover, the Handgun License requirement has "adversely impacted the ability of MSI to attract new members, as MSI membership is largely composed of individuals who have or seek to have handguns in the home for lawful self-defense." Pennak Decl., Ex. 2, at ¶¶ 2, 6. Contrary to Defendants' assertion, Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs. Mem."), at p. 14, MSI's membership did in

-34-

fact decrease as a result of the enactment of the Handgun License requirement. Pennak Decl., Ex. 2, at ¶ 6. These adverse impacts are present and ongoing and thus are not remotely conjectural.

The causal connection and redressability between this injury to MSI and matters complained of in this suit are also direct and immediate. The burdens imposed by the Handgun License would be redressed by the declaratory and injunctive relief requested. This relief would affect MSI directly because MSI's membership grows and prospers by the exercise of these rights by law abiding citizens. *See* Pennak Dep., Ex. 17, at 45:1–11. MSI also has standing to assert the vagueness claim because MSI's mission includes education and instruction concerning firearms and MSI has many members, including the President of MSI, who actually perform instruction in furtherance of MSI's mission. *See* Pennak Decl., Ex. 2, at ¶¶ 1-3. All these instructors, as well as other MSI members, "have been burdened and are deterred by the vague provisions of the HQL from temporarily loaning handguns to others." *Id*. at ¶ 3.

MSI also has representative standing to sue on behalf of its members because its members would individually have standing to sue on all the claims brought in this case. MSI's membership includes each of the individual Plaintiffs in this case as well as numerous other individuals who do not have a Handgun License and are thus subject to the Handgun License application's burdens and obstacles. The individual Plaintiffs, as well as MSI's other members, wish to purchase a handgun without a Handgun License. These individuals satisfy each of the familiar elements of Article III standing, viz., injury-in-fact, causation and redressability. *See Havens*, 455 U.S. at 378 (1982) ("In determining whether [an organizational plaintiff] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual.").[6]

---

[6] Defendants mistakenly rely on *Maryland Highways Contractors Association, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). In that case, the court held that the association had failed to prove its allegation that its members "had been injured in their business or property." The standing of MSI and MSI's members here are not based on such

Defendants argue incorrectly that Plaintiffs must have applied for and been denied a Handgun License. Defs. Mem., at pp. 12 (citing *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012)). It is well-settled that "[t]he Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands.'" *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969); *see also, e.g., Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938) ("As the ordinance is void on its face, it was not necessary for appellant to seek a permit under it").

This principle has strong application in Second Amendment challenges to laws that preclude a person from acquiring a firearm. For example, in *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), the D.C. Circuit sustained the plaintiff's standing to challenge "a regulatory scheme" that impaired his ability to obtain a firearm. In so holding, the court expressly rejected the same argument made by Defendants here, explaining that the plaintiff "does not claim he has a right to be issued a 'permit' or 'license' by the Government" and that "the right to possess, not the right to a permit or license, was the substance of their claim." *Id.* at 501. Here, as in *Dearth*, plaintiffs "raise[] a constitutional challenge to the regulatory and 'statutory classifications' that bar [plaintiffs] from acquiring a firearm" and thus do not have to apply for a permit that they do not want. *Id.*; *see also A.N.S.W.E.R. Coal. v. Salazar*, 915 F. Supp. 2d 93, 103 (D.D.C. 2013) (holding that "[a] permit denial, however, is not a prerequisite to establish standing" to challenge the very regulation that restricted access to the areas in which plaintiffs wished to protest). Second Circuit law is in accord. *See, e.g., Prayze FM v. FCC*, 214 F.3d 245, 251 (2d Cir. 2000) (holding that facial challenges do not require an application). Plaintiffs here want to purchase a handgun *without* a

---

injuries to "business or property" but on the burdens placed on the exercise of their constitutional rights by the Handgun License requirements. Pennak Decl., Ex. 2, at ¶ 3. *See N.Y.Civil Liberties Union v. Grandeau,* 528 F.3d 122, 131 (2d Cir. 2008) ("administrative burdens" on constitutional rights sufficient to establish Art. III standing).

Handgun License and are barred from doing so. *See Dearth*, 641 F.3d at 501 ("We agree with Dearth that the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury.").

The individual Plaintiffs also have standing to challenge facially the Handgun License requirement on vagueness grounds. The Supreme Court has repeatedly instructed that standing does "not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (collecting cases). Here, for example, Ms. Miller is married to a person who has a handgun. *See* Miller Dep., Ex. 4, at 16:10–21. Under Section 5-144, both Mrs. Miller and her husband are at risk of arbitrary and discriminatory enforcement of the vague provisions at issue simply because they have "participated" in Mrs. Miller's "receipt" of a handgun in the home or on the range when she did not possess a Handgun License within the meaning of Section 5-117.1(c) and Section 5-144(a). Ms. Miller testified that she is in fear of precisely this sort of prosecution. Miller Dep., Ex. 4, at 19:5–10, 38:1–40:13. MSI members also include persons who are instructors as well as others who are lawful owners of handguns. Pennak Decl., Ex. 2, at ¶ 3. The vague language of Section 5-117.1(c), which allows only a person who has a Handgun License to "receive" a handgun, places every one of those individuals at risk of arbitrary or discriminatory enforcement of Section 5-117.1(c) should they allow any person who does not have a Handgun License to "receive" a handgun. *Id*.

Defendants' standing argument fails even as to "as applied" challenges. *Decastro*, on which Defendants rely, acknowledges that in "as applied" challenges, it is not necessary to actually apply where such an application would be "futile." *Decastro*, 682 F.3d at 164. Here, applying for a Handgun License would be "futile" for at least one MSI member, Dana Hoffman, a 75 year old

woman who lives alone in Takoma Park, MD. Hoffman Dep., Ex. 16, at 8:1–14:3. Ms. Hoffman

suffers from a documented medical condition, hyperacusis, which is a severe sensitivity to sound.

*See* The Hyperacusis Network, *What is Hyperacusis*, http://www.hyperacusis.net/what-is-it/.

Because of that condition, Ms. Hoffman "can't go to a class and be in a room with a bunch of other

people learning about gun safety, and also can't go to a firing range and fire a gun." Hoffman Dep.,

Ex. 16, at 22:16–23:5. Without "proof" of the required training and a training "certification"

expressly required by Section 5.117.1(g), Ms. Hoffman's application would be automatically

rejected. MSI has associational standing to bring this claim on Ms. Hoffman's behalf. *NRA, Inc.*

*v. ATF*, 700 F.3d 185, 191 (5th Cir. 2012), *cert. denied*, 571 U.S. 1196 (2014).

Defendants make light of Ms. Hoffman's life-altering medical disability, stating in a

footnote that Ms. Hoffman should have contacted the Maryland State Police and asked for an

accommodation to use "quieter alternative ammunition." Defs. Mem., at p. 14 n.4. The Handgun

License requirement contains no such exceptions to the required training. Further, to a person

suffering from hyperacusis, there is nothing remotely "quiet" about the discharge of live

ammunition in any form, much less on a range where other shooters may also be firing. Firing

ranges are *very* loud. An individual plaintiff, Deborah Miller, also has a physical disability that

would make it very difficult to sit through four hours of classroom training, thereby making it

futile for her to apply. Miller Dep., Ex. 4, at 33:1–34:17 ("I have back issues [disc] so sitting still

for four hours would be a burden on me.").

Other members of MSI have testified that it was far too burdensome and expensive for

them to attend the classes and spend the money necessary to obtain a Handgun License. *See*

Deposition of Scott Miller ("S. Miller Dep."), Ex. 25, at 24:4–25:11 (as an EMT in Washington,

D.C., he works 10 hour shifts and "really long nights" and that he is in school and his time is

consumed with "other necessary tasks."); Deposition of John Clark ("Clark Dep."), Ex. 26, at 14:22–19:15 (testifying that the fees and fingerprinting deterred him from applying for a Handgun License because there were no fingerprint services offered in Carroll County where he lives and that he wanted to buy a better gun for home defense). Attempting to minimize those injuries, Defendants acknowledge these harms, Defs. Mem., at p. 13, but contend that that all these individuals, including the 75-year-old Ms. Hoffman, have sufficient money to pay all the expenses associated with obtaining a Handgun License and thus completely lack standing to sue in this case.

But these individuals' ability to shoulder these burdens is beside the point for purposes of standing. *See Warth*, 422 U.S. at 500 (noting "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *White Tail Park v. Stroube,* 413 F.3d 451, 460 (4th Cir. 2005) ("The standing doctrine, of course, depends not upon the merits"). A person who is being required to pay money most certainly has standing to complain that the money is being illegally extracted. *See, e.g.*, *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 292–93 (3d Cir. 2005) (noting that "[t]here can be no doubt that this financial harm counts as injury-in-fact"). Here, these individuals are all directly injured by the need to spend any funds, time and or other resources to obtain a Handgun License and thus all have standing.

Defendants also mistakenly rely on *Lane* as support for their assertion that an individual lacks standing to challenge "minor inconveniences." Defs. Mem., at p. 12. First, the burdens inflicted by Section 5-117.1 and its regulations cannot be dismissed as mere "minor inconveniences." *See* above on pages 13-16. Second, nothing in *Lane* actually stands for that proposition. In *Lane*, the plaintiffs had asserted that they were harmed because out-of-state dealers (third parties) were barred from selling a handgun to plaintiffs due to the federal law at issue there. In addressing this claim, the court acknowledged that "[c]onsumers burdened by regulation of the

sellers they transact with may be able to establish that they have suffered an injury in fact, as the Supreme Court has made clear in the context of Commerce Clause litigation," but held that in those cases the plaintiffs had standing because they "were burdened directly" and the plaintiffs in *Lane* were not directly burdened, for purposes of standing to bring a Second Amendment claim against the federal law at issue, because they could legally purchase a handgun in their home state of residence. *Lane*, 703 F.3d at 672–73. Here, unlike plaintiffs in *Lane*, the individual Plaintiffs are not challenging a restriction placed on third parties, rather they are challenging statutory requirements and regulations directed specifically at them. *See Warth*, 422 U.S. at 499. And, unlike the plaintiffs in *Lane*, Plaintiffs here do not have the option of bypassing the Handgun License requirement by buying handguns elsewhere, as federal law bans such out-of-state sales. *See Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018).

The individuals (and, by extension, MSI for purposes of associational standing) also easily satisfy the rest of the standing requirements: causation and redressability. The Handgun License requirement is the direct cause of plaintiffs' injury because without those requirement plaintiffs would be entitled to exercise their Second Amendment right to purchase a handgun. Striking down those requirements, in whole or in part, would "redress" that injury directly because such an order enjoining enforcement would mean that plaintiffs could exercise that right without the burden and obstacles imposed by the Handgun License requirement. The same would hold true for the vagueness claims, as an injunction barring enforcement of Section 5-117.1(c)'s ban on "receiving" a handgun without a Handgun License would protect MSI members and the individual plaintiffs who are chilled in the exercise of their Second Amendment right to "receive" or participate in the "receipt" a handgun by the risk of arbitrary or discriminatory enforcement flowing from that vague prohibition.

No more is required for MSI members to have standing and thus for MSI to have associational standing. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341–42 (2014); *Steffel v. Thompson*, 415 U.S. 452, 480 (1974) (Rehnquist, J., concurring) (observing that "declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity"); *Ellis v. Dyson,* 421 U.S. 426, 432 (1975) (noting that "in *Steffel*, we rejected the argument that bad-faith prosecution, harassment, or other unique and extraordinary circumstances must be shown before federal declaratory relief may be invoked against a genuine threat of state prosecution"). That fear of arbitrary prosecution is genuine. *See, e.g.*, Miller Dep., Ex. 4, at 19:5–22 ("Because of the new law, I was concerned that if I used [my husband's] gun it would be considered receiving the handgun and that I could be prosecuted" because the law was "unclear"); Pennak Decl., Ex. 2, at ¶ 3 ("instructors, including myself, as well as other members of MSI, have been burdened and are deterred by the vague provisions of Section 5-117.1 from temporarily loaning handguns to others, including friends and family"). The prospect of such enforcement directly chills the exercise of plaintiffs' core fundamental right, recognized in *Heller*, to possess handguns for self-defense in the home. No more is required. *See, e.g, NRA v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("[P]re-enforcement review is usually granted under the Declaratory Judgment Act when a statute imposes costly, self-executing compliance burdens or if it chills protected activity.") (quotation omitted).

> **2.    Atlantic Guns has standing because its business has suffered from the loss of handgun sales and its customers were delayed or denied from acquiring a handgun due to the Handgun License requirement.**

Atlantic Guns has standing to bring this lawsuit. In addition to its standing based upon injury through loss of handgun sales and related revenues, under *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), sellers have standing when their customers may be injured. *Id*. at 286; *see also, e.g., Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977) (permitting contraceptive distributors to assert the interests of their customers); *Craig v. Boren*, 429 U.S. 190, 192–97 (1976)

(permitting beer vendors to assert the interests of their customers). This is no less true in Second Amendment cases. *Ezell v. City of Chi. Ill.*, 651 F.3d 684, 696 (7th Cir. 2011) (permitting firing ranges to assert Second Amendment claims on behalf of their customers).

Defendants challenge Atlantic Guns' injury showing for purposes of standing solely because it has not established that any reduction in handgun sales has been caused "exclusively by the [Handgun License] requirement and not by anything else." Defs. Mem., at p. 15 & Ex. 15. It is enough for standing purposes that a plaintiff establish that the challenged law is a cause of its injury, not the only cause. *Sierra Club v. United States Dept. of the Int.*, 899 F.3d 260, 284 (4th Cir. 2018) ("the causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury") (collecting cases).

As Defendants' argument suggests, there is ample evidence showing Atlantic Guns' handgun sales declined following the Handgun License requirement. Maryland State Police's own records demonstrate beyond dispute that the Handgun License requirement has severely impacted Atlantic Guns' business. Schneider Decl., Ex. 1, at ¶ 9 & Ex. A. That spreadsheet, produced by Maryland State Police from its official records subsequent to Atlantic Guns' corporate deposition, sets forth the number of Atlantic Guns' total annual handgun sales each year from 2000 to 2017. *Id*. In the four years since the Handgun License took effect (2014–2017), Atlantic Guns has lost approximately 20 percent of its average annual handgun sales compared to the four-year period following the Handgun License requirement's implementation (2009–2012).[7] *Id*. Atlantic Guns' gross revenues from handgun sales have also decreased by a similar amount over this same time. *Id*. at ¶ 9 & Ex. B.

---

[7] Atlantic Guns' handgun sales data for the year 2013 are not used in the comparison to avoid the distorting effects of the sales increase following the Newtown shooting in mid-December 2012 and the run up to the Handgun License's effective date on October 1, 2013.

Similarly, Defendants claim that Atlantic Guns lacks standing to represent the interests of its customers who have been denied handguns because of the Handgun License requirement solely because it has not identified any such customer by name. Defs. Mem., at p. 15. Contrary to Defendants' suggestion, however, Atlantic Guns need not identify each such customer or even a single customer by name. *See Craig,* 429 U.S. at 194–96 (vendor had standing to assert claims "of males 18–20 years of age" without identifying individual males in this group); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 683–84 (1977) (distributor of contraceptive devices); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (physicians providing abortion services). It is enough that Atlantic Guns' uncontroverted evidence established that it has turned away customers on a weekly basis because they lacked a Handgun License, totaling hundreds of customers since the imposition of the Handgun License requirement where acquisition of a handgun was delayed if not denied. Schneider Decl., Ex. 1, at ¶ 8. Defendants do not challenge these facts.

It simply is untrue, as Defendants claim, that Atlantic Guns "is free to continue selling handguns to the same customers it had prior to the implementation of the [Handgun License requirement]." Defs. Mem., at p. 15. Atlantic Guns is forbidden to do that by Section 5-117.1(b) unless each of its customers obtains a Handgun License, and the uncontroverted evidence demonstrates that many of Atlantic Guns' customers are delayed or deterred from ever getting that license.

For these reasons, Atlantic Guns has standing to bring this lawsuit challenging all aspects of the Handgun License requirement that injures it and its customers.

**B.       The Handgun License requirement violates the Second Amendment.**

For the reasons set forth above on pages 20–22, *Heller's* text, history, and tradition standard must be applied because the Handgun License requirement effects a ban and is unconstitional per se under *Heller.* As demonstrated above, *Kolbe* incorrectly applied *Chester's* two-part approach

to evaluate a ban and should not be followed here. Regardless, the Handgun License requirement

fails either strict or intermediate scrutiny.

> **1.    The Handgun License requirement burdens conduct within the scope
> of the Second Amendment's guarantee.**

Defendants do not dispute that the right to acquire a handgun in the home for self-defense

is a fundamental right protected by the Second and Fourteenth Amendments. Defendants cursorily

and incorrectly argue that the Handgun License requirement imposes "conditions" but not a

"burden" on this right. Defs. Mem., at p. 17, relying on *Planned Parenthood of Se. Pa. v. Casey*,

505 U.S. 833, 873 (1992) (evaluating a restriction on abortion rights under a very different "undue

burden" standard). Defendants cite no authority for this semantical distinction, and none exists. To

the contrary, in the analogous First Amendment context, the Supreme Court has held that

"requiring a permit as a prior condition on the exercise of the right to speak imposes an objective

burden on some speech of citizens holding [certain views]." *Watchtower Bible & Tract Soc'y of*

*N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002).

The undisputed facts demonstrate that the Handgun License requirement burdens

Plaintiffs' Second Amendment rights. The Handgun License bans handgun acquisition by law-

abiding, responsible citizens unless they undergo a time-consuming, inconvenient, expensive,

redundant, and unnecessary application process. The Handgun License requirement has

discouraged at least one-quarter of Marylanders who wish to exercise their fundamental Second

Amendment rights from doing so. *Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No.

5 (from October 1, 2013 through 2017, 30,877 Marylanders started a Handgun License application

but stopped before completing it) *with* Collective Ex. 15 (Maryland issued 93,165 Handgun

Licenses during this same time).

Because the Handgun License requirement burdens conduct within the Second Amendment, the Court must turn to the second part of the two-part approach to select and apply "an appropriate form of means-end scrutiny." *Chester*, 628 F.3d at 680. Under this second part, strict scrutiny is the only appropriate form of scrutiny because the Handgun License requirement burdens the core right of self-defense in the home. *Id.*; *see also* pages 26–27 above. Defendants cannot meet their burden under strict scrutiny, as demonstrated above on pages 27–31. Defendants cannot meet their burden under intermediate scrutiny either.

### 2. Defendants cannot meet their burden under intermediate scrutiny.

Intermediate scrutiny first requires Defendants to prove the existence of a real problem that the Handgun License alleviates in a direct and material way. *E.g.*, *United States v. Nat'l Treasury Empls. Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broad Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("*Turner I*"); *see also Silvester v. Becerra*, 138 S. Ct. 945, 948 (2018) (Thomas J., dissenting from denial of writ of certiorari in Second Amendment case). The Supreme Court has made clear that under intermediate scrutiny:

> When the Government defends a regulation . . . as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner Broad. Sys.*, 512 U.S. at 664 (citations omitted); *see also, e.g., id.* (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (9th Cir. 1977) ("A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist"); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 788 (D. Md. 2008) *aff'd*, 368 Fed. App'x 370 (4th Cir. 2010). Solutions to hypothetical, abstract problems cannot survive intermediate scrutiny. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (only rational-

basis review allows the government to justify a law with "rational speculation unsupported by evidence or empirical data") (citations omitted).

In *Turner Broadcasting*, the Supreme Court vacated summary judgment in favor of the government because the government did not prove the existence of the claimed problem. 512 U.S. at 667. Although the government presented a study showing that the claimed problem may or could exist, the Court held that without "some additional evidence to establish" that the claimed problem actually existed, the proposed remedy could not survive intermediate scrutiny. *Id*. at 667. On that record, the Court "c[ould] not determine whether the threat . . . is real enough to overcome the challenge to the provisions made by these appellants." *Id*. The Court found it "significant, for instance, that the parties have not presented any evidence" that the claimed problem actually existed. *Id*.

Defendants must demonstrate that the Handgun License requirement will in fact alleviate dangers to public safety in a direct and material way; they have failed to do so. Assuming Defendants could clear this initial burden, the Supreme Court is equally clear that intermediate scrutiny requires Defendants to prove that laws impacting a fundamental right, such as the Handgun License, are "narrowly tailored to serve a significant government interest." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). Defendants also have the burden to demonstrate that the Handgun License does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interest." *Id*. at 2535 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989)).

The Fourth Circuit's decision in *Kolbe* must be read in light of this Supreme Court precedent. The *Kolbe* court recognized properly that First Amendment precedent is the proper "guide" in Second Amendment litigation, but then departed from this standard, requiring only that

"the government . . . show that the challenged law is reasonably adapted to a substantial governmental interest." *Kolbe*, 849 F.3d at 133 (quotations and citations omitted). Indeed, *after Kolbe* was decided, the Supreme Court reaffirmed *McCullen's* intermediate scrutiny standard in *Packingham v. N.C.*, 137 S. Ct. 1730 (2017), stating that "[i]n order to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* at 1736 (quoting *McCullen*, 134 S. Ct. at 2534). This Court must use the Supreme Court's articulation of the test. *See Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331, 337 n.7 (4th Cir. 1996) (stating that circuit precedent is not binding if "superseded by a decision of the Supreme Court."). *Kolbe's* formulation of intermediate scrutiny relied upon by Defendants, Defs. Mem., at p. 19, cannot be reconciled with *McCullen* and its progeny.

Under either formulation of the test, "[f]it matters" and where, like here, a statute is "poorly tailored to the Government's interest" it fails intermediate scrutiny. *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014). Defendants must provide substantial evidence proving that the Handgun License requirement is "narrowly tailored to serve a significant government interest" and does not "burden substantially more [protected conduct] than is necessary to further that interest." *McCullen*, 134 S. Ct. at 2535. As demonstrated below, the Handgun License fails both prongs of this test.

Plaintiffs acknowledge that in determining whether the Handgun License is narrowly tailored, it is not the role of the Court to replace the judgment of the legislature with its own. *Turner Broad. Sys.*, 512 U.S. at 666. This does not mean, however, that predictive judgments of the legislature are insulated from review. *Id*. Rather, a court must "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Id*. And this requirement of "substantial evidence" is itself substantial. In *Turner Broad Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ("*Turner II*"), the Court analyzed empirical evidence over the course

of 20 pages before sustaining the legislature's conclusion. *Turner II*, 520 U.S. at 196–224. *See, e.g., Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018) ("Mere citation is an inadequate application of intermediate scrutiny, even according deference to the predictive judgment of a legislature, and *Turner Broadcasting* itself shows why.").

### a. Defendants cannot establish that the recited harms exist or that the Handgun License will alleviate these harms in a direct and material way.

The Handgun License cannot survive intermediate scrutiny because Defendants fail to "demonstrate that the recited harms are real, not merely conjectural and that the regulation will in fact alleviate these harms in a direct and material way." *E.g.*, *Turner I*, 512 U.S. at 664. At the very least, Defendants also have failed to show that the Handgun License does not "burden substantially more [protected conduct] than is necessary to further that interest," *Turner II*, 520 U.S. at 2113–14, or are otherwise "narrowly tailored" to legitimate goals. *McCullen*, 134 S. Ct. at 2534.

### 1. Defendants cannot establish that the additional 30-day delay alleviates a demonstrated harm in a direct and material way.

As noted above on page 29, allowing Defendants up to 30 days to review and rule upon a Handgun License application is arbitrary and does not relieve Defendants of any demonstrated harm. Prior to the Handgun License requirement, Defendants took seven days to investigate every potential handgun purchaser. Md. Code Ann., Pub. Safety § 5-118; *id*. at § 5-123(a). Further, Defendants concede that some "Handgun License applications have been processed the same business day that they are received." Col. Pallozzi Interrog. Resp., Ex. 20, No. 7. Defendants have not established the need for a 30-day delay, and they should not be allowed any more time than absolutely necessary to process Handgun License applications. This 30-day delay, tacked on to the 77R seven-business-day delay, cannot possibly be the least restrictive means to achieve whatever Defendants' unidentified interest may be.

### 2. Defendants cannot establish that the fingerprint requirement alleviates a demonstrated harm in a direct and material way.

Defendants fail to demonstrate that the fingerprint requirement alleviates a demonstrated harm in a direct and material way. Defendants claim that the fingerprint requirement "enables [the Maryland State Police] to ensure that the applicant is positively identified and not using false identification or altering his or her identification information" and "deter[s] straw purchasers and those intending to purchase firearms solely for criminal purposes" from purchasing a handgun. Defs. Mem., at pp. 21–24. But the 77R Handgun Registration process, along with the other federal and state laws, already allowed Defendants to ensure that the applicant is positively identified and not using a false identification. Defendants admit that the only possible harm for the Handgun License to alleviate would be prohibited individuals who could have acquired a handgun after undergoing a 77R Handgun Registration background check but not under the Handgun License fingerprint requirement. *See* A. Johnson Dep., Ex. 6, at 112:8–117:7. Dispositively, Maryland cannot identify a single individual who fits this description. *Id*. at 116:1–117:7. Defendants present no evidence that anyone in Maryland ever used a false or altered identification to purchase a handgun before the Handgun License requirement took effect. *Id*. at 113:3–21. Defendants also present no evidence of any straw purchases or of individuals who purchased a handgun solely for criminal purposes. *Id*. at 76:16–22; J. Johnson Dep., Ex. 7, at 25:10–16, 28:6–14. Because Maryland is now REAL ID Act compliant, there is no likelihood of false identification.

Defendants also claim that "a fingerprint record can be used to identify if a holder of a[] [Handgun License] is convicted of a disqualifying offense subsequent to passing the initial background investigation. . . . That identification enables [Maryland State Police] to revoke the disqualified person's [Handgun License] and, where necessary, retrieve unlawfully possessed firearms." Defs. Mem., at pp. 23–24. But the 77R Handgun Registration process allowed

Defendants to easily locate and disarm handgun owners who were subsequently disqualified from handgun ownership. Webster Dep., Ex. 5, at 19:14–20:14. And Defendants present no evidence that the Maryland State Police was unable to disarm these individuals prior to the Handgun License requirement under existing requirements. *Id*. Thus, Defendants cannot demonstrate the existence of any harm for the fingerprint requirement to alleviate.

Even if these alleged problems did exist, Defendants cannot demonstrate that the fingerprint requirement alleviates them in a direct and material way. The Maryland State Police and its expert Professor Webster admit that the fingerprint requirement does not add any benefit from what the previous 77R Handgun Registration process conferred. *See* A. Johnson Dep., Ex. 6, at 112:8–19; Webster Dep., Ex. 5, at 19:14–20:14. Thus the fingerprint requirement does not, indeed could not, alleviate any problem in a direct and material way.

Further, Defendants have no admissible evidence that the Handgun License alleviates Maryland's equally unsupported straw purchase problem. For this proposition, Defendants rely upon Professor Webster's discredited and irrelevant testimony. Professor Webster relies upon a 2017 study that purports to assess the Firearm Safety Act's ("FSA") impact on the supply of handguns diverted to criminal use in Baltimore. Defs. Mem., at Ex. 19, ¶ 18 (citing Cassandra K. Crifasi et al., *The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore*, 3(5) The Russel Sage Foundation Journal for the Social Sciences 128–40 (2017) (the "Baltimore Study")). But the Baltimore Study is of no help to Defendants. Although it concludes that the FSA caused a reduction in the supply of crime handguns in Baltimore, this conclusion is not based on any actual (or reliable) data on the supply of crime handguns in Baltimore or anywhere else. Kleck Decl., Ex. 24, at ¶¶ 4–12. The study utilized firearms trace data on guns recovered by police. This trace data, however, is useless in assessing the supply of crime

guns. *Id*. The ATF disclaims explicitly that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download. Therefore, trace data cannot be used to draw conclusions regarding Baltimore crime guns or crime guns generally, rendering the study's conclusion useless under standard statistical models. Kleck Decl., Ex. 24, at ¶¶ 6–8. Most importantly, Professor Webster's study cannot isolate the effect, if any, of the Handgun License requirement from all of the other factors he admits bear upon the supply of crime guns in Baltimore. *See* Webster Dep., Ex. 5, at 248:16–251:20; Kleck Decl., Ex. 24, at ¶ 10–11. Professor Webster's testimony and studies provide Defendants with no evidence that the fingerprint requirement alleviates the claimed straw purchase problem.[8]

### 3. Defendants cannot establish that the additional half-day classroom training with live-fire requirement alleviates a demonstrated harm in a direct and material way.

Defendants cannot demonstrate that the additional safety course with live-fire requirement alleviates a demonstrated harm in a direct and material way. Defendants claim seven purposes accomplished by the classroom training with live-fire requirement, including: (1) "reduc[ing] the likelihood that a member of a household who is not eligible to possess a firearm [possesses a firearm;]" (2) "may[be] deter[ring] straw purchasers[;]" (3) "enhance[ing] knowledge of and compliance with State laws[;]" (4) "reduc[ing[ access of firearms to children[;]" (5) "reduc[ing] the risk of accidental discharges[;] (6) "reduc[ing] the likelihood of theft[;]" and (7) "enhance[ing]

---

[8] Defendants make cursory reference to two other studies, both of which discuss the possibility that permit-to-purchase laws reduce the homicide rate. Defs. Mem., at pp. 23–24. Defendants do not claim the homicide rate is a problem the fingerprint requirement will alleviate. *See id*. Nevertheless, both studies are fatally flawed and provide no support to Defendants. Kleck Decl., Ex. 24, at ¶¶ 13–23.

effective law enforcement." Defs. Mem., at pp. 26–27. But Defendants concede readily that they have no evidence that any of these issues were real problems or that a half-day of training and a live-fire requirement have or will alleviate them in a direct and material way. Regarding claimed interests (1) and (4), Defendants fail to demonstrate that prohibited individuals and children were accessing handguns at home or that these individuals are accessing handguns less than before the Handgun License went into effect. A. Johnson Dep., Ex. 6, at 109:12–111:9. Regarding claimed interest (2), Defendants have no evidence of a single straw purchase in Maryland from before the Handgun License took effect (or, necessarily, that the Handgun License requirement deterred any straw purchases). *Id*. at 76:16–22, 113:3–9; J. Johnson Dep., Ex. 7, at 25:10–28:14. Regarding claimed interest (3), Defendants have no evidence that the Handgun License requirement has effected better gun storage practices in Maryland. A. Johnson Dep., Ex. 6, at 109:7–110:11. Regarding claimed interest (5), Defendants have no evidence of a single accidental discharge, either before or after the Handgun License requirement. *Id*. at 75:17–76:11. Regarding claimed interest (6), Defendants have no evidence of handgun theft, either before or after the Handgun License requirement. *Id*. at 119:16–18. And regarding claimed interest (7), Defendants have no evidence that the Handgun License requirement has enhanced effective law enforcement. The firearms safety training with live-fire requirement are non-answers to hypothetical problems and thus cannot survive intermediate scrutiny. *Turner Broad. Sys.*, 512 U.S. at 664.

### b. Defendants cannot establish that the Handgun License is narrowly tailored to serve a substantial government interest.

The Handgun License is not narrowly tailored because it imposes burdens without any concomitant benefit. Each individual requirement is independently as burdensome as it is unnecessary.

### 1. The additional 30-day delay is not narrowly tailored to serve a substantial government interest.

Defendants do not even attempt to meet their burden of demonstrating that the additional 30-day delay (in addition to the post-purchase waiting period mandated by Md. Code Ann., Pub. Safety § 5-123(a)) is narrowly tailored to a substantial interest. Defendants also fail to put forth any proof that the delay is narrowly tailored to meet this unidentified interest. Because Defendants fail to put forth any proof, they necessarily cannot demonstrate that the additional 30-day delay is narrowly tailored to serve a substantial government interest. *Turner I*, 512 U.S. at 664.

### 2. The fingerprint requirement is not narrowly tailored to serve a substantial government interest.

The fingerprint requirement burdens far more protected conduct than is necessary to serve Defendants' claimed interests in preventing straw purchases, preventing purchases with false or altered identification, and revoking Handgun Licenses from disqualified individuals. This is necessarily true because the fingerprint requirement is universal but, as demonstrated above on pages 49–51, does not further any of these interests. The fingerprint requirement adds a burden but no benefit and thus fails intermediate scrutiny. Additionally, for the reasons described above on pages 49–51, Defendants do not have a substantial interest in using fingerprints to revoke Handgun Licenses.

### 3. The classroom training with live-fire requirement is not narrowly tailored to serve a substantial government interest.

The additional half-day classroom requirement is not narrowly tailored to achieve a substantial government purpose. As demonstrated above on pages 7–8, the Handgun License safety course is substantively identical to the 77R Handgun Registration online presentation. The additional burdens imposed by the Handgun License course provide no benefit and cannot survive intermediate scrutiny.

Additionally, the live-fire requirement is not narrowly tailored to advance Defendants' claimed interests in safe storage of a firearm (and the negative consequences that arise from unsafe storage). Rather, it is unrelated entirely. In firing a firearm, Handgun License applicants do not learn how or where to store a firearm. Rather, the applicant must only "safely *fire*[] at least one round of live ammunition." COMAR 29.03.01.29 (emphasis added). Maryland does not require any additional hands-on practice regarding safe storage. *See id*. Thus this requirement is not substantially related to Defendants' stated interest.

While Defendants purport to rely on *Heller III*, Defs. Mem., at p. 27, Defendants fail to note that the D.C. Circuit in *Heller III* struck down a training requirement that mandated instruction in the law, a requirement that is virtually identical to the same requirement imposed by Section 5-117.1(d)(3)(ii)(1). *See Heller III*, 801 F.3d at 278–79 (holding that the District had "presented no evidence from which it could conclude that passing a test of knowledge about local gun laws" sufficiently "fit" the District's justification and that "the test of legal knowledge" was therefore unconstitutional). *Heller III* sustained the other training requirements imposed by the District's law, but that training consisted of merely watching a one-hour video online, *id*. at 279, exactly what the 77R Handgun Registration previously required. That hardly compares to the Handgun License training: four hours of classroom attendance plus live-fire training by a State-approved, State-licensed instructor at a range.

Defendants also fail to acknowledge that the one-hour online video at issue in *Heller III* came about only after the District had abandoned its earlier training requirement that had been challenged in *Heller II*, in which the District had required "a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction." *Heller II*, 670 F.3d at 1249. The D.C. Circuit held that this training requirement, among other "novel" registration

requirements, made "it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home." *Id*. at 1255. The court applied intermediate scrutiny, vacated summary judgment for the District and remanded for a further factual inquiry, holding that the District had failed to present "evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests" asserted by the District. *Id*. at 1259. After that remand, the District repealed its training requirement and substituted the one hour of online video. *See Heller III,* 801 F.3d at 269. As noted above, even then, the D.C. Circuit still invalidated the legal training part of that one hour video requirement. Like the District in *Heller II*, Defendants have not justified the much more burdensome training requirements at issue here that closely resemble those at issue in *Heller II*. Instead, as noted above, the Handgun License is a pretext for Defendants to reduce the exercise of the Second Amendment generally. That interest cannot survive any heightened constitutional scrutiny.

### c.   Defendants enacted the Handgun License without substantial evidence.

None of the Handgun License requirements were "based on substantial evidence." *Turner I*, 512 U.S. at 666. Defendants state that the Maryland General Assembly heard from "various public policy and law enforcement experts advocating for the [Handgun License] requirements." Defs. Mem., at p. 3. This is a vast overstatement at best. These so-called experts included Professor Daniel Webster, former Baltimore County Police Chief James Johnson, and former Baltimore City Police Commissioner Anthony Batts. *Id*. at pp. 3–4. None of these individuals advocated for the live-fire requirement. Further, both former-Chief Johnson and former-Commissioner Batts provided only conclusory, general support for the fingerprint and additional firearm safety course requirements. Neither provided any reason why these requirements are necessary, whether they were narrowly tailored to respect law-abiding Marylanders' Second Amendment rights, or how

they would enhance public safety in Maryland. For instance, former-Chief Johnson testified only that "[t]he requirement that purchasers obtain proof that they completed firearms safety training is an exceptional element of the Bill." Defs. Mem., at Ex. 5. Similarly, former Commissioner Batts' testimony consisted of a conclusory statement that a background check using fingerprints will "ensur[e] that the applicant is not prohibited from possessing a handgun." Defs. Mem., at Ex. 6. He also testified in support of "training" but again did not testify what training he had in mind or why it would be beneficial. *Id*. These testimonies do not provide any specific support for the Handgun License and fail to demonstrate that the 77R Handgun Registration process is inadequate.

Professor Webster testified only in support of a fingerprint requirement that did not become part of the Handgun License requirement as passed. Defs. Mem., at p. 3 & Ex. 3. He testified that if the fingerprints were "processed directly by law enforcement agencies – which [he] assume[d] would be the case when the Secretary writes regulations to implement the statute – [this] would result in fewer false applications for firearm purchases being processed." *Id*. But Maryland does not process fingerprints directly with law enforcement agencies; it uses private vendors. COMAR 12.15.05. Thus his testimony is irrelevant and cannot support the Handgun License or its fingerprint requirement. Additionally, although Professor Webster discussed the findings of a study conducted by the United States General Accounting Office ("GAO"), he later conceded the inapplicability of this study to Maryland or the Handgun License requirement. The GAO did not examine Maryland, and the states at issue in the GAO study did not have handgun purchase laws similar to Maryland's 77R Handgun Registration process. Webster Dep., Ex. 5, at 23:7–13, 170:19–171:19. Finally, Professor Webster's research, which he referenced at the hearings, is similarly inapplicable to the Handgun License. Professor Webster concedes that he has not researched handgun violence in states with laws similar to Maryland's Handgun License. Although

several states, *i.e.*, Connecticut and Missouri, have or did have permit-to-purchase laws, the only shared requirement between these states and Maryland is a nominal license requirement. *Id*. at 189:9-13. The requirements to obtain these licenses differ in critical ways, rendering the studies useless here. *See* Kleck Decl., Ex. 24, at 13–23; *see also* Webster Dep., Ex. 5, at 178:20–180:1, 184:16–190:5.

The undisputed evidence in this case shows that Defendants have failed to prove that the Handgun License requirement is narrowly tailored to meet a substantial government interest. The Handgun License requirement levies a substantial burden on plaintiffs' Second Amendment rights, while advancing very little, if at all, the government's claimed interests. For these reasons, the Handgun License requirement cannot withstand even intermediate scrutiny, the lowest standard to which it can be held.

### C.     The Handgun License requirement violates the Due Process Clause of the Fourteenth Amendment.

As the Supreme Court recently stated in *Johnson v. United States*, 135 S. Ct. at 2556, "[o]ur cases establish that the Government violates [the due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." (collecting cases). *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) ("'the prohibition of vagueness in criminal statutes…is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'") The legislature has an "obligation to establish adequate guidelines for enforcement of the law" and that obligation is "'the more important aspect of the vagueness doctrine.'" *Aston v. Brown*, 660 A.2d 447, 456 (Md. 1995) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). A vague statute must be struck down even if some applications

are clear, a point confirmed by the Fourth Circuit in the *Kolbe* litigation. *See Kolbe*, 849 F.3d at 148 n.19.

### 1.    The terms "receive" and "receipt" are fatally vague.

Section 5-117.1(b) bans a seller from making a "transfer" of a handgun to a person who does not have a Handgun License. Section 5-117.1(c), in contrast, allows only a person who has a Handgun License to "receive" a handgun. Section 5-117.1 is enforced under Section 5-144(a), which punishes (with 5 years of imprisonment) the "participation" in any "transfer" or "receipt" of a handgun that is prohibited by Section 5-117.1(b),(c). The terms "transfer," "receive" and "receipt" are not defined in the statute or the regulations.

While the "plain meaning" of a statue is usually controlling in Maryland, *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999), in cases of doubt, the Maryland courts turn to Black's Law Dictionary and other common dictionaries for definitions of statutory terms that are left undefined by law. *See, e.g., Matter of Reese for Howard County*, 2018 WL 3642142 (July 31, Md. 2018). Black's Law Dictionary defines "transfer" to include "an act of the parties, or of the law, by which the title to property is conveyed from one living person to another." *Transfer*, The Law Dictionary, https://thelawdictionary.org/transfer-n/. Thus, in *Chow v. State*, 903 A.2d 388, 407 (Md. 2006), the Maryland Court of Appeals turned to Black's Law Dictionary and other dictionaries to determine the meaning of "transfer" as used in Md. Code Public Safety § 5-124, *Chow*, 393 Md. at 445, to conclude that "transfer" meant the permanent transfer of ownership of a handgun. *Id*. at 447–48.

As in *Chow*, Black's Law dictionary should inform the analysis concerning the meaning of "receive" and "receipt." Black's Law Dictionary defines the term "receive" simply to mean "[t]o    acquire    or    get    something."    *Receive*,    The    Law    Dictionary, https://thelawdictionary.org/receive/, (last visited Oct. 5, 2018). Likewise, the Merriam-Webster

Dictionary defines the transitive verb "receive" to mean simply "to come into possession of." *Receive*, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/receive ("[t]he primary meaning of the verb 'to receive' is 'to take possession or delivery of,' as of a gift or of a letter") (citation omitted). Similarly, the use of the term "receipt" in Section 5-144 (the enforcement provision for Section 5-117.1) is the "[t]he action of receiving something or the fact of its being received." *Receipt*, Merriam-Webster, available at https://en.oxforddictionaries.com/definition/receipt. "Receipt" thus essentially means "receive."

If "receive" is given its dictionary meaning, then subsection 5-117.1(c) broadly bans the simple act of acquiring, getting or taking possession of a handgun by any means, including mere temporary possession. Yet, that reading would criminalize even temporary possession of a handgun in the home by anyone who lacks a Handgun License. That creates enormous potential liability for plaintiffs. Under Section 5-117.1(c), as enforced by Section 5-144(a), all MSI members are exposed to arrest and prosecution merely by "participating" in providing temporary possession ("receipt") to another person who does not possess a Handgun License, including a spouse or a member of the family. Those in "receipt" are likewise subject to arrest and prosecution for their "participation" in such a possession. The statute could thus easily send an entire family to jail.

Moreover, the Handgun License regulations, challenged here, require live-fire of a handgun as part of that training and live-fire is obviously impossible without at least the temporary receipt of a handgun. Indeed, the "orientation component" required by Section 5-117.1(d)(3)(iii), effectively requires temporary possession in the classroom. It is, therefore, impossible for MSI's members who are private instructors, Pennak Decl., Ex. 2, at ¶¶ 2 –3, to provide the required training – or for citizens to receive it – without risking "arbitrary enforcement." *Johnson*, 135 S.

Ct. at 2256. At a minimum, a state may not impose a requirement and then make it impossible to satisfy that requirement. *See Broderick v. Rosner*, 294 U.S. 629, 639 (1935) (Brandeis, J.).

That criminalization of temporary possession is utterly incompatible with *Heller*'s ruling that law-abiding citizens have a constitutional right to possess a handgun in the home, as Defendants have realized in consistently refusing to adopt any such plain language reading of "receive" in this case. Consequently, on November 17, 2017, hardly two months after Judge Garbis refused to dismiss plaintiffs' claim, the Maryland State Police issued Advisory LD-HQL-17-003. *See* Defs. Mem., at p. 31 (relying on this Advisory). That Advisory decreed that "receive" actually means only a permanent receipt, just as a "transfer" in *Chow* meant permanent transfer. Critically, however, this interpretation is not contained in any regulation. That refusal to issue a regulation is consistent with the State Police's refusal to define these terms in 2013 when MSI submitted comments to the proposed Handgun License regulations authorized by Section 5-117.1(n), and specifically requested that the Maryland State Police regulations include a definition of the statutory words "receive" and "receipt." Pennak Decl., Ex. 2, at ¶ 5 & Ex. A. The Maryland State Police ignored MSI's request for a regulatory definition, and there are no definitions, in either the statute or the regulations, of these critical words.

### 2. *Chow* does not save this statute from vagueness invalidation.

In issuing the Advisory, Defendants effectively have conceded that banning temporary possession or receipt in the home would be indefensible under *Heller*. Yet, the Advisory does nothing to protect the right to possession in the home. First, nothing in *Chow* actually addresses the meaning of "receive," much less that term as it is used in Section 5-117.1. *Chow* held that an illegal "transfer" under Section 5-124 required a "permanent exchange of title or possession," and held that a temporary exchange would not support a conviction. *Chow*, 903 A.2d at 402.

At issue here is the meaning of the word "receive," not the word "transfer." Subsection 5-117.1(c), the subsection at issue here, does not use "transfer" (or "transferee") at all. Rather, subsection 5-117.1(c) states that a person may not "receive" a handgun without a Handgun License. Any definition of the word "transfer" as it is used in Section 5-124, the statute at issue in *Chow*, has no obvious bearing on the meaning of the different word "receive" as used in subsection 5-117.1(c). The plain meaning of "transfer" and "receive" are obviously different, as the dictionary definitions confirm.

This is confirmed by Section 5-144(a), which makes it a crime to "knowingly participate" in any "rental, transfer, purchase, possession, or receipt," covered by Section 5-117.1(b) & (c). It is well established that "if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *State Bd. of Elections v. Snyder ex rel. Snyder,* 76 A.3d 1110, 1126 & n. 28 (Md. 2013). Thus, "participating" in a "transfer" (including acting as the "transferee") must therefore mean something different than "participating" in a "receipt." It is perfectly possible for a "receipt" to take place without a "transfer" as defined in *Chow,* precisely because a "transfer" may mean a permanent "transfer" (as *Chow* held) while a "receipt" may well include any temporary possession, just as it means under federal law and in standard dictionary definitions.

Stated differently, had the General Assembly intended the Handgun License requirement to apply only to a permanent or otherwise non-temporary receipt of a handgun, it would have used "transfer" in subsection 5-117.1(c), or it could have defined "receive" to mean the permanent receipt. It did neither. Indeed, the legislature is presumed to have knowledge of all judicial decisions interpreting its laws. *Fangman v. Genuine Title, LLC*, 136 A.3d 772, 791 n.18 (Md.

2016). If, like Defendants insist, the word "transfer" has a particular meaning as determined by *Chow*, then the General Assembly's use of a different word ("receive") must have a different meaning, because "the Legislature is presumed to have meant what it said and said what it meant." *Arundel Corp. v. Marie*, 860 A.2d 886, 894 (Md. 2004) (citation omitted). In short, "receive" and "receipt" are fatally vague because "ordinary people" do not have "fair notice" as to whether these terms include a mere temporary possession, or not.

### 3. The Maryland State Police Advisory is entitled to no weight or deference.

Nothing in the Maryland State Police Advisory changes any of this. While the legislature has stated that the Maryland State Police "may adopt regulations to carry out the provisions of this section" under Section 5-117.1(n), the Maryland State Police has not set out this definition of "receive" in actual "regulations." Tellingly, a regulation might give the interpretation some legal force, but the Maryland State Police has adroitly avoided that consequence by issuing a mere Advisory. The Maryland State Police has thus quite purposefully continued its prior refusal to give these terms meaning in actual regulations. An "Advisory" may be disregarded or changed at any time for any reason or no reason, without notice or consequence.

First, in issuing an Advisory rather than a regulation, and only then shortly after Defendants lost their motion to dismiss, the Advisory was obviously issued purely for the purpose of securing a litigation advantage in this case, rather for any legitimate reason. Such a transparent "litigation position" non-regulatory administrative action is not entitled to any consideration by this Court. *See, e.g.*, *Sierra Club v. Dept. of the Interior*, at 286–87 (refusing to give any credence to "litigation positions that do not reflect an exercise of delegated legislative authority"). The Advisory should be disregarded on this ground alone.

-62-

Second, nothing in this Advisory precludes prosecution. In Maryland, the prosecution authority lies with the State's Attorneys. *See Murphy v. Yates*, 348 A.2d 837 (Md. 1975). The State's Attorneys are independent of the Attorney General under the Maryland Constitution. *See* Md. Const. Art. V, § 7. Maryland law also holds that "equitable estoppel does not apply against the State in regard to governmental functions," *Heartwood 88, Inc. v. Montgomery Cty.*, 846 A.2d 1096, 1117 (Md. Ct. App. 2004), which means that local law enforcement and State's Attorneys and the Maryland State Police itself, are free to proceed without regard to the Advisory. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ("the integrity of the administrative process requires that courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ."). (quotation omitted).

Third, in effect, the Advisory amounts to no more than a non-binding assurance, for now, that the State Police will not arrest for temporary possessions. Yet, such assurances cannot save a statute. *See McDonnell v. United States*, 136 S. Ct. 2355, 2373–74 (2016) (noting that "we cannot construe a criminal statute on the assumption that the Government will 'use it responsibly'") (quoting *United States v. Stevens*, 559 U.S. 460, 480-81 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.")); *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) ("But we cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it."); *Lewis v. Alexander*, 685 F.3d 325, 341 (3d Cir. 2012), *cert. denied,* 568 U.S. 1123 (2013) ("to the extent the agency is pleading for a chance to interpret the statute more leniently than the statute's text might suggest, we question whether we can credit such an interpretation").

**D.      The Maryland State Police regulations and application practices are void because they are inconsistent with Section 5-117.1.**

"While reliance upon the broad statutory authority conferred by the Legislature generally will be sufficient to justify an agency's regulation/rule making authority, logic compels the self-evident conclusion that there is an outer limit to an agency's authority." *Medstar Health v. Md. Health Care Comm'n*, 827 A.2d 83, 96 (Md. 2003). Accordingly, "[a]n agency's authority extends only as far as the General Assembly prescribes." *Thanner Enters., LLC v. Balt. Cty.*, 995 A.2d 257, 263 (Md. 2010). Thus, an agency's rule or regulations cannot "contradict the language or purpose of the statute." *Medstar Health*, 827 A.2d at 96. As demonstrated below, the Maryland State Police regulations and practices violate Section 5-117.1 in multiple ways.

**1.      The live-fire requirement is not authorized by law.**

First, the Maryland State Police has grafted onto Section 5-117.1(d)(3)(iii)'s requirement of a "firearms orientation component" an entirely new "practice component" under which the applicant must safely fire "at least one round of live ammunition." COMAR 29.03.01.29C(4). Although Section 5-117.1(n) provides that "[t]he Secretary may adopt regulations to carry out the provisions of this section," it does not allow the Maryland State Police to add *new* "provisions," such as adding "a practice component" to the statutorily required "orientation component." Teaching safe handling of a firearm can be accomplished without a "practice" component. Pennak Decl., Ex. 2, at ¶¶ 9–11. An instructor need only make use of dummy rounds to provide the "orientation" required by the statute. Live-fire is not needed to provide an "orientation" or a "demonstration." *Id.*, Ex. 2, at ¶¶ 7–9. By itself, a requirement to fire one round of live ammunition serves no training purpose at all. *Id.* at ¶¶ 8–11. Defendants' expert conceded that point in discovery. *See* J. Johnson Dep., Ex. 7, at 52:14–53:2 ("I think just firing one round is not adequate").

-64-

The legislative history of the Handgun License requirement also contradicts Defendants' argument. As originally proposed, the Handgun License provisions required a safety course that included "a firearms qualification component that demonstrates the person's proficiency and use of the firearm." 2013 Leg. Sess. SB 281 (First Reader) at 17.[9] By common usage of these terms, a "qualification component" that demonstrates "proficiency" calls for live fire. This "qualification component" was deleted, however, and Section 5-117.1(d)(3)(iii) was changed to its current language by amendment in the House of Delegates. Chapter 427 of the 2013 Laws of Maryland. The debate on the floor of the House of Delegates confirms that the amendment was intended to eliminate a live-fire requirement that would have been associated with the "proficiency and use" language. General Assembly of Maryland, *2013 Regular Session Proceedings – House Audio, April 2, 2013, Session 2*, at 19:05 (April 2, 2013).[10] The General Assembly's rejection of this language in the law as passed means that live fire training exceeds the scope of the statutory grant.

Reading the statute as limiting the training requirements to those statutorily enumerated is also necessary to avoid rendering the law unconstitutional. *See Washington Suburban Sanitary Com'n v. Phillips*, 994 A.2d 411, 420 (Md. 2010) ("a construction of a provision which casts doubt on its constitutionality should be avoided"). The live-fire component imposes severe burdens on the ability of Maryland citizens to obtain a Handgun License. Training without a live-fire requirement can take place anywhere, while training that must include live-fire can only take place at a firing range, the availability of which is highly limited (there are none in Baltimore City, for example). Pennak Decl., Ex. 2, at ¶¶ 9, 11.

---

[9] Available at http://mgaleg.maryland.gov/2013RS/bills/sb/sb0281f.pdf.

[10] Available                                                                                                                        at http://mgaleg.maryland.gov/webmga/frmlegislation.aspx?id=2013rs_house_audio&stab=02&pid=legisnlist&tab=subject3&ys=2013rs.

The need for a range, in turn, acts as a complete barrier to the acquisition of a Handgun License by persons, especially the poor, minorities and the disadvantaged, who live in areas, such as Baltimore and most of urban Maryland, where access to a shooting range is highly limited or non-existent. *Id*. at ¶ 11. While Defendants assert, Defs. Mem., at p. 7, that this problem can be alleviated by the use of "non-lethal marking projectiles" also known as simunition rounds, in fact that assertion is wrong for multiple reasons. First, these rounds are designed for high level, force-on-force combat training and they can be quite dangerous. Pennak Decl., Ex. 2, at ¶ 13. Such ammunition requires special, expensive modifications to handguns and special protective equipment to fire safely. *Id*. at ¶¶ 12–13. Few instructors have access to such equipment or facilities. *Id*. at ¶14. No student needs combat training to demonstrate "the safe operation and handling of a firearm" under Section 5-117.1(d)(3)(iii).

Second, in any event, as the Maryland State Police expressly recognize in Advisory LD-HQL-17-004, Pennak Decl., Ex. 2, at ¶¶ 12, 15 & Ex. B, simunition rounds are legally considered to be live ammunition under Maryland law, Md. Code Public Safety § 5-133.1(a), and the discharge of such ammunition is flatly banned by local law in the urban portions of Maryland, including all of the City of Baltimore, all of Prince Georges County and most of Montgomery County. *Id*. at ¶¶ 15–18. The sole exception is for discharges taking place on "established ranges" which are protected from local regulation by state law, Md. Code, Criminal Law § 4-209(d)(2). Pennak Decl., Ex. 2, at ¶ 11. Again, there are very few such ranges in these areas (and none in Baltimore City). *Id*. at ¶¶ 15–18. Defendants conceded this point in discovery. J. Johnson Dep., Ex. 7, at 54:14–17. In short, Defendants' suggestion, Defs. Mem., at p. 7, that such simunition rounds can be used outside the range may well be true at special police training facilities with proper equipment, but for everyone else, such use would be directly contrary to law in all these

urban areas. Given the modifications required, the use of such rounds would be grossly impractical and expensive everywhere. But for the live-fire requirement, Handgun License instruction could take place in any otherwise suitable location, including urban areas, as state law provides that local governments "may not prohibit the teaching of or training in firearms safety, or other educational or sporting use" of firearms. Md. Code, Criminal Law, § 4-209(b)(2). Pennak Decl., Ex. 2, at ¶ 19. The live-fire requirement thus effectively *reduces* firearms instruction, which is precisely contrary to Defendants' supposed goal.

The patent absurdity of the live-fire requirement makes painfully obvious that the real goal was to create an unjustifiable obstacle to the right to purchase a handgun for self-defense in the home. *Heller II,* 601 F.3d at 1249, 1255 (holding that the live-fire and 4 hour classroom training requirement then imposed by the District imposed substantial burdens on the right to possess a handgun and remanding). As established above, that goal is constitutionally impermissible. *See above* at pages 22–25.

> **2.     The Maryland State Police has illegally shifted its duties under Section 5-117.1(f) to the applicants and private vendors and eliminated NRA instructors as a separate category of "qualified handgun instructors."**

Finally, the Maryland State Police has unlawfully hijacked the state-certified private fingerprint vendor system to avoid the requirements imposed by Section 5-117.1(f). It has thus burdened applicants with the additional fees charged by private vendors while at the same time effectively restricted access to inconvenient fingerprinting services to those offered by that system. The express terms of Section 5-117.1(f) require the Secretary to apply to the state "Central Repository" for a background check and further requires that "the Secretary shall submit" the following: (i) the Handgun License applicant's fingerprints to the Director of the Central Repository and to the FBI and to the Secretary; (ii) the fee authorized by Md. Code Criminal

Procedure 10-221(b)(7) for access to Maryland Criminal records; (iii) the processing fee required by the FBI for a background check.

Instead of making these required submissions, the Maryland State Police use the existing State-certified private vendor system. This use is not even addressed, much less authorized by the regulations, but is entirely a matter of Maryland State Police practice. Under this system, it is the applicant, via the vendor, who is actually making every one of these submissions, not the Secretary.

Yet, Section 5-117.1(f)(3) expressly requires every one of these submissions to be made by "the Secretary." This shift (1) forces the use of the burdensome online application system mandated by the Maryland State Police, (2) maximizes the administrative convenience of the Maryland State Police, and (3) off-loads all the burden and costs of these private services onto the applicant, who must pay the vendor a fee for these services. *See* COMAR 12.15.05.07D. Such a system is flatly *ultra vires*.

Finally, the Maryland State Police has unlawfully refused to accept training certifications issued by instructors certified by a "nationally recognized firearms organization" (NRA) even though these individuals are specifically designated as a separate category of "qualified handgun instructors" by statute. Md. Code Ann., Public Safety § 5-101(q)(3). Rather, NRA instructors must become Maryland State Police licensed instructors under Section 5-101(q)(2), thereby effectively doing away with Section 5-101(q)(3) instructors as a separate category of instructors. Pennak Decl., Ex. 2, at ¶ 10. The Maryland State Police has thus illegally conscripted Section 5-101(q)(3) instructors into its online system for applications. *Id*.

**Conclusion**

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants'
Motion for Summary Judgment and grant Plaintiffs' Cross-motion for Summary Judgment,
declaring Section 5-117.1 of the Public Safety Article of the Maryland Code to be unconstitutional
under Second and Fourteenth Amendments to the Constitution and Maryland State Police
regulations and practices void because *ultra vires*.


Respectfully Submitted,

/s/ Cary J. Hansel
Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs


John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: October 5, 2018                    Counsel for Plaintiff Atlantic Guns, Inc.

**Table of Exhibits to Plaintiffs' Memorandum in Support of
Cross-motion for Summary Judgment and in Opposition to Defendants'
Motion for Summary Judgment**

**Exhibit No.**     **Title**

1.      Declaration of Stephen Schneider filed under seal

2.      Declaration of Mark Pennak

3.      Excerpts of the Deposition of Susan Vizas

4.      Excerpts of the Deposition of Deborah Miller

5.      Excerpts of the Deposition of Daniel Webster

6.      Excerpts of the Deposition of Andy Johnson

7.      Excerpts of the Deposition of James Johnson

8.      Excerpts of the Deposition of James Russell

9.      77R Handgun Registration Safety Course Training Video

10.     Md. Code Ann., Pub. Safety § 5-118 (2003)

11.     Excerpts of the Deposition of Diane Armstrong

12.     J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America* (Oct. 20, 1999)

13.     Firearm Safety Act, 2013 Maryland Laws Ch. 427 (S.B. 281)

14.     Defendants William M. Pallozzi's Third Supplemental Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories

15.     Deposition Exhibits 48, 105 & 106

16.     Excerpts of the Deposition of Dana Hoffman

17.     Excerpts of the Deposition of Mark Pennak

18.     Deposition Exhibit 21

19.     Excerpts of the Deposition of Stephen Schneider

20.     Defendant William M. Pallozzi's Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories

21.     Administrative Log

22.     Maryland Crime Statistical Data

23.     Declaration of Carlisle Moody

24.     Declaration of Gary Kleck

25.     Excerpts of the Deposition of Scott Miller

26.     Excerpts of the Deposition of John Clark

27.     Declaration of Connor Blair

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of October, 2018, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record. I also certify to the service via United States Mail copies of Exhibit 1 (filed under seal) and Exhibit 9 to Defendants' counsel.

/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)