

**CONFIDENTIAL INFORMATION REDACTED**

# Transcript of Deborah Kay Miller

**Date:** February 27, 2018
**Case:** Maryland Shall Issue, Inc., et al. -v- Hogan, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF MARYLAND
 3     - - - - - - - - - - - - x
 4    MARYLAND SHALL ISSUE,    :
 5    INC., et al.,            :
 6              Plaintiffs,    :   Civil Action No.
 7       v.                    :   16-cv-3311-MJG
 8    LAWRENCE HOGAN, et       :
 9    al.,                     :
10              Defendants.    :
11     - - - - - - - - - - - - x
12
13            CONFIDENTIAL INFORMATION REDACTED
14            Deposition of DEBORAH KAY MILLER
15                   Baltimore, Maryland
16               Tuesday, February 27, 2018
17                       1:27 p.m.
18
19
20    Job No.:  178304
21    Pages:  1 - 47
22    Reported By:  Sandra A. Slater, RPR, CSR
```

1   understand or that is unclear to you, please ask
2   me to rephrase it and I will do that.  Okay?
3        A   Okay.
4        Q   If you need to take a break at any time,
5   just let me know and we will arrange to do that.
6   All right?
7        A   Okay.
8        Q   What is your current address?
9        A   297 Aston Forest Lane in Crownsville,
10  Maryland 21032.
11       Q   And how long have you lived there?
12       A   Since 2001.
13       Q   Is that a single family home?
14       A   Yes.
15       Q   And do you own it?
16       A   Yes.
17       Q   And who lives there with you?
18       A   My husband.
19       Q   Anybody else?
20       A   No.
21       Q   How long have you lived in Maryland?
22       A   I've lived in Maryland almost my whole

1    life except for the first three months.
2        Q   Are you taking any medications that would
3    affect your ability to testify truthfully or
4    remember events?
5        A   No.
6        Q   Are you suffering from any medical
7    conditions that affect your memory or would impair
8    your ability to testify truthfully today?
9        A   No.
10       Q   Have you ever been a party to a lawsuit
11   before?
12       A   No.
13       Q   Have you ever been convicted of a crime?
14       A   No.
15       Q   Other than your attorneys have you talked
16   to anybody about this lawsuit?
17       A   No.
18       Q   What is your current employment situation?
19       A   I work for the Department of Defense.
20       Q   And what is your job there?
21       A   Currently, I'm an office manager.
22       Q   And what are your job duties?

1          A   Answering the phone, reserving conference
2     rooms, things like that.
3          Q   And how long have you been in this
4     position?
5          A   So I started December 26th so it's new.
6          Q   December 26th of 2017?
7          A   Correct.
8          Q   And where did you work before that?
9          A   The same place, Department of Defense.
10         Q   Different position?
11         A   Yes, different position.
12         Q   What was your position before you became
13    office manager?
14         A   Customer service representative.
15         Q   And what were your duties in that
16    position?
17         A   I processed requests for travel
18    authorizations and authorized the flights.
19         Q   And how long were you in that position?
20         A   Since 2012.
21         Q   So 2012 to December 26th, 2017?
22         A   Yes.

```
1        Q   So it's just you and your husband at the
2    house; is that correct?
3        A   Correct.
4        Q   And do you have a computer in the house?
5        A   Yes.
6        Q   Do you have internet access?
7        A   Yes.
8        Q   Do you have a credit or debit card?
9        A   Yes.
10       Q   Do you have a Maryland driver's license or
11   Maryland State ID?
12       A   Yes.
13       Q   Do you have access to a scanner?
14       A   Yes.
15       Q   Do you own any firearms?
16       A   No, I do not.
17       Q   Have you ever owned any firearms?
18       A   No.
19       Q   Have you ever rented any firearms?
20       A   No.
21       Q   Have you ever fired a handgun?
22       A   Yes.
```


CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                16

```
 1        Q   When you've been to the shooting range
 2   have you fired handguns or long guns or both?
 3        A   Handguns.
 4        Q   Have you ever fired a handgun outside of a
 5   shooting range?
 6        A   No.
 7        Q   Have you ever taken any firearm safety
 8   training?
 9        A   No, I have not.
10        Q   Does your husband own any firearms?
11        A   Yes.
12        Q   How many?
13        A   I don't know the exact number.
14        Q   More than five?
15        A   I don't know.
16        Q   More than 10?
17            MR. HANSEL:  Don't guess, just if you
18   know.
19        A   I don't know.
20        Q   Does he own handguns, long guns or both?
21        A   Both.
22        Q   Do you know if he has a Maryland Handgun
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                16

```
 1        Q   When you've been to the shooting range
 2   have you fired handguns or long guns or both?
 3        A   Handguns.
 4        Q   Have you ever fired a handgun outside of a
 5   shooting range?
 6        A   No.
 7        Q   Have you ever taken any firearm safety
 8   training?
 9        A   No, I have not.
10        Q   Does your husband own any firearms?
11        A   Yes.
12        Q   How many?
13        A   I don't know the exact number.
14        Q   More than five?
15        A   I don't know.
16        Q   More than 10?
17            MR. HANSEL:  Don't guess, just if you
18   know.
19        A   I don't know.
20        Q   Does he own handguns, long guns or both?
21        A   Both.
22        Q   Do you know if he has a Maryland Handgun
```

1  questions about some of the allegations in here.
2  Have you seen this before, Exhibit 14? Excuse me,
3  Exhibit 2?
4      A  Yes.
5      Q  On page 3, paragraph 12, there's an
6  allegation that says that you would like to
7  purchase a handgun for self defense, target
8  practice and other lawful purposes. Do you see
9  that?
10     A  Yes.
11     Q  Is that true?
12     A  That is true.
13     Q  When did you decide that you wanted to
14  purchase a handgun?
15     A  It was last year.
16     Q  2017?
17     A  Um-hum.
18     Q  Is that yes?
19     A  Yes.
20     Q  And what prompted that decision, if
21  anything?
22     A  Because I wanted to be able to defend

1  myself in my home.
2     Q  All right.  Your husband already has guns
3  in the house, correct?
4     A  Yes.
5     Q  Why did you feel you needed to have one
6  for yourself?
7     A  Because of the new law, I was concerned
8  that if I used his gun it would be considered
9  receiving the handgun and that I could be
10 prosecuted.
11    Q  And how did you find out about that part
12 of the law?
13       MR. HANSEL:  Objection.  Give me a second
14 to think about that.  Go ahead.  I stated an
15 objection but you can answer.
16    A  Oh.  I read the law.
17    Q  Did you talk to anybody about the law?
18    A  No, I read it for myself.
19    Q  And you became concerned that the law
20 would not permit you to take possession of a
21 handgun that belonged to your husband?
22    A  Yes, it was unclear.

```
 1        Q   Have you ever shopped for handguns?
 2        A   I've looked at them, but that's about it.
 3        Q   Have you looked at them at a gun store or
 4    on the internet?
 5        A   At a gun store.
 6        Q   Which gun store?
 7        A   I don't remember the name of it.
 8        Q   When did you visit the gun store to look
 9    at the handguns?
10        A   It was about a year ago.
11        Q   And how much were you planning to spend on
12    this handgun?
13        A   I don't know.  I hadn't thought about the
14    price.
15        Q   You have the financial wherewithal to
16    purchase a handgun?
17        A   Yes.
18        Q   Have you thought about a price range that
19    you're willing to spend?
20        A   No, I have not.
21        Q   Have you done any research to determine
22    what type of handgun would best suit your needs?
```

```
 1       A   No, I have not.
 2       Q   Are you a member of any gun rights
 3   organizations?
 4           MR. HANSEL:  Objection.  Go ahead.
 5           THE WITNESS:  Go ahead?
 6           MR. HANSEL:  Yep.  I'll be real clear when
 7   you're not supposed to answer.  I'm pretty good at
 8   making myself known, so you'll be all right until
 9   I let you know.  Thank you.
10       A   I am currently a member of Maryland Shall
11   Issue, MSI.
12       Q   Any others?
13       A   No.
14       Q   How long have you been a member of MSI?
15       A   Last year.
16       Q   2017?
17       A   Yes.
18       Q   Do you participate in any activities in
19   connection with your membership at MSI?
20           MR. HANSEL:  Objection. Go ahead.  Go
21   ahead.
22       A   Oh.  I attend some of the meetings.
```

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller
Conducted on February 27, 2018      33

1    Q  Can you describe for me the inconvenience
2  that has deterred you from obtaining an HQL?
3    A  The training, the time for the training.
4  I have back issues so sitting still for four hours
5  would be a burden on me.
6    Q  Anything else?
7    A  Taking the time off work.
8    Q  Anything else?
9    A  No.
10   Q  So it's not the cost?
11   A  The cost is a burden but the important
12 thing is my back issues for the training.
13   Q  So you have the financial wherewithal to
14 pay the fees that are required to get an HQL if
15 you want to, correct?
16      MR. HANSEL:  Objection.  Asked and
17 answered.  Irrelevant.  Go ahead.  You can answer.
18   A  It is a burden but it is -- I can do it.
19   Q  And you said your understanding was that
20 the training would take approximately four hours,
21 correct?
22   A  Yes.

```
1        Q   All right.  Do you know whether that would
2    need to be during the day or during the week or
3    whether you could do it on a Saturday or in the
4    evening?
5        A   No, I don't.
6        Q   So you don't know whether you would need
7    to take off time from work to complete the
8    training or not, correct?
9        A   Correct.
10       Q   And you said you have back issues.  When
11   did those start?
12       A   It started in around 2001.
13       Q   And is it ongoing, you suffer from it
14   today?
15       A   Yes.
16       Q   And what specifically is the problem?
17       A   I have the disc in my back.
18       Q   What do you do at work, you have to sit at
19   a desk?
20       A   Yes.
21       Q   All day?
22       A   I have to get up.  When my back gets
```

1  uncomfortable, I get up.
2      Q  But most of the time when you're at work
3  you are seated at a desk; is that correct?
4      A  Yes.
5      Q  Have you done any research to determine
6  whether during the training that's required to
7  obtain a HQL you would have the opportunity to get
8  up and move around?
9      A  No, I haven't.
10     Q  Have you made any inquiries of any
11  Maryland State Police approved firearm safety
12  trainers or instructors as to whether or not you
13  could get an accommodation for your back problems
14  if you took the training?
15     A  No, I have not.
16     Q  Did you have to submit to a background
17  check when you got your current job?
18     A  Yes.
19     Q  Do you need a handgun for your work?
20     A  No.
21     Q  Do you have any other physical
22  disabilities other than your back that affect your

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                38

```
1      Q  You said you were confused by the receive
2   and receipt portion of the HQL law?
3           MR. HANSEL:  Objection.  She didn't say
4   that.  She said it was ambiguous.
5      Q  Did it confuse you?
6      A  I felt it was vague.
7      Q  What about it did you find to be vague?
8      A  It just -- it didn't define what it meant
9   to receive.
10     Q  And did you do any research into that
11  issue?
12     A  No, I just read the law.
13     Q  Are you aware of any Maryland State Police
14  guidance on that question?
15     A  No.
16          (D. Miller Deposition Exhibit 15 was
17  marked for identification and retained by
18  counsel.)
19     Q  Ms. Miller, let me ask you to look at
20  what's been marked as Exhibit 15.  This is an
21  advisory from the Maryland State Police concerning
22  the interpretation of "received" in the HQL law.
```

```
 1   Have you seen this before?
 2        A   No, I haven't seen this.
 3            MR. HANSEL:  They issue a lot of
 4   advisories.  Just for the record, this is
 5   LD-HQL-17-003 dated November 17th, 2017.  I just
 6   put it on the record because there's the issue of
 7   a lot of advisories.
 8        Q   At the bottom you'll see where it says
 9   therefore, an individual not otherwise prohibited
10   from owning or possessing regulated firearms is
11   not required to possess an active HQL in order to
12   borrow a regulated firearm from another individual
13   on a temporary basis.  Do you see that?
14        A   Yes.
15        Q   In light of that do you still believe that
16   you have a need to purchase a handgun?
17        A   Yes.
18        Q   Why?
19        A   After reading the law, I felt I could be
20   prosecuted.
21        Q   All right.  So even under this
22   interpretation, you feel you could still be
```

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018

40

```
 1  prosecuted?
 2          MR. HANSEL:  Would you like to stipulate
 3  that no one can be prosecuted?
 4          MR. SCOTT:  I'm not going to stipulate to
 5  anything, Counsel, and the question remains
 6  pending.
 7          MR. HANSEL:  I'll happily stipulate, if
 8  you would like, and then that would solve the
 9  issue.
10          MR. SCOTT:  Can you read back the last
11  question, please?
12          (Pending question read.)
13      A   Yes.
14      Q   Have you had any surgery for your back?
15      A   Yes.
16      Q   How many times?
17      A   Twice.
18          (D. Miller Deposition Exhibit 16 was
19  marked for identification and retained by
20  counsel.)
21      Q   I've had marked as Exhibit 16 the Answers
22  to Interrogatories that we received from your
```