Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-------------------------------X

MARYLAND SHALL ISSUE, INC.,          :

et al.,                              :

                                     : Case No:

       Plaintiffs                 : 16-cv-3311-MJG

                                     :

        -vs-                     : Pages 1 - 109

                                     :

LAWRENCE HOGAN, in his               :

capacity of Governor of              :

Maryland, et al.,                    :

                                     :

       Defendants                 :

-------------------------------X

Deposition of James Johnson

Baltimore, Maryland

Tuesday, March 13, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  390081

MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT
7

1   just mentioned that you are prepared to address with

2   respect to the specific requirements of the Handgun

3   Qualification License in Maryland?

4          A.   Could you ask me the question again?

5          Q.   Sure.  Of course.  The first area of

6   testimony for, set forth for you are the

7   requirements of the Handgun Qualification License in

8   Maryland, and we talked a little bit about

9   fingerprinting, a little bit about training just

10  now.  Are there any other requirements other than

11  the training and the fingerprinting requirements of

12  the Handgun Qualification License that you are

13  prepared to address?

14         A.   I think I would address today the

15  background work that's done as well.  I think the

16  opposing side believes that the current NICS system

17  check is sufficient, and I would argue that

18  Maryland's system is more comprehensive.

19         Q.   All right.  Now, when you talk about

20  Maryland's system is more comprehensive, are you

21  referring to the 77R background check?

22         A.   I believe that the fingerprint itself is a



Page 20

1   more robust element that determines one's true

2   identity.  The NICS check obviously can be defeated

3   with false identification, and I believe that's a

4   significant measure to reduce false ID, and I would

5   also state at this time that the training class

6   itself I strongly believe will reduce straw

7   purchasing, which is very significant.

8       Q.   Is there anything about the background

9   check associated with the HQL application processing

10  other than fingerprinting that's different from the

11  background check on a 77R application?

12      A.   Ask the question again, please.

13      Q.   Sure.  Is there anything different other

14  than the fingerprint about the background check on

15  an HQL application that's different from the

16  background check on a 77R application in Maryland?

17      A.    If I understand it correctly, Maryland

18  prohibits now an individual who voluntarily

19  committed themselves for more than 30 days or an

20  individual who was involuntarily committed.  I

21  believe the state of Maryland or the state is in a

22  better position to research and verify those



High

Page 21

1   circumstances to begin with.

2           I've had an opportunity to actually travel

3   to the state and location that administers these

4   NICS checks and sat at the console of an operator.

5   These NICS checks are done in two, two-and-a-half

6   minutes.  Understanding Maryland's process, I

7   believe it to be a much more exhaustive, thorough

8   process, and I do believe it's reasonable.

9       Q.   So isn't it true that the Maryland process

10   that you're referring to, in addition to the NICS

11   process, takes place in connection with the 77R

12   application, as well as with the HQL application?

13       A.   I don't know if it actually involves the

14   77 or not.  I don't know.

15       Q.   So you don't know what process is done to

16   do a background check on a 77R application by

17   Maryland State Police compared to whatever process

18   they do to do a background check on the HQL

19   application; is that what you're saying?

20       A.   I don't know.

21       Q.   Okay.  Now, what is it about

22   fingerprinting that makes a difference in a



Page 24

1              THE WITNESS:  I'm not in a position to

2      answer the question.

3      BY MR. SWEENEY:

4          Q.   Now, fingerprinting is not, per se, going

5      to deter a straw purchaser; correct?  Because by

6      definition a straw purchaser is an individual who

7      can be positively identified and is qualified to

8      purchase a handgun; correct?

9              MS. KATZ:  Objection to form.  You can

10     answer.

11             THE WITNESS:  I believe that's an accurate

12     statement.

13     BY MR. SWEENEY:

14         Q.   All right.  So what is it about the

15     fingerprinting process that in any way discourages

16     straw purchases?

17         A.   I believe that an individual that knows

18     that they have to render fingerprints is less likely

19     to carry out the scheme.  I believe that most

20     individuals have a great concern or a concern about

21     rendering their fingerprints.

22             It's been my experience throughout my



Page 25

1   adult life that individuals are very concerned about

2   the government possessing their fingerprints for

3   various reasons that they'll have to explain.

4        Q.   And that's true for all Maryland citizens;

5   correct?

6             MS. KATZ:  Objection as to form.  You can

7   answer, if you can.

8             THE WITNESS:  I can't answer that.

9   BY MR. SWEENEY:

10       Q.   Now, do we have any information as to

11  whether or not the fingerprinting requirement has

12  caught anyone who was a straw purchaser?

13            MS. KATZ:  Objection to form.  You can

14  answer.

15            THE WITNESS:  I don't possess that

16  information.

17  BY MR. SWEENEY:

18       Q.   All right.  Do you have any data on the

19  extent to which straw purchases of handgun occurred

20  in Maryland prior to the Handgun Qualification

21  License requirement being initiated?

22       A.   Yes.



Page 26

```
 1        Q.    What information do you have?

 2        A.    I think the case that I put forward is a

 3   Palasinski case where an individual bought for who

 4   she knew was a convicted felon that was prohibited.

 5   Those guns were subsequently used in multiple

 6   homicides.

 7              I also bring to your attention the death

 8   of a Baltimore County police tactical officer who

 9   was killed with a gun purchased at a Bass Pro

10   Outlet, I believe, in South Carolina by a couple who

11   later traded that gun for drugs, and that gun was

12   then subsequently used to kill a police officer.

13              There's a case in New York where a gun was

14   purchased for an individual who killed two firemen,

15   for example, a 2015 case I believe it is or '14

16   case.

17        Q.    Are those all the examples?

18        A.    Those are the ones that come to mind.  I'd

19   have to do research.  I'm sure there are a

20   significant number of cases like that nationwide.

21        Q.    Now, the first one, can you spell the name

22   of the individual?
```



Page 27

1        A.    Palasinski?

2        Q.    Yes.

3        A.    No.

4        Q.    And that occurred in Maryland?

5        A.    Yes, sir.

6        Q.    All right.  And the second one, the police

7    officer was shot in Maryland, but the gun was not

8    purchased in Maryland; correct?

9        A.    That's correct.

10       Q.    And there is nothing about the Handgun

11   Qualification License that could have prevented that

12   from occurring; am I correct?

13       A.    The individual that used that gun on the

14   officer was prohibited.  He went outside the state

15   to acquire that weapon, so Maryland's HQL would not

16   have affected that case.

17       Q.    All right.  And the New York incident you

18   indicated had nothing to do with Maryland; correct?

19       A.    No.  It's just an example of another straw

20   purchase that's, you know, very obvious.

21       Q.    So, the Palasinski case is the only

22   example that comes to mind in which you're aware of



Page 28

1    a straw purchase in Maryland; correct?

2         A.   That is the case that I'm quite aware of.

3    However, I'm very comfortable in saying that with

4    research and resources additional cases could be

5    found.

6         Q.   All right.  As you sit here today, are you

7    aware of any research and any resources that have

8    been done that tell us anything about the prevalence

9    of straw purchasing of handguns in Maryland before

10   or after the Handgun Qualification License was

11   initiated?

12            MS. KATZ:  Objection as to form.  You can

13   answer.

14            THE WITNESS:  No.

15   BY MR. SWEENEY:

16        Q.   You also mentioned that you thought the

17   training requirement of the Handgun Qualification

18   License could deter a straw purchaser.  Did I

19   understand that correctly?

20        A.   Yes.

21        Q.   And could you elaborate on that opinion

22   for me, please?



Page 52

1   research, time, and resources.

2        Q.   Which you have not done in advance of your

3   opinion in this case?

4        A.   No, sir.

5        Q.   All right.  And you also don't have any

6   such information specifically about Maryland;

7   correct?

8        A.   That's correct.

9        Q.   Item 7 of your testimony talks about the

10  live fire requirement.  We already discussed that.

11  Is there anything else about your opinion with

12  respect to the live fire requirement that you'd like

13  to address?

14       A.   Well, personally, I think just firing one

15  round is not adequate, but I do not think the

16  requirement to show proficiency in discharging a

17  round is unreasonable.  Again, I would draw your

18  attention to the process of actually chambering a

19  round, which is an exercise in and of itself.  And,

20  you know, the average individual that's new to guns,

21  I think, would struggle working that mechanism of

22  the weapon, and I'm sure that's a necessary



Page 53

1    component or process in actually discharging a

2    round.

3        Q.   Now, can this live fire training take

4    place anywhere or do you have to have it at a

5    special location?

6        A.   I believe that with the change in allowing

7    a marker-type round that can be conducted virtually

8    anywhere.  I do not believe that is discharging a

9    weapon in a metropolitan district, for example, so I

10   believe it could be done anywhere.  We use

11   simunition weapons in classrooms, at the academy.

12   We use simunition weapons in various locations.

13       Q.   So it's your opinion then that a

14   simunition live fire training can take place within

15   the city limits of Baltimore City?

16       A.   I do not think it's discharging a weapon

17   in a metropolitan district.

18       Q.   And so that could take place anywhere?  It

19   could take place, say, in a backyard or a home in

20   Baltimore City?

21       A.   When I think about this issue, I'm

22   thinking about a projectile that simply delivers a



Page 54

1    paint ball-type mark on an object.  I understand

2    there's certain restrictions of the shell casing

3    itself, but without research I do not think that

4    it's discharging a weapon in a metropolitan

5    district.

6         Q.   So that's your opinion as you sit here

7    today, but you haven't researched it specifically?

8         A.   No, sir.

9         Q.   Okay.  So do you know, for instance, if

10   The Cop Shop in Baltimore City is offering Handgun

11   Qualification License training including live fire

12   now?

13        A.   I do not know about that location.

14        Q.   Do you know of any location in Baltimore

15   City that offers Handgun Qualification License

16   training?

17        A.   Not in Baltimore City.

18        Q.   What's the closest training location

19   outside of Baltimore City that you can think of?

20        A.   Off Route 43 in the Essex community, which

21   is approximately 17 minutes north of the Baltimore

22   City line, you've got a location, Continental Arms,



```
1        Q.    Was there any issue with your county of

2   residence?

3        A.    I own property in Harford County,

4   Maryland, and I own property in Baltimore County,

5   Maryland.

6        Q.    And the Fallston address you gave me this

7   morning is in Harford County?

8        A.    That's correct.

9        Q.    And how long has that been your residence?

10        A.    For the past year I've used that address,

11   but I still own the one in Baltimore County as well.

12        Q.    All right.  Of the firearms that you

13   mentioned you owned, do you keep any of them for

14   self-defense purposes?

15        A.    I do.

16        Q.    And which of the firearms do you use for,

17   do you keep for self-defense purposes?

18        A.    The semiautomatic handgun.

19        Q.    Do you keep it loaded and accessible for

20   self-defense purposes?

21        A.    I do.

22        Q.    Do any other members of your family
```

