Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-----------------------------X

MARYLAND SHALL ISSUE, INC.,       :

et al.,                           :

                                  : Case No:

          Plaintiffs              : 16-cv-3311-MJG

                                  :

             -vs-                 : Pages 1 - 229

                                  :

LAWRENCE HOGAN, in his            :

capacity of Governor of           :

Maryland, et al.,                 :

                                  :

          Defendants              :

-----------------------------X


Deposition of Diane S. Armstrong

Baltimore, Maryland

Friday, March 23, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  391104


MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT 11

Page 18

1    And who on your staff did you talk to?

2         A.   Do you want all their names?  'Cause I

3    have five people on my staff.

4         Q.   Yes.  So I will need those names.

5         A.   Mona Smith.

6         Q.   And what is her title?

7         A.   All of the individuals are office service

8    clerks.

9         Q.   Got it.  All right.  So the other four

10   names?

11        A.   Tienda Greene.

12        Q.   Could you spell the first name?

13        A.   T-I-E-N-D-A, G-R-E-E-N-E; Diane Duckett,

14   D-U-C-K-E-T-T.  I'm trying to go in the line.  Sam

15   Michaelson.

16        Q.   All right.

17        A.   And Dellene, D-E-L-L-E-N-E, Lizama,

18   L-I-Z-A-M-A.

19        Q.   Can you estimate how many hours you spent

20   preparing for the deposition today?

21        A.   Three or four.  I did not keep track.

22        Q.   And can you summarize the subject matters



1      Q.   Can you elaborate on how it is that the

2  information that the trainer enters on the trainer's

3  screen gets to a screen that your unit sees in the

4  initial processing of a standard HQL application?

5      A.   I don't know the details on the workings

6  of the computer, but I know that, when a student

7  enters in an instructor's ID number, it is then

8  supposed to transmit over to the instructor's

9  account for them to sign off on it.  They do not get

10  any notification that a student has submitted their

11  application.

12      Q.   Does it happen every, on some occasion

13  that in reviewing a standard HQL application there

14  is no entry under training?

15      A.   Can you --

16      Q.   It was a terrible question.  Let me try it

17  again.  So, when your unit reviews the standard HQL

18  applications, are there times when there is no entry

19  under training?

20      A.   Yes.

21      Q.   All right.  And what do you do then?

22      A.   We reach out to the applicant and advise



Page 48

1  them that the instructor at that time had not signed

2  off on the training and for them to reach out to the

3  instructor or, if they have a certificate from the

4  class, to -- they e-mail that to us, and we can use

5  that.

6      Q.   Okay.  Just to be clear, your unit does

7  not reach out to the trainer and ask the trainer to

8  complete that.  You reach out to the applicant and

9  ask the applicant to have the trainer complete it;

10 am I correct?

11     A.   Correct, because we don't know who they've

12 used as an instructor.  That does not come over.

13     Q.   All right.  Are there times when they put

14 in the trainer's identification on their

15 application, but there's no indication that the

16 training is complete?

17     A.   Can you reword that?

18     Q.   Sure.  I understood that your unit will

19 receive an identification of the trainer from the

20 applicant in the standard HQL application, and it's

21 based on that identification that you know which

22 trainer they went to?



Page 59

1        A.    Can you repeat that?  I'm sorry.

2        Q.    Sure.  So you're processing an

3    application.  You come up against a 30-day deadline.

4        A.    Mm-hmm.

5        Q.    You recognize it's 30 days, but you don't

6    have all the information to approve it at that

7    point.  Do you disapprove it on the 30-day deadline?

8             MR. SCOTT:  Objection.  It's beyond the

9    scope of her designation.  You can answer, if you

10   know.

11            THE WITNESS:  I don't know.  I would just

12   say that it would depend on what we need to approve

13   or disapprove it.

14   BY MR. SWEENEY:

15       Q.    Okay.  Well, let's say if you still need a

16   training verification and you're on day 30, what

17   happens to that application?  Is it disapproved or

18   is it simply held?

19       A.    Well, we have to deny it until we get the

20   training confirmed.

21       Q.    Now, if an application is denied and then

22   the training is confirmed, how is that treated?



Page 60

1    What happens then?

2        A.    Then we overturn the denial and approve

3    the application.

4        Q.    And does that sometimes happen after the

5    30-day deadline?

6        A.    Yes.

7        Q.    And that's happened more than once after

8    the 30-day deadline?

9        A.    Are we talking just about the instructors

10   or in general for the administrative log?

11       Q.    I'm just focusing on that portion of the

12   administrative log dealing with training, training

13   verification.

14       A.    From the instructor?

15       Q.    Right.

16       A.    To the best of my knowledge, there is no

17   one that has gone over 30 days for the training.

18       Q.    Okay.

19       A.    That have been denied.

20       Q.    I didn't understand your response.  Could

21   you elaborate?

22       A.    There is no one on the administrative log



Page 61

1   that is beyond 30 days that has been denied for the

2   training.  All of the training has been cleared from

3   contacting the applicants.

4        Q.   And what are the other reasons why an

5   application gets on the administrative log other

6   than lack of training verification?

7             MR. SCOTT:  Objection.  Beyond the scope

8   of her designation.  You can answer.

9             THE WITNESS:  Okay.  Live Scan, proof of

10  residency, if they have an out-of-state driver's

11  license, and training documentation other than the

12  instructor 'cause there's a difference between the

13  training documentation and the instructor.

14  BY MR. SWEENEY:

15       Q.   Explain to me the difference.

16       A.   The training documentation would be either

17  a DD 214 or the DNR Hunter Safety Card.

18       Q.   And those would be exemptions from

19  training; correct?

20       A.   Correct.

21       Q.   What happens if someone starts and submits

22  a standard application and they don't have training



Page 62

1    verification, but they seek an exemption from

2    training?  How is that application handled?

3        A.   I don't understand the question.

4        Q.   Sure.  An individual submits a standard

5    application.

6        A.   Mm-hmm.

7        Q.   But it does not have training

8    verification.  And then the initial -- does the

9    initial processing unit inquire of them about their

10   training verification?  And suppose they learn that

11   they are exempt from training, and then they get a

12   verification, the DD form or the DNR.  What happens

13   then to the processing of that standard application?

14       A.   Then we internally switch -- we ask the

15   applicant to e-mail or fax over their documents, and

16   if it's acceptable, then we -- excuse me -- then we

17   switch internally the application from the incorrect

18   application to the correct application.

19       Q.   The first application has a unique

20   identifier number in your system; is that correct?

21   The standard application that was first submitted in

22   that instance we're talking about.



Page  63

```
 1              MR. SCOTT:  Objection.

 2              THE WITNESS:  I don't know.

 3   BY MR. SWEENEY:

 4       Q.  Oh, you don't know whether or not each

 5   application has a unique identifier in your system?

 6       A.  I don't know what you mean by unique

 7   identifier.

 8       Q.  Oh, sure.  How do you tell the

 9   applications apart from your system?

10       A.  It comes by the type that the applicant

11   submits.

12       Q.  Okay.  I'm sorry.  I didn't mean to cut

13   you off.

14       A.  If the applicant commits a standard, it

15   comes through showing HQL standard.

16       Q.  And let's say this is an applicant by a

17   particular individual John Smith.  Does that have a

18   particular identifying number?

19              MR. SCOTT:  Objection.

20   BY MR. SWEENEY:

21       Q.  For that individual application?

22       A.  I don't know.
```



Page 64

1        Q.   All right.  And when you, in the

2   processing unit, switch that initial standard

3   application to a training exempt application after

4   obtaining verification that the individual is

5   exempt, is that the same application that was

6   initially submitted or is that a new application

7   that has begun that is a training exempt

8   application?

9        A.   It would be the same application.

10       Q.   In addition to training verification, what

11  are the other deficiencies that would put an

12  application on the administrative log?  I'm trying

13  to understand.  You mentioned instructor, and how is

14  that different from training?

15       A.   Well, the instructor is when they have to

16  take the four-hour training class.

17       Q.   So that's for the standard applicant?

18       A.   Correct.

19       Q.   And then the training criteria otherwise

20  would be for the exempt applicant?

21       A.   Correct.

22       Q.   What are the issues about Live Scan that



Page 65

1    would cause an application to be placed on the

2    administrative log?

3           MR. SCOTT:  Objection.  Beyond the scope.

4    You can answer, if you can.

5           THE WITNESS:  Just the inability to verify

6    that they obtained the Live Scan or that it was

7    coded to the wrong authorization number.

8    BY MR. SWEENEY:

9       Q.   And what is a, what is the authorization

10   number that a Live Scan fingerprint is coded to?

11          MR. SCOTT:  Objection.  You can answer.

12          THE WITNESS:  When you go to get your

13   fingerprints done, my understanding is that you have

14   to tell them the reason that you're there to get

15   printed.  Each reason has an authorization number

16   that gets coded to that department.

17   BY MR. SWEENEY:

18      Q.   Does your initial HQL processing unit

19   verify that the Live Scan information is complete

20   and accurate?

21          MR. SCOTT:  Objection.  You can answer all

22   of his questions after I object, unless I tell you



Page 66

1    not to.

2              THE WITNESS:  Okay.  Yes.

3    BY MR. SWEENEY:

4         Q.   And if the Live Scan information is not

5    complete or to your review accurate, what do you

6    then do with that application?

7              MR. SCOTT:  Objection.

8              THE WITNESS:  They reach out to the

9    applicant.

10   BY MR. SWEENEY:

11        Q.   And in the case of it being, the

12   fingerprints being coded to the wrong authorization

13   number, what is the applicant asked to do about

14   that?

15        A.   Contact the vendor who took the

16   fingerprints and have them resubmit the prints with

17   the correct authorization code.

18        Q.   And to your knowledge, has that occurred

19   more than once?

20        A.   Yes.

21        Q.   And can you estimate how many times that's

22   occurred?



Page 77

1    your unit currently that you supervise?

2         A.   Five.

3         Q.   Those five, and those are the individuals

4    we talked about earlier.  You gave me their names;

5    correct?

6         A.   Correct.

7         Q.   All right.  So there are six of you all

8    together that compose the personnel of the HQL

9    initial processing staff; correct?

10        A.   Let me just recount.  Correct.

11        Q.   Are the three troopers and the one

12   civilian assistant who do the secondary processing

13   officed near your group?

14        A.   Yes.

15        Q.   And in addition to the six that are in

16   your group and the four of them, are there any other

17   personnel that are assigned to the processing of HQL

18   applications?

19        A.   No.

20        Q.   Where are the personnel who process the

21   77R applications physically located in relationship

22   to you and your group?



Page 91

1    and training exempt HQL applications?

2              MR. SCOTT:  Objection.

3              THE WITNESS:  Yes.

4    BY MR. SWEENEY:

5         Q.   Does the Maryland State Police offer Live

6    Scan fingerprinting to the public?

7         A.   No.

8         Q.   How does an HQL standard or training

9    exempt applicant obtain Live Scan fingerprinting?

10             MR. SCOTT:  Objection.

11             THE WITNESS:  They have to contact a

12   vendor.

13   BY MR. SWEENEY:

14        Q.   And are the vendors who provide Live Scan

15   fingerprinting satisfactory to the Maryland State

16   Police certified as such by the Maryland State

17   Police?

18             MR. SCOTT:  Objection.

19             THE WITNESS:  No, they are not regulated

20   by the State Police.

21   BY MR. SWEENEY:

22        Q.   All right.  How would an applicant know



Page 92

1    where to go to get Live Scan fingerprinting?

2              MR. SCOTT:  Objection.

3              THE WITNESS:  They would check the, I

4    guess we have a list on our website or they can

5    search their browser for fingerprint vendors.

6    BY MR. SWEENEY:

7         Q.   What is your understanding of where the

8    list on the Maryland State Police website of

9    fingerprinting vendors comes from?

10             MR. SCOTT:  Objection.

11             THE WITNESS:  The Department of Public

12   Safety.

13   BY MR. SWEENEY:

14        Q.   Do you know if Live Scan fingerprinting

15   satisfactory to the Maryland State Police is offered

16   in every Maryland county and in the city of

17   Baltimore?

18             MR. SCOTT:  Objection.

19             THE WITNESS:  No, I do not know.

20   BY MR. SWEENEY:

21        Q.   Does Maryland State Police set any

22   specific fee or range of fees for private



Page 101

1      Q.   And can you indicate where in the document

2  a change is made without telling me the substance of

3  the change?

4           MR. SCOTT:  Objection.

5           MR. SWEENEY:  Are you instructing her not

6  to answer?

7           MR. SCOTT:  You can answer yes or no.

8  BY MR. SWEENEY:

9      Q.   Can you indicate in the document where you

10 made that change without telling me what the nature

11 of the change was?

12     A.   Yes.

13     Q.   And where on the document did you make

14 that change?

15          MR. SCOTT:  Objection.  I'm going to

16 instruct her not to answer that.

17          MR. SWEENEY:  All right.

18 BY MR. SWEENEY:

19     Q.   And are you going to follow your counsel's

20 instruction?

21     A.   Yes.

22     Q.   All right.  In paragraph three you state



Page 102

1    that you received numerous phone calls daily from

2    citizens related to the HQL application process.  Do

3    you see that?

4         A.    Yes.

5         Q.    Approximately how many phone calls a day

6    on average do you receive from citizens related to

7    the HQL application process?

8         A.    Me, personally?

9         Q.    Yes.

10        A.    More than 20.

11        Q.    And can you estimate how many calls are

12   received by the individuals that you supervise on

13   average on a daily basis from citizens related to

14   the HQL application process?

15        A.    More than 20.

16        Q.    So the total would be more than 40

17   received by your unit each day on average from

18   citizens related to the HQL application process;

19   correct?

20        A.    Correct.

21        Q.    Do you maintain any log of those telephone

22   calls?



Page 103

1      A.   No.

2      Q.   Do you take any notes of those calls?

3      A.   No.

4      Q.   Do you ever confirm or follow up those

5  calls with e-mails or letters to the individual

6  callers?

7      A.   No.

8      Q.   And are the individuals who you supervise

9  follow the same pattern of not maintaining logs or

10  notes or following up with e-mails or letters to the

11  individuals they speak to with respect to the HQL

12  process?

13      A.   Yes.

14      Q.   Paragraph four of Exhibit Number 47 says,

15  "Currently, MSP does not track the number of HQ

16  applications on the MSP server that have been

17  initiated through the MSP website."

18           Did MSP ever track the number of HQL

19  applications on the MSP server that had been

20  initiated through the MSP website?

21           MR. SCOTT:  Objection to form.

22           THE WITNESS:  No.



Page 139

1    e-mails stay on there, that they do not, even if we

2    delete them, they do not delete.  They may delete

3    from us, but they stay on the server.

4         Q.   When you say you were told by your

5    section --

6         A.   We were told by our information system

7    technology section that the e-mails stay on there.

8         Q.   And in connection with the collection of

9    e-mails that were provided to us in discovery, were

10   you making that inquiry or is this general knowledge

11   you have?

12        A.   That's general knowledge that I have.

13        Q.   And do you have any information about who

14   was involved in collecting the e-mails regarding

15   citizen reports of difficulties with the HQL that

16   were provided to us?

17        A.   No.

18        Q.   We talked before about your estimate of

19   the number of calls that you and your people

20   received daily with respect to questions about the

21   HQL.  Can you estimate the number of e-mail

22   inquiries that you receive daily, you or your people



Page 140

1    receive daily with respect to the HQL?

2         A.   Me, personally, I do over 30 e-mails a

3    day, and I do not know the number of e-mails handled

4    by everyone in my section, no.

5         Q.   Can you make an estimate, as you did with

6    the phone calls, that it's probably at least as many

7    as you receive?

8         A.   Combined?

9         Q.   Yes.

10        A.   Combined it's probably -- it could be 20

11   or more, but it's not going to be as many as mine

12   because I have the department e-mails.

13        Q.   When you receive an e-mail from a citizen

14   making an inquiry about the HQL, do you e-mail them

15   or call them in response?

16        A.   Usually e-mail them.

17        Q.   All right.  And is there an e-mail address

18   that you use to respond?

19        A.   Yes.

20        Q.   And what address is this?

21        A.   The msp.hql@maryland.gov.

22        Q.   And do you always sign your e-mails as



Page 187

1              THE WITNESS:  No.

2  BY MR. HANSEL:

3      Q.   The training information is received,

4  obviously, from a third party; right, from the

5  trainer?

6      A.   The class, yes, that is received by a

7  third party.

8      Q.   Okay.  And, likewise, the Live Scan

9  information as it comes to you is received from a

10  third-party vendor; is that correct?

11      A.   Correct.

12      Q.   Okay.  All right.  So, other than going to

13  those third parties, the trainer for the class and

14  the Live Scan folks, that is not something that an

15  individual has immediate personal control over.

16  They have to rely on those third parties to submit

17  the information; is that right?

18              MR. SCOTT:  Objection.

19              THE WITNESS:  Correct.

20  BY MR. HANSEL:

21      Q.   Okay.  And not only do they have to rely

22  on the third parties to submit the information, but



Page 188

1    in the proper form with the proper codes; is that

2    right?

3             MR. SCOTT:  Objection.

4             THE WITNESS:  Correct.

5    BY MR. HANSEL:

6        Q.   Okay.  All right.  And applications, you

7    agree with me certainly, and I think we've seen some

8    examples -- we can dig them back up, if you want,

9    but you agree with me certainly that applications

10   can take longer than 30 days to be approved for

11   reasons that are unrelated to the individuals that

12   are not the fault of the applicant?  Let's put it

13   that way.

14            MR. SCOTT:  Objection.

15   BY MR. HANSEL:

16       Q.   Examples being problems with Live Scan,

17   miscoding by the sheriff's department, issues with

18   their trainer not getting the data in.

19       A.   Then, yes.

20       Q.   Okay.  All right.  And just to be clear,

21   because we muddied the question significantly, you

22   agree with me that applications can take longer, for



Page 189

```
 1    an HQL can take longer than 30 days to process for

 2    reasons that are beyond the control of the

 3    applicant; correct?

 4              MR. SCOTT:  Objection.

 5              THE WITNESS:  And also beyond the control

 6    of the State Police.

 7    BY MR. HANSEL:

 8         Q.   And the applicant?

 9              MR. SCOTT:  Objection.

10              THE WITNESS:  The applicant and the State

11    Police, yes.

12    BY MR. HANSEL:

13         Q.   Okay.  All right.  In cases where the

14    incomplete nature of the application is not the

15    fault of the applicant, is the HQL, nevertheless,

16    denied?

17              MR. SCOTT:  Objection.

18              THE WITNESS:  What do you mean by

19    "nevertheless, denied"?

20    BY MR. HANSEL:

21         Q.   Is it not approved.

22         A.   It is not approved until we get the
```



Page 190

1    documentation that is required by law.

2        Q.    And for -- and that is the, at the 30-day

3    mark, the application then is placed on this

4    administrative log; is that correct?

5        A.    Correct.

6        Q.    Okay.  And then it's removed from the

7    administrative log and dealt with appropriately, but

8    in the appropriate case approved when the problem

9    with Live Scan or the problem with training is

10   corrected; is that right?

11            MR. SCOTT:  Objection.

12            THE WITNESS:  Correct.

13   BY MR. HANSEL:

14       Q.    Okay.  So the overall time period in those

15   circumstances from the person hitting the submit

16   button and paying the fee to actually having

17   approval of their HQL is in those circumstances

18   longer than 30 days?

19            MR. SCOTT:  Objection.

20            THE WITNESS:  Correct.

21   BY MR. HANSEL:

22       Q.    Okay.  Now, the administrative log, I



Page 220

1    but I'm asking you was the Internet Explorer problem

2    fixed before or after 2017, if you know?

3              MR. SCOTT:  Objection.

4    BY MR. HANSEL:

5         Q.   And remember, we looked at an e-mail from

6    December 28 of 2016 when it still existed.

7         A.   And that is why I said I do not know the

8    date.  I'm not going to tell you a date that I don't

9    know.

10        Q.   I'm not asking the date.

11        A.   I don't even want to guess at a date that

12   I don't know.

13        Q.   So you don't even know the year, other

14   than what the e-mails show?

15        A.   Correct.

16        Q.   Okay.  All right.  Is there any path for

17   someone without a fixed address to obtain an HQL in

18   Maryland?

19             MR. SCOTT:  Objection.

20             THE WITNESS:  They need, what we require

21   in the HQL is an address on the application for us

22   to mail them the card.  That's what we require.

