## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,

               *Plaintiffs,*

    v.

LAWRENCE HOGAN, *et al.*,

               *Defendants.*

Case No. 16-cv-3311-ELH

**BRIEF OF *AMICI CURIAE* INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION, INTERNATIONAL ASSOCIATION OF LAW ENFORCEMENT FIREARMS INSTRUCTORS, PROFESSORS OF SECOND AMENDMENT LAW, SECOND AMENDMENT FOUNDATION, CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, JEWS FOR THE PRESERVATION OF FIREARMS OWNERSHIP, MILLENNIAL POLICY CENTER, & INDEPENDENCE INSTITUTE, IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Joseph G.S. Greenlee
Millennial Policy Center
3443 S. Galena St., Suite 120
Denver, CO 80231
(970) 485-3303
josephgreenlee@gmail.com
Bar No. 809450 (*Pro Hac Vice*)

David B. Kopel
Independence Institute
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

Gregory M. Kline
Law Office of Gregory M. Kline
PMB #159
550M Ritchie Highway
Severna Park, MD 21146
(410) 541-6384
gregory.kline@gklinelaw.com
Bar No. 14363
*Counsel of Record*

**QUESTION PRESENTED**

Does Maryland's process to obtain a license to possess a handgun in one's home violate the Second Amendment?

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, *Amici Curiae* make the following statements:

The **International Law Enforcement Educators and Trainers Association** is an LLC corporation, incorporated in Wisconsin. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

The **International Association of Law Enforcement Firearms Instructors, Inc.** is a 501(c)(3) nonprofit educational corporation, incorporated in Massachusetts. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

The **Second Amendment Foundation** is a non-profit corporation, incorporated in Washington. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

The **Independence Institute** is a non-profit corporation, incorporated in Colorado. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Jews for the Preservation of Firearms Ownership** is a non-profit corporation, incorporated in Wisconsin. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**The Citizens Committee for the Right to Keep and Bear Arms** is a non-profit corporation, incorporated in Washington. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

The **Millennial Policy Center** is a non-profit corporation, incorporated in Colorado. It has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Gregory M. Kline*
*Counsel of Record*

# TABLE OF CONTENTS

QUESTION PRESENTED ............................................................................ i

CORPORATE DISCLOSURE STATEMENT ................................................ ii

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT OF *AMICI CURIAE* ............................................................ 1

CONSENT TO FILE .................................................................................. 3

SUMMARY OF ARGUMENT ..................................................................... 4

ARGUMENT .......................................................................................... 6

   I.   MARYLAND'S TRAINING REQUIREMENT VIOLATES THE SECOND AMENDMENT ................................................................................. 6

      A.   The training requirement burdens the Founding-Era scope of the Second Amendment. ................................................................. 7

         1.   Maryland ............................................................................. 8

         2.   Plymouth ............................................................................. 9

         3.   Virginia ............................................................................... 9

         4.   North Carolina .................................................................. 11

         5.   New York ........................................................................... 11

         6.   Delaware ............................................................................ 11

         7.   Vermont ............................................................................. 11

         8.   New Hampshire ................................................................. 12

      B.   Maryland's training requirement fails intermediate scrutiny because its interest would be achieved just as effectively without it. ......................... 13

         1.   Formal classroom instruction is not always the best training ................ 14

         2.   For four decades, the firearms accident rate has been plunging. ........... 15

         3.   Maryland's thin evidence does not carry Maryland's burden of proof. .... 17

   II.   MARYLAND'S EXPENSIVE AND LONG DELAYS FOR HANDGUN PURCHASES VIOLATE THE SECOND AMENDMENT. ............................. 19

      A.   The licensing process burdens the Founding-Era scope of the right. ....... 19

      B.   Maryland's background check requirement is not longstanding. ............. 23

      C.   Any presumption of lawfulness is rebutted. ................................... 27

      D.   The lengthy licensing process fails intermediate scrutiny because less burdensome alternatives exist. .................................................... 28

CONCLUSION ...................................................................................... 34

APPENDIX I. ACCIDENT DATA ............................................................. 36

APPENDIX II. *AMICI* PROFESSORS ........................................................................ 41

CERTIFICATE OF COMPLIANCE........................................................................... 45

CERTIFICATE OF SERVICE.................................................................................... 46

# TABLE OF AUTHORITIES

## Supreme Court Cases

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .......................................................................................... 6, 13

*Dorr v. United States,*
195 U.S. 138 (1904) .......................................................................................... 26

*Hawaii v. Mankichi,*
190 U.S. 197 (1903) .......................................................................................... 26

*Luis v. United States,*
136 S. Ct. 1083 (2016) ...................................................................................... 20

*McCullen v. Coakley,*
134 S. Ct. 2518 (2014) .......................................................................... 29, 30, 31

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) .......................................................................................... 22

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ................................................................................... 13, 30

## Other Cases

*Aldridge v. Commonwealth,*
4 Va. 447 (Gen. Ct. 1824) ................................................................................. 21

*Andrews v. State,*
50 Tenn. 165 (1871) .......................................................................................... 20

*Bonidy v. U.S. Postal Serv.,*
790 F.3d 1121 (10th Cir. 2015) ........................................................................ 32

*Doe v. Cooper,*
842 F.3d 833 (4th Cir. 2016) ................................................................. 13, 18, 30

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ............................................................................ 31

*Heller v. District of Columbia,*
801 F.3d 264 (D.C. Cir. 2015) .......................................................................... 31

*Jackson v. City & Cty. of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) ................................................................. 19

*Reynolds v. Middleton,*
  779 F.3d 222 (4th Cir. 2015) ........................................................... 30, 34

*State v. Newsom,*
  27 N.C. 250 (1844) ................................................................................ 21

*Teixeira v. Cty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) (en banc) ................................................ 19

*U.S. v. Moore,*
  666 F.3d 313 (4th Cir. 2012) ........................................................... 27, 28

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ................................................................... 6

*United States v. Pruess,*
  703 F.3d 242 (4th Cir. 2012) ........................................................... 27, 28

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ............................................................... 32

*Waters v. State,*
  1 Gill 302 (Md. 1843) ............................................................................ 21

*Watson v. Stone,*
  4 So. 2d 700 (Fla. 1941) ........................................................................ 23

## Constitutional Provisions

U.S. Const. amend. II ................................................................... passim

U.S. Const. art. I, § 8, cl. 16 ......................................................................... 7

## Statutes

1731–1743 S.C. Pub. Laws 163 ............................................................... 20

18 U.S.C. § 922(t)(1) ................................................................................ 32

1865 Laws of Fla. 25 (Dec. 18, 1865) ..................................................... 21

1865 Miss. Laws 165 (Nov. 29, 1865) ..................................................... 21

1923 N.D. Laws 226................................................................................... 25

1927 N.J. Laws 744................................................................................... 26

2000 Mich. Pub. Acts 381 ........................................................................ 26

2012 Mich. Pub. Acts 377 ........................................................................ 26

2015. S.B. 35, 2015–16 Leg. Sess. (Wis. 2015)........................................ 29

26 Del. Laws 28 (1911) ............................................................................ 24

30 Del. Laws 55 (Apr. 10, 1919) ............................................................. 24

Act 351, 1925 Ark. Acts 1047 (1925)....................................................... 25

Ch. 109, § 5, 1921 Mont. Laws 112 (1921)............................................. 25

Ch. 260, 1925 Or. Laws 468 .................................................................... 24

COMAR 29.03.01.29 ................................................................................ 7

MD Code, Public Safety, § 5-123............................................................. 26

Md. Code Ann., Pub. Safety § 5-117.1..................................................... 7

## Other Authorities

Adomaitis, Greg, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.COM, June 5, 2015 ............................................................. 28

America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance (Jon L. Wakelyn ed. 2006) ................................... 11

Archives of Maryland (William Hand Browne ed., 1885) .......................... 20

ATF Annual Firearms Manufacture and Export Report (2014)................ 38

Breyer, Stephen, Breaking the Vicious Circle: Toward Effective Risk Regulation (1992)................................................................................... 17

Centers for Disease Control and Prevention, *Fatal Injury Data*, WISQARS ........... 16

Centers for Disease Control and Prevention, WISQARS Fatal Injury Data Visualization ......................................................................................... 40

Centers for Disease Control, *Compressed Mortality File* ........................... 38

Commerce in Firearms in the United States (2014) ................................... 38

Cottrol, Robert J. & Diamond, Raymond T., *"Never intended to be applied to the white population": Firearms regulation and racial disparity—The redeemed south's legacy to a national jurisprudence?*, 70 Chi.-Kent L. Rev. 1307 (1995) .... 23

Cottrol, Robert J. & Diamond, Raymond T., *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309 (1991) ........................... 22

Din, Benjamin, et al., *New driver's license requirements are coming to U.S. airports. Is your state ready?*, WASHINGTON POST, Sept. 13, 2017 ........................ 33

Editorial, *Concealed Pistols*, N.Y. TIMES, Jan. 27, 1905 ........................................... 24

*Frequently Asked Questions About Eddie Eagle*, NRAEXPLORE ................................ 19

Gun Safety Tips, CORDCUTTING.COM, https://cordcutting.com/roku-channel/gun-safety-tips/. .......................................................................................... 15

Imlay, Charles V., *The Uniform Firearms Act*, 12 A.B.A. J. 767 (1926) ............. 25, 26

Johnson, Nicholas, et al., Firearms Law and the Second Amendment: Regulation, Rights and Policy (2d ed. 2017) ............................................... 17, 38, 39

Jones, Martha S., Birthright Citizenship: A History of Race and Rights in Antebellum America (2018) ...................................................................... 21

Karberg, Jennifer C., et al., *Background Checks for Firearm Transfers, 2015 – Statistical Tables*, U.S. DEPARTMENT OF JUSTICE (Nov. 2017) .............................. 33

Karp, Aaron, *Estimating Global Civilian-Held Firearms Numbers*, SMALL ARMS SURVEY (2018) ........................................................................... 16

Kleck, Gary, Targeting Guns (1997) ......................................................... 38

Kopel, David B., *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 HARV. J. LEGISL. 303 (2016) ............................................. 25

Laws of New Hampshire: First Constitutional Period, 1784–1792 (1916) .............. 13

Laws of New Hampshire: Revolutionary Period, 1776–1784 (1916) ........................ 12

Maryland Department of Transportation, *Real ID* ..................................... 33

Maryland Driver's License, MOTOR VEHICLE ADMINISTRATION .................................. 15

Proceedings and Acts of the General Assembly of Maryland January 1637/8—
September 1664 (William Hand Browne ed, 1883) .................................................. 9

Proceedings of the Council of Maryland, 1636-1667 (reprint 1965) ........................... 9

*Project Child Safe*, www.projectchildsafe.org.............................................................. 19

Ryden, George H., Delaware–The First State in the Union (1938)........................... 11

Shorter Oxford English Dictionary (1993).................................................................. 26

The Colonial Laws of New York from the Year 1664 to the Revolution (1896) ........ 11

The Colonial Records of the State of Georgia (Allen D. Candler ed., 1904) .............. 20

The Compact with the Charter and Laws of the Colony of New Plymouth
(William Brigham ed., 1836) ...................................................................................... 9

Third Report of the Committee on a Uniform Act to Regulate the Sale and
Possession of Firearms, in Handbook of the National Conference of
Commissioners on Uniform State Laws and Proceedings of the
Thirty-Sixth Annual Meeting Denver, Colorado July 6–12, 1926 (1926)............... 26

Vermont State Papers: Being a Collection of Records and Documents,
Connected with the Assumption and Establishment of Government by the
People of Vermont (William Slade ed. 1823) ......................................................... 12

Waller, Julian & Whorton, Elbert, *Unintentional Shootings, Highway Crashes,
and Acts of Violence*, 5 Accident Analysis & Prevention 351 (1973) ..................... 19

Wright, Gary L., *Woman Won't Be Charged: Boyfriend's Slaying Ruled
Self-Defense*, CHARLOTTE OBSERVER, Oct. 3, 1990................................................. 29

## STATEMENT OF *AMICI CURIAE*

International Law Enforcement Educators and Trainers Association ("ILEETA") is an association of 4,000 professional law enforcement instructors. ILEETA's training programs for criminal justice practitioners aim to reduce law enforcement risk and to save lives of police officers and the public. ILEETA joins this brief because it believes Maryland's handgun licensing system, including the training component, is counterproductive. One reason is that armed citizens who pass background checks help improve public safety and reduce crime, and Maryland's system deters and delays lawful gun ownership. ILEETA's amicus briefs were cited by Justice Breyer in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and by Justices Alito and Stevens in *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

The International Association of Law Enforcement Firearms Instructors, Inc. ("IALEFI") is an educational association founded in 1981 by police firearms instructors. IALEFI is dedicated to the development and operation of training programs for firearms instructors among law enforcement, security, criminal justice, and investigative agencies and organizations. IALEFI's 3,500-plus members include instructors from nearly every federal law enforcement agency, every branch of the U.S. military, and law enforcement agencies nationwide. IALEFI participated in the Supreme Court amicus briefs discussed above. It is participating in this brief because it believes Maryland's handgun training and licensing systems are dangerously flawed and will depress home handgun ownership by law-abiding, responsible citizens.

*Amici* professors are 11 law professors who teach and write on the Second Amendment: Randy Barnett (Georgetown), Royce Barondes (Missouri), Robert Cottrol (George Washington), Nicholas Johnson (Fordham), Donald Kilmer (Lincoln), Nelson Lund (George Mason), Joyce Malcolm (George Mason), George Mocsary (Southern Illinois), Joseph Olson (Mitchell Hamline), Glenn Reynolds (Tennessee), and Gregory Wallace (Campbell). As more fully described in the Appendix, the above professors were cited extensively by the Supreme Court in *District of Columbia v. Heller* and *McDonald v. City of Chicago.* Oft-cited by lower courts as well, these professors include the authors of the first law school textbook on the Second Amendment, as well as many other books and law review articles on the subject.

The Second Amendment Foundation ("SAF") is a nonprofit foundation dedicated to protecting the right to keep and bear arms through educational and legal action programs. SAF has over 650,000 members, in every State of the Union. SAF organized and prevailed in *McDonald v. City of Chicago.*

The Citizens Committee for the Right to Keep and Bear Arms is a related organization dedicated to protecting firearms rights through grassroots organizing.

The Independence Institute is a non-partisan public policy research organization founded on the eternal truths of the Declaration of Independence. The Institute also participated in the *Heller* and *McDonald* amicus briefs discussed above.

Jews for the Preservation of Firearms Ownership is a non-profit educational civil rights corporation that focuses on firearms ownership and responsibility. Its work centers on the history of gun control.

2

Millennial Policy Center is a research and educational center whose mission is to develop and promote policy solutions that advance freedom and opportunity for the Millennial Generation.

The case concerns *amici* because it goes to the heart of the constitutional right of law-abiding citizens to defend themselves and others.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

---

[1] No counsel for a party in this case authored this brief in whole or in part. No party or counsel for a party contributed money intended to fund the preparation and submission of this brief. No person other than *amici* and their members contributed money intended to fund preparing or submitting this brief.

3

## SUMMARY OF ARGUMENT

The Fourth Circuit has adopted a Two-Part Test for Second Amendment challenges. In Part One, the Court determines whether the law burdens the Founding-Era scope of the right to keep and bear arms. In Part Two, the Court applies the appropriate level of heightened scrutiny, where the Government bears the burden of proving the constitutionality of the law.

Maryland's training requirement burdens the Founding-Era scope of the right. No colonial or Founding-Era law ever required training to possess a firearm. Indeed, many laws required firearm ownership without requiring training. Some laws required persons expressly exempted from training to own firearms.

The objective of reducing firearms accidents has been accomplished with great success over the past four decades—without Maryland's burdensome training requirement. Maryland's training requirement fails intermediate scrutiny because Maryland has failed to prove that the reduction would be achieved less effectively absent its new regulation.

Maryland's long and expensive licensing process burdens the Founding-Era scope of the right. No person with full civil rights was required to obtain a government license to possess a firearm in the colonial or founding periods. Nor is such a licensing system a "presumptively lawful" longstanding regulation. In the first decades of the twentieth century, a few states imposed some form of licensing laws, but some of those were quickly repealed, and others were much less burdensome than Maryland's current process.

Moreover, Fourth Circuit precedent establishes that any presumption of constitutionality can be rebutted, where, as here, the regulation applies to law-abiding citizens in defense of hearth and home.

Supreme Court and Fourth Circuit precedent require that substantially less burdensome alternatives be considered in intermediate scrutiny. Maryland's burdensome licensing process fails heightened scrutiny because substantially less burdensome alternatives exist, including the national background check law.

## ARGUMENT

## I.   MARYLAND'S TRAINING REQUIREMENT VIOLATES THE SECOND AMENDMENT.

The Fourth Circuit employs a Two-Part Test for Second Amendment challenges:

> The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. *Heller* left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

A core of the Second Amendment right is the possession of a handgun in the home. *See District of Columbia v. Heller*, 554 U.S. 570, 628–30 (2008) ("the home [is] where the need for defense of self, family, and property is most acute"). In Maryland, law-abiding citizens cannot possess a handgun in the home unless they spend over a month complying with the various requirements of the State's licensing scheme. Accordingly, the licensing scheme imposes a burden on conduct falling within the Second Amendment right. The scheme should thus be reviewed under heightened scrutiny in Part Two of the Two-Part Test.

## A. The training requirement burdens the Founding-Era scope of the Second Amendment.

To exercise the constitutional right to possess a handgun in the home in Maryland, one must obtain a Handgun Qualification License ("HQL"). Md. Code Ann., Pub. Safety § 5-117.1(c)(1)(i). To qualify for an HQL, an applicant must complete "a firearms safety training course approved by the Secretary that includes: (i) a minimum of 4 hours of instruction by a qualified handgun instructor; (ii) classroom instruction on: 1. State firearm law; 2. home firearm safety; and 3. handgun mechanisms and operation; and (iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." § 5-117.1(d)(3). In addition to the explicit statutory requirements, the Maryland State Police has imposed additional requirements, interpreting § 5-117.1 as mandating, among other things, a practice component in which the applicant fires live ammunition. COMAR 29.03.01.29.

Maryland's amicus argues that the training requirement is exempt from Part Two scrutiny because "firearms training was required by law in nearly all of the States at the time of the Second Amendment's ratification." Everytown Br. 6. The amicus refers to laws "that required militia members be trained on the proper use of firearms." *Id.*

Plaintiffs do not challenge Maryland's authority to require militia training— which is directly addressed by U.S. Const. art. I, § 8, cl. 16 ("reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress"). Rather, Plaintiffs challenge Maryland's authority to require extensive training to exercise their

constitutional right to keep arms in their homes—about which Everytown says nothing.

Maryland's amicus offers no example of a colonial or Founding-Era law that preconditioned firearm ownership on training. No such law existed. And it is telling that Maryland's amicus finds its closest Founding-Era analog in the military training of the day.

None of the laws relied on by the State's amicus obliged anyone to undergo training *before* acquiring a gun. To the contrary, the laws required certain persons to possess arms. *Some* of the persons required to possess arms had to bring their privately-owned arms to militia training sessions.

At least eight colonies or states required arms ownership unconnected to militia service. None of those laws required training. Some statutes expressly exempted these owners from training. No colonial or Founding-Era law made training a prerequisite for voluntary gun ownership. No colonial or Founding-Era law made training a pre-condition for militiamen being able to possess arms.

### 1. Maryland

A 1638/9 act required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne." Proceedings and Acts of the General Assembly of Maryland January 1637/8—September 1664, at 77 (William Hand Browne ed,

1883).[2] If a household lacked the mandated arms, the government provided them. *Id.* Yet only households with three or more men had to send anyone for militia service. *Id.* at 78. A female "house keeper" had to keep a gun in "her" house, but she did not participate in militia training or service. The same requirements were included in a 1658 law. 3 Proceedings of the Council of Maryland, 1636-1667, at 345 (reprint 1965).

### 2. Plymouth

A 1632 Plymouth law required that "every freeman or other inhabitant of this colony provide for himselfe and each under him able to beare armes a sufficient musket and other serviceable peece." The Compact with the Charter and Laws of the Colony of New Plymouth 31 (William Brigham ed., 1836). At the time, the colony had no militia law.

### 3. Virginia

Many laws in colonial Virginia required firearm ownership regardless of training:

- 1623: "That no man go or send abroad without a sufficient partie will armed."[3]

- 1624: "That men go not to worke in the ground without their arms (and a centinell upon them)."[4]

- 1624: "That the commander of every plantation take care that there be sufficient of powder and amunition within the plantation under his command and their pieces fixt and their arms compleate."[5]

---

[2] The dual years for some colonial statutes (e.g., 1638/9) are used to account for the change from the Old Style calendar to the New Style. Under the New Style, the new year begins on January 1. Under Old Style, the new year began on March 25. So what we today would call "February 1639" was considered by Marylanders of the time to be "February 1638." The English and their colonies adopted the New Style in 1752.

[3] William Waller Hening, 1 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 127 (1808).

[4] *Id.*

[5] *Id.*

- 1632: "NOE man shall goe or send abroade without a sufficient party well armed."[6]

- 1632: "NOE man shall goe to worke in the grounds without theire armes, and a centinell uppon them"[7]

- 1632: "ALL men that are fittinge to beare armes, shall bring their pieces to the church"[8]

- 1639: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council"[9]

- 1643: "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"[10]

- 1659: "That every man able to beare armes have in his house a fixt gunn two pounds of powder and eight pound of shott at least"[11]

- 1662: "that every man able to beare armes have in his house a fixed gun, two pound of powder and eight pound of shot at least"[12]

- 1676: "that in goeing to churches and courts in those tymes of danger, all people be enjoyned and required to goe armed for their greate security"[13]

In 1762, Virginia required persons exempt from militia training to keep the required militia arms at home: The law mandated that "every person so exempted shall always keep in his house or place of abode such arms, accoutrements, and ammunition, as are by the [1757] act required to be kept by the militia."[14]

---

[6] *Id.* at 173.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 226.
[10] *Id.* at 263.
[11] *Id.* at 525.
[12] 2 Hening at 126.
[13] *Id.* at 333.
[14] 4 Hening at 534, 537.

### 4. North Carolina

To promote immigration, land grants were offered to settlers starting in 1664. To qualify, the settlers had to first provide themselves with certain supplies, including being "armed with a good firelock or matchlock bore." 1 America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance 210–11 (Jon L. Wakelyn ed. 2006) (Concessions and Agreements, Jan. 11, 1664).

### 5. New York

A 1684 law expressly required that "all persons though freed from Training by the Law . . . be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others." 1 The Colonial Laws of New York from the Year 1664 to the Revolution 161 (1896).

### 6. Delaware

While "all male persons . . . between the age of seventeen and fifty were to enlist" in the militia under a 1741 law, "every Freeholder and taxable Person" had to "provide himself with . . . One well fixed Musket or Firelock." George H. Ryden, Delaware–The First State in the Union 117 (1938). In other words, a female freeholder or taxable person, as well as males over fifty, had to possess arms, but they did not participate in militia training.

### 7. Vermont

Under a 1779 law, males from sixteen to sixty had to attend musters. At the muster, persons would bring their arms and other equipment ("accoutrements") to

prove that they had the items required by law. Muster days were sometimes also training days.

Although muster was for only males of certain ages, the arms possession requirement was broader. "[E]very listed soldier *and other householder*" in Vermont had to "always be provided with, and have in constant readiness, a well fixed firelock." Vermont State Papers: Being a Collection of Records and Documents, Connected with the Assumption and Establishment of Government by the People of Vermont 307 (William Slade ed. 1823) (emphasis added).

### 8.  New Hampshire

A law passed in 1780 explicitly required persons exempt from militia training to keep militia arms at home:

> all male persons under Seventy years of age & Capable of Bearing Arms who are Exempted by the first Section of this Act from Common and ordinary Trainings and are not Included in that part of the Militia called the Training Band, Shall Constitute an alarm List . . . and Shall be in all respects Equipped with Arms & Accoutrements as by this Act is Directed for those of the Training Band.

4 Laws of New Hampshire: Revolutionary Period, 1776–1784, at 276 (1916). Persons on the alarm list would be required to come to the defense of their local community in case of attack. They did not have to serve in the militia, which might be marched to diverse locations. They were not required to train.

When New Hampshire ratified the Second Amendment on January 25, 1790, the alarm list consisted of "all Male persons from forty to sixty . . . exempted . . . from common and ordinary Training." The alarm list had to keep the same arms as the

militia. 5 Laws of New Hampshire: First Constitutional Period, 1784–1792, at 178–179 (1916).

In sum, many colonial and founding-era laws required firearm ownership without requiring training. Some required persons specifically exempted from training to own firearms. No law required training before acquiring a firearm. Thus, there is no historical precedent for Maryland's training requirement. Accordingly, it must be reviewed under Part Two to the Two-Part Test.

### B. Maryland's training requirement fails intermediate scrutiny because its interest would be achieved just as effectively without it.

The plaintiffs are not challenging Maryland laws that require training for carrying loaded firearms in public places—such as when hunting, or when carrying a concealed defensive handgun pursuant to a permit. Instead, this case involves only the training requirement for the simple possession of a handgun in one's home. Because the core right may not be exercised unless a citizen takes the particular course required by Maryland, the requirement should be tested under strict scrutiny.

Even under the more relaxed standard of intermediate scrutiny, Maryland has not carried its burden of proof at the summary judgment stage.

As the Fourth Circuit explained, under intermediate scrutiny, "the State was required to prove that it 'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Doe v. Cooper*, 842 F.3d 833, 844–45 (4th Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

13

The State and its amicus argue that the training requirement enhances public safety by reducing firearm accidents. The training requirement fails intermediate scrutiny because accident reduction was already being achieved very effectively absent the new burden.

### 1.  Formal classroom instruction is not always the best training.

According to Maryland's amicus, sixty-one percent of firearms owners receive "formal" training. Everytown Br. 15. The implication is that the other thirty-nine percent are untrained. This is incorrect. Some people grow up learning about firearms through instruction from older relatives. Other persons are taught firearms safety by experienced friends.

Different people learn best with different learning styles. Some persons thrive on oral instruction in a formal classroom. Others learn better from individualized personal instruction in an informal setting. Formal teaching from a stranger is best for some students, while others learn better under the less-formal guidance of a family member or experienced friend. Neither Maryland nor its amicus have offered evidence that firearms owners who do not take formal classes never receive safety instruction.

Instruction aside, every new gun comes with a safety manual. Safety manuals and other materials are also readily available for free, including online, from firearms organizations. Anyone who simply reads a safety booklet and follows its straightforward rules (including safe storage) will never cause an accident.

14

Video training materials are readily available for citizens who learn best visually and orally and at their own pace. YouTube has many safety instruction videos, some of them for specific models of firearms. Anyone with a Roku device can watch the Gun Safety Tips channel.[15]

A telling comparison can be drawn to Maryland's driver's license training requirements.[16] Driving is not a constitutionally protected right, and results in over 80 times more accidental deaths per year than do firearms. Nevertheless, Maryland requires no standardized training before one can obtain a driver's license. One can learn to drive in a high school "Drivers Ed" class, or from a parent or other adult driver, or at a commercial driving school, or be self-taught. One can study for the written portion of the licensing test on a Maryland MVA website, or using a written booklet published by the MVA, or not at all, as one chooses.

## 2.  For four decades, the firearms accident rate has been plunging.

It is empirically certain that firearms safety is increasing, because while the number of firearms has soared, the number of accidents has plunged. The objective of reducing firearms accidents has been accomplished with great success over the past four decades—without Maryland's burdensome training requirement.

---

[15] Gun Safety Tips, CORDCUTTING.COM, https://cordcutting.com/roku-channel/gun-safety-tips/. Roku is a "cord-cutting" device that is attached to a television, allowing users to watch some channels for free and others for a monthly fee. The Gun Safety Tips channel is free.

[16] Maryland Driver's License, MOTOR VEHICLE ADMINISTRATION, http://www.mva.maryland.gov/drivers/apply/md-drivers-license.htm (last visited Oct. 5, 2018).

Today, fatal firearm accidents are rare. Many estimates place the number of civilian owned firearms in America between 300- and 400-million. The Small Arms Survey recently estimated the number at 393,300,000. Aaron Karp, *Estimating Global Civilian-Held Firearms Numbers*, SMALL ARMS SURVEY 4 (2018). Yet, there are only a few hundred accidental deaths from firearms each year.

The Centers for Disease Control's most recent statistics on accidental deaths from firearms are for 2016. That year, 495 deaths were caused by an accidental discharge (up slightly from 489 in 2015). These made up 1.28 percent of the 38,658 firearm deaths that year (the large majority of which were suicides), and 0.3 percent of all 161,374 accidental deaths. By comparison, there were 58,335 accidental fatal poisonings, 40,327 deaths from motor vehicle accidents, 34,673 deaths from accidental fallings, 3,786 accidental drownings, and 2,803 deaths from accidental exposure to smoke, fire, and flames. Centers for Disease Control and Prevention, *Fatal Injury Data*, WISQARS.[17] *See* Graph 2 in the Appendix for a WISQARS computed Data Visualization of all unintentional deaths in 2016.

Using the number of firearms estimated in the Small Arms Survey, for every firearm that was used in an accidental fatality, 794,545 firearms were not.

The accidental fatality rate—including among children—has been sharply decreasing for four decades. This is true despite a sharp increase in the number of firearms in America.

---

[17] Available at https://webappa.cdc.gov/sasweb/ncipc/mortrate.html (run query).

16

Table 1 in the Appendix shows, and Graph 1 illustrates, that from 1948 to 2014, the number of firearms per capita in the United States increased 214 percent (from 0.36 guns per person to 1.13), while the fatal gun accident rate declined by 88 percent (from 1.55 fatal accidents per 100,000 persons to 0.18).

Accident data involving children became available in 1950. Table 1 shows that from 1950 to 2014, the accidental firearm fatality rate for children (ages 0 to 14) fell by 92 percent (from 1.10 per 100,000 persons to 0.09).

Thus, the rate of fatal gun accidents for all ages is currently at an all-time low, while the gun supply is at an all-time high. "The annual risk level for a fatal gun accident is around 0.18 per 100,000 population—less than the risk of death from taking two airplane trips a year, or getting a whooping cough vaccination." Nicholas Johnson, et al., Firearms Law and the Second Amendment: Regulation, Rights and Policy 23 (2d ed. 2017) (citing Stephen Breyer, Breaking the Vicious Circle: Toward Effective Risk Regulation 5, 7 (1992) (airplane and vaccine data)).

### 3. Maryland's thin evidence does not carry Maryland's burden of proof.

Maryland offers little evidence proving that the training requirement prevents fatal accidents or accidental discharges. In the Motion, Maryland provides three citations: Ex. 20 ¶ 19, Ex. 20 ¶ 20, and Ex. 21 ¶ 14.

Exhibit 20 is the Declaration of James P. Russell, Jr., a Captain in the Maryland State Police. In paragraph 19, Captain Russell states, "It is my opinion that the HQL training's required instruction . . . promotes safe handling and operation of firearms, which reduces the risk of accidental discharges and, thus, the risk of potentially fatal

accidents." In paragraph 20, Captain Russell continues: "In my experience . . . requiring that applicants demonstrate the hands-on safe operation and handling of a firearm helps reduce accidental discharges." It is unremarkable that a captain in the Maryland State Police supports a requirement established in part by the Maryland State Police. But Maryland must offer more than assertions to meet its burden of proof.

Exhibit 21 is the Declaration of James W. Johnson, the former Chief of the Baltimore County Police Department. In paragraph 14, Chief Johnson explains that because he is "aware of numerous incidents of accidental discharges of handguns in Maryland . . . It is my opinion that the HQL training requirement . . . can prevent such accidental discharges because it teaches the operation of the weapon."

The conclusory opinions of Chief Johnson and Captain Russell fail to carry Maryland's burden under intermediate scrutiny. As in *Cooper*, "The State tries to overcome its lack of data, social science or scientific research, legislative findings, or other empirical evidence with a renewed appeal to [anecdote], as well as to 'logic and common sense.' But neither anecdote, common sense, nor logic, in a vacuum, is sufficient to carry the State's burden of proof." 842 F.3d at 846. "[W]hile the State's argument may be conceptually plausible, it presented no evidence or data to substantiate it before the district court." *Id.*

One reason there are so many fewer accidents today may be ever-increasing knowledge of safe practices. For example, Project ChildSafe, created by the National Shooting Sports Foundation, is funded in part by the U.S. Department of Justice,

18

partnered with the National Lieutenant Governors Association, and promoted by local law enforcement across the country. *See Project Child Safe*, www.projectchildsafe.org. The Eddie Eagle Gun Safety program, created by the NRA, won two awards from the National Safety Council, and has been honored or endorsed by the National Sheriffs' Association, USDOJ, and Association of American Educators. It is taught by police and sheriffs in schools and elsewhere all over America. *See Frequently Asked Questions About Eddie Eagle*, NRAEXPLORE, https://eddieeagle.nra.org/faqs/.

People who cause gun accidents tend to have high rates of "arrests, violence, alcohol abuse, highway crashes, and citations for moving traffic violations." Julian Waller & Elbert Whorton, *Unintentional Shootings, Highway Crashes, and Acts of Violence*, 5 Accident Analysis & Prevention 351, 353 (1973). Unlike in 1973, many such people are now prevented from buying a gun by the National Instant Check System.

## II. MARYLAND'S EXPENSIVE AND LONG DELAYS FOR HANDGUN PURCHASES VIOLATE THE SECOND AMENDMENT.

### A. The licensing process burdens the Founding-Era scope of the right.

The Second Amendment protects the right to acquire arms. *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("the right to possess firearms for protection implies a

corresponding right to obtain the bullets necessary to use them") (quotations omitted); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right . . . to purchase and provide ammunition suitable for such arms"). *See also Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., dissenting) (quoting *Jackson* with approval).

There were no laws requiring persons who had full civil rights to obtain government permission to acquire a firearm until the twentieth century. The only comparable laws from the colonial and founding periods were discriminatory against persons whose full rights were not recognized, namely African-Americans and Indians.

The first gun control law in America was enacted in Virginia in 1619. It forbade African-Americans and Indians to have arms, unless they were issued a license "to keep and use guns, powder, and shot." 4 Hening at 131.

In Maryland, a 1715 law stated "[t]hat no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master." 75 Archives of Maryland 268 (William Hand Browne ed., 1885).

Similarly, South Carolina in 1740 punished slaves who had firearms, unless they possessed the master's written permission. 1731–1743 S.C. Pub. Laws 163, 168–69. Georgia copied the South Carolina law in 1755 and re-enacted it in 1768. The Colonial Records of the State of Georgia 76–78, 117–18 (Allen D. Candler ed., 1904).

20

Like many slave states during the nineteenth century, Maryland enacted a Black Code. An 1806 statute forbade free African-Americans from possessing firearms or dogs, unless issued a license. 1806 Md. Laws ch. 81, §§ 1–2 (Jan. 4, 1807); *Waters v. State*, 1 Gill 302, 309 (Md. 1843) (noting that among the many restrictions on free African-Americans are laws "to make it unlawful for them to bear arms"); Martha S. Jones, Birthright Citizenship: A History of Race and Rights in Antebellum America 102–07 (2018) (in Baltimore in the 1850s, licenses were issued and unlicensed possession or carrying was almost never prosecuted). *See also State v. Newsom*, 27 N.C. 250 (1844) (upholding 1841 licensing statute for free persons of color because they are supposedly not part of the social contract); *Aldridge v. Commonwealth*, 4 Va. 447, 449 (Gen. Ct. 1824) (noting the many restrictions on free persons of color, including "upon their right to bear arms").

After the Civil War, licensing laws were enacted by unreconstructed Southern governments. *See* 1865 Laws of Fla. 25, 27 (Dec. 18, 1865) (No "negro, mulatto, or other person of color" may possess firearms unless issued a license by a probate judge, based on "the recommendation of two respectable citizens of the county certifying the peaceful and orderly character of the applicant." Punishment was forfeiture of the arms, along with thirty-nine lashes or an hour in the pillory.); 1865 Miss. Laws 165, 165–66 (Nov. 29, 1865) (regular session) (requiring license from the county board of police). Gun licensing laws and other impediments to the exercise of Second Amendment rights were a leading motive for enactment of the Fourteenth Amendment and the Civil Rights Act of 1866. *See McDonald v. City of Chicago*, 561

21

U.S. 742, 771–78 (2010) (plurality op.); *Id.* at 833–38, 843–50 (Thomas, J., concurring); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 335–38 (1991). *Cf. McDonald*, 561 U.S. at 855–58 (Thomas, J., concurring) (explaining how judicial failure to enforce the Second Amendment against state and local governments left African-Americans defenseless against violent attackers).

Racially discriminatory laws that would violate today's Fourteenth Amendment are poor precedent. Thus, there is no Founding-Era justification for Maryland's licensing system. The system severely burdens the Founding-Era scope of the right.

Like earlier laws, the statutes in the instant case have racial implications. As Plaintiffs explained, "Maryland's Handgun Qualification License process is lengthy (averaging a month), expensive (totaling hundreds of dollars in fees, costs and travel, not counting time off of work), invasive (including fingerprints and a full background investigation)." Amended Complaint at 2. Although the current Maryland statute, unlike its predecessors, is not facially discriminatory, some poor people cannot afford a licensing process costing hundreds of dollars and requiring time off from work. Systems imposing severe barriers on poor people have disparate racial impact. The disparate impact is unjustifiable, because federal law already requires a thorough background check.

A licensing law that forbids in-home self-defense with a handgun for over a month—or perhaps permanently in the case of a poor person—is one of the particular evils that the Fourteenth Amendment was enacted to remedy.

22

**B. Maryland's background check requirement is not longstanding.**

The State's amicus argues that Maryland's law nevertheless falls outside the scope of the Second Amendment right because it is one of the "longstanding regulations" identified by *Heller* as "presumptively lawful." Everytown Br. at 9. Claiming "more than a century of legal tradition," the amicus cites a handful of laws that were far less burdensome than Maryland's present scheme. *Id.* at 9–13. Most of those laws have been repealed, and some of them, like earlier licensing laws, were discriminatory.

A prime example, not discussed by the State's amicus, is the 1893 Florida statute forbidding possession of handguns or repeating long guns without a license from the board of county commissioners. As a Florida Supreme Court Justice later pointed out, "The statute was never intended to be applied to the white population and in practice has never been so applied…. [T]here had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested." *Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941) (Buford, J., concurring).

Regarding the laws that the State's amicus does cite, New York's 1911 Sullivan Act also targeted minorities. *See e.g.*, Robert J. Cottrol & Raymond T. Diamond, *"Never intended to be applied to the white population": Firearms regulation and racial disparity—The redeemed south's legacy to a national jurisprudence?*, 70 Chi.-Kent L. Rev. 1307, 1334 (1995) ("the Sullivan Law was aimed at New York City, where the large foreign born population was deemed peculiarly susceptible and perhaps inclined

to vice and crime."); Editorial, *Concealed Pistols*, N.Y. TIMES, Jan. 27, 1905 (touting the proposal that eventually became the Sullivan Act as "corrective and salutary in a city filled with immigrants and evil communications, floating from the shores of Italy and Austria-Hungary").[18]

A 1911 Delaware law prevented handgun sales "until the purchaser ha[d] been positively identified." 26 Del. Laws 28, 28–29, §§ 1, 2, 4 (1911). It did not require government permission—or any government involvement—for the sale to take place. The 1919 revision required that the positive identification be made by "two freeholders." 30 Del. Laws 55, 55–56, § 1 (Apr. 10, 1919) (special sessions). The Delaware law was for only verification of a buyer's identity. The law did not inquire into the buyer's background, not did it require government permission before Second Amendment rights could be exercised.

The 1913 Oregon law was modeled on New York's Sullivan Act. It was abolished and replaced by a 1925 law affirming that "no permit or license to purchase, own, possess, or keep" a handgun was required. Ch. 260, 1925 Or. Laws 468.

The 1925 Oregon model, which rejected the harsh Sullivan Act, was the Revolver Association Act—written by the United States Revolver Association, endorsed by the NRA, and the model of the Uniform Firearms Act. The UFA and its predecessors were drafted by Karl T. Frederick, a New York lawyer who later was elected President of the NRA. The UFA was specifically intended to stop oppressive laws like the Sullivan

---

[18] http://query.nytimes.com/gst/abstract.html?res=9C03E4D8163DE733 A25754C2A9679C946497D6CF [http://perma.cc/XMJ8-9GVB].

Act. David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legisl. 303, 346–57 (2016).

Maryland's current onerous system is closer to the widely-rejected Sullivan Act than to the UFA. If the UFA is part of the American history and tradition of reasonable gun laws, Maryland's current system is the opposite.

The 1918 Montana law (enacted at the height of World War I xenophobia) was repealed in 1921. Ch. 109, § 5, 1921 Mont. Laws 112, 114 (1921); Kopel, 53 Harv. J. Legisl. at 343–44 (noting that the bill's definition of "criminal syndicalism" outlawed all speech in support of civil disobedience).

The 1923 North Dakota statute was mostly based on Frederick's model. Accordingly, it required commercial dealers to notify law enforcement about handgun sales within one week. The handgun buyer had to wait one day after the sale to take possession of the gun. There was no requirement for a government license or any other prior authorization. 1923 N.D. Laws 226, at 381–82.

According to the *A.B.A. Journal*, the 1923 Arkansas law "was found so impracticable in enforcement" that it was repealed in 1925. Act 351, 1925 Ark. Acts 1047 (1925); Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 768 (1926). At a conference of the National Commissioners on Uniform State Laws, an Arkansas commissioner explained that the act "proved a complete failure; that scarcely anybody registered his pistols and it was realized that it worked an injustice to the few who did so." Third Report of the Committee on a Uniform Act to Regulate the Sale and Possession of Firearms, in Handbook of the National Conference of

Commissioners on Uniform State Laws and Proceedings of the Thirty-Sixth Annual Meeting Denver, Colorado July 6–12, 1926, at 571, 572 (1926).

Michigan's 1925 law lasted only two years. The National Conference of Commissioners on Uniform State Laws called it "radical." Third Report at 572. The *A.B.A. Journal* reported in 1926 that "the registration feature had upon last information not yet been put into effect, because of technical difficulties." Imlay at 768. The 1927 replacement included a permit-to-purchase requirement that was eliminated first for concealed carry license-holders in 2000, then for retail transactions in 2012. 2000 Mich. Pub. Acts 381; 2012 Mich. Pub. Acts 377.

The 1927 Hawaii law is weak precedent because Hawaii was a territory—not a state—and only partially constrained by the U.S. Constitution. The *Insular Cases* had held that the Bill of Rights was intended for only the United States' contiguous mainland. *See, e.g., Dorr v. United States*, 195 U.S. 138 (1904) (no right to trial by jury in the Philippine Islands); *Hawaii v. Mankichi*, 190 U.S. 197 (1903) (Sixth Amendment requirement for an unanimous jury not applicable in Hawaii; only "fundamental" constitutional rights apply in U.S. territories).

The 1927 New Jersey law contained a 7-day waiting period. 1927 N.J. Laws at 744–45. Maryland, by contrast, takes a month on average to process a HQL application, *in addition to* the 7-day waiting period imposed by MD Code, Public Safety, § 5-123.

Something that is "longstanding" has two characteristics: being "long" and being "standing." *See* 1 Shorter Oxford English Dictionary 1625 (1993) ("adj. Of long

standing; that has existed a long time, not recent."). Of the laws offered by the State's amicus, only those from New York, Michigan, Hawaii, and New Jersey are still standing in any capacity. Michigan's was substantially repealed early this century. New Jersey's required a 1-week waiting period, rather than Maryland's 5-week period (including the month to process the HQL and the additional 1-week statutory waiting period). This leaves only Hawaii and New York, both with dubious backgrounds.

Thus, Maryland's lengthy permitting requirement is not "longstanding." It is contrary to American history and tradition.

### C. Any presumption of lawfulness is rebutted.

"Presumptively lawful" regulations are not *conclusively* lawful. Fourth Circuit precedent establishes that the presumption can be rebutted, particularly where, as here, it applies to law-abiding citizens in defense of hearth and home. As the court explained in *United States v. Pruess*:

> In *Moore*, 666 F.3d at 318, we held that "the *Chester* analysis is more streamlined" in cases involving firearms regulations deemed "presumptively lawful" in *Heller*. That is, a presumptively lawful regulation could not violate the Second Amendment unless, as applied, it proscribed conduct "fall[ing] within the category of ... '*law-abiding responsible* citizens ... us[ing] arms in defense of hearth and home.'" *See id.* at 319 (quoting *Heller,* 554 U.S. at 635, 128 S.Ct. 2783).

703 F.3d 242, 245 (4th Cir. 2012) ("*Pruess II*") (citing *U.S. v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012)). In *Pruess II*, the defendant failed to rebut the presumption. "Pruess, like the defendant in *Moore,* cannot rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him. Pruess' repeated violations of the

firearms laws, leading to at least twenty prior convictions, make clear he is hardly 'law-abiding' and 'responsible.'" *Id.* at 246.

In contrast to the felon ban challenged in *Pruess II* and *Moore*, Maryland's background check requirement applies to nearly every Marylander wanting to possess a handgun in the home for self-defense. Therefore, until the requirement is satisfied, "it proscribe[s] conduct falling within the category of law-abiding responsible citizens using arms in defense of hearth and home." *Pruess II*, 703 F.3d at 245 (brackets and quotations omitted). Hence, any presumption of lawfulness is rebutted, and the Court must apply heightened scrutiny.

### D. The lengthy licensing process fails intermediate scrutiny because less burdensome alternatives exist.

Because waiting periods leave people defenseless—completely denying individuals the core Second Amendment right to self-defense, *Heller*, 554 U.S. at 630—they should be reviewed under strict scrutiny. The five-week wait and substantial cost make Maryland's licensing regime especially burdensome.

For some persons, the burdens can be fatal. In 2015, a New Jersey woman named Carol Browne was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) in her driveway while waiting over a month for the State to process her application to own a handgun. Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com, June 5, 2015.[19]

---

[19] https://www.nj.com/camden/index.ssf/2015/06/nj_gun_association_calls_berlin_womans_death_an_ab.html.

Conversely, in September 1990, a mail carrier named Catherine Latta of Charlotte, North Carolina, went to the police to obtain permission to buy a handgun. Her ex-boyfriend had previously robbed her, assaulted her several times, and raped her. The clerk at the sheriff's office informed her that the gun permit would take two to four weeks. "I told her I'd be dead by then," Ms. Latta later recalled. That afternoon, she illegally bought a pistol on the street. Five hours later, her ex-boyfriend attacked her outside her house, and she shot him dead. The county prosecutor decided not to prosecute Ms. Latta for either the self-defense homicide, or the illegal gun. Gary L. Wright, *Woman Won't Be Charged: Boyfriend's Slaying Ruled Self-Defense*, CHARLOTTE OBSERVER, Oct. 3, 1990.

Incidents like the above are why some states repealed waiting periods after the National Instant Check System became available. *See*, *e.g.*, 2015. S.B. 35, 2015–16 Leg. Sess. (Wis. 2015).[20]

Laws that prohibit home defense for over a month should be reviewed under strict scrutiny. But even under intermediate scrutiny, Maryland has not carried its burden of proof at the summary judgment stage.

The Supreme Court most recently reaffirmed intermediate scrutiny's substantially-less-burdensome requirement in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014). Applying intermediate scrutiny in the First Amendment context, the Court explained that "the government must demonstrate that alternative measures that

---

[20] https://docs.legis.wisconsin.gov/2015/related/acts/22   [https://perma.cc/M72P-VP5U].

burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540.

*McCullen* struck a Massachusetts law that prohibited standing "on a public way or sidewalk within 35 feet of an entrance or driveway" of an abortion clinic. *Id.* at 2525. The law furthered a significant governmental interest, but it was unconstitutional because "[t]he buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 2537.

As the Fourth Circuit wrote, "*McCullen v. Coakley* clarifies what is necessary to carry the government's burden of proof under intermediate scrutiny." *Reynolds v. Middleton*, 779 F.3d 222, 228 (4th Cir. 2015). "[I]ntermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *Id.* at 229. Moreover, "the burden of proving narrow tailoring requires the County to *prove* that it actually *tried* other methods to address the problem." *Id.* at 231. "Without such evidence, the County cannot carry its burden of demonstrating that the Amended Ordinance is narrowly tailored." *Id.* at 232. *See also Cooper*, 842 F.3d at 844–45 ("the State was required to prove that it . . . does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Many courts have properly applied this approach in the Second Amendment context.

The D.C. Circuit, quoting *McCullen*, struck a requirement for the triennial re-registration of firearms because less burdensome alternatives already existed. *Heller v. District of Columbia* ("*Heller III*"), 801 F.3d 264, 277–78 (D.C. Cir. 2015). Although re-registration could be used to check if the owner had become a prohibited person, "District officials and experts conceded [that] background checks could be conducted at any time without causing the registrations to expire." *Id.* at 277 (brackets in original).

The District argued that re-registration would help "to maintain the accuracy of the registration database." *Id.* at 278. But the already-existing "requirement that gun owners report relevant changes in their information" was substantially less burdensome. *Id.*

Third, the District argued that re-registration would help to "determine when firearms have been lost or stolen." *Id.* But the already-existing law requiring the immediate report of the loss or theft of a firearm was substantially less burdensome. *Id.* So because substantially less burdensome alternatives existed, re-registration failed intermediate scrutiny.

The Seventh Circuit, applying "not quite 'strict scrutiny,'" struck down a ban on firing ranges within city limits, because the safety concerns "may be addressed by more closely tailored regulatory measures" that are less burdensome. *Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011).

The Ninth Circuit considered a substantially less burdensome alternative to San Francisco's ban on hollow-point ammunition sales in *Jackson*. The ban was upheld

31

because Jackson's proposed alternative of prohibiting the possession of such bullets in public but allowing their purchase for home defense was actually *more* burdensome—because the sales ban still allowed for possession anywhere. 746 F.3d at 969–70.

The Tenth Circuit upheld a firearms ban on persons subject to domestic violence restraining orders only after determining that there was not "a severable subcategory of persons as to whom the statute is unconstitutional." *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010). In other words, there was not a substantially less burdensome alternative that would prevent a severable subcategory of persons from being unnecessarily burdened.

In another case, the Tenth Circuit upheld a firearms ban on United States Postal Service property. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015). The majority and the dissent disagreed as to the feasibility of a substantially less burdensome alternative. The dissent argued that USPS could issue permits allowing firearms in its parking lots. But the majority concluded that "an alternative system involving piecemeal exceptions and individual waivers would be wasteful and administratively unworkable." *Id.* at 1128.

A substantially less burdensome alternative has long been the law in Maryland. Federal law requires that a background check be completed before any handgun purchase from a federally licensed dealer. 18 U.S.C. § 922(t)(1). "Since the effective date of the Brady Act on February 28, 1994, through December 31, 2015, nearly 197 million applications for firearm transfers or permits were subject to background

checks and more than 3 million applications (1.5%) were denied." Jennifer C. Karberg, et al., *Background Checks for Firearm Transfers, 2015 – Statistical Tables*, U.S. DEPARTMENT OF JUSTICE, 1 (Nov. 2017).[21] Maryland's requirement that sales or transfers between private persons must also be routed through licensed dealers for background checks is not at issue in this case.

To argue that the federal system—that worked successfully 197 million times and prevented more than 3 million prohibited persons from acquiring a firearm—is inadequate, Maryland points to an experiment conducted from October 2000 through February 2001 in which counterfeit state driver's licenses were used to purchase firearms in five states (Virginia, West Virginia, Montana, New Mexico, and Arizona— notably, *not* Maryland). Def. Ex. 4.

Since 2001, Maryland, like other states, has joined the federal Real ID program. Enacted after the September 11 terrorist attacks, Real ID requires states to substantially upgrade their standards for driver's licenses, including holograms to prevent counterfeiting. *See* Maryland Department of Transportation, *Real ID*, http://www.mva.maryland.gov/realid/index.htm; Benjamin Din, et al., *New driver's license requirements are coming to U.S. airports. Is your state ready?*, WASHINGTON POST, Sept. 13, 2017 ("States still issue their own documents, but they need to meet tougher security standards related to card issuance, card design and application processing.").[22]

---

[21] https://www.bjs.gov/content/pub/pdf/bcft15st.pdf.
[22] https://www.washingtonpost.com/graphics/2017/national/real-ids/?utm_term=.ea674d9edcd1.

Whatever issues with counterfeit driver's licenses existed in other states before 9/11, Maryland has introduced no evidence to show that counterfeit licenses are currently a problem in Maryland gun sales.

"[T]he burden of proving narrow tailoring requires the County to *prove* that it actually *tried* other methods to address the problem." *Reynolds*, 779 F.3d at 231. Here, Maryland has tried another method—a substantially less burdensome method—and nothing in the record indicates that Maryland's Real ID program is failing. Accordingly, Maryland has failed to "carry its burden of demonstrating" that the statute "is narrowly tailored." *Id.* at 232. Thus, the unnecessarily burdensome licensing scheme fails intermediate scrutiny.

## CONCLUSION

Defendants' motion for summary judgment should be denied. Plaintiffs' cross-motion for summary judgment should be granted.

Respectfully submitted,

Gregory M. Kline
Law Office of Gregory M. Kline
PMB #159
550M Ritchie Highway
Severna Park, MD 21146
410-541-6384
Bar No. 14363
*Counsel of Record*

Joseph G.S. Greenlee
Millennial Policy Center
3443 S. Galena St., #120
Denver, CO 80231
(970) 485-3303
josephgreenlee@gmail.com
Bar No. 809450 (*Pro Hac Vice*)

34

David B. Kopel
Independence Institute
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

# APPENDIX I. ACCIDENT DATA

## TABLE 1: Rate of Gun Ownership vs. Rate of Gun Homicide and Fatal Gun Accidents

| Year | Population (in 1,000s) | Total gun stock | Guns per capita | Murder and nonnegligent manslaughter per 100,000 persons | Fatal gun accidents | FGAs for ages 0-14 | Population age 0 to 14 (in 1,000s) | Fatal gun accidents per 100,000 persons | FGAs per 100,000 persons for ages 0-14 |
|---|---|---|---|---|---|---|---|---|---|
| 1948 | 146,091 | 53,203,031 | 0.36 | 5.6 | 2,270 | | | 1.55 | |
| 1949 | 148,666 | 55,406,460 | 0.37 | 5.1 | 2,326 | | | 1.56 | |
| 1950 | 151,871 | 57,902,081 | 0.38 | 5.0 | 2,174 | 451 | 40,853 | 1.43 | 1.10 |
| 1951 | 153,970 | 59,988,664 | 0.39 | 4.7 | 2,247 | 520 | 42,065 | 1.46 | 1.24 |
| 1952 | 156,369 | 61,946,315 | 0.40 | 4.9 | 2,210 | 519 | 43,377 | 1.41 | 1.20 |
| 1953 | 158,946 | 63,945,235 | 0.40 | 4.6 | 2,277 | 498 | 44,759 | 1.43 | 1.11 |
| 1954 | 161,881 | 65,558,052 | 0.40 | 4.6 | 2,281 | 527 | 46,266 | 1.41 | 1.14 |
| 1955 | 165,058 | 67,387,135 | 0.41 | 4.3 | 2,120 | 522 | 47,867 | 1.28 | 1.09 |
| 1956 | 168,078 | 69,435,933 | 0.41 | 4.4 | 2,202 | 508 | 49,449 | 1.31 | 1.03 |
| 1957 | 171,178 | 71,416,509 | 0.42 | 4.3 | 2,369 | 549 | 51,080 | 1.38 | 1.07 |
| 1958 | 174,153 | 73,163,450 | 0.42 | 4.3 | 2,172 | 538 | 52,699 | 1.25 | 1.02 |
| 1959 | 177,136 | 75,338,188 | 0.43 | 4.5 | 2,258 | 542 | 54,345 | 1.27 | 1.00 |
| 1960 | 179,972 | 77,501,065 | 0.43 | 5.1 | 2,334 | 544 | 55,971 | 1.30 | 0.97 |
| 1961 | 182,976 | 79,536,616 | 0.43 | 4.8 | 2,204 | 507 | 56,046 | 1.20 | 0.90 |
| 1962 | 185,739 | 81,602,984 | 0.44 | 4.6 | 2,092 | 456 | 56,019 | 1.13 | 0.81 |
| 1963 | 188,434 | 83,834,808 | 0.44 | 4.6 | 2,263 | 538 | 55,946 | 1.20 | 0.96 |
| 1964 | 191,085 | 86,357,701 | 0.45 | 4.9 | 2,275 | 500 | 55,835 | 1.19 | 0.90 |
| 1965 | 193,457 | 89,478,922 | 0.46 | 5.1 | 2,344 | 494 | 55,619 | 1.21 | 0.89 |
| 1966 | 195,499 | 93,000,989 | 0.48 | 5.6 | 2,558 | 535 | 55,287 | 1.31 | 0.97 |
| 1967 | 197,375 | 97,087,751 | 0.49 | 6.2 | 2,896 | 598 | 54,890 | 1.47 | 1.09 |
| 1968 | 199,312 | 102,302,251 | 0.51 | 6.9 | 2,394 | 527 | 54,492 | 1.20 | 0.97 |
| 1969 | 201,298 | 107,111,820 | 0.53 | 7.3 | 2,309 | 455 | 54,089 | 1.15 | 0.84 |
| 1970 | 203,798.7 | 111,917,733 | 0.55 | 7.9 | 2,406 | 506 | 53,803 | 1.18 | 0.94 |
| 1971 | 206,817.5 | 116,928,781 | 0.57 | 8.6 | 2,360 | 481 | 53,835 | 1.14 | 0.89 |
| 1972 | 209,274.9 | 122,304,980 | 0.58 | 9.0 | 2,442 | 554 | 53,700 | 1.17 | 1.03 |
| 1973 | 211,349.2 | 128,016,673 | 0.61 | 9.4 | 2,618 | 541 | 53,450 | 1.24 | 1.01 |
| 1974 | 213,333.6 | 134,587,281 | 0.63 | 9.8 | 2,513 | 532 | 53,163 | 1.18 | 1.00 |
| 1975 | 215,456.6 | 139,915,125 | 0.65 | 9.6 | 2,380 | 495 | 52,895 | 1.10 | 0.94 |

| 1976 | 217,553.9 | 145,650,789 | 0.67 | 8.8 | 2,059 | 428 | 52,605 | 0.95 | 0.81 |
|------|-----------|-------------|------|------|-------|-----|--------|------|------|
| 1977 | 219,760.9 | 150,748,000 | 0.69 | 8.8 | 1,982 | 392 | 52,325 | 0.90 | 0.75 |
| 1978 | 222,098.2 | 156,164,518 | 0.70 | 9.0 | 1,806 | 349 | 52,060 | 0.81 | 0.67 |
| 1979 | 224,568.6 | 161,888,861 | 0.72 | 9.7 | 2,004 | 372 | 51,523 | 0.89 | 0.72 |
| 1980 | 227,224.7 | 167,681,587 | 0.74 | 10.2 | 1,955 | 316 | 51,369 | 0.86 | 0.62 |
| 1981 | 229,465.7 | 173,262,755 | 0.76 | 9.8 | 1,871 | 298 | 51,275 | 0.82 | 0.58 |
| 1982 | 231,664.4 | 178,218,890 | 0.77 | 9.1 | 1,756 | 279 | 51,367 | 0.76 | 0.54 |
| 1983 | 233,792.0 | 182,273,263 | 0.78 | 8.3 | 1,695 | 243 | 51,458 | 0.73 | 0.47 |
| 1984 | 235,824.9 | 186,683,867 | 0.79 | 7.9 | 1,668 | 287 | 51,580 | 0.71 | 0.56 |
| 1985 | 237,923.7 | 190,658,136 | 0.80 | 8.0 | 1,649 | 278 | 51,616 | 0.69 | 0.54 |
| 1986 | 240,132.8 | 194,182,072 | 0.81 | 8.6 | 1,452 | 234 | 51,592 | 0.60 | 0.45 |
| 1987 | 242,288.9 | 198,526,508 | 0.82 | 8.3 | 1,440 | 247 | 51,965 | 0.59 | 0.48 |
| 1988 | 244,499.0 | 203,306,821 | 0.83 | 8.5 | 1,501 | 277 | 52,604 | 0.61 | 0.53 |
| 1989 | 246,819.2 | 208,489,609 | 0.84 | 8.7 | 1,489 | 273 | 53,405 | 0.60 | 0.51 |
| 1990 | 249,438.7 | 212,823,547 | 0.85 | 9.4 | 1,416 | 236 | 54,065 | 0.57 | 0.44 |
| 1991 | 252,127.4 | 216,695,946 | 0.86 | 9.8 | 1,441 | 227 | 55,352 | 0.57 | 0.41 |
| 1992 | 254,994.5 | 222,067,343 | 0.87 | 9.3 | 1,409 | 216 | 56,297 | 0.55 | 0.38 |
| 1993 | 257,746.1 | 228,660,966 | 0.89 | 9.5 | 1,521 | 205 | 57,203 | 0.59 | 0.36 |
| 1994 | 260,289.2 | 235,604,001 | 0.91 | 9.0 | 1,356 | 185 | 57,918 | 0.52 | 0.32 |
| 1995 | 262,764.9 | 240,599,526 | 0.92 | 8.2 | 1,225 | 181 | 58,380 | 0.47 | 0.31 |
| 1996 | 265,189.8 | 245,003,546 | 0.92 | 7.4 | 1,134 | 138 | 58,850 | 0.43 | 0.23 |
| 1997 | 267,743.6 | 249,261,384 | 0.93 | 6.8 | 981 | 142 | 59,217 | 0.37 | 0.24 |
| 1998 | 270,248.0 | 253,771,440 | 0.94 | 6.3 | 866 | 121 | 59,659 | 0.32 | 0.20 |
| 1999 | 272,690.8 | 258,490,668 | 0.95 | 5.7 | 824 | 88 | 59,955 | 0.30 | 0.15 |
| 2000 | 281,421.9 | 263,208,364 | 0.94 | 5.5 | 776 | 86 | 60,253 | 0.28 | 0.14 |
| 2001 | 285,317.6 | 267,335,304 | 0.94 | 5.6 | 802 | 72 | 60,435 | 0.28 | 0.12 |
| 2002 | 287,973.9 | 272,180,680 | 0.95 | 5.6 | 762 | 60 | 60,646 | 0.26 | 0.10 |
| 2003 | 290,809.8 | 276,813,674 | 0.95 | 5.7 | 730 | 56 | 60,738 | 0.25 | 0.09 |
| 2004 | 293,655.4 | 281,683,638 | 0.96 | 5.5 | 649 | 63 | 60,822 | 0.22 | 0.10 |
| 2005 | 296,507.1 | 286,837,125 | 0.97 | 5.6 | 789 | 75 | 60,953 | 0.27 | 0.12 |
| 2006 | 299,398.5 | 292,555,450 | 0.98 | 5.8 | 642 | 54 | 61,023 | 0.21 | 0.08 |
| 2007 | 301,621.2 | 299,017,274 | 0.99 | 5.7 | 613 | 65 | 61,295 | 0.20 | 0.11 |
| 2008 | 304,059.7 | 305,894,116 | 1.01 | 5.4 | 592 | 62 | 61,570 | 0.19 | 0.10 |
| 2009 | 307,006.6 | 314,862,296 | 1.03 | 5.0 | 554 | 48 | 61,883 | 0.18 | 0.08 |
| 2010 | 308,745.5 | 322,863,994 | 1.05 | 4.8 | 606 | 55 | 61,227 | 0.20 | 0.09 |
| 2011 | 311,721.6 | 332,223,910 | 1.07 | 4.7 | 591 | 69 | 61,176 | 0.19 | 0.12 |
| 2012 | 314,112.0 | 340,802,520 | 1.08 | 4.7 | 548 | 58 | 61,124 | 0.17 | 0.11 |
| 2013 | 316,497.5 | 351,647,312 | 1.11 | 4.5 | 505 | 69 | 61,086 | 0.16 | 0.14 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2014 | 318,857.0 | 360,697,938 | 1.13 | 4.5 | 586 | 50 | 61,079 | 0.18 | 0.09 |

The table is from Johnson et al., at 9–12. Sources cited by this textbook for the table are:

Fatal gun accidents from Centers for Disease Control, *Compressed Mortality File*,[23] and Gary Kleck, Targeting Guns 323–24 (1997). The gun supply figures through 1994 are from Kleck, at 96–97 (providing citations for all data). Additions to the gun supply from 1995 through 2014 are from the 2014 edition of ATF's Commerce in Firearms in the United States ex. 1-3,[24] plus the 2014 ATF Annual Firearms Manufacture and Export Report.[25] Homicide rates are from FBI, Uniform Crime Reports and the University of Albany's Sourcebook of Criminal Justice Statistics. Populations are from the Census Bureau.

---

[23] http://wonder.cdc.gov/mortSQL.html (run query).
[24] https://www.atf.gov/resource-center/docs/firearmscommerceannualstatisticalreport2014pdf/download.
[25] https://www.atf.gov/firearms/docs/afmer-2014-final-report-cover-revised-format-2-17-16/download.

**GRAPH 1: Fatal gun accident rate versus the number of guns per capita, 1948-2014.**



The graph is from Johnson et al., at 24. The graph is based on the data in Table 1.

**GRAPH 2: WISQARS Data Visualization of all unintentional deaths in 2016.**



Firearms (0.3%)

Source: Centers for Disease Control and Prevention, WISQARS Fatal Injury Data Visualization, available at https://wisqars-viz.cdc.gov/ (run query). Query terms are as stated in the lower left area below the graph.

## APPENDIX II. *AMICI* PROFESSORS

Randy E. Barnett is Carmack Waterhouse Professor of Legal Theory at the Georgetown University Law Center and is Director of the Georgetown Center for the Constitution. He is the author of 12 books, including the textbook Constitutional Law: Cases in Context (3rd ed. 2018). Among the cases he has litigated are *NFIB v. Sebelius* and *Gonzales v. Raich*. His scholarship has been cited by the U.S. Supreme Court majority in *Heller*, by Justice Thomas's dissent in *Gonzalez v. Raich*, and also by the D.C., Third, Sixth, Seventh, Ninth, and Eleventh Circuits; the supreme courts of New Jersey, Oklahoma, Oregon, Washington, and Wisconsin; and federal district courts in six states.

Royce de R. Barondes is James S. Rollins Professor of Law at the University of Missouri School of Law. He teaches firearms law and business law. His research on firearms law is published by the *Houston Law Review* (forthcoming) and University of Virginia *Journal of Law & Politics*.

Robert J. Cottrol is Harold Paul Green Research Professor of Law at George Washington. His scholarship was cited in Justice Thomas's concurring opinions in *McDonald v. Chicago* and *Printz v. United States*, and by the Fourth Circuit in *Kolbe v. Hogan*, 849 F.3d 114 (2017) (Traxler, J., dissenting). Prof. Cottrol is author of four legal history books on race and law, and editor of a three-volume anthology of the right to arms. He is author of "The Right to Bear Arms" entry for The Oxford International Encyclopedia of Legal History and on "The Second Amendment" in The Oxford Companion to the Supreme Court of the United States. His Second

41

Amendment scholarship has been published in the Yale Law Journal, Georgetown Law Journal, and Journal of American Legal History.

Nicholas J. Johnson is Professor of Law at Fordham University, School of Law. He is co-author of the first law school textbook on the Second Amendment, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (Aspen Pub. 2d ed. 2017) (with David B. Kopel, George A. Mocsary, and Michael P. O'Shea). The casebook has been cited by majorities in *People v. Chairez* (Supreme Court Illinois) and *Grace v. District of Columbia* (D.C. Cir.), and by dissents in *Drake v. Filko* (3d Cir.) and *Heller II* (D.C. Cir.). Prof. Johnson is also author of *Negroes and the Gun: The Black Tradition of Arms* (Prometheus 2014). His articles on the right to arms have been published by the *Hastings Law Review*, *Ohio State Law Journal*, and *Wake Forest Law Review*. Other courts citing his right to arms scholarship include the Seventh Circuit, Eastern District of New York, and Washington Court of Appeals.

Donald E.J. Kilmer, Jr., is Adjunct Professor of Constitutional Law at Lincoln University Law School, where his courses include Second Amendment.

Nelson Lund is University Professor at George Mason University, Antonin Scalia Law School. He is author of the entry on "District of Columbia v. Heller," in The Oxford Guide to United States Supreme Court Decisions (2d ed. 2009). His Second Amendment scholarship has appeared in the UCLA Law Review, Hastings Law Journal, Georgetown Journal of Law and Policy, and Constitutional Commentary. His Second Amendment scholarship has been cited by the D.C., Third, Fifth, Seventh, Eighth, and Ninth Circuits; federal district courts in Illinois and Virginia; and the

42

Illinois Appellate Court, the Virginia Court of Appeals, the Washington Supreme Court, and the Wyoming Supreme Court.

Joyce Malcolm is Patrick Henry Professor of Constitutional Law and the Second Amendment at George Mason University, Antonin Scalia Law School. She is author of seven books on British and American history, most notably To Keep and Bear Arms: The Origins of an Anglo-American Right (Harvard Univ. Pr. 1994). The book was cited by the majority opinions in *District of Columbia v. Heller* and *McDonald v. City of Chicago*, by Justice Thomas's concurrence in *Printz v. United States*, and by the Fourth Circuit in *United States v. Chester*, 628 F.3d 673 (2010). It has also been cited by the D.C. and Ninth Circuits; by federal district courts in Oregon, Pennsylvania, Texas, and West Virginia; and by the Oregon Supreme Court, Oregon Court of Appeals, and Washington Supreme Court.

George A. Mocsary is Associate Professor of Law, Director of Faculty Development, and Director of the Law and Economics Program at Southern Illinois University School of Law. He is co-author of the textbook *Firearms Law and the Second Amendment*, described more fully in conjunction with Professor Johnson. His articles have appeared in the *BYU Law Review*, *George Washington Law Review*, and *Duke Law Journal Online*. His Second Amendment scholarship was cited by the U.S. Supreme Court in *McDonald v. Chicago*, by the Fourth Circuit in *Kolbe v. Hogan*, 849 F.3d 114 (2017) (Traxler, J., dissenting), and by the Seventh Circuit.

Joseph E. Olson is emeritus Professor of Law at Mitchell Hamline School of Law, where he taught Second Amendment, business law, and tax law. His scholarship on

the right to arms was cited by *District of Columbia v. Heller*, and also by the Ninth Circuit, Eastern District of New York, and Washington Supreme Court. His articles on the right have appeared in the *Stanford Law and Policy Review*, *Georgetown Journal of Law & Public Policy*, and *Michigan Journal of Law Reform*.

Glenn H. Reynolds is Beauchamp Brogan Distinguished Professor of Law at the University of Tennessee College of Law, where he teaches constitutional law and technology law. His constitutional scholarship has been published in the Columbia Law Review, Virginia Law Review, University of Pennsylvania Law Review, Wisconsin Law Review, and Northwestern University Law Review. The Seventh Circuit cited his scholarship as a model of "originalist interpretive method as applied to the Second Amendment." *Ezell v. City of Chicago*, 651 F.3d 684, 699 n.11 (7th Cir. 2011). In addition, his right to arms scholarship has been cited by the First, Third, Fourth, Fifth, Seventh, Eighth, and Ninth Circuits; by federal district courts in Wisconsin, Illinois, and Texas; and by the Supreme Courts of Kentucky and Oregon.

E. Gregory Wallace is Professor of Law at Campbell University School of Law, where his constitutional law courses include the Second Amendment. He recently supervised a Campbell Symposium on the anniversary of the *Heller* decision, and is author of a forthcoming article on "assault weapons" in a symposium of the *Southern Illinois Law Journal*.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and format requirements of Local Rule 112.2. The typeface is 12-point, proportionately spaced Century Schoolbook font.

Dated this 5th day of October 2018.

/s/ *Gregory M. Kline*
*Counsel of Record*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2018, I served the foregoing brief via the CM/ECF system for the United States District Court for the District of Maryland, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 5th day of October 2018.

/s/ *Gregory M. Kline*
*Counsel of Record*

46