# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Case No. 16-cv-3311-ELH** |
| | ) |
| **LAWRENCE HOGAN, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### Plaintiffs' Motion to Strike Opinions of Defendants' Experts
### James Johnson, James Russell, and Daniel Webster

Defendants rely upon the declarations of their proffered expert witnesses former Baltimore County Chief of Police James Johnson, Maryland State Police Captain James Russell, and Bloomberg Professor Daniel Webster of the Bloomberg School of Public Health in support of their Motion for Summary Judgment. Dkt. 59 & 59-1. Chief Johnson's and Capt. Russell's opinions are not based upon sufficient facts or data. Professor Webster's opinions do not fit the facts of this case and are unreliable. Because Defendants may only rely upon admissible evidence in support of their motion for summary judgment, Defendants may not rely upon these inadmissible opinions. *E.g.*, *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the [party's] case to determine whether the [party] has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial."). Defendants' reliance on each of these opinions under Federal Rule of Civil Procedure 56 is improper. Under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26, Plaintiffs respectfully request that the Court strike from the record and preclude Defendants from relying upon the opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration ("Chief Johnson Decl.") (Dkt. 59-21), paragraphs 13, 17–25 in Capt. Russell's declaration ("Capt. Russell

Decl.") (Dkt. 59-20), and paragraphs 8–20 in Professor Webster's declaration ("Webster Decl.") (Dkt. 59-19).

### A. James Johnson and James Russell

Under Federal Rule of Evidence 702(b), expert witness testimony is admissible only if "the testimony is based on sufficient facts or data." Under this Rule, "the trial judge is assigned the task of 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Zellers v. NexTech Northeast, LLC*, 533 F. App'x 192, 196 (4th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)). "[W]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994); *see also, e.g.*, *Blake v. Bell's Trucking, Inc.*, 168 F. Supp. 2d 529, 533 (D. Md. 2001) ("A district court has a responsibility to ensure than an expert's opinion has an adequate basis in fact."); *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 470 & n.11 (D. Md. 2000) ("Speculation, guesswork and conjecture are not acceptable substitutes for facts and data.").

While trained experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit*[1] of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157–58 (1999) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). When determining whether to admit testimony, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. For example, the United States District Court for the Northern District of Texas excluded expert testimony when the expert witness conducted no survey, study, or analysis but instead "base[d] his opinion on

---

[1] Literally translated "he himself said it," an expert's *ipse dixit* is "[s]omething asserted but not proved." *Ipse Dixit*, Black's Law Dictionary (10th ed. 2014).

personal experience and attempt[ed] to use that personal experience to extrapolate." *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd*, No. 3:12-CV-01462, 2015 WL 12698060, at *2 (N.D. Tex. 2015).

In the District of Maryland, expert testimony is based on "sufficient facts or data" when the expert witness expresses comprehensive knowledge in his or her field of study, along with a complete understanding of the case itself. *See Elat v. Ngoubene*, 993 F. Supp. 2d 497, 511 (D. Md. 2014). In *Elat*, the plaintiff retained an expert witness to opine that she was the victim of human trafficking. *Id*. at 510–11. While preparing for her testimony, the expert witness interviewed the plaintiff and reviewed multiple pleadings, depositions, "more than 200 pages of documents produced in discovery," and "publications about human trafficking." *Id*. at 511. The expert witness's preparation was so comprehensive, the Court noted that there were few, if any, available documents that she failed to consider. *Id*. Thus, her opinions were "based on sufficient facts or data," and the Court refused to exclude her testimony. *Id*.

In *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911 (4th Cir. 2004), by contrast, the district court precluded the plaintiffs' expert witness from testifying that the design of a product was defective because he had no training in the design of the product or familiarity with the product itself. *Id*. at 918. Because of his lack of experience, "his opinion [was] invalid" and thus properly excluded. *Id*. And, because the testimony was properly excluded, the proffering party was unable to prove its case, and "summary judgment on all claims was clearly proper." *Id*.; *see also Stolting v. Jolly Roger Amusement Park, Inc.*, 37 F. App'x 80, 83 (4th Cir. 2002) (affirming the exclusion of expert testimony that was based on nothing more than "bare conclusions without reliable support").

The assertions in paragraphs 7–15 and 17–18 of Chief Johnson's declaration and paragraphs 13 and 17–25 of Capt. Russell's declaration are not based on sufficient data and are therefore inadmissible under Federal Rule of Evidence 702(b).

### 1. Chief James Johnson

Chief Johnson opines that proper firearms training—which he also opines the Handgun License requirements provide—is necessary to promote public safety in Maryland. *See* Chief Johnson Decl., Dkt. 59-21, at ¶¶ 14–18. Chief Johnson claims that the Handgun License requirements, including the fingerprint requirement and the four-hour firearm safety training, will reduce the access of handguns to ineligible people, the incidents of accidental discharge, and straw purchases. *Id.* ¶¶ 7–12. Chief Johnson believes that, through the Handgun License requirements, firearms-safety instructors will verify that all applicants have complied with the requirements and are well-versed on firearms safety. *Id.* ¶ 13.

These opinions are mere beliefs because they are not based on sufficient facts or data. They are merely *ipse dixit* and should be excluded. Although Chief Johnson claims to possess "an extensive amount of knowledge of local and national gun law," Johnson Dep., Ex. 1, at 14:11–12, his deposition testimony revealed numerous gaps in relevant knowledge and a dearth of statistical or empirical evidence in support of his positions. When asked whether he has facts or data to support his positions, Chief Johnson repeatedly answered, "no," "I do not know," or some variation thereof. *See*, *e.g.*, *id.* at 33:22–34:10 (whether police have issued guidelines or standards for Handgun License instructors); 35:4–12 (on how many occasions prohibited individuals have purchased handguns prior to the Handgun License requirement), 41:4–7 (if he has studies regarding straw purchasing), 51:17–52:8 (the number of accidental shootings in Maryland or nationwide), 85:4–86:6 (how often firearms are used in self-defense in Baltimore County), 88:1–

4 (how often homeowners use firearms to defend their homes), 90:6–18 (what percentage of crime guns are in Baltimore County), & 91:9–13 (whether handgun crimes in Baltimore County have decreased since the Handgun License took effect). With respect to the Handgun License requirements, Chief Johnson has no data relevant to the effectiveness of the fingerprinting or "live fire" components, despite his current position as chair of the Law Enforcement Partnership. *Id*. at 16:15–17:4. Based upon his testimony, Chief Johnson anticipates that Handgun License trainers will effectively "weed out" those unqualified to obtain a Handgun License, though he "do[es] not know" whether the Maryland State Police has issued any written or oral guidance on the subject. *Id*. at 33:22–34:10. Nor does he have facts or data relevant to handgun ownership by impaired individuals prior to the initiation of the Handgun License requirement. *Id*. at 35:4–12.

Chief Johnson also lacks knowledge of crime causation and prevention. With respect to straw purchases, Chief Johnson "do[es] not possess statistics on the prevalence of false identification," *id*. at 23:7–14, and has no information on "whether or not the fingerprinting requirement has caught anyone who was a straw purchaser," *id*. at 25:10–16. Nor is he familiar with any studies illuminating the behavior of straw purchasers. *Id*. at 41:4–7. Despite strong opinions on the subject, Chief Johnson has no information on the prevalence of accidental gun injury and death in Maryland prior to the initiation of the Handgun License requirement. *Id*. at 50:9–13; 51:17–52:8. And he has no data to demonstrate how often firearms are used defensively by citizens in Baltimore County. *Id*. at 85:18–86:6. Chief Johnson has no data with respect to the percentage of handguns that are illegally owned or possessed at the time they are used in criminal activity in Maryland. *Id*. at 90:8–20.

Chief Johnson offers a series of unsupported opinions devoid of statistical or empirical support. Despite the list of credentials stemming from his law enforcement background, Chief

Johnson's opinions are nothing more than *ipse dixit* masquerading as "sufficient facts or data." Like the expert in *De Boulle*, Chief Johnson has conducted no empirical research but attempts to use his professional resume to breach the gaps in knowledge and logic that were exposed during his deposition testimony. Unlike the expert witness in *Elat*, Chief Johnson has failed to demonstrate a comprehensive knowledge of the facts underlying this case or in his field of study relevant to the Handgun License requirement. His opinion testimony should be excluded because it is nothing more than his *ipse dixit*.

### 2.   Captain James Russell

Capt. Russell opines that the Handgun License requirements encourage responsible gun ownership and public safety in Maryland. Capt. Russell Decl., Dkt. 59-20, at ¶¶ 13, 17. He believes that the Handgun License training requirement, by encouraging safe storage practices, reduces the risk that minors or prohibited adults will gain access to firearms or that eligible adults will accidentally discharge a firearm. *Id*. ¶¶ 18–21. Capt. Russell also opines that the Handgun License requirement's live-fire component improves the effectiveness of the training by requiring applicants to prove their ability to safely fire and clear a firearm. *Id*. ¶ 24.

Like Chief Johnson, Capt. Russell's opinions are not based on sufficient facts or data but are *ipse dixit* and should be excluded. Aside from his "13 years of being on a live firing range," Russell Dep., Ex. 2, at 11:13–14, Capt. Russell possesses little empirical knowledge to support his opinions on training civilians. He has instructed maybe five Handgun License applicants, only four of whom obtained a Handgun License. He has never conducted research relevant to firearm use and its relationship to public safety. *Id*. at 20:19–22. Nor is he familiar with empirical research on whether the Handgun License requirements actually reduce the occurrence of accidental firearms discharge. *See id*. at 93:7–18. Capt. Russell has no knowledge of whether the Handgun License

requirements have reduced the number of straw purchases in Maryland or the number of felons or disqualified people in possession of firearms. *Id*. at 136:5–17. And he has no data on whether the Handgun License training requirement has effected compliance with Maryland firearms storage law. *Id*. at 136:18–21. Furthermore, Capt. Russell has no idea "how many accidental discharges occur[red] in Maryland either before or after the [Handgun License] requirement," and he has no idea how such a statistic may be obtained. *Id*. at 166:10–14. Despite his Maryland State Police work experience, Capt. Russell has little knowledge of whether the Handgun License requirement serves its intended purpose. His opinions are nothing more than *ipse dixit* and should be excluded.

The opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration and paragraphs 13, 17–25 of Capt. Russell's declaration are not based on sufficient facts or data and thus are inadmissible. Capt. Russell's opinions are unsupported say-so and should be stricken.

### B. Daniel Webster

#### 1. Professor Webster's opinions in paragraphs 8–11 and 13–20 of his declaration do not fit the facts of this case.

Under *Daubert*, an expert's testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. (citation omitted). Therefore, an expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The District of Maryland has held, for example, that an expert's opinion does not fit the facts of the case where his testimony is based upon circumstances outside the scope of the case itself. *See Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 502 (D. Md. 2000) (excluding an expert's testing on rollover propensity in large vehicles because his methods bore no relation to real-world circumstances and so did not measure what was at issue in the case).

Like in *Samuel*, Professor Webster's opinions do not fit the facts of this case. Professor Webster seeks to opine that the Handgun License requirement is an effective way to prevent (1) straw purchases, or the diversion of guns for criminal purposes; (2) homicides; (3) suicides; and (4) serious injuries and deaths to police officers. Webster Decl., Dkt. 59-19, at ¶¶ 8–20. Professor Webster claims that the fingerprinting and safety-training requirements will reduce the likelihood of false identifications at the point of purchase and the opportunity for would-be offenders to access loaded firearms. *Id*. ¶¶ 8–9 & 18–20. In support of his claims, Professor Webster proffers research conducted in other states on the effect of so-called permit-to-purchase (or "PTP") laws. *See id*. ¶¶ 14–16. Specifically, Professor Webster relies heavily on Missouri's PTP law, which was repealed on August 28, 2007, and Connecticut's PTP law, which became effective October 1, 2015. *Id*. ¶¶ 15–16. Professor Webster's research allegedly revealed an upward trend in crime to correlate with the repeal of Missouri's PTP law and a significant reduction in Connecticut's firearm homicide rate over the first ten years its PTP law was in effect. *Id*. ¶¶ 14–16. This data demonstrates ostensibly that PTP laws (like Maryland's Handgun License requirement) have a statistically significant effect on reducing gun violence. *Id*. ¶¶ 14–20.

But, under the *Daubert* standard, Professor Webster's opinions do not fit the facts of this case. Professor Webster admits that the Missouri and Connecticut PTP laws have little in common with Maryland's Handgun License requirement. The PTP laws in Missouri, Connecticut, and Maryland share only a tenuous, nominal bond—all three laws require a permit in order to purchase firearms. Webster Dep., Ex. 3, at 189:9–13. But the requirements to obtain a license in each state differ in critical ways. For example:

- ***Missouri (formerly Mo. Rev. Stat. § 571.090):*** According to Professor Webster, "there's only one common denominator between the Missouri PTP law and the Handgun License, and that's the requirement of a permit in order to purchase." Webster Dep., Ex. 3, at 179:18–180:1. Unlike Maryland, neither fingerprinting nor safety training was required

prior to the issuance of a PTP in Missouri. *Id.* at 55:15–19. On this point, Professor Webster's research revealed no special value to fingerprinting as opposed to the other elements of a PTP law in effect in other jurisdictions. *Id.* at 184:16–22. And "Missouri required in-person appearance at a law enforcement agency, which Maryland does not." *Id.* at 56:6–9.

- *Connecticut (Conn. Gen. Stat. Ann. §§ 29-28(b), 29-29):* Connecticut, like Maryland, requires parties seeking a PTP to provide fingerprints and undergo a background check prior to issuance. But, unlike Maryland, "the fingerprinting requirement in Connecticut has to be obtained through a law enforcement agency." Webster Dep., Ex. 3, at 45:6–10. Connecticut also requires a training course for PTP applicants, but Connecticut's required training is "an eight-hour course as opposed to a four-hour course." *Id.* at 44:15–20. And Connecticut requires photo identification on its permits to purchase, while Maryland does not. *Id.* at 56:16–18.

By analyzing these states' laws, Professor Webster relies upon data that does not fit the facts of this case. Because these studies relied upon by Professor Webster are so factually distinguishable, they tell us nothing about the potential effects of the Handgun License requirement. Professor Webster's opinions do not fit the facts of this case and should be excluded.

**2. Professor's Webster's opinions in paragraph 17 of his declaration is unreliable.**

Professor Webster relies upon incorrect data in his declaration to support his opinion that the Handgun License is "associated" with a "48 percent reduction in firearm homicide rates in [Maryland's] large urban counties." Webster Decl., Dkt. 59-1, at ¶ 17. Professor Webster bases this conclusion upon his own retracted study.[2] This data, which Professor Webster concedes was inaccurate, cannot provide a basis for a reliable causation opinion. Ex. 4 (Supplemental Report). Professor Webster nevertheless continues to rely upon this study to support his opinion in paragraph 17, and the Court should strike this opinion and preclude Defendants from relying upon it.

---

[2] Cassandra K. Crifasi, et al., *Association between firearm laws and homicide in large, urban U.S. counties, 95(3) Journal of Urban Health* 383–90 (2018).

**Conclusion**

For the foregoing reasons, this Court should strike from the record and preclude Defendants from relying upon the opinions contained in paragraphs 7–15 and 17–18 of Chief Johnson's declaration (Dkt. 59-21), paragraphs 13 and 17–25 in Capt. Russell's declaration (Dkt. 59-20), and paragraphs 8–11, 13–20 in Professor Webster's declaration (Dkt. 59-19).


Dated: Oct. 5, 2018                              Respectfully submitted,

                                                 */s/ John Parker Sweeney*
                                                 John Parker Sweeney
                                                 T. Sky Woodward
                                                 James W. Porter, III
                                                 Marc A. Nardone
                                                 Bradley Arant Boult Cummings LLP
                                                 1615 L Street N.W., Suite 1350
                                                 Washington, DC 20036
                                                 P: 202-719-8316
                                                 jsweeney@bradley.com

                                                 Cary Johnson Hansel, III
                                                 Hansel Law, P.C.
                                                 2514 North Charles Street
                                                 Baltimore, MD 21218
                                                 P: 301-461-1040
                                                 cary@hansellaw.com

                                                 *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2018, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Counsel for Plaintiffs*