# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,   *

    *Plaintiffs,*   *

    v.   *   Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*   *

    *Defendants.*   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO
## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General

JENNIFER L. KATZ (Fed. Bar #28973)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.)
410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: November 16, 2018    Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.      THE PLAINTIFFS' PURPORTED STATEMENT OF "UNDISPUTED" FACTS
        CONTAINS REPEATED MISREPRESENTATIONS OF THE FACTUAL RECORD AND
        MANY MISLEADING STATEMENTS ........................................................... 2

II.     THE PLAINTIFFS HAVE FAILED TO RAISE A GENUINE DISPUTE OF FACT THAT
        THEY HAVE STANDING TO CHALLENGE THE HQL REQUIREMENT. ......................... 8

III.    THE HQL REQUIREMENT DOES NOT VIOLATE THE SECOND AMENDMENT .......... 14

        A.      The HQL Requirement Does Not Ban Any Law-Abiding Person from
                Possessing a Handgun for In-Home Self-Defense. .................................... 14

        B.      The HQL Requirement Does Not Impose a Severe Burden on the
                Second Amendment Right to Possess Firearms for In-Home Self-
                Defense. ................................................................................................. 17

        C.      The HQL Requirement Is Reasonably Adapted to the State's
                Compelling Interest in Public Safety. ........................................................ 19

                1.      The HQL Requirement Was Enacted to Curb the Real and
                        Devastating Effects of Gun Violence. ........................................... 21

                2.      The Record Evidence Demonstrates the Fingerprint
                        Requirement Is Reasonably Adapted to Furthering the State's
                        Interest in Public Safety. ............................................................ 23

                3.      The Record Evidence Demonstrates the Firearm Safety
                        Training and Live-Fire Requirements Are Reasonably Adapted
                        to Furthering the State's Interest in Public Safety. ........................ 28

        D.      The State of Maryland Enacted the HQL Requirement Based on
                Substantial Evidence. ............................................................................. 32

IV.   THE TERMS "RECEIVE" AND "RECEIPT" ARE NOT VOID FOR VAGUENESS............ 34

    A.   The FSA's Use of "Receive" and "Transfer" as Flip Sides of the Same Transaction Makes Plain that "Receive" Is the Reciprocal End of a Permanent, Gratuitous Exchange. ................................................................. 34

    B.   The State Has Consistently Interpreted the Terms at Issue to Refer to a Permanent, Gratuitous Exchange. ............................................................. 37

V.   THE CHALLENGED MSP REGULATIONS AND PROCESSES ARE ENTIRELY CONSISTENT WITH THE LANGUAGE AND PURPOSE OF THE FSA.............................. 40

    A.   The Live-Fire Requirement Does Not Contradict the Language or Purpose of the Statute. .................................................................................. 40

    B.   The Secretary Properly Submits Fingerprints to DPSCS Through Delegation to Local Law Enforcement and State-Certified Fingerprint Vendors. ...................................................................................................... 43

    C.   MSP's Requirement that Qualified Handgun Instructors Who Have a Certification Issued by a Nationally Recognized Firearms Organization Receive a Certificate from MSP and Use MSP's Automated System Does Not Contradict the Language or Purpose of the Statute. ...................................................................................................... 47

**DEFENDANTS' RESPONSE MEMORANDUM IN OPPOSITION TO THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION .............................................................................................................. 50

    THE HQL REQUIREMENT WAS ENACTED TO FURTHER THE STATE'S COMPELLING INTEREST IN PUBLIC SAFETY. ........................................................... 50

CONCLUSION ................................................................................................................. 53

# TABLE OF AUTHORITIES

**Page**

### Cases

*120 West Fayette St. LLP v. Mayor & City Council*, 413 Md. 309 (2010) ....................... 46

*Baltimore v. Wollman*, 123 Md. 310 (1914)..................................................................... 46

*Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*,
262 F. App'x 556 (4th Cir. 2008) ................................................................................ 44

*Brown v. State*, 454 Md. 546 (2017) ................................................................................ 36

*Buckley v. Valeo*, 424 U.S. 1 (1976)................................................................................. 52

*Chow v. State*, 393 Md. 431 (2006).................................................................... 35, 36, 37, 38

*Christ by Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427 (1994)............................ 40

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)........................................... 20

*City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*,
982 F.2d 1086 (7th Cir. 1992)..................................................................................... 12

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)............................................................ 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... 14, 15, 16, 51

*Doe v. Virginia Dep't of State Police*, 713 F.3d 745 (4th Cir. 2013) ............................... 11

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772 (D. Md. 2010) ............. 43

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) ............................ 45

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)................................................... 11

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) .................................... 18

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ........................... 16, 23, 32

*Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ..................................... 10

*Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35 (1966).................................. 39

*Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835 (N.D. Ill. 2011) .............................. 18

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.) (en banc), *cert. denied*,
138 S. Ct. 469 (2017) ...........................................................................passim

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013),
*cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014).............................. 18

*Macke Co. v. State Dept. of Assessments and Taxation*, 264 Md. 121 (1972)................. 36

*Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012) ........................................... 38, 39

*Maryland Highways Contractors Ass'n, Inc. v. Maryland*,
933 F.2d 1246 (4th Cir. 1991)................................................................... 10, 13

*Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1 (2003) .................... 40, 41

*Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236 (D. Md. 1997) ...................................... 44

*MSI v. Hogan*, No. 18-cv-1700-JKB (D. Md. Nov. 16, 2018) ..................................... 11, 39

*N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122 (2d Cir. 2008) ............................ 10

*Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
612 F.3d 724 (4th Cir. 2010)........................................................................... 44

*Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001) ..................... 33

*Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir. 1998) ............... 39

*Silvester v. Becerra*, 138 S. Ct. 945 (2018) ........................................................ 20

*Smith v. State*, 425 Md. 292 (2012) ................................................................... 37

*Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990) ................................... 12

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ......................................... 25

*United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011) ......................................... 24

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ......................................... 25

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010) ....................................... 41

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ............................... 19

*United States v. Williams*, 553 U.S. 285 (2008)................................................... 39

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1983) ..................................................................... 38, 39

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)............................ 8, 19, 20

## Constitutional Provisions

U.S. Const. amend. I.................................................................................. 8, 20

U.S. Const. amend. II ................................................................................ passim

U.S. Const. amend. XIV ........................................................................... 10

## Statutes

Md. Ann. Code art. 27, § 442(d)(1)........................................................ 35

Md. Code Ann., Pub. Safety § 5-101(q)(1)-(3) ...................................... 47

Md. Code Ann., Pub. Safety § 5-101(q)(2) ............................................ 48

Md. Code Ann., Pub. Safety § 5-101(q)(3) ............................................ 47, 48

Md. Code Ann., Pub. Safety § 5-101(s) .................................................. 34

Md. Code Ann., Pub. Safety § 5-117.1(b) .............................................. 34, 36

Md. Code Ann., Pub. Safety § 5-117.1(c) ............................................... 34, 36

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) .................................... 40, 42

Md. Code Ann., Pub. Safety § 5-117.1(f)(2)........................................... 45

Md. Code Ann., Pub. Safety § 5-117.1(f)(3)(iii)..................................... 45

Md. Code Ann., State Gov't § 10-125..................................................... 43, 47

## Rules

Fed. R. Civ. P. 701................................................................................... 41

## Regulations

COMAR 12.15.05.01–.10........................................................................... 45

COMAR 29.03.01.29(C)(4) ..................................................................... 40

**Miscellaneous**

100 Md. Op. Att'y Gen. 29 (2015) ....................................................................... 46

88 Md. Op. Att'y Gen. 25 (2003) ......................................................................... 46

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

_____

## INTRODUCTION

The Handgun Qualification License ("HQL") requirement of the Firearms Safety Act of 2013 (the "FSA") is a constitutional exercise of Maryland's police power in the interest of promoting public safety and reducing the negative effects of firearms violence. Substantial evidence in the summary judgment record, including empirical, peer-reviewed research, and the opinions of highly-experienced law enforcement experts, supports the General Assembly of Maryland's judgment that the fingerprint background check, classroom firearm safety training, and live-fire requirements of the HQL application process are reasonably adapted to the State's compelling interest in public safety.

The HQL fingerprint background check has been shown to reduce the diversion of guns to criminals, and enables the Maryland State Police ("MSP") to positively identify HQL applicants for purposes of the background check and to identify licensees who are subsequently convicted of offenses that make them ineligible for an HQL.  Law enforcement experts, based on decades of experience with firearm safety training, believe that the classroom training and live-fire requirements make Marylanders safer by reducing access of firearms to prohibited persons including minors and instructing applicants on the safe handling of a firearm.  Because these requirements are constitutional, so too are the costs and time necessary to implement and comply with them.

The plaintiffs' memorandum in support of their cross-motion for summary judgment and in response to the defendants' motion for summary judgment (ECF 77 (Pls.'

Mem.))[1] does not identify any genuine dispute of material fact to the contrary, and their legal arguments would require this Court to disregard controlling Fourth Circuit precedent, and to reach a conclusion contrary to how other courts have considered similar challenges.

## ARGUMENT

## I. THE PLAINTIFFS' STATEMENT OF "UNDISPUTED" FACTS CONTAINS REPEATED MISREPRESENTATIONS OF THE FACTUAL RECORD AND MANY MISLEADING STATEMENTS.

Due to the weakness of their substantive arguments, the plaintiffs resort to misrepresenting several critical facts in the summary judgment record and making highly misleading claims. Before turning to the merits of the defendants' arguments, it is important to refute some of these critical misrepresentations and misleading claims, which permeate the plaintiffs' arguments in support of their cross motion and in response to the defendants' motion for summary judgment.

First, the plaintiffs invent from whole cloth their assertion that the State enacted the FSA with the intent to deter law-abiding citizens from exercising their Second Amendment rights. On the contrary, the evidence in the record demonstrates that the General Assembly considered the opinions of social science and law enforcement experts as to the public safety benefits of the HQL requirements when enacting the FSA. (*See, e.g.*, ECF 59-3 through 6 (testimony and evidence before the General Assembly).) Attempting to support

---

[1] The plaintiffs' memorandum contains separate sections addressing their cross-motion and their response to the defendants' motion, but with a large degree of repetition and overlap. To the extent issues relate to both motions, the defendants address them in this first section. The defendants address the issue that relates only to the plaintiffs' cross-motion at pages 50-52.

2

their false claim, the plaintiffs misrepresent the deposition testimony of the State's expert Daniel Webster, Sc.D., who testified that the HQL's requirement that applicants submit their fingerprints to law enforcement may be "intimidating" to a *prospective illegal straw purchaser*, because in those circumstances, "usually a prohibited individual is asking someone, in essence, to stick their neck out to purchase a gun for them . . . ." (Ex. 24, Tr. of Daniel Webster Dep. 30:1-31:4; *see also id.* at 31:11-14 ("[W]hen a prohibited person is asking someone to buy a gun for them, [the licensing process] likely causes hesitancy to do so").)   The plaintiffs seize on Dr. Webster's use of the word "intimidating" and repeatedly mischaracterize his testimony to argue that the State, by requiring a fingerprint-based background check, intended to intimidate law-abiding citizens from exercising their Second Amendment rights.   Dr. Webster suggested no such thing, and his deposition testimony when properly read in context makes clear his opinion, based on empirical, peer-reviewed research, that the robust background check deters straw purchasers.   (*Id.*; *see also* Ex. 31, Suppl. Decl. of Daniel W. Webster ¶¶ 4-5.)

Second, attempting to distract the Court from their own expert's acknowledgement that MSP's ability to revoke HQLs based on fingerprint matches enhances public safety (ECF 59-22, Tr. of Gary Kleck Dep. at 49), the plaintiffs inexplicably contend that MSP is not revoking HQLs based on fingerprint matches of licensees who subsequently commit disqualifying offenses.   (ECF 77 (Pls.' Mem.) at 24.)   On the contrary, documentary and testimonial evidence demonstrates that MSP routinely receives criminal history reports based on HQL fingerprint matches and that, when a licensee has been convicted of a

3

disqualifying offense, MSP revokes his or her HQL.[2]  (Ex. 25, Tr. of Andy Johnson Dep. at 133:20-134:13 (explaining the reporting from DPSCS and how MSP revokes HQLs based on that reporting); *see also* ECF 59-7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6 (revocation log that tracks HQL revocations based on fingerprint match report).)  Despite this evidence, the plaintiffs cite to Capt. Johnson's deposition testimony where he agreed that "*other than reports that are triggered by fingerprint matches*"—which Capt. Johnson had just explained were used by MSP to revoke HQLs of newly-ineligible individuals— "there's no reporting to Maryland State Police of the arrest of any HQL holder . . . ."  (Ex. 25, Tr. of A. Johnson Dep. at 136:11-16 (emphasis added).)

Third, the plaintiffs make the unsupported claim that the fingerprint requirement is unnecessary for MSP to locate and disarm handgun owners who are subsequently disqualified from handgun ownership because of the pre-existing handgun registration process.  (ECF 77 (Pls.' Mem.) at 16.)  The plaintiffs rely on the deposition testimony of the State's expert Dr. Webster, in which he acknowledges that, prior to the HQL fingerprint requirement, MSP could dispossess disqualified individuals of their registered firearms when MSP learned that an individual had been convicted of a disqualifying offense.  But the plaintiffs cite no evidence that any statute or regulation or state or local policy or procedure existed, prior to the HQL requirement, to ensure reporting of every registered

---

[2] As explained in the defendants' opening memorandum (ECF 59-1 (Defs.' Mem.) at 5), the FSA requires the Maryland Department of Public Safety and Correctional Services ("DPSCS"), which warehouses the fingerprint records, to provide MSP with any criminal history information it receives "after the date of the initial criminal history records check."  Md. Code Ann., Pub. Safety § 5-117.1(f)(7) (LexisNexis 2018 Suppl.).

firearms owner who was convicted of a disqualifying offense.  Indeed, no such statute, regulation, policy or procedure pre-existed the HQL fingerprint requirement (Ex. 30, Decl. of First Sgt. Donald Pickle ¶¶ 10-12; Ex. 31, Webster Suppl. Decl. ¶ 6 ), and Capt. Johnson testified, unchallenged by plaintiffs, that prior to the fingerprint requirement there were no such regular reports received by MSP.  (Ex. 25, Tr. of A. Johnson Dep. at 136:4-10.)

Fourth, in support of their assertion that the fingerprint requirement of the HQL application does not deter straw purchases, the plaintiffs misleadingly cite the testimony of the State's law enforcement expert James Johnson, the former Chief of the Baltimore County Police Department, agreeing with plaintiffs' counsel's statement that "by definition a straw purchaser is an individual who can be positively identified and is qualified to purchase a handgun" and, thus, "fingerprinting is not, per se, going to deter a straw purchaser."  (Ex. 26, Tr. of James Johnson Dep. at 24:4-12.)  In the very next exchange, however, former Chief Johnson explained that the fingerprinting process discourages straw purchases because a potential straw purchaser "that knows that they have to render fingerprints is less likely to carry out the scheme" because of "a concern about rendering their fingerprints."  (*Id.* at 24:14-21.)  Thus, when properly read in context, it is clear that Chief Johnson believes, based on his law enforcement experience, that although a straw purchaser would be able to pass a fingerprint-based background check, that same purchaser would be deterred from going through with the criminal enterprise because of the fingerprint requirement.

Fifth, the plaintiffs falsely claim that the defendants have conceded there is no difference between the HQL's four-hour classroom training requirement and the 45-minute

video that handgun purchasers were required to view under the prior law, simply because they covered similar subject areas.  (ECF 77 (Pls.' Mem.) at 17.)  On the contrary, both of the State's law enforcement experts articulated various advantages of the four-hour classroom training over the 45-minute video, discussed below at pages 29-32.

Sixth, the plaintiffs falsely state that the defendants have "conceded" that the live-fire "requirement is specious at best," relying on the deposition testimony of former chief Johnson.  (ECF 77 (Pls.' Mem.) at 24.)  Although Chief Johnson testified that he believes firing one round of ammunition is "not adequate" to be proficient at firing a handgun (Ex. 26, Tr. of J. Johnson Dep. at 52:14-17), he testified that the live-fire requirement would help prevent accidental discharges by demonstrating the applicant's ability to chamber a round (*id.* at 52:14-53:2), and effectively clear the weapon after firing (*id.* at 106:20-107:5). Indeed, as discussed below at pages 31-33, both of the State's law enforcement experts have opined on the public safety advantages of the live-fire requirement.

Seventh, the plaintiffs make the very misleading claim that the HQL requirement "discouraged at least one-quarter of Marylanders who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin a Handgun License application from completing it and obtaining their Handgun License."  (ECF 77 (Pls. Mem.) at 12.)  The plaintiffs base this claim on the raw number of users who have initiated an HQL application on MSP's server but not yet completed the application.  (*See* ECF 77-14, Col. Pallozzi Third Supp. Interrog. Resp. No. 5.)  But the plaintiffs have failed to raise any genuine dispute that *any* of these users who initiated but did not complete an application were discouraged from exercising their Second Amendment rights, let alone

*all* of them.  Indeed, the plaintiffs have failed to identify a *single person* who claims to have initiated but abandoned an application because they were deterred by the HQL requirements.  Moreover, this raw data cannot be used to speculate as to why any particular application was not completed, which can occur for any number of reasons including because individuals often learn after they initiate an application that they are ineligible due to their age, immigration status, residency status, or criminal history; because individuals often create multiple accounts and initiate multiple applications due to a forgotten username or password or for testing purposes; and because there is no way to determine whether an applicant who initiated an application that has not yet been submitted as final intends to submit an application in the future.  (ECF 77-14, Col. Pallozzi Third Supp. Interrog. Resp. No. 5; Ex. 27, Tr. of Diane Armstrong Dep. at 113-15, 117, 124.)

Eighth, the plaintiffs contend that there is no evidence that the HQL requirement of the FSA has been effective in promoting public safety.  (ECF 77 (Pls.' Mem.) at 17-18.)  For a number of reasons discussed below at pages 24-25, this is plainly wrong.  A recently-published empirical, peer-reviewed study shows that since the FSA was enacted, there has been a dramatic, statistically significant reduction in a major indicator in the diversion of guns to criminals, and there has been a statistically significant reduction in the homicide rates in Maryland's major urban counties with the exception of Baltimore City, where the homicide rate rose steeply following the death of Freddie Gray and the ensuing unrest.  (ECF 59-19, Webster Decl. ¶¶ 17-19; Ex. 31, Webster Supp. Decl. ¶ 7.)

## II.   THE PLAINTIFFS HAVE FAILED TO RAISE A GENUINE DISPUTE OF FACT THAT THEY HAVE STANDING TO CHALLENGE THE HQL REQUIREMENT.

The plaintiffs have failed to establish that they have standing to challenge the HQL requirement.  As discussed in the defendants' opening memorandum (ECF 59-1 (Defs.' Mem.) at 12-14), neither of the individual plaintiffs nor any member of MSI has established that applying for an HQL would be futile.  The plaintiffs misplace reliance on First Amendment prior restraint cases to argue that they need not establish futility in order to challenge the license requirement.  *See Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013) (declining to apply First Amendment prior restraint doctrine in Second Amendment challenge).  Further, in *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), the regulation at issue made it "impossible" for the plaintiff to truthfully complete the application to purchase a firearm.  *Id.* at 500; *see also id.* at 502 ("[T]he Government cannot so easily avoid suit when it has erected a regulatory scheme that precludes Dearth from truthfully completing the application form the Government requires for the purchase of a firearm.").  Here, in contrast, the plaintiffs have put forth no evidence that it would be "impossible" for them to complete the application for an HQL.  Rather, the individual plaintiffs and identified MSI members either were unfamiliar with the requirements, simply did not wish to comply with them, or failed to research or seek any accommodation for their alleged disabilities.

Plaintiff Deborah Kay Miller testified that she believes she needs an HQL to use her husband's weapons to defend herself in the home, even though she has fired these same handguns at a firing range multiple times since the FSA was enacted and after this lawsuit

8

was filed.  (ECF 59-9, Tr. of Deborah Kay Miller Dep. at 15-17, 19, 22, 38.)  Despite being

able to afford the requirements to obtain an HQL, Ms. Miller has not even applied for one.

(*Id.* at 20-21, 25-26, 28.)  Nor has she sought any accommodation for the back problems

she claims have prevented her from undergoing the training, despite sitting for hours at

work each day; nor has she contacted even a single instructor to inquire as to whether she

will have to sit for the entirety of the instruction.  (*Id.* at 33-36.)  Plaintiff Susan Brancato

Vizas is exempt from the training requirement because she has taken hunter safety training

(ECF 14, Am. Compl. ¶ 16), yet identified only the cost of training as a potential deterrent

to obtaining an HQL.  (ECF 59-10, Tr. of Susan Brancato Vizas Dep. at 32, 43-45.)

MSI members Scott Miller and John Clark both testified that they can afford to

obtain an HQL, and Mr. Clark is exempt from the training requirement, but both simply

have chosen not to apply for a license.  (ECF 59-12, Tr. of Scott Miller Dep. at 9-10, 24;

ECF 59-13, Tr. of John Clark Dep. at 20-21.)  Indeed, Mr. Miller testified that he chose not

to take the HQL training course because "it just seemed silly to take a class just to prove

that you can operate a handgun" and, instead, has completed most of the more time-

consuming hunter safety training that will exempt him from the HQL training

requirement.[3]  (ECF 59-12, Tr. of S. Miller Dep. at 19-21.)  Mr. Clark testified that he was

discouraged from applying for an HQL because the Carroll County Sheriff's Office no

longer offered fingerprinting services.  (ECF 59-13, Tr. of Clark Dep. at 20.)  But he

---

[3] Mr. Miller's admission that he had time to take the 15-hour hunter safety training
and neglected to take the HQL training because he found it "silly," belies the plaintiffs'
claim that Mr. Miller was too busy to satisfy the HQL requirements.

9

admitted that he had not looked for another fingerprinting vendor since 2014.  (*Id.*)[4]  MSI

member Dana Hoffman testified that she has no knowledge of the HQL requirements,

failed to identify any desire to own a handgun for in-home self-defense citing only a desire

to possess a handgun to defend herself in public, and has not researched or sought any

accommodation for her purported inability to satisfy the live-fire requirement due to her

hearing disability.[5]  (ECF 59-14, Tr. of Dana Hoffman Dep. at 24-28, 32, 42-43.)

Further, MSI failed to respond to the defendants' argument that it does not have

representational standing due to the conflicting interests of its members who are qualified

handgun instructors and, thus, benefit from the HQL's training requirement. *See Maryland*

*Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1253 (4th Cir. 1991) (no

representational standing where some members benefitted from the challenged statute).[6]

---

[4] There are at least two State-licensed livescan fingerprint vendors located in Westminster, Maryland in Carroll County, near Mr. Clark's home (ECF 59-11, MSI Answers to Interrog 1).  *See* http://www.dpscs.state.md.us/publicservs/fingerprint.shtml.

[5] MSP permits the firing of alternative ammunition, which does not require presence at a firing range and is significantly quieter to shoot than traditional ammunition.  (ECF 59-7, A. Johnson Decl. ¶¶ 27-29.)  In any event, MSI does not have standing merely to challenge the statute as applied to Ms. Hoffman based on her alleged disability, because such a claim would "require[] individualized proof" and, thus, is not "properly resolved in a group context."  *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).  Moreover, Ms. Hoffman has not been denied an HQL based on her disability or sought any accommodation, making any such as-applied challenge not ripe for review.

[6] MSI merely argued in a footnote that *Maryland Highway Contractors Ass'n* is distinguishable because that case concerned only the organizational members' injuries to "business or property."  (ECF 77 (Pls.' Mem.) at 35-36 n.6.)  On the contrary, the case concerned allegations that the regulation at issue violated the organizational members' equal protection rights guaranteed by the Fourteenth Amendment. Further, MSI's reliance on *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008) is misplaced, because that case did not involve representational standing; rather, the "administrative burdens" were imposed on the organization itself and were significant enough to satisfy

The plaintiffs' suggestion that they have standing to bring their vagueness challenge also fails given that there is no immediate or credible threat of enforcement of the FSA to bar temporary possession of firearms either for emergent in-home self-defense or target practice. *See Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 759 (4th Cir. 2013) ("The hardship prong of our ripeness analysis is 'measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law.'" (citation omitted)).

MSI also has failed to establish organizational standing.  Aside from vague assertions about "the organization's abstract social interests," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 & n.21 (1982), MSI has failed to demonstrate a concrete injury to carrying out its mission.  *See MSI v. Hogan*, No. 18-cv-1700-JKB, slip op. at 8-9 (Dkt. 34) (D. Md. Nov. 16, 2018) (finding no organizational standing where "MSI disagrees with the police decisions of the Maryland Legislature . . . which are inconsistent with MSI's own policy objectives"); *Cf. Havens*, 455 U.S. at 379 (finding sufficient allegations of standing at motion to dismiss stage because direct services fair housing organization alleged it had to direct resources from its mission of counseling and referral services to identify and correct illegal steering practices).  The non-specific claims of MSI's president that the organization lost some unidentified number of unidentified members after the FSA was enacted are insufficient to establish standing and belied by the fact that MSI's

---

organizational standing.  MSI has not argued or produced any evidence that the HQL requirement imposes any administrative burdens on the organization itself.

membership has increased over 40 percent since this lawsuit was initiated.  (*Compare* ECF 14 (Am. Compl.) ¶ 25 (alleging MSI had "approximately 772 members statewide" at that time), *with* (ECF 77-2, Decl. of Mark Pennak ¶ 2 (MSI has "over 1,100 members, statewide").)  Nor does MSI's expenditure of funds to litigate this action establish standing, because "[a]n organization cannot . . . manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit."  *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).  Unlike the fair housing organization in *Havens* that had to shift resources from promoting its mission to investigating and correcting illegal housing practices, MSI identifies no such injury.  MSI's reliance on *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) is similarly misplaced, because there the city had standing to sue on behalf of its residents because it established that the city's fair housing agency was unable to perform its routine services because "it has to commit resources against those engaged in racial steering."

Aside from the self-serving statements of Atlantic Guns' owner, the plaintiffs have not produced a shred of evidence to support their claim that Atlantic Guns has turned away hundreds of customers since the HQL requirement was enacted.  (ECF 77 (Pls.' Mem.) at 3.)  Indeed, Atlantic Guns' owner could not identify a single customer that has been turned away or for whom deposits were held, despite that the plaintiffs' obligations to preserve relevant documentary evidence has been in effect since at least October 2016 when this litigation was commenced:

> [QUESTION:]  As Atlantic Guns' designee can you identify any potential customers of Atlantic Guns that have been deterred from

completing the HQL application process because of the expense and inconvenience of the HQL requirements?

[ANSWER:]    Are you asking me can I identify them by specific name?

[QUESTION:]  Correct.

[ANSWER:]    No, I cannot.

(ECF 59-15, Tr. of Stephen Schneider Dep. at 21-22.)

Moreover, any such conversations with these unidentified customers would be inadmissible hearsay and, thus, insufficient to defeat summary judgment. *Md. Highways Contractors Ass'n*, 933 F.2d at 1251. In any event, Atlantic Guns must demonstrate ongoing harm to establish standing for prospective injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Atlantic Guns' most recent annual sales of handguns are on par with sales during the time period before the undisputed spike in gun sales during 2012 and 2013. (ECF 84, Sealed Decl. of Stephen Schneider Ex. A.) Further, Atlantic Guns offered no evidence that the decline in sales in 2014 and 2015 was not the direct result of the massive increase in sales that Atlantic Guns enjoyed during 2012 and 2013. (*See id.* (showing 2013 sales of handguns were more than double those in 2011).) Finally, Atlantic Guns does not have standing to challenge the HQL requirement on behalf of its unidentified potential customers, because the market for Atlantic Guns' guns has not been restricted. Unlike government regulations that made it impossible or illegal for vendors to offer goods or services to any potential customer affected by the regulation, the HQL requirement does not prohibit Atlantic Guns from continuing to sell handguns to previous handgun purchasers or any new handgun purchasers, so long as they have a valid HQL.

13

III.   THE HQL REQUIREMENT DOES NOT VIOLATE THE SECOND
       AMENDMENT.

For the reasons discussed in the defendants' opening memorandum in support of

summary judgment, the HQL requirement easily withstands constitutional scrutiny,

because there is ample evidence in the record to support the legislature's judgment that

requiring handgun purchasers to submit fingerprints for a robust background check and

receive four hours of firearm safety training including safely firing one live round of

ammunition is reasonably adapted to the State's compelling interest in public safety.  In

response, the plaintiffs erroneously contend (1) that Maryland's requirement that handgun

purchasers satisfy reasonable conditions geared toward keeping guns out of the hands of

criminals and enhancing safe storage, handling, and operation of handguns is tantamount

to a complete ban on handgun possession like the law struck down in *District of Columbia*

*v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"); (2) that despite failing to identify any individual

who has been deterred from handgun possession by the actual requirements of the HQL

law, these requirements impose a severe burden on handgun possession and, thus, are

subject to strict scrutiny; and (3) that the reasonable requirements do not satisfy a

formulation of the intermediate scrutiny standard that has been rejected by the en banc

Fourth Circuit in the Second Amendment context.  For the reasons discussed below, all of

these contentions lack merit.


A.     The HQL Requirement Does Not Ban Any Law-Abiding Person
       from Possessing a Handgun for In-Home Self-Defense.

The plaintiffs erroneously contend that the HQL requirement effects a "ban" on

handgun possession, and, thus, that the law must be invalidated for the same reason the

14

District of Columbia's ban on handgun possession in the home was struck down in *Heller I.*  On the contrary, up through the first quarter of 2018, nearly 100,000 Marylanders have successfully obtained an HQL and, thus, may purchase, rent, or receive handguns within the State.  (*See* ECF 59-7, A. Johnson Decl. Ex. 1 at Bates MSP003292 (showing a total of 97,879 total active HQLs since October 1, 2013).)  In fact, although handgun sales in Maryland dipped in 2014 and 2015 after the undisputed spike in gun sales in 2012 and 2013 (*see* ECF 59-1 (Defs.' Mem.) at 15 n.5), Maryland experienced robust handgun sales in 2017.  (Ex. 28, Yearly Count of Firearm Transfers by Gun Type.)[7]  Similarly, plaintiff Atlantic Guns' handgun sales in 2016 and 2017 are on par with their handgun sales prior to 2012, before the law was enacted.  (*See* ECF 84-1, Schneider Sealed Decl, Ex. A.) Indeed, Plaintiff MSI tweeted earlier this year about the recent marked increase in firearms background checks that have occurred in Maryland, based on data compiled by the Federal Bureau of Investigation, showing thousands of handgun background checks each month. (Ex. 29, MSI Tweet, Apr. 5, 2018); *see also* https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state_type.pdf/view.

Further demonstrating the fallacy of their argument, the plaintiffs have failed to identify even a *single* law-abiding individual who has sought but failed to obtain an HQL

---

[7] Although the data in Exhibit 28 contains some discrepancies in coding as to the specific type of handgun that was transferred in 2014, 2015, and 2016, those discrepancies have no effect on the data for 2017 handgun transfers.  (Ex. 25, Tr. of A. Johnson Dep. at 149-50.) As of January 1, 2017, firearms transfer data is no longer entered manually from applications, but instead is taken directly from the newly-required digital application for firearm transfers.  (*Id.* at 159-60.)

and, thus, has been prevented from obtaining a handgun for in-home self-defense.  (*See, e.g.*, ECF 59-15, Tr. of Schneider Dep. at 21-22.)  Rather, the plaintiffs have identified only a handful of individuals who simply have chosen not to obtain an HQL, and none of those individuals has even attempted the process, researched the actual requirements, or sought accommodations where they believed them necessary.

Contrary to the plaintiffs' mischaracterization of these individuals' testimony, this choice not to obtain an HQL was not due to the impossibility of meeting the requirements, either because of cost or time or other alleged burdens, but rather because they simply do not wish to expend the time or money to comply with the requirements.  (*See* discussion above at pages 8-10.)  Atlantic Guns was unable to identify even a *single* customer who has been deterred from purchasing a handgun because of the HQL requirement.  (ECF 59-15, Tr. of Schneider Dep. at 21-22.)

Far from a ban on handgun possession, the HQL requirement is a reasonable regulatory requirement that made more robust the existing requirements for handgun purchases in Maryland and is geared toward enhancing public safety, a compelling State interest.  Tellingly, the plaintiffs do not cite a single case in which any court has held that a licensing law, like Maryland's HQL requirement, is tantamount to a ban on handgun possession.  The D.C. Circuit upheld the vast majority of the District's handgun registration law enacted in the wake of *Heller I*, including fingerprint and training requirements under intermediate scrutiny.  *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*").

Finally, as the plaintiffs concede, their argument that this Court should strike down the HQL requirement as a per se violation of the Second Amendment is foreclosed by the United States Court of Appeals for the Fourth Circuit's en banc decision in *Kolbe v. Hogan*, in which the Fourth Circuit applied intermediate scrutiny to Maryland's bans on assault weapons and large-capacity magazines, 849 F.3d 114, 130 (4th Cir.) (en banc), *cert. denied*, 138 S. Ct. 469 (2017) ("Even assuming the Second Amendment reaches [the banned] weapons and magazines, . . . the FSA is subject to — and readily survives—the intermediate scrutiny standard of review.").  (*See* ECF 77 (Pls.' Mem.) at 43-44 (arguing that the en banc Fourth Circuit in *Kolbe* "incorrectly applied" the Fourth Circuit's "two-part approach to evaluate a ban and should not be followed here.").)

> **B.   The HQL Requirement Does Not Impose a Severe Burden on the Second Amendment Right to Possess Firearms for In-Home Self-Defense.**

As described in the defendants' opening memorandum, under the Fourth Circuit's two-pronged approach to analyzing Second Amendment challenges, where a law burdens conduct falling within the scope of the Second Amendment's guarantee, the level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."  *Kolbe*, 849 F.3d at 132-33.

To the extent the plaintiffs have generated any genuine dispute that the HQL requirement burdens their exercise of their Second amendment rights, intermediate scrutiny is the applicable standard of review because the HQL requirement "does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding

responsible citizens to use arms for self-defense in the home." *Id.* at 138; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1257-58 (D.C. Cir. 2011) ("*Heller II*") (holding intermediate scrutiny was the appropriate standard of review to apply to the District's firearm registration law, which includes fingerprint and firearm safety training requirements); *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013), *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014) (explaining that "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right" and holding that New York's $350 firearm licensing fee "easily survives 'intermediate scrutiny'"); *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835, 845 (N.D. Ill. 2011) (applying a form of intermediate scrutiny to registration requirement that was "merely regulatory" and, thus, "[did] not place a categorical limit on [the plaintiff's] possession of firearms").

In response, the plaintiffs allege that the HQL process is time consuming, inconvenient, and expensive. (ECF 77 (Pls.' Mem.) at 44.) The plaintiffs' complaints arise merely from the existence of the requirements and their associated costs. Tellingly, however, neither individual plaintiff nor any identified member of MSI or customer of Atlantic Guns has claimed that he or she suffered any burden arising from (1) the time it took to complete or process an HQL application, (2) an inability to access a qualified handgun instructor or fingerprint vendor (both of which are accessible from links on MSP's

website)[8], (3) an ability to complete the online application, or (4) an inability to afford an HQL.[9]

Nevertheless, the plaintiffs argue, erroneously, that strict scrutiny is the proper standard in this case.  They rely entirely on prior dicta in Fourth Circuit cases that ultimately applied intermediate scrutiny, *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) and *Woollard v. Gallagher*, 712 F.3d 865, 878 (4th Cir. 2013).  Notably, the en banc Fourth Circuit expressly rejected this approach in *Kolbe*, explaining that "neither *Masciandaro* nor *Woollard* purported to, or had reason to, decide whether strict scrutiny always, or even ever, applies to laws burdening the right of self-defense in the home."  *Kolbe*, 849 F.3d at 133-34.  Like in *Kolbe*, intermediate scrutiny is the applicable standard of review.

### C.     The HQL Requirement Is Reasonably Adapted to the State's Compelling Interest in Public Safety.

In *Kolbe*, the Fourth Circuit set forth the intermediate scrutiny standard that applies in the Second Amendment context.  Under this "less onerous standard" the State must "show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471). Intermediate

---

[8] Qualified handgun instructors can be located by county and zip code at https://emdsp.mdsp.org/verification/.      Fingerprint providers can be located at http://www.dpscs.state.md.us/publicservs/fingerprint.shtml.

[9] Although MSI has qualified handgun instructors within its membership, the plaintiffs have not identified any instructor who has turned away an applicant because of an inability to pay or been asked to provide training at a reduced rate.  MSP Captain James Russell testified that he provides the HQL firearm safety training free of charge.  (Ex. 33, Tr. of James Russell Dep. at 85.)

scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Id.* (quoting *Masciandaro*, 638 F.3d at 474). "In other words, there must be 'a fit that is 'reasonable, not perfect.'" *Id.* (quoting *Woollard*, 712 F.3d at 878). A court's role is not to determine whether the legislature made the correct policy decision; rather, it is "to ensure that the legislature's policy choice substantially serves a significant governmental interest." *Woollard*, 712 F.3d at 881.

The Fourth Circuit's articulation of the intermediate scrutiny standard in *Kolbe* forecloses the plaintiffs' argument for a more onerous standard to be applied here. Indeed, the plaintiffs' argument that intermediate scrutiny requires that the law be "narrowly tailored" to the State's objectives (ECF 77 (Pls.' Mem.) at 46) was pressed repeatedly to the Fourth Circuit in *Kolbe*. *See Kolbe v. Hogan*, Appeal No. 14-1945 (4th Cir.), ECF 26 at 33, 2014 WL 5680384, at *46; ECF 61 at 14-15, 2015 WL 217266, at *14-15; ECF 66. The Fourth Circuit implicitly rejected that argument, articulating and applying the "less onerous standard" set forth above. *Kolbe*, 849 F.3d at 133. Yet, the plaintiffs simply ignore this binding Fourth Circuit precedent, misplacing reliance on First Amendment cases involving challenges to broad restrictions prohibiting speech in public fora that do not control in the Second Amendment context. *See Woollard*, 712 F.3d at 883 n.11 (declining to apply First Amendment prior restraint doctrine in Second Amendment challenge); *see also Silvester v. Becerra*, 138 S. Ct. 945, 948 (2018) (Thomas, J., dissenting from denial of cert.) ("[I]ntermediate scrutiny requires a 'reasonable fit' between the law's ends and means, *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993).").

Because the plaintiffs have failed to respond at all to the defendants' argument that the HQL requirements are reasonably adapted to the State's compelling interest in public safety, they have failed to raise any genuine dispute, and the defendants are entitled to summary judgment on that basis alone.

### 1. The HQL Requirement Was Enacted to Curb the Real and Devastating Effects of Gun Violence.

Having failed to engage in the proper intermediate scrutiny analysis, the plaintiffs suggest that the HQL law does not survive scrutiny because the HQL requirements "are non-answers to hypothetical problems" and that there is no evidence of the HQL's effectiveness.  They so argue despite the evidence in the record that (1) the HQL's implementing statute has been associated with a significant decrease in the diversion of guns to criminals in Maryland (ECF 59-19, Webster Decl. ¶ 18; Ex. 31, Webster Suppl. Decl. ¶ 7); (2) following the enactment of the HQL's implementing statute, the homicide rate in all major urban areas in Maryland decreased significantly with the exception of Baltimore City, which experienced a steep increase in violent crime due to the post-riot surge following the death of Freddie Gray and ensuring unrest (ECF 59-19, Webster Decl. ¶ 17); (3) empirical, peer-reviewed studies of other states' experiences with permit-to-purchase laws demonstrates that such laws are correlated with reductions in the diversion of guns to criminals and gun-related homicides (*id.* ¶¶ 14-16; Ex. 31, Webster Suppl. Decl. ¶¶ 11-12); (4) the HQL fingerprint requirement allows MSP routinely to identify individuals who are subsequently convicted of a disqualifying offense and revoke their HQLs (ECF 59-7, A. Johnson Decl. ¶¶ 22-23); (5) the State's law enforcement experts

21

testified that the in-person classroom training was a more effective vehicle for teaching firearm safety training, including proper storage and handling of a firearm, and, thus, would reduce access of firearms to prohibited persons including minors (ECF 59-21, J. Johnson Decl. ¶¶ 15-17; ECF 59-20, Russell Decl. ¶¶ 17-23, 26); and (6) the State's law enforcement experts, including the former chief of a major law enforcement agency who was aware of over one hundred accidental discharges of firearms in Maryland (Ex. 26, Tr. of J. Johnson Dep. at 105-06) and a firearms safety trainer who has spent thousands of hours providing firearms training, testified that the live-fire requirement was critical to firearm safety training and would reduce accidental discharges (ECF 59-21, J. Johnson Decl. ¶¶ 3-4, 14, 18; ECF 59-20, Russell Decl. ¶¶ 10-11, 13-15, 20, 24-25).

Ignoring this evidence, the plaintiffs argue that the State was precluded from enacting a more robust background check and training requirement than previously required under State law because of the inherent difficulty in tracking some of the public safety benefits the HQL requirement is designed to effect.  For example, the plaintiffs contend that because the State was unable to track the incidence of undetected straw purchases or use of false identification to purchase firearms that occurred before the HQL requirement was implemented, the legislature was acting to solve a problem that does not exist. (*See* ECF 77 (Pls.' Mem.) at 49-50.)  They argue the same for the utility of the training requirement in reducing the incidence of improper storage of firearms in the home and accidental discharges of firearms.  (*See* ECF 77 (Pls.' Mem.) at 51-52.)  In other words, the plaintiffs contend that the State cannot take common sense action to reduce the negative effects of firearms violence unless it can show how many undetected straw purchases of

firearms have occurred or how many gun owners improperly store handguns in their homes such that they are accessible to minors.  This is nonsense and not supported by any Second Amendment jurisprudence.  Moreover, this argument ignores that the HQL requirement merely made more robust the preventative measures the State was already taking to keep firearms out of the hands of criminals and promote safe storage and use of firearms in ways that social science and law enforcement experts believe will promote public safety and reduce the negative effects of accidental and intentional gun violence.  Further, there is ample evidence in the record to support the General Assembly's predictive judgment that requiring a fingerprint background check and more robust firearm safety training is reasonably adapted to the State's interest in public safety.

> ## 2.    The Record Evidence Demonstrates the Fingerprint Requirement Is Reasonably Adapted to Furthering the State's Interest in Public Safety.

As set forth in the defendants' opening memorandum, the fingerprint requirement has three primary benefits.  First, the fingerprint requirement enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information.  (ECF 59-1 (Defs.' Mem.) at 21-23.)   Accordingly, the fingerprint requirement "advance[s] public safety by preventing at least some ineligible individuals from obtaining weapons."  *Heller III*, 801 F.3d at 276-77 (upholding District's fingerprint requirement).  In response, the plaintiffs ignore the State's evidence and merely speculate, absent any expert testimony or other evidence, that "[b]ecause Maryland is now REAL ID Act compliant, there is no likelihood of false identification."  (ECF 77 (Pls.'

Mem.) at 49.)  This unsupported speculation fails to raise any genuine issue for trial to challenge the State's evidence, including expert testimony, that the more robust fingerprint-based background check reduces the likelihood that prohibited persons will gain access to firearms.  *See United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011) (fact finder may not draw inferences from evidence requiring expert testimony "through argument instead of specialized knowledge").

Second, as predicted, the fingerprint and other licensing requirements have had the effect of reducing straw purchases in Maryland, as demonstrated by an empirical, peer-reviewed study authored by Dr. Webster and his colleagues, which found that that since 2013 there has been a precipitous, statistically-significant decline in a key indicator of the diversion of guns to criminals through straw purchases.  (ECF 59-19, Webster Decl. ¶ 18; ECF 59-1 (Defs.' Mem.) at 23-24; Ex. 31, Webster Suppl. Decl. ¶ 7.)  Bolstering this conclusion are the results of a survey of probationers and parolees in Baltimore, 40 percent of whom reported that obtaining a handgun was more difficult after the FSA's enactment. (ECF 59-19, Webster Decl. ¶ 19; Ex. 31, Webster Suppl. Decl. ¶ 7.)

In response to these study findings, the plaintiffs offer no evidence to the contrary, and instead challenge the peer-reviewed methodology used by Dr. Webster and his colleagues through the declaration of their expert Gary Kleck.  Notably, Professor Kleck's criticisms of the use of firearm trace data as an indicator of straw purchases are not widely accepted, have not been published in any peer-reviewed journals, and have been discredited in a peer-reviewed article authored by the leading social science experts who study gun violence.  (Ex. 31, Webster Supp. Decl. ¶¶ 8-10.)  Moreover, as the Fourth Circuit has

24

made clear, it is the job of the legislature "to weigh conflicting evidence and make policy judgments," to which courts "must accord substantial deference . . . ." *Kolbe*, 849 F.3d at 140 (internal quotation marks and citations omitted). This Court's obligation is simply "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)). Legislatures may draw reasonable inferences from empirical, peer-reviewed, published research, like Professor Webster's published articles, about the potential effects of public policy. *See United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (explaining that the government may "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."). (Ex. 31, Webster Suppl. Decl. ¶ 10.)

The plaintiffs simply ignore Dr. Webster's findings that the HQL requirement is estimated to have led to drastically reduced firearm homicide rates in large urban counties in Maryland with the exception of Baltimore City, which experienced a steep rise in homicides following the death of Freddie Gray in police custody and the ensuing unrest, as is common following such events. (Ex. 19, Webster Decl. ¶ 17; Ex. 2 at 16.) And the plaintiffs' experts, relying on the increased homicide rate in Maryland, failed to account for justifiable homicides, homicides committed with long guns, or the effect of the events surrounding the death of Freddie Gray in any of their analyses (*see* Ex. 34, Tr. of Dep.

Carlisle Moody at 29-35), rendering their opinions on the effectiveness of the HQL requirement worthless.[10]

Third, the fingerprint requirement has enabled MSP to identify individuals who are subsequently convicted of disqualifying offenses and revoke their HQLs, an effect the plaintiffs' expert Gary Kleck agrees furthers the State's interest in public safety. (ECF 59-1 (Defs.' Mem.) at 24-25.)  Since the defendants filed their motion for summary judgment, DPSCS has improved its reporting of criminal history information to MSP and now sends a daily record of licensees who have been convicted of offenses that make them ineligible for an HQL.  (Ex. 30, Pickle Decl. ¶ 9.)  Prior to the HQL fingerprint requirement, no such routine reporting was made to MSP about the criminal history information of registered gun owners.  (*Id.* ¶¶ 10-12.)  As discussed above, the plaintiffs' arguments to the contrary mainly rely on distorting the evidence in the summary judgment record or pretending that the General Assembly had no basis on which to conclude that this additional, common sense measure to prevent gun violence would promote public safety.

---

[10] Plaintiffs' expert, Carlisle Moody, who opined that the increased homicide rate showed that the HQL was not effective in reducing firearms-related homicides was "not very" familiar with the events involving Freddie Gray, and had not controlled for those events or analyzed them in any way in forming his expert opinions.  (Ex. 34, Tr. of Moody Dep. at 33-35.)  Although Professor Moody claimed to have attempted to control for the "Ferguson effect" in Maryland, which he "presume[d] . . . was sufficient to control for the Freddie Gray incident" (*id.* at 35), he acknowledged that he did no analysis of firearm homicide rates in urban areas where there had been high-profile police killings of suspects during the study period (*id.* at 56-57).  Professor Moody's only source of information about the "Ferguson effect" was a Wikipedia article, which he "assumed" was accurate, but did not know who had authored the article and had not read any of the cited sources.  (*Id.* at 36-37.)  Professor Moody's opinions should be stricken for the reasons set forth in the Defendants' Motion to Strike.

Having failed to engage in any discussion of the proper intermediate scrutiny standard, the plaintiffs argue that the fingerprint background check and the requisite processing time to conduct the background check are not narrowly tailored to the State's interest in public safety. (*See* ECF 77 (Pls.' Mem.) at 29-30, 51-54.) Here again, they are wrong. As discussed above, the plaintiffs' own expert agreed that the ability of MSP to revoke HQLs from subsequently-disqualified individuals based on fingerprints advances the State's interest in public safety. (ECF 59-22, Tr. of Kleck Dep. 49.) There is no evidence in the record that MSP was able to accomplish this goal prior to the fingerprint requirement, nor is there any testimonial evidence in the record that there are less restrictive means to accomplishing this goal. The same is true with respect to reducing straw purchases, given that there is no evidence in the record that there is a less restrictive way to reduce the flow of guns to criminals than to require prospective purchasers of handguns to submit their fingerprints to law enforcement for a robust background check as part of a licensing requirement.

Because the fingerprint-based background check easily satisfies intermediate scrutiny, the processing period during which MSP conducts the background check also is constitutional. This processing time, which was enacted to allow MSP to conduct the more robust background check under the FSA and not as a waiting period to delay handgun purchases, is reasonably adapted to the State's interest in keeping handguns out of the hands of persons lawfully prohibited from possessing them and also is the least restrictive means of doing so. The time to complete processing varies depending on the time it takes to resolve any questions that arise during the background investigation, which can involve

awaiting information about out-of-state convictions and related court documents.  (ECF 59-7, A. Johnson Decl. ¶ 11.) There is no dispute that as soon as the background check is complete and the HQL is approved, the HQL is mailed within one to two days of the application's approval. (*Id.* ¶ 14.)

Moreover, contrary to how the plaintiffs attempt to frame the 30-day processing period, it is not a mandatory waiting period.  Although MSP does not track the average time it takes to process HQL applications, MSP records demonstrate that MSP personnel are routinely processing applications within 15 days of receipt by MSP.  (*Id.* ¶¶ 12-13 & Decl. Ex. 1.)[11]  The processing time, which is statutorily capped at 30 days and routinely completed in less than half that time, is a critical component to ensure that prohibited individuals do not gain possession of handguns.

### 3.    The Record Evidence Demonstrates the Firearm Safety Training and Live-Fire Requirements Are Reasonably Adapted to Furthering the State's Interest in Public Safety.

As the State's law enforcement experts testified, the classroom training and live-fire requirement are critical to training handgun purchasers on the proper storage, handling, and operation of firearms, and thus, will reduce accidental discharges and access of

---

[11] The plaintiffs complain that delays from State-certified fingerprint vendors or qualified handgun instructors may result in incomplete applications.  (ECF 77 (Pls.' Mem.) at 13.)  But because none of the plaintiffs actually has applied for an HQL, there can be no as-applied challenge contending that any particular delay in processing impeded anyone's Second Amendment rights in this case.  Moreover, Capt. Johnson testified that even where an application is submitted as incomplete, MSP works with the applicant to complete it and in most cases is able to process the application within 30 days of its initial incomplete submission.  (Ex. 25, Tr. of A. Johnson Dep. at 140-41.)

firearms to ineligible persons, including minors.  Tellingly, the plaintiffs do not argue that firearm safety training or the specific subject areas of the HQL training requirement do not further the State's interest in public safety.  Rather, the plaintiffs contend that the four-hour classroom training does not survive scrutiny because it is redundant of the prior 45-minute video training that was required under the handgun registration process.  But the plaintiffs cite no expert or other testimony to support this contention.  (*See* ECF 77 (Pls.' Mem.) at 17, 31, 51-52.)  The State, by contrast, has proffered the opinions of law enforcement experts that the prior 45-minute video training was wholly insufficient and that the classroom training is superior for a number of reasons.  The plaintiffs have, thus, failed to raise a genuine issue for trial that the HQL's training and live-fire requirement are reasonably adapted to the State's compelling interest in public safety.

Former chief Johnson testified, based on his 39 years of experience in law enforcement during which he received and conducted numerous trainings on firearm safety and worked closely with firearms safety trainers, that the classroom training is a significant improvement over the prior video training because "[p]roper training is done in a classroom setting with an instructor that involves hands-on experience and allows for dialogue between the instructor and the student, such that students can ask questions."  (ECF 59-21, J. Johnson Decl. ¶ 17.)  He further cited an "advantage of classroom training is that an instructor can verify that an individual attended the training, as opposed to watching a video, which cannot be verified" (*id.*) and opined, based on his years of working with firearm safety trainers, that "certified firearm safety trainers will responsibly verify that HQL applicants who have attended firearm safety training have complied with all of the

training requirements, including a demonstration of the safe operation and handling of a firearm" (*id.* ¶ 13).

Capt. Russell, who has spent thousands of hours over the last 13 years teaching firearms safety, similarly opined "that the HQL's live, in-person classroom training is more effective than the former training given by video because it provides the students an opportunity to ask questions and receive feedback from the instructor" and has opined that in his experience, "students tend to be more attentive in a classroom setting than they are watching a video.  A further benefit of the in-person training is that the instructor must verify that the student was present for and completed the course, whereas students watching a video may leave the room while the video is playing."  (ECF 59-20, Russell Decl. ¶ 26.) Capt. Russell who is familiar with the 45-minute video further opined that the four-hour classroom training is superior because it "provides more thorough instruction on State firearms law, handgun and firearm safety in the home, and handgun mechanisms and operation, and has a verification component such that an instructor verifies that an applicant participated in the training."  (*Id.* ¶¶ 22-23.)

Both Capt. Russell and former Chief Johnson also opined on the public safety benefits of the live-fire requirement.  Capt. Russell opined "that the addition of the requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon." (ECF 59-20, Russell Decl. ¶ 24.)  He "believe[s] that this is a significant step toward

ensuring responsible and safe gun ownership" and opined, based on his years of firearm safety training, "merely watching a video describing how to fire a handgun is not sufficient training on the safe handling and operation of a handgun." (*Id.* ¶ 25.)

Former Chief Johnson described his knowledge of and experience responding to "accidental discharges of handguns in Maryland, some of which were fatal . . . involving police officers and private citizens." (ECF 59-21, J. Johnson Decl. ¶ 14.) He recounted that "[m]any accidental discharges resulted from the individual pulling the trigger of a semiautomatic firearm without having realized that there was a round chambered in the weapon after the ejection of the magazine" and opined, based on his extensive law enforcement experience, "that the HQL training requirement that a person demonstrate the safe firing of one round of live ammunition can prevent such accidental discharges because it teaches the operation of the weapon including how to clear the weapon after firing." (*Id.*)

In response, as discussed above, the plaintiffs can only ignore, downplay, or mischaracterize these experts' testimony. The plaintiffs further suggest that the training requirement is ineffective and pretext for discrimination because the MSP does not mandate that firearm trainers use MSP's sample curriculum. Yet, the plaintiffs have come forward with no evidence to support their purported concern that qualified handgun instructors are not incorporating all of the required statutory and regulatory requirements into their lesson plans. On the contrary, former Chief Johnson testified based on his nearly 40 years of law enforcement experience that "certified firearm safety trainers will responsibly verify that HQL applicants who have attended firearm safety training have

complied with all of the training requirements, including a demonstration of the safe operation of handling of a firearm."  (*Id.* at ¶ 13.)

Finally, the plaintiffs also misplace reliance on *Heller III*, which did not strike down the District's training requirement, but rather found that the District had not presented sufficient evidence to justify the requirement that a handgun registrant "demonstrate satisfactorily, in accordance with a test prescribed by the Chief [of Police], a knowledge of the laws of the District of Columbia pertaining to firearms," D.C. Code Ann. § 7-2502.03, particularly because "only a few of the 15 questions in the test actually prescribed by the Chief plausibly reflect a concern with public safety." *Heller III*, 801 F.3d at 279 (holding only that the "test of legal knowledge" of the District's firearms laws was unconstitutional). Maryland law, by contrast, requires only that firearms safety training include classroom instruction on "State firearm law" among other subjects, Pub. Safety § 5-117.1(d)(3)(ii)(1), and does not require that applicants prove their knowledge of State law on subjects unrelated to public safety.  Further, unlike in *Heller III*, the State has presented expert testimony that training on State law is critical to public safety because of the provisions relating to firearm storage, firearm transport, and the prohibition on straw purchases, among others.

**D.    The State of Maryland Enacted the HQL Requirement Based on Substantial Evidence.**

As set forth above, there is substantial evidence in the record to support the General Assembly's predictive judgment that the HQL requirement is reasonably adapted to the State's compelling interest in public safety.  The plaintiffs, in failing to refute the

defendants' arguments under the proper intermediate scrutiny argument, mount no challenge to this assertion.  Instead, the plaintiffs ignore the universe of evidence and suggest wrongly that the General Assembly did not have substantial evidence before it when it enacted the FSA.  Again, this same argument was made to the Fourth Circuit in *Kolbe* and, again, the Fourth Circuit rejected it.  849 F.3d at 140 n.14 (rejecting the plaintiffs' contention that the State could not amass evidence in litigation, because "it was appropriate for the State to supplement [evidence in the legislative record] in these proceedings" (citing *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 357 (4th Cir. 2001) ("We may . . . look to evidence outside the legislative record in order to confirm the reasonableness of [the legislature's] predictions.")))

Moreover, as the Fourth Circuit also found in *Kolbe*, "there was ample evidence in the legislative record" to support the General Assembly's judgment in this case.  *Kolbe*, 849 F.3d at 140 n. 14 (relying on similar testimony before the General Assembly).  As described in the defendants' opening memorandum, the General Assembly received testimony from Dr. Webster, a lead academic researcher on gun policy who testified about empirical, peer-reviewed research of the effectiveness of permit-to-purchase laws in other states in reducing the negative effects of firearms violence, and also received testimony from leading law enforcement experts in the State, then-Chief Johnson and then-Chief of the Baltimore City Police Department Anthony Batts concerning how the HQL requirement in particular would further public safety.

For all of these reasons, the defendants are entitled to summary judgment.

IV.   THE TERMS "RECEIVE" AND "RECEIPT" ARE NOT VOID FOR VAGUENESS.

The plaintiffs' vagueness challenge must fail because the terms "receive" and "receipt" are clearly defined by the structure of the statute's text and the consistent interpretation of those terms by MSP, the agency responsible for administering the HQL law.

A.   The FSA's Use of "Receive" and "Transfer" as Flip Sides of the Same Transaction Makes Plain that "Receive" Is the Reciprocal End of a Permanent, Gratuitous Exchange.

As explained in the defendants' opening memorandum, the FSA uses the terms "transfer" and "receive" as the flip sides of the same transaction.  Section 5-117.1(b) addresses the transfer of handguns from the perspective of the transferor, and prohibits a transferor to "sell, rent, or transfer" a handgun to someone without an HQL.  Section 5-117.1(c) then addresses the transaction from the transferee side, forbidding an individual to "purchase, rent, or receive" a handgun without an HQL.  These provisions are mirror images of each other. "Sell" and "purchase" are two sides of a permanent transfer for consideration of ownership. "Rent" is used in both provisions to refer to both sides of a transaction that is defined by the statute as a "temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm." Md. Code Ann., Pub. Safety § 5-101(s).   "Transfer," as used in subsection (b), and "receive," as used in subsection (c), are two sides of the third and final type of transaction covered by the statute, a permanent, noncommercial transfer of a firearm.

34

That natural meaning is confirmed by context and controlling Maryland law. The Maryland Court of Appeals considered the scope of transfers governed by Maryland's regulated firearms laws—then covered in § 442 of the former Article 27 and subsequently recodified in subtitle 1 of Title 5 of the Public Safety Article—in *Chow v. State*, 393 Md. 431 (2006).  In *Chow*, the Court of Appeals specifically addressed the meaning of the term "transfer" as used in a statute making it unlawful for a person who is not a regulated gun owner to "sell, rent, transfer, or purchase any regulated firearm" without complying with the application process and waiting period. *Chow*, 393 Md. at 442 (quoting former art. 27, § 442(d)(1)).

In undertaking its analysis, the Court of Appeals observed that the word "transfer" can have different meanings in different contexts, and so it was required to "look to the context in which the word is used." *Id.* at 448.  The court therefore looked to the definitions of the other terms that were paired with "transfer" in the statute, including in provisions that addressed the sale or rental or firearms. *Id.* at 448-49. In those statutes, the court concluded, all of the terms used except "rent" contemplated a permanent exchange of title or possession of the firearm.  *Id.*  "Rent," by contrast, was (and still is) expressly defined in the statute to be "the temporary transfer of a regulated firearm for consideration where the firearm is taken from the firearm owner's property." *Id.*  Thus, the court concluded that the statute established three different types of transactions intended to be covered: (1) permanent commercial transfers, covered by the terms "sell" and "purchase"; (2) temporary commercial transfers where the firearm leaves the owner's property, covered by the defined term "rent"; and (3) permanent gratuitous transfers, covered by the term

35

"transfer."  *Id.* at 454-55.  Based on this analysis, the Court ultimately concluded that the prohibition on the "transfer" of a regulated firearm did not address a "*temporary* gratuitous exchange of a regulated firearm between persons legally permitted to possess firearms." *Id.* at 463 (emphasis in original).

The analysis in *Chow* is equally applicable to the use of the term "receive" in § 5-117.1(c).  As discussed above, the General Assembly used "receive" and "transfer" to address two sides of the same transaction—the permanent, gratuitous transfer of ownership of a regulated firearm.  The plaintiffs ignore the analysis in *Chow* and argue that the words "transfer" and "receive" cannot possibly refer to the same transaction because, outside of the context of the legislation at issue, they are capable of different definitions.  In so doing, the plaintiffs ignore the general principle of statutory construction that "'[t]he meaning of the plainest language is controlled by the context in which it appears.'"  *Brown v. State*, 454 Md. 546, 551 (2017) (citation omitted).  Thus, regardless of whether the term "receive" standing alone could refer to temporary possession, the plaintiffs would have this Court simply ignore that in the FSA the General Assembly paired the term "receive" in § 5-117.1(c) with the term "transfer" in § 5-117.1(b), which term had already been defined by the Court of Appeals as a permanent exchange.  *See Macke Co. v. State Dept. of Assessments and Taxation*, 264 Md. 121, 132-33 (1972) (when the General Assembly legislates in light of a prior judicial construction without disturbing that construction, the General Assembly "is deemed to have acquiesced in the prior judicial interpretation as expressing the legislative intent").

Moreover, the plaintiffs illustrate the unreasonableness of their argument by claiming that interpreting "receipt" to cover temporary possession, as they purport to do, would be inconsistent with the "live fire" requirement, because if someone is not permitted to possess temporarily a handgun without first obtaining an HQL, they would never be able to complete the training necessary to obtain the HQL.  (ECF 77 (Pls.' Mem.) at 59.)  And yet, as noted above, nearly 100,000 Marylanders have applied successfully for an HQL since 2013.  It is a "well-established canon[] of statutory construction" that "a statute must be given 'a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.'"  *Smith v. State*, 425 Md. 292, 299 (2012) (citation omitted). That "principle applies even when the statute is ambiguous." *Id.*

An additional reason the terms "receive" and "receipt" cannot reasonably be construed as broadly as plaintiffs proffer is that they would render superfluous all of the other statutory terms defining the transactions that are covered by the regulated firearms laws. If, as the plaintiffs posit, "receive" and "receipt" cover any exchange of physical possession of a firearm—regardless of whether the exchange is temporary or permanent and whether it is for consideration—they would necessarily also cover any sale, purchase, rental, or other transfer of a firearm, rendering those terms superfluous. Statutes must be read so as not to render superfluous any of their terms. *Chow*, 393 Md. at 442.

### B.     The State Has Consistently Interpreted the Terms at Issue to Refer to a Permanent, Gratuitous Exchange.

In their opening memorandum, the defendants presented testimonial and documentary evidence that since the FSA was enacted in 2013, the Office of the Attorney

37

General of Maryland and MSP have interpreted the terms "receive" and "receipt" to be synonymous with the term "transfer" as previously defined by the Court of Appeals in *Chow*.  (ECF 59-7, A. Johnson Decl. ¶¶ 25-26 & Decl. Ex. 7.)  Contrary to the plaintiffs' contention, this interpretation was not developed merely to defend this litigation.  Indeed, since 2013, MSP has published a Frequently Asked Question on its HQL webpage, making clear that a person does not need an HQL to fire at a gun range, but instead that an HQL is "only required to purchase, rent or transfer a firearm."  (Ex. 32, Decl. of William Rasinski ¶¶ 5-6.)[12]  MSP has since published a formal advisory of its interpretation.  As the Fourth Circuit has instructed, federal courts "must 'consider any limiting construction that a state court or enforcement agency has proffered'" before finding a statute's terms vague.  *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1983)).  Thus, to the extent the statute's use of the terms "receive" and "transfer" to reference the flip sides of the same transaction has left any ambiguity as to the scope of the term "receive," the State's consistent interpretation of the terms "transfer" and "receive" to be synonymous resolves any ambiguity.

The plaintiffs contend, erroneously, that because MSP has not codified its interpretation of "receive" and "receipt" to by synonymous with "transfer" in a regulation it has no effect.  In *Kolbe*, however, the Fourth Circuit expressly relied on an MSP advisory setting forth the definition of the term "copy" to find that the term was not void for

---

[12] The "Handgun Qualification License" FAQ can be found on MSP's public website, *see* https://mdsp.maryland.gov/Pages/FAQs.aspx (last visited, Oct. 31, 2018).  For ease of reference, a pdf of the public webpage is attached as Exhibit 35.

vagueness.  *Kolbe*, 849 F.3d at 148-49.  Here, too, MSP's formal advisory demonstrates that the terms "receive" and "receipt" have been clearly defined by MSP, the agency responsible for implementing the HQL requirement, and, thus, are not vague.

Finally, the plaintiffs erroneously argue that, despite MSP's clear interpretation of the terms "receive" and "receipt," they are void for vagueness based on the plaintiffs' unsupported speculation that a rogue prosecutor in the State may seek to enforce the statute in a way that is not compatible with how the terms have been interpreted by MSP.  But State prosecutors were independent constitutional officers at the time *Kolbe* was decided, and the Fourth Circuit relied on MSP's definition of a copy to find that the criminal prohibition at issue was not vague.  Moreover, the wholly speculative risk that the statute may be enforced in a way that is incompatible with its structure and MSP's interpretation of it is properly "the subject of an as-applied challenge." *United States v. Williams*, 553 U.S. 285, 302-03 (2008); *see also Vill. of Hoffman Estates*, 455 U.S. at 504 (explaining that even where "it is possible that specific future applications . . . may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise" (quoting *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 52 (1966)); *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) ("Nullification of a law in the abstract involves a far more aggressive use of judicial power than striking down a discrete and particularized application of it."); *MSI v. Hogan*, 18-cv-1700-JKB, slip op. at 25-27.  "A difference of opinion amongst judges or law enforcement does not make a statute unconstitutionally vague." *Martin*, 700 F.3d at 137.

For all of these reasons, the defendants are entitled to summary judgment.

## V.   THE CHALLENGED MSP REGULATIONS AND PROCESSES ARE ENTIRELY CONSISTENT WITH THE LANGUAGE AND PURPOSE OF THE FSA.

As discussed in the defendants' opening memorandum, courts accord substantial deference to regulatory action taken pursuant to an agency's statutory authority, with their review "limited to assessing whether the agency was acting within its legal boundaries." *Medstar Health v. Maryland Health Care Comm'n*, 376 Md. 1, 20-21 (2003) (citation omitted).   Courts examining regulations adopted under Maryland law are generally required to "defer to the agencies' decisions," especially with respect to "agencies working in the area of health and safety.  *Id.* at 21 (citation omitted). Thus, Maryland courts have "upheld [an] agency's rules and regulations as long as they did not contradict the language or purpose of the statute." *Id.* (quoting *Christ by Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427, 437 (1994)).  In response to the defendants' motion for summary judgment and in support of their own, the plaintiffs argue that three of the Secretary's regulatory actions are not authorized by law.  For the reasons that follow, these arguments all fail.

### A.   The Live-Fire Requirement Does Not Contradict the Language or Purpose of the Statute.

As explained in the defendants' opening memorandum, the plaintiffs' challenge to the regulatory requirement of "a practice component in which the applicant safely fires at least one round of live ammunition," COMAR 29.03.01.29(C)(4), must fail, because there is no plausible reading of the FSA's requirement that an applicant "demonstrate[] the . . . safe *operation* . . . of a firearm," Pub. Safety § 5-117.1(d)(3)(iii) (emphasis added), that is contradicted by the regulation's practice component.  Without offering any reading of the statute's text to the contrary, the plaintiffs rely on inadmissible lay opinions, resort to

distorting the FSA's legislative history, and argue that the live-fire requirement is inconvenient and, thus, should be struck down.

First, the plaintiffs improperly rely on the opinions offered by MSI President Mark Pennak that, based on his experience as a firearms instructor, the live-fire requirement is not necessary to show demonstration of the safe handling of a firearm. (ECF 77 (Pls.' Mem.) at 64 (relying on ECF 77-2, Pennak Decl. ¶¶ 7-11).) Mr. Pennak was never identified as an expert witness in this case and his opinions, which are based on his specialized knowledge as a firearm safety trainer, cannot be offered as opinion testimony of a lay witness in this case. Fed. R. Civ. P. 701 (opinion law testimony may not be "based on scientific, technical, or other specialized knowledge"); *United States v. Johnson*, 617 F.3d 286, 292-93 (4th Cir. 2010) (reiterating that "Rule 701 forbids the admission of expert testimony dressed in law witness clothing" and rejecting purported lay opinion testimony based on police officer's "credentials and training" (citation omitted)). In any event, Mr. Pennak's opinion that a live-fire requirement is not necessary to demonstrate orientation and safe handling of a firearm is wholly irrelevant, because it has nothing to do with whether the live-fire requirement contradicts the language or purpose of the statute. Nor can his lay opinion override the Secretary's judgment as to what is required to demonstrate safe handling of a firearm, a judgment that courts must accord substantial deference. *Medstar Health*, 376 Md. at 20-21.

Second, the plaintiffs misrepresent the legislative record in this case. They falsely contend that the General Assembly intended to exclude any live-fire requirement from the firearm safety training through its adoption of an amendment that omitted prior language

in the bill that would have required a demonstration of firearm "proficiency." (*See* ECF 77 (Pls.' Mem.) at 65.)[13]  In reality, the discussion of the amendment's adoption, which the plaintiffs cite and thus ostensibly have listened to, is limited to the concerns expressed by the amendment's sponsor that requiring a showing of "proficiency" would be no different than the proficiency training required for law enforcement personnel and, thus, would require applicants to shoot a full course of fire and score at least 70 percent or better.[14] There is no evidence in the legislative record that the General Assembly, by amending the statute to require "a firearms orientation component that *demonstrates the person's safe operation and handling of a firearm*," Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) (emphases added), intended to exclude a less onerous live-fire component from the training requirement.

Finally, the plaintiffs' contention that the alleged inconvenience of the live-fire requirement renders it ultra vires has no merit.  This argument, which is nothing but a retread of the plaintiffs' Second Amendment argument, must fail because it has nothing to do with the statute's text or purpose.  In addition, this argument relies on the plaintiffs' inaccurate assertion that the live-fire requirement can only be satisfied at a firing range, which is not the case given MSP's approval of the use of alternative ammunition.  (ECF

---

[13] The amendment replaced the requirement of "a firearms qualification component that demonstrates the proficiency and use of the firearm" with "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm."  (Ex. 37, 2013 Laws of Md. ch. 427 at 28.)

[14] The House of Delegates audio for April 2, 2013, Session 2, is available at http://mgaleg.maryland.gov/webmga/frmlegislation.aspx?id=2013rs_house_audio&stab=02&pid=legisnlist&tab=subject3&ys=2013rs

59-7, A. Johnson Decl. ¶ 7.) [15]   Moreover, to bring a challenge under Maryland's Administrative Procedure Act, the plaintiffs must demonstrate "that the regulation or its threatened application interferes with or impairs or threatens to interfere with or impair a legal right or privilege of the petitioner."  Md. Code Ann., State Gov't § 10-125.  Here, neither individual plaintiff has testified that she cannot access a firing range.  Indeed, Ms. Vizas is exempt from the training requirement, and Ms. Miller testified that she has fired her husband's handguns at a nearby firing range on several occasions.  (Ex. 59-9, Tr. of D. Miller Dep. at 14, 30, 44.)  Neither MSI nor Atlantic Guns has identified any member or customer, respectively, who has complained that their "access to a shooting range is highly limited or non-existent."

## B. The Secretary Properly Submits Fingerprints to DPSCS Through Delegation to Local Law Enforcement and State-Certified Fingerprint Vendors.

The plaintiffs do not respond to the defendants' argument that the FSA does not *require* MSP to offer fingerprinting services as part of the HQL application process, and, thus, they have abandoned the issue.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [the defendant's]

---

[15] Mr. Pennak's opinion, based on his specialized knowledge of simunition rounds, that the use of alternative ammunition approved by MSP does not alleviate the alleged inconvenience of the live-fire requirement is not admissible as opinion law testimony and must be stricken for the reasons discussed above and set forth in the defendants' motion to strike portions of Mr. Pennak's declaration.  Moreover, Mr. Pennak cites only the local ordinances of Baltimore City, Montgomery County, and Prince George's County as requiring that alternative ammunition be fired at a range.  Neither of the individual plaintiffs in this case resides in any of these jurisdictions.

argument" in dispositive motion, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff's failure to address in opposition brief an argument raised in defendant's opening brief constitutes abandonment of claim).   Accordingly, the defendants are entitled to summary judgment on the only claims in Count III of the plaintiffs' amended complaint concerning the fingerprint requirement (*see* ECF 14 ¶ 78 (alleging that MSP "has chosen not to" provide background check and fingerprinting services, even though MSP "is not precluded by Section 5-117.1 from providing such services"); *id.* ¶ 80(d) ("nothing in [§ 5-117.1(f)(3)(i)] *requires* the Maryland State Police to accept only those fingerprints obtained through a State-certified live-scan vendor or refusing to provide fingerprinting services at Maryland State Police facilities" (emphasis added)).

Now, for the first time at summary judgment, the plaintiffs make a new allegation that the Secretary has acted ultra vires because he does not physically "submit" an applicant's fingerprint record to DPSCS for the criminal background check, but instead submits the records through local law enforcement or State-certified fingerprint vendors. (ECF 77 (Pls.' Mem.) at 67-68.)  As an initial matter, "it is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." (quoting *Gilmour v. Gates, McDonald & Co.*, 382

44

F.3d 1312, 1315 (11th Cir. 2004))).[16]  In any event, the plaintiffs' newly-raised claim is meritless.

Section § 5-117.1(f)(2) of the Public Safety Article directs the Secretary to apply to the Criminal Justice Information System Central Repository of DPSCS ("Central Repository") for a background check of each HQL applicant.  As part of that background check, the statute provides that "the Secretary shall submit to the Central Repository . . . a complete set of the applicant's legible fingerprints taken in a format approved by the Director of the Central Repository[.]"  Md. Code Ann., Pub. Safety § 5-117.1(f)(3)(iii).  As explained in the Defendants' opening memorandum, DPSCS issued rules governing fingerprinting in 2012 that require the submission of electronic fingerprint records.  (ECF 59-7, A. Johnson Decl. Ex. 5.)  Various local law enforcement agencies offer fingerprinting services to the public.  *See* http://www.dpscs.state.md.us/publicservs/fingerprint.shtml.  In addition, DPSCS licenses private entities to provide electronic fingerprint services for non-criminal justice purposes, *see id.*, and has promulgated regulations that govern these entities, *see* COMAR 12.15.05.01–.10.  Far from acting ultra vires, the record shows that the Secretary complies with his statutory duties by submitting, through law enforcement or State-certified livescan vendors, a complete set of each applicant's fingerprints to the Central Repository taken in a format approved by DPSCS.

---

[16] In his responses to the plaintiffs' interrogatories, Col. Pallozzi explained that "MSP does not receive or disseminate fingerprints in connection with HQL applications." (Ex. 38, Col. Pallozzi's Answer to Interrog. No. 14.)

Nevertheless, the plaintiffs mistakenly contend that the Secretary rather than local law enforcement entities or State-certified livescan vendors must physically "submit" the applicants' fingerprints to the Central Repository.  The plaintiffs simply misunderstand Maryland administrative law.  In Maryland, the general rule is that delegation of an officer or agency's statutory duty does not pose a concern when the duty delegated is ministerial or administrative, rather than discretionary.  "When the duty includes purely ministerial tasks and the statute is silent on how they are to be performed, the express power to perform the duty carries with it the implied authority to delegate the ministerial tasks."  100 Md. Op. Att'y Gen. 29 (2015), 2015 WL 2222495 at *14; *see also* 88 Md. Op. Att'y Gen. 25, 32 (2003) ("[T]hese limitations on delegation do not mean that an agency may not delegate administrative duties that are ministerial in nature. . . . Express statutory authority is not required for the delegation of such authority, and legislative intent to permit delegation within an agency may be inferred."); *120 West Fayette St. LLP v. Mayor & City Council*, 413 Md. 309, 349 (2010) ("'The rule is plain and well established that legislative or discretionary powers or trust devolved by law or charter on a council or governing body cannot be delegated to others, but ministerial or administrative functions may be delegated to subordinate officials.'" (citing *Baltimore v. Wollman*, 123 Md. 310, 315 (1914))). Accordingly, the Secretary has not acted ultra vires merely because he does not himself perform the ministerial task of submitting fingerprint records to DPSCS, which is required in every case and involves no discretionary judgment.

Finally, although the plaintiffs allege that the use of private vendors leads to small administrative fees and purported inconvenience, they have failed to demonstrate that the

Secretary's actions "interferes with or impairs or threatens to interfere with or impair a legal right or privilege of the petitioner."  Md. Code Ann., State Gov't § 10-125.  As discussed above, the plaintiffs have abandoned any claim that MSP is required by statute to provide fingerprinting services and has never alleged that the statute requires these services be provided free of any administrative fee. Thus, the plaintiffs have made no showing that they would not be subjected to the same administrative fees and alleged inconvenience were the Secretary himself to submit the fingerprint records to the Central Repository. Moreover, neither individual plaintiff nor any identified member of MSI or customer of Atlantic Guns has provided any evidence that they lack access to a State-certified fingerprint vendor.

> **C.** **MSP's Requirement that Qualified Handgun Instructors Who Have a Certification Issued by a Nationally Recognized Firearms Organization Receive a Certificate from MSP and Use MSP's Automated System Does Not Contradict the Language or Purpose of the Statute.**

The plaintiffs' third argument that the Secretary has acted ultra vires by requiring all qualified handgun instructors to be certified by MSP also is without merit.  Under § 5-101(q) of the Public Safety Article, a qualified handgun instructor means a certified instructor who "(1) is recognized by the Maryland Police and Correctional Training commissions; (2) has a qualified handgun instructor license issued by the Secretary; or (3) has a certification issued by a nationally recognized firearms organization."  Md. Code Ann., Pub. Safety § 5-101(q)(1)-(3).  The plaintiffs argue that the Secretary has "effectively do[ne] away with Section 5-101(q)(3) instructors as a separate category of instructors"

(ECF 77 (Pls.' Mem.) at 68) by  requiring that these instructors obtain certification from MSP and "establish their own on-line accounts with the State Police" through which they verify that an applicant completed the required firearm safety training.  (ECF 77-2, Pennak Decl. ¶ 10.)  Again, the amended complaint does not contain any hint of this allegation, despite that Mr. Pennak, upon whose testimony the plaintiffs rely, was a qualified handgun instructor at the time the amended complaint was filed.

In any event, the plaintiffs fail to explain how merely requiring that all qualified handgun instructors become certified by MSP, such that MSP is able to ensure an applicant's training certification is legitimate and use the same electronic application process across all applications, contradicts the FSA's language or purpose.  The plaintiffs also ignore that MSP has different processes for the category of qualified handgun instructors who have certifications from a nationally recognized firearms organization (§ 5-101(q)(3)), and the category of instructors who obtain a qualified handgun instructor license from MSP (§ 5-101(q)(2)).   Under the latter category, an instructor who does not have certification from a nationally-recognized firearms organization must submit an application to MSP for a "Qualified Handgun Instructor License."[17]  These applicants must provide proof of their "formal training in the care, safety, and use of handguns, including a minimum qualification score of 80 percent on a practical police course" and proof of a

---

[17] MSP's public website contains a "Qualified Handgun Instructor" FAQ that contains all of the information described above, *see* https://mdsp.maryland.gov/Pages/FAQs.aspx (last visited, Oct. 31, 2018).  For ease of reference, a pdf of the public webpage is attached as Exhibit 36.

"minimum of 1 year of experience in instruction in the care, safety, and use of handguns."

A Qualified Handgun Instructor License must be renewed every four years.

In contrast, instructors with certifications from a nationally recognized firearms organization need not apply to MSP for a license.  Rather, they need only provide a valid copy of the NRA or other certification card to MSP to receive a "Qualified Handgun Instructor Certificate."  This certificate expires on the date the NRA or other certification expires.  Tellingly, the plaintiffs have not alleged that NRA-certified instructors, such as Mr. Pennak, have to do anything other than simply submit to MSP their NRA credentials and their identifying information to complete this process.  The plaintiffs have failed to demonstrate how the Secretary has contradicted the language or purpose of the statutory definition of a qualified handgun instructor merely by requiring that instructors with NRA credentials submit proof of their certification and establish and use an account through MSP's online system.

For all of these reasons, the defendants are entitled to summary judgment.

———————————————————

## DEFENDANTS' RESPONSE MEMORANDUM IN OPPOSITION TO THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

———————————————————

## INTRODUCTION

The vast majority of the arguments and points raised in the plaintiffs' memorandum in support of their cross-motion for summary judgment are repetitive of arguments and points raised in their opposition to the defendants' motion for summary judgment, and have thus been addressed above. Those passages of the discussion above are incorporated by reference here. The issue raised only with respect to the plaintiffs' cross-motion is addressed below.

### THE HQL REQUIREMENT WAS ENACTED TO FURTHER THE STATE'S COMPELLING INTEREST IN PUBLIC SAFETY.

In their memorandum in support of their cross-motion for summary judgment, the plaintiffs erroneously contend that the HQL requirement was enacted merely as a ruse to deter law-abiding citizens from exercising their Second Amendment rights, despite record evidence that the legislature received the testimony of social science and public safety experts advocating for the HQL requirement because of its potential to enhance public safety.  As discussed above, the plaintiffs can point to no evidence in the summary judgment record to support their claim and, instead, mischaracterize the deposition testimony of the State's expert Daniel Webster that the fingerprint requirement is "intimidating" to potential straw purchasers.  The plaintiffs also point to comments made by a former Attorney General of Maryland in 1999, prior to the Supreme Court's decision

in *Heller I*, yet fail to explain how these statements have anything to do with the intent of the 106 legislators who voted for the FSA and then-Governor Martin O'Malley who signed the bill into law nearly 15 years later in 2013.

Moreover, the plaintiffs' focus on the alleged intent of the legislature misunderstands the nature of this Court's inquiry under the standards established by the Fourth Circuit.  Under a proper application of the Fourth Circuit's two-pronged framework for analyzing Second Amendment challenges, this Court does not attempt to divine the intent of the legislature in passing firearms laws (and certainly not based on unrelated comments from non-legislators).  Rather, this Court's function is to assess the degree of burden on the Second Amendment right, and here, because any burden is not severe, to assess whether substantial evidence supports the legislature's predictive judgment that the regulations are reasonably adapted to promoting public safety.  *Kolbe*, 849 F.3d at 133.  In so doing, it is not this Court's role to "second-guess[]" the "judgment made by the General Assembly of Maryland," because "[i]t is the legislature's job . . . to weigh conflicting evidence and make policy judgments." *Id.* at 140 (citations omitted; alteration in original).  As discussed in the defendants' opening memorandum (ECF 59-1 at 21-30) and above at pages 24-33, contrary to the plaintiffs' unsupported claims, the evidentiary record amply supports the legislature's judgment in this case.

Unable to counter this record evidence with evidence to the contrary, the plaintiffs mischaracterize and misrepresent testimony about the effectiveness of the HQL requirements and other evidence in the record to falsely contend that the State enacted the HQL requirement merely to act as a deterrent to law-abiding citizens.  These arguments,

which focus on the fingerprint-based background check and firearm safety training, are addressed above at pages 24-33.

Finally, the plaintiffs contend that the General Assembly's intent to impede Second Amendment rights rather than promote public safety can be divined from the Act's exemptions from the HQL training component for persons who currently own registered firearms or have passed hunter safety training.  The opposite is true.  Were the General Assembly intending to make it more difficult for law-abiding Marylanders to purchase handguns, it simply would have required that all Marylanders take an additional training course.  That the General Assembly exempted certain individuals who had already undergone some form of training from the requirement demonstrates that the State was attempting to use the least restrictive means to achieve its compelling end of promoting public safety by enacting a more robust firearm safety training requirement.  Moreover, the legislature need not aim to "strike at all evils at the same time"; rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."  *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (citations and internal quotation marks omitted).

For these reasons, there is no genuine dispute that the State enacted the FSA, including the HQL requirement, to further the State's compelling interest in public safety.

**CONCLUSION**

The Court should grant the defendants' motion for summary judgment, deny the plaintiffs' cross-motion for summary judgment, and enter judgment in favor of the defendants as to all counts of the amended complaint.

                              Respectfully Submitted,

                              BRIAN E. FROSH
                              Attorney General

                                /s/ Jennifer L. Katz
                              JENNIFER L. KATZ (Fed. Bar #28973)
                              ROBERT A. SCOTT (Fed. Bar #24613)
                              Assistant Attorneys General
                              200 St. Paul Place, 20th Floor
                              Baltimore, Maryland 21202
                              410-576-7005 (tel.); 410-576-6955 (fax)
                              jkatz@oag.state.md.us

Dated: November 16, 2018      Attorneys for Defendants

**TABLE OF EXHIBITS TO**
**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT AND RESPONSE TO OPPOSITION TO PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**Exhibit No.  Title**

24.     Excerpts of deposition transcript of Daniel Webster

25.     Excerpts of deposition transcript of Andy Johnson

26.     Excerpts of deposition transcript of James Johnson

27.     Excerpts of deposition transcript of Diane Armstrong

28.     Yearly Count of Firearm Transfer by Gun Type

29.     MSI Tweet, April 5, 2018

30.     Declaration of First Sergeant Donald Pickle

31.     Supplemental Declaration of Daniel Webster

32.     Declaration of Corporal William Rasinski

33.     Excerpts of deposition transcript of Captain James Russell

34.     Excepts of deposition transcript of Carlisle Moody

35.     Maryland State Police, "Handgun Qualification License" FAQ

36.     Maryland State Police, "Qualified Handgun Instructor" FAQ

37.     The Firearm Safety Act of 2013, Chapter 427 of the 2013 Laws of Maryland

38.     Col. William M. Pallozzi Answers to Interrogatories

39.     Supplemental Declaration of Angela Maggitti