# EXHIBIT 31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,    *

     *Plaintiffs,*            *

     v.                  *        Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.*,      *

     *Defendants.*        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## SUPPLEMENTAL DECLARATION OF DANIEL W. WEBSTER

I, Daniel W. Webster, under penalty of perjury, declare and state:

1.      I am Professor of Health Policy and Management, Co-Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health.  I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.      I previously submitted an expert declaration in this case, dated August 15, 2018, in support of the Defendants' motion for summary judgment (ECF 59-19).

3.      I have reviewed the Plaintiffs' memorandum of law in support of their cross-motion for summary judgment and in opposition to the Defendants' motion for summary judgment (ECF 77) and the expert declarations submitted by Gary Kleck (ECF 77-24) and Carlisle Moody (ECF 77-23).  I submit this supplemental declaration to specifically address

certain instances where Plaintiffs or their experts have misconstrued my work or my testimony in this case.

4.     First, Plaintiffs have cited my testimony as authority for their claim that the State of Maryland enacted the Handgun Qualification License requirement in order to intimidate law-abiding Marylanders from exercising their Second Amendment rights, by taking my deposition testimony out of context.  In that testimony, Plaintiffs' counsel began by questioning me about my peer-reviewed research on the public safety benefits of permit-to-purchase requirements, such as Maryland's HQL requirement, specifically about the importance of applying to law enforcement for such a permit.  My answer discussed the effect of the application to law enforcement on firearm marketplaces, and as I stated in my deposition testimony, "in the context of straw purchase where someone, usually, not always, but usually a prohibited person is asking someone, in essence, to stick their neck out to purchase a gun for them, that going into a less than reputable gun shop or alternatively going to different private sales venues, might be gun shows or other similar kind of situations through online, that that appears to be and probably, frankly, is a relatively risk-free thing to do.  And I think that going directly to law enforcement when a prohibited person is asking someone to buy a gun for them, it likely causes hesitancy to do so."  (Defs.' Ex. 24, Tr. of Daniel Webster Dep. at 30-31.)  It was in this context of discussing permit-to-purchase laws on deterring straw purchases that I stated that the relevance of applying to law enforcement might be "intimidating."  (*Id.*)  Evidence that permit-to-purchase laws, such as Maryland's HQL requirement, reduce the diversion of guns for criminal use has been a central finding of my peer-reviewed research that I detail

in my expert report in this case. (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 6-14.)

5.     To be clear, although my research and that of my peers has found that permit-to-purchase laws may act as a deterrent to straw purchases because of the intimidating factor of having to apply to law enforcement for a permit, and in the case of Maryland submit fingerprints through a State-certified vendor to a law enforcement agency, I do not have personal knowledge of PTP laws generally or the HQL requirement specifically acting as a deterrent to law-abiding citizens who wish to exercise their Second Amendment rights.  Nor am I familiar with any published research on that topic.

6.     Second, the plaintiffs cited to my testimony for the misleading proposition that the HQL requirement has not enhanced the Maryland State Police's ability to identify disqualified persons who own registered firearms.  I understand from evidence in this case that the fingerprint records submitted as part of the HQL application process are routinely used to generate reports when fingerprint records of HQL holders are implicated in subsequent arrests for potentially disqualifying offenses.  These fingerprint reports allow MSP personnel to track the disposition of these arrests and revoke a person's HQL upon conviction of a disqualifying offense.  In my deposition testimony, I accurately answered in the affirmative Plaintiffs' counsel's question as to whether "the Maryland State Police has a registry of handgun ownership such that, if I were to be convicted of a disqualifying offense, they could readily look me up, determine if I owned a handgun, and dispossess me of that handgun; correct?"  (Tr. of Webster Dep. at 19-20.)  This query assumes, however, that the Maryland State Police has received information that an owner of a registered

firearm has been convicted of a disqualifying crime. Based on my gun policy research in the State of Maryland, I am aware that there is no such routine reporting of individuals convicted of all disqualifying offenses from local law enforcement agencies to the Maryland State Police. In contrast, the reports routinely generated based on the fingerprint records allow the Maryland State Police to track arrests without having to rely on reporting from local law enforcement.

7.      Third, Plaintiffs contend that there has been no showing that the HQL requirement has had any impact on illegal behaviors such as straw purchases in Maryland, despite clear evidence to the contrary described in my expert report. Since the enactment of the FSA, there has been a 76 percent reduction in the number of handguns recovered by Baltimore Police Department within 12 months or less from retail sale by someone other than the legal purchaser of the gun. The widespread consensus among leading researchers who study gun trafficking is that the number of firearms recovered within a year of retail sale from a possessor who was not the retail purchaser of record is a reliable indicator of firearm diversion through straw purchases. My research team's survey data showing that 40 percent of surveyed probationers and parolees in Baltimore reported that it is harder to acquire a handgun since the enactment of the FSA further bolsters this conclusion. Aggregate crime gun trace data for Maryland also shows a reduction in the share of all crime guns with retail sale to crime intervals that are 12 months or less and that a smaller percentage of guns used in crime in Maryland were originally sold by Maryland retail sellers.

8.     Plaintiffs' expert Gary Kleck in his expert declaration makes a number of misleading, unsupported criticisms of this peer-reviewed study and other peer-reviewed studies in which I was the lead or senior author.  Professor Kleck first criticizes my and my colleagues' use of firearms trace data based on the Bureau of Alcohol, Tobacco, Firearms and Explosives' disclaimer that the firearms trace data that it generates is not a representative sample of crime guns.  Although it is not possible to verify one way or another whether recovered, traced firearms are a representative sample of firearms used by criminals, this data has been widely used for years by scientific researchers to study the effects of gun policy on the supply of crime guns.  More broadly, volumes of research on crime are based on police reported incidents and arrests.  These data may not reflect all criminal behavior because not all behavior is recorded by police, yet invaluable lessons have been learned from data from police records. In contrast, Professor Kleck's suggestion that because crime gun data may not reflect the universe of gun crime then the data can tell us nothing about the effectiveness of gun policy on the diversion of guns to criminals is not widely accepted among the scientific community.

9.     Professor Kleck next relies on his law review article in which he criticizes the use of gun trace data by scientific researchers in peer-reviewed journals.  Professor Kleck's criticism has been roundly debunked by the leading experts in gun policy research in a peer-reviewed journal article that I discussed in my expert report.  (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 6-7.)

10.     Further, Professor Kleck's opinion that "the most direct measure of firearms availability among people willing to kill is the percent of homicides committed with guns"

5

(ECF 77-24, Kleck Decl. ¶ 9) is not based on any peer-reviewed research.  In cities with longstanding problems with gangs and serious violence, a large share of homicides have always been committed with firearms. His use of this metric to determine whether the HQL requirement has affected gun availability to criminals is also flawed because it fails to account for the surge in gun violence that occurred in Baltimore City immediately following the in-custody death of Freddie Gray and the riots that were prompted by this death. Both Professor Kleck's opinion and the opinion of Plaintiffs' other expert Carlisle Moody regarding the impact of the FSA on the homicide rate in Maryland are highly flawed because neither of them took into account the effect of riots following the death of Freddie Gray on the number of homicides in Baltimore City.  They neglected to account for this historical event despite that it is well-documented that riots and civic unrest are often followed by sharp increases in violent crime.  (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 16.)  Their failure to account for this significant event renders their analysis on the homicide rate following the enactment of the FSA fatally flawed.

11.     Professor Kleck's criticisms of the synthetic control method for estimating the impacts of public policies also are flawed. Synthetic control methods are widely used in studies of crime in recent years by researchers who understand how the selection of inappropriate controls in non-experimental studies can bias estimates of an intervention's (e.g., a gun law) effects when key determinants of crime are not systematically measured. We demonstrate in our peer-reviewed study that the synthetic control model we use very accurately predicts Connecticut's homicide rate trends during the decade preceding the adoption of the PTP law.  It is only after the PTP law has been in place for a few years that

Connecticut's trends depart dramatically lower from the counterfactual prediction from the synthetic control.  Kleck argues that some other policies that we do not control for in our analyses might explain this dramatic decline in homicide rates in Connecticut following its adoption of a PTP law, but offers no specific data or even a compelling theory as to what that missing factor or policy was that led to the dramatic reduction in homicides in Connecticut from 1996 through 2005. He also does not explain why the synthetic control model works to predict Connecticut's homicide trends so well before the state introduced its PTP law, but the forecasted synthetic control trend is so starkly different than Connecticut's homicide trends after the law was in place.  Kleck has long argued that gun laws do not affect gun violence and it is interesting that his explanation for our findings is that we did not control for other gun laws.

12.     Professor Kleck argues that research on the impact of Missouri's repeal of its PTP law does not demonstrate that Missouri's increase in firearm homicide rates are unique within the region, yet I demonstrate very clearly in my prior declaration that Missouri's per capita increase in firearm homicides from 1999-2006 vs. 2008-2016 was higher than any other US state other than Delaware.  Kleck claims that Nebraska and Ohio experienced larger increases in firearm homicide rates than did Missouri, yet compared with the per capita increase in Missouri between these two periods (+1.41), was less than half as large as in Nebraska (+0.67) and one fifth as large as in Iowa (+0.24).  Furthermore, a recent paper I co-authored with two statisticians at the University of Pennsylvania accepted for publication in the journal *Epidemiology* demonstrated with additional data and two additional analytic methods found a clear and statistically significant increase in

7

firearm homicide rates in Missouri associated with its PTP law repeal of the approximate magnitude that we estimated in my 2014 study.

13.     I have also read the Plaintiffs' motion to strike portions of my expert declaration in this case (ECF 79).  In it they criticize my reliance on the studies of the effects of permit-to-purchase laws in Connecticut (after enactment) and Missouri (after repeal) on the ground that the permit-to-purchase laws in those states are not identical to Maryland's HQL requirement.  Critically, although there are variations in the requirements across the states, the permit-to-purchase laws in Maryland, Connecticut, and formerly in Missouri all share the most important component of such laws, which is that in order to purchase a handgun, the purchaser first was required to apply to a law enforcement agency for a permit or a license.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _Nov. 9, 2018_            _____

                                                Daniel W. Webster

8