# EXHIBIT 3

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MARYLAND
 3
 4   -------------------------------x
     MARYLAND SHALL ISSUE, INC.,
 5
     et al.,
 6
                     Plaintiffs,
 7
      v.                                Civil Case No.
 8
     LAWRENCE HOGAN, et al.,            16-cv-3311-MJG
 9
                     Defendants.
10   -------------------------------x
11
12
13            Deposition of GARY KLECK
14               Baltimore, Maryland
15                 May 18, 2018
16                  10:02 a.m.
17
18
19
20   Job No.:  190812
21   Pages:   1 - 52
22   Transcribed by:  Bobbi J. Fisher, RPR
```

1    Q.   Have you done any study or analysis to
2    determine if the training required by the Maryland
3    HQL law has reduced the number of accidental
4    shootings in Maryland?
5    A.   No.
6    Q.   Are you aware of any such studies?
7    A.   No.
8    Q.   Are you aware of any empirical facts or
9    data that show whether the training required by the
10   Maryland HQL law has reduced the number of
11   accidental shootings in Maryland?
12   A.   No.
13   Q.   So in light of that testimony, you would
14   agree that you don't know one way or the other
15   whether the training required by Maryland's HQL law
16   has reduced accidental shootings in Maryland?
17        MR. SWEENEY:  Objection.
18   A.   That's correct.  I don't know one way or
19   the other.
20   Q.   Do you have an understanding of whether a
21   background check was required under Maryland and/or
22   federal law prior to the enactment of the HQL law?

1      A.   Yes.  My understanding was that it was
2  such a requirement.
3      Q.   And do you know what the prior background
4  check consisted of?
5      A.   I'm not sure I understand.  What do you
6  mean "consisted of"?  You mean who was prohibited
7  or --
8      Q.   No, no, no.
9           What background check was conducted?
10     A.   Well, the federal procedure that
11 prevailed before the HQL was implemented was that
12 you would go to the seller and identify yourself
13 and provide suitable identification and they would,
14 in turn, contact a law enforcement database and a
15 background check would be performed, and if you
16 passed, the sale would go through, and if you were
17 denied, it would, at least for a time, the sale
18 would not go through.
19     Q.   Do you have any understanding of whether
20 there is a difference between the background check
21 that was conducted prior -- in Maryland -- prior to
22 the HQL law and the background check that's

1  required under the HQL law?
2     A.  I'm not aware of any difference.
3     Q.  Did the background check that was in
4  effect prior to the HQL require that the --
5     A.  Hold on; can I revise that answer?
6     Q.  Yes.
7     A.  My understanding is that, under the HQL,
8  the background check also applies to private
9  transfers of firearms; in other words, non-dealer
10 transfers, whereas, at least the federal background
11 check that prevailed before the HQL only covered
12 dealer transfers.
13    Q.  Do you have an understanding of whether
14 the -- whether Maryland law required a background
15 check or private sales of handguns prior to the HQL
16 law?
17    A.  I don't think it did, but I'm not certain
18 about that.
19    Q.  Did the background check that was
20 required by Maryland law prior to the HQL law
21 require that the applicant be fingerprinted?
22    A.  I don't know.

Transcript of Gary Kleck
Conducted on May 18, 2018                                23

```
 1         Q.   You would agree that the purpose of
 2   requiring a background check prior to the purchase
 3   of a handgun is to prevent certain individuals who
 4   were not qualified to own handguns from acquiring
 5   them; is that correct?
 6              MR. SWEENEY:  Objection.
 7         A.   Yes.
 8         Q.   And you would agree that, under federal
 9   law and Maryland law, that certain persons are
10   prohibited from purchasing a handgun; correct?
11         A.   Yes.
12         Q.   And that includes convicted felons;
13   correct?
14         A.   Yes.
15         Q.   And includes individuals convicted of
16   certain misdemeanors involving violence; correct?
17         A.   Yes.
18         Q.   And it includes persons who have been
19   adjudicated mentally defective or who have been
20   committed to a mental institution; correct?
21         A.   Yes.
22         Q.   And it includes persons who are habitual
```

Transcript of Gary Kleck
Conducted on May 18, 2018

24

```
 1   drunkards or alcoholics; correct?
 2        A.   Yes.
 3        Q.   Have you done any study or analysis to
 4   determine if the requirement under Maryland's HQL
 5   law, that an applicant be fingerprinted, has
 6   reduced the number of handguns possessed by
 7   convicted felons in Maryland?
 8        A.   No.
 9        Q.   Are you aware of any such study?
10        A.   No.
11        Q.   Are you aware of any empirical facts or
12   data that show whether the requirement under
13   Maryland's HQL law, that an applicant be
14   fingerprinted, has reduced the number of handguns
15   possessed by convicted felons in Maryland?
16        A.   No.
17        Q.   So in light of that testimony, you would
18   agree that you don't know one way or the other
19   whether the requirement under Maryland's HQL law,
20   that an applicant be fingerprinted, has reduced the
21   number of handguns possessed by convicted felons in
22   Maryland?
```

1                MR. SWEENEY:  Objection.
2        A.   Yes.
3        Q.   Have you done any study or analysis to
4    determine if the requirement under Maryland's HQL,
5    that an applicant be fingerprinted, has reduced the
6    number of handguns possessed by persons in Maryland
7    who are not qualified to possess handguns under
8    federal or state law?
9        A.   No, I have not done such study, and I
10   don't know of anyone else who has.
11       Q.   Are you aware of any empirical facts or
12   data that show whether the requirement under
13   Maryland's HQL law, that an applicant be
14   fingerprinted, has reduced the number of handguns
15   possessed by persons in Maryland who are not
16   qualified to possess handguns under federal or
17   state law?
18       A.   No.
19       Q.   In light of that testimony, you would
20   agree that you don't know one way or the other
21   whether the requirement under Maryland's HQL law,
22   that an applicant be fingerprinted, has reduced the

1 number of handguns possessed by persons in Maryland
2 who are not qualified to possess handguns under
3 federal or state law?
4     MR. SWEENEY: Objection.
5   A. Yes.
6   Q. Are you familiar with the term "straw
7 purchaser" of a handgun?
8   A. Yes.
9   Q. Have you done any study or analysis to
10 determine -- well, strike that.
11     What does that term mean to you?
12   A. A straw purchaser is a person who is
13 legally eligible to buy a gun, and they represent
14 themselves to the seller as if they were the true
15 purchaser when, in fact, they are fronting for
16 someone else who is providing the money for the
17 purchase and who is presumably not qualified;
18 otherwise, they'd have no motive for doing it,
19 although that's not technically part of the
20 definition.
21   Q. Have you done any study or analysis to
22 determine if the requirement under Maryland's HQL

1  law, that an applicant be fingerprinted, has
2  reduced the number of straw purchases of handguns
3  in Maryland?
4      A.   No.
5      Q.   Are you aware of any empirical facts or
6  data that show whether the requirement under
7  Maryland's HQL law, that an applicant be
8  fingerprinted, has reduced the number of straw
9  purchases of handguns in Maryland?
10     A.   No.
11     Q.   In light of that testimony, you would
12 agree that you don't know one way or the other
13 whether the requirement under Maryland's HQL law,
14 that an applicant be fingerprinted, has reduced the
15 number of straw purchases of handguns in Maryland?
16          MR. SWEENEY:  Objection.
17     A.   Yes.
18     Q.   Have you done any study or analysis to
19 determine if the training required by Maryland's
20 HQL law has had any effect on compliance with
21 Maryland law regulating the storage of handguns in
22 the home?

1      A.   No.
2      Q.   Are you aware of any empirical facts or
3  data that show whether the training required by
4  Maryland's HQL law has had any effect on compliance
5  with Maryland law regulating the storage of
6  handguns in the home?
7      A.   No.
8      Q.   In light of your testimony, you would
9  agree that you don't know one way or the other
10 whether the training required by Maryland's HQL has
11 enhanced compliance with Maryland law, regulating
12 the storage of handguns in the home?
13         MR. SWEENEY:  Objection.
14     A.   Yes.
15     Q.   Have you done any study or analysis to
16 determine if the enactment of Maryland's HQL law
17 has reduced the amount of gun crime in Maryland?
18     A.   Could you repeat that question, please?
19         MR. SCOTT:  Could you read it back,
20 please?
21         COURT REPORTER:  I cannot.
22         MR. SCOTT:  Oh, okay.

```
1   BY MR. SCOTT:
2       Q.   Have you done any study or analysis to
3   determine if the enactment of Maryland's HQL law
4   has reduced the amount of gun crime in Maryland?
5       A.   No.
6       Q.   Are you aware of any such studies?
7       A.   I'm aware of Professor Webster's studies
8   where he attempted to do that, but I don't think
9   there's any reliable findings yielded by that
10  research.
11      Q.   Are you aware of any other such studies?
12      A.   No.
13      Q.   Are you aware of any empirical facts or
14  data that show whether the enactment of Maryland's
15  HQL law has reduced the amount of gun crime in
16  Maryland?
17      A.   Again, the answer would be the same,
18  given that homicide is one kind of crime, and so,
19  yes, I mean, Webster's attempted to evaluate that,
20  and I don't think it yielded any reliable
21  information.
22      Q.   All right.  So other than Professor
```

```
 1   Webster's study, you're not aware of any empirical
 2   facts or data that show whether the enactment of
 3   Maryland's HQL law has reduced the amount of gun
 4   crime in Maryland?
 5        A.   When I refer to Professor Webster's
 6   research, I'm referring to three studies, not just
 7   one study, and I would include, for example, the
 8   Kerfazi (ph), et al., the "et al." including
 9   Webster has one of the authors.
10        Q.   All right.  So other than those -- the
11   three studies involving Professor Webster, you're
12   not aware of any empirical facts or data that show
13   whether the enactment of Maryland's HQL law has
14   reduced gun crime in Maryland?
15             MR. SWEENEY:  Objection.
16        A.   Yes.
17        Q.   And in light of your testimony, you would
18   you don't know one way or the other whether the
19   enactment of Maryland's HQL law has reduced the
20   amount of gun crime in Maryland; correct?
21             MR. SWEENEY:  Objection.
22        A.   Yes.
```

```
 1         Q.   Have you done any study or analysis to
 2   determine if the enactment of Maryland's HQL law
 3   has reduced the number of suicides by handguns in
 4   Maryland?
 5         A.   No.
 6         Q.   Are you aware of any such studies?
 7         A.   No.
 8         Q.   Are you aware of any empirical facts or
 9   data that show whether the enactment of Maryland's
10   HQL law has reduced the number of suicides by
11   handguns in Maryland?
12         A.   No.
13         Q.   And in light of that testimony, you would
14   agree that you don't know one way or the other
15   whether the enactment of Maryland's HQL law has
16   reduced the number of suicides by handguns in
17   Maryland?
18              MR. SWEENEY:  Objection.
19         Q.   Is that correct?
20         A.   Yes.
21         Q.   All right.  In your report, which is
22   Exhibit 118, you discuss Professor Webster's
```

```
 1   don't know what it indicates.
 2        Q.   Are you -- do you have any legal
 3   training?
 4        A.   No.
 5        Q.   Let's refer to your C.V., which is
 6   included in the report.  It was previously marked
 7   as Exhibit 118.  I believe your C.V. begins on page
 8   46.
 9             I notice that you have a separate section
10   under publications under C.V. for articles in
11   peer-reviewed journals.  That starts on page 49.
12   Is that correct?
13        A.   Yes.
14        Q.   And what is the significance of an
15   article being peer reviewed?
16        A.   When an author submits an article to a
17   professional journal, the journal will send it out
18   to people who are hopefully experts on the same
19   topic, and they'll make an evaluation and a
20   recommendation as to whether or not it ought to be
21   published.
22             So it serves as a screening purpose.  The
```

Transcript of Gary Kleck
Conducted on May 18, 2018

36

1  purpose is, at least theoretically, to preclude the
2  worst research from being published.
3       Q.   Are peer-reviewed articles likely -- are
4  peer-reviewed articles more likely to be accepted
5  as valid by a researcher's colleagues than
6  non-peer-reviewed articles?
7       A.   Yes.  Rightly or wrongly, that's true.
8       Q.   Your report references an article that
9  you published in 2009 called "The Myth of Big-time
10 Gun Trafficking" in the "UCLA Law Review" with
11 Shun-Yung Wang; is that correct?
12      A.   Yes.
13      Q.   Was that article peer reviewed?
14      A.   I'm not sure.  Law reviews typically
15 don't have peer review, but on occasion, they do,
16 and it's possible they did in that case.  I really
17 don't remember.
18      Q.   But you would agree that articles in law
19 reviews are typically not peer reviewed?
20      A.   That is correct.
21      Q.   You also list a 2013 article in your C.V.
22 that was published in the Fordham Urban Law

Transcript of Gary Kleck
Conducted on May 18, 2018          37

```
 1   Journal.  Was that article peer reviewed?
 2        A.   No.  I mean, it's misplaced and it
 3   probably should have been in the other articles
 4   section.
 5        Q.   What about the 1999 article in the
 6   St. Louis University Law Review?  Was that peer
 7   reviewed?
 8        A.   I'm not sure about that one.
 9        Q.   When were you first contacted about this
10   case?
11        A.   Oh, I couldn't really tell you for sure
12   but sometime in the past year or so.
13        Q.   And who contacted you initially?
14        A.   I think it might have been Jay -- Jay --
15   it's John's law firm, but I forget the guy's last
16   name.
17        Q.   So it was somebody at Mr. Sweeney's firm?
18        A.   It was.
19        Q.   Other than the documents that you
20   provided in response to the subpoena today, were
21   you provided with any factual information about
22   this case from anybody in Mr. Sweeney's firm?
```