IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) Case No. 16-cv-3311-ELH |
| | ) |
| LAWRENCE HOGAN, et al., | ) |
| | ) |
| **Defendants.** | ) |

**Plaintiffs' Opposition to Defendants' Motion to Strike Opinions of
Lay Witness Mark Pennak and Experts Carlisle Moody and Gary Kleck**

This Court should deny Defendants' Motion to Strike Opinions of Plaintiffs' Lay Witness Mark Pennak and Experts Gary Kleck and Carlisle Moody ("Motion"). (Doc. 91-1.) Mr. Pennak's testimony is admissible under Federal Rule of Evidence 701 as the opinion of a lay witness because it is derived from his personal observation and is not based on specialized or technical knowledge. Testimony from Professors Moody and Kleck is admissible under Federal Rule of Evidence 702 because it satisfies the requirements of Rule 702 as interpreted in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Defendants' arguments in support of striking the expert witnesses are geared more toward the weight of the evidence and not the admissibility of the evidence as a threshold issue before the Court. Because testimony from all three is admissible, Defendants' Motion should be denied.

**I.  Mr. Pennak may offer lay witness testimony under Rule 701 because his opinion is derived from firsthand observation and is not based on specialized knowledge, skill, or experience.**

Mr. Pennak's testimony satisfies Rule 701, which permits a lay witness to give opinion testimony that is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based

1

on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See also Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017). According to *Lord & Taylor*, "the key to Rule 701 lay opinion testimony is that it must arise from the personal knowledge or firsthand perception of the witness." *Id*. As a result, the test for determining admissibility of lay witness testimony is simply whether the Court may reasonably conclude that the lay witness's testimony is "predicated on his previous experience." *Id*. at 576 (citation omitted); *see also United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (noting that "second-hand information" lacks "the foundational personal perception needed under Rule 701").

Defendants argue that Mr. Pennak's testimony should be struck because he was not designated as an expert under Rule 702 but nonetheless seeks to offer "specialized knowledge of firearm safety training" and other so-called "expert" opinions. (Doc. 91-1 at 1–4.) The entirety of Mr. Pennak's testimony is based on his firsthand experience and is permissible lay testimony under Rule 701.

Defendants first take issue with Mr. Pennak's opinion that there is no value to the live-fire component of Maryland's Handgun License Requirement. (Doc. 91-1 at 3.) According to Mr. Pennak, "[f]iring one live round accomplishes no training objective at all," (*Id.* at 7, ¶ 9)—a point with which one of Defendants' experts agrees, (Doc. 79-2 at 14–15 (Well, personally, I think just firing one round is not adequate.")) Mr. Pennak is qualified to opine on this issue because he is a State Police-certified handgun instructor for both the Handgun Qualification License and wear-and-carry permits. (Doc. 77-2 at 6, ¶ 7.) Defendants do not dispute that Mr. Pennak is a certified handgun instructor or that he has given handgun qualification instruction on "numerous occasions" in his capacity with both the Maryland State Police and the National Rifle Association. (*Id.*; *see also id*. at 8, ¶ 10.) Mr. Pennak's opinion that firing live rounds of ammunition should only be

done on a "properly constructed range" is also a product of his extensive experience as a handgun instructor. (*Compare* Doc. 91-1 at 3 *with* Doc. 77-2 at 9, ¶ 11.) And Mr. Pennak has sufficient firsthand experience through his time at the Drug Enforcement Administration Academy to know when and how simunition rounds may be properly used under certain circumstances. (*Compare* Doc. 91-1 at 3 *with* Doc. 77-2 at 9–10, ¶¶ 12–13.)

In addition to the nature of Mr. Pennak's testimony, Defendants argue that they "had no opportunity to cross-examine Mr. Pennak on his credentials, training, or experience, or the reliability or relevance of his opinions." (Doc. 91-1 at 3–4.) But Mr. Pennak made himself available to be deposed during discovery, and Defendants wholly failed to probe the bases for his opinions and the firsthand experiences that inform them. MSI had provided detailed interrogatory responses (signed by Mr. Pennak), attached as Exhibit 1, and Mr. Pennak personally testified on the legislation that adopted the Handgun License Requirement, attached as Exhibit 2.  His written and oral testimony has been available to Defendants since 2013 as part of the bill file on that legislation. Mr. Pennak also personally drafted, signed and submitted MSI's Comments to the Maryland State Police in which some of these topics (e.g., the live-fire requirement and the vagueness of "receive" and "receipt") are discussed extensively (Doc. 77-2, Exh. A at 11, 15-19) and those Comments are specifically referenced in the Amended Complaint (Doc. 13, ¶¶ 55,7 6). Defendants have possessed those Comments also since 2013.  In short, Defendants had ample notice of Mr. Pennak's lay opinions and Plaintiffs' intent to rely upon them in this case.  That Defendants failed to question Mr. Pennak about these issues does not make his testimony inadmissible under Rule 701.

Because Mr. Pennak's testimony is based on firsthand experiences and not scientific, technical, or otherwise specialized knowledge, it is admissible under Rule 701. Defendants' Motion should be denied.

**II. Professors Moody and Kleck may offer expert witness testimony under Rule 702 because their opinions satisfy the requirements for expert testimony announced in *Daubert*.**

Professors Moody and Kleck are qualified as expert witnesses under Rule 702. The Rule permits expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Because *Daubert* "did not work a 'seachange over federal evidence law,' . . . 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Id*. (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Defendants' arguments in support of its Motion go primarily to the weight that Professors Moody's and Kleck's opinions should be afforded and not whether the opinions are admissible at all. Defendants' Motion should be denied.

**A. Professor Moody's testimony is based on sufficient facts and data derived from reliable methodology applied to the facts of this case.**

Defendants argue that Professor Moody's testimony is unreliable because he failed to consider alternate causes in support of his opinion that Maryland's Handgun License Requirement was not effective in reducing the rate of firearms-related homicide. (Doc. 91-1 at 4.) Defendants' principal claim is that Professor Moody failed to account for the effect of the death of Freddie

4

Gray in his analysis and that he relied on sources that Defendants deem to be less than reputable when forming his opinions. (Doc. 91-1 at 5.) But even if Defendants are correct, and they are not, Professor Moody's supposed failure to conduct his research as Defendants would does not by itself impugn the quality of his statistical findings. *See Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017) (holding that a disagreement with an expert's otherwise reliable methodology is no basis for excluding expert testimony under Rule 702). Nor is Professor Moody's opinion undermined by the fact that it may conflict with the testimony of Defendants' expert. The purported pitfalls that Defendants have identified go to the weight and probativeness of Professor Moody's testimony, not its admissibility. *See Bazemore v. Friday*, 478 U.S. 385, 399–400 (1986) (per curiam) (Brennan, J., joined by all other Members of the Court, concurring).

Professor Moody's testimony is based on abundant, indeed redundant, reliable data that examined the issues he was addressing from a number of different perspectives, and is admissible under Rule 702. Professor Moody used four different statistical methods to evaluate Maryland's Handgun License Requirement. (Doc. 77-23 at 2, ¶ 4.) Through these statistical exercises, Professor Moody determined that permit-to-purchase laws like Maryland's Handgun License Requirement have no statistically significant impact on the rate of firearm homicide. (Doc. 77-23 at 5, ¶ 10; 6, ¶ 13; 8 ¶ 15.) His research ranged in technique from comparing Maryland to states in close geographical proximity, (Doc. 77-23 at 5–6); to simulating synthetic circumstances, (Doc. 77-23 at 3–5); to comparing Maryland with other states that have passed permit-to-purchase laws, (Doc. 77-23 at 6–7). It can hardly be said that Professor Moody's research would be inadmissible even if he had failed to account for one instance of local unrest in his analysis. *See Bazemore*, 478 U.S. at 399–400.

Defendants have not advised the Court, however, that Professor Moody's research evaluates the time period beginning after the Handgun License Requirement took effect in 2013, which included data from before the 2015 death of Freddie Gray. (*See* Doc. 77-23 at 2, ¶ 5; 3, ¶ 7.) Nor did Defendants advise the Court that Professor Moody explained at length that he did account in his research for the "Ferguson effect," beginning a year earlier than the Freddie Gray incident in Baltimore, which was a nationwide response to a similar incident of alleged police brutality in Missouri in 2014. Deposition of Prof. Moody, at pages 33-38, 53-57, attached as Exhibit 3; *see also* Richard Rosenfeld, Documenting and Explaining the 2015 Homicide Rise: Research Directions, at pages 18-23 (National Institute of Justice 2016), attached as Exhibit 4. So while Professor Moody may have not specifically accounted for the Freddie Gray incident, his research accounted for the Ferguson effect that generally would account for any Freddie Gray effect as well. Defendants' characterization of Professor Moody's research is misleading.

In any event, an expert's failure to account for one variable in his research does not render his testimony inadmissible. *See id*. at 397–401. In *Bazemore*, the plaintiffs sued for racial discrimination in employment and proffered regression analyses to demonstrate that the defendant had compensated Caucasian employees at a rate higher than their minority counterparts. *Id*. at 398–99. The analysis used four independent variables (race, education, tenure, and job title), which were selected based on testimony that these factors were accurate predictors of compensation disparity. *Id*. at 399–400. Both the trial and appellate courts rejected the expert's regression analyses, noting that the expert had failed to account for a number of relevant variables. *Id*. at 399. According to the court of appeals, "an appropriate regression analysis of salary should include all measurable variables thought to have an effect on salary level." *Id*. (citation and alterations omitted). The United States Supreme Court disagreed, calling the appellate court's analysis

"plainly incorrect." *Id*. at 400. "While the omission of variables . . . may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable. . . ." *Id*. (citation and alterations omitted). The failure to include some relevant variables affects the weight of the testimony but not its admissibility. *Id*.

At no point in the Motion do Defendants meaningfully contend that Professor Moody's research is unreliable. (*See* Doc. 91-1 at 4–6.) No evidence suggests that Professor Moody's analyses are incorrect or that they suffer from any known infirmity beyond failing to specifically consider the death of Freddie Gray. But failing to consider that one factor—to the extent Professor Moody's research fairly could be said not to account for this variable, when in fact it generally dis account for it—would not be sufficient to render his testimony inadmissible. *See Bazemore*, 478 U.S. at 400.

Defendants' interpretation of and reliance on *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001), is incorrect. In *Cooper*, the court evaluated the admissibility of a medical expert's opinion, noting that a medical expert "normally should not be excluded because the expert has failed to rule out every possible alternative cause. . . ." *Id*. While the district court has discretion to exclude expert testimony that is unexplained or unsupported, a medical expert's failure to consider an alternative cause "normally affect[s] the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Id*.; *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). Professor Moody has not been designated as a medical expert, so *Cooper*'s analogical value is negligible. Nevertheless, *Cooper*'s analysis gives clout to the Rules Advisory Committee's suggestion that "the rejection of expert testimony [be] the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes to 2000

Amendments.  In any event, to the extent Professor Moody's research took into consideration the general Ferguson effect, it cannot be fairly said that he failed to consider any Freddie Gray effect as a possible alternative cause.

Professor Moody's opinions are admissible because they are both explained and supported by an excess of reliable research and data. Defendants' arguments are "appropriate fodder for cross-examination" and "go only to the weight of [Professor Moody's] testimony, not its admissibility." *Heckman v. Ryder Truck Rental, Inc.*, No. CIV. CCB-12-664, 2014 WL 3405003, at *3 (D. Md. July 9, 2014). Defendants' Motion should be denied.

### B. Professor Kleck's testimony is based on empirical research that he conducted pursuant to accepted data collection techniques.

Defendants argue that "Professor Kleck's testimony is not based on peer-reviewed research, has not been widely accepted, and is irrelevant to the issues in this case." (Doc. 91-1 at 7.) According to Defendants, the lack of peer review in Professor Kleck's research is the death knell of his testimony. (*See* Doc. 91-1 at 7.) To be sure, *Daubert* identified four factors to be used when determining the reliability of a scientific theory or technique: (1) testability; (2) the extent of peer review and publication; (3) the known or potential rate of error; and (4) the degree of acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 589–95.  But "whether the expert opinion … has been subject to peer review" is but one factor to consider when determining whether expert testimony should be admitted. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005); *see also Daubert*, 509 U.S. at 593 (noting that publication and peer review are "not [the] *sine qua non* of admissibility," as they do not "necessarily correlate with reliability"). "[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability

as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999).

Defendants' argument principally rests not so much on a weighing of the number of peer reviewed studies on each side, but on the contradiction between Professor Kleck's testimony and that of its own expert, Professor Webster. (Doc. 91-1 at 7–9.) Such conflicts between the testimonies of expert witnesses "goes to the credibility of expert testimony, not its admissibility, and is the province of the jury." *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1185 (11th Cir. 2013). Any disagreements between Professor Kleck and Professor Webster "could be aired out in front of the jury and tested by the crucible of cross-examination." *See id*. (quoting *Bazemore*, 478 U.S. at 400 ("The identification of . . . flaws in generally reliable scientific evidence is precisely the role of cross-examination.")). Likewise, "objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011).

Regardless, Professor Kleck's qualifications more than compensate for whatever peer review Defendants claim is lacking. *See Peabody Coal Co. v. Director*, 201 F.3d 436, 1999 WL 1020530, at \*4 (4th Cir. 1999) ("Qualifications of expert witnesses can buttress the reliability of their opinions.") (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 536 (4th Cir. 1998)). The United States Court of Appeals for the Eleventh Circuit recognized that "an expert's overwhelming qualifications may bear on the reliability of his expert testimony." *Tampa Bay Water*, 731 F.3d at 1185. In *Tampa Bay Water*, the expert witness at issue had attained his doctorate degree in the relevant field and had "spent his academic career authoring or coauthoring dozens of articles in the area" of interest. *Id*. Professor Kleck received a doctorate in sociology from the University of Illinois and has since "published the most comprehensive reviews of evidence concerning guns

9

and violence in the scholarly literature," including "all of the leading professional journals in [his] field." (Ex. A to Doc. 77-24 at 1.) His testimony is reliable by virtue of his credentials and experience.

As with Professor Moody, all of Defendants' arguments seeking to strike Professor Kleck's testimony go to the weight of the evidence and not its admissibility.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion to Strike Opinions of Plaintiffs' Lay Witness Mark Pennak and Experts Gary Kleck and Carlisle Moody.


Dated: December 7, 2018

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, DC 20036
P: 202-719-8316
jsweeney@bradley.com

Cary Johnson Hansel, III
Hansel Law, P.C.
2514 North Charles Street
Baltimore, MD 21218
P: 301-461-1040
cary@hansellaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

        Respectfully submitted,

        */s/ John Parker Sweeney*
        John Parker Sweeney
        *Counsel for*