Prepared Testimony of Mark W. Pennak In Opposition to HB 294
1316 Brentland Road
Knoxville, MD 21758
(301) 834 8854
m.pennak@comcast.net
March 1, 2013

## SUMMARY

First, who I am. I am married, a father of two children, a 14-year-old daughter and a 19-year-old son, and a stepfather to a 13-year-old boy, a 20-year-old young man and 21-year-old young woman. I am the protector of my family. I am also a life-long registered Democrat. I have voted in every primary and every general election since I became a voter in 1971, and I am an educated and informed voter. I have also been a lawyer for 38 years and my litigation practice is at the highest levels in the federal courts. I am also a life-long hunter and owner of rifles, shotguns and handguns. While HB 294 takes modest steps to keep guns out of the hands of the mentally ill, the remaining parts of HB 294 will serve only to promote years of litigation, result in criminalization of otherwise law-abiding people, and not effectively protect me or my family from violence. This testimony is written solely on my own behalf, as a private citizen.

The underlying theme of this legislation is the imposition of heavy burdens on the fundamental constitutional right to purchase and possess a handgun along with severe penalties on the otherwise innocent possession of regulated firearms. While the stated purpose is crime control, the Bill illegally seeks to accomplish that end by restricting the rights of law-abiding citizens. The State has effectively decided, in this legislation, that the exercise of the constitutional right is, itself, undesirable. That goal is impermissible. The burdens are, *in toto*, among the most severe in the Nation and are of highly dubious constitutionality.

HB 294 also criminalizes the innocent violation of restrictions on concealed carry permits available under existing law and converts such violations into a major criminal offense with mandatory jail time and the consequent imposition of a federal firearms disability for all firearms owned by the permit holder. The proper sanction for violating a permit restriction is suspension or revocation – not making that person "subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $250 and not exceeding $2,500 or both" under MD Code, Criminal Law, § 4-203(c)(2).

Finally, the new restrictions on and criminalization of ammunition possession. HB 294 effectively bans the mere possession of any type of ammunition by persons under the age of 21, thereby banning possession of ammunition by persons between the ages of 18-21 (including my son and stepson) even though these persons may lawfully purchase and possess long guns in this state. During Senate proceedings on SB 281, the Governor conceded that these provisions were



indefensible and SB 281 was amended to remove these provisions. HB 294 should likewise be amended.

## THE BURDEN ON THE CONSTITUTIONAL RIGHT TO PURCHASE A HANDGUN

**The Burdens Created by HB 294** . The Attorney General's office has opined in its February 6, 2013 informal opinion that the licensing provisions of SB 281 and its companion bill, HB 294, are constitutional. Indeed, that informal opinion states that the licensing provisions of SB 281 and HB 294 would not be subject to constitutional challenge because, in its view, these provisions are merely reasonable regulations that do not burden the right at all. As demonstrated below, that assertion is breathtakingly and transparently wrong. Indeed, the assertion itself evidences a cavalier disregard of the Second Amendment principles recognized by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), and made applicable to and binding on all 50 States in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). Maryland is one of the very few states that does not have a Second Amendment counterpart in its state constitution. Prior to *McDonald*, gun possession and use in Maryland was thus treated as privilege rather than right. See, e.g., *Scherr v. Handgun Permit Review Bd.*, 163 Md.App. 417, 880 A.2d 1137 (Md.App., 2005). Maryland has been able to ignore Second Amendment principles for most of its history. With the Supreme Court's ruling in *McDonald*, the State Government of Maryland must now get used to the idea that its citizens have the very constitutional rights that the State so long denied to its citizens. As *Heller* stated, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." (554 U.S. at 636). Any failure by the State to recognize and implement these new legal constraints will result in heavy litigation costs and create an unnecessary adversarial relationship between Maryland's gun owners and State Government.

The licensing provisions of HB 294 are particularly egregious and SB 281, as passed by the Senate on February 28, 2013, does little to ameliorate those burdens. The HB 294 would require the prior registration of all handgun buyers who must obtain a "handgun qualification license" in order to purchase or rent a handgun. To obtain such a license, a person must pay a $100 application fee,"the fee authorized under § 10–221(B)(7)," and the "mandatory processing fee" for NICS checks. The applicant must also submit "two complete sets of the applicant's legible fingerprints," and "proof of satisfactory completion of a firearms safety training course approved by the Secretary" that must consist of "a minimum of 8 hours of instruction by a qualified handgun instructor" on specified subjects. The applicant bears the cost of all of these requirements. These costs are substantial. The Secretary of the State Police demands LiveScan computer fingerprinting, which costs a minimum of $75.00. The specified training course of 8 hours is roughly equivalent to the NRA's Basic Pistol course, which costs approximately between $100 and $150, plus the cost of any ammunition that may be used for a personally owned pistol. The Bill does not set any limit on the cost that the Secretary may impose for this training and there is no statutory assurance that the NRA course will be deemed sufficient. The

license itself, is good only for five years, at which time the licensee must redo the entire process. The total cost of these requirements is roughly $385.00, every five years.

The amended version of SB 281, as it passed the Senate only barely lessens these burdens. As passed by the Senate, SB 281 lowers the training requirement to 4 hours, but retains the live fire component. It lengthens the time from 1 year to 3 years for prior training to count for this training requirement and provides for prior training up to 10 years prior to the application to count for the live fire component. And it provides that actual training instructors approved by the Secretary or by a "national organization" need not take the training. The Senate also changed the 5 year license period to 10 years, dropped the training requirement for renewals, lowered the renewal fee to $20 and provided that the renewal applicant need not undergo the same background check required in the initial application. SB 281 still requires the initial applicant to be fingerprinted (but need only provide a "compete set" instead of two sets), pay the cost of background checks and, with those few exceptions noted above, take the training. SB 281 still accords the Secretary 30 days to approve the application. The cost of an initial license is still approximately $310. Applicants must still take time out from work and get fingerprinted and take and pay for training, assuming that they are even able to find training.

In short, even these amendments do little to lessen the core problem with this licensing scheme, *viz.*, the unconstitutional imposition of a burdensome prior restriction on the right of a law-abiding citizen to purchase a handgun for self-defense in the home. Whether the burdens are those in current HB 294 or in the amended SB 281, there can be little dispute that these requirements would substantially burden a law-abiding citizen's now recognized, constitutional right to keep and bear arms under the Second Amendment, as construed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). This right is so fundamental that it has been incorporated into the Due Process Clause of the 14th Amendment and thus made applicable to the States. See *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010)("citizens must be permitted to use handguns for the core lawful purpose of self defense"). As discussed below, the burden is on the State to justify any burden on this core constitutional right. HB 294 articulates no such justification and none is apparent.

**Handguns Are Already Heavily Regulated In Maryland.** All handguns and so called assault weapons are heavily regulated by existing Maryland law. In Maryland, such purchases of handguns and "assault weapons" already require a separate form, a 7-day waiting period and a background check by the State Police of federal and state databases. MD Code, Public Safety, § 5-101. State law already requires the purchaser to complete a on-line firearms course, which now provided free of charge. MD Code, Public Safety, § 5-118. Maryland already requires

background checks and a waiting period for sales of all regulated firearms by private sales, so there is no so-called "gun show loophole" in Maryland. MD Public Safety Article, § 5-124. Private sales are thus fully regulated. Maryland permits only one purchase of a handgun every 30 days. MD Code, Public Safety, § 5-128. Straw purchases are already banned under State law. MD Code, Public Safety, § 5-136. Knowing participation in a straw purchase "of a regulated firearm to a minor or to a person prohibited by law from possessing a regulated firearm" is already severely punished in Maryland by MD Code, Public Safety, § 5-141, which makes such straw purchasers "subject to imprisonment not exceeding **10 years** or a fine not exceeding **$25,000 or both**." These provisions effectively prevent "gun-running" and other types of illegal sales. Few "gun-runners" or "straw purchasers" will endure a 7 day waiting period or accept the 30-day restriction between each individual purchase. Few will risk a 10 year prison sentence, if the law were enforced. Indeed, there is no real evidence that straw purchases are a significant problem in Maryland. Straw purchases are also heavily regulated under federal law, 18 U.S.C. 922(a)(6), which imposes a 10 year prison term for lying on federal form 4473. See 18 U.S.C. 924(a)(2). Both the federal form and the state form require that the purchaser affirm that they not a straw purchaser.

**There Is No Evidence Of A Straw Purchaser Problem In Maryland And No Evidence That The Licensing Provisions Would Be Effective Over and Above Existing Restrictions In Preventing Straw Purchases**. The principal rationale advanced by the Attorney General and the sponsors of HB 294 is that prior licensing is necessary to control "straw purchases." The fingerprinting requirement is not defended as necessary to identify the applicant. No argument is advanced that this requirement would aid in the apprehension of criminals trying to obtain firearms. Yet, the sponsors have advanced no evidence that (1) straw purchases are a significant problem in Maryland, or (2) the restrictions imposed by HB 294 on handgun purchases will be more effective in preventing any straw purchases that do occur under the existing regulatory regime. In the absence of such actual evidence, the licensing provisions will not pass muster in the courts.

The Attorney General's February 6, 2013, informal opinion purports to rely on D W Webster, J S Vernick, L M Hepburn, *Relationship between licensing, registration, and other gun sales laws and the source state of crime guns*, Injury Prevention 2001;7:184–1 ("The Injury Prevention Paper" or "Paper"). No other support is cited. For the reasons set below, that Paper is constitutionally insufficient to support the argument that this particular licensing provision in Maryland would substantially advance the state's interest in preventing straw purchases.

First, the Paper itself acknowledges that "criminals and delinquent youth tend to obtain guns in private transactions with acquaintances and to a lesser degree from thefts" and not from federally licensed dealers who are already prohibited from allowing straw purchases. To

account for this reality, the Paper expressly suggests that the best way to stop straw purchases is to heavily restrict and burden all sales of handguns by licensed dealers, even though that would restrict legal sales to law-abiding citizens. Yet, as discussed below, under *Heller*, law-abiding citizens have a right to purchase handguns under the Second Amendment and any state restriction that is intended to restrict the right itself is legally illegitimate. In short, the State may not restrict the rights of law-abiding citizens just so as to incidently limit the availability of guns to criminals. For example, the state could likewise prevent straw purchases by restricting sales to the very rich, or by requiring purchasers to post a $1,000 bond, or submit to a search of their homes or take a drug test prior to making a purchase. While all of these provisions would regulate a sale and would be undoubtedly effective in preventing straw purchases, no one would seriously argue that these measures would be constitutional. The Attorney General's opinion thus goes too far in suggesting that the State is free to impose any regulation, no matter the burden, on the commercial sale of guns without regard to Second Amendment. (Op. at 3-4).

HB 294 does not merely regulate the "conditions and qualifications" of sales, commercial or otherwise. It and SB 281 **ban** any such sales to otherwise law-abiding citizens who are being directly regulated with the imposition of heavily burdensome conditions on their right to purchase a handgun. Since handguns may not be purchased out-of-state, 18 U.S.C. 922(a)(3), this legislation flatly forecloses all adequate alternative avenues for the purchase of a handgun. Such a regulation of sales is unconstitutional. See, e.g., *United States. v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms *if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense*.") (emphasis added). In this regard, the availability of long guns for purchase is legally irrelevant. As *Heller* states, "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629. As *Heller* confirms, "handguns are the most popular weapon chosen by Americans for self-defense in the home." (*Id*. at 630). The State may not impose heavy burdens and extended delays as a pre-condition to the right to purchase a handgun.

More fundamentally, the Bill does not regulate the sale, it expressly regulates the law-abiding. It does little or nothing to actually regulate the criminal or the straw purchaser, as those individuals are already banned from purchasing a handgun. For example, after *Heller*, the state could not ban the commercial sale of guns to law-abiding citizens in order to prevent criminals from coming into possession of such guns. Indeed, the federal Court of Appeals for the Seventh Circuit has held that the City of Chicago could not ban gun ranges in the City because that restriction on the commercial operation of a gun range impaired the rights of gun owners to shoot at a range and thus maintain proficiency. See *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). In so holding, the court employed near-strict scrutiny in its analysis. Significantly,

the Paper cited by the Attorney General was written in 2001, long before the Supreme Court decided *Heller* in 2008, where the Court held that the government may not ban the possession of handguns, and before 2010, when the Supreme Court applied *Heller* to the states with its decision in *McDonald*. A central premise of the 2001 Paper -- that straw purchases may be controlled by the limiting the number of guns owned by the law-abiding -- has become legally impermissible.

Second, as noted above, Maryland already combats straw purchases with a seven-day waiting period, a 30-day period between purchases and a separate form, Form 77, in addition to the federal form, Form 4473. The state already bans unregulated private sales and severely punishes straw purchasers with 10 years in prison. Both the state form and the federal form affirmatively require the purchaser to represent under penalty of perjury that he or she is the real purchaser. Lying on the federal form is a violation of 18 U.S.C. 922(a)(6) and is a felony punishable under 18 U.S.C. 924(a)(2) by up to 10 years in prison. Lying on the Maryland form is perjury and is punishable by 10 years in prison. See MD Code, Criminal Law, § 9-101(b)("A person who [commits perjury] is guilty of [a] misdemeanor ... and on conviction is subject to imprisonment not exceeding ten years."). The Attorney General has produced no evidence that suggests that these existing measures do not control straw purchases. Indeed, we are informed that prosecutions under these provisions are very rare.

These existing restrictions are unusually strict among the states and the effectiveness of such restrictions are not addressed by the 2001 Paper cited by the Attorney General. Specifically, to be probative, the 2001 Paper would have to examine the effect of these existing restrictions in Maryland and assess whether the new licensing provisions would have an additional, substantial effect **on the margin**. The Paper does not even attempt to do so, as it expressly acknowledges that the few states with licensing provisions also impose other, additional restrictions for which the Paper does not attempt to control as independent variables. There is no evidence, for example, that fingerprinting is independently effective, apart from other restrictions, in preventing straw purchases. In short, the Paper is not evidence that the licensing provisions would be marginally more effective than the existing strict restrictions already imposed by Maryland. As discussed below, that is the sort of proof that the courts will require when these provisions are litigated, as they most surely will be.

Third, the Paper acknowledges that the registration and licensing provisions it advocates are not effective in places adjoining states that do not impose such licensing restrictions on the purchase of a handgun. Neither Virginia nor Pennsylvania impose any such restrictions. Neither state even imposes a 7-day waiting period or a 30-day interval between purchases. Neither state bans unregulated private sales. All the major population centers in Maryland are a short drive from one or both of these two states. As the Paper expressly acknowledges, licensing and registration

provisions will not be effective in such circumstances. In short, in the absence of real evidence of a significant straw purchasing problem in Maryland or evidence that the licensing provisions would actually be significantly effective in preventing the straw purchases that do occur, the licensing provisions of HB 294 can only be regarded as an onerous burden on the law-abiding citizens of Maryland. Indeed, any straw purchases that do occur in Maryland could be very effectively combated by the vigorous prosecution of existing law, which impose severe penalties for straw purchases. Since handguns have been long regulated and since the State Police maintain a permanent database of such purchases, rentals and transfers, MD Code, Public Safety, § 5-123(d)(2), the State Police and other law enforcement officials should be able to trace the ownership of any Maryland-purchased handgun found on a crime scene. Yet, neither the Governor nor the sponsors of the HB 294 have suggested that such vigorous enforcement has been tried or is even contemplated.

**The Licensing Provisions Would Not Survive Either Strict Scrutiny or Intermediate Scrutiny.** The lack of real evidence is of constitutional dimension. While the question has not yet been definitively settled by the Supreme Court as to whether the Second Amendment "core right" of self defense extends outside the home,[1] there is no dispute among the federal courts of appeals that, at a minimum, the core right extends to the right to purchase and possess a handgun for self defense **in the home** by law-abiding citizens. Because these licensing requirements are a pre-condition to the purchase of any handgun, they indisputably burden the right of citizens to be armed with a handgun in the home. These licensing provisions thus burden "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphases omitted).

Tthe Attorney General's informal opinion states that the Fourth Circuit has adopted intermediate scrutiny to assess Second Amendment claims. That statement is incomplete and misleading. In the very case cited by the Attorney General, the Fourth Circuit distinguished between regulations affecting the right outside the home and those that affect the right inside the home and stated that **"we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."** *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (emphasis added). See also

---

[1] The "outside-the-home" issue is presently pending before the Supreme Court in a petition for certiorari filed in *Kachalsky v. Cacase*, 701 F.3d 81 (2d Cir. 2012), petition pending, No. 12-845 (filed January 2013). The Second Circuit in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), recently held that the core right of self-defense does extend outside the home and struck down an Illinois statute that banned the possession of a handgun outside the home.

*Chester*, 628 F.3d at 683 (suggesting that any abridgement of the "core right" would be subject to strict scrutiny). Accordingly, since the licensing provisions of HB 294 burden the right to purchase a handgun for self-defense in the home, these provisions would be subject to strict scrutiny under controlling Fourth Circuit precedent. Under that test, the State would be required to show both a "compelling" state interest and that the measure was "narrowly tailored" to that interest, *viz.*, was the least restrictive measure that addressed the compelling interest. See, e.g., *Abrams v. Johnson*, 521 U.S. 74, 91 (1997); *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 683 F.3d 539, 558 (4th Cir. 2012). Strict scrutiny almost always results in invalidation of a regulatory provision. See Laurence H. Tribe, *American Constitutional Law* § 16–30, at 1089 (1st ed.1978) (noting strict scrutiny is a "virtual death-blow"). Here, the licensing provisions would not survive strict scrutiny. The compelling state interest articulated by the Attorney General is the prevention of straw purchases. Yet, licensing provisions that broadly burden the rights of all law-abiding citizens can hardly be characterized as "narrowly tailored" to straw purchasers. The licensing provisions cover all legitimate purchasers, not merely illegal straw purchasers.

In any event, even under the more relaxed standard of intermediate scrutiny that the Fourth Circuit stated in *Masciandaro* as applicable to restrictions on the right outside the home, "the government bears the burden of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is 'substantially served by enforcement of the regulation.'" *United States v. Carter*, 669 F.2d 411, 417 (4th Cir. 2012) (citations omitted). "Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 682. Here, the State has an important government interest in preventing straw purchases. The State will, however, face great difficulty in showing that this interest is "substantially served" by the licensing regulation.

First, any such showing will require real evidence, not mere conjecture or supposition. See *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (noting that the State may not "'rely upon mere 'anecdote and supposition'" in attempting to meet its burden), quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000); *Chester*, 628 F.3d at 682 (requiring a "strong showing"). Indeed, this need for real evidence has been repeatedly stressed in the Second Amendment case law. See *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) (*Heller II*) (vacating a district court decision sustaining the D.C. requirements and remanding for a factual determination on whether the District's attempts at "licensing the owner of the firearm" were supported by actual evidence under intermediate scrutiny); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (holding that Illinois ban on public possession of handguns outside the home was not supported by sufficient legislative facts); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *cert. denied* 131 S.Ct. 1674 (2011) (requiring a "form of strong showing"— a/k/a "intermediate scrutiny"—in a Second Amendment challenge

- 8 -

to a prosecution under 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor); *Ezell*, 651 F.3d at 708 (striking down City of Chicago ban on gun ranges and holding that "'logic and data" must demonstrate "a substantial relation between [the regulation] and [an important governmental] objective.") (quoting *Skoien*, 614 F.3d. at 642); *Chester*, 628 F.3d at 682 (remanding because the government "has not attempted to offer sufficient evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal."). The State will have to do far better than the 2001 Paper cited by the Attorney General if it wishes to meet the evidentiary burdens imposed by intermediate scrutiny. For example, the Attorney General will have to produce real "data" showing that fingerprinting actually deters straw purchasers.

In fact, the new requirements are designed to discourage and burden the right to own and possess a handgun, which, as noted, was one of the premises of the 2001 Paper cited by the Attorney General as support for a licensing requirement. Yet, again, that is not a legitimate or legally permissible justification. See, e.g., *Woollard v. Sheridan*, 863 F.Supp.2d 462 (D. Md. 2012), appeal pending, No. 12-1437 (4th Cir.) (argued Oct. 24, 2012) (holding that Maryland's restrictive gun licensing standard was unconstitutional because it operated as "a rationing system . . . [that] aims . . . simply to reduce the total number of firearms"). The State may not seek to discourage, repress or tax the exercise of Second Amendment rights any more than it may seek to discourage, repress or tax other constitutional rights. See, e.g., *Murdock v. Pennsylvania*, 319 U.S. 105, 112 (1943) (holding invalid a "a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment."). As Murdock holds, "person cannot be compelled 'to purchase, through a license fee or a license tax, the privilege freely granted by the constitution.'" (319 U.S. at 114). See also *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (following *Murdock*); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights"). The Supreme Court's decision *Murdock*, for example, suggested that states could charge at most, a "nominal" fee for a permit, but made clear in *Forsyth County*, that any such permitting system, no matter how small the fee, would be unconstitutional where the state used impermissible criteria in its permitting process.

The costs imposed by HB 294 and even by SB 281 as passed by the Senate, are far from "nominal." Rather, even SB 281 imposes roughly $310 in costs. These costs are imposed by the State and thus charged to the State, regardless of whether the State actually received the money or regardless whether it costs more than these fees to administer the program. A state many not justify a heavy burden simply on the ground that burdens it chose to impose cost a lot. Nothing compels the state to impose the burden in the first instance. even more fundamentally than the costs, both HB 294 and SB 281 impose huge delays in buying the constitutionally

protected arm. The principle is simple: states and localities may not charge people burdensome fees or precondition the exercise of a fundamental constitutional right with burdensome, time-consuming requirements. People who exercise their constitutional right to own handguns are not some sort of subclass of humans, whom the state must oversee and supervise as potential miscreants. *McDonald* expressly rejected the argument "that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety." *McDonald*, 130 S. Ct. at 3045.

The D.C. Circuit's recent decision in *Heller II* is instructive in its application of intermediate scrutiny. In that case, the plaintiffs challenged a host of provisions imposed by the District of Columbia, including many imposed by HB 294 and by SB 281, as passed by the Senate:

> Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant demonstrate knowledge about firearms, § 7–2502.03(a)(10), be fingerprinted and photographed, § 7–2502.04(a)–(b), take a firearms training or safety course, § 7–2502.03(a)(13)(A), meet a vision requirement, § 7–2502.03(a)(11), and submit to a background check every six years, § 7–2502.07a(d). *Heller II*, 670 F.3d at 1255).

The provisions, the Court ruled, "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self defense in the home—the 'core lawful purpose' protected by the Second Amendment." (Id). Applying intermediate scrutiny, the court held that these requirements were "novel" and could only be justified if, on remand, if the District court show, with real evidence, "a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit "that employs not necessarily the least restrictive means but ... *a means narrowly tailored to achieve the desired objective*.'" (670 F.3d at 1258) (citations omitted) (emphasis added). The court then remanded the case for trial, holding that "[w]e cannot conclude, however, that the novel registration requirements—or any registration requirement as applied to long guns—survive intermediate scrutiny based upon the record as it stands because the District has not demonstrated a close fit between those requirements and its governmental interests." (670 F.3d at 1258). So too here. As explained above, HB 294 and SB 281 fail even intermediate scrutiny as there is no "tight fit" between the desire to control straw purchasers and the licensing requirements imposed by these bills. *A fortiori,* HB 294 and SB 281 could not survive review under controlling Fourth Circuit law which requires strict scrutiny for regulations that burden the right in the home.

**The Burdens Are Substantial And Unprecedented.** Very few States impose any requirement to obtain a license to purchase a handgun. The costs of the burdens imposed by these Bills, including the $100 application in HB 294 and the $25 fee in the amended SB 281, taken together with the cost of the other new requirements, would be at or near the Nation's highest. Current Maryland law requires one to submit an application form and pay a $10 application fee prior to the purchase of a handgun. Md. Code Ann., Pub. Safety §§ 5-117, 5-118(a)(2). Training under current law is free. As noted above, the costs imposed by the Bill approximates $385, which would mean that the costs of satisfying state requirements would leap from $10 to $385.00. The reduction of the fee to $25 by the amended SB 281 would lower that cost only to about $310.00. That is extreme by any measure.

These new requirements would also place Maryland on the outer most edge of extreme gun regulation in the Nation. The next highest cost is imposed by the City of New York, which, alone in New York State, imposes a $340 fee. That NYC fee has been challenged in litigation presently pending the federal court. *Kwong v. Bloomberg*, No. 12-157-8 (2d Cir.) (argued Feb. 1, 2013). New York City's fees may well be struck down, but those fees are, in any event, limited to the City and do not apply state-wide, as HB 294 would here. Other residents of the State of New York (other than residents of Worchester) pay only $10 (plus the $94.25 fingerprinting fee) to obtain a handgun license – and their licenses do not expire, unlike the five year life of the license created by HB 294. See N.Y. Penal Law § 400.00(10).

Similarly, Illinois also requires people to obtain licenses to keep handguns in their homes, but the fee is only $10 for a license and that license is valid for 10 years. See 430 Ill. Comp. Stat. 65/5, 65/7. The District of Columbia requires $25 to register a handgun for 3 years, plus $35 for fingerprinting and background checks. D.C. Code §§ 7-2502.03(d), 7-2502.05(b); 7-2502.07a(a); D.C. Mun. Regs. tit. 24, § 2320.3(c)(3), (g). Formerly, D.C. required a training class of only four hours, but provided that class for free. D.C. Code §§ 7-2502.03(a)(13). D.C. has removed that training requirement very recently. Very recently, the D.C. Council has "repealed the provision requiring first time registrants to take a 4-hour firearm training course. Instead, MPD is now offering an online Firearms Safety Training Course. There is no cost for taking this course and it should take approximately 30 minutes to complete." See http://mpdc.dc.gov/node/406462   In any event, event these D.C. procedures are under constitutional attack in presently pending litigation, on remand from the D.C. Circuit's decision in *Heller II*. See *Heller v. D.C.*, No. 08-cv-01289 (D.D.C.).

This legislation is supposedly modeled after New Jersey because New Jersey requires a permit to purchase a handgun. Yet, the cost of this permit in New Jersey is a mere $2. N.J. Stat. Ann. § 2C:58-3(f). A person applying for the first time must submit fingerprints for an FBI background check, which costs an additional $60.25. N.J. Admin. Code §§ 13:54-1.4(d) & (g),

13:59-1.3. No live fire training is required. Similarly, California requires a person to pay $25 to obtain a 5-year "handgun safety certificate" before purchasing a handgun, and to also pay background check fees totaling $14 any time they buy a gun. Cal. Penal Code §§ 27540(e), 28225(a), 31650(a). California does not require fingerprinting or impose live fire training requirements. Plainly, the costs and burdens imposed by HB 294 on the right to buy a handgun are extreme, even as measured against the laws of other highly restrictive states.

The other burdens are also substantial. Under HB 294, the Secretary has a full 30 days to approve a license and there is no provision for expedited treatment of licenses, or any consequence associated with a failure to meet that 30-day requirement. Given the staffing levels at the State Police, HB 294 would effectively impose a minimum 30-day waiting period just to obtain a license. Indeed, according to the Department of Legislative Services in 2011, there were 53,444 approved handgun transfer applications. The 8 hour training course imposed by current HB 294 and even the 4 hour course mandated by amended SB 281 would create a huge backlog of applications for training. Providing training for either the 8 hour course or the 4 hour course for 53,444 people could take years. While the bills allow the Secretary to waive training if the applicant "has completed a certified firearms training course approved by the Secretary," the legislation does not specify or give the Secretary any guidance on what certifications that the Secretary may accept. Thus, there is no assurance that any NRA course, for example, would be deemed acceptable. And even assuming *arguendo* that NRA courses were deemed acceptable by the Secretary, there simply is no current NRA course limited to 4 hours that also includes live fire and all the subject matters mandated by this legislation. The closest NRA course that meets these requirements is the Basic Pistol Course and that course is at least 8 hours long and includes extensive (and expensive) live fire of up to 100 rounds of ammunition. The cost of that course is approximately $100 to $150, depending on the fee charged by the private instructor, the range fees and the ammunition costs. See
http://www.nrainstructors.org/CourseCatalog.aspx

In addition to all these burdens imposed by HB 294 and amended SB 281, current Maryland law already imposes an additional 7-day waiting period to actually purchase the handgun. There are no consequences associated with a failure to issue a timely license and thus the currently existing poor staffing levels at the State Police would necessarily adversely affect the ability of the Secretary to meet even this 30-day standard. Presently, the State Police are so backlogged that they taking more than 30 days just to conduct the background checks required by current law to be completed in 7 days. That burden and those delays would increase exponentially with the background investigations required by HB 294. Since, under HB 294 and SB 281, no handgun may be purchased without a license, a person is basically disarmed during any period of delay from purchasing the very firearm that *Heller* held was constitutionally protected.

- 12 -

It gets worse. Unique among the states, both SB 281, as amended and HB 294 require training that "demonstrates the person's proficiency and use of the firearm." By contrast, the D.C. government formerly required only four hours of classroom firearms training and the safety class was provided free of charge by the Chief of Police, and there was no requirement to show "proficiency." As noted above, DC has abolished even this training requirement and, ironically, moved to the very kind of on-line training that is now required in Maryland under current law, but which HB 294 and amended SB 281 would abolish. There are simply not enough instructors certified by the Secretary or gun ranges available to train the tens of thousands of people yearly who purchase a handgun in Maryland every year.

Finally, under HB 294, there are very few limits on the Secretary's discretion. The scope of discretion provided to the Secretary HB 294 in designing and administering the course is virtually unlimited within the very broad parameters set by the Bill. For example, the Secretary would be free to impose marksmanship requirements and other tests to demonstrate "proficiency," even for possession strictly limited to the home. Similarly unlimited is the cost of the course that is imposed on the applicant. Such unfettered administrative discretion over the exercise of a fundamental constitutional right is of dubious constitutionality. See, e.g., *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958). In sum, HB 294's restrictions on a simple purchase are unprecedented in American law. The burdens imposed by the Bill will quite likely draw immediate challenge in the courts. If the plaintiffs prevail, the State would be liable for substantial attorneys' fees and costs under federal civil rights law, 42 U.S.C. 1988. These fees can be quite substantial. For example, the City of Chicago has already paid in excess of $1.2 million in attorneys' fees to plaintiffs' counsel who have prevailed in Second Amendment litigation against the City.

### THE REGISTRATION REQUIREMENTS ARE ONEROUS AND THE PENALTIES SEVERE

HB 294 amends subtitle 3 of Article 4 of the Maryland criminal code to include all assault weapons (not just pistols) and criminalizes mere continued possession of the banned, so called "assault weapons." Thus, under Section 4-303, as amended by the Bill, the statute would provide:

> (a) Except as provided in subsection (b) of this section, a person may not:
> (1) transport an assault [pistol] WEAPON into the State; or
> (2) **possess**, sell, offer to sell, transfer, purchase, or receive an assault [pistol] WEAPON.

Under HB 294, as currently written, a violation of subtitle 3 is punishable under 4-306, which provides:

> (a) A person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

In addition, as amended by the Bill, Section 4-304 would provide that:

> A law enforcement unit may seize as contraband and dispose of according to regulation an assault [pistol] WEAPON transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

There are only two exceptions to this ban on mere possession of so called "assault weapons." First, existing Maryland owners of these banned long guns must "register" their guns. The Bill provides the only exception to this ban on possession and that is in Section 4-303, which provides:

> A person who lawfully possessed an assault long gun or a copycat weapon before October 1, 2013, and who registers the assault long gun or copycat weapon with the secretary of state police before November 1, 2013.

A new resident of Maryland is likewise given only 30 days to register if he wishes to possess lawfully the banned long guns. The Bill would provide in Section 5-143, as amended, as follows:

> A person who moves into the state with the intent of becoming a resident shall register all regulated firearms with the Secretary within 30 days after establishing residency

These provisions are severe. An existing Maryland resident who fails, for any reason, to register his banned long gun "before November 1, 2013," is not only subject to seizure of the banned gun as "contraband," but is also liable to a large fine and a 3 year prison term. A new Maryland resident who fails to register within 30 days of becoming a Maryland resident is subject to the same penalties. The Bill makes no allowance for excusable neglect or late registration, as the Bill does not allow any registration after the 30 day period. There is no specific intent or scienter requirement. Mere possession on or after November 1, 2013, by a current resident constitutes a major criminal offense. Indeed, an attempt to register after 30 days would presumably result in seizure and prosecution for illegal possession of the firearm. Yet, for many

- 14 -

existing Maryland residents, this registration requirement would be redundant. These "assault weapons" have been treated as regulated firearms since 1996 in Maryland and the State Police already maintain a record of Maryland purchases, rentals and transfers. See MD Code, Public Safety, § 5-123(d)(2) ("The Secretary shall maintain a permanent record of all notifications received of completed sales, rentals, and transfers of regulated firearms in the State").

Moreover, because the Bill provides that possession contrary to the Bill's provisions is "punishable" by imprisonment in excess of two years, conviction under these provisions would create federal disability under 18 U.S.C. 922(g)(1) for the possession of *any* firearm. See 18 U.S.C. 921(a)(20)(defining terms where the offense is a conviction for a state misdemeanor). Thus, a mere failure to register in time would mean that the owner would lose *all* of his or her modern firearms, rifles, handguns, shotguns, basically anything other than black powder guns. Violation of Section 922(g) is also punishable by imprisonment of up to 10 years under federal law. See 18 U.S.C. 924(a)(2). See, e.g., *United States v. Capps*, 77 F.3d 350, 352 (10th Cir. 1996) ("[T]he only knowledge required for a § 922(g) conviction is knowledge that the instrument possessed is a firearm."). These extreme sanctions would obtain for a failure to register even in those cases in which the sale of regulated firearm **was already registered** with the State Police under MD Code, Public Safety, § 5-123(d)(2).

The amended version of SB 281, as passed by the Senate, attempts to deal with this dual registration requirement by providing that persons need not re-register their "assault weapons." SB 281 does not even specify that Form 77 used in these prior sales and reported to the State Police constitutes "registration," even though the State Police maintain a permanent database of these sales under MD Code, Public Safety, § 5-123(d)(2). Moreover, that provision excusing prior Maryland sales that could be deemed to be "registration" would still not address individuals who purchased their guns before 1996 in Maryland, or persons who brought their guns with them when they moved into Maryland from out of state and thus never had their sales reported under Maryland law. It bears emphasis that few states regulated these rifles at all after the expiration of the federal ban in 2004.

Senate Bill 281 attempts to deal with these severe penalties by changing the penalty provisions of the legislation. SB 281, as passed by the Senate, now extends the time to register until January 1, 2014, and states that a person who voluntarily registers prior to that time is not subject to Section 4-306. However, SB 281, as passed by the Senate makes no change to the 30 day requirement for new Maryland residents, who must still register their guns within 30-days after becoming a Maryland resident. SB 281, as passed, does provide that a person who registers before May 1, 2014 is subject only to a civil fine of $290, which then increases every six months to a maximum civil fine of $1000 per registered firearm, if registration does not take place until between November 1, 2015 and May 1, 2016. It further provides that if the unregistered "assault long

gun" or copycat weapon is discovered by a law enforcement officer after January 1, 2014, the failure to register is not subject to Section 4-306, but instead is punished as a misdemeanor offense up to one year of prison time. While these changes in SB 281, as passed by the Senate, have the virtue of eliminating the extreme punishment imposed under Section 4-306 and the accompanying federal firearms disability, these sanctions are still severe and may still punishes the mere possession of a firearm that was lawfully purchased and possessed prior to the enactment of this legislation.

Does the state truly wish to visit these severe consequences on otherwise law-abiding, productive citizens of the Maryland, who lawfully purchased and possessed these firearms prior to HB 294? Imagine, for example, a member of the military on active duty and deployed overseas, fighting in defense of our country. If that person failed to to register prior to January 1, 2014, because he was overseas, he or she would be, upon return to Maryland, immediately subject to fines and potential prosecution under this Bill. That would be quite a homecoming shock for those who put their lives on the line in defense of our liberty. The same conversion of law-abiding citizens into criminals would obtain for any other type of innocent failure to register within the 30 days. With all due respect, the penalties imposed by this Bill would constitute an abuse of the State's police power and should not be countenanced.

The Bill's intent to criminalize law-abiding citizens is all the more incomprehensible given the nature of the long guns banned by the Bill. For example, the Bill bans the AR-15 rifle, which is a semi-automatic rifle that fires the .223 Remington round. Yet, in terms of lethality, the AR-15 is utterly indistinguishable from the Ruger Ranch Rifle, which is also a semi-automatic rifle that fires the .223 Remington round. The AR-15 is banned and yet the Ruger is not. See MD Code, Public Safety, § 5-101(p)(2). That would remain true under HB 294's ban on "assault long guns" and "copycat weapons." Why the difference in treatment? Because the AR-15 looks scary. The AR-15 has extended pistol grip and may have a flash suppressor or an adjustable stock, while the Ruger Ranch Rifle has a conventional wooden stock and a regular pistol grip. Yet, these differences are utterly cosmetic. This emphasis on cosmetic differences obtains for other types of regulated long guns as well. See
http://www.thetruthaboutguns.com/2012/11/foghorn/media-matters-thinks-cosmetic-differences-matter-for-an-assault-weapons-ban/.

HB 294 takes this emphasis on cosmetic differences to a new level of irrationality with its ban on "copycat" weapons. For example, The Bill bans all the "Assault Long Guns" listed in the amended Section 5-101(R)(2) of the Public Safety Article. This is the same list of guns that are considered to be regulated firearms under current law, MD Code, Public Safety, § 5-101(p)(2). Under current law and as amended by HB 294, this list expressly **excludes** the "Colt AR–15 Sporter H–BAR rifle." See Section 5-101(R)(2)(xv)(as amended), and MD Code, Public Safety,

§ 5-101(p)(2)(xv)(current law). That exclusion of this rifle from the list of regulated firearms is long-standing and reflects the reality that this specialized rifle is used in competition shooting. Yet, HB 294 then turns around and bans this very same rifle as a so-called "copycat weapon" merely because this rifle has (and has always had) an extended pistol grip.[2] Is the intent of this legislation to ban Maryland residents from shooting competitions that make use of this rifle? The same point applies to the ban on semi-automatic, centerfire rifles with a "thumbhole stock." Such stocks are used in shooting competitions. Is there any public policy justification for this ban on competition stock rifles? Is there any real evidence that thumbhole stock rifles have been used in crimes? The larger point here is that the "lethality" of a firearm is a function of the cartridge and the rate of fire. An extended pistol grip, or a flash suppressor or an adjustable stock do not make a firearm more lethal. If the State is going to criminalize its citizens and potentially destroy families with prosecutions, it should do so for fact-based reasons that have substance, not because the item looks scary.

The criminalization of citizens is even harder to understand in light of the fact, confirmed by the FBI, that rifles (any type of rifle) are the *least* likely weapon to be used in an actual crime. In Maryland in 2011, out of the 272 gun-related deaths, only two (2) were the caused by a rifle of any type. Accordingly to the FBI, Marylanders are more than 16 times more likely to die from "other weapons" (non-firearm) (34 deaths) than be killed by a rifle. See http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-20 . Indeed, at 17 deaths, "hands and feet etc" caused more than eight times as many deaths as

---

[2] HB 294 defines a "copycat weapon" as follows:

(E) (1) "COPYCAT WEAPON" MEANS:
(I) A SEMIAUTOMATIC CENTERFIRE RIFLE THAT CAN ACCEPT A DETACHABLE MAGAZINE AND **HAS ANY** OF THE FOLLOWING:
1. A PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON;
2. A THUMBHOLE STOCK;
3. A FOLDING OR TELESCOPING STOCK;
4. A GRENADE LAUNCHER OR FLARE LAUNCHER;
5. A FLASH SUPPRESSOR; OR
6. A FORWARD PISTOL GRIP;

I note that SB 281, as passed by the Senate, has struck the reference to "thumbhold stock" from the list of features and now requires that the copyright weapon possess two of the forbidden features.

rifles. (Id.). In view of these hard numbers, the public safety justification for banning these rifles and fining and imprisoning their owners simply disappears. Please do not convert law-abiding, productive members of society into criminals.

## CRIMINALIZATION OF CARRY PERMIT RESTRICTIONS IS UNWARRANTED

In furtherance of the underlying criminalization theme of HB294, the Bill would amend Criminal Law Section 4-203 to criminalize the carrying of a concealed handgun under a permit in places or circumstances not otherwise allowed under restrictions that Secretary may impose on permits under Section 5–307 of the Public Safety Article. Save for persons with Top Secret and SCI security clearances, persons with a concealed carry permit are among the most investigated persons in Maryland. They are fingerprinted, their employers are interviewed, their references are contacted, they are interviewed face-to-face by State Police Troopers and their backgrounds are thoroughly investigated. Under current Maryland law, these individuals must have a "good and substantial reason" to carry a gun. Section 5-307 allows the Secretary to place restrictions on the circumstances in which these individuals may carry concealed weapons, such as when these persons are carrying cash or traveling for business. These people are probably the most law-abiding people in Maryland, Yet, under HB 294 and SB 281, as passed in the Senate, these individuals would be punished because of any deviation, innocent or otherwise, from any such restriction with imprisonment under Section 4-203. That would convert a mere, inadvertent license violation into a major criminal offense. Indeed, the sanctions imposed by Section 4-203 are severe, including mandatory jail time. On the very first conviction, a person "is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $250 and not exceeding $2,500 or both." MD Code, Criminal Law, § 4-203(c)(2).

A conviction for this offense imposes a lifetime bar on firearms ownership under federal law, 18 U.S.C. 922(g). The same is true under state law. See also *Maryland State Police v. McLean*, 197 Md.App. 430, 440, 14 A.3d 658 (Md.App.,2011) ("In our view, the language of PS § 5–101(g)(3), read together with PS § 5–133(b)(1) is clear and unambiguous with respect to the issue presented in this case: a person who has been convicted of a violation classified as a misdemeanor in the State that carries a statutory penalty of more than two years may not possess a regulated firearm."). The proper sanction for a license violation is suspension or revocation, not mandatory prison time and a permanent firearms disability.

## THE RESTRICTIONS ON AMMUNITION POSSESSION ARE IRRATIONAL ON THEIR FACE

HB 294 creates a new section, 5-133.1 in the Maryland Public Safety Article. That new provision imposes a total ban on possession of ammunition that would ban all hunters under the

age of 21 from hunting without being "under the supervision" of someone who is at least 21. It would ban unsupervised persons between the ages of 18-21 from possessing ammunition for long guns that may be legally purchased and/or possessed by otherwise qualified persons between the ages of 18-21. A bill this irrational will not survive challenge. Indeed, this irrationality was implicitly recognized by amendments made at the Senate committee on February 14, 2013, where the Committee, at the request of the Governor, amended Section 5-133.1 to limit the scope of the ammunition ban to persons who otherwise are subject to broad firearms disability under Section 5-133(b) and (c). SB 281 passed the Senate as thus amended. That corrects the problem and that correction should likewise be adopted by the House.

## CONCLUSION

In sum, please resist the urge to "do something." Instead, do something effective that does not impair the right and ability of law-abiding citizens to defend themselves and their families. That something is legislation that keeps the guns out of the hands of crazy people by mandating appropriate reporting to the NICS. That something is legislation funding armed school resource officers who are empowered to protect our children by providing real security in the schools. Burdening constitutional rights, banning scary looking rifles, and criminalizing law-abiding gun citizens does nothing to protect me or my children.

Thank you. Mark W. Pennak, Frederick County Maryland.