IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 16-cv-3311-ELH** |
| ) | |
| **LAWRENCE HOGAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**Plaintiffs' Reply in Support of Cross-Motion for Summary Judgment**

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs


John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: December 7, 2018                    Counsel for Plaintiff Atlantic Guns, Inc.

# Table of Contents

Table of Contents ...................................................................................................... ii

Table of Authorities .................................................................................................. iv

I.  The undisputed facts establish that Plaintiffs each have standing. ..................... 1

    A.  MSI has standing because the HQL requirements impede its efforts to
carry out its mission. ...................................................................................... 1

    B.  The Individual Plaintiffs have standing because the HQL requirements
burden their constitutional right to acquire a handgun ........................................ 2

    C.  Atlantic Guns has standing because its customers were delayed or denied
from acquiring a handgun and because its business suffered from the loss
of handgun sales due to the Handgun License Requirement. ................................ 4

II.  Defendants failed to create any genuine dispute of fact that the Handgun License
Requirement is burdensome, unnecessary, and ineffective. ................................ 5

III.  The undisputed facts establish that the Handgun License Requirement violates the
Second Amendment. .......................................................................................... 9

    A.  The Handgun License Requirement is unconstitutional under *Heller*. ................ 9

    B.  Defendants failed to argue that the Handgun License Requirement satisfies
strict scrutiny ................................................................................................ 10

    C.  Defendants failed to meet their intermediate scrutiny burden under either
the standard set forth by the Supreme Court or the standard applied in
*Kolbe*. ........................................................................................................ 11

        1.  Defendants failed to establish the Handgun License Requirement
alleviates any real problem in a direct and material way. ......................... 11

        2.  Defendants failed to establish that the Handgun License is
narrowly tailored or even reasonably adapted to a state interest. ............ 13

            a.  The fingerprinting requirement is unnecessary and
ineffective. ............................................................................... 14

            b.  The classroom training and live-fire requirements are
unnecessary and ineffective. ....................................................... 15

        3.  The Handgun License Requirement was not based upon substantial
evidence. .............................................................................................. 15

IV. The Handgun License Requirement violates the Due Process Clause of the Fourteenth
Amendment...............................................................................................16

V. Maryland State Police regulations and practices are ultra vires………..…………………18

    A. The live fire requirement cannot stand….………………………………………18

    B. Maryland State Police practices violate the statute.…………………………..……18

Conclusion……………………………….……………………………………………………20

# Table of Authorities

**Page(s)**

## Cases

*Arizona State Legislature v. Arizona Indep. Redistricting Com'n*,
　135 S.Ct. 2652 (2015) ........................................................................................................2

*Caetano v. Massachusetts*,
　136 S. Ct. 1027 (2016) ......................................................................................................10

*Chow v. State*,
　393 Md. 431 (2006) ...........................................................................................................16

*City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*,
　982 F.2d 1086 (7th Cir. 1992) ............................................................................................2

*Craig v. Boren*,
　429 U.S. 190 (1976) ............................................................................................................5

*Dearth v. Holder*,
　641 F.3d 499 (D.C. Cir. 2011) ........................................................................................3, 4

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ................................................................................................9, 10, 11

*Ezell v. City of Chicago*,
　651 F.3d 684 (7th Cir. 2011) ......................................................................................10, 13

*FCC v. Beach Commc'ns, Inc.*,
　508 U.S. 307 (1993) ..........................................................................................................12

*Galloway v. State*,
　365 Md. 599 (2001) ...........................................................................................................18

*Gen. Elec. Co. v. Joiner*,
　522 U.S. 136 (1997) ............................................................................................................8

*Gen. Motors Corp. v. Tracy*,
　519 U.S. 278 (1997) ............................................................................................................5

*Havens Realty Corp. v. Coleman*,
　455 U.S. 363 (1982) ............................................................................................................1

*Heller v. District of Columbia*,
　670 F.3d 1244 (D.C. Cir. 2011) ..................................................................................10, 13

*Johnson v. United States,*
   135 S. Ct. 2551 (2015)...........................................................................................17

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) (en banc) ....................................................11, 15, 17

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ...................................................................................1

*Martin v. Lloyd,*
   700 F.3d 132 (4th Cir. 2012) .................................................................................17

*McCullen v. Coakley,*
   134 S. Ct. 2518 (2014)...........................................................................................13

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010)...............................................................................................10

*Montgomery County v. Atlantic Guns, Inc.,*
   302 Md. 540 (1985) ...............................................................................................16

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) .................................................................................10

*MSI v. Hogan,*
   No. 18-cv-1700-JKB, slip op. (D. Md. Nov. 16, 2018)...........................................1

*NY State Rifle & Pistol Ass'n. v. Cuomo,*
   804 F.3d 242, 264 (2d Cir. 2015), *cert. denied*, 136 S.Ct. 2486 (2016).................13

*People for Ethical Treatment of Animals v. Doughney,*
   263 F.3d 359 (4th Cir. 2001) ...................................................................................4

*Sessions v. Dimaya,*
   138 S.Ct. 1204 (2018)............................................................................................17

*Sierra Club v. United States Dept. of the Int.,*
   899 F.3d 260 (4th Cir. 2018) ...................................................................................2

*Silvester v. Becerra,*
   138 S. Ct. 945 (2018).............................................................................................11

*Steffel v. Thompson,*
   415 U.S. 452 (1974)................................................................................................3

*Stenberg v. Carhart,*
   530 U.S. 914 (2000)...............................................................................................17

*Turner Broad Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ........................................................................................11, 12, 13

*United States v. Larson,*
    2018 WL 4203470 (4th Cir. 2018) ..........................................................................17

*United States v. Nat'l Treasury Empls. Union,*
    513 U.S. 454 (1995) .................................................................................................11

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................................2

*Wrenn v. District of Columbia,*
    864 F.3d 650 (D.C. Cir. 2017) ................................................................................10

**Statutes**

28 U.S.C. § 1983 ................................................................................................................3, 4

Md. Code Ann., Public Safety § 5-101(q)(3) ..............................................................18, 19

Md. Code, Public Safety, § 5-117.1 ........................................................................1, 10, 15

Md. Code, Public Safety, § 5-117.1(c) ...............................................................................9

Md. Code, Public Safety, § 5-117.1(d) .............................................................................19

Md. Code, Public Safety, § 5-117.1(d)(3)(iii), .................................................................18

Md. Code, Public Safety, § 5-117.1(e)(1) .........................................................................19

Md. Code, Public Safety, § 5-117.1(f) ..............................................................................19

Md. Code, Public Safety, § 5-117.1(f)(3) ..........................................................................20

**Other Authorities**

D.W. Webster, et al*., Injury Prevention*, 2001 ..................................................................6

Fed. R. Civ. P. 15(b)(2) .......................................................................................................4

J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America*
    (Oct. 20, 1999) ...........................................................................................................6

## Argument

I.    **The undisputed facts establish that Plaintiffs each have standing.**

    A.    **MSI has standing because the HQL requirements impede its efforts to carry out its mission.**

Defendants claim that MSI does not have organization standing because "it has failed to demonstrate a concrete injury to carrying out its mission."  (Doc. 89, Def. Mem. at 11.)  Completely absent in Defendants' response is any mention of the Fourth Circuit's decision in *Lane v. Holder,* 703 F.3d 668, 674 (4th Cir. 2012), where the court stated that "[a]n organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." 703 F.3d at 674.  As Plaintiffs demonstrated in previous filings, "[e]nactment of MD Code, Public Safety, § 5-117.1, and the implementing regulations of the Maryland State Police, have also adversely affected the ability of MSI to attract and retain members, as the regulatory restrictions imposed by these provisions are in direct contravention of MSI's goals of promoting the acquisition and ownership of handguns and protecting the right acquire a handgun for self-defense."  (Doc. 77-2, Pennak Decl. ¶6.)  There is nothing remotely "abstract" about that interest.  Indeed, the harm to MSI is more direct and substantial than the injury to the plaintiff organization found sufficient in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.").

Defendants do not and cannot deny that MSI seeks to promote the acquisition and ownership of handguns by the law-abiding and do not deny that the HQL requirements make that goal much harder to achieve.[1]  Defendants do not deny that MSI actively fought against enactment of that

---

[1] Defendants' reliance on *MSI v. Hogan*, No. 18-cv-1700-JKB, slip op. at 8-9 (Dkt. 34) (D. Md. Nov. 16, 2018) is misplaced.  That case was primarily about whether Maryland violated the Takings Clause of the Fifth Amendment in banning "rapid fire trigger activators," not handguns.  MSI's mission of promoting the acquisition and ownership of handguns was not at issue.

legislation when it was before General Assembly and objected to the subsequent State Police regulations during the notice and comment period.  (Doc. 77-2, Pennak Decl. ¶5.) Defendants wrongly assert that MSI has not been hurt because MSI's membership has grown *over the course* of this litigation, but that increase occurred only after MSI brought this suit challenging the HQL requirements, as gun owners rallied to support that effort after the dramatic fall-off of MSI membership that followed enactment of the Firearm Safety Act of 2013.  (*Id.* ¶6a);[2]  *see Sierra Club v. United States Dept. of the Int*., 899 F.3d 260, 284 (4th Cir. 2018) ("The causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury."). That increase hardly demonstrates that MSI's mission has not been impaired by the HQL requirements or that MSI did not suffer a loss of membership as a result of the enactment of this law.[3] At bottom, MSI has provided sufficient evidence to demonstrate an injury that affords it standing.

### B.   The Individual Plaintiffs have standing because the HQL requirements burden their constitutional right to acquire a handgun

Defendants confuse the merits of Plaintiffs claims with the analysis of whether they have standing to bring the claims. (*See* Doc. 89 at 39); *see also Arizona State Legislature v. Arizona Indep. Redistricting Com'n*, 135 S.Ct. 2652, 2663 (2015).  Standing "turns on the nature and source of the claim asserted."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975). In this case, the injury alleged is that the HQL requirements unconstitutionally burden the Second Amendment rights of Plaintiffs by imposing a burdensome and unnecessary permitting scheme on their fundamental right to acquire a handgun.

---

[2] Through inadvertence, the Pennak Declaration (Doc. 77-2) includes two paragraphs that are both numbered "6."  Both paragraphs relate to the standing of MSI.  For clarity, the second paragraph "6" is referred to herein as paragraph "6a."

[3] Defendants' attack (Doc. 89 at 12) on MSI's reliance on C*ity of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992), fails to grasp the nature of MSI's injury. MSI is injured not merely from the expenditure of funds to bring suit.  Rather, as in *Matchmaker*, this suit "is deflection of the [MSI's] time and money" that could have been spent on MSI's mission. (*Id*.).

Each of the Plaintiffs affirmatively desires to acquire a handgun but is not permitted to do so by Maryland without shouldering the unconstitutional burdens imposed this statutory and regulatory scheme. This is enough.  *See Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) ("We agree with Dearth that the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury.")

Defendants purport to distinguish *Dearth*, as a case where the challenged law made it "impossible" to obtain a firearm, while in this case compliance with the HQL requirements is not "impossible" for the Individual Plaintiffs.  This is an incorrect statement of the law.  In each case, standing is an inquiry that evaluates whether a plaintiff has been injured by a challenged law by imposition of a burden on the exercise of a constitutional right; it does not evaluate whether the burden rises to the most extreme level possible.  Thus, the plaintiff in *Dearth* had standing because he claimed he had "the right to possess, not the right to a permit or license." *Id*. at 501.  So too here. Like the claim at issue in *Dearth*, the Individual Plaintiffs are subject to what they alleged to be an unconstitutional permitting scheme and have standing to object to the burdens that the scheme placed on their constitutional right to acquire a handgun.

Defendants continue their insistence (Doc. 89 at 9) that MSI members, such as Mrs. Miller and Ms. Hoffman, have no standing to object to the training requirements because they have not asked for an "accommodation" for their physical disabilities that make it hard or impossible to take the necessary training.   Defendants do not dispute these disabilities and do not dispute that nothing in the HQL statute or the State Police regulations provide any avenue for seeking an accommodation. Regardless, the Supreme Court has made clear that there is no requirement to exhaust administrative remedies, even where they do exist, in suits brought under 28 U.S.C. § 1983. *See, e.g.*, *Steffel v.*

*Thompson*, 415 U.S. 452, 472-73 (1974) ("When federal claims are premised on [§ 1983] . . . we have

not required exhaustion of state judicial or administrative remedies . . . .").[4]

Defendants do not dispute that the other Individual Plaintiffs have been burdened by the HQL

requirements but assert that these burdens can be ignored for purposes of standing because they "have

chosen not to apply for a license." (Doc. 89 at 9.) That is a false choice. Defendants have offered

no response to Plaintiffs' point that individuals need not apply for a permit to have standing to

complain that the requirement of a permit is *itself* unconstitutional. (*See* Doc. 77. at 36.) Defendants

simply ignore that well-established principle. All of these Plaintiffs have standing to claim that their

rights have been violated. *See Dearth*, 641 F.3d at 501.

   **C.    Atlantic Guns has standing because its customers were delayed or denied from
          acquiring a handgun and because its business suffered from the loss of handgun
          sales due to the Handgun License Requirement.**

The undisputed facts establish that Handgun License Requirement has delayed or denied

Atlantic Guns' customers from acquiring a handgun. Defendants do not dispute that Atlantic Guns

has turned away hundreds of customers since the Handgun License Requirement took effect. (*See*

Doc. 89 at 12–13.) This undisputed fact ends the inquiry.

Defendants nevertheless argue that Atlantic Guns lacks standing on behalf of these individuals

because Atlantic Guns has not identified them. (Doc. 89 at 12–13.) Defendants do not engage in the

---

[4] Defendants' claim that MSI may not represent the interests of MSI member Dana Hoffman because it requires individualized participation by Ms. Hoffman. (Doc. 89 at 5.) Yet, Ms. Hoffman **has** participated individually in this lawsuit by subjecting herself to discovery, including a deposition taken by Defendants. Adding Ms. Hoffman as a named plaintiff would be thus utterly pointless, but Plaintiffs are prepared to amend the complaint to do so, should the Court so require. Given that Defendants have had full notice of her claims (*see* MSI Answer to Interr. 1 (attached as Exhibit 2)), and have conducted discovery of Ms. Hoffman, the complaint should be deemed amended to include her individual claims under Rule 15(b)(2), Fed. R. Civ. Proc. *See*, e.g., *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367-68 (4th Cir. 2001). Defendants' claim (Doc. 89 at 10) that MSI cannot represent Ms. Hoffman because its membership includes instructors is risible. There is no conflict between Ms. Hoffman's desire to acquire a handgun and the interests of MSI instructors because these instructors provide services precisely for that purpose. By definition, no MSI member supports the HQL statute or regulations, instructors included.

analysis set forth in *Craig v. Boren*, 429 U.S. 190, 192–97 (1976) and its progeny, which establish standing for sellers when, as here, their customers may be injured. Defendants instead make the unsupported claim that Atlantic Guns may not rely on unidentified customers. (Doc. 89 at 13.) Atlantic Guns need not identify specific customers. To the contrary, sellers have standing when their customers "may" be injured. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997). Defendants attempt to distinguish Atlantic Guns from the plaintiffs in *Boren* and other cases because "the [Handgun License Requirement] does not prohibit Atlantic Guns from continuing to sell handguns to previous handgun purchasers or any new handgun purchasers, so long as they have a[] [Handgun License]." (Doc. 89 at 13.) Defendants offer no authority for this distinction, and none exists.

The undisputed facts also establish that Atlantic Guns has standing under *General Motors* because the Handgun License Requirement has reduced Atlantic Guns' handgun sales. Defendants admit that Atlantic Guns' handgun sales were reduced in 2014 and 2015. And the undisputed facts show that Atlantic Guns' handgun sales have in fact decreased since the Handgun License Requirement took effect. (*See* Doc. 85, Schneider Decl. & Doc. 77-1 at Exs. A & B (under seal).) There can be no dispute that Atlantic Guns has standing to bring this suit.

## II. Defendants failed to create any genuine dispute of fact that the Handgun License Requirement is burdensome, unnecessary, and ineffective.

Plaintiffs' Cross-Motion set forth dozens of undisputed material facts spanning more than 18 pages. (Doc. 77 at 2-19.) Defendants attempted unsuccessfully to dispute only a handful of these facts, but failed to create any genuine disputes because Defendants' admissions foreclose any.

Defendants failed to dispute that Maryland enacted the Handgun License Requirement to "intimidat[e]" Marylanders from exercising their constitutional right to acquire a handgun. Defendants' expert Professor Daniel Webster admitted as much at his deposition. (Doc. 77 at 22 & Doc. 77-5 at 30:1-33:16.) This case's record demonstrates that Professor Webster's desire to reduce lawful handgun ownership is representative of Defendant's long-held desire to prevent law-abiding

citizens from exercising their Second Amendment rights. *See, e.g.*, J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America*, at 6, 63 (Oct. 20, 1999) (stating the "goal" of "eliminat[ing] widespread handgun ownership through restrictive handgun licensing").

Moreover, in 2013, the Office of the Maryland Attorney General issued a letter advising the General Assembly that this then-proposed legislation would be constitutional because there was "significant scientific evidence demonstrating the efficacy of licensure systems in keeping handguns out of criminal hands." (Letter of Dan Friedman, Counsel to the General Assembly to The Honorable Brian Frosh, January 29, 2013 at 5, *attaching* D.W. Webster, et al*., Injury Prevention*, 2001;7:184-189. (attached as Exhibit 1).) Yet, in making that assertion, that Office relied on and attached an article by Prof. Webster stating that this purported "efficacy" arises through "laws that restrict **legal** gun ownership and gun transfers such as licensing and registration" so as to "constrain the supply of guns" that could conceivably be illegally transferred to or stolen by criminals. (*Id*. at 188 (emphasis added).) In short, the HQL law is aimed directly burdening the constitutional right of "legal gun ownership" and only through that burden hopes to affect crime. As explained in Plaintiffs' opening brief, legislation specifically intended to burden the exercise of a constitutional right is cannot stand. (Doc. 77 at 22-23.) At a minimum, such legislation is vastly overbroad and thus is not "tailored" to a legitimate purpose. (*Id*. at 52-55.)

Defendant's expert Chief James Johnson's deposition admission also confirms that the Handgun License Requirement was intended to intimidate citizens from exercising their citizens' right to acquire a handgun.

> Q. All right. So what is it about the fingerprinting process that in any way discourages straw purchases?
>
> A. I believe that an individual that knows that they have to render fingerprints is less likely to carry out the scheme. I believe that most individuals have a great concern or a concern about rendering their fingerprints. It's been my experience throughout my adult life that individuals are very concerned about the government possessing their fingerprints for various reasons that they'll have to explain.

(Doc. 77-7, J. Johnson Dep., at 24:14-25:3.)

Defendants cannot genuinely dispute that the Handgun License Requirement is the culmination of Maryland's well-documented desire to burden handgun possession through licensing schemes.

Defendants failed to dispute that the fingerprint requirement is burdensome. The undisputed facts establish that the fingerprinting requirement adds a burden while purportedly addressing a problem that does not exist. And the burden is substantial, because State approved private vendors are almost absent in vast areas of Maryland.  (*See* MSI Answer to Interr. 10 (attached as Exhibit 2).) All these areas include MSI members. (*Id.*)

Defendants failed to dispute that the fingerprint requirement is unnecessary. Defendants do not dispute that the preexisting 77R Handgun Registration process already allowed it to disarm unqualified firearm possessors. (Doc. 89 at. 3-4.) Defendants failed to dispute that the fingerprint requirement is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government issued photographic identification of another individual who does not have a criminal record. Defendants admit they have no evidence that anyone in Maryland fitting this description has ever attempted to purchase a handgun. (Doc. 77-6, A. Johnson Dep., at 114:4–117:7.)

Defendants failed to dispute that the Handgun License Requirement does not deter straw purchases. Chief Johnson's deposition confirms admits this fact:

> Q. Now, fingerprinting is not, per se, going to deter a straw purchaser; correct? Because by definition a straw purchaser is an individual who can be positively identified and is qualified to purchase a handgun; correct?
> . . .
> A: I believe that's an accurate statement.

(Doc. 77-7, J. Johnson Dep., at 24:4-12.)

Defendants failed to dispute that that the Handgun License Requirement's longer, in-person safety course requirement covers the same material as the indisputably effective pre-existing 77R

Handgun Registration 45-minute online presentation: state firearm law, home firearm safety, and handgun mechanisms and operation. (Doc. 89 at 5–6.) Defendants extoll the hypothetical benefits of "having the opportunity to ask questions and receive feedback from the instructor" and a "more thorough instruction on State firearm law." *Id*. at 29-30. Defendants do not provide support for these claims necessary to create a genuine dispute of fact, only its experts' inadmissible *ipse dixit*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (confirming that a court may disregard an expert's *ipse dixit*).

Defendants failed to dispute that the live-fire requirement provides a significant burden without a concomitant benefit. Chief Johnson's admission that "firing one round is not adequate" forecloses such a dispute. Defendants incorrectly claim that he also testified that the live-fire requirement would help prevent accidental discharges by demonstrating the applicant's ability to chamber a round and clear the weapon after firing. (Doc. 89 at 6.) Chief Johnson testified in full that:

> Well, personally, I think just firing one round is not adequate, but I do not think the requirement to show proficiency in discharging a round is unreasonable. Again, I would draw your attention to the process of actually chambering a round, which is an exercise in and of itself. And, you know, the average individual that's new to guns, I think, would struggle working that mechanism of the weapon, and I'm sure that's a necessary component or process in actually discharging a round.

(Doc. 77-7, J. Johnson Dep. at 52:9-53:2.) Chief Johnson did not state or even imply that firing one round would demonstrate proficiency in chambering or clearing a round. (*Id.* at 52:953:2.) Chief Johnson's testimony that he "thinks" that "repeat[ing] a process" of firing a firearm to create "muscle memory" does not create a dispute of fact that the live fire requirement, which requires the Handgun License Applicant to fire only one round, provides no benefit. (*Id.* at 106:20-107:5.) Defendants failed to dispute that the live fire requirement effectively bans completion of the Handgun License training in almost the entire urban part of Maryland, where local laws have banned the discharge of any live ammunition except at an established firing range. (Doc. 77-2, Pennak Decl. ¶¶15-19.) The live fire requirement thus effectively obstructs the ability of law-abiding citizens in these areas to

complete the Handgun License training course in their residential jurisdiction. MSI has members in every one of those jurisdictions.

Defendants failed to dispute that many Marylanders start but never complete the Handgun License application process, admitting that nearly 25 percent of Marylanders who initiate a Handgun License application do not complete it. (Doc. 89 at. 6-7.) Defendants argue that this information is not reliable because Plaintiffs have not identified these individuals and ascertained the precise reasons they did not complete a Handgun License application. That is simply smoke meant to obscure the obvious burden of the application process. The inference is inescapable that many if not most of these individuals intended to lawfully acquire a handgun but the Handgun License application's burden caused them to forgo their fundamental right to do so.  In sum, Defendants failed to create any genuine disputes of fact, establishing as a matter of law that the Handgun License unconstitutionally bans handgun acquisition by the law-abiding.

III.    **The undisputed facts establish that the Handgun License Requirement violates the Second Amendment.**

Defendants failed to dispute that the Handgun License requirement bans handgun acquisition without first obtaining a Handgun License. (Doc. 89 at 14-15.) The Handgun License Requirement is thus unconstitutional per se under *Heller*'s holding and analysis. Second, the undisputed facts establish that the Handgun License requirement cannot survive any form of heightened scrutiny. Defendants cannot escape their admissions that demonstrating that the Handgun License adds burdens to the 77R Handgun Registration requirements without any accompanying benefit.

A.    **The Handgun License Requirement is unconstitutional under *Heller*.**

Handgun bans are per se unconstitutional. *See District of Columbia v. Heller*, 554 U.S. 570 at 636 (2008). Defendants failed to dispute that that the Handgun License Requirement is a ban on handguns. Section 5-117.1(c) expressly prohibits Marylanders from "purchas[ing], rent[ing], or receiv[ing] a handgun" unless they "possess[] a valid handgun qualification license issued to the

person by the Secretary in accordance with this section." Defendants do not argue that Section 5-117.1 does not mean what it says. Instead, they argue that a number of Marylanders have obtained a Handgun License. (Doc. 89 at 14-16.) This has no bearing on whether the Handgun License Requirement bans individuals from acquiring a handgun *until* they obtain their Handgun License. Defendants' admission that no Marylander may acquire a handgun without first obtaining a Handgun License is dispositive that the Handgun License Requirement is incontrovertibly a ban. (*Id.*)

Defendants refuse to engage in the controlling *Heller* text, history, and tradition analysis. Summary judgment in favor of Plaintiffs is warranted because this ban has no historical antecedent and is inconsistent with the understanding of the right to keep and bear arms at the time of the founding. Maryland's Handgun License is unconstitutional under *Heller*, 554 U.S. at 628.

> **B.**   **Defendants failed to argue that the Handgun License Requirement satisfies strict scrutiny.**

The Supreme Court has held per se unconstitutional a categorical prohibition of handguns because it restricts, like here, the right of law-abiding, responsible citizens to keep arms in common use for lawful purposes like self-defense in the home. *See Heller*, 554 U.S. at 635–36; *McDonald v. City of Chicago*, 561 U.S. 742 at 785–86 (2010); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 at 1028 (2016). At least two other United States Circuit Courts of Appeal have applied the Supreme Court's categorical analysis despite intra-circuit precedent applying the two-step interest-balancing approach to laws less burdensome to the core Second Amendment right than the ones under consideration. *Compare Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), *with Ezell v. City of Chicago*, 651 F.3d 684 at 701–04  (7th Cir. 2011); *compare Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017), *with Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1252 (D.C. Cir. 2011). As in *Wrenn*, "*Heller I*'s categorical approach is appropriate here even though [this Court's] previous cases . . . applied tiers of scrutiny to gun laws." *See Wrenn*, 864 F.3d at 666.

If the Court nevertheless applies some measure of heightened constitutional scrutiny, it must select strict scrutiny because the Challenged Laws burden the core of the Second Amendment right. The Fourth Circuit confirmed this requirement most recently in *Kolbe,* sitting en banc, applying intermediate scrutiny to Maryland's assault rifle ban because it "ban[ned] only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition. Those include magazines holding ten or fewer rounds, nonautomatic and some semiautomatic long guns, and—most importantly—handguns" which are "'the quintessential self-defense weapon.'" *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc), quoting *Heller*, 554 U.S. at 629. *Kolbe* points to a strict scrutiny analysis for a law burdening the acquisition of handguns for use in the home, the Second Amendment's core right. The Handgun License Requirement does just that, and thus strict scrutiny is required.

Defendants make no argument that the Handgun License survives strict scrutiny. This concession is fatal to the Handgun License Requirement, because Defendants have the burden of establishing constitutionality under heightened scrutiny.

**C.   Defendants failed to meet their intermediate scrutiny burden under either the standard set forth by the Supreme Court or the *Kolbe* standard.**

**1.   Defendants failed to establish that the Handgun License alleviates any real problem in a direct and material way.**

Defendants failed to carry their burden to prove the existence of a real problem that the Handgun License alleviates in a direct and material way. *See e.g.*, *United States v. Nat'l Treasury Empls. Union*, 513 U.S. 454, 475 (1995 (*quoting Turner Broad Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("*Turner I*"); *see also Silvester v. Becerra*, 138 S. Ct. 945, 948 (2018) (Thomas J., dissenting from denial of writ of certiorari in Second Amendment case). The Supreme Court is clear that under intermediate scrutiny:

> When the Government defends a regulation . . . as a means to redress past harms or
> prevent anticipated harms, it must do more than simply posit the existence of the

> disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner Broad. Sys.*, 512 U.S. at 664 (citations omitted). Solutions to hypothetical, abstract problems cannot survive intermediate scrutiny. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (only rational-basis review allows the government to justify a law with "rational speculation unsupported by evidence or empirical data") (citations omitted).

Defendants point to two supposed benefits. First, there they claim there has been "a dramatic, statistically significant reduction in a major indicator in the diversion of guns to criminals." (Doc. 89 at 7.) But Defendants have failed to dispute that there has been no significant reduction in the availability of handguns for use in crime or in crimes committed with handguns. Defendants rely upon Professor Webster's study concluding that the Handgun License Requirement is associated with two "indicators" of a reduction of handguns to prohibited persons. One of these indicators is that two fewer handguns were recovered within one year of purchase from 2012 to 2013 and that eight fewer handguns were recovered from 2013 to 2014, this out of hundreds if not thousands of crime guns recovered annually in Baltimore. These numbers are a laughably low sample size that cannot be used to justify the sweeping conclusion relied upon by Defendants or to justify the State's infringement on a fundamental right. Moreover, the average "time to crime" of a handgun in Maryland is 12.4 years. If this is the average, the number of handguns that were recovered within one year is simply irrelevant to the evaluation of whether the Handgun License Requirement is effective.

Defendants try to bolster this data with a vague survey of unknown individuals, boasting that 41% of less than 200 individuals who are believed to be criminals in Baltimore opined – while in close proximity to a parole office – that the Handgun License Requirement has made it harder to acquire a handgun illegally. (Of course 41% is a minority and suggests that most criminals in Baltimore believe it is NOT harder to acquire a handgun illegally now.) Professor Webster

inexplicably relies upon this tiny sample of maybe criminals to conclude that the Handgun License is associated with a reduction of handguns to prohibited persons. The subjective, unsupported beliefs of an unidentified population of individuals is evidence of nothing.

Meanwhile, Defendants failed to dispute that the homicide rate in Maryland has increased, and significantly since the Handgun License Requirement took effect. Defendants rely instead on data suggesting that the homicide rate has decreased in three of 24 Maryland counties. (Doc. 89 at 25.) The Handgun License is actually associated with an increase in the homicide rate in Baltimore County, as well as Baltimore City. (Doc. 77 at 17-18.) The Handgun License Requirement is statewide, and Defendants lack any data even suggesting that the homicide rate has decreased statewide. Defendants' cherry-picking of three unrepresentative counties cannot support their arguments. Defendants have failed to carry their burden to prove that the Handgun License Requirement is effective at all, let alone sufficiently so to justify its burden on the law-abiding.

> **2.   Defendants failed to establish that the Handgun License is narrowly tailored or even reasonably adapted to a state interest.**

Defendants also pretend that *McCullen v. Coakley*, 134 S. Ct. 2518 (2014) does not apply here. In *McCullen*, the Supreme Court articulated Defendants' intermediate scrutiny burden to prove that laws, such as the Handgun License Requirement, impacting a fundamental right are "narrowly tailored to serve a significant government interest." *Id.* at 2534; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). Defendants must demonstrate a "tight fit" between the Handgun License Requirement and that government interest. *See Heller II*, 670 F.3d at 1258; *Ezell*, 651 F.3d at 708–09. Defendants again do not argue that the Handgun License Requirement survives this analysis and effectively concede that it cannot. *See also NY State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), *cert. denied*, 136 S.Ct. 2486 (2016) (striking down a 7 round load limit).

Defendants instead insist that they must establish only that the Handgun License is reasonably adapted to a substantial governmental interest. Defendants have not met their burden under this

-13-

standard either. Defendants claim several alleged benefits of the Handgun License Requirement, but each either contradicts Defendants' own admissions or is a benefit also provided by the pre-existing, less-burdensome, and effective 77R Handgun Registration requirement.

### a. The fingerprinting requirement is unnecessary and ineffective.

Defendants first argue that that fingerprinting requirement enables Maryland State Police to ensure that each Handgun License applicant is positively identified and not using false or altered identification. Defendants failed to dispute that the 77R Handgun Registration process provided Defendants this same ability. (Doc. 77-6, A. Johnson Dep., at 112:8–15.)

Defendants argue that the Handgun License Requirement has reduced straw purchases or purchases with false identification in Maryland. Defendants rely upon Professor Webster's 2017 study, which as demonstrated above at 12-13, provides no evidence of anything. And Defendants' expert admitted that the fingerprint requirement does not deter straw purchasing or purchasing with a false identification. (Doc. 77-7, J. Johnson Dep., at 24:4–12.) Defendants have no evidence that the Handgun License requirement has stopped or deterred even a single straw purchaser. (*Id*. at 25:10–16.) Defendants have not even attempted to determine the prevalence of straw purchasers in Maryland. (*Id*. at 28:6–14; Doc. 77-6, A. Johnson Dep., at 76:16–22.) Likewise, Defendants have no information regarding the number of purchases effectuated with a false identification. (Doc. 77-6, A. Johnson Dep., at 117:3–7.) Additionally, Defendants have no information demonstrating that the Handgun License has reduced the number of handguns recovered in crime or that the Handgun License requirement has reduced the number of firearms it recovers from prohibited individuals each year. (*Id*. at 78:3–79:4, 88:21–89:2, 109:17–110:11, 110:22–111:9.) Defendants admit their lack of evidence. (Doc. 89 at 22.) Defendants' admissions and failure of proof cannot be overcome by an inapt study.

Finally, Defendants argue third that the fingerprint requirement has enabled Maryland State Police to identify individuals who are subsequently convicted of disqualifying offenses and revoke their Handgun Licenses. Again, however, as established on page 7 above, Defendants admit that the pre-existing 77R Handgun Registration process provided this ability. This supposed benefit is not a benefit at all.

### b. The classroom training and live-fire requirements are unnecessary and ineffective.

Defendants argue that the classroom training and live-fire requirements "will reduce accidental discharges and access of firearms to ineligible persons, including minors."(Doc. 89 at 27-28.) Defendants' predictions, based on nothing but their witness' *ipse dixit*, simply do not satisfy intermediate scrutiny, which requires Defendants to prove the existence of a real problem that the Handgun License Requirement alleviates in a direct and material way.

Moreover, Defendants' conclusory claim that the 45-minute video required by the 77R Handgun Registration is "wholly-insufficient" fails because Section 5-117.1 allows those who currently own a registered firearm – and thus took only the 45 minute video – to purchase handguns without taking the classroom training or live-fire requirement. The General Assembly deems the 45 minute video sufficient. Defendants cannot now argue to the contrary. Defendants' purported interest is also belied by the undisputed fact that Defendants do not control or attempt to control the content of any course. (*See* Doc. 89 at 31.) Defendants do not dispute that each of the hundreds of private instructors throughout Maryland may create their own course curriculum, and the Maryland State Police does not monitor any course to ensure that the required material is being taught.

### 3. The Handgun License Requirement was not based upon substantial evidence.

Defendants failed to dispute Plaintiffs' proof of the paucity of evidence before the General Assembly. Instead, Defendants rely upon *Kolbe* as evidence that this little evidence was satisfactory. Defs. Reply, at pp. 32-33. In *Kolbe*, the General Assembly relied upon evidence directly related to a

-15-

ban on assault weapons. But the General Assembly heard no evidence regarding such critical elements as the live-fire requirement, and only conclusory, general support for the Handgun License Requirement's fingerprint and additional firearm safety course requirements. And it heard erroneous testimony from Professor Webster that the fingerprinting requirement would be effective in deterring straw purchasers because it would be administered by the police, who would supposedly intimidate would be straw purchasers from applying (and, as Chief Johnson admitted, *see* page 6 above, the law-abiding as well). But Maryland State Police off-loaded the fingerprinting onto private vendors and eliminated even this supposed benefit. (Doc. 77 at 10.)

## IV.     The Handgun License Requirement violates the Due Process Clause

Defendants' reliance on *Chow v. State*, 393 Md. 431 (2006), is unavailing as Defendants admit that *Chow* merely addressed the term "transfer." "Transfer" is a different term than "receive" under standard dictionary definitions and thus covers different conduct.  Defendants assert that it would be absurd to read "receive" broadly as that would encompass HQL training separately required by the statute.  (Def. Mem. at 33).  Yet, the terms "receive" and "receipt" cover much more than HQL training, as those terms facially encompass temporary possession of a handgun in the home by a member of the family who lacked an HQL or informal target practice at a range, or even NRA training courses, which are taught by MSI instructors.

Defendants assert that the State Police have consistently interpreted "receive" as not including temporary possession, but Defendants do not deny that defendants have "consistently" refused to incorporate that interpretation into any binding rule or regulation, despite MSI's request in 2013 that the State Police do so.  In fact, the State Police interpretation is "vaporware" as it can be ignored or disregarded at any time.  Even a formal Attorney General Opinion would be unavailing as such opinions are non-binding under Maryland law, *Montgomery Co. v. Atlantic Guns, Inc.*, 302 Md. 540, 548 (1985), and the Supreme Court has repeatedly "warned" against accepting such opinions as

"authoritative." *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000). If a court may not accept a formal Attorney General opinion, then *a fortiorari*, a court may not accept a mere State Police interpretation.

Defendants' reliance on *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012), is particularly misplaced. That ruling does not survive the Supreme Court's subsequent decision in *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015), where the Court held that a vague statute must be struck down even if some applications are clear. *See Kolbe,* 849 F.3d at 148 n.19 ("In *Johnson*, the Court rejected the notion that 'a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'"). Defendants do not, and cannot, escape the Supreme Court's decision in *Johnson*.

Defendants misleadingly suggest that the court in *Kolbe* relied on a State Police advisory, yet *Kolbe* actually held that a pre-existing "Attorney General's opinion, *coupled with* the State Police bulletin" provided guidance. *Kolbe*, 849 F.3d at 148-49 (emphasis added). No such formal, pre-existing Attorney General Opinion is present here. In any event, the *Kolbe* court overlooked the Supreme Court holdings, collected in *Stenberg*, which have expressly disapproved of any such reliance precisely because such "guidance" is not binding.

Finally, Defendants cling to an out-of-date position, erroneously contending that the vagueness challenge may be raised only in an "as applied" case. (Def. Mem. at 39). The Fourth Circuit has held that "[a]fter *Johnson*, at least, we know that a statute that doesn't raise First Amendment problems may nevertheless be impermissibly vague on due process grounds." *United States v. Larson*, 2018 WL 4203470 *2 (4th Cir. 2018). The Supreme Court in *Dimaya* applied *Johnson* to reject the dissent's suggestion that such challenges "must be limited to cases in which the statute is unconstitutionally vague as applied to the person challenging it." *Sessions v. Dimaya*, 138 S.Ct. 1204, 1242 (2018) (Thomas, J., dissenting). A facial vagueness challenge is cognizable.

**V.      Maryland State Police regulations and practices are ultra vires.**

   **A.      The live fire requirement cannot stand.**

Defendants failed to dispute that the Maryland State Police have impermissibly grafted onto Section 5-117.1(d)(3)(iii)'s requirement of a "firearms orientation component" an entirely new "practice component" under which the applicant must safely fire "at least one round of live ammunition." COMAR 29.03.01.29C(4).  Defendants merely opine, in an *ipse dixit*, that the live fire "practice component" allows the applicant to "demonstrate" the "safe operation of a firearm."  But, Section 5-117.1(d)(3)(iii), makes clear that the "demonstration" requirement is part of the "orientation component," and thus the meaning of "demonstration" is limited by what is necessary to provide an "orientation."  By common usage, an "orientation" to a firearm is done in a classroom where an instructor will "demonstrate" how a handgun is operated.  (Doc. 77-2, Pennak Decl. ¶¶8, 9.)

Defendants conceded that the General Assembly struck from Handgun License legislation a proficiency requirement that would have required live fire, asserting that there is "no evidence" that in doing so the legislature "intended to exclude a less onerous live-fire component."  (Doc. 89 at 42.) That assertion is false, as the legislature substituted an "orientation" component for the proficiency requirement.  (Doc. 77-2, Pennak Decl. ¶¶8, 9.)  That "orientation" requirement should be construed narrowly because a broad construction would create a severe Second Amendment constitutional problems associated with the lack of access to an established firing range that the live fire requirement necessitates.  (*Id*. at ¶¶15-19); *see, e.g*, *Galloway v. State*, 365 Md. 599 (2001).

   **B.      Maryland State Police practices violate the statute.**

Defendants have unlawfully refused to accept training certifications issued by instructors certified by a "nationally recognized firearms organization" (NRA) even though these individuals are specifically designated as a separate category of "qualified handgun instructors" by statute. Md. Code Ann., Public Safety § 5-101(q)(3).  Defendants first falsely claim that there is not a "hint" of this

claim in the complaint.   (Doc. 89 at 48.)   Paragraph 80(g) of the Amended Complaint (Doc. 14) specifically alleges that the State Police have gone beyond the HQL statute in "requiring training by a private State certified instructor."   Paragraphs 81, 82, and 83 (Doc. 14) allege that the State Police have illegally acted "beyond the statutory authority" and contrary to the Constitution in failing to recognize NRA training.

Defendants deny that NRA instructors are "licensed" by the State Police, but Defendants do not dispute that the State Police refuse to recognize any NRA instruction or any NRA course unless or until such instructors are approved by the State Police and issued a "certificate."   By any measure, such a "certificate" is tantamount to a "license" because only instructors possessing the "certificate" may conduct HQL training. (Doc. 89 at 49.)   That enforced conscription of NRA instructors is contrary to Section 5-101(q)(3), which makes plain that the legislature contemplated that NRA instructors are "qualified" (without more) and that NRA training would be sufficient (without more) as long as it met the requirements otherwise specified in Section 5-117.1(d). That is precisely why Section 5-117.1(e)(1) authorizes the State Police to accept an application where the applicant has "completed a certified firearms training course approved by the Secretary."

Instead, the State Police have refused to recognize **any** NRA course as sufficient (Doc. 77-2, Pennak Decl. ¶10) and will not accept NRA instructors and their instruction **unless** such instructors agree to be conscripted into the State Police electronic application system, a system that imposes still more burdens and duties on NRA instructors.   (*Id.*).   Defendants wrongly assert (Doc. 89 at 43) that Plaintiffs have abandoned their attack on the State Police reliance on private vendors. Plaintiffs' opening papers highlighted how unnecessary and oppressive this fingerprinting requirement is in Maryland.  (Doc. 77 at 14, 16, 29, 49, 53.)  Plaintiffs have specifically asserted that the State Police have hijacked the existing vendor system "to avoid the requirements imposed by Section 5-117.1(f)."

(*Id*. at 67).  That claim was raised in the Amended Complaint at paragraphs 80(d), 82 and 83 (Doc. 14). That claim has not been abandoned.

On the merits, Defendants substitute *ipse dixit* for analysis.  Defendants admit (Doc. 89 at 45) that Section 5-117.1(f)(3) imposes a mandatory duty on the State Police "to submit" the fingerprints and the requisite fees to the Central Repository.  Yet, in requiring that "submission," section 5-117.1(f)(3) plainly contemplates that the State Police provide fingerprinting services, which the State Police have refused to do.  As noted above, Professor Webster testified in support of this legislation under the impression that such fingerprinting would be performed by police so as to "intimidate" people from exercising their right to acquire a handgun. (Doc. 77-5 at 30, 174.) Undeterred, Defendants argue that the State Police are entitled to "delegate" that submission to another "agency" or to "subordinate officials" "within the agency."  (Doc. 89 at 46.)  But vendors are private businesses, not such an "agency" or "subordinate officials." Defendants have not cited a single case sustaining delegation of a mandatory duty to a wholly private business.

Defendants cavalierly assert that the costs shifted to applicants are merely "small administrative fees and purported inconvenience."  (Doc. 89 at 46.)  Yet, there is nothing minor about the burdens associated with the use of private vendors.  Such private vendors are rare or non-existent in rural parts of Maryland and thus impose substantial burdens in addition to the fees such vendors are free to charge. (Doc. 77 at 14 & n.4; MSI Answer to Interr. 10 (attached as Exhibit 2).) The State Police simply may not disregard its statutory duties so as to impose these costs and burdens on Handgun License applicants.

## Conclusion

For the foregoing reasons, Defendants failed to create a genuine dispute of fact and Plaintiffs are entitled to judgment as a matter of law.

Respectfully Submitted,

/s/ Cary J. Hansel
Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Counsel for Plaintiffs

John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: December 7, 2018                    Counsel for Plaintiff Atlantic Guns, Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th day of December, 2018, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)