FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 APR -4 PM 5: 29

CLERK'S OFFICE
AT BALTIMORE

DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., et al. | * |
| | * |
| | * **UNDER SEAL** |
| v. | * Civil Case No. ELH-16-3311 |
| | * |
| LAWRENCE HOGAN, et al. | * |
| | * |

\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

In this case, the Court considers a challenge to the constitutionality of Maryland's handgun licensing requirement, enacted in 2013 by the Maryland General Assembly as part of a comprehensive effort to protect public safety.[1] The legislation, known as the Firearm Safety Act of 2013 (the "FSA" or the "Act"), was spawned by the tragic, senseless, and brutal murders committed in Newtown, Connecticut in 2012, when 20 first-graders and six adults were slaughtered by an individual who used an AR-15-type Bushmaster rifle. *See Kolbe v. Hogan*, 849 F.3d 114, 119-20 (4th Cir. 2017) (en banc), *cert. denied*, ___ U.S. ___, 138 S. Ct. 469 (2017).[2]

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), for itself and approximately 772 members; Atlantic Guns, Inc. ("Atlantic Guns"); Deborah Kay Miller; and Susan Vizas have filed suit against defendants Lawrence Hogan, in his capacity as Governor of Maryland, and William M. Pallozzi,

---

[1] This case was initially assigned to Judge Marvin Garbis. It was reassigned to me on July 26, 2018, due to the retirement of Judge Garbis. *See* Docket.

[2] In *Kolbe*, the Fourth Circuit concluded, *inter alia*, that the FSA's ban on assault weapons did not contravene the Second Amendment, because such weapons are not protected by the Second Amendment. 849 F.3d at 121. Alternatively, it ruled that, even if the banned weapons "are somehow entitled to Second Amendment protection," the provision was properly subjected to intermediate scrutiny and is "constitutional under that standard of review." *Id.*

in his capacity as Superintendent of the Maryland State Police. ECF 1.[3] Plaintiffs' suit concerns the provision in the FSA that requires a prospective handgun buyer to obtain a Handgun Qualification License ("HQL") before purchasing a handgun. *See* Md. Code (2018 Repl. Vol.), § 5-117.1 of the Public Safety Article ("P.S.").

Plaintiffs' First Amended Complaint (ECF 14) contains three counts. Count I (¶¶ 47-57) asserts a claim alleging violation of the Second Amendment of the Constitution. According to plaintiffs, the HQL application process "unnecessarily chills the exercise of Second Amendment rights . . . . *Id.* ¶ 49. Count II asserts a violation of the Due Process Clause of the Fourteenth Amendment, based, *inter alia*, on statutory vagueness. In Count III (¶¶ 74-87), plaintiffs allege an ultra vires claim under Md. Code, § 10-125(d) of the State Government Article ("S.G."), challenging rulemaking by the Maryland State Police ("MSP"). Plaintiffs seek, *inter alia*, an order declaring that P.S. § 5–117 violates the Second Amendment and the Due Process Clause of the Fourteenth Amendment, both on its face and as applied. ECF 16 at 21-22.

Defendants moved to dismiss the First Amended Complaint. ECF 18. On September 6, 2017, Judge Marvin Garbis, to whom the case was then assigned, issued a Memorandum and Order (ECF 34), dismissing a challenge to the Instructor Certification Requirement of the Act with respect to Count II. He denied the motion as to all other claims. *Id.*

Discovery has since concluded. Now pending is defendants' motion for summary judgment under Fed. R. Civ. P. 56 (ECF 59), supported by a memorandum (ECF 59-1) (collectively, "Defendants' Motion") and multiple exhibits. Plaintiffs filed a consolidated opposition and cross motion for summary judgment (ECF 77, "Plaintiffs' Motion"), along with

---

[3] Two plaintiffs named in the suit (ECF 1; ECF 14), Ana Sliveira and Christine Bunch, have since abandoned their claims. *See* ECF 44.

2

numerous exhibits. Defendants filed a combined reply in support of Defendants' Motion and an opposition to Plaintiffs' Motion (ECF 89), along with many more exhibits. Plaintiffs replied (ECF 96) and submitted additional exhibits.

Each side has also filed a motion to exclude the other side's expert witnesses, along with oppositions and replies to each motion (collectively, "the Expert Witness Motions"). *See* ECF 79; ECF 90; ECF 91; ECF 94; ECF 95; ECF 97.

Several amici have filed briefs, with leave of court. They focus largely on whether the Act comports with the Second Amendment. ECF 70; ECF 78.[4]

No hearing is necessary to resolve the pending motions. *See* Local Rule 105(6) (D. Md. 2018). For the reasons that follow, I conclude that plaintiffs lack standing to pursue their claims. Accordingly, I shall grant Defendant's Motion, deny Plaintiffs' Motion, and deny, as moot, the Expert Witness Motions.

## I. Factual Background[5]

### A. The FSA

In 2013, the Maryland General Assembly enacted the FSA. In relevant part, the statute requires most Maryland handgun purchasers to first obtain a Handgun Qualification License. Subject to certain exemptions, "[a] dealer or any other person may not sell, rent, or transfer a

---

[4] The submissions from amici are as follows: a brief filed by Everytown for Gun Safety, a gun-violence-prevention organization, in support of Defendants' Motion, ECF 70; a brief in support of Plaintiffs' Motion, filed jointly by the International Law Enforcement Educators and Trainers Association, the International Association of Law Enforcement Firearms Instructors, the Second Amendment Foundation, the Citizens Committee for the Right to Keep and Bear Arms, Jews for the Preservation of Firearms Ownership, the Millennial Policy Center, the Independence Institute, and eleven law professors from various institutions. ECF 78.

[5] The Factual Background is largely derived from the exhibits submitted by the parties, including various declarations and deposition transcripts.

3

handgun" to a second person, and the second person "may not purchase, rent, or receive a handgun" from the first person, unless the buyer, lessee, or transferee presents a valid HQL. P.S. § 5-117.1(b), (c). In order to obtain an HQL, the applicant must satisfy several requirements. A person who violates the statute is guilty of a misdemeanor, and is subject to imprisonment for up to five years and/or a fine not exceeding $10,000. *Id.* § 5-144(b).

The FSA requires the Secretary of the Maryland Department of State Police ("MSP") to issue an HQL to an applicant who satisfies four criteria: (1) the applicant must be at least 21 years of age; (2) the applicant must be a Maryland resident; (3) the applicant must have completed an acceptable firearms training course within three years of applying for an HQL; and (4) the applicant must not be otherwise prohibited from owning a firearm, based on a background investigation after fingerprints are provided by the applicant. *Id.* § 5-117.1(d).

An applicant must complete a written application, in a manner designated by the Secretary, and payment of a non-refundable application fee in an amount not to exceed $50. *Id.* § 5-117.1(g). Moreover, the application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" the Maryland Department of Public Safety and Correctional Services ("DPSCS") and the Federal Bureau of Investigation. *Id.* § 5-117.1(f)(3)(i); ECF 59-7 at 1-9 (Declaration of MSP Captain Andy Johnson), ¶ 23.[6] The applicant must also submit proof of completion of the training requirement, and a statement under oath that he or she is not prohibited from gun ownership. P.S. § 5-117.1(g).

The Secretary of MSP must apply to DPSCS for a criminal history records check for all HQL applicants. *Id.* § 5-117.1(f)(2). If DPSCS receives criminal history information "after the

---

[6] ECF 59-7 exceeds 100 pages, and includes multiple exhibits. Defense counsel did not include a table of contents for ECF 59-7 to facilitate the location of the exhibits.

4

date of the initial criminal history records check," the MSP may revoke the HQL of a person who becomes ineligible to possess the handgun. *See* ECF 59-7 at 7, ¶¶ 23, 24.

In order to obtain a valid HQL, most applicants must complete a four-hour firearms safety training course, taught by a qualified handgun instructor ("QHI"), consisting of both classroom instruction and "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." P.S. § 5-117.1(d)(3). However, an applicant is exempt from the training requirement under certain conditions, including prior completion of safety training or lawful ownership of a "regulated firearm." *Id.* §§ 5-117.1(e); 5-101(r).

The Act requires the MSP to process any completed application within 30 days of its receipt. *Id.* § 5-117.1(h). Once issued, an HQL is valid for ten years (*id.* § 5-117.1(i)) and may be renewed. Id. § 5-117.1(j).

If the HQL is not approved, the Secretary must provide a written denial, along with a statement of reasons and notice of appeal rights. *Id.* § 5-117.1(h). A person whose application is not approved may request a hearing with the Secretary within 30 days of the denial, and thereafter may seek judicial review in State court. *Id.* § 5-117.1(I)(1), (3).

As authorized by the Act, the MSP adopted regulations to effectuate the HQL requirements. *See* P.S. §§ 5-105; 5-117.1(n); Code of Maryland Regulations ("COMAR") 29.03.01.26-41. Among other things, the regulations require submission of an online application for an HQL, which includes the applicant's "name, address, driver's license or photographic identification soundex number," along with other identifiers and a nonrefundable application fee of $50. COMAR 29.03.01.28. The regulations also require that the applicant's fingerprints be taken by a State-certified vendor using "livescan" technology, which requires a fingerprinting fee of $17. P.S. § 5-117.1(f)(3)(i); ECF 59-7 at 7, ¶ 23; ECF 59-7 at 81-84.

5

With respect to the required firearms safety training course, the regulations require the course to include "a practice component in which the applicant safely fires at least one round of live ammunition." COMAR 29.03.01.29. However, as of November 17, 2017, MSP permits the use of "non-lethal marking projectiles" to satisfy the HQL's "live fire" training requirement. *See* ECF 59-7 at 100.

## B. The Plaintiffs

MSI is a non-profit membership organization that is "'dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public.'" ECF 77-2 (Decl. of Mark W. Pennak, MSI President), ¶ 2 (quoting https://www.marylandshallissue.org/jmain/index.php). MSI's purposes include "promoting and defending the exercise of the right to keep and bear arms" and "defending the Constitutional right of law-abiding persons to lawfully purchase, own, possess and carry firearms and firearms accessories." *Id.*

MSI's membership has grown since suit was filed. As of October 3, 2018, it had more than 1,100 members throughout Maryland. *Id.*

In the course of this litigation, MSI identified four members "whose circumstances MSI relies upon in part to establish standing and other elements of its case." ECF 59-11, MSI's Response No. 1. One of those members, Deborah Miller, is also one of the named plaintiffs. The second MSI member, John Matthew Clark, purchased a 9-millimeter handgun in September 2013, before the HQL Act took effect. ECF 59-13 (Clark Deposition) at 3. Mr. Clark uses his handgun for target shooting at a range approximately two miles from his home. *Id.* at 4. He wants a larger 9-millimeter handgun, but has not shopped for or selected one. *Id.* at 5. Moreover, Mr. Clark has

not applied for an HQL, because he believes the requirement is unconstitutional, and he is deterred by the cost. *Id.* at 10-11. He did some "very light research" in 2014 on the required fingerprinting, but does not remember the exact fees and hours. *Id.* at 8-10. He believes he would be exempt from the law's training requirement. *Id.* at 12.

The third identified MSI member, Dana Hoffman, testified that she has not fired a gun since the 1960s. ECF 59-14 (Hoffman Deposition) at 5. She went to a gun show for the first time in 2017. *Id.* at 4. Ms. Hoffman would like to have a license to purchase a handgun, but has not decided on a particular gun. *Id.* at 3. Nor has she applied for an HQL. *Id.* at 18. She has no financial hardship, and she has a computer, internet access, a credit or debit card, a driver's license, and a scanner. *Id.* at 12-13. Ms. Hoffman has hyperacusis, a condition affecting her hearing, and she is unable to tolerate noise. *Id.* at 5-7. She believes that in order to complete the HQL training course, she would have to fire at least 20 bullets. *Id.* at 7. However, she is not sure how long the required training would take. *Id.* at 16.

The fourth identified MSI member, Scott Miller, was prompted to join the organization as a result of the passage of the Act. ECF 59-12 (Scott Miller Deposition) at 4. Mr. Miller owns a sporting shotgun, and has shopped online for handguns, but does not have the money to purchase one right now. *Id.* at 5. He has a computer, internet access, a credit or debit card, a driver's license, and a scanner. *Id.* at 6. Mr. Miller believes that the training class required for the HQL lasts about ten hours. *Id.* at 7. He has taken most of Maryland's Hunter Safety Course, but still has one requirement to complete. *Id.* at 8. Mr. Miller has not completed an application for an HQL, due to principle and inconvenience. *Id.* at 12-14. Nor has he done any research regarding the fingerprinting requirement. *Id.* at 10-12.

7

Plaintiff Atlantic Guns is a licensed federal firearms dealer. ECF 14, ¶ 26. Under seal, Stephen Schneider, the owner of Atlantic Guns, has submitted a declaration with attached data showing the number of guns sold in Atlantic Gun's two stores, and the gross revenue derived for each year from 2000 through 2017. ECF 84 [SEALED]. Atlantic Guns

> is aware of individual potential customers who express an interest in purchasing a handgun but cannot for lack of a Handgun Qualification License. Sometimes potential customers make a deposit toward the purchase. Atlantic Guns holds the deposit. On many occasions, customers will ask for a return of the deposit, having not acquired a Handgun Qualification License. Once the deposit is returned, Atlantic Guns does not retain the potential customer's information. As to deposits currently being held, Atlantic Guns cannot know if the customer is pursuing the Handgun Qualification License or not.

ECF 59-16, Atlantic Guns's Interrogatory Response No. 7.

Atlantic Guns cannot identify, by name, any potential customers who were denied HQLs or were deterred from purchasing handguns by the HQL requirement. *Id.*; ECF 59-15 (Deposition of Schneider, Corporate Designee) at 4-5. Schneider acknowledged at his deposition that he cannot establish that any reduction in business "was caused exclusively by the HQL requirement. . . ." *Id.* at 7.

Plaintiff Deborah Kay Miller joined MSI in 2017. ECF 77-4 (Miller Deposition) at 11. Ms. Miller would like to purchase a handgun, and previously looked at some guns, but has not made any decisions about the type of gun she wants to purchase or the price she is willing to pay. *Id.* at 10-11. Ms. Miller can afford the cost of an HQL, but has not taken any steps to initiate the application process. *Id.* at 12-14. She has a computer, internet access, a credit or debit card, a driver's license, and a scanner. *Id.* at 6. But, she claims that she has been deterred from applying for an HQL because of the time required for the training course. *Id.* at 12. She has not investigated whether the HQL training would require her to miss time at work. *Id.* at 13.

Ms. Miller suffers from a back injury that she claims would make it difficult for her to sit through safety training. But, she has not inquired whether an accommodation can be made or whether the trainer would permit her to stand at will. *Id.* at 14. Ms. Miller is concerned that the Act is vague as to whether using her husband's gun at the firing range or at home would constitute "receipt," potentially subjecting her to prosecution. *Id.* at 9, 15-17.

Plaintiff Susan Vizas has passed Maryland's Hunter Safety Training course. ECF 59-10 (Vizas Deposition) at 16-17. Her spouse owns firearms, although she is not certain whether he has an HQL. *Id.* at 4. Ms. Vizas has a computer, internet access, a credit or debit card, a driver's license, and a scanner. *Id.* at 3-4. She decided in 2015 that she wanted to purchase a handgun. *Id.* at 5. She did not purchase one earlier because of financial constraints. *Id.* at 8-9. Ms. Vizas has not decided on a particular gun to purchase, and has not done a lot of research into available options. *Id.* She has not taken steps to apply for or to obtain an HQL, because she is deterred by the expense and the time required to take a class, get fingerprinted, and wait for a background check. *Id.* at 22. She believes the total cost to obtain an HQL would be about $400. *Id.* at 12.

## II. Legal Standards

### A. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Harmoosh*, 848 F.3d at 238 ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there

are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United*

*States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a genuine dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

When, as here, the parties have filed cross motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)

11

(citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both sides have moved for summary judgment, it does not follow that summary judgment is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE, § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

## B.     Standing

Defendants first argue that this Court is without subject matter jurisdiction to consider this case because each plaintiff lacks Article III standing to pursue the suit. According to defendants, plaintiffs have failed to provide any evidence that "they have suffered a concrete injury that is fairly traceable to the HQL law." ECF 59-1 at 18.

Plaintiffs counter that they have standing to challenge the HQL requirement. ECF 77 at 44. MSI maintains that it has both organizational and representative standing. *Id.* Moreover, plaintiffs claim that the individual plaintiffs have standing to challenge the Act on vagueness and other grounds. *Id.* at 48. They also contend that they need not have applied for an HQL in order to obtain standing. *Id.* at 47. And, they claim that Atlantic Guns has standing because it has suffered a loss of revenue and because its customers have been injured. *Id.* at 52.

To establish standing under Article III of the Constitution, a plaintiff must satisfy three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely,

as opposed to merely speculative, that the injury will be redressed by a favorable
decision.

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper v. Amnesty Int'l
USA*, 568 U.S. 398, 409 (2013); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th
Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668,
671 (4th Cir. 2012); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

It is a bedrock principle that Article III of the Constitution limits judicial power to "actual,
ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477 (1990) (citations
omitted); *see Clapper,* 568 U.S. at 488. "Indeed, 'no principle is more fundamental to the
judiciary's proper role in our system of government than the constitutional limitation of federal-
court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.,* 856
F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. ——, 136 S.Ct. 1540,
1547 (2016)).

The Supreme Court explained in *Arizona Christian School Tuition Organization v. Winn*,
563 U.S. 125, 133 (2011): "Continued adherence to the case-or-controversy requirement of Article
III maintains the public's confidence in an unelected but restrained Federal Judiciary . . . . For the
federal courts to decide questions of law arising outside of cases and controversies would be
inimical to the Constitution's democratic character." *See also DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332, 341 (2006) ("[T]he constitutional limitation of federal-court jurisdiction to actual
cases or controversies" is "fundamental to the judiciary's proper role in our system of
government[.]"); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (stating that
Article III standing "enforces the Constitution's case-or-controversy requirement"), *abrogated in
part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118
(2014); *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (stating that under Article III of

the Constitution "'the exercise of judicial power depends upon the existence of a case or controversy'") (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)); *Miller v. Brown,* 462 F.3d 312, 316 (4th Cir. 2006) (stating that Article III "gives federal courts jurisdiction only over cases and controversies") (internal quotation marks and citations omitted).

Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). Conversely, in the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . . " *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc.*, 136 S.Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The "constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [] of justiciability.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted). Like standing, ripeness is an issue of subject matter jurisdiction. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see Nat'l Ass'n for the Advancement of Colored People v. Bureau of the Census*, PWG-18-891, 2019 WL 355743, at \*8 (D. Md. Jan. 19, 2019) ("NAACP") (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

14

As with standing, the ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). Standing focuses on who can sue, and ripeness "'concerns the appropriate timing of judicial intervention.'" *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)); *see NAACP*, 2019 WL 355743, at \*8 (noting that standing addresses who may sue, and ripeness addresses when a party may sue).

Notably, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). In other words, "the ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements' . . . ." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citations omitted); *see also South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019); *NAACP*, 2019 WL 355743, at \*14.

The doctrines of ripeness and standing have largely blurred in declaratory judgment actions. *See* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3532.5 (3d ed. 2018). In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court recognized that "standing and ripeness boil down to the same question." *Id.* at 128 n.8; *accord Susan B. Anthony*, 573 U.S. at 157 n.5; *see South Carolina v. United States*, 912 F.3d at 730; *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *NAACP*, 2019 WL 355743, at \*8; *see also Capital Associated Indus., Inc. v. Stein*, 283 F.Supp.3d 374, 380 (M.D.N.C. 2017) (characterizing discussion of standing and ripeness as "one involving 'standing'" in light of *MedImmune* and *Susan B. Anthony*).

15

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11. As discussed, *infra*, "the standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case . . . ." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth. Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

As indicated, the requirements for constitutional standing reflect that Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984), abrogated in part on other grounds by *Lexmark Int'l, Inc.*, *supra*, 572 U.S. 118; *see also Lujan*, 504 U.S. at 560 ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III[.]"); *So. Walk at Broadlands Homeowner's Assoc. Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)).

In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's exercise of jurisdiction. *United States v. Windsor*, 570 U.S. 744 (2013); *see also, e.g., Elk Grove Unified Sch. Dist.*, 542 U.S. at 11; *Doe v. Sebelius*, 676 F.Supp.2d 423, 428 (D. Md. 2009). Prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (citation omitted).

One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This limitation serves to "preclude a court from deciding

'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.*, 125 F.Supp.2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th Cir. 1984)).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Lujan*, 504 U.S. at 561; *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). When "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal*, 911 F.3d at 187 (quoting *So. Walk*, 713 F.3d at 181-82); *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Moreover, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [because] on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citation and quotation marks omitted); *accord Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018); *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205 (4th Cir. 2017); *NAACP*, 2019 WL 355743, at *17.

But, given the post-discovery posture of this case, the Court does not consider the challenge to standing on the basis of the pleadings. The standing issue is presented here in the procedural posture of cross-motions for summary judgment, after the parties have had the benefit of full discovery.

A court must assess a plaintiff's standing as of the date the suit is filed. *See Lujan*, 504 U.S. at 570 n.5 (plurality opinion). A plaintiff's proof as to each element of standing "must be

17

supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. In this case, presenting at the summary judgment stage, plaintiffs cannot merely rely on their allegations. Rather, they must cite to "particular parts of materials in the record" that, taken as true, show that "a fact [relevant to standing] cannot be or is genuinely disputed." *Equal Rights Center v. Equity Residential*, 798 F. Supp. 2d 707, 719 (D. Md. 2011) (quoting Fed. R. Civ. P. 56(c)(1)). If, as to the standing issue, defendants show "that there is no genuine dispute as to any material fact," the court is required to grant summary judgment. Fed. R. Civ. P. 56(a).

To meet the injury-in-fact requirement, a plaintiff must establish that he/she/it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural and hypothetical.'" *Spokeo, Inc.*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). As the Fourth Circuit recently explained in *Deal*, 911 F.3d at 189, the two concepts— actual, ongoing injury or imminent injury—are "disjunctive." Also of relevance here, "the Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

A threatened injury can also satisfy Article III standing, although "not all threatened injuries constitute an injury-in-fact." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 137 S. Ct. 2307 (2017); *see South Carolina*, 912 F.3d at 726. An "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see Lujan*, 504 U.S. at 564, 112 S.Ct. 2130. But, "'[a]llegations of possible

18

future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original)). This requirement serves "to ensure that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

In some cases, it is enough that there is a "substantial risk" of the occurrence of a harm that "prompt[s] plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. However, in such a case, the plaintiff cannot rely on an "attenuated chain of inferences" nor "on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). Nor can plaintiffs "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.; see, e.g., Wikimedia*, 857 F.3d at 216 ("Nor can Plaintiffs establish standing on the ground that . . . surveillance compels them to take burdensome and costly measures.").

In general, "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (internal quotation marks omitted). On the other hand, a claim "should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Id.* (internal quotation marks omitted). As the Fourth Circuit recently reiterated, "an alleged harm is too 'speculative' to support Article III standing when the harm lies at the end of a 'highly attenuated chain of possibilities.'" *South Carolina*, 912 F.3d at 727 (quoting *Clapper*, 568 U.S. at 410).

19

Of note, Judge Garbis considered the standing issue in this case preliminarily in adjudicating defendants' Motion to Dismiss. As to the Second Amendment claim, resolving all inferences in favor of plaintiffs, he said, ECF 34 at 20: "Plaintiffs allege adequate facts to present a plausible claim that the HQL Provision and regulations have deprived them (or their members or customers) of the Second Amendment right to possess a handgun in the home for self-defense." With respect to the vagueness challenge, Judge Garbis found it sufficient at the motion to dismiss stage that MSI had alleged that its members were confused as to whether they could allow temporary possession of their handguns to individuals who do not possess an HQL. ECF 34 at 26. Moreover, he found that plaintiffs had sufficiently stated an ultra vires claim under Maryland law. *Id.* at 29. But, he dismissed plaintiffs' due process claim as to the law's reliance on private handgun instructors, concluding that the claim was speculative because plaintiffs had not alleged the deprivation of any right and the regulations did not vest instructors with discretionary power. *Id.* at 24-25 & n.13.

Nevertheless, Judge Garbis said, ECF 34 at 16: "Ultimately, to prevail, Plaintiffs must prove the identity of specific individuals who are personally injured or deterred by each contested aspect of the challenged requirements in order to have standing." He also said, *id.* at 15-16 (emphasis in original):

> The Amended Complaint does not contain even general factual allegations that any individual Plaintiff or any member/customer of the entity Plaintiffs are affected by aspects of the [Act] other than time and cost, nor do they make allegations that would allow the Court to derive an inference that they are burdened by some of these provisions, such as the need for access to a computer, a debit card, or a fixed address.

> \*\*\*

> Taken in a light most favorable to Plaintiffs, with all inferences that can be derived from the facts alleged, it is plausible that some MSI members do hunt for their food or live in urban areas, and thus have standing as to those challenges. Ultimately, to

20

prevail, Plaintiffs must prove the identity of specific individuals who are personally injured or deterred by each contested aspect of the challenged requirements in order to have standing.

## III. Discussion

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *See* U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), the Supreme Court determined that, by its operative clause, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."

According to the *Heller* majority, the Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 634-35. Nevertheless, the Court recognized that "the right secured by the Second Amendment is not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Indeed, the Court has made clear that the Second Amendment permits "reasonable firearms regulations." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010); *see also Caetano v. Massachusetts*, ___ U.S. ___, 136 S. Ct. 1027 (2016) (per curiam); *Kolbe v. Hogan*, 840 F.3d 114, 132 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

The parties primarily dispute whether the injury-in-fact element is satisfied here. An injury-in-fact is the "[f]irst and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). As described above, to demonstrate an injury-in-fact, the plaintiff must have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

21

## A. Individual Standing

### 1. Second Amendment

As indicated, neither of the two individual plaintiffs in this case has applied for an HQL. Nor has either one investigated the specific requirements for application. ECF 77-4 (Deborah Miller Deposition) at 12-14; ECF 59-10 (Vizas Deposition) at 8, 9, 22. Moreover, neither has cited facts to demonstrate that she would be unable to obtain an HQL if she were to complete the application form.

Defendants contend that the individual plaintiffs and identified MSI members have failed to establish standing because "plaintiffs have put forth no evidence that it would be 'impossible' for them to complete the application for an HQL." ECF 89 at 15 (quoting *Dearth v. Holder*, 641 F.3d 499, 500 (D.C. Cir. 2011)). They claim that plaintiffs were merely "unfamiliar with the requirements, simply did not wish to comply with them, or failed to research or seek any accommodation for their alleged disabilities." ECF 89 at 15.

Plaintiffs insist that, to establish standing, they do not have to show that they applied for the HQL, because they are challenging the "regulatory and 'statutory classifications'" that limit their acquisition of firearms. ECF 77 at 47 (quoting *Dearth*, 641 F.3d at 500). They add that they "do not have to apply for a permit that they do not want." ECF 77 at 47.

Generally, "to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (quoting *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) (punctuation omitted); *see also So. Blasting Servs., Inc. v. Wilkes Cty., No. Car.*, 288 F.3d 584, 595 (4th Cir. 2002) (finding plaintiffs lacked standing to bring a constitutional claim to a permitting scheme where "plaintiffs have never even applied for a permit, much less been denied one" and "cannot

demonstrate an actual injury"); *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (per curiam) ("[A] plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit.").

In *Decastro*, 682 F.3d at 164, the Second Circuit determined that plaintiff did not have standing to challenge New York's gun licensing laws as applied to him because he had failed to apply for a gun license. The Fifth Circuit has likewise determined that a plaintiff lacked standing to challenge a federal law requiring a certification from local law enforcement officials before transferring a machine gun, where the plaintiff had not fully completed the certification process. *Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996). In other instances, courts relied on plaintiffs' submission to the challenged policy to support a finding of standing to sue. *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (concluding that the fact that a plaintiff "has applied for and been denied a registration certificate to own a handgun . . . constitutes an injury independent of the District's prospective enforcement of its gun laws" and noting: "We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury"); *Kwong v. Bloomberg*, 876 F. Supp. 2d 246, 251 (S.D.N.Y. 2012) ("The individual plaintiffs in this case have suffered a concrete and actual injury because they have all paid the $340 application fee that is challenged as unconstitutional.").

An exception lies where the plaintiff can demonstrate by a "substantial showing" that submitting to the challenged policy would be "futile." *Hamilton v. Pallozzi*, 848 F.3d 614, 620-21 (4th Cir. 2017) (determining that a plaintiff need not apply for a handgun permit to make his claim justiciable, where the state "has erected a regulatory scheme that precludes [a plaintiff] from truthfully completing the application form the Government requires for the purchase of a firearm.") (quoting *Dearth*, 641 F.3d at 502); *see Jackson-Bey*, 115 F.3d at 1096 ("This threshold requirement

23

for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit (or, in this case, registration) would have been futile.").

Plaintiffs rely principally on *Dearth v. Holder*, *supra*, 641 F.3d 499. They argue that in *Dearth*, the D.C. Circuit sustained a plaintiff's standing to challenge a regulatory scheme that "impaired his ability to obtain a firearm," and "expressly rejected the same argument made by Defendants here, explaining that ... 'the right to possess, not the right to a permit or license, was the substance of their claim.'" ECF 77 at 47 (quoting *Dearth*, 641 F.3d at 501).

The plaintiff in *Dearth*, an American citizen who resided in Canada, challenged "a regulatory scheme that preclude[d] [him] from truthfully completing the application form the Government requires for the purchase of a firearm[.]" *Id.* at 502. The challenged laws, among other things, made "it unlawful for 'any person . . . who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes." *Id.* at 501 (quoting 18 U.S.C. § 922(a)(9)). The plaintiff "twice attempted to go through the 'formal process' of applying to purchase a firearm and each time failed" because he could not truthfully state that he resided in the United States. *Id.* Indeed, the court noted that the challenged laws and implementing regulations "together make it *impossible* for a person who lives outside the United States lawfully to purchase a firearm in the United States." *Id.* at 500 (emphasis added). Based on the plaintiff's efforts to acquire a firearm and his stated intent to return to the United States, the D.C. Circuit concluded that his injury was "sufficiently real and immediate" to find standing. *Id.* at 503.

Plaintiffs' reliance on *Dearth* is misplaced. The Fourth Circuit has relied on *Dearth* in a futility context, stating: "[W]e agree with our sister circuits that plaintiffs are not required to undertake futile exercises in order to establish ripeness, and may demonstrate futility by a

24

substantial showing." *Hamilton*, 848 F.3d at 621. However, post discovery, the individual plaintiffs have made no showing as to futility, much less a substantial one.

Plaintiffs also rely on cases in the First Amendment context to argue that a permit denial is not required to establish standing. *See* ECF 77 at 47 (citing *A.N.S.W.E.R. Coalition v. Salazar*, 915 F. Supp. 2d 93, 103 (D.D.C 2013)); *Prayze FM v. FCC*, 214 F.3d 245, 251 (2d Cir. 2000)).

In *A.N.S.W.E.R.*, 915 F. Supp. 2d at 96, a grassroots organization challenged the constitutionality of a regulation that granted exclusive access on a parade route to the "Presidential Inaugural Committee" or "PIC." The plaintiff sought to secure space for its members to engage in political dissent during the Presidential Inaugural Parade, but had yet to apply for or obtain a permit. *Id.* The court found that, under the circumstances, a permit denial "is not a prerequisite to establish standing." *Id.* at 103 (citing *Dearth*, 641 F.3d at 502). The fact that the plaintiff "did not apply for, and thus was not denied, a permit for sidewalk space" did not bar it "from establishing standing with respect to its lack of access to those areas." *A.N.S.W.E.R.*, 915 F. Supp. 2d at 103.

Likewise, in *Prayze FM*, the Second Circuit determined that, while a broadcast license denial was not required to establish standing, the plaintiff must still "'make[] a substantial showing that application for the benefit ... would have been futile.'" 214 F.3d at 351 (quoting *Jackson-Bey*, 115 F.3d at 1096). Ultimately, the court determined that plaintiff had not demonstrated the requisite futility. *Id.*

Despite Judge Garbis's forewarning that, "[u]ltimately, to prevail, Plaintiffs must prove the identity of specific individuals who are personally injured or deterred by each contested aspect of the challenged requirements in order to have standing," none of the individuals have shown evidence that they have suffered any of the harms alleged in the Amended Complaint, even after

25

the benefit of discovery. *See* ECF 34 at 16. In fact, neither Ms. Vizas, Ms. Miller, nor the other three members identified by MSI have applied for the HQL. Nor have they articulated any burden as a result of the law, "such as the need for access to a computer, a debit card, or a fixed address," which Judge Garbis specifically noted as an obstacle to the establishment of standing in this case. *See id.* at 15-16; ECF 77-4 at 6 (Deborah Miller Deposition); ECF 59-13 at 21 (Clark Deposition); ECF 59-14 at 12-13 (Hoffman Deposition); ECF 59-12 at 6 (Scott Miller Deposition); ECF 59-10 at 3-4 (Vizas Deposition).

To the extent that the individual plaintiffs or identified MSI members claim that their medical conditions would have precluded them from obtaining a license, these "unsupported claim[s] of futility [are] not enough to excuse a plaintiff's failure to apply." *Jackson-Bey*, 115 F.3d at 1096 (citing *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 55 (D.C. Cir. 1991)); ECF 77-4 (Miller Deposition) at 14; ECF 59-14 at 5-6.

Ms. Miller asserts that her back issues would have precluded her from sitting for the time required to complete the required training. ECF 77-4 at 12-13. However, she did no research to determine whether she could stand up and move around during the training. ECF 77-4 at 14. Nor did she ask the MSP whether she could obtain an accommodation for her back problems. *Id.* Therefore, she fails to cite a factual basis to suggest that the MSP would have denied an accommodation for her medical condition, as required by law. *See Jackson-Bey*, 115 F.3d at 1096 ("[W]e are unable to say that, if Jackson-Bey had followed the simple procedure of filling out the one-page form to register as an MST member at the time of his father's funeral, he would not have received the accommodation of his religious needs.").[7]

---

[7] Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,

26

Ms. Hoffman maintains that her "severe hyperacusis," a hearing disorder that renders her unable to tolerate sound, prevented her from attending a training "in a room with a bunch of other people learning about gun safety" and from going "to a firing range and fir[ing] a gun." ECF 59-14 at 5-6. She spoke to one person who provides a firearms safety training course, but she did not know how much the trainer charged. *Id.* at 6-9. Apart from speaking to this one trainer, she has performed no other research on one-on-one firearms safety training. *Id.* Moreover, she did not seek an accommodation from the MSP for such training. *Id.* at 10. Although she has spoken to firing ranges about shooting there to satisfy her "live fire" training requirement (*id.* at 9-10), the record does not reflect that she sought an accommodation from the MSP as to the "live fire" training requirement.

The record does not demonstrate that it would have been futile for Ms. Hoffman to seek accommodations. Notably, on November 17, 2017, in response to numerous requests, the MSP issued Advisory LD-HQL-17-004, which permits the use of alternative ammunition in the form of non-lethal, marking projectiles to satisfy the live-fire requirement. ECF 59-7 at 100, Johnson Declaration, Exhibit 9. In his Declaration (ECF 59-7 at 1-9), MSP Captain Johnson explains that the use of these projectiles "does not require access to a firing range." *Id.* ¶ 29. Further, he attests that, in his experience, the firing of the projectiles "is significantly quieter than firing of traditional ammunition," such that he does "not wear ear protection" when firing the projectile rounds. *Id.*

---

or be subjected to discrimination by any such entity." Title II defines "public entity" to include "any State or local government." *Id.* § 12131(1)(A). Pursuant to congressional instruction, *see id.* § 12134(a), the Attorney General has promulgated regulations implementing Title II of the ADA. *See A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 362 (4th Cir. 2008). Of relevance here, federal regulations explicitly forbid public entities from "administer[ing] a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(6). In the context of licensing or certification, a person is "qualified" within the meaning of Title II if he or she can meet the "essential eligibility requirements" for receiving a license or certification. 42 U.S.C. § 12132(2).

Without applying for the HQL, or even investigating the process for the application, the individual plaintiffs' claims are purely "speculative" or "conjectural." Therefore, the individual plaintiffs cannot meet their burden to establish constitutional standing to challenge the HQL.

## 2.    Due Process Vagueness Claim

As noted, the Act provides that a person may not "purchase, rent, or receive a handgun" without an HQL. P.S. §§ 5-117.1(c), 5-144(a)(1). In regard to Count II, plaintiffs argue that the terms "receipt" or "receive," as used in the Act, are void for vagueness. [8] They contend that "[s]uch conduct could include the temporary receipt of a handgun by a spouse, family member or friend, who may lack an HQL, at a firing range, or in the home or such receipt while conducting firearms instruction for such persons lacking an HQL." ECF 14, ¶ 66.

Plaintiffs also cite multiple examples of hypothetical conduct that they believe may or may not be prohibited by the Act, such as securing a handgun after an individual lawfully carrying a handgun is medically incapacitated, securing a handgun following an automobile accident involving a car in which a handgun is being transported by a properly licensed individual, handling a handgun at a gun store, or firing a handgun at a gun range. *Id.* ¶ 67. In particular, plaintiffs argue that the Act "criminalize[s] such innocent conduct" and denies plaintiffs their due process right "to know to a reasonable certainty what is required of them so they may act accordingly." *Id.* ¶ 66.

Just as with their Second Amendment claims, plaintiffs have failed to establish standing with respect to the due process count. Where, as here, plaintiffs assert a preenforcement facial challenge to a criminal law, a plaintiff may establish constitutional standing by demonstrating

---

[8] The other argument plaintiffs presented in Count II, relating to the authority vested in the QHLs, was dismissed by Judge Garbis by his Order of September 6, 2017. ECF 34.

(1) "'an intention to engage in a course of conduct arguably affected with a constitutional interest,'" and (2) a "'credible threat of prosecution'" under the statute. *Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 320 (D. Md. 2016) (quoting *W. Va. Citizens Def. League, Inc. v. City of Martinsburg*, 483 F. App'x 838, 839 (4th Cir. 2012) (per curiam)), *aff'd*, 848 F.3d 614 (4th Cir. 2017); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (requiring "a realistic danger of sustaining a direct injury as a result of the statute's operation"). "When plaintiffs 'do not claim that they have ever been threatened with prosecution [or] that a prosecution is likely,' . . . they do not allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 298-99 (*quoting Younger v. Harris*, 401 U.S. 37, 42 (1971)).

Chief Judge Bredar of this Court recently considered an analogous situation in *Maryland Shall Issue, Inc. v. Hogan*, 353 F. Supp. 3d 400, 418-19 (D. Md. 2018). In that case, MSI and four members challenged Maryland's prohibition of the manufacture, sale, transport, or possession of "rapid fire trigger activators," including bump stocks. Among other claims, plaintiffs asserted that the statutory definition of "rapid fire trigger activator" was unconstitutionally vague, because the definition could "be read to encompass" a variety of firearm accessories that might have some marginal impact on a weapon's rate of fire. *Id.* at 418. Judge Bredar concluded that the plaintiffs lacked "standing to mount a pre-enforcement challenge on vagueness grounds," because there were no facts alleged from which to infer a credible threat of prosecution. *Id.* at 419. Therefore, he dismissed that count. He reasoned: "Plaintiffs do not claim to have been threatened with prosecution on the basis of their possession of the additional devices as to which [the Act] is allegedly vague. Nor do they allege that any state official with enforcement authority has made statements or taken actions from which the Court might infer intent to prosecute in such a manner." *Id.*

29

As in Judge Bredar's case, plaintiffs have not proffered evidence suggesting any "credible threat of prosecution" for any of the various acts or concerns that they have enumerated. To the contrary, while Maryland has declined to enact regulations specifically clarifying its intent with respect to the definition of "receive" or "receipt," the MSP has included a Frequently Asked Questions ("FAQ's") on its website, one of which clarifies that a person does not require an HQL to fire a gun at a gun range. ECF 89-12 at 3. The MSP has also published a formal "Advisory" confirming that interpretation. ECF 59-7 at 96; *see also* ECF 59-7 at 98 (Letter of 3/12/13 from Dan Friedman, counsel to the General Assembly, concerning the meaning of the word "receive").[9]

In order for plaintiffs to face a risk of "direct injury" from enforcement of the HQL Act, *Babbitt*, 442 U.S. at 298, a law enforcement agent would need to conclude that the temporary conduct plaintiffs have articulated, some of which would occur only in an emergency situation, constitutes conduct requiring an HQL. Outside of pure "speculation" and "conjecture," plaintiffs simply have not adduced evidence to establish any threat of such enforcement. *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (dismissing as "conjecture" the notion that police will routinely enforce the law unconstitutionally and as "speculation" the possibility that the plaintiff would be part of a traffic stop in the future that would lead to an arrest and provoke the use of a chokehold). In fact, the sheer number of varying hypothetical situations that plaintiffs propose illustrates the speculative nature of the analysis plaintiffs urge. *See, e.g., Vill. of Hoffman Estates*, 455 U.S. at 504 (noting that where "it is possible that specific future applications . . . may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise") (internal quotations omitted).

---

[9] Dan Friedman now serves as a judge on the Maryland Court of Special Appeals.

Clearly, should Maryland authorities later attempt to enforce the Act in one of the hypothetical contexts plaintiffs raise, or make a specific threat of such enforcement, a justiciable case may be presented to the Court at that time. However, without evidence of a credible threat of prosecution for a criminal violation, plaintiffs lack standing to lodge a preenforcement attack on the Act.

### B.  MSI

#### 1.  Organizational Standing

The analysis of whether an organization has standing to sue is governed by the same elements used to assess an individual's standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). An organization may suffer an injury in fact where a defendant's actions impede its efforts to carry out its mission. *Id.*

MSI alleges that "Maryland's HQL requirements directly harm MSI as an organization by undermining its message and acting as an obstacle to the organization's objectives and purposes." ECF 14, ¶ 25. MSI cites *Havens Realty Corp.*, 455 U.S. 363, to support its assertion of Article III standing. But *Havens* is inapposite.

The suit in *Havens* was filed by an organization devoted to equal housing opportunity, which sued a real estate company alleged to have engaged in racial steering. The Supreme Court determined that the district court had erred by dismissing the organization's claims on standing grounds, because the organization had "broadly alleged" that the defendant's practices "perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* at 379. Thus, the allegations sufficed, at the motion to dismiss stage, to state a claim that the plaintiff organization had suffered an injury in fact. *Id.* But, the Supreme Court specifically noted that the organization "will have to demonstrate at trial

31

that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." *Id.* at 379 n.21.

This case presents at the summary judgment stage. Yet, MSI has offered no evidence that it has suffered any impairment in its ability to further its mission. At the deposition of Mark Pennak, MSI's corporate designee, Pennak asserted that the HQL requirement "very substantially" impeded MSI's efforts to carry out its mission. ECF 59-17 at 11. He stated, *id.* at 12: "HQL, in our view, stands as an obstacle to the acquisition of firearms . . . for no other reason than to ration and prohibit and obstruct the exercise of the constitutional right to acquire a firearm. And that is, in itself, an obstacle to MSI's mission . . . ." But, on further questioning, Pennak conceded that the Act has had no impact on MSI's ability to communicate about its issues of concern or to promote its views. *Id.* at 12-14. Moreover, as noted earlier, MSI's membership has grown considerably since suit was filed, following the enactment of the FSA, undermining MSI's assertions that the regulations hinder its ability to attract new members. *See* ECF 14, ¶ 25; ECF 59-11 at 3.

This case is far more similar to *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012), in which the Fourth Circuit considered, *inter alia*, a claim of organizational standing for a non-profit organization, the Second Amendment Foundation, Inc. ("SAF"), and two individuals. SAF was dedicated to "promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control." *Id.* at 671. Alleging that they had been injured by a federal law and a Virginia state statute limiting interstate transfers of handguns, the plaintiffs filed a preenforcement challenge to the constitutionality of the statutes. *Id.* at 670. They sought injunctive and declaratory relief, to the extent the laws barred the acquisition of handguns by out-

32

of-state residents. *Id.* at 671. Specifically, SAF alleged that its "resources [were] taxed by inquiries

into the operation and consequences of interstate handgun transfer provisions." *Id.* at 675.

The Court determined, *id.* (alterations in *Lane*):

This "mere expense" to SAF does not constitute an injury in fact, however. Although a diversion of resources might harm the organization by reducing the funds available for other purposes, "it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices." *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). To determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely "abstract concern[s] with a subject that could be affected by an adjudication." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *see BMC Mktg.*, 28 F.3d at 1277; *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (noting that finding standing for an organization that redirects some of its resources to litigation and legal counseling in response to actions of another party would "impl[y] that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another"). Such a rule would not comport with the case or controversy requirement of Article III of the Constitution.

In his opinion in *Maryland Shall Issue, Inc.*, *supra*, 353 F. Supp. 3d 400, Judge Bredar

considered MSI's organizational standing to challenge Maryland's recent law, SB-707, prohibiting

the manufacture, sale, transport, or possession of "rapid fire trigger activators," including bump

stocks and similar devices. *Id.* at 408. Judge Bredar reasoned, *id.* (alterations in original):

Here, the only direct harm MSI alleges to support standing in its non-representational, organizational capacity is that the Act "undermin[es] [MSI's] message and act[s] as an obstacle to the organization's objectives and purposes." (Compl. ¶ 8). In short, MSI disagrees with the policy decisions of the Maryland Legislature embodied in SB-707, which are inconsistent with MSI's own policy objectives. To the extent this is an "injury" at all, it is neither concrete, nor particularized.

In concluding that MSI lacked standing to challenge the statute in its organizational

capacity, Judge Bredar quoted *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972): "'[A] mere

interest in a problem, no matter how longstanding the interest and no matter how qualified the

33

organization is in evaluating the problem, is not sufficient [to establish standing.]'" *Maryland Shall Issue, Inc.*, 353 F. Supp. 3d at 408.

MSI's assertion of standing in the instant case precisely mirrors the assertion rejected by the Fourth Circuit in *Lane* and by Judge Bredar in *Maryland Shall Issue*. MSI's disagreement with the laws enacted by the Maryland General Assembly does not confer standing on behalf of the organization to challenge the law's validity in the absence of an injury-in-fact.

## 2. Associational Standing

MSI also asserts that it has standing to bring suit in an associational capacity, for constitutional harms suffered by its members. An association can establish standing "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see Lujan*, 504 U.S. at 563.

Because none of MSI's individual members have shown standing to sue in his or her own right, MSI cannot establish associational standing.

## C. Atlantic Guns

The Amended Complaint alleges: "The constitutional rights of Atlantic Guns, its owners, and its customers are being violated by the HQL requirement." ECF 14, ¶ 26. Specifically, Atlantic Guns asserts that it "has suffered and continues to suffer a significant reduction in its business due to the HQL requirement." *Id.* Further, it alleges that it "represents the interests of all of its customers who are unable to purchase a handgun because of the unconstitutional HQL requirement." *Id.*

34

The Second Amendment protects an individual's right to keep and bear arms. But, it does not provide the unfettered right to sell handguns. In *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), the Ninth Circuit considered the constitutionality of a county ordinance requiring a gun store in an unincorporated area to be located "at least five hundred feet away from any of the following: schools, day care centers, liquor stores or establishments serving liquor, other gun stores, and residentially zoned districts." *Id.* at 674. The plaintiff, a prospective gun store operator, had been denied a conditional use permit for his gun store because it was located only "446 feet from two residential properties in different directions." *Id.* at 675.

Although the court recognized that the Second Amendment protects citizens' ability to acquire firearms, *id.* at 677-78, it concluded: "Teixeira fails to state a plausible claim on behalf of his potential customers that the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction." *Id.* at 680. Accordingly, the *Teixiera* court concluded that the law imposed "no burden on conduct falling within the scope of the Second Amendment's guarantee," because "the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Id.* at 682.

However, case law establishes that retailers may have standing to sue in certain circumstances when their customers suffer constitutional violations. *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977) (permitting contraceptive distributors to assert the interests of their customers); *Craig v. Boren*, 429 U.S. 190, 192-97 (1976) (permitting a beer vendor to assert the equal protection rights of its customers); *Ezell v. City of Chi.*, 651 F.3d 684, 696 (7th Cir. 2011) (allowing a firing range to assert Second Amendment claims on behalf of its customers). Such third-party standing, sometimes called *jus tertii* standing, may apply "[w]here

35

practical obstacles prevent a party from asserting rights on behalf of itself." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955 (1984). Although the law of such "prudential standing" is far from clear, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-128 (2014), a review of some cases in which it has been applied is instructive.

In *Craig*, the Supreme Court considered the constitutionality of an Oklahoma law restricting vendors from selling certain beer to males under age 21, although the same product could be sold to women age 18 or older. *Craig*, 429 U.S. at 191-92. A licensed beer vendor asserted an equal protection claim on behalf of "males 18-20 years of age," which was the group prohibited from purchasing the beer under the law. *Id.* The Court considered whether it was proper to allow the vendor to assert third party standing on behalf of the prohibited group. The Court stated, *id.* at 193-94:

> [O]ur decisions have settled that limitations on a litigant's assertions of jus tertii are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. *See, e.g. Barrows v. Jackson,* 346 U.S. 249, 255, 257, 73 S.Ct. 1031, 1034, 1035, 97 L.Ed. 1586 (1953); *see also Singleton v. Wulff,* 428 U.S. 106, 123-24, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (Powell, J., dissenting). These prudential objectives, thought to be enhanced by restrictions on third-party standing, cannot be furthered here, where the lower court already has entertained the relevant constitutional challenge and the parties have sought or at least have never resisted an authoritative constitutional determination. In such circumstances, a decision by us to forgo consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence.

Moreover, the Court concluded that the beer vendor had established an independent claim of standing, because heeding the statute's mandate would cause her to incur "a direct economic injury through the constriction of her buyers' market." *Id.* at 194. As a vendor with standing, the Court continued, the beer vendor was "entitled to assert those concomitant rights of third parties

that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195.

In *Eisenstadt v. Baird*, 405 U.S. 438 (1972), a vendor was convicted of distributing contraceptive foam to a third party, in contravention of a statute barring the distribution, but not the use of the product. The Supreme Court found that the distributor had standing to challenge the constitutionality of the statute on the basis of its infringement of the privacy rights of the end users. *Id.* at 443-46. In assessing standing, the Supreme Court found that "more important than the nature of the relationship between the litigant and those whose rights he seeks to assert is the impact of the litigation on the third-party interests." *Id.* at 445. Because the use of the contraceptive foam was not prohibited by the law, the end users would have no forum to address their rights, even though their ability to obtain the product would be severely affected. *Id.* at 446. Thus, the distributor's ability to challenge the law was critical to protection of the constitutional rights at issue. *Id.*

Similarly, in *Carey v. Population Services International*, 431 U.S. 678, 681 (1977), distributors of contraceptives filed suit to challenge a New York statute prohibiting the advertising and display of contraceptives, banning contraceptive sales to anyone under the age of 16, and requiring that all contraceptives be distributed by a licensed pharmacist. The Court considered whether a North Carolina company, Population Planning Associates, Inc. ("PPA"), that sold nonmedical contraceptive devices by mail order to New York residents without age limitation, had standing to challenge the New York statute. *Id.* at 682-84. New York authorities had advised PPA, by letter, that its activities violated New York law, and threatened legal action by New York's Attorney General. *Id.* at 682-83. The Supreme Court determined that PPA had standing "not only in its own right but also on behalf of its potential customers" because it was forced to choose

between obeying the New York law with "direct economic injury through the constriction of (its) market" or incurring legal sanctions by disobeying the law. *Id.* at 683-84 (quoting *Craig*, 429 U.S. at 194).

The case of *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), also provides guidance. In that case, a collection of individual and organizational plaintiffs challenged Chicago's gun control laws, passed shortly after the Supreme Court decided *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Parts of the challenged legal framework required an hour of range training to obtain a permit to possess a firearm, but also prohibited firing ranges from the city. *Id.* at 689-92. The Seventh Circuit found that the individual plaintiffs had standing because the firing range ban caused "continuous harm to their claimed right to engage in range training and interfere[d] with their right to possess firearms for self-defense." *Id.* at 695. Action Target, Inc., a business that designed and supplied shooting ranges, was found to have standing on the basis of the actual harm it suffered by not being able to do business in Chicago, and also to "'act[] as [an] advocate[] of the rights of third parties who seek access to' its services." *Id.* at 696 (quoting *Craig*, 429 U.S. at 195). The Seventh Circuit did not go into great detail explaining how the shooting range established standing, partially because the individual plaintiffs in the case had established standing, and "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Id.* at 696 n.7.

In this case, the parties have had ample opportunity for discovery. Atlantic Guns has not established that it suffered any economic injury as a result of the HQL requirement. Nor has Atlantic Guns provided any evidence that the ability of any of its customers to acquire firearms was inhibited as a result of the HQL requirement. Indeed, Atlantic Guns is unable to identify any specific customer who decided not to purchase a gun as a result of the FSA.

38

Atlantic Guns's sales numbers have ███████████████ *See* ECF 84-1; ECF 84-2 [SEALED]. The records show ███████████████████████ ███████████████ *Id.* [SEALED]. At least in the Silver Spring Atlantic Guns store, the sales numbers ████████████ *Id.* [SEALED]. Excluding the two aberrant years of ████████ Atlantic Guns averaged more than ██ annual handgun sales from 2000 to 2017. ECF 84-1 [SEALED]. It has exceeded that average ██ ███████████ *Id.* [SEALED].

Moreover, what appears to be ███████████████ from year to year are not explained by the FSA. For example, in 2016 the Rockville store derived ██ in gross revenue from handgun sales, but the following year, 2017, it derived ████ Both years followed the HQL requirement. ECF 84-2 [SEALED]. Similarly, in the Silver Spring store, again excluding the two aberrant years, the average annual gross revenue from 2009 through 2017 was ██████ and that number was ███████████ *Id.* [SEALED].

Even assuming, *arguendo*, that Atlantic Guns could establish that its business has declined since the HQL took effect, it has not adduced evidence to create a genuine issue of material fact that the decline is attributable to any regulatory burden placed on its customers' Second Amendment rights. In the other third party standing cases discussed above, the businesses' customers or some identified class of customers, were completely prohibited from availing themselves of the businesses' services. Here, the HQL requirement does not impose any categorical prohibition that constricted Atlantic Guns' buyers' market.

To be sure, the HQL licensing scheme requires customers to take certain steps before purchasing a handgun from Atlantic Guns. But, Atlantic Guns has not demonstrated that any customers who would have qualified ultimately decided against a purchase as a result of the

39

licensing requirements. Of the customers who placed a deposit and did not ultimately consummate the purchase, it is entirely speculative to surmise that they were somehow deterred by an inability to comply with the HQL requirements, or a denial of an HQL, instead of a change of mind or a decision to purchase a firearm from another vendor.

Additionally, unlike in *Craig*, 429 U.S. at 192, where the ability for individuals to challenge the law was hindered because the restriction only covered a narrow age range, or *Eisenstadt*, 405 U.S. at 446, where end users of a product were "denied a forum in which to assert their rights" because they were not subject to prosecution, individual handgun purchasers *should* be able to establish standing to challenge the HQL provision (notwithstanding the failure of the individual plaintiffs to do so in this case, for reasons already explained). Accordingly, Atlantic Guns has failed to establish that it has standing on an independent basis, or that the circumstances warrant *jus tertii* standing on behalf of its customers.

### A.    Standing as to Ultra Vires Claim

Plaintiffs allege that the Secretary of the Maryland State Police acted ultra vires, in violation of the Maryland Administrative Procedure Act, S.G. § 10-125(d), by imposing additional barriers to and restrictions on a citizen's ability to acquire firearms, through issuance of regulations interpreting the HQL requirements. ECF 14, ¶¶ 74-87. Plaintiffs contend that regulations issued by the MSP were "arbitrary and capricious, unreasonable and an abuse of discretion under Maryland administrative law." *Id.* ¶ 87.

In particular, plaintiffs maintain that MSP imposed requirements that an applicant "own[] or obtain[] access to a computer with an internet connection," *id.* ¶ 80(a); "own[] or hav[e] access to an electronic document scanner*, " id.* ¶ 80(b); "hav[e] a fixed address and telephone number," *id.* ¶ 80(c); obtain fingerprints "through a State-certified live-scan vendor," *id.* ¶ 80(d); "hav[e] a

40

credit card or debit card," *id.* ¶ 80(e); obtain training "by a private State certified instructor," *id.* ¶ 80(f); and have "access to a shooting range" to fulfill the requirement that the applicant complete training that includes firing "at least one round of live ammunition." *Id.* ¶ 80(g). In addition, plaintiffs complain that the MSP's failure to approve certain alternative training courses was arbitrary, unreasonable, and contrary to law and authority. *Id.* ¶¶ 81-82. Finally, plaintiffs contend that by shifting the burden of paying for training to the applicants, the MSP exceeded its statutory authority, because the Act only requires payment of a nonrefundable application fee of up to $50. *Id.* ¶¶ 85-86.

The Maryland Administrative Procedure Act authorizes individuals to "file a petition for a declaratory judgment on the validity of any regulation," and challenge the validity of a regulation on the basis that it "violates any provision of the United States or Maryland Constitution," "exceeds the statutory authority of the unit," or "the unit failed to comply with statutory requirements for adoption of the provision." S.G. § 10-125(a), (d). However, standing to challenge agency action is limited to a person "'whose personal or property rights [are] adversely affected by the decision.'" *Patuxent Riverkeeper v. Md. Dep't of the Env't*, 422 Md. 294, 298, 29 A.3d 584, 587 (2011) (citation omitted).

"[I]n order to be 'aggrieved' for purposes of judicial review, a person ordinarily must have an interest 'such that he is personally and specifically affected in a way different from . . . the public generally." *Sugarloaf Citizens' Ass'n v. Dep't of the Env't*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996) (quotations and citations omitted). Although Maryland taxpayers are liberally permitted to bring claims challenging alleged ultra vires acts of government officials, *Boitnott v. Mayor and City Council of Balt.*, 356 Md. 226, 234, 738 A.2d 881, 885 (1999), not every taxpayer will be deemed to have standing.

41

In *Inlet Associates. v. Assateague House Condominium Association*, 313 Md. 413, 440-41, 545 A.2d 1296, 1310 (1988), for example, the Maryland Court of Appeals stated that a taxpayer has standing "only when some special damage is alleged and proved, or a special interest is shown distinct from that of the general public." *Id.* at 441, 545 A.2d at 1310. Additionally, to establish standing to challenge an action by a state agency, an organization must have "'a property interest of its own – separate and distinct from that of its individual members and that . . . an organization has no standing in court unless [it] has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public . . . .'" *Voters Organized for the Integrity of City Elections v. Balt. City Elections Bd.*, 451 Md. 377, 396-97, 152 A.3d 827, 838 (2017) (quoting *Evans v. State*, 396 Md. 256, 328-29, 914 A.2d 25, 68 (2006)).

Thus, to survive summary judgment on the issue of standing, the record must contain evidence of: 1) the existence of an ultra vires act by the Secretary of MSP and 2) a special interest, distinct from that of the general public, on the part of an individual or organizational plaintiff. *See* The constitutional standing analysis above demonstrates that none of the plaintiffs can meet the second prong of that standard. Accordingly, plaintiffs lack standing to assert the state law ultra vires claim.

## IV.  Conclusion

For the reasons set forth above, I shall grant defendants' motion for summary judgment, deny plaintiff's cross-motion for summary judgment, and deny, as moot, both parties' motions to strike expert witnesses.

An Order follows, consistent with this Memorandum Opinion.[10]

Dated: March 31, 2019

_____/s/_____
Ellen L. Hollander
United States District Judge

---

[10] The Memorandum Opinion will be filed under seal because it contains confidential business information filed under seal by a party. Therefore, the Court will file a redacted version of the Memorandum Opinion or, alternatively, after consultation with counsel, it will lift the seal. By April 5, 2019, the parties shall advise the Court as to whether they object to the lifting of the seal so that the Court may publicly issue this Memorandum Opinion or, alternatively, whether the Court should file a redacted version, as to pages 8 and 39.