**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 19-1469**

———————————

MARYLAND SHALL ISSUE, INCORPORATED; ATLANTIC GUNS, INCORPORATED; DEBORAH KAY MILLER; SUSAN BRANCATO VIZAS,

        Plaintiffs – Appellants,

and

ANA SLIVEIRA; CHRISTINE BUNCH,

        Plaintiffs,

    v.

LAWRENCE HOGAN, in his capacity as Governor of Maryland; WILLIAM M. PALLOZZI, in his capacity as Superintendent, Maryland State Police,

        Defendants – Appellees.

-------------------------------

NATIONAL RIFLE ASSOCIATION; MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INCORPORATED; NATIONAL SHOOTING SPORTS FOUNDATION,

        Amici Supporting Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen L. Hollander, District Judge.  (1:16-cv-03311-ELH)

———————————

Argued:  May 6, 2020                         Decided:  August 3, 2020

Amended:  August 31, 2020

———————————

Before AGEE, KEENAN, and RICHARDSON, Circuit Judges.

———————————

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Agee wrote the opinion, in which Judge Keenan and Judge Richardson joined.

———————————

**ARGUED:** Mark William Pennak, LAW OFFICES OF MARK W. PENNAK, Chevy Chase, Maryland; John Parker Sweeney, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants. Robert A. Scott, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Cary J. Hansel, Baltimore, Maryland, for Appellants. Brian E. Frosh, Attorney General, Jennifer L. Katz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. T. Sky Woodward, James W. Porter, III, Marc A. Nardone, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellant Atlantic Guns, Inc. David H. Thompson, Peter A. Patterson, Brian W. Barnes, John D. Ohlendorf, COOPER & KIRK, PLLC, Washington, D.C., for Amici National Rifle Association of America, Inc. and Maryland State Rifle & Pistol Association, Inc. Craig A. Livingston, LIVINGSTON LAW FIRM, P.C., Walnut Creek, California; Jerome Bennett Crites, III, SHUMAKER LOOP & KENDRICK LLP, Charleston, South Carolina; Lawrence G. Keane, General Counsel, THE NATIONAL SHOOTING SPORTS FOUNDATION, INC., Newtown, Connecticut, for Amicus The National Shooting Sports Foundation, Inc.

AGEE, Circuit Judge:

Maryland Shall Issue, Inc. ("MSI"); Deborah Kay Miller and Susan Vizas; and Atlantic Guns, Inc. ("Atlantic Guns")[1] brought suit against Lawrence Hogan in his capacity as Governor of Maryland and William M. Pallozzi in his capacity as Superintendent of the Maryland State Police (collectively "State Defendants"). Appellants challenge the constitutionality of Maryland's handgun licensing law, which is part of the Maryland Firearm Safety Act of 2013 ("FSA"), for violating their Second Amendment rights. They also challenge other FSA regulations as vague and ambiguous in contravention of the Fourteenth Amendment and separately attack certain FSA regulations as ultra vires under Maryland law. The district court granted summary judgment to the State Defendants on the ground that Appellants lacked Article III standing as to all claims. Because we hold that Atlantic Guns has standing to pursue the Second Amendment claim, we affirm in part and reverse in part the judgment of the district court and remand this case for further proceedings.

I.

A.

Before addressing the merits of the parties' arguments, we begin with an explanation of the statutory scheme in question. In 2013, the Maryland General Assembly enacted the

---

[1] The opinion refers to Miller and Vizas collectively as the "Individual Plaintiffs" and all four plaintiffs collectively as "Appellants."

3

FSA to "protect[] its citizens and law enforcement officers," by regulating the sale, transfer, and possession of certain firearms within Maryland. *Kolbe v. Hogan*, 849 F.3d 114, 120, 129 (4th Cir. 2017) (en banc).

In relevant part, the FSA provides that "[a] dealer or any other person may not sell, rent, or transfer a handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person a valid handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary [of the State Police.]" Md. Code, Pub. Safety § 5-117.1(b). To obtain such a handgun qualification license ("HQL"), a person must: (1) be at least 21 years old; (2) be a resident of Maryland; (3) complete a minimum of 4 hours of firearms safety training within the prior three years; and (4) "based on an investigation, [not be] prohibited by federal or State law from purchasing or possessing a handgun." *Id.* § 5-117.1(d). The safety training, which is undertaken at the applicant's expense, must cover classroom instruction on "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation" along with a live-fire "firearms orientation component that demonstrates the person's safe operation and handling of a firearm."[2] *Id.* § 5-117.1(d)(3).

An individual may apply for an HQL by submitting the mandated materials, including a written application, a "nonrefundable application fee to cover the costs to administer the program of up to $50," and, as noted above, proof of completing firearms

---

[2] Certain individuals, such as a "qualified handgun instructor" and "an honorably discharged member of the armed forces of the United States or the National Guard," are exempt from the safety course training requirement. *Id.* § 5-117.1(e).

safety training or an exemption to that requirement. *Id.* § 5-117.1(g). Once the HQL application is received, the Secretary of State Police "appl[ies] to [the Criminal Justice Information System Central Repository of the Department of Public Safety and Correctional Services] for a State and national criminal history records check for each applicant[.]" *Id.* § 5-117.1(f)(2). "As part of the application for a criminal history records check," the Secretary must provide, among other things, "a complete set of the applicant's legible fingerprints." *Id.* § 5-117.1(f)(3). Based on the result of this criminal history records check and the information provided by an applicant, the Secretary issues a decision to the applicant "[w]ithin 30 days after receiving a properly completed application." *Id.* § 5-117.1(h).

The FSA authorizes the State Police to adopt regulations to implement the HQL requirement. *Id.* § 5-117.1(n). Under this statutory authority, the State Police has adopted various regulations providing guidance on how to obtain an HQL, including what information an applicant must submit and what a qualifying safety training course must include. For instance, the regulations require an applicant to provide, among other things, "[a] complete set of the applicant's fingerprints, taken and submitted in the manner prescribed by the Secretary on the application." Md. Code Regs. 29.03.01.28(B)(3). The applicant is responsible for obtaining his or her fingerprints from an approved vendor at his or her expense. The State Police further mandates that the applicant "safely fire[] at least one round of live ammunition" during the safety training course. Md. Code Regs. 29.03.01.29(C)(4).

Only four designated groups of people are exempt from the HQL requirement:

(1) a licensed firearms manufacturer;

(2) a law enforcement officer or person who is retired in good standing from service with a law enforcement agency of the United States, the State, or a local law enforcement agency of the State;

(3) a member or retired member of the armed forces of the United States or the National Guard; or

(4) a person purchasing, renting, or receiving an antique, curio, or relic firearm, as defined in federal law or in determinations published by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Md. Code, Pub. Safety § 5-117.1(a). Apart from these limited exceptions, anyone who fails to comply with the HQL requirement "is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both." *Id.* § 5-144(b).

B.

With the statutory framework in mind, we now turn to the specific circumstances of this case. MSI is a non-profit membership organization that, in its own words, is "dedicated to the preservation and advancement of gun owners' rights in Maryland" and "seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public." Opening Br. 8. It has more than 1,100 members. The Individual Plaintiffs are MSI members who would like to own a handgun, but have not attempted to purchase one and do not intend to obtain an HQL. Atlantic Guns, which has no formal affiliation with any of the other parties, is a family-

6

owned, federally licensed firearms dealer that operates several commercial gun stores in Maryland.

Appellants argue that the FSA has caused them various injuries. The Individual Plaintiffs claim that the FSA prevents them from purchasing a handgun, even though they are willing to do so. Specifically, Vizas alleges that she is unable to commit the time and the expense required to fulfill the HQL requirement, while Miller alleges that she suffers from a medical condition that prevents her from completing the safety training course. Because the Individual Plaintiffs have neither taken any steps to apply for an HQL nor expressed any desire to obtain one, they do not have an HQL and the FSA precludes them from purchasing a handgun. As a result, they assert that the FSA's "ban on the unlicensed acquisition" of a handgun has harmed them. Opening Br. 20. For its part, MSI claims that the FSA disrupted the pursuit of its organizational mission by deterring its members from acquiring handguns and caused it to alter its mission by expending funds to oppose the FSA. Atlantic Guns separately alleges that the FSA barred it from selling handguns to customers who did not possess an HQL, which constricted its market and caused direct economic loss.   Based on these asserted injuries, Appellants allege that the HQL requirement violates their Second Amendment rights to purchase a handgun (or, for Atlantic Guns, its ancillary right to sell firearms) for self-defense and protection in the home.

Further, the Individual Plaintiffs claim that the HQL requirement is void for vagueness under the Fourteenth Amendment based on its use of two terms, "receive" and

"receipt," in two specific subsections of the FSA. In their view, these terms as used in the FSA are so vague and ambiguous that they lead to absurd results and do not sufficiently clarify what conduct without an HQL is innocent. Based on this ambiguity, the Individual Plaintiffs allege that the HQL requirement violates the Due Process Clause of the Fourteenth Amendment.

Lastly, the Individual Plaintiffs assert that the State Police acted ultra vires in violation of the Maryland Administrative Procedure Act, Md. Code, State Gov't § 10-125, by exceeding its rulemaking authority in promulgating certain regulations under the FSA. They claim that the State Police have implemented regulations imposing additional requirements to secure an HQL that are not authorized by the FSA.

Appellants raised those three claims in a complaint filed against the State Defendants in the District of Maryland. The State Defendants moved to dismiss the complaint, arguing in part that all Appellants lacked standing to bring a Second Amendment claim because none of them "allege[d] that they themselves or one of their members or customers are negatively impacted by those requirements." J.A. 53. The district court initially rejected this argument based on MSI's contention that after discovery, it could identify specific members who were injured by the HQL requirement. The court held that this allegation was "plausible" and could establish standing of "some MSI members" to raise a Second Amendment claim at this stage. Because the presence of one party with standing was sufficient to satisfy Article III's case-or-controversy requirement, the district court denied the State Defendants' motion to dismiss the Second Amendment

Claim for lack of standing. The court then examined whether MSI and the Individual Plaintiffs alleged plausible due process and ultra vires claims under Federal Rule of Civil Procedure 12(b)(6), determined that the due process claim only as to the instruction certificate requirement failed to survive this scrutiny, and dismissed that claim accordingly.[3]

The parties proceeded to discovery and then filed cross-motions for summary judgment. The State Defendants again argued that Appellants lacked standing on all claims because they did not suffer a concrete injury that was traceable to the FSA. Specifically, the State Defendants contended that neither of the Individual Plaintiffs had applied for an

---

[3] Except as provided in another section of the regulation, Md. Code Regs. 29.03.01.29(A) requires an applicant to "complete a Firearms Safety Training Course and submit a Firearms Safety Training Certificate issued by a Qualified Handgun Instructor." This Certificate "constitute[s] proof that the applicant satisfactorily completed a Firearms Safety Training Course." Md. Code Regs. 29.03.01.29(A). The Individual Plaintiffs and MSI argued to the district court that this certificate requirement violated the Fourteenth Amendment Due Process Clause because an instructor "could refuse to issue such a certificate, thereby preventing an applicant from successfully completing the application and being considered to receive an HQL." J.A. 61. The Individual Plaintiffs and MSI asserted that the FSA and related regulations did not "provide for a hearing or judicial review of an Instructor's denial of a Certificate," which, they alleged, violated procedural due process. J.A. 61. The district court held that this claim was "speculative" and failed to survive Federal Rule of Civil Procedure 12(b)(6) because the Individual Plaintiffs and MSI did not "allege a deprivation due to the denial of a Training Certificate." J.A. 62. They do not challenge this decision on appeal and thus have waived appellate review of the dismissal of the due process claim as to the instructor certification requirement. *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) ("'[A]ny issue that could have been but was not raised on appeal is waived and thus not remanded.'").

HQL; that MSI had not demonstrated the FSA harmed its mission; and that Atlantic Guns had failed to establish economic injury.

The district court agreed with the State Defendants. It first held that the Individual Plaintiffs failed to demonstrate an injury because they had not applied for an HQL, had not requested accommodations necessary to complete an application, or otherwise proved that they could not have obtained an HQL. In the district court's view, these deficiencies were fatal to the Individual Plaintiffs' standing to pursue their claims.

The district court further concluded that MSI lacked standing. At the outset, it observed that the lack of standing for the Individual Plaintiffs—who are MSI members— barred MSI from asserting associational standing[4] through them. The court also concluded that MSI lacked organizational standing because it failed to prove the FSA hindered its ability to pursue its mission.

Lastly, the district court held that Atlantic Guns lacked independent standing because it failed to prove the FSA caused a concrete economic injury to it. In addition, the court rejected the alternative assertion of Atlantic Guns that it had third-party standing on behalf of potential customers who would purchase a handgun but for the HQL requirement, holding that this principle did not apply because customers could assert their own claims.

---

[4] To establish associational standing, an organization must show: "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Lane v. Holder*, 703 F.3d 668, 674 n.6 (4th Cir. 2012).

Based on its determination that none of Appellants had established a concrete, traceable injury and thus lacked standing, the district court granted summary judgment to the State Defendants and denied Appellants' motion for summary judgment.

This appeal followed, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

### A.

We review de novo the district court's determinations as to Appellants' standing. *See Green v. City of Raleigh*, 523 F.3d 293, 298 (4th Cir. 2008). In doing so, we recognize that "[a]t least one plaintiff must demonstrate standing for each claim and form of requested relief" for that claim to proceed. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). "[T]he Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (internal quotation marks omitted). Consequently, once it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (declining to analyze whether additional plaintiffs had standing when one plaintiff did); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

Against this backdrop, we turn to the first issue raised in this appeal: whether the district court erred in dismissing the Second Amendment challenge based on its conclusion

that none of the Appellants had standing. For the reasons discussed in the next section, we conclude the district court erred in holding that Atlantic Guns lacks both independent and third-party standing to bring a Second Amendment claim. And because standing for one party on a given claim is sufficient to allow a case to proceed in its entirety on that issue, we need not reach the question of whether the Individual Plaintiffs and MSI have standing to bring their Second Amendment claims.

## B.

Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Therefore, to establish individual standing, a plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct. 1540, 1547 (2016). We address each requirement in turn as it applies to Atlantic Guns.

## 1.

Requiring plaintiffs to demonstrate they have suffered an injury in fact ensures that they have "'a personal stake in the outcome of the controversy.'" *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Under this rubric, the Supreme Court has defined such an injury as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548.

The district court determined that Atlantic Guns failed to meet the injury-in-fact requirement for constitutional standing because it "ha[d] not established that it suffered any economic injury as a result of the HQL requirement." J.A. 1452. To support this conclusion, the court cited three factors. First, the court observed that "Atlantic Guns [was] unable to identify any specific customer who decided not to purchase a gun as a result of the FSA." J.A. 1452. Second, the court noted that, excluding 2012 and 2013, "Atlantic Guns averaged more than 1,700 annual handgun sales from 2000 to 2017," and it "exceeded that average in both 2016 and 2017." J.A. 1453. And third, Atlantic Guns' records showed that: (1) in one of its stores, the gross revenue from handgun sales decreased between 2016 to 2017 —indicating that any lost business was not explained by the FSA; and (2) in its other store, its 2016–2017 gross revenue was higher than the "average annual gross revenue from 2009 through 2017." J.A. 1453. When considered together, the district court found this evidence was sufficient as a matter of law to override any claim that Atlantic Guns had suffered financial harm as a result of the FSA.

In challenging that conclusion, Atlantic Guns argues that the district court erred in deciding factual issues at summary judgment by discrediting its uncontroverted evidence of economic loss while crediting the State Defendants' arguments. Specifically, Atlantic Guns asserts that the court erroneously focused on the *extent* of the economic injury as opposed to the *existence* of one. We agree. The district court took a selective view of the evidence, essentially rendering a merits determination rather than engaging in the proper inquiry at the summary judgment stage of the proceedings.

13

"'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (2018) (quoting *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017)). And, as the Supreme Court has made clear, lost business opportunities satisfy this requirement. *See, e.g., Craig v. Boren*, 429 U.S. 190, 194 (1976). A careful review of the record shows that Atlantic Guns presented evidence that it has suffered this type of loss.

Atlantic Guns' owner and president, Stephen Schneider, testified during his deposition that "our handgun sales have suffered after the 2013 law went into effect. We— the number of firearm[s], handguns specifically[,] that we're selling has declined at both our locations due to the law." J.A. 339. When asked what "evidence [he] ha[d] that demonstrates those assertions," Schneider pointed to "[s]ales figures" and noted that he also had "a count of the number of . . . handguns that we've sold that would also bear that out." J.A. 339.

This testimony is consistent with Schneider's signed declaration submitted on behalf of Atlantic Guns in opposition to the State's motion for summary judgment. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (holding that in order to discredit an affidavit at summary judgment, it must, for example, "flatly contradict[] that party's earlier sworn deposition"). In his declaration, Schneider averred that Atlantic Guns "has been severely impacted by the passage of Maryland's Handgun License Requirement because it is barred by law from providing handguns to customers who do not have a Handgun License." J.A. 1412. According to Schneider, "Atlantic Guns turns away would

be [sic] customers every week for this reason, totaling at least in the hundreds over the five years since the Handgun License requirement took effect." J.A. 1412. As a result, "[s]ince the Handgun License took effect in Maryland, Atlantic Guns has sold significantly fewer handguns per year." J.A. 1412. In fact, Schneider stated that, according to Maryland State Police records, "comparing the four years prior to the Handgun License enactment in 2013 (2009–2012) to the four years following (2014–2017), Atlantic Guns lost approximately 20 percent of its prior handgun sales after the Handgun License requirement was imposed." J.A. 1412, 1413. "Atlantic Guns' gross revenues from handgun sales have also decreased by a similar amount since the Handgun License requirement took effect." J.A. 1412; *see also* J.A. 1414. The State Defendants adduced no evidence to the contrary, and instead sought to recharacterize the sales numbers and gross revenues.

We conclude Schneider's uncontroverted testimony and declaration, along with the pertinent Maryland State Police records and Atlantic Guns' year-over-year sales records, are sufficient to establish an injury in fact for purposes of Article III standing. *See Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 981 (4th Cir. 1992) (holding that disposition by summary judgment on standing grounds was inappropriate where the district court accepted the conclusions of the defendant's experts over the conclusions offered by the plaintiff's expert). Indeed, for standing purposes, Atlantic Guns is virtually indistinguishable from the beer vendor in *Craig v. Boren*, 429 U.S. 190 (1976), where the Supreme Court concluded that "[t]he operation of" a challenged statute that results in "the constriction of [a vendor's] buyers' market" plainly "inflict[s an] 'injury in fact' . . .

15

sufficient to guarantee [it] concrete adverseness[.]" *Id.* at 194 (internal quotation marks omitted); *see also Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban[.]").

The extent of Atlantic Guns' economic injury—including its ability to identify lost customers as well as the scope of the purported decline in handguns sold and lost revenue— are material issues of fact to be resolved in the Second Amendment analysis on the merits. *See Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) (observing that courts "'must not confuse standing with the merits'"); *see also NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013) ("[S]tanding analysis is not an accounting exercise[.]"), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018). For purposes of standing, the evidence in the record reflects that Atlantic Guns has, in fact, suffered an injury through the constriction of its pool of potential customers. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[A] loss of even a small amount of money is ordinarily an 'injury.'"); *accord Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("'[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'").

Therefore, we conclude that the district court improperly weighed the evidence, which was error at the summary judgment stage. When considering the uncontroverted evidence under the appropriate standard, we find that Atlantic Guns has adequately established an injury in fact for Article III purposes.

2.

16

Having found that Atlantic Guns has suffered an injury in fact, we turn to the second requirement for constitutional standing: traceability. An injury is traceable if "there [is] a causal connection between the injury and the conduct complained of" by the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Air Evac*, 910 F.3d at 760 (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005)). On the facts of this case, therefore, the question is whether Atlantic Guns can demonstrate that the HQL requirement is "fairly traceable" to its injury, though it does not have to be "the sole or even immediate cause of th[at] injury." *Sierra Club v. Dept. of the Interior*, 899 F.3d 260, 283–84 (4th Cir. 2018).

The district court answered this query in the negative by concluding that Atlantic Guns had "not adduced evidence to create a genuine issue of material fact that the decline [in business since the HQL requirement took effect] is attributable to any regulatory burden placed on its customers' Second Amendment rights." J.A. 1453. According to the court, that is because "the HQL requirement does not impose any categorical prohibition that constricted Atlantic Guns' buyers' market." J.A. 1453. After reviewing the record, we conclude the district court again failed to follow the appropriate summary judgment standard and erred in its ultimate assessment that any injury was not traceable to the FSA.

On its face, the HQL requirement undoubtedly constrains Atlantic Guns' ability to sell handguns and limits its potential customer base. *See Lujan*, 504 U.S. at 561–62 (Where "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). Although the district court theorized alternative explanations for the decline in Atlantic Guns' business, this was improper at the summary judgment stage. We only require the facts, taken in the light most favorable to the plaintiffs, to support a reasonable inference of a causal relation.

Here, the record supports the requisite inference. First, after the FSA took effect, the dealer's handgun sales suffered. J.A. 339. Temporal correlation does not prove causation, but it is probative. *See United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1349 (11th Cir. 2019) ("Correlation is not causation, but neither must correlation be ignored."). Second, Atlantic Guns has turned away customers who lacked a license. Indeed, certain customers had even gone so far as to put down a deposit—which Atlantic Guns returned when they failed to acquire an HQL. J.A. 348, 343–44. We think it reasonable to infer that some of these customers would have proceeded with a purchase. Third, prospective handgun purchasers have confirmed that they have "been deterred from purchasing a handgun because of the . . . HQL law." *E.g.*, J.A. 294–95, 312; *see also* J.A. 292 ("I went to the sporting goods store and was hoping to purchase a handgun and found out about the [HQL requirement]."). As our previous decisions have made clear, when a "challenged provision[] . . . inhibits [a vendor's] ability

18

to" conduct its business, "the alleged injury is . . . traceable to the" provision at issue. *Air Evac*, 910 F.3d at 760; *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) (holding that the traceability requirement is "clearly present" when the challenged law "directly and expressly limits" the plaintiff's conduct).

Moreover, "[t]he legal duties created by the [HQL requirement] are addressed directly to vendors such as" Atlantic Guns. *Craig*, 429 U.S. at 194; *cf.* Md. Code, Pub. Safety § 5-117.1(b) (prohibiting firearms dealers from "sell[ing], rent[ing], or transfer[ing] a handgun to [anyone] unless the [individual] presents to the dealer or other person a valid handgun qualification license."). Atlantic Guns is "obliged either to heed the" statute, "thereby incurring a direct economic injury through the constriction of [its] buyers' market, or to disobey the statutory command and suffer[.]" *Craig*, 429 U.S. at 194; *cf.* Md. Code, Pub. Safety §§ 5-144(b) (stating that violating the HQL requirement is a misdemeanor punishable by up to five years in jail and a $10,000 fine), 5-114(b)(2) (stating that a dealer's license "shall [be] revoke[d]" if the licensee "is convicted of a disqualifying crime"), 5-101(g)(3) (stating that "a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years" is a disqualifying crime). The Supreme Court "repeatedly has recognized that such injuries establish the threshold requirements of a 'case or controversy' mandated by Art. III," and are thus fairly traceable to the challenged statute. *Craig*, 529 U.S. at 194. The same is true here.

3.

19

Finally, we examine the third requirement for constitutional standing—whether Atlantic Guns' injury is likely to be redressed by a favorable judicial decision. A claim is redressable if a favorable outcome would repeal the "burdens" on purchasing the plaintiff's goods. *See Finlator v. Powers*, 902 F.2d 1158, 1162 (4th Cir. 1990). The district court did not analyze this requirement, and the State Defendants do not dispute that Atlantic Guns satisfies it.

And, indeed, Atlantic Guns' asserted injury is redressable because the injunctive relief sought here would allow it to sell handguns to a broader range of potential customers, thereby increasing its opportunity to make sales and generate revenue. *See Air Evac*, 910 F.3d at 760; *accord Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 282 (6th Cir. 1997) (holding that a favorable ruling is likely to redress an injury where the plaintiff "abandoned a line of business because of passage of the [challenged law] and "would promptly resume the prohibited activities" if "the [challenged law was] declared unconstitutional").

## C.

In light of the foregoing, we find that Atlantic Guns has satisfied the constitutional requirements to bring its own, independent Second Amendment claim. But our inquiry does not end here because Atlantic Guns separately seeks third-party—sometimes referred to as *jus tertii*—standing to bring a Second Amendment claim as to its customers' right to

*purchase firearms.*[5] We now turn to the question of whether Atlantic Guns has established

standing to bring the latter claim.

Courts have long adhered to the rule that a "plaintiff generally must assert his own

legal rights and interests, and cannot rest his claim to relief on the legal rights or interests

of third parties." *Warth*, 422 U.S. at 499. "This rule assumes that the party with the right

has the appropriate incentive to challenge (or not challenge) governmental action and to do

so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S.

125, 129 (2004). It represents "a healthy concern that if the claim is brought by someone

other than one at whom the constitutional protection is aimed," *Secretary of State of Md. v.

Joseph H. Munson Co.*, 467 U.S. 947, 955 n.5 (1984), "the courts might be 'called upon to

decide abstract questions of wide public significance even though other governmental

institutions may be more competent to address the questions and even though judicial

intervention may be unnecessary to protect individual rights,'" *Kowalski*, 543 U.S. at 129

(quoting *Warth*, 422 U.S. at 500).

---

[5] Of course, because the standing to assert a claim is distinct from the merits of that claim, we state no opinion today on the merits of Atlantic Guns' asserted second amendment claims in either its independent or *jus tertii* capacities. *Compare Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."), *with Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) ("[T]he Second Amendment does not confer a freestanding right . . . upon a proprietor of a commercial establishment to sell firearms."). We merely recognize that at least one plaintiff must establish standing to bring suit on each claim. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

But "this rule [is not] absolute." *Id.* at 129. Instead, the Supreme Court has "recogniz[ed] that there may be circumstances where it is necessary to grant a third[-]party standing to assert the rights of another." *Id.* at 129–30. One such circumstance arises when a party seeks third-party standing to bring claims challenging a statute that injures the rights of others. When considering such a request, the court must determine "whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement"— as Atlantic Guns has here—"and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Joseph H. Munson Co.*, 467 U.S. at 956. To that end, the Supreme Court has generally limited this exception by requiring parties seeking third-party standing to make two showings. First, the court must ascertain whether the party asserting the right has "a close relation[ship]" with the person who possesses the right. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Second, the court must consider whether there is a "hindrance" to the possessor's ability to protect his own interests. *Id.*

Although the State Defendants argued that Atlantic Guns failed to make a sufficient showing to satisfy either requirement, the district court rested its decision on Atlantic Guns' purported inability to satisfy only the second requirement: an individual's ability to protect his own interests vis a vis an HQL. According to the court, in "other third[-]party standing cases . . ., the businesses' customers or some identified class of customers, were completely prohibited from availing themselves of the businesses' services." J.A. 1453. The district court then opined that "[h]ere, the HQL requirement does not impose any categorical

22

prohibition that constricted Atlantic Guns' buyers' market." J.A. 1453. Based on that

conclusion, the district court opined that, "individual handgun purchasers should be able

to establish standing to challenge the HQL provision" on their own. J.A. 1454 (emphasis

omitted). In reaching this conclusion, however, the district court erred.

The Supreme Court has "been quite forgiving" with the two requirements to

establish third-party standing. *Kowalski*, 543 U.S. at 130; *accord Caplin & Drysdale,*

*Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (holding the requirements for

third-party standing satisfied even when there was no hindrance preventing individuals

from bringing their own constitutional claims). Indeed, "'the Court has enunciated [several]

concerns that justify a lessening of prudential limitations of standing," *Kowalski*, 543 U.S.

at 130, including "when enforcement of the challenged restriction against the litigant would

result indirectly in the violation of third parties' rights," *Warth*, 422 U.S. at 510.

Thus, the Supreme Court has unequivocally held that "a vendor with standing to

challenge the lawfulness of" a regulation—as Atlantic Guns has here—"is entitled to assert

those concomitant rights of third parties that would be diluted or adversely affected should

[its] constitutional challenge fail and the [regulations] remain in force." *Craig*, 429 U.S. at

195 (internal citation quotation marks omitted). "Otherwise, the threatened imposition of

governmental sanctions might deter" a plaintiff and "other similarly situated vendors from

selling" their items to members of their potential customer base, "thereby ensuring that

enforcement of the challenged restriction against the [vendor] would result indirectly in the

violation of third parties' rights." *Id.* (internal quotation marks omitted) (alteration in

23

original). Moreover, the *Craig* Court reached this conclusion despite the dissent's observation that there was "no barrier what[so]ever" to the vendor's customers preventing them from bringing independent claims. *Craig*, 429 U.S. at 216 (Burger, C.J., dissenting).

"Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig*, 429 U.S. at 195 (majority op.); *accord Carey v. Population Servs. Int'l*, 431 U.S. 678, 682–84 (1977) (holding that a mail-order seller of non-medical contraceptives had standing to argue that a state statute prohibiting distribution of such items violated its customers' substantive due process rights). Courts have invariably found that a vendor has a sufficiently close relationship with its customers when a challenged statute prevents that entity from transacting business with them. *See, e.g.*, *Craig*, 429 U.S. at 192–97 (concluding that vendors have a close relationship with their potential vendees); *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 43–44 (D.C. Cir. 1999) (recognizing a close relationship can exist "on the basis of the vendor-vendee relationship alone").

Courts have likewise consistently held that a vendor has third-party standing to pursue claims on behalf of its customers, regardless of whether a vendor's customers are hindered in bringing their own claims. *See, e.g., Epona, LLC v. Cty. of Ventura*, 876 F.3d 1214, 1219–20 (9th Cir. 2017) (rejecting the argument that affected third parties were fully capable of asserting their own claims and holding that vendors had standing to challenge permitting requirements on behalf of their potential clients); *Teixeira v. Cty. of Alameda*,

873 F.3d 670, 678 (9th Cir. 2017) (en banc) (citing *Craig* and holding that "Teixeira, as the would-be operator of a gun store, thus has derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers"); *Kaahumanu v. Hawaii*, 682 F.3d 789, 797 (9th Cir. 2012) (holding that a wedding planner had standing to challenge permitting regulations on behalf of those who sought to get married); *Ezell*, 651 F.3d at 696 (allowing a vendor to challenge city ordinance banning firing-range facilities on behalf of third parties who seek access to those facilities); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (recognizing that the Supreme Court has held that "businesses can assert the rights of their customers and that restricting the ability to purchase an item is tantamount to restricting that item's use"); *United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 155 (3d Cir. 2005) (holding that a vendor of obscene materials had standing to challenge a federal obscenity statute on behalf of its customers).

The district court erred in ignoring this long line of precedent, which instructs our decision here. Therefore, in addition to concluding that Atlantic Guns has standing to pursue its individual Second Amendment claim, we further hold that it has third-party standing to challenge the HQL requirement on behalf of potential customers like the Individual Plaintiffs and other similarly situated persons.

\* \* \* \*

In light of our conclusion that Atlantic Guns has both independent and third-party standing, we reverse the district court's judgment in favor of the State Defendants as to the Second Amendment claims and remand for further proceedings consistent with this opinion.

25

III.

Next, we address whether the Individual Plaintiffs and MSI members have standing to bring their vagueness claim as to the FSA under the Fourteenth Amendment. They raise a facial challenge, arguing that the statute's use of two terms, "receive" and "receipt," is unconstitutionally vague. In their view, the ambiguity inherent in these two terms "lead[s] to absurd results under Maryland law" and "leaves persons woefully uninformed as to [what] conduct is unlawful." J.A. 31–32. The Individual Plaintiffs specifically challenge the use of these terms in two sections: that a person "may . . . *receive* a handgun only if the person . . . possesses a valid [HQL]" and is otherwise not "prohibited from purchasing or possessing a handgun," Md. Code, Pub. Safety § 5-117.1(c) (emphasis added), and that a person "may not . . . knowingly participate in the . . . *receipt* of a regulated firearm in violation of" the HQL requirement, *id.* § 5-144(a)(1) (emphasis added).[6]

By challenging the HQL requirement without submitting to it, the Individual Plaintiffs "seek preenforcement review" of the FSA. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010). The Supreme Court has held, "[w]hen contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights." *Babbitt v. United Farm Workers Nat'l*

---

[6] For instance, plaintiffs contend the FSA—interpreted broadly—could ban the temporary handling of a family member's handgun or the use of an instructor's gun at a firing range. *See* Appellant Br. 30–31.

26

*Union*, 442 U.S. 289, 298 (1979) (internal quotations marks and alterations omitted). But to bring a cognizable preenforcement challenge, a party must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). To establish a credible threat of prosecution, plaintiffs must allege "fears of state prosecution" that are not "imaginary or speculative," *Babbitt*, 442 U.S. at 298, and are "actual and well-founded [enough to establish] that the statute will be enforced against them," *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).

In *Susan B. Anthony List,* the Supreme Court identified four decisions—*Steffel v. Thompson*, 415 U.S. 42 (1974), *Babbitt*, 442 U.S. at 298, *American Booksellers Association*, 484 U.S. 383, and *Holder*, 561 U.S. at 1—that illustrate "circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III." 573 U.S. at 159. In the earliest example, *Steffel*, in which "police officers threatened to arrest petitioner and his companion for distributing handbills protesting the Vietnam War," the Supreme Court found a credible threat of enforcement. *Id.* at 159. Because the petitioner "had been warned to stop handbilling and threatened with prosecution if he disobeyed [and] his companion's prosecution showed that his 'concern with arrest' was not 'chimerical,'" the Court allowed a preenforcement challenge to proceed. *Id.* Later, in *Babbitt*, the Supreme Court held that the petitioners had standing to bring a preenforcement challenge because they had "actively engaged in" the proscribed conduct in the past, alleged an

intention to continue that conduct in the future, and showed that this plan made prosecution "inevitable." *Id.* at 160.

Likewise, the Supreme Court recognized a preenforcement challenge was permissible in *American Booksellers Association* because the booksellers had already published books that were covered by the challenged statute and alleged that "costly compliance measures would be necessary to avoid prosecution for displaying such books." *Id.* Lastly, the Supreme Court found a credible threat of prosecution in *Holder* where plaintiffs challenged a law that criminalized knowingly providing material support or resources to a foreign terrorist organization. *Id.* at 160–61. There, "[t]he plaintiffs . . . had provided support to groups designated as terrorist organizations prior to the law's enactment and would provide similar support in the future. The Government had charged 150 persons with violating the law and declined to disavow prosecution if the plaintiffs resumed their support of the designated organizations." *Id.* at 161.

The district court here held that the Individual Plaintiffs failed to present such circumstances and thus establish a credible threat of prosecution. We agree. Assuming that plaintiffs have alleged a sufficient intention "to engage in conduct afflicted with a constitutional interest," they have offered no evidence to support a credible threat of prosecution. *Babbitt*, 442 U.S. at 298. First, Maryland has not threatened prosecution for the supposedly proscribed conduct as in *Steffel* or *Holder*. On the contrary, the State Police issued an "FAQ" affirming that an HQL is not needed to fire a gun at a gun range. J.A. 1281 (Q: "Do I need an HQL to fire at a gun range?" A: "No. An HQL is the only required

28

[sic] to purchase, rent or transfer a firearm.").  Second, plaintiffs have offered no evidence of the law having been enforced as they fear, again as in *Steffel* or *Holder*.  *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) ("[R]espondents fail to offer any evidence that their communications have been monitored under § 1881a, a failure that substantially undermines their standing theory").  Third, unlike in *Babbit*, *American Booksellers*, and *Holder*, the Individual Plaintiffs have not alleged any concrete intention to (arguably) violate the FSA by temporarily receiving a family member's gun in an emergency situation.  *Cf. Lujan*, 504 U.S. at 564 ( "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

We believe the record before us shows that (1) plaintiffs will not in fact be prosecuted for allegedly protected conduct and (2) they have no intention of engaging in such conduct in the first place.  Plaintiffs' generalized fears and concerns do not establish an actual and well-founded fear of prosecution because they show nothing "more than the fact that state officials stand ready to perform their general duty to enforce laws." *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986). Because the Individual Plaintiffs fail to establish a credible threat of prosecution, we affirm the district court's holding that they lack standing to pursue a facial vagueness challenge.

IV.

29

Lastly, the Individual Plaintiffs assert standing to raise a claim of ultra vires acts by the State Police. They allege that the State Police exceeded its rulemaking authority by enacting HQL regulations that are outside the scope of the FSA. As relief, the Individual Plaintiffs seek a declaratory judgment that the State Police acted in excess of its statutory authority and that it can no longer enforce the challenged regulations.

The district court examined the Individual Plaintiffs' standing to raise this claim under state law standing principles. In Maryland, "standing to bring a judicial action generally depends on whether one is 'aggrieved,' which means whether a plaintiff has 'an interest such that he or she is personally and specifically affected in a way different from the public generally.'" *Kendall v. Howard Cty.*, 66 A.3d 684, 691 (Md. 2013) (alterations omitted). Thus, "'an individual or an organization has no standing in court unless he has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public.'" *Evans v. State*, 914 A.2d 25, 68 (Md. 2006). The district court held that the Individual Plaintiffs did not establish "a special interest, distinct from that of the general public," as to the challenged regulations and thus lacked standing to raise the ultra vires claim. J.A. 1456.

We agree that the Individual Plaintiffs lack standing for this claim, but do so based on their failure to satisfy the standing requirement of Article III. Before considering their standing under Maryland law, federal courts must first determine whether they have Article III standing because the existence of a "case or controversy" is "*the* threshold question in every federal case." *Warth*, 422 U.S. at 498 (emphasis added). "Standing to sue in any

30

Article III court is . . . a federal question which does not depend on the party's [] standing in state court." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 804 (1985); *see Davis v. Detroit Pub. Sch. Cmty. Dist.*, 899 F.3d 437, 443 (6th Cir. 2018) (holding that in determining standing of plaintiffs who raise state law claims in federal court, the courts "must consider whether [p]laintiffs have standing under Article III before considering whether they have standing under state law"); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 436 n.1 (7th Cir. 1994) ("Although this cause of action arises under state law, the federal standing requirements of Article III still apply.").

The Individual Plaintiffs argue that the challenged regulations harm them by subjecting them to HQL requirements that are not authorized by the FSA. Specifically, they assert that "the Maryland State Police's 'live fire' requirement in the regulations was unauthorized by the" FSA and the regulations "illegally shifted [the State Police's] fingerprinting duties and costs . . . to the applicants and private vendors" without authority under the FSA. Opening Br. 33. But the Individual Plaintiffs allege this violation even though they have indicated they will not acquire a handgun unless the HQL requirement itself is eliminated. Appellant Br. 20 ("The ban on the unlicensed acquisition imposed by the Handgun License Requirement is itself the harm from which Plaintiffs seek relief"); *see also* J.A. 312 ("Q: What specifically about the HQL has deterred you from purchasing a handgun? A: Its existence."). In other words, plaintiffs do not claim to be injured by the specific requirements of the HQL—they claim to be injured by the existence of the HQL itself.

31

Accordingly, as to the HQL's specific requirements, they stand in the shoes of all members of the public who happen to disagree with a particular law. This alleged injury is insufficient to establish Article III standing. The Supreme Court has held that this type of injury establishes nothing more than "the impact on plaintiff . . . plainly undifferentiated and common to all members of the public" and therefore is "an impermissible generalized grievance" that is "an inadequate basis on which to grant standing." *Lujan*, 504 U.S. at 575–76 (alteration and internal quotation marks omitted). The Court has explained that "injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable because assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." *Id.* (internal quotation marks omitted).

Instead, to establish standing, the Individual Plaintiffs must demonstrate "a personal stake in the outcome," showing that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (internal quotation marks omitted). They have failed to do so here. So long as they never intend to apply for an HQL, the Individual Plaintiffs' alleged injury attributable to the HQL's specific requirements is conjectural at best. *See Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (holding the plaintiff lacked standing to seek a declaratory judgment that a certain New York statute was unconstitutional because it was "most unlikely" that he would be subject to the statute in

the future, which "precluded a finding that there was 'sufficiently immediacy and reality'

here").

Therefore, we affirm the district court's holding that the Individual Plaintiffs lack

standing to pursue the ultra vires claim.


V.

For the foregoing reasons, the district court's judgment is

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS.