# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,     *

     *Plaintiffs,*     *

     v.     *     Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*     *

     *Defendants.*     *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General

RYAN R. DIETRICH (Fed. Bar #27945)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7648 (tel.)
410-576-6955 (fax)
rdietrich@oag.state.md.us

Dated: November 25, 2020     Attorneys for Defendants

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND................................................................................................. 2

    Maryland's Enactment of the Firearm Safety Act of 2013 to Enhance Public
    Safety and Deter Crime ............................................................................................. 2

    The HQL Law and Implementing Regulations ....................................................... 4

    Procedural History..................................................................................................... 8

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT...................................................................................................................... 11

I.     PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL LAW IS
     REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN
     ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF
     FIREARMS VIOLENCE. ...................................................................................... 11

     A.    Plaintiffs Have Failed to Create Any Issue for Trial that the HQL Law
          Burdens Their Second Amendment Rights, and to the Extent the HQL
          Law Burdens Conduct Falling Within the Scope of the Second
          Amendment, Intermediate Scrutiny Is the Applicable Standard of
          Review.............................................................................................. 12

          1.    The FSA Does Not Impose a Burden on the Exercise of Second
               Amendment Rights.......................................................................... 13

          2.    Even if the FSA Imposes a Burden on Conduct Protected by
               the Second Amendment, this Court Should Apply Intermediate
               Scrutiny .......................................................................................... 14

     B.    The HQL Law Satisfies Intermediate Scrutiny Because It Is
          Reasonably Adapted to a Substantial Governmental Interest. .................... 18

          1.    The Fingerprint and Background Investigation Provisions of
               the HQL Law Are Constitutional. .................................................. 19

          2.    The Firearm Safety Training Provision of the HQL Law Is
               Constitutional. ................................................................................ 25

3.      The Costs Associated with the HQL Law and the Application
        Period Are Constitutional............................................................... 30

CONCLUSION ................................................................................................. 32

## TABLE OF EXHIBITS

| Exhibit No. | Title |
|---|---|
| 1. | Intentionally left blank |
| 2. | Md. Code Ann., Pub. Safety § 5-117.1 |
| 3. | Testimony of Daniel W. Webster in Support of H.B. 294 |
| 4. | U.S. General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification*, GAO–01–427 (2001) |
| 5. | Testimony of James W. Johnson (Mar. 1, 2013) |
| 6. | Testimony of Anthony W. Batts (Feb. 6, 2013) |
| 7. | Declaration of Captain Andy Johnson |
| 8. | Code of Maryland Regulations (COMAR) 29.03.01.26—.41 |
| 9. | Declaration of First Sergeant Donald Pickle |
| 10. | Declaration of Captain Andrew Rossignol |
| 11. | **Declaration of Daniel W. Webster, ScD** |
| 12. | Second Supplemental Declaration of Daniel W. Webster, ScD |
| 13. | **Declaration of Captain James Russell** |
| 14. | **Declaration of James W. Johnson** |
| 15. | Excerpts of deposition transcript of Gary Kleck |
| 16. | Declaration of Mary Scanlan |

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ...................................................... 10

*Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106, 119 (3d Cir. 2018); ................................................. 17, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 10

*Center for Auto Safety Inc. v. Athey*, 37 F.3d 139 (4th Cir. 1994) .................................... 30

*Connecticut Citizens Defense League, Inc. v. Lamont*, 465 F.Supp.3d 56 (D. Conn. 2020) ........................................................................................................ 31

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ................................................................... 30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................................... 12

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) .................................................... 16, 17

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................................... 26

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ............................................................... 18

*Heller v. District of Columbia*, 554 U.S. 570 (2008) ................................................. passim

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ..................................... 15

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ................................. passim

*Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835 (N.D. Ill. 2011) ......................... 15, 30

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.) (en banc), *cert. denied,* 138 S. Ct. 469 (2017) ....................................................................................... passim

*Kwong v. de Blasio*, 134 S. Ct. 2696 (2014) .................................................................... 15

*Kwong. v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ........................................................ 15

*Lane v. Holder* 703 F.3d 668 (4th Cir. 2012) .................................................................. 14

*Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) ................. 16, 17

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) ................................. 10

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................ 12, 26, 31

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ............................................................ 26

*National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ............................................................ 12, 14

*New York State Rifle & Pistol Assoc., Inc. v. City of New York*, 140 S.Ct. 1525 (2020) .................................................................................... 26

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ....... 12

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) ................................................... 17

*People v. Tucker*, 117 N.Y.S.3d 401 (N.Y. App. 2020) ................................................... 15

*Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992) ................. 14, 31

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ......................................................................... 11

*Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001) .................... 18

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................... 10

*Silvester v. Becerra*, 138 S.Ct. 945 (2018) ...................................................................... 17

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ......................................... 14

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .................................................... 18

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) .................................................... 18

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) .................................................. 17

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) .................................................. 15

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) .............................. 13, 16, 17

*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) ............................................... 17

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .......................................... 17, 18, 20

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019 ............................................................... 17

## Constitutional Provisions

U.S. Const. amend. I ...................................................................................................... 30

U.S. Const. amend. XIV .................................................................................................. 8

## Statutes

2007 Laws of Md., Ch. 427 ............................................................................................ 2

Conn. Gen. Stat. § 29-36(f) .......................................................................................... 23

Conn. Gen. Stat. § 29-36(g) ........................................................................................... 23

Conn. Gen. Stat. § 29-36(g)(b)(2) ................................................................................. 31

Md. Code Ann., Pub. Safety § 5-101(q) (LexisNexis 2018) .......................................... 4

Md. Code Ann., Pub. Safety § 5-101(r) (LexisNexis 2018) .......................................... 5

Md. Code Ann., Pub. Safety § 5-117.1 (LexisNexis 2018) ............................... 2, 27, 28, 1

Md. Code Ann., Pub. Safety § 5-117.1(a) (LexisNexis 2018) ....................................... 4

Md. Code Ann., Pub. Safety § 5-117.1(b) (LexisNexis 2018) ....................................... 4

Md. Code Ann., Pub. Safety § 5-117.1(c) (LexisNexis 2018) ....................................... 4

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) (LexisNexis 2018) ............................... 4, 29

Md. Code Ann., Pub. Safety § 5-117.1(e) (LexisNexis 2018) ....................................... 5

Md. Code Ann., Pub. Safety § 5-117.1(f)(2) (LexisNexis 2018) .................................... 5

Md. Code Ann., Pub. Safety § 5-117.1(f)(3)(i) (LexisNexis 2018) ................................ 6

Md. Code Ann., Pub. Safety § 5-117.1(f)(7) (LexisNexis 2018) ................................... 6

Md. Code Ann., Pub. Safety § 5-117.1(g) (LexisNexis 2018) ....................................... 7

Md. Code Ann., Pub. Safety § 5-117.1(g)(2) (LexisNexis 2018) ................................. 30

Md. Code Ann., Pub. Safety § 5-117.1(h) (LexisNexis 2018) ....................................... 7

Md. Code Ann., Pub. Safety § 5-117.1(h)(1) (LexisNexis 2018) ................................. 31

Md. Code Ann., Pub. Safety § 5-117.1(i) (LexisNexis 2018) ....................................... 7

Md. Code Ann., Pub. Safety § 5-117.1(j) (LexisNexis 2018)............................................7

Md. Code Ann., Pub. Safety § 5-117.1(l)(1) (LexisNexis 2018) ......................................8

Md. Code Ann., Pub. Safety § 5-117.1(l)(3) (LexisNexis 2018) ......................................8

Md. Code Ann., Pub. Safety § 5-118 (LexisNexis 2018) ................................................8

Md. Code Ann., Pub. Safety § 5-118(b) (LexisNexis 2018)...........................................21

Md. Code Ann., Pub. Safety §§ 5-121 – 5-123 (LexisNexis 2018) ..................................8

N.Y. Penal Law § 400.00(4-a)........................................................................................31

## Rules

Fed. R. Civ. P. 56.....................................................................................................1, 11

Fed. R. Civ. P. 56(a) ...................................................................................................10

Fed. R. Civ. P. 56(c) ...................................................................................................10

## Regulations

COMAR 12.04.02.03—.05 ............................................................................................29

COMAR 12.04.02.03.10(D) ..........................................................................................29

COMAR 29.03.01.26–.41...............................................................................................5

COMAR 29.03.01.28(C) ................................................................................................7

COMAR 29.03.01.29......................................................................................................5

COMAR 29.03.01.34......................................................................................................7

## INTRODUCTION

Defendants Governor Lawrence J. Hogan, Jr. and Superintendent of Maryland State Police Colonel Woodrow W. Jones, III, sued in their official capacities, move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs have failed to create a genuine issue of material fact to support their Second Amendment challenge to Maryland's requirement that most individuals wishing to purchase a handgun in Maryland first be issued a Handgun Qualification License ("HQL").  Plaintiffs have failed to produce any evidence that the HQL law—which simply strengthens measures that were previously in place—burdens their Second Amendment rights.  Moreover, the HQL law easily satisfies intermediate scrutiny because the challenged requirements—that applicants be fingerprinted and receive four hours of firearm safety training—have been shown through empirical, peer-reviewed research to reduce crime and further the State's compelling interest in promoting public safety.

The summary judgment record shows that the HQL fingerprint background check reduces the diversion of guns to criminals, and enables the Maryland State Police to positively identify HQL applicants for purposes of the background check and to identify licensees who are subsequently convicted of offenses that make them ineligible to own a handgun.  Further, law enforcement experts, based on decades of experience with firearm safety training, have testified that instructing applicants on the safe handling and storage of a handgun through safety training and a live-fire requirement will make Marylanders safer by reducing the risk of accidental shootings and reducing access of firearms to minors

and other prohibited persons.  For all of these reasons, the defendants are entitled to summary judgment.

## FACTUAL BACKGROUND

### Maryland's Enactment of the Firearm Safety Act of 2013 to Enhance Public Safety and Deter Crime

The Firearm Safety Act of 2013, Chapter 427 of the 2013 Laws of Maryland (the "FSA"), was a comprehensive effort to enhance public safety.  Most relevant to this case, the FSA requires that most purchasers of handguns in Maryland have a valid HQL.  As detailed more fully below, to obtain a valid HQL, applicants must simply be fingerprinted (and pass a background investigation) and take a four-hour firearms safety training course. These requirements are set forth in § 5-117.1 of the Public Safety Article, which is reproduced as Exhibit 2.

In legislative hearings concerning the FSA, the General Assembly heard testimony from various public policy and law enforcement experts advocating for the HQL prerequisite and, in particular, its fingerprinting and training requirements.  The Director of the Johns Hopkins Center for Gun Policy and Research, Daniel W. Webster, ScD, testified that under the State's prior regulatory regime that did not require a fingerprint background check, Maryland's "system [was] especially vulnerable to illegal straw purchases and individuals using false identification in their applications to purchase regulated firearms."  (Ex. 3, Test. of Daniel W. Webster in Support of HB 294 at 1.) Professor Webster relayed the findings of a study conducted by the United States General Accounting Office ("GAO"), concluding that background checks based on photographic

2

identification were inadequate to "ensure that the prospective purchaser [of firearms] is not a felon." (Ex. 3, at 1 (quoting U.S. GAO, GAO-01-427, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification* 2 (2001) (attached as Ex. 4).) Professor Webster further outlined his peer-reviewed research showing the positive effects on public safety of state laws with requirements similar to Maryland's HQL law. (Ex. 3, at 1-4.)

The General Assembly also heard testimony from then-Baltimore County Police Chief James W. Johnson, who testified that the HQL requirement "will reduce the number of non-intentional shootings by ensuring that gun owners know how to safely use and store firearms"; "will decrease illegal gun sales and purchases by ensuring that all licensees are eligible to possess firearms under Federal and State law"; and "will reduce murder rates" as such laws have done in other states. (Ex. 5, Test. of James W. Johnson at 3 (Mar. 1, 2013).) Chief Johnson expressly advocated for the fingerprinting requirement of the HQL, which "will help law enforcement to identify people involved in gun crimes" but not be "an inconvenience" for law-abiding Marylanders. (Ex. 5, at 3.) Chief Johnson further testified that the four-hour training course was an improvement over the "insufficient" prior requirement that handgun purchasers view a 30-minute video, and that this training would have the incidental effect of deterring straw purchasers. (Ex. 5, at 4.) Similarly, then-Baltimore City Police Commissioner, Anthony Batts, testified before the General Assembly that the fingerprint requirement would allow for a comprehensive background investigation, thus "ensuring that the applicant is not prohibited from possessing a handgun," and that both the fingerprinting and training requirements would deter straw purchasers. (Ex. 6, Test. of Anthony W. Batts at 1-2 (Feb. 6, 2013).)

3

**The HQL Law and Implementing Regulations**

Subject to certain exemptions,[1] the HQL law provides that one person may not "sell, rent, or transfer a handgun" to a second person, and the second person may not "purchase, rent, or receive a handgun" from the first person, unless the second person presents a valid HQL.  Md. Code Ann., Pub. Safety § 5-117.1(b), (c) (LexisNexis 2018).  Under the law, the Secretary of the Maryland Department of State Police ("MSP") *must* issue an HQL to an applicant who:  (i) is at least 21 years old; (ii) is a Maryland resident; (iii) has completed a firearms safety training course meeting certain criteria within three years of applying for an HQL; and (iv) based on an investigation by MSP, is not prohibited from owning a firearm.

The FSA provides that the required firearms safety training course must include at least four hours of instruction by a qualified handgun instructor ("QHI").[2]  Pub. Safety § 5-117.1(d)(3).  The course must include instruction on (1) "State firearm law," (2) "home

---

[1] Active and retired members of law enforcement agencies and the military are not required to obtain an HQL.  Md. Code Ann., Pub. Safety § 5-117.1(a) (LexisNexis 2018).  The FSA also does not apply to "licensed firearms manufacturer[s]" or "a person purchasing, renting, or receiving an antique, curio, or relic firearm" as defined by federal law.  *Id*.

[2] The Maryland Code defines a "qualified handgun instructor" as "a certified firearms instructor who: (1) is recognized by the Maryland Police and Correctional Training commissions; (2) has a qualified handgun instructor license issued by the Secretary; or (3) has a certification issued by a nationally recognized firearms organization."  Md. Code Ann., Pub. Safety § 5-101(q).  MSP maintains a searchable database of licensed QHIs on its website.  *See* https://emdsp.mdsp.org/verification/ (providing contact information for over 1,000 qualified handgun instructors in Maryland, last visited November 20, 2020).

firearm safety," and (3) "handgun mechanisms and operation."[3]  *Id.*  The course must also contain "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm."  *Id.*  As part of this orientation component, an applicant must "safely fire[] at least one round of live ammunition."  COMAR 29.03.01.29.  Notably, the training course requirement is waived for a person who, among other exemptions, already lawfully owns a handgun[4] or has completed certain other training courses.  Pub. Safety § 5-117.1(e).

The FSA requires the Secretary of MSP to apply to the Maryland Department of Public Safety and Correctional Services ("DPSCS") for a State and national criminal history records check for each HQL applicant.  Pub. Safety § 5-117.1(f)(2). The application

---

[3] Regulations promulgated pursuant to the FSA flesh out the "minimum curricula" relating to each statutory subject:

(1) State Firearm Law.  Overview of the State firearm laws, including discussion of what constitutes a regulated firearm, how to properly purchase or transfer a firearm, where allowed to carry or transport a firearm, when necessary to possess a carry permit, and who is prohibited from possessing firearms.

(2) Home Firearm Safety.  Overview of handgun and firearm safety in the home, including discussion of access to minors, locking and storing of firearms, and use of safety devices, such as secure lock boxes.

(3) Handgun Mechanisms and Operation.  Overview of the proper operation and safe handling of a handgun, including cleaning and maintenance, the loading and unloading of ammunition, and the differences between revolvers and semi-automatic handguns.

COMAR 29.03.01.29.  The regulations adopted pursuant to the FSA appear at COMAR 29.03.01.26–.41 and are attached as Exhibit 8.

[4] The FSA exempts from the training course a person who already legally owns a "regulated firearm," Pub. Safety § 5-117.1(e), which includes a handgun, Pub. Safety § 5-101(r).

5

must include "a complete set of the applicant's legible fingerprints taken in a format approved by" DPSCS and the Federal Bureau of Investigation.   Pub. Safety § 5-117.1(f)(3)(i).  In accordance with fingerprint rules promulgated by DPSCS in 2012, HQL applicants must submit their fingerprints to DPSCS via livescan technology.[5]  (Ex. 7, Decl. of Andy Johnson ¶ 23 & Decl. Ex. 5.)

The FSA creates an ongoing obligation on the part of DPSCS to update MSP's Licensing Division regarding the criminal history information of HQL applicants and licensees.  *See* Pub. Safety § 5-117.1(f)(7) (stating that, if DPSCS receives criminal history information "after the date of the initial criminal history records check," it must provide that information to MSP's Licensing Division).  This updated criminal history information enables MSP to revoke the HQLs of persons who become ineligible to possess them and, where necessary, to retrieve firearms from disqualified persons.  (Ex. 7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6.)  Prior to the FSA, there was no statute or regulation that mandated the reporting of criminal history record information to MSP after the date of an initial background check, nor did any law enforcement agency or court system routinely report such information.  (Ex. 9, Decl. of Donald Pickle ¶¶ 10-12.)

With regard to the application process itself, the FSA requires an applicant for an HQL to submit:  (1) "an application in the manner and format designated by the Secretary";

---

[5]   The fingerprint policy is available on MSP's website at http://mdsp.maryland.gov/Organization/Documents/NewFingerprintRules.2.pdf**,** and MSP provides a link to a DPSCS website listing commercial fingerprinting services, at http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Fingerprinting.aspx**.**

(2) an application fee "to cover the costs to administer the program of up to $50"[6]; (3) proof of completion of the training requirement; (4) any other information or documentation required by the Secretary; and (5) a statement under oath that the individual is not prohibited from possessing a handgun.  Pub. Safety § 5-117.1(g).  The FSA places a statutory cap on the length of time within which the Secretary must act; within 30 days of receiving a complete application, the Secretary must either issue an HQL or provide a written denial accompanied by a statement of the reason for the denial and notice of appeal rights.  Pub. Safety § 5-117.1(h).  All properly completed applications that have been received by MSP since the inception of the HQL requirement have been processed within this statutorily-mandated 30-day timeframe.  (Ex. 7, A. Johnson Decl. ¶ 12.); (Ex. 10, Decl. of Andrew Rossignol ¶ 15.)

An HQL is valid for 10 years from its issuance.[7]  Pub. Safety § 5-117.1(i).  A person who is denied an HQL for any reason, or whose HQL is revoked for any reason, may request a hearing from the Secretary within 30 days of the denial or revocation, and thereafter may seek judicial review in state court.  Pub. Safety § 5-117.1(l)(1), (3).

---

[6] In accordance with MSP's estimates of the cost to process each HQL application, the Secretary set the HQL application fee at the statutory cap of $50.  COMAR 29.03.01.28(C).  In 2018, the processing and production costs associated with each HQL application exceeded $50 and did not account for other costs associated with administering the HQL program.  (Ex. 7, A. Johnson Decl. ¶¶ 15-18 & Decl. Exs. 3, 4.)

[7] A person seeking to renew his or her HQL license need only pay a $20 application fee; they need not complete another firearms safety course or resubmit fingerprints.  Pub. Safety § 5-117.1(j); COMAR 29.03.01.34.

A person who possesses an HQL and who wishes to purchase a handgun must comply with § 5-118 of the Public Safety Article.  Pursuant to Public Safety § 5-118, an individual with a valid HQL wishing to purchase a handgun must complete an application (known as a 77R form) confirming that the applicant is not prohibited from acquiring a handgun and pay an application fee of $10.  Unless an application is disapproved by the MSP within seven days (during which time the MSP conducts a review of the application and background check), the applicant may take possession of the handgun.  Pub. Safety §§ 5-121 – 5-123.

### Procedural History

Plaintiffs filed their initial complaint on October 3, 2016 (ECF 1) and an amended complaint on December 28, 2016 (ECF 14), alleging (1) that the HQL law violates the Second Amendment; (2) that the HQL law violates the Due Process Clause of the Fourteenth Amendment because of the law's reliance on private handgun instructors to provide the firearm safety training, and because the HQL law's application to individuals who "receive" a handgun is void for vagueness; and (3) that various aspects of the regulations implementing the HQL law are ultra vires under Maryland law.  The defendants moved to dismiss the complaint in its entirety on standing grounds and for failure to state a claim on which relief can be granted.  (ECF 18.)

On September 16, 2017, this Court issued a memorandum opinion denying, for the most part, defendants' motion to dismiss.  (ECF 34.)  This Court allowed plaintiffs discovery to prove standing, explaining that "[u]ltimately, to prevail, Plaintiffs must prove the identity of specific individuals who are personally injured or deterred by each contested

aspect of the challenged requirements in order to have standing." (*Id.* at 16.)  As to the Second Amendment claim, resolving all inferences in favor of plaintiffs, this Court found that "Plaintiffs allege adequate facts to present a plausible claim that the HQL Provision and regulations have deprived them (or their members or customers) of the Second Amendment right to possess a handgun in the home for self-defense." (*Id.* at 20.)  With regard to the vagueness challenge, this Court found it sufficient at the motion to dismiss stage that MSI had alleged that its members were confused as to whether they could allow temporary possession of their handguns to individuals who do not possess an HQL.  (*Id.* at 26.)  This Court also found that plaintiffs had sufficiently pled an ultra vires claim under Maryland law, because the sufficiency of the complaint depended solely on whether plaintiffs are "entitled to a declaration at all" and not necessarily one in their favor.  (*Id.* at 29 (citation omitted).)  This Court, however, dismissed plaintiffs' due process claim as to the law's reliance on private handgun instructors, concluding that, in addition to not being ripe, the claim was wholly speculative because plaintiffs had not alleged the deprivation of any right and the regulations did not vest QHIs with discretionary power.  (*Id.* at 24-25 & n.13.)

After extensive discovery, the parties filed cross-motions for summary judgment on all claims.  (ECF 59, 77.)  On April 4, 2019, this Court granted summary judgment for defendants.  (ECF 102).  Without reaching the merits of plaintiffs' claims, this Court concluded that none of the plaintiffs was able to demonstrate standing.  (*Id.* at 3.)  Plaintiffs appealed that ruling to the Fourth Circuit.  *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020).  The Fourth Circuit concluded that plaintiff Atlantic Guns, a federally-

licensed firearms dealer in Maryland, had standing to assert a Second Amendment claim, both independently (on the basis of economic injury) and through the doctrine of third-party standing (on behalf of potential customers such as the individual plaintiffs).  *Id*. at 210-16.  The Fourth Circuit, however, affirmed this Court's decision with respect to the constitutional due process claim and the challenge to the MSP regulations as ultra vires, concluding that plaintiffs lacked standing to bring these claims.  *Id.* at 216-20.

Consequently, the only claim that remains viable in this Court on remand is the Second Amendment claim encompassed within Count I of the Amended Complaint.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "facts must be viewed in the light most favorable to the non-moving party," but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party bears the burden of production under Rule 56 to designate

specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

## ARGUMENT

**I.   PLAINTIFFS' SECOND AMENDMENT CLAIM FAILS BECAUSE THE HQL LAW IS REASONABLY ADAPTED TO THE STATE'S SUBSTANTIAL INTERESTS IN ADVANCING PUBLIC SAFETY AND REDUCING THE NEGATIVE EFFECTS OF FIREARMS VIOLENCE.**

Plaintiffs' Second Amendment challenge to the HQL law fails because substantial evidence in the summary judgment record supports the General Assembly's judgment that the law is reasonably related to advancing the State's compelling interest in public safety.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *Heller v. District of Columbia*, 554 U.S. 570, 592 (2008) (*Heller I*), the Supreme Court held that, notwithstanding its prefatory clause, the Second Amendment encompasses an individual right to possess firearms for self-defense. The Second Amendment, however, did not itself grant this right; rather, it "codified a *pre-existing* right." *Id*. (emphasis in original).  Given this historical backdrop, the Supreme Court noted that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and that the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id*. at 626; *see also National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("Since even before the Revolution, gun use and gun control have been inextricably intertwined.").

11

The Supreme Court has instead made clear that "reasonable firearms regulation" is permissible under the Second Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010); *see also New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("[S]tate regulation of the right to bear arms 'has always been more robust' than analogous regulation of other constitutional rights."). Indeed, the Supreme Court itself has identified "presumptively lawful regulatory measures" that do not violate the Constitution, including bans on "the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms," among others. *Heller I*, 554 U.S. at 626-27 & n.26.

A.   **Plaintiffs Have Failed to Create Any Issue for Trial that the HQL Law Burdens Their Second Amendment Rights, and to the Extent the HQL Law Burdens Conduct Falling Within the Scope of the Second Amendment, Intermediate Scrutiny Is the Applicable Standard of Review.**

As with nearly all of its sister circuits, the United States Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing Second Amendment challenges. *Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir.) (en banc), *cert. denied,* 138 S. Ct. 469 (2017). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* at 133 (quotation omitted). If not, the challenged law is valid. *Id.* at 133. "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment," courts "apply[ ] an appropriate form of means-end scrutiny." *Id.* (quotation omitted). The level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* (quotation omitted). Thus,

while a "severe burden on the core Second Amendment right of armed self-defense should require strong justification," "laws that merely regulate rather than restrict . . . may be more easily justified." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (citations omitted).

1.   **The FSA Does Not Impose a Burden on the Exercise of Second Amendment Rights.**

Although the HQL law imposes conditions on individuals seeking to purchase, rent, or receive handguns, including that they pass a fingerprint-based background check and receive four hours of firearm safety training, the HQL law does not deprive any "law-abiding, responsible citizen" of the right to possess a handgun for in-home self-defense. *Heller I*, 554 U.S. at 635.  Because the HQL law leaves this right unscathed, the plaintiffs have failed to demonstrate how its requirements impose any constitutionally cognizable burden on their Second Amendment-protected conduct.  Indeed, throughout this litigation, plaintiffs have failed to identify even a single individual who was deterred from purchasing a handgun due to the HQL law; nor have they produced any evidence that any law-abiding, responsible citizen has been deprived of the right to purchase a handgun for in-home self-defense due to any inability to comply with the HQL law.  Rather, the individuals identified by plaintiffs simply declined to obtain an HQL either on principle or because of "minor inconveniences" associated with "costs and logistical hurdles" that are insufficient to establish an injury under the Second Amendment.  *Lane v. Holder* 703 F.3d 668, 672-73 (4th Cir. 2012).  Yet, "not every law which makes a right more difficult to exercise is, *ipso facto,* an infringement of that right."  *Planned Parenthood of Se. Pennsylvania v. Casey*,

13

505 U.S. 833, 873 (1992) (noting as an example that the Court has "held that not every ballot access limitation amounts to an infringement of the right to vote"); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) ("[T]he Second Amendment does not elevate convenience and preference over all other considerations.").  Instead, the reasonable conditions that the HQL law imposes on commercial and other transactions involving handguns, that do not impose any significant burden on the exercise of the Second Amendment right, fall within the presumptively lawful regulations identified in *Heller I*, 554 U.S. at 626-27 & n.26; *see also National Rifle Ass'n*, 700 F.3d at 200 (noting that "laws keeping track of who in the community had guns" "were commonplace in the colonies . . . around the time of the founding").  Plaintiffs' Second Amendment challenge, thus, fails as a matter of law.

> ### 2.   Even if the FSA Imposes a Burden on Conduct Protected by the Second Amendment, this Court Should Apply Intermediate Scrutiny.

Even assuming that plaintiffs had adduced evidence that the HQL requirement imposes a burden on their Second Amendment rights that is distinct from the logistical burdens associated with any regulation governing firearms transactions, their claims would still fail.  Intermediate scrutiny would be the appropriate test because the HQL requirement "does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding responsible citizens to use arms for self-defense in the home."  *Kolbe*, 849 F.3d at 138.  The challenged provisions "'do[] not severely limit the possession of firearms' . . . [and] none of the [statutory or regulatory] requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any

14

other lawful purpose.'" *Heller v. District of Columbia*, 670 F.3d 1244, 1257-58 (D.C. Cir. 2011) (*Heller II*) (holding intermediate scrutiny was the appropriate standard of review to apply to the District's firearm registration law, which includes fingerprint and firearm safety training requirements (citation omitted)); *see also United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) (noting that a challenged law did not "touch on the Second Amendment's core protections" because individuals remained free to possess and purchase firearms for self-defense); *Kwong. v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) (explaining that "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right" and holding that New York's $350 firearm licensing fee "easily survives 'intermediate scrutiny'"), *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014); *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835, 845 (N.D. Ill. 2011) (applying a form of intermediate scrutiny to registration requirement that was "merely regulatory" and, thus, "[did] not place a categorical limit on [the plaintiff's] possession of firearms"); *People v. Tucker*, 117 N.Y.S.3d 401, 406-07 (N.Y. App. 2020) (rejecting the notion that "the expense and logistics of obtaining a license constitute substantial burdens on the right to possess a handgun in the home for self-defense"). Nor does the FSA "disarm" anyone who already legally owns a handgun. *See Heller I*, 554 U.S. at 598 (noting that one of the driving forces behind the Second Amendment was "the fear that the Federal Government would disarm the people in order to impose rule through a standing army or select militia").

Plaintiffs' contention that the HQL law amounts to a "ban," and thus subject to strict scrutiny, should be rejected. In contrast to the "total ban" on possession of handguns at

issue in *Heller I*, where most citizens could not legally possess a handgun under any circumstances, here the HQL does not prevent law-abiding, responsible citizens from acquiring handguns. *See Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127-28 (2d Cir. 2020) (concluding that a requirement that a person show "good moral character" to acquire a license to keep a handgun in their home was not a "total ban" and "not onerous" because it did not prevent law-abiding, responsible individuals from acquiring a handgun). In fact, since 2017, more than 109,000 Marylanders have obtained an HQL, and more than 229,000 applications for the transfer of regulated firearms have been approved.  (Ex. 10, Rossignol Decl. ¶¶ 5-9 & Decl. Ex. 1.)  These figures demonstrate that the HQL law is far from a prohibition.  Instead, to the extent that the HQL law imposes conditions on the ability to purchase a handgun, these are regulations that affect only the "manner" in which a handgun may be purchased. *See Duncan v. Becerra*, 970 F.3d 1133, 1158 (9th Cir. 2020) (noting that a ten-day waiting period for handgun purchases was "more akin to time, place, or manner restrictions in the First Amendment context").  And as a "manner" restriction "that otherwise d[oes] not affect how a citizen exercises her Second Amendment rights after" complying with the HQL requirements, it is subject to, at most, intermediate scrutiny. *Id.*

This "less onerous" standard of intermediate scrutiny "requires the government to show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471).  Intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the

16

individual right in question.'"  *Id.* (quoting *Masciandaro*, 638 F.3d at 474).  "In other words, there must be 'a fit that is 'reasonable, not perfect.'"  *Id.* (quoting *Woollard v. Gallagher*, 712 F.3d 865, 878 (4th Cir. 2013)).[8]

To meet its burden, the State may "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as

---

[8] In a previous filing, plaintiffs claimed that the Supreme Court has altered the formulation of intermediate scrutiny such that, to be satisfied, the government must now show that a law is "narrowly tailored to serve a significant governmental interest."  (ECF 77 at 58 (citing *Packingham v. North Carolina*, 137 S.Ct. 1730, 1736 (2017).)  This argument fails in this case for several reasons.  First, *Packingham* arose squarely within the First Amendment context and thus does not control the analysis here.  Although the Fourth Circuit has recognized that First Amendment principles inform Second Amendment analysis, that Court—like its sister circuits—has been cautious not to import First Amendment jurisprudence wholesale.  *See Masciandaro*, 638 F.3d at 470 (noting that "[t]he Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right" (citation omitted)).  Therefore, the articulation of the intermediate scrutiny standard for Second Amendment claims set forth in *Kolbe* (which has been applied by the Fourth Circuit since 2010, *see United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010)) remains good law, and this Court must follow that precedent until the Fourth Circuit or the Supreme Court dictates otherwise.  Moreover, any notion that the intermediate scrutiny standard has been amended in the Second Amendment context is undercut by the fact that, post-*Packingham*, Justice Thomas acknowledged in a dissent from a denial of certiorari in a Second Amendment case that "intermediate scrutiny requires 'only that the regulation "promot[e] a substantial government interest that would be achieved less effectively absent the regulation"'" and that "intermediate scrutiny requires a '"reasonable fit"' between the law's ends and means."  *Silvester v. Becerra*, 138 S.Ct. 945, 947-48 (2018) (Thomas, J., dissenting from the denial of certiorari).  Similarly, other circuits that have addressed Second Amendment questions post-*Packingham* have continued to adhere to longstanding articulations of the intermediate scrutiny standard that are consistent with *Kolbe*.  *See, e.g., Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 119 (2d Cir. 2020); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020); *Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019); *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106, 119 (3d Cir. 2018); *but see Duncan v. Becerra*, 970 F.3d 1133, 1165 (9th Cir. 2020) (acknowledging *Packingham* to emphasize that "intermediate scrutiny is a searching inquiry" but nonetheless observing that "the precise contours of intermediate scrutiny may vary").

17

circumstances and context require." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). A court's role is not to determine whether the legislature made the correct policy decision; rather, it is "to ensure that the legislature's policy choice substantially serves a significant governmental interest." *Woollard*, 712 F.3d at 881. As the Fourth Circuit has explained, "[t]he judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court." *Kolbe*, 849 F.3d at 140. "That is, '[i]t is the legislature's job, not [the courts'], to weigh conflicting evidence and make policy judgments.'" *Id.* (quoting *Woollard*, 712 F.3d at 881 (citation omitted)). "It would be foolhardy—and wrong—to demand that the legislature support its policy choices with an impregnable wall of unanimous empirical studies." *Gould v. Morgan*, 907 F.3d 659, 676 (1st Cir. 2018). Instead, this Court's "obligation is simply 'to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Kolbe*, 849 F.3d at 140 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)). And in conducting this analysis, this Court "must 'accord substantial deference to the predictive judgments of [the legislature].'" *Kolbe*, 849 F.3d at 140 (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001) (quoting *Turner*, 512 U.S. at 666)).

**B.    The HQL Law Satisfies Intermediate Scrutiny Because It Is Reasonably Adapted to a Substantial Governmental Interest.**

The HQL law easily satisfies the first prong of the intermediate scrutiny analysis, because, as the Fourth Circuit has recognized in rejecting a challenge to other provisions

enacted under the FSA, "Maryland's interest in the protection of its citizenry and the public safety is not only substantial, but compelling." *Kolbe*, 849 F.3d at 139.

Under the second prong, expert testimony, empirical evidence, case law, and common sense all demonstrate that the HQL law's fingerprint-based background check and firearm safety training provisions are, at a minimum, "reasonably adapted" to these interests. In support of its motion for summary judgment, Maryland submits the declarations of (1) Daniel W. Webster, ScD, the Director of the Johns Hopkins Center for Gun Policy and Research and a leading expert in the academic study of the effects of firearms laws on public safety (Ex. 11, Decl. of Daniel W. Webster ¶¶ 1, 4-5); (Ex. 12, Second Supp. Decl. of Daniel W. Webster, ScD. ¶ 1); (2) Captain James P. Russell of MSP, an active member of law enforcement for over 20 years and a firearms safety trainer for over 13 years (Ex. 13, Decl. of James Russell ¶¶ 1-2, 3-4, 6-10); and (3) James W. Johnson, former Chief of the Baltimore County Police Department with nearly 40 years of law enforcement experience and a former Chairman of the National Law Enforcement Partnership to Prevent Gun Violence (Ex. 14, Decl. of James W. Johnson ¶¶ 2, 4).

### 1.    The Fingerprint and Background Investigation Provisions of the HQL Law Are Constitutional.

Maryland's requirement that HQL applicants submit a set of fingerprints serves three critical public safety functions. First, the fingerprint requirement enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information. (Ex. 7, A. Johnson Decl. ¶ 20; Ex. 3, Webster Test. 1; Ex. 14, J. Johnson Decl. ¶ 8.) Although not an inconvenience for Marylanders generally

(Ex. 5, J. Johnson Test. 3), this enhanced identification requirement makes it more difficult for a prohibited person to obtain access to a firearm.  (Ex. 11, Webster Decl. ¶ 9; Ex. 14, J. Johnson Decl. ¶¶ 8-9); *see also Heller v. District of Columbia*, 801 F.3d 264, 276-77 (D.C. Cir. 2015) (*Heller III*) (holding the District could reasonably conclude that its fingerprint requirement would "advance public safety by preventing at least some ineligible individuals from obtaining weapons").  Robust background checks based on proper identification of an applicant animate the State's policy of keeping firearms out of the possession of felons, a "presumptively lawful" and longstanding firearms restriction. *Heller I*, 554 U.S. at 626-27 & n.26.  Indeed, if the Second Amendment does not prohibit states from barring felons and other categories of individuals from acquiring handguns, it cannot be read to deny states the tools necessary to accurately identify those individuals.

The State's interest is particularly acute when it comes to keeping handguns out of the hands of criminals.  Handguns are the firearms most frequently used by criminals in Maryland.  *Woollard*, 712 F.3d at 877.  According to data collected by the FBI, there were 551 murders in Maryland in 2019, 460 of which involved a firearm.  Of those 460, 414 involved handguns.  Federal Bureau of Investigation, 2019 Crime in the United States, Table 20, Murder by State, Types of Weapons, 2019, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-20 (last visited November 20, 2020). Thus, handguns were used in nine out of every ten murders with firearms and more than three quarters of all murders in Maryland.  *Id.*

Although Maryland handgun purchasers were required to undergo a background check as part of the purchase process before the HQL law, that background check was—

and remains—inadequate because it is based only on state-issued identification, not fingerprints.  Pub. Safety § 5-118 (b).  Thus, prior to the HQL requirement, Maryland lacked sufficient tools to ensure that prohibited persons were not prevented from obtaining handguns.  (Ex. 3, Webster Test. at 1.)  The General Assembly heard testimony from Professor Webster about the GAO investigation in which undercover agents using counterfeit driver's licenses succeeded, without exception, in purchasing firearms from federally-licensed firearms dealers in five states.  (Ex. 3, at 1.)  The GAO report concluded that federal background checks conducted by the firearm dealers without fingerprinting "cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful."  (Ex. 4 at 2.)  Although the GAO report did not involve purchases in the District of Columbia, the D.C. Circuit nonetheless relied on this report to credit the District's evidence demonstrating that "background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more susceptible to fraud."  *Heller III*, 801 F.3d at 276.  This Court should credit Maryland's evidence showing the same.

Second, unlike with a background check based solely on state-issued identification, a fingerprint record can be used to determine if an HQL licensee is convicted of a disqualifying offense subsequent to passing the initial background investigation. Identification through fingerprints enables MSP to receive updated and reliable criminal history information from other law enforcement agencies and court systems and, in turn, allows MSP to revoke a disqualified person's HQL and, where necessary, retrieve unlawfully possessed firearms.  (Ex. 7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6.)  This

aspect of the HQL requirement promotes public safety by enhancing the State's ability to identify and disarm individuals who are not eligible to possess firearms.  (Ex. 11, Webster Decl. ¶ 10 & Decl. Ex. 2 at 5.)  Indeed, plaintiffs' own expert witness agreed in his deposition testimony in this case that this advantage of the fingerprint requirement benefits public safety.  (Ex. 15, Tr. of Dep. Gary Kleck at 49.)  Again, this feature did not exist prior to the enactment of the FSA.  (Ex. 9, Pickle Decl. ¶¶ 10-12.)

Third, the fingerprint requirement, through its inherent and lasting reliability, acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes.  (Ex. 11, Webster Decl. ¶ 8; Ex. 14, J. Johnson Decl. ¶¶ 8-9, 11.) Empirical studies of the effects of laws that require individuals to obtain a license to purchase a firearm and pass a background check based on fingerprints have found that these laws are associated with a reduction in the flow of guns to criminals.  (Ex. 11, Webster Decl. ¶¶ 8-9, 13-15, 18-20 & Decl. Ex. 2 at 6-14, Decl. Ex. 3 at 8.)  Permit-to-purchase laws, like Maryland's HQL law, are associated with a statistically significant 11 percent reduction in firearm homicide rates.  (Ex. 11, ¶ 17 & Decl. Ex. 7.)  In Maryland, the FSA's HQL requirement is estimated to have led to drastically reduced firearm homicide rates in large urban counties, with the exception of Baltimore City where homicide rates increased after the death of Freddie Gray in 2015 and the ensuing unrest.  (Ex. 11 ¶ 17.)[9]  Further,

---

[9] The well-documented riots and civic unrest in Baltimore City in late April and May 2015 following the in-custody death of Freddie Gray, occurred 18 months after the HQL requirement went into effect in October 2013.  According to Professor Webster, "[i]t is commonly known and well-documented that dramatic civil unrest prompted by actions taken by police are often followed by sharp increases in violent crime" that have been "attributed to 'de-policing' and to a crisis in the legitimacy of law enforcement in alienated

the HQL requirement has been shown to be associated with a significant reduction in the number of handguns that have been diverted to criminals in Baltimore soon after retail purchase.  (Ex. 11, ¶ 18 & Decl. Ex. 8.)  And a study showed that a significant percentage of surveyed criminals in Baltimore believe that the FSA has made it more difficult for criminals to obtain handguns.  (Ex. 11, ¶ 19 & Decl. Ex. 8.)  This evidence strongly supports the legislature's predictive judgment that the HQL requirement would reduce straw purchases and other diversion of guns to criminals.

Two studies of Connecticut's handgun licensing law—which includes requirements for enhanced background checks with fingerprints and completion of an approved handgun safety course, Conn. Gen. Stat. § 29-36(f), (g)—similarly found that the licensing requirement to purchase a firearm was associated with a statistically significant reduction in Connecticut's firearm homicide rates during the first decade that the law was in place, with no similar reduction in non-firearm homicides.  (Ex. 11 ¶14 & Decl. Ex. 4; Ex. 12, ¶ 4 & Decl. Ex 3.)  Also supportive is the case of Missouri, which experienced an increase in the percentage of crime guns recovered by police that had been originally sold by in-state retailers after it repealed its handgun licensing requirement.  (Ex. 11, ¶ 15 & Decl. Ex. 5; Ex. 12, ¶¶ 2, 4 & Decl. Exs. 1 & 3.)  Studies of Missouri's and Connecticut's experiences also have found the presence of firearm licensing laws to be associated with

───────────────

minority communities where gun violence is concentrated."  (Ex. 11, Webster Decl. Ex. 2 at 16.)

lower rates of firearm-related suicides.  (Ex. 11, ¶ 16 & Decl. Ex. 6; Ex. 12, ¶ 4 & Decl. Ex. 3.)

Additional research shows that handgun purchaser licensing laws are associated with significant reductions in the incidence of fatal mass shootings.  (Ex. 12, ¶ 3 & Decl. Ex. 2.)  One study estimated that "handgun purchaser licensing laws requiring either in-person application with law enforcement or fingerprinting (of applicants) were associated with incidents of fatal mass shootings 56 percent lower than that of other states."  (Ex. 12, ¶ 3 & Decl. Ex. 2.)

Finally, the effectiveness of a licensing requirement is shown by research that examined the effects of laws in Maryland and Pennsylvania, enacted around the same time, that extended background check requirements to private transfers of handguns.  (Ex. 12, ¶ 4 & Decl. Ex. 3.)  One study found no evidence that these types of background checks, by themselves, reduced homicide or suicide rates.  (Ex. 12, ¶ 4 & Decl. Ex. 3.)  But the research nonetheless supported the conclusion that the addition of a licensing requirement had "large public safety benefits in preventing homicides and suicides" because diversion of guns for criminal use shortly after retail sale dropped in Maryland dramatically after the enactment of the FSA.  (Ex. 12, ¶ 4 & Ex. 3.)

As described above, the summary judgment record provides "substantial evidence" to support the General Assembly's "reasonable inferences" that the HQL fingerprint requirement enhances public safety.  *Kolbe*, 849 F.3d at 140.

## 2. The Firearm Safety Training Provision of the HQL Law Is Constitutional.

Empirical evidence, expert testimony, case law, and common sense also support the General Assembly's conclusion that requiring HQL applicants to receive four hours of firearms safety training promotes public safety. Handguns are necessarily and purposely dangerous, and requiring minimal training in how to avoid unintended harm from their ownership easily satisfies intermediate scrutiny. *See Heller III*, 801 F.3d at 278-79 (holding District's mandatory firearms safety training was constitutional based on the District's presentation of "substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms"). The regulatory requirement that applicants demonstrate the baseline competency to safely fire a single live round of ammunition likewise is reasonably adapted to the State's substantial interest in promoting firearm safety.

The requirement that handgun purchasers be trained in firearm safety is also consistent with the nature of the Second Amendment right itself. As an acknowledgment of the "risk inherent in firearms and other weapons [that] distinguishes the Second Amendment from other fundamental rights," *Association of New Jersey Rifle and Pistol Clubs*, 910 F.3d at 122 n. 28, woven throughout Second Amendment jurisprudence is the recognition that the vibrancy of the right depends on a citizenry that exercises it responsibly. *See, e.g., Heller I*, 554 U.S. at 635 (noting that the core of the Second Amendment implicates the rights of "law-abiding, *responsible* citizens" (emphasis added)); *see id.* at 598 (noting that "the adjective 'well-regulated' implies nothing more

25

than the imposition of *proper discipline and training*" and that "when the able-bodied men of a nation are *trained in arms* and organized, they are better able to resist tyranny" (emphasis added)); *id*. at 619 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right [under the Second Amendment]" (citation omitted)). For example, in his opinion dissenting from a finding of mootness in *New York State Rifle & Pistol Assoc., Inc. v. City of New York*, Justice Alito recognized that "a necessary concomitant" of the core Second Amendment right to keep a handgun in the home for self-defense "is to take a gun to a range in order to gain and maintain the skill necessary to use it *responsibly*." 140 S.Ct. 1525, 1541 (2020) (Alito, J., dissenting) (emphasis added). Other courts have also recognized that it is the *responsible* use of firearms that preserves the stature of the right. *See, e.g., Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[T]he core right wouldn't mean much without the training and practice that make it effective."). This backdrop makes clear that regulations designed to ensure that those who exercise the right do so responsibly falls well within the type of "reasonable firearms regulations" that are interwoven within the Second Amendment's affirmative self-defense right. *McDonald*, 561 U.S. at 784.

The effectiveness of the minimal training requirements of the FSA is demonstrated by the record in this case. First, training on the proper storage of firearms reduces the likelihood that a member of a household who is not eligible to possess a firearm will gain

access to one, which is particularly critical because the majority of school shootings are committed by minors with guns brought from their homes.  (Ex. 11, Webster Decl. ¶ 11 & Decl. Ex. 2 at 5; *see also* Ex. 14, J. Johnson Decl. ¶ 15 (describing such incidents in Maryland).)  Surveys of gun owners show that unsafe gun storage is common, but that gun owners who complete firearms safety training are more likely to store their guns locked and unloaded.  (Ex. 11, ¶ 11 & Decl. Ex. 2 at 5.)  Requiring that applicants receive four hours of firearm safety training also has the incidental effect of deterring straw purchasers who, unlike "law-abiding, responsible citizens" seeking to possess handguns for in-home self-defense, are seeking only to engage in illegal transactions.  (Ex. 11, ¶ 9 & Decl. Ex. 2 at 4.)

Further, based on their extensive law enforcement and firearms safety training experience, both Captain Russell and former Chief Johnson conclude that the HQL firearms safety training contemplated by § 5-117.1 encourages responsible gun ownership and has numerous public safety benefits.  (Ex. 13, Russell Decl. ¶ 13; Ex. 14, J. Johnson Decl. ¶ 10.)  Together, Captain Russell and former Chief Johnson have more than 60 years of combined law enforcement experience.  Based on this experience, they have concluded that the HQL firearms safety training contemplated by § 5-117.1 enhances knowledge of and compliance with State laws that are designed to promote public safety and reduce access of firearms to children and persons who are prohibited by law from possessing firearms (Ex. 13, ¶ 17; Ex. 14, ¶¶ 11, 15); promotes safe handling and operation of firearms, which reduces the risk of accidental discharges and, thus, the risk of potentially fatal accidents (Ex. 13, ¶ 19; Ex. 14, ¶ 14); reduces the likelihood of theft, thus, reducing access

27

of firearms to criminals and reducing the risk of injury or death by gunshot (Ex. 13, ¶¶ 18; 21; Ex. 14, ¶ 15); and enhances effective law enforcement by reducing access of firearms to prohibited persons (Ex. 13, ¶ 21; Ex. 14, ¶ 12).  Further, these law enforcement experts conclude that the requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, promotes public safety by reducing accidental discharges. (Ex. 13, ¶ 20; Ex. 14, ¶ 14.)

Captain Russell and former Chief Johnson also both conclude that the four-hour training contemplated by § 5-117.1 is superior to the former training by which handgun purchasers merely had to watch a short instructional video.  (Ex. 13, ¶¶ 22-23, 26; Ex. 14, ¶ 17.)  They both have concluded that watching a video is not sufficient training on the safe handling and operation of a handgun, and that the addition of the requirement that applicants safely fire one round of live ammunition improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon.  (Ex. 13, ¶¶ 24, 25; Ex. 14, ¶¶ 17-18.)  Both Captain Russell and former Chief Johnson also assert that the instruction requirement is superior to the video because, unlike a prerecorded presentation, the live instruction (1) allows the instructor to verify that the applicant actually attended the training, and (2) "provides the [applicant] an opportunity to ask questions and receive feedback from the instructor."  (Ex. 13, ¶¶ 23-26; Ex. 14, ¶ 17.)[10]

---

[10]  In response to the COVID-19 pandemic, since July 2020 the MSP Licensing Division has permitted this instruction component to be done via real time bi-directional

28

Common sense further supports the State's judgment in enacting the firearm safety training requirement.   In Maryland, law enforcement officers are required to receive extensive training on the operation, handling, and storage of handguns, including in the home.  *See* COMAR 12.04.02.03—.05; 12.04.02.03.10(D).   These longstanding training requirements strongly support the utility of the relatively brief, four hours of training that civilian handgun purchasers must receive.  *See Heller III,* 801 F.3d at 279 & n.3 (relying on "anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training").  Given the popularity of handguns for in-home self-defense, *see Heller I*, 554 U.S. at 628, and the potential dangers that arise when handguns are improperly stored or handled in the home, Maryland's requirement of a four-hour training course is reasonably adapted to the State's goal of reducing firearm-related deaths.

The summary judgment record provides "substantial evidence" to support the General Assembly's "reasonable inferences" that requiring a four-hour firearm safety training course with "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm," Pub. Safety § 5-117.1(d)(3), enhances public safety. *Kolbe*, 849 F.3d at 140.

---

audio and video connection.  (Ex. 10, Rossignol Decl. ¶ 12 & Decl. Ex. 2.)  This format preserves the ability to ask questions and receive feedback.

### 3. The Costs Associated with the HQL Law and the Application Period Are Constitutional.

As set forth above, Maryland's HQL law is constitutional.  Because "reasonable fees associated with the constitutional requirements" of firearm licensing "are also constitutional," plaintiffs' challenge to the $50 application fee to cover the costs of administering the HQL program also fails.  *Heller III*, 801 F.3d at 278 (finding registration fees of $13 per firearm and $35 for fingerprinting were constitutional); *see also Kwong* 723 F.3d at 165-67 (approving $350 licensing fee); *Justice*, 827 F. Supp. 2d at 842 (approving $25 application fee).  Just as in the First Amendment context, the State may impose licensing fees when the fees are designed "to meet the expense incident to the administration" of the licensing statute.  *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (citation omitted) (upholding parade licensing statute that imposed a sliding fee); *see also Center for Auto Safety Inc. v. Athey*, 37 F.3d 139, 145 (4th Cir. 1994) (holding that charitable registration fees furthered legitimate government purpose in "enabl[ing] the state to prevent fraud by charities soliciting funds in Maryland").  Here, the statute limits the allowable fee only to the amount "to cover the costs to administer the program," Pub. Safety, § 5-117.1(g)(2), and the record demonstrates that, in 2018, the costs to administer the program actually exceeded $50 per application.  (Ex. 7, A. Johnson Decl. ¶¶ 15-18 & Decl. Exs. 3, 4.)

Similarly, because the fingerprinting and training provisions are constitutional, the "additional requirement" that applicants bear the cost of complying with them "is but a corollary necessary to implement those requirements" and, thus, also constitutional.  *Heller*

*III*, 801 F.3d at 277.  Nothing in *Heller I* or *McDonald* suggests that presumptively lawful regulations on the commercial sale of firearms or a state's enactment of reasonable regulation to protect public safety cannot impose some costs on consumers of firearms. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it." *Casey*, 505 U.S. at 874.  Moreover, plaintiffs have produced no evidence that these costs have deterred them or their customers.

Finally, plaintiffs challenge the length of time it takes for the State to issue the HQL after an application is submitted, which is statutorily capped at 30 days.  Pub. Safety § 5-117.1(h)(1). Importantly, this is not a waiting period; HQL licenses are sent to approved individuals as soon as the administrative process is completed, even if they are completed in less than 30 days. (Ex. 7, A. Johnson Decl. ¶ 14.)  The record demonstrates that all properly completed HQL applications been acted upon within 30 days of submission.  (Ex. 7, A. Johnson Decl. ¶ 12 & Decl. Ex. 1; Ex. 10, Rossignol Decl. ¶¶ 14-15.)  Notably, the 30-day statutory limit is significantly shorter than the time limit adopted in some other states.  *See, e.g.*, N.Y. Penal Law § 400.00(4-a) (providing for a six-month application period); Conn. Gen. Stat. § 29-36(g)(b)(2) (90-day period).

*       *       *

"The U.S. Constitution permits the States to set out a procedural road to lawful handgun ownership, rather than simply allowing anyone to acquire and carry a gun.  That road may be long.  It may be narrow.  It may even have tolls." *Connecticut Citizens Defense League, Inc. v. Lamont*, 465 F.Supp.3d 56, 73 (D. Conn. 2020) (citations omitted).

For all the reasons set forth above, Maryland's "procedural road," which is designed to—and, as the evidence demonstrates, does—advance the public safety of *all* Marylanders, is a constitutionally permissible regulation on the transfer and sale of handguns.

## CONCLUSION

For the reasons set forth above, the defendants are entitled to summary judgment on all remaining claims in the Amended Complaint.

Respectfully Submitted,

BRIAN E. FROSH
Attorney General

  /s/ Ryan R. Dietrich
RYAN R. DIETRICH (Fed. Bar #27945)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7648 (tel.); 410-576-6955 (fax)
rdietrich@oag.state.md.us

Dated: November 25, 2020      Attorneys for Defendant