**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

MARYLAND SHALL ISSUE, INC., *et al.*,

        *Plaintiffs*,

   v.

LAWRENCE HOGAN, in his capacity
as GOVERNOR OF MARYLAND, *et al.*,

        *Defendants*.

---

Case No. 1:16-cv-03311-ELH

 

**BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

GIBSON, DUNN & CRUTCHER LLP
Thad A. Davis
555 Mission Street, Suite 3000
San Francisco, CA 94105

Brian A. Rosenthal (admitted *Pro Hac Vice*)
200 Park Avenue
New York, NY 10166-0193

Amina Mousa (*Pro Hac Vice* Pending)
3161 Michelson Drive
Irvine, CA 92612

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

December 2, 2020

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Everytown for Gun Safety (formally, "Everytown for Gun Safety Action Fund") states that it has no parent corporations and has no stock.  Accordingly, no publicly held company owns 10% or more of its stock.

*/s/ Thad Davis*
THAD A. DAVIS (Bar No. 18806)
GIBSON, DUNN & CRUTCHER LLP
tdavis@gibsondunn.com
*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ............................................................................... 1

INTRODUCTION ......................................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.      Under Heller And Fourth Circuit Precedent, Laws Based In A Longstanding
        Regulatory Tradition Are Constitutional ............................................................ 3

II.     Permits To Purchase, Training Requirements, And Fees Are Presumptively
        Lawful, Longstanding Regulations Outside The Scope Of The Second
        Amendment ......................................................................................................... 4

        A.      Permits To Purchase And Background Checks Are Consistent With More
                Than A Century Of Legal Tradition. ...................................................... 5

        B.      At The Time Of The Second Amendment's Ratification, Nearly All States
                Required Firearms Training ................................................................... 10

        C.      Firearm License Fees Are Longstanding Regulations Outside The Scope
                Of The Second Amendment ................................................................... 13

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018)..........................................................................................1

*District of Columbia v. Heller*,
554 U.S. 570 (2008).....................................................................2, 3, 5, 6, 10, 15

*Dorr v. United States*,
195 U.S. 138 (1904)......................................................................................7

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ........................................................................10

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018), *cert. denied*, No. 18-1272, 2020 WL 3146683
(U.S. June 15, 2020) .....................................................................................3

*Hawaii v. Mankichi*,
190 U.S. 197 (1903)......................................................................................7

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ....................................................................4

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015).......................................................................5

*Hirschfeld v. Bureau of Alcohol, Firearms & Explosives*,
No. 19-2250 (4th Cir.) ..................................................................................1

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012)............................................................................4

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) (en banc) ........................................................3

*Kuck v. Danaher*,
600 F.3d 159 (2d Cir. 2010)..........................................................................5

*Libertarian Pty. of Erie Cty. v. Cuomo*,
No. 18-0386 (2d Cir.)....................................................................................1

*Malpasso v. Pallozzi*,
No. 1:18-cv-01064-MJG (D. Md. June 15, 2018) .........................................1

<u>**TABLE OF AUTHORITIES**</u>
(continued)

<u>**Page(s)**</u>

*Malpasso v. Pallozzi*,
  No. 18-2377 (4th Cir.) ..................................................................................................1

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ......................................................................................................5

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012) .......................................................................................4

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part), *cert. denied*, No. 18-843 (U.S. June 15, 2020) ..................................................6

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ..................................................................................................1

*Silvester v. Becerra*,
  843 F.3d 816 (9th Cir. 2016) .....................................................................................5, 6

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ......................................................................................3, 4

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ....................................................................................4, 10

**Statutes**

18 Pa. Cons. Stat. § 611 ...........................................................................................................9

18 Pa. Cons. Stat. § 6111(b)(3) ..............................................................................................15

18 Pa. Cons. Stat. § 6111.2 .....................................................................................................15

26 U.S.C. § 4181 ......................................................................................................................15

1936 Ala. Laws 82 .....................................................................................................................9

Cal. Code Regs. tit. 11, § 4001 ...............................................................................................14

Cal. Penal Code §§ 28100–28490 .............................................................................................9

Cal. Penal Code § 28230 .........................................................................................................14

Cal. Penal Code § 31650 .........................................................................................................14

Cal. Stat. 339 .............................................................................................................................9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Colo. Rev. Stat. § 18-12-112 ................................................................................9

Colo. Rev. Stat. § 24-33.5-424(3.5) ....................................................................14

Conn. Gen. Stat. § 29-17a(b) ...............................................................................14

Conn. Gen. Stat. §§ 29-33(c), 29-36l(f), 29-37a(e)-(j) ........................................9

Conn. Gen. Stat. § 29-36h ....................................................................................14

1923 Conn. Pub. Acts 252 ......................................................................................9

D.C. Code Ann. §§ 7-2502.01–7-2502.04 .............................................................9

Del. Code tit. 11, § 1448B, tit. 24, § 904A ...........................................................9

Fla. Stat. § 790.065(1)(a) .....................................................................................14

1866 Ga. Laws 27-28, §§ 3–4 ...............................................................................13

Georgia, Penal Code, Art. 3 § 348 (1914) ...........................................................14

Haw. Rev. Stat. Ann. §§ 134-2, 134-13 .................................................................9

Haw. Rev. Stat. § 134-3(b) ...................................................................................14

1933 Haw. Sess. Laws 39, § 8 ..............................................................................14

Ill. Code § 74-668 .................................................................................................15

Ill. Comp. Stat. 5/24-3(k) .......................................................................................9

Ill. Comp. Stat. 65/1–65/15a ..................................................................................9

Ill. Comp. Stat. 65/5(a) ........................................................................................14

1925 Ind. Acts 207 ..................................................................................................9

Iowa Code § 724.17 .................................................................................................9

1793 Mass. Acts 172 .............................................................................................12

Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E .......................9

Mass. Gen. Laws ch. 140, § 129B(9A) .................................................................14

Md. Code Ann., Crim. Proc. § 10-221(b)(7) .........................................................14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Md. Code Ann., Pub. Safety § 5-117.1(f) ............................................................9

Md. Code Ann., Pub. Safety § 5-117.1(g) ..........................................................14

Mich. Comp. Laws §§ 28.422, 28.422a .............................................................9

1925 Mich. Pub. Acts 313 ...................................................................................9

1927 Mich. Pub. Acts 372 ...................................................................................8

Militia Act of 1792 § 1 ......................................................................................11

1921 Mo. Laws .....................................................................................................7

1921 Mo. Laws 691, § 2 ....................................................................................13

1918 Mont. Laws 2 ..............................................................................................6

N.C. Gen. Stat. §§ 14-402–14-404 .....................................................................9

N.C. Gen. Stat. § 14-404(e) .........................................................................14, 15

1856 N.C. Sess. Laws 34, § 23, pt. 4 ...............................................................13

1919 N.C. Sess. Laws 197 ...................................................................................8

1919 N.C. Sess. Laws 397, § 3 ...........................................................................7

1919 N.C. Sess. Laws 397, § 6 .........................................................................13

1923 N.D. Laws 266 ............................................................................................9

1923 N.H. Laws 118 ............................................................................................9

1927 N.J. Laws 746 ..............................................................................................7

N.J. Stat. Ann. § 2C:58-3 ....................................................................................9

N.J. Stat. Ann. § 2C:58-3(f) ..............................................................................14

N.M Stat. Ann. § 30-7-7.1 ...................................................................................9

N.Y. Gen. Bus. Law § 898 ...................................................................................9

1913 N.Y. Laws 1627, § 1897 .............................................................................6

1931 N.Y. Laws 792 ............................................................................................8

<u>**TABLE OF AUTHORITIES**</u>
(continued)

<u>**Page(s)**</u>

N.Y. Penal Law § 400.00(14) ........................................................................14

Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409 ....................................9

Neb. Rev. Stat. § 69-2404 ......................................................................14, 15

Nev. Rev. Stat. §§ 202.2547–202.254 ...........................................................9

Nev. Rev. Stat. § 202.2547(7) .....................................................................14

1913 Or. Laws 497 ........................................................................................7

1925 Or. Laws 260 ........................................................................................9

Or. Rev. Stat. § 166.414 .............................................................................14

Or. Rev. Stat. §§ 166.435, 166.436 ..............................................................9

1931 Pa. Laws 158 ........................................................................................9

R.I. Gen. Laws §§ 11-47-35–11-47-35.2 .......................................................9

1935 S.D. Sess. Laws 208 .............................................................................9

Tenn. Code Ann. §§ 38-6-109, 19-17-1316(e) ............................................15

Tenn. Code § 70-3-101 (2016) ...................................................................15

Utah Code Ann. § 76-10-526(12) ...............................................................15

Va. Code Ann. § 18.2-308.2:2 .......................................................................9

Va. Code Ann. § 18.2-308.2:2(J) ................................................................15

Vt. Stat. Ann. tit. 13, § 4019 ........................................................................9

1925 W. Va. Acts 25-30, ch. 3, § 7 ............................................................14

Wa. Mun. Code, ch. 5.50.030 ....................................................................15

1935 Wash. Sess. Laws 172 ..........................................................................9

Wis. Stat. § 175.35(2i) ...............................................................................15

**Other Authorities**

A. Hutchinson, *Code of Mississippi* 182 (1798-1848) ...............................13

vi

<u>**TABLE OF AUTHORITIES**</u>
(continued)

**Page(s)**

Baron von Steuben's *Regulations for the Order and Discipline of the Troops of the United States (1779)*.................................................................................12

Brian M. Shay, *After 230 years, the 'Blue Book' still guides NCOs, U.S. Army (Nov. 2, 2009)* .........................................................................................12

Giffords Law Center, <u>Licensing</u> (last visited Nov. 18, 2020),
http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing.................................................................................13

Centers for Disease Control and Prevention, Injury Prevention and Control,
<u>https://webappa.cdc.gov/sasweb/ncipc/mortrate.html</u> (calculator showing 188,017 total firearm fatalities from 2014–2018, for an annual average of 37,603) .................................................................................................2

J. Blocher & D.A.H. Miller, *The Positive Second Amendment* 136 (2018).....................................4

N.Y. Police Dep't License Div., https://licensing.nypdonline.org/new-app-instruction/ (last visited Nov. 13, 2020)............................................................15

Saikrishna Bangalore Prakash, *The Separation and Overlap of War and Military Powers*, 87 Tex. L. Rev. 299, 332 (2008) ..............................................12

**Constitutional Provisions**

Second Amendment...........................................................1, 3, 4, 5, 7, 10, 11, 12, 13

U.S. Const. art. I, § 8, cl. 16........................................................................11

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly 6,000,000 supporters across the nation, including more than 150,000 in Maryland.  Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of 20 children and six adults in an elementary school in Newtown, Connecticut.  The mayors of 13 Maryland cities are members of Mayors Against Illegal Guns.  Everytown also includes a large network of gun violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown's mission includes defending gun-safety laws through the filing of amicus briefs providing historical context, social science, and doctrinal analysis that might otherwise be overlooked.  Everytown has previously filed a brief in this case, *see* ECF No. 70, as well as in other Second Amendment cases in the District of Maryland, the Fourth Circuit, and elsewhere. *See, e.g.*, *Hirschfeld v. Bureau of Alcohol, Firearms & Explosives*, No. 19-2250 (4th Cir.) (ECF NO. 21); *Malpasso v. Pallozzi*, No. 18-2377 (4th Cir.) (ECF No. 26); *Malpasso v. Pallozzi*, No. 1:18-cv-01064-MJG (D. Md. June 15, 2018) (ECF No. 16); *Libertarian Pty. of Erie Cty. v. Cuomo*, No. 18-0386 (2d Cir.) (ECF No. 75).  Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other gun cases.  *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rehaif v. United States*, 139 S. Ct. 2191, 2210–11 n.4 (2019) (Alito, J., dissenting).[1]

---

[1]  Everytown submits this brief on motion for leave to file.  Defendants and Plaintiff Atlantic Guns, Inc. consent to this filing.  The remaining Plaintiffs take no position.  No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

# INTRODUCTION

This case is about the right of the people of Maryland to be free from gun violence, and a state's power to pass laws to protect that freedom.  Every day, more than 100 Americans are killed and 200 more are injured by gunshot.[2]  The laws at issue in this case—which mandate that most individuals in Maryland obtain a Handgun Qualification License ("HQL") before acquiring a handgun[3]—are neither drastic nor novel.  Indeed, requiring permits to purchase, as well as background checks, training, and fees, are longstanding, widely-accepted measures adopted by any states.  These measures are deeply embedded in our nation's history and have proven to be effective in reducing public harm and saving lives.

Everytown submits this brief in support of the State's motion for summary judgment, and, in particular, to make three points further demonstrating the constitutionality of the HQL under the Second Amendment.  *First*, the HQL Law's requirement that those seeking to purchase a firearm first obtain a permit after undergoing a thorough identification and background check process is longstanding and lawful under *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Second*, the HQL Law's training requirement is consistent with the original understanding of the Second Amendment because government training mandates were ubiquitous in 1791.  *Third*, the

---

[2]  *See WISQARS*, *Fatal Injury Reports, National, Regional, and State, 1981-2018*, Centers for Disease Control and Prevention, Injury Prevention and Control, https://webappa.cdc.gov/sasweb/ncipc/mortrate.html (calculator showing 188,017 total firearm fatalities from 2014–2018, for an annual average of 37,603); *see also A More Complete Picture The Contours of Gun Injury in the United States*, Everytown Research & Policy, (Nov. 11, 2019), https://everytownresearch.org/report/a-more-complete-picture-the-contours-of-gun-injury-in-the-united-states/#appendix (73,330 nonfatal firearm injuries annually).

[3]  These provisions of Maryland's Firearm Safety Act of 2013 (the "FSA"), along with their implementing regulations, are referred to herein as the "HQL Law."  For a full list of the HQL Law's requirements and exceptions, we respectfully refer the Court to Exhibits 2 and 8 to Defendants' Motion for Summary Judgment, ECF No. 125, at Ex. 2 (§ 5-117.1 of the Public Safety Article of Maryland Code Annotated) & Ex. 8 (Code of Maryland Regulations 29.03.01.26—.41, ECF NO. Nos. 125-2, 125-8).

HQL Law's licensing fees are consistent with fees and taxes that states have historically imposed on individuals seeking to obtain or possess a firearm.

## ARGUMENT

**I.     UNDER *HELLER* AND FOURTH CIRCUIT PRECEDENT, LAWS BASED IN A LONGSTANDING REGULATORY TRADITION ARE CONSTITUTIONAL**

In *Heller*, the Supreme Court announced that the Second Amendment protects an individual right, rather than a militia-based right, and struck down a D.C. law that prohibited keeping an operable handgun in the home for self-defense.  *See Heller*, 554 U.S. at 636.  The Court stressed, however, that "the right secured by the Second Amendment is not unlimited," and identified examples of "presumptively lawful regulatory measures" that do not impinge on that right.  *Id.* at 626-27 & n.26.  These include "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 626-27.

To implement *Heller*, the Fourth Circuit, like every circuit to have considered the issue,[4] applies a two-step approach in Second Amendment cases.  First, courts must assess "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" as historically understood.  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).  Second, if the law does fall within the Second Amendment's scope, then the court applies "means-end scrutiny."  *Id*; *see also Kolbe*, 849 F.3d at 141 (two-step framework "is entirely faithful to the *Heller* decision and appropriately protective of the core Second Amendment right").

If a court finds that a law regulates conduct falling outside the Second Amendment's scope at the first step, then the inquiry ends—"the challenged law is valid" and there is no need for

---

[4]  *See, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 132-33 (4th Cir. 2017) (en banc) (collecting decisions); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018), *cert. denied*, No. 18-1272, 2020 WL 3146683 (U.S. June 15, 2020).

means-end scrutiny.  *Chester*, 628 F.3d at 680.  Moreover, to qualify as longstanding and fall outside the scope of the Second Amendment, a regulation "need not 'mirror limits that were on the books in 1791,'" *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010), nor "boast a precise founding-era analogue," *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012); *cf. Kachalsky v. County of Westchester*, 701 F.3d 81, 91 (2d Cir. 2012) (upholding law regulating public carry of firearms, which has "a number of close and longstanding cousins"); J. Blocher & D.A.H. Miller, *The Positive Second Amendment* 136 (2018) ("[L]ower courts have used analogy to extend *Heller*'s exclusions beyond those specifically identified in the case.").[5]

## II.   PERMITS TO PURCHASE, TRAINING REQUIREMENTS, AND FEES ARE PRESUMPTIVELY LAWFUL, LONGSTANDING REGULATIONS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT

The HQL Law's permit-to-purchase requirements, including its background check, training, and fee obligations, are constitutional at the first step of the Fourth Circuit's two-step framework.  All are part of longstanding regulatory traditions and thus regulate conduct that falls outside the Second Amendment's scope.  Permit-to-purchase laws, and analogous laws requiring a thorough background check, are precisely the kind of "longstanding" restrictions—prohibiting "the possession of firearms by felons and the mentally ill" and regulating "the commercial sale of arms"—that the Supreme Court described in *Heller* as "presumptively lawful."  *Heller*, 554 U.S. at 626, 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (confirming certain

---

[5] Even the small number of dissenting judges who would prefer to interpret the Second Amendment to bar any firearm regulation not grounded in "text, history, and tradition"—a view contrary to the two-part Second Amendment test that is the law of this Circuit (and every other Circuit that has weighed in)—acknowledge that "the proper interpretive approach" to the historical inquiry involves "reason[ing] *by analogy* from history and tradition."  *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) (emphasis added).

longstanding categories of laws regulating firearms as articulated in *Heller* do not violate the Second Amendment).  Moreover, mandatory firearms training was widespread in the founding era, and laws requiring fees to obtain or possess a firearm have existed for over a century.  Accordingly, the permitting, training, and fee requirements of the HQL Law fall outside the scope of the Second Amendment and do not conflict with any Second Amendment-protected rights.[6]  Summary judgment in favor of the State is warranted at step one of the Fourth Circuit's Second Amendment framework based on history alone.

> ### A. Permits to Purchase and Background Checks Are Consistent with More than a Century of Legal Tradition.

Laws requiring that permits to purchase, and analogous laws requiring background checks before purchase, have a lengthy historical pedigree, tracing back more than a century.  These "longstanding" laws are "presumptively lawful" under *Heller*.  *See Heller*, 554 U.S. at 626-27 & n.26 (noting the decision did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" or "conditions and qualifications on the commercial sale

---

[6] Even if the challenged permitting, background check, training, and fee requirements of the HQL Law fell within the scope of the Second Amendment, social science research, empirical evidence, and evidence regarding the costs involved in managing the permit scheme demonstrate that each readily satisfies the applicable (intermediate) standard of scrutiny.  The State has set out that evidence in its motion papers.  *See* Defendants' Memorandum in Support of Motion for Summary Judgment, ECF No. 125-1 ("State Br.") at 18-31.  Furthermore, as the State notes, *see id.* at 30-31, the constitutionality of the permitting requirement entails the constitutionality of its fee provisions.  *See Heller v. District of Columbia* ("*Heller III*"), 801 F.3d 264, 278 (D.C. Cir. 2015) ("[R]easonable fees associated with the constitutional requirements of registration and fingerprinting are also constitutional[.]").  And, as the State also notes, *see* State Br. at 31, the HQL application period itself does not raise constitutional concerns here either.  *See Silvester v. Becerra*, 843 F.3d 816, 827 (9th Cir. 2016) ("There is … nothing new in having to wait for the delivery of a weapon.); *see also Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) (recognizing, in the firearms licensing context, "that administrative determinations may require a non-trivial amount of time to complete").

of arms"); *id*. at 635 (describing such laws as "exceptions" to the right to bear arms).[7]

The relevant history here dates back to at least the early twentieth century, when state legislatures began passing laws requiring permits to purchase guns, with attendant inquiry into the purchaser's background.  In 1911, **New York** passed the Sullivan Act, requiring permits to possess firearms, which function much like the permits required under the HQL Law.  1911 N.Y. Laws 195, at 442 § 1914, *reproduced in* Appendix of Historical Authority to Brief of Everytown for Gun Safety as Amicus Curiae, ECF No. 70-1, at Add. 132-33 (seller must, before delivering the firearm to the purchaser, "require such purchaser to produce a permit"); *see also* 1913 N.Y. Laws 1627, § 1897, ECF No. 70-1, at Add. 134-37 (establishing requirement that magistrate be "satisfied of the good moral character of the applicant and provided that no good cause exists for the denial of such application").

Other states soon followed suit, passing laws requiring that a prospective firearm purchaser must first obtain a permit from a municipal judge or sheriff, who had to determine that the prospective purchaser was not prohibited by law from possessing a firearm and was of good moral character.  *See, e.g.*, 1918 Mont. Laws 2, at 6 § 3, ECF No. 70-1, at Add. 140 (**Montana:** "No permit shall be given by the sheriff until he is satisfied that the person applying for such permit is of good moral character and does not desire such fire arm or weapon for any unlawful purpose."); 1919 Hawaii Sess. Laws 166, ECF No. 70-1, at Add. 145-46 (**Hawaii**: prohibiting the sale of

---

[7]  *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 1009 n.19 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) ("[P]oint-of-sale restrictions such as background checks and waiting periods … are more easily defended as restrictions on 'the possession of firearms by felons and the mentally ill.'" (citation omitted)), *cert. denied*, No. 18-843 (U.S. June 15, 2020); *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring) ("On its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun.").

handguns "unless the person desiring to purchase the same shall first have obtained from the sheriff . . . a written permit for such purchase");[8] 1919 N.C. Sess. Laws 397, § 3, ECF No. 70-1, at Add. 148 (**North Carolina:** "[B]efore the clerk . . . shall issue any such license or permit, he shall fully satisfy himself . . . as to the good moral character of the applicant."); 1921 Mo. Laws at 691 § 2, ECF No. 70-1, at Add. 151 (**Missouri:** "Such permit shall be issued . . . if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety."); 1927 N.J. Laws at 742, 746 §§ 7, 9, ECF No. 70-1, at Add. 209-11 (**New Jersey:** permit should be granted to persons of "good character" and "good repute" who are not subject to exclusions due to age, insanity, drug use, and criminal convictions).

Many of these laws required the prospective purchaser to affirmatively prove his identity and good moral character by providing evidence—for example, sworn affidavits of sponsors—in order to receive a permit to possess a firearm.  *See* 1913 Or. Laws, at 497 § 2, ECF No. 70-1, at Add. 138 (**Oregon:** "[N]o judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from the at least two reputable freeholders as to

---

[8]  In a prior submission, amici curiae for Plaintiffs erroneously argued that Hawaiian laws from this time period are "weak precedent" because the Bill of Rights did not apply to Hawaii while it was a territory.  *See* Kopel Br. at 26, ECF No. 78.  However, the two cases upon which they rely do not support this assertion.  First, *Hawaii v. Mankichi*, 190 U.S. 197 (1903), explicitly held that "most, if not all, the privileges and immunities contained in the Bill of Rights of the Constitution were intended to apply [to Hawaii] from the moment of annexation."  *Id.* at 217–18.  The Court found only that the two specific rights at issue—the rights to a grand jury and a unanimous verdict—did not apply to Hawaii because they "concern[ed] merely a method of procedure."  *Id.* at 218.  The Second Amendment, by contrast, is not a procedural right.  Second, *Dorr v. United States*, 195 U.S. 138 (1904), spoke of the Constitution's application in *unincorporated* territories, and thus has no bearing on Hawaii, an incorporated territory.

the applicant's good moral character.").[9]   Some of these laws, including **New York**'s Sullivan Act

as amended in 1931, required, subject to limited exceptions, that fingerprints of purchasers be

taken and kept on file with the police.   1931 N.Y. Laws 792, at 2391 § 5.10; *see also* 1927 Mich.

Pub. Acts 372, at 887–88 § 6 (**Michigan:** "Every license issued hereunder shall bear the imprint

of the right thumb of the licensee, or, if that not be possible, of the left thumb or some other finger

of such licensee.").

As an alternative to the permit-to-purchase approach, many state legislatures in the early

twentieth century adopted a related approach for assessing a prospective purchaser's eligibility to

purchase and possess a firearm.   In 1926, the National Conference of Commissioners on Uniform

State Laws approved a model law, the Uniform Firearms Act, under which "the applicant for [a]

pistol files an application with a firearms dealer and forty-eight hours later receives the pistol for

home use, providing the police investigation that has been made in the meantime shows him to

have a clean record as an upright citizen."   *Sportsmen Fight Sullivan Law*, 23 J. Criminology 665,

665 (1932), ECF No. 70-1, at Add. 242 (noting National Rifle Association's efforts in lobbying

New York to adopt the Uniform Firearms Act).   The 1926 model law was, in turn, based on

proposed legislation that the United States Revolver Association had issued a few years earlier.

*See* Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767 (1926).   In the 1920s and

1930s, several states enacted versions of these two model laws.[10]   These statutes generally

---

[9]   *See also, e.g.*, 1919 N.C. Sess. Laws 197, at 398 § 3, ECF No. 70-1, at Add. 148 (**North Carolina:** "[B]efore the clerk of the Superior Court shall issue any such license or permit, he shall fully satisfy himself by affidavits, oral evidence, or otherwise, as to the good moral character of the applicant therefor.").

[10]   *See*, *e.g.*, 1923 Cal. Stat. 339, at 696-97 § 2 (**California**), ECF No. 70-1, at Add. 156; 1923 Conn. Pub. Acts 252, at 3707 (**Connecticut**), ECF No. 70-1, at Add. 163-66; 1923 N.D. Laws 266 (**North Dakota**), ECF No. 70-1, at Add. 167-71; 1923 N.H. Laws 118 (**New Hampshire**), ECF No. 70-1, at Add. 172-75; 1925 Ind. Acts 207 (**Indiana**), ECF No. 70-1, at Add. 176-82; 1925

prohibited firearm possession by, or transfer to, individuals in certain categories (those with felony

or crime-of-violence convictions, aliens, those under the age of 18 or 21, and/or those with mental

illnesses or substance abuse disorders); and several enabled a background check by coupling a

requirement that sellers promptly convey information about the buyer to law enforcement with a

waiting period. *See, e.g.*, 1931 Pa. Laws 158, at 497, 499 § 9, ECF No. 70-1, at Add. 222 (seller

required to send buyer's declaration to police within six hours of application and to wait at least

48 hours before delivering firearm); 1935 S.D. Sess. Laws 208, at 355-56 § 9, ECF No. 70-1, at

Add. 229 (same); 1935 Wash. Sess. Laws 172, at 599, 601 § 9, ECF No. 70-1, at Add. 234 (same).

Currently, 22 states and the District of Columbia have laws requiring all firearms purchasers to

first undergo a background check.[11]   These longstanding laws provide further evidence that a

closely analogous law, like Maryland's HQL Laws, mandating a thorough background check as

part of a permit-to-purchase requirement, falls outside the scope of the Second Amendment.

    In sum, the HQL Law's permit-to-purchase and background check requirements are clearly

---

Mich. Pub. Acts 313 (**Michigan**), ECF No. 70-1, at Add. 183-86; 1925 Or. Laws 260 (**Oregon**), ECF No. 70-1, at Add. 187-90; 1931 Pa. Laws 158, at 497, 499 § 9 (**Pennsylvania**), ECF No. 70-1, at Add. 222; 1935 S.D. Sess. Laws 208, at 355-56 § 9 (**South Dakota**), ECF No. 70-1, at Add. 229; 1935 Wash. Sess. Laws 172, at 599, 601 § 9 (**Washington**), ECF No. 70-1, at Add. 234; 1936 Ala. Laws 82, at 51, 53 § 9 (**Alabama**), ECF No. 70-1, at Add. 239-40.

[11]   *See* Cal. Penal Code §§ 28100–28490; Colo. Rev. Stat. § 18-12-112; Conn. Gen. Stat. §§ 29-33(c), 29-36l(f), 29-37a(e)-(j); Del. Code tit. 11, § 1448B, tit. 24, § 904A; D.C. Code Ann. §§ 7-2502.01–7-2502.04; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 Ill. Comp. Stat. 65/1–65/15a, 720 Ill. Comp. Stat. 5/24-3(k); Iowa Code § 724.17; Md. Code Ann., Pub. Safety § 5-117.1(f); Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E; Mich. Comp. Laws §§ 28.422, 28.422a; Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409; Nev. Rev. Stat. §§ 202.2547–202.2548; N.J. Stat. Ann. § 2C:58-3; N.M Stat. Ann. § 30-7-7.1; N.Y. Gen. Bus. Law § 898; Or. Rev. Stat. §§ 166.435, 166.436; N.C. Gen. Stat. §§ 14-402–14-404; 18 Pa. Cons. Stat. § 611; R.I. Gen. Laws §§ 11-47-35–11-47-35.2; Rev. Code Wash. § 9.41.113; Va. Code Ann. § 18.2-308.2:2 (effective July 1, 2021); Vt. Stat. Ann. tit. 13, § 4019.

"longstanding," with historical antecedents reaching back to the early 1900s.[12]  Under *Heller*, such longstanding laws regulating the sale of firearms to prevent them from falling into the hands of felons and other dangerous people are "presumptively lawful."  *See Heller*, 554 U.S. at 626-27, 627 n.26.  Accordingly, these provisions do not regulate conduct within the scope of the Second Amendment.

> **B.     At the Time of the Second Amendment's Ratification, Nearly All States Required Firearms Training**

The historical record also makes clear that the original understanding of the Second Amendment did not prohibit the government from mandating firearms training.  At the time of this country's founding, most men had to participate in a militia.  *See Heller*, 554 U.S. at 595-96 (collecting sources showing that "the ordinary definition of the militia" at the time of the founding was "all able-bodied men").  Membership in a militia, in turn, went hand-in-hand with mandatory participation in training, including firearms training.  According to *Heller*, "the adjective 'well-regulated' [in the Second Amendment] implies nothing more than the imposition of proper discipline *and training*."  *Id.* at 597 (emphasis added).  And the Constitution specifically provides for the training of the militia.  *See* U.S. Const. art. I, § 8, cl. 16.

In the years leading up to the ratification of the Constitution in 1788 and the Second Amendment in 1791, many states enacted laws requiring militia training, which included training in the proper use of firearms.  State laws in effect at the time of ratification define the membership

---

[12] *See Skoien*, 614 F.3d at 639-41 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by all felons was not enacted until 1961"); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *see also Fyock*, 779 F.3d at 997 (noting that even "early twentieth century regulations might … demonstrate a history of longstanding regulation").

of the militia (generally able-bodied men under the age of 50), the weapons a militiaman must own, and the regular training a militiaman must undergo.  For example, under a 1778 **New Jersey** law, militiamen had to "assemble, properly armed and accoutered" on the first Monday seven months of the year, at a location designated by the commanding officer, and "spend the Remainder of the Day in Training and Exercise."  1778 N.J. Sess. Laws 21, at 42, 46 §§ 14-15, ECF No. 70-1, at Add. 5.  In **Delaware**, every company in the militia had to "be exercised and instructed once in every Month" save three, and every battalion had to "be properly trained and disciplined" bi-annually.  1782 Del. Sess. Laws, at 1, 3 §§ 1, 5-6, ECF No. 70-1, at Add. 26, 28.  A 1784 **Georgia** law required militia companies to assemble to "train and exercise" up to six times per year.  *See* The Colonial Records of the State of Georgia, Volume 19, Part 2, at 350-51, ECF No. 70-1, at Add. 46-47.  In **New York**, militiamen were required to "rendezvous four times in every year, for the purpose of training, disciplining, and improving in martial exercises."  1786 New York Sess. Laws 25, at 220, 222, ECF No. 70-1, at Add. 60.

When Congress exercised its power under the Militia Clauses and enacted the Militia Act in 1792, it made clear that all militiamen were expected to train with their firearms.  The Act required all "free, able-bodied white male citizens" between the ages of 18 and 45 to enroll in the militias, equip themselves with, among other tools of the trade, "a good musket or firelock," and "appear so armed, accoutered and provided, when called out to exercise or into service."  Militia Act of 1792 § 1, ECF No. 70-1, at Add. 70.  To implement the Act, **Connecticut**, **New Hampshire**, **Massachusetts**, and **Rhode Island** all enacted laws requiring militia training.[13]

---

[13]  *See* 1792 Conn. Sess. Laws 423, 428, ECF No. 70-1, at Add. 80 (mandating training three days per year, at which the commanding officer would instruct the troops "in the use of arms and discipline of war"); 1792 N.H. Sess. Laws at 441-42, ECF No. 70-1, at Add. 84 ("instruction in military discipline" to occur twice per year); 1793 Mass. Acts at 172, 185 § 25, ECF No. 70-1, at

Militia training routinely included instruction and practice in the proper use of firearms. Militias used Baron von Steuben's *Regulations for the Order and Discipline of the Troops of the United States*, first published in 1779. *See* Saikrishna Bangalore Prakash, *The Separation and Overlap of War and Military Powers*, 87 Tex. L. Rev. 299, 332 (2008).[14] Von Steuben's manual "had over 150 pages of instructions about, among other things, … how to fire while advancing and retreating," *id.* at 376-77, and included extensive drills covering loading, aiming, and firing, *see* von Steuben, *Regulations* at 8-16.

At the time the Second Amendment was ratified, therefore, the federal government, the states, and the citizenry understood and accepted that the government could mandate training in the safe and proficient use of firearms. The far more extensive training required during the founding era means that Maryland's training requirement does not impinge on the scope of the Second Amendment right as originally understood. Maryland's training is limited to four hours and firing one round of ammunition—in contrast to the founding era's requirement to appear, musket in tow, at whatever location selected by a commanding officer, to train multiple times per year. Because the HQL Law's training requirement clearly comports with the original understanding of the Second Amendment, this Court should find it constitutional at the first step

---

Add. 107-08 ("every Captain or Commanding Officer of a company, shall call his company together three days in each year for company discipline"); 1794 R.I. Sess. Laws at 14, 22 § 12, ECF No. 70-1 at Add. 124 (meetings twice per year "for the Purpose of training, disciplining and improving them in martial Exercise" with senior ranks meeting once every two years for the same purpose).

[14] *See also* Brian M. Shay, *After 230 years, the 'Blue Book' still guides NCOs*, U.S. Army (Nov. 2, 2009), https://www.army.mil/article/29717/after_230_years_the_blue_book_still_guides_ncos ("In March of 1779, Congress endorsed [von Steuben's Regulations] and ordered [them] to be used throughout the Army. Many of the state militias also adopted [them]. In 1792, … the Uniformed Militia Act[] … included the use of [v]on Steuben's regulations.").

of the Fourth Circuit's two-step analysis.[15]

### C.   Firearm License Fees Are Longstanding Regulations Outside the Scope of the Second Amendment

Laws imposing fees or taxes on obtaining or possessing firearms are similarly longstanding and thus outside the scope of the Second Amendment.

Taxation on the possession of firearms dates back to at least the mid-nineteenth century.[16] *See* A. Hutchinson, *Code of Mississippi* 182 (1798-1848) (1844 tax rate of $2 "on each dueling or pocket pistol"); 1851 Ala. Sess. Laws 3 ($2 tax on "revolving pistol[s]"); 1856 N.C. Sess. Laws 34, § 23, pt. 4 ($1.25 tax on every pistol "used, worn or carried about the person" that year); 1866 Ga. Laws 27-28, §§ 3–4 ($1 county tax on each gun "over the number of three kept or owned on any plantation"); 1902-1904 Va. Acts 155-157, sch. B, § 6 (taxing all firearms); 1919 N.C. Sess. Laws 397, § 6, ECF No. 70-1, at Add. 149 (taxing firearms as personal property); 1926 Va. Acts 285-87, ch. 158, §§ 1-9 ($1 "license tax ... on each pistol or revolver").  Additionally, beginning in the early twentieth century, several states and localities imposed fees for obtaining a permit to purchase or possess a firearm.  *See, e.g.*, 1919 N.C. Sess. Law 397, § 3, ECF No. 70-1, at Add. 148 (50¢ fee to obtain permit to purchase); 1921 Mo. Laws 691, § 2, ECF No. 70-1, at Add. 151 (50¢ fee for permit to purchase); 1927 N.J. Law 742, 746, § 9, ECF No. 70-1, at Add. 210-11 (50¢ fee to obtain a "permit to purchase or carry a pistol or revolver"); 1931 N.Y. Law 2390, § 5.10, ECF No. 70-1, at Add. 217-18 (50¢ fee for "license ... to possess a weapon not to be carried on the

---

[15]  Along with Maryland, several states, including California, Connecticut, Hawaii, Massachusetts, and Rhode Island, and the District of Columbia continue to require gun safety training for the purchase or possession of handguns or other firearms.  *See* Giffords Law Center, <u>Licensing</u> (last visited Nov. 18, 2020), http://lawcenter.giffords.org/gun-laws/policy-areas/gun-owner-responsibilities/licensing.

[16]  Historical laws cited in this brief and not included in the appendix to Everytown's prior amicus brief are included in an appendix submitted with this brief.

person"); Samuel A. Ettelson, *Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916*, 458-459 (Vol. 9, 1916) ($1 fee for permit to purchase a firearm in Chicago). In today's dollars, these taxes and fees ranged from $7 to $70,[17] and many of these charges occurred annually or separately for each gun purchased.[18]

Fees and taxes on the purchase or possession of firearms have continued through modern day. At least 10 states, the District of Columbia, and local governments have firearm licensing or registration laws requiring payment of an administrative fee,[19] and at least 13 states charge an additional administrative fee for a mandatory background check.[20] These administrative fees range from $5 in Nebraska and North Carolina to $340 in New York City.[21] In addition, several

---

[17] *Inflation Calculator*, Official Data Foundation, officialdata.org (calculating the current dollar amount for 50¢ in 1921 and $2 in 1844).

[18] Moreover, beginning in the late nineteenth century, states and localities enacted fee requirements for obtaining licenses to carry firearms in public, which ranged from $15 to over $300 in today's dollars. See Laws of Nebraska Relating to the City of Lincoln 210, § 6 (1895) (50¢ fee for concealed-carry license); Park's Annotated Code of the State of Georgia, Penal Code, Art. 3 § 348 (1914) ($100 bond and 50¢ fee for public-carry license); 1925 W. Va. Acts 25-30, ch. 3, § 7 ($20 payment to the sheriff and $2 payment to the clerk of the court for public-carry license); 1933 Haw. Sess. Laws 39, § 8 ($10 fee for concealed-carry permit); George W. Hess, Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) ($2 fee for concealed-carry license).

[19] *See, e.g.*, Cal. Penal Code § 31650; Conn. Gen. Stat. § 29-36h; D.C. Mun. Regs. tit. 24, § 2320.3; Haw. Rev. Stat. § 134-3(b); 430 Ill. Comp. Stat. 65/5(a); Md. Code Ann., Pub. Safety § 5-117.1(g); Mass. Gen. Laws ch. 140, § 129B(9A); Nev. Rev. Stat. § 202.2547(7); N.J. Stat. Ann. § 2C:58-3(f); N.Y. Penal Law § 400.00(14); N.C. Gen. Stat. § 14-404(e) .

[20] *See* Cal. Code Regs. tit. 11, § 4001; Cal. Penal Code § 28230; Colo. Rev. Stat. § 24-33.5-424(3.5); Conn. Gen. Stat. § 29-17a(b); Fla. Stat. § 790.065(1)(a); Md. Code Ann., Crim. Proc. § 10-221(b)(7); Nev. Rev. Stat. § 202.2547(7); N.J. Admin. Code § 13:54-1.4(d); Or. Rev. Stat. § 166.414; 18 Pa. Cons. Stat. § 6111(b)(3); Tenn. Code Ann. §§ 38-6-109, 19-17-1316(e); Utah Code Ann. § 76-10-526(12); Va. Code Ann. § 18.2-308.2:2(J); Wis. Stat. § 175.35(2i).

[21] *See* Neb. Rev. Stat. § 69-2404; N.C. Gen. Stat. § 14-404(e); *New Application Instructions*, N.Y. Police Dep't License Div., https://licensing.nypdonline.org/new-app-instruction/ (last visited Nov. 13, 2020) ($340 application fee for handgun license; $140 application fee for a rifle or shotgun permit).

states and localities, as well as the federal government, impose taxes on the sale of firearms or ammunition, in addition to the standard state-law sales tax.[22]

Taken together, these laws demonstrate that taxes and fees on access to firearms are longstanding regulations that fall outside the scope of the Second Amendment.  Accordingly, the HQL Law fees, like the licensing scheme itself, are presumptively lawful "conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 635.

As shown above, the lengthy history of firearm license fees and taxes places these types of regulations beyond the scope of the Second Amendment, and the HQL Law fees do not impinge upon Plaintiffs' right to keep and bear arms.

## CONCLUSION

For the foregoing reasons and those set out in the State's brief, amicus Everytown for Gun Safety respectfully urges this Court to grant the Defendants' Motion for Summary Judgment.

Dated: December 2, 2020                          Respectfully submitted,


                                                  */s/ Thad Davis*
                                                 Thad A. Davis (Bar No. 18806)
                                                 GIBSON DUNN & CRUTCHER LLP
                                                 tdavis@gibsondunn.com
                                                 *Counsel for Amicus Curiae*
                                                 *Everytown for Gun Safety*


## CERTIFICATE OF SERVICE

I, Thad Davis, hereby certify that on December 2, 2020, I electronically filed the foregoing

---

[22] *See* 18 Pa. Cons. Stat. § 6111.2 ($3 surcharge per firearm sale); Cook Cty., Ill. Code § 74-668 ($25 tax per firearm sale); Seattle, Wa. Mun. Code, ch. 5.50.030 (tax on retailers of $25 per firearm sold); 26 U.S.C. § 4181 (10-11% excise tax on firearm and ammunition sales by a manufacturer, producer, or importer).  In addition, Tennessee imposed a "special privilege tax" on sales of shotgun shells and metallic cartridges from 1937 until 2019. *See* Tenn. Code § 70-3-101 (2016) (10c per container); 1937 Tenn. Sess. Laws 296; 2019 Tenn. HB 494 (repeal).

with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system.  All participants are registered CM/ECF users, and will be served by the CM/ECF system.

/s/ Thad Davis
Thad A. Davis (Bar No. 18806)
GIBSON DUNN & CRUTCHER LLP
tdavis@gibsondunn.com
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*