IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) Case No. 16-cv-3311-ELH |
| | ) |
| LAWRENCE HOGAN, et al., | ) |
| | ) |
| **Defendants.** | ) |

**Plaintiffs' Motion to Strike Opinions of Defendants' Experts**
<u>**James Johnson, James Russell, and Daniel Webster**</u>

Defendants rely upon the declarations of their proffered expert witnesses former Chief of the Baltimore County Police Department James Johnson (ECF 125-14), Maryland State Police Captain James Russell (ECF 125-13), and the declaration and second supplemental declaration of Bloomberg Professor Daniel Webster of the Bloomberg School of Public Health (ECF 125-11 & ECF 125-12, respectively) in support of their Motion for Summary Judgment. Chief Johnson's and Capt. Russell's opinions are not based upon sufficient facts or data. Professor Webster's opinions do not fit the facts of this case and are unreliable. Because Defendants may only rely upon admissible evidence in support of their motion for summary judgment, Defendants may not rely upon these inadmissible opinions. *E.g.*, *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the [party's] case to determine whether the [party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof in his claim at trial."). Defendants' reliance on each of these opinions under Federal Rule of Civil Procedure 56 is improper. *See id*. Under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 56, Plaintiffs respectfully request that the Court strike from the record and preclude Defendants from relying upon the opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration ("Chief Johnson Decl."), paragraphs 13, 17–25 in Capt. Russell's

declaration ("Capt. Russell Decl."), paragraphs 8–20 in Professor Webster's declaration ("Webster Decl."), and paragraphs 5–8 in Professor Webster's second supplemental declaration ("Webster Supp. Decl.").

### A. James Johnson and James Russell

Under Federal Rule of Evidence 702(b), expert witness testimony is admissible only if "the testimony is based on sufficient facts or data." Under this Rule, "the trial judge is assigned the task of 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Zellers v. NexTech Northeast, LLC*, 533 F. App'x 192, 196 (4th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)). "[W]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994); *see also, e.g.*, *Blake v. Bell's Trucking, Inc.*, 168 F. Supp. 2d 529, 533 (D. Md. 2001) ("A district court has a responsibility to ensure than an expert's opinion has an adequate basis in fact."); *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 470 & n.11 (D. Md. 2000) ("Speculation, guesswork and conjecture are not acceptable substitutes for facts and data.").

While trained experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157–58 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). When determining whether to admit testimony, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. For example, the United States District Court for the Northern District of Texas excluded expert testimony when the expert witness conducted no survey, study, or analysis but instead "base[d] his opinion on

personal experience and attempt[ed] to use that personal experience to extrapolate [his conclusion]." *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd*, No. 3:12-CV-01462, 2015 WL 12698060, at *2 (N.D. Tex. Jan. 21, 2015).

In the District of Maryland, "sufficient facts or data" requires that the expert witness possess comprehensive knowledge in his field of study and a complete understanding of the case itself. *See Elat v. Ngoubene*, 993 F. Supp. 2d 497, 510–11 (D. Md. 2014). In *Elat*, the plaintiff retained an expert witness to opine that she was the victim of human trafficking. *Id*. While preparing for her testimony, the expert witness interviewed the plaintiff and reviewed multiple pleadings, depositions, "more than 200 pages of documents produced in discovery," and "publications about human trafficking." *Id*. at 511. The expert witness's preparation was so comprehensive, the Court noted that there were few, if any, available documents that she failed to consider. *Id*. Thus, her opinions were "based on sufficient facts or data," and the Court refused to exclude her testimony. *Id*.

In *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911 (4th Cir. 2004), by contrast, the Fourth Circuit affirmed exclusion of expert testimony regarding the design of a product because the proposed expert had no training in the design of the product or familiarity with the product itself. *Id*. at 917. Because of his lack of experience, "his opinion [was] invalid" and properly excluded. *Id*. And, because the testimony was properly excluded, the proffering party was unable to prove its case, and "summary judgment on all claims was clearly proper." *Id*. at 918; *see also Stolting v. Jolly Roger Amusement Park, Inc.*, 37 F. App'x 80, 83 (4th Cir. 2002) (affirming the exclusion of expert testimony that was based on nothing more than "bare conclusions without reliable support").

The assertions in paragraphs 7–15 and 17–18 of Chief Johnson's declaration and paragraphs 13 and 17–25 of Capt. Russell's declaration are not based on sufficient data and are therefore inadmissible under Federal Rule of Evidence 702(b).

**1. Chief James Johnson**

Chief Johnson opines that proper firearm training—which he also opines the HQL requirements provide—is necessary to promote public safety in Maryland. *See* Chief Johnson Decl., ECF 125-14, at ¶¶ 14–18. Chief Johnson claims that the HQL requirement, including the fingerprint requirement and the four-hour firearm safety training, will reduce the access of handguns to ineligible people, the incidents of accidental discharge, and straw purchases. *Id.* ¶¶ 7–12. Chief Johnson believes that firearm safety instructors will verify that all applicants have complied with the HQL safety course requirements and are well-versed on firearm safety. *Id.* ¶ 13.

These opinions are mere beliefs that are not based on sufficient facts or data. As *ipse dixit*, they should be excluded. *E.g.*, *Kumho Tire*, 526 U.S. at 157–58. Although Chief Johnson claims to possess "an extensive amount of knowledge of local and national gun law," Johnson Dep., Ex. 1, at 14:7–18, his deposition testimony revealed numerous gaps in relevant knowledge and a dearth of statistical or empirical evidence in support of his positions. When asked whether he has facts or data to support his positions, Chief Johnson repeatedly answered, "no," "I do not know," or some variation thereof. For example:

- "I do not know" whether the Maryland State Police has issued guidelines, standards, or expectations to HQL safety instructors. Deposition of Chief Johnson ("Johnson Dep."), Ex. 1, at 33:22–35:3;

- "No, I do not" have "any facts or data that indicate on how many occasions [prohibited individuals] purchased handguns in Maryland prior to the Handgun Qualification License being initiated." *Id*. at 35:4–12;

- "No, I do not" have "data or information about incidents in which [prohibited] individuals have or have not been able to obtain handguns after the Handgun Qualification License." *Id*. at 35:14–18;

- "No" studies to support his opinion that firearm training deters straw purchasing. *Id*. at 41:4–7;

- "I do not possess" material indicating the number of accidental shootings in Maryland or nationwide and have not researched this topic. *Id*. at 51:17–52:8;

- "I have no data" on "how often firearms [or handguns specifically] are used defensively in Baltimore County." *Id*. at 85:4–86:6;

- "No" data on "how often homeowners have had to use handguns to protect themselves in their homes." *Id*. at 88:1–4;

- "No" data on "how often or what percentage of crime guns are handguns in Baltimore County" or "the percentage of handguns that are crime guns that are not illegally owned or possessed at the time they are used in crime" in Baltimore or Maryland. *Id*. at 90:6–20;

- "I have no information" on "whether or not handgun crimes in Baltimore County have decreased since the Handgun Qualification License went into effect." *Id*. at 91:9–13;

- "No" the Law Enforcement Partnership, the organization Chief Johnson chairs, has not recommended a permit-to-purchase scheme, a fingerprint requirement, or a training requirement. *Id*. at 16:15–18:17.

Chief Johnson anticipates that HQL trainers will effectively "weed out" those unqualified to obtain an HQL, though he "do[es] not know" whether the Maryland State Police has issued any written or oral guidance on the subject. *Id*. at 33:22–34:10. Nor does he have facts or data relevant to handgun ownership by impaired individuals prior to the initiation of the HQL requirement. *Id*. at 35:4–12.

Chief Johnson also lacks knowledge of crime causation and prevention. With respect to straw purchases, Chief Johnson "do[es] not possess statistics on the prevalence of false identification," *id*. at 23:6–14, and has no information on "whether or not the fingerprinting requirement has caught anyone who was a straw purchaser," *id*. at 25:10–16. Nor is he familiar with any studies illuminating the behavior of straw purchasers. *Id*. at 41:4–7. Despite strong opinions on the subject, Chief Johnson has no information on the prevalence of accidental gun injury and death in Maryland prior to the initiation of the HQL requirement. *Id*. at 50:9–13; 51:17–52:8. He has no data to demonstrate how often firearms are used defensively by citizens in Baltimore County. *Id*. at 85:18–86:6. Chief Johnson has no data with respect to the percentage of handguns that are illegally owned or possessed at the time they are used in criminal activity in Maryland. *Id*. at 90:8–20.

Chief Johnson offers a series of unsupported opinions devoid of statistical or empirical support. Despite the list of credentials stemming from his law enforcement background, Chief Johnson's opinions are nothing more than *ipse dixit* masquerading as "sufficient facts or data." Like the expert in *De Boulle*, Chief Johnson has conducted no empirical research but attempts to

use his professional resume to breach the gaps in knowledge and logic that were exposed during his deposition testimony. Unlike the expert witness in *Elat*, Chief Johnson has failed to demonstrate a comprehensive knowledge of the facts underlying this case or in his field of study relevant to the HQL requirement. His opinion testimony should be excluded because it is nothing more than his *ipse dixit*.

### 2. Captain James Russell

Capt. Russell opines that the HQL requirement encourages responsible gun ownership and public safety in Maryland. Capt. Russell Decl., ECF 125-13, at ¶¶ 13, 17. He believes that the HQL training requirement, by encouraging safe storage practices, reduces the risk that minors or prohibited adults will gain access to firearms or that eligible adults will accidentally discharge a firearm. *Id*. ¶¶ 18–21. Capt. Russell also opines that the HQL requirement's live-fire component improves the effectiveness of the training by requiring applicants to prove their ability to safely fire and clear a firearm. *Id*. ¶ 24.

Like Chief Johnson, Capt. Russell's opinions are not based on sufficient facts or data but are *ipse dixit* and should be excluded. Aside from his "13 years of being on a live firing range," Russell Dep., Ex. 2, at 11:8–14, Capt. Russell possesses little empirical knowledge to support his opinions on training civilians. He has never conducted research relevant to firearm use and its relationship to public safety. *Id*. at 20:19–22. Nor is he familiar with empirical research on whether the HQL training requirement actually reduces the occurrence of accidental firearms discharge. *See id*. at 93:7–18. Capt. Russell has no knowledge of whether the HQL training requirement has reduced the number of straw purchases in Maryland or the number of felons or disqualified people in possession of firearms. *Id*. at 136:5–17. And he has no data on whether the HQL training requirement has affected compliance with Maryland firearms storage law. *Id*. at 136:18–137:11.

Furthermore, Capt. Russell has no idea "how many accidental discharges occur[red] in Maryland either before or after the HQL requirement," and he has no idea how such a statistic may be obtained. *Id*. at 166:10–15. Despite his Maryland State Police work experience, Capt. Russell has little knowledge of whether the HQL training requirement serves its intended purpose. His opinions are nothing more than *ipse dixit* and should be excluded.

The opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration and paragraphs 13, 17–25 of Capt. Russell's declaration are not based on sufficient facts or data and thus are inadmissible. Capt. Russell's opinions are unsupported say-so and should be stricken.

**B. Daniel Webster**

**1. Professor Webster's opinions in paragraphs 8–20 of his declaration and paragraphs 5-8 of his second supplemental declaration do not fit the facts of this case.**

Under *Daubert*, an expert's testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. (quotation omitted). Therefore, an expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Relying on *Daubert*, the District of Maryland has held that an expert's opinion does not fit the facts of the case where his testimony is based upon circumstances outside the scope of the case itself. *See Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 502 (D. Md. 2000) (excluding an expert's testing on rollover propensity in large vehicles because his methods bore no relation to "real-world" circumstances and so "d[id] not measure what was at issue in the case").

Like in *Samuel*, Professor Webster's opinions do not fit the facts of this case. Professor Webster opines that the HQL requirement is an effective way to prevent: (1) straw purchases, or the diversion of guns for criminal purposes; (2) homicides; (3) suicides; and (4) serious injuries

and deaths to police officers. Webster Decl., ECF 125-11, at ¶¶ 8–20. Professor Webster claims that the fingerprinting and safety-training requirements will reduce the likelihood of false identifications at the point of purchase and the opportunity for would-be offenders to access loaded firearms. *Id*. ¶¶ 8–9 & 18–20. Professor Webster proffers research conducted in other states on the effect of so-called permit-to-purchase (or "PTP") laws. *See id*. ¶¶ 14–16. Specifically, Professor Webster relies heavily on Missouri's PTP law, which was repealed on August 28, 2007, and Connecticut's PTP law, which became effective October 1, 2015. *Id.* ¶¶ 15–16. Professor Webster's research allegedly revealed an upward trend in crime to correlate with the repeal of Missouri's PTP law and a significant reduction in Connecticut's firearm homicide rate over the first ten years its PTP law was in effect. *Id*. ¶¶ 14–16. Professor Webster relies on these studies to opine that PTP laws (like Maryland's HQL requirement) have a statistically significant effect on reducing gun violence. *Id*. ¶¶ 14–20.

But Professor Webster admits that the Missouri and Connecticut PTP laws have little in common with Maryland's HQL requirement. Professor Webster agrees that the PTP laws in Missouri, Connecticut, and Maryland are related only nominally in that all three require a permit to purchase a firearm. Deposition of Daniel Webster ("Webster Dep."), Ex. 3, at 189:9–13. The permit requirements in each state differ in critical ways. For example:

- ***Missouri (formerly Mo. Rev. Stat. § 571.090):*** According to Professor Webster, "there's only one common denominator between the Missouri PTP law and the HQL, and that's the requirement of a permit in order to purchase." Webster Dep., Ex. 3, at 179:18–180:1. Unlike Maryland, neither fingerprinting nor safety training was required prior to the issuance of a PTP in Missouri. *Id*. at 55:14–19. On this point, Professor Webster's research revealed no "special value to fingerprinting as opposed to the other elements of a PTP law in effect in [other] jurisdiction[s]." *Id.* at 184:16–188:9. And "Missouri required in-person appearance at a law enforcement agency, which Maryland does not." *Id*. at 56:6–9.

- ***Connecticut (Conn. Gen. Stat. Ann. §§ 29-28(b), 29-29):*** Connecticut, like Maryland, requires parties seeking a PTP to provide fingerprints and undergo a background check prior to issuance. But, unlike Maryland, "the fingerprinting requirement in Connecticut has

to be obtained through a law enforcement agency." Webster Dep., Ex. 3, at 45:6–13. Connecticut also requires a training course for PTP applicants, but Connecticut's required training is "an eight-hour course as opposed to a four-hour course." *See id*. at 44:15–20. And Connecticut requires photo identification on its permits to purchase, while Maryland does not. *Id*. at 56:16–18.

By analyzing these states' laws, and not Maryland's, Professor Webster relies upon data that does not fit the facts of this case. Because these studies relied upon by Professor Webster are so factually distinguishable, they tell us nothing about the potential effects of the HQL requirement. Professor Webster's opinions in his declaration do not fit the facts of this case and should be excluded.

Professor Webster's second supplemental declaration, and the opinions it advances, only exacerbate the divide between Professor Webster's opinions and the facts of this case. In apparent recognition of the flaws in his prior studies and testimony in this case, Professor Webster has "completed additional research studies" touching upon his prior testimony. ECF 125-12, at ¶ 4.

The first, according to Professor Webster, is an update of his own prior, fatally-flawed analysis of Missouri's repeal of its permit-to-purchase law. *See* Hasegawa RB, Webster DW, Small DS. *Bracketing the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law. Epidemiology* 2019 May; 30(3): 371-379 (the "Second Missouri Study"). ECF 125-12, at ¶ 5. The second, Daniel W. Webster, *et al.*, *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Public Policy 171-212 (2020) (the "Fatal Mass Shooting Study"), purports to find that permit-to-purchase laws that require "either in person application with law enforcement *or* fingerprinting" (emphasis added) resulted in a 56% lower chance of fatal mass shootings. ECF 125-12, at ¶ 6. The third, Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in Four States, 1985-2017*, 110 Am. J. of Public Health 10, 1546 (October

2020) (the "PTP study"), claims that permit-to-purchase laws in four states resulted in a dramatic decrease in firearm homicide and firearm suicide rates.[1] ECF 125-12, at ¶ 7.

Each of these studies, in addition to being flawed in their own individual way, cannot be relied upon because they are the product of manifest "data dredging," where a researcher identifies some non-causal associations (such as, for example, a coincidental uptick in firearm homicide rates the year after the repeal of a particular gun control law), and then continuously refines his research approach in an attempt to support a hypothesis that there is a causal relationship, usually by cherry-picking laws, or locations, or date ranges, to the exclusion of the larger body of available data. *See* Kleck Supp. Decl., Ex. 4, at ¶¶ 2–23. This approach is of no value to either a court or a legislative body, because it does not accurately analyze whether any particular gun control law is likely to have a salutary effect on violence in that jurisdiction. *Id*. It also fails to match the facts of this case, because its biased selection of data to utilize makes it inapplicable to the HQL requirement and its actual effects here.

Professor Webster's Second Missouri Study cherry-picks the state of Missouri, artificially restricts the date range analyzed, and makes no effort to explain why all the alleged increase in firearm crime happened *in one year* and then reverted to its pre-repeal rate. *Id*. at ¶¶ 20–36. In the Fatal Mass Shooting Study, Professor Webster cherry-picks which variables to control for (while ignoring nearly all actual confounding variables), cherry-picks what kind of mass shootings to include (and how to define them in terms of numbers of fatalities), cherry-picks which states to include in the study, and obscures whether fingerprinting *or* personally appearing at a law

---

[1] Professor Webster estimates that the repeal of Missouri's handgun purchaser licensing law was "associated" with a 47.3% increase in firearm homicide rates in this study. ECF 125-12, at ¶ 7. However, in the Hasegawa study, Webster and his colleagues estimated that the same repeal was "associated" with a 27% increase in firearm homicide rates. *Id*. at ¶ 5. No explanation is given for the enormous difference in the results of the two studies.

enforcement agency *or* perhaps both has the allegedly beneficial effect on fatal mass shootings. *Id*. at ¶¶ 12–23, 37–38. Finally, the PTP Study cherry-picks the date range it analyzes, the states it reviewed, and the factors and variables it would include in its so-called "synthetic control" methodology. *Id*. at ¶¶ 12–23, 55–56.

Even worse, in the PTP Study, Professor Webster could have compared the *actual* effect of the HQL requirement from 2013 to 2017 (data he had and that was within the date range of the rest of the study) to the effect of the Maryland 77R comprehensive background check in place from 1996, but he chose not to do so, instead comparing the 77R to Connecticut's purchasing license. *Id*. By ignoring Maryland-specific data during the 2013-2017 date range, Professor Webster avoided reporting that the firearm homicide rate surged in Maryland following implementation of the HQL requirement in 2013. *Id.* This problem is hinted at, but not addressed or resolved, in Defendants' MSJ. *See* ECF 125, at 22–23, n. 9 (claiming that "dramatic civil unrest prompted by actions taken by police are often followed by sharp increases in violent crime….") (citing Webster Decl., at 16). Not only does this study not fit the facts of this case, it actively and intentionally ignores the facts of this case to reach its forced conclusions.

Because these studies relied upon by Professor Webster are factually distinguishable, clearly the result of data dredging, and all ignore the actual effect of the HQL requirement during the relevant time period in Maryland, they tell us nothing about the potential effects of the HQL requirement. Professor Webster's opinions in his second supplemental declaration do not fit the facts of this case and should be excluded. *See, e.g.*, *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 98 (1st Cir. 2020) ("[T]he reliability bar cannot be met by an expert's self-serving assertion that his conclusions were derived by the scientific method; rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require

some objective, independent validation of the expert's methodology.") (citation and quotations omitted); *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1007 (4th Cir. 2020) (Agee, J., concurring in part and dissenting in part) ("In fulfilling its gatekeeping function, a district court must conduct a preliminary assessment to determine whether the methodology underlying the expert witness' testimony is valid.") (quotation omitted).

### 2. Professor's Webster's opinions in paragraph 17 of his declaration are unreliable and fail to show a causal link between the HQL requirement and perceived public safety effects.

Professor Webster relies upon revised data in his declaration to support his opinion that the HQL requirement is "associated" with a "48 percent reduction in firearm homicide rates in [Maryland's] large urban counties." Webster Decl., ECF 125-11, at ¶ 17. Professor Webster bases this conclusion upon his own study, which had to be revised by an erratum because of incorrect data.[2] The revised data cannot provide a basis for a reliable causation opinion. As Professor Webster notes, the revised data purportedly shows an "association" between the HQL requirement and a 48% *decrease* in firearm homicide rates in Maryland's large urban counties, while simultaneously showing an "association" between the HQL requirement and a 28% *increase* in firearm homicide rates in Baltimore. Webster Decl., ECF 125-11, at ¶ 17. This formulation, *i.e.* relying on "associational" language, instead of the more precise "causal" or "effective" language, makes it obvious that Professor Webster is identifying no causal link between the HQL requirement and firearm homicide rates in Maryland. Rather, the HQL requirement was – coincidentally – in effect during a time period in which the Baltimore firearm homicide rate rose while the state-wide firearm homicide rate fell. *See, e.g., In re Lipitor (Atorvastatin Calcium)*

---

[2] Cassandra K. Crifasi, et al., *Association between firearm laws and homicide in large, urban U.S. counties, 95(3) Journal of Urban Health* 383–90 (2018).

*Marketing, Sales Practices and Products Liability Litigation*, 227 F. Supp. 3d 452, 482–83 (D.S.C. 2017) (association is not equivalent to causation, and does not create a genuine issue of material fact as to causation). Professor Webster fails to demonstrate (or even explicitly state) that the HQL requirement *caused* either of these effects. Furthermore, these two results that allegedly are "associated" with the HQL statute are contradictory: the *same* statute is associated with *both* an *increase* in homicides and a *decrease* of homicides *at the same time*. Professor Webster never explains the contradiction, simply claiming that the aftermath of the post-Freddie Gray riots in Baltimore caused the homicide rate there to increase dramatically, while failing to adduce any evidence that supports that claim. Because Professor Webster only identifies, at best, a correlative – and not causative – relationship between the HQL requirement and firearm homicide rates in Maryland, the Court should strike this opinion and preclude Defendants from relying upon it.

## Conclusion

For the foregoing reasons, this Court should strike from the record and preclude Defendants from relying upon the opinions contained in paragraphs 7–15 and 17–18 of Chief Johnson's declaration (ECF 125-14), paragraphs 13 and 17–25 in Capt. Russell's declaration (ECF 125-13), paragraphs 8–20 in Professor Webster's declaration (ECF 125-11), and paragraphs 5-8 in Professor Webster's second supplemental declaration (ECF 125-12).

Dated: January 27, 2021                                          Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, DC 20036
P: 202-719-8316
jsweeney@bradley.com

Cary Johnson Hansel, III
Hansel Law, P.C.
2514 North Charles Street
Baltimore, MD 21218
P: 301-461-1040
cary@hansellaw.com

*Counsel for Plaintiffs*


# CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2021, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Counsel for Plaintiffs*