# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 16-cv-3311-ELH** |
| ) | |
| **LAWRENCE HOGAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### Plaintiffs' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Plaintiff Atlantic Guns, Inc.

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Dated: January 27, 2021          Counsel for Plaintiffs

**Table of Contents**

Table of Authorities ........................................................................................................ iii

Introduction .................................................................................................................... 1

Procedural History ......................................................................................................... 3

Statement of Undisputed Facts ...................................................................................... 5

    A.    Plaintiffs ........................................................................................................ 5

    B.    Maryland's handgun possession laws ........................................................... 7

    C.    The HQL requirement (effective October 1, 2013 – present) ...................... 10

    D.    Defendants admit that the HQL requirement's purpose and effect are to prevent law-abiding, responsible Maryland citizens from acquiring and possessing handguns. ..................................................................................... 12

    E.    The HQL requirement is burdensome ......................................................... 14

        1.    The HQL requirement is time-consuming. .......................................... 14

        2.    The HQL requirement is expensive. .................................................... 16

    F.    The HQL requirement is unnecessary and ineffective. ................................ 17

        1.    The additional 30-day delay is unnecessary. ...................................... 17

        2.    The fingerprint requirement is unnecessary. ....................................... 18

        3.    The HQL safety course with live-fire requirement is unnecessarily burdensome. ....................................................................................... 19

        4.    The HQL requirement is ineffective. ................................................... 20

Standard of Review ........................................................................................................ 22

Argument in Support of Plaintiffs' Cross-motion for Summary Judgment ................... 23

    A.    The HQL requirement is unconstitutional because it is inconsistent with the Second Amendment's text, history, and tradition. ....................................... 24

    B.    The HQL requirement is unconstitutional because it is a pretext to reduce the exercise of a constitutional right. .......................................................... 27

    C.    The HQL requirement is unconstitutional under the two-part approach used by the Fourth Circuit. .................................................................................. 30

        1.    The HQL requirement burdens conduct within the scope of the Second Amendment's guarantee. ...................................................... 30

2.      Strict scrutiny applies because the HQL requirement severely burdens the Second Amendment's core right. .......................................... 34

3.      Defendants cannot meet their burden under strict scrutiny because the HQL requirement is not the least restrictive alternative to achieve a compelling interest. ................................................... 36

   a.      The additional 30-day delay is not the least restrictive alternative to achieve a compelling interest. ............................... 36

   b.      The fingerprint requirement is not the least restrictive alternative to achieve a compelling interest. ............................... 37

   c.      The classroom training with live-fire requirement is not the least restrictive alternative to achieve a compelling interest. ...... 38

Argument in Opposition to Defendants' Motion for Summary Judgment ................................. 38

A.      The HQL requirement fails intermediate scrutiny. .............................................. 39

   1.      Defendants cannot establish that the recited harms exist or that the HQL requirement will alleviate these harms in a direct and material way. ........................................................................................ 42

      a.      Defendants cannot establish that the additional 30-day delay alleviates a demonstrated harm in a direct and material way ...... 43

      b.      Defendants cannot establish that the fingerprint requirement alleviates a demonstrated harm in a direct and material way ...... 43

      c.      Defendants cannot establish that the additional half-day classroom training with live-fire requirement alleviates a demonstrated harm in a direct and material way. ....................... 48

   2.      Defendants cannot establish that the HQL requirement is narrowly tailored to serve a substantial government interest. ................................. 49

      a.      The additional 30-day delay is not narrowly tailored to serve a substantial government interest. ................................................. 49

      b.      The fingerprint requirement is not narrowly tailored to serve a substantial government interest. ................................................. 49

      c.      The classroom training with live-fire requirement is not narrowly tailored to serve a substantial government interest. ...... 50

   3.      Defendants enacted the HQL requirement without substantial evidence. ....................................................................................... 52

Conclusion ......................................................................................................... 54

## Table of Authorities

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................22

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ...............................................................................37

*Caetano v. Massachusetts*,
136 S. Ct. 1027 (2016) .............................................................................................25

*Centro Tepeyac v. Montgomery Cty.*,
722 F.3d 184 (4th Cir. 2013) ...................................................................................36

*Chisolm v. TransSouth Fin. Corp.*,
95 F.3d 331 (4th Cir. 1996) .....................................................................................39

*City of L.A. v. Alameda Books, Inc.*,
535 U.S. 425 (2002) .................................................................................................28

*Corcoran v. Sessions*,
261 F. Supp. 3d 579 (D. Md. 2017) .........................................................................23

*Cox v. City of Charleston, SC*,
416 F.3d 281 (4th Cir. 2005) ...................................................................................22

*Crawford v. Washington*,
541 U.S. 36 (2004) ...................................................................................................24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................................ *passim*

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020) .................................................................................41

*Edenfield v. Fane*,
507 U.S. 761 (1993) .................................................................................................40

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...................................................................................40

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .................................................................................................40

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ................................................36

*Grace v. Dist. of Columbia*,
  187 F. Supp. 3d 124 (D.D.C. 2016) ................................................28

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) .................................... *passim*

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) .................................... *passim*

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (9th Cir. 1977) ................................................40

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ................................................25

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) (en banc) ................................3, 30, 35, 39

*Maryland Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) .................................... *passim*

*McCullen v. Coakley*,
  573 U.S. 464 (2014)................................................39, 42

*McCutcheon v. FEC*,
  572 U.S. 185 (2014)................................................42

*McDonald v. Chicago*,
  561 U.S. 742 (2010)................................................23, 25, 39

*Murdock v. Commonwealth of Pa.*,
  319 U.S. 105 (1943)................................................28

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012) ................................................27

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
  140 S. Ct. 1525 (2020)................................................25

*Packingham v. N.C.*,
  137 S. Ct. 1730 (2017)................................................39

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992)................................................32

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*,
584 F. Supp. 2d 766 (D. Md. 2008) ...................................................................40

*Rogers v. Grewal*,
140 S.Ct. 1865 (2020) ......................................................................................39

*Saenz v. Roe*,
526 U.S. 489 (1999) ..........................................................................................28

*Silvester v. Becerra*,
138 S.Ct. 945 (2018) .........................................................................................39

*Silvester v. Harris*,
41 F. Supp. 3d 927 (E.D. Cal. 2014) ................................................................31

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ............................................................................32

*Sons of Confederate Veterans, ex rel. Griffin v. Comm'r of the Va. Dep't. of Motor Vehicles*,
288 F.3d 610 (4th Cir. 2002) ...........................................................................36

*State v. Reid*,
1 Ala. 612 (1840) .............................................................................................27

*Teixeira v. Cty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) (en banc) ...........................................................23

*Turner Broad Sys., Inc. v. FCC*,
512 U.S. 622 (1994)................................................................................. *passim*

*Turner Broad Sys., Inc. v. FCC*,
520 U.S. 180 (1997)....................................................................................41, 42

*United States v. Carter*,
669 F.3d 411 (4th Cir. 2012) ..................................................................23, 35, 40

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ..................................................................34, 35, 37

*United States v. Jackson*,
390 U.S. 570 (1968)...........................................................................................28

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ........................................................................35, 39

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)..............................................................................36, 37, 40

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ........................................................................32

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ....................................................35, 36

*Young v. Hawaii*,
    896 F.3d 1044 (9th Cir. 2018) .....................................................42

**Statutes, Rules, and Regulations**

6 C.F.R. 37.15(b) ........................................................................8

6 C.F.R. 37.15(b) ........................................................................8

6 C.F.R. 37.15(c) ........................................................................8

18 U.S.C. § 922(a)(3) ..................................................................9

18 U.S.C. § 922(a)(5) ..................................................................9

18 U.S.C. § 922(b)(3) ..................................................................9

1941 Maryland Laws, Chapter 622 ................................................7

1966 Maryland Laws, Chapter 502 ................................................7

COMAR 12.15.05 ......................................................................53

COMAR 12.15.05.05 ...................................................................11

COMAR 12.15.05.07 ...................................................................11

COMAR 29.03.01.29 ..................................................................50

COMAR 29.03.01.29C(4) .............................................................10

Fed. R. Civ. P. 56 .......................................................................22

Md. Code. Ann., Art. 27, § 445 .....................................................9

Md. Code Ann., Pub. Safety § 5-117.1 ...............................10, 17, 54

Md. Code Ann., Pub. Safety § 5-117.1(b) ........................................26

Md. Code Ann., Pub. Safety § 5-117.1(c) ........................................25

Md. Code Ann., Pub. Safety § 5-117.1(d) .................................14, 38

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) ...................................................................10

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(i) .............................................................14

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(ii)(1) ........................................................50

Md. Code Ann., Pub. Safety § 5-117.1(e)(6) ..................................................................38

Md. Code Ann., Pub. Safety § 5-117.1(f) .................................................................10, 11

Md. Code Ann., Pub. Safety § 5-117.1(g) ......................................................................10

Md. Code Ann., Pub. Safety § 5-117.1(h) .................................................................11, 14

Md. Code Ann., Pub. Safety § 5-118 ........................................................................ *passim*

Md. Code Ann., Pub. Safety § 5-118(a) ............................................................................9

Md. Code Ann., Pub. Safety § 5-118(b)(3)(x) (2003) ......................................................9

Md. Code Ann., Pub. Safety § 5-120 ................................................................................8

Md. Code Ann., Pub. Safety § 5-121 ................................................................................8

Md. Code Ann., Pub. Safety § 5-123 ...........................................................................8, 12

Md. Code Ann., Pub. Safety § 5-123(a) ...........................................................9, 17, 43, 49

Md. Code Ann., Pub. Safety § 5-124 ................................................................................9

Md. Code Ann., Pub. Safety § 5-143(a) ..........................................................................29

Md. Code (1966), Art. 27, § 442 ......................................................................................8

Md. Code (1941), Art. 27, § 531(D) .................................................................................7

Md. Code (1941), Art. 27, § 531(E) ..................................................................................7

## Other Authorities

Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016:
   Maryland, https://bit.ly/3iPncPp .............................................................................45

Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background
   Check Laws, and Firearm Homicide and Suicide in Four States, 1985–2017*,
   110 Am. J. of Public Health 10, 1546 (October 2020) ............................................46

Cassandra K. Crifasi et al., *The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore*, 3(5) The Russel Sage Foundation Journal for the Social Sciences 128 (2017) ..........................................45

Daniel W. Webster, *et al.*, *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States,* 19 Criminology & Public Policy 171 (2020) ..................................................................46

Daniel Webster and Rebecca Williams, *Reducing Violence and Building Trust Data Guide Enforcement of Gun Laws in Baltimore*, Johns Hopkins Bloomberg School of Public Health Center for Gun Policy and Research (June 4, 2020), *available at* https://bit.ly/39fwIs2 ..............................................................20

Dept. Homeland Sec., *REAL ID Enforcement: Maryland*, https://www.dhs.gov/real-id/maryland ........................................................................8

Everytown for Gun Safety, *Gun Violence in Maryland* (Feb. 2020), *available at* https://bit.ly/3a4JTvg ..................................................................................................21

Handgun Qualification License, *Maryland State Police*, https://bit.ly/2MORpSZ ......................16

Hasegawa RB, Webster DW, Small DS. *Bracketing the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law. Epidemiology* 2019 May; 30(3): 371–79 ................................................................................................46

J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America* (Oct. 20, 1999) ..........................................................................................................12

J. Joseph Curran, Symposium: Guns as a Consumer Product: New Public Health and Legal Strategies to Reduce Gun Violence, 4 J. Health Care L. & Pol'y 1, 5 (2000), *available at* https://bit.ly/3pYiOQy ................................................................13

Luke Broadwater and Ian Duncan, *'Neighborhoods are crying out': Baltimore has highest homicide rate of U.S. big cities*, The Baltimore Sun, Sept. 25, 2018, *available at* https://bit.ly/2KHZXKy ............................................................20

Maryland Shall Issue, *About Us*, https://bit.ly/2NG7GtR..............................................................6

Maryland State Police, *Fingerprinting*, https://bit.ly/2Ygxwqn ..................................................11

Maryland State Police, Licensing Division Bulletin, LD-HQL-20-002 (July 28, 2020), https://rb.gy/4tofgg ..........................................................................................10

Maryland State Police, *Qualified Handgun Instructor,* https://bit.ly/3s8XeLc ............................11

Md. Dept. of Pub. Safety, *Fingerprinting Services/Fingerprinting Courses*, http://bit.ly/3sZdCOW ................................................................................................11

Md. Dept. of Pub. Safety, *Fingerprinting Services/Fingerprinting Courses*, https://bit.ly/2YiqNw0 ...........................................................................................15

Phil Davis and Phillip Jackson, *With Baltimore close to the 300-homicide mark again, leaders mull new approaches amid some signs of improvement*, The Baltimore Sun, Nov. 20, 2020, *available at* https://bit.ly/3prQGW0 .....................................21

Ron Cassie, *The high-capacity handguns fueling Baltimore's epidemic of violence increasingly enter the city through an underground network of out-of-state traffickers. Can anything be done to turn off the spigot?*, Baltimore Magazine (Dec. 2020), *available at* https://bit.ly/3sT8gV9 ....................................................21

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 508–09 (2004).........................................27

U.S. Const. amend. I ..........................................................................................24, 32, 39

U.S. Const. amend. II............................................................................................ *passim*

U.S. Const. amend. VI .................................................................................................24

**Introduction**

Maryland's "permit-to-purchase" law bans Maryland's law-abiding, responsible citizens from acquiring a handgun without first applying for and obtaining a handgun qualification license ("HQL"). It also bans Maryland's firearm retailers from selling handguns to individuals without an HQL. The HQL application and approval process is time-consuming and burdensome, requiring law-abiding, responsible Maryland citizens who wish to acquire a handgun to, at their own expense:

- Initiate the HQL application online;

- Locate and travel to an approved fingerprint vendor to obtain fingerprints;

- Attend a half-day classroom instruction;

- Locate and travel to a shooting range and pass a live-fire exercise;

- Complete and submit the HQL application online;

- Pay a $50 application fee;

- Wait up to 30 days (and oftentimes longer) for the Maryland State Police to conduct a background check and approve or deny the HQL application.

The process does not end there. After an HQL application is approved, a prospective purchaser must then undergo Maryland's pre-existing and still-continuing handgun registration process prior to purchasing a handgun ("77R Handgun Registration"), which requires purchasers to undergo a second, redundant background check; register the handgun they wish to purchase; pay another fee; and wait an additional seven business days before finally acquiring their handgun for possession in their homes. Defendants admit the preexisting and continuing 77R Handgun Registration process kept those who are prohibited from acquiring firearms from doing so. The HQL requirement imposes a superfluous layer of regulatory inconvenience and expense that

unnecessarily burdens the core right of the Second Amendment to acquire and possess a handgun for self-defense in the home.

The HQL requirement is not just burdensome. Prospective purchasers are banned from purchasing, renting, or receiving a handgun for self-defense in their homes while they work to complete their HQL applications, while they wait 30 days or longer for the State to process their applications, and while they wait another seven business days after purchasing their handguns. The undisputed facts demonstrate both that the HQL requirement temporarily bans handgun acquisition and that it was intended to deter, and has deterred, tens of thousands of law-abiding, responsible Maryland citizens from exercising their core Second Amendment right to possess handguns for self-defense in the home.

The HQL requirement is unconstitutional because it effects a ban on handgun acquisition that is inconsistent with the Second Amendment's text, history, and tradition. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."). *Heller* made clear that a handgun ban extending "to the home, where the need for defense of self, family, and property is most acute" is per se unconstitutional. *Id.* at 628–29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,' would fail constitutional muster."). The HQL requirement is a ban that extends to the home, so it is unconstitutional. And even if not considered a permanent or outright ban, the HQL requirement is unconstitutional because it is inconsistent with the Second Amendment's text, history, and tradition. There is no historical antecedent for conditioning the right to acquire a

firearm on submitting fingerprints or undergoing training, including the live fire of a handgun, and Defendants fail to demonstrate that any existed.

The HQL requirement is also unconstitutional under the United States Court of Appeals for the Fourth Circuit's two-part approach, which first examines whether the challenged law burdens conduct protected by the Second Amendment and then whether the State carried its burden to demonstrate the challenged law survives heightened scrutiny. *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc). Under the first part, the law of the case and the undisputed facts establish that the HQL requirement burdens conduct protected by the Second Amendment—the right of law-abiding, responsible Maryland citizens to acquire a handgun for self-defense in the home. The law of the case and the undisputed facts also establish that the HQL requirement burdens firearm retailers' protected Second Amendment right to sell handguns to these individuals. Under the second part, strict scrutiny is appropriate because Fourth Circuit case law is clear that the right of law-abiding, responsible Maryland citizens to acquire and possess a handgun for self-defense in the home is the Second Amendment's core right and that burdens on the core right must be reviewed using strict scrutiny. The HQL requirement fails strict or even intermediate scrutiny because Defendants have not demonstrated that the HQL requirement advances public safety in Maryland. The undisputed facts establish the opposite. The HQL requirement adds an unnecessary burden to the Second Amendment right to purchase and sell handguns. It therefore is not appropriately tailored, and summary judgment for Plaintiffs is appropriate.

**Procedural History**

Plaintiffs filed their Amended Complaint on December 28, 2016, alleging that the HQL requirement violates on its face the Second Amendment right to purchase and sell handguns. Am. Compl., ECF 14. Defendants moved to dismiss, arguing that Plaintiffs lacked standing and that

their causes of action fail as a matter of law. Defs. Mot. to Dismiss, ECF 18. The Honorable Marvin J. Garbis denied Defendants' motion with respect to Plaintiffs' Second Amendment cause of action, noting that "Defendants do not deny that the HQL Provision and implementing regulations burden conduct within the scope of the Second Amendment, namely, the ability of a law-abiding citizen to attain a handgun for use in the home for self defense." Order on Defs. Mot. to Dismiss, ECF 34, at 13. Judge Garbis stated that it was "premature" to choose between strict or intermediate scrutiny but held that the HQL requirement "do[es] implicate the core right of the Second Amendment." *Id*. at 17–19. Judge Garbis distinguished Plaintiffs (who are law-abiding and responsible) and the HQL requirement (which burdens the core right) from previous Fourth Circuit Second Amendment precedent that applied intermediate scrutiny because the plaintiffs were not law-abiding and responsible or the challenged law did not burden the core right. *Id*. at 17.

After conducting extensive discovery, the parties filed cross-motions for summary judgment. This Court held that Plaintiffs lacked standing, dismissed the case in its entirety, and entered judgment for Defendants. Mem. Op., ECF 102.

The Fourth Circuit reversed and remanded, holding that Plaintiff Atlantic Guns, Inc. ("Atlantic Guns"), has standing to assert a Second Amendment cause of action, both "to bring its own, independent Second Amendment claim" that the HQL requirement infringes its right to sell handguns and "to bring a Second Amendment claim as to its customers' right to purchase firearms." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 214, 216 (4th Cir. 2020). Atlantic Guns has standing to assert its right to sell because, among other things, "the HQL requirement undoubtedly constrains Atlantic Guns' ability to sell handguns and limits its potential customer base." *Id*. at 213. Atlantic Guns also has third party standing to assert its customers' right to buy because the HQL requirement restricts its customers from purchasing handguns. *Id*. at 214–16.

The Fourth Circuit held that Atlantic Guns' "uncontroverted evidence" established that the HQL requirement caused Atlantic Guns to lose handgun sales and gross revenue. *Id*. at 211–12. The Fourth Circuit also held that the HQL requirement caused the injury to Atlantic Guns' Second Amendment rights and this injury would be redressed if judgment were entered in its favor. *Id*. at 212–13. Because Atlantic Guns has both "independent and third-party standing to bring a Second Amendment cause, each of the Plaintiffs has standing to bring a Second Amendment cause of action." *Id*. at 216.

## Statement of Undisputed Facts

### A.     Plaintiffs

Atlantic Guns is a family-owned firearms retailer founded in 1950 by the current owner's father. *See* Declaration of Stephen Schneider ("Schneider Decl."), Ex. 1, at ¶ 2.[1] Atlantic Guns is a licensed Maryland regulated firearms dealer. *Id*. at ¶¶ 3–4. It buys, sells, receives, and transfers firearms including handguns within and without Maryland. *Id*. at ¶ 3. Atlantic Guns' customers and prospective customers are law-abiding, responsible Maryland citizens who wish to possess handguns for self-defense in their homes but are prevented and deterred from doing so by Maryland's HQL requirement. *Id*. at ¶ 5. Handguns are the most popular firearm choice of Atlantic Guns' customers for self-defense in the home. *Id*. at ¶ 6. The HQL requirement causes Atlantic Guns to turn away would-be handgun customers weekly. *Id*. at ¶ 8. Since the HQL requirement took effect in 2013, Atlantic Guns has turned away hundreds of customers who wished to purchase handguns but lacked an HQL. *Id*. In addition to delaying or denying its customers' acquisition of handguns, the HQL requirement has severely impacted Atlantic Guns' Second Amendment right

---

[1] Plaintiffs file a redacted version of his declaration that redacts Atlantic Guns' confidential business information. An unredacted version of Mr. Schneider's declaration along with its exhibits is filed under seal identified as ECF 77-01.

to sell handguns. *Id*. at ¶ 7. According to Defendants' records, Atlantic Guns' handgun sales and revenue decreased substantially after the HQL requirement was imposed. *Maryland Shall Issue*, 971 F.3d at 211.

Plaintiff Maryland Shall Issue, Inc. ("MSI") is an "all volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms." Maryland Shall Issue, *About Us*.[2] MSI's membership includes over 1,900 law-abiding, responsible Maryland citizens, including the Individual Plaintiffs as well as numerous other individuals who do not possess an HQL but wish to acquire a handgun. Declaration of Mark Pennak ("Pennak Decl."), Ex. 2, at ¶ 2, 3; Deposition of Dana Hoffman ("Hoffman Dep."), Ex. 16, at 13:20–14:6; Deposition of John Matthew Clark ("Clark Dep."), Ex. 26, at 15:11–18; Deposition of Scott Thomas Miller ("S. Miller Dep."), Ex. 25, at 9:19–10:19; Deposition of Deborah Miller ("D. Miller Dep."), Ex. 4, at 18:5–12. The HQL requirement has deterred MSI's members from obtaining handguns because it is burdensome, time-consuming, and expensive. Clark Dep., Ex. 26, at 14:17–15:10; S. Miller Dep., Ex. 25, at 24:4–25:11; Deposition of Mark Pennak ("Pennak Dep."), Ex. 17, at 23:17–25:14.

Plaintiff Susan Brancato Vizas is a Maryland resident and MSI member. Deposition of Susan Vizas ("Vizas Dep."), Ex. 3, at 9:20–10:4. Ms. Vizas has never owned a firearm, however, in 2015, Ms. Vizas decided that she wanted to purchase a handgun for self-defense, target practice, the ability to inherent her father's gun, and other lawful purposes. *Id*. at 18:4–12, 24:14–25:10. Ms. Vizas has taken and passed the hunter safety training in the State of Maryland, but she has been dissuaded from further pursuing purchase of a handgun because of the additional costs and

---

[2]*Available at* https://bit.ly/2NG7GtR (last visited Jan. 27, 2021).

time commitment of acquiring a handgun pursuant to the HQL requirement. *Id*. at 36:20–37:3, 43:6–17.

Plaintiff Deborah Kay Miller is a Maryland resident and MSI member employed by the Department of Defense. D. Miller Dep., Ex. 4, at 8:8–12, 9:18–21, 29:10–11. Ms. Miller has never owned a firearm, however, in 2017, she decided that she wanted to purchase a handgun so that she would be able to defend herself in her own home. *Id*. at 13:17–18, 18:5–19:1. Ms. Miller understands the financial burden of purchasing a handgun and despite the financial ability to do so, she has not acquired a handgun because she cannot complete the required training under the HQL requirement due to physical limitations. *Id*. at 21:15–17, 33:1–5, 34:10–17.

**B.     Maryland's handgun possession laws**

In 1941, Maryland enacted a "Pistols" Subtitle to the Maryland Code to regulate the "sale, identification marks and possession of pistols." *See* 1941 Maryland Laws, Chapter 622. This statute prohibited selling or transferring a handgun to persons convicted of a crime of violence or to fugitives from justice. *See* Md. Code (1941), Art. 27, § 531(D)–(E), currently codified at Md. Code Ann., Pub. Safety § 5-118. Maryland has since enacted four sets of laws intended to prevent prohibited persons from acquiring handguns: the 77R Handgun Registration Requirement (1966), the Gun Violence Act of 1996, the Responsible Gun Safety Act of 2000, and the Firearms Safety Act of 2013 that included the HQL requirement.

In 1966, Maryland enacted the 77R Handgun Registration requirement. *See* 1966 Maryland Laws, Chapter 502. This law prohibited firearm dealers from transferring a handgun to a prospective purchaser "until after seven days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee, . . . and forwarded by the prospective seller . . . to the Superintendent of the Maryland State Police." Md.

Code (1966), Art. 27, § 442, currently codified at Md. Code Ann., Pub. Safety §§ 5-118, 5-120 & 5-123.

The 77R Handgun Registration application requires the prospective purchaser's identifying information, including their "name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's [license] or photographic identification soundex number, [and] occupation." Md. Code Ann., Pub. Safety § 442, currently codified at Md. Code Ann., Pub. Safety §§ 5-118, 5-121. The Maryland State Police use this information to conduct a background check on the prospective firearm purchaser, including a National Instant Background Check. *See* Deposition of Daniel Webster ("Webster Dep."), Ex. 5, at 73:1–15; Deposition of James Johnson ("J. Johnson Dep."), Ex. 7, at 19:5–21:20.

The 77R Handgun Registration requirement has ensured that individuals prohibited from possessing firearms do not acquire or possess a handgun in Maryland. *See* Deposition of Andy Johnson ("A. Johnson Dep."), Ex. 6, at 116:1–11. Maryland's compliance with the federal REAL ID Act, *see* Dept. Homeland Sec., *REAL ID Enforcement: Maryland*,[3] further ensures that the Maryland "driver's or photographic identification" is authentic because the REAL ID Act requires Maryland to "include document security features on REAL ID driver's licenses and identification cards designed to deter forgery and counterfeiting, *see* 6 C.F.R. 37.15(a)–(b).[4] Moreover, under

---

[3] *Available at* https://www.dhs.gov/real-id/maryland (last visited Jan. 27, 2021).

[4] 6 C.F.R. 37.15(a)(b) (such ID cards "must contain at least three levels of integrated security features that provide the maximum resistance to persons' efforts to – (1) Counterfeit, alter, simulate, or reproduce a genuine document; (2) Alter, delete, modify, mask, or tamper with data concerning the original or lawful card holder; (3) Substitute or alter the original or lawful card holder's photograph and/or signature by any means; and (4) Create a fraudulent document using components from legitimate driver's licenses or identification cards.") Moreover, "States must employ security features to detect false cards," including at a level of "[c]ursory examination, without tools or aids involving easily identifiable visual or tactile features, for rapid inspection at point of usage." 6 C.F.R. 37.15(c).

federal law, no Maryland resident may purchase a handgun in any state other than Maryland. 18 U.S.C. §§ 922(a)(3), (a)(5), (b)(3).

The 77R Handgun Registration process also requires Maryland citizens to wait seven business days after purchasing a handgun before taking possession of it. Md. Code Ann., Pub. Safety § 5-123(a); Maryland State Police, Licensing Division Bulletin, LD-FRU-16-001 (Jan. 22, 2016).[5] The Maryland State Police use the 77R Handgun Registration to register the applicant with the Maryland State Police as a purchaser of that particular handgun, Md. Code Ann., Pub. Safety § 5-118(a), allowing Defendants to locate and disarm individuals who subsequently become prohibited from handgun ownership, Webster Dep., Ex. 5, at 19:14–22:12.

The Gun Violence Act of 1996 made the 77R Handgun Registration requirement applicable to all handgun transfers, including gifts and private sales. Md. Code. Ann., Art. 27, § 445, currently codified at Md. Code Ann., Pub. Safety § 5-124.

The Responsible Gun Safety Act of 2000 expanded the 77R Handgun Registration requirement to require all prospective handgun purchasers complete an hour-long, online firearm safety course on Maryland firearm law, home firearm safety, and handgun mechanisms and operation. Md. Code Ann., Pub. Safety § 5-118; Deposition of James Russell ("Russell Dep."), Ex. 8, at 83:7–11. A video on CD of the 77R Handgun Registration safety course was filed previously identified as ECF 77-9 and can be viewed via Windows Media Player. The Police Training Commission created this presentation and provided it to applicants without charge. Md. Code Ann., Pub. Safety § 5-118(b)(3)(x) (2003), Ex. 10.

---

[5] *Available at* https://bit.ly/2M6OTHy.

### C.      The HQL requirement (effective October 1, 2013 – present)

Maryland now also requires all handgun purchasers to apply for and obtain an HQL before undertaking the 77R Handgun Registration process. Md. Code Ann., Pub. Safety § 5-117.1 ("Section 5-117.1"). To apply for an HQL, Maryland citizens must submit: (1) an online application and "a nonrefundable application fee to cover the costs to administer the program of up to $50"; (2) proof of completion of a qualifying safety course within three years before submitting an HQL application; (3) a complete set of fingerprints; and (4) "a statement made by the applicant under the penalty of perjury that the applicant is not prohibited under federal or State law from possessing a handgun." Section 5-117.1(f)–(g).

The HQL safety course must be live and last four hours. Section 5-117.1(d)(3). It replaces the online, one-hour 77R Handgun Registration presentation but covers the same subject areas: state firearm law, home firearm safety, and handgun mechanisms and operation. Russell Dep., Ex. 8, at 83:7–11. The HQL safety course may taken remotely as a temporary solution to issues caused by in-person gathering during the COVID-19 pandemic. In addition to the safety course, HQL applicants must also complete "a practice component in which the applicant safely fires at least one round of live ammunition." COMAR 29.03.01.29C(4). This component cannot be done remotely. *See* Maryland State Police, Licensing Division Bulletin, LD-HQL-20-002 (July 28, 2020).[6]

Unlike the 77R Handgun Registration safety course, the HQL safety course is not provided by Maryland State Police. The Maryland State Police neither attempts to control the content of the HQL safety course nor ensures that the required material is being taught. A. Johnson Dep., Ex. 6, at 66:21–68:21; Russell Dep., Ex. 8, at 114:11–19; Pennak Decl., Ex. 2, at ¶ 4. Instead, each of the

---

[6] *Available at* https://rb.gy/4tofgg (last visited Jan. 27, 2021).

hundreds of private instructors throughout Maryland may create his own course curriculum. *See* Maryland State Police, *Qualified Handgun Instructor* (stating under frequently asked question "How do instructors get the course information?" that "Instructors will be responsible for the specific course and will attest/certify that they instructed the minimum criteria required in SB281.").[7] HQL applicants are required to locate and arrange training through an approved qualified handgun instructor and rely upon that instructor to verify training of the applicant with the Maryland State Police through the instructor's on-line account. Pennak Decl., Ex. 2, at ¶ 10.

The complete set of fingerprints must be taken via "live-scan" technology by a State-certified vendor. COMAR 12.15.05.05. Applicants must pay a $30 fee to the State-certified vendor directly, plus any additional fee that the private, certified vendor decides to charge. *See* COMAR 12.15.05.07. The vendor submits the required fees to the Central Repository. COMAR 12.15.05.07; Md. Dept. Of Pub. Safety, *Fingerprinting Services/Fingerprinting Courses*.[8] An HQL application must be submitted within 72 hours of the time the prints are taken. Maryland State Police, *Fingerprinting*.[9] The Maryland State Police submits these fingerprints for a state and national criminal history records check and conducts a background check. Section 5-117.1(f). This is the same background check applicants undergo during the 77R Handgun Registration process, except the 77R Handgun Registration background check does not rerun the prospective purchaser's fingerprints. Webster Dep., Ex. 5, at 38:11–39:3.

The Maryland State Police must approve or deny an HQL application within 30 days of receiving it. Section 5-117.1(h). After the Maryland State Police approves the HQL application,

---

[7] *Available at* https://bit.ly/3s8XeLc (last visited Jan. 27, 2021).
[8] *Available at* http://bit.ly/3sZdCOW (last visited Jan. 27, 2021).
[9] *Available at* https://bit.ly/2Ygxwqn (last visited Jan. 27, 2021).

the Maryland State Police transmits the HQL to the applicant. Deposition of Diane Armstrong ("Armstrong Dep."), Ex. 11, at 220:20–22.

At this point, Plaintiffs may begin the 77R Handgun Registration process, including undergoing another background check and waiting an additional seven business days to take possession of the handgun. Webster Dep., Ex. 5, at 38:18–39:3; Md. Code Ann., Pub. Safety § 5-123. Throughout the duration of the HQL and 77R Handgun Registration processes (a minimum of 38 days and often much longer), Defendants ban Maryland citizens from purchasing, renting, or receiving a handgun and ban Maryland's firearm retailers from selling handguns to these individuals.

### D. Defendants admit that the HQL requirement's purpose and effect are to prevent law-abiding, responsible Maryland citizens from acquiring and possessing handguns.

Defendants' expert Professor Daniel Webster admits that Maryland implemented the HQL requirement to "intimidat[e]" Maryland citizens to prevent them from exercising their constitutional right to acquire a handgun. Webster Dep., Ex. 5, at 30:1–33:16. Webster's view of this legislation is particularly relevant here because he was the lead expert witness proffered by then-Senator Brian Frosh in testimony before the Maryland General Assembly in support of the legislation that became the HQL requirement. *Id.* at 165:19–175:2. Senator Frosh was the HQL requirement's primary sponsor. *Id.*

Maryland's goal of preventing handgun possession in Maryland is not new. In 1999, then-Maryland Attorney General Joseph Curran published a special report with the stated "goal" of "eliminat[ing] widespread handgun ownership through restrictive handgun licensing." J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America*, at 6, 63 (Oct. 20, 1999), Ex. 12. He reiterated in 2000 that this goal "means" that "we should restrict the future sale of handguns to those who can show a real, law enforcement need for one." Symposium: Guns as a

Consumer Product: New Public Health and Legal Strategies to Reduce Gun Violence, 4 J. Health Care L. & Pol'y 1, 5 (2000).[10] The HQL requirement implements Attorney General Curran's view that Maryland should use restrictive licensing to restrict handguns to only law enforcement personnel.

The HQL requirement is well on its way to accomplishing the goal of preventing handgun possession. From 2013 to 2017, the HQL requirement discouraged nearly one-quarter of Maryland citizens who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin an HQL application from completing it and obtaining their HQL. *Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No. 5 (from October 1, 2013 through 2017, 30,877 Maryland citizens started an HQL application but stopped before completing it) *with* Collective Ex. 15, Dep. Ex. 48, 105, 106[11] (Maryland issued 93,155 HQLs during this same time). Since 2018, 37,500 HQL applications were started but not submitted as final to the Maryland State Police. Ex. 14. Atlantic Guns' handgun sales decreased by 20 percent in the four years following the HQL requirement's enactment compared to the previous four years, confirming the HQL requirement is a barrier to handgun acquisition by law-abiding citizens. *Maryland Shall Issue*, 971 F.3d at 210, 212 (reviewing the "uncontroverted evidence of [Atlantic Guns'] economic loss," including "[Mr.] Schneider's uncontroverted testimony and declaration, along with the pertinent Maryland State Police records and Atlantic Guns' year-over-year sales records"). The precise number of law-abiding citizens who wish to exercise their Second Amendment rights but who never even start an HQL application because of the HQL requirement's burdens is unknown but

---

[10] *Available at* https://bit.ly/3pYiOQy.
[11] The parties numbered all deposition exhibits sequentially. Because these exhibits were used in multiple depositions, they are simply referred to as "Dep. Ex."

is certainly substantial. It includes at the very least the Individual Plaintiffs, many of MSI's members, and Atlantic Guns' customers. *Supra* 5–7.

>        **E.       The HQL requirement is burdensome.**

>                **1.       The HQL requirement is time-consuming.**

The HQL requirement imposes an additional statutorily-permissible 30-day waiting period. Section 5-117.1(d), (h). Defendants' review often takes much longer than 30-days. *See* Armstrong Dep., Ex. 11, at 59:15–60:8. Since the HQL requirement took effect, more than 9,700 Maryland citizens have had their HQL application denied at the 30-day mark as incomplete. A. Johnson Dep., Ex. 6, at 123:7–124:7, 127:19–128:14, 139:4–140:18; Administrative Log, Ex. 21. These HQL applications were denied not because the applicant submitted an incomplete application but because the safety course instructor failed to timely submit the Firearms Safety Training verification to the Maryland State Police or live-scan fingerprints were not transmitted by the vendor to the Central Repository. *Id.*; Armstrong Dep., Ex. 11, at 187:2–190:20. In these instances, Defendants' review took longer than 30 days through no fault of the HQL applicants. Armstrong Dep., Ex. 11, at 187:2–190:20. This delay is in addition to the 77R Handgun Registration process's mandatory seven-business-day post-purchase waiting period.

In addition to the statutory delay, completing an HQL application takes time. Prospective handgun purchasers must begin an application, find a firearm instructor, complete a half day of firearm instruction in a classroom format, complete the live-fire requirement, locate a live-scan fingerprint vendor, obtain fingerprints, and complete their application online.

The safety course with live-fire requirement is burdensome. HQL applicants must schedule and attend a safety course. Hoffman Dep., Ex. 16, at 22:16–23:1, 24:6–14. The HQL safety course alone requires at least a half day of instruction. Section 5-117.1(d)(3)(i). Then, the applicant must ensure that the HQL instructor submits the training verification to the Maryland State Police.

Armstrong Dep., Ex. 11, at 47:1–48:12, 187:2–190:20. The live-fire requirement imposes upon HQL applicants the burden to locate, schedule, and travel to a shooting range. There are no ranges in Baltimore City or other urban areas accessible by mass transportation, requiring urban residents to travel outside their cities for this training. *See* Pennak Decl., Ex. 2, at ¶¶ 15–19; A. Johnson Dep., Ex. 6, at 53:1–14; *see also* Russell Dep., Ex. 8, at 128:22–129:16. This difficulty affects more than a million Maryland citizens. Pennak Decl., Ex. 2, at ¶¶ 12–13, 18. The live-fire requirement also requires the applicant to secure a firearm and ammunition. *See* Russell Dep., Ex. 8, at 176:16–177:14, 182:18–183:6.

The fingerprint requirement is burdensome. The applicant must locate a fingerprint live-scan vendor approved by the Maryland State Police, travel to that vendor, and have his or her fingerprints taken. Armstrong Dep., Ex. 11, at 91:8–92:19. In contrast to shooting ranges that cannot be found in urban areas, there are hardly any private fingerprinting vendors in rural areas, including no vendors at all in small towns and even some entire counties, necessitating long drives. *See* Md. Dept. of Pub. Safety, Fingerprinting Services/Fingerprinting Courses.[12] For example, there are no private vendors at all in Somerset, Kent, or Caroline Counties and only one vendor in Queen Anne's County in Stevensville. *Id.* There is no vendor north or east of Stevensville until Elkton in Cecil County on the Eastern Shore. *Id.* West of the Chesapeake Bay, there is only one vendor in all of Calvert County and only three in St. Mary's County. *Id.* Western Maryland is also poorly served, with only two vendors in Allegany County, located in Cumberland and Frostburg and only eleven miles from each other. *Id.* There are no vendors at all between Frostburg and McHenry in Garrett County to the west and between Cumberland and Hagerstown in Washington County to the east. *Id.*

---

[12] *Available at* https://bit.ly/2YiqNw0 (last visited Jan. 27, 2021).

Once all of these steps are completed, the applicant must then log back online to complete his application. The inconvenience and daunting complexity of all this are self-evident and are confirmed by the volume of HQL-related complaints and questions received by the Maryland State Police, totaling more than 40 phone calls and 50 emails per day. Armstrong Dep., Ex. 11, at 101:22–103:13, 139:18–140:12. The burdensomeness of this process also is confirmed by the fact that nearly 25 percent of Maryland citizens who initiate an HQL application do not complete it. *Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No. 5 (from October 1, 2013 through 2017, 30,877 Maryland citizens started an HQL application but stopped before completing it) *with* Collective Ex. 15 (Maryland issued 93,165 HQLs during this same time). More than 55,556 HQL applications were initiated but not completed through 2017 and another 37,500 since then, totaling more than 93,000 applications initiated but not completed. Ex. 14. In these instances, Defendants have significantly delayed, if not outright deprived, a law-abiding Maryland citizen of his Second Amendment right to acquire a handgun. Many more law-abiding citizens like the Individual Plaintiffs are too daunted by the HQL requirement's burdens to even start an HQL application.

### 2.     The HQL requirement is expensive.

An HQL application costs well over $200. This includes $50 to submit the application, Handgun Qualification License, *Maryland State Police*,[13] $100 or more to complete the safety course and live-fire requirement, Pennak Decl., Ex. 2, at ¶ 7, about $50 or more for live-scan fingerprints, a $30 fee for fingerprint background check, and service fees charged by the vendor. Pennak Dep., Ex. 17, at 22:15–19; Ex. 18; Schneider Dep., Ex. 19, at 17:7–18. This does not include the costs of traveling to the fingerprint vendor and shooting range to complete the live-fire requirement. By way of comparison, the average cost of a new handgun in Maryland in 2018 was

---

[13] *Available at* https://bit.ly/2MORpSZ (last visited Jan. 27, 2021).

between approximately $500 and $600. Schneider Decl., Ex. 1, at ¶ 10. The $200+ out-of-pocket costs of obtaining an HQL, plus the costs of time off from work and travel, is a disproportionate financial burden on the exercise of a constitutional right. Under the 77R Handgun Registration process, the cost was only $10 and required no time off from work to attend training or obtain fingerprinting.

### F.     The HQL requirement is unnecessary and ineffective.

#### 1.     The additional 30-day delay is unnecessary.

Prior to the HQL requirement, Defendants investigated all potential handgun purchasers in seven days. Md. Code Ann., Pub. Safety § 5-118; *id.* at § 5-123(a). Defendants have not provided any support to justify a 30-day delay to process an HQL application. Defendants' concession that some "Handgun License applications have been processed the same business day that they are received" confirms that the additional 30-delay allowed Section 5-117.1 is unnecessary. Col. Pallozzi Interrog. Resp., Ex. 20, No. 7.

Nearly 10,000 HQL applications have not been processed within 30 days. *See* Administrative Log, Ex. 21; Declaration of Connor Blair, Ex. 27, at ¶ 8; Armstrong Dep., Ex. 11, at 187:2–190:20. The primary reason for these delays is not the fault of the applicant. Instead, it is because the safety course instructor failed to timely submit the Firearms Safety Training verification to the Maryland State Police or the live-scan vendor failed to submit the live-scan fingerprints to the Central Repository. A. Johnson Dep., Ex. 6, at 123:7–124:7, 127:19–128:14, 139:4–140:18; Administrative Log, Ex. 21; Armstrong Dep., Ex. 11, at 187:2–190:20. With such significant delay attendant to processing and providing HQL applications, Defendants' failure to justify the necessity of the 30-day delay, let alone an extended indefinite delay in almost 10,000 applications, is a critical failure in carrying their burden of proof.

### 2.    The fingerprint requirement is unnecessary.

The fingerprint requirement is unnecessary to positively identify handgun purchasers because, as Defendants admit, the pre-existing 77R Handgun Registration already did so. Maryland State Police's corporate designee testified that:

> Q: Under the 77R process then and now individual purchasers of handguns are checked to see whether or not they are legally able to possess a handgun; correct?
>
> A. Yes.
>
> Q. And if they are legally able to possess a handgun under the 77R process, presumably they would also pass the [HQL] application process and obtain an HQL; correct?
>
> A. Yes.

A. Johnson Dep., Ex. 6, at 116:1–11; *see also* Webster Dep., Ex. 5, at 38:9–39:3 (HQL background check is not "materially different" from subsequent 77R Handgun Registration background check); Supplemental Declaration of Gary Kleck ("Kleck Supp. Decl."), Ex. 28, at ¶ 15 (fingerprinting is not necessary as disqualified persons virtually never use a false name at a retail seller to acquire a firearm). Defendants positively identified with certainty all 77R Handgun Registration applicants without requiring fingerprints. A. Johnson Dep. Ex. 6, at 112:8–11 ("Q. All right. The 77R required positive identification of an applicant to purchase a handgun; correct? A. Yes, sir.").

The fingerprint requirement is also unnecessary for Defendants to locate and disarm handgun owners who are subsequently disqualified from handgun ownership because, as Defendants admit, the 77R Handgun Registration process already allowed Defendants to locate and disarm handgun owners who were subsequently disqualified from handgun ownership. Webster testified:

> Q: . . . When I purchase a handgun in Maryland, it's registered with the Maryland State Police; am I correct?
>
> A. That's correct.

> Q. And the Maryland State Police has a registry of handgun ownership such that, if I were to be convicted of a disqualifying offense, they could readily look me up, determine if I owned a handgun, and dispossess me of that handgun; correct?
>
> A. That's correct.

Webster Dep., Ex. 5, at 19:14–20:3. Webster confirmed that Defendants have "always been able to do that." *See id.* at 20:4–14.

The fingerprint requirement is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government-issued photographic identification of another individual who does not have a criminal record. Defendants have no evidence that anyone in Maryland has ever attempted to purchase a handgun in such circumstances. A. Johnson Dep., Ex. 6, at 114:4–117:7. Because Maryland is now a REAL ID compliant state, there is no likelihood that false Maryland identification will be used for such a purchase. The fingerprint requirement is unnecessary.

### 3. The HQL safety course with live-fire requirement is unnecessarily burdensome.

The half-day, classroom training requirement is unnecessary because, as Defendants admit, it teaches the same curricula as the one-hour, pre-recorded 77R Handgun Registration course requirement. *Supra* 10. Defendants concede that there is no difference between the old and new courses' curricula, Russell Dep., Ex. 8, at 80:6–83:11, except that the classroom format allows for questions and answers. Defs. MSJ, at 28. But Defendants submit no evidence that there are any questions asked or answered in these training sessions, whether online or in person.

The live-fire requirement is also unnecessary because, as Defendants admit, firing a single round with a handgun is not helpful to acquire skills of safe operation and handling of a firearm. J. Johnson Dep., Ex. 7, at 52:14–53:2; *see* Russell Dep., Ex. 8, at 106:8–108:7. The live-fire requirement does, moreover, require that the instructor and the student travel to a range to fire the

one live round required by the Maryland State Police. Under local laws applicable to millions of Maryland citizens who live in the urban areas of Maryland, that discharge of live ammunition can only be conducted at an established shooting range, of which there are very few in or around urban areas, including none in the City of Baltimore. Pennak Decl., Ex. 2, at ¶¶ 13–22. This was known to the Maryland State Police when they promulgated its live-fire regulation. Pennak Decl., Ex. 2, at Ex. A, 8–12.

### 4.    The HQL requirement is ineffective.

The HQL requirement has not improved public safety. Comparing Maryland crime data for the four years prior to the six years since the HQL requirement took effect, the following have all increased: homicides, shooting homicides, handgun homicides, shooting homicide rates, handgun homicide rates, and the number of recovered handguns used in crime. *See* Md. Criminal Statistical Data, Ex. 22. The HQL requirement has not reduced firearm homicides. *See* A. Johnson Dep., Ex. 6, at 98:7–99:10; Moody Decl., Ex. 23, at ¶ 8; *see also* Ex. 22. Broadly speaking, permit-to-purchase laws, like the HQL requirement, are not associated with any reduction in a state's firearm homicide rate. Moody Decl., Ex. 23, at ¶¶ 4, 17; *See* Kleck Decl., Ex. 24, at ¶¶ 5–23; Kleck Supp. Decl., Ex. 28, at ¶¶ 5–9. In Baltimore, the homicide rate has skyrocketed since the HQL requirement took effect, Ex. 22, topping all other major cities in 2017, *see* Luke Broadwater and Ian Duncan, *'Neighborhoods are crying out': Baltimore has highest homicide rate of U.S. big cities*, The Baltimore Sun, Sept. 25, 2018.[14] The homicide rate in Baltimore increased sharply in 2015 and has remained high ever since. *E.g.*, Daniel Webster and Rebecca Williams, *Reducing Violence and Building Trust Data Guide Enforcement of Gun Laws in Baltimore*, Johns Hopkins

---

[14] *Available at* https://bit.ly/2KHZXKy.

Bloomberg School of Public Health Center for Gun Policy and Research, at 12 (June 4, 2020)[15];

Everytown for Gun Safety, *Gun Violence in Maryland*, at 1 (Feb. 2020)[16]; Phil Davis and Phillip

Jackson, *With Baltimore close to the 300-homicide mark again, leaders mull new approaches amid*

*some signs of improvement*, The Baltimore Sun, Nov. 20, 2020 ("Baltimore's homicide streak

began in 2015. . . .")[17].

In the four years since the HQL requirement's enactment, Maryland did not experience a

slower rate of growth in firearm homicide rates compared to states that do not have permit-to-

purchase laws like the HQL requirement. Moody Decl., Ex. 23, at ¶¶ 4, 12–14, 16–17. It is

unsurprising that the HQL requirement has not improved public safety in Baltimore or throughout

Maryland because the HQL requirement regulates handgun transactions in Maryland, but "[n]early

two-thirds of guns associated with crime in Baltimore come from out of state. And Maryland

overall now has the highest rate of out-of-state crime gun 'imports' in the country." Ron Cassie,

*The high-capacity handguns fueling Baltimore's epidemic of violence increasingly enter the city*

*through an underground network of out-of-state traffickers. Can anything be done to turn off the*

*spigot?*, Baltimore Magazine (Dec. 2020).[18]

The fingerprint requirement, specifically, is ineffective. It does not deter straw purchasing

or purchasing with a false identification. J. Johnson Dep., Ex. 7, at 24:4–12. Defendants have no

evidence that the HQL requirement has stopped or deterred a single straw purchaser. *Id*. at 25:10–

16. Nor have Defendants attempted to determine the prevalence of straw purchasers in Maryland.

*Id*. at 28:6–14; A. Johnson Dep., Ex. 6, at 76:16–22. Likewise, Defendants have no information

---

[15] *Available at* https://bit.ly/39fwIs2.

[16] *Available at* https://bit.ly/3a4JTvg.

[17] *Available at* https://bit.ly/3prQGW0.

[18] *available at* https://bit.ly/3sT8gV9.

regarding the number of purchases made with a false identification, information demonstrating that the HQL requirement has reduced the number of handguns recovered in crime, or information demonstrating that the HQL requirement has reduced the number of firearms it recovers from prohibited individuals each year. A. Johnson Dep., Ex. 6, at 78:3–79:4, 88:21–89:2, 109:17–110:11, 110:22–111:9, 117:3–7. Instead, Maryland implemented the fingerprint requirement, under the guise of deterring straw purchasers, to "intimidat[e]" Maryland citizens and keep them from exercising their constitutional right to acquire a handgun. Webster Dep., Ex. 5, at 30:1–33:16; *see also* J. Johnson Dep., Ex. 7, at 24:14–25:3.

The HQL safety course with live-fire training requirement also is ineffective. The undisputed facts confirm that the live-fire training has had no positive effect on public safety in Maryland. Defendants have no information regarding the number of unintentional accidental shootings in Maryland each year. A. Johnson Dep., Ex. 6, at 75:17–76:11. Defendants present no evidence demonstrating that accidental shootings are a problem, and Defendants' expert admits that the live-fire requirement is not adequate. J. Johnson Dep., Ex. 7, at 52:14–53:2. Nor do Defendants present any information demonstrating that the HQL requirement has affected gun storage practices in Maryland or that gun storage is a problem in Maryland. A. Johnson Dep., Ex. 6, at 109:17–110:11.

### Standard of Review

Federal Rule of Civil Procedure 56 requires that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To defeat a motion for summary judgment, Defendants must do more than create "some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Defendants must demonstrate a genuine issue to a material fact. *Id*.

Defendants have the burden to establish the constitutionality of the HQL requirement. *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012) (remanding Second Amendment challenge to the district court because the State had not satisfied its burden of demonstrating the statute's constitutionality); *see also Cox v. City of Charleston, SC*, 416 F.3d 281, 284 (4th Cir. 2005) ("An ordinance that requires individuals or groups to obtain a permit before engaging in protected speech is a prior restraint on speech. . . . As a prior restraint, the Ordinance is laden with 'a heavy presumption against its constitutional validity,' and the City bears the burden of proving its constitutionality."). Defendants must carry their burden whether the Court analyzes the constitutionality of the HQL requirement under the text, history, and tradition standard or under the two-part approach. *See Corcoran v. Sessions*, 261 F. Supp. 3d 579, 598 n.37 (D. Md. 2017) ("While a cursory search for arguably relevant evidence revealed cases and a Maryland Attorney General opinion tracing the history of the Maryland Firearms Prohibitions as well as relevant social science studies, it is for the State Defendants to marshal the appropriate evidence, not the Court.").

**Argument in Support of Plaintiffs' Cross-motion for Summary Judgment**

The HQL requirement violates Maryland citizens' fundamental right to acquire a handgun in the home for self-defense, whether analyzed under the Supreme Court's text, history, and tradition analysis or under the Fourth Circuit's two-part approach. *Heller*, 554 U.S. at 628–29; *McDonald v. Chicago*, 561 U.S. 742, 750 (2010); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quotation omitted, collecting cases), *cert. denied*, 138 S. Ct. 1988 (2018). It also violates Maryland's firearm retailers' right to sell handguns. *Maryland Shall Issue*, 971 F.3d at 214 (holding that Atlantic Guns has standing to assert its Second Amendment right to sell handguns).

-23-

A.     **The HQL requirement is unconstitutional because it is inconsistent with the Second Amendment's text, history, and tradition.**

In *Heller*, the Supreme Court struck down as unconstitutional a handgun ban and provided an extensive analysis of the Second Amendment's text, history, and tradition, establishing the process for determining whether a challenged law violates the Second Amendment. *Heller*, 554 U.S. at 576–625. Firearm regulations that are not rooted in the text, history, and tradition of the Second Amendment are unconstitutional because they are not consistent with the Second Amendment. *See id. Heller* established that a ban of handguns—a class of firearms that are commonly possessed by law-abiding citizens—is inconsistent with the text, history, and tradition of the right and the Court should not resort to any further analysis. *Id.* at 636. Because there is no textual or historical support for a handgun ban, it is a policy choice that is simply "off the table," and is unconstitutional per se. *Id.*

*Heller* precludes interest-balancing by "future legislatures or (yes) even future judges." *Id.* at 634–35 (declining to adopt either Justice Breyer's explicit interest-balancing inquiry or the enhanced intermediate or strict scrutiny often applied in the First Amendment arena). The Court held that such interest-balancing is inappropriate because the Second Amendment was "the very *product* of interest balancing" at the time of its enactment, and the right of law-abiding, responsible citizens to use arms is elevated above all other interests. *Heller*, 554 U.S. at 635 (emphasis in original). Like the Second Amendment, several other individual rights are subject to "categorical constitutional guarantees" rather than open-ended balancing tests. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1283 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (citing *Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) (recognizing a categorical constitutional guarantee under the Sixth Amendment for the accused to be confronted with the witness against him)). Consistent with this approach, the Court struck down a handgun ban notwithstanding

evidence that handgun violence presents a serious problem in the United States. *Heller*, 554 U.S. at 634–35.

The Supreme Court's subsequent *McDonald* and *Caetano* decisions that affirmed *Heller*'s text, history, and tradition standard is the only proper analysis for evaluating the constitutionality of the HQL requirement. *McDonald*, 561 U.S. at 790–91 (rejecting the notion that judges will be forced to make difficult empirical judgments because doing so is precluded by the Court's holding and analysis in *Heller*); *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027–28 (2016) (vacating and remanding where state supreme court failed to apply *Heller*'s reasoning and analysis to a stun gun ban). In both cases, the Supreme Court stayed true to *Heller*'s text, history, and tradition analysis and chose not to engage in any form of interest balancing. Taken together, *Heller*, *McDonald*, and *Caetano* are unequivocal: the only analysis for a handgun ban is *Heller*'s text, history, and tradition approach, which demonstrates that such a ban is unconstitutional per se.

Justices Gorsuch, Kavanaugh, and Barrett, who joined the Supreme Court after *Heller*, have expressed their agreement with *Heller*'s standard. *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1527, 1541 (2020) (Justice Gorsuch joining Section IV.A of Justice Alito's dissent, which would have held a city ordinance unconstitutional under *Heller*'s text, history, and tradition analysis); *id.* at 1527 (Kavanaugh, J., concurring) (citing *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.")); *Kanter v. Barr*, 919 F.3d 437, 464–65 (7th Cir. 2019) (Barrett, J., dissenting) (analyzing history and tradition to conclude that the government may not categorically disarm non-violent felons).

Maryland bans its law-abiding citizens from acquiring handguns unless they first obtain an HQL. Maryland also bans its firearm retailers from selling handguns to law-abiding, responsible citizens who lack an HQL. Section 5-117.1's plain language makes clear that this is a ban, prohibiting with narrow exception all Maryland citizens from "purchas[ing], rent[ing], or receiv[ing] a handgun" unless they "possess[] a valid handgun qualification license issued to the person by the Secretary in accordance with this section." Section 5-117.1(b)–(c). Maryland added to its already-effective 77R Handgun Registration requirement the complex and burdensome requirements of the HQL application that impose an additional delay of 30 days or more upon a law-abiding citizen seeking to acquire a handgun. Burdening the acquisition of a handgun with an unnecessary regulatory scheme is a ban plain and simple. Under *Heller*, the inquiry ends here and the HQL requirement cannot stand.

Even if the HQL requirement is not considered a permanent or outright ban, it is unconstitutional under *Heller* because it is inconsistent with the Second Amendment's text, history, and tradition. There is no historical antecedent for the HQL application's requirements (whether individually or taken together), and Defendants present no evidence of any. There is no historical antecedent for training as a prerequisite on the exercise of the right. Defendants note that firearm owners have historically been responsible but present no evidence that the exercise of the right has been conditioned upon satisfying a training requirement. Defs. MSJ, at 25–26. There is no antecedent for either a live fire exercise or fingerprinting as a prerequisite to the exercise of the right.

Defendants cite *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*BATFE*"), 700 F.3d 185 (5th Cir. 2012), for evidence that certain colonial-era laws "[kept] track of who in the community had guns." *Id*. at 200. Not only is the

HQL requirement not a firearms registry—the 77R Handgun Registration does this—but the laws referenced in *BATFE* were not firearm registries as a prerequisite to ownership. *Id*. (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 508–09 (2004)). These militia laws were not at all analogous to the HQL requirement, which mandates extensive training, a live fire exercise, fingerprinting, and multiple background checks before law-abiding, responsible Maryland citizens may purchase a handgun for self-defense in their homes. They were instead laws mandating firearm possession for militia use. Cornell & DeDino, *supra*, at 508–09. Those who did not possess firearms and did not show up for "musters" (with the arms they already possessed) were fined. *Id*. at 509–10. The colonial era laws referenced in *BATFE* did not regulate or condition firearm possession, like the HQL requirement does.

Because the HQL requirement is inconsistent with the Second Amendment's text, history, and tradition, it is unconstitutional.

**B.      The HQL requirement is unconstitutional because it is a pretext to reduce the exercise of a constitutional right.**

Defendants' purported public safety interests are an unconstitutional pretext for preventing law-abiding Maryland citizens from acquiring and possessing handguns. Maryland enacted the HQL requirement to "intimidate" the citizens of Maryland from acquiring a handgun as part of a restrictive licensing scheme designed to impede handgun purchases. Webster Dep., Ex. 5, at 30:1–33:16; *see also* J. Johnson Dep., Ex. 7, at 24:14–25:3. Second Amendment jurisprudence makes clear that this is unconstitutional. *State v. Reid,* 1 Ala. 612, 616–17 (1840) ("A statute which, under the pretense of regulating, amounts to a destruction of the right . . . [is] clearly unconstitutional.") (cited in *e.g.*, *Heller*, 554 U.S. at 629).

In *Saenz v. Roe*, 526 U.S. 489 (1999), the Supreme Court held that "[i]f a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'" *Id.* at 499 n.11 (quoting *United States v. Jackson*, 390 U.S. 570, 581 (1968) (brackets and ellipsis the Court's)); *see also Murdock v. Commonwealth of Pa.*, 319 U.S. 105, 110–11 (1943*)* (the state may not enact a law for the purpose of reducing the exercise of a constitutional right). Nor may a state suppress adverse secondary effects of a constitutional right by suppressing the right itself. *See, e.g.*, *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 449–50 (2002) (Kennedy, J., concurring) ("It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech.").

This principle applies with equal force in the Second Amendment context. For instance, in *Heller v. District of Columbia* ("*Heller III*"), 801 F.3d 264 (D.C. Cir. 2015), the United States Court of Appeals for the District of Columbia Circuit struck down the District's ban on registering more than one pistol per month. *Id.* at 280. The District defended that ban by claiming that the registration requirement at issue advanced police protection by allowing police to check the registry before approaching an individual or their home. *Heller III*, 801 F.3d at 298. But because the District admitted that it did not actually check the registry, the Court held that this justification could not be used to support the law at issue. *Id.* The District also defended the ban because it "promote[d] public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* The court rejected that defense because "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Id.*; *see also Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. Dist. of Columbia*, 864 F.3d 650 (D.C.

Cir. 2017) ("it is not a permissible strategy to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right" (quotation marks omitted)).

Maryland has long had the stated "goal" of "eliminat[ing] widespread handgun ownership through restrictive handgun licensing." Ex. 12, at 6. The HQL requirement effectuates the goal of reducing Maryland citizens' exercise of their Second Amendment constitutional rights. The HQL requirement is intended to intimidate Maryland citizens from exercising their constitutional rights, *see* Webster Dep., Ex. 5, at 30:1–33:16, and it has indisputably had this effect. *Supra* 11–13. Defendants' interests are pretextual, and the HQL requirement fails any level of scrutiny for this reason alone.

The undisputed facts demonstrate that Maryland's public safety interest is a pretext to further burden and deter law-abiding Maryland citizens from acquiring a handgun. For example, Defendants claim that fingerprints could be used to identify HQL holders who subsequently become disqualified from possessing a firearm, but the Maryland State Police does not actually do this. A. Johnson Dep., Ex. 6, at 136:11–16. Defendants' claim is akin to the District of Columbia's unsubstantiated and unsuccessful claims in *Heller III*. Similarly, Defendants concede that they do not monitor, control, or govern the HQL safety course's content. *E.g.*, *id.*, at 66:21–68:21. Defendants instead allow individual HQL instructors to create their own curricula, allowing for substantial variation between courses. Russell Dep., Ex. 8, at 67:18–68:2, 69:18–71:8. The exceptions to the safety course with live-fire requirement further illustrate the pretextual nature of Defendants' claimed interests. Those who move to Maryland are required to register their handgun within 90 days of establishing residency but are not required to take any safety course. Md. Code Ann., Pub. Safety § 5-143(a). Likewise, applicants with a hunting license from any jurisdiction are

exempted from the live-fire requirement whether or not the hunting training involved live-fire of a handgun. A. Johnson Dep., Ex. 6, at 68:17–21. Defendants concede that their justification for this requirement is specious because they admit that "firing one round is not adequate." J. Johnson Dep., Ex. 6, at 52:9–53:2; *see also* Pennak Decl., Ex. 2, at ¶¶ 7–19. This requirement is designed to erect a barrier to access for those living in urban areas like Baltimore City where no ranges can be found or reached by mass transportation. The undisputed facts demonstrate that the HQL requirement is a pretext to further burden and discourage law-abiding Maryland citizens from acquiring a handgun.

     **C.**    **The HQL requirement is unconstitutional under the two-part approach used by the Fourth Circuit.**

The HQL requirement is also unconstitutional under the two-part analysis employed by the Fourth Circuit. *Kolbe*, 849 F.3d at 133. Under this analysis, a court must first determine whether the challenged law burdens conduct protected by the Second Amendment as it was historically understood. *Id*. at 133. If it does, the court must then apply an appropriate form of heightened scrutiny. *Id*. The HQL requirement burdens conduct within the Second Amendment's guarantee. Strict scrutiny is the only appropriate level of scrutiny because the HQL requirement burdens the Second Amendment's core right. And the HQL requirement cannot survive strict scrutiny because it is not the least restrictive alternative to achieve a compelling interest.

     **1.**    **The HQL requirement burdens conduct within the scope of the Second Amendment's guarantee.**

Both Defendants and the Fourth Circuit agree that the HQL requirement burdens conduct within the scope of the Second Amendment's guarantee. In denying Defendants' Motion to Dismiss, Judge Garbis noted that "Defendants do not deny that the HQL Provision and implementing regulations burden conduct within the scope of the Second Amendment, namely, the ability of a law-abiding citizen to attain a handgun for use in the home for self defense." Order

on Defs. Mot. to Dismiss, ECF 34, at 13. The Fourth Circuit confirmed that the HQL requirement burdens conduct within the scope of the Second Amendment's guarantee by holding that "the HQL requirement undoubtedly constrains Atlantic Guns' ability to sell handguns and limits its potential customer base" and that this "injury is redressable because the injunctive relief sought here would allow it to sell handguns to a broader range of potential customers." *Maryland Shall Issue*, 971 F.3d at 214. Atlantic Guns brings only a Second Amendment challenge to the HQL requirement. By holding that Atlantic Guns' Second Amendment injury is redressable, the Fourth Circuit necessarily held that the HQL requirement injures (*i.e.*, burdens) conduct within the scope of the Second Amendment. *See id. Heller* is clear: "Whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The HQL requirement burdens precisely this right and falls squarely within the scope of the Second Amendment.

The HQL requirement is not presumptively constitutional. It does not fit within the longstanding regulations noted in *Heller*. *Id*. at 626–27 n.26 (noting as "presumptively constitutional lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms"). The HQL requirement affects law-abiding and responsible citizens and is not a longstanding prohibition or condition on the commercial sale of arms. Both courts to address government-imposed delays on handgun acquisition agree. In *Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal. 2014), the United States District Court for the Eastern District of California stated that "in terms of *Heller*'s longstanding presumptively lawful regulations, Defendant has not established that the 10-day waiting period is a presumptively lawful longstanding regulatory measure that imposes a condition and qualification on the commercial sale

of a firearm." The United States Court of Appeals for the Ninth Circuit confirmed this, finding that historically, "[d]elays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business." *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 945 (2018).

Defendants cursorily and incorrectly argue that the HQL requirement imposes "conditions" but not a "burden" on this right. Defs. MSJ, at 13–14, relying on *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 873 (1992) (evaluating a restriction on abortion rights under a very different "undue burden" standard). Defendants cite no authority for this semantical distinction here, and none exists. To the contrary, in the analogous First Amendment context, the Supreme Court has held that "requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens holding [certain views]." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002).

Defendants also incorrectly argue that "plaintiffs have failed to identify even a single individual who was deterred from purchasing a handgun due to the HQL law" and have also failed to "produce[] any evidence that any law-abiding, responsible citizen has been deprived of the right to purchase a handgun for in-home self-defense due to any inability to comply with the HQL law." Defs. MSJ, at 13. The record is replete with evidence of individuals who have been deterred from obtaining a handgun because of the HQL requirement. Both Individual Plaintiffs have been so deterred. The undisputed facts demonstrate that Ms. Vizas wanted to purchase a handgun for self-defense, target practice, the ability to inherent her father's gun, and other lawful purposes but has not because of the additional costs and time commitment of acquiring a handgun pursuant to the HQL requirement. Vizas Dep., Ex.3, at 18:4–12, 24:14–25:10. 36:20–37:3, 43:6–17. Ms. Miller, too, decided that she wanted to purchase a handgun for self-defense in her home but has not

because she has a physical disability that would make it very difficult to sit through the four hours of classroom training required by the HQL requirement, thereby making it futile for her to apply. Miller Dep., Ex. 4, at 13:17–18, 18:5–19:1, 33:1–34:17.

MSI's members have also been deterred from obtaining a handgun due to the HQL requirement. The undisputed facts confirm that MSI members Scott Miller and John Clark have not acquired a handgun because of the HQL requirement's burdens. Miller Dep., Ex. 25, at 24:4–25:11; Clark Dep., Ex. 26, at 14:22–19:15.

Evidence of Atlantic Guns' handgun sales confirms the HQL requirement deters its customers from acquiring a handgun. *See Maryland Shall Issue*, 971 F.3d at 213 ("Atlantic Guns has turned away customers who lacked a license. Indeed, certain customers had even gone so far as to put down a deposit—which Atlantic Guns returned when they failed to acquire an HQL. . . . [P]rospective handgun purchasers have confirmed that they have 'been deterred from purchasing a handgun because of the HQL law.'"). Defendants' own records demonstrate beyond dispute that the HQL requirement has severely impacted Atlantic Guns' business. Schneider Decl., Ex. 1, at ¶ 9 & Ex. A. In the four years since the HQL requirement took effect (2014–2017), Atlantic Guns has lost approximately 20 percent of its average annual handgun sales compared to the four-year period preceding the HQL requirement's implementation in 2013 (2009–2012).[19] *Id*. Atlantic Guns' uncontroverted evidence establishes that it has turned away customers on a weekly basis because they lacked an HQL, totaling hundreds of customers since the imposition of the HQL requirement. *Id*. at ¶ 8.

---

[19] Atlantic Guns' handgun sales data for the year 2013 are not used in the comparison to avoid the distorting effects of the sales increase following the Newtown shooting in mid-December 2012 and the run up of sales prior to the HQL requirement's effective date on October 1, 2013.

The individuals identified by Plaintiffs do not even include the tens of thousands of law-abiding, responsible citizens who wish to acquire a handgun for lawful purposes and have begun but not completed an HQL application or who have not even begun an HQL application at all. *Supra* 15. The undisputed facts demonstrate that the HQL requirement has discouraged at least one-quarter of Maryland citizens who wish to exercise their fundamental Second Amendment rights from doing so. *Compare* Col. Pallozzi Third Supp. Interrog. Resp., Ex. 14, No. 5 (from October 1, 2013 through 2017, 30,877 Maryland citizens started an HQL application but stopped before completing it) *with* Collective Ex. 15 (Maryland issued 93,165 HQLs during this same time); *see also* Ex. 14 (Since 2018, 37,500 HQL applications were started but not submitted as final to the Maryland State Police).

The HQL requirement's burdens are real and work to prevent law-abiding, responsible Maryland citizens from exercising their Second Amendment rights. Because the HQL requirement burdens conduct within the scope of the Second Amendment and is not presumptively constitutional, the Court must progress to the second part of the analysis and determine the level of heightened scrutiny to apply in reviewing the HQL requirement.

### 2. Strict scrutiny applies because the HQL requirement severely burdens the Second Amendment's core right.

Should the Court engage in a means-end analysis, Fourth Circuit precedent requires strict scrutiny. *See* ECF 34, at 13. From the time that it adopted the two-part analysis in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit has stated repeatedly that if a challenged law implicates the core right of a law-abiding, responsible citizen to possess a firearm in his or her home, the law is subject to a strict scrutiny analysis. For instance, in *Chester*, the defendant, a misdemeanant, unsuccessfully moved to dismiss his indictment on the grounds that the Supreme Court had identified only the mentally ill and felons as classes of persons that could be denied the

right to possess firearms. *Chester*, 628 F.3d at 673. The Fourth Circuit declined to apply strict scrutiny to the prohibition on ownership of firearms by misdemeanants, explaining:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id.* at 682–83 (emphasis in original).

The undisputed facts demonstrate that Plaintiffs possess the critical characteristic lacking in defendant Chester: they are law-abiding, responsible citizens who seek to acquire a handgun for self-defense in the home. They do not fall into any less-protected category, and a ban on their ability to acquire a handgun for self-defense in their home is subject to strict scrutiny.

Subsequently, the Fourth Circuit opined that a ban on possession of firearms in the home is subject to strict scrutiny: "As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *see also United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*."). The court in *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) agreed, adding that intermediate scrutiny applies to bearing arms outside the home, rejecting the view that would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny . . ." *Id.* at 878. In *Kolbe*, 849 F.3d at 138, the court applied intermediate scrutiny rather than strict scrutiny because the challenged law left "citizens free to protect themselves with . . . most importantly – handguns." Applicable Fourth Circuit law mandates that strict scrutiny is the proper standard of review when

a law like the HQL requirement infringes on the right of a law-abiding, responsible citizen "to arm oneself at the home." *Woollard*, 712 F.3d at 878.

> **3.      Defendants cannot meet their burden under strict scrutiny because the HQL requirement is not the least restrictive alternative to achieve a compelling interest.**

To satisfy strict scrutiny, Defendants must establish that the challenged laws are narrowly tailored to promote a compelling government interest. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 189 (4th Cir. 2013). To be narrowly tailored, the law must employ the least restrictive means to achieve the interest. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *see also Sons of Confederate Veterans, ex rel. Griffin v. Comm'r of the Va. Dep't. of Motor Vehicles*, 288 F.3d 610, 626 (4th Cir. 2002). Thus, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813. Defendants do not have a legitimate interest in discouraging the exercise of the right itself, so the only conceivable interest is to protect public safety and deter crime. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). The HQL requirement does neither. It certainly is not the "least restrictive" means of achieving those goals. Rather, the HQL requirement imposes redundant and unnecessary burdens, over and above the existing 77R Handgun Registration process, on law-abiding Maryland citizens' constitutional right to acquire a handgun. It necessarily fails strict scrutiny.

> **a.  The additional 30-day delay is not the least restrictive alternative to achieve a compelling interest.**

Maryland allows Defendants up to 30 days to approve or deny a completed HQL application (in addition to the time it takes to complete an HQL application and subsequent 77R Handgun Registration process), explicitly banning law-abiding Maryland citizens from exercising their Second Amendment right to acquire a handgun during this period. Defendants have not

articulated any interest this delay achieves, though it is presumably to ease Defendants' administrative burden in reviewing HQL applications. Defendants' administrative burden is not a compelling interest. *See Chester*, 628 F.3d at 692 (noting that "Section 922(g)(9) is not merely intended to accomplish bureaucratic shortcuts or administrative convenience") (Davis, J., concurring); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) ("Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny."); *Heller III*, 801 F.3d at 287 (Henderson, J., concurring in part and dissenting in part) (same). The undisputed fact that Defendants processed 77R Handgun Registration applications within seven business days prior to the HQL requirement, and still do every time a licensee purchases a handgun, demonstrates that the HQL requirement cannot be the least restrictive means to achieve Defendants' unidentified interests.

### b. The fingerprint requirement is not the least restrictive alternative to achieve a compelling interest.

Defendants claim the fingerprint requirement allows them to positively identify HQL applicants, allowing them to "mak[e] it more difficult for a prohibited person to obtain access to a firearm." Col. Pallozzi Interrog. Resp., Ex. 20, No. 20; A. Johnson Dep., Ex. 6, at 111:19–112:7. Defendants also claim that the fingerprint requirement allows them to disarm those who become prohibited after legally purchasing a handgun. *See* A. Johnson Dep., Ex. 6, at 40:1–3, 65:7–13.

But Defendants admit that the 77R Handgun Registration requirement already allowed Defendants to accomplish this same interest. *Supra* 18–19. Because the 77R Handgun Registration requirement was less restrictive and accomplished Defendants' interest, the HQL requirement's fingerprint requirement is necessarily not the least restrictive alternative. *Playboy*, 529 U.S. at 813.

### c. The classroom training with live-fire requirement is not the least restrictive alternative to achieve a compelling interest.

The HQL safety course requirement is not the least restrictive means to achieve Defendants' interest because the safety course required under the 77R Handgun Registration process was sufficient and less burdensome. *Supra* 20. The safety courses' curricula are substantively identical. *Compare* Md. Code Ann., Pub. Safety § 5-117.1(d) *with* Ex. 9. Defendants cannot dispute this fact because they concede that they do not control or even have the ability to monitor the content of the safety course's instruction. *E.g.*, A. Johnson Dep., Ex. 6, at 66:21–68:21. Further, by exempting those who happen to "lawfully own a [handgun]" before the HQL requirement went into effect, Section 5-117.1(e)(6), Defendants tacitly admit that the 77R Handgun Registration's safety course already achieved Defendants' interest because these individuals watched only the 77R Handgun Registration video safety presentation. Defendants also admit that the HQL's live-fire component, requiring applicants to fire a single round, is not helpful to acquiring skills of safe firearm operation and handling. J. Johnson Dep., Ex. 7, at 52:14–53:2; *see* Russell Dep., Ex. 8, at 106:8–108:7. Because the 77R Handgun Registration requirement was less restrictive and accomplished Defendants' interest, the HQL requirement's safety course with live-fire requirement is necessarily not the least restrictive alternative.

Because the HQL requirement is inconsistent with the Second Amendment's text, history, and tradition, it is unconstitutional under *Heller*. Because HQL requirement burdens the Second Amendment's core right but is not narrowly tailored to a compelling interest, it is also unconstitutional under *Kolbe*'s two-part analysis.

### Argument in Opposition to Defendants' Motion for Summary Judgment

Defendants' motion for summary judgment defended the HQL requirement only under the intermediate scrutiny standard and made no effort to justify it under either *Heller*'s text, history,

and tradition standard or strict scrutiny. Not only is the HQL requirement unconstitutional under *Heller*'s standard and under strict scrutiny, it is also unconstitutional under intermediate scrutiny.

### A.    The HQL requirement fails intermediate scrutiny.

*Kolbe* stated that intermediate scrutiny "requires the government to show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471). After *Kolbe* was decided, the Supreme Court made clear that "to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.'" *Packingham v. N.C.*, 137 S. Ct. 1730, 1732 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). This Court must use the Supreme Court's articulation of intermediate scrutiny. *See Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331, 337 n.7 (4th Cir. 1996) (stating that circuit precedent is not binding if "superseded by a decision of the Supreme Court.").

Defendants argue in a lengthy footnote that *Packingham*'s iteration of intermediate scrutiny does not apply here because "*Packingham* arose squarely within the First Amendment context and thus does not control the analysis here." Defs. MSJ, at 17 n.8. *Kolbe* refuted this argument by noting that First Amendment precedent is the proper "guide" in Second Amendment litigation. 849 F.3d at 133. The Supreme Court has also rejected this argument, stating that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780. Defendants also suggest that Justice Thomas stated the proper iteration of intermediate scrutiny in his dissent from denial of certiorari in *Silvester v. Becerra*, 138 S.Ct. 945, 947–48 (2018). Justice Thomas' dissent and his Second Amendment jurisprudence are clear that "courts should [only] ask whether the challenged law complies with the text, history, and tradition of the Second Amendment," and that, if applied, intermediate scrutiny in the Second Amendment context cannot be less demanding than it is when applied to other rights. *Id.* at 947–49 & n.4; *see also Rogers v. Grewal*, 140 S.Ct. 1865, 1867

(2020) (Thomas, J., dissenting from a denial of certiorari) (noting that the lower court decisions applying intermediate scrutiny have impermissibly "devolved" into interest balancing).

Under any iteration, however, intermediate scrutiny requires a reviewing court to scrutinize whether the challenged law addresses "harms" that "are real" in a "material" way. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The Supreme Court has made clear that under intermediate scrutiny:

> When the Government defends a regulation . . . as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner Broad Sys., Inc. v. FCC* ("*Turner II*"), 512 U.S. 622, 664 (1994) (citations omitted); *see also, e.g., id.* (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (9th Cir. 1977) ("A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist"); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.,* 584 F. Supp. 2d 766, 788 (D. Md. 2008), *aff'd*, 368 Fed. App'x 370 (4th Cir. 2010).

Solutions to hypothetical, abstract problems cannot survive intermediate scrutiny. *See FCC v. Beach Commc'ns, Inc*. ("*Turner I*"), 508 U.S. 307, 315 (1993) (only rational-basis review allows the government to justify a law with "rational speculation unsupported by evidence or empirical data") (citations omitted); *see also Ezell v. City of Chicago,* 651 F.3d 684, 708 (7th Cir. 2011) (striking down City of Chicago ban on gun ranges and holding that "logic and data" must demonstrate "a substantial relation between [the regulation] and [an important governmental] objective"); *Carter*, 669 F.2d at 418 (noting that the State may not "'rely upon mere 'anecdote and supposition'" in attempting to meet its burden) (quoting *Playboy*, 529 U.S. at 822; *Heller II*, 670 F.3d at 1248 (remanding for a factual determination on whether the District's attempts at "licensing the owner of the firearm" were supported by actual evidence under intermediate scrutiny).

In *Turner II*, the Supreme Court vacated summary judgment in favor of the government because the government did not prove the existence of the claimed problem. 512 U.S. at 667. Although the government presented a study showing that the claimed problem may or could exist, the Court held that without "some additional evidence to establish" that the claimed problem actually existed, the proposed remedy could not survive intermediate scrutiny. *Id*. at 667. On that record, the Court "c[ould] not determine whether the threat . . . is real enough to overcome the challenge to the provisions made by these appellants." *Id*. The Court found it "significant, for instance, that the parties have not presented any evidence" that the claimed problem actually existed. *Id*.

Intermediate scrutiny in the Second Amendment context does not allow deference to the legislature's findings. *See, e.g.*, *Duncan v. Becerra*, 970 F.3d 1133, 1166 (9th Cir. 2020). Deference to the legislature is appropriate only in "cases . . . involving congressional judgments concerning regulatory schemes of inherent complexity and assessments . . . . Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise." *Turner Broad. Sys., Inc. v. F.C.C.* ("*Turner III*"), 520 U.S. 180, 196 (1997). Laws burdening Second Amendment rights that are meant to address firearm violence, like the HQL requirement, "do[] not involve highly technical or rapidly changing issues requiring such deference" and are not entitled to *Chevron*-like deference. *Duncan*, 970 F.3d at 1167. Though the *Heller* dissent explicitly advanced deferring to the legislature to resolve Second Amendment challenges, 554 U.S. at 690 (Breyer, J., dissenting), the *Heller* majority did not.

Even if some deference were permissible, "deference does not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law." *Turner II*, 512 U.S. at 666. This Court must "assure that, in formulating its judgments, [the legislature] has drawn

reasonable inferences based on substantial evidence." *Id*. And this requirement of "substantial evidence" is itself substantial. In *Turner III*, the Court analyzed empirical evidence over the course of 20 pages before sustaining the legislature's conclusion. 520 U.S. at 196–224. *See, e.g., Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018) ("Mere citation is an inadequate application of intermediate scrutiny, even according deference to the predictive judgment of a legislature, and *Turner Broadcasting* itself shows why."), *vacated* 915 F.3d 681 (9th Cir. 2019).

Under any application of intermediate scrutiny, "[f]it matters" and where, like here, a statute is "poorly tailored to the Government's interest" it fails intermediate scrutiny. *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014). Defendants must provide substantial evidence proving that the HQL requirement is "narrowly tailored to serve a significant government interest" and does not "burden substantially more [protected conduct] than is necessary to further that interest." *McCullen*, 573 U.S. at 486. As demonstrated below, the HQL requirement fails both prongs of this test.

> ### 1. Defendants cannot establish that the recited harms exist or that the HQL requirement will alleviate these harms in a direct and material way.

The HQL requirement cannot survive intermediate scrutiny because Defendants fail to "demonstrate that the recited harms are real, not merely conjectural and that the regulation will in fact alleviate these harms in a direct and material way." *E.g.*, *Turner II*, 512 U.S. at 664. Defendants also have failed to show that the HQL requirement does not "burden substantially more [protected conduct] than is necessary to further that interest," *Turner III*, 520 U.S. at 2113–14, or are otherwise "narrowly tailored" to legitimate goals. *McCullen*, 573 U.S. at 486.

**a.   Defendants cannot establish that the additional 30-day delay alleviates a demonstrated harm in a direct and material way.**

As noted above on pages 16–17, allowing Defendants up to 30 days to review and rule upon an HQL application is arbitrary and does not relieve Defendants of any demonstrated harm. Prior to the HQL requirement, Defendants took seven days to investigate every potential handgun purchaser. Md. Code Ann., Pub. Safety § 5-118; *id.* at § 5-123(a). Defendants concede that some "Handgun License applications have been processed the same business day that they are received." Col. Pallozzi Interrog. Resp., Ex. 20, No. 7. Defendants have not established the need for a 30-day delay to process HQL applications. This 30-day delay, tacked on to the 77R Handgun Registration seven-business-day delay, cannot possibly be the least restrictive means to achieve Defendants' interests, and Defendants have made no effort to demonstrate that it is.

**b.   Defendants cannot establish that the fingerprint requirement alleviates a demonstrated harm in a direct and material way.**

Defendants fail to demonstrate that the fingerprint requirement alleviates a demonstrated harm in a direct and material way. Defendants claim that the fingerprint requirement "enables [the Maryland State Police] to ensure that the applicant is positively identified and not using false identification or altering his or her identification information" and "deter[s] . . . straw purchasers and those intending to purchase firearms solely for criminal purposes" from purchasing a handgun. Defs. MSJ, at 19, 22. But the 77R Handgun Registration process, along with the other federal and state laws, already allowed Defendants to ensure that the applicant is positively identified and not using a false identification. Defendants admit that the only possible harm for the HQL requirement to alleviate would be prohibited individuals who could have acquired a handgun after undergoing a 77R Handgun Registration background check but not under the HQL requirement fingerprint requirement. *See* A. Johnson Dep., Ex. 6, at 112:8–117:7. Defendants cannot identify a single individual who fits this description. *Id.* at 116:1–117:7. Defendants present no evidence that

anyone in Maryland ever used a false or altered identification to purchase a handgun before the HQL requirement took effect. *Id*. at 113:3–21. Defendants also present no evidence of any straw purchases or of individuals who purchased a handgun solely for criminal purposes. *Id*. at 76:16–22; J. Johnson Dep., Ex. 7, at 25:10–16, 28:6–14. Because Maryland is now REAL ID Act compliant, there is no likelihood of false identification.

Defendants also claim that "a fingerprint record can be used to determine if an HQL licensee is convicted of a disqualifying offense subsequent to passing the initial background investigation" and that fingerprinting "allows [Maryland State Police] to revoke a disqualified person's HQL and, where necessary, retrieve unlawfully possessed firearms." Defs. MSJ, at 21. But the 77R Handgun Registration process allowed Defendants to easily locate and disarm handgun owners who were subsequently disqualified from handgun ownership. Webster Dep., Ex. 5, at 19:14–20:14. And Defendants present no evidence that the Maryland State Police was unable to disarm these individuals prior to the HQL requirement under existing requirements. *Id*. Defendants cannot demonstrate the existence of any harm for the fingerprint requirement to alleviate.

Even if these alleged problems did exist, Defendants cannot demonstrate that the fingerprint requirement alleviates them in a direct and material way. The Maryland State Police and its expert Webster admit that the fingerprint requirement does not add any benefit from what the previous 77R Handgun Registration process conferred. *See* A. Johnson Dep., Ex. 6, at 112:8–19; Webster Dep., Ex. 5, at 19:14–20:14. The fingerprint requirement does not, indeed could not, alleviate any problem in a direct and material way.

Further, Defendants have no admissible evidence that the HQL requirement alleviates Maryland's equally unsupported straw purchase problem. For this proposition, Defendants rely

upon Webster, who in turn relies upon a 2017 study that purports to assess the Firearm Safety

Act's ("FSA") impact on the supply of handguns diverted to criminal use in Baltimore. Defs. MSJ,

at Ex. 11, ¶ 18 (citing Cassandra K. Crifasi et al., *The initial impact of Maryland's Firearm Safety*

*Act of 2013 on the supply of crime guns in Baltimore*, 3(5) The Russel Sage Foundation Journal

for the Social Sciences 128–40 (2017) (the "Baltimore Study")). But the Baltimore Study does not

help Defendants. Although it concludes that the FSA caused a reduction in the supply of crime

handguns in Baltimore, this conclusion is not based on any actual (or reliable) data on the supply

of crime handguns in Baltimore or anywhere else. Kleck Decl., Ex. 24, at ¶¶ 4–12. The study

utilized firearm trace data on guns recovered by police. This trace data, however, is useless in

assessing the supply of crime guns. *Id*. The ATF disclaims explicitly that "[t]he firearms selected

[for tracing] do not constitute a random sample and should not be considered representative of the

larger universe of all firearms used by criminals, or any subset of that universe." Bureau of

Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland.[20] Therefore,

trace data cannot be used to draw conclusions regarding Baltimore crime guns or crime guns

generally, rendering the study's conclusion useless under standard statistical models. Kleck Decl.,

Ex. 24, at ¶¶ 6–8. Most importantly, Webster's study cannot isolate the effect, if any, of the HQL

requirement from all of the other factors he admits bear upon the supply of crime guns in

Baltimore. *See* Webster Dep., Ex. 5, at 248:16–251:20; Kleck Decl., Ex. 24, at ¶¶ 10–11. Webster's

testimony and studies provide Defendants with no evidence that the fingerprint requirement

alleviates the claimed straw purchase problem.

      In the time that has passed since this case was first briefed on summary judgment, in tacit

recognition of the flaws in his prior studies and testimony in this case, Webster has "completed

---

[20] *Available at* https://bit.ly/3iPncPp (last visited Jan. 27, 2021).

additional research studies" touching upon his prior testimony. Defs. MSJ, at Ex. 12, ¶ 4. Defendants make cursory reference to two of these studies, both of which discuss the possibility that permit-to-purchase laws reduce the homicide rate. Defs. MSJ, at 22–24. Defendants do not claim the homicide rate is a problem the fingerprint requirement will alleviate. *See id.* Nevertheless, both studies are fatally flawed and provide no support to Defendants.

The first, according to Webster, is an update of Webster's prior, fatally-flawed analysis of Missouri's repeal of its permit-to-purchase law. *See* Hasegawa RB, Webster DW, Small DS. *Bracketing the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law*. *Epidemiology* 2019 May; 30(3): 371–79 (the "Second Missouri Study"). The second, Daniel W. Webster, *et al.*, *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Public Policy 171–212 (2020) (the "Fatal Mass Shooting Study"), purports to find that permit-to-purchase laws that require "either in person application with law enforcement or fingerprinting" resulted in a 56% lower chance of fatal mass shootings. The third, Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in Four States, 1985–2017*, 110 Am. J. of Public Health 10, 1546 (October 2020) (the "PTP study"), claims that permit-to-purchase laws in four states resulted in a dramatic decrease in firearm homicide and firearm suicide rates.[21]

Each of these studies, in addition to being flawed in their own individual way, cannot be relied upon because they are the product of manifest "data dredging," where a researcher identifies

---

[21] Webster estimates that the repeal of Missouri's handgun purchaser licensing law was associated with a 47.3% increase in firearm homicide rates in this study. However, in the Hasegawa study, Webster and his colleagues estimated that the same repeal was associated with a 27% increase in firearm homicide rates. No explanation is given for this enormous difference; neither Defendants nor Webster even so much as acknowledge the obvious inconsistency of the two studies.

some non-causal associations (such as, for example, a coincidental uptick in firearm homicide rates the year after the repeal of a particular gun control law), and then continuously refines his research approach in an attempt to support a hypothesis that there is a causal relationship, usually by cherry-picking laws, or locations, or date ranges, to the exclusion of the larger body of available data. *See* Kleck Supp. Decl., Ex. 28, at ¶¶ 2–28. This approach is of no value to either a court or a legislative body, because it does not accurately analyze whether any particular gun control law is likely to have a salutary effect on violence in that jurisdiction. *Id.*

Webster's Second Missouri Study cherry-picks Missouri, artificially restricts the date range analyzed, and makes no effort to explain why all the alleged increase in firearm crime happened *in one year* and then reverted to its pre-repeal rate. *Id.* at ¶¶ 29–36. In the Fatal Mass Shooting Study, Webster cherry-picks which variables to control for (while ignoring nearly all actual confounding variables), cherry-picks what kind of mass shootings to include (and how to define them in terms of numbers of fatalities), cherry-picks which states to include in the study, and obscures whether fingerprinting *or* personally appearing at a law enforcement agency *or* perhaps both has the allegedly beneficial effect on fatal mass shootings. *Id.* at ¶¶ 37–54. Finally, the PTP Study cherry-picks the date range it analyzes, the states it reviewed, and the factors and variables it would include in its so-called "synthetic control" methodology. *Id.* at ¶¶ 62–77. Even worse, Webster could have compared the actual effect of the Maryland HQL from 2013 to 2017 (data he had and that was within the date range of the rest of the study) to the effect of the Maryland 77R comprehensive background check in place from 1996, but he chose not to do so, instead comparing the 77R to Connecticut's purchasing license. *Id.* at ¶ 56. By omitting mention of Maryland's HQL, Webster avoided reporting that the firearm homicide rate surged in Maryland following implementation of the HQL in 2013. *Id.* This problem is hinted at, but not addressed or

resolved, in Defendants' MSJ. *See* Defs' MSJ, at p. 22, n. 9 (claiming that "dramatic civil unrest prompted by actions taken by police are often followed by sharp increases in violent crime….") (citing Webster Decl. at 16). Defendants offer no evidence to support this speculation to explain Maryland's dramatically increasing firearm homicide rate. These unreliable and self-serving studies provide no support for Defendants' contentions that the HQL will improve public safety in Maryland in any way. This Court should disregard those studies and the testimony of Webster.

> **c. Defendants cannot establish that the additional half-day classroom training with live-fire requirement alleviates a demonstrated harm in a direct and material way.**

Defendants cannot demonstrate that the additional safety course with live-fire requirement alleviates a demonstrated harm in a direct and material way. Defendants claim seven purposes accomplished by the classroom training with live-fire requirement, including: (1) "reduc[ing] the likelihood that a member of a household who is not eligible to possess a firearm will gain access to one;"" (2) "deterring straw purchasers;" (3) "enhanc[ing] knowledge of and compliance with State laws;" (4) "reduc[ing] access of firearms to children;" (5) "reduc[ing] the risk of accidental discharges[;] (6) "reduc[ing] the likelihood of theft;" and (7) "enhanc[ing] effective law enforcement." Defs. MSJ, at 26–28. But Defendants concede that they have no evidence that any of these issues were real problems or that a half-day of training and a live-fire requirement have or will alleviate them in a direct and material way. Regarding claimed interests (1) and (4), Defendants fail to demonstrate that prohibited individuals and children were accessing handguns at home or that these individuals are accessing handguns less than before the HQL requirement went into effect. A. Johnson Dep., Ex. 6, at 109:12–111:9. Regarding claimed interest (2), Defendants have no evidence of a single straw purchase in Maryland from before the HQL requirement took effect (or, necessarily, that the HQL requirement deterred any straw purchases). *Id*. at 76:16–22, 113:3–9; J. Johnson Dep., Ex. 7, at 25:10–28:14. Regarding claimed interest (3),

Defendants have no evidence that the HQL requirement has led to better gun storage practices in Maryland. A. Johnson Dep., Ex. 6, at 109:7–110:11. Regarding claimed interest (5), Defendants have no evidence of a single accidental discharge, either before or after the HQL requirement. *Id.* at 75:17–76:11. Regarding claimed interest (6), Defendants have no evidence of handgun theft, either before or after the HQL requirement. *Id.* at 119:16–18. And regarding claimed interest (7), Defendants have no evidence that the HQL requirement has enhanced effective law enforcement. The firearm safety training with a live-fire requirement are non-answers to hypothetical problems and cannot survive intermediate scrutiny. *Turner II*, 512 U.S. at 664.

### 2. Defendants cannot establish that the HQL requirement is narrowly tailored to serve a substantial government interest.

The HQL requirement is not narrowly tailored because it imposes burdens without any concomitant benefit. Each individual requirement is independently as burdensome as it is unnecessary.

### a. The additional 30-day delay is not narrowly tailored to serve a substantial government interest.

Defendants do not even attempt to meet their burden of demonstrating that the additional 30-day delay (in addition to the post-purchase waiting period mandated by Md. Code Ann., Pub. Safety § 5-123(a)) is narrowly tailored to a substantial interest. Defendants also fail to put forth any proof that the delay is narrowly tailored to meet any substantial interest. Because Defendants fail to put forth any proof, they necessarily cannot demonstrate that the additional 30-day delay is narrowly tailored to serve a substantial government interest. *Turner II*, 512 U.S. at 664.

### b. The fingerprint requirement is not narrowly tailored to serve a substantial government interest.

The fingerprint requirement burdens far more protected conduct than is necessary to serve Defendants' claimed interests in preventing straw purchases, preventing purchases with false or

altered identification, and revoking HQLs from disqualified individuals. This is necessarily true because the fingerprint requirement is universal but, as demonstrated above on pages 17–18, does not further any of these interests. The fingerprint requirement adds a burden but no benefit and fails intermediate scrutiny. Additionally, for the reasons described above on pages 17–18, Defendants do not have a substantial interest in using fingerprints to revoke HQLs.

### c. The classroom training with live-fire requirement is not narrowly tailored to serve a substantial government interest.

The additional half-day classroom requirement is not narrowly tailored to achieve a substantial government purpose. As demonstrated above on page 20, the HQL safety course is substantively identical to the 77R Handgun Registration online presentation. The additional burdens imposed by the HQL course provide no benefit and cannot survive intermediate scrutiny.

Additionally, the live-fire requirement is not narrowly tailored to advance Defendants' claimed interests in safe storage of a firearm (and the negative consequences that arise from unsafe storage). Rather, it is unrelated entirely. In firing a firearm, HQL applicants do not learn how or where to store a firearm. Rather, the applicant must only "safely *fire*[] at least one round of live ammunition." COMAR 29.03.01.29 (emphasis added). Maryland does not require any additional hands-on practice regarding safe storage. *See id*. This requirement is not substantially related to Defendants' stated interest.

While Defendants purport to rely on *Heller III*, Defs. MSJ, at 29, Defendants fail to note that the D.C. Circuit in *Heller III* struck down a training requirement that mandated instruction in the law, a requirement that is virtually identical to the same requirement imposed by Section 5-117.1(d)(3)(ii)(1). *See Heller III*, 801 F.3d at 278–79 (holding that the District had "presented no evidence from which it could conclude that passing a test of knowledge about local gun laws" sufficiently "fit" the District's justification and that "the test of legal knowledge" was therefore

unconstitutional). *Heller III* sustained the other training requirements imposed by the District's law, but that training consisted of merely watching a one-hour video online, *id*. at 279, exactly what the 77R Handgun Registration previously required. That hardly compares to the HQL training: four hours of classroom attendance plus live-fire training by a State-approved, State-licensed instructor at a range.

Defendants also fail to acknowledge that the one-hour online video at issue in *Heller III* came about only after the District had abandoned its earlier training requirement that had been challenged in *Heller II*, in which the District had required "a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction." *Heller II*, 670 F.3d at 1249. The D.C. Circuit held that this training requirement, among other "novel" registration requirements, made "it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home." *Id*. at 1255. The court applied intermediate scrutiny, vacated summary judgment for the District and remanded for a further factual inquiry, holding that the District had failed to present "evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests" asserted by the District. *Id*. at 1259. After that remand, the District repealed its training requirement and substituted the one hour of online video. *See Heller III,* 801 F.3d at 269. As noted above, even then, the D.C. Circuit still invalidated the legal training part of that one hour video requirement. Like the District in *Heller II*, Defendants have not justified the much more burdensome training requirements at issue here that closely resemble those initially at issue in *Heller II*. Instead, as noted above, the HQL requirement is a pretext for Defendants to reduce the exercise of the Second Amendment right generally. That interest cannot survive any heightened constitutional scrutiny.

### 3. Defendants enacted the HQL requirement without substantial evidence.

None of the HQL requirements were "based on substantial evidence." *Turner II*, 512 U.S. at 666. Defendants state that the Maryland General Assembly heard from "various public policy and law enforcement experts advocating for the HQL prerequisite." Defs. MSJ, at 3. This is a vast overstatement at best. These so-called experts included Webster, former Baltimore County Police Chief James Johnson, and former Baltimore City Police Commissioner Anthony Batts. *Id.* at 3–4. None of these individuals advocated for the live-fire requirement. The live-fire requirement in the original bill was actually struck by the legislature as the bill was enacted. Pennak Decl., Ex. 2, at Ex. A, 8–9. Further, both former-Chief Johnson and former-Commissioner Batts provided only conclusory, general support for the fingerprint and additional firearm safety course requirements. Neither provided any reason why these requirements are necessary, whether they were narrowly tailored to respect law-abiding Maryland citizens' Second Amendment rights, or how they would enhance public safety in Maryland. For instance, former-Chief Johnson testified only that "[t]he requirement that purchasers obtain proof that they completed firearm safety training is an exceptional element of the Bill." Defs. MSJ, at Ex. 5. Similarly, former Commissioner Batts' testimony consisted of a conclusory statement that a background check using fingerprints will "ensur[e] that the applicant is not prohibited from possessing a handgun." Defs. MSJ, at Ex. 6. He also testified in support of "training" but again did not testify what training he had in mind or why it would be beneficial. *Id.* These testimonies do not provide any specific support for the HQL requirement and fail to demonstrate that the 77R Handgun Registration process is inadequate.

Webster testified only in support of a fingerprint requirement that did not become part of the HQL requirement as passed. Defs. MSJ, at 3 & Ex. 3. He testified that if the fingerprints were "processed directly by law enforcement agencies—which [he] assume[d] would be the case when

the Secretary writes regulations to implement the statute—[this] would result in fewer false applications for firearm purchases being processed." *Id*. But Maryland does not process fingerprints directly with law enforcement agencies; it uses private vendors. COMAR 12.15.05. His testimony is irrelevant and cannot support the HQL requirement or its fingerprint requirement. Additionally, although Webster discussed the findings of a study conducted by the United States General Accounting Office ("GAO"), he later conceded the inapplicability of this study to Maryland or the HQL requirement. The GAO did not examine Maryland, and the states at issue in the GAO study did not have handgun purchase laws similar to Maryland's 77R Handgun Registration process. Webster Dep., Ex. 5, at 23:7–13, 170:19–171:19. Defendants rely heavily on this GAO report, Defs. MSJ, at 21, but fail to acknowledge that it predates the REAL ID Act. Noted above on page 8, the REAL ID Act is fully implemented in Maryland. Defendants do not suggest that counterfeiting of REAL ID compliant licenses is a problem or that any such compliant licenses have ever been counterfeited and then used to purchase a firearm in any state, much less in Maryland. The REAL ID Act likewise was not considered by the D.C. Circuit in *Heller III*, on which Defendants likewise mistakenly rely.

Finally, Webster's research, which he referenced at the hearings, is similarly inapplicable to the HQL requirement. At the time, Webster conceded that he had not researched handgun violence in states with laws similar to Maryland's HQL requirement. Although several states, *e.g.*, Connecticut and Missouri, have or did have permit-to-purchase laws, the only shared requirement between these states and Maryland is a nominal license requirement. *Id*. at 189:9–13. The requirements to obtain these licenses differ in critical ways, rendering the studies useless here. *See* Kleck Decl., Ex. 24, at ¶¶ 13–23; Kleck Supp. Decl., Ex. 28, at ¶¶ 36–38; *see also* Webster Dep., Ex. 5, at 178:20–180:1, 184:16–190:5.

The undisputed evidence in this case shows that Defendants have failed to prove that the HQL requirement is narrowly tailored to meet a substantial government interest. The HQL requirement levies a substantial burden on plaintiffs' Second Amendment rights, while advancing very little, if at all, the government's claimed interests. For these reasons, the HQL requirement cannot withstand even intermediate scrutiny, the lowest standard to which it can be held.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-motion for Summary Judgment, declaring Section 5-117.1 of the Public Safety Article of the Maryland Code to be unconstitutional under the Second Amendment to the Constitution.

Respectfully Submitted,

*/s/* John Parker Sweeney
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Plaintiff Atlantic Guns, Inc.

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Dated: January 27, 2021                    Counsel for Plaintiffs

**Table of Exhibits**

**Exhibit No.**     **Title**

1.   Redacted Declaration of Stephen Schneider

2.   Declaration of Mark Pennak

3.   Excerpts of the Deposition of Susan Vizas

4.   Excerpts of the Deposition of Deborah Miller

5.   Excerpts of the Deposition of Daniel Webster

6.   Excerpts of the Deposition of Andy Johnson

7.   Excerpts of the Deposition of James Johnson

8.   Excerpts of the Deposition of James Russell

9.   77R Handgun Registration Safety Course Training Video CD previously filed and identified as ECF 77-09

10.  Md. Code Ann., Pub. Safety § 5-118 (2003)

11.  Excerpts of the Deposition of Diane Armstrong

12.  J. Joseph Curran, *A Farewell To Arms The Solution to Gun Violence in America* (Oct. 20, 1999)

13.  Firearm Safety Act, 2013 Maryland Laws Ch. 427 (S.B. 281)

14.  Defendants William M. Pallozzi's Third Supplemental Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories and Email transmitting HQL Applications Data from Assistant Attorney General Robert Scott on October 30, 2020.

15.  Deposition Exhibits 48, 105 & 106 and Email Transmitting Maryland State Police Firearm Transfer Data Transmitted from Assistant Attorney General Robert Scott on October 27, 2020.

16.  Excerpts of the Deposition of Dana Hoffman

17.  Excerpts of the Deposition of Mark Pennak

18.  Deposition Exhibit 21 LiveScan HQL Fingerprinting Gosts

19.  Excerpts of the Deposition of Stephen Schneider

20.  Defendant William M. Pallozzi's Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories

21.  Administrative Log

22.  Maryland Crime Statistical Data

23.  Declaration of Carlisle Moody

24.  Declaration of Gary Kleck

25.  Excerpts of the Deposition of Scott Miller

26.  Excerpts of the Deposition of John Clark

27.  Declaration of Connor Blair

28.  Supplemental Declaration of Gary Kleck

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of January, 2021, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.


/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)