IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.;** | ) | |
| | ) | |
| | ) | |
| | ) | **Case No.: 16-cv-3311-ELH** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWRENCE HOGAN, et al.;** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

DECLARATION OF MARK W. PENNAK,
PRESIDENT, MARYLAND SHALL ISSUE, INC.

COMES NOW the declarant, Mark W. Pennak, and hereby solemnly swears under the penalties of perjury and upon personal knowledge that the contents of the following declaration are true:

1. My name is Mark W. Pennak and I am over eighteen (18) years of age, and competent to testify. I am the President of plaintiff Maryland Shall Issue ("MSI"), which provides representation in this suit on behalf of itself and its members. I became President of MSI in 2016 and prior to that time I was Vice-Chairman of the Board, a Board member and a member of MSI. I have been an attorney since 1975, and I have been active member of the Bar of the District of Columbia since 1976, and an active member of the Maryland Bar since May of 2019. For more than 33 years, I practiced law as an attorney at the Appellate Staff of the Civil Division of the United States Department of Justice until I retired from the federal government on October 31, 2016. I remain an active member of the D.C. Bar and the Maryland Bar. As President of MSI, I

EXHIBIT
2

have testified repeatedly, both orally and in written testimony, before Committees of the Maryland General Assembly as a legal expert in federal and state firearms law and the law of self-defense.

2. MSI is a non-profit membership organization incorporated under the laws of Maryland with its principal place of business in Annapolis, Maryland, with approximately 1900 members, statewide. By an overwhelming margin, MSI members are residents of Maryland. "MSI is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public." https://www.marylandshallissue.org/jmain/index.php. These purposes of MSI include promoting and defending the exercise of the right to keep and bear arms. MSI thus endorses, promotes and encourages law-abiding adults, who are otherwise legally qualified to own and possess firearms, to acquire and to become proficient in the use of handguns for lawful self-defense purposes. This purpose encompasses defending the Constitutional right of law-abiding persons to lawfully purchase, own, possess and carry firearms and firearms accessories. Pursuant to that objective, MSI brought this suit as lead plaintiff.

3. The membership of MSI includes each of the named individual plaintiffs in this suit as well as numerous other individuals who do not possess a Handgun Qualification License and who are faced with the obstacles created by MD Code, Public Safety, § 5-117, and the implementing regulations of the Maryland State Police, concerning their constitutional right to purchase a handgun in Maryland. MSI brings this suit on its own behalf as an organization and on behalf of each of its many members who do not have an HQL, its many members who object to the HQL requirements, and its many members who have been deterred from exercising their Second Amendment right to acquire a handgun because of the HQL requirements. MSI has many members

2

who are National Rifle Association ("NRA") instructors as well as "qualified handgun instructors" within the meaning of Section 5-117.1, including the undersigned and most of the officers and Board members of MSI.

4. I am a Maryland State Police certified "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-117.1(d)(3)(i), for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and have been since 2013. I am also a National Rifle Association ("NRA") certified instructor in Rifle, Pistol, Personal Protection in the Home, Personal Protection Outside the Home and Muzzelloading. I am a NRA certified Range Safety Officer. As a Maryland State Police certified "qualified handgun instructor," I have, on numerous occasions, given instruction and training to students seeking the Handgun Qualification License under Section 5-117.1 and Maryland State Police regulations, as well as providing instruction to persons seeking to obtain the Maryland Wear and Carry Permit under MD Code, Public Safety, § 5-306. I have also given instruction to persons seeking NRA certificates in the "Basic Pistol," "Personal Protection In the Home" and "Personal Protection Outside the Home" courses. I have been long-standing merit badge counselor for the Boy Scouts of America and have given rifle and pistol firearms instruction to Scouts in that capacity. I am a member of the Frederick County Chapter of the Izaak Walton League of America, as well as a member of two other private firing ranges in Frederick County, MD. I also give informal handgun instruction to individuals outside of these formal courses. While the regulations adopted by the Maryland State Police set forth general contents of the HQL course, the State Police have never monitored or supervised the actual instruction accorded in my HQL training courses.

5. As a member of MSI, I participated in presenting expert panel testimony to the Maryland General Assembly in opposition to the enactment of the Firearms Safety Act of 2013 in the

Maryland General Assembly. See http://mgahouse.maryland.gov/mga/play/8697a09e-c001-4bb4-a558-f365e3c5422b/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c. MSI actively and strongly opposed enactment of that legislation at the time. That opposition included opposing the proposed handgun qualification license provisions that became law and are codified as MD Code, Public Safety, § 5-117.1. I am the drafter of and a signatory to the MSI Comments On Proposed Weapons Regulations, Maryland Register for Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, as published in Maryland Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG 1568 et seq. (Sept. 20, 2013). Those comments were submitted to the Maryland State Police on behalf of MSI and each of its Board members and Officers in October of 2013 in opposition to the regulations adopted by the Maryland State Police under Section 5-117.1 and which are at issue in this case. A true and correct copy of those comments submitted to the Maryland State Police is attached as Exhibit A.

6. The objectives and purposes of MSI include promoting the constitutional right of lawful armed self-defense and the lawful armed defense of family and loved ones. As part of its mission, MSI actively encourages all law-abiding adult citizens of this State to acquire handguns for lawful self-defense in and outside the home. MSI defends the constitutional rights of law-abiding citizens to purchase handguns, in court, before the Maryland General Assembly and in other public and private forums. The HQL requirements, MD Code, Public Safety, § 5-117.1, and the implementing Maryland State Police regulations, burden and obstruct the exercise of the right of law-abiding residents of Maryland, including MSI members, to acquire handguns for lawful self-defense in and outside the home and thus frustrates the mission of MSI.

7. As a Maryland State Police certified "qualified handgun instructor" for the HQL class, I have had numerous occasions to give instruction in "a firearms orientation component that

demonstrates the person's safe operation and handling of a firearm," required by MD Code, Public Safety, § 5-117.1(d)(3)(iii). I have charged $100, plus expenses, for the HQL training course. I am aware that other instructors charge at or in excess of $100. For instance, Guntry in Owings Mills charges $175.00 (including fingerprints), the Frederick Chapter of the Izaak Walton League of America charges $150.00 (without fingerprinting), Gilbert Indoor Range in Rockville offers the course for "free" with the purchase of an annual membership that costs $175.00, and The Machinegun Nest in Frederick charges $100 per person.

8. The firearms instruction I offer includes the hands-on use by students of actual handguns of various types, including single and double action revolvers and semi-automatic handguns of different makes, models and calibers. This classroom orientation instruction has never required or involved the use of live ammunition. In the classroom, a student achieves a full orientation concerning the functionality and the safe operation and handling of all these types of handguns without live ammunition. As a basic safety measure, live ammunition is never permitted anywhere in the classroom at any time in any class that I have taught. This ban on ammunition in the classroom is also a hard and fast rule in all NRA courses I have ever taught or participated in as a student. Such bans on live ammunition in the classroom is a matter of basic safety and are standard operating procedures in firearms instruction.

9. In the HQL and the NRA classes that I have taught, the orientation component of firearms instruction that demonstrates safe operation and handling of a handgun includes the use of dummy rounds, sometimes referred to as "snap caps." A dummy round or "snap cap" is typically made of metal and plastic and is the same size and shape as an actual round of live ammunition but contains no actual primer, bullet or powder. Such dummy rounds or snap caps allow the student to practice loading an actual handgun using the dummy rounds, pulling the trigger and otherwise

5

operating the handgun thus "loaded" with dummy ammunition. A "snap cap" has a part that functions as a center fire impact "primer," which is usually connected to a spring inside the body of the snap cap that allows the firing pin or hammer of the handgun to impact the "primer" without damaging the firearm. A dummy round or snap cap thus protects the firearm from damage that can result in some types of handguns from "dry firing" on an empty chamber. The use of such dummy rounds also the student to mimic the operation of live ammunition by allowing the slide of a semi-automatic handgun to chamber a round in the same way as it would with a live round of ammunition.

10. But for the Maryland State Police requirement, imposed by COMAR 29.03.01.29 C 4, that a student "fires at least one round of live ammunition," I would never have any occasion or reason to include "live fire" in providing HQL instruction on any of the elements of instruction required by Section 5-117.1. Omitting live fire instruction would permit me to offer full HQL instruction at any suitable location, such as the student's home. I have never found it necessary for a student to fire a round of live ammunition in order for the student to "demonstrate safe operating and handling of a firearm." I routinely teach the safe operation and handling of a handgun, using real firearms, without the student engaging in live fire. Firing one live round accomplishes no training objective at all.

11. As a certified NRA instructor, I have also taught the NRA Basic Pistol course, as well as more advanced courses, such as Personal Protection in the Home and Personal Protection Outside the Home. The Basic Pistol course is a minimum of 8 hours of instruction and the more advanced "Personal Protection" classes are a minimum of 16 hours of instruction. All such courses include very extensive live fire as well as extensive instruction on the safe use, handling and operation of handguns. The eight hour Basic Pistol class typically involves approximately 200

6

rounds of live fire of pistols. The 16 hour "Personal Protection" courses typically involve approximately 300 rounds of live fire of pistols. The "Personal Protection" courses also require extensive legal instruction. This legal instruction must be given by either a law enforcement officer or an attorney and includes the same basic areas of legal instruction mandated by the HQL statute. These courses, including the Basic Pistol course, are widely accepted as sufficient proof of live fire training by States, such as Florida and Virginia, which require live fire training for the issuance of a concealed carry permit for carrying a handgun in public. The HQL statute, Section 5-117.1(d)(3), allows the Maryland State Police to approve "a firearms safety training course." Yet, the Maryland State Police do not recognize any of these NRA courses as sufficient training for purposes of the HQL, even though the HQL regulates only the acquisition of handguns and cannot be used to legally carry a handgun in public.

12. Section 5-101(q)(3) of the Maryland Code of Public Safety specifically defines "Qualified handgun instructor" to include an instructor who "has a certification issued by a nationally recognized firearms organization," such as the NRA. Yet, notwithstanding Section 5-101(q)(3), NRA certified instructors are not recognized as instructors by the Maryland State Police. Accordingly, any HQL course taught by such NRA instructors are not considered valid by the State Police **unless** the NRA instructor **also** possesses a Qualified Handgun Instructor license **issued by the State Police**. The State Police have thus effectively done away with Section 5-101(q)(3) instructors and NRA training as a separate category of "qualified handgun instructors." In order to provide HQL instruction, the NRA instructor must apply to the State Police for a "Qualified Handgun Instructor Certificate." That certificate, once issued, contains the instructor's State Police identification number. Only if the course is taught by a Maryland State Police certified "qualified handgun instructor" will the instruction be recognized by the Maryland State Police for

7

purposes of issuing the Handgun Qualification License. The on-line application process used by the State Police requires each applicant to identify the applicant's instructor by reference to the State Police issued instructor number. Only State Police licensed instructors appear on the State Police website of approved instructors. In addition, all HQL instructors must establish their own on-line accounts with the State Police. Such instructors must use that on-line account to verify the training received by a student after the student submits an application for the HQL. Such instructor on-line verification is required before any HQL is issued by the State Police. None of these instructor requirements and verification procedural steps is set forth in State Police regulations. Yet, all of these requirements are mandatory, as enforced by the State Police.

13. The Maryland State Police regulations, COMAR 29.03.01.29 C (4), require the student to "safely fire[]" a live round. The Maryland State Police requirement of "live fire" in the HQL course requires the use of a firing range, as firing even one live round of ammunition can only be done "safely" on a properly constructed range. In Comments submitted to the Maryland State Police by MSI during its rulemaking process, MSI strongly objected to the live fire requirement, noting this need for a range and that most firing ranges "are relatively few in number in Maryland and mostly privately owned." *See* MSI Comments at 9. While the State Police accepted other comments made by MSI, the comments on the live fire requirement were ignored by the Maryland State Police in issuing the regulations at issue here. *See* 2013 MD REG TEXT 338193 (NS) (Dec. 23, 2013). As further detailed below, the discharge of ammunition is generally banned in the more populated areas of Maryland, except at established firing ranges. State law bars counties and municipalities from prohibiting the discharge of firearms at established ranges. MD Code, Criminal Law, § 4-209(d)(2). The City of Baltimore has no private or publicly available firing range. As a result of the Maryland State Police requirement of "live fire," the absence of a range

in Baltimore means that it is legally impossible for me as an instructor to complete the HQL training of a student in the City of Baltimore. The population of the City of Baltimore is over 600,000 people.

14. A similar problem exists in Baltimore County. Section 17-2-101(a) of the Baltimore County ordinances provides that, with listed exceptions, "a person may not fire or discharge a crossbow, pistol, air pistol, gas-propelled pistol, rifle, air rifle, gas-propelled rifle, or shotgun within: (1) The limits of the metropolitan district of the county; (2) A nondistrict enclave within the metropolitan district; or (3) An appendage attached to the metropolitan district." The "metropolitan district" of Baltimore County is "the geographic boundary within which a property may be eligible to receive public water and sewer service." https://bit.ly/3sHPqjJ. That area is quite large, encompassing almost the entirely of the heavily populated areas of the County all around Baltimore City. *See* maps set forth at https://www.baltimorecountymd.gov/Agencies/publicworks/basicservices.html. Like the other counties, there is an exception for discharges "[o]n a permanently located, properly posted, and bona fide target range, the location of which has been filed with the Police Department." Section 17-2-101(c)(2)(i). However, like other counties, there are relatively few public ranges in Baltimore County available for HQL pistol instruction. The population of Baltimore County is over 800,000 people.

15. On November 17, 2017 (after this suit was filed and after the State's Motion To Dismiss was denied on September 6, 2017), the Maryland State Police announced in Advisory LD-HQL-17-004 (Exh. B), that it had determined that "the use of non-lethal marking projectiles would meet the HQL 'live fire' training requirement." That Advisory also states that such marking ammunition, often also called "simunition" rounds, is acceptable if it meets the Maryland statutory

definition of ammunition set forth in MD Code, Public Safety, §5-133.1(a), in that it is "a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm." I have personally used such simunition rounds at the Drug Enforcement Administration Academy of the Department of Justice located at Quantico, Virginia. Simunition rounds are not the same as "paint ball" rounds, as paint ball rounds typically use compressed air or $CO_2$ as a propellant, and thus do not qualify as live ammunition under MD Code, Public Safety, §5-133.1(a). Accordingly, paint ball rounds may not be used to satisfy the State Police requirement of live fire.

16. Simunition rounds use a projectile (usually plastic) that impacts the target with enough force to cause a deep, painful bruise and could cause serious injury to an unprotected face, eyes, throat or other sensitive tissues of the body. Such ammunition is typically used in realistic "force-on-force" combat training exercises in which special protective equipment is mandatory. Because this simunition ammunition uses an explosive charge, firing such ammunition can be quite loud. For example, firing a 9mm simunition round results in an explosive noise of approximately 139 decibels (weapon dependent), a level widely recognized as sufficient to cause ear injury. https://www.cdc.gov/nceh/hearing_loss/what_noises_cause_hearing_loss.html. Without such special protective equipment, the "safe" way to fire a simunition round is at a suitable range with ear and eye protection. As a "qualified handgun instructor" and a certified NRA instructor, I would not give instruction involving the firing of any live round of ammunition, including simunition rounds, in any other way.

17. Simunition firearms require not only special ammunition but also special physical modifications to existing handguns in order for them to fire such simunition rounds. *See*, *e.g.*, https://simunition.com/en/. To my knowledge, very few HQL instructors, including myself, own

or have ready access to such conversion equipment necessary to modify existing handguns to fire simunition rounds. Acquiring such equipment typically requires not only instructor credentials, but also contracts to purchase the training systems provided by the manufacturer, special insurance, attendance at a certification course, and other requirements. *See*, *e.g.*, https://simunition.com/en/range_program.

18. The Maryland State Police Advisory LD-HQL-17-004 correctly recognizes that simunition rounds are legally considered to be live ammunition. Ex. B. Accordingly, the actual firing of such simunition rounds is regulated by counties and municipalities in Maryland the same way that the firing of other types of live ammunition is regulated. While preempting most local laws concerning firearms, State law expressly permits such local regulation of firearm discharges. *See* MD Code, Criminal Law, § 4-209(d). In Montgomery County, Maryland, where I live, the County broadly bans, with limited exceptions, the discharge of live ammunition anywhere in the Montgomery County "urban area." *See* Montgomery County Ordinances Ch.57, Section 57-4. The "urban area" of Montgomery County is most of Montgomery County, including all areas south, southeast of Black Hill Regional Park in north-central Montgomery County, south and east of Seneca Creek State Park in western Montgomery County and all areas south and west of designated areas right on the border of Montgomery County in the eastern portion of the County. *See* Ex. C. In so far as relevant to HQL instruction, the sole exception to this general ban is a "shooting range that the Firearms Safety Committee has inspected and approved in writing." Section 57-4(b)(1).

19. To my knowledge, there is only one such authorized shooting range open to the public in the Montgomery County "urban area"—the privately owned Gilbert Indoor Range located at 14690 Rothgeb Drive, Rockville, Maryland. My understanding is that while Gilbert's provides HQL classes, it does not permit other instructors to use its range for that purpose. While there are

private ranges operated by chapters of The Izaak Walton League of America in Montgomery County, access to these ranges is restricted to members and their guests only. To my knowledge, there are no other established ranges anywhere else in Montgomery County. The population of Montgomery County is over 1 million people.

20. When I give HQL and other firearms instruction, I generally do so in Frederick County which has more ranges and has no such extensive or county-wide bans on discharges of firearms. In Frederick County, I have thus been able to give live fire instruction on private land other than at an established range. Frederick County is, however, highly inconvenient to persons living in lower Montgomery County. Potential students of mine who have contacted me for HQL training have declined to take the training when I informed them that they would have to travel to Frederick County to receive the live fire training required by the Maryland State Police.

21. Prince Georges County effectively bans the discharge of a firearm anywhere in Prince Georges County. *See* County Code Section 14-142(a) ("No person shall practice shooting at any mark, board, sign, tree, bank, or other object with any gun, rifle, cannon, mortar, pistol, or other firearm within the limits of this County . . . ."). Such a discharge is allowed only with the written consent of "all owners, tenants, or occupants of real estate residing within the carrying capacity of such firearms." The exception for established firing ranges (Section 14-142(c)(3)) does not enable me provide HQL instruction in Prince Georges County, as it appears that there are only two such public ranges anywhere in or near Prince Georges County (the Maryland Small Arms Range and Fred's Outdoors). Maryland Small Arms Range is located at 9801 Fallard Court, Meadows, Maryland, near Joint Base Andrews, which is far from my home. Fred's Outdoors is located at 2895 Crain Hwy., Waldorf, Maryland, in or immediately adjacent to Charles County, which is even farther from my home. The population of Prince George's County is over 900,000 people.

22. Baltimore City bans the "discharge" of "any gun, pistol or firearm" in the City of Baltimore, with the only exception being that such discharge of firearms is allowed "on permanently located, properly posted and bona fide target ranges, the location of which has been fled (sic) with the Police Department of Baltimore City." Section 59-2 of Article 19 of Baltimore Ordinances. To my knowledge, there are no such ranges anywhere in the City of Baltimore, other than the police range, access to which is limited to law enforcement officers. The lack of a firing range effectively means that the Maryland State Police mandated live fire training for the HQL class cannot be legally completed within the City of Baltimore.

23. But for the Maryland State Police "live fire" requirement, I could and would conduct and complete HQL instruction in any otherwise suitable location, including in Baltimore City, Montgomery County and Prince Georges County, as state law expressly bars any county or municipality from prohibiting firearms safety training. MD Code, Criminal Law, § 4-209(b)(2) ("A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety . . . ."). Specifically, without the "live fire" requirement, I could and would increase HQL training to students as it could be completed in student homes or other meeting locations that are convenient to students and instructors alike.

Signed: _____     Dated: _Jan 23, 2021_

Mark W. Pennak
President, Maryland Shall Issue, Inc.

13



October 2013

**President**
Patrick Shomo

**Vice President**
Dan Blasberg

**Secretary**
Brian Simmons

**Treasurer**
David Michailof

**Board of Directors**
Peter Bagnell
George Durst
Mark Pennak
Rob Bowman
Greg Primrose
Teddy Schatz
Frank Zastawnik

**Membership Comittee**
Peter Bagnell
Jef Fernley
David Michailof

**Events Committee Chair**
Glen LaAsmar

VIA USPS and EMAIL to
Thomas.Vondersmith@maryland.gov

Thomas L. Vondersmith, Jr.
Administrator
Department of State Police
1201 Reisterstown Road
Pikesville, MD 21208

Re:     Comments On Proposed Weapons Regulations, Maryland Register for
        Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, as published in
        Maryland Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG
        1568 et seq. (Sept. 20, 2013)

### COMMENTS OF *MARYLAND SHALL ISSUE* AND OF ITS DIRECTORS AND

### OFFICERS, INDIVIDUALLY AND ON BEHALF OF *MARYLAND SHALL ISSUE*

These comments are submitted in response to the Proposed Weapons
Regulations published by the Maryland State Police in the Maryland Register for
Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, published in Maryland
Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG 1568 et seq. (Sept.
20, 2013).  The comments set forth below on behalf of Maryland Shall Issue,(MSI), a duly
incorporated Section 501(c)(4) educational organization and on behalf of each of the
Directors and Officers of MSI in their individual and official capacities, including
President - Patrick Shomo, Vice President - Dan Blasburg, Treasurer - Dave Michailof,
Secretary - Brian Simmons and the following members of the MSI Board of Directors :
Peter Bagnell, George Durst, Mark Pennak, Rob Bowman, Greg Primrose, Frank
Zastawnik, and Teddy Schatz.  For the reasons set forth below, the regulations are
seriously flawed and cannot be implemented as currently written.  Nothing in these
comments should be construed as a waiver or acceptance by MSI, or by its officers and
directors, of the underlying legality or constitutionality of any provision of SB 281.
Rather, these comments are limited to addressing some of the major flaws and

EXHIBIT A

Case 1:16-cv-03311-ELH   Document 135-3   Filed 10/05/18   Page 15 of 39

shortcomings in the implementation of SB 281 by the State Police in the proposed
regulations.

## I.   THE REGULATIONS VIOLATE SECTION 7 OF THE PRIVACY ACT, 5 U.S.C. 552A NOTE IN REQUIRING SOCIAL SECURITY NUMBERS.

The regulations repeatedly require an applicant for various permits and licenses
to submit his federal Social Security Number (SSN).  This submission is mandatory and
any failure to include appears to be subject to punishment or denial of the application on
that basis alone.  These requirements to submit a Social Security number are flatly in
violation of Section 7(a) and Section 7(b) the Privacy Act, 5 U.S.C. 552 Note, Public Law
93-579 (1974), and must be eliminated.

Specifically, Section 7(a)(1) of the Privacy Act makes it unlawful for "[a]ny
Federal, State or local government agency" to "deny to any individual any right, benefit,
or privilege provided by law because of such individual's refusal to disclose his social
security account number."  Section 7(b) of the Privacy Act provides that an agency that
any agency that "requests an individual to disclose his social security account number
shall inform that individual whether that disclosure is mandatory or voluntary, by what
statutory or other authority such number is solicited, and what uses will be made of it."
Section 7(a) and Section 7(b) create individually enforceable rights that supersede and
preempt any provision of state law in conflict with these requirements.  See, e.g., *Schwier
v. Cox*, 340 F. 3d 1284, 1288 (11th Cir. 2003) (holding that Section 7 of the Privacy Act
"clearly confers a legal right on individuals: the right to refuse to disclose his or her
[social security number] without suffering the loss 'of any right, benefit, or privilege
provided by law.'"); *Ingerman v. Del. River Port Auth.*, 630 F.Supp.2d 426, 437–38 (D.N.J.
2009) (same).  These provisions may be enforced as federal rights under 42 U.S.C. 1983,
and attorneys' fees and costs may be awarded against the state and state officers in any
such suit under 42 U.S.C. 1988.  (Id.).

Numerous sections of the proposed regulations violate Section 7 of the Privacy
Act.  Specifically, the following subsections in the proposed regulations demand the
applicant's Social Security Number (references are to COMAR 29.01.01.xx, as proposed):

1. A new resident of MD must register his regulated firearms and provide his
SSN (Section .05);

2. The purchaser of a regulated firearm must include the applicant's SSN (Section
.16);

3. A multiple purchase applicant must include the SSN (Section .24);

4. A designated collector applicant must provide his SSN (Section .25);

5. The applicant for a Handgun Qualification License must include the SSN, both initially and upon renewal (Sections .28 and .34);

6. The SSN must be provided by applicants for instructor designation and renewals of the designation (Sections .38 and .39);

7. An applicant for a dealer's license must include his SSN (Section .45 );

8. A dealer must provide the transferee's SSN in complying with his duties to provide shell casings (Section .58).

This demand for the social security number also appears in the proposed regulations for the hand gun carry permit, COMAR 29.03.02 et seq. Handgun Permit Unit. Specifically, an applicant for a carry permit must provide his SSN both in the initial application (Section .04) and upon any application for a renewal (Section .12).

All these provisions are in violation of federal law. Specifically, these provisions violate Section 7(b) of the Privacy Act in that none of these sections "inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it."

The new proposed regulations also violate Section 7(a) of the Privacy Act in that the regulations expressly state that the State Police will deny the application or license if the SSN is omitted. Indeed, the proposed regulations even threaten criminal prosecution for any such omission, stating:

.06 False or Omitted Information.

A. An applicant shall not provide false information on an application for a permit, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a permit or for criminal prosecution.

.17 Regulated Firearm Application—False or Omitted Information.

A. Any false information supplied or statement made in the application is a crime which may be punished by imprisonment for a period of not more than 3 years, or a fine of not more than $5,000, or both.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
3

B. An applicant shall not provide false information on a regulated firearm application, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

C. Any knowing material omission or false statement may be considered grounds for disapproval of an application or for criminal prosecution.

.46 Dealer's License—False or Omitted Information.

A. An applicant may not provide false information on an application for a dealer's license, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a license or for criminal prosecution.

.30 Handgun Qualification License—False or Omitted Information.

A. An applicant shall not provide false information on the application for Handgun Qualification License, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a license or for criminal prosecution.

Plainly, the regulations threaten to do precisely what Section 7(a) bans, viz., "deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."  Indeed, the threat of criminal prosecution for any such omission is particularly egregious.  These provisions are flatly illegal.

## II.   THE REGULATIONS UNLAWFULLY BAN AMMUNITION "SOLELY DESIGNED FOR A REGULATED FIREARM"

Section .03 of the new regulations purports to ban the possession of ammunition by persons under the age of 21 if the ammunition is "solely designed for a regulated firearm."  Specifically, Section .03(B) states:

B. A person under the age of 21 years may not possess a regulated firearm **or ammunition solely designed for a regulated firearm,** unless the person is not otherwise prohibited from possessing a regulated firearm and is:

(1) A member of the armed forces of the United States or the National Guard and is performing official duties;

(2) Required to possess a regulated firearm for employment purposes and holds a valid permit under Public Safety Article, Title 5, Subtitle 3, Annotated Code of Maryland;

(3) Temporarily transferring or possessing a regulated firearm or ammunition and is:

(a) Under the supervision of another who is at least 21 years old and who is not prohibited by federal or State law from possessing a firearm; and

(b) Acting with the permission of the parent or legal guardian of the person;

(4) Temporarily transferring or possessing a regulated firearm or ammunition and is:

(a) Participating in marksmanship training of a recognized organization; and

(b) Under the supervision of a qualified instructor; or

(5) Possessing the firearm for self-defense or the defense of others against a trespasser into the person's residence or a residence in which the person is an invited guest.

This provision, to the extent it addresses "ammunition solely designed for a regulated firearm," is contrary to law and beyond the authority of the Maryland State Police.

The ammunition ban is simply not authorized, either by Senate Bill 281 or by any other provision of state law. SB 281 amends Section 5-133.1 of the Public Safety Article to state:

(B) A Person May Not Possess Ammunition If the Person Is Prohibited from Possessing a Regulated Firearm under § 5–133 (B) or (C) of this Subtitle

These provisions of Section 5-133.1 as enacted by SB 281 are now reflected in the proposed regulations in new section.06 Ammunition.  That section states:

A. A person may not possess ammunition if the person is prohibited from possessing a regulated firearm under Regulation .03A of this chapter or Public Safety Article, §5-133(b)-(c), Annotated Code of Maryland.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

However, Section 5-333(b) and (c), as amended, do not purport to ban, or even address, possession of a regulated firearm by a person on account of their being under the age of 21. Section 5-133(d) does purport to ban possession of regulated firearms by persons under the age of 21, but, as re-enacted by SB 281, nothing in Section 5-133(d) purports to address possession of ammunition, must less ammunition possession by persons under the age of 21, much less ammunition "solely designed for a regulated firearm." In short, nothing in any current Maryland statute purports to address, much less ban, possession of ammunition "solely designed for a regulated firearm" as Section .03 does.

The language in the proposed regulations banning possession of ammunition by persons under the age of 21 appears to have been taken from an earlier version of Section 5-133(d), which did specifically contain the language set forth in the proposed regulations. However, that language was repealed in legislation enacted by the General Assembly in 2011. Specifically, Acts 2011, c. 343, § 1, in subsecs. (d)(1), (d)(2)(i), and (d)(2)(iv), deleted "or ammunition solely designed for a regulated firearm" after "regulated firearm"; and in subsec. (d)(2)(vi), deleted "or ammunition" after "possession of a firearm." A copy of that legislation is attached and is incorporated into these comments by reference.

The State Police lack the discretion to re-impose a ban on "ammunition solely designed for a regulated firearm" where precisely that ban was repealed by the General Assembly in 2011. The law of Maryland clearly establishes that "[a]n agency's authority extends only as far as the General Assembly prescribes." *Thanner Enterprises, LLC v. Baltimore County.* 414 Md. 265, 995 A.2d 257 (2010). See also *Board of Liquor License Commissioners v. Hollywood Productions, Inc.*, 344 Md. 2, 10, 684 A.2d 837, 841 (1996) ("[R]egardless of any rule making authority that the Liquor Board may enjoy, it may not impose a sanction that exceeds the confines of its expressly or impliedly delegated powers."). Nothing in SB 281 authorizes the State Police to impose new restrictions not otherwise imposed by statute. The ban imposed by Section .03 cannot be justified as an interpretative matter, as there is no phrase or term that could possibly support this ban. The legislative intent was expressed in 2011 with the repeal of the very language that Section .03 re-imposes. The ban is lawless and thus must stricken.

The language "solely designed for regulated firearms" is objectionable for the additional reason that it is hopelessly vague and undefined, thus raising fundamental Due Process Clause concerns. See, e.g., *FCC v. Fox Television Stations, Inc.* 132 S.Ct. 2307, 2317 (2012) ("the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). These

concerns are at a zenith when a vague statute purports to regulate the exercise of fundamental constitutional rights. (Id.) ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."). Nowhere in these draft regulations is there any definition for what constitutes ammunition "designed solely" for regulated firearms. For example, if the language "solely designed" is meant to mean solely "used" in handguns, then the language is nonsensical. In fact, many, if not most, so-called handgun calibers are used in non-regulated long guns. For example, the Henry Big Boy lever action rifle is chambered in .44 Magnum, .45 Colt & .357 Magnum, which are all considered to be handgun cartridges, but which are also perfectly well suited to use in non-regulated long guns. See http://henryrepeating.com/rifle-big-boy.cfm. Similarly, the Rossi Model M92 lever action rifle is chambered in the .38 Special, .357 Mag., .44 Mag., .45 Colt and .44-40 Win., cartridges that are also used in handguns. See http://www.rossiusa.com/product-details.cfm?id=150. These rifles are available in the United States and Maryland.

If the phrase "designed solely" is intended to refer to the original intent of the designer when the cartridge was created, then there is simply no way someone could possibly be on notice that a particular round of ammunition is banned. Many types of ammunition used in handguns have been in the marketplace for decades and there is no generally accepted or common understanding what the original design intent was at the time the cartridge was produced. Such uncertainty and lack of notice creates massive problems under the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution. See *Fox Television*, 132 S.Ct. at 2317 ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'") quoting *United States v. Williams*, 553 U.S. 285, 304 (2008). See also *Conley v. United States*, --- A.3d ----, 2013 WL 5355730 (D.C., September 26, 2013) (holding that a DC statute violated the Due Process Clause by criminalizing behavior that the average citizen would not know to be wrongful). In sum, given these issues, there is no reason for the State Police to re-impose the ban on ammunition that the General Assembly wisely repealed in 2011.

## III.    THE REGULATIONS IMPROPERLY IMPOSE A "ONE ROUND" REQUIREMENT FOR THE HANDGUN QUALIFICATION LICENSE

As enacted, SB 281, in that part now codified in Section 5-117.1 of the Public Safety Article imposed a ban on the purchase, rental or receipt of any handgun unless that person possessed a State issued Handgun Qualification License. To acquire that

HQL, the person, with specified exceptions, must take a training course, which is defined to be:

> (i) a minimum of 4 hours of instruction by a qualified handgun instructor;
>
> (ii) classroom instruction on:
>
> 1. State firearm law;
>
> 2. home firearm safety; and
>
> 3. handgun mechanisms and operation; and
>
> (iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm;

Public Safety Article §5-117.1(d)(3).  Nothing in this language mentions "proficiency" or "live ammunition" or even purports to require any "practice."

Notwithstanding the lack of authorization, the proposed regulations concerning the Handgun Qualification License (HQL) adds an additional requirement of firing "one round of live ammunition" and a "practice component," providing:

> 4) Operation and Handling Demonstration. Orientation that demonstrates the applicant's safe operation and handling of a firearm, **including a practice component in which the applicant safely fires at least one round of live ammunition**

The bolded language is new and is not in SB 281, as enacted.  As set forth below, this requirement to file "at least one round of live ammunition" as part of a "practice component" is both unauthorized by SB-281 and is unconstitutional under the Second Amendment to the Constitution.

First, the "live fire" requirement and the imposition of a "practice component" are not authorized by statute.  The initial version of SB-281 submitted by the Governor in the Senate contained a requirement that the HQL training would contain "A FIREARMS QUALIFICATION  COMPONENT THAT DEMONSTRATES THE PERSON'S PROFICIENCY AND USE OF A FIREARM."  That language was understood by all to encompass a "live fire" component, as proficiency can only be demonstrated through live fire.  SB 281, for example, imposed such a proficiency requirement for carry permits as part of the 16 hours of training that is now required for such permits under Section 5-306 of the Public Safety Article.

The Governor's proposal to require proficiency drew heavy opposition and was changed by an amendment proposed by Del. McDermott and adopted on April 2, 2013.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

8

Case 1:16-cv-03311-ELH   Document 135-3   Filed 10/05/18   Page 22 of 39

See http://mgaleg.maryland.gov/2013RS/am...1_48392701.pdf That amendment was discussed on the floor.  See http://mgaleg.maryland.gov/webmga/frmAudioVideo.aspx?ys=2013RS&clip=HSE_04022013_2.mp4

      This amendment was adopted because the live fire requirement necessary to demonstrate "proficiency" for the simple purchase of a handgun would require access to a firing range, which are relatively few in number in Maryland and mostly privately owned.  During the hearings on the Governor's proposal requiring "proficiency" for the HQL, it was repeatedly pointed out in both the House and the Senate hearings that any live fire requirement would effectively act on a *de facto* ban on the purchase of handguns because of the lack of publicly available gun ranges in Maryland.  See, e.g., testimony beginning at 1:16 extending through 2:01. http://mgahouse.maryland.gov/House/Play/1b31254187ae46e8bd799eae2685029c1d?catalog=03e481c7-8a42-4438-a7da-93ff74bdaa4c. The amendment by Del. McDermott was understood to remedy this problem by eliminating any live fire requirement.  The enacted language also does not contain any requirement for any "practice component," as the proposed regulations seek to impose.  A "practice component" is necessary to show proficiency, it is not necessary to "demonstrate operation and handling of a firearm."  The statutory language requires that the trainee "demonstrate" safe handling; it does not require that the trainee "practice" safe handling, much less "practice" with an actual handgun, much less "practice" actually firing such a handgun.  The regulations' imposition of the live fire requirement and a practice component thus contravene the legislative language and intent of the SB 281.  These requirements are therefore invalid.

      Second, a live fire requirement is unconstitutional.  The imposition of a live fire requirement creates an enormous obstacle to the purchase of a handgun, as it requires access to a firing range which are generally privately owned in Maryland and not available to non-members.  The live fire requirement thus acts as a burdensome prior restriction on a law-abiding citizen's now recognized, constitutional right to keep and bear arms under the Second Amendment, as construed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home").  This right is so fundamental that it has been incorporated into the Due Process Clause of the 14th Amendment and thus made applicable to the States. See *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010)("citizens must be permitted to use handguns for the core lawful purpose of self defense").

      The burden is on the State to justify any burden on this core constitutional right.  While the question has not yet been definitively settled by the Supreme Court as to

Case 1:16-cv-03311-ELH   Document 135-3   Filed 10/05/21   Page 23 of 39

whether the Second Amendment "core right" of self defense extends outside the home, there is no dispute among the federal courts of appeals that, at a minimum, the core right extends to the right to purchase and possess a handgun for self defense in the home by law-abiding citizens.  Because these licensing requirements are a pre-condition to the purchase of any handgun, they indisputably burden the right of citizens to be armed with a handgun in the home.  Indeed, the D.C. Circuit has so held with respect to the licensing provisions of D.C. law.  *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011) (*Heller II*).  As *Heller II* ruled, these licensing provisions thus burden "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense."  *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis omitted).  The State would be required to show both a "compelling" state interest and that the measure was "narrowly tailored" to that interest, *viz.*, was the least restrictive measure that addressed the compelling interest. See, e.g., *Abrams v. Johnson*, 521 U.S. 74, 91 (1997); *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 683 F.3d 539, 558 (4th Cir. 2012). Strict scrutiny almost always results in invalidation of a regulatory provision.  See Laurence H. Tribe, *American Constitutional Law* § 16–30, at 1089 (1st ed.1978) (noting strict scrutiny is a "virtual death-blow").  Here, the licensing provisions would not survive strict scrutiny. .

In any event, even under the more relaxed standard of intermediate scrutiny, "the government bears the burden of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is 'substantially served by enforcement of the regulation.'"  *United States v. Carter*, 669 F.2d 411, 417 (4th Cir. 2012) (citations omitted).  "Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government."  *Chester*, 628 F.3d at 682. Any such showing will require real evidence, not mere conjecture or supposition.  See *Carter*, 669 F.3d at 418 (noting that the State may not "'rely upon mere 'anecdote and supposition'" in attempting to meet its burden), quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000); *Chester*, 628 F.3d at 682 (requiring a "strong showing").  Indeed, this need for real evidence has been repeatedly stressed in the Second Amendment case law.  See *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) (vacating a district court decision sustaining the D.C. requirements and remanding for a factual determination on whether the District's attempts at "licensing the owner of the firearm" were supported by actual evidence under intermediate scrutiny); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (holding that Illinois ban on public possession of handguns outside the home was not supported by sufficient legislative facts); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *cert. denied* 131 S.Ct. 1674 (2011) (requiring a "form of strong showing" — a/k/a "intermediate scrutiny" — in a Second Amendment challenge to a prosecution under 18 U.S.C. §

922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor); *Ezell v. City of Chicago,* 651 F.3d 684, 708 (7th Cir. 2011) (striking down City of Chicago ban on gun ranges and holding that "'logic and data" must demonstrate "a substantial relation between [the regulation] and [an important governmental] objective.") (quoting *Skoien,* 614 F.3d. at 642); *Chester,* 628 F.3d at 682 (remanding because the government "has not attempted to offer sufficient evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal.").

Here, the only conceivable legitimate state interest served by the training requirement is safety.  Yet, there is no evidence that safety is substantially furthered by a live fire requirement.  Nationwide, very few states impose any licensing requirement on the purchase of a handgun. None, to our knowledge, impose any requirement of live fire for the simple purchase of a handgun for self-defense in the home.  For example, the District of Columbia has the strictest gun control laws in the country and D.C. formerly required a training class of four hours, but provided that class for free.  D.C. Code §§ 7-2502.03(a)(13).  D.C. did not require live fire training.  More recently, D.C. has repealed the provision requiring first time registrants to take a 4-hour firearm training course. Instead, D.C. Police are now offering an online Firearms Safety Training Course.  There is no cost for taking this course and it takes approximately 30 minutes to complete.  See http://mpdc.dc.gov/node/177912.  If D.C. does not require live fire with its extremely strict rules, what possible justification does Maryland State Police have for such imposition of live fire?  We know of none.

Thus, with the promulgation of these regulations, Maryland would become the *only* state in the United States that not only imposes a licensing requirement, but also imposes  a state-wide "live fire" requirement as an additional requirement for purchase of a handgun for self-defense in the home (as opposed to outside-the-home carry).  This requirement for a simple purchase for home defense is utterly unnecessary to implement Section 5-117.1.  Section 5-117.1 requires only "firearms orientation component that demonstrates the person's safe operation and handling of a firearm."  Safe operation and handling of a handgun can easily be "demonstrated" by the actual handling of the firearm and the use of "snap caps" or dummy rounds that would allow the individual trainee to experience pulling the trigger without live ammunition.  We are informed that the State Police have not conducted any studies or possess any evidence that would suggest that live fire is necessary to demonstrate safe handling.  As explained above, real evidence is a constitutional requirement and the burden is on the State to submit that evidence.  In essence, the regulations create a substantial constitutional issue concerning the necessity for live fire when the regulations could have much more easily construed the training requirements of Section 117.1 to avoid such constitutional issues.  The State

Police's approach thus directly contravenes the usual rule that "a construction of a provision which casts doubt on its constitutionality should be avoided." *Washington Suburban Sanitary Com'n v. Phillips*, 413 Md. 606, 620, 994 A.2d 411, 420 (2010).  A live fire requirement will not survive challenge.

IV.     **THE PROPOSED REGULATIONS IMPROPERLY PURPORT TO BAN POSSESSION OF A REGULATED FIREARM BY PERSONS WHOSE DISQUALIFYING CONVICTION HAS BEEN EXPUNGED**

Section .03, COMAR 29.03.01.03, sets forth what purports to be a list of persons who may not possess any firearm whatsoever.  Most of these provisions largely copy the underlying statute and are not objectionable.  For example, subparts (5) and (6) of Section .03 provide that persons prohibited from possession include a person who has been convicted of a "disqualifying crime," including a person who:

> (5) Has received probation before judgment for a crime of violence, except for assault in the second degree;

> (6) Has received probation before judgment for a domestically related crime, as defined in Criminal Procedure Article, §6-233, Annotated Code of Maryland;

This ban corresponds to the language set for in SB 281 in amendments to Section 5-101 of the Public Safety Article.

However, SB 281 amends Section 5-101 to include a further qualification of the term 'disqualifying crime" to exclude any crime "THAT WAS EXPUNGED UNDER TITLE 10, SUBTITLE 1 OF 26 THE CRIMINAL PROCEDURE ARTICLE."  See SB 281, amending Section 5-101(b)(2).  Nowhere in the proposed regulations is this provision reflected.  Nowhere in the proposed regulations are persons advised that such expungement relieves the person of the firearms disability.  Since the regulations purport to be comprehensive, the regulations should be amended to add this additional qualification.

V.     **THE REGULATIONS FAIL TO ADDRESS THE USE OF "RECEIVE" OR "RECEIPT" AS USED IN THE REGULATIONS AND SB 281**.

The regulations, as proposed fail to define the use of receive or receipt as used in various places throughout SB 281.  This failure may well lead to arbitrary enforcement and prosecution and should be clarified by the regulations.  We therefore respectfully request that the regulations be revised and amended to define "receive" and "receipt" in such a way as to make clear that these terms apply only to the permanent transfer of ownership of article in question.  The regulations should also make clear that the

temporary "receipt" of these articles is not prohibited as between law-abiding persons who are otherwise qualified to possess these items under other provisions of state and federal law.

**Assault Weapons and Magazines**

SB-281 amends various sections of the Criminal Article to regulate receive or receipt of the newly defined provisions concerning "assault weapons," providing:

4–303.

(a) Except as provided in subsection (b) of this section, a person may not:

(1) transport an assault weapon into the State; or

(2) possess, sell, offer to sell, transfer, purchase, or **receive** an assault weapon.

Similarly, SB-281 amends Section 4-304 and Section 4-305 to provide:

4–304

A law enforcement unit may seize as contraband and dispose of according to regulation an assault weapon transported, sold, transferred, purchased, **received**, or possessed in violation of this subtitle.

4-305

(b) A person may not manufacture, sell, offer for sale, purchase, **receive**, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.

Violations of these provisions would arguably subject the violator to the risk of a conviction under Section 4-306 of a misdemeanor and thus become "subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000."

**Handguns**

In addition SB-281 creates a whole new set of provisions regulating the "receipt" of handguns in particular.  Section 5-501 of the Public Safety Article has added a new provision for the newly created "Handgun Qualification License."

(O) "Handgun Qualification License" means a license issued by the Secretary that authorizes a person to purchase, rent, or **receive** a handgun.

SB-281 then relies on this definition of the "Handgun Qualification License" in creating Section 117.1 to the Public Safety Article.  Subsections (b) and (c) of newly enacted

Section 117.1 broadly mandate that a person have such a "Handgun Qualification License" as a condition to acquiring such a handgun, providing:

(B) a dealer or any other person may not sell, rent, or transfer a regulated firearm handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person a valid regulated firearm handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary under this section.

(c) a person may purchase, rent, or **receive** a handgun only if the person:

(1) (i) possesses a valid handgun qualification license issued to the person by the Secretary in accordance with this section; * * * *

Section 5-143 of the Public Safety Article (which was recodified without change by SB-281 to become Section 5-144), can be read to apply to transactions governed by new Section 5-117.1 so as to impose severe criminal penalties. Section 5-144 provides:

(a) Except as otherwise provided in this subtitle, a dealer or other person may not:

(1) knowingly participate in the illegal sale, rental, transfer, purchase, possession, or **receipt** of a regulated firearm in violation of this subtitle;

* * * *

Penalty

(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

The regulations do not purport or define "receive" or "receipt" in these provisions.

**Interpretation Issues Associated with SB 281's Regulation of "Receipt" or "Receive":**

The terms "receipt" or "receive" in these provisions of SB-281 are not defined, either in the existing code or in SB-281 and there is, of course, no Maryland case law on these newly enacted provisions. Regulation of the "receipt" of firearms is addressed under federal law, 18 U.S.C. 922(h), which provides:

(h) It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment--

(1) to **receive**, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce;

or

(2) to **receive** any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

However, there are significant differences between "receive" as used in SB-281 and "received" as used in federal law. Subsection (g), referenced in Section 922(h), refers to persons who are disqualified from possessing any firearms because of prior criminal convictions or other disqualification. In this context, the term "receive" as used in subsection (h) "means to take possession of or to knowingly accept the same." See, e.g., *United States v. Turnmire*, 574 F.2d 1156, 1157 (4th Cir. 1978). Other federal courts of appeals are in accord. (Id). *Turnmire* explains that, under federal law, "'receipt' may be inferred by mere possession, on the assumption that one cannot possess without having had first "received." See *Turnmire*, 574 F.2d at 1157 (approving the instruction that "since one cannot possess something without having received it, (then) receipt of a firearm may be shown circumstantially by proving possession.").

Stated simply and as detailed more specifically below, if this federal interpretation of "receive" under Section 922(h) were to be used under SB-281, it would shut down instructional shooting, family shooting activities, youth shooting and the mere temporary transfer of firearms at the range to friends and other persons who wish to learn about shooting activities or try out a particular handgun or assault weapon. Assault weapons, magazines and handguns may also be the lawful property of sanctioned competitive teams or incorporated shooting clubs. These organizations may temporarily loan these items to team or club members for use at the range. A literal reading of "receive" or "receipt" would ban such loans and thus effectively impair the legitimate functioning of such organizations. A literal definition of "receive" or "receipt" also could be applied to bar a gunsmith from taking temporary possession of an assault weapon, a magazine or handgun for purposes of repair. A gunsmith presumably would be able to take temporary possession of a handgun if he or she had a Handgun Qualification License, but the ban on "receipt" with respect to assault weapons and magazines do not contain any such exception for the temporary "receipt" of an assault weapon by a gunsmith for purposes of repair. Given these potential issues and the inherent uncertainties associated with the terms "receive" and "receipt," it is incumbent on the State Police to define these terms.

As is apparent, a literal definition of "receive" or "receipt" under SB-281 would be little short of absurd. Few persons will temporarily loan an assault weapon, a

magazine or handgun for temporary use at the range under these provisions. Otherwise innocent, law-abiding persons could risk arrest, criminal prosecution and imprisonment by participating in such temporary "receipts" of these items. SB 281 would become a legal trap for the unwary. That result cannot be tolerated. With the enactment of SB 281, the General Assembly did not intend to create a whole new class of criminals arising from the temporary loan of these regulated articles as between otherwise law-abiding citizens.

Such a strict construction of "receive" for purposes of the above provisions in State law, as amended by SB-281, would also expose innocent, law-abiding persons to the loss of all their firearms for life. Under federal law, 18 U.S.C. 921(a)(20) and 18 U.S.C. 922(g), a person convicted of a state misdemeanor, which is "punishable" by a sentence of greater than two years in prison, becomes a disqualified "felon in possession" and loses the right to possess any modern firearms for the rest of his or her life. Any possession of such firearms after such a conviction for such state misdemeanor may also result in federal imprisonment of up to 10 years under 18 U.S.C. 924(a)(2). Violations of any of the SB-281 provisions noted above or a conviction under former Section 5-143 (now Section 5-144) easily satisfies these conditions for a permanent federal firearms possession disability.

There are other reasons that the federal definition of "receive" for purposes of 18 U.S.C. 922(h) should not be applied or extended to the terms "receive" or "receipt" as used in SB-281 or for prosecution under Section 5-144. Unlike the disqualified persons addressed in 18 U.S.C. 922(h), these persons affected by SB-281 are not already criminals or otherwise disqualified from owning or possessing firearms. For example, unlike Section 922(h), which bans "receive, possess, or transport" by prohibited persons, nothing in SB-281 purports to ban the mere possession of a handgun by a person without a handgun license; it focuses on the transaction or the transfer of the handgun. Under SB-281, a person who lawfully owns and possesses an "assault weapon" prior to October 1, 2013, may continue to own, possess, transport and lawfully use that weapon. Similarly, the ban on sales and transfers and on the receipt of magazines with a capacity of greater than 10 rounds does not ban the continued possession or use of such magazines or even the receipt of such magazines in transactions taking place out-of-state. Persons who already own handguns are not required to obtain a Handgun Qualification License to keep and lawfully use his or her already-owned handguns.

Yet, if the existing lawful owner of such an assault weapon, or magazine or handgun were temporarily to loan his assault weapon, magazine or handgun to another law-abiding person, such as a spouse, other family members, a friend or even a student at a sanctioned training course, then the recipient of that assault weapon, magazine or

handgun could be seen as "taking possession" and thus "receiving" these articles simply by that fact alone.  That result does not obtain under Section 922(h), which bars receipt only by a person who is already banned from possessing firearms.  Section 922(h) states that a prohibited person may not "receive, possess, or transport" a firearm in order to keep guns out of the hands of criminals and the definition of "receipt" in Section 922(h) should be read in light of that purpose.  No such legitimate purpose is served by applying that definition to the temporary "receipt," as used in SB-281 and Section 5-144, to otherwise law-abiding citizens.  In short, the provisions of SB-281 and Section 5-144 contemplate an ownership transaction in which there is a permanent transfer or receipt of ownership, not a mere temporary receipt of a regulated firearm or magazine on a shooting outing.

Incorporating the strict interpretation of "receipt" or "receive" applicable to Section 922(h) to the use of those terms in SB 281 would also make it needlessly difficult, if not impossible, to provide and receive the training now required by SB-281 for the Handgun Qualification License.  Specifically, SB-281 enacts Section 5-117.1 of the Public Safety Article, which imposes a training requirement for the Handgun Qualification License and the State Police now propose live fire, as discussed above.  Satisfying these requirements necessitates that the trainee to take temporary possession (and hence "receipt") of various types of handguns in order to be properly and fully instructed on "Handgun mechanisms and operation" and to satisfy the "orientation component" for the "safe operation and handling" of that firearm.  Indeed, the proposed regulations now require handling of a firearm and the actual firing of "one round of live ammunition" before a HQL may be issued.  Such receipt and possession is also mandatory in the eight-hour NRA Basic Pistol course taught to new shooters, as well as in other, more advanced NRA courses.

Nothing in SB-281 expressly exempts training from the separate requirement that person must possess a HQL prior to the receipt of a handgun.  Thus, if "receipt" requires a HQL and "receipt" means mere possession, then the statute would effectively impose a "Catch 22" and an unconstitutional ban on the purchase of handgun.  As *Jackson v. United States,* --- A.3d ----, 2013 WL 5458946 (D.C. 2013), recently explained, "we have concluded that *Heller* means it would be 'impermissible under the Second Amendment to convict a defendant for possessing an unregistered handgun in the home when the District's unconstitutional ban made registration of a handgun impossible, unless the defendant was disqualified from registering the handgun for constitutionally permissible reasons.'" quoting *Magnus v. United States,* 11 A.3d 237, 242–43 (D.C.2011) (citing *Plummer v. United States*, 983 A.2d 323 (D.C.2009); see also *Herrington v. United States*, 6 A.3d 1237 (D.C.2010) (extending this holding to a conviction for unlawful possession of handgun ammunition).  This principle means that the State may not,

under *Heller*, require training as a condition to the purchase of a handgun and then make that training legally or practically impossible to obtain. See *Ezell*, 651 F.3d at 698 (sustaining the argument that Chicago's "range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city."). Moreover, the State has no legitimate interest in banning the receipt of handguns in NRA courses which are otherwise completely lawful and which train students in the safe handling and storage of firearms.

Such practical absurdities are also present for persons under the age of 21, who are expressly permitted to take temporary possession of a regulated handgun under Section 5-133(d) of the Public Safety Article if they are being supervised by a person over 21 or if that person under 21 is "1. participating in marksmanship training of a recognized organization; and 2. under the supervision of a qualified instructor." SB-281 re-enacted these provisions without change. Persons under the age of 21 are barred from obtaining a HQL by Section 5-117(d)(1). Yet, obviously, a person under 21 must also "receive" the regulated firearm in order to perform the shooting permitted by Section 5-133(d) and the supervising person over 21 or the instructor must "participate" in such receipt (within the arguable meaning of Section 5-144) if such shooting is to take place. SB-281 re-enacted these provisions of Section 5-133(d); it did not intend to implicitly repeal these provisions by banning the "receipt" of regulated firearms used for these legitimate purposes. See *State v. Johnson*, 415 Md. 413, 422, 2 A.3d 368, 373 (2010) (noting that the courts must give the statute "a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense."). Construing "receipt" to mean "possession" would render the shooting permitted by Section 5-133(d) legally impossible, thereby rendering that provision a dead letter. By any measure, that result is "incompatible with common sense." (Id.).

In enacting SB-281, the General Assembly did not enact a "Catch 22" law by mandating training that could not be reasonably accomplished without violating other provisions in the same statute, or by allowing shooting by persons under 21, but then making it impossible to "receive" the very guns necessary for such shooting activity. Cf *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, --- F.3d ----, 2013 WL 1092793 (9th Cir. 2013) (refusing to construe a statute to create a Catch 22 situation). The General Assembly did not intend any construction of SB 281 that would lead to absurd results, such as banning all NRA training unless each participant possessed a HQL. See, e.g., *Blue v. Prince George's County*, --- A.3d ----, 2013 WL 5382188 (Md.,2013) ("An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality."), quoting *Town of Oxford v. Koste*,

204 Md.App. 578, 585–86, 42 A.3d 637 (2012), aff'd, 431 Md. 14, 63 A.3d 582 (2013) (citations omitted).  This is particularly so as these provisions of SB-281 regulate the exercise of the fundamental Second Amendment constitutional rights to own and possess a handgun for self-defense in the home and thus should be strictly and narrowly construed to minimize constitutional issues.  See, e.g., *VNA Hospice of Maryland v. Department of Health and Mental Hygiene*, 406 Md. 584, 961 A.2d 557, 569 (2008) ("we have 'consistently adhered to the principle that "an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the act permits."'") (citations omitted).  As explained above, the State cannot, consistent with *Heller*, mandate training for the purchase of a handgun and then make that training impossible.

Accordingly, the regulations should define the terms "receipt" or "receive" in the above provisions of law to limit the terms "receipt" and "receive" to a permanent ownership context and to exclude the temporary receipt of a regulated firearm or magazine for otherwise legal purposes, such as the temporary receipt of a regulated firearm or magazine.  Such a gloss was applied to the temporary "transfer" of a regulated firearm in *Chow v. State,* 393 Md. 431, 903 A.2d 388 (2006).  The Court in *Chow* interpreted former section 442(d)(1), which is currently codified (without substantial change) as § 5–124 of the Public Safety Article.  Section 442(d)(1) provided (and Section 5-124 currently provides) that "'[a] person who is not a regulated firearms dealer may not sell, rent, transfer, or purchase any regulated firearm.'"  (903 A.2d at 390-91) (quoting Section 442(d)).  The Court held that "the plain language and legislative history of the 'Regulated Firearms' subheading indicates that the word 'transfer,' as used in § 442(d), is used **in an ownership context** and does not apply to the situation extant in the case sub judice — that of a gratuitous temporary exchange or loan between two adults who are otherwise permitted to own and obtain regulated firearms."  (Id. at 391) (emphasis added).  The *Chow* Court's interpretation of "transfer" in former Section 442(d)(1) should also be applied to the terms "receive" and "receipt" as used in SB-281 and for prosecutions under Section 5-144, as amended, so to limit the terms "receipt" and "receive" to an "ownership context."

Case 1:16-cv-03311-ELH   Document 135-2   Filed 10/05/21   Page 33 of 39

## CONCLUSION

For all the foregoing reasons, the regulations must be revised and amended in the manner set forth above.   Nothing in these comments should be construed as a waiver or acceptance by MSI or its officers and directors, concerning the underlying legality or constitutionality of any provision of SB 281.  Rather, these comments are limited to addressing some of the major flaws and shortcomings in the implementation of SB 281 by the State Police in the proposed regulations.

Respectfully submitted:

Mark W. Pennak, Member, MSI Board of Directors,

on behalf of MSI, its Officers and Directors

President - Patrick Shomo,

Vice President – Dan Blasberg,

Treasurer - Dave Michailof,

Secretary - Brian Simmons

MSI Board of Directors :

Peter Bagnell,

Rob Bowman,

George Durst,

Mark Pennak,

Greg Primrose,

Teddy Schatz

Frank Zastawnik,

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

Case 1:16-cv-03311-ELH   Document 135-3   Filed 01/29/21   Page 34 of 39
Case 1:16-cv-03311-ELH   Document 75-2   Filed 10/05/18   Page 34 of 39

2011 Maryland Laws Ch. 343 (H.B. 519)                                    Page 1

MARYLAND 2011 SESSION LAWS
REGULAR SESSION

Additions are indicated by Text; deletions by
Text.
Vetoes are indicated by Text ;
stricken material by Text .

Chapter 343
H.B. No. 519
FIREARMS--VIOLATION OF SPECIFIED PROHIBITIONS--AMMUNITION AND PENALTY

AN ACT concerning

**Firearms--Violation of Specified Prohibitions--Ammunition and Penalty**

FOR the purpose of repealing a certain prohibition against the possession of ammunition solely designed for a regulated firearm by a person who is under a certain age; applying a certain penalty to the knowing violation of a certain prohibition against obliterating, removing, changing, or altering the manufacturer's identification mark or number on a firearm; and generally relating to firearms violations.

BY repealing and reenacting, without amendments,
Article--Public Safety
Section 5–142
Annotated Code of Maryland
(2003 Volume and 2010 Supplement)

BY repealing and reenacting, with amendments,
Article--Public Safety
Section 5–133(d) and 5–143
Annotated Code of Maryland
(2003 Volume and 2010 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article--Public Safety**

<< MD PUBLIC SAFETY § 5–133 >>

**5–133.**

(d)(1) Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm or ammunition solely designed for a regulated firearm.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) Unless a person is otherwise prohibited from possessing a regulated firearm, this subsection does not apply to:

(i) the temporary transfer or possession of a regulated firearm ~~or ammunition solely designed for a regulated firearm~~ if the person is:

1. under the supervision of another who is at least 21 years old and who is not prohibited by State or federal law from possessing a firearm; and

2. acting with the permission of the parent or legal guardian of the transferee or person in possession;

(ii) the transfer by inheritance of title, and not of possession, of a regulated firearm;

(iii) a member of the armed forces of the United States or the National Guard while performing official duties;

(iv) the temporary transfer or possession of a regulated firearm ~~or ammunition solely designed for a regulated firearm~~ if the person is:

1. participating in marksmanship training of a recognized organization; and

2. under the supervision of a qualified instructor;

(v) a person who is required to possess a regulated firearm for employment and who holds a permit under Subtitle 3 of this title; or

(vi) the possession of a firearm ~~or ammunition~~ for self-defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest.

<< MD PUBLIC SAFETY § 5–142 >>

**5–142.**

(a) A person may not obliterate, remove, change, or alter the manufacturer's identification mark or number on a firearm.

(b) If on trial for a violation of this section possession of the firearm by the defendant is established, the defendant is presumed to have obliterated, removed, changed, or altered the manufacturer's identification mark or number on the firearm.

<< MD PUBLIC SAFETY § 5–143 >>

**5–143.**

(a) Except as otherwise provided in this subtitle, a dealer or other person may not **:**

**(1)** knowingly participate in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

firearm in violation of this subtitle **; or**

    **(2) knowingly violate § 5–142 of this subtitle**.

(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

(c) Each violation of this section is a separate crime.

SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2011.

Approved May 10, 2011.

Effective date: October 1, 2011.

MD LEGIS 343 (2011)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNCLASSIFIED//FOR OFFICIAL USE ONLY



# MARYLAND STATE POLICE

**Maryland Department of State Police / Licensing Division
1111 Reisterstown Road
Pikesville, Maryland
Office: (410) 653.4500 / Fax: (410) 653.4036**

# ADVISORY

## LD-HQL-17-004

## NOVEMBER 17, 2017

## ALTERNATIVE AMMUNITION FOR HANDGUN QUALIFICATION LICENSE (HQL) LIVE FIRE TRAINING COMPONENT

PUBLIC SAFETY §5-117.1(c)(3)(iii) requires a firearms orientation component that demonstrates the person's safe operation and handling of a firearm, which includes, as required by COMAR 29.03.01.29.C(4), a practice component in which the applicant safely fires at least one round of live ammunition.

The Maryland State Police (MSP) has received several requests to review alternative non-lethal, marking projectiles to satisfy the "live fire" component of the HQL training requirement. The MSP has determined that the use of non-lethal marking projectiles would meet the HQL "live fire" training requirement provided that the non-lethal marking projectile meets the following requirements:

1) meets the definition of "ammunition" as defined in Public Safety §5-133.1(a): "a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm;" and
2) can be fired from a firearm as defined in Public Safety §5-101(h)(1)(i): "a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive."

If you have any questions regarding this matter, please contact the Handgun Qualification License Unit, by email, at msp.hql@maryland.gov, or call the Licensing Division at 410-653-4500. Thank you for your attention to this matter.

Alert Advisories are a service of the Maryland Department of State Police. The content of this document is for OFFICIAL USE ONLY. Any request for disclosure of this document or the information contained herein, should be referred to either the originator of the Advisory, or the Maryland Department of State Police, Licensing Division, 410.653.4500.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**EXHIBIT B**

HQL_0003600

with the person's history of mental illness and that in his opinion, the person is not disabled by such illness in a manner which should prevent his possessing a rifle or shotgun; (5) has been confined to any hospital or institution for treatment of alcoholism unless a licensed physician has by affidavit stated that he is familiar with the person's history of alcoholism and that in his opinion, the person is no longer suffering from a disability in such manner which should prevent his possessing a rifle or shotgun.

**Keeping Guns on Persons or in Vehicles**

It is unlawful for any person to have either concealed or exposed, or to have in a motor vehicle where it can be readily used, any gun which uses explosive ammunition unless a person is engaged in a lawful mission where it is necessary to use a gun; or is employed as a special guard, special police officer, or special detective and has been deputized by the sheriff, or has been appointed a constable, or has been licensed by the laws of the state to carry a gun and is in the immediate vicinity of the premises of any employer whose occupation requires someone to carry a gun.

A person is allowed to carry a gun if he is a member of the military service or authorized as a peace officer; or is engaged in lawful hunting, drill training, or target practice, or is on property which the person owns or leases or with prior permission of the owner or lessee; or is going to or from lawful hunting, drill training, or target practice, or is engaged in any lawful transfer of possession such as carrying a gun from a gunsmith or repairman, provided that the gun is not loaded and the person is traveling on a public highway, or on property which he owns or leases, or on property with prior permission from the owner or lessee.

**Penalty for Violation of Weapons Law**

The residents of Montgomery County, by and through their government, fully expect that any and all persons who engage in hunting or other activities associated with the discharge of firearms and/or bows and arrows, do so in a safe and responsible manner, without placing anyone at risk of harm. We, therefore, seek your voluntary compliance with all provisions of this law as well as other existing state and federal statutes governing hunting and the discharge of weapons. Voluntary compliance with the law will serve to protect the safety and well being of all.

The Montgomery County Department of Police remains committed to public education and to the strict enforcement of these laws. Any person convicted of any of the provisions of this chapter may be fined up to $1,000 or confined in the Montgomery County Detention Center for a period not to exceed six months, or both fine and confinement.

# MONTGOMERY COUNTY WEAPONS LAW

The ownership, possession, and use of weapons within Montgomery County, Maryland, is limited by the County weapons law. This pamphlet is a summary of the major provisions of the law and is provided for information only. Copies of the actual ordinance, Chapter 57, titled "Weapons", of the Montgomery County Code, can be obtained from the Office of the County Attorney, 101 Monroe Street, Rockville, Maryland 20850, or at regional libraries.

The County is divided, for the purpose of the law, into two areas which have different restraints on weapons and their usage. The discharge of guns is totally prohibited within the urban area as shown on the map on the reverse side of this pamphlet, with some specific exceptions as noted below. The law also places some limits on the discharge of guns outside the urban area. In addition, the law includes limitations on the discharge of bows that apply both inside and outside the urban area.

In view of the continued growth and development which takes place in the County it is necessary, for the protection and welfare of our residents and communities, to review the urban area boundary on a regular basis. The urban area boundary can be changed through the normal legislative process. The current boundary has been in place since May 15, 1997.

# DISCHARGE OF GUNS

**Inside the Urban Area**

Other than under the exceptions noted in this summary, a person must not discharge a gun within the urban area (see map inside this brochure), whether the gun is loaded with blank or live cartridges or projectiles of any kind.

**Outside the Urban Area**

Outside the urban area, a person must not discharge fixed ammunition from a rifle or pistol of any caliber higher than a .25 caliber, or discharge a full metal jacketed bullet of any caliber from any gun. Fixed ammunition is defined as any ammunition composed of a projectile or projectiles, a casing, an explosive charge, and a primer, all of which shall be contained as one unit. Hunters are advised that breech loading rifles may not be used to hunt deer in Montgomery County pursuant to Maryland hunting regulations. For more information on the proper weapons and seasons for hunting consult the Maryland Guide to Hunting and Trapping published annually by the Maryland Department of Natural Resources and available on-line at www.dnr.state.md.us/huntersguide/deerregs.asp.

---

The newly revised urban area (again, that portion of the County where the discharge of firearms is generally prohibited) is defined as "that part of the County within the following boundaries: Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/ Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the northeast side of the Potomac River to the emptying of Seneca Creek into the Potomac River; then north along Seneca Creek to Route 112 (Seneca Road); then east along Route 112 to Route 28 (Darnestown Road); then northwest along Route 28 to Route 118 (Damestown-Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northwest along Route 117 to Little Seneca Creek; then northeast along Little Seneca Creek to Black Hill Regional Park; then along the eastern boundary of Black Hill Regional Park to the Park's southernmost intersection with 1-270; then northwest along I270 to Little Seneca Creek; then north along Little Seneca Creek to West Old Baltimore Road; then east along West Old Baltimore Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road; then southeast on Brink Road to the Town of Laytonsville; then along the northern boundary of the Town of Laytonsville to Route 420 (Sundown Road); then east along Route 420 to Route 650 (Damascus Road); then southeast along Route 650 to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road; then northeast along Brighton Dam Road to Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108 (Ashton Road); then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the east side of the Potomac Electric Power Company right-of-way to Route 198 (Sandy Spring Road); then east along Route 198 to the Prince George's County/Montgomery County boundary line; then southwest along the Montgomery County/Prince George's County boundary line to the Montgomery County/District of Columbia boundary line; then along the Montgomery County/District of Columbia boundary line to the place of beginning."



Department of Police
Firearm Safety Committee
2350 Research Boulevard • Rockville, Maryland 20850
240-773-5030

11/08                                                                 #7970

---

A person must not discharge fixed ammunition from any rifle or pistol except at legal game or varmints on the ground or at a safe target which is on or near the ground and will not deflect a bullet.

A person must not discharge a gun onto, across, or within 50 yards of a public road. A person, other than the owner or occupant, must not discharge a gun within 150 yards of a building or camp designed for human occupancy without the owner or occupant's written consent, or shoot, from, onto, or across public or private land without the owner or occupant's written consent.

**Exceptions**

The prohibitions on discharge of guns *inside and outside the urban area* are not applicable to the discharge of a gun: (1) on any target, trap, skeet, or shooting range that has been inspected and approved in writing by the Firearm Safety Committee; (2) in a private basement or cellar target range; (3) where necessary to protect life or property or to kill a dangerous animal; (4) to any duly authorized peace officer acting in the proper performance of his official duties; (5) to the discharge of blank cartridges in musical and theatrical performances, parades, or sporting events; (6) to the firing of salutes by firing squads at military funerals; or (7) under a deer damage control permit issued by the Maryland Department of Natural Resources. (Note: A person may not discharge a gun *inside the urban area* even after obtaining a deer damage control permit unless the person also obtains approval from the Chief of Police).

A person may also discharge a gun *inside the urban area* for the purpose of hunting deer on private property that is at least 50 acres in size under the following conditions: (1) the person discharges the gun from an elevated position; (2) the person does not load the gun until the person is in the elevated position; (3) the person unloads the gun before descending from the elevated position; (4) the projectile has a downward trajectory; (5) the property owner complies with any public notice requirements in applicable regulations; and (6) the property owner has given the Chief of Police written notice at least 15 days before any gun is discharged on the property that lists the day(s) hunting will occur and the time hunting will begin and end each day, lists the name of each hunter, and includes a copy of the record plat or tax assessment record for the property. Up to five owners of contiguous parcels may aggregate their property to meet the 50 acre threshold.

A shooting range approval certificate is valid for three years and is issued by the Firearm Safety Committee after a finding that the discharge of guns on the range will not jeopardize life or property. The certificate may specify types of guns and ammunition that may be used on the range. Certificates will only be issued on written request by the person lawfully in possession of the land on which the range is located.

---



Requests should be sent to:

**FIREARM SAFETY COMMITTEE**
c/o Montgomery County Department of Police
2350 Research Boulevard
Rockville, Maryland 20850

## DISCHARGE OF BOWS

A person must not discharge a bow in the County: (1) from, onto, or across a public road; (2) into or within 150 yards of a building or camp designed for human occupancy without the owner or occupant's written consent; or (3) on, from, onto, or across public or private land without the owner or occupant's written consent.

The restrictions in the previous paragraph do not apply to target archery practiced under the following safety guidelines established by Executive Regulation: (1) target archery may be practiced on public property in the County in any area designated for target archery; and (2) target archery may be practiced on private property in the County with the owner or occupant's written consent as long as: (a) an arrow does not travel across or hit on a public road or strike any person, animal, or vehicle on a public road; and (b) an arrow does not travel across or land on property owned or occupied by a person who has not given written consent for the target archery, or hit any person, animal, building, or vehicle.

**Transfer of Rifles or Shotguns to Minors**

It is unlawful to give, sell, rent, lend, or otherwise transfer any rifle or shotgun to a person under the age of 18 years unless the relationship which exists is that of parent and child, guardian and ward, or adult instructor and pupil, or unless the transfer is in connection with a regularly conducted program of marksmanship training.

**Unlawful Ownership or Possession of Firearms**

A person must not possess, exercise control over, use, carry, transport, or keep a rifle, shotgun, or pistol, if the person: (1) is an unlawful user of or addicted to marijuana or any depressant or stimulant drug or narcotic drug (as defined in Section 5-101 of the Criminal Law Article of the Annotated Code of Maryland), or is under treatment for such addiction; (2) has been convicted in any court of a crime of violence, or of trafficking in narcotics or of a criminal violation of any of the provisions of Section 5-602 to 5-609 and Sections 5-612 to 5-614 of the Criminal Law Article of the Annotated Code of Maryland, or any federal firearms control law; (3) is a fugitive from justice; (4) has been confined to any hospital or institution for treatment of a mental disorder, or mental illness unless a licensed physician has by affidavit stated that he is familiar

EXHIBIT C

# WEAPONS LAW LIMITS



The **urban area** again, that portion of the County where the carrying of firearms is generally prohibited) is defined as "That part of the County within the following boundaries: Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the north-east side of the Potomac River to the emptying of Seneca Creek into the Potomac River; then north along Seneca Creek to Route 112 (Seneca Road); then east along Route 112 to Route 28 (Darnestown Road); then northwest along Route 28 to Route 118 (Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northeast along Route 117 to Little Seneca Creek; then northeast along Little Seneca Creek to Black Hill Regional Park; then along the park's southernmost intersection with I-270; then northwest along I-270 to Little Seneca Creek; then northwest along Route 118 to the Town of Laytonsville; then along the northern boundary of the Town of Laytonsville to Route 420 (Sundown Road); then east along Route 420 to Route 650 (Damascus Road); then southeast along Route 650 to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road; then southeast on Brink Road to Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108 (Ashton Road); then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the east side of the Potomac Electric Power Company right-of-way to Route 198 (Sandy Spring Road); then east along Route 198 to the Prince George's County/Montgomery County boundary line; then southwest along the Montgomery County/Prince George's County boundary line to the Montgomery County/District of Columbia boundary line; then along the Montgomery County/District of Columbia boundary line to the place of beginning."

WEST OLD BALTIMORE RD.
LITTLE SENECA CREEK
I-270
BLACK HILL REGIONAL PARK
LITTLE SENECA CREEK
ROUTE 117
ROUTE 118
ROUTE 28
ROUTE 112
WATTS BRANCH
SENECA CREEK

ROUTE 355
BRINK ROAD
ROUTE 420
DAMASCUS ROAD
ROUTE 97
BRIGHTON DAM ROAD
ROUTE 650
ROUTE 108
ROUTE 198
PEPCO LINE

SCALE IN MILES
0  1  2  3

PRINCE GEORGES COUNTY LINE

DISTRICT LINE
DISTRICT LINE

NORTH

URBAN AREA