Daniel Webster

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

          Plaintiffs             :   16-cv-3311-MJG

                                 :

          -vs-                   :   Pages 1 - 337

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

          Defendants             :

------------------------------X


Deposition of Daniel Webster, Ph.D.

Washington, D.C.

Wednesday, June 13, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409352


MAGNA LEGAL SERVICES

(866) 624-6221

EXHIBIT
5

Daniel Webster

Page 19

1    understanding about what the Maryland State Police

2    were able to do by way of identifying individuals

3    who owned handguns who were subsequently convicted

4    of a disqualifying offense?

5         A.   Could you just restate the question again

6    to some extent?

7         Q.   Sure.  Prior to the HQLs fingerprinting

8    requirement, was the Maryland State Police able to

9    identify handgun owners upon their conviction of a

10   disqualifying offense?

11        A.   They would -- they could determine whether

12   a gun that they possessed had been registered, had

13   been through their system.

14        Q.   I'm asking a slightly different question.

15   I'm, obviously, putting it ineloquently, so let me

16   try it again.  When I purchase a handgun in

17   Maryland, it's registered with the Maryland State

18   Police; am I correct?

19        A.   That's correct.

20        Q.   And the Maryland State Police has a

21   registry of handgun ownership such that, if I were

22   to be convicted of a disqualifying offense, they

Daniel Webster

Page 20

1    could readily look me up, determine if I owned a

2    handgun, and dispossess me of that handgun; correct?

3        A.   That's correct.

4        Q.   And they've always been able to do that,

5    and the fingerprinting requirement of the HQL did

6    not add anything to that capability; am I correct?

7             MR. SCOTT:  Objection.  Go ahead.

8             THE WITNESS:  I think what it does, it's a

9    more clear-cut way to confirm identity.  So, if

10   someone took my wallet, used my ID to purchase a gun

11   that I didn't actually buy, you know, there's a

12   question, I guess, of, you know, who possessed that

13   gun, who purchased that gun.  When you have

14   fingerprint verification, there's no question.

15   BY MR. SWEENEY:

16       Q.   There's nothing about the HQL that

17   requires verification of fingerprints at the point

18   of purchase of a handgun, is there?

19       A.   Verifies identity at that particular

20   point?

21       Q.   Fingerprints.

22       A.   Well, they can check them against other

Daniel Webster

Page 21

1    information.

2         Q.    Let me understand.  When I go to purchase

3    a handgun in Maryland today and I fill out my 77R

4    application, do I give my fingerprints at the point

5    of purchase in order for my fingerprints to be

6    verified at that time?

7         A.    Not at that time.  You're supposed to do

8    that beforehand.

9         Q.    Okay.  And beforehand in connection with

10   acquiring my HQL?

11        A.    Sorry.  Say that again.

12        Q.    Sure.  When you say beforehand, that I

13   provided my fingerprints beforehand, I provided them

14   in connection with applying for my HQL originally;

15   correct?

16        A.    That's correct, yes.

17        Q.    All right.  But that has nothing to do

18   with the ability of the Maryland State Police, if

19   I'm convicted of a disqualifying offense, to

20   identify that I am an owner of a handgun and

21   dispossess me of the handgun.  They had that ability

22   long before the fingerprinting requirement of the

Daniel Webster

Page 22

1    HQL; correct?

2            MR. SCOTT:  Objection.  Go ahead.

3            THE WITNESS:  Well, again, I'll just

4    restate what I said before, which is, if everything

5    was done above board with proper identification,

6    they could be able to do that, but if someone used a

7    fake ID, I don't think they would be able to do

8    that.

9    BY MR. SWEENEY:

10       Q.   How many firearms have been purchased in

11   Maryland with fake IDs?

12       A.   I don't know.

13       Q.   Has there ever been a study done on that?

14       A.   On Maryland specifically, no.  There was a

15   study probably about 20 years ago by the General

16   Accounting Office for U.S. Congress where they went

17   into gun shops in, I believe, about five or six

18   states and attempted to purchase firearms with fake

19   IDs, and what they found in those cases -- I don't

20   remember exactly the number of tries they did, but

21   there wasn't a single case in which they were, their

22   IDs were questioned or their applications did not --

Daniel Webster

Page 23

1    in each case they were able to walk away with

2    firearms.

3         Q.   And none of those dealers were licensed

4    firearms dealers in the state of Maryland; is that

5    correct?

6         A.   That's correct.

7         Q.   And none of those states studied by the

8    GAO had a waiting period like the seven-day waiting

9    period that's long been in effect in Maryland;

10   correct?

11        A.   Again, I don't remember each of the

12   states.  I'm not going to confirm or deny that.  I'm

13   not sure.

14        Q.   All right.  How much time have you spent

15   preparing for this case so far.

16        A.   It's, my last calculation, I think it's

17   about 54 hours, something like that.

18        Q.   And can you tell me what you have spent

19   those 54 hours doing?

20        A.   Sure.  Reviewing relevant documents,

21   relevant studies, looking at ATF data that they put

22   on their website for gun traces, crime gun traces,

Daniel Webster

Page 30

1        Q.    What do you mean by apply directly to law

2    enforcement?  What does that mean?

3        A.    What that means -- and, again, it varies

4    from state to state.  Sometimes that means a

5    face-to-face application at a local or state law

6    enforcement or public safety agency.  Sometimes that

7    means applying not face to face, but through mail or

8    there may be one case that allows an online process.

9        Q.    And what is the importance of the element

10   of applying directly to law enforcement?

11       A.    Right.  So, in my opinion, I think the

12   relevance is that it is a more meaningful, I guess,

13   application, perhaps, frankly, intimidating of sort

14   of underscoring what's at stake here.  The important

15   thing is the overall context of firearm

16   marketplaces, and we know from research that there

17   are a relatively small percentage of licensed gun

18   dealers who through a variety of kinds of evidence

19   suggest that they are not particularly rigorous in

20   vetting and sort of making sure that sales

21   applications are done in an accurate and lawful

22   manner.

Daniel Webster

Page 31

1             And in the context of straw purchase where

2    someone, usually, not always, but usually a

3    prohibited individual is asking someone, in essence,

4    to stick their neck out to purchase a gun for them,

5    that going into a less than reputable gun shop or

6    alternatively going to different private sales

7    venues, might be gun shows or other similar kind of

8    situations through online, that that appears to be

9    and probably, frankly, is a relatively risk-free

10   thing to do.

11            And I think that going directly to law

12   enforcement when a prohibited person is asking

13   someone to buy a gun for them, it likely causes

14   hesitancy to do so.

15        Q.   All right.  So I get the intimidating

16   factor being face to face with a law enforcement

17   officer at police headquarters, but what is the

18   intimidating effect of applying through the mail, as

19   you said, some of these PTPs allow?

20        A.   Yeah.  Honestly, I don't know.  I haven't

21   studied that.

22        Q.   And you also said that there's online

Daniel Webster

Page 32

1    applications for some of these, at least one of

2    these PTPs.  What's the intimidating effect to

3    applying to a law enforcement agency online?

4          A.   Yeah, again, I don't know.  I haven't

5    studied that specifically.

6          Q.   So in Maryland, for instance, is that the

7    example you were thinking that you can apply online

8    for your PTP?

9          A.   In Maryland you have to go to a certified

10   vendor, you know, that processes fingerprinting,

11   does the fingerprinting, so it's not -- you can't be

12   fingerprinted online.

13         Q.   But you apply online?

14         A.   Yeah.

15         Q.   But you apply directly to the Maryland

16   State Police online?

17         A.   Yes.

18         Q.   That would qualify under your definition

19   of applying directly to a law enforcement agency for

20   the permit; correct?

21         A.   Yes, but, again, I think it's distinct

22   from other states that allow that without a

Daniel Webster

Page 33

1   fingerprinting process.

2       Q.   All right.  We'll get to that.  Now, are

3   the firearms marketplaces more important than

4   polling places in America?

5       A.   I'm not sure I understand the question.

6   Important in what way?

7       Q.   Well, you said that firearms markets are

8   important and, therefore, people should be

9   intimidated to make sure they are aware of the

10  seriousness of going into the firearms market.

11          MR. SCOTT:  Objection.

12  BY MR. SWEENEY:

13      Q.   So I'm asking you if they are more

14  important than polling places in that regard.

15          MR. SCOTT:  Objection.

16          THE WITNESS:  I don't know.

17  BY MR. SWEENEY:

18      Q.   Should we intimidate people before they go

19  into polling places to exercise their right to vote

20  in order to impress upon them the seriousness of

21  what they are about to do?

22          MR. SCOTT:  Objection.

Daniel Webster

Page 38

1    fee for the HQL needs to be paid before you get your

2    training or only after you've obtained your

3    training?

4         A.   I don't recall.

5         Q.   Is there anything else that's required in

6    order to get an HQL?

7         A.   Well, most importantly, of course, that

8    you don't have any disqualifying conditions.

9         Q.   So could we call that a background check?

10        A.   Yes.

11        Q.   And is there any difference between the

12   background check that's done for the HQL and the

13   background check that was previously done for the

14   purchase of a handgun in Maryland?

15        A.   Not in a sense of the same agency doing

16   the background check, again, looking for the same

17   disqualifying conditions.

18        Q.   And after one obtains an HQL in Maryland

19   today and goes to purchase a handgun, is there any

20   subsequent background check done at that time?

21        A.   Yes.

22        Q.   And how does that background check differ

Daniel Webster

Page 39

1   from the background check done to obtain your HQL?

2      A.   Again, I don't think they are materially

3   different.

4      Q.   Do you know how long it takes from start

5   to finish to get your HQL?

6      A.   Start to finish?  So, well, there's always

7   a waiting period.  So with respect to, like, a

8   backlog of how long it takes them to process it?

9   I'm not sure what you mean.

10      Q.   Well, if you were -- have you applied for

11   an HQL?

12      A.   I have not.

13      Q.   Okay.  So, if I were to apply for an HQL,

14   which I have done, how long does it take me?  How

15   many days from the time I start the process of

16   obtaining an HQL until I receive my HQL?  Do you

17   have any idea how long that is?

18      A.   I don't.  It would depend upon how quickly

19   you got your safety training requirements and

20   whether there -- sometimes there might be delays

21   with background checks.

22      Q.   So it might take several days for me to

Daniel Webster

Page 70

1    probation in Baltimore City.

2        Q.   If my handgun is stolen because some

3    criminal can't get it in a straw purchase now and

4    decides he wants to take my handgun, do I have any

5    obligations under law with respect to that stolen

6    handgun?

7        A.   You do.

8        Q.   What are they?

9        A.   You're required -- again, this was part of

10   the Firearms Safety Act of 2013.  You're required to

11   report that theft to law enforcement within 72 hours

12   of learning that your gun has been stolen.

13       Q.   If I no longer have the handgun that I own

14   in my possession, the only way I could have

15   dispossessed myself of it is to have transferred it,

16   lost it, or lost it to theft; correct?

17       A.   Pretty much, yeah.

18       Q.   And if I transfer it in Maryland, I have

19   to register that, and I have to do a 77R, even if

20   it's a private transfer; correct?

21       A.   That's correct.

22       Q.   And that's long been the law; correct?

Daniel Webster

Page 73

1      Q.   "Straw purchasers simply have to go into a

2  gun shop, present a government issued ID, complete a

3  form that the gun owner or employee transmits to the

4  FBI and/or state law enforcement agency to complete

5  the transaction."

6           In Maryland it's always been the

7  requirement that the Maryland State Police do a

8  background check, which is over and above the F.B.I.

9  NICS check, and includes more checking on more

10  things than the F.B.I. NICS check includes; correct?

11      A.   I don't know if it's always been the case,

12  but it's been the case for a long time, yes.

13      Q.   Long before the HQL came into effect;

14  correct?

15      A.   Yes.

16      Q.   And when you say in the next sentence most

17  states do not require background checks or record

18  keeping for firearm transfers between non-licensed

19  sellers and purchasers, that's not the case in

20  Maryland; right?  We already talked about that?

21      A.   Correct.

22      Q.   So that factor doesn't apply here?

Daniel Webster

Page 165

1    constitution, in fact, does confer on Americans the

2    individual right to own guns?

3              MR. SCOTT:  Objection.

4              THE WITNESS:  Yes.  Okay.

5    BY MR. SWEENEY:

6        Q.   Did Joseph Curran serve as attorney

7    general under Governor O'Malley?

8        A.   I don't really remember whether they

9    intersected or not.

10       Q.   And did Martin O'Malley attend your

11   summit?

12       A.   He did.

13       Q.   And did he support the Firearm Safety Act

14   of 2013?

15       A.   Yes.  He signed it.

16       Q.   In fact, he was one of the foremost

17   proponents of it; am I correct?

18       A.   Yes.

19       Q.   Who was the primary author of what became

20   the Firearm Safety Act of 2013?

21       A.   I, honestly, don't know.

22       Q.   Did Brian Frosh, the attorney general of

Daniel Webster

Page 166

1   Maryland, have any role in the time he was in the

2   Senate?

3        A.   I suspect he had an important role given

4   his role in the Senate of chairing the Judicial

5   Proceedings Committee and being someone who has had

6   firearm policy as a particular area of his interest.

7        Q.   And have you met Mr. Frosh?

8        A.   Oh, yes.

9        Q.   And you've had conversations with him?

10       A.   Sure.

11       Q.   And you've had conversations with him

12   about firearms law and policy?

13       A.   Yes.

14       Q.   Did you have conversations with him about

15   the proposed Firearm Safety Act of 2013?

16       A.   I mostly talked to him about handgun

17   purchaser licensing.  I think I may have also talked

18   to him -- actually, there were three components, the

19   purchaser licensing, the granting the State Police

20   greater authority to take action against gun dealers

21   who are violating state firearm law, and the

22   requirement for mandatory reporting of theft.

Daniel Webster

Page 167

 1      Q.   All right.  Did you testify on the bill

 2   that became the Firearm Safety Act of 2013?

 3      A.   I did.

 4      Q.   How did that come about?  Who invited you?

 5      A.   I believe Senator Frosh.

 6      Q.   And do you remember what he asked you to

 7   do?

 8      A.   He asked me if I would come and testify in

 9   support of the law.

10      Q.   And you were happy to do that?

11      A.   I was willing to do that, yes.

12      Q.   He didn't subpoena you to do that and

13   compel you to be there to testify, did he?

14      A.   No.

15           MR. SWEENEY:  Let's mark this as 146.

16           (Exhibit No. 146, Pages out of Bill File

17   for SB281, was marked for identification and

18   retained by Mr. Scott.)

19   BY MR. SWEENEY:

20      Q.   And I've marked 156 pages 105 to 110 out

21   of the bill file on SB281, which appears to be

22   written testimony in support of SB281 by you; am I

Daniel Webster

Page 168

1   correct?

2           MR. SCOTT:  I think it's 146, Counsel.

3           THE WITNESS:  It's 146.

4           MR. SWEENEY:  I'm sorry.

5           MR. SCOTT:  You said 156.

6           MR. SWEENEY:  Oh, I did.  It is 146.

7   That's correct.  I'm sorry.

8           THE WITNESS:  Yes.

9   BY MR. SWEENEY:

10      Q.   If I was good with numbers, I could have

11  been an epidemiologist.  Is this a statement that

12  you, yourself, prepared and submitted to the

13  Maryland Senate Judicial Proceedings Committee?

14      A.   Yes.

15      Q.   And that was chaired by Brian Frosh at the

16  time?

17      A.   Yes.

18      Q.   In paragraph two you identify three

19  different aspects of the proposed Firearms Safety

20  Act of 2013, a licensing system for purchasers of

21  regulated firearms, a provision to reduce ammunition

22  capacity limits, and the reporting of events which

Daniel Webster

Page 169

1    triggered disqualification; am I correct?

2         A.   Yes.

3         Q.   And the first one relates to the HQL

4    requirement; correct?

5         A.   Yes.

6         Q.   And the other two are different

7    requirements that would have been a part of the

8    Firearms Safety Act of 2013; correct?

9         A.   Yes.

10        Q.   In total there were a couple of dozen of

11   those requirements; correct?

12        A.   I don't remember the exact number of

13   requirements.

14        Q.   We'll get to that.  You say in the next

15   paragraph, "Arguably, the most important objective

16   of the state's gun laws is to prevent dangerous

17   individuals from possessing firearms."  Do you see

18   that?

19        A.   Yes.

20        Q.   By dangerous individuals are you referring

21   only to individuals who are disqualified by reason

22   of mental illness or defect or have been convicted

Daniel Webster

Page 170

1  of a disqualifying criminal offense?

2      A.   Yes, and, of course, that extends to

3  individuals under certain domestic violence

4  restraining orders as well.

5      Q.   I accept that.  But no other individuals;

6  am I correct?

7      A.   Right.

8      Q.   Now, you say here that the system, the

9  Maryland system is especially vulnerable to illegal

10  straw purchases and individuals using false

11  identification in their applications to purchase

12  regulated firearms; am I correct?

13      A.   Mm-hmm.  Yes.

14      Q.   And you have no data on the special

15  vulnerability of Maryland to illegal straw

16  purchasers or the use of false identification by

17  individuals purchasing firearms; correct?

18      A.   No.

19      Q.   And here's that General Accounting Office

20  study that you referred to in which they went and

21  used false identification at gun stores in Virginia,

22  West Virginia, Montana, New Mexico, and Arizona;

Daniel Webster

Page 171

1    correct?  We talked about that a little earlier.

2        A.   Yes.

3        Q.   Now, down in the next line it says, "All

4    five states conform to minimum requirements of the

5    Brady Act relying on instant background checks, but

6    do not require fingerprinting or waiting periods for

7    firearm purchases."  Did I read that correctly?

8        A.   Mm-hmm.  Yes.

9        Q.   Does that refresh your recollection that

10   the GAO study you relied on involved states that did

11   not have waiting periods for firearms purchases like

12   Maryland does?

13       A.   Yes.

14       Q.   The GAO did not make any study and, to

15   your knowledge, there is no study of the degree of

16   scrutiny, casual or otherwise, that Maryland

17   firearms dealers like my client give to firearms

18   purchasers; correct?

19       A.   Correct.

20       Q.   That same paragraph three sentences down

21   it says, "Systems requiring firearm purchase

22   applications be processed directly by law

Daniel Webster

Page 172

1    enforcement agencies," skipping, "would result in

2    fewer false applications for firearm purchases being

3    processed and fewer guns in the wrong hands."  Did I

4    read that correctly?

5         A.    Mm-hmm.  Yes.

6         Q.    All right.  And the HQL is an example of

7    something which is processed directly by law

8    enforcement agencies in your statement here?

9         A.    Well, it's processed now through the

10   certified, the fingerprint component is processed by

11   the certified vendors to do that.

12        Q.    And you said here you assumed, however,

13   that the HQL would be implemented by direct

14   application to law enforcement agencies; correct?

15        A.    Yes.

16        Q.    And that didn't happen; right?

17        A.    That's correct.

18        Q.    The next paragraph you say,

19   "Permit-to-Purchase licensing and registration

20   firearms laws could mitigate the potential negative

21   consequences of negligent sales practices by gun

22   dealers."  Do you see that?

Daniel Webster

Page 173

1        A.    Yes, at the bottom of page one there.

2        Q.    And you don't have any data on negligent

3    sales practices by Maryland gun dealers or my client

4    in particular, Atlantic Guns; correct?

5        A.    Correct.

6        Q.    The next paragraph carries over onto page

7    two, and down below it talks about federal firearms

8    sales laws have several weaknesses, and it cites

9    Braga and Gaglardi.  Is that the Braga study that we

10   talked about earlier today?

11       A.    No.  Actually, this references a chapter

12   in the book Reducing Gun Violence in America that we

13   just discussed that came out in 2013.

14       Q.    All right.  And the point made here is

15   that there is no specific statute making straw

16   purchases illegal under federal law; correct?

17       A.    Correct.

18       Q.    And that's not the case in Maryland where

19   we have a law that makes straw purchases illegal;

20   correct?

21       A.    That's correct.

22       Q.    And the next paragraph you point out that

Daniel Webster

Page 174

1    Connecticut, Iowa, Massachusetts, New Jersey, New

2    York, and the District of Columbia all require

3    persons wishing to purchase handguns apply directly

4    with a law enforcement agency and be photographed

5    and fingerprinted; correct?

6         A.   Yes.

7         Q.   And that's what you were assuming the

8    Maryland Handgun Qualification License would

9    require; correct?

10        A.   Correct.

11        Q.   But it did not; correct?

12        A.   Correct.

13        Q.   Now, you went on on page four and page

14   five to focus on the policies involving reporting of

15   the mentally ill and banning assault weapons and

16   large capacity ammunition feeding devices as

17   provisions in the proposed Firearm Safety Act that

18   you believed would help prevent gun violence;

19   correct?

20        A.   Yes.

21        Q.   And there are a number of other provisions

22   in SB281 that also would prevent gun violence;

Daniel Webster

Page 175

1    correct?

2         A.   Yes, in my opinion.

3         Q.   All right.  And let's mark as Exhibit 147

4    a copy of SB281.

5              (Exhibit No. 147, SB281 File, was marked

6    for identification and retained by Mr. Scott.)

7    BY MR. SWEENEY:

8         Q.   I'm not going to apologize for how it

9    looks.  I have no Maryland legislative process, but

10   I will ask you have you seen previously the document

11   that we've marked as 147, which is a markup of

12   Senate Bill 281, which is the Firearms Safety Act of

13   2013 as passed.

14        A.   Yes.

15        Q.   And do you recognize this as the actual

16   content of that law?

17        A.   Appears to be.

18        Q.   And it was codified in different

19   provisions of the Maryland code, but this is the

20   only really back-to-back iteration of what was

21   contained in that act; correct?

22             MR. SCOTT:  Objection.

Daniel Webster

Page 178

1    we had, the states with permit-to-purchase licensing

2    had proportionally fewer of their guns used in

3    crime, actually came from guns that they sold and

4    were regulated under state law.  They had fewer

5    number of guns that made their way very quickly from

6    a retail sale to criminal involvement.

7              They generally had lower levels of firearm

8    mortality and a growing body of evidence in what we

9    had begun of our first iteration of the effect of

10   Missouri's repeal of a handgun purchaser licensing

11   system.  At that time, again, the evidence was

12   indicating that the purchaser licensing was

13   protective both against diversions of guns from

14   criminal use and against homicide rights, preventive

15   against homicide.

16             We now have additional research that makes

17   me feel even stronger that this is a type of policy

18   that is among our most effective at curtailing gun

19   violence.

20        Q.   So what did Missouri's permit-to-purchase

21   plan have in common with Maryland's HQL requirement?

22        A.   Well, first and foremost, if you were

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 27 of 39

Daniel Webster

Page 179

1    going to purchase a handgun, you needed to get a

2    permit.  And that was always step one.  I think

3    that's the most important.

4         Q.   And that was a permit that you had to

5    apply directly to a law enforcement agency in

6    Missouri to get; correct?

7         A.   Yes.

8         Q.   Unlike Maryland?

9              MR. SCOTT:  Objection.

10             THE WITNESS:  Correct.

11   BY MR. SWEENEY:

12        Q.   And Missouri didn't require fingerprinting

13   like Maryland requires fingerprinting, did it?

14        A.   That's right.

15        Q.   And it didn't require training either;

16   correct?

17        A.   That's correct.

18        Q.   So, if we're looking for a common

19   denominator, there's only one common denominator

20   between the Missouri PTP law and the HQL, and that's

21   the requirement of a permit in order to purchase; am

22   I correct?

Daniel Webster

Page 180

1        A.   Yes.

2        Q.   Do any of the components of the Firearms

3   Safety Act, other than the HQL, not have any effect

4   on firearms violence?

5        A.   I have to go through all of these

6   provisions.

7        Q.   Just the ones you talked about.  Would

8   they not have any effect at all or do you think

9   they'd have some effect on preventing firearms?

10        A.   I think some effects.  Some of them would

11   be more gradual than others.  So, for example, like

12   an enhanced regulatory capacity for State Police

13   with respect to licensed gun dealers, it may be that

14   is a more gradual effect as compliance increases and

15   the degree to which the State Police demonstrate

16   that there are consequences to not following the

17   laws.

18             So that is sort of a question mark of how

19   quickly that might impact laws.  The data we have

20   about licensing suggests that, when you have a new

21   law, there's generally some impact that grows a

22   little bit over time, but that's my own opinion is

Daniel Webster

Page 184

1    by Collins and colleagues this year they found

2    that -- and I can pull it up probably quickly here

3    or it's actually in my report.  Anyway, they made

4    distinctions between fingerprinting, discretionary

5    permitting, so there's only three states that allow

6    some discretion meaning, even if you don't meet a

7    disqualifier, if something is, there's a red flag,

8    so to speak, in someone's record, they can use

9    discretion to deny.  That's the most restrictive

10   form of licensing with fingerprinting and then all

11   other licensing.

12          And, basically, there was a dose response

13   kind of effect that the strongest effects were for

14   those that allow discretion.  Second strongest was

15   those that required fingerprinting.

16   Q.   So in your own studies of Missouri and

17   Connecticut and Maryland under PTP laws, have you

18   been able to identify any, a special value to

19   fingerprinting as opposed to the other elements of

20   the PTP law in effect in a particular jurisdiction?

21   A.   Not with those three separate studies I

22   can't say that we have.  Basically, what we've done,

Daniel Webster

Page 185

1    this is what we did in each case is -- well, I'll

2    take it one by one.  So Missouri we were interested

3    in understanding what happens when you take a law

4    away that other research suggests might be important

5    for preventing diversion of guns for criminal use.

6            Connecticut we are looking at the impact

7    of that particular policy and its effect.  One

8    reason we chose those two policy change times is

9    that, until the Firearms Safety Act of 2013 in

10   Maryland, those were the two most recent changes

11   that were, could be studied.

12           So now we're, with the Maryland law we're

13   been able to first look at indicators of diversions

14   from crime gun trace data.  We've been able to look

15   at survey data from people involved in underground

16   gun market, and now we've had some early data on

17   homicides from an extended analysis of a paper that

18   we published recently in the Journal of Urban Health

19   looking at the effects of state firearm policies on

20   homicide rates in large urban counties.

21           So what the published study found was an

22   average, aggregated average across all of the

Daniel Webster

Page 186

1    policies 14 percent reduction in firearm homicide

2    rates in that study that covered data from 1981

3    through 2015.  As I presented in the report, my

4    report, we were interested to understand what was

5    going on in Maryland and also understanding probably

6    at least a third of my time is focused on

7    understanding what's going on in Baltimore and its

8    gun violence program and different strategies to

9    address it.  I've been mostly studying local

10   policing and community prevention programs.

11          But through my studies and another study

12   published by Steven Morgan at Johns Hopkins it was a

13   very well-known phenomenon that occurred in

14   Baltimore following the death of Freddie Gray, the

15   in-custody death of Freddie Gray that led to broad

16   civil unrest and riots, documented change in

17   policing practices, sort of an underpolicing, a step

18   back by the police department.

19          So, depending on the statistical model of

20   sort of what was the impact of that civil unrest in

21   the Freddie Gray case, anywhere from 50 percent to

22   100 percent increase in shootings and homicides

Daniel Webster

Page 187

1    associated with that change.  So we knew that that

2    was a huge historical confounder that, when you're

3    trying to tease apart the effect of the law overall

4    in Maryland, you had to understand what was going on

5    in Baltimore.

6              So we stratified our estimate of the

7    effect of this law on gun homicides in the major

8    urban counties other than Baltimore.  That includes

9    Baltimore County, Anne Arundel County, Montgomery

10   County, Prince George's County, and we found a large

11   and statistical significant decrease in gun homicide

12   rates in those counties while a 25 percent increase

13   in Baltimore, again, Baltimore influenced by the

14   post-Freddie Gray riot data.

15             So to me the available data that we have

16   right now suggests that the law is working as

17   intended.  It's preventing the diversions of guns

18   for criminal misuse, and it's leading to fewer

19   homicides with guns.

20             MR. SWEENEY:  Could you reread my

21   question, Kathleen, if you can find it?

22             (The reporter read back as requested.)

Daniel Webster

Page 188

1   BY MR. SWEENEY:

2       Q.   And your answer to my question is no, you

3   have not; correct?

4       A.   The answer to your question was we studied

5   each of these laws separately and reported what we

6   found.  And as we discussed, there are differences

7   in these laws, one of which is the fingerprint

8   requirement with respect to difference between

9   Missouri and Maryland.

10      Q.   And the only thing that Missouri,

11  Maryland, and D.C. have in common, and Connecticut

12  have in common is that they all require a permit to

13  purchase?

14      A.   No.  There are other things that Maryland

15  shares with, certainly with Connecticut.

16      Q.   With respect to the requirements of their

17  permit-to-purchase law, the elements differ in each

18  of those three states, so the only common

19  denominator for the three states is that they all

20  require a permit to purchase?

21          MR. SCOTT:  Objection.

22          THE WITNESS:  Maryland and Connecticut

Daniel Webster

Page 189

1    both require safety training, and they both require

2    fingerprints.  So those two things, and they also

3    require a point of sale background check

4    requirement.  So they are similar in those three

5    respects.

6    BY MR. SWEENEY:

7        Q.   And Missouri doesn't require those?

8        A.   That's correct.

9        Q.   So the three only have in common that the

10   permit to purchase is required; correct?

11           MR. SCOTT:  Objection.

12           THE WITNESS:  Among all three, I will

13   agree that what you said is factually correct.

14   BY MR. SWEENEY:

15       Q.   And that Maryland differs from Missouri

16   and Connecticut in that regard because, unlike

17   Missouri and Connecticut, it does not require a

18   direct application to law enforcement in order to

19   obtain that permit; correct?

20           MR. SCOTT:  Objection.

21           THE WITNESS:  I'm not sure what to do.

22           MR. SCOTT:  I'm objecting to the question.

Daniel Webster

Page 190

1    You can answer.

2            THE WITNESS:  Okay.  So your statement was

3    that Maryland differs from those other two with

4    respect to the other two have direct, in-person

5    application.  Maryland does not.  That is true.

6            MR. SWEENEY:  Let's take a break.

7            (Whereupon, a short recess was taken from

8    3:43 to 3:51 p.m.)

9    BY MR. SWEENEY:

10       Q.   Doctor, in your expert report on page two

11   you assert that the Center For Gun Policy and

12   Research that you direct was established to look

13   objectively at all available data; correct?

14       A.   Yes.

15       Q.   And when you review the research on the

16   effect of gun controls on violence that you do, do

17   you always follow that principle?

18       A.   Yes.

19       Q.   And when you draw a conclusion about the

20   impact of permit-to-purchase laws on homicide rates,

21   do you objectively review all the relevant scholarly

22   research?

Daniel Webster

Page 248

1    say the firearms selected do not constitute a random

2    sample and should not be considered representative

3    of the larger universe of all firearms used by

4    criminals or any subset of that universe; is that

5    correct?

6        A.    That's what it states.

7        Q.    Do you have any information that the ATF

8    is saying that?

9        A.    Well, I think they are correct in the

10   first part in that, in essence, there's no way for

11   us to know whether they represent an accurate sample

12   or not, but I think the statement dismisses the

13   validity and importance of those data more so than I

14   feel is the case, and I think many experts would

15   agree.

16       Q.    Your report on the HQL in Baltimore

17   includes data from a survey conducted of criminals

18   in Baltimore; correct?

19       A.    Very specifically we conducted a survey of

20   individuals on parole and probation, and these were

21   anonymous surveys, and we recruited outside of

22   offices where parolees, people on probation report

Daniel Webster

Page 249

1    to their POs.

2         Q.    So how did you determine that they

3    qualified for that narrow definition of criminal

4    that you were using?

5         A.    We asked them.  We asked them whether they

6    were on parole or probation.

7         Q.    And how did you identify these criminals

8    to ask them that question?

9         A.    I just said that.  We recruited

10   individuals as they were exiting the buildings in

11   which the Maryland Department of Public Safety and

12   Correctional Services has places for people to

13   report who are on parole and probation.

14        Q.    Did you do anything to verify whether or

15   not these individuals, in fact, were criminals, in

16   fact, were on probation?

17        A.    No.  This was an anonymous survey.  We

18   wanted, we thought the best way to get honest,

19   accurate data is to not ask for identifiers that we

20   would verify.

21        Q.    Did you ask these men if they actually

22   tried to get a gun before the HQL went into effect?

Daniel Webster

Page 250

1      A.   We asked them their experience in

2   acquiring firearms in the underground market.  I

3   don't have the very specific survey items in front

4   of me, but we asked them questions that were, like,

5   ever?  Have you ever done this?  And then we asked

6   about the last 12 months, and then we had a set of

7   questions that asked them to, in their own, for

8   their own impressions or perceptions whether they

9   observed, perceived changes in the ability to get

10   guns or get individuals to buy guns for them

11   following the October 2013 gun laws.

12      Q.   How many of the men you surveyed admitted

13   to getting a gun after the Firearms Safety Act was

14   in effect?

15      A.   I'd have to go back and look at our data.

16   I don't remember offhand.  We didn't ask the

17   question exactly in the way that you just phrased

18   it.  We asked, as I mentioned before, we asked about

19   whether they acquired a gun within the past

20   12 months.  So, based on when we were collecting the

21   data, anybody said yes to that question would, in

22   essence, would have been acquiring a gun post

Daniel Webster

Page 251

1   Firearms Safety Act.

2        Q.    And you didn't ask any of them if they had

3   ever acquired a gun prior to the Firearms Safety Act

4   going into effect?

5        A.    We, again, asked whether they ever had and

6   then the experience within 12 months, so sometimes

7   some said yes to the first question of ever, and

8   more said no to the more frequent, more recent time

9   period than ever.

10       Q.    Did you do anything to parse that ever

11   period in a pre-FSA and a post-FSA section?

12       A.    No.

13       Q.    It's possible that none of the men you

14   interviewed actually acquired a firearm prior to the

15   FSA taking effect?

16       A.    Is it possible?  Let me -- is it possible?

17   Yeah, it's possible.  I think it's incredibly highly

18   improbable, again, based upon the differences in

19   response of ever acquired and acquired within the

20   past year.

21            MR. SWEENEY:  Let's take a quick break.

22            (Whereupon, a short recess was taken from