

# A Farewell To Arms

The Solution to Gun Violence in America

**Maryland Attorney General's Special Report**

**J. Joseph Curran, Jr., Attorney General**

October 20, 1999

EXHIBIT
12

# EXECUTIVE SUMMARY

**A** three-year old in Baltimore City kills himself with the handgun he finds under a mattress.  A mother of two is shot in Prince George's County hanging curtains in her window. A Park Heights pastor is gunned down in a botched robbery outside his home. A stray bullet from a drug dispute fells a thirteen-year old girl outside her Carrollton Ridge rowhouse, making her the fifth to die in the neighborhood in four months.

How violent must it get before we demand an end? How many more anguished parents must bury their children before we deal with gun violence head on, instead of taking the small, timid measures which have constituted "gun control" for the past quarter century? How many tragedies of premature death and disabling injury must we endure before we realize we need to think about gun violence in a different way?

Gun violence is not just about law enforcement. Children dying in a school cafeteria, an elderly man taking his own life with a handgun, an eight-year old shooting his sister - in these tragedies we must begin to recognize the multi-dimensional. Gun violence is about law enforcement, but it is also a crisis of public health and consumer protection. We have thus far attempted only to fix the law enforcement piece, *e.g.* prohibiting convicted felons from owning guns, doing background checks on some gun buyers. Yet because our problem is more complex, this one-dimensional approach dooms us to failure. Until we recognize this truth, we will not be able to fashion the solutions that will finally end our nightmare.

We are overrun with guns. Despite waiting periods, one-gun-a-month laws, and other faltering attempts to stem the flow, we are hemorrhaging guns into our streets, schools and homes. In a country of about 270 million people, there are over 200 million guns - 65-70 million of which are handguns - and these numbers are climbing. Forty-four million Americans - or 25% of all adults and 38% of American households - possess at least one gun.

Yet despite the ever-increasing number of guns in circulation, the number of Americans choosing to own a firearm is declining. *Fewer and fewer of us own more and more guns.* Only 16% of Americans own a handgun; five out of six of us do not.

Thus, there are two critical questions we must ask ourselves. First, what do we pay to indulge the minority among us who accumulate firearms? In other words, what is the cost of gun

☛ *Gun violence is about law enforcement, but it is also a crisis of public health and consumer protection.*

☛ *In Maryland, more people die from firearms than motor vehicle accidents - well over 700 a year.*



HQL_0000612

ownership in America? The answer lies in our daily headlines, in the quiet mourning for lives lost, and in the economic toll of these recurring tragedies. The costs are at once incalculable and astronomical.

First and foremost, we pay in deaths. Over 35,000 Americans die from firearms every year - about 100 deaths a day. Firearm injuries have doubled since 1962 and are now the eighth leading cause of death. In Maryland, more people die from firearms than motor vehicle accidents - well over 700 a year. Handguns are responsible for the vast majority of these fatalities.

The U.S. gun homicide rate for children under 15 years old is *sixteen* times higher than in 25 other industrialized countries combined. In 1996, 104 Maryland children under age 19 died from firearm homicide or suicide. In addition, for every firearm death in Maryland and nationwide, nearly three people suffer non-fatal firearm injuries.

Contrary to popular perception, most gun death in America is not crime-related. Suicides, which have doubled over the past few decades because of greater access to firearms, represent 54% of all firearm deaths. Unintentional shootings constitute 3-4%. Homicides represent 41%, and most of these deaths occur among family members or acquaintances.

This breakdown underscores the multi-faceted nature of gun violence. Law enforcement measures can address only the relatively small percentage of deaths represented by homicides outside the context of family violence. If we were also to institute public health and consumer protection measures, we could begin to prevent both the 58% of deaths represented by suicides and unintentional shootings, and the substantial percentage of homicides occurring among family and friends.

In addition to death and injury, we also pay in economic terms. The price of gun ownership is not measured only by the human costs of cutting short a child's life or consigning a teenager forever to a hospital bed. Firearm death and injury impose economic burdens, *i.e.*, the costs of medical care, lost productivity and quality of life, police and emergency services, and criminal justice resources. Medical care alone costs between $2.3 and $4 billion annually, of which at least 67% is borne by the public through elevated insurance premiums and higher taxes. Estimates of additional direct and indirect costs range from $20 to $112 billion annually. Based on conservative estimates, Marylanders pay more than $90 million a year in lifetime medical costs alone for firearm injury and deaths.

Those are the facts. A declining minority of Americans own an ever-increasing number of guns. Yet all pay the consequences, as we watch children

☞ *Based on conservative estimates, Marylanders pay more than $90 million a year in lifetime medical costs alone for firearm injury and deaths.*

## Parents End Hunt for Killer of Son

■ **Crime:** Marine was shot in August at a bus stop. His father went back to the spot every week, armed with a sketch of the gunman. Now a gang member

3

HQL_0000613

die in our streets and we shoulder the increasing costs of that carnage.

As this tragedy has unfolded, how has the gun industry responded? It has refused to make guns safer. It has failed to market and distribute its products in a way calculated to keep guns out of the hands of children and criminals. It has reacted to a saturated market by creating new products with greater killing power and by attempting to expand its market to women and children.

Unlike many consumer products, guns can last for decades. With fewer Americans wanting to own a gun, the industry has contrived reasons to buy new guns. Instead of using the need for innovation to produce safer guns, it has opted to develop guns with increased lethality. As one scholar writes, "Lethality is the nicotine of the gun industry." The industry has created the desire to buy "better" guns by putting on the market assault-style weapons and firearms with greater ammunition capacity, higher firepower, or increased concealability. If having the capacity to kill one person is good, being able to kill 30 people without reloading is even better. The industry has also marketed its innovative new products aggressively to expand its market, targeting women and children.

The freedom the gun industry

☞ **Unlike virtually every other consumer product, from refrigerators to toothpaste, guns are exempted from the jurisdiction of the Consumer Product Safety Commission.**

enjoys to pursue these strategies has no parallel. Unlike virtually every other consumer product, from refrigerators to toothpaste, guns are exempted from the jurisdiction of the Consumer Product Safety Commission. Instead, the federal government's power over firearms and ammunition is limited essentially to issuing licenses and collecting taxes.

We would not tolerate for a moment a situation in which there were no safety regulation of automobiles. We take for granted the wisdom of the regulation that makes power lawnmowers safer. No one regrets the lives saved every year since safety standards made butane cigarette lighters child-resistant. Yet guns, an inherently dangerous product, are free from health and safety regulation.

Increasing the killing power of firearms has been the gun industry's reaction to declining gun ownership and bloodletting across America. What, then, should be our response? When a man killed 16 children and a teacher with four handguns at Dunblane Primary School in Scotland in 1997, Britain banned all handguns. When a man gunned down 35 people with a variety of assault weapons in Australia in 1996, that country banned all automatic and semi-automatic weapons and pump-action shotguns.



**Survival 101: 'Get Down'**

*Parents Teach Children to Take Cover When Bullets Fly at East Capitol Dwellings.*

4

HQL_0000614



Now it is our turn. Two teens massacre 12 children and a teacher at Columbine High School in Colorado. A disgruntled day trader in Atlanta goes on a shooting spree leaving nine people dead and 13 wounded. A man guns down 8 teens and adults celebrating a religious holiday in the sanctuary of a church; even our institutions of faith are no longer inviolate. So should we wrangle for months over whether background checks at gun shows make sense? Should we fight in Congress and state legislatures for a few more of the modest proposals that mean gun control in this country and then declare victory? How long do we wait for a genuine solution? Until 25 children are killed on a playground? Or maybe 35? Or 100?

No. The time is now. We must get serious - no more band-aids, no more excuses. The moral fiber of our society will be measured by our response. The problem is not just guns in the wrong hands or a failure to enforce laws already on the books. Yes, we should use all the tools at our disposal to prevent crime. Yet this is about more than crime. It is a public health crisis - an epidemic of violent yet preventable death. Modest measures that keep guns away from criminals, together with all the punishment a civilized society can impose, will never stop all the dying.

Getting serious means posing the second critical question: Are the terrible costs that flow from handgun violence worth the benefits? In other words, is the price we pay for indulging the minority who own handguns really worth it? This cost-benefit analysis leads to one answer only - no. The costs overwhelm the benefits.

The common justification for widespread civilian gun ownership is two-fold: the hunting and shooting sports, and self-defense. Neither provides justification for the millions of handguns circulating in our neighborhoods. Hunters and sports shooters do not generally use handguns, and the notion that we are safer with guns in our homes to defend ourselves is false. Study after study shows that guns are rarely used successfully in self-defense, and the chance of a family member dying from a firearm-related injury is far greater in homes with guns.

For me, therefore, the answer is easy. I have added up the costs, and they outweigh the benefits. As a grandfather, I am ready to say enough children have died. In short, I believe that we should no longer allow unrestricted handgun ownership. More effective laws and vigilant enforcement can reduce criminal firearm injury. Increased safety and child-proofing features on handguns can prevent unintentional shootings. Personalized guns can prevent teen suicides and injury from stolen guns. Yet even all these measures would still leave untouched thousands of preventable handgun injuries and deaths every year. We would still be left mourning the multitude of deaths and disabling injury which result from the adult suicide attempts and domestic assaults

☞ *Is the price we pay for indulging the minority who own handguns really worth it?*

HQL_0000615

☞ *We must institute a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership.*

which occur in homes across America every day.

Thus, our public policy goal should be to restrict the sale and possession of all handguns to those who can demonstrate a legitimate law enforcement purpose or can guarantee that the use of such guns will be limited to participation in a regulated sporting activity. Handgun ownership that advances reasonable law enforcement purposes must be permitted. Individuals with a professional need to have a licensed gun - law enforcement officers, gun collectors, some business owners and certain other professional groups - will continue to keep handguns on business premises or for use on the job. The rest of us, however, must give them up. The cost has simply become too great.

We must begin to work toward this goal immediately. We must institute a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership. This plan must reflect the several dimensions of gun violence, so that it

begins to reduce specific categories of firearm deaths and injuries. Thus, I recommend the following three-step plan to make Maryland the first state in the country to close the door on the widespread handgun ownership that has contributed to so much preventable tragedy and suffering.

## Consumer Protection Measures:

We should seek to reduce child-inflicted firearm injury and other unintentional shootings, teen suicides, and criminal assaults with stolen guns by holding the gun industry to the same health and safety standards imposed on every other consumer product in the American marketplace. Several technologies now exist which, if the gun industry were compelled to develop them, would prevent many of these handgun injuries and deaths.

We should pursue three separate means of requiring the gun industry to adhere to safety standards. Congress should give the Consumer Product Safety Commission jurisdiction over guns. We should impose our own safety standards on all guns sold in Maryland. We should also enable the tort system to restore



6

balance in the marketplace between the industry and the consumer by reinstating strict liability for firearm injury, thereby allowing lawsuits seeking to hold the gun industry accountable in Maryland.

### 1. Federal Firearms Safety Regulation:

At the federal level, I call upon Congress to create a meaningful federal health and safety regulatory authority over the gun industry. The federal government must finally insist on the same level of responsibility from the gun industry as it does from the manufacturers of toys. We must end the absurd paradox that there are no federal safety standards for one of the most inherently dangerous products in the American marketplace.

### 2. State Firearms Safety Regulation:

In Maryland, we must pursue the same strategy. We can accomplish this through either direct legislation or regulation. We should support and work to ensure the success of Governor Glendening's legislative initiative to require handguns sold in Maryland to be "personalized," or capable of being fired only by authorized users. This legislation would prevent unintentional injuries, teen suicides, and assaults with stolen guns.

Alternatively, we can impose personalized gun technology and other safety features on guns sold in Maryland through regulation. We are unique in the country in having a Handgun Roster Board charged with approving all handguns to be sold in Maryland. The Board should promulgate common sense regulations setting safety standards which all handguns sold in



the State must meet. This would allow Marylanders the benefit of all current and emerging technologies which can make guns safer. If this fails, I intend to investigate the possibility of promulgating such regulations under the Consumer Protection Act.

While state regulation should go forward, I also recommend that local governments explore similar measures to regulate the safety of guns in their jurisdictions. Prince George's and Montgomery counties have already taken significant steps toward limiting minors' access to firearms. While state law preempts some local firearms regulation, there is room for local initiative, particularly with respect to minors' access to guns.

We must also ensure that Marylanders do not suffer from any unfair or deceptive firearms marketing practices. I intend to investigate the extent to which the gun industry may be marketing handguns to Maryland children or making misleading claims about the utility of handgun ownership for self-defense.

### 3. Use of Tort System to Promote Firearm Safety Measures:

Holding the companies who design and manufacture guns accountable for preventable gun injury and death will also induce the industry to make guns safer. We should no longer tolerate the

☞ *We must end the absurd paradox that there are no federal safety standards for one of the most inherently dangerous products in the American marketplace.*

7

> ☞ **We must heap appropriate scorn on the industry's "we don't pull the trigger" excuse, as it continues to inject increasingly lethal guns into the marketplace.**

> ☞ **We should impose at least the same requirements on people wishing to own and operate firearms as we do on those wishing to own and operate motor vehicles.**

industry's "not my problem" defense to the carnage its products wreak. We must heap appropriate scorn on the industry's "we don't pull the trigger" excuse, as it continues to inject increasingly lethal guns into the marketplace, to distribute more guns than law-abiding citizens could ever need, and to refuse to take meaningful steps to make guns safer or to keep them out of the wrong hands.

The tort system provides us with time-tested, traditional tools which encourage industries to make products safer by allowing the imposition of liability for product injury. Specifically, the common law doctrine of strict liability shifts the costs of product injury from victims to those who make and distribute the product, thus providing them the incentive to make the product safer. Courts generally impose this liability when a manufacturer's product or activity is inherently dangerous, the risk of injury outweighs its utility, and a safer design is feasible.

Under current Maryland law, we cannot use this common law doctrine; a compromise in 1987 over the Handgun Roster Board eliminated this means to hold the gun industry accountable. At the time, it seemed a good compromise. Technology has



evolved since then, however, and both individuals and governments around the country are seeking to induce the industry to adhere to safety standards and use safer technologies through civil lawsuits. I believe, therefore, that this balance created by the tort system between the gun industry and the consumer should be restored in Maryland. We certainly do not want our State to become a safe haven for guns the industry would not dare market elsewhere. Thus, I will request the General Assembly to reinstate strict liability for firearm injury.

## Law Enforcement Measures:

We should also take several steps to assist law enforcement efforts to reduce criminal, non-domestic homicides and firearm injury.

### 1. Firearm Fingerprint Licensing and Training:

We should impose at least the same requirements on people wishing to own and operate firearms as we do on those wishing to own and operate motor vehicles. Even more to the point, we already require anyone wishing to carry a concealed firearm for protection to obtain a permit. The requirements for this permit are considerably

8

more stringent than those necessary to pass a background check when buying a gun. In addition to never having been convicted of a felony, a person must be found, on the basis of an investigation, not to have exhibited a "propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons." The applicant must also provide fingerprint identification and satisfactory evidence of being qualified and trained in the use of handguns.

There is no reason why the same should not be required of people wishing to own handguns. Is it no less important for a person with a handgun under his mattress not to have a "propensity for violence" than it is for a person carrying the gun to work? Why should we allow people to own handguns without knowing how to operate them safely when we do not allow the same for people driving cars? We should end this nonsensical paradox and require anyone buying a gun to obtain a fingerprint license.

## 2. Lawbreakers Cannot Own Handguns:

We should also take the common sense step of preventing anyone who breaks the law from owning a handgun. Currently, only convicted felons, spouse and child abusers, those adjudicated mentally ill, and those convicted of misdemeanors carrying penalties of more than two years of incarceration are precluded from owning firearms in Maryland. This bar should be extended to anyone, including juveniles, who is convicted of *any* misdemeanor. Recent studies show that any prior misdemeanor convictions increase by sevenfold the chances of future criminal activity, including firearms-related offenses and violent crime. We would eliminate a significant amount of criminal firearm use if guns were taken from the hands of anyone who breaks the law.

## 3. Increase Law Enforcement Tools for Targeting Illegal Sales and Possession of Handguns:

Finally, the General Assembly should provide assistance to law enforcement efforts to reduce illegal sales and possession of handguns by enacting two changes in the firearms laws.

First, illegal possession, sale, or transfer of a firearm should be a felony, not a misdemeanor. Although the misdemeanor charge carries the potential for incarceration, neither offenders nor the criminal justice system treat the offense as seriously as they would if it were a felony. We send the wrong message in charging a person who sells

☞ *Illegal possession, sale, or transfer of a firearm should be a felony, not a misdemeanor.*



Atlanta teen fatally shot by girl, 12

☞ *People must come to realize that we endanger our lives and those of our children by owning and carrying handguns, and by tolerating it in our neighbors.*

ammunition to a minor or engages in interstate firearms trafficking with nothing more than a misdemeanor.

Second, law enforcement officers investigating the illegal sale of regulated firearms should be permitted to use body wires. This would enhance substantially the ability to identify and prosecute straw purchasers and gun traffickers.

## Public Health Measures:

These consumer protection and law enforcement initiatives will make significant strides toward reducing certain categories of preventable firearm injury and death. Yet thousands will still die. None of these measures will stop the multitudes of adults and senior citizens who take their lives in moments of anguish, or the thousands of family members or friends who kill or maim loved ones in moments of rage. To stop this horrific but preventable violence, we must turn the whole ship around. We must stop the unrestricted, widespread public availability and private ownership of handguns.

### 1. Change Our Culture of Guns:

In the short run, we must change our gun culture. People must come to realize that we endanger our lives and those of our children by owning and



carrying handguns, and by tolerating it in our neighbors. There is no reason why, in going to a movie theater or grocery store, we should worry that someone's gun might discharge accidentally and kill our child. As attitudes have slowly but surely undergone radical transformation regarding such critical public health issues as smoking and using seatbelts, bicycle helmets, and child car restraints, so too must owning and carrying handguns come to be seen as dangerous and aberrant behavior. We must change people's minds about how far they are willing to endanger themselves in tolerating the choice of others to carry a gun.



Thus, I call upon everyone - private employers, government agencies, schools, physicians, and especially parents - to help. First, to put teeth into this initiative, I ask the General Assembly to take the lead and make guns in public accommodations illegal. It is one thing to continue to tolerate people choosing to endanger themselves and their loved ones by keeping a gun at home. We should no longer, however, allow them to force others to endanger themselves by going to a movie theater or baseball game where guns are permitted. In addition, private employers outside the context of public accommodations

HQL_0000620

should prohibit guns on their premises, with prominent signs to remind the public that guns must be left at the door.



Second, we must all help escalate the conversation about the dangers of gun ownership. Physicians should counsel patients, and teachers should talk to students about the perils of gun ownership. Schools should ask students and families to sign gun-free pledges. We should create gun-free zones, like drug-free zones, around school premises.

Most critically, parents must be involved. They must talk with their children about the dangers of guns and gun ownership. They must also talk to the parents of their children's friends. How many times might your child have visited a friend whose parents have a loaded gun hidden in a closet? We must begin setting limits for ourselves and those who live around us.

**2. Restrictive Handgun Licensing:**

In the long run, we must go the last mile. These limits must be reflected in the laws by which we govern ourselves. The law must embody the public policy goal of ridding our homes and communities of handguns through restrictive handgun licensing. Handgun ownership which advances reasonable law enforcement purposes can and must continue, but the costs of allowing the rest of us to own handguns are too great.  We should endure those costs no longer.

The result will be well worth it. Imagine an inner city where mothers no longer keep children from playing outside for fear of drive-by shootings. Imagine a suburban high school cafeteria where the worst teenage disagreements lead only to fistfights, never to shoot outs. Imagine a major metropolitan newspaper that would never again blare the headline, "Three Year-Old Boy Shoots Self With Gun Found In Parent's Bedroom." Imagine a hospital emergency room where beleaguered doctors desperately trying to save a child bleeding to death of a gunshot wound would be a thing of the past.

That is the result I want for Maryland and for America.

J. Joseph Curran, Jr.
*Attorney General of Maryland*
October 20, 1999

☛ *The law must embody the public policy goal of ridding our homes and communities of handguns through restrictive handgun licensing.*

11

# I.   The Proliferation Of Guns And Gun Lethality In America

A common misconception holds that our culture of gun ownership dates back to the early days of the Republic, with the bulk of our citizenry owning firearms as our founding fathers drafted the Second Amendment.  On the contrary, gun ownership in the eighteenth and early nineteenth centuries was far from widespread; guns at that time were still individually crafted, very expensive, and difficult to repair, so ownership was restricted largely to prosperous landowners.  Prior to 1850, less than 10% of the populace owned firearms, and public sentiment was indifferent to personal gun ownership.

Only with industrialization in the 1840's, when guns began to be mass pro-duced, did ownership become commonplace.  Our "gun culture" grew, therefore, with the growth of the gun industry, and it was not until after the Civil War that the notion of a right to own guns became part of the American psyche.  Since those post-war years, the gun industry has carefully and successfully cultivated this uniquely American notion of personal gun ownership, and the result has been a flourishing gun culture.[1]

## A.  Gun Ownership

Nowhere in the developed world does a greater percentage of the citizenry own at least one firearm.  Great Britain has banned handguns altogether and Australia has banned all automatic and semi-automatic weapons, as well pump-action shotguns.  Similarly, Japan and most European countries strictly control gun own-ership.[2]  By contrast, 38% of American households and 25% of all adults own at least one gun.  About 23% of households and 16% of adults own at least one hand-gun.[3]  In gun-owning households, the average number of guns is 4.1.[4]  In a country of 270 million people, there are more than 200 million guns in circulation.

☞ *One in four Americans owns a gun.*

---

[1]   *See* MICHAEL A. BELLESILES, *The Origins of Gun Culture in the United States, 1760-1865* at 18-20, 38, and *Introduction to Part One* at 4,5, of GUNS IN AMERICA (Jan E. Dizard, Robert M. Muth and Stephen P. Andrews, eds., 1999).

[2]   TOM DIAZ, MAKING A KILLING: THE BUSINESS OF GUNS IN AMERICA at 8 (1999).

[3]   TOM W. SMITH, NATIONAL OPINION RESEARCH CENTER, 1998 NATIONAL GUN POLICY SURVEY:  RESEARCH FINDINGS, at 10-12, Tables 6-8 (University of Chicago, May, 1999).

[4]   *See* PHILIP J. COOK ET AL., *Regulating Gun Markets*, 86 J. CRIM. L. 59, 81 (1995).

HQL_0000622

## 1. Who Owns Guns?

Members of virtually every demographic group own guns.  Gun ownership is most prevalent among men living in rural areas, where the hunting and gun culture has its deepest roots.  Men are far more likely to own guns than women, and married couples are more likely to own guns than single people.  Gun ownership generally increases with income but bears little relation to educational levels or the presence of children in a home.[5]

Gun possession among juveniles is increasing; 14% of teens report carrying a gun regularly, with the number closer to 22% in the inner city.  These numbers skyrocket to a stunning 88% among convicted juvenile offenders.[6]  In 1996, one in 17 high school senior boys reported carrying a gun to school in the previous 4 weeks, and almost 13% of middle and high school students report knowing a student who brought a gun to school.[7]

Other studies of students in high risk neighborhoods show even more disturbing trends.  A Los Angeles survey revealed that 10% of the youth had owned or possessed a gun at some point, and 30% had a close friend who owned a gun.[8]  Skyrocketing increases in juvenile weapons violations also demonstrate the increase in youth gun possession.  Between 1970 and 1992, annual juvenile weapons violations rose 291%.[9]  Juvenile homicide more than doubled between 1987 and 1994, and virtually the entire increase in homicide offending was firearm-related, *i.e.*, juvenile firearm homicide increased 200%, while homicide offenses involving other weapon types increased only 10%.[10]  Between 80-90% of all juvenile homicides involve a handgun.[11]

The Gun Control Act of 1968 made it illegal to sell or transfer a firearm to a minor.[12]  Yet gun possession rates among teens make clear that a determined youth can usually obtain a gun.  Of those youth reporting gun ownership in a Los Angeles survey of youth in an at-risk neighborhood, 70% had obtained the gun from a friend.  25% of all youth knew where to get a gun in their neighborhood, and 7% reported they could acquire one in less than an hour.[13]  Far too many youth can

☞ *More teens own guns than ever before, including 88% of all juvenile offenders.*

☞ *The presence of children in a home bears almost no correlation to whether a gun is kept in the household.*

---

[5]    Tom W. Smith, *supra*, note 3.

[6]    Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Promising Strategies to Reduce Gun Violence at 4 (February 1999).

[7]    *Id.* at 6.

[8]    Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Report to Congress on Juvenile Violence Research at 11 (July 1999).

[9]    James T. Dixon, *On Lemon Squeezers and Locking Devices: Consumer Product Safety and Firearms, A Modest Proposal*, 47 Case Western Law Review 979, 990 (1997).

[10]    Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, OJJDP Research: Making a Difference for Juveniles at 14 (August 1999).

[11]    OJJDP, Report to Congress on Juvenile Violence Research, *supra*, note 8 at 11.

[12]    Pub. L. No. 90-354, 8 Stat. 162 (1968)(codified at 18 U.S.C. Section 922(b)(1) (1994)).

[13]    OJJDP, Report to Congress on Juvenile Violence Research, *supra*, note 8.

HQL_0000623

acquire a gun without even stepping outside their homes.  During a Senate hearing exploring the problem of children and weapons, the Executive Director of the National School Safety Center stated that "the primary source of all weapons [is] the student's residence."[14]

## 2. Habits of Gun Ownership

> ☞ *One-half of handgun owners buy their guns from unregulated sellers, 53% keep them unlocked at home, and one-third keep them loaded.*

Almost half of all handgun owners report obtaining their handguns from unregulated sources, *e.g.*, gun shows, private sales, gifts.[15]  This means that these purchases are subject to no federal controls whatsoever.  A private gun owner can choose to sell his gun to a minor, an alcoholic, a drug addict, or a convicted felon.

Study after study also reveals that, having bought their guns, most gun owners fail to exercise standard gun safety precautions.  First, they carry them frequently, usually loaded.  Among residents of households with handguns, 23% report carrying the gun away from home within the last year.  22% of the carriers do so almost daily, 11% several times a week, and 17% several times or once a month.  Half of those who carry guns away from home keep their guns loaded while out of the home.[16]

Second, many gun owners ignore standard guidelines for storing a gun.  Over one-third of gun owners keep their guns loaded all or some of the time while at home, and 53% keep them unlocked.  Handgun owners are twice as likely to keep their guns loaded.[17]  One recent study showed that 14% of gun owners living with children kept a gun both loaded and unlocked.[18]  Another revealed that 61% of gun-owning parents keep at least one gun unlocked.[19]

## 3. Breadth of Gun Ownership

### a. How Many Guns Do We Own?

> ☞ *In a country of 270 million people, there are well over 200 million guns.*

No one knows exactly how many guns are currently in our communities, but estimates range from 200 to 250 million, with an influx of new guns into the market of about 5 million annually.[20]  Between 65 to 70 million are handguns.  Most of the

---

[14]   *Children Carrying Weapons: Why the Recent Increase: Hearing on the Possession of Weapons Among Children and the Presence of These Weapons in our Schools Before the Senate Committee on the Judiciary,* 102nd Congress, 2d Sess. (1992).

[15]   Tom W. Smith, *supra,* note 3 at 11.

[16]   Douglas S. Weil and David Hemenway, *Loaded Guns in the Home: Analysis of a National Random Survey of Gun Owners* at 226-227, in Guns in America, *supra,* note 1.

[17]   *Id.*

[18]   *See* Hemingway, *et al.*, *Firearm Training and Storage,* 273 JAMA 46, 47 (1995).

[19]   *See* Yvonne D. Senturia *et al.*, *Gun Storage Patterns in U.S. Homes with Children,* 150 Archives Pediatrics & Adolescent Medicine 265, 265 (1996).

HQL_0000624

growth in ownership has occurred within the last 25 years; a national firearms ownership survey estimates that 80% of all guns in private hands in 1994 had been acquired within the previous twenty years.  Approximately 38,000 gun sales, of which 18,000 are handguns, occur every day in this country.[21]  The Bureau of Alcohol, Tobacco and Firearms ("ATF") estimates that 7.5 million new and used firearms are sold at retail outlets every year.[22]

☞ *Handguns have accounted almost completely for the sharp increase in the number of guns over the last quarter century; there are 65-70 million handguns currently in circulation.*

### b. Who Makes Them?

There are about 1,200 firearm manufacturers in the United States.  The domestic firearms market is a mix of old-line, established manufacturers and new, smaller outfits that have sprung up largely in response to the ban on the import of the cheap handguns known as Saturday night specials.[23]  While many of the most dangerous and misused guns come from the small, often short-lived companies, a few giants of the industry produce the vast majority of domestic firearms.

More to the point, while these old, established companies attempt to paint themselves as "responsible" manufacturers, set apart from the "Ring of Fire" California-based manufacturers of Saturday night specials, the handguns produced by the so-called "responsible" companies are nonetheless among the most commonly used in crime.  Despite the growth of more cheaply-made handguns over the last 15 years, firearms manufactured by Smith & Wesson, Sturm, Ruger & Co., Inc., Colt's Mfg. Co., Inc., and Beretta USA Corp. have also made the list of the top ten crime guns traced by the ATF over the last decade.[24]

An increasing percentage of the guns sold today also come from foreign companies which, as one industry analyst puts it, want their share of the world's "last great [gun] market."[25]  America is a net importer of guns.  Between 1973 and 1994, for example, the average annual firearms export rate was 8% of domestic production.  During roughly the same period, over 20 million guns were imported for the U.S. civilian market.  Most foreign companies exporting firearms to this country sell far fewer guns in their own markets.  For example, in 1993 only 1.2% of Japan's gun production stayed in Japan, which has stringent gun control, while about 80% of its firearms exports came into the United States.[26]  There are almost 800 federally

☞ *A few large manufacturers supply most of the guns sold in this country, but an increasing percentage of the guns flowing into the American marketplace come from foreign companies that take advantage of the huge U.S. demand.*

---

20      *See, e.g.,* BELLESILES, *supra,* note 1 at 17; ADAM WALINSKY, *The Crisis of Public Order* at 299 in GUNS IN AMERICA, *supra,* note 1.

21      OJJDP, PROMISING STRATEGIES TO REDUCE GUN VIOLENCE, *supra,* note 6 at 4.

22      JAMES T. DIXON, *supra,* note 9 at 984 (citations omitted).

23      Many domestic manufacturers have become domestic subsidiaries of foreign companies in recent years, at least in part because such acquisitions have enabled foreign manufacturers to evade the more stringent requirements imposed on gun imports.  DIAZ, *supra,* note 2 at 5.

24      *Id.* at 23-30.

25      *Id.* at 69-70 (citation omitted).

26      *Id.* at 31.

15

licensed gun importers, which bring in both new and military surplus firearms.  For example, one company specialized until recently in importing Chinese military assault weapons.[27]

### c. What Kinds of Guns Do We Own: The Shift from Long Guns to Handguns

🖝 *Fewer and fewer Americans own more and more guns.*

The types of guns sold in the United States has also changed significantly since World War II.  Before the second world war, the gun industry produced primarily a stable line of utilitarian long guns for hunters and sports shooters.  The sharp growth in the industry in the last half century has occurred in the production of powerful handguns and assault rifles - guns designed for military or criminal use rather than hunting.[28]

In the 1960s, rifles and shotguns used mostly for sport constituted 80% of the 80 million guns in circulation, with only 12% of adults owning a handgun.  By 1976, the number of handgun owners had increased to 21%, and at least half of the new guns coming on the market ever since have been handguns.[29]  With respect to imports alone, the percentage represented by handguns increased from 24% to 62% between 1978 and 1994.[30]  Thus, since the 1960's, the percentage of all guns in circulation represented by handguns has risen from 20% to roughly 35%.  The market has changed fundamentally from guns designed for killing animals to guns designed to kill people more and more efficiently.

🖝 *The market for firearms has changed from guns designed to kill animals to guns designed to kill people.*

### 4. Gun Ownership in Decline

Despite our widespread gun ownership and steadily increasing supply of handguns, the percentage of Americans who own guns is declining.  In the early 1970s, 50% of adults lived in households with guns, and this number has fallen below 40% today.  The percentage of adults personally owning a gun has decreased from 29% in 1980 to 25% in 1998.[31]

This decline, however, is occurring in long gun ownership.  Handgun ownership continues to rise.  Between 1973 and 1998, long gun household ownership fell from 42% to 32%, while handgun household ownership rose from 20% to 23%.[32]

## B. The Gun Industry: Unfettered Freedom from Regulation

In the emotional debate about gun ownership in America, with rhetoric from all sides about personal freedom, the founding fathers, and the epidemic of violence, we often lose sight of the pedestrian fact that the gun industry is an extremely

---

| | |
|---|---|
| 27 | *Id.* at 39-40. |
| 28 | *Id.* at 83. |
| 29 | Walinsky, *supra,* note 20. |
| 30 | Diaz, *supra,* note 2 at 30. |
| 31 | Tom W. Smith, *supra,* note 3 at 12. |
| 32 | *Id.* |

16

profitable business.  It also enjoys a unique privilege as the only unregulated industry in corporate America.

## 1. The Business of Guns

The business of making, importing and selling guns is a booming, multi-billion dollar industry.  While the companies make it difficult to get a detailed picture of their activities, estimates put the economic impact of gun and ammunition sales at about $9 billion annually.  Total sales, including accessories and gun-related services, is estimated at between $20 to $25 billion.[33]   One estimate puts hunting expenditures alone, by 17 million enthusiasts, at $10 billion.[34]  The Sporting Arms and Ammunition Manufacturers Institute, Inc., a gun industry trade group, claims that the hunting and shooting sports market generates about $18 billion each year.  Yet these estimates are difficult to verify; one scholar has observed that "the firearms industry is a business so secret that it makes the tobacco industry look like a model of transparency."[35]

☞ *Gun and ammunition sales generate about $9 billion annually.*

## 2. Where Is the Watchdog?

### a. Federal Restraints on the Manufacture, Distribution, and Possession of Firearms

If the way in which the gun industry operates remains a mystery, it should be no surprise that it does so largely as it pleases.  The ATF ostensibly regulates the industry, but its function is limited primarily to issuing pro forma licenses and collecting excise taxes.  Thus, domestic firearms manufacturers, importers, and retail dealers must obtain federal firearms licenses.  Purchasers of new handguns at federally-licensed dealers are also subject to background checks.  What this means in practice, however, is that in America, almost anyone can sell a gun and almost anyone can buy a gun.[36]

☞ *In America, almost anyone can sell a gun and, more significantly, almost anyone can buy a gun.*

### i. Interstate Licensing Requirements

To become a federally-licensed, interstate trafficking gun dealer, one need simply be over 21, have a place of business which conforms to local zoning laws, a clean criminal record, no history of willfully violating any firearms laws, and a few hundred dollars to pay the application fee for the federal license.[37]  If one cannot meet these minimal requirements, one can simply forego the license and sell guns privately, at gun shows or out of one's home.

---

[33]     DIAZ, *supra*, note 2 at 7.
[34]     *See* ALAN FARNHAM, *A Bang That's Worth Ten Billion Bucks*, FORTUNE AT 80 (Mar. 9, 1992).
[35]     DIAZ, *supra*, note 2 at 5.
[36]     *Id.* at 50-58.
[37]     THE GUN CONTROL ACT OF 1968, 18 U.S.C. CHAPTER 44, §923.

HQL_0000627

Until 1993, there were about 250,000 federally-licensed dealers in this country. Only 20,000 had actual stores, and half of those were pawn brokers. Since the passage of the Brady bill, the 1994 crime bill and other administrative reforms, the number has dropped to between 90,000 and 100,000. This decrease has been attributed to the new requirements that licensed dealers specify an actual place of business on the license application, and notify local law enforcement authorities of their license.[38]

☞ **At least 40% of all gun transfers occur outside the minimal federal regulations governing licensed firearms dealers.**

Once licensed, the dealer must keep a record of all gun sales. Yet stringent restrictions instituted by the Firearm Owner's Protection Act in 1986, which rolled back many regulatory controls of the Gun Control Act of 1968, preclude the ATF from keeping any national database of gun ownership, and strictly limit on-site inspections to ensure dealer compliance.[39]

### ii. Restrictions on Buyers

To buy a gun from a federally-licensed dealer, one must be of sound mind and not be a convicted felon or a spouse or child abuser. If these are problems, however, there are no federal restrictions on buying a gun privately from any unlicensed seller willing to make the sale. A buyer without a license also may not purchase a handgun across state lines.[40]

☞ **Conservative estimates put the number of stolen firearms each year at about 500,000.**

### iii. Unregulated Sales and Sources

Thus, even the restrictions placed on "regulated" sales by licensed dealers are lax and poorly enforced. Moreover, at least 40% of all gun transfers occur outside this minimal regulatory framework. While federal law precludes interstate sales among unlicensed, private citizens, it imposes no restrictions on transfers between residents of the same state.[41] In gun shows held every weekend across the country, private citizens exchange guns with no obligation to perform background checks or record the transfer. Estimates of the number of gun shows held annually range from 2,000 to 5,000.[42] In addition, conservative estimates put the number of stolen firearms each year at about 500,000.[43]

---

[38] DIAZ, *supra*, note 2 at 42.

[39] VIOLENCE POLICY CENTER, *Gun Shows in America: Tupperware Parties for Criminals, Executive Summary* at 1 (July 1996). For example, the ATF had an extremely difficult time tracing the guns used in the Columbine High shootings because of the limitations placed on the agency by Congress. *See* WALL STREET JOURNAL, *Weapons Search: The ATF's Tracers Follow Tortuous Path of the Littleton Guns* (April 30, 1999).

[40] DIAZ , *supra*, note 2 at 37.

[41] The exception to this otherwise blanket freedom are the various restrictions placed on the sale of a few specific classes of firearms, *e.g.*, machine guns and semi-automatic assault weapons. *Id.* at 37.

[42] *Id.* at 47. Maryland is one of the few exceptions; firearm sales at gun shows are subject to background checks. *See* discussion at Section I(B)(2)(b), *infra*.

[43] COOK, ET AL., *supra*, note 4, at 81-82.

18

Thus, the federal regulations governing gun manufacturing, buying and selling are minimal.[44]  As author Tom Diaz puts it, "the nature and quality of the firearm, the ethics of the dealer, and the good sense or even sobriety of the buyer are effectively irrelevant to the exchange of money for guns in most states."[45]  Any other restrictions are left to the individual states.

### b. State Laws and Regulations

State laws governing the legal transfer of firearms vary widely, from virtually no restrictions on licensing, sale or possession in some states, like Arizona, to some limited licensing and purchasing requirements in others, including Maryland.  Even states with their own restrictions, however, suffer from failing to define what constitutes being a dealer and thus needing a license, and limiting the types of guns subject to regulation.[46]

Among the states, Maryland is one of the more progressive.  First, Maryland requires dealers to obtain a state license, although the requirements are very similar to those at the federal level.[47]  The State also limits gun purchases to one a month per buyer; prohibits "straw purchases," where someone buys a gun for someone else; and requires a background check and 7-day waiting period on all gun transfers, including secondary sales.  It is also illegal to sell a gun to a person under 21, and minors cannot possess guns without parental consent and supervision.  The State also strictly regulates the sale of assault pistols, machine guns, and magazines with more than twenty rounds of ammunition.[48]

In addition, Maryland is unique in the country in having a Handgun Roster Board.  Created in 1988, the Board determines which handguns may be sold in Maryland.  The nine-member board, made up of law enforcement, gun control, NRA, gun industry, and citizen representatives, is charged with compiling a handgun roster of permitted handguns, and only handguns on the roster can be sold in the State.  The Board must use nine criteria in determining which handguns are permitted, *i.e.*, concealability, ballistic accuracy, weight, quality of materials, quality of manufacture, reliability as to safety, caliber, detectability by standard security

☞ *"The nature and quality of the firearm, the ethics of the dealer, and the good sense or even sobriety of the buyer are effectively irrelevant to the exchange of money for guns in most states."*

---

[44]     Some argue that, on the contrary, there are more than 20,000 gun laws, and our whole problem with gun violence is that we do not enforce them adequately.  What they fail to mention is that the vast majority of these "gun laws" have nothing to do with the manufacturing, sale or possession of guns, but deal instead with collateral issues like regulating where gun stores are located, whether firearms may be discharged within city limits, etc.  *Id.* at 5.

[45]     *Id.* at 36.

[46]     *Id.* at 38.

[47]     To obtain a state license, one must have a place of business, submit a photograph, fingerprints, be at least 21, a citizen and of sound mind, have a clean criminal record, and not be an addict or habitual user of any controlled substances.  Md. Ann. Code, Art. 27, §443 (1996 Repl.).

[48]     Md. Ann. Code, Art. 27, §§372, 378-9, 441,441A, 442, 442A,445 *et.seq.* (1996 Repl.).

19

HQL_0000629

☞ *The gun industry has unfettered freedom to design, manufacture and promote its lethal products with virtually complete disregard for consumer health and safety. It answers to no one.*

equipment, and utility for legitimate sporting, self-protection, or law enforcement activities. The Board can place handguns on the roster on its own initiative, or citizens can petition for placement, and decisions can be appealed under the Maryland Administrative Procedure Act.[49]

The intent of the Handgun Roster Board law was to ban the type of handguns colloquially known as "Saturday Night Specials." These handguns, predominantly made by so-called "Ring of Fire" small gun manufacturers, are particularly attractive to criminals. They are low-cost, light weight, easily concealed, poorly made, have short barrels, and are inaccurate and unreliable. The Board has specifically disapproved 29 handguns out of the more than 2,000 available. An additional 82 handguns which have been manufactured since 1984 are not on the approved list, and thus, although not expressly disapproved, may not be sold in Maryland.[50]

Maryland has augmented to a limited extent, therefore, the barebones federal regulation of the sale and possession of firearms. Like the federal government and almost every other state, however, Maryland has failed to take serious steps to regulate firearms from a public health or consumer product safety perspective.

### 3. The Gun Industry's Exemption from Consumer Product Safety Commission Jurisdiction

None of the skeletal federal regulations and few state regulations contain the minimal health and safety standards applied to most other consumer products in the American marketplace. A comparison of guns and cars is striking.

☞ *If you want to own and drive a car in America, you must register your vehicle and obtain a license demonstrating basic driving skills. If you want to own and operate a gun in America, you need only go to a gun show and buy one, without ever having touched one in your life.*

Automobiles, like guns, are a widely-used and potentially injurious product. As a result, we require universal registration for ownership and licensing for operation. A person who wants to operate an automobile must pass a test showing he or she knows how to drive and has a basic understanding of standard safety laws and practices. By contrast, there is no requirement that a person who wishes to own and use guns know anything about how to operate, store, or clean them safely. A 21-year-old can carry a newly-purchased semi-automatic pistol out of a gun show without ever having laid eyes on one. Similarly, we require automobile manufacturers to incorporate a plethora of safety features into their automobile designs, and their cars must pass a myriad of tests designed to maximize health and safety. By contrast, the law is silent on safety features required of gun manufacturers or importers.

Aside from the ATF's limited regulatory authority, no federal agency has any authority over health and safety firearms issues, or weighs the relative costs and benefits of any firearms product. Notwithstanding firearms' undisputed reign as one of the most "inherently dangerous products" ever made, no federal agency has a thing to say, for example, about how guns are designed. Nor does anyone monitor

---

[49]     Md. Ann. Code, Art. 27, §§36I-36J (1988).

[50]     MARYLAND STATE POLICE HANDGUN ROSTER BOARD LIST (September 19, 1994).

HQL_0000630

the quality of the materials used or whether any safety features should be required in a firearm's design and manufacture.  Perhaps most paradoxically, no federal governmental authority assesses whether the dangers of certain firearm designs outweigh their utility.[51]

The legislation creating the Consumer Product Safety Commission ("CPSC"), which sets minimum  health and safety standards for virtually every other product available to the American consumer, expressly exempted the gun industry from its jurisdiction through an amendment offered by a National Rifle Association board member.[52]  Since then, the NRA and the gun industry have vehemently fought all efforts to repeal this nonsensical exemption.  Thus, subject to limited potential tort liability, the gun industry continues to operate without restriction, free to design, manufacture, distribute and promote its products without regard for consumer health or safety.  If a particular new gun design makes accidental discharge more likely, it matters not.  If a new feature on a gun design serves no purpose other than enabling the user to shoot three times as many victims without reloading, who cares?  The industry answers to no one.

## 4. The Saturated Market and the Need for Innovation

Despite its $9 billion in annual sales and added billions from ancillary services, the gun industry has faced a recurring, serious problem.  Unlike most consumer products, guns do not wear out.  While few of us own our grandparents' phonograph or 1950 Oldsmobile, guns can be and are passed down from generation to generation.  With minimum care of a gun, there is no utilitarian reason to buy a new one.  As Sen. Patrick Moynihan once put it, "the life of a handgun seems to be measured in decades, generations, and even centuries."[53]  One analyst notes that the usable life of a firearm is best measured by the number of rounds it is able to fire, which can be as many as 10,000.[54]

This durability, combined with a declining interest among young people in the hunting and shooting sports, has created a saturated gun market.[55]  As one industry magazine summed it up, "more and more guns [are] being purchased by fewer and fewer consumers."[56]  Thus, in order to survive, the gun industry has been forced to *create* reasons for people to buy new guns by developing different products.  Again, as an industry magazine advises, "convincing people they need more guns is the job of innovation."[57]

☞ *Guns do not wear out. "The life of a handgun seems to be measured in decades, generations, and even centuries."*

---

[51]   DIAZ, *supra*, note 2 at 11-14, 193-4.

[52]   *See* DIXON, *supra*, note 9 at 1003; *see also* DIAZ, *supra*, note 2 at 13.

[53]   139 CONG. REC. S16,931 (daily ed. Nov. 3, 1993).

[54]   GEORGE D. NEWTON, JR. & FRANKLIN E. ZIMRING, *Firearms and Violence in American Life*, 3,5(1970).

[55]   DIAZ, *supra*, note 2 at 91-93.

[56]   *Id.* at 93, *citing, Doing Business in the Golden Age of Consumers*, SHOOTING INDUSTRY at 29 (February 1997).

[57]   *Id., citing, The Industry White Papers: Expert Intelligence on the State of the Industry; the Future of the Gun Industry*, 38 SHOOTING INDUSTRY, No. 7 at 40 (July 1993).

HQL_0000631

## C.   The Implications of Regulatory Freedom and a Saturated Market

The gun industry is certainly not the only business ever to confront the problems of saturated markets and the need for innovation to spur further sales.  What is unique about the firearms industry, however, is that its innovation has not been constrained or shaped in any way by health and safety regulation.  Thus, the industry's drive to survive in a saturated market, combined with the lack of regulatory oversight, has produced disastrous results.

### 1. Increased Lethality

☛ *The gun industry has systematically made its products more and more lethal, promoting them as more effective and more efficient.  New firearms are more likely to kill instead of simply injure, and are able to kill more people at one time.*

The gun industry could have reacted to market saturation by developing safer guns.  It could have responded, for example, by designing a variety of safety features to make an unintentional discharge less likely, to make guns child-proof, or to make guns less concealable for use in criminal activity.

Yet the industry chose to do the opposite.  It began instead to manufacture guns with greater killing power.  It made guns more and more lethal, *e.g.*, military style assault rifles, higher caliber pistols.  It made guns capable of holding more rounds of ammunition, increased the power of the rounds, and made guns smaller and more easily concealable.[58]

For example, beginning in the late 1970's, gun manufacturers began promoting pistols over the previously-favored revolvers by developing new pistols in higher calibers which combined double-action operation with high capacity magazines.  The pistols carried many more rounds than revolvers, and could be fired faster and reloaded more quickly.  By 1987, pistol production had surpassed revolver production.  A Justice Department study comparing the magazine capacity of handguns acquired before and after 1993 found a 25% increase in average magazine capacity between pre-1993 and 1994 handguns, with 38% of the latter having a capacity of ten or more rounds.[59]

The lack of federal regulation over the industry has made this lethal innovation possible.  No one has required gun industry executives to consider increasing gun safety instead of killing power.  Thus, the exponential growth in the gun market reflects a shift in focus from guns designed to kill animals to guns designed to kill people.   The gun industry has relied on, in the words of an NRA executive, the "Rambo factor," with the emphasis in shooting activities moving to "large caliber arms that can be fired rapidly. . . the key words in arms and ammunition advertising are not skill, accuracy or marksmanship. . . [but] 'power,' 'speed' and 'firepower.'"[60]

---

[58]   *Id.* at 93-101.
[59]   *Id.* at 99-101.
[60]   *Id.* at 83, *citing,* INTERNATIONAL ASSOCIATION OF FISH AND WILDLIFE AGENCIES, *Proceedings of the First National Shooting Range Symposium* at 89 (1990).

22

The new focus on killing power has rendered guns more effective tools of crime. For example, the industry's development of new, high-capacity, double-action 9mm pistols has exacerbated both the level and destructiveness of gun violence. High-capacity magazines make possible the "spray and pray" shooting technique, so more victims are shot more times. Fewer victims survive gunshot wounds, and the damage and cost of treatment for those who do is far greater. From 1985 to 1992, for example, the domestic manufacture of 9mm pistols increased 92%, while hand-gun deaths correspondingly increased 48%.[61]

## 2. Aggressive Marketing and Targeting New Markets

The gun industry could have responded to a saturated market by decreasing supply. It might have diversified, branching out into less lethal forms of recreation. Industry executives could have recognized that in a country of 270 million people and 200 million guns, we have enough. They chose another route and, as the manufacturers of an unregulated consumer product, they were free to do so. They began marketing their new, more lethal products very aggressively. They blatantly targeted the most promising new markets - women and children.

### a. Aggressive Marketing

The industry has used the gun press, the entertainment media, and industry trade, lobbying, and "gun rights" organizations to promote its products. These three institutions have worked together to stoke the fires of the American gun culture, where a firearm is an icon, embodying manliness, individual liberty, self-reliance, and the right to exact personal justice.[62]

The gun press is not only a cheerleader for the industry, but is also intricately involved in its strategy and planning. No firearm is unworthy of praise. Much of the rhapsody by the press emphasizes the "Rambo" factor, focusing on how much damage new firearms can effect. This boosterism, which is thinly-disguised advertising, helps generate interest in the steady stream of increasingly deadly products coming on the market.[63]

One recent example is the campaign in the gun press to convince citizens they need to arm themselves for the Y2K problems which might befall us in the new millennium. The February, 1999 issue of *Guns and Ammo* exhorts, for instance, "There's Still Time! ARM YOURSELF for the Y2K Disaster!"[64] The August, 1999 issue of the *American Guardian* features the article "Y2 Care About Y2K," in which

> ☛ *In its drive to expand, the gun industry has aggressively targeted young people, using the schools, cartoon characters, video games and other advertising techniques in a "wrestling match for the hearts and minds of our children."*

> ☛ *One recent example of the gun industry's aggressive marketing is the campaign to convince citizens they need to arm themselves for Y2K.*

---

[61]   *Id.* at 102-105. Police officials in Baltimore City corroborate that the 9mm pistol has become the crime weapon of choice. Of the 2,814 guns confiscated in Baltimore City in 1998, 21.1% were 9mm pistols. BALTIMORE CITY POLICE DEPARTMENT, *Caliber Handgun Submissions By Frequency, 1998.*

[62]   DIAZ, *supra,* note 2 at 50-68.

[63]   *Id.* at 51-60.

[64]   ROBERT HAUSMAN, *There's Still Time! ARM YOURSELF for the Y2K Disaster!* GUNS AND AMMO at 30 (February 1999).

HQL_0000633

readers are told to "add to their [firearm] capabilities," and to "stock enough ammunition to last for a few weeks of severe social unrest."[65]  The September, 1999 issue of *Handguns* advises, "If there is a Y2K problem, you'll need . . . a gun," and it cautions against trading ammunition for food, because "if you have the ammunition, you can get the food."[66]

The entertainment media also glorifies gun violence.  The "shootout" is a centerpiece of many films, television shows and video games.  Popular movie stars are shown using guns to solve conflict successfully.  Entertainment even promotes specific types of firearms; Dirty Harry's use of the .44 Magnum boosted its popularity enormously.[67]  As the industry magazine *Guns and Ammo* put it, "T.V. and motion picture guns create powerful, unforgettable images that have had a measurable impact on the shooting world."[68]

☛ *The industry has introduced new guns designed expressly to appeal to women, and has marketed them by playing upon women's fear for their personal safety, particularly the fear of rape.*

Finally, the gun industry trade and advocacy organizations promote the gun culture and industry products through financial support, political lobbying, grass roots organizing and other methods.  While the National Rifle Association ("NRA") is the largest and most well-known of these organizations, there are many others which also contribute to the extremely powerful voice gun advocates enjoy at all levels of government.

### b. Targeting New Markets

Notwithstanding its exponential growth over the last century, gun ownership remains concentrated among white males.  A key to the industry's future viability, therefore, is to continue its strength in this group while expanding to others.

The industry has focused on women, both as a market unto themselves and as a vehicle to reach children.  Growing up with a gun in the home is a strong predictor of whether a child will choose to own a gun as an adult.[69]  As the National Shooting Sports Foundation ("NSSF") has reported, "bringing women and youngsters to the shooting sports is the goal of fully half of [its new programs.]"[70]  The industry has

---

[65]    JAMES CORD, *Y2 Care About Y2K,* AMERICAN GUARDIAN at 44 (August 1999).

[66]    WALT RAUCH, *Smith & Wesson's Model 10 Revolver: A Good Choice as a Y2K Handgun,* HANDGUNS at 55 (September 1999).

[67]    DIAZ, *supra,* note 2 at 60-64.

[68]    *Id.* at 60, *citing, Guns of T.V. and Movies: Behind the Scenes,* GUNS & AMMO AT 42-43  (December 1985).

[69]    PHILIP J. COOK AND JENS LUDWIG, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use* at 31 (Police Foundation 1996).

[70]    DIAZ, *supra,* note 2 at 184, *citing, NSSF Board Approves New Programs: New Focus on Women &*

24

introduced new guns designed expressly to appeal to women, and has marketed them by playing upon women's fear for their personal safety, particularly the fear of rape.[71]

In its attempt to corral children into its fold, the industry has also targeted the youth market directly.  Examples of this strategy abound.  At the NRA's 1996 annual meeting, then-President Marion Hammer introduced her 10-year old grandson, stating, "I know that when the NRA reaches out and takes the hand of a child, we are touching America's future."[72]  Ms. Hammond then outlined the NRA's agenda to "invest" in America's youth in an "old-fashioned wrestling match for the hearts and minds of our children."[73]

Since then the NRA has dedicated $100 million towards this "investment," and has used a variety of strategies in this orchestrated attempt to reach out to America's youth.  For example, it has employed popular idols, like Tom Selleck and former Seattle Seahawks wide receiver and Congressman Steve Largent, in advertisements. In a full-page ad appearing in the March 8, 1999 cover of *Time Magazine*, Tom Selleck advises "Shooting teaches young people good things. . . So whether it's an afternoon throwing clay birds or getting up at dawn in turkey season or just cleaning grandpa's side-by-side, you can't lose."  At the bottom of the page, a young boy is pictured holding a shooting clay next to his father, who is holding a shotgun, with the question, "Did You Know . . . The NRA's youth hunting, safety and training programs reach more than a million young people each year."[74]

The May, 1997 issue of the NRA's *American Guardian* magazine touts a similar alliance between gun manufacturer Browning and rock singer Ted Nugent. Browning's president explained, "We hope our affiliation with Ted will be a catalyst for our promotion of the hunting and shooting lifestyle to a younger audience. . . " The NRA youth magazine *InSights* routinely carries ads for firearms, including the Harrington & Richardson 929 Sidekick revolver and the Savage Arms "Predator" combination rifle/shotgun.[75]

☛ *"I know that when the NRA reaches out and takes the hand of a child, we are touching America's future."*

---

[71]    The effectiveness of this strategy is born out in advertisements aimed at industry members of products designed to appeal to women, which, rather than focusing on women's safety, boast instead of the prospect that the products will "doubl[e] our business."  *Id.* at 185.  A recent study by the Violence Policy Center underscores, however, that this effort to induce women to buy guns by playing upon their fear of stranger assault is dangerously misguided.  Contrary to this myth, most fatal assaults by men against women are the result of domestic violence, and most involve a handgun.  More than 12 times as many women were murdered by a man they knew than were killed by male strangers.  Violence Policy Center, *When Men Murder Women: An Analysis of 1996 Homicide Data* (September 1998).

[72]    Violence Policy Center, *Start 'Em Young:  Recruitment of Kids to the Gun Culture.  Section One: 'An Old Fashion Wrestling Match for the Hearts and Minds of Our Children,'* at 1 (1999).

[73]    *Id.*

[74]    *Id.* at 2.

[75]    *Id.* at 2.

25

HQL_0000635

The NRA has also used a cartoon character, Eddie Eagle, to put a friendly face on guns for kids in the name of "gun safety." Rather than discouraging guns in the home or focusing on the inherent danger of firearms, especially when adults store them unlocked, this program places the onus of gun ownership safety and responsibility directly on children. An entire product line, from bibs to backpacks and plush toys, features the Eddie Eagle mascot. Firearms manufacturers contribute thousands of dollars to fund the Eddie Eagle program through the NRA Foundation, for as one NRA Foundation official explained, "The industry is an indirect beneficiary of this program."[76]

The industry has developed smaller firearms designed specifically for children, and it has expressly marketed the aesthetics of guns to appeal to teenagers. For example, in describing a particularly menacing-looking assault weapon, the AP9, a *Guns & Ammo* review raved, " . . . it is one mean-looking dude, considered cool and Ramboish by the teenage crowd; to a man, they love the AP9 at first sight. Stuffed to the brim with Nyclad hollow points, the pistol is about as wicked a piece as you can keep by your pillow, . . . Take a look at one. And let your teen-age son tag along. Ask him what *he* thinks." (Emphasis in original).[77] The industry has also purchased inserts in scouting magazines to reach five to eight million young people as "potential customers;" it has urged shooting ranges to develop "education and training" programs for children and to offer discounts to adults who bring children in; and it has developed CD-ROM hunting and other gun-oriented games.[78]

Finally, the industry has used both elementary and middle schools to introduce children to firearms through NSSF educational materials focusing on hunting and "wildlife management." Outlining this last strategy in the 1993 issue of the NSSF's publication *SHOT Business*, an industry columnist urged,

> "Use the schools . . . they can be a huge asset. Schools collect . . . a large number of minds and bodies that are important to your future well-being. How else would you get these potential customers and future leaders together, to receive your message about guns and hunting, without the help of the schools . . . Schools are an opportunity. Grasp it."[79]

☛ *The industry has developed smaller firearms designed specifically for children, and it has expressly marketed the aesthetics of guns to appeal to teenagers.*

---

[76] VIOLENCE POLICY CENTER, *Joe Camel With Feathers: How the NRA with Gun and Tobacco Industry Dollars Uses it Eddie Eagle Program to Market Guns to Kids,* at 1-2 (1999).

[77] DIAZ, *supra*, note 2 at 129 (citations omitted).
*Youngsters,* NSSF REPORTS (January/February 1992).

[78] *Id.* at 186-189.

[79] *Id.* at 188, *citing,* GRITS GRESHAM, *Community Relations: The Schoolchildren of Today Are the Leaders of Tomorrow,"* SHOT BUSINESS at 9 (September/October 1993).

HQL_0000636

## D. The Industry Shirks Responsibility

The gun industry has responded to its shrinking market base by using innovation to increase lethality, by aggressively marketing that increased lethality, and by reaching out to women and children as potential expanded markets. Yet even as it expends resources to create the markets for increasing numbers of increasingly lethal firearms, it denies any responsibility for the havoc in our streets, and it refuses to take any steps which might begin to stem the flow of blood.

One journalist, who traced the path of a gun used in a murder, concluded that a "none-of-my-business attitude permeates the firearms distribution chain from production to final sale, allowing gun makers and gun marketers to promote the killing power of their weapons while disavowing any responsibility for their use in crime."[80] A prominent industry executive corroborated this finding when he was asked about the industry's responsibility for gun violence and he responded simply "It's not my fault. It really isn't."[81]

One dodge the industry executives employ is to claim that the market is demanding the increasingly lethal firearms they produce. Yet the industry's own exhortations about the need for innovation to increase demand belie this excuse. Others attempt to claim that only a few irresponsible companies are creating the problem. Yet the presence of old-line company handguns among the top ten crime guns belies these evasions of responsibility.

Other common dodges are to fall back on the Second Amendment or to blame the victims. As the chief executive of Ruger explained, "People do their own thing. . . in this country, you have the constitutional right to make a gun and to buy a gun . . . that's not debatable."[82] In responding to inquiries about unintentional child shootings, the chief executive of Smith & Wesson responded, "The problem is not the guns . . . These people that they call children, in my mind, are little criminals and ought to be held accountable."[83]

In short, the industry fails to acknowledge even a shared responsibility for the high cost of gun violence in America, and it refuses to give any ground in efforts to curb the violence. It stands firm against the very efforts it claims are the only ones that work, *i.e.,* "keeping the guns out of the wrong hands." If the industry were

☛ *If the gun industry were willing to help keep guns out of the wrong hands, why does it oppose background checks at gun shows?*

☛ *The gun industry refuses to acknowledge even the smallest bit of responsibility for the carnage its products wreak. It refuses to acquiesce to the smallest steps to begin to curb the violence.*

---

[80]    *Id.* at 194, *citing* ERIK LARSON, *The Story of a Gun; Cobray M-11/9,* 271 THE ATLANTIC 1, 48 (January, 1993).

[81]    *Id., citing,* William Ruger, Sr.

[82]    *Id.* at 196.

[83]    *Id.* at 197 (citations omitted).

27

willing to help with even this one aspect of gun tragedy, why would it oppose background checks at gun shows?  While insisting that our daily tragedies would disappear if we would simply keep guns out of the hands of criminals, the industry sits on its own hands, making no effort to limit the distribution of its products to those very criminals.

## II. Costs Of The Carnage

☞ *There is a disconnect between actual gun ownership in America and our tolerance of gun ownership.*

Notwithstanding the fact that the industry has had to work hard to nurture our gun culture, to maintain viable levels of interest in personal gun ownership, and to increase its market base, many people do believe vehemently that we have a right to own guns.  Only 25% of us actually do own guns, with only 16% owning handguns, and the vast majority of Americans believe there should be stricter gun control laws.  For example, 85% of Americans endorse the mandatory registration of handguns and five-day waiting periods before purchase.  Almost 80% favor requiring background checks in private sales, and 75% agree that government should do everything possible to keep guns from criminals, even if such measures make it harder for law-abiding citizens to obtain guns.  70% believe that all handgun owners should be licensed and trained in the use of their weapons.[84]

Yet the fact remains that while we want these and other stronger restrictions on gun ownership, most of us stop short of acknowledging that we would prefer a blanket prohibition on personal gun ownership.  Only 39% would support restricting the possession of handguns to "the police and other authorized persons," and only 16% want a "total ban on handguns."[85]

Thus, there is a disconnect between *actual* gun ownership in America and our *tolerance* of gun ownership.  Although a far greater percentage of us own guns than do the citizens of any other developed country, gun owners are still a minority in the United States. Yet most of us, despite choosing not to own a gun ourselves, are willing to tolerate gun ownership by others.  We acquiesce to the minority's insistence that our Constitution creates an inalienable right to own guns and that preserving that inalienable right is important to our culture and way of life.

This indulgence of the minority leads inexorably to the first critical question: what does it cost us?  What do we pay for continuing to tolerate personal gun ownership?  In what ways do we all suffer from its impact on our culture and way of life?

---

[84]   Tom Smith, *supra*, note 3 at 2-4.
[85]   *Id.* at 4.

HQL_0000638

## A.  Human Costs - Who Dies and How Do they Die?

An analysis of who dies and how they die from gun violence makes clear the nature of the problem.  The epidemic of gun violence in this country is not just a law enforcement issue.  It is also about public health and consumer product safety.  As long as we continue to view the challenge of gun violence through a single lense, real solutions will elude us.  Until we recognize all three aspects of how guns injure and destroy, they will continue tearing mercilessly at the fabric of American life.

### 1. Numbers of Deaths

Between 35,000 and 40,000 people have died from gun injury every year in America over the past decade.  More than 30,000 have died each year since 1972, and over one million total have died since 1965.[86]  More than 100 die every day, making firearms the 8th leading cause of death in the United States.[87]  It is the 2nd leading cause of injury death, surpassed only by motor vehicle fatalities.  In 1996, firearm deaths actually exceeded those from motor vehicles in six states, including Maryland, and the Centers for Disease Control and Prevention estimates that by the year 2001, firearms will surpass motor vehicles as the leading cause of product-related death nationwide.[88]

In Maryland, firearm death has surpassed motor vehicle accident death since 1991.  In 1996, firearm deaths numbered over 16 per 100,000 people, for a total of 764, giving Maryland the 14th highest rate in the country.[89]  Since 1987, the handgun death rate has risen 73%.[90]

### 2. Demographics of Gun Fatalities

#### a. National Statistics

Males are more than six times more likely to die from firearms than females in all age groups, but male teens and young adults suffer most disproportionately.  The 1996 firearms death rate among male teens ages 15-19 was 36.3 per 100,000, nearly three times higher than the overall firearms death rate of 12.9 per 100,000.  This group constitutes 3.4% of the population and yet accounted for almost 13% of

☛ *Gun violence in America is not just about crime; it is a multi-faceted crisis of law enforcement, public health, and consumer product safety.*

☛ **Over 35,000 people die each year from firearm injury, or more than 100 every day.**

☛ **In recent years in Maryland, more people have died from guns than from motor vehicle accidents.**

---

[86]   Violence Policy Center, *Who Dies?  A Look At Firearms Death and Injury in America, Appendix One: Number and Rates of Firearm Mortality-United States,1965-1996* (1999) (citations omitted).

[87]   OJJDP, Promising Strategies to Reduce Gun Violence, *supra*, note 6 at 3.

[88]   Centers for Disease Control/National Center for Health Statistics, *Fatal Firearm Injuries in the United States 1962-1994* (1997).

[89]   Violence Policy Center, *Who Dies?, supra*, note 86 at *Firearm Deaths by State, 1996.*

[90]   Maryland Department of Health & Mental Hygiene, *Firearm-Related Mortality in Maryland, 1976-1996, Report of the Maryland Firearm-Related Injury Surveillance System* at 2, Table 11 (June 1997).

HQL_0000639

Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 30 of 63

☛ *An American teenager today is more likely to die of a gunshot wound than from all "natural" causes of death combined.*

☛ *Gun injury is the leading cause of death among African-American males ages 15-24.*

☛ *Every day in America, an average of 12 children die from guns.*

☛ *In 1996, 53% of all homicide and suicide gun deaths in Maryland were African-American males.*

firearms deaths.[91]  This disproportionate impact is even greater for African-American males.  Firearm death is *the* leading cause of death among African-American males ages 15-24, and the second leading cause of death in the 5-14 age group.[92]

These alarming rates correspond to surveys regarding male teen access and use of firearms.  In 1997, nearly one in 10 male high school students reported carrying a gun in the previous 30 days.[93]  In the same year, 18, 19, and 20 year-olds ranked first, second, and third in the number of gun homicides committed.  Of all gun homicides where the offender was identified, 24% were committed by 18-20 year-olds.[94]

Children are also disproportionately victimized by gun violence.  In 1996, 4,643 children and teenagers were killed by firearms in the United States, or an average of 12 every day.  Between 1993 and 1995, firearm injury was the 2nd leading cause of death for children aged 10-14, and the risk of dying from gun injury for teens aged 15-19 more than doubled between 1985 and 1994.[95]  The firearm homicide rate for the 15-24 year-old age group increased 158% during roughly the same decade.  In sum, a teenager today is more likely to die of a gunshot wound than from all "natural" causes of death combined.[96]

## b. Maryland Deaths

Maryland gun deaths rose to a peak of 797 in 1993, and have declined since then, to a total of 764 in 1996, the latest available figures.  Of the 714 deaths representing homicides and suicides in 1996, the vast majority of victims, or 87%, were male.  Of these, 53% were African-American males.[97]

The age group hardest hit by homicide or suicide gun death in Maryland is 15 to 24 years old; 224 young people died in 1996.  In the same year, 104 children under age 19 died from homicide or suicide gun injury, or 15% of all firearm-related deaths.[98]  Between 1992 and 1997, 3,641 Marylanders died of gunshot wounds.[99]

---

[91]   VIOLENCE POLICY CENTER, *Who Dies?,  supra*, note 86 at *Males and Firearms Violence* at 1.

[92]   *Id.*

[93]   *Id.  See also*, CENTERS FOR DISEASE CONTROL, *Youth Risk Behavior Surveillance - United Sates, 1997,* 47 MORBIDITY AND MORTALITY WEEKLY REPORT SS-3 (August 14, 1998).

[94]   DEPARTMENT OF THE TREASURY AND DEPARTMENT OF JUSTICE, *Gun Crime in the Age Group 18-20* at 2 (June 1999).

[95]   THE HELP NETWORK, *Firearm Injury and Fatality Among Children and Adolescents* at 1 (January 1999) (citations omitted).

[96]   OJJDP, *Promising Strategies to Reduce Gun Violence, supra,* note 6 at 3.

[97]   JOHNS HOPKINS GUN POLICY CENTER, *Firearm Deaths in Maryland, Summary Tables* (July 13, 1999).

[98]   *Id.*

[99]   MARYLAND OFFICE OF THE CHIEF MEDICAL EXAMINER, *Annual Report* at 15 (1997).

HQL_0000640

### 3. Epidemic of Gun Violence

Thus, we find ourselves in the midst of an epidemic.  Compare the polio epidemic in the 1950's.  In 1952, 3,145 people of all ages died from polio.  In 1993, 39,595 people died from gun violence, of which 5,751 were children.[100]  Between 1988 and 1991, the 144,237 people who died from firearm injury exceeded the number of men who died in battle during the entirety of the Vietnam War.

Moreover, we are first among industrialized nations in the severity of this epidemic.  The rate of death from firearms in the United States is eight times higher than in its economic counterparts around the world.[101]  In 1996, handguns were used to murder 30 people in Great Britain, 106 in Canada, and 15 in Japan.  By contrast, a mind-boggling 9,390 were used in the homicide deaths of Americans.[102]

These huge gaps yawn even wider when comparing firearm deaths in children.  The firearm homicide rate for children age 15 and under is 16 times higher in America than in 25 other industrialized countries *combined.*  In the 15-24 year-old age group, the U.S. firearm homicide rate is 5 times higher than in Canada and 30 times higher than in Japan.[103]  A stunning 9 out of 10 murders of children worldwide occur in the United States.[104]

### 4. How Firearm Deaths Occur

#### a. National Experience

The way in which the 34,000 plus Americans die each year from firearm injury underscores the multi-faceted nature of the problem.  Contrary to popular perception, most gun death in this country is not crime-related.  Firearm homicides certainly constitute a sizable percentage of the deaths, but they are outnumbered by suicides, and a substantial percentage result from unintentional injury.  Even among firearm homicide victims, most die not at the hands of unknown criminals, but rather from someone they know.[105]

The law enforcement model for examining gun violence addresses homicide.  Yet only by treating gun violence also as a public health issue can we address the

☞ *More children died of firearm injury in 1996 than died in the entire polio epidemic of the 1950's.*

☞ *9 out of 10 murders of children worldwide occur in the United States.*

☞ *15% of all homicide and suicide gun deaths in 1996 were children under age 19.*

☞ *Most gun deaths are not crime-related; the majority of firearm deaths are suicides.*

---

[100]   Georges C. Benjamin, M.D., Secretary, Maryland Department of Health & Mental Hygiene, *Violence as a Public Health Issue,* presented June 10, 1999, *citing,* MMWR, Vol 46, No. RR-14.

[101]   The Help Network, *U.S. Firearm Homicide and Suicide Facts* (1999), *citing* Kellerman and Waeckerle, *Preventing Firearm Injuries,* 32 Annual Emergency Medicine 77, 79 (July 1998).

[102]   Join Together Online, *How Communities Can Take Action to Prevent Gun Violence* at 1 (Summer 1999) (citations omitted).

[103]   OJJDP, *Promising Strategies to Reduce Gun Violence, supra,* note 6 at 3.

[104]   Georges C. Benjamin, *supra,* note 100, *citing* UNICEF data reported in the *Chicago Tribune,* 9/23/93.

[105]   Violence Policy Center, *Who Dies?, supra,* note 86, at *Introduction* at 1, *citing* Federal Bureau of Investigation *Uniform Crime Reports.*

HQL_0000641

suicide component of gun death, and only by treating guns as consumer products which must be regulated like all others can we reduce unintentional firearm injury.

### i. Suicides

First, of the 34,040 firearm deaths in 1996, the majority, or 54%, were suicides.[106]  Firearms are used in the majority of all suicides, and the alarming increase in suicides in recent years is attributed to increased access to firearms.[107]  For example, between 1952 and 1992, the incidence of suicide among adolescents and young adults nearly tripled, and the rate more than doubled in the 10-14 age group between 1980 and 1995.[108]  In 1996, there were 1,308 gun suicides among young people 10-19 years old, or more than 3 every day.[109]

The rate of suicide by firearm among the elderly is also rising, with 103,503 Americans over age 65 taking their own life between 1979 and 1996.  In 1996, almost 4,000 suicides occurred among men over 65.  This represented 21% of all suicides, while that age group represents only 5% of the total population.

### ii. Homicides

Second, firearm death from homicide exacts the terrible toll that is so familiar from the nightly news and daily headlines.  Roughly 41% of all firearm deaths are from homicide, and nearly 70% of homicides are committed with a firearm.  Of these firearm homicides, the vast majority are committed with a handgun.  In 1997, for example, 86% of all firearms homicides in which the type of gun was known were committed with handguns.[110]

One disturbing trend is the increasing number of homicides committed by juveniles, and the increasing number of juvenile homicides committed with a firearm.  Rates of adolescent arrest for murder by firearm increased 79% through

☛ *More than three American children and teens commit suicide every day.*

☛ *Nearly 70% of all homicides are committed with a gun, and the vast majority of all firearm homicides are committed with a handgun.*

---

[106]   Of the remainder, 41% were homicides, 3% were unintentional, and 2% were undetermined deaths.  OJJDP, *Promising Strategies to Reduce Gun Violence, supra,* note 6 at 3.  This breakdown differs somewhat among children and teenagers, with 61% homicides, 28% suicides, and 8% unintentional shootings.  THE HELP NETWORK, *Firearm Injury and Fatality Among Children and Adolescents, supra,* note 95, at 1.

[107]   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy* at 1 (November 1998).

[108]   THE HELP NETWORK, *U.S. Firearm Homicide and Suicide Facts, supra,* note 101 at 1 (citations omitted); VIOLENCE POLICY CENTER, *Who Dies?, supra,* note 86, at *Males and Firearms Violence* at 1.

[109]   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy, supra,* note 107 at 2.

[110]   *Id.* at 1.

[111]   DIXON, *supra,* note 9 at 990.

32

the 1980's.[111]  Between 1988 and 1993, the juvenile homicide arrest rate more than doubled.[112]  The homicide arrest rate has dropped since then, but the juvenile violent crime arrest rate is still nearly 50% higher today than ten years ago.  Most significantly, nearly all the growth in the juvenile violent crime rate has been hand-gun-related.[113]

### iii.  Unintentional Shooting Deaths

Finally, unintentional gunshot deaths account for about 3% of overall fatalities, and 8% of child firearm death.  From 1987 to 1996, nearly 2,200 American children under age 14 died from unintentional shootings, with 138 dying in 1996 alone.  The rate of unintentional firearms death is highest among males age 15-19.  For all children under 15, the death rate is nine times higher than in 15 other industrialized countries combined.[114]

## b. Maryland Experience

Because of the high homicide rate in Maryland, the ratio of homicides to suicides differs from national figures.  Of the 764 firearm deaths in 1996, homicides accounted for 58% and suicides accounted for 35%, with about 2% unintentional and 5% undetermined.[115]

Of the homicides, 76% were African-American males, 11% were white males, and 13% were female.  The highest rates of homicide gun death were in the 20-24 year-old age group, followed by age 15-19.  Ninety-one children under age 19 were murdered by firearm.  Of all the homicides in which the type of gun was known, a telling 91% were handguns.

Of the suicides, 72% were white males, 15% were African-American males, and 12% were female.  The highest rates of suicide gun death were among senior citizens, with the 75 to 84 age group leading, followed by 65-74.  Twelve teens killed themselves by firearm.[116]

Thus, firearms violence is not simply an issue of crime.  Crime-related firearm injury is the most highly visible and notorious aspect of gun violence, but it is only one piece of the tragedy.

☞ *The rate at which American children die from unintentional shootings is nine times higher than in other industrialized countries.*

☞ *91 Maryland children were murdered by firearm in 1996.*

☞ *62 Maryland senior citizens took their own lives by firearm in the same year.*

---

[112]    OJJDP, OJJDP Research: Making a Difference for Juveniles, *supra*, note 10 at 14.

[113]    *Id.* at 14-15.

[114]    Johns Hopkins Center for Gun Policy and Research, *Fact Sheet on Gun Injury and Policy, supra*, note 107 at *Unintentional Firearm Deaths* at 1.

[115]    Johns Hopkins Center for Gun Policy and Research, *Firearm Deaths in Maryland, Summary Tables, supra*, note 97.

[116]    *Id.*

HQL_0000643

### 5. Nonfatal Firearm Injury

In addition to the epidemic of firearm death, nearly three times as many Americans suffer nonfatal firearm injuries every year. In 1995, 35,957 people died from gunshot wounds, while an additional 41,362 were hospitalized with firearm injuries and another 42,656 were treated in hospital emergency rooms.[117] For every unintentional shooting death, more than 16 people suffer nonfatal unintentional shooting injuries, and for every gun homicide, four people survive a firearm assault. By contrast, about 85% of firearm suicide attempts result in death.[118]

☛ An estimated 100,000 people are treated for nonfatal gunshot wounds every year.

With estimates of nonfatal gun injury at about three times the number of gun deaths, the 764 Maryland gun deaths in 1996 indicate that over 2,000 Marylanders suffer nonfatal firearms injuries each year.

## B.  Economic Costs - Who Pays For What?

The emotional and psychological toll on all those who suffer injury themselves or must endure the injury or death of a loved one from firearms is incalculable. These human costs alone give rise to the question of how much more suffering we will tolerate to protect the "right" to own guns. Yet these intangible costs are only the beginning. The economic costs, which touch virtually all of us, have become astronomical.

### 1. National Estimates

☛ The average total lifetime cost of medical care for a fatal gunshot injury is $14,000; the average estimated total cost, including police and emergency services and lost productivity, is $938,500.

Estimates as to exactly how large an economic burden flows from firearm injury vary, but even those in the conservative range are startling. The estimated average cost of medical care for a fatal gunshot wound is about $14,000.[119] The average estimated total cost, including medical care, police services and lost productivity, is $938,500.[120]

Nonfatal firearm injuries are far more costly in medical terms than gunshot fatalities. The most severe nonfatal injuries, such as traumatic brain or spinal cord injury, can require lifetime care and rehabilitative services totaling more than $1 million per survivor. Putting the most severe injuries aside, the estimated average cost per firearm injury survivor is between $36,000 and $38,000.[121]

---

[117]   THE HELP NETWORK, *Costs of Firearm Injuries* at 1 (February 1999).

[118]   THE HELP NETWORK, *U.S. Firearm Homicide and Suicide Facts* at 1 (February 1999).

[119]   The most recent study of the medical costs of gunshot injury estimates that the total cost of a fatal gunshot wound in Maryland is $13,191 in 1994 dollars. *See*, PHILIP J. COOK, ET AL., *The Medical Costs of Gunshot Injuries in the United States*, JAMA Vol. 282, No. 5 at 447 (August 4, 1999). Other studies estimate the cost to be $14,000 nationwide. *See, e.g.*, THE HELP NETWORK, *Cost of Firearm Injuries* at 1 (February 1999) (citations omitted).

[120]   THE HELP NETWORK, *Cost of Firearm Injuries, supra*, note 119.

[121]   *Id. See also*, COOK ET AL., *supra*, note 119.

34

The estimated annual cost of total health care expenditures ranges from $2.3 to $4 billion.[122]  Estimates of annual overall costs, which include loss of productivity and quality of life, range from $20 billion to $126 billion.[123]  Whatever the actual figure, most of these costs are passed on to private insurers and taxpayers.  The most recent study estimates that taxpayer-funded government programs pay 49% of the total medical costs for gunshot injuries, and private insurance pays 18%.  In addition, while victims pay 19%, many are unable actually to make payment, and these costs then pass through to other health care consumers.[124]  Thus, while far too many of us are affected directly by the intangible costs of firearm injury, either as a victim, relative, friend or employer of a victim, nearly all of us shoulder the burden of these huge economic costs in the form of higher insurance premiums and higher taxes.

> ☛ *The estimated annual cost of all gun-related health care is between $2.3 and $4 billion, the majority of which we all finance in the form of higher insurance premiums and higher taxes.*

## 2. Costs to Marylanders

The best estimates for the total medical costs of gunshot injury in Maryland come from the recent study published in the *Journal of the American Medical Association* which analyzed Maryland and two other states as the basis for its conclusions.  The Maryland data from this study, however, covers only firearm injuries in which the victims were hospitalized.  Thus, these estimates do not include injuries in which the victim was treated in the emergency room only or did not seek medical treatment.  The data also excludes the cost of the emergency transport and medical examiner's services incurred when gunshot victims died at the scene of the incident.

The  medical costs alone of 1994 Maryland gun fatalities in which the victim was hospitalized totaled over $2.6 million.  200 hospitalized victims died of gunshot wounds, at an average cost per death of $13, 191.[125]  Applying a separate study's $938,500 estimate of the total direct cost of every firearm fatality, which factors in police and emergency services and lost productivity, the total cost of Maryland hospitalized gun fatalities in 1994 was almost $200 million.[126]

> ☛ *The total cost of Maryland hospitalized gun fatalities in 1994 was almost $200 million.*

---

[122]     *Id.  See also,* JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy, supra,* note 107, *citing* WENDY MAX AND DOROTHY P. RICE, *Shooting in the Dark: Estimating the Cost of Firearm Injuries,* 12 HEALTH AFFAIRS 171 (1993).

[123]     For the lower estimate, *see* note 122, *supra*.  The higher figure comes from a 1997 study estimating that each firearm fatality costs $2.8 million, including both direct costs, *e.g.,* medical care, mental health care, emergency transport, police services, and insurance administration costs, as well as indirect costs, *e.g.,* lost productivity, pain and suffering, and diminished quality of life.  The study also estimated nonfatal injuries at $249,000 for every hospitalized victim, and $73,000 for every victim treated in an emergency room and released.  All annual costs totaled $126 billion.  TED R. MILLER AND MARK A. COHEN, *Costs of Gunshot and Cut/Stab Wounds in the United States, With Some Canadian Comparisons,* 29 Accid. Anal. & Prev. 329 (1997).

[124]     COOK, ET AL., *supra,* note 119 at 451-453; *see also* MARY J. VASSER, ET AL., *Hospitalizations for Firearm-Related Injuries,* 275 JAMA 1734 (1996).

[125]     COOK, ET AL., *supra,* note 119 at 450.

[126]     THE HELP NETWORK, *Cost of Firearm Injuries, supra,* note 119 at 1.

35

☛ *Why is no cost-benefit analysis conducted when gun industry executives decide a new firearm should have twice the magazine capacity?*

Nonfatal, hospitalized gun injuries imposed even greater direct medical costs. In 1994, 2,394 people were hospitalized and survived firearm injury, with an average lifetime medical cost per injury of $36,685. The total lifetime medical cost of all 1994 nonfatal hospitalized gun injuries was $87.5 million. This figure does not include police and emergency services, or lost productivity. Marylanders underwrote at least 67% of these dollars through higher insurance premiums and higher taxes.[127]

In sum, analysis of the costs of gun violence in this country reveals two important truths. First, both the economic costs associated with medical and emergency services, loss of productivity and quality of life, and the intangible costs of death and maiming injury are enormous. We pay dearly for our "right to bear arms." Second, the nature of firearms injury and death make clear that we have on our hands a crisis of three dimensions - law enforcement, public health, and consumer product safety. Only in recognizing this will we succeed in fashioning real and lasting solutions.

## III.   Cost/Benefit Analysis:  Debunking Gun Industry Myths

☛ *With suicide rates among our youth doubling and tripling because of increased access to firearms, why does the "right" to have a gun in a home where a depressed teenager can take his own life on a whim go unchallenged?*

In the face of such costs, we must ask a second critical question: "Is it worth it?" Amid the clamor about the Second Amendment, our hunting and shooting heritage, and the need for self-defense, the fundamental question of whether the benefits of personal gun ownership are worth the carnage in our homes, schools and streets is lost.

Yet this question must be answered . We demand that it be answered with every other consumer product in the American marketplace. The Consumer Product Safety Commission, the Food and Drug Administration and other federal regulatory agencies make judgments about whether the risks of a particular product, or a new feature on a particular product, are worth the projected benefits. Why is no cost-benefit analysis conducted when gun industry executives decide a new firearm should have twice the magazine capacity? With 86% of all firearm homicides committed with a handgun, why do we not stack up the benefits of handgun ownership against this sobering reality? With suicide rates among our youth doubling and tripling because of increased access to firearms, why does the right to have a gun in a home where a depressed teenager can take his own life on a whim continue to go unchallenged?

So let us do that analysis. Let us look at the "right" to own handguns and the purported benefits of personal gun ownership so that we may begin to make rational judgments about what we should continue to tolerate. With the terrible risks and costs of handgun violence borne by all Americans, we must look at the real

---

[127]   COOK, ET AL., *supra,* note 119 at 452.

HQL_0000646

benefits which flow from the "right" to own guns and determine whether any circumstances still exist in which the benefits outweigh the costs.

Gun proponents advance two arguments as to why this cost-benefit analysis is either futile or unnecessary. First, the argument goes, it matters not whether the benefits of personal gun ownership outweigh the costs because the Constitution has recognized an inalienable, individual right to such ownership. Second, we need not figure out how valuable the "benefits" of gun ownership are because the costs would be eliminated if we could just keep guns out of the hands of criminals. Both arguments are spurious.

## A. The Myth of the Second Amendment

First, no rational discussion about how we might limit personal gun ownership is possible as long as the Second Amendment continues to be used as a weapon in a battle for which it was never designed. A notion has evolved over the years, in conjunction with the growth of our "gun culture," that the Constitution confers on all Americans the inalienable, individual "right" to own guns. The NRA has even tried to assert that this right extends to the personal ownership of machine guns and military-style assault weapons. If this were true, then a cost-benefit analysis of personal gun ownership would be academic; no matter how high the costs or how many people were dying in the streets, we would have no recourse short of amending the Constitution.

This notion of an individual constitutional right to own firearms is a myth. The Supreme Court and all lower federal courts have *unanimously* held, since the first decision in 1886, that the Second Amendment is about the *states'* right to maintain a militia, and has nothing whatever to do with an individual's right to bear arms outside the context of a state militia.

The profound and widespread misunderstanding of this so-called "constitutional right" must be dispelled so that rational discourse can take its place. For years, the NRA has loudly and consistently distorted public understanding of the Second Amendment, with so much success that most Americans believe erroneously that it does indeed confer on individuals the right to own a gun.[128] Far fewer of us, however, believe that the Constitution *should* confer such a right or that any such right stands in the way of gun control laws, and it is important to the national debate that we dispel the myth that it does.[129] In the words of former U.S. Supreme Court Chief Justice Warren Burger, the NRA has perpetrated a "fraud on the American public."[130]

☛ *In distorting the meaning of the Second Amendment to argue that it confers on individuals the right to own guns, the NRA has, in the words of former Chief Justice Warren Burger, perpetrated a "fraud on the American public."*

---

[128]   CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *The Second Amendment: Myth and Meaning*; *see also*, TOM W. SMITH, *supra*, note 3 at 8.

[129]   TOM W. SMITH, *supra*, note 3 at 8.

[130]   CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *supra*, note 128, *citing Interview with Chief Justice Warren Burger*, MACNEIL/LEHRER NEWSHOUR, WNET, New York, New York (December 16, 1991).

HQL_0000647

☞ *"It is appalling how distorted . . . and unknown to the public is the judicial consensus on the Second Amendment."*

First, gun control opponents would have us believe that the Second Amendment states simply that the "right of the people to keep and bear Arms shall not be infringed." This language is repeated over and over, and indeed graces the national headquarters of the NRA.

The full text of the Second Amendment, however, reads as follows: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Both Supreme Court interpretation and historical records of the constitutional ratification debates make clear that this amendment was added only to ensure that the federal government could not pass laws restricting the right of the states to maintain a militia. State militias in those days were military forces comprised of ordinary citizens serving as part-time soldiers with their own private arms. The "Anti-Federalists" among the Constitutional framers feared the federal standing army, believed the state militias would serve as an important counterpoint to that army, and thus wanted to ensure the federal government could never require the states to disarm their militias.[131]

No federal court has *ever* held that the Second Amendment is anything but a guarantee *to the states* that they are free to maintain a militia and to allow their citizens to be armed in connection with the maintenance of that militia. No court has ever held that it confers on the individual *anything*, let alone a right to own guns, except in connection with participation in a state militia. Indeed, courts have dismissed outright cases brought by individuals under the Second Amendment, holding that only the states have standing to sue because only the states have any rights to assert under the Amendment.[132] The Second Amendment also does not apply to state laws.[133]

As one scholar has put it, "It is appalling how distorted . . . and unknown to the public is the judicial consensus on the Second Amendment."[134] Examples of this judicial consensus and clarity on the Second Amendment's meaning abound. In 1939, for example, the Supreme Court upheld a law prohibiting the shipment of

---

[131]    *See, generally,* CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *supra,* note 128; VIOLENCE POLICY CENTER, *The Second Amendment: No Right to Keep and Bear Arms* (1998).

[132]    *See, e.g.,* Hickman v. Block, 81 F.3rd 98 (9th Cir.), ("Because the Second Amendment guarantees the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this right is infringed.") *cert. denied,* 519 U.S. 912 (1996).

[133]    79 Opinions of the Attorney General ___ (1994) [Opinion No. 94-012 (February 25, 1994)].

[134]    *Guns and the Judiciary: Interview with Dennis Henigan,* www.handguncontrol. org/legalaction/ C2/c2henigan.htm.

38

sawed-off shotguns in interstate commerce because the law had no "reasonable relationship to the preservation or efficiency of a well-regulated militia." It held that the Second Amendment "must be interpreted and applied" only in the context of safeguarding the states' rights with respect to their militias.[135]  More recently, in upholding a restriction in the Gun Control Act of 1968 prohibiting felons from owning firearms, the Supreme Court applied only a rational basis instead of a strict scrutiny standard, reasoning that the "legislative restrictions on the use of firearms do not trench upon any constitutionally protected liberties."[136]

The lower federal appellate courts have not deviated from the interpretation of the Supreme Court.  In 1976, for example, the Sixth Circuit Court of Appeals dismissed the defendant's multiple arguments that federal law prohibiting his possession of an unregistered machine gun violated his Second Amendment rights, stating that the arguments were "based on the erroneous supposition that the Second Amendment is concerned with the rights of individuals rather than those of the states."[137]  Similarly, the Seventh Circuit upheld both a 1981 ban on the possession and sale of handguns in a suburb of Chicago because "possession of handguns by individuals is not part of the right to keep and bear arms," and an ordinance freezing the number of handguns in Chicago because the law did "not impinge upon the exercise of a fundamental personal right."[138]

In sum, since the Supreme Court's decision in *Miller,* federal appellate courts have addressed the meaning of the Second Amendment in over thirty cases, and in *every* case, they have rejected any suggestion that it guarantees an individual the right to be armed except in connection with the states' right to maintain a citizens' militia.  The courts also have never struck down any gun control law on Second Amendment grounds.

Thus, in assessing our tolerance of private gun ownership, and whether the benefits outweigh the costs, we must shed the unfounded premise that the Constitution demands it.  The Second Amendment's use as a political weapon bears no relationship to its meaning.  In a rational debate over whether we should continue to permit personal gun ownership, we must consider all purported benefits, but we cannot continue to allow gun proponents to cloak their advocacy in the Constitution.

☛ *The Second Amendment's use as a political weapon bears no relationship to its meaning.*

---

[135]     United States v. Miller, 307 U.S. 174, 178 (1939).
[136]     Lewis v. United States, 445 U.S. 55, 64, n. 8 (1980).
[137]     United States v. Warin, 530 F.2d 103, 108 (6th Cir.), *cert. denied,* 96 S.Ct. 3168 (1976).
[138]     Quilici v. Village of Morton Grove, 695 F.2d 261, 271 (7th Cir. 1982); Byrne v. City of Chicago, 727 F.2d 633, 636 (7th Cir. 1984).

HQL_0000649

## B. The Illusory Promise of "Keeping Guns Out of the Wrong Hands"

Even though the Second Amendment does not confer a right to individual gun ownership, gun proponents argue that we could eliminate its terrible costs if we would just enforce the laws already on the books to keep guns out of the hands of criminals.

This argument fails for two reasons.  First, with over 200 million guns in circulation in a country of 270 million people, it is totally unrealistic to hope that even the most beefed-up criminal justice system could ever accomplish this task.  Second, even if this illusion could ever be made a reality, it would only solve part of the problem.  The suicides, unintentional shooting deaths, and homicides committed among family members in the heat of conflict would continue unabated.

### 1. Enforcement of Current Firearms Laws Will Not Keep Guns Out of the  Hands of Criminals

There are roughly 20,000 federal, state, and local laws currently on the books governing firearms.  Gun advocates use this figure to insist that gun violence is simply a problem of poor police work and prosecution.  How many times have we heard the exhortation, "If we just enforced the laws we already have . . ."

The problem with this theory is that the vast majority of these laws have nothing to do with the sale or possession of firearms.  Rather, they regulate peripheral issues like zoning laws mandating where gun stores and shooting ranges may be located, how firearms may be transported, or where they can be discharged.[139]  For example, as the recent debates in Congress have demonstrated, notwithstanding the alarming access to and use of firearms by children, we do not even have consistent laws on how old one must be to use, possess, or buy a gun.  Thus, our gun laws, even if vigorously enforced, are not sufficient to enable law enforcement to keep guns away from criminals.

Second, the gun industry and many gun proponents themselves thwart vigorous enforcement of the laws and regulations we do have.  For example, it is illegal to sell a gun to a convicted felon.  The only way to enforce this law is through background checks.  Yet the gun lobby cries foul at the notion that background checks be required at gun shows, where thousands of firearms change hands every year.  Similarly, the Firearm Owner's Protection Act of 1996 has erected many obstacles to the ATF's ability to enforce laws governing licensed federal firearms dealers.  For example, it precludes the agency from keeping any national database on gun sales and restricts ATF inspection of dealers.  In the recent Columbine tragedy, the ATF's ability to trace the guns used in the massacre depended largely upon luck and old

☞ *With over 200 million guns in circulation, not even the most beefed-up criminal justice system could ever round up all the illegal ones.*

☞ *In the recent Columbine tragedy, the ATF's ability to trace the guns used in the massacre depended largely upon luck and old fashioned police leg work, for it had no record or ability to keep a record of the sale of the guns to the teenagers.*

---

[139]      Diaz, *supra*, note 2 at 36.

HQL_0000650

fashioned police leg work, for it had no record or ability to keep a record of the sale of the guns to the teenagers.[140]  Thus, the gun lobby not only fails to cooperate in the effort to "keep guns away from criminals," but also resists efforts to make enforcement more effective.

Thus, a gun policy premised on the notion that we need only enforce the laws "already on the books" is doomed to failure.  This is not to say that we should ever relax our efforts to pursue gun-toting criminals with every tool in our arsenal.  We should also attempt, where appropriate and possible, to augment police and prosecution resources.  Yet the fact remains that our current laws are inadequate, and even the most vigorous enforcement efforts will not keep guns away from those who should not have them.

## 2. Keeping Guns Away From Criminals Would Not Solve the Problem

Finally, even if we arrested, prosecuted and incarcerated every person illegally possessing a gun beginning tomorrow, we would only solve a relatively small part of the tragedy of gun violence.  Crime is only its most visible and notorious component.  We would still suffer the senseless tragedy of children accidentally shooting themselves.  We would still shake our heads, 18,000 times a year, over the story of an unhappy teen or lonely retiree putting a gun to his head in a moment of anguish.  We would not even prevent the majority of homicides.  Most homicides are committed by family members or friends in *legal* possession of a gun who become, as we all do at one time or another, very angry.  Instead of storming out of the house, they reach for their perfectly legal gun.

Thus, we cannot escape the imperative that we examine how the benefits of gun ownership stack up against the costs by retreating either to the Second Amendment or to the untenable theory that keeping guns out of the wrong hands will do the trick.

# C.  The Benefits of Personal Gun Ownership

So what are the benefits and how do they stack up?  Aside perhaps from collecting guns as museum relics, the two justifications for gun ownership most commonly advanced are the recreational enjoyment of hunting and sport shooting and the need to defend ourselves.  While both have surface appeal, and the shooting sports justify long gun ownership, neither can stand up under analysis as a rationale for personal handgun ownership.

☞ *Even if we incarcerated every criminal with a gun tomorrow, we would have done nothing to stop the thousands of suicides, unintentional shooting deaths, and family-related homicides.*

---

[140]    DAVID B. OTTAWAY, *With Often Arcane Tools, U.S. Agency Traces Littleton Guns*, WASHINGTON POST, at A06 (April 30, 1999).

41

## 1. Our Hunting and Shooting Heritage

The gun industry's promotional materials are filled with bucolic images of fathers passing on to sons the joys of the shooting sports.  In fact, the industry is working hard to regenerate interest in hunting and sport shooting.  As fewer and fewer Americans live the rural life conducive to hunting, interest in the sports and long gun ownership is declining.

Yet despite declining interest, these sports are extremely important to some Americans, and there is little reason to focus on them in our efforts to find solutions to gun violence.  The guns used in the shooting sports are not, for the most part, the guns causing the death and injury in our homes and communities.  Long guns are the instruments of hunters and sports shooters, while the vast majority of firearm injury occurs from handguns.  For example, of all the firearm homicides in 1996 in which the type of gun was known, 86% involved handguns.  Thus, eliminating the shooting sports would not solve very much of our problem.

On the other hand, we are deceived if we continue to allow gun enthusiasts to use recreational shooting sports as justification for handgun ownership.  They are two very separate issues which gun advocates attempt disingenuously to tie together to drum up support.  There is no reason why the most dedicated, enthusiastic hunter, mindful of preserving what he perceives to be our national heritage, need ever own a handgun.  Conversely, there is no reason why any restrictions on handgun ownership need ever impede the hunter's enjoyment of his sport.

## 2. The Myth of Self-Defense

Finally, gun advocates wrap their message of the glories of gun ownership in a package of fear.  They prey upon people's worries about their personal safety and that of their families.  They talk of the armed burglar and the rapist.  Gun industry advertisements paint pictures of a family saved from the would-be murderer by the valiant father brandishing his 9 mm pistol.[141]  Implicit and explicit in all of this hype is the notion that those of us with guns are safer.  With a gun, we can protect ourselves against the crime and violence in our communities.  Without a gun, we stand naked against the intruder and will die at his hands.

The problem is that the propaganda is false.  People are persuaded to buy handguns for self-protection under false pretenses.  Most people who own guns for self-protection have handguns.  Yet while thousands of Americans harbor handguns in their homes believing it increases their safety, the truth is just the opposite.

☞ *Long guns are the instruments of the shooting sports, while handguns cause 86% of all firearm injury.*

---

[141]   DIAZ, *supra*, note 2 at 155-60, *citing* ERIK ECKHOLM, *The Riots Bring a Rush to Arm and New Debate*, N.Y. TIMES, May 17, 1992 at 18 (discussion of how industry advertisements played upon fears for personal safety after the 1992 Los Angeles riots).

[142]   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Guns in the Home* at 1 (November 1998)(citations omitted).

42

HQL_0000652

First, guns in the home are rarely  used for protection.[142]  For every time a citizen used a firearm in 1996 in a justifiable homicide, 160 lives were ended through criminal homicide, suicide, or unintentional shootings.[143]  The U.S. Bureau of Justice Statistics estimates that there are on average 108,000 defensive uses of guns each year, compared to about 1.3 million crimes committed with guns.[144]  Another recent study concluded that a gun was used for protection in fewer than 2% of all cases of home invasion.[145]

Second, the dangers of keeping a gun in the home far outweigh its speculative benefits.  The homicide of a family member is almost 3 times more likely to occur in homes with guns than in those without guns.  The risk of a family member committing suicide is five times higher in homes with guns, with this risk elevated still further in homes with adolescents and young adults.  A gun in the home also increases the chances that domestic violence incidents will end in death.  Domestic assaults with firearms are 12 times more likely to be fatal than non-firearm-related assaults.[146]  Finally, a gun in the home creates the risk of unintentional shooting that

☛ *A gun is used for protection in fewer than 2% of all cases of home invasion.*

☛ *In homes with guns, the homicide of a family member is three times more likely and a suicide five times more likely than in homes without guns.*

---

143   VIOLENCE POLICY CENTER, *Who Dies?, supra,* note 86 at *Introduction* at 1.

144   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Guns in the Home, supra,* note 142 at 1.

145   *See* KELLERMAN *ET AL., Weapon Involvement in Home Invasion Crimes,* 273 JAMA 1759, 1761 (1995).  In one study, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* JOURNAL OF CRIMINAL LAW AND CRIMINOLOGY, Vol. 86, No. 1, pp. 150-187 (1995), authors Gary Kleck and Marc Gertz claim that a survey of households reveals that 2.5 million Americans use a gun defensively against criminal attackers each year.  Subsequent studies, however, have shown this figure to be wildly over-estimated.  For example, when broken down into number of defensive gun uses in which the attackers were supposedly wounded or killed, that number was close to the total number of people killed or treated for gunshot wounds in a single year.  Yet we know that most firearm death and injury each year results from suicides, criminal homicides, and unintentional shootings.  The far better estimate is 108,000 defensive gun uses each year, a figure derived from the National Crime Victimization Survey conducted by the Census Bureau for the U.S. Department of Justice.  In this survey, the question about defensive gun uses is limited to those actually reporting a crime victimization in which there was direct contact with the perpetrator.  *See, e.g.,* DAVID HEMENWAY, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates,* THE JOURNAL OF CRIMINAL LAW AND CRIMINOLOGY, Vol. 87, No. 4, pp. 1430-1445 (1997); COOK, *ET AL., The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?,* JOURNAL OF POLICY ANALYSIS AND MANAGEMENT, Vol. 16, No. 3, 463-469 (1997).

146   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Guns In The Home, supra,* note 142, *citing* KELLERMAN, *ET AL., Gun Ownership as a Risk Factor for Homicide in the Home,* NEW ENGLAND JOURNAL OF MEDICINE, 329:1084-1091 (1993) and KELLERMAN, *ET AL., Suicide in the Home in Relation to Gun Ownership,* NEW ENGLAND JOURNAL OF MEDICINE, 327:467-472 (1992).  A recent study also shows that women are far more likely to be killed by a spouse or partner in the home than they are in an assault by a stranger.  VIOLENCE POLICE CENTER, *When Men Kill Women: An Analysis of Homicide Data, supra,* note 71.

HQL_0000653

would otherwise not exist at all.[147]  Thus, the risks of having a gun in the home for protection outweigh the speculative benefits, and gun advocates' advertisements to the contrary are misleading at best.

In sum, neither preservation of shooting as recreation nor the need for self-defense can fairly be advanced as a benefit of handgun ownership to be weighed against its grim toll on American life.

## D.  Precedent of Other Industrialized Nations

Lest we believe that we have no guidance in our attempt to determine whether the benefits of handgun ownership justify its costs, we need only look to our company in the industrialized world.  Without comparing the experience of other countries, it is possible to become desensitized to our levels of violence.  It becomes possible to accept it unquestioningly as inevitable - a fact of life at the end of the 20th century.  We have, indeed, become at some level inured to it.  Yet looking outside our borders jerks us back to the realization that it need not be so.  Most other industrialized nations have eschewed whatever benefits might flow from widespread handgun ownership in favor of strict gun control, and they have far lower firearm injury rates to show for it.

☞ *In 1996, more than twice as many people were murdered by handgun in Maryland than in Canada, Germany, Great Britain, Japan, Australia, and New Zealand combined.*

---

[147]  Gun proponents often cite one highly-publicized study which claims that so-called "right-to-carry" ("RTC") laws have been responsible for substantial decreases in violent crime.  *See,* JOHN R. LOTT AND DAVID B. MUSTARD, *Crime, Deterrence, and Right-to-carry Concealed Handguns,* JOURNAL OF LEGAL STUDIES, XXVI(1):1-68 (1997).  Many states have recently enacted such laws, which enable people to obtain permits to carry concealed weapons more easily.  Several independent analyses have demonstrated the conclusions of Lott's study to be without merit.  Researchers at the Johns Hopkins Center for Gun Policy and Research, as well as scholars at Carnegie Mellon University and Georgetown University have all, independently, dismissed the validity of Lott's claims for a variety of reasons, including flawed statistical models and analyses, and failure to control for variables such as poverty and crime cycles.  *See,* WEBSTER, *ET AL., Flawed Gun Policy Research Could Endanger Public Safety,* AMERICAN JOURNAL OF PUBLIC HEALTH, 87:918-921 (!997); J. LUDWIG, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence From State Panel Data,* INTERNATIONAL REVIEW OF LAW AND ECONOMICS, 18:239-254 (1998); DANIEL W. WEBSTER, *The Claims That Right-to-Carry Laws Reduce Violent Crime are Unsubstantiated,* JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH (1997).  For example, these subsequent studies conclude that after controlling for changes in poverty and crime cycles, RTC laws have no significant effect on states' murder rates.  Similarly, Lott and Mustard tout Florida as a prime example of RTC laws' deterrent effect on rape and homicide.  They fail to acknowledge, however, that violent crime rates *rose* initially after the RTC law went into effect.  Only after the state passed stringent laws requiring mandatory background checks and waiting periods did violent crime rates begin to decline.  In any event, Florida nonetheless has had the highest per capita violent crime rate in the country since 1987, the year in which the RTC law went into effect.  *See also,* CENTER TO PREVENT HANDGUN VIOLENCE, *Carrying Concealed Weapons* (1999).  Thus, Lott's study fails to establish that RTC laws reduce violent crime, and fails to undercut the myriad statistical analyses showing that guns in the home increase the likelihood that someone in the home will be killed or injured with that gun.

44

For example, in 1996, handguns murdered 2 people in New Zealand, 13 in Australia, 15 in Japan, 30 in Great Britain, 106 in Canada, and 213 in Germany, for a total of 379.  By tragic contrast, 9,390 people were murdered by handgun in the United States.[148]  More than twice as many people were murdered in Maryland alone than in all 6 countries combined.

Similarly, in one year firearms killed no children in Japan, 19 in Great Britain, 57 in Germany, 109 in France, and 153 in Canada, for a total of 338.  Again, by tragic contrast, 5,285 children were killed in America.[149]  In 1996, 91 children were killed in Maryland.

That more children are killed in Maryland every year than in Japan, Great Britain, and Germany combined speaks volumes about our priorities.

# IV.   A Solution:  Attacking Gun Violence As Problem Of Law Enforcement, Public Health, And Consumer Product Safety

To what conclusion does this cost-benefit analysis lead us?  For me, on a personal level, the answer is very easy.  I am ready to say that we have suffered long enough.  As a grandfather, I am ready to say too many children have died.  I have added up the costs, and they so outweigh the benefits as to smother them.  In short, I count myself among those who believe that we should no longer allow unrestricted handgun ownership.  Our public policy goal must be to rid our communities of handguns.

Only through restrictive handgun licensing, which would allow possession of guns to advance reasonable law enforcement purposes only, will we ever reduce all types of gun death and injury.  More effective guns sales and distribution laws, and vigorous enforcement of those laws, can reduce intentional criminal firearm injury.  Encouraging gun manufacturers to equip guns with safety and child-proofing features will help prevent unintentional shootings.  Personalized guns can prevent teen suicides and injury from stolen guns.  Yet not even all of these measures together would address all preventable gun violence and death.  We would still be left with the adult suicides and the domestic assaults which take thousands of lives every year.

*☛ In 1996, a total of 338 children were killed by handgun in Japan, Great Britain, Canada, Germany and France.  5,285 children were killed by handguns in America.*

*☛ Our public policy goal must be to rid our communities of handguns.*

---

[148]   CENTER TO PREVENT HANDGUN VIOLENCE, *Flyer, citing* U.S. Department of Justice statistics.
[149]   *Id.*

HQL_0000655

Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 46 of 63

☛ *We must undertake a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership.*

Thus, we must cease to allow the widespread, unrestricted ownership of handguns. The owner of a grocery store should still be able to obtain a license to protect his business premises.  The sports shooter who enjoys competitive shooting must still be permitted sharpen his skills with a gun left at the shooting range.  The police officer must still carry a gun on the job.  But no one should be able to reach for a gun hidden under a pillow to shoot a loved one in a moment of anger, or to turn it on himself in a moment of anguish.  We should no longer tolerate living in communities awash with handguns.

We must begin to work immediately toward this goal.  We must undertake a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership.  This plan must constitute a comprehensive strategy which reflects the nature of gun violence as a multi-faceted problem of law enforcement, public health and consumer product safety.  We must pursue specific initiatives designed to reduce every possible category of preventable firearm death and injury.  And we must act now.  Too many people are dying to wait for the next study, the next election, or the next Littleton massacre.

Thus, I recommend the following three-step plan to make Maryland the first state in the country to close the door on widespread handgun ownership:

☛ **To decrease preventable teen suicides, unintentional shootings, and injury from stolen firearms, we should regulate firearms as a consumer product, at the federal, state and local levels, to require safety and child-proofing features and to promote the development of personalized guns.  We should also provide gun manufacturers the incentive to institute these safety measures by allowing the use of strict liability in the courts.**

## A.  Regulating Firearms As a Consumer Product

☛ *We should immediately demand that guns become subject to the same rigorous regulatory oversight as are automobiles, lawnmowers, stepladders, aspirin bottles, child car seats . . . the list is endless.*

It defies all logic, fairness, and intelligent analysis that we do not regulate guns under the health and safety standards we apply to every other product available to American consumers.  We should immediately demand, at the federal, state, and local levels, that guns become subject to the same rigorous regulatory oversight as are automobiles, lawnmowers, stepladders, aspirin bottles, child car seats . . . the list is endless.  The health and safety of the consumer should assume the same importance in the realm of firearms as it does in all other spheres of American product manufacturing.

HQL_0000656

## 1. Federal Health and Safety Regulatory Authority Over the Gun Industry

First, Congress should finally do what it should have done thirty years ago when it created the Consumer Product Safety Commission and end the gun industry's unique and paradoxical exemption from that agency's jurisdiction.  Congress should turn over responsibility for gun health and safety regulation to the agency that oversees virtually every other consumer product, most of which pose far less inherent danger to the American consumer than the firearm.

The CPSC was created in 1972 in response to a general recognition that too many people were being killed or injured from certain consumer products, and continued piecemeal regulation of these products would be ineffective.[150]  The CPSC, as well as other federal agencies like the Federal Drug Administration and the National Traffic Safety Administration, all work to protect us from unreasonable risk of injury or death from consumer products.  The CPSC alone has jurisdiction over more than 15,000 products, including ironically, pellet and air guns.  It has the power to set mandatory safety standards, monitor industry compliance with them, issue recalls of defective products, and disseminate safety information to the public.  It also maintains the National Electronic Injury Surveillance System to collect data on product-related injuries and to do follow-up studies.  This system allows the CPSC to identify specific product hazards, quantify injuries, and respond appropriately.  Finally, it can ban products it determines to be unreasonably hazardous.

The cigarette lighter provides a germane example of how the CPSC functions.  Beginning in 1985, a nurse petitioned the Commission requesting that disposable butane lighters be made child-resistant.  The Commission knew at that time that 140 children, most of whom were under age 5, were dying each year from fires started by playing with the lighters.  Thus, in response to the petition, the Commission conducted field studies regarding which lighters were causing the injuries and in what manner, the child-resistance of existing lighters, and relevant product information to determine baseline acceptability standards.  Thereafter, pursuant to its research and after posting advance notice of proposed rule-making, it published a proposed safety standard, which was enacted in 1993.[151]

Firearms stand virtually alone in their exemption from basic health and safety regulation.  Why should an assault rifle avoid the scrutiny to which a coffeemaker is subject?  Congress should finally undo the harm of thirty years ago when an NRA board member in Congress offered the amendment insulating the firearms industry

☛ *Why should an assault rifle avoid the scrutiny to which a coffeemaker is subject?*

---

[150]     For general discussion about the powers of the Consumer Product Safety Commission, *see* Dixon, *supra*, note 9 at 1000-1004; *see also* Diaz, *supra*, note 2 at 201-206.

[151]     *See* Dixon, *supra*, note 9 at 1002-03.

HQL_0000657

from health and safety regulation.  It should give the CPSC jurisdiction over fire-arms, or accord similar powers to the ATF.

Were the CPSC or another federal agency given such regulatory authority, it could make substantial improvements in both the safety of firearms themselves and the relatively freewheeling way in which they are distributed.  It could, for example, divide firearms into categories based upon the level of risk they present to public safety, and then place different controls on manufacture, distribution, and use in each category.  Assault weapons would thus be subject to different regulatory restrictions than long guns.  It could also set safety standards regarding, for ex-ample, the likelihood of accidental discharge and child accessibility, monitor com-pliance with the standards, and recall defective models.

*☛ Were Congress to right the mistake of thirty years ago, and put firearms under CPSC jurisdiction, the federal government could assume the same responsibility over assault weapons and machine guns as it does over pacifiers.*

In short, were Congress to right the mistake of thirty years ago, the federal government could assume the same responsibility over assault weapons and ma-chine guns as it does over pacifiers.  It could perform the same analysis of the risks and benefits and enact appropriate controls on the vast array of firearms available to American consumers as it does routinely with the thousands of other, mostly far more pedestrian, products available in this country.  It should be allowed to assume that long overdue responsibility.

## 2.  State Health and Safety Regulation

Although federal regulation is necessary and can be most effective in some areas, there is plenty of room for the states to step in where the federal government falls short.  Some states have enacted limited laws governing the sale, use and possession of firearms, but most states have yet to venture into regulating firearms as a product under state consumer protection or firearm control laws.  The states should remedy this omission.

### a. Massachusetts' Consumer Protection Firearms Regulations

In the sole example of state health and safety regulation of firearms, former Massachusetts Attorney General Scott Harshbarger did promulgate consumer protection regulations of firearms before he left office in 1998, and the Supreme Judicial Court of Massachusetts recently upheld the validity of those regulations.[152]  The regulations define as deceptive or unfair, under the state Consumer Protection Act, the transfer of certain types of handguns to consumers.  They essentially prohibit the commercial sale or transfer of handguns failing to satisfy prescribed safety and performance standards.  These standards prohibit guns made without tamper-resistant serial numbers, some kind of locking mechanism and child-proofing devices, as well as guns made of certain inferior materials with a barrel shorter than three inches.  They also prohibit guns prone to repeated firing based on a single pull of the trigger, prone to explosion during firing with standard

---

[152]   American Shooting Sports Council, Inc. v. Attorney General, 429 Mass. 871, 711 N.E. 2d 899 (1999).

HQL_0000658

ammunition, or prone to accidental discharge.  Finally, any gun sold without a "personalization" device, which allows the gun to be fired only by an authorized user, must be accompanied by stringent warnings.[153]

In sum, the Massachusetts regulations are common sense health and safety restrictions on an inherently dangerous product.  The federal government ought to make such basic regulations national in scope, but absent such sensible federal initiative, the states should set the example.

### b. Recommendation for Maryland

In pursuing this goal in Maryland, we should enact legislation imposing health and safety requirements on handguns sold in the State.  Alternatively, we can pro- mulgate regulations toward the same end.

#### i. Model Legislation

Governor Glendening has recently created a *Task Force on Child-Proof Guns* charged with "draft[ing] legislation to implement measures that prevent the unin- tentional and criminal misuse of handguns by children and other unauthorized users."[154]  I applaud and fully support the Governor's recognition that the time is ripe for such a requirement, and Marylanders deserve the protections it would offer.

"Personalized" or "smart" guns would permit a gun to be fired only by an authorized user.  Some rudimentary ways of accomplishing this have existed for a long time, and more sophisticated, high-tech methods are being developed.  For example, a safety lock currently on the market requires knowledge of the combina- tion lock for firing.  Another device involves putting a magnet in the gun which must be aligned with a magnet on a ring worn by the user.[155]

A number of newer technologies, however, could be placed in the original design of the gun, thereby not requiring action by the consumer to "personalize" the gun.  For example, one device would read the user's fingerprint, another would use a "touch memory sensor" to read a serial number or other identifying number on a ring worn by the user, and still others would use radio frequency identification or remote control codes.[156]

These safety features would eliminate much of the gun death that plagues us. Quite simply, without restrictions on unintended, unauthorized use of firearms, they are unsafe.  As one scholar has said, "Child-play becomes injury and death. Adolescent immaturity, frustration, and dysfunction become arrest, assault, suicide, and homicide.  A firearm bought for protection or sport becomes a valued instru- ment for the commission of crime."[157]

> ☞ *I applaud and fully support the Governor's recognition that the time is ripe for requiring all guns sold in Maryland to be "personalized," or able to be fired only by an authorized user.*

> ☞ *Without restrictions on unintended, unauthorized use of firearms, "child-play becomes injury and death.  Adolescent immaturity, frustration, and dysfunction become arrest, assault, suicide, and homicide."*

---

[153]  940 Code Mass. Regs. §§16.00 *et seq.* (1997).

[154]  Governor's Executive Order 01.01.1999.18.

[155]  Johns Hopkins Center for Gun Policy and Research, *Personalized Guns: Reducing Gun Deaths Through Design Changes* at 7 (May 1998).

[156]  *Id.* at 8-10.

[157]  Dixon, *supra,* note 9 at 1005.

49

In sum, while personalization technology would not rid us of all gun injury and death, it would reduce dramatically teen suicides, unintentional shooting injuries and deaths, and  criminal shootings with stolen guns.  While suicides by gun owners and criminal acts by those in legal possession of guns would continue, the reduction in these other areas would be significant.

First, the elimination of teen suicides by firearm would save three lives every day nationwide, and an average of 10 lives a year in Maryland.   With the turbulence characteristic of adolescence, at least one-third of all teens have thoughts of suicide.  With a firearm accessible, these thoughts can be given effect.  Studies show a strong correlation, for example, between adolescent suicide risk and a gun in the home.[158]  That teen suicides doubled between 1970 and 1990 is also attributed to increased access to firearms.  The actual number of suicide *attempts* did not go up significantly, but more attempts were successful because of firearm use.  When a firearm is the chosen method for a suicide attempt, there is an 85-90% chance the attempt will end in death.[159]

Second, the prevention of unintentional shootings would eliminate between 1,200 to 2,000 deaths every year nationwide.  In Maryland, at least 12 people died from unintentional shootings (with 38 more undetermined deaths) in 1996 alone, and many more were non-fatally injured.  About 40% of all gunshot wounds suffered by children are unintentional.[160]

Finally, the homicides and non-fatal shootings from stolen guns represent a substantial portion of criminal gun death.  National Crime Victimization Survey and FBI data show that about 500,000 guns, primarily handguns, are stolen every year.  Other surveys show that thefts are a significant source of guns used in crime; one-third of the guns used by armed felons are stolen.[161]  Preventing the use of guns by unauthorized users would effectively stem this flow of illegal gun use.  Thus, of the 445 homicides in Maryland in 1996, personalized gun technology might have prevented the 148 which likely were committed with stolen guns.

In short, personalized gun technology would significantly reduce gun injury and death in Maryland.  It would require patience, for older, unsafe guns would continue in circulation for years.  Yet gradually, with all new guns personalized, the circulation of unsafe guns would diminish.  While our own children or even grandchildren would perhaps not see the full benefit, we would ensure that our grandchildren's children would not die because a curious child picked up a gun or a despondent teen indulged a passing, fatal fantasy.

☞ *The elimination of teen suicides by firearm would save three lives every day nationwide, and an average of 10 lives a year in Maryland.*

☞ *The prevention of unintentional shootings would eliminate between 1,200 to 2,000 deaths every year nationwide.*

☞ *Thefts are a significant source of guns used in crime; one-third of the guns used by armed felons are stolen.*

---

[158]     JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Personalized Guns: Reducing Gun Deaths Through Design Changes, supra*, note 155 at 3-4.

[159]     DIXON, *supra*, note 9 at 991 (citations omitted).

[160]     JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Personalized Guns: Reducing Gun Deaths Through Design Changes, supra*, note 155 at 4-5 and *Firearms Deaths in Maryland: Summary Tables," supra*, note 97, Table I.

[161]     *Id.* at 5.

HQL_0000660

I appeal to the General Assembly, therefore, to show the courage and leadership needed to put Maryland in the forefront of this opportunity to protect our future generations.  It should enact legislation immediately which sets forth a requirement, to be phased in over the next few years, for all handguns sold in Maryland to be personalized, or able to be fired by authorized users only.

### ii.  Health and Safety Regulation

In holding handguns to the same health and safety standards applied to other consumer products, we can also take advantage of our unique status as the only state with a Handgun Roster Board.  With its mandate and expertise, the Board is in an optimal position to take important steps toward promoting the protection of children and others.  It should use its authority to promulgate regulations with a view toward requiring child-proofing devices, personalized gun technology, and other safety features on guns sold in Maryland.

> 👉 *Personalized guns would ensure that our grandchildren's children would not die because a curious child picked up a gun or a despondent teen indulged a passing, fatal fantasy.*

The Handgun Roster Board's current mandate, as explained above, is to review handguns to determine whether they are "useful for legitimate sporting, self-protection, or law enforcement purposes," and approve or disapprove them for sale in Maryland.[162]  It must consider each handgun in light of nine specific criteria, *i.e.*, concealability, ballistic accuracy, weight, quality of materials and manufacture, *reliability as to safety,* caliber, detectability by standard security equipment, and utility for legitimate sporting, self-protection, or law enforcement activities.[163]  Under its current authority, therefore, the Board can consider any consumer product safety issue, including whether a gun has a child-proofing device, in deciding whether the gun is useful for sporting, self-protection or law enforcement purposes.

Under this authority, the Board should promulgate regulations setting forth the health and safety standards it will apply to all guns to be approved for sale in Maryland.  These regulations should work towards implementing Governor Glendening's proposal to require "personalized" or "smart" guns in Maryland, as well as the standards set forth in the Massachusetts regulations.

> 👉 *As public outcry, as well as litigation, finally propel the gun industry to use its formidable powers of innovation to develop new safety devices to protect the innocent from gun violence, the Handgun Roster Board should ensure that Marylanders receive the full benefit of those innovations.*

Under such regulations, the Board would be able to hold the firearms industry to the health and safety standards we apply to every other consumer product sold in Maryland.  The Board could also modify the regulations as necessary to respond to emerging technologies.  As public outcry, as well as litigation, finally propel the gun industry to use its formidable powers of innovation to develop new safety devices to protect the innocent from gun violence, the Handgun Roster Board should ensure, to the extent possible, that Marylanders receive the full benefit of those innovations.

---

[162]     Md. Ann. Code Art. 27, §3J(b)(1)(1988).

[163]     Md. Ann. Code Art. 27, §§3I-J (1988).

51

If the Handgun Roster Board does not exercise its authority to afford Marylanders the protection from dangerous handguns they deserve, I intend to investigate the possibility of promulgating health and safety firearm regulations under the Consumer Protection Act. As outlined below, I will also examine the extent to which the industry uses deceptive advertising to market its products as an additional potential avenue for consumer firearms regulation.

### iii.  Unfair or Deceptive Advertising

In addition to imposing safety regulations on the design of handguns to be sold in Maryland, we should begin looking at the way guns are promoted in the State. Most important, it is illegal to sell guns to a minor, and any firearms advertisements targeting children should be banned. In addition, claims that gun ownership increases the safety of household members are highly suspect. Thus, I intend to begin an investigation of firearms promotion and advertisement in Maryland, and to take whatever steps may be appropriate to ensure that the gun industry does not unfairly target our children or subject anyone to misleading or deceptive information about its products.

*☞ Any firearms advertisements targeting children should be banned.*

### iv.  Local Health and Safety Regulations

While federal consumer safety regulation will potentially be more effective than state regulation, and state regulation more effective than local, the old adage that "something is better than nothing" is certainly germane here. Should the State fail to protect children from the unintentional gunshot wound or premature death, then localities should step in. Montgomery and Prince George's counties, commendably, have already enacted ordinances requiring the sale of any handgun to be accompanied by the sale of a trigger lock.[164] Other counties should follow suit, and they may be able to go even farther in protecting their residents from harm.

State law generally preempts local regulation of firearms and ammunition, but there are several exceptions. Most important, counties and municipalities may regulate the sale and possession of firearms as they relate to minors and law enforcement personnel.[165] In an Opinion of the Attorney General, we concluded that this exception gives localities the power to require guns to be kept inaccessible to minors, or to mandate the sale of trigger locks to accompany all handgun transfers.[166] Thus, localities may be able to enact their own requirements for the sale of personalized gun technology and the use of such technology by law enforcement.

---

[164]   *See, e.g.,* Montgomery County Code §57-5A(a)-(c).

[165]   Md. Code Ann., Art. 27, §36H *et seq.*

[166]   *See* 76 Op. Att'y Gen. 240 (1991); 82 Op. Att'y Gen. ___ (1997)[Opinion No. 97-04 (February 13, 1997)].

HQL_0000662

## B.  Holding the Gun Industry Accountable

We cannot and should not, however, rely solely on legislative and regulatory reform to stem the flow of gun violence in our communities.  In the end, we must persuade the gun industry itself to join the effort to increase the safety of its products.  Yet the gun industry has an incredibly powerful lobby and huge financial backing.  Past experience teaches that the gun industry vigorously resists all reforms, with huge sums of money and lobbying prowess.  We are unlikely to get true cooperation or willingness to work toward real solutions until the industry has financial reasons to come to the table.

### 1. Restoring the Legal Balance Between Individuals and Gun Manufacturers

In short, the gun industry will only begin to make significant changes in the way it manufactures and distributes its products when it begins to feel the pinch in its pocketbook.  With its decision to respond to market saturation by increasing firearm lethality, with its refusal to develop safety mechanisms or do anything to help "keep guns out of hands of criminals," including closing gaping loopholes in private gun sales, the gun industry should be subject to the same accountability as other American product manufacturers.

In short, we must restore the legal balance between individuals and the gun industry to allow consumers to hold the industry accountable through the courts.  We have a time-honored tradition in this country of recognizing that some things can be fixed more effectively through the tort system, rather than through government intervention.  Allowing consumers to sue manufacturers of products which cause harm, and to hold them strictly liable for injuries under certain circumstances, has helped to maintain a necessary but delicate balance in the marketplace between the individual and powerful corporate manufacturers.

We lack this critical balance in Maryland.  The Maryland consumer cannot sue gun manufacturers in Maryland courts under the doctrine of strict liability.  This has profound implications for our State.  As lawsuits against the gun industry spring up all over the country, we are in danger of becoming a safe haven for surplus or unsafe guns - a dumping ground for an industry under siege.

### 2. Reinstating Strict Liability

Thus, we must reinstate strict liability as a theory under which Marylanders can seek to recover damages from the gun manufacturers.  We must make it clear that for those who continue irresponsibly to flood our State with unsafe guns, for those who persist in putting an abnormally dangerous product into the Maryland marketplace, there will be a cause of action under which they can be held accountable in Maryland courts.

☛ *We must persuade the gun industry itself to join the effort to increase the safety of its products.*

☛ *As lawsuits against the gun industry spring up all over the country, we are in danger of becoming a safe haven for surplus or unsafe guns - a dumping ground for an industry under siege.*

☛ *We must restore the legal balance between individuals and the gun industry to allow consumers to hold the industry accountable through the courts.*

53

*☞ Strict liability shifts the costs to the party both better able to bear them and in a better position to eliminate them.*

In 1985, in a groundbreaking case *Kelley v. R.G. Industries*,[167] the Court of Appeals of Maryland held that strict liability could be imposed on the manufacturers of Saturday Night Specials. While declining to apply previously-recognized principles of strict liability to handguns in general, it decided to expand common law strict liability doctrine to conform with public policy on handgun use established by the General Assembly and to hold Saturday Night Special manufacturers liable. Specifically, finding that Saturday Night Specials are too inaccurate, unreliable, and poorly made for any legitimate uses, but rather are valued only for criminal activity, manufacturers and marketers of the guns could be held strictly liable for gunshot injuries flowing from their criminal misuse. The Court noted that the gun manufacturers and dealers knew or should have known they were making and selling a product "principally to be used in criminal activity."[168]

The promise this decision may have held for bringing the gun industry into court never unfolded, since the General Assembly later eliminated all strict liability for damages flowing from firearms.[169] While this legislative compromise seemed right at the time, firearms technology and the dynamics of gun violence have changed. In reversing the trend the *Kelley* decision may have launched, we eliminated the Maryland consumer's ability to use what is widely-recognized as one of the best means of injury prevention - holding manufacturers of inherently and unreasonably dangerous products strictly liable for harms caused by their products.[170]

The purpose of strict liability is to ensure that the costs of injuries resulting from unreasonably dangerous or defective products be placed on the manufacturer rather than on victims.[171] Without strict liability, the costs of accidents and injury fall on the victim, and thus the injurer does not factor such costs into his decision-making about his product, and has no incentive to minimize the risk of accident and injury. Strict liability shifts the costs to the party both better able to bear them and in a better position to eliminate them.[172] Thus, strict liability discourages parties from manufacturing and distributing dangerous products, or encourages them to develop alternative designs and distribution which are safer.[173]

---

[167]   304 Md. 124, 497 A.2d 1143 (1985).

[168]   *Id.* at 155.

[169]   Md. Ann. Code Art. 27, §36H-5(h)(1), which states, "A person or entity may not be held strictly liable for damages of any kind resulting from injuries to another person sustained as a result of the criminal use of any firearm by a third person, unless the person or entity conspired with the third person to commit, or willfully aided, abetted, or caused the commission of the criminal act in which the firearm was used."

[170]   *See* Mark D. Polston and Douglas S. Weil, *Unsafe By Design:  Using Tort Actions to Reduce Firearm-related Injuries,* 8 Stanford Law and Policy Review 13 (Winter, 1997).

[171]   Greenman v. Yuba Power Prod. Inc., 59 Cal. 2d 57, 63, 377 P.2d 897, 901 (1962).

[172]   *See* Andrew O. Smith, *The Manufacture and Distribution of Handguns As An Abnormally Dangerous Activity,* 54 University of Chicago Law Review 369, 371 (1987).

[173]   *See* W. Prosser, J. Wade & V. Schwartz, *Cases and Materials on Torts,* 74-65 (7th ed. 1982).

54

Courts hold parties strictly liable under two general theories, *i.e.,* the abnormally dangerous activity doctrine, and the abnormally dangerous product doctrine.[174]  Under the first theory, a party may be strictly liable if engaged in an ultrahazardous activity, the danger of which cannot be eliminated even with the exercise of reasonable care, and the risks of which outweigh the utility to the community.[175]

Under the second doctrine, the manufacturer or marketer of an unreasonably dangerous product may be strictly liable if the court finds the product to be manufactured, designed, or marketed defectively.[176]  In assessing the alleged defect, courts determine either whether the product conforms to consumer expectations, whether the risks of the product outweigh its benefits, or whether an alternative, safer product design would have been feasible.[177]  Finally, some courts are beginning to recognize what scholars have called "generic liability" or "product category liability," in which strict liability is imposed upon manufacturers and marketers of products that are unreasonably dangerous despite the best possible design, construction, and warnings.[178]

In Maryland, individuals are now precluded from seeking recovery for handgun injury and death under any and all of these principles of strict liability.  Marylanders are missing the opportunity others are now grasping to force the firearms industry finally to act responsibly.  Handgun manufacturers and distributors "inject into the stream of commerce products intended to facilitate the infliction of grave personal injury."[179] The State of Maryland, its taxpayers and consumers of health insurance have incurred substantial financial harm from the costs resulting from these products, and many individuals have suffered untold misery and economic burden from the harm inflicted by firearms.  Moreover, these harms will become more severe as lawsuits and regulations in other states begin to outlaw the sale of unsafe guns which remain perfectly legal in Maryland.  Maryland will become a handgun mecca.

☛ *The State of Maryland, its taxpayers and consumers of health insurance have incurred substantial financial harm from the costs resulting from these products, and many individuals have suffered untold misery and economic burden from the harm inflicted by firearms.*

---

[174]   RESTATEMENT (SECOND) OF TORTS, §402A.

[175]   *Id.* at §§519-520.

[176]   2 L. FRUMER & M. FRIEDMAN, *Products Liability*, §16A(4)(f)(i).

[177]   *See* Phipps v. General Motors Corp., 278 Md. 337, 363 (1976); Kelley v. R.G. Industries, 304 Md. at 136-138; Barker v. Lull Engineering Co., Inc., 20 Cal.3d 413, 143, 573 P.2d 443 (1978).

[178]   *See* CARL T. BOGUS, *The Third Revolution in Products Liability*, 72 CHICAGO KENT LAW REVIEW 3 (1996).

[179]   ANDREW O. SMITH, *supra,* note 171 at 369.

55

HQL_0000665

☞ *We must reinstate strict liability, so Maryland consumers can use what is widely-recognized as one of the best means of injury prevention - holding manufacturers of inherently and unreasonably dangerous products strictly liable for harms caused by their products.*

In short, to protect our future and ensure Maryland does not become a safe haven for unsafe guns, we should make it clear that the gun industry shall also answer in our State for the harms it has caused. We should reinstate strict liability by statute, so that Marylanders have the means to force the industry to come to terms with the unreasonably dangerous nature of the products it pushes on American men, women, and children. Marylanders should be permitted to persuade the courts that any gun without a child-proof design or personalization technology is unreasonably dangerous, for a child's misuse of a gun or a criminal's use of a stolen gun are certainly foreseeable;[180] the gun industry has marketed guns without adequate safety warnings and safeguards against distribution to criminals;[181] the manufacture and distribution of handguns is an abnormally dangerous activity in which the harm it causes outweighs its benefits;[182] or handguns are abnormally dangerous products regardless of their manufacture or design because they have created a public health crisis of epidemic proportions.[183]

Thus, we should repeal the statute barring the imposition of strict liability for firearm injury and enact a strict liability law ensuring Marylanders the right to hold the gun industry accountable. Why should we put our State at any greater risk by allowing it to become a mecca for unsafe guns? Why should we be deprived of the opportunity, which is finally opening up at the end of this violent century, to make the gun industry answer for its share of the terrible cost of gun violence and to mend its ways? We should not pass up this opportunity to make Maryland a safer place for our children and grandchildren.

---

[180]   *See* POLSTON AND WEIL, *supra,* note 169.

[181]   DANIEL C. POPE,  *Maryland Holds Manufacturer of 'Saturday Night Specials' Strictly Liable For Injuries Suffered By Innocent Victims of Criminal Handgun Violence,* XX Suffolk University Law Review 1147, 1156 (1986) (and citations therein).

[182]   *See* ANDREW O. SMITH, *supra,* note 171.

[183]   *See* CARL T. BOGUS, *supra,* note 177.

HQL_0000666

☛ To reduce intentional criminal shootings, we should take the following law enforcement measures.  First, we should require all gun owners to be trained in the proper use, storage and cleaning of guns, and to obtain a fingerprint license before they take a firearm home.  We should also preclude all lawbreakers from owning a gun - not only convicted felons, but also those convicted of a misdemeanor.  Finally, we should assist law enforcement efforts by making the illegal sale and possession of firearms a felony and by allowing investigators to wear body wires when targeting illegal firearm sales.

## A. Firearm Fingerprint Licensing and Training

We should end the paradox that Americans must pass a driver's test and obtain a license to operate a car, but can own and fire a handgun with no training or experience.  We do require anyone wishing to *carry* a concealed firearm for protection to obtain a permit.  The requirements for this permit are considerably more stringent than those necessary to pass a background check when buying a gun.  In addition to never having been convicted of a felony, a person must be found, on the basis of an investigation, not to have exhibited a "propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons."[184]  The applicant must also provide fingerprint identification and satisfactory evidence of being qualified and trained in the use of handguns.[185]

There is no reason why the same should not be required of people wishing to own handguns.  Is it any less important for a person with a handgun under his mattress not to have a "propensity for violence" than it is for a person carrying the gun to work?  Why should we allow people to own handguns without knowing how to operate them safely when we do not allow the same for people driving cars?  To put it in the starkest terms, why do we allow anyone with any inclination toward violence to have a handgun?  How many people must die before we acknowledge that this makes no sense?

In addition to preventing individuals with a known propensity for violence from owning handguns, fingerprint licensing will make it harder for the link between a gun and the person using it to be broken.  This will aid law enforcement in its efforts to trace guns used in crime, and it will serve as both an impediment and a deterrence to straw purchases and other illegal firearms sales.

☛ We should end the paradox that Americans must pass a driver's test and obtain a license to operate a car, but can own and fire a handgun with no training or experience.

☛ No person should be allowed to own a handgun without demonstrating, on the basis of an investigation, that he has no "propensity for violence" or mental instability.

---

[184]    Md. Code Ann., Art. 27, §36E(5)(1996 Repl.).
[185]    *Id.*

HQL_0000667

A study conducted recently by the Center to Prevent Handgun Violence supports the efficacy of fingerprint licensing.[186]  The study compared the use of firearms in crime and suicide in Maryland and New Jersey, two states with similar demographics.  Both states' populations have similar age distribution and educational levels, percentages of people living below the poverty line, and percentages living in urban and rural settings.  The states also have similar firearms laws, with the exception that New Jersey has required firearm purchasers to obtain a license since the 1960's.

The study, which compared firearms-related crime and suicide rates between 1970 and 1994, showed that New Jersey's violent crime, murder, and suicide rates are all significantly lower than those in Maryland.  The mean percent of Maryland's homicide rates are 38% higher, aggravated assault rates 53% higher, and suicide rates 69% higher than those in New Jersey.[187]

Thus, we should require anyone buying a gun to obtain a fingerprint license.  The requirements should be similar to those now imposed on gun owners seeking a permit to carry their guns, *i.e.,* the prospective gun owner should be required to submit fingerprints, to demonstrate evidence of being qualified in the operation of handguns, and to be found, on the basis of an investigation, not to have a propensity for violence.

## B.    Lawbreakers Should Not Own Handguns: Instituting Any Misdemeanor Conviction as a Bar to Gun Ownership

☞ *No one who breaks the law, juvenile or adult, should be allowed to own a handgun.*

We should also take the common sense step of preventing anyone who breaks the law from owning a handgun.  Currently, only convicted felons, spouse and child abusers, those convicted of misdemeanors carrying penalties of more than two years of incarceration, and those adjudicated mentally ill are precluded from owning firearms in Maryland.  These laws reflect the policy that certain gun violence can be prevented by barring persons believed to be at high risk of future criminal activity from owning firearms.  Indeed, background checks of prospective gun buyers identify about 70,000 prohibited persons every year, most of whom have been convicted of felonies.

This law leaves the misimpression that only law-abiding citizens own and purchase handguns.  On the contrary, thousands of people with a history, sometimes substantial, of criminal activity buy handguns legally every year.  Misdemeanor convictions carrying a penalty of less than two years incarceration are no obstacle to the legal purchase of firearms in Maryland, regardless of the number or types of misdemeanors on a person's record.

---

[186]   Center to Prevent Handgun Violence, *The Effectiveness of Firearms Licensing* (July 1996).
[187]   *Id.*

Both longstanding research and recent scholarship demonstrate that this policy is misguided.  Experts established long ago that people with a history of even a single prior arrest are, as a group, significantly more likely to engage in future criminal activity than are those with no criminal history.[188] A recent study published in the *Journal of the American Medical Association* concluded specifically that handgun purchasers with prior misdemeanor convictions are at substantially increased risk of future criminal activity, including violent and firearms-related crimes.[189]

The study examined the criminal records of almost 6,000 handgun purchasers over 15 years, both before and after the firearms purchase.  It found that handgun purchasers with at least one prior misdemeanor conviction were more than 7 times as likely as those with no prior criminal record to be charged after the handgun purchase with a new offense, including nonviolent firearm offenses, violent offenses, and Violent Crime Index offenses.  Those with more than one prior conviction for a violent misdemeanor offense were more than 10 times as likely to be charged with new criminal activity, and 15 times as likely to be charged with murder, rape, robbery, or aggravated assault.  Even those with only *one* misdemeanor conviction for a nonviolent offense were nearly 5 times as likely to be charged with new offenses involving firearms or violence.[190]

Thus, I recommend that Maryland take the lead in correcting this error and establish the simple policy that no one who breaks the law can own a handgun. This automatic bar should also include juvenile offenders.  The evidence makes clear that allowing persons with any criminal history to own a handgun increases the chances that some legally purchased guns will be used in future gun violence. Moreover, a recent national survey indicates that 95% of Americans, including 91% of gun owners, support prohibiting the purchase of firearms by persons with misdemeanor convictions.[191]  We should save lives and prevent many future violent crimes by instituting a misdemeanor conviction of any kind as a bar to the purchase of a handgun in Maryland.

> ☞ *Handgun purchasers with prior misdemeanor convictions are more than seven times more likely to commit a new offense as those with no prior criminal record.*

---

[188]  This increased likelihood of future criminality also characterizes juveniles with arrest records. For example, one study showed that 94% of boys incarcerated in juvenile institutions were arrested as adults, with 82% for a major felony and 65% for a violent crime.  Another survey found that 36% of juveniles with only one arrest were arrested again by age 25, 62% with 2-4 juvenile arrests had another by age 25, and 78% with 5 or more juvenile arrests were rearrested as adults.  *See,* OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, U.S. DEPARTMENT OF JUSTICE, *Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders* at 114-115 (1995)(citations omitted).

[189]  CAREN J. WINTEMUTE, *ET AL., Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns,* JAMA Vol. 280, No. 24 (December 23/30, 1998).

[190]  *Id.*

[191]  S. P. TERET, D. W. WEBSTER, AND J.S. VERNICK, ET AL., *Support For New Policies to Regulate Firearms: Results of Two National Surveys,* 339 NEW ENGLAND JOURNAL OF MEDICINE 813-818 (1998).

HQL_0000669

## C. Increase Law Enforcement Tools for Targeting Illegal Sales and Possession of Handguns

Finally, the General Assembly should provide assistance to law enforcement efforts to reduce illegal sales and possession of handguns by enacting two changes in the firearms laws.  First, under current law, illegal possession or sales of firearms are misdemeanors.[192]  Although violations of Art. 27, §445, which set forth the restrictions on the sale, transfer and possession of firearms, carry the potential for incarceration, these crimes should be felonies.  The characterization of these offenses as misdemeanors sends the wrong message.  It conveys both to potential offenders and to members of the criminal justice system responsible for prosecuting and sentencing offenders that the crimes are not that serious.  It falls critically short of communicating what should be the opposite message, *i.e.*, that illegal firearm sales and possession contribute to an epidemic of violence we will no longer tolerate, and they will be treated as the profound threat that we recognize them to be.

For example, Art. 27, §445(c) prohibits the sale of ammunition to a minor.  Should not this crime, which could lead to the kind of tragedy suffered at Columbine High School in Colorado, be a felony?  Should a person who "transports firearms into this State for the purpose of illegal sale or trafficking" be charged with a mere misdemeanor?[193]  In addition to the message we want to send offenders, there is a practical, law enforcement-related reason these crimes should be felonies.  If a Maryland firearm trafficker leaves the State, the FBI cannot assist Maryland law enforcement in tracking down the fugitive because he is only charged with a misdemeanor.  Thus, violations of Art. 27, §445 should be felonies.

Second, law enforcement officers investigating the illegal sale of regulated firearms should be permitted to use body wires.  Under the law prohibiting straw purchases, the details of a transaction are critical to whether it constitutes an illegal sale.[194]  It is often extremely difficult to reconstruct these details to prosecute the crime without proof of what actually happened.  We should enhance law enforcement's ability to identify and prosecute straw purchasers and gun traffickers by allowing them to tape the illegal transactions.

☞ *The illegal sale or possession of firearms should be a felony, not a misdemeanor.*

---

[192]   Md. Ann. Code, Art. 27, §§445-449 (1996 Repl.).
[193]   Md. Ann. Code, Art. 27, *supra*, note 191, §449(d).
[194]   Md. Ann. Code, Art. 27, §441 (1996 Repl.).

HQL_0000670

Crime gun tracing statistics from Baltimore City underscore the importance of cracking down on illegal trafficking and straw purchases.  The *ATF Crime Gun Trace Analysis Report* shows that 57% of crime guns in Maryland originate within the State.  Eleven percent come from border states, with 32% from the 47 other states.  A large percentage of these guns are purchased legally and turn up in a crime within three years.  Thus, the report demonstrates that a significant amount of illegal gun trafficking and straw purchases are taking place in Maryland.[195]  According law enforcement a more effective means of identifying illegal gun purchases is of critical importance.

☛ **To reduce the remainder of firearm death and injury, i.e., adult suicides and assaults between family and acquaintances, we must, in the short term, change our gun culture so that gun ownership is no longer viewed as positive, mainstream behavior.  In the long term, we will not eliminate all types of handgun death and injury until, through restrictive handgun licensing, we ensure that most people no longer have guns.**

## A. Changing the Gun Culture

Government regulation can address many of the causes of gun injury and death, but as in most things, it cannot be the full answer.  To reduce the categories of injury not reachable by government intervention or the tort system, we must, in the short term, change our culture - the culture in which the majority who do not own guns accept without question the risk of being surrounded by people who do.  We must change the fact that we do not typically even think about the dangers we all face every day - the risk of taking our children shopping at a mall and having someone's firearm accidentally discharge; the risk of going to work and having a fellow employee's momentary rage turn lethal; the risk of a neighbor's child finding his parent's loaded, unlocked gun and unintentionally killing a daughter; the risk of a criminal stealing a neighbor's gun to hold us up at gunpoint.  We must change this culture of passive acceptance to one in which people view gun ownership as danger-ous and aberrant and behave accordingly.  Gun ownership must go the way of smoking, which was once accepted universally and is now recognized as a harmful activity that cannot be inflicted on other unconsenting individuals.

*☛ 57% of crime guns in Maryland originate within the State.*

*☛ Gun ownership must go the way of smoking, which was once accepted universally and is now recognized as a harmful activity that cannot be inflicted on other unconsenting individuals.*

---

[195]     The Baltimore County Police Department's *Third Grade Gun Safety Program* and its high school counterpart, *Violence in America*, teach children, with age-appropriate curricula, about the dangers of guns, how to handle various situations which might involve guns, the nature of gun violence in America, and how to respond to and avoid violence.

61

This kind of sea change in public attitudes and behavior requires mounting a vigorous public information campaign.  This campaign must confront not only decades of misinformation and misunderstanding, but also the gun industry's and the NRA's well-financed propaganda.

Daunting though it seems, it can be done.  Our attitudes toward smoking have changed radically over the past few years.  A generation ago almost no one wore seatbelts despite their availability, and now their widespread use saves thousands of lives each year.  Bicycle helmets and child car restraints are still other examples of public information campaigns changing public attitudes and behavior.

*☞ We must engage everyone - schools, employers, physicians, government, and especially parents - to begin the task of informing and convincing people of the truth about guns and gun ownership.*

Thus, I recommend that we must engage everyone - schools, employers, physicians, government, and especially parents - to begin the task of informing and convincing people of the truth about guns and gun ownership.  First, to put teeth in this initiative, I call upon the General Assembly to take the lead and make guns in public accommodations illegal.   We do not allow smokers to harm others in public places by indulging their smoking habit. Likewise, we should no longer allow anyone, with the exception of licensed law enforcement officers, to endanger the lives of others by carrying a gun into a place of public accommodation.  It is one thing to continue to tolerate people choosing to endanger themselves and their loved ones by harboring a handgun in their bedroom.  It is quite another to ask people to endanger their own children by taking them to a movie theater where people are permitted to carry handguns.

In addition, private employers outside of the context of public accommodations should follow the State's lead in making workplaces "gun-free."  Prominent signs should remind everyone entering that guns must be left behind.

Second, we all must help escalate the conversation about the dangers of guns.  Physicians, especially pediatricians, should talk to patients about the dangers of firearms.  Law enforcement officers should take advantage of their status as role models in the classroom and teach children about how to protect themselves from gun violence.  For example, the Baltimore County Police have instituted gun violence prevention programs in area elementary, middle and high schools.[196]

Schools should also make such discussions part of their curriculum.  They should ask parents to sign gun-free pledges, which would assure other parents that their children will not be endangered by guns in the homes of their children's friends.  They should consider following the example of some schools around the country which have already asked students to sign gun-free pledges.  Finally, as we have with drug-free zones, we should create gun-free zones around school premises.

---

[196]       The Baltimore County Police Department's *Third Grade Gun Safety Program* and its high school counterpart, *Violence in America*, teach children, with age-appropriate curricula, about the dangers of guns, how to handle various situations that might involve guns, the nature of gun violence in America,  and how to respond to and avoid violence.

62

As always, parents have a special role.  Without the commitment and involve-ment of parents, genuine change in attitude and behavior is beyond reach.  Parents must talk to their kids, question their kids, and listen to their kids about guns.  They must explain the propaganda, the dangers, the temptations.  They must talk to the parents of their children's friends about their attitudes and habits regarding gun ownership.  Finally, they must become models for their children.

Thus, I call upon educators, doctors, business owners, private and public em-ployers, and especially parents to join in an effort to change our gun culture into one in which everyone regards guns as the destructive instruments of injury and death we know them to be, and to see gun ownership as dangerous, unacceptable behavior.

## B. Restrictive Handgun Licensing: Homes and Neighborhoods Free of Guns

The course I have outlined will take us a long way toward a safer, saner Mary-land.  I pledge to do everything possible to move these initiatives forward.  Yet the sad truth is that even at the end of that road, we will not be where we should be, or where we can be.  We are capable of more - an even better Maryland and a better country.  To get there, we must overcome the reluctance within ourselves and in others to confront candidly why we own handguns at all, and to come to terms with the inexorable conclusion that gun ownership is not worth its costs.

Our goal, then, must be to eliminate widespread handgun ownership through restrictive handgun licensing.  This will preserve the benefits of handgun use while finally ridding our communities of its terrible cost.  Law enforcement personnel must have handguns for use on the job.  Business owners may need a licensed gun on the premises under certain circumstances.  Sports shooters will still practice their sport.  Where guns are needed to advance reasonable law enforcement pur-poses or to participate in a regulated sporting activity, they will be licensed for use in that manner.  People will no longer, however, own guns without demonstrating a compelling law enforcement or recreational reason to do so.

The presence of handguns in homes across America endangers everyone.  We do not need them, and the misguided desire people feel to own handguns for self-defense would be greatly diminished if they did not feel threatened by widespread handgun ownership.  We certainly do not need handguns badly enough to continue numbly to accept the pain and anguish they inflict.  Handguns exact too high a price.  We should pay it no longer.

☛ *Without the commitment and involvement of parents, genuine change in attitude and behavior is beyond reach.*

☛ *Handguns exact too high a price. We should pay it no longer.*

HQL_0000673