## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,  *

    *Plaintiffs,*        *

    v.                *      Civil Case No. 16-cv-3311-MJG

LAWRENCE HOGAN, *et al.*,     *

    *Defendants.*      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANT WILLIAM M. PALLOZZI'S ANSWERS TO PLAINTIFF ATLANTIC GUNS, INC.'S FIRST SET OF INTERROGATORIES

Defendant, William M. Pallozzi, by his attorneys, hereby responds as follows to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories served upon him and states as follows:

A.    The word usage and sentence structure used in these answers is that of the attorneys who in fact prepared these answers and the language does not purport to be the exact language of the executing party.

B.    The Interrogatories have been interpreted and answered in accordance with the Federal Rules of Civil Procedure.

C.    Defendant Col. Pallozzi expressly reserves the right to supplement these answers at a later date should it become necessary to do so.

### GENERAL OBJECTIONS

1.    Col. Pallozzi objects to every Interrogatory to the extent it seeks information and/or documents protected by the attorney-client and/or work product privileges.

EXHIBIT
20

2.     Col. Pallozzi objects to the extent that the Interrogatories, including subparts, exceed the number permitted under the Federal Rules of Civil Procedure.

3.     Col. Pallozzi objects to the extent the Interrogatories seek information in possession of parties other than Col. Pallozzi or the Maryland State Police ("MSP"). These answers are based solely on the knowledge and information in the possession of Col. Pallozzi and MSP, and not on knowledge or information possessed by any other person or entity.

4.     Subject to and without waiving the foregoing general objections, Col. Pallozzi responds to the Interrogatories as follows:

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**     Identify the number of handgun transfers in Maryland each year from 2012 through 2016.

**ANSWER:**   Col. Pallozzi states that MSP does not maintain records of the number of handgun transfers each year in Maryland.  Rather, MSP maintains records of the number of applications made to transfer regulated firearms in Maryland each year, and pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Col. Pallozzi is producing business from which this information can be derived at Bates range MSP000578-1089. Col. Pallozzi further states that MSP has requested data from the Maryland Automated Firearms Services System, maintained by the Maryland Department of Public Safety and Correctional Services, which tracks the number of handgun transfers that are not disapproved in

Maryland each year, and Col. Pallozzi will supplement this answer pursuant to Rule 26(e) of the Federal Rules of Civil Procedure when that data is received.

**INTERROGATORY NO. 2:**    Identify the number of handgun transfers disapproved in Maryland each year from 2012 through 2016, including the reasons for disapproval and the number of disapprovals for each reason.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground it is vague and ambiguous and seeks discovery of matters that are not relevant to any party's claims or defenses under Rule 26(b)(1), insofar as it seeks information about disapproval of regulated firearm transfers that have no relation to the HQL requirement that is the subject of this lawsuit.  Without waiving these objections, Col. Pallozzi states that MSP does not maintain records of the number of handgun transfers in Maryland that are disapproved each year.   Rather, MSP maintains records of the number of applications made to transfer regulated firearms that are disapproved, and pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Col. Pallozzi is producing business from which this information can be derived at Bates range MSP1090-1175.  Col. Pallozzi further states that the number of applications for regulated firearm transfers that were disapproved due to the applicant not having an HQL from 2012 through 2016 are as follows:  40 in 2014, 49 in 2015, and 7 in 2016.

**INTERROGATORY NO. 3:**    Identify the number of HQLs issued each year from 2013 through 2017.

**ANSWER:**   Pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, Col. Pallozzi will produce business records from which the information sought by this interrogatory can be derived at Bates range MSP000578-1089.

**INTERROGATORY NO. 4:**   Identify the number of HQL applications denied each year from 2013 through 2017, including the reasons for any such denial, including the instances in which a person was denied an HQL solely because of information obtained from fingerprints.

**ANSWER:**   Pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, Col. Pallozzi will produce business records from which the information sought by this interrogatory can be derived at Bates range MSP000578-1089, 1090-1167, 1176-1217.

**INTERROGATORY NO. 5:**   Identify the number of HQL applications not completed each year from 2013 through 2017.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that the term "not completed" is undefined, vague and ambiguous.  Without waiving these objections, Col. Pallozzi states that MSP does not have this information within its possession.

**INTERROGATORY NO. 6:**   Identify   all   citizen   inquiries   into   the burden/difficulty in meeting HQL requirements.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome and seeks information that is not proportionate to the needs of the case.  Col. Pallozzi also objects on the ground that this interrogatory does not contain a timeframe.  Without waiving his objections, Col. Pallozzi states that he will produce copies of written inquiries that the MSP received from citizens relating to the

4

burden/difficulty in meeting HQL requirements from October 1, 2013 to the present, if any, that can be located through a reasonably diligent search of MSP's records.

**INTERROGATORY NO. 7:** Identify the shortest, longest, and average amount of time to process an HQL application.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that it does not contain a timeframe and is therefore overly broad and unduly burdensome.   Col. Pallozzi further objects on the ground that this interrogatory is vague and ambiguous. Without waiving his objections, Col. Pallozzi states that the amount of time it takes to process an HQL application is fact-dependent and varies based on a number of factors that can be associated with any given application, including but not limited to: an applicant providing the incorrect authorization code to a fingerprint vendor; awaiting transmission of fingerprints from the vendor to the Department of Public Safety and Correctional Services; awaiting an applicant's submission of certification of prior training for a training-exempt HQL application; the lack of a disposition listed on an applicant's criminal history for a potential disqualifying charge, and any follow-up investigation to determine that disposition; the number of applications received on a particular day; an applicant providing incorrect answers on an application; awaiting verification from a qualified handgun instructor that the applicant completed the necessary training; an applicant's incorrect submission of a qualified handgun instructor's verification code; among other factors.

Col. Pallozzi further states that HQL applications have been processed the same business day that they are received, and that MSP has complied with the statutory provision that the processing period not exceed 30 days.

**INTERROGATORY NO. 8:**     Identify the shortest, longest, and average amount of time to notify an applicant of HQL approval.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that it does not contain a timeframe and is therefore overly broad and unduly burdensome.   Col. Pallozzi further objects on the ground that this interrogatory is vague and ambiguous. Without waiving his objections, Col. Pallozzi states that, generally, once an application is approved, the HQL is printed within 24 hours of the approval, and the HQL is placed in the mail to the applicant within 24 hours of printing.

**INTERROGATORY NO. 9:**     Identify the cost of processing each HQL application.

**ANSWER:**   Col. Pallozzi objects on the ground that this interrogatory does not contain a timeframe.   Without waiving his objection, Col. Pallozzi states that the current cost of processing each HQL application is at least $51.34.    Col. Pallozzi further states that this cost accounts for the salaries, benefits, and overtime costs to employ the civilian and sworn personnel who process HQL applications, and the materials required to create an HQL, including the cards, printers, ink, and laminate.   Col. Pallozzi further states that this cost figure does not take into account the salary and benefits of MSP Command staff who routinely deal with HQL issues; the computers and computer software used to process the applications; equipment for sworn personnel, including vehicles, fuel, and other costs; and infrastructure costs related to MSP's Licensing Division, including building expenses, electricity, and telephone service, among other expenses.   Factoring in these other costs, the cost of processing each HQL exceeds $51.34

6

**INTERROGATORY NO. 10:** Identify all individuals involved in the MSP decision to set the HQL application fee at $50.00, and any documents related to the $50.00 application fee requirement, and state the reasons for that decision.

**ANSWER:** Col. Pallozzi objects to this interrogatory to the extent it seeks information protected by the deliberate process privilege or attorney-client privilege. Without waiving those objections, Col. Pallozzi identifies former Director of MSP's Planning and Research Division, Thomas Williams; former Assistant Commander of MSP's Licensing Division, Lt. John Cook; and former MSP Fiscal Impact Analyst, Sgt. Graham Lange. Col. Pallozzi further states that the decision to set the HQL application fee at $50.00 was based on a fiscal analysis that was performed to prepare the Fiscal Note Summary for the Firearm Safety Act, showing that the estimated cost to process an HQL application was in excess of $50.00 and is being produced at Bates range MSP001228-1289.

**INTERROGATORY NO. 11:** Identify all requests from citizens to accept alternative means of payment for the HQL application fee other than credit or debit card, and whether MSP accepted alternative means of payment, such as cash, check, or money order.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome and seeks information that is not proportionate to the needs of the case. Col. Pallozzi also objects on the ground that this interrogatory does not contain a timeframe. Without waiving his objections, Col. Pallozzi states that he will produce copies of written inquiries that the MSP received from citizens from October 1,

7

2013 to the present to accept alternative means of payment for the HQL application fee other than credit or debit card that can be located through a reasonably diligent search of MSP's records.  Col. Pallozzi further states that MSP does not accept alternative means of payment for the HQL application fee other than credit or debit card.  Col. Pallozzi further states that to the best of his knowledge all of the individuals who have attempted to pay for the HQL application fee using alternate means of payment, of which he is aware, ultimately submitted electronic applications along with payment by credit or debit card for the application fee.

**INTERROGATORY NO. 12:** Identify all requests from citizens to waive the HQL's Maryland driver's license identification requirement, and whether MSP accepted alternative forms of identification, such as a Maryland non-driver identification card.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that the term "HQL's Maryland driver's license identification requirement" is undefined, vague and ambiguous.  Without waiving his objections, Col. Pallozzi states that there is no statutory requirement that an individual possess a Maryland driver's license to obtain an HQL, and that COMAR 29.03.01.28 requires that the HQL application shall include the applicant's "driver's license or photographic identification soundex number."

**INTERROGATORY NO. 13:** Identify the location, availability (in hours), and cost of all Law Enforcement fingerprinting services, and state which of these are open to members of the public to use for an HQL application.

**ANSWER:**   The MSP does not have this information in its possession, but does provide a link on its website to the Maryland Department of Public Safety & Correctional

Services' webpage that lists fingerprinting service providers throughout the State.  *See*

http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDi

vision/Fingerprinting.aspx.

**INTERROGATORY NO. 14:** Identify how MSP uses and/or disseminates

fingerprints received with HQL applications, and whether, when, and how the fingerprint

data is destroyed.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that the term

"fingerprint data" is undefined, vague and ambiguous.  Without waiving his objections,

Col. Pallozzi states that the MSP does not receive or disseminate fingerprints in connection

with HQL applications.  Rather, MSP receives the State or federal identification number

that corresponds with an individual's fingerprints and uses that data to conduct a

background investigation prior to issuance of an HQL.  MSP also generates regular reports

using the State or federal identification numbers that correspond with licensees'

fingerprints to determine whether a licensee is subsequently convicted of a disqualifying

offense after obtaining an HQL.

**INTERROGATORY NO. 15:** Identify all requests from citizens to waive or

reimburse fees for HQL applications, fingerprinting, and/or Firearms Safety Course

training requirements.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that it is

overly broad, unduly burdensome and seeks information that is not proportionate to the

needs of the case.  Col. Pallozzi also objects on the ground that this interrogatory does not

contain a timeframe.  Without waiving his objections, Col. Pallozzi states that he will

produce copies of written inquiries that the MSP received from citizens from October 1, 2013 to the present to waive or reimburse fees for HQL applications, fingerprinting, and/or Firearms Safety Course training requirements, if any, that can be located through a reasonably diligent search of MSP's records.

**INTERROGATORY NO. 16:** Identify applications submitted in person, on paper, or otherwise non-electronically, for each year from 2013 through 2017 and state the ultimate disposition of the applications.

**ANSWER:** MSP does not accept HQL applications in non-electronic form. Col. Pallozzi states that an applicant may apply in-person at MSP's Licensing Division located at 1111 Reisterstown Road, Pikesville, Maryland, 21208, by using a computer located there to prepare and submit the electronic application, but that MSP does not track the number of applications submitted in this manner. Col. Pallozzi further states that he is producing copies of written correspondence with individuals who attempted to submit paper copies and/or payment by personal check or money order at Bates range MSP001290-1411. Col. Pallozzi further states that to the best of his knowledge, all of the individuals who have attempted to submit paper copies of the HQL application and/or pay for the initial HQL application fee by personal check or money order, of which he is aware, ultimately submitted electronic applications. The disposition of these applications is as follows: 2 were approved in 2014; 1 was approved in 2015; 6 were approved in 2016 and 1 was denied in 2016 due to the applicant's criminal record; 2 were approved in 2017.

**INTERROGATORY NO. 17:** Identify all requests from citizens to waive the fingerprinting, Firearms Safety Course training, and/or "Live Fire" requirements.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome and seeks information that is not proportionate to the needs of the case. Col. Pallozzi also objects on the ground that this interrogatory does not contain a timeframe. Without waiving his objections, Col. Pallozzi states that he will produce copies of written inquiries that the MSP received from citizens from October 1, 2013 to the present to waive the fingerprinting, Firearms Safety Course training, and/or "Live Fire" requirements, if any, that can be located through a reasonably diligent search of MSP's records.

**INTERROGATORY NO. 18:** Identify any and every instance a Firearms Safety Course instructor failed to provide verification to support an HQL application.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome and seeks information that is not proportionate to the needs of the case. Col. Pallozzi also objects on the ground that this interrogatory does not contain a timeframe. Without waiving his objections, Col. Pallozzi states that the MSP does not have this information in its possession.

**INTERROGATORY NO. 19:** Identify all individuals involved in the MSP decision to require "Live Fire" training and any documents related to the "Live Fire" requirement, and state the reasons for that decision.

**ANSWER:** Col. Pallozzi objects to the extent this interrogatory to the extent it seeks information protected by the deliberative process privilege or attorney-client privilege. Without waiving these objections, Col. Pallozzi identifies former Director of MSP's Planning and Research Division, Thomas Williams; and former Assistant

11

Commander of MSP's Licensing Division, Lt. John Cook. Col. Pallozzi further states that the decision to require "Live Fire" training arose from the statutory requirement that applicants receive firearms safety training that includes "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm," such that completing one round of live fire is a demonstration of the applicant's basic orientation in the operation of a firearm.

**INTERROGATORY NO. 20:** Identify any public safety advancement identified by MSP obtained through each of the HQL-specific requirements of fingerprinting, Firearms Safety Course training, "Live Fire" requirement, and Maryland driver's license identification requirement.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that the term "public safety advancement" is undefined, vague and ambiguous. Col. Pallozzi further objects because there is no requirement that an applicant have a Maryland driver's license to obtain an HQL. In addition, Col. Pallozzi objects to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Discovery (fact and expert) is not complete, and therefore, Col. Pallozzi reserves the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light during fact and expert discovery.

Subject to and without waiving his objections, Col. Pallozzi states that the HQL-specific requirements of fingerprinting, Firearms Safety Course training, and "Live Fire" promote public safety by, among other things, reducing the likelihood that an individual prohibited from possessing a firearm will gain access to handguns; enhancing and promoting safe handling, operation, and storage of handguns and other firearms owned or possessed by those who have undergone the training and live fire requirements; and thereby reducing the incidence of accidental and/or intentional injury and death caused by improper use of handguns and other firearms and reducing the use of firearms in criminal activity.

Col. Pallozzi further states that Maryland's requirement that HQL applicants obtain a set of fingerprints for purposes of conducting enhanced background checks substantially serves the State's interest in promoting public safety by making it more difficult for a prohibited person to obtain access to a firearm. *See Heller v. District of Columbia*, 801 F.3d 264, 276-77 (D.C. Cir. 2015) ("*Heller III*") (holding the District could reasonably conclude that the fingerprint requirement would "advance public safety by preventing at least some ineligible individuals from obtaining weapons"). Robust background checks animate the State's policy of keeping firearms out of the possession of felons, a "presumptively lawful" and longstanding firearms restriction. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008) ("*Heller I*"). Further, "background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more susceptible to fraud." *Heller III*, 801 F.3d at 276. An investigation conducted by the U.S. General Accounting Office ("GAO") revealed that undercover agents using counterfeit driver's licenses succeeded, without exception, in

purchasing firearms from federally-licensed firearms dealers. *Id.* The report "concluded that federal background checks conducted by the firearm dealers [without fingerprinting] 'cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful.'" *Id.* (quoting GAO–01–427, Firearms Purchased from Federal Firearm Licensees Using Bogus Identification 2 (2001)).

The State's interest in promoting public safety is particularly acute when it comes to keeping handguns out of the hands of criminals. Handguns are the firearms most frequently used by criminals in Maryland. *Woollard v. Gallagher*, 712 F.3d 865, 877 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2013). According to data collected by the FBI, there were 430 murders in Maryland in 2016, 328 of which involved a firearm. Of those 328, 309 involved handguns. Federal Bureau of Investigation, 2016 Crime in the United States, Table 12, Murder by State, Types of Weapons, 2016, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/tables/table-12 (last visited December 19, 2017). Thus, murders with handguns comprised more than 94% of murders with firearms and more than 71% of all murders in Maryland. *Id.*

Further, empirical studies of the effects of laws that require individuals to obtain a license to purchase a firearm and pass a background check based on fingerprints have found that these laws are associated with a reduction in the flow of guns to criminals.[1] A study

---

[1] Daniel Webster *et al.*, *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 109-22 (Webster, *et al.*, eds., Johns Hopkins Univ. Press 2013).

of Connecticut's law – which includes requirements for enhanced background checks with fingerprints and completion of an approved handgun safety course, Conn. Gen. Stat. § 29-36(f), (g) – found that the licensing requirement to purchase a firearm was associated with a statistically significant reduction in Connecticut's firearm homicide rates during the first decade that the law was in place, with no similar reduction in non-firearm homicides.[2]

Similarly supportive is the experience of Missouri, which went in the opposite direction after it repealed its handgun licensing requirement. After repeal, firearm-related homicide rates increased abruptly, with no similar increase in surrounding states or the nation, and the state experienced an increase in the percentage of crime guns recovered by police that had been originally sold by in-state retailers.[3] Studies of Missouri's and Connecticut's experiences also have found the presence of firearm licensing laws to be associated with lower rates of firearm-related suicides.[4]

Further, common sense supports the General Assembly's conclusion that Maryland's requirement that HQL applicants receive training in the proper and safe operation, handling, and storage of a handgun, will lead to a decrease in accidental deaths by firearm. Handguns are necessarily and purposely dangerous, and requiring minimal training in how to avoid unintended harm from their ownership promotes public safety.

---

[2] Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Public Health 8, e49 (Aug. 2015).

[3] Daniel Webster, *et al.*, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. of Urban Health 2, 293 (2014).

[4] Cassandra K. Crifasi, *et al.*, *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventive medicine 43 (2015).

*See Heller III*, 801 F.3d at 278-79 (holding District's mandatory firearms safety training was constitutional based on the District's presentation of "substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms"). Indeed, in Maryland, law enforcement officers are required to receive extensive training on the operation, handling, and storage of handguns, including in the home. *See* COMAR 12.04.02.03 − .05; 12.04.02.03.10(D). These longstanding training requirements strongly support the utility of the relatively brief, four hours of training that civilian handgun purchasers must receive. *See Heller III*, 801 F.3d at 279 & n.3 (relying on "anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training"). Given the popularity of handguns for in-home self-defense, *see Heller I*, 554 U.S. at 628, and the potential dangers that arise when handguns are improperly stored or handled in the home, Maryland's requirement of a four-hour training course bolsters the State's goal of reducing firearm-related deaths.

Col. Pallozzi further states that the public safety benefits of the HQL requirements are the subject of testimony supporting the Firearms Safety Act before the General Assembly, and are discussed in the academic journal articles and other documents that are being produced in discovery.

**INTERROGATORY NO. 21:** Identify all requests from citizens to define, explain, or clarify "Receive" or "Receipt" received by MSP.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome and seeks information that is not proportionate to the needs of the case. Col. Pallozzi also objects on the ground that this interrogatory does not contain a timeframe. Without waiving his objections, Col. Pallozzi states that he will produce copies of written inquiries that the MSP received from citizens from October 1, 2013 to the present to define, explain, or clarify "Receive" or "Receipt," if any, that can be located through a reasonably diligent search of its records.

**INTERROGATORY NO. 22:** Identify all arrests and disposition of any charges for an illegal "Receipt."

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is vague, overly broad, unduly burdensome, and seeks information that is not relevant to any party's claim or defense in this action, nor proportionate to the needs of the case. Without waiving these objections, Col. Pallozzi states that he is not aware of any arrest or disposition of any charges arising solely from a violation of the law requiring that an individual, not otherwise prohibited from possessing a firearm, obtain an HQL prior to receiving or being in receipt of a handgun.

**INTERROGATORY NO. 23:** Identify all arrests and disposition of any charges for false statements on an HQL application or Form 77R, or for "straw purchase" of a handgun.

**ANSWER:** Col. Pallozzi objects to this interrogatory on the ground that it is overly broad, unduly burdensome, contains no timeframe, and seeks information that is not relevant to any party's claim or defense in this action, nor proportionate to the needs of the

17

case.  Without waiving these objections, Col. Pallozzi states that pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, he will produce business records from which the information sought by this interrogatory can be derived at Bates range MSP001437-1492.

**INTERROGATORY NO. 24:** Identify any deterrent effect of the HQL fingerprinting requirement to an individual attempting to make a "straw purchase" of a handgun identified by MSP.

**ANSWER:** Col. Pallozzi objects to this interrogatory as unduly burdensome to the extent that it seeks the premature disclosure of expert witness materials in violation of the Court's scheduling order. In addition, Col. Pallozzi objects to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Discovery (fact and expert) is not complete, and therefore, Col. Pallozzi reserves the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light during fact and expert discovery.

Subject to and without waiving these objections, Col. Pallozzi states that evidence and experience of law enforcement personnel demonstrates that by requiring potential handgun purchasers to undergo a fingerprint background check they are less willing to act as a straw purchaser, thus reducing the incidence of straw purchases. Col. Pallozzi further

identifies testimony supporting the Firearms Safety Act before the General Assembly, and the academic journal articles and other documents that are being produced in discovery.

**INTERROGATORY NO. 25:** Identify each and every reason and fact relied upon by you to support the utility of each of the HQL requirements in promoting public safety and reducing the negative effects of firearms violence.

**ANSWER:** Col. Pallozzi objects to this interrogatory as unduly burdensome to the extent that it seeks the premature disclosure of expert witness materials in violation of the Court's scheduling order. In addition, Col. Pallozzi objects to this interrogatory because "contention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110 (D.N.J. 1990); *see also In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 336 (N.D. Cal. 1985) ("the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period."). Discovery (fact and expert) is not complete, and therefore, Col. Pallozzi reserves the right to rely on any legal theories, facts, documents, testimony, or evidence which may come to light during fact and expert discovery.

Subject to and without waiving these objections, Col. Pallozzi refers to his answers to Interrogatories 20 and 24. Col. Pallozzi further identifies the testimony supporting the Firearms Safety Act before the General Assembly, and the academic journal articles and other documents that are being produced in discovery.

BRIAN E. FROSH
Attorney General


/s/ Jennifer L. Katz
JENNIFER L. KATZ (Fed. Bar # 28973)
ROBERT A. SCOTT (Fed. Bar # 24613)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.); 410-576-6955 (fax)
jkatz@oag.state.md.us

Dated: December 29, 2017          Attorneys for Defendants

**VERIFICATION**

I, Col. William M. Pallozzi hereby execute these answers to interrogatories in my official capacity as Superintendent of the Maryland State Police.  Some of the information set forth in these answers was collected by others and such information is not necessarily within my personal knowledge.  However, in my official capacity, I solemnly affirm under the penalties of perjury that the foregoing Answers to Interrogatories are true to the best of my knowledge, information and belief.


_12/29/17_

Date

_[signature]_

Signature

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 29th day of December, 2017, a copy of the foregoing Defendant's Responses to Interrogatories was sent by first class mail, postage pre-paid, and e-mail to:

Cary J. Hansel (cary@hansellaw.com)
2514 N. Charles Street
Baltimore, MD 21218

John Parker Sweeney, Esq. (JSweeney@bradley.com)
T. Sky Woodward, Esq. (SWoodward@bradley.com)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036

_____
Robert A. Scott