# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,   *

    *Plaintiffs,*   *

    v.   *   Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.*,   *

    *Defendants.*   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO
## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General

ROBERT A. SCOTT (Fed. Bar #24613)
RYAN R. DIETRICH (Fed. Bar #27945)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7648 (tel.)
410-576-6955 (fax)
rdietrich@oag.state.md.us

Dated: March 8, 2021          Attorneys for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.     THE PLAINTIFFS' STATEMENT OF "UNDISPUTED" FACTS CONTAINS REPEATED MISREPRESENTATIONS OF THE FACTUAL RECORD AND MANY MISLEADING STATEMENTS. ........................................................................ 2

II.    THE HQL REQUIREMENT DOES NOT VIOLATE THE SECOND AMENDMENT. .......... 12

    A.    The HQL Requirement Does Not Ban Any Law-Abiding Person from Possessing a Handgun for In-Home Self-Defense. .................................... 13

    B.    To the Extent That the HQL Requirement Constitutes a Burden on Second Amendment Rights, Intermediate Scrutiny—Rather Than Strict Scrutiny—Applies Because the HQL Requirement Does Not Impose a Severe Burden on the Right to Possess Firearms for In-Home Self-Defense. ..................................................................................... 16

    C.    This Court Should Apply the Articulation of the Intermediate Scrutiny Standard Set Forth in *Kolbe* and Recently Reaffirmed by the Fourth Circuit. ................................................................................................... 18

    D.    The HQL Requirement Is Reasonably Adapted to the State's Compelling Interest in Public Safety. ....................................................... 21

        1.    The Record Evidence Demonstrates the Fingerprint Requirement Is Reasonably Adapted to Furthering the State's Interest in Public Safety. ................................................................ 23

        2.    Because the Fingerprint-Based Background Check Easily Satisfies Intermediate Scrutiny, the Processing Period During Which MSP Conducts the Background Check Also Is Constitutional. ................................................................................. 30

        3.    The Record Evidence Demonstrates That the Firearm Safety Training and Live-Fire Requirements Are Reasonably Adapted to Furthering the State's Interest in Public Safety. ........................... 31

E.    The State of Maryland Enacted the HQL Requirement Based on Substantial Evidence. ................................................................................ 36

CONCLUSION ................................................................................................................ 38

## INTRODUCTION

The Handgun Qualification License ("HQL") requirement of the Firearms Safety Act of 2013 (the "FSA") is a constitutional exercise of Maryland's police power in the interest of promoting public safety and reducing the negative effects of firearms violence. Substantial evidence in the summary judgment record, including empirical, peer-reviewed research, and the opinions of highly-experienced law enforcement experts, supports the General Assembly of Maryland's judgment that the fingerprint background check, classroom firearm safety training, and live-fire requirements of the HQL application process are reasonably adapted to the State's compelling interest in public safety.

The HQL fingerprint background check has been shown to reduce the diversion of guns to criminals, and enables the Maryland State Police ("MSP") to positively identify HQL applicants for purposes of the background check and to identify licensees who are subsequently convicted of offenses that make them ineligible for an HQL. Law enforcement experts, based on decades of experience with firearm safety training, believe that the classroom training and live-fire requirements make Marylanders safer by reducing access of firearms to prohibited persons including minors and instructing applicants on the safe handling of a firearm. Because these requirements are constitutional, so too are the costs and time necessary to implement and comply with them.

Plaintiffs' memorandum in support of their cross-motion for summary judgment and in response to the defendants' motion for summary judgment (ECF 135-1 (Pls.' Mem.))[1]

_____

[1] Plaintiffs' memorandum contains separate sections addressing their cross-motion and their response to the defendants' motion, but with a large degree of repetition and

does not identify any genuine dispute of material fact to the contrary.  Instead, by relying exclusively on standards that have been rejected by the Fourth Circuit, their legal arguments would require this Court to disregard controlling law, and to reach a conclusion contrary to how other courts have considered similar challenges.

# ARGUMENT

## I.   THE PLAINTIFFS' STATEMENT OF "UNDISPUTED" FACTS CONTAINS REPEATED MISREPRESENTATIONS OF THE FACTUAL RECORD AND MANY MISLEADING STATEMENTS.

Due to the weakness of their substantive arguments, plaintiffs resort to misrepresenting several critical facts in the summary judgment record and making highly misleading claims.  Before turning to the flaws in plaintiffs' arguments, it is important to refute some of these critical misrepresentations and misleading claims that permeate plaintiffs' memorandum in support of their cross motion and in response to the defendants' motion for summary judgment.

First, plaintiffs invent from whole cloth their assertion that the State enacted the FSA with the intent to deter law-abiding citizens from exercising their Second Amendment rights.  (ECF 135-1 at 12-13, 29-30.)  On the contrary, the evidence in the record demonstrates that the General Assembly considered the opinions of social science and law enforcement experts as to the public safety benefits of the HQL requirements when enacting the FSA.  (*See, e.g.*, ECF 125-3 through 6 (testimony and evidence before the

---

overlap.  Because of this overlap, and for purposes of clarity, this memorandum serves as both the defendants' response to the plaintiffs' motion for summary judgment as well as a reply to the plaintiffs' response to the defendants' motion for summary judgment.

General Assembly).)  Attempting to support their false claim, plaintiffs misrepresent the deposition testimony of the State's expert Daniel Webster, Sc.D., who testified that the HQL's requirement that applicants submit their fingerprints to law enforcement may be "intimidating" to a *prospective illegal straw purchaser*, because in those circumstances, "usually a prohibited individual is asking someone, in essence, to stick their neck out to purchase a gun for them . . . ."  (Ex. 17, Tr. of Daniel Webster Dep. 30:1-31:4; *see also id.* at 31:11-14 ("[W]hen a prohibited person is asking someone to buy a gun for them, [the licensing process] likely causes hesitancy to do so").)  Plaintiffs seize on Dr. Webster's use of the word "intimidating" and repeatedly mischaracterize his testimony to argue that the State, by requiring a fingerprint-based background check, intended to intimidate law-abiding citizens from exercising their Second Amendment rights.  (ECF 135-1 at 12).  Dr. Webster suggested no such thing, and his deposition testimony when properly read in context makes clear his opinion, based on empirical, peer-reviewed research, that the robust background check and interaction with law enforcement deters straw purchasers.  (Ex. 17, Tr. of Daniel Webster Dep. 30:1-31:4; *see also id.* at 31:11-14; *see also* Ex. 18, Suppl. Decl. of Daniel W. Webster ¶¶ 4-5.)

Second, plaintiffs make the facially absurd claim that the FSA was somehow the culmination of an effort led by former Maryland Attorney General Joseph Curran to nefariously "prevent[] handgun possession in Maryland[.]"  (ECF 135-1 at 12.)  Plaintiffs point to a special report published 14 years earlier in 1999 (when Mr. Curran was the attorney general) in which he advocated for stringent registration and eligibility requirements that would have restricted *all* handgun possession (including within the

home) to only those with a special need, such as law enforcement.  (ECF 135-13 at 11.) This document is a red herring for numerous reasons.  First, former Attorney General Curran did not hold elected office at the time of the passage of the FSA, and the legislative record fails to show that he played any role in its enactment.  Moreover, former Attorney General Curran's views expressed in the report were reflective only of his own personal policy preferences, and thus his aspirational goal of banning all handguns simply cannot be imputed to be "Maryland's goal" (assuming that a state could itself have a goal independent of that reflected by the collective expression of its duly-elected legislators).[2] In addition, former Attorney General Curran's policy recommendations were expressly premised on his belief—based on nothing less than the unequivocal words of former Chief Justice Warren Burger[3]—that the Second Amendment did not protect an individual right to possess firearms.  That prevailing view was, of course, obliterated eight years later in *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), thus resetting the debate over gun control measures moving forward.  More importantly, former Attorney General Curran's policy goal—"to restrict the sale and possession of all handguns to those who can demonstrate a legitimate law enforcement purpose or can guarantee that the use of such guns will be limited to participation in a regulated sporting activity" (ECF 135-13 at 6)—

---

[2] Maryland's governor at the time, Parris Glendening—who was otherwise a supporter of gun control measures—called Mr. Curran's plan "unrealistic and unpassable." Daniel LeDuc, *Gun Ban Unrealistic, Glendening Says*, Washington Post (October 21, 1999).

[3] As cited in former Attorney General Curran's report, Chief Justice Burger famously asserted in 1991 that the notion that the Second Amendment encompassed an individual right was "a fraud on the American public." (ECF 135-13 at 37.)

is not at all what the FSA intended to, or does, accomplish.  Rather, as stated above, the challenged components of the FSA represent common-sense, incremental measures that do not restrict the possession or ownership of handguns by law-abiding citizens, but instead bolster features that were already part of Maryland firearms laws so as to improve public safety objectives.

Third, attempting to distract the Court from their own expert's acknowledgement that MSP's ability to revoke HQLs based on fingerprint matches enhances public safety (ECF 125-15, Tr. of Gary Kleck Dep. at 49), plaintiffs inexplicably contend that MSP is not revoking HQLs based on fingerprint matches of licensees who subsequently commit disqualifying offenses.  (ECF 135-1 at 29 ("Defendants claim that fingerprints could be used to identify HQL holders who subsequently become disqualified from possessing a firearm, but the Maryland State Police does not actually do this.").)  On the contrary, documentary and testimonial evidence demonstrates that MSP routinely receives criminal history reports based on HQL fingerprint matches and that, when a licensee has been convicted of a disqualifying offense, MSP revokes his or her HQL.[4]  (Ex. 20, Tr. of Andy Johnson Dep. at 133:20-134:13 (explaining the reporting from DPSCS and how MSP revokes HQLs based on that reporting).); *see also* (ECF 125-7, A. Johnson Decl. ¶¶ 23-24 & Decl. Ex. 6 (revocation log that tracks HQL revocations based on fingerprint match

---

[4] As explained in the defendants' opening memorandum (ECF 125-1) at 6), the FSA requires the Maryland Department of Public Safety and Correctional Services ("DPSCS"), which stores the fingerprint records, to provide MSP with any criminal history information it receives "after the date of the initial criminal history records check."  Md. Code Ann., Pub. Safety § 5-117.1(f)(7) (LexisNexis 2018 Supp.).

report).)  Despite this evidence, plaintiffs cite to Capt. Johnson's deposition testimony where he agreed that "*other than reports that are triggered by fingerprint matches*"— which Capt. Johnson had just explained were indeed used by MSP to revoke HQLs of newly-ineligible individuals—"there's no reporting to Maryland State Police of the arrest of any HQL holder . . . ."  (Ex. 20, Tr. of A. Johnson Dep. at 136:11-16 (emphasis added).)

Fourth, plaintiffs make the unsupported claim that the fingerprint requirement is unnecessary for MSP to locate and disarm handgun owners who are subsequently disqualified from handgun ownership because of the pre-existing handgun registration process.  (ECF 135-1 at 18.)  Plaintiffs rely on the deposition testimony of the State's expert Dr. Webster, in which he acknowledges the common sense notion that, prior to the HQL fingerprint requirement, MSP could have dispossessed disqualified individuals of their registered firearms if MSP were to learn that an individual had been convicted of a disqualifying offense.  But plaintiffs cite no evidence that any statute or regulation or state or local policy or procedure existed, prior to the HQL requirement, to ensure reporting of every registered firearms owner who was convicted of a disqualifying offense.  Indeed, no such statute, regulation, policy or procedure pre-existed the HQL fingerprint requirement (ECF 125-9, Decl. of First Sgt. Donald Pickle ¶¶ 10-12; Ex. 18, Webster Suppl. Decl. ¶ 6), and Capt. Johnson testified, unchallenged by plaintiffs, that prior to the fingerprint requirement there were no such regular reports received by MSP.  (Ex. 20, Tr. of A. Johnson Dep. at 136:4-10.)

Fifth, in support of their assertion that the fingerprint requirement of the HQL application does not deter straw purchases, plaintiffs misleadingly cite the deposition

testimony of the State's law enforcement expert James Johnson, the former Chief of the Baltimore County Police Department, in which he agreed with plaintiffs' counsel's statement that "by definition a straw purchaser is an individual who can be positively identified and is qualified to purchase a handgun" and, thus, "fingerprinting is not, per se, going to deter a straw purchaser."  (ECF 135-1 at 21-22 (citing (Ex. 21, Tr. of James Johnson Dep. at 24:4-12).)  In the very next exchange during his deposition, however, former Chief Johnson explained that the fingerprinting process discourages straw purchases because a potential straw purchaser "that knows that they have to render fingerprints is less likely to carry out the scheme" because of "a concern about rendering their fingerprints." (Ex. 21, Tr. of James Johnson Dep. at 24:14-21.)  Thus, when properly read in context, it is clear that Chief Johnson believes, based on his law enforcement experience, that although a straw purchaser would be able to pass a fingerprint-based background check, that same purchaser would be less willing and thus less likely to go through with the criminal enterprise because of the fingerprint requirement.

Sixth, plaintiffs falsely claim that the defendants have conceded there is no difference between the HQL's four-hour live training requirement and the 45-minute video that handgun purchasers were required to view under the prior law, simply because they covered similar subject areas.  (ECF 135-1 at 19.)  On the contrary, both of the State's law enforcement experts articulated various advantages of the four-hour classroom training over the 45-minute video, discussed below at pages 32-35.  *See also* (ECF 125-1 at 26-28.)

Seventh, plaintiffs falsely state that the defendants have "conceded" that the live-fire requirement is "specious," relying on the deposition testimony of former Chief

Johnson.  (ECF 135-1 at 19-20, 22, 30.)  Although Chief Johnson testified that he believes firing one round of ammunition is "not adequate" to be proficient at firing a handgun (Ex. 21, Tr. of J. Johnson Dep. at 52:14-17), this is by no means a concession that the live-fire requirement had no benefits.  Instead, Chief Johnson testified that the live-fire requirement would help prevent accidental discharges by demonstrating the applicant's ability to chamber a round (*id.* at 52:14-53:2), and effectively clear the weapon after firing (*id.* at 106:20-107:5).  Indeed, as discussed below at pages 32-35, both of the State's law enforcement experts have opined on the public safety advantages of the live-fire requirement.

Eighth, plaintiffs make the very misleading claim that the HQL requirement "discouraged nearly one-quarter of Maryland citizens who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin an HQL application from completing it and obtaining their HQL."  (ECF 135-1 at 13.)  Plaintiffs base this claim on the raw number of users who have initiated an HQL application on MSP's server but not yet completed the application.  (*See* ECF 135-1 at 13.)  This raw data, however, cannot support speculation as to why any particular application was not completed, which can occur for any number of reasons including because individuals often learn after they initiate an application that they are ineligible due to their age, immigration status, residency status, or criminal history; because individuals create multiple accounts and initiate multiple applications due to a forgotten username or password or for testing purposes; and because there is no way to determine whether an applicant who initiated an application that has not yet been submitted as final intends to submit an application in the

future.  (ECF 135-15, Col. Pallozzi Third Supp. Interrog. Resp. No. 5; Ex. 22, Tr. of Diane Armstrong Dep. at 113-15, 117, 124.)  Plaintiffs have failed to raise any genuine dispute that *any* of these users who initiated but did not complete an application were discouraged from exercising their Second Amendment rights, let alone *all* of them.

The same goes for plaintiffs' claim that the "number of law-abiding citizens who never even start an HQL application because of the HQL requirement's burdens is unknown but is certainly substantial."  (ECF 135-1 at 13-14.)  For example, although plaintiffs claim that MSI members Scott Miller and John Clark were "deterred from obtaining a handgun due to the HQL requirement" (ECF 135-1 at 33), the record instead demonstrates that, even though both testified that they can afford to obtain an HQL, and Mr. Clark is exempt from the training requirement, they simply have chosen not to apply for an HQL.  (Ex. 23, Tr. of Scott Miller Dep. at 9-10, 24; Ex. 24, Tr. of John Clark Dep. at 20-21.)  Indeed, Mr. Miller testified that he chose not to take the HQL training course because "it just seemed silly to take a class just to prove that you can operate a handgun" and, instead, has completed most of the more time-consuming hunter safety training that will exempt him from the HQL training requirement.[5]  (Ex. 23, Tr. of S. Miller Dep. at 19-21.)  Mr. Clark testified that he was discouraged from applying for an HQL because the Carroll County Sheriff's Office no longer offered fingerprinting services.  (Ex. 24, Tr. of

---

[5] Mr. Miller's admission that he had time to take the 15-hour hunter safety training and neglected to take the HQL training because he found it "silly," disproves the plaintiffs' claim that Mr. Miller was deterred because of the purported burdens of satisfying the HQL requirements.

Clark Dep. at 20.)  But he admitted that he had not looked for another fingerprinting vendor since 2014.  (*Id.*)[6]

And aside from the self-serving statements of Atlantic Guns' owner, plaintiffs have not produced a shred of evidence to support their claim that Atlantic Guns has turned away "hundreds of customers since the imposition of the HQL requirement."  (ECF 135-1 at 33.) Indeed, Atlantic Guns' owner was unable to identify a single customer that had been turned away or for whom deposits were held, despite plaintiffs' obligations to preserve relevant documentary evidence having been in effect since at least October 2016 when this litigation was commenced.  (Ex. 25, Tr. of Stephen Schneider Dep. at 21-22.)

Ninth, the plaintiffs claim that "[d]efendants' own records demonstrate beyond dispute that the HQL requirement has severely impacted Atlantic Guns' business."  (ECF 135-1 at 33.)  Plaintiffs point to the fact that if one were to measure Atlantic Guns' average yearly handgun sales for the four-year period before the enactment of the FSA (2009-2012) against its average yearly handgun sales for the four-year period subsequent to the enactment of the FSA (2014-2017), it would show a 20 percent drop in sales.  (ECF 135-1 at 33 (citing ECF 135-2, Schneider Decl. ¶ 9 & Ex. A).)  Of course, plaintiffs' calculation does not include figures for 2013, when Atlantic Guns had a banner year and enjoyed sales that were more than double that of the yearly average from the preceding four years. Although plaintiffs assert that omitting sales figures for 2013 "avoid[s] the distorting

---

[6] There are at least two State-licensed livescan fingerprint vendors located in Westminster, Maryland in Carroll County, near Mr. Clark's home. *See* http://www.dpscs.state.md.us/publicservs/fingerprints.html.

effects of the sales increase following the Newtown shooting in mid-December 2012 and the run up of sales prior to the HQL requirement's effective date on October 1, 2013" (ECF 135-1 at 33 n.19), plaintiffs' calculations do not account for the *offsetting* effect that the vastly increased sales might have had on sales in the years immediately following those events.  But when both of these distorting effects are removed by measuring only the four most recent years of Atlantic Guns' sales (i.e., 2017-2020), the figures tell the opposite story.  Indeed, rather than showing diminished sales, Atlantic Guns' figures show that, in the last four years while the HQL requirement has been in effect, it sold ████████ ████ *more* handguns per year than it did during the four years immediately preceding the enactment of the FSA.  (Compare ECF 135-2, Ex. A with Ex. 26, Confidential Stipulation.) These figures belie the notion that the FSA had a "severe[] impact" on Atlantic Guns' sales of handguns.

Tenth, plaintiffs contend that there is no evidence that the HQL requirement of the FSA has been effective in promoting public safety.  (ECF 135-1 at 20-21.)  For a number of reasons discussed below at pages 25-31, this is plainly wrong.  Not only is this conclusion supported by studies relating to similar laws in Missouri and Connecticut, but a published empirical, peer-reviewed study shows that since the FSA was enacted, there has been a dramatic, statistically significant reduction in a major indicator in the diversion of guns to criminals, and there has been a statistically significant reduction in the homicide rates in Maryland's major urban counties with the exception of Baltimore City, where the homicide rate rose steeply following the death of Freddie Gray and the ensuing unrest.

(ECF 125-11, Webster Decl. ¶¶ 17-19; Ex. 18, Webster Suppl. Decl. ¶ 7; ECF 125-12, Webster Second Supp. Decl. ¶¶ 4-8; Ex. 19, Webster Third Supp. Decl.)

## II.  THE HQL REQUIREMENT DOES NOT VIOLATE THE SECOND AMENDMENT.

For the reasons discussed in the defendants' opening memorandum in support of summary judgment, the HQL requirement easily withstands constitutional scrutiny, because there is ample evidence in the record to support the legislature's judgment that requiring handgun purchasers to submit fingerprints for a robust background check and receive four hours of firearm safety training including safely firing one live round of ammunition is reasonably adapted to the State's compelling interest in public safety.  In response, plaintiffs erroneously contend (1) that Maryland's requirement that handgun purchasers satisfy reasonable conditions geared toward keeping guns out of the hands of criminals and enhancing safe storage, handling, and operation of handguns is tantamount to a complete "ban" on handgun possession like the law struck down in *Heller I*; (2) that despite failing to identify any individual who has been deterred from handgun possession by the actual requirements of the HQL law, these requirements impose a severe burden on handgun possession and, thus, are subject to strict scrutiny; and (3) that the reasonable requirements do not satisfy a formulation of the intermediate scrutiny standard that has been rejected by the en banc Fourth Circuit in the Second Amendment context.  And notably, while plaintiffs chide the defendants for failing to address their claims under the particular standards that they claim apply here, plaintiffs have not engaged in any analysis under the only standard that does apply:  intermediate scrutiny as articulated by the Fourth

Circuit in *Kolbe v. Hogan*, 849 F.3d 114, 130 (4th Cir.) (en banc), *cert. denied*, 138 S. Ct. 469 (2017).  For the reasons discussed below, this Court should deny plaintiffs' motion for summary judgment and instead grant the defendants' motion for summary judgment.

### A.   The HQL Requirement Does Not Ban Any Law-Abiding Person from Possessing a Handgun for In-Home Self-Defense.

Plaintiffs erroneously contend that the HQL requirement effects a "ban" on handgun possession, and, thus, that the law must be invalidated for the same reason the District of Columbia's ban on handgun possession in the home was struck down in *Heller I*.  (ECF 135-1 at 26.)  Plaintiffs vastly distort the meaning of the term "ban," and then attempt to shoehorn the FSA into that mangled definition.  But a simple comparison of the laws at issue demonstrates the fallacy in plaintiffs' argument.  The law struck down in *Heller I* prohibited virtually all citizens from possessing a handgun under any circumstances.  Here, in contrast, any law-abiding Maryland citizen may obtain a HQL and may thereafter acquire a handgun.  To suggest that the HQL requirement bans Marylanders from possessing a handgun is no different than suggesting that a driver's licensing scheme bans Marylanders from driving.

Moreover, plaintiffs' semantic overreach is contradicted by the actual effect of the law on legal handgun ownership.  The record demonstrates that, from the effective date of the FSA through the end of 2020, a total of 192,506 Marylanders have successfully obtained an HQL, and thus may purchase, rent, or receive handguns within the State.  (Ex. 27, Decl. of Lt. Padraic Lacy ¶ 7 & Decl. Ex. 1.)  And although handgun sales in Maryland dipped in 2014 and 2015 after the undisputed spike in gun sales in 2012 and 2013, in 2016

Maryland began to experience robust handgun sales.  (Ex. 28, Yearly Count of Firearm Transfers by Gun Type.)[7]  In fact, during each of the past four years (2017-2020), the yearly figure for handgun transfers has exceeded every year prior to the enactment of the FSA. (Compare Ex. 28, Yearly Count of Firearm Transfers by Gun Type, with Ex. 27, Lacy Decl. ¶ 7 & Ex. 1.)  Significantly, the number of handgun transfers in 2020 actually *exceeded* the number of transfers in 2013, when Maryland experienced vastly inflated handgun sales in the run up to the effective date of the FSA.  (*Id*.) The enactment of the HQL requirement has thus hardly prevented Marylanders from acquiring handguns. Instead, Marylanders have been acquiring handguns at a record pace ever since the law went into effect.  Similarly, as discussed earlier, plaintiff Atlantic Guns' handgun sales have followed an identical trend, experiencing an ███████ *increase* in handgun sales over the last four years compared to the four years prior to the enactment of the FSA. Plaintiff's argument that the law constitutes a "ban" is contradicted by the undisputed facts and should be rejected.

Further demonstrating the fallacy of their argument, plaintiffs have failed to identify even a *single* law-abiding individual who has sought but failed to obtain an HQL and, thus, has been prevented from obtaining a handgun for in-home self-defense.  (*See, e.g.*, Ex. 25,

---

[7] Although the data in Exhibit 28 contains some discrepancies in coding as to the specific type of handgun that was transferred in 2014, 2015, and 2016, those discrepancies have no effect on the data for 2017 handgun transfers.  (Ex. 20, Tr. of A. Johnson Dep. at 149-50.) As of January 1, 2017, firearms transfer data is no longer entered manually from applications, but instead is taken directly from the newly-required digital application for firearm transfers.  (*Id.* at 159-60.)

Tr. of Schneider Dep. at 21-22.)  Rather, plaintiffs have identified only a handful of individuals who simply have chosen not to obtain an HQL, and none of those individuals has even attempted the process, researched the actual requirements, or sought accommodations where they believed them necessary.   Contrary to plaintiffs' mischaracterization of these individuals' testimony, this choice not to obtain an HQL was not due to the impossibility of meeting the requirements, either because of cost or time or other alleged burdens, but rather because, as discussed above at pages 8-10, they simply do not wish to expend the time or money to comply with the requirements.

Far from a ban on handgun possession, the HQL requirement is a reasonable regulatory requirement that made more robust the existing requirements for handgun purchases in Maryland and is geared toward enhancing public safety, a compelling State interest.  Tellingly, plaintiffs do not cite a single case in which any court has held that a licensing law, like Maryland's HQL requirement, is tantamount to a ban on handgun possession.  On the contrary, the D.C. Circuit upheld the vast majority of the District's handgun registration law enacted in the wake of *Heller I,* including fingerprint and training requirements.  *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*").

Similarly, this Court should reject plaintiffs' claim that this Court should apply a test that automatically invalidates any firearms regulation that is "not rooted in the text, history, and tradition of the Second Amendment."  (ECF 135-1 at 24.)  Although such a per se test has some garnered support among some jurists, the fact remains that no court has adopted such a myopic and unworkable test.  Indeed, the Fourth Circuit—and nearly all other sister circuits—has instead adopted a well-settled two-part test that examines the

extent to which a law burdens conduct that falls within the scope of the Second Amendment's guarantees. *Kolbe*, 849 F.3d at 130. The Fourth Circuit reaffirmed the viability of this test just days ago. *Harley v. Wilkinson*, No. 19-1632, 2021 WL 667099, at *2 (4th Cir. Feb. 22, 2021). In any event, as the brief of amicus Everytown for Gun Safety aptly shows, there is a robust historical pedigree for laws requiring a permit to purchase firearms and background checks (ECF 129 at 5-10) and laws requiring training in the proper use of firearms (ECF 129 at 10-13.) Thus, even if this Court were to disavow established circuit precedent and apply the plaintiff's preferred standard, the FSA would nonetheless survive scrutiny.

> ### B. To the Extent That the HQL Requirement Constitutes a Burden on Second Amendment Rights, Intermediate Scrutiny—Rather Than Strict Scrutiny—Applies Because the HQL Requirement Does Not Impose a Severe Burden on the Right to Possess Firearms for In-Home Self-Defense.

As described in the defendants' opening memorandum, under the Fourth Circuit's two-pronged approach to analyzing Second Amendment challenges, where a law burdens conduct falling within the scope of the Second Amendment's guarantee, the level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Kolbe*, 849 F.3d at 132-33. To the extent plaintiffs have generated any genuine dispute that the HQL requirement burdens their exercise of their Second amendment rights, intermediate scrutiny is the applicable standard of review because the HQL requirement "does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding responsible citizens to use arms for self-defense in the home." *Id.* at 138. As explained in the defendants' opening memorandum, no court

has found a severe burden where, as in this case, a regulation did not have the effect of "prevent[ing] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Heller v. District of Columbia*, 670 F.3d 1244, 1257-58 (D.C. Cir. 2011) ("*Heller II*").

In response, plaintiffs nonetheless claim that strict scrutiny is the appropriate level of scrutiny because, in their view, the HQL process is time consuming, inconvenient, and expensive. (ECF 135-1 at 14-17, 34-39.) Plaintiffs' complaints, however, arise from the mere existence of the requirements and their associated costs. Tellingly, neither individual plaintiff nor any identified member of MSI or customer of Atlantic Guns has claimed that he or she suffered any cognizable burden arising from (1) the time it took to complete or process an HQL application, (2) an inability to access a qualified handgun instructor or fingerprint vendor (both of which are accessible from links on MSP's website), (3) an ability to complete the online application, or (4) an inability to afford an HQL.[8] And, as set forth above, nearly 200,000 Marylanders have satisfied the HQL requirement since it went into effect. (Ex. 27, Lacy Decl. ¶ 7.) Again, because the HQL requirement does not have the effect of preventing a law-abiding Marylander from acquiring a handgun, plaintiffs' claim that the HQL requirements amount to a severe burden should be rejected.

---

[8] Although MSI has qualified handgun instructors within its membership, the plaintiffs have not identified any instructor who has turned away an applicant because of an inability to pay or been asked to provide training at a reduced rate. MSP Captain James Russell testified that he provides the HQL firearm safety training free of charge. (Ex. 29, Tr. of James Russell Dep. at 85.)

Plaintiffs also rely on prior dicta in Fourth Circuit cases that ultimately applied intermediate scrutiny, *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011), *Woollard v. Gallagher*, 712 F.3d 865,  878 (4th Cir. 2013) and *United States v. Carter*, 669, F.3d 411, 416 (4th Cir. 2012).  (ECF 135-1 at 34-35.)  Notably, the en banc Fourth Circuit expressly rejected this approached in *Kolbe*, explaining that "neither *Masciandaro* nor *Woollard* purported to, or had reason to, decide whether strict scrutiny always, or even ever, applies to laws burdening the right of self-defense in the home."  *Kolbe*, 849 F.3d at 133-34.  Like in *Kolbe*, intermediate scrutiny is the applicable standard of review.

C.   **This Court Should Apply the Articulation of the Intermediate Scrutiny Standard Set Forth in *Kolbe* and Recently Reaffirmed by the Fourth Circuit.**

As noted above, in *Kolbe* the Fourth Circuit set forth the intermediate scrutiny standard that applies in the Second Amendment context.   Under this "less onerous standard," the State must "show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471). Intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Id.* (quoting *Masciandaro*, 638 F.3d at 474). "In other words, there must be 'a fit that is 'reasonable, not perfect.'" *Id.* (quoting *Woollard*, 712 F.3d at  878).  A court's role is not to determine whether the legislature made the correct policy decision; rather, it is "to ensure that the legislature's policy choice substantially serves a significant governmental interest."  *Woollard*, 712 F.3d at 881.

The Fourth Circuit's articulation of the intermediate scrutiny standard in *Kolbe* forecloses plaintiffs' argument that a more onerous standard should be applied here. Indeed, plaintiffs' argument that intermediate scrutiny requires that the law be "narrowly tailored" to the State's objectives (ECF 135-1 at 39) was presented to the Fourth Circuit in *Kolbe*. *See Kolbe v. Hogan*, Appeal No. 14-1945 (4th Cir.), ECF 26 at 33, 2014 WL 5680384, at *46; ECF 61 at 14-15, 2015 WL 217266, at *14-15 (citing, *e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014)).  The Fourth Circuit implicitly rejected the notion that such a heightened standard should apply, instead articulating and applying the "less onerous standard" set forth above.  *Kolbe*, 849 F.3d at 133.  Yet, plaintiffs simply ignore this binding Fourth Circuit precedent, misplacing reliance on First Amendment cases involving challenges to broad restrictions prohibiting speech in public fora that—despite serving as a "guide"—do not control in the Second Amendment context.  *See Woollard*, 712 F.3d at 883 n.11 (declining to apply First Amendment prior restraint doctrine in Second Amendment challenge).

As demonstrated in the defendants' opening memorandum, no circuit court has applied plaintiffs' formulation of intermediate scrutiny in the context of the Second Amendment; instead, several circuits have recently reaffirmed their longstanding articulations of the intermediate scrutiny standard in the Second Amendment context.  *See, e.g., Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 119 (2d Cir. 2020) (stating that, under intermediate scrutiny, "the question is whether the laws are 'substantially related to the achievement of an important government interest'" (citation omitted)); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020), *cert. denied*, 2021 WL

19

666524 (U.S. Feb. 22, 2021) ("Intermediate scrutiny requires the lesser showing of 'a reasonable fit between the challenged regulation and an important government objective.'" (citation omitted)); *Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 109 (2020) ("To survive intermediate scrutiny, a statute 'must be substantially related to an important governmental objective.'" (citation omitted)); *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019) ("To survive intermediate scrutiny at step two, the government must show that the [firearm regulation] is substantially related to an important governmental objective. Consistent with how we apply intermediate scrutiny in the First Amendment context, the 'fit' between the challenged regulation and the asserted governmental objective need only 'be reasonable, not perfect.'"); *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. of New Jersey*, 910 F.3d 106, 119 (3d Cir. 2018) ("[U]nder intermediate scrutiny[,] the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." (citation omitted)).   And since the defendants' opening memorandum was filed, the Fourth Circuit has reaffirmed that, "[u]nder the standard of intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged law and a substantial governmental objective."   *Harley v. Wilkinson*, No. 19-1632, 2021 WL 667099, at *3 (4th Cir. Feb. 22, 2021).

Plaintiffs' claim that the standard for intermediate scrutiny has somehow been altered since *Kolbe* is simply wrong.  And because plaintiffs have failed to respond at all to the defendants' argument that the HQL requirements are reasonably adapted to the

State's compelling interest in public safety, they have failed to raise any genuine dispute, and the defendants are entitled to summary judgment on that basis alone.

### D.   The HQL Requirement Is Reasonably Adapted to the State's Compelling Interest in Public Safety.

Having failed to engage in the proper intermediate scrutiny analysis, plaintiffs suggest that the HQL law does not survive scrutiny because the HQL requirements are "[s]olutions to hypothetical, abstract problems" and that there is no evidence of the HQL's effectiveness.  (ECF 135-1 at 40.).  They so argue despite the evidence in the record that (1) the HQL's implementing statute has been associated with a significant decrease in the diversion of guns to criminals in Maryland (ECF 125-11, Webster Decl. ¶ 18; Ex. 18, Webster Suppl. Decl. ¶ 7); (2) following the enactment of the HQL's implementing statute, the homicide rate in all major urban areas in Maryland decreased significantly with the exception of Baltimore City, which experienced a steep increase in violent crime due to the surge following the death of Freddie Gray and ensuing unrest (ECF 125-11, Webster Decl. ¶ 17); (3) empirical, peer-reviewed studies of other states' experiences with permit-to-purchase laws demonstrate that such laws are correlated with reductions in the diversion of guns to criminals and gun-related homicides (id. ¶¶ 14-16; Ex. 18, Webster Suppl. Decl. ¶¶ 11-12; ECF 125-12, Webster Second Supp. Decl. ¶¶ 5-8); (4) empirical, peer-reviewed studies of other states' experiences with permit-to-purchase laws demonstrate that such laws are correlated with reductions in fatal mass shootings (ECF 125-12, Webster Second Supp. Decl. ¶ 6.); (5) the HQL fingerprint requirement allows MSP routinely to identify individuals who are subsequently convicted of a disqualifying offense and revoke their

21

HQLs (ECF 125-7, A. Johnson Decl. ¶¶ 22-23); (6) the State's law enforcement experts testified that the in-person classroom training was a more effective vehicle for teaching firearm safety training, including proper storage and handling of a firearm, and, thus, would reduce access of firearms to prohibited persons including minors (ECF 125-14, J. Johnson Decl. ¶¶ 15-17; ECF 125-13, Russell Decl. ¶¶ 17-23, 26); and (7) the State's law enforcement experts, including the former chief of a major law enforcement agency who was aware of over 100 accidental discharges of firearms in Maryland (Ex. 21, Tr. of J. Johnson Dep. at 105-06) and a firearms safety trainer who has spent thousands of hours providing firearms training, testified that the live-fire requirement was critical to firearm safety training and would reduce accidental discharges (ECF 125-14, J. Johnson Decl. ¶¶ 3-4, 14, 18; ECF 125-13, Russell Decl. ¶¶ 10-11, 13-15, 20, 24-25).

Despite this evidence, plaintiffs argue that the State was precluded from enacting a more robust background check and training requirement than previously required under state law because of the inherent difficulty in tracking some of the public safety benefits the HQL requirement is designed to achieve. For example, plaintiffs contend that because the State was unable to track the incidence of undetected straw purchases or use of false identification to purchase firearms that occurred before the HQL requirement was implemented, the legislature was acting to solve a problem that does not exist. (*See* ECF ECF 135-1 at 44.) They argue the same for the utility of the training requirement in reducing the incidence of improper storage of firearms in the home and accidental discharges of firearms. (*See* ECF 135-1 at 48-49.) In other words, plaintiffs contend that the State cannot take common sense action to reduce the negative effects of firearms

violence unless it can show how many undetected straw purchases of firearms have occurred or how many gun owners improperly store handguns in their homes such that they are accessible to minors.  This is absurd and not supported by any Second Amendment jurisprudence.  Moreover, this argument ignores that the HQL requirement merely made more robust the preventative measures the State was already taking to keep firearms out of the hands of criminals and promote safe storage and use of firearms in ways that social science and law enforcement experts believe will promote public safety and reduce the negative effects of accidental and intentional gun violence.  Further, there is ample evidence in the record to support the General Assembly's predictive judgment that requiring a fingerprint background check and more robust firearm safety training is reasonably adapted to the State's interest in public safety.

> **1.    The Record Evidence Demonstrates the Fingerprint Requirement Is Reasonably Adapted to Furthering the State's Interest in Public Safety.**

Having failed to engage in any discussion of the proper intermediate scrutiny standard, plaintiffs argue that the fingerprint background check and the requisite processing time to conduct the background check are not narrowly tailored to the State's interest in public safety.  (*See* ECF 135-1 at 49-50.)  Here again, they are wrong.  As discussed above, plaintiffs' own expert agreed that the ability of MSP to revoke HQLs from subsequently-disqualified individuals based on fingerprints advances the State's interest in public safety.  (ECF 135-15, Tr. of Kleck Dep. 49.)  There is no evidence in the record that MSP was able to accomplish this goal prior to the fingerprint requirement, nor is there any testimonial evidence in the record that there are less restrictive means to accomplishing this goal.  The

same is true with respect to reducing straw purchases, given that there is no evidence in the record that there is a less restrictive way to reduce the flow of guns to criminals than to require prospective purchasers of handguns to submit their fingerprints to law enforcement for a robust background check as part of a licensing requirement.

As set forth in the defendants' opening memorandum, the fingerprint requirement has three primary benefits.  First, the fingerprint requirement enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information.   (ECF 125-1 at 19-21.)   Accordingly, the fingerprint requirement "advance[s] public safety by preventing at least some ineligible individuals from obtaining weapons." *Heller III*, 801 F.3d at 276-77 (upholding District's fingerprint requirement).  In response, plaintiffs ignore the State's evidence and merely speculate, absent any expert testimony or other evidence, that "[b]ecause Maryland is now REAL ID Act compliant, there is no likelihood of false identification."  (ECF 135-1 at 44.)  This unsupported speculation fails to raise any genuine issue for trial to challenge the State's evidence, including expert testimony, that the more robust fingerprint-based background check reduces the likelihood that prohibited persons will gain access to firearms.  *See United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011) (fact finder may not draw inferences from evidence requiring expert testimony "through argument instead of specialized knowledge").

Second, the fingerprint requirement has enabled MSP to identify individuals who are subsequently convicted of disqualifying offenses and revoke their HQLs, an effect plaintiffs' expert Gary Kleck agrees furthers the State's interest in public safety.  (ECF

24

125-15 Tr. of Kleck Dep. 49.)  DPSCS sends a daily record of licensees who have been convicted of offenses that make them ineligible for an HQL.  (ECF 125-9, Pickle Decl. ¶ 9.)  Prior to the HQL fingerprint requirement, no such routine reporting was made to MSP about the criminal history information of registered gun owners.  (*Id.* ¶¶ 10-12.)  As discussed above, plaintiffs' arguments to the contrary mainly rely on distorting the evidence in the summary judgment record or pretending that the General Assembly had no basis on which to conclude that this additional, common sense measure to prevent gun violence would promote public safety.

Third, as predicted, the fingerprint and other licensing requirements have had the effect of reducing straw purchases in Maryland, as demonstrated by an empirical, peer-reviewed study authored by Dr. Webster and his colleagues, which found that since 2013 there has been a precipitous, statistically-significant decline in a key indicator of the diversion of guns to criminals through straw purchases.  (ECF 125-11, Webster Decl. ¶ 18; Ex. 18, Webster Suppl. Decl. ¶ 7.)  Bolstering this conclusion are the results of a survey of probationers and parolees in Baltimore, 40 percent of whom reported that obtaining a handgun was more difficult after the FSA's enactment.  (ECF 125-11, Webster Decl. ¶ 19; Ex. 18, Webster Suppl. Decl. ¶ 7.)

In response to these study findings, plaintiffs offer no evidence to the contrary, and instead challenge the peer-reviewed methodology used by Dr. Webster and his colleagues through the declaration of their expert Gary Kleck.  (ECF 135-1 at 45.)  Notably, Professor Kleck's criticisms of the use of firearm trace data as an indicator of straw purchases are not widely accepted, have not been published in any peer-reviewed journals, and have been

discredited in a peer-reviewed article authored by the leading social science experts who study gun violence. (Ex. 18, Webster Supp. Decl. ¶¶ 8-10.)  In any event, Professor Kleck's criticism are of no moment because, as the Fourth Circuit has made clear, it is the job of the legislature "to weigh conflicting evidence and make policy judgments," to which courts "must accord substantial deference . . . ."  *Kolbe*, 849 F.3d at 140 (internal quotation marks and citations omitted).  This Court's obligation is simply "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."  *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)). Legislatures may draw reasonable inferences from empirical, peer-reviewed, published research, like Professor Webster's published articles, about the potential effects of public policy.  *See United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (explaining that the government may "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require.").

In response to Dr. Webster's findings that the HQL requirement is estimated to have led to reduced firearm homicide rates in large urban counties in Maryland, plaintiffs rely solely on the fact that firearm homicides in Maryland as a whole have increased.  (ECF 135-1 at 47-48.)  But as Dr. Webster explained, this data set is skewed by the predictable steep rise in homicides experienced by Baltimore City following the death of Freddie Gray in police custody and the ensuing unrest—a factor unrelated to the efficacy of the HQL law.  (ECF 125-11, Webster Decl. ¶ 17.)  And plaintiffs' experts, relying on the increased homicide rate in Maryland, did not consider this confounding factor, nor did they account for justifiable homicides, homicides committed with long guns, or the effect of the events

26

surrounding the death of Freddie Gray in any of their analyses (*see* Ex. 30, Tr. of Dep. Carlisle Moody at 29-35), rendering their opinions on the effectiveness of the HQL requirement worthless.[9]

Plaintiffs also claim that the HQL requirement does not affect public safety in Maryland because "the HQL requirement regulates handgun transactions in Maryland, but "[n]early two-thirds of guns associated with crime in Baltimore come from out of state," with Maryland having "the highest rate of out-of-state crime gun 'imports' in the country." (ECF 135-1 (citation omitted).)  But this simply proves the law's effectiveness, showing that the HQL law has made it much more difficult for criminals to purchase guns in Maryland.  That was the intent of the law, and Maryland's success cannot be diminished simply because the legislatures of other states have chosen not to enact similar measures.

Plaintiffs' attacks on the other, more recent studies referenced in the defendants' motion for summary judgment fall flat as well.  First, as a general matter, Professor Kleck attacks these studies as the results of "data dredging," a "disreputable" and "unreliable"

---

[9] Plaintiffs' expert, Carlisle Moody, who opined that the increased homicide rate showed that the HQL was not effective in reducing firearms-related homicides was "not very" familiar with the events involving Freddie Gray, and had not controlled for those events or analyzed them in any way in forming his expert opinions.  (Ex. 30, Tr. of Moody Dep. at 33-35.)  Although Professor Moody claimed to have attempted to control for the "Ferguson effect" in Maryland, which he "presume[d] . . . was sufficient to control for the Freddie Gray incident" (*id.* at 35), he acknowledged that he did no analysis of firearm homicide rates in urban areas where there had been high-profile police killings of suspects during the study period (*id.* at 56-57).  Professor Moody's only source of information about the "Ferguson effect" was a Wikipedia article, which he "assumed" was accurate, but did not know who had authored the article and had not read any of the cited sources.  (*Id.* at 36-37.)  Professor Moody's opinions should be stricken for the reasons set forth in the Defendants' Motion to Strike.

practice whereby researchers ostensibly comb through data, refining their hypothesis until the data supports a favored outcome.  (ECF 135-1 at 46-47.)  Professor Kleck's sole support for this assertion, however, is his unfounded speculation regarding Dr. Webster's (and his colleagues') research practices.  But the fact of the matter is that these conclusions in Dr. Webster's studies "are supported by peer-reviewed articles published in top scientific journals that use multiple sources of data and multiple analytical techniques commonly used to estimate the effects of change in public policies on public safety outcomes[.]"  (Ex. 19, Webster Third Supp. Decl. ¶ 3.)   Professor Kleck's implication that Dr. Webster's widely-accepted research methods are somehow unsound rings hollow.

With particular regard to the updated study of Missouri's permit-to-purchase law (ECF 125-12, Webster Second Supp. Decl., Ex. 1), Professor Kleck claims that the study: (1) artificially restricts the date range analyzed, (2) cherry-picks Missouri as the sole state studied, and (3) is based entirely on a one-year increase in the homicide rate the year immediately after the law in question was repealed.  (ECF 135-1 at 47.)  However, as Dr. Webster explains:  (1) the chosen period, 1999-2007, was a "very stable period for annual firearm homicide rates, [and thus] ideal for isolating the effects of a very meaningful change in state firearm policy," (2) Missouri was chosen as the focus of the study because it was the only state that had a change in a permit-to-purchase law during that period, and (3) although the Missouri firearm homicide rate was consistent with surrounding states before the repeal of the permit-to-purchase law, the rate increased after the repeal and continued to remain higher than those surrounding states thereafter.  (Ex. 19, Webster Third Supp. Decl. ¶ 8.)

With regard to the fatal mass shooting study (ECF 125-12, Webster Second Supp. Decl., Ex. 2), Professor Kleck claims that the study:  (1) cherry-picks which variables to control for, (2) cherry-picks how the phrase "fatal mass shootings" is defined, (3) cherry-picks which states were included in the study, and (4) fails to differentiate between laws requiring fingerprinting and/or a personal appearance at a law enforcement agency.  (ECF 135-1 at 47.)  Dr. Webster explains:  (1) Professor Kleck fails to identify any otherwise unidentified variable that could explain the results obtained by the study, (2) the study defined mass shooting as involving four or more deaths because, had the number been increased to five or more deaths, the number of mass shootings to be studied would have decreased by over 85 percent (with a growing number of those incidents involving rifles, thus eliminating any significance to handgun permit laws), (3) five states were excluded from the study because those states had many years of missing data that would have skewed the overall data had they been included, and (4) the study analyzed laws with either fingerprinting or personal appearance at a law enforcement agency because to further break down those laws into discrete categories (i.e., only fingerprinting or only personal appearance) would have provided very few data points for each category.  (Ex. 19, Webster Third Supp. Decl. ¶ 20-26.)

Finally, with regard to the study that analyzed the effect of laws from Missouri, Connecticut, Maryland, and Pennsylvania (ECF 125-12, Webster Second Supp. Decl., Ex. 3), Professor Kleck claims that the study:  (1) cherry-picks the data range it analyzes, (2) is limited only to four states despite other states having permit-to-purchase laws, (3) limits the factors used in its synthetic control methodology, and (4) despite analyzing Maryland's

background check laws, does not analyze the HQL law.  (ECF 135-1 at 47.)  Dr. Webster explains:  (1) the studies used more recent data because "[f]orecasting firearm homicide or suicide rates based on temporal patterns observed 30 to 90 years ago simply makes no sense and is likely to produce biased and inefficient (broader confidence intervals) estimates of policy effects," (2) the study was limited to four states because those states all experienced changes in the same types of laws within the same period, thus allowing researchers to better compare and contrast those laws, (3) the synthetic control methodology used in the study is a "widely accepted, and often preferred, method for estimating policy impacts," and (4) because the purpose of the study was to examine the effect solely of comprehensive background checks in Maryland versus Pennsylvania, data was not included for the period after the HQL went into effect because of the possible biasing effect of that law.  (Ex. 19, Webster Third Supp. Decl. ¶ 17-19, 27-28.)

> ### 2.  Because the Fingerprint-Based Background Check Easily Satisfies Intermediate Scrutiny, the Processing Period During Which MSP Conducts the Background Check Also Is Constitutional.

Plaintiffs also claim that the 30-day statutory limit on the time within which the MSP must process an HQL application renders the HQL requirement unconstitutional. This processing time, which was enacted to allow MSP to conduct the more robust background check under the FSA and not as a mandatory waiting period to delay handgun purchases, is reasonably adapted to the State's interest in keeping handguns out of the hands of persons lawfully prohibited from possessing them and also is the least restrictive means of doing so.  The time to complete processing varies depending on the time it takes

to resolve any questions that arise during the background investigation, which can involve awaiting information about out-of-state convictions and related court documents.  (ECF 125-7, A. Johnson Decl. ¶ 11.) There is no dispute that as soon as the background check is complete and the HQL is approved, the HQL is mailed within one to two days of the application's approval. (*Id.* ¶ 14; ECF 125-10, Rossignol Decl. ¶ 13.)[10]

> **3.    The Record Evidence Demonstrates That the Firearm Safety Training and Live-Fire Requirements Are Reasonably Adapted to Furthering the State's Interest in Public Safety.**

As the State's law enforcement experts testified, the training and live-fire requirement are critical to training handgun purchasers on the proper storage, handling, and operation of firearms, and thus, will reduce accidental discharges and access of firearms to ineligible persons, including minors.  Tellingly, plaintiffs do not argue that firearm safety training or the specific subject areas of the HQL training requirement do not further the State's interest in public safety.  Rather, plaintiffs contend that the four-hour training does not survive scrutiny because it is redundant of the prior 45-minute video training that was required under the handgun registration process.  But plaintiffs cite no expert or other testimony to support this contention.  (*See* ECF 135-1 at 19.)  The State, by

---

[10] The plaintiffs complain that delays from State-certified fingerprint vendors or qualified handgun instructors may result in incomplete applications.  (ECF 135-1 at 17.) But because none of the plaintiffs actually has applied for an HQL, there can be no as-applied challenge contending that any particular delay in processing impeded anyone's Second Amendment rights in this case.  Moreover, Capt. Johnson testified that even where an application is submitted as incomplete, MSP works with the applicant to complete it and in most cases is able to process the application within 30 days of its initial incomplete submission.  (Ex. 20, Tr. of A. Johnson Dep. at 140-41.)

contrast, has proffered the opinions of law enforcement experts that the prior 45-minute video training was wholly insufficient and that the classroom training is superior for a number of reasons. Plaintiffs have, thus, failed to raise a genuine issue for trial that the HQL's training and live-fire requirement are reasonably adapted to the State's compelling interest in public safety.

Former chief Johnson testified, based on his 39 years of experience in law enforcement during which he received and conducted numerous trainings on firearm safety and worked closely with firearms safety trainers, that the training required by the HQL law is a significant improvement over the prior video training because proper training "involves hands-on experience and allows for dialogue between the instructor and the student, such that students can ask questions." (ECF 125-14, J. Johnson Decl. ¶ 17.) He further cited an advantage of live training is that an instructor "can verify that an individual attended the training, as opposed to watching a video, which cannot be verified" (*id.*) and opined, based on his years of working with firearm safety trainers, that "certified firearm safety trainers will responsibly verify that HQL applicants who have attended firearm safety training have complied with all of the training requirements, including a demonstration of the safe operation and handling of a firearm" (*id.* ¶ 13).

Capt. Russell, who has spent thousands of hours over the last 13 years teaching firearms safety, similarly opined "that the HQL's live, in-person classroom training is more effective than the former training given by video because it provides the students an opportunity to ask questions and receive feedback from the instructor" and has opined that in his experience, "students tend to be more attentive in a classroom setting than they are

watching a video.  A further benefit of the in-person training is that the instructor must verify that the student was present for and completed the course, whereas students watching a video may leave the room while the video is playing." (ECF 125-13, Russell Decl. ¶ 26.) Capt. Russell, who is familiar with the 45-minute video, further opined that the four-hour classroom training is superior because it "provides more thorough instruction on State firearms law, handgun and firearm safety in the home, and handgun mechanisms and operation, and has a verification component such that an instructor verifies that an applicant participated in the training." (*Id.* ¶¶ 22-23.)

Both Capt. Russell and former Chief Johnson also opined on the public safety benefits of the live-fire requirement.  Capt. Russell opined "that the addition of the requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon." (ECF 125-13, Russell Decl. ¶ 24.)  He "believe[s] that this is a significant step toward ensuring responsible and safe gun ownership" and opined, based on his years of firearm safety training, that "merely watching a video describing how to fire a handgun is not sufficient training on the safe handling and operation of a handgun." (*Id.* ¶ 25.)

Former Chief Johnson described his knowledge of and experience responding to "accidental discharges of handguns in Maryland, some of which were fatal . . . involving police officers and private citizens." (ECF 125-14, J. Johnson Decl. ¶ 14.)  He recounted that "[m]any accidental discharges resulted from the individual pulling the trigger of a

33

semiautomatic firearm without having realized that there was a round chambered in the weapon after the ejection of the magazine" and opined, based on his extensive law enforcement experience, "that the HQL training requirement that a person demonstrate the safe firing of one round of live ammunition can prevent such accidental discharges because it teaches the operation of the weapon including how to clear the weapon after firing." (*Id.*)

In response, as discussed above, plaintiffs can only ignore, downplay, or mischaracterize these experts' testimony.  Plaintiffs further suggest that the training requirement is ineffective and pretext for discrimination because the MSP does not mandate that firearm trainers use MSP's sample curriculum.  (ECF 135-1 at 29-30.)  Yet, plaintiffs have come forward with no evidence to support their purported concern that qualified handgun instructors are not incorporating all of the required statutory and regulatory requirements into their lesson plans.  On the contrary, as noted above, former Chief Johnson testified based on his nearly 40 years of law enforcement experience that "certified firearm safety trainers will responsibly verify that HQL applicants who have attended firearm safety training have complied with all of the training requirements, including a demonstration of the safe operation of handling of a firearm."  (ECF 125-14, J. Johnson Decl. ¶ 13.)

Likewise, plaintiffs contend that the General Assembly's intent to impede Second Amendment rights rather than promote public safety can be divined from the Act's exemptions from the HQL training component for persons who currently own registered firearms or have passed hunter safety training.  (ECF 135-1 at 29-30.)  The opposite is true.  Were the General Assembly intending to make it more difficult for law-abiding

Marylanders to purchase handguns, it simply would have required that *all* Marylanders take an additional training course.   That the General Assembly exempted certain individuals who had already undergone some form of training demonstrates that the State was attempting to use the least restrictive means to achieve its compelling end of promoting public safety by enacting a more robust firearm safety training requirement.   Moreover, the legislature need not aim to "strike at all evils at the same time"; rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (citations and internal quotation marks omitted).

Finally, plaintiffs also misplace reliance on *Heller III*, which did not strike down the District's training requirement, but rather found that the District had not presented sufficient evidence to justify the requirement that a handgun registrant "demonstrate satisfactorily, in accordance with a test prescribed by the Chief [of Police], a knowledge of the laws of the District of Columbia pertaining to firearms," D.C. Code Ann. § 7-2502.03, particularly because "only a few of the 15 questions in the test actually prescribed by the Chief plausibly reflect a concern with public safety." *Heller III*, 801 F.3d at 279 (holding only that the "test of legal knowledge" of the District's firearms laws was unconstitutional). Maryland law, by contrast, requires only that firearms safety training include classroom instruction on "State firearm law" among other subjects, Pub. Safety § 5-117.1(d)(3)(ii)(1), and does not require that applicants prove their knowledge of State law on subjects unrelated to public safety.   Further, unlike in *Heller III*, the State has presented expert testimony that training on State law is critical to public safety because of the provisions

relating to firearm storage, firearm transport, and the prohibition on straw purchases, among others.

### E.    The State of Maryland Enacted the HQL Requirement Based on Substantial Evidence.

As set forth above, there is substantial evidence in the record to support the General Assembly's predictive judgment that the HQL requirement is reasonably adapted to the State's compelling interest in public safety.  Plaintiffs, in failing to refute the defendants' arguments under the proper intermediate scrutiny argument, mount no challenge to this assertion.  Instead, plaintiffs ignore the universe of evidence in the record and suggest wrongly that the General Assembly did not have substantial evidence before it when it enacted the FSA.  (ECF 135-1 at 52-53.)   This same argument was made to the Fourth Circuit in *Kolbe* and, again, the Fourth Circuit rejected it.  849 F.3d at 140 n.14 (rejecting plaintiffs' contention that the State could not amass evidence in litigation, because "it was appropriate for the State to supplement [evidence in the legislative record] in these proceedings" (citing *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 357 (4th Cir. 2001) ("We may . . . look to evidence outside the legislative record in order to confirm the reasonableness of [the legislature's] predictions.")).

Moreover, as the Fourth Circuit also found in *Kolbe*, "there was ample evidence in the legislative record" to support the General Assembly's judgment in this case.  *Kolbe*, 849 F.3d at 140 n. 14 (relying on similar testimony before the General Assembly).  As described in the defendants' opening memorandum, the General Assembly received testimony from Dr. Webster, a lead academic researcher on gun policy who testified about

empirical, peer-reviewed research of the effectiveness of permit-to-purchase laws in other states in reducing the negative effects of firearms violence, and also received testimony from leading law enforcement experts in the State, then-Chief Johnson and then-Chief of the Baltimore City Police Department Anthony Batts, concerning how the HQL requirement in particular would further public safety.  (ECF 125-1 at 2-3.)

Finally, plaintiffs' focus on the alleged intent of the legislature misunderstands the nature of this Court's inquiry under the standards established by the Fourth Circuit.  Under a proper application of the Fourth Circuit's two-pronged framework for analyzing Second Amendment challenges, this Court does not attempt to divine the intent of the legislature in passing firearms laws (and certainly not based on unrelated comments from non-legislators).  Rather, this Court's function is to assess the degree of burden on the Second Amendment right, and here, because any burden is not severe, to assess whether substantial evidence supports the legislature's predictive judgment that the regulations are reasonably adapted to promoting public safety.   *Kolbe*, 849 F.3d at 133.  In so doing, it is not this Court's role to "second-guess[]" the "judgment made by the General Assembly of Maryland," because "[i]t is the legislature's job . . . to weigh conflicting evidence and make policy judgments."  *Id.* at 140 (citations omitted; alteration in original).  As discussed in the defendants' opening memorandum (ECF 125-1 at 18-31) and above at pages 25-30, contrary to plaintiffs' unsupported claims, the evidentiary record amply supports the legislature's judgment in this case.

**CONCLUSION**

The Court should grant the defendants' motion for summary judgment, deny plaintiffs' cross-motion for summary judgment, and enter judgment in favor of the defendants as to all counts of the amended complaint.


Respectfully Submitted,

BRIAN E. FROSH
Attorney General

  /s/ Ryan R. Dietrich
RYAN R. DIETRICH (Fed. Bar #27945)
ROBERT A. SCOTT (Fed. Bar #24613)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7648 (tel.); 410-576-6955 (fax)
rdietrich@oag.state.md.us

Dated: March 8, 2021                    Attorneys for Defendants

38

**TABLE OF EXHIBITS TO**
**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT AND RESPONSE TO OPPOSITION TO PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**Exhibit No.  Title**

17.  Excerpts of deposition transcript of Daniel Webster

18.  Supplemental Declaration of Daniel Webster

19.  Third Supplemental Declaration of Daniel Webster

20.  Excerpts of deposition transcript of Andy Johnson

21.  Excerpts of deposition transcript of James Johnson

22.  Excerpts of deposition transcript of Diane Armstrong

23.  Excerpts of deposition transcript of Scott Miller

24.  Excerpts of deposition transcript of John Clark

25.  Excerpt of deposition transcript of Stephen Schneider, designee of Atlantic Guns

26.  Confidential stipulation (filed under seal)

27.  Declaration of Lieutenant Padraic Lacy

28.  Yearly Count of Firearm Transfer by Gun Type

29.  Excerpts of deposition transcript of Captain James Russell

30.  Excepts of deposition transcript of Carlisle Moody

31.  Supplemental Declaration of Mary Scanlan