IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
|     *Plaintiffs*, | * | |
| v. | * | No. 1:16-cv-03311-ELH |
| LAWRENCE HOGAN, *et al.* | * | |
|     *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
### TO STRIKE OPINIONS OF DEFENDANTS' EXPERTS

The plaintiffs' motion to strike the opinions of defendants' experts is meritless and should be denied. Each of the witnesses—former Baltimore County Police Chief James Johnson, Maryland State Police Captain James Russell, and Professor Daniel Webster, Sc.D., Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health—offers relevant and admissible expert opinion testimony under Federal Rule of Evidence 702. For the reasons that follow, none of the paragraphs in these experts' declarations should be stricken.

### ARGUMENT

**I.   CHIEF JOHNSON'S AND CAPTAIN RUSSELL'S EXPERT OPINIONS ARE BASED ON THEIR EXTENSIVE LAW ENFORCEMENT EXPERIENCE AND ARE ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 702.**

The plaintiffs' motion to strike portions of Chief Johnson's and Captain Russell's declarations should be denied because the law enforcement experts' opinions are based on

their extensive experience, specialized knowledge, training, and skills in firearms safety and training and, thus, are admissible under Federal Rule of Evidence 702 ("Rule 702"):

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Despite the experts' extensive knowledge, experience, and training in law enforcement generally, and firearm safety training in particular, the plaintiffs contend that Chief Johnson's and Captain Russell's opinions are not "based on sufficient facts or data" as required by Rule 702(b), because they are not based on "statistical or empirical evidence" (ECF 133 at 4) or "empirical research" (*id.* at 6). According to the plaintiffs, absent such statistical evidence or empirical research, Chief Johnson's and Capt. Russell's expert opinions, based on their respective 39 and 21 years of law enforcement experience, are merely "*ipse dixit*." (*Id.* at 6, 7.) The plaintiffs are wrong.

The text of Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience." Fed R. Evid. 702 advisory committee's notes to 2000 amendments. "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* Here, Chief Johnson and Captain Russell both opined about the potential public safety benefits of the Handgun Qualification License ("HQL") requirement

based on their extensive experience as law enforcement officers and their knowledge, training, and observations amassed during their law-enforcement careers. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Courts routinely admit this type of expert testimony. *See e.g.*, *Woollard v. Gallagher*, 712 F.3d 865, 877 n.6 (4th Cir. 2013) (relying on the declarations of three law enforcement officers based on their "law enforcement experience in Maryland" to find firearms law satisfied intermediate scrutiny); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 781 (D. Md. 2014), *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) (admitting expert testimony of law enforcement officers in challenge to Maryland's assault weapons and large-capacity magazine bans "based on their personal knowledge and experiences"); *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 954 (8th Cir. 2000) (police detective qualified as an expert on theft in insurance case where he had investigated thefts in the area for several years and had special knowledge of jewelry theft); *Ernst v. Ace Motor Sales, Inc.*, 550 F. Supp. 1220, 1223-24 (E.D. Pa. 1982) (officer's expert testimony admissible where he was chief of police for eight years, had received formal training in accident investigation, and had investigated hundreds of accidents, because "he surely possessed the requisite 'knowledge, skill, experience, training or education' required under R. 702").

  Chief Johnson testified based on his 39-years of law enforcement experience, which included being the Chief of the 20th largest police department in the United States (ECF 125-14, Decl. of James Johnson ¶ 2), and during which time he "conducted hundreds of presentations on firearm safety, including trainings on the safe handling, cleaning,

unlocking, securing, transporting, storing, and firing of firearms" (*id.* ¶ 3); "spent hundreds of hours handling various types of handguns" (*id.* ¶ 4); was aware of the causes of and responded to "numerous incidents of accidental discharges of handguns in Maryland" (*id.* ¶ 14); and had exposure to cases involving straw purchases of firearms (*id.* ¶ 11) and school-related firearms incidents where minors accessed firearms improperly stored in the home (*id.* ¶ 15).  It was based on this experience that he opined about the importance of the HQL firearm safety training and live-fire requirements in furthering public safety through enhancing proper storage, transport, and handling of firearms; reducing access of firearms to prohibited persons, including minors; reducing the incidence of accidental shootings; and, in concert with the fingerprint requirement, deterring straw purchases.

      Captain Russell testified based on his 21 years of law enforcement experience, which includes thousands of hours teaching firearms safety training to hundreds of police candidates, sworn officers, retired officers and others, and during which time he "witnessed firearms safety students engage in dangerous conduct on the firing range, including pointing loaded handguns in the direction of others, placing their fingers on the trigger of a loaded handgun at inappropriate times and failing to recognize that a round of ammunition can remain in the gun's firing chamber even after the magazine is removed." (ECF 125-13, Decl. of James Russell ¶¶ 2, 10, 15.)  Capt. Russell's extensive experience in firearms safety training allows him to draw conclusions based on what he has observed concerning in-person firearm safety training and its effects on safe handgun handling and operation.  Based on this experience, he testified that the HQL training and live-fire requirements would further the State's interest in public safety in a number of ways,

including reducing accidental discharges, promoting proper storage, reducing access of firearms to criminals and minors, and mitigating the risk of injury or death by gunshot.

Notably, the plaintiffs have not challenged the sufficiency of the experience, skill, or training on which both Chief Johnson's and Captain Russell's expert testimony rely. The plaintiffs, therefore, misplace reliance on *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911, 917 (4th Cir. 2004), in which the district court did not abuse its discretion in excluding expert testimony in a products liability case where the expert had "no training" relevant to the product at issue. Here, in contrast, the expert opinions of Chief Johnson and Captain Russell are not mere unsupported assertions, as the plaintiffs erroneously contend. They are "conclusion[s] from a set of observations based on extensive and specialized experience" in law enforcement, *Kumho*, 526 U.S. at 156—experience that the plaintiffs have not challenged. The expert opinions of Chief Johnson and Captain Russell based on their decades of unchallenged law enforcement experience, training, and observations are admissible, and the plaintiffs' motion to exclude paragraphs 7-15 and 17-18 of Chief Johnson's declaration and paragraphs 13 and 17-25 of Captain Russell's declaration should be denied.

II. **PROFESSOR WEBSTER'S EXPERT OPINIONS ARE HIGHLY RELEVANT TO THE ISSUES IN THIS CASE AND ARE ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 702.**

The plaintiffs do not challenge the qualifications of Professor Daniel Webster, Sc.D. Professor Webster is Professor of Health Policy and Management and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of

Public Health.  (ECF 125-11, Decl. of Daniel Webster ¶ 1.)  Over his three-decade-long career, Professor Webster has devoted much of his research to gun-related injuries and violence, has researched and written numerous studies related to gun violence and prevention, and has published 121 articles in scientific, peer-reviewed journals.  (*Id.* ¶¶ 1-4.)  Professor Webster is qualified to testify as an expert on the issue of gun violence and prevention and his opinions are admissible.

The plaintiffs erroneously argue that Professor Webster's opinions based on his empirical, peer-reviewed research of the effects of permit-to-purchase laws in Missouri and Connecticut "do not fit the facts of this case" because, although the laws share some similarities with Maryland's HQL law, they are not identical to Maryland's HQL law.  (ECF 133 at 8-9.)  Professor Webster, however, explained in his expert testimony that all three state laws shared a critical component that was "most important," which is that "if you were going to purchase a handgun, you needed to get a permit.  And that was always step one."  (Ex. 1, Tr. of Dep. Daniel Webster at 178-79; *see also* Ex. 2, Supplemental Declaration of Daniel W. Webster, ¶ 13, filed previously as ECF 89-8.)[1]

Moreover, the plaintiffs simply misunderstand the nature of Professor Webster's testimony.  Professor Webster relied on his empirical, peer-reviewed research of the effects of permit-to-purchase laws, similar to Maryland's HQL law, in other states to opine on the effect of such laws generally and what impact Maryland's similar law might have on

---

[1] Professor Webster testified that both Connecticut's and Maryland's laws require applicants receive firearm safety training, submit fingerprints, and pass a background check.  (Ex. 1, Webster Dep. at 44; ECF 125-11, Webster Decl. ¶ 14.)

6

reducing the negative effects of gun violence. This evidence bears directly on the ultimate issue in this case, which is whether there is substantial evidence in the record to support the General Assembly of Maryland's predictive judgment that enacting the HQL law will further public safety.

As this Court explained in a prior challenge to provisions enacted in Maryland's Firearm Safety Act of 2013, "[i]n attempting to further the state's important interests, the legislature is not required to refrain from acting until it has evidence demonstrating proposed legislation will certainly have the desired effects. It is allowed to make predictions." *Kolbe*, 42 F. Supp. 3d at 779 (relying on "flexible" inquiry under Rule 702 to reject plaintiffs' argument that "expert opinions may not be considered in determining the constitutionality" of firearms laws "unless they are stated with [a reasonable degree of] scientific certainty"). In such cases, courts "defer to those predictions as long as they are the result of reasonable inferences and deductions based on substantial evidence." *Id.* (citing *Turner Broadcasting Sys., Inc. v. F.C.C.,* 512 U.S. 622, 665 (1994) ("Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which empirical support may be unavailable.")). Professor Webster's research on the effects of permit-to-purchase laws in other states, about which he testified to the General Assembly, are highly relevant to whether the General Assembly's predictions were based on substantial evidence.

Tellingly, the plaintiffs fail to cite a single case in which expert testimony based on the outcomes of similar, but not identical, public policies has been excluded because those states' experiences enacting similar public policies do not fit the facts of the case at hand.

7

Instead, they rely only on *Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 493 (D. Md. 2000), *aff'd sub nom. Berger v. Ford Motor Co.*, 95 F. App'x 520 (4th Cir. 2004). In that case, Ford challenged a particular test used by plaintiffs' expert to evaluate an automobile's safety because the test "lack[ed] an objective protocol for implementation," was not capable of duplication when "performed successively under the same or substantially identical conditions," was similar to a test that had been "criticized in peer-review literature," and had "not been accepted within the automotive industry." The holding in that case, that an unreliable test to evaluate an automobile's safety was inadmissible to prove the highly-specific issue concerning the cause of an automobile's malfunction, is inapposite to this case, which involves the legislature's predictive judgments about what types of public policies relating to firearms will best promote public safety. Professor Webster's expert opinions, based on his numerous studies related to gun violence and its prevention, including 121 articles published in scientific, peer-review journals, are relevant to the ultimate issue in the case; namely, whether there is a reasonable fit between the HQL requirement and Maryland's substantial governmental interests in public safety and reducing the effects of firearms violence. His opinions about the potential effects of the HQL law based on his empirical, peer-reviewed research of the effects of similar, but not identical, laws clearly fit the facts of this case and are admissible.

      Finally, the plaintiffs' challenge to paragraph 17 of Professor Webster's declaration also must fail. The plaintiffs contend that Professor Webster's opinion in Paragraph 17 of his Declaration (ECF 125-11) should be struck because it relies on "incorrect data" to support his opinion that the HQL law is associated with a 48 percent reduction in firearm

8

homicide rates in Maryland's large urban counties. Plaintiffs' claim is meritless because, as explained in Professor Webster's supplemental report, the studies' authors have analyzed the corrected data, and Professor Webster, using the corrected data, has found that the "estimates for the effects in the Maryland jurisdictions were largely unchanged from what I included in my original expert report in this case; we continue to see statistically significant large reductions in firearm homicide rates in the large urban jurisdictions excluding Baltimore City." (ECF 125-11, Webster Decl. ¶ 17 & n.5; Decl. Ex. 3, Suppl. to Expert Report of Daniel Webster 1-2.) Further, contrary to the plaintiffs' claim, the study on which Professor Webster based his Maryland-specific analysis has not been retracted; rather the authors submitted the revised data and analysis to the journal as an erratum. (*Id.*) Given that the data for Maryland has remained unchanged and that Professor Webster did not rely on any incorrect data in his declaration, the plaintiffs' motion to strike paragraph 17 of his declaration should be denied.

Plaintiffs also seek to strike certain portions of Professor's Webster's Second Supplemental Declaration (ECF 125-12), which was submitted in further support of defendants' pending motion for summary judgment. Plaintiffs assert various reasons why the published studies relied upon by Professor Webster are "flawed" and the product of alleged "cherry picking" and "data dredging." (ECF 133 at 11.) In support of these contentions, plaintiffs' rely on a supplemental declaration from their own expert, Gary Kleck. (ECF 135-29.) However, as shown in the Third Supplemental Declaration of Daniel Webster, attached hereto as Exhibit 3, Professor Kleck's assertions concerning the

purported flaws in Professor Webster's research are plainly wrong.  Webster Third Supp. Decl., Ex. 3.

Furthermore, at most, plaintiffs' arguments illustrate disagreements between Professor Webster and Professor Kleck.  As plaintiffs themselves have argued in their own filings in this case, "such conflicts between the testimonies of expert witnesses 'go[] to the credibility of expert testimony, not its admissibility.'"  Plaintiffs Opposition to Defendants' Motion to Strike Opinion Testimony, ECF 94 at 9, quoting *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1185 (11th Cir. 2013); *see also Heckman v. Ryder Truck Rental, Inc.*, No. CIV. CCB-12-664, 2014 WL 3405003, at *3 (D. Md. July 9, 2014) (denying motion to exclude expert testimony because arguments over methodology are "appropriate fodder for cross-examination" and "go only to the weight of [expert's] testimony, not its admissibility."  Defendants' motion should be denied.

## CONCLUSION

For the foregoing reasons, the plaintiffs' Motion to Strike Opinions of Defendants' Experts James Johnson, James Russell, and Daniel Webster should be denied in its entirety.

                              Respectfully Submitted,

                              BRIAN E. FROSH
                              Attorney General

                              */s/ Robert A. Scott*
                              ROBERT A. SCOTT (Fed. Bar #24613)
                              RYAN R. DIETRICH (Fed. Bar #27945)
                              Assistant Attorneys General
                              200 St. Paul Place, 20th Floor
                              Baltimore, Maryland 21202
                              410-576-7055 (tel.); 410-576-6955 (fax)
                              rscott@oag.state.md.us

Dated: March 8, 2021               Attorneys for Defendants