# EXHIBIT 3

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF MARYLAND
3
4    -------------------------------x
     MARYLAND SHALL ISSUE, INC.,
5
     et al.,
6
                     Plaintiffs,
7
      v.                                    Civil Case No.
8
     LAWRENCE HOGAN, et al.,                16-cv-3311-MJG
9
                     Defendants.
10   -------------------------------x
11
12
13             Deposition of GARY KLECK
14                Baltimore, Maryland
15                   May 18, 2018
16                   10:02 a.m.
17
18
19
20   Job No.:  190812
21   Pages:  1 - 52
22   Transcribed by:  Bobbi J. Fisher, RPR
```

Transcript of Gary Kleck
Conducted on May 18, 2018

20

1  Q.  Have you done any study or analysis to
2  determine if the training required by the Maryland
3  HQL law has reduced the number of accidental
4  shootings in Maryland?
5  A.  No.
6  Q.  Are you aware of any such studies?
7  A.  No.
8  Q.  Are you aware of any empirical facts or
9  data that show whether the training required by the
10 Maryland HQL law has reduced the number of
11 accidental shootings in Maryland?
12 A.  No.
13 Q.  So in light of that testimony, you would
14 agree that you don't know one way or the other
15 whether the training required by Maryland's HQL law
16 has reduced accidental shootings in Maryland?
17      MR. SWEENEY:  Objection.
18 A.  That's correct.  I don't know one way or
19 the other.
20 Q.  Do you have an understanding of whether a
21 background check was required under Maryland and/or
22 federal law prior to the enactment of the HQL law?

Transcript of Gary Kleck
Conducted on May 18, 2018
21

```
 1        A.   Yes.  My understanding was that it was
 2   such a requirement.
 3        Q.   And do you know what the prior background
 4   check consisted of?
 5        A.   I'm not sure I understand.  What do you
 6   mean "consisted of"?  You mean who was prohibited
 7   or --
 8        Q.   No, no, no.
 9             What background check was conducted?
10        A.   Well, the federal procedure that
11   prevailed before the HQL was implemented was that
12   you would go to the seller and identify yourself
13   and provide suitable identification and they would,
14   in turn, contact a law enforcement database and a
15   background check would be performed, and if you
16   passed, the sale would go through, and if you were
17   denied, it would, at least for a time, the sale
18   would not go through.
19        Q.   Do you have any understanding of whether
20   there is a difference between the background check
21   that was conducted prior -- in Maryland -- prior to
22   the HQL law and the background check that's
```

1  required under the HQL law?
2      A.   I'm not aware of any difference.
3      Q.   Did the background check that was in
4  effect prior to the HQL require that the --
5      A.   Hold on; can I revise that answer?
6      Q.   Yes.
7      A.   My understanding is that, under the HQL,
8  the background check also applies to private
9  transfers of firearms; in other words, non-dealer
10 transfers, whereas, at least the federal background
11 check that prevailed before the HQL only covered
12 dealer transfers.
13     Q.   Do you have an understanding of whether
14 the -- whether Maryland law required a background
15 check or private sales of handguns prior to the HQL
16 law?
17     A.   I don't think it did, but I'm not certain
18 about that.
19     Q.   Did the background check that was
20 required by Maryland law prior to the HQL law
21 require that the applicant be fingerprinted?
22     A.   I don't know.

Transcript of Gary Kleck
Conducted on May 18, 2018                                    23

1      Q.   You would agree that the purpose of
2  requiring a background check prior to the purchase
3  of a handgun is to prevent certain individuals who
4  were not qualified to own handguns from acquiring
5  them; is that correct?
6           MR. SWEENEY:  Objection.
7      A.   Yes.
8      Q.   And you would agree that, under federal
9  law and Maryland law, that certain persons are
10 prohibited from purchasing a handgun; correct?
11     A.   Yes.
12     Q.   And that includes convicted felons;
13 correct?
14     A.   Yes.
15     Q.   And includes individuals convicted of
16 certain misdemeanors involving violence; correct?
17     A.   Yes.
18     Q.   And it includes persons who have been
19 adjudicated mentally defective or who have been
20 committed to a mental institution; correct?
21     A.   Yes.
22     Q.   And it includes persons who are habitual

1   drunkards or alcoholics; correct?
2       A.   Yes.
3       Q.   Have you done any study or analysis to
4   determine if the requirement under Maryland's HQL
5   law, that an applicant be fingerprinted, has
6   reduced the number of handguns possessed by
7   convicted felons in Maryland?
8       A.   No.
9       Q.   Are you aware of any such study?
10      A.   No.
11      Q.   Are you aware of any empirical facts or
12  data that show whether the requirement under
13  Maryland's HQL law, that an applicant be
14  fingerprinted, has reduced the number of handguns
15  possessed by convicted felons in Maryland?
16      A.   No.
17      Q.   So in light of that testimony, you would
18  agree that you don't know one way or the other
19  whether the requirement under Maryland's HQL law,
20  that an applicant be fingerprinted, has reduced the
21  number of handguns possessed by convicted felons in
22  Maryland?

1           MR. SWEENEY:  Objection.
2       A.  Yes.
3       Q.  Have you done any study or analysis to
4   determine if the requirement under Maryland's HQL,
5   that an applicant be fingerprinted, has reduced the
6   number of handguns possessed by persons in Maryland
7   who are not qualified to possess handguns under
8   federal or state law?
9       A.  No, I have not done such study, and I
10  don't know of anyone else who has.
11      Q.  Are you aware of any empirical facts or
12  data that show whether the requirement under
13  Maryland's HQL law, that an applicant be
14  fingerprinted, has reduced the number of handguns
15  possessed by persons in Maryland who are not
16  qualified to possess handguns under federal or
17  state law?
18      A.  No.
19      Q.  In light of that testimony, you would
20  agree that you don't know one way or the other
21  whether the requirement under Maryland's HQL law,
22  that an applicant be fingerprinted, has reduced the

1  number of handguns possessed by persons in Maryland
2  who are not qualified to possess handguns under
3  federal or state law?
4         MR. SWEENEY:  Objection.
5      A.   Yes.
6      Q.   Are you familiar with the term "straw
7  purchaser" of a handgun?
8      A.   Yes.
9      Q.   Have you done any study or analysis to
10 determine -- well, strike that.
11         What does that term mean to you?
12     A.   A straw purchaser is a person who is
13 legally eligible to buy a gun, and they represent
14 themselves to the seller as if they were the true
15 purchaser when, in fact, they are fronting for
16 someone else who is providing the money for the
17 purchase and who is presumably not qualified;
18 otherwise, they'd have no motive for doing it,
19 although that's not technically part of the
20 definition.
21     Q.   Have you done any study or analysis to
22 determine if the requirement under Maryland's HQL

```
 1   law, that an applicant be fingerprinted, has
 2   reduced the number of straw purchases of handguns
 3   in Maryland?
 4        A.   No.
 5        Q.   Are you aware of any empirical facts or
 6   data that show whether the requirement under
 7   Maryland's HQL law, that an applicant be
 8   fingerprinted, has reduced the number of straw
 9   purchases of handguns in Maryland?
10        A.   No.
11        Q.   In light of that testimony, you would
12   agree that you don't know one way or the other
13   whether the requirement under Maryland's HQL law,
14   that an applicant be fingerprinted, has reduced the
15   number of straw purchases of handguns in Maryland?
16             MR. SWEENEY:  Objection.
17        A.   Yes.
18        Q.   Have you done any study or analysis to
19   determine if the training required by Maryland's
20   HQL law has had any effect on compliance with
21   Maryland law regulating the storage of handguns in
22   the home?
```

Transcript of Gary Kleck
Conducted on May 18, 2018
28

```
 1        A.   No.
 2        Q.   Are you aware of any empirical facts or
 3   data that show whether the training required by
 4   Maryland's HQL law has had any effect on compliance
 5   with Maryland law regulating the storage of
 6   handguns in the home?
 7        A.   No.
 8        Q.   In light of your testimony, you would
 9   agree that you don't know one way or the other
10   whether the training required by Maryland's HQL has
11   enhanced compliance with Maryland law, regulating
12   the storage of handguns in the home?
13             MR. SWEENEY:  Objection.
14        A.   Yes.
15        Q.   Have you done any study or analysis to
16   determine if the enactment of Maryland's HQL law
17   has reduced the amount of gun crime in Maryland?
18        A.   Could you repeat that question, please?
19             MR. SCOTT:  Could you read it back,
20   please?
21             COURT REPORTER:  I cannot.
22             MR. SCOTT:  Oh, okay.
```

```
1    BY MR. SCOTT:
2         Q.    Have you done any study or analysis to
3    determine if the enactment of Maryland's HQL law
4    has reduced the amount of gun crime in Maryland?
5         A.    No.
6         Q.    Are you aware of any such studies?
7         A.    I'm aware of Professor Webster's studies
8    where he attempted to do that, but I don't think
9    there's any reliable findings yielded by that
10   research.
11        Q.    Are you aware of any other such studies?
12        A.    No.
13        Q.    Are you aware of any empirical facts or
14   data that show whether the enactment of Maryland's
15   HQL law has reduced the amount of gun crime in
16   Maryland?
17        A.    Again, the answer would be the same,
18   given that homicide is one kind of crime, and so,
19   yes, I mean, Webster's attempted to evaluate that,
20   and I don't think it yielded any reliable
21   information.
22        Q.    All right.  So other than Professor
```

Transcript of Gary Kleck
Conducted on May 18, 2018

30

```
 1   Webster's study, you're not aware of any empirical
 2   facts or data that show whether the enactment of
 3   Maryland's HQL law has reduced the amount of gun
 4   crime in Maryland?
 5        A.   When I refer to Professor Webster's
 6   research, I'm referring to three studies, not just
 7   one study, and I would include, for example, the
 8   Kerfazi (ph), et al., the "et al." including
 9   Webster has one of the authors.
10        Q.   All right.  So other than those -- the
11   three studies involving Professor Webster, you're
12   not aware of any empirical facts or data that show
13   whether the enactment of Maryland's HQL law has
14   reduced gun crime in Maryland?
15             MR. SWEENEY:  Objection.
16        A.   Yes.
17        Q.   And in light of your testimony, you would
18   you don't know one way or the other whether the
19   enactment of Maryland's HQL law has reduced the
20   amount of gun crime in Maryland; correct?
21             MR. SWEENEY:  Objection.
22        A.   Yes.
```

1      Q.   Have you done any study or analysis to
2   determine if the enactment of Maryland's HQL law
3   has reduced the number of suicides by handguns in
4   Maryland?
5      A.   No.
6      Q.   Are you aware of any such studies?
7      A.   No.
8      Q.   Are you aware of any empirical facts or
9   data that show whether the enactment of Maryland's
10  HQL law has reduced the number of suicides by
11  handguns in Maryland?
12     A.   No.
13     Q.   And in light of that testimony, you would
14  agree that you don't know one way or the other
15  whether the enactment of Maryland's HQL law has
16  reduced the number of suicides by handguns in
17  Maryland?
18          MR. SWEENEY:  Objection.
19     Q.   Is that correct?
20     A.   Yes.
21     Q.   All right.  In your report, which is
22  Exhibit 118, you discuss Professor Webster's

1  don't know what it indicates.
2       Q.   Are you -- do you have any legal
3  training?
4       A.   No.
5       Q.   Let's refer to your C.V., which is
6  included in the report.  It was previously marked
7  as Exhibit 118.  I believe your C.V. begins on page
8  46.
9            I notice that you have a separate section
10 under publications under C.V. for articles in
11 peer-reviewed journals.  That starts on page 49.
12 Is that correct?
13      A.   Yes.
14      Q.   And what is the significance of an
15 article being peer reviewed?
16      A.   When an author submits an article to a
17 professional journal, the journal will send it out
18 to people who are hopefully experts on the same
19 topic, and they'll make an evaluation and a
20 recommendation as to whether or not it ought to be
21 published.
22           So it serves as a screening purpose.  The

1 | purpose is, at least theoretically, to preclude the
2 | worst research from being published.
3 |     Q.   Are peer-reviewed articles likely -- are
4 | peer-reviewed articles more likely to be accepted
5 | as valid by a researcher's colleagues than
6 | non-peer-reviewed articles?
7 |     A.   Yes.  Rightly or wrongly, that's true.
8 |     Q.   Your report references an article that
9 | you published in 2009 called "The Myth of Big-time
10 | Gun Trafficking" in the "UCLA Law Review" with
11 | Shun-Yung Wang; is that correct?
12 |     A.   Yes.
13 |     Q.   Was that article peer reviewed?
14 |     A.   I'm not sure.  Law reviews typically
15 | don't have peer review, but on occasion, they do,
16 | and it's possible they did in that case.  I really
17 | don't remember.
18 |     Q.   But you would agree that articles in law
19 | reviews are typically not peer reviewed?
20 |     A.   That is correct.
21 |     Q.   You also list a 2013 article in your C.V.
22 | that was published in the Fordham Urban Law

```
 1   Journal.  Was that article peer reviewed?
 2        A.   No.  I mean, it's misplaced and it
 3   probably should have been in the other articles
 4   section.
 5        Q.   What about the 1999 article in the
 6   St. Louis University Law Review?  Was that peer
 7   reviewed?
 8        A.   I'm not sure about that one.
 9        Q.   When were you first contacted about this
10   case?
11        A.   Oh, I couldn't really tell you for sure
12   but sometime in the past year or so.
13        Q.   And who contacted you initially?
14        A.   I think it might have been Jay -- Jay --
15   it's John's law firm, but I forget the guy's last
16   name.
17        Q.   So it was somebody at Mr. Sweeney's firm?
18        A.   It was.
19        Q.   Other than the documents that you
20   provided in response to the subpoena today, were
21   you provided with any factual information about
22   this case from anybody in Mr. Sweeney's firm?
```