# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., et al.,   )
                                         )

Plaintiffs,                        )

v.                               )   Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, et al.,          )

Defendants.                  )

**Plaintiffs' Reply Memorandum in Support of Cross-Motion for Summary Judgment**

John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

*Counsel for Plaintiff Atlantic Guns, Inc.*

Cary J. Hansel (Bar No. 14722)
HANSEL LAW, P.C.
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Dated: April 14, 2021                                *Counsel for Plaintiffs*

**Table of Contents**

Table of Contents..................................................................................................... i

Table of Authorities ................................................................................................ ii

Introduction............................................................................................................. 1

Argument ................................................................................................................. 1

    I.     Defendants fail to create any genuine dispute of fact that the HQL requirement violates the Second Amendment. ....................................... 1

         A.    It is undisputed that the HQL requirement is inconsistent with the Second Amendment's text, history, and tradition........................................ 1

         B.    It is undisputed that the HQL requirement burdens the core right of the Second Amendment. .................................................................. 3

         C.    It is undisputed that the HQL requirement burdens the core right without a concomitant benefit................................................................. 6

    II.    The undisputed facts establish that the HQL requirement violates the Second Amendment.................................................................................. 8

         A.    Defendants never argue that the HQL requirement is consistent with the Second Amendment's text, history, and tradition............................... 8

         B.    Defendants never argue that the HQL requirement satisfies strict scrutiny............................................................................................. 9

         C.    Defendants cannot meet their intermediate scrutiny burden under any formulation............................................................................................. 13

             1.    Defendants fail to establish that the HQL requirement alleviates any real problem in a direct and material way............. 14

             2.    Defendants fail to establish that the HQL requirement is narrowly tailored or reasonably adapted to a state interest........... 16

                 a.    The fingerprinting requirement is unnecessary and ineffective. ...................................................................... 17

                 b.    The classroom training and live-fire requirements are unnecessary and ineffective. ............................................. 18

             3.    The HQL requirement was not based upon substantial evidence. ......................................................................................... 19

Conclusion .............................................................................................................. 20

Certificate of Service .............................................................................................. 22

i

Table of Authorities

Page(s)

**Cases**

*Chisolm v. TransSouth Fin. Corp.*,
  95 F.3d 331 (4th Cir. 1996) ............................................................ 9, 13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................................... *passim*

*Edenfield v. Fane*,
  507 U.S. 761 (1993)............................................................................ 14

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................... 9

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993)............................................................................ 15

*Gallagher v. New York State Bd. of Elections*,
  477 F.Supp.3d 19 (S.D.N.Y. 2020)..................................................... 11

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).............................................................................. 7

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................................... 4, 9, 19

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (9th Cir. 1977) .................................................................. 14

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) (en banc) ......................................... *passim*

*McCullen v. Coakley*,
  573 U.S. 464 (2014)............................................................................ 13

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ............................................................... 9

*National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
  Explosives*,
  700 F.3d 185 (5th Cir. 2012) ........................................................... 1, 2

*Packingham v. N.C.*,
  137 S. Ct. 1730 (2017)........................................................................ 13

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.,*
  584 F. Supp. 2d 766 (D. Md. 2008) ................................................................. 14

*Saenz v. Roe,*
  526 U.S. 489 (1999) ............................................................................................. 6

*Silvester v. Becerra,*
  138 S. Ct. 945 (2018) ........................................................................................ 14

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
  502 U.S. 105 (1991) .......................................................................................... 10

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) .......................................................................................... 14

*Turner Broad Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ................................................................................... 14, 17

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................................. 2

*United States v. Nat'l Treasury Emps. Union,*
  513 U.S. 454 (1995) .......................................................................................... 14

*Whole Woman's Health v. Hellerstedt,*
  136 S. Ct. 2292 (2016) ...................................................................................... 11

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ........................................................................... 9

**Statutes**

MD Code, Gen. Prov., § 4-325(a)(1) ................................................................... 3

MD Code, Public Safety, § 5-117.1(a) ............................................................... 11

MD Code, Public Safety, § 5-117.1(e) .......................................................... 11, 18

MD Code, Public Safety, § 5-117.1(f)(3) ........................................................... 17

**Other Authorities**

Alec MacGillis, *How to Stop a Police Pullback*, The Atlantic (Sept. 3, 2020)
  *available at* https://www.theatlantic.com/ideas/archive/2020/09/how-stop-
  police-pullback/615730 .................................................................................... 12

Letter of Dan Friedman, Counsel to the General Assembly, to the Honorable
  Brian Frosh, *Re: Senate Bill 281, The "Firearm Safety Act of 2013,"* January
  29, 2013 ................................................................................................................. 5

Maryland Network Against Domestic Violence, *2019 Homicide Prevention Report*, *available at* https://issuu.com/mnadv/docs/2019_dv_homicide_prevention_report ................................. 12

Maryland State Police, Crime in Maryland: 2017 Uniform Crime Report, *available at* https://mdsp.maryland.gov/Document%20Downloads/2017%20Uniform%20 Crime%20Report.pdf ............................................................................................ 12

Phil Davis and Phillip Jackson, *With Baltimore close to the 300-homicide mark again, leaders mull new approaches amid some signs of improvement*, The Baltimore Sun, Nov. 20, 2020, *available at* https://www.baltimoresun.com/news/crime/bs-md-ci-cr-300-homicides-2020-20201120-iwgbid4dezdplkdqz5g3ocr3wu-story.html ........................................... 11

Phillip Jackson, *Maryland said it has released 2,000 inmates from prisons and jails to slow the spread of Coronavirus*, The Baltimore Sun (Apr. 21, 2020), *available at* https://www.baltimoresun.com/coronavirus/bs-md-maryland-prisons-release-inmates-coronavirus-20200421-yc52bbol5jevnbkgeqnbn47hjy-story.html .......................................................... 12

U.S. Const. amend. I ........................................................................................... 9, 13

U.S. Const. amend. II ........................................................................................ *passim*

## Introduction

Eight years after the HQL requirement's enactment, Defendants admit tens of thousands Marylanders have started but failed to complete the arduous process of obtaining an HQL. Law-abiding citizens wishing to acquire a handgun are delayed by a month or more or completely frustrated into giving up the effort entirely. At the same time, Defendants can point to no progress made in achieving the public safety goals they claim justify the law. This Court should strike the HQL requirement because it violates the Second Amendment right to keep and bear arms.

## Argument

Defendants' Opposition confirms the undisputed facts demonstrate that the HQL requirement violates the Second Amendment because it is inconsistent with the Supreme Court's text, history, and tradition test. Defendants do not even engage in this dispositive analysis. Defendants' Opposition also confirms the undisputed facts demonstrate that the HQL requirement also fails the Fourth Circuit's two-part analysis because it significantly burdens exercise of Second Amendment rights by law-abiding citizens without providing a concomitant benefit.

## I. Defendants fail to create any genuine dispute of fact that the HQL requirement violates the Second Amendment.

Plaintiffs' Cross-Motion sets forth dozens of undisputed material facts spanning more than 15 pages. (Doc. 135-1, Pltfs. Mem., at 5–22.) Defendants attempt (unsuccessfully) to dispute only a handful of these facts and fail to create any genuine disputes of material fact because their admissions foreclose any genuine dispute.

### A. It is undisputed that the HQL requirement is inconsistent with the Second Amendment's text, history, and tradition.

Defendants do not dispute that the HQL requirement is inconsistent with the Second Amendment's text, history, and tradition. Defendants do not even defend their initial assertion that the colonial-era laws cited in *National Rifle Association of America, Inc. v. Bureau of Alcohol,*

*Tobacco, Firearms, & Explosives* ("*BATFE*"), 700 F.3d 185 (5th Cir. 2012), offer historical support for the HQL requirement. (*See* Doc. 125-1, Defs. Mem., at 11 (citing *BATFE*, 700 F.3d at 200) (citing laws that "[kept] track of who in the community had guns").) For the unrefuted reasons explained in Plaintiffs' Cross-Motion, the laws cited in *BATFE* are not analogous to the HQL requirement because they did not create prerequisites to acquisition (like the HQL requirement) but created registries of already-obtained arms. (Doc. 135-1, Pltfs. Mem., at 26–27.)

Rather than argue that the HQL requirement is consistent with the Second Amendment's text, history, and tradition, Defendants cursorily reference the brief of amicus Everytown for Gun Safety. (Doc. 140, Defs. Opp., at 16.) This amicus brief does not rely upon *BATFE* or provide any other evidence that the HQL requirement is consistent with the Second Amendment's text, history, or tradition. It instead admits that the permit-to-purchase laws analogous to the HQL requirement did not exist until "the early twentieth century," more than 120 years after the Second Amendment's ratification. (Doc. 129, Amicus Br., at 5–6, 8.) Because *District of Columbia v. Heller* adopted "the original understanding of the Second Amendment," 554 U.S. 570, 625 (2008), the relevant historical inquiry is "at the time of ratification," *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (citing *Heller*, 554 U.S. at 625), rendering the laws cited in the amicus brief irrelevant. The amicus brief also argues that the training portion of the HQL requirement is consistent with the Second Amendment's history and tradition because "at the time of the Second Amendment's ratification, nearly all states required firearms training." (Doc. 129, Amicus Br., at 10.)

Amicus cites a number of founding-era laws that required militiamen to train on the arms they had already acquired. (*Id*. at 10–11.) These laws only show that at the time of ratification, militiamen acquired their firearms before undergoing state-sponsored training—not as a

prerequisite to ownership, as the HQL requirement mandates. (*Id*. ("State laws in effect at the time of ratification define the membership of the militia (generally able-bodied men under the age of 50), *the weapons a militiaman must own*, and the regular training a militiaman must undergo.") (emphasis added).) The amicus brief cites no founding era laws requiring training as a prerequisite to firearm ownership, demonstrating that these laws are not analogous to the HQL requirement.

### B. It is undisputed that the HQL requirement burdens the core right of the Second Amendment.

Defendants do not dispute that since the HQL requirement took effect through January 15, 2021, 71,701 individuals started an HQL application but never submitted it as final to Maryland State Police. (Doc. 135-1, Pltfs. Mem., at 13; Feb. 26, 2021 email from R. Scott, attached as Exhibit 1.) These individuals wished to exercise their Second Amendment right to possess a handgun in their homes—and even began the process to do so—but were inhibited from doing so by the burdens attendant to the HQL requirement. A number of these applicants tried multiple times but could not overcome the HQL requirement's burdens. (*Id*. (99,598 applications were begun but never submitted as final during the same time period).) Defendants argue that this information is not reliable because Plaintiffs have not identified these individuals and ascertained the precise reasons they did not complete an HQL application. That is simply smoke meant to obscure the obvious burden of the HQL application process. Plaintiffs have no way to identify these individuals because this information is confidential under Maryland law. MD Code, Gen. Prov., § 4-325(a)(1). Defendants could likely provide such information but have not done so. On summary judgment, that failure warrants an inference that such information would be adverse to Defendants.

In light of the unrefuted evidence of attempted but incomplete applications, Defendants cannot dispute that the HQL requirement has prevented tens of thousands of Maryland citizens who wished to possess a handgun in their homes from doing so. Because this fact is undisputed,

Defendants cannot dispute that the HQL requirement has the effect of "prevent[ing] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose," a fact that Defendants recognize warrants strict scrutiny review. (Doc. 125-1, Defs. Mem., at 14–15 (quoting *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1257–58 (D.C. Cir. 2011)).)

Defendants fail to dispute that Maryland enacted the HQL requirement to "intimidat[e]" law-abiding, responsible Maryland citizens from exercising their constitutional right to acquire a handgun for self-defense in their homes. Defendants' expert Professor Daniel Webster admitted this at his deposition. (Doc. 135-6, D. Webster Dep., at 30:1–33:16.) Defendants attempt to excuse Professor Webster's admission by falsely suggesting that he was referring only to intimidating straw purchasers. (Doc. 140, Defs. Opp., at 3.) But Professor Webster's testimony makes clear:

> Q: And what is the importance of the requirement of applying directly to law enforcement?
>
> A: Right. So, in my opinion, I think the relevance is that it is a more meaningful, I guess, application, perhaps, frankly, intimidating of sort of underscoring what's at stake here. . . .

(Doc. 135-6, D. Webster Dep., at 30:1–22.) Professor Webster went on to note that this was particularly important in the context of straw purchasers. (*Id*. at 31:1–14.) But Professor Webster did not refute the characterization of his opinion that all "people should be intimidated to make sure they are aware of the seriousness of going into the firearms market." (*Id*. at 33:7–34:2.)

Defendants' expert Chief James Johnson also admitted that the HQL requirement was intended to intimidate citizens from exercising their citizens' right to acquire a handgun:

> Q. All right. So what is it about the fingerprinting process that in any way discourages straw purchases?
>
> A. I believe that an individual that knows that they have to render fingerprints is less likely to carry out the scheme. I believe that most individuals have a great concern or a concern about rendering their fingerprints. It's been my experience

throughout my adult life that individuals are very concerned about the government possessing their fingerprints for various reasons that they'll have to explain.

(Doc. 135-8, J. Johnson Dep., at 24:14–25:3.)

Defendants cannot genuinely dispute that the HQL requirement is the culmination of Maryland's well-documented desire to burden handgun possession through licensing schemes. Defendants admit that, in 1999, then-current Maryland Attorney General Joseph Curran "advocated for stringent registration and eligibility requirements that would have restricted all handgun possession . . . to only those with a special need, such as law enforcement." (Doc. 140, Defs. Opp., at 3–4) (emphasis removed). Defendants' recognition that Curran's goal was "obliterated" by *Heller* does not dispute that this policy goal existed. (*Id*. at 4.)

Public officials in Maryland remain at least comfortable with reducing lawful handgun ownership; the Office of the Maryland Attorney General confirmed in 2013 that the HQL requirement is meant to restrict private handgun possession. Opining on the HQL requirement's likely efficacy, the Office of the Maryland Attorney General noted in a letter to the General Assembly that there was "significant scientific evidence demonstrating the efficacy of licensure systems in keeping handguns out of criminal hands." Letter of Dan Friedman, Counsel to the General Assembly, to the Honorable Brian Frosh, *Re: Senate Bill 281, The "Firearm Safety Act of 2013,"* January 29, 2013, at 5 (attaching D.W. Webster, et al., Injury Prevention, 2001;7:184–89 (attached as Exhibit 2)). The letter relied on and attached an article by Professor Webster stating that this purported "efficacy" arises through "laws that restrict *legal* gun ownership and gun transfers such as licensing and registration" so as to "constrain the supply of guns" that could conceivably be illegally transferred to or stolen by criminals. (*Id*. at 188 (emphasis added).) In short, the HQL requirement is aimed directly at burdening the constitutional right of "legal gun ownership" and only through that burden hopes to affect crime. As explained in Plaintiffs' Cross-

Motion, legislation specifically intended to burden the exercise of a constitutional right cannot stand. (Doc. 135-1, Pltfs. Mem., at 27–30 (citing *Saenz v. Roe*, 526 U.S. 489 (1999).) At a minimum, such legislation is vastly overbroad because it is not "tailored" to a legitimate purpose. (*Id*. at 36–54.)

### C. It is undisputed that the HQL requirement burdens the core right without a concomitant benefit.

Defendants fail to dispute that the fingerprint requirement is unnecessary. Defendants do not dispute that the preexisting 77R Handgun Registration process already allowed it to disarm unqualified firearm possessors. (Doc. 140, Defs. Opp., at 6.) Defendants argue that the 77R Handgun Registration process did not "ensure reporting of every registered firearms owner who was convicted of a disqualifying offense." (*Id*.) But Defendants do not dispute that the fingerprint requirement is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government issued photographic identification of another individual who does not have a criminal record. And Defendants admit they have no evidence that anyone in Maryland fitting this description has ever attempted to purchase a handgun. (Doc. 135-7, A. Johnson Dep., at 114:4–117:7.)

Defendants fail to dispute that the fingerprint requirement is burdensome. The undisputed facts establish that the fingerprinting requirement adds a burden while purportedly addressing a problem that does not exist. And the burden is substantial, because State-approved private vendors are almost absent in vast areas of Maryland. (*See* MSI Answer to Interr. 10 (attached as Exhibit 3).) All these areas include MSI members. (*Id*.)

Defendants fail to dispute that the HQL requirement does not deter straw purchases. Chief Johnson's deposition confirms this fact:

Q. Now, fingerprinting is not, per se, going to deter a straw purchaser; correct? Because by definition a straw purchaser is an individual who can be positively identified and is qualified to purchase a handgun; correct? . . .

A: I believe that's an accurate statement.

(Doc. 135-7, J. Johnson Dep., at 24:4–12.) Chief Johnson then opined that fingerprinting may deter straw purchasers, but neither Defendants nor Chief Johnson offer evidence to support this opinion. Defendants' experts' inadmissible *ipse dixit* do not create a genuine dispute of fact. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (confirming that a court may disregard an expert's *ipse dixit*).

Defendants fail to dispute that that the HQL requirement's longer, in-person safety course requirement covers the same material as the pre-existing 77R Handgun Registration 45-minute online presentation: state firearm law, home firearm safety, and handgun mechanisms and operation. (Doc. 140, Defs. Opp., at 7.) Defendants extoll the hypothetical benefits of "having the opportunity to ask questions and receive feedback from the instructor" and a "more thorough instruction on State firearms law." *Id*. at 32–33. But again, Defendants' experts' inadmissible *ipse dixit* do not create a genuine dispute of fact. *See Joiner*, 522 U.S. at 146.

Defendants fail to dispute that the live-fire requirement imposes a significant burden without a concomitant benefit. Chief Johnson's admission that "firing one round is not adequate" forecloses such a dispute. Defendants incorrectly claim that Chief Johnson also testified that the live-fire requirement would help prevent accidental discharges by demonstrating the applicant's ability to chamber a round and clear the weapon after firing. (Doc. 140, Defs. Opp., at 8.) Chief Johnson testified in full:

> Well, personally, I think just firing one round is not adequate, but I do not think the requirement to show proficiency in discharging a round is unreasonable. Again, I would draw your attention to the process of actually chambering a round, which is an exercise in and of itself. And, you know, the average individual that's new to guns, I think, would struggle working that mechanism of the weapon, and I'm sure

7

that's a necessary component or process in actually discharging a round.

(Doc. 135-8, J. Johnson Dep., at 52:9–53:2.) Practicing "chambering a round" is just as easily accomplished by using dummy rounds or "snap caps," the use of which can be safely taught in a classroom. (135-3, Pennak Decl., at ¶¶ 8–9.) Chief Johnson did not state or even imply that firing one round would demonstrate proficiency in chambering or clearing a round. (Doc. 135-8, J. Johnson Dep., at 52:953:2.) Chief Johnson's testimony that he "thinks" that "repeat[ing] a process" of firing a firearm to create "muscle memory" does not create a dispute of fact that the live fire requirement, which requires the HQL applicant to fire only one round, provides no benefit. (Deposition of James Johnson, Exhibit 4, at 106:20–107:5.) Defendants fail to dispute that the live fire requirement effectively bans completion of the HQL training in almost all urban areas of Maryland because there is nowhere to legally discharge a firearm except at an established firing range. (Doc. 135-3, Pennak Decl., at ¶¶ 13, 21–22.) The live fire requirement thus effectively obstructs the ability of law-abiding citizens in these areas to complete the HQL training course in their residential jurisdiction.

## II. The undisputed facts establish that the HQL requirement violates the Second Amendment.

### A. Defendants never argue that the HQL requirement is consistent with the Second Amendment's text, history, and tradition.

Detailed above, Defendants make no argument that the HQL requirement is consistent with the Second Amendment's text, history, or tradition—the only proper analysis for evaluating the constitutionality of the HQL requirement. (Doc. 135-1, Pltfs. Mem., at 23–25.) Defendants' entire argument is instead dedicated to whether the HQL requirement survives intermediate scrutiny—a mode of analysis rejected by the Supreme Court. *Heller*, 554 U.S., at 634–35 (declining to adopt either Justice Breyer's explicit interest-balancing inquiry or the enhanced intermediate or strict

scrutiny often applied in the First Amendment arena). Even if the HQL requirement is not considered a permanent or outright ban, it is unconstitutional per se under *Heller* because it is inconsistent with the Second Amendment's text, history, and tradition.

Although *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc), applied the two-part approach advocated by Defendants, this Court must follow Supreme Court precedent and analyze the HQL requirement in accordance with the Second Amendment's text, history, and tradition. *See Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331, 337 n.7 (4th Cir. 1996) (circuit precedent is not binding if it is "superseded by a decision of the Supreme Court"). At least two other United States Circuit Courts of Appeal have applied the Supreme Court's categorical analysis despite intra-circuit precedent applying the two-step interest-balancing approach to laws less burdensome to the core Second Amendment right than the ones under consideration. *Compare Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), *with Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *compare Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017), *with Heller II*, 670 F.3d 1244, 1252 (D.C. Cir. 2011). As in *Wrenn*, "*Heller I*'s categorical approach is appropriate here even though [this Court's] previous cases . . . applied tiers of scrutiny to gun laws." *See* 864 F.3d at 666.

**B. Defendants never argue that the HQL requirement satisfies strict scrutiny.**

If the Court applies some measure of heightened constitutional scrutiny, it must select strict scrutiny because the HQL requirement severely burdens the acquisition of handguns by law-abiding, responsible citizens for use in the home. (Doc. 135-1, Pltfs. Mem., at 44–45 (collecting cases).) Most recently, *Kolbe* confirmed that strict scrutiny applies to a law burdening the Second Amendment's core right when it applied intermediate scrutiny to Maryland's assault rifle ban only because it "ban[ned] only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition. Those include

magazines holding ten or fewer rounds, nonautomatic and some semiautomatic long guns, and—most importantly—handguns which are 'the quintessential self-defense weapon.'" *Kolbe*, 849 F.3d at 138 (quoting *Heller*, 554 U.S. at 629).

Defendants do not dispute that the HQL requirement burdens the right of law-abiding, responsible citizens' use of handguns for self-defense in the home (the core right) (Doc. 34, at 13), and they recognize that severe burdens on the Second Amendment's core right require strict scrutiny. (Doc. 140, Defs. Opp., at 16–17.) Defendants argue that the HQL requirement does not impose a severe burden because it does "not have the effect of preventing an individual from possessing a firearm in his home or elsewhere." *Id.* at 17 (quotation omitted). But Defendants' own data proves the opposite. Even if the HQL requirement is not a statutory or outright ban, it has had the effect of preventing tens of thousands of individuals from possessing a handgun in their homes. (Doc. 135-1, Pltfs. Mem., at 13; Exhibit 1.) State action is not narrowly drawn if it regulates conduct that does not meaningfully advance the state interest at issue and is thus "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991). Defendants have no legitimate interest in suppressing handgun ownership by law-abiding Maryland citizens. Yet, the undisputed facts demonstrate that the HQL requirement effectively blocked at least one-quarter of Maryland citizens who filed HQL applications and wished to exercise their fundamental Second Amendment rights. (Doc. 135-1, Pltfs. Mem., at 34.) If the HQL requirement blocked that many individuals who actually applied, it is likely that the daunting prospect of completing an HQL application deterred many tens of thousands more. By any measure, the HQL requirement's burden is severe.

Defendants try to sweep these individuals under the rug by noting that other Maryland citizens have obtained an HQL. (Doc. 140, Defs. Opp., at 13–14.) An unconstitutional law does

not become constitutional simply because some people have complied with it or overcome its burdens. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016) (striking down law that resulted in fewer facilities providing abortions); *Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 43 (S.D.N.Y. 2020) (enjoining election law that led to 13% and 10% drop-off in ballots counted in two elections).

Defendants also argue that the burden is not *that* severe by noting that handgun transfers have increased over the last several years. But Defendants do not say how many of these transfers were to first-time purchasers subject to the HQL process or were to residents who had managed to obtain an HQL since 2013. Defendants could anonymize and aggregate that information and present it here but have not done so. Again, Defendants' failure to do so warrants an adverse inference. Defendants also cannot rely upon this argument because they failed to demonstrate that the increase in handgun transfers was not still depressed by the HQL requirement. Those favored by the State (those who already own a regulated firearm, certain law enforcement and military members, and others enumerated in subsections 117.1(a) and (e)), are exempt from the HQL requirement altogether or are not subject to the HQL training requirements and have an easier time completing an HQL application. Everyone else is subject to the full burdens of the HQL requirement.

In practice, the HQL requirement works to burden the core right most severely when armed defense in the home is needed most. HQL applications crescendoed in 2020, when fears and uncertainties surrounding the COVID-19 pandemic, racial equality protests, and a heated presidential election grew. Also in 2020, crime increased,[1] the State of Maryland and various

---

[1] *See* Phil Davis and Phillip Jackson, *With Baltimore close to the 300-homicide mark again, leaders mull new approaches amid some signs of improvement*, The Baltimore Sun, Nov. 20, 2020, *available at*

localities released criminals from prisons,[2] and legitimate fears of a police "pullback" grew.[3] But the Maryland State Police did not allow remote training until July 28, 2020. MSP Bulletin, LD-HQL-20-002 at 1. Applicants were still required to complete the live-fire requirement in-person (*id*. at 2), so the applicant still had to leave the home (risking exposure to COVID-19) just so that an instructor could witness one shot.

COVID-19 made obtaining an HQL riskier and more difficult precisely when an HQL was needed most. Similar delays and difficulties may occur any time a severe strain is placed on any one of the many steps necessary to apply for and obtain an HQL. And no externality is required for the HQL requirement to burden society's most vulnerable individuals who find themselves in immediate need of armed protection in their homes. By way of example, each day of each year, women with their children flee abusive, threatening husbands or partners. *See* Maryland State Police, Crime in Maryland: 2017 Uniform Crime Report, at 59–60 (In 2017, there were 32,505 reported incidents of domestic violence in Maryland.).[4] These victims have a real and immediate need for armed protection because of the real and immediate fear for their and their children's lives. Maryland Network Against Domestic Violence, *2019 Homicide Prevention Report*, at 3 (In 2019, 20 intimate partners lost their lives to domestic violence in Maryland).[5] But they cannot obtain an HQL for at least five weeks and a handgun for at least six weeks. (Doc. 135-1, Pltfs.

---

https://www.baltimoresun.com/news/crime/bs-md-ci-cr-300-homicides-2020-20201120-iwgbid4dezdplkdqz5g3ocr3wu-story.html

[2] Phillip Jackson, *Maryland said it has released 2,000 inmates from prisons and jails to slow the spread of Coronavirus*, The Baltimore Sun (Apr. 21, 2020), *available at* https://www.baltimoresun.com/coronavirus/bs-md-maryland-prisons-release-inmates-coronavirus-20200421-yc52bbol5jevnbkgeqnbn47hjy-story.html.

[3] Alec MacGillis, *How to Stop a Police Pullback*, The Atlantic (Sept. 3, 2020) (noting police pullback in many cities and recounting that in 2015 Baltimore police in fact pulled back after the Freddie Gray riots), *available at* https://www.theatlantic.com/ideas/archive/2020/09/how-stop-police-pullback/615730/.

[4] *Available at* https://mdsp.maryland.gov/Document%20Downloads/2017%20Uniform%20Crime%20Report.pdf.

[5] *Available at* https://issuu.com/mnadv/docs/2019_dv_homicide_prevention_report.

Mem., at 11–12.) The HQL requirement's severe burden on these individuals' core right to possess a handgun in their homes has real consequences.

The HQL requirement cannot survive strict scrutiny, and Defendants make no argument that it does. This concession is fatal to the HQL requirement because Defendants have the burden of establishing constitutionality under heightened scrutiny.

### C. Defendants cannot meet their intermediate scrutiny burden under any formulation.

Defendants run from Supreme Court precedent yet again, arguing that intermediate scrutiny requires Defendants to demonstrate only that that HQL requirement is reasonably adapted to a substantial governmental interest. (Doc. 140, Defs. Opp., at 18.) The Supreme Court has never articulated an intermediate scrutiny standard specific to Second Amendment challenges because it has rejected intermediate scrutiny as a way to analyze Second Amendment rights. But the Supreme Court has articulated a tiered scrutiny standard in the First Amendment context, which *Kolbe* suggested may serve as a guide to Second Amendment challenges. 849 F.3d at 133.

If this Court applies intermediate scrutiny to the HQL requirement, it must follow *Packingham v. N.C.*, 137 S. Ct. 1730, 1736 (2017), decided after *Kolbe*, which makes clear that "to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest." (quotation omitted). *Packingham* also confirmed the Court's prior holdings that a law also must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id*. (collecting cases). Defendants must actually have considered alternatives to the course it adopted. *McCullen v. Coakley*, 573 U.S. 464, 479, 495 (2014). *Packingham* is binding precedent that must be followed because circuit precedent is not binding if it is "superseded by a decision of the Supreme Court." *Chisolm*, 95 F.3d at 337 n.7.

Defendants do not argue that the HQL requirement survives the analysis required by the Supreme Court and effectively concede that it does not. Regardless, Defendants do not dispute that under any iteration, intermediate scrutiny requires a reviewing court to scrutinize whether the challenged law addresses "harms" that "are real" in a "material" way. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Because the HQL requirement does not alleviate a real problem in a direct and material way, it is neither narrowly tailored to serve a significant governmental interest nor reasonably adapted to a substantial governmental interest. Instead, the undisputed facts establish that the HQL requirement burdens "substantially more" constitutionally protected conduct than "necessary to further [its substantial] interest." *Turner Broad. Sys., Inc. v. F.C.C.* ("*Turner II*"), 520 U.S. 180, 214 (1997).

### 1. Defendants fail to establish that the HQL requirement alleviates any real problem in a direct and material way.

Defendants fail to demonstrate the existence of a real problem that the HQL requirement alleviates in a direct and material way. *See e.g.*, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broad. Sys., Inc. v. F.C.C.* ("*Turner I*"), 512 U.S. 622, 664 (1994)); *see also Silvester v. Becerra*, 138 S. Ct. 945, 948 (2018) (Thomas J., dissenting from denial of writ of certiorari in Second Amendment case). Defendants do not dispute that:

> When the Government defends a regulation . . . as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner I*, 512 U.S at 664 (citation omitted); *see also, e.g.*, *id*. (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (9th Cir. 1977) ("A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist")); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 788 (D. Md. 2008), *aff'd* 368 Fed. App'x 370

(4th Cir. 2010). Solutions to hypothetical, abstract problems cannot survive intermediate scrutiny. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (only rational-basis review allows the government to justify a law with "rational speculation unsupported by evidence or empirical data") (citations omitted).

Defendants point to two supposed benefits, but neither is sufficient. First, they claim the HQL requirement "has been associated with a significant decrease in the diversion of guns to criminals in Maryland." (Doc. 140, Defs. Opp., at 21.) But Defendants fail to dispute that there has been no significant reduction in the availability of handguns for use in crime or in crimes committed with handguns. Defendants rely upon Professor Webster's study concluding that the HQL requirement is associated with two "indicators" of a reduction of handguns to prohibited persons. One of these indicators is that two fewer handguns were recovered within one year of purchase from 2012 to 2013 and that eight fewer handguns were recovered from 2013 to 2014— this out of more than a thousand crime guns recovered in Baltimore in these years. (Doc. 125-11, at Ex. 8.) These numbers are a laughably low sample size that cannot be used to justify the sweeping conclusion relied upon by Defendants or to justify the State's infringement on a fundamental right.

Defendants try to bolster this data with a vague "parolee-probationer survey," in which Professor Webster asked certain men whether they thought it became more or less difficult to acquire a handgun illegally after the Firearm Safety Act went into effect. The men surveyed were those Professor Webster and his team found near parole and probation offices and who told Professor Webster, via an anonymous survey, that they were out on parole or probation. (Doc. 135-6, D. Webster Dep., at 249:2–20.) Professor Webster did not verify that these men were in fact criminals out on parole or probation. *Id*. In all, Professor Webster surveyed fewer than 200

15

men. In any event, 41% of these men stated in the survey—taken in proximity to a parole or probation office—that the HQL requirement has made it harder to acquire a handgun illegally. (Of course 41% is a minority and suggests that most criminals in Baltimore believe it is NOT harder to acquire a handgun illegally now.) Professor Webster inexplicably relies upon this tiny sample of maybe-criminals to conclude that the HQL requirement is associated with a reduction of handguns to prohibited persons. The subjective, unsupported beliefs of an unidentified population of individuals is evidence of nothing.

Meanwhile, Defendants fail to dispute that the homicide rate in Maryland has increased since the HQL requirement took effect. Defendants rely instead on data suggesting that the homicide rate has decreased in three of 24 Maryland counties. (Doc. 140, Defs. Opp., at 26.) The HQL requirement is actually associated with an increase in the homicide rate in Baltimore County, as well as Baltimore City. (Doc. 135-1, Pltfs. Mem., at 20–21.) The HQL requirement is statewide, and Defendants lack any data even suggesting that the homicide rate has decreased statewide. Defendants' cherry-picking of three unrepresentative counties cannot support their arguments. Defendants have failed to carry their burden to prove that the HQL requirement is effective at all, let alone sufficiently so to justify its burden on law-abiding citizens.

### 2. Defendants fail to establish that the HQL requirement is narrowly tailored or reasonably adapted to a state interest.

The HQL requirement fails any intermediate scrutiny analysis because Defendants have not demonstrated that it is narrowly tailored or reasonably adapted to a state interest. Defendants claim several alleged benefits of the HQL requirement, but each either contradicts Defendants' admissions or is a benefit also provided by the pre-existing, less-burdensome 77R Handgun Registration requirement. Defendants have failed to meet their burden of demonstrating that the

16

HQL requirement does not burden "substantially more" constitutionally protected conduct than "necessary to further [its important] interest." *Turner II*, 520 U.S. at 214.

The HQL requirement has discouraged 71,701 individuals, or at least one-quarter of Maryland citizens who have filed HQL applications, from exercising their right to acquire a handgun. (Doc. 135-1, Pltfs. Mem., at 34; Exhibit 1.) Any process that effectively excludes that many individuals from exercising a constitutional right cannot possibly be considered to be sufficiently "tailored" to "fit" a legitimate governmental objective. Rather than minimize the HQL requirement's burdens, Defendants have increased the burdens on law-abiding citizens at every turn. For instance, Defendants added the useless "live fire" requirement, requiring applicants to obtain access to a range so as to legally fire one shot. Ranges are a rarity in the urban parts of Maryland and non-existent in the City of Baltimore. (*See* Doc. 135-3, Pennak Decl., at ¶¶ 13–16, 18–23 & Ex. A at 8.) Defendants also refused to provide fingerprinting services, as required by MD Code, Public Safety, § 5-117.1(f)(3). Instead, Defendants require HQL applicants to obtain fingerprints from private vendors at additional cost even though vendors are rare in rural parts of Maryland. (Doc. 135-1, Pltfs Mem., at 15.)

### a. The fingerprinting requirement is unnecessary and ineffective.

Defendants first argue that the fingerprinting requirement enables Maryland State Police to ensure that each HQL applicant is positively identified and not using false or altered identification. Defendants failed to dispute that the 77R Handgun Registration process provided Defendants this same ability. (Doc. 135-7, A. Johnson Dep., at 112:8–15.)

Defendants argue that the HQL requirement has reduced straw purchases or purchases with false identification in Maryland. Defendants rely upon Professor Webster's 2017 study, which as demonstrated above at pages 12–13, provides no such evidence. And Defendants' expert admitted that the fingerprint requirement does not deter straw purchasing or purchasing with a false

identification. (Doc. 135-8, J. Johnson Dep., at 24:4–12.) Defendants have no evidence that the HQL requirement has stopped or deterred even a single straw purchaser. (*Id.* at 25:10–16.) Defendants have not even attempted to determine the prevalence of straw purchasers in Maryland. (*Id.* at 28:6–14; Doc. 135-7, A. Johnson Dep., at 76:16–22.) Likewise, Defendants have no information regarding the number of purchases effectuated with a false identification. (Doc. 135-7, A. Johnson Dep., at 117:3–7.) Additionally, Defendants have no information demonstrating that the HQL requirement has reduced the number of handguns recovered in crime or that the HQL requirement has reduced the number of firearms it recovers from prohibited individuals each year. (*Id.* at 78:3–79:4, 88:21–89:2, 109:17–110:11, 110:22–111:9.) Defendants admit their lack of evidence. (Doc. 89 at 22.) Defendants' admissions and failure of proof cannot be overcome by an inapt study.

Finally, Defendants argue that the fingerprint requirement has enabled Maryland State Police to identify individuals who are subsequently convicted of disqualifying offenses and revoke their HQLs. Again, however, as established on page 6 above, Defendants admit that the pre-existing 77R Handgun Registration process provided this ability. This supposed benefit is not a benefit at all.

### b. The classroom training and live-fire requirements are unnecessary and ineffective.

Defendants argue that the classroom training and live-fire requirements "will reduce accidental discharges and access of firearms to ineligible persons, including minors." (Doc. 140, Defs. Opp., at 31.) Defendants' predictions, based on nothing but their witness's *ipse dixit*, do not satisfy intermediate scrutiny, which requires Defendants to prove the existence of a real problem that the HQL requirement alleviates in a direct and material way.

Moreover, Defendants' conclusory claim that the 45-minute video required by the 77R Handgun Registration is "wholly-insufficient" fails because Section 5-117.1(e) allows those who owned, prior to 2013, a registered firearm—and thus took only the 45-minute video—to acquire an HQL and purchase handguns without taking the classroom training or live-fire requirement. Defendants likewise do not dispute that *Heller II* struck down D.C.'s four-hour training requirement. 670 F.3d at 1255. Like the D.C. Circuit, the General Assembly deems that 45-minute video sufficient. Defendants' purported interest is also belied by the undisputed fact that Defendants do not control or attempt to control the content of any course. (*See* Doc. 140, Defs. Opp., at 31–33.) Defendants do not dispute that each of the hundreds of private instructors throughout Maryland may create their own course curriculum, and the Maryland State Police does not monitor any course to ensure that the required material is being taught. Without such oversight, there is no evidence that the training courses actually being taught bear any relationship to any of the asserted government interests.

### 3.   The HQL requirement was not based upon substantial evidence.

Defendants fail to dispute the paucity of evidence before the General Assembly. Instead, Defendants rely upon *Kolbe* as evidence that this little evidence was satisfactory. (Doc. 140, Defs. Opp., at 36–37.) In *Kolbe*, the General Assembly relied upon evidence directly related to a ban on assault weapons. But the General Assembly heard no evidence regarding such critical elements as the live-fire requirement. Defendants do not dispute that the General Assembly amended the original bill to eliminate a live fire requirement. (*See* Doc. 135-3, Pennak Decl., at Ex. A at 8–9.) The General Assembly heard only conclusory, general support for the HQL requirement's fingerprint and additional firearm safety course requirements. And it heard erroneous testimony from Professor Webster that the fingerprinting requirement would be effective in deterring straw purchasers because it would be administered by the police, who would supposedly intimidate

would-be straw purchasers from applying (and, as Chief Johnson admitted, *see* pages 4–5 above, the law-abiding as well). But Maryland State Police off-loaded the fingerprinting onto private vendors and eliminated even this supposed benefit. (Doc. 135-1, Pltfs. Mem., at 11.) What little testimony the General Assembly heard in support of the HQL requirement regarded a provision that never made it into law.

### Conclusion

For the foregoing reasons, Defendants failed to create a genuine dispute of fact, and Plaintiffs are entitled to judgment as a matter of law.

Dated: April 14, 2021                    Respectfully Submitted,

                                         */s/* John Parker Sweeney
                                         John Parker Sweeney (Bar No. 08761)
                                         James W. Porter, III (Bar No. 19416)
                                         Marc A. Nardone (Bar No. 18811)
                                         BRADLEY ARANT BOULT CUMMINGS LLP
                                         1615 L Street N.W., Suite 1350
                                         Washington, D.C. 20036
                                         Phone: 202-393-7150
                                         Facsimile: 202-347-1684
                                         jsweeney@bradley.com

                                         *Counsel for Plaintiff Atlantic Guns, Inc.*

                                         Cary J. Hansel (Bar No. 14722)
                                         HANSEL LAW, P.C.
                                         2514 N. Charles Street
                                         Baltimore, MD 21218
                                         Phone: 301-461-1040
                                         Facsimile: 443-451-8606
                                         cary@hansellaw.com

                                         *Counsel for Plaintiffs*

**Table of Exhibits**

**Exhibit No.    Title**

1.  Email transmitting the total number of applications and users who started but never submitted an application from 2018-2020 from Assistant Attorney General Robert Scott on February 26, 2021.

2.  Letter of Dan Friedman, Counsel to the General Assembly, to the Honorable Brian Frosh, Re: Senate Bill 281, The "Firearm Safety Act of 2013" (Jan. 29, 2013) attaching D.W. Webster, et al., *Relationship between licensing, registration, and other gun sales laws and the source state of crime guns*, 7 Injury Prevention 184 (2001).

3.  Plaintiff Maryland Shall Issue, Inc.'s Answers to Defendants' Interrogatories.

4.  Excerpts from the Deposition of James Johnson.

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of April, 2021, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)