**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



National Institute of Justice

# Documenting and Explaining the 2015 Homicide Rise: Research Directions

Richard Rosenfeld*
University of Missouri – St. Louis

June 2016

*Dr. Rosenfeld prepared this paper with support from the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, under contract number 2010F_10097 (CSR, Incorporated). The opinions, findings, and conclusions or recommendations expressed in this publication are those of the authors and do not necessarily represent those of the Department of Justice.

NCJ 249895



change over time in the involvement in homicide, both as offenders and victims, of ex-prisoners under community supervision. If ex-prisoners contributed significantly to the homicide increase, researchers should observe a corresponding increase in the homicide rate of persons on parole and in the proportion of homicides committed by parolees in those cities exhibiting large increases in homicide. These data will have to be compiled from the records of local law enforcement agencies.

## FERGUSON EFFECT

What has become known as the "Ferguson effect" on the homicide increase, as noted, is subject to considerable controversy and evidence-free rhetoric. The term is also unfortunate, because it does not only apply to the police killing in Ferguson and because its precise meaning is unclear. The dominant de-policing interpretation is that highly publicized incidents of police use of deadly force against minority citizens, including but not limited to the Ferguson incident, caused police officers to disengage from their duties, particularly proactive tactics that prevent crime. Interestingly, however, that is not the interpretation of the individual who evidently coined the term. Sam Dotson, Chief of the St. Louis Metropolitan Police Department, used the term in an interview with a reporter in November of 2014, three months after Michael Brown was killed. "It's the Ferguson effect," Dotson said. "I see it not only on the law enforcement side, but the criminal element is feeling empowered by the environment" (Byers 2014).

It is important to emphasize both arguments Chief Dotson advanced in the interview.[15] He stated that the police in St. Louis were redeployed from their normal and more proactive responsibilities to address protest activities and civil disorder in Ferguson and elsewhere in the St. Louis area during the months immediately following Brown's death. As conditions returned to normal, so did police activity. For example, arrest rates returned to pre-Ferguson levels after decreasing during the late summer and fall of 2014.

In the view of the St. Louis police chief, changes in police deployment patterns did result in crime increases in St. Louis in the immediate aftermath of the Ferguson incident. But he does not believe that his officers engaged in de-policing in the conventional sense of a work slowdown or reluctance to engage in vigorous, proactive enforcement. That is where the second point becomes relevant. The Ferguson effect, in his view, was not simply a matter of altered police behavior. Criminals, according to Chief Dotson, became "empowered" by the police killing in Ferguson and ensuing protests and civil unrest. The question then becomes how such feelings and beliefs might have triggered a homicide increase that persisted at least another year after Ferguson.

Intentionally or not, the St. Louis police chief invoked an important strain of sociological and criminological thinking in his explanation of the Ferguson effect: the idea that violence escalates when individuals and communities are alienated from the legitimate means of social control. When persons do not trust the police to act on their behalf and to treat them fairly and with respect, they lose confidence in the formal apparatus of social

---

[15] The discussion in this section is based on Byers (2014) and personal communication with Chief Dotson.

control and become more likely to take matters into their own hands. Interpersonal disputes are settled informally and often violently. Honor codes develop that encourage people to respond with violence to threats and disrespect (Anderson 1999). Predatory violence increases because offenders believe victims and witnesses will not contact the police. Individuals engage in "self-help" and entire communities become "stateless" social locations (Black 1983, 2010).

Randolph Roth (2009) has distinguished the proximate and ultimate causes of historical changes in U.S. homicide rates. Proximate causes refer to conditions that criminologists typically point to as risk factors for violence (e.g., economic disadvantage, firearm carrying, drug and alcohol use). Ultimate causes are the more or less widespread popular beliefs that government and the legal system are legitimate and worthy of respect, and that government officials can be trusted. When the perceived legitimacy of government and trust in officials erode, according to Roth, homicide rates increase. Such historical periods include the years immediately preceding the American Revolution and the Civil War. Both Roth (2009) and Gary LaFree (1998) have attributed the rise in homicide during the 1960s and 1970s to the declining legitimacy of U.S. political institutions.

The police are the front line of government in disadvantaged urban communities. Following Roth (2009), the ultimate cause of violence in these communities is lack of confidence in the police. When the police are called to respond to a crime, they arrive at the scene late or not at all. They do not follow up with vigorous and thorough investigation, even of the most serious crimes (Leovy 2015). They harass innocent youth. And, too often, they use force unnecessarily and indiscriminately. What matters is not the factual accuracy of these beliefs in every instance; what matters is that they can metastasize into a pronounced "legal cynicism," especially in disadvantaged African-American communities (Sampson and Bartusch 1998). When people believe the procedures of formal social control are unjust, they are less likely to obey the law (Tyler 2006).

If this complex of "feelings and beliefs," in Roth's (2009) terms, is the ultimate cause of escalations in homicide, the more proximate cause could be widely publicized incidents of police use of force that seem to confirm the validity of the underlying belief system. Lack of confidence in the police among African-Americans predates the recent police killings in Ferguson, Cleveland, New York and elsewhere. But it is likely to be activated by such incidents, transforming longstanding latent grievances into an acute legitimacy crisis. If that led to the 2015 homicide increase, we should expect at least four empirical conditions to hold: (1) the increase should be concentrated in cities with large African-American populations, (2) the timing of the increase should correspond closely to controversial incidents of police use of force against African-Americans, (3) confidence in the police should be substantially lower among African-Americans than other groups and (4) the homicide increase should be greater among African-Americans than other groups.

The available evidence supports the first two expectations. We have seen that 10 cities with relatively large African-American populations accounted for two-thirds of the



Figure 8: Percentage of Adults With "a Great Deal/Quite a Lot" of Confidence in the Police (2011-2014)

Source: Gallup Poll

big-city homicide increase in 2015 (see Table 1 and Figure 3). Further, the homicide increase occurred in the immediate aftermath of controversial police use-of-force incidents. The timing of the increase provides stronger support for the Ferguson effect explanation, in either of its versions, than for explanations attributing the homicide rise to expanding drug markets or declining imprisonment. Neither hypothesis can easily account for the sheer abruptness of the increase in 2015 or, in the case of the drug market explanation, for why homicide rates did not begin to rise several years earlier. At the same time, researchers must be open to the possibility that the homicide increase predated the Ferguson events, at least in some cities (Rosenfeld 2015).

There is ample evidence in support of the third expectation regarding African-Americans' lack of confidence in the police. As shown in Figure 8, just 37 percent of blacks compared with 59 percent of whites expressed "a great deal" or "quite a lot" of confidence in the police in Gallup surveys conducted between 2011 and 2014.[16] The sizable racial gap in attitudes toward the police is not the result of Ferguson or other recent events. For example, in 1997, 60 percent of blacks compared with 30 percent of whites answered "yes" when asked in Gallup surveys whether the police treat blacks less fairly than whites, as shown in Figure 9 (see page 21). The racial difference in responses to this item increased over the next 10 years. Interestingly, the racial gap did not change appreciably between 2007 and 2015, the year after the Ferguson incident and other controversial episodes of police use of deadly force against African-Americans. Finally, the difference between blacks and whites in attitudes toward the police extends to the justice system as a whole, as shown in Figure 10 (see page 22). Fully two-thirds of black respondents and just a quarter of whites told Gallup in 2013 they believe the justice system is biased against blacks. After Ferguson in 2015, the percentage of blacks who believe the justice system is biased increased to 74 percent, although the comparable increase among whites was larger, rising to 42 percent.

---

[16] For source data for Figures 8-10, see http://www.gallup.com/poll/175088/gallup-review-black-white-attitudes-toward-police.aspx.



Figure 9: Are Blacks Treated Less Fairly Than Whites by Police? (% Yes)

Source: Gallup Poll

There is little question that blacks and whites differ greatly in their confidence in the police, belief that the police treat blacks less fairly than whites, and belief that the justice system is racially biased. The racial gap in attitudes toward the police is not a recent development. Tensions between the police and the black community triggered the urban civil disorders of the 1960s (Report of the National Commission on Civil Disorders 1968). Lack of confidence in the police represents a smoldering reservoir of discontent among African-Americans that is ignited by heavily publicized episodes of police use of force — the ultimate and proximate causes, respectively, of the escalation of violence. This hypothesis regarding the recent homicide rise merits close scrutiny by researchers, along with the alternative version of the Ferguson effect that attributes the homicide increase to de-policing. Finally, if the legitimacy crisis explanation is correct, we should observe larger increases in homicide among African-Americans than whites or other groups. Further, the increases should be concentrated in the disadvantaged black communities of large cities where legal cynicism is most pronounced (Sampson and Bartusch 1998).

It will be easier to empirically evaluate the de-policing hypothesis than the legitimacy crisis explanation of the 2015 homicide increase. If de-policing was the operative mechanism, we should observe larger drops in arrests and other self-initiated police activities in cities that experienced the greatest homicide increases. The arrest data are readily available from the UCR, or will be when the 2015 UCR data are released in the fall of 2016. Data on pedestrian and traffic stops, building checks, and other self-initiated police activity will have to be obtained from local police departments. It should be noted, however, that the de-policing hypothesis presupposes a very large effect of policing on crime, large enough to explain homicide increases from de-policing of 50 percent or more in some cities. Effect sizes of that magnitude far surpass those revealed in research on the most effective policing strategies to prevent crime (Braga, Papachristos, and Hureau 2014).



Figure 10: Is the Justice System Biased Against Black People? (% Yes)

Source: Gallup Poll

Testing the hypothesis that a police legitimacy crisis caused the homicide increase will be more difficult. The four empirical expectations discussed above are necessary but not sufficient conditions to rule out other explanations. The key question that must be answered concerns the mechanisms that translate community discontent with the police into escalating levels of violence. Very little is known about this hypothesized relationship. Does widespread discontent lead offenders to believe they can commit crime with impunity? That seems to be what the St. Louis police chief meant when he said criminals became "empowered" by the Ferguson events. Is community discontent with the police fertile soil for "stop snitching" campaigns? Even more basic criminological questions are at issue. Was the homicide increase fueled primarily by offenders and victims with extensive criminal records or did the violence spread beyond the already criminally involved population? In other words, was the increase spurred by a growing prevalence of criminal violence or by a heightened incidence of violence among active offenders?

The latter question might be addressed with data from ongoing longitudinal studies of delinquency and crime (e.g., Berg et al. 2016; Loeber and Farrington 2011). To determine whether discontent with the police reduced the willingness of African-Americans to report crimes to the police, police reporting rates by race can be accessed from the National Crime Victimization Survey when BJS releases the 2015 data and the results can be compared with those for previous years and across differing community types. The best and perhaps only way to address other questions pertaining to the hypothesized police legitimacy crisis is through ethnographic research in African-American communities that seeks to disclose how chronic discontent with the police may be activated by controversial incidents of police use of force and, in turn, may lead to a rise in violence.

In summary, there are several empirical indicators and methods to evaluate alternative explanations of the 2015 homicide rise. It may turn out that the three considered here, as well as others yet to be proposed, are not competing hypotheses so much as interacting components of a broader explanation. For example, we might expect offenders to feel

especially "empowered," not only in the context of community discontent and anger, but when they also believe, correctly or not, that the police have backed off as a result. Homicide increases owing to a Ferguson effect might have been greater in cities with expanding drug markets and a larger pool of recently released prisoners than elsewhere. The necessary research will take time to carry out and must await the release of key empirical indicators.

## TOWARD A 21ST CENTURY CRIME INFORMATION SYSTEM

At several points in this discussion, reference has been made to the need to wait for the release of data needed to document and explain the recent homicide increase. The FBI's UCR data cannot answer all of the empirical questions raised here, but they can be used to address some important ones, such as whether arrest rates fell in the large cities registering homicide increases or, indeed, whether the homicide increase extended beyond the large cities. FBI Director Comey has pointed to the importance of the data his agency compiles for understanding and responding to the homicide rise, noting that "without more reliable data, the task of identifying trends and remedies to fix them is far more challenging. . . . [I]t's important, because it gives us the full picture of what's happening" (Schmit and Apuzzo 2015).

Imagine how the public debate over the homicide rise might have differed had the FBI released monthly UCR data one or two months after the collection period. We would have known whether other crimes in addition to homicide were increasing. We would know whether smaller cities were experiencing crime increases. We would not have had to rely on newspaper reporters and policy advocates to gather data from small and nonrepresentative samples. Assuming the Supplementary Homicide Reports data were not far behind, researchers would have had some indication of whether drug-related homicides were on the rise. The debate over de-policing could have been informed by comparative data on arrest rates. Better and timelier data would not have ended the debate, but they would have placed it on sounder empirical footing.

There are no longer technical impediments to timely release of the nation's crime and arrest data by the FBI. That is largely because the national UCR program no longer compiles data directly from the 18,000 law enforcement agencies in the country. Rather, most of the data are compiled, checked and submitted by state UCR programs.[17] Many of the state programs submit the data on a monthly basis and those that do not can be encouraged to do so. Even if the FBI was able to release timely data for just five percent of the nation's law enforcement agencies, roughly 900 jurisdictions, that would constitute a much larger number of cases than currently available. Researchers could then construct reasonably representative samples from those data that would be far more useful than the

---

[17] According to the UCR Data Quality Guidelines: "For the most part, agencies submit monthly crime reports, using uniform offense definitions, to a centralized repository within their state. The state UCR Program then forwards the data to the FBI's UCR Program" (www.fbi.gov/about-us/cjis/ucr/data-quality-guidelines-new/#_ftn2).