**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 16-cv-3311-ELH |
| | ) |
| LAWRENCE HOGAN, et al., | ) |
| | ) |
| Defendants. | ) |

**Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike Opinions of**
**<u>Defendants' Experts James Johnson, James Russell, and Daniel Webster</u>**

This Court should strike certain portions of the expert opinions of Chief James Johnson, Captain James Russell, and Professor Daniel Webster under Federal Rule of Evidence 702. The opinions of these witnesses are inadmissible because they are irrelevant to Maryland's HQL requirement and would not be helpful to the jury in its resolution of Plaintiffs' claims. All three of these witnesses offer purely speculative opinions of the public safety benefits they hope will flow from the HQL requirement, but have nothing to say about any specific benefits actually being achieved eight years into Maryland's enforcement of its HQL requirement. It is too late in the day to rely solely upon such unfounded hopes. These "experts'" willful ignorance of the absence of any improvement in public safety since this requirement took effect is reason enough to strike their unfounded opinions.

Specifically, Paragraphs 7–15 and 17–18 in Chief Johnson's Declaration (Doc. 59-21) and Paragraphs 13 and 17–25 in Captain Russell's Declaration (Doc. 59-20) should be struck because they are not "based on sufficient facts or data" under Federal Rule of Evidence 702. These witnesses base their opinions on generalized knowledge of and experience in the field of law enforcement, which is insufficient to support their opinions on the impact of the HQL requirement.

Likewise, Paragraphs 8–11 and 13–20 in Professor Webster's Declaration (Doc. 59-19); Paragraphs 5–8 of Professor Webster's Second Supplemental Declaration (Doc. 125-12); and the entirety of his Third Supplemental Declaration (Doc. 142-3) should be struck because his testimony does not fit the facts of this case. The data he uses to support his opinion is, by his own admission, unrelated to Maryland's HQL requirement.

Under Rule 702, this Court should perform a rigorous gatekeeping function to ensure that the proffered expert testimony meets certain standards. *Giddings v. Bristol-Myers Squibb Co.*, 192 F. Supp. 2d 421, 425 (D. Md. 2002). In doing so, the Court should confirm that the testimony to be given "is more than mere speculation." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) ("*Daubert I*")); *see also Hunt Valley Baptist Church, Inc. v. Baltimore Cnty*, No. ELH-17-804, 2018 WL 2717834, at *3 (D. Md. June 6, 2018) ("[A] court should exclude testimony based on 'belief or speculation,' *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999), or when [it is] not supported by the record."). "Only relevant, reliable testimony that is based on scientific knowledge should be admitted." *Giddings*, 192 F. Supp. 2d at 425.

The requirement that expert testimony be relevant and reliable extends beyond scientific knowledge to include "expert testimony based on technical or other specialized knowledge" as well. *Peters v. Baltimore City Bd. of Sch. Comm'rs*, No. WMN-13-3114, 2014 WL 4187307, at *6 (D. Md. Aug. 21, 2014). The party offering expert testimony must establish its admissibility by a preponderance of the evidence. *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011). Testimony that does not satisfy these standards is not admissible and should be stricken. *See Giddings*, 192 F. Supp. 2d at 425. "[N]othing in either *Daubert* [*I*] or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data by only the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

## I.   Despite their general law enforcement experience, neither Chief Johnson nor Captain Russell have specific experience that is relevant to the HQL requirement sufficient to support their opinions on its impact.

Chief Johnson's and Captain Russell's opinions are inadmissible because they are not "based on sufficient facts or data." *See* Fed. R. Evid. 702(b). Defendants argue that Chief Johnson and Captain Russell are qualified as expert witnesses under Rule 702 because of their "extensive knowledge, experience, and training in law enforcement generally, and firearm safety training in particular." (Doc. 90 at 2.) Both witnesses have lengthy careers in law enforcement, vaguely boasting of "hundreds of hours" handling firearms or "thousands of hours" teaching firearms safety courses. (*Id.* at 4. (internal quotations omitted).) As a result of these general experiences, Chief Johnson and Captain Russell are offered to opine about the "potential public safety benefits" of the HQL requirement. (*Id*. at 2–3.) At no point do Defendants detail Chief Johnson's or Captain Russell's specific expertise relevant to the "potential public safety benefits" of the HQL requirement. (*See id*. at 1–5.) Defendants never meaningfully connect Chief Johnson's or Captain Russell's general law enforcement experience to the potential public safety benefits of the HQL requirement. (*Id*. at 3–5.)

Under Rule 702(b), expert testimony that is not "based on sufficient facts or data" is irrelevant and must be excluded. To satisfy the requirements of Rule 702(b), expert testimony cannot be based on generalized experience unconnected to the subject matter of the testimony. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts [of the case]. [This Court's]

3

gatekeeping function requires more than simply 'taking the expert's word for it." Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*")).

It is well-settled that "general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience." *See, e.g.*, *Ruark v. BMW of N. Am., LLC*, No. CIV.A. ELH-09-2738, 2014 WL 351640, at *3 (D. Md. Jan. 30, 2014); *Smith v. Cent. Admixture Pharm. Servs., Inc.*, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010); *Fitzgerald v. Smith & Nephew Richards, Inc.,* No. JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999). Under Rule 702, that a proposed witness is an expert in one area "does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001); *see also 1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.*, No. DKC 2002-1622, 2004 WL 2191709, at *12 n.30 (D. Md. Sept. 7, 2004) (noting that "qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony") (quotations omitted).

This Court has been presented with nothing more than Chief Johnson's and Captain Russell's "qualifications, their conclusions and their assurances of reliability. Under *Daubert* [*I*], that's not enough." *See Daubert II*, 43 F.3d at 1319. Contrary to the Advisory Committee's clear directive, Defendants failed to explain how Chief Johnson's and Captain Russell's experiences relate to the potential public safety benefits of Maryland HQL requirement or how those experiences form a sufficient basis for their opinions. *See* Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments.

None of Chief Johnson's work experience relates directly to the HQL requirement. Chief Johnson broadly and vaguely opines that the HQL requirement will "make Maryland safer" by reducing access to handguns by disqualified persons and by ensuring that handgun owners have been properly trained. (Doc. 59-21 at ¶ 7.) He claims that, by requiring fingerprinting for a handgun purchase, Maryland can somehow reduce the amount of straw purchases. (*Id*. at ¶¶ 8–9.) He also claims that the four-hour live-fire requirement may somehow encourage more responsible gun ownership. (*Id*. at ¶ 10.) But Chief Johnson offers no concrete evidence, data, or experience to meaningfully connect these ethereal opinions with the practicality of the Maryland HQL requirement. Chief Johnson has never studied or otherwise evaluated the utility of a fingerprinting requirement or a live-fire training component prior to issuing a permit to purchase a handgun. (Doc. 79-2 at 16:15–22.) He is unfamiliar with the Maryland State Police standards for administering the HQL requirement (*id*. at 33:22–34:10); knows of no studies evaluating the behavior of straw purchasers (*id*. at 41:4–7); and has no information relevant to whether the fingerprint requirement deters straw purchases at all (*id*. at 25:10–16). Chief Johnson's general experience is irrelevant to the impact and effectiveness of the Maryland HQL requirement on public safety.

Despite his tenure as "Chief of the 20th largest police department in the United States" (Doc. 142 at 3), Chief Johnson lacks any meaningful knowledge of critical crime prevention data and other general statistics. He does not know how many accidental shootings occur annually in Maryland or nationwide. (Doc. 79-2 at 51:17–52:8). He knows nothing about how often firearms are used in self-defense in Baltimore County (*id*. at 85:4–86:6); the percentage of crime in Baltimore County involving the use of firearms (*id*. at 90:6–18); or whether the HQL requirement has reduced the level of firearm violence in Baltimore County (*id*. at 91:9–13). Chief Johnson

cannot rely on his general law enforcement experience to excuse his lack of specific experience and knowledge relevant to the subject matter of this lawsuit. This sort of unalloyed appeal to authority is nothing more than *ipse dixit*. Chief Johnson's unsubstantiated and speculative opinions should be disregarded by this Court.

So too with Captain Russell. Relying on his "21 years of law enforcement experience" (Doc. 142 at 4), Captain Russell believes that the HQL requirement "enhances knowledge of and competence with State laws designed to promote public safety." (Doc. 59-20 at ¶ 17.) He too broadly and vaguely claims that the HQL requirement will promote the safe storage of firearms (*id*. at ¶ 18) and eliminate the possession of handguns by disqualified persons (*id*. at ¶ 17). Despite his expansive opinions, Captain Russell has no information on whether the HQL requirement has positively affected compliance with Maryland's firearms storage laws. (Doc. 79-3 at 136:18–21.) He has no idea whether the HQL requirement has reduced the number of straw purchases or the number of disqualified people in possession of firearms in Maryland. (*Id.* at 136:5–17.) Nor does he have a working knowledge of statistics relevant to the existence and prevention of crime in Maryland. (*See id*. at 166:10–14.)

Neither Chief Johnson nor Captain Russel provide any substantive analysis that would support their opinions, or explain how the HQL requirement actually has improved public safety. Rather, they offer nothing more than speculative assurances based solely on their experience and authority, giving the Court nothing more than a "trust me" to rely upon. This Court cannot accept Chief Johnson's and Captain Russell's *ipse dixit* as substitute for the sufficient and relevant facts or data required under Rule 702. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157–58 (1999). Their testimonies are not relevant and should be excluded.

**II.    Professor Webster's testimony demonstrates that his opinions are based on studies that are not relevant to Maryland's HQL requirement.**

As with the opinions of Chief Johnson and Captain Russell, Defendants mistakenly assume that Professor Webster's unrelated professional experience must perforce qualify him as an expert in this case. Defendants argue that Professor Webster may rely on his research on Missouri's and Connecticut's permit-to-purchase laws to analyze Maryland's HQL requirement because it may enable him "to opine on the effect of such laws generally." (Doc. 90 at 6.) But, as with the opinions of Chief Johnson and Captain Russell, Professor Webster's opinion is only relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 341 (D. Md. 2011) (quoting *Daubert* [*I*], 509 U.S. at 591). If the expert's opinion does not "fit" the facts of the case, the testimony "is not relevant and, ergo, non-helpful." *Id*. Professor Webster has not studied the effects of the HQL requirement on public safety in Maryland even after eight years of experience with enforcement of the law. This alone should require striking his opinions as unhelpful.

Defendants admit that Professor Webster's research is limited to laws outside the State of Maryland and that he has not studied the effects of Maryland's HQL requirement. (Doc. 142 at 6.) Defendants rely instead on Professor Webster's ability to extrapolate from his extraneous research to make predictive judgments about the effect of Maryland's HQL requirement. (*Id*. at 6–7.) They also tout Professor Webster's academic and professional qualifications, detailing his research and publications. (*Id*. at 5–6.) However accomplished Professor Webster may be, Defendants wholly fail to contradict the plain fact that his research is unrelated to the subject matter of this lawsuit. (*See id*.) Professor Webster admits that the laws he studied share a nominal bond with Maryland's HQL requirement—namely, that all three laws require something resembling a permit to purchase firearms. (Doc. 79-4 at 189:9–13.) But that is all that he has been able to demonstrate those

7

schemes have in common. Unlike Maryland, Missouri's permit-to-purchase law requires no fingerprinting or safety training. (*Id*. at 55:15–19.) Connecticut's permit-to-purchase law requires fingerprinting and safety training, but the execution of these requirements in Connecticut differs markedly from their application in Maryland. For example, unlike Maryland, Connecticut requires that the fingerprinting be done by a law enforcement agency (*id*. at 45:6–10), and Connecticut requires an eight-hour training course instead of a four-hour course (*id*. at 44:15–20) and, unlike Maryland, allows the use of NRA training to satisfy these requirements. *See* Conn. Gen. Stat. Ann. § 29-36f(b). The differences in these laws are numerous and substantive enough to take Professor Webster's opinion outside the scope of appropriate and helpful testimony in this case.

Defendants' reliance on *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), is misplaced. In *Kolbe*, the plaintiffs challenged the admissibility of expert testimony on the grounds that it was not based on "a reasonable degree of scientific certainty." *Id*. The Court determined that the legislature may make certain predictive judgments based on "reasonable inferences and deductions based on substantial evidence." *Id*. at 779. Plaintiffs here take issue with the fact that Professor Webster studied the wrong thing to enable him to opine on the impact of Maryland's HQL requirement. Had he studied the Maryland law—or a law sufficiently similar—the Court may be able to use his testimony to predict the effect of the Maryland HQL requirement. Because he did not, his testimony does not fit the facts of this case, is irrelevant, and should be excluded. [1]

Nothing in Professor Webster's 35-page Third Supplemental Declaration remedies the fatal flaws in his methodology and analysis. First, Professor Webster nowhere demonstrates a causal relationship between any of the laws he studied and alleged changes in crime rates. Professor

---

[1] Defendants mistakenly assert that Plaintiffs claim that Professor Webster "retracted" the study on which he based his Maryland-specific analysis. (Doc. 142 at 9.) However, in their Motion to Strike, Plaintiffs clearly stated "Professor Webster bases this conclusion upon his own study, which had to be revised by an erratum because of incorrect data." (Doc. 133 at 13.) The parties appear to be in agreement as to this fact.

Webster tries to address this failing by arguing that "[t]he changes in diversions of firearms for criminal use that coincide with the changes in firearm homicide rates are consistent with a causal relationship." (Doc. 142-3 at ¶ 30.) But coincidence and mere association are insufficient in and of themselves to establish causation and neither his Third Supplemental Declaration, nor any other aspect of his testimony in this case, demonstrate any causal effect between the Maryland HQL requirement and any specific public safety benefit. Professor Webster claims his Missouri study shows that the repeal of that state's permit-to-purchase ("PTP") law "was associated" with an increase in firearm homicides, and was "coincident" with an increase in firearm suicides, movement of crime guns, number of guns sold in Missouri recovered in neighboring states of Illinois and Iowa, and number of law enforcement officers nonfatally wounded with handguns. (*Id.* at ¶ 3.) Professor Webster also declares that the adoption of the HQL "*was followed by* an immediate 76% reduction in the number of handguns recovered in crime by Baltimore police that had been originally been sold by a Maryland firearms dealer…." (Id. at ¶ 15 (emphasis added).) Professor Webster also claims that Connecticut's PTP law "was associated with" a 27.8% decline in firearm homicide rates. (*Id.* at ¶ 26.)

Such soft "associational" findings cannot suffice to establish causation between any given firearms policy and changes in crime rates that happen to occur at or near the same time. Professor Webster plainly admits as much when he states "many of the changes in gun laws are very modest in nature and unlikely to impact population-level firearm rates *whereas other law changes are more substantial and have been shown to be associated with changes in firearm homicide rates*." (Doc. 142-3 at ¶ 27 (emphasis added).) And yet, these "more substantial" "other law changes" are excluded as confounding factors from his studies notwithstanding their admitted association with changes in firearms homicide rates. Much like with the patently inconsistent results of his own

studies on the "association" of the repeal of Missouri's PTP law with a rise in firearm homicide rates in Missouri (47.3% in one study, but 27% in another), (*see* Doc. 133 at 11, n.1), Professor Webster makes no effort to justify his isolated focus on a handful of specific changes in firearms laws while ignoring the confounding effects of other, admittedly "more substantial" changes in law and other material factual circumstances. No analysis is provided even claiming that these firearms laws were causally related to any of these alleged changes in firearms-related crime rates. Professor Webster's opinions should not be considered by this Court for this reason alone. *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. and Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 482–83 (D.S.C. 2017) ("Evidence of an association does not create a genuine issue of material fact as to causation.") (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999) ("Showing association is far removed from proving causation.")).

Second, Professor Webster does not dispute his calculated use of data dredging in his studies: he and his colleagues cherry-picked the states, laws and time frames they sought to review, while simultaneously selectively disregarding, unweighting, or excluding large amounts of time, other laws, or even significant social distortions from the study. *Daubert I* mandates that an expert's opinion "must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." 509 U.S. at 590. Rather than base his opinion on "what is known," Professor Webster devotes the bulk of his Third Supplemental Declaration to rationalizing having engaged in this cherry-picking, selecting correlative situations and admittedly ignoring large societal events like the crack cocaine epidemic and the civil unrest associated with certain policing incidents such as Baltimore's Freddie Gray riots.

According to Professor Webster, he has a "strong rationale" for selectively ignoring any data prior to 1999, specifically that that time period included the "most dramatic changes in firearm homicide rates in decades" because of, among other things, the crack cocaine epidemic. (Doc. 142-3 at ¶ 4.) No matter the reason, Professor Webster and his colleagues intentionally ignored these changes in homicide rates to the detriment of the inclusiveness of his studies. But that the homicide rate in St. Louis went up by 35% from 2019 to 2020—without any mention of St. Louis' contemporaneously worsening opioid epidemic[2]—*is* included in Professor Webster's opinion as further evidence that repeal of the PTP contributed to the rise in firearms crime rates in Missouri. In other words, unique phenomena that undercut his opinion are ignored or excluded, but unique phenomena that confirm the bias of his studies are included and elevated. The absence of objectivity is obvious.

With respect to leaving five states out of his analysis, Professor Webster simply concedes that including them "*would have likely skewed our data*." (Doc. 142-3 at ¶ 25 (emphasis added).) Professor Webster does not explain why the data would be skewed, or why an analysis that included, instead of excluded, five states from a study would be more accurate, and not less. Professor Webster also cannot explain why, in a case involving the efficacy of Maryland's HQL law, he does not simply study the effect of that law on firearm homicide rates in Maryland, except to say that the firearm homicide rates "skyrocketed" after the riots associated with the death of Freddie Gray, and have remained high ever since. (*Id.* at ¶ 27.) Professor Webster has established a pattern of ignoring critical disruptive cultural phenomena (the crack epidemic, the Freddie Gray riots, and now perhaps COVID-19) that would undermine the looked-for outcomes from which he and his colleagues work backward. They may never produce an objective study of the results of

---

[2] Stoeker, Bosworth, and Rottinek, *Missouri's Fentanyl Problem: The China Connection*, Mo Med. 117(4): 362–369 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7431056.

Maryland's HQL law. These results-driven rationalizations are not remotely helpful to the trier of fact and cannot be credited. No matter what Professor Webster's reasons were for doing so, there is no question that the data utilized by Professor Webster and his colleagues is manipulated to the point that the results of their studies, and Professor Webster's opinions based on those studies, are not credible, and this Court should disregard them.

Finally, Professor Webster does not resolve the fatal ambiguity in his studies between fingerprinting and/or in-person application to a law enforcement agency. As a result, we have no way of knowing whether fingerprinting *or* in-person application to a law enforcement agency is the characteristic of a permit to purchase scheme that allegedly reduces firearm-related crime. Surprisingly, Professor Webster admits that Maryland is the lone jurisdiction that has a fingerprinting requirement, but not an in-person application requirement. (Doc. 142-3 at ¶ 23.) Accordingly, it was just lumped in with the other states that had both an in-person application requirement and a fingerprinting requirement, and the two states that had an in-person application requirement but not a fingerprinting requirement, resulting in the creation of a new catch-all category of states that had a fingerprinting and/or in-person application requirement. Of course, since Maryland does not have an in-person application requirement, there is absolutely no way to know if its law will be successful at reducing firearm homicide rates based on fingerprinting alone (especially since Professor Webster has not studied Maryland' HQL requirement). Professor Webster tries to get around this obvious shortcoming, arguing that because other states with an in-person application requirement allegedly are associated with a reduction in firearm homicide rates, Maryland's HQL requirement will have the same salutary effect, because it is part of the group that has a fingerprinting requirement and/or an in-person application requirement.

This argument fails as a matter of common sense. It would be like studying every state that has the death penalty and solitary confinement, including a state that did not have the death penalty but recently passed a law allowing for solitary confinement, and concluding that the new law would have a deterrent effect on violent crime because states that have the death penalty and/or solitary confinement demonstrate such a deterrent effect. Because Professor Webster fails to isolate for the effects of a fingerprinting requirement in the absence of in-person application at a law enforcement agency, it is not possible to know what effect – if any – Maryland's HQL requirement might have on firearm homicide rates in Maryland, and Professor Webster's opinion that it will reduce firearm homicide rates is not founded in fact and should be disregarded as unhelpful.

Professor Webster's opinions in this case are result-driven, pure *ipse dixit*. He does not demonstrate any causal relationship between any firearm law he has studied and a change in firearm-related crime rates. He cherry-picks data by arbitrarily limiting the time range, or locations analyzed, or by excluding critical material variables on an inconsistent basis to reach desired conclusions. His 35-page Third Supplemental Declaration simply underscores that the studies upon which Professor Webster's opinions rely do not fairly relate to Maryland's HQL requirement. Professor Webster's refusal to look at the actual effects of Maryland's HQL requirement confirms his bias. His opinions should be excluded as speculative and unfounded in fact.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court strike from the record and preclude Defendants from relying on the opinions contained in Paragraphs 7–15 and 17–18 in Chief Johnson's Declaration (Doc. 59-21), Paragraphs 13 and 17–25 in Captain Russell's Declaration (Doc. 59-20), Paragraphs 8–11, 13–20 in Professor Webster's Declaration (Doc. 59-

19), Paragraphs 5–8 of Professor Webster's Second Supplemental Declaration (Doc. 125-12), and

all of Professor Webster's Third Supplemental Declaration (Doc. 142-3).

Dated: April 14, 2021                          Respectfully submitted,


                                               */s/ John Parker Sweeney*
                                               John Parker Sweeney
                                               James W. Porter, III
                                               Marc A. Nardone
                                               Bradley Arant Boult Cummings LLP
                                               1615 L Street N.W., Suite 1350
                                               Washington, DC 20036
                                               P: 202-719-8316
                                               jsweeney@bradley.com

                                               Counsel for Plaintiff Atlantic Guns, Inc.

                                               Cary Johnson Hansel, III
                                               Hansel Law, P.C.
                                               2514 North Charles Street
                                               Baltimore, MD 21218
                                               P: 301-461-1040
                                               cary@hansellaw.com

                                               *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2021, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
Counsel for Plaintiff Atlantic Guns, Inc.