# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| MARYLAND SHALL ISSUE, INC., et al. | * | |
| | * | |
| v. | * | Civil Case No. ELH-16-3311 |
| | * | |
| LAWRENCE HOGAN, Jr. et al. | * | |
| | * | |
| | ********* | |

## MEMORANDUM OPINION

This litigation involves a challenge to the constitutionality of Maryland's handgun licensing requirement, embodied in Maryland's Firearm Safety Act of 2013 (the "FSA" or the "Act"), Md. Code (2018 Repl. Vol.), § 5-117.1 of the Public Safety Article ("P.S."). Plaintiffs Maryland Shall Issue, Inc. ("MSI"); Atlantic Guns, Inc. ("Atlantic Guns"); Deborah Kay Miller; and Susan Vizas have filed suit against defendant Lawrence Hogan, Jr., in his capacity as Governor of Maryland, and defendant William M. Pallozzi, in his capacity as Secretary and Superintendent of the Maryland State Police. The suit concerns the provision of the FSA that requires a prospective handgun buyer to obtain a Handgun Qualification License ("HQL") as a condition for purchasing a handgun. *See* P.S. § 5-117.1; ECF 1 ("Complaint"); ECF 14 ("First Amended Complaint").[1] In plaintiffs' view, the HQL requirement violates their rights under the Second Amendment to the Constitution.

Cross-motions for summary judgment are pending. *See* ECF 125; ECF 135. But, this Memorandum Opinion addresses only the parties' respective motions to strike certain opinions of the opposing side's witnesses. ECF 133 (Plaintiffs' Motion); ECF 145 (Defendants' Motion). The declarations of the relevant witnesses are attached as exhibits to the motions for summary

---

[1] I shall refer to the defendants collectively as the "State."

judgment. *See* ECF 125-11; ECF 125-12; ECF 125-14; ECF 125-15; ECF 135-3; ECF 135-24; ECF 135-25.

Plaintiffs have moved to strike the opinions of defendants' three expert witnesses under Rule 702 of the Federal Rules of Evidence ("F.R.E."): Daniel Webster; Captain James P. Russell of the Maryland State Police ("MSP"); and James Johnson, former Chief of the Baltimore County Police Department ("BCPD"). ECF 133. Defendants oppose Plaintiffs' Motion. ECF 142. And, plaintiffs have replied. ECF 152.

Defendants have moved to exclude part of the testimony of plaintiffs' two expert witnesses, also under Rule 702.  They are Gary Kleck, Ph.D. and Carlisle Moody, Ph.D.  In addition, under F.R.E. 701, they seek to exclude the opinion testimony of a lay witness, MSI President Mark Pennak. ECF 145. The motion is supported by a memorandum. ECF 145-1 (collectively, the "Defendants' Motion"). Plaintiffs oppose Defendants' Motion (ECF 151), and defendants have replied. ECF 155.

No hearing is necessary to resolve the pending motions. *See* Local Rule 105(6). For the reasons that follow, I shall grant the Defendants' Motion in part and deny it in part, and I shall deny Plaintiffs' Motion.[2]

## I.       The FSA

In 2013, the Maryland General Assembly enacted the FSA.  In relevant part, the FSA provides: "A dealer or any other person may not sell, rent, or transfer a handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person

---

[2] I incorporate the facts set forth in my Memorandum Opinion of March 31, 2019.  ECF 98.

a valid handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary [of the Maryland State Police.]" P.S. § 5-117.1(b).

To obtain an HQL, a person must satisfy a handful of conditions.  Of relevance here, an applicant must "complete a minimum of 4 hours of firearms safety training within the prior three years" and, "based on an investigation," the individual may not be "prohibited by federal or State law from purchasing or possessing a handgun." *Id.* § 5-117.1(d). The safety training, which is undertaken at the applicant's expense, must cover classroom instruction on "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation," along with a live-fire "firearms orientation component that demonstrates the person's safe operation and handling of a firearm." *Id.* § 5-117.1(d)(3).  In addition, an applicant must complete a written application and pay a non-refundable application fee in an amount not to exceed $50.  *Id*. § 5-117.1(g).  Moreover, the application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" the Maryland Department of Public Safety and Correctional Services ("DPSCS"). *Id*. § 5-117.1(f)(3)(i).

Once the HQL application is received, the Secretary shall apply to the Criminal Justice Information System Central Repository of the DPSCS and "for a State and national criminal history records check for each applicant[.]" *Id.* § 5-117.1(f)(2). The Secretary "shall issue" a decision to the applicant "[w]ithin 30 days after receiving a properly completed application." *Id.* § 5-117.1(h)(1).

## II.    Legal Standard

### A.

The parties have styled their motions as motions "to strike" opinion testimony.  *See* ECF 133; ECF 145.  Pursuant to F.R.E. Rule 104(a), the court is responsible for determining

"preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence."  This includes the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence ("F.R.E.") and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

In *Daubert*, the Supreme Court made clear that scientific evidence is admissible under F.R.E. 702 if "it rests on a reliable foundation and is relevant."  Thereafter, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court extended the principles pertaining to scientific expert testimony to all expert testimony requiring technical or specialized knowledge.

F.R.E. 702 governs expert testimony.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Pursuant to Rule 702, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue, and the testimony is both reliable and relevant.  *See United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019).  The rule "was intended to liberalize the introduction of relevant expert evidence."  *Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 261 (4th Cir. 1999).

To be admissible, "'the proffered expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation . . . .'"  *United States v. Landersman*,

4

886 F.3d 393, 412 (4th Cir. 2018) (citation omitted).  And, the party seeking to present expert testimony has the burden to establish its admissibility by a preponderance of the evidence.  *See Cady v. Ride-Away Handicap Equipment Corp.*, 702 Fed. App'x 120, 124 (4th Cir. 2017) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011).

The trial court serves a "gatekeeping role" by making pretrial determinations "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93. This gatekeeper role helps to ensure that the expert's testimony "rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see Landersman*, 886 F.3d at 412; *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 (4th Cir. 2017).

However, the Supreme Court did not intend the gatekeeper role to "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596); *see United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (recognizing that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). Because the district court "is not intended to serve as a replacement for the adversary system . . . the rejection of expert testimony is the exception rather then the rule."  *In re Lipitor*

*(Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018) (citation and quotation marks omitted).

As noted, to be admissible, scientific evidence must be both reliable and relevant.  *Daubert*, 509 U.S. at 597.   To be reliable, the testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions.  *Id.* at 589–90; *see Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  An expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'"  *Belville*, 919 F.3d at 232 (citation omitted). Put another way, the evidence or testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert* 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005).

Helpfulness to the trier of fact is "the 'touchstone'" under Rule 702.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citation omitted).  And, "'[d]oubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.'"   *Mack v. Amerisource Bergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (citation omitted).  In effect, a tie goes to the proponent of the expert evidence.

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony.  *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").  On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See Berry*

6

*v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, AW–07–3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999), *aff'd sub nom. Fitzgerald v. Smith & Nephew, Inc.*, 11 F. App'x 335 (4th Cir. 2001)).

*Daubert* articulated five non-exhaustive factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *see also United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Belville*, 919 F.3d at 233; *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003).

Notably, the factors are "'not exhaustive.'" *Belville*, 919 F.3d at 233 (citation omitted). Moreover, the evaluation "is always a flexible one . . . ." *Oglesby*, 190 F.3d at 250. As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Thus, the factors are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Id.* at 151; *see Nease*, 848 F.3d at 229. Indeed, the Supreme Court has said that the factors are not a "checklist." *Kumho Tire Co.*, 526 U.S. at 150.

The trial court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004); *see Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017). But, expert testimony need not be "'irrefutable or certainly correct'" in order to be admissible. *Moreland*, 437 F. 3d at 431 (citation omitted); *see Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195; *Westberry*, 178 F.3d at 261. Therefore, "'questions regarding the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility." *Bresler,* 855 F.3d at 195 (citation omitted).

On the other hand, a court should exclude testimony based on "belief or speculation," *Oglesby*, 190 F.3d at 250, or when not supported by the record. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340. Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Similarly, a court may exercise its "discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered.'" *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

Further, proposed testimony that concerns matters within the common knowledge and experience of a lay juror does not pass muster. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995); *Kopf*, 993 F.2d at 377. "While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact . . . an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Shreve v. Sears, Roebuck*

*& Co.*, 166 F. Supp. 2d 378, 392–393 (D. Md. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

In contrast to the common law, F.R.E. 704(a) permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact." *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020), *cert. denied sub nom. Washington v. United States*, ___ U.S. ___, 141 S. Ct. 927 (2020); *see United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006); *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002). As the *Campbell* Court observed, the decision whether to permit such testimony turns on an analysis of Rule 702. *Campbell*, 963 F.3d at 314.

In any event, under Rule 702 the party who seeks admission of evidence is not relieved of the burden of meeting the requirements of other applicable federal rules. This includes Rule 401, concerning relevance, and Rule 403's instruction that evidence may be excluded for undue prejudice, confusion of the issues, or a potential to mislead the jury. *Casey*, 823 F. Supp. 2d at 341; *see Westberry*, 178 F.3d at 261 ("[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded.").

**B.**

Rule 701 of the F.R.E. governs lay witness testimony. It provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702

Thus, in accordance with Rule 701, a lay witness may offer an opinion only if it is "rationally based on [his] perception." *United States v. Smith*, 962 F.3d 755, 766 (4th Cir. 2020) (internal

quotations omitted), *reh'g denied* (July 14, 2020), *cert. denied*, ___ U.S. ___, 141 S. Ct. 930 (2020).

Rule 701 was amended in 2000, adding subsection (c), in order "to prohibit the inappropriate admission of expert opinion under Rule 701." *United States v. Perkins*, 470 F.3d 150, 155 n.8 (4th Cir. 2006) (quoting *United States v. Garcia*, 291 F. 3d 127, 139 n.8 (2d Cir. 2002)) (internal quotations omitted). This amendment "ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Cim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee note to 2000 amendment. Put differently, "Rule 701 forbids the admission of expert testimony dressed in lay witness clothing." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (quoting *Perkins*, 470 F.3d at 156).  Thus, for a witness to provide an opinion that is "based on scientific, technical, or other specialized knowledge[,]" the witness *must* be presented as an expert pursuant to Rule 702. *Smith*, 962 F.3d at 766.

### III.    Plaintiffs' Motion

### A.  Law Enforcement Officers James Johnson and James Russell

Plaintiffs have moved to exclude paragraphs 7-15 and 17-18 of Johnson's Declaration (ECF 125-14) and paragraphs 13 and 17-25 of Russell's Declaration (ECF 125-13). ECF 133 at 4. In the paragraphs at issue, Johnson opines on the value of firearm safety training and identification requirements in relation to public safety. ECF 125-14, ¶¶ 7-15, 17-18. And, Russell discusses the public benefits of firearm safety training, such as reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership. ECF 125-13, ¶¶ 13, 17-25.

Plaintiffs argue that these opinions are "not based on sufficient data and are therefore inadmissible under Federal Rule of Evidence 702(b)." *Id.* Although plaintiffs concede that Johnson has "'an extensive amount of knowledge of local and national gun law,'" they argue that "his deposition testimony revealed numerous gaps in relevant knowledge and a dearth of statistical or empirical evidence in support of his positions." *Id.* As to Russell, plaintiffs assert: "Aside from his '13 years of being on a live firing range,' . . . Russell possesses little empirical knowledge to support his opinions . . . ." *Id.* at 7-8 (citing ECF 125-13, ¶ 10).

The State counters that the "text of Rule 702 'expressly contemplates that an expert may be qualified on the basis of experience.'" ECF 142 at 2 (citing Fed. R. Evid. 702 advisory committee note to 2000 amendment); *see Kumho Tire*, 526 U.S. at 156 (noting that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). It argues: "Chief Johnson and Captain Russell both opined about the potential public safety benefits of the Handgun Qualification License ('HQL') requirement based on their extensive experience as law enforcement officers and their knowledge, training, and observations during their law enforcement careers." ECF 142 at 2-3.

Plaintiffs rely principally upon *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911 (4th Cir. 2004), to support their argument. ECF 133 at 4. In *Higginbotham*, the Fourth Circuit affirmed the exclusion of expert testimony regarding the design of a ladder in a products liability case when the expert had "no training in metallurgy nor . . . in ladder design." *Higginbotham*, 85 F. App'x at 917.

In contrast, Johnson has thirty-nine years of experience with firearm safety in the context of law enforcement. ECF 125-14, ¶ 2. Johnson joined the BCPD in January 1979, and he served as its Chief of Police from 2007 until his retirement in 2017. *Id.* Moreover, Johnson has "conducted hundreds of presentations on firearm safety, including trainings on the safe handling, cleaning,

unlocking, securing, transporting, storing, and firing of firearms." *Id.* ¶ 3. More recently, he "provided in-service training on how to reduce accidental discharges and how to properly safeguard a service weapon." *Id.*

Similarly, Russell has twenty-one years of experience with law enforcement. ECF 125-13, ¶ 2. He joined the MSP in 1997 and has served in several units, including routine patrol, criminal investigations, domestic violence, firearms training, recruiting, and field operations. *Id.* He also holds a "certification as a firearms instructor from the Maryland Police Training Commission" and previously "provided firearms training to more than 300 trooper candidates" at the MSP Academy. *Id.* ¶¶ 3, 4. After leaving the Academy, he continued to provide firearm training to officers, retired officers, and citizens. *Id.* ¶¶ 6, 8, 9. In 2013, he was "certified to teach the four-hour safety training required under Maryland law to obtain a Handgun Qualification License." *Id.* ¶ 12.

Furthermore, despite plaintiffs' argument that this testimony "is not based on sufficient facts or data," the *Daubert* factors are explicitly flexible. ECF 133 at 4; *Kumho Tire*, 526 U.S. at 150 ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'") (citation omitted). As discussed, the court has "'broad discretion' in choosing which *Daubert* factors to apply and how to consider them." *Belville*, 919 F.3d at 233 (quoting *Oglesby*, 190 F.3d at 250). And, the Fourth Circuit has upheld the admission of expert experiential testimony from members of law enforcement.

For example, in the context of narcotics cases, the Fourth Circuit has explained that "'experiential expert testimony' [is] different from scientific testimony and [is] allowable from 'law enforcement officers with extensive drug experience.'" *United States v. Campbell*, 851 F. App'x 370, 373 (4th Cir. 2021) (quoting *United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007)). In assessing the foundation of such testimony, the Fourth Circuit has said that there are

"meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *Wilson*, 484 F.3d at 274. In *Wilson*, for example, the Court said that an officer could testify as to the meaning of coded words in drug trafficking, so long as he could "explain" the basis for his opinion. *Id.* at 276 (internal quotation and citation omitted). In this regard, the Fourth Circuit emphasized the officer's extensive experience in law enforcement. *See id.* ("[The officer] was a nine-year veteran of the Baltimore County Police Department. He spent most of his career investigating narcotics traffickers and had participated in hundreds of drug investigations and arrests.").

And, in another Maryland case challenging the FSA, Judge Blake admitted the testimony of three law enforcement officers, despite the objection that their opinions were "outside the scope of [the officers'] expertise." *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 (D. Md. 2014), *aff'd in part, vacated in part,* 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017). Judge Blake noted that the testimony at issue was not about expert ballistics but instead "based on [the officers'] personal knowledge and experiences" with shotguns and other assault rifles. *Kolbe*, 42 F. Supp. 3d at 781.

As indicated, in the paragraphs at issue with respect to Johnson (ECF 125-14, ¶¶ 7-15, 17-18), Johnson opines on the value of firearm safety training and identification requirements in relation to public safety. *See id.* In particular, he asserts that certain HQL requirements will help reduce access to handguns by criminals, accidental discharges, and straw purchases, while also promoting responsible gun ownership, among other things. *See id.*

Johnson's opinions regarding the effectiveness of specific HQL requirements do not rest on empirical data or statistics. *See* ECF 133-2 at 6, 7, 10, 13, Tr. 23, 25, 35, 51. Rather, his opinions regarding the value of training and identification checks are predicated on his experience with the

BCPD, as well as "hundreds of hours of research into issues related to gun violence, attendance at law enforcement meetings and conferences, and hundreds of conversations with other law enforcement officers regarding their experience." ECF 125-14, ¶ 4. Such experiential testimony is admissible to the extent it supports the claim that firearm safety training generally promotes public safety.

The case for the admission of Russell's testimony is equally clear. In the paragraphs at issue (ECF 125-13, ¶¶ 13, 17-25), Russell discusses the public safety benefits of firearm safety training, such as reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership. Russell's comments are based upon "thousands of hours over the last 13 years teaching firearms safety training to hundreds of police candidates, sworn officers, retired officers, and others." *Id.* ¶ 10. Moreover, Russell was certified in the "four-hour firearms safety training required under Maryland law to obtain a Handgun Qualifying License." *Id.* ¶ 12.

Russell's opinions are based on his extensive experience.  He has observed the efficacy of the training prior to and after the implementation of the HQL and drew conclusions based on this comparison. To the extent that Russell opines on the value of firearm safety training, his testimony is admissible.

## B.  Professor Daniel Webster

Plaintiffs seek to exclude portions of Webster's declarations. ECF 133. Webster holds several professional positions, as follows:  "Professor of Health Policy and Management, Director of Health and Public Policy Ph.D. Program, Deputy Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health."  ECF 125-11, ¶ 1. Webster's

research focuses primarily on gun-related injuries and violence; he has directed numerous studies related to gun violence and its prevention, and he has published over 100 peer-reviewed articles. *Id.* ¶ 4. During the legislative hearings in 2013 concerning the FSA, the Maryland General Assembly heard testimony from various public policy and law enforcement experts with regard to the HQL, and Webster was one of them.  *See* ECF 125-3.

In his declarations and expert report, Webster discusses why he believes that laws that require citizens to obtain a permit to purchase a firearm, including Maryland's HQL, promote public safety and reduce firearm violence. *See* ECF 125-11; ECF 125-12.  Plaintiffs argue that paragraphs 8-20 of Webster's Declaration (ECF 125-11) and paragraphs 5-8 of Webster's Supplemental Declaration (ECF 125-12) should be excluded because Webster's opinions do not fit the facts of this case. ECF 133 at 8.

In particular, plaintiffs posit that the "studies relied upon by Professor Webster are factually distinguishable, clearly the result of data dredging, and all ignore the actual effect of the HQL requirement during the relevant time period in Maryland," so they "tell us nothing about the potential effects of the HQL requirement." *Id.* at 12. According to plaintiffs, Webster's reliance on the studies of permit-to-purchase laws in Missouri and Connecticut is misplaced because there are "numerous and substantive" differences between the laws of Missouri, Connecticut, and Maryland. ECF 152 at 8.

In response, defendants tout Webster's qualifications and assert that "plaintiffs simply misunderstand the nature of Professor Webster's testimony." ECF 142 at 6. According to defendants, Webster relied on the studies of permit-to-purchase laws "in other states to opine on the effect of such laws generally and what impact Maryland's similar law might have on reducing the negative effects of gun violence." *Id.* at 6-7.

As noted, the evidence or testimony of an expert witness must be relevant to the extent that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *Nease*, 848 F.3d at 229; *Forrest*, 429 F.3d at 80–81.  And, an expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'"  *Belville*, 919 F.3d at 232 (citation omitted).

As plaintiffs point out, there are significant differences between the permit laws in Connecticut, Missouri, and Maryland. In Missouri, for example, the permit law did not require fingerprinting or safety training.  And, the law in Connecticut requires an eight-hour training course, rather than the four-hour course in Maryland, and Connecticut also requires photo identification on its permits to purchase. ECF 133 at 9. Despite the differences between the laws, Webster used those studies to predict whether Maryland's licensing requirements might have an impact on reducing gun violence.

The Court must determine, *inter alia*, whether Maryland's decision to enact the HQL law was based on substantial evidence. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997). The General Assembly considered Webster's testimony in deciding to enact the FSA. The General Assembly would have known of the distinctions in the laws of Missouri and Connecticut. Moreover, in *Heller v. District of Columbia*, 45. F. Supp. 3d 35 (D.D.C. 2014), *aff'd in part*, 801 F.3d 264 (D.C. Cir. 2015), the court addressed challenges to a firearm registration law with requirements similar to Maryland's HQL law.  The *Heller* Court considered some of the same opinions that Webster has offered in this case, including those as to the study of the permit-to-purchase law in Missouri. *Id.* at 52-53.  As in *Heller*, Webster's analysis here with regard to the studies conducted in Connecticut and Missouri does not render his testimony inadmissible.

Further, plaintiffs take issue with paragraph 17 of Webster's Declaration. There, Webster discusses a study that he conducted to assess the FSA's impact on the homicide rate in Maryland. ECF 125-11, ¶ 17.  Based on that study, Webster concluded that the HQL requirements were associated with a 48% reduction in firearm homicide rates in Anne Arundel, Montgomery, and Prince Georges' counties. *Id.*

According to plaintiffs, paragraph 17 is inadmissible because it relies on "incorrect data" and "fails to demonstrate (or even explicitly state) that the HQL requirement caused" any change in the firearm homicide rates in Maryland. ECF 133 at 13-14. As noted, they also assert that the data on which Webster relies in his Supplemental Declaration is "flawed" and the product of "cherry picking" and "data dredging." *Id.* at 10-12.

In my view, plaintiffs' arguments pertain to the weight of the witness's conclusions, not admissibility. *See Bresler*, 855 F.3d at 195 (noting that "'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility'") (quoting *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)) (alteration in *Bresler*).  Indeed, other courts have admitted Webster's expert opinions, similar to those advanced here. *See, e.g.*, *Kolbe*, 42 F. Supp. 3d at 780; *Heller*, 45. F. Supp. 3d at 41-42.

Accordingly, I shall deny plaintiffs' motion to exclude portions of Webster's declarations.

## IV.   Defendants' Motion

### A.  Carlisle Moody

Moody is a professor of economics at the College of William and Mary, where he teaches econometrics, mathematical economics, and time series analysis. ECF 135-24, ¶ 2. According to Moody, he has "researched guns, crime, and gun policy for almost 20 years and published 12

articles related directly to these topics." *Id.* For this case, Moody "used four different methods to study the FSA's impact" on Maryland's firearm homicide rate and concluded that the "FSA has had no beneficial impact…." *Id.* ¶ 4.

Defendants seek to exclude Moody's expert opinion (ECF 135-24) in full for failure to satisfy the requirements of Rule 702. *See* ECF 145-1. In particular, the State asserts that Moody's testimony "is not based on sufficient facts or data and is not the product of reliable principles and methods" because Moody "failed to account for justifiable homicides, homicides committed with long guns, or the effect of the events in 2015 surrounding the death of Freddie Gray in his analysis." *Id.* at 4.[3] In other words, defendants contend that Moody did not "control for [the] Freddie Gray effect" in his analysis. *Id.* at 5. Thus, defendants posit, his conclusions are unreliable.

Plaintiffs counter that "it is clear that this effect [of the events in 2015] was accounted for in Professor Moody's methodology." ECF 151 at 5. Specifically, Moody explained that he relied on a Wikipedia page to understand the Freddie Gray phenomenon. ECF 145-3 (Moody Dep.) at 12. And, he said that he implicitly accounted for the "Freddie Gray" effect when he compared "the percent change in the homicide rate after 2014 for Maryland and for states that did not have permit to purchase laws." *Id.* at 15.

To be sure, there may be some lacunae in Moody's reasoning. But, defendants' challenge primarily "amounts to a disagreement with the values" Moody chose to assign to certain variables in his research. *Bresler*, 855 F.3d at 195. As with Webster, "such challenges to the accuracy of [Moody's] calculations 'affect the weight and credibility' of [Moody's] assessment, not its admissibility." *Id.* at 196 (quoting *Zoltek Corp.*, 543 F.3d at 997); *see also Heckman v. Ryder Truck*

---

[3] The civic unrest in Baltimore City in late April and May 2015 occurred after the death of Freddie Gray, who was injured while in police custody.  The unrest occurred some 18 months after the HQL requirement went into effect (October 2013).

*Rental, Inc.*, CCB-12-664, 2014 WL 3405003 (D. Md. July 9, 2014) (finding that expert's failure to account for certain variables did not make the testimony inadmissible, but should only go to weight of the testimony). Accordingly, I decline to strike his testimony.

### B.  Gary Kleck

Plaintiffs also identified Gary Kleck as an expert. ECF 145-2; *see* ECF 135-25 (Kleck Expert Report and Declaration); ECF 135-29 (Kleck Supplemental Declaration). He is a Professor of Criminology and Criminal Justice at Florida State University. ECF 135-25 at 11. Kleck's research focuses on the impact of firearms and gun control on violence, and he has authored or co-authored a number of books and articles addressing topics in this field. *Id.* Kleck's Declaration focuses on his view of the flaws in Webster's studies and conclusions. *See generally* ECF 135-25.

The State seeks to exclude Kleck's testimony in full on the basis that it "is not based on peer-reviewed research, has not been widely accepted, and is irrelevant to the issues in this case." ECF 145-1 at 7. In response, plaintiffs emphasize that whether an expert opinion is subject to peer review is just one factor to consider when determining whether expert testimony should be admitted. ECF 151 at 9. Furthermore, plaintiffs argue: "Professor Kleck's qualifications more than compensate for whatever peer review Defendants claim is lacking." *Id.* at 10 (citing *Peabody Coal Co. v. Dir., Off. of Workers' Compensation Programs*, 201 F.3d 436(Table), 1999 WL 1020530, at *4 (4th Cir. 1999) ("Qualifications of expert witnesses can buttress the reliability of their opinions.")).

With respect to the issue of relevance, defendants assert that the "issue in this case [is] whether there is substantial evidence in the record to support the General Assembly's predictive judgment that enacting the HQL law would further public safety." ECF 145-1 at 8. According to

the State, Kleck's criticism of the methods Webster employs "do not bear on [] the question [at hand] . . . ." *Id.* But, Kleck's opinions are relevant for the same reason as Webster's.

The State next complains that Kleck's testimony is not based on "peer-reviewed research." ECF 145-1 at 7. For example, the State points out that "Kleck relies primarily on a law review article that he co-authored and that appeared in the UCLA Law Review in 2009 for the assertion that ATF gun 'trace data' is not a reliable indicator of straw gun purchases." *Id.* (citing ECF 135-25, ¶ 7). When questioned at his deposition regarding the law review article, Kleck stated, ECF 145-4 at 16: "Law reviews typically don't have peer review, but on occasion, they do, and it's possible they did in that case. I really don't remember."

Kleck's testimony is admissible for two primary reasons. First, Kleck references other reputable sources, including the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in support of his contentions. *See, e.g.,* ECF 135-25, ¶ 7 (noting that "ATF explicitly cautions potential users of their trace data that 'the firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe."). Second, the Fourth Circuit has explained: "'The fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, *though not dispositive*, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.'" *Nease*, 848 F.3d at 229 (4th Cir. 2017) (emphasis added) (citing *Daubert*, 509 U.S. at 594). That Kleck relies on some studies that are not peer reviewed is not dispositive.

The State also claims that "Professor Kleck's criticisms of the use of firearm trace data as an indicator of straw purchases have been discredited in a peer-reviewed article authored by the leading social science experts who study gun violence." ECF 145-1 at 8 (citing ECF 140-2

(Webster Supplemental Declaration), ¶¶ 8-10). However, this does not render Kleck's opinion on trace data inadmissible. Again, this argument goes to weight, not admissibility.

In sum, under the flexible *Daubert* factors, I conclude that Kleck's testimony is based on research that he was entitled to consider.  Moreover, his testimony is relevant. Accordingly, I shall deny the motion to strike Kleck's expert testimony.

### C.  Mark Pennak

Plaintiffs seek to admit the lay opinions of Mark Pennak concerning the HQL training requirements under F.R.E. Rule 701. He is the president of MSI and a qualified handgun instructor. ECF 145-1 at 1-4.  Defendants seek to exclude several paragraphs from Pennak's Declaration (ECF 135-3).

The Fourth Circuit has recognized that "'the line between lay opinion testimony under 701 and expert testimony under Rule 702 is a fine one.'" *United States v. Farrell*, 921 F.3d 116, 143 (4th Cir. 2019) (quoting *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010)), *cert. denied*, __ U.S. __, 140 S. Ct. 269 (2019).  The "'guiding principle' in distinguishing a lay opinion from an expert opinion is that lay testimony must 'be based on personal knowledge.'" *Farrell*, 921 F.3d at 143 (internal citation omitted). In making this determination, the court is "afforded a good deal of discretion." *Smith*, 962 F.3d at 767.

Notably, the Advisory Committee Notes to Rule 701 provide that testimony based on "'the particularized knowledge that the witness has by virtue of his or her position in [a] business'" may be admissible under Rule 701 because "it is not based on 'experience, training or specialized knowledge within the realm of an expert[.]'" *Lord & Taylor, LLC*, 849 F.3d at 576 (quoting Fed. R. Evid. 701 advisory committee note to 2000 amendment); *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1217 (11th Cir. 2003) (testimony that charges

billed for repairs were "reasonable" did not constitute expert testimony because "testimony by business owners and officers is one of the prototypical areas [of lay opinions] intended to remain undisturbed" by the amendment); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (a business owner is permitted to give lay opinion testimony as to damages, as it is based on his knowledge and participation in the day-to-day affairs of the business).

Further, the Fourth Circuit has specified that "if a witness's firsthand observations are 'common enough' and require applying only a 'limited amount of expertise,' they may fairly come in under Rule 701." *Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156). On the other hand, "opinions resulting 'from a process of reasoning which can be mastered only by specialists in the field' must be admitted through Rule 702." *Smith*, 962 F.3d at 767 (quoting *United States v. Howell*, 472 F. App'x 245, 246 (4th Cir. 2012) (quoting Fed. R. Evid. 701 advisory committee note to 2000 amendment)).

As noted, Pennak is the president of MSI and a qualified handgun instructor within the meaning of P.S. § 5-117.1(d)(3)(i). ECF 135-3, ¶ 4. He is also a "National Rifle Association ('NRA') certified instructor in Rifle, Pistol, Personal Protection in the Home, Personal Protection Outside the Home and Muzzelloading" and an "NRA certified Range Safety Officer." *Id.* Pennak has "given instruction and training to students seeking" an HQL on "numerous occasions." *Id.*

In his Declaration, Pennak provides his opinion regarding the HQL training requirements, including the live-fire requirement. *See* ECF 135-3.  He has not been designated as an expert witness, however.

In particular, defendants seek to exclude the opinions Pennak offers in paragraphs 8-10, 13, 15-17, 18-19 and 21-23 of his Declaration. ECF 145-1 at 1-4. The pertinent details of these paragraphs are set forth, *infra*.  Defendants argue that Pennak's opinions "are based on his

specialized knowledge of firearm safety training and, thus, are not properly admissible as Rule 701 lay opinion testimony." *Id.* at 2.

Plaintiffs counter that Pennak's opinions are admissible as lay testimony under Rule 701 because they are "derived from firsthand observation" and are "not based on specialized knowledge, skill, or experience." ECF 151 at 1. They emphasize that Pennak's testimony is "predicated on his previous experience[,]" *id.* (citing *Lord & Taylor, LLC*, 849 F.3d at 576), and the opinions are "offered 'on the basis of relevant historical or narrative facts that the witness has perceived.'" ECF 151 at 2 (quoting *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990)).

In paragraph 8, Pennak opines on the use of live ammunition during the firearm safety training, as required under P.S. § 5-117.1(d)(3)(iii), and the typical orientation that his students receive regarding the "'functionality and the safe operation and handling of all these types of handguns without live ammunition[.]'" ECF 145-1 at 3 (quoting ECF 135-3, ¶ 8). These statements are admissible under Rule 701 because they are based on Pennak's firsthand observations as well as his "particularized knowledge" from his experience as an instructor. ECF 135-3, ¶ 8; *see Perkins*, 470 F.3d at 153 (admitting opinion testimony of police officers as to the reasonableness of an officer's use of force because "their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, . . . their opinions were admissible."). Similarly, Pennak's testimony regarding his own classroom instruction, set forth in paragraph 10, constitutes a firsthand observation. ECF 135-3, ¶¶ 8, 10.

However, Pennak's conclusion in paragraph 10 that "[f]iring one live round accomplishes no training objective at all[]" is not admissible. This is a conclusion regarding firearm safety training in general, rather than one regarding Pennak's specific programs. *Id.* And, unlike Pennak's

statement about basic safety in paragraph 8, this is an opinion that could not be derived from a simple understanding of commonly accessible procedures. *Id.* ¶ 8. As the defense correctly points out, Pennak "brought the wealth of his experience . . . to bear on [his] observations and made connections." *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007). This requires a "process of reasoning which can be mastered only by specialists in the field." ECF 155 at 2. Thus, I shall exclude the last sentence in paragraph 10.

Likewise, in ECF 135-3, ¶ 9, Pennak provides an in-depth explanation of the "composition and functioning of 'snap cap' dummy rounds." Further, he notes that the use of such "dummy rounds" permits a student to mimic real ammunition by "allowing the slide of a semi-automatic handgun to chamber a round in the same way as it would with a live round." This is outside the realm of observation or common knowledge. *See Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156).

Of relevance here, the F.R.E. 701 Advisory Committee Note to the 2000 Amendment explains that "courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the subject is established." *Id.* (citing *United States v. Westbrook*, 896 F.2d 330 (8th Cir. 1990)). But, the Committee notes that if "that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702." Fed. R. Evid. 701, advisory committee note to 2000 Amendment (citing *United States v. Figueroa-Lopez*, 125 F.2d 1241 (9th Cir. 1997)). Here, the intricate, internal functioning of the rounds and the firearms are unquestionably "scientific, technical, or other specialized knowledge," analogous to explaining the manufacture of a narcotic. *Smith*, 962 F.3d at 766. Thus, paragraph 9 is not admissible.

The State calls into question Pennak's statement in paragraph 13 that the "live-fire requirement 'requires the use of a firing range, as even firing one live round of ammunition can only be done safely on a properly constructed range[.]'" ECF 145-1 at 3 (citing ECF 135-3, ¶ 13). Further, Pennak points out that "the discharge of ammunition is generally banned in the more populated areas of Maryland, except at established firing ranges." ECF 135-3, ¶ 13. These statements are admissible under Rule 701 because they are based on knowledge "common enough" to constitute a lay opinion and contain information that one could obtain through familiarity with local custom and practice. *Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156).

As to paragraphs 15-17, 18-19, and 21-23, defendants complain that Pennak uses his "specialized knowledge of simunition rounds" to opine on the "'safe' use and training purposes of simunition rounds" as well as the "modifications required to fire simunition rounds" and the "purported effect of local ordinances on the use of simunition rounds and the live-fire requirement." ECF 145-1 at 3.

In paragraph 15, Pennak provides an in-depth analysis of the difference between simunition rounds and "paint ball" rounds. In doing so, he describes how "compressed air or CO2" is used as "a propellant." In paragraphs 16 and 17, Pennak addresses the decibel level produced by firing simunition ammunition and the modification equipment needed to use simunition ammunition. Such information is clearly beyond the scope of common knowledge or knowledge gained by firsthand observation. In my view, it is analogous to the manufacture of narcotics described in the Committee Notes. *See* Fed. R. Evid. 701, advisory committee note to 2000 amendment.

In paragraph 18, Pennak opines on state law and local regulations as they relate to the firing of simunition rounds. Even if Pennak formed these opinions as a result of his job-related experience, they fall outside the boundaries of lay expertise. *See United States v. Vega*, 813 F.3d

386 (1st Cir. 2016) (finding that opinions by two lay witnesses in Medicare fraud prosecution that depended on their understanding technical Medicare laws should not have been admitted without first qualifying witnesses as experts).

In paragraphs 19 and 21-23, Pennak addresses, *inter alia*, shooting ranges in the Montgomery County area (ECF 135-3, ¶ 19), and the impact of the live fire requirement on Pennak's ability to provide HQL training. *Id.* ¶¶ 21-23. To the extent the information concerns Pennak's firsthand experience as a firearm safety instructor, it is "common enough" to satisfy the requirements of Rule 701. Additionally, the Advisory Committee Notes to the 2000 Amendment state that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as accountant, appraiser, or similar expert." Fed. R. Evid. 701, advisory committee note to 2000 amendment. Here, Pennak shares his opinions as to the projected challenges of his business, so he need not qualify as an expert.

Considering Pennak's firsthand experience as a firearm safety instructor, and upon review of the relevant paragraphs, I am satisfied that paragraphs 8, 10 (with the exception of the last sentence), 13, 19, and 21-23 are admissible under Rule 701. But, I shall exclude from consideration paragraph 9, the last sentence of paragraph 10, and paragraphs 15-18.

## I.      Conclusion

For the reasons set forth above, I shall grant Defendants' Motion in part and deny it in part. And, I shall deny Plaintiffs' Motion.

An Order follows, consistent with this Memorandum Opinion.


Dated: July 27, 2021                                            /s/
                                                  Ellen L. Hollander
                                                  United States District Judge

26