IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
|   | * |   |
| MARYLAND SHALL ISSUE, INC., et al. | * |   |
|   | * | **REDACTED** |
| v. | * | Civil Case No. ELH-16-3311 |
|   | * |   |
| LAWRENCE HOGAN, Jr. et al. | * |   |

## MEMORANDUM OPINION

This Memorandum Opinion resolves a challenge under the Second Amendment to the constitutionality of Maryland's handgun licensing requirement, embodied in Maryland's Firearm Safety Act of 2013 (the "FSA" or the "Act"). The FSA, codified in Md. Code (2018 Repl. Vol.), § 5-117.1 of the Public Safety Article ("P.S."), was enacted by the Maryland General Assembly in the aftermath of the 2012 tragedy in Newtown, Connecticut, when 20 first-graders and six adults were brutally murdered by a 20-year-old individual who killed the victims with an AR-15-type Bushmaster rifle.

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), for itself and approximately 1,900 members; Atlantic Guns, Inc. ("Atlantic Guns"); Deborah Kay Miller; and Susan Vizas filed suit against defendant Lawrence Hogan, Jr., in his capacity as Governor of Maryland, and defendant Colonel William M. Pallozzi, in his capacity as the Secretary and Superintendent of the Maryland State Police ("MSP").[1]  ECF 1 (Complaint); ECF 14 (First Amended Complaint or "FAC").[2]  I shall refer to the defendants collectively as the "State."

---

[1] Colonel Woodrow W. Jones, III has since succeeded Pallozzi as Secretary and Superintendent of the MSP. Neither party sought to substitute Jones for Pallozzi, but defendants specify that their motion for summary judgment (ECF 125) is brought on behalf of Governor Hogan and Col. Jones. The Clerk shall substitute Jones as a defendant.

[2] This case was initially assigned to Judge Marvin Garbis.  It was reassigned to me on July 26, 2018, due to the retirement of Judge Garbis.  *See* Docket.

In particular, plaintiffs challenge the provision of the Act that requires a Handgun Qualification License ("HQL") as a condition for purchasing a handgun in Maryland. The First Amended Complaint (ECF 14) contains three counts. Count I asserts a claim alleging that the HQL contravenes the Second Amendment. Count II asserts a violation of the Due Process Clause of the Fourteenth Amendment, based, *inter alia*, on statutory vagueness. In Count III, plaintiffs assert an ultra vires claim under Md. Code (2014 Repl.), § 10-125(d) of the State Government Article, challenging alleged rulemaking by the MSP.

As discussed, *infra*, I previously found that the plaintiffs lacked Article III standing as to their claims. ECF 98. On appeal, the Fourth Circuit affirmed in part and reversed in part and remanded for further proceedings. *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). Only the Second Amendment claim remains.

Cross-motions for summary judgment are now pending. Defendants' motion (ECF 125) is supported by a memorandum (ECF 125-1) (collectively, "Defendants' Motion") and 15 exhibits. ECF 125-2 to ECF 125-16. They argue that plaintiffs have failed to present a genuine dispute of material fact to support their Second Amendment challenge to the HQL law. ECF 125-1 at 8. Moreover, defendants assert that the Act "easily satisfies intermediate scrutiny" review. *Id.*

Plaintiffs have filed a combined cross-motion for summary judgment and opposition to Defendants' Motion (ECF 135), supported by a memorandum (ECF 135-1) (collectively, "Plaintiffs' Motion") and 28 exhibits. ECF 135-2 to ECF 135-29. They argue that the "undisputed facts" demonstrate that the "HQL requirement is unconstitutional because it effects a ban on handgun acquisition that is inconsistent with the Second Amendment's text, history, and tradition." ECF 135-1 at 12. Further, plaintiffs argue that the Act is subject to strict scrutiny, but they maintain that, even under intermediate scrutiny, defendants cannot meet their burden because the

requirements as to the HQL are "unnecessary and ineffective." *Id.* at 27. Plaintiffs take issue with the "30-day delay" in obtaining the HQL, the fingerprint requirement, and the safety course with the live-fire requirement. *Id.* at 46-48. Moreover, plaintiffs argue that the HQL process is "burdensome," *id.* at 12, as well as "superfluous" and "redundant," in light of the "pre-existing and still-continuing handgun registration process," identified by them as the "77R Handgun Registration." *Id.* at 11.

Defendants have filed a combined opposition to Plaintiffs' Motion and a reply in support of their own motion (ECF 140), along with 15 additional exhibits. Plaintiffs have replied (ECF 150) and submitted four additional exhibits.

With leave of Court (ECF 128), Everytown For Gun Safety ("Everytown"), a gun-violence-prevention organization, filed an amicus brief in support of Defendants' Motion. ECF 129 ("Amicus Brief"). The Amicus Brief includes 13 exhibits.  Everytown argues that the HQL  law is constitutional for three reasons: 1) the background check process that the law requires "is longstanding and lawful" under *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"); 2) the training requirement is consistent with the original understanding of the Second Amendment; and 3) the licensing fees are consistent with fees and taxes that states have been historically imposed on individuals seeking to obtain a firearm. ECF 129 at 11-12.

No hearing is necessary to resolve the pending motions. *See* Local Rule 105(6). For the reasons that follow, I conclude that the HQL law is constitutional. Accordingly, I shall grant Defendants' Motion and deny Plaintiffs' Motion.

## I.      Procedural Summary

Plaintiff MSI is a non-profit membership organization that is "'dedicated to the preservation and advancement of gun owners' rights in Maryland.  It seeks to educate the

community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public.'"  ECF 135-3 (Decl. of Mark W. Pennak, MSI President), ¶ 2 (internal citation omitted).  MSI's purpose includes "promoting and defending the exercise of the right to keep and bear arms" and "defending the Constitutional right of law-abiding persons to lawfully purchase, own, possess and carry firearms and firearms accessories." *Id.*  As of January 2021, MSI had approximately 1,900 members throughout Maryland.  *Id.*

Plaintiff Atlantic Guns is a licensed federal firearms dealer that was founded in 1950. ECF 135-2 (Decl. of Stephen Schneider, owner of Atlantic Guns, dated 10/3/2018), ¶¶ 2, 3. According to Schneider, handguns are the most popular firearm of choice for Atlantic Guns' customers and the HQL requirement has "severely impacted" Atlantic Guns' business. *Id.* ¶¶ 6, 7.  In particular, Schneider states, *id.* ¶ 8: "Atlantic Guns turns away would be customers every week [because of the HQL requirement], totaling at least in the hundreds over the five years since the Handgun License requirement took effect. Sometimes prospective customer[s] place a deposit on a handgun, which we then hold pending their obtaining a Handgun License. Some of these customers later request refunds and the sale is not consummated."

The individual plaintiffs, Miller and Vizas, are MSI members.  They claim that they would like to own a handgun, but have not attempted to purchase one and do not intend to obtain an HQL.

Miller has never owned a firearm, but her husband owns both handguns and long guns. ECF 135-5 at 7, Tr. 17. In 2017, Miller decided that she wanted to purchase a handgun because she "wanted to be able to defend [herself] in [her] home." *Id.* at 8-9, Tr. 18-19. Further, she decided that she needed to have a gun for herself, rather than use her husband's gun, because she was concerned that under the "new law," using her husband's gun would constitute "receipt," potentially subjecting her to prosecution. *Id.* at 9, Tr. 19. Miller claimed that the "time for the

4

training" is an "inconvenience that has deterred" her from obtaining an HQL. *Id.* at 12, Tr. 33. Specifically, Miller explained that she has "back issues" that make it difficult to sit for the four-hour course and it would also be burdensome to take time off from work. *Id.*

Vizas decided in 2015 that she wanted to purchase a handgun. ECF 135-4 at 5, Tr. 18. She explained that she wanted to "just have it." *Id.* at 7, Tr. 25. Vizas took a "hunter safety training" course in Maryland in 2016 because her children wanted to attend the class. *Id.* at 9, Tr. 37. But, she claimed that the "expense" of the required HQL class and the "time to take the class, to get fingerprints, [and] to wait for a background check" are an "inconvenience that has deterred [her] from obtaining an HQL." *Id.* at 10, Tr. 43.

In the course of this litigation, MSI has also identified other members who do not possess an HQL but who wish to acquire a handgun. ECF 135-27 (Dep. of John Matthew Clark); ECF 135-17 (Dep. of Dana Hoffman); ECF 135-26 (Dep. of Scott Miller). None of these individuals has actually applied for an HQL. But, they claim that the HQL requirements have deterred them from acquiring licenses and purchasing handguns. Mr. Miller, for example, explained that "the inconvenience" associated with the HQL requirements has deterred him from purchasing a handgun. ECF 135-26 at 3, Tr. 24. But, he also said, *id.*: "I have no reason to believe that I'd be barred from owning one…" *See also* ECF 135-17 at 11-12, Tr. 23-24 (Hoffman explaining that going to the required training would be problematic because of her medical conditions).

As noted, the FAC originally contained three counts. Defendants moved to dismiss. ECF 18. Judge Marvin Garbis, to whom the case was then assigned, issued a Memorandum and Order (ECF 34), granting the motion as to the Instructor Certification Requirement of the Act with respect to Count II. But, he denied the motion as to all other claims. *Id.*

At the conclusion of discovery, the parties filed cross-motions for summary judgment. By Memorandum Opinion (ECF 98) and Order (ECF 99) of March 31, 2019, I concluded that plaintiffs lacked Article III standing as to all claims in the FAC.   Therefore, I granted the defendants' summary judgment motion (ECF 59) and denied plaintiffs' cross motion for summary judgment (ECF 77). *See* ECF 102 ("Redacted Memorandum Opinion"). Plaintiffs subsequently appealed to the Fourth Circuit.  ECF 103.

On appeal, the Fourth Circuit affirmed in part and reversed in part, and remanded the case for further proceedings. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). The Court determined that Atlantic Guns has standing to assert a Second Amendment claim, both "to bring its own, independent Second Amendment claim" and to bring a Second Amendment claim "on behalf of potential customers" under the doctrine of third-party standing. *Id.* at 214, 216. And, "because standing for one party on a given claim is sufficient to allow a case to proceed in its entirety on that issue," the other plaintiffs (Vizas, Miller, and MSI) also had standing to bring a Second Amendment claim. *Id.* at 210, 216.

Notably, the Fourth Circuit "state[d] no opinion…on the merits of Atlantic Guns' asserted second amendment claims." *Id.* at 214 n.5. Moreover, the Fourth Circuit affirmed the decision as to Counts II and III, concluding that plaintiffs lacked standing to bring the constitutional due process claim and the challenge to the MSP regulations as ultra vires. *Id.* at 216-20. Thus, the Court said, *id.* at 216: "In light of our conclusion that Atlantic Guns has both independent and third-party standing, we reverse the district court's judgment in favor of the State Defendants as to the Second Amendment claims [in Count I] and remand with instructions that the claims proceed to trial."

Accordingly, only Count I remains at issue.  Following the remand by the Fourth Circuit,

the parties submitted a proposed scheduling order, which provided for additional discovery.  ECF

120.  I approved the parties' proposed schedule. ECF 121. The cross-motions for summary

judgment followed.

## II.        Factual Background[3]

### A.        Handgun Laws in Maryland

In 1941, Maryland enacted a "Pistols" subtitle to the Maryland Code, which banned the

sale or transfer of a handgun to a person convicted of a crime of violence or a fugitive. *See* Md.

Code (1941), Art. 27, §§ 531(A)–(G), now codified at P.S. § 5-118.  Since 1966, Maryland has

enacted four statutes intended to prevent prohibited persons from acquiring handguns.  In 1966,

the Maryland General Assembly enacted the 77R Handgun Registration Requirement.  It was

followed by the Gun Violence Act of 1996; the Responsible Gun Safety Act of 2000; and the

Firearm Safety Act of 2013.

The 77R Handgun Registration Requirement ("77R" or "Handgun Registration") has

several requirements. Plaintiffs assert that they "are not challenging the 77R background check

process." ECF 14, ¶ 50 n.1.

The application under the Handgun Registration statute requires the purchaser to provide,

*inter alia*, his or her "name, address, Social Security number…driver's [license] or photographic

identification soundex number…"  *See* Md. Code (1966), Art. 27, § 442, now codified at P.S. § 5-

---

[3] I incorporate here the facts set forth in my earlier opinion (ECF 98), as supplemented by the new factual material submitted by the parties with their summary judgment motions. In general, when citing to an exhibit, I have identified the exhibit at least once, but not repeatedly. In addition, when citing to the parties' submissions, I use the electronic pagination, which does not always correspond to the page numbers on the submissions.

118. This information is used by the MSP to conduct a background check as to a prospective purchaser. P.S. § 5-121; ECF 135-6 (Dep. of Daniel Webster) at 14, Tr. 73.

Under 77R, firearms dealers are prohibited from transferring a handgun to a prospective purchaser "until after seven days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee…and forwarded by the prospective seller…to the Superintendent of the Maryland State Police." Md. Code (1966), Art. 27, § 442; *see* P.S. §§ 5-118, 5-120, 5-123.

The Gun Violence Act of 1996 made the 77R Handgun Registration requirement applicable to all handgun transfers, including gifts and private sales. Md. Code (1996), Art. 27, § 445, now codified at P.S. § 5-124. And, the Responsible Gun Safety Act of 2000 added the requirement that all prospective handgun purchasers must complete "a certified firearms safety training course that the Police Training Commission conducts…." ECF 135-11; *see* Md. Code (2003), P.S. § 5-118(b)(3)(x). Pursuant to this requirement, the Police Training Commission created an hour-long, online course for prospective handgun purchasers. ECF 135-1 at 19.

### B.    The FSA

The Maryland General Assembly enacted the FSA in 2013, and it went into effect on October 1, 2013.  In relevant part, the Act requires most Maryland handgun purchasers to first obtain an HQL. Subject to certain exemptions not pertinent here,[4] "[a] dealer or any other person may not sell, rent, or transfer a handgun" to a second person, and the second person "may not purchase, rent, or receive a handgun" from the first person, unless the buyer, lessee, or transferee

---

[4] Active and retired members of law enforcement agencies and the military are not required to obtain an HQL. P.S. § 5-117.1(a). The FSA also does not apply to "licensed firearms manufacturer[s]" or "a person purchasing, renting, or receiving an antique, curio, or relic firearm," as defined by federal law. *Id.*

presents a valid HQL.  P.S. § 5-117.1(b), (c).  A person who violates the Act is guilty of a misdemeanor, and is subject to imprisonment for up to five years and/or a fine not exceeding $10,000.  *Id.* § 5-144(b).

To obtain an HQL, a person must satisfy a handful of conditions.  Of relevance here, an applicant must "complete a minimum of 4 hours of firearms safety training within the prior three years" and, "based on an investigation," the individual may not be "prohibited by federal or State law from purchasing or possessing a handgun." *Id.* § 5-117.1(d).[5] The safety training, which is undertaken at the applicant's expense, must cover classroom instruction on "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation," along with a live-fire "firearms orientation component that demonstrates the person's safe operation and handling of a firearm." *Id.* § 5-117.1(d)(3).

An applicant must complete a written application, in a manner designated by the Secretary of the MSP (the "Secretary").  *See* P.S. § 5-101(u) (defining "Secretary").  As authorized by the Act, the MSP adopted regulations to effectuate the HQL requirements. *See* P.S. §§ 5-105; 5-117.1(n); Code of Maryland Regulations ("COMAR") 29.03.01.26-.41.

The application must include the applicant's "name, address, driver's license or photographic identification soundex number," along with other identifiers and a nonrefundable

---

[5] The applicant must also be at least 21 years of age to obtain an HQL. P.S. § 5-117.1(d). But *see Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 410 (4th Cir. 2021) (concluding that federal criminal statutes making it unlawful for federal firearms licensees to sell handguns to people under 21 years of age violate the Second Amendment), *vacated as moot*, ___ F.4th ___, 2021 WL 4301564 (4th Cir. Sept. 22, 2021). The age requirement is not at issue in this case.

I note that *Hirschfeld* was vacated after this Memorandum Opinion was first issued, but prior to its designation by West for publication. Therefore, I have added the change in *Hirschfeld's* status.

application fee of $50. P.S. § 5-117.1(g); COMAR 29.03.01.28.  Moreover, the application must

include "a complete set of the applicant's legible fingerprints taken in a format approved by" the

Maryland Department of Public Safety and Correctional Services ("DPSCS") and the Federal

Bureau of Investigation ("FBI").  P.S. § 5-117.1(f)(3)(i); *see* ECF 125-7 (Decl. of MSP Captain

Andy Johnson) at 1-9. The applicant's fingerprints must be taken by a State-certified vendor using

"livescan" technology.  P.S. § 5-117.1(f)(3)(i); ECF 125-7, ¶ 23.[6]  In addition, the applicant must

submit proof of completion of the training requirement, and a statement under oath that the

applicant is not prohibited from gun ownership.  P.S. § 5-117.1(g).

Using the fingerprints provided in a completed application, the Secretary must apply to

DPSCS for a criminal history records check for all HQL applicants.  *Id.* § 5-117.1(f)(2).  And, if

DPSCS receives criminal history information "after the date of the initial criminal history records

check," it must share that information with MSP; MSP may subsequently revoke the HQL of a

person who becomes ineligible to possess the handgun.  *Id.* § 5-117.1(f)(7); *see* ECF 125-7, ¶¶ 23,

24; ECF 140-4 (Dep. of Andy Johnson) at 9-10, Tr. 133-134 (explaining how DPSCS reports

arrests and prosecutions to MPS and if the charge is a "disqualifier" for an HQL, then MSP will

revoke the individual's HQL); ECF 125-9 (Affidavit of First Sgt. Donald Pickle, Assistant

Commander of MSP's Licensing Div.), ¶ 6.

In order to obtain a valid HQL, most applicants must complete a four-hour, live firearms

safety training course, taught by a qualified handgun instructor ("QHI"), consisting of both

classroom instruction and "a firearms orientation component that demonstrates the person's safe

---

[6] Plaintiffs complain that there are "hardly any [State-certified] private fingerprinting
vendors in rural areas." ECF 135-1 at 25.  But, according to the State's website, there are at least
86   vendors   across   the   State   that   provide   fingerprinting   services.   *See*
https://www.dpscs.state.md.us/publicservs/fingerprint.shtml.

operation and handling of a firearm." P.S. § 5-117.1(d)(3).  In particular, the safety training must cover classroom instruction on "State firearm law"; "home firearm safety"; and "handgun mechanisms and operation." *Id.* And, as part of the "firearms orientation component," which "demonstrates" the "safe operation and handling of a firearm," § 5-117.1(d)(3)(iii), the applicant must "safely fire[] at least one round of live ammunition."  COMAR, 29.03.01.29. The safety course is not provided by the MSP, but the MSP has a sample lesson plan for the course on its website for use by QHIs.  ECF 135-7 (Dep. of Andy Johnson) at 8-9, Tr. 68-69; ECF 135-9 (Dep. of MSP Captain James Russell) at 5-6, Tr. 70-71; *Id.* at 14, Tr. 114.[7]

A person can become a QHI if he or she has: "A valid Qualified Handgun Instructor License issued by the Secretary"; "Been recognized by the Maryland Police and Correctional Training Commission"; or "A valid instructor certification issued by a nationally recognized firearms organization." COMAR, 29.03.01.37. An individual may obtain a Qualified Handgun Instructor License from the Secretary by providing, among other things, proof of "formal training in the care, safety, and use of handguns, including a minimum qualification score of 80 percent on a practical police course," and proof of a "minimum of 1 year of experience in instruction in the care, safety and use of handguns." *Id.* 29.03.01.38.

HQL applicants are required to locate, arrange, and pay for training at their own expense. However, an applicant is exempt from the training requirement under certain conditions, including prior completion of a safety training course, lawful ownership of a "regulated firearm," which

---

[7] As of November 17, 2017, the MSP permits the use of "non-lethal marking projectiles" to satisfy the HQL's "live fire" training requirement. *See* ECF 125-7 at 100. Moreover, since July 2020, because of the COVID-19 pandemic, the Licensing Division has permitted the instruction component of the training course to be done via "real time, bi-directional audio and video connection." ECF 125-10, ¶ 12.

includes a handgun, or "an honorably discharged member of the armed forces of the United States or the National Guard."  P.S. §§ 5-117.1(e), 5-101(r).

The Act requires the MSP to process any completed application within 30 days of its receipt.  *Id.* § 5-117.1(h). For the most part, HQL applications are processed in the order that they are submitted to MSP. ECF 125-7, ¶ 6. According to the two Commanders of the Licensing Division of MSP, all "properly completed application[s]" that have been received by the MSP since the inception of the HQL law have been processed within this mandated 30-day time frame. *Id.* ¶ 12; ECF 125-10 (Decl. of MSP Captain Andrew Rossignol), ¶ 15. If the application is missing components at the 30-day mark, then the application will receive an administrative denial that can be overturned once all of the components of the applications are submitted. ECF 135-7 at 33-35, Tr. 138-140. This means that some applications are not fully processed within 30 days. *Id.* at 35, Tr. 140.

Once an applicant receives an HQL, then the applicant must comply with P.S. § 5-118 before taking possession of the gun. Section 5-118 requires an individual to complete an application (known as the 77R form) confirming that he or she is not prohibited from acquiring a handgun, among other things, and pay a $10 application fee. Unless an application is disapproved by the MSP within seven days of submitting the 77R form, the applicant may take possession of the gun. P.S. §§ 5-122, 5-123; *see* ECF 135-6 (Dep. of Daniel Webster, Director of the Johns Hopkins University Center for Gun Policy and Research) at 11, Tr. 38. The HQL is valid for ten years (P.S. § 5-117.1(i)) and may be renewed without completion of another firearms safety course or the resubmission of fingerprints.  *Id.* § 5-117.1(j); COMAR, 29.03.01.34.

If the HQL is not approved, the Secretary must provide a written denial, along with a statement of reasons and notice of appeal rights.  *Id*. § 5-117.1(h).  A person whose application is

not approved may request a hearing with the Secretary within 30 days of the denial, and thereafter may seek judicial review in State court.  *Id*. §§ 5-117.1(I)(1), (3).

According to plaintiffs, the process of obtaining fingerprints, taking the training course, and submitting an application to the MSP may cost an applicant more than $200. ECF 135-1 at 26. For starters, an applicant may have to pay at least $50 for live-scan fingerprints and from $50 to more than $100 for the required safety course. *See* ECF 135-19 ("LiveScan HQL Fingerprinting Costs as of 12/2/2017"); ECF 135-20 (Dep. of Schneider) at 3, Tr. 17; ECF 135-18 (Dep. of Pennak) at 4-5, Tr. 22-23. Then, as noted, an applicant must submit a $50 application fee to MSP with the completed application. P.S. § 5-117.1(g)(2).

In legislative hearings concerning the FSA, the General Assembly heard testimony from various public policy and law enforcement experts advocating for the licensing requirement generally, and the fingerprint and training requirements in particular. *See* ECF 125-3; ECF 125-5; ECF 125-6.  Dr. Daniel Webster, ScD, MPH, Director of the Johns Hopkins University Center for Gun Policy and Research, was one of the experts.  He testified, ECF 125-3 at 2: "Arguably, the most important objective of a state's gun laws is to prevent dangerous individuals from possessing firearms. Although Maryland has some useful laws to accomplish this task, the system is especially vulnerable to illegal straw purchases and the individuals using false identification in their applications to purchase regulated firearms."

In support of the Act, Webster discussed various studies of gun violence and public policies.  He relied, *inter alia*, on a study conducted by the U.S. Government Accountability Office ("GAO"), in which five "agents acting in an undercover capacity used ... counterfeit driver's licenses in attempts to purchase firearms from gun stores and pawnshops that were licensed by the federal government to sell firearms." ECF 125-4 (GAO–01–427, FIREARMS PURCHASED

FROM FEDERAL FIREARM LICENSEES USING BOGUS IDENTIFICATION 2 (2001)) ("GAO Study"), at 5-6.[8] The investigators conducted the study in states that relied on "the instant background check," but which "do not require fingerprinting or a waiting period" for firearm purchases. *Id.* Based on these results, the report concluded that "the instant background check . . . cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful." *Id.* at 5.

Further, Webster explained that the District of Columbia and five states—Connecticut, Iowa, Massachusetts, New Jersey, and New York—require individuals to apply directly with a law enforcement agency and be photographed and fingerprinted before they can purchase handguns. ECF 125-3 at 3. Those states, according to Webster, "have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-2010—Connecticut 5.1, Iowa 6.4, Massachusetts 3.5, New Jersey 5.2, and New York 5.0—compared with the overall rate for the nation of 9.5." *Id.* Missouri, however repealed a licensing law that it had in place in 2007. According to Webster, "[i]mmediately following the repeal of Missouri's permit-to-purchase licensing law [in 2007], the share of guns recovered by Missouri police agencies that had an unusually short time interval from retail sale to crime indicative of trafficking more than doubled." *Id.* Further, he explained, *id.*: "Preliminary evidence suggests that the increase in the diversion of guns to criminals linked to the law's repeal may have translated into increases in homicides committed with firearms."

---

[8] The states in which the GAO conducted its study had adopted the National Instant Criminal Background Check System ("NICS"), *see* 18 U.S.C. § 922(t), under which the following information is required of each individual who undergoes a NICS check: (1) name, (2) sex, (3) race, (4) date of birth, and (5) state of residence. 28 C.F.R. § 25.7. A dealer may, in addition, report the purchaser's Social Security Number or other identifying number and physical description. *Id.*

The General Assembly also heard testimony from then-Baltimore County Police Chief James Johnson. *See* ECF 125-5. He maintained that the HQL requirement would "reduce the number of non-intentional shootings by ensuring that gun owners know how to safely use and store firearms"; "will decrease illegal gun sales and purchases by ensuring that all licensees are eligible to possess firearms under Federal and State law"; and "will reduce murder rates." *Id.* at 4. As to the fingerprint requirement, Johnson said that it "will help law enforcement identify people involved in gun crimes," and it "is not an inconvenience" for Marylanders. *Id.* at 4. Further, with respect to the training requirement, Johnson noted: "The current viewing requirement – viewing a 30-minute video – is insufficient." *Id.* at 5. And, he averred that the training would deter straw purchasers because they would not be inclined to "sit through a four-hour training program." *Id.*[9]

Similarly, then-Baltimore City Police Commissioner Anthony Batts testified that most "of the homicides and non-fatal shootings that plague Baltimore are perpetrated by prohibited persons with illegal guns." ECF 125-6 at 2. According to Batts, the training and fingerprint requirement will "ensur[e] that the applicant is not prohibited from possessing a handgun" and will serve "as a deterrent to straw buyers of handguns." *Id.* at 2-3.

From October 1, 2013, when the FSA went into effect, through the end of 2020, a total of 192,506 Marylanders have successfully obtained an HQL. ECF 140-11 at 4. And, between 2015 through 2020, 180,423 HQL applications were submitted to the Licensing Division of the MSP, of which 5,001 were denied. ECF 135-16 at 1 (MSP Licensing Division Report, 1/4/2018); ECF 140-11 at 4 (MSP Licensing Division Report, 12/31/2020).

---

[9] "Straw purchases are transactions in which persons who are legally prohibited from purchasing a firearm (due to criminal history or other disqualifying events) recruit third-parties to purchase guns for them." ECF 125-11, ¶ 8.

According to the evidence, from October 1, 2013 through 2020, some 93,056 HQL applications were initiated but not submitted to the MSP. ECF 135-15 (Pallozzi Third Supp. Interrog. Resp.) at 3-4, 8. Colonel Pallozzi postulated that there "are a number of reasons why an individual might initiate but not submit an application." *Id.* at 4. For example, he noted that "an application may be created for training purposes, or by an individual who has no intention of submitting an application." *Id.* Further, he explained, *id.*: "MSP personnel who process applications routinely receive communications from individuals who are ineligible for an HQL, including because of their age, immigration status, residency status, or criminal history, who have initiated an application but ultimately decide not to submit the application because they are ineligible for an HQL."

Also of relevance, plaintiffs have provided the following Maryland crime data, gathered from the Maryland Uniform Crime Reports and U.S. Department of Justice Federal Bureau of Investigation, Criminal Justice Information Services Division, ECF 135-23:

| Year | Homicides | Shooting Homicides | Handgun Homicides | Shooting Homicide Rate | Handgun Homicide Rate | Recovered Handguns Used in Crime |
|---|---|---|---|---|---|---|
| 2009 | 440 | 308 | 299 | 5.40 | 5.24 | 4,359 |
| 2010 | 426 | 296 | 278 | 5.12 | 4.81 | 4,378 |
| 2011 | 398 | 272 | 265 | 4.66 | 4.54 | 4,515 |
| 2012 | 372 | 281 | 271 | 4.77 | 4.60 | 4,546 |
| 2013[10] | 387 | 272 | 268 | 4.58 | 4.52 | 4,611 |

---

[10] Plaintiffs omitted data for 2013. But, because the data is publicly available and is subject to judicial notice under Federal Rule of Evidence 201, I have included it. *See* MD Uniform Crime Report 2013 at 14, 17, https://pilot-mdsp.maryland.gov/Document%20Downloads/Crime%20in%20Maryland%202013UCR.pdf; Recovered Handguns Used in Crime data available online is from U.S. Department of Justice

| 2014 | 363 | 245 | 231 | 4.09 | 3.86 | 4,487 |
|------|-----|-----|-----|------|------|-------|
| 2015 | 553 | 419 | 398 | 6.97 | 6.62 | 4,963 |
| 2016 | 534 | 402 | 368 | 6.68 | 6.11 | 5,291 |
| 2017 | 569 | 441 | 401 | 7.28 | 6.62 | 5,269 |
| 2018 | 489 | 452 | 401 | 7.48 | 6.64 | 6,832 |
| 2019[11] | 543 | 514 | 462 | 8.50 | 7.64 | 5,971 |

The parties also dispute whether the HQL has negatively impacted gun sales in Maryland. The following chart documents the number of handguns sold by Atlantic Guns in Maryland from 2009 through 2020. *See* ECF 84-1[12]; ECF 141-1 [SEALED].

| Year | Guns transferred |
|------|------------------|
| 2009 | |
| 2010 | |
| 2011 | |
| 2012 | |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | |
| 2019 | |
| 2020 | |

Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data 2013 Report, https://www.atf.gov/resource-center/docs/143894-mdatfwebsite13pdf/download.

[11] The data for 2020 is not yet available.

[12] This exhibit was filed in 2018 with plaintiffs' first summary judgment motion. *See* ECF 75.  Plaintiffs again refer the Court to the document. *See* ECF 135-1 at 15 n.1.

The summary indicates that gun sales fell in the years immediately following the enactment of the FSA. However, during the past four years, Atlantic Guns has ███████████████ than it did during the four years immediately preceding the enactment of the FSA.

Additional facts are included, *infra*.

### III.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Market Development Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016);

*Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*

*Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a genuine dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

When, as here, the parties have filed cross-motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because multiple parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

Notably, there are no material facts in dispute.  Rather, the parties disagree over the application of the law to the facts.  And, in particular, they disagree about the decision-making of the Maryland General Assembly.

## IV.   Discussion

### A.  The Second Amendment Generally

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  *See* U.S. Const. amend. II.  In *Heller I*, 554 U.S. at 592, the Supreme Court determined that, by its operative clause, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."

According to the *Heller I* majority, the Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 634-35. Accordingly, the Court found that a complete prohibition on handguns—the class of weapon "overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]" in the home—infringed on the central protection of the Second Amendment and thus failed any level of constitutional scrutiny. *Id.* at 628–29; *see also Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013) (noting that self-defense in the home is the "core protection" of the Second Amendment right).

Nevertheless, the Court recognized that "the right secured by the Second Amendment is not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller I*, 554 U.S. at 626; *see Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 419 (4th Cir. 2021), *vacated as moot*, ___

21

F.4th ___, 2021 WL 4301564 (4th Cir. Sept. 22, 2021); *Walker v. Donahoe*, 3 F.4th 676, 689 (4th Cir. 2021). Indeed, the Court has made clear that the Second Amendment permits "reasonable firearms regulations." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010); *see Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); *see also Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir. 2017) (en banc), *cert. denied*, __ U.S. __, 138 S. Ct. 469 (2017); *United States v. Chester*, 628 F.3d 673, 675 (4th Cir. 2010).

The *Heller I* Court provided a non-"exhaustive" list of "presumptively lawful regulatory measures," including "longstanding prohibitions" on firearm possession by certain groups of people, and "laws imposing conditions and qualifications on the commercial sale of arms." *Heller I*, 554 U.S. at 626–27 & n.26; *see McDonald*, 561 U.S. at 786 (noting that the Court's holding in *Heller* "did not cast doubt on such longstanding regulatory measures…['] laws imposing conditions and qualifications on the commercial sale of arms.'") (quoting *Heller I*, 554 U.S. at 626-27). And, in *Kolbe*, 849 F.3d at 121, the Fourth Circuit concluded that the FSA's ban on assault weapons did not contravene the Second or Fourteenth Amendments, because such weapons are not protected by the Second Amendment. Alternatively, it ruled that, even if the banned weapons "are somehow entitled to Second Amendment protection," the provision was properly subjected to intermediate scrutiny and is "constitutional under that standard of review." *Id.*

The Fourth Circuit, like several other circuits, has adopted a two-pronged approach to analyzing Second Amendment challenges. *Chester*, 628 F.3d at 680; *see Hirschfeld*, 5 F.4th at 414-15; *see also Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) ("Like our sister circuits, we apply a two-prong approach in considering as-applied Second Amendment challenges."); *Kolbe*, 849 F.3d at 132 ("Like most of our sister courts of appeals, we have concluded that "a two-part approach to Second Amendment claims seems appropriate under *Heller*." (internal citation

omitted)); *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (holding that courts "generally engage in the ... two-pronged [*Chester*] analysis for facial Second Amendment challenges"); *see, e.g., Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012). Under this approach, the court must first determine "'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.'" *Kolbe*, 849 F.3d at 133 (quoting *Chester*, 628 F.3d at 680). If it does not impose a burden, then the challenged law is valid. *Kolbe*, 849 F.3d at 133. "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment, [the Court must] next 'apply[ ] an appropriate form of means-end scrutiny.'" *Id.* In other words, the court must determine whether to apply strict scrutiny or intermediate scrutiny; this "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* (internal quotations omitted) (noting that courts should look to the First Amendment as a guide in determining the applicable standard of review); *see Hirschfeld*, 5 F.4th at 415 ("Just as the First Amendment employs strict scrutiny for content-based restrictions but intermediate scrutiny for time, place, and manner regulations, the scrutiny in this context 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'") (quoting *Chester*, 628 F.3d at 682).

Courts "are at liberty to" avoid ruling on the first prong of the test, and "assume that a challenged statute burdens conduct protected by the Second Amendment and focus instead on whether the burden is constitutionally justifiable." *Hosford*, 843 F.3d at 167. Indeed, the Fourth Circuit has found it "prudent" not to rest on the first prong's historical inquiry. *Id.*; *see Woollard*, 712 F.3d at 875 ("[W]e are not obliged to impart a definitive ruling at the first step of the *Chester*

inquiry. And indeed, we and other courts of appeals have sometimes deemed it prudent to instead resolve post-*Heller* challenges to firearm prohibitions at the second step."); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (assuming that the Second Amendment was implicated by a statute prohibiting possession of firearms in national parks and applying intermediate scrutiny); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 789 (D. Md. 2014) ("Nevertheless, the court need not resolve whether the banned assault weapons and LCMs are useful or commonly used for lawful purposes… and will assume, although not decide, that the Firearm Safety Act places some burden on the Second Amendment right."), *aff'd in part, vacated in part,* 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

As to what level of scrutiny to apply, the Fourth Circuit has instructed that when a law severely burdens "the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home," it is subject to the strict scrutiny test. *Kolbe*, 849 F.3d at 138. But, if a law "does not severely burden" that core protection, then intermediate scrutiny is the appropriate standard. *Id.*; *see Chester*, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right … may be more easily justified."); *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) ("*NYSRPA*") ("Heightened scrutiny need not … be akin to strict scrutiny when a law burdens the Second Amendment—particularly when that burden does not constrain the Amendment's core area of protection." (internal quotation marks omitted)).

To satisfy strict scrutiny, "the government must prove that the challenged law is 'narrowly tailored to achieve a compelling governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Abrams v. Johnson*, 521 U.S. 74, 82 (1997)). This is a demanding standard that requires the government to

establish that "'no less restrictive alternative' would serve its purpose." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (*citing United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 237 (D. Md. 2020).

"The less onerous standard of intermediate scrutiny requires the government to show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471). Stated differently, the government must prove "that there is a reasonable fit between the challenged regulation and a substantial governmental objective." *Chester*, 628 F.3d at 683 (internal quotation marks omitted); *see Hirschfeld*, 5 F.4th at 415; *Harley*, 988 F.3d at 769.

Unlike strict scrutiny, intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 474). Rather, the State must demonstrate that there is "a fit that is 'reasonable, not perfect.'" *Woollard*, 712 F.3d at 878 (quoting *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012)) (cleaned up); *see Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) ("In applying intermediate scrutiny, we ask 'whether the statutes at issue are substantially related to the achievement of an important governmental interest.'") (internal citation omitted); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) ("Intermediate scrutiny requires the lesser showing of 'a reasonable fit between the challenged regulation and an important government objective.'") (citation omitted), *cert. denied*, __ U.S.__, 141 S. Ct. 1397 (2021). In fact, a "statute may meet this standard despite being overinclusive in nature." *Harley*, 988 F.3d at 769.

## B.  Text, History, and Tradition

Plaintiffs urge the Court to analyze their Second Amendment claim based on "text, history, and tradition," rather than the two-pronged approach discussed earlier. ECF 135-1 at 34-37; *see Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition ...."). As recently as July 2021, the Fourth Circuit applied the two-step framework in analyzing a Second Amendment claim. *Hirschfeld*, 5 F.4th at 414-15; *see also Harley*, 988 F.3d at 769; *Kolbe*, 849 F.3d at 141 (two-step framework "is entirely faithful to the *Heller* decision and appropriately protective of the core Second Amendment right"). As part of the inquiry, however, the Court must also "consider text, structure, history, and practice to reveal the original public meaning of the Second Amendment." *Hirschfeld*, 5 F.4th at 419. Therefore, I shall proceed under the two-pronged approach.[13]

### C.  HQL's burden on the Second Amendment

---

[13] Even if I were to analyze the dispute based only on the "text, history, and tradition," this would not compel a finding that the HQL is unconstitutional. *Heller I* and *McDonald* "did not hold that a state's firearms licensing laws were unconstitutional[.]" *Libertarian Party of Erie Cty. v. Cuomo*, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018). Rather, the *Heller I* Court found unconstitutional a total ban on handguns, but the Court declined to address the constitutionality of a handgun licensing requirement. *See Heller I*, 554 U.S. at 631. Thus, the Second Circuit, for example, rejected the argument that New York State's firearms licensing laws were unconstitutional under *Heller I* and *McDonald*, concluding that so holding "would stretch the conclusions of both decisions well beyond their scope." *Libertarian Party*,  970 F.3d at 127; *see also, e.g., United States v. Focia*, 869 F.3d 1269, 1283 (11th Cir. 2017) (rejecting claim that federal statute was "an impermissible prior restraint in violation of the Second Amendment because it criminalizes dealing in firearms without a license," and collecting cases from the First, Second, Third, Fourth, and Seventh Circuits rejecting similar claims); *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843, 847 (7th Cir. 2012) ("If the state may set substantive requirements for ownership, which *Heller* says it may, then it may use a licensing system to enforce them.... Courts of appeals uniformly hold that some kind of license may be required."); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 379 (D. Mass. 2013) ("[T]he requirement of prior approval by a government officer, or a licensing system, does not by itself render [a firearms] statute unconstitutional on its face.") (internal quotation marks omitted), *aff'd*, 783 F.3d 332 (1st Cir. 2015).

The parties vigorously disagree as to the analysis under the two-step framework. Plaintiffs contend that the HQL "requirement burdens conduct within the Second Amendment's guarantee," and they insist that strict scrutiny "is the only appropriate level of scrutiny because the HQL requirement burdens the Second Amendment's core right." ECF 135-1 at 40. According to plaintiffs, the HQL requirements fail the intermediate scrutiny test because (1) the recited harms do not exist and, in any event, the HQL requirement will not "alleviate these harms in a direct and material way," and (2) they dispute "that the HQL requirement is narrowly tailored to serve a substantial government interest." *Id.* at 59.

Conversely, defendants argue that the HQL law does not impose a burden on the exercise of Second Amendment rights because it "does not deprive any 'law-abiding, responsible citizen' of the right to possess a handgun for in-home self-defense." ECF 125-1 at 20 (*quoting Heller I*, 554 U.S. at 635). However, even if the HQL law did impose such a burden, defendants maintain that intermediate scrutiny would be the appropriate test because the law does not severely limit the possession of firearms or prevent individuals from possessing a firearm. *Id.* at 21.  And, they insist that the law would survive under the intermediate scrutiny test because Maryland has a substantial interest in promoting public safety, and the HQL requirements are reasonably adapted to that interest. ECF 140 at 26-39.

The Fourth Circuit recently clarified the appropriate approach in *Hirschfeld*, 5 F.4th 407, which involved "several federal laws and regulations that prevent federally licensed gun dealers from selling handguns to any 18-, 19-, or 20-year-old." It said, *id.* at 418: "At step one of the *Chester* inquiry, we ask 'whether the conduct at issue was understood to be within the scope of the right *at the time of ratification*.'" (Quoting *Chester*, 628 F.3d at 680) (emphasis in *Hirschfeld*). The *Hirschfeld* Court also said, 5 F.4th at 418-19:

> The government bears the burden to show that the regulation clearly falls outside the scope of the Second Amendment. *See* [*Chester*, 628 F.3d] at 681–82; *Ezell* [*v. City of Chicago*], 651 F.3d [684], [] 702–03 [(7th Cir. 2011)]; *Tyler* [*v. Hillsdale*], 837 F.3d [678], [] 688 [(6th Cir. 2016)]. And in the face of historical silence or ambiguity, we assume the conduct is protected. *Chester*, 628 F.3d at 680–82. At the very least, this inquiry requires us to consider text, structure, history, and practice to reveal the original public meaning of the Second Amendment. *See Heller*, 554 U.S. at 576–628, 128 S.Ct. 2783. The relevant question is: What did the right to keep and bear arms mean to the public at the time of ratification?

I need not delve into a historical analysis in this case, however, because the Supreme Court has already determined that the type of firearm at issue under the HQL law—the handgun—unquestionably falls within the scope of the Second Amendment. Indeed, the Supreme Court has characterized the handgun as "the quintessential self-defense weapon" and observed that handguns are "the most popular weapon chosen by Americans for self-defense in the home." *Heller I*, 554 U.S. at 629 (deeming the District of Columbia's handgun ban to be unconstitutional because it prohibited "an entire class of arms that is overwhelmingly chosen by American society for [self-defense]" (internal quotation marks omitted)); *see Kolbe*, 849 F.3d at 131.

The requirements for the purchase of a handgun, as set out in the HQL law, undoubtedly burden this core Second Amendment right because they "make it considerably more difficult for a person lawfully to acquire and keep a firearm…for the purpose of self-defense in the home." *Heller II*, 670 F.3d at 1255; *see Libertarian Party of Erie County*, 300 F. Supp. 3d at 441 (finding that a firearm licensing law burdens conduct protected by the Second Amendment). Thus, I must proceed to the second step of the two-prong inquiry.

### D.  Level of Scrutiny

### 1.

The Second Amendment protects the right of "a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 682-83 (emphasis in original); *see* ECF

135-1 at 44-45. As indicated, the handgun is the "quintessential self-defense weapon." *Heller I*, 554 U.S. at 629. And, the licensing law implicates the core of the Second Amendment right because it places a burden on the ability of law-abiding citizens to own firearms for self-defense in the home.

Because the handgun is protected by the Second Amendment, the Court must decide the level of scrutiny to apply in evaluating the constitutionality of the Act. *See Hirschfeld*, 5 F.4th at 440 ("Having found that 18-year-olds are protected by the Second Amendment, our precedent requires that we apply 'an appropriate form of means-end scrutiny.'") (internal citation omitted). In addition to considering the "nature of the conduct being regulated," the Court must consider "the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682; *see Fyock v. City of Sunnyvale*, 779 F.3d 991, 998-99 (9th Cir. 2015) (determining appropriate level of scrutiny by considering "how severely, if at all, the law burdens [the Second Amendment] right"); *Heller II*, 670 F.3d at 1261 (determining "the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right"). Thus, the applicable level of scrutiny is determined by whether and to what extent the challenged regulation burdens the core Second Amendment right.

Heightened scrutiny is appropriate where the law imposes a severe burden on Second Amendment protections. A law severely burdens the core right if it "effectively disarm[s] individuals or substantially affect[s] their ability to defend themselves." *Kolbe*, 849 F.3d at 139. But, there is no substantial burden "'if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.'" *Libertarian Party of Erie Cty.*, 300 F. Supp. 3d at 442 (quoting *NYSRPA*, 804 F.3d at 259). And, "intermediate scrutiny is the appropriate standard [where the challenged provision] does not severely burden the core protection of the Second Amendment, i.e.,

29

the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe*, 849 F.3d at 138; *see Chester*, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right ... may be more easily justified.").

The record is clear that plaintiffs and others like them are readily able to acquire handguns in Maryland for self-defense if they obtain an HQL. In fact, the plaintiffs do not provide evidence establishing that *any* law-abiding, responsible citizen who applied for an HQL was denied the HQL. *See Libertarian Party of Erie Cty*, 970 F.3d at 127–28. Moreover, the HQL requirements place no more than "marginal, incremental, or even appreciable restraint on the right to keep and bear arms." *NYSRPA*, 804 F.3d at 259 (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)).

Only "the narrow class of persons who are adjudged to lack the characteristics necessary for the safe possession of a handgun" face a substantial burden on the core Second Amendment protection as a result of the HQL. *Aron v. Becker*, 48 F. Supp. 3d 347, 371 (N.D.N.Y. 2014).  In contrast, "law-abiding, responsible citizens face nothing more than time" and a reasonable "expense" in order to possess a handgun.  *Libertarian Party of Erie Cty.*, 300 F. Supp. 3d at 443. I note that plaintiffs have no quarrel with the 77R law, an earlier statute that also included a training requirement, a waiting period, and a fee.

Although the HQL law implicates the core Second Amendment right, the burden is not so severe as to require strict scrutiny. Other courts addressing challenges to registration and licensing requirements have applied intermediate scrutiny on the ground that "none of the … requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Heller II* , 670 F.3d at 1258; *see NYSRPA*, 804

F.3d at 260 (applying intermediate scrutiny where "[t]he burden imposed by the challenged legislation is real, but it is not 'severe'" (citation omitted)); *United States v. Marzzarella*, 614 F.3d 85, 96–97 (3d Cir. 2010) (noting that registration requirements "do[ ] not severely limit the possession of firearms"); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1329 (S.D. Cal. 2020) (noting that the disputed provision "does not categorically ban the possession of arms used for self-defense. It therefore does not impose a substantial burden on the Second Amendment, and allows for intermediate rather than strict scrutiny.").

Indeed, "there has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020); *see, e.g., Hirschfeld*, 5 F.4th at 440-41 (applying intermediate scrutiny without deciding "how close to the core of the Second Amendment these laws strike"); *Kolbe*, 849 F.3d at 138 (applying intermediate scrutiny where the law "does not severely burden the core protection of the Second Amendment"); *Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) (declining to apply strict scrutiny to a firearms prohibition that "addresses only conduct occurring outside the home," without deciding if or when strict scrutiny applies to a law reaching inside the home); *Woollard*, 712 F.3d at 876 (applying intermediate scrutiny to requirement that an individual demonstrate a "good and substantial reason" for carrying a handgun in public before he can obtain a permit to do so); *Carter*, 669 F.3d at 417 (applying intermediate scrutiny on review of a Second Amendment challenge to prohibition of firearms for users of marijuana); *Masciandaro*, 638 F.3d at 471 (applying intermediate scrutiny to a regulation barring the carrying of loaded weapons in a motor vehicle in a national park); *Chester*, 628 F.3d at 682-83 (applying intermediate scrutiny when reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by a person convicted of a

misdemeanor crime of domestic violence); *see also Sibley v. Watches*, 460 F. Supp. 3d 302, 313-14 (W.D.N.Y. May 18, 2020) ("The Second Circuit and district courts in this Circuit have continually chosen to apply intermediate scrutiny to general challenges under the Second Amendment.") (internal quotation marks omitted); *Doe No. 1 v. Putnam Cty.*, 344 F. Supp. 3d 518, 538 n.12 (S.D.N.Y. 2018) ("[T]he Second Circuit has not yet applied [strict] scrutiny to any statute in the Second Amendment context ....").

Accordingly, because the licensing law implicates the core Second Amendment right, but does not severely burden it, I shall apply intermediate scrutiny.

## 2.

As a threshold matter, the parties disagree over the precise contours of the intermediate scrutiny test. According to plaintiffs, the Supreme Court's most recent iteration of the test is that "'to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.'" ECF 135-1 at 49 (quoting *Packingham v. N.C.*, ___ U.S. ___, 137 S. Ct. 1730, 1732 (2017) (internal citation omitted)). Indeed, as the Fourth Circuit recently noted, *Hirschfeld*, 5 F.th at 441 n.56: "Exactly what intermediate scrutiny requires in a given situation remains unclear. *Compare Chester*, 628 F.3d at 683 ('reasonable fit'), *with Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) ('substantially related')." I shall apply the test as it has been articulated by the Fourth Circuit in its most recent Second Amendment opinions. *See Hirschfeld*, 5 F.4th 407; *Harley*, 988 F.3d 766; *Kolbe*, 849 F.3d 114.

"Under the standard of intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged law and a substantial governmental objective." *Harley*, 988 F.3d at 769; *see Hirschfeld*, 5 F.4th at 440-41. But, the fit need not be perfect or even the least intrusive means of accomplishing the desired objective. *United States v. Staten*, 666 F.3d

154, 162 (4th Cir. 2011). Rather, the defendants must show "'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest." *NYSRPA*, 804 F.3d at 264; *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) ("*Turner I*").

"Various evidence can be mustered to meet [the intermediate scrutiny] standard but 'reference to legislative findings, academic studies, or other empirical data is necessary.'" *Hirschfeld*, 5 F.4th at 441 (quoting *Tyler*, 837 F.3d at 694). Further, "while 'case law, and even common sense' may be relied on, the government may not 'rely upon mere anecdote and supposition.'" *Hirschfeld*, 5 F.4th at 441 (quoting *Tyler*, 837 F.3d at 694 (internal quotations and citation omitted)); *see also Hirschfeld*, 5 F.4th at 449 ("Congress may not pass intermediate scrutiny by relying on unsupported conclusory testimony to justify its desired outcome."); *Heller v. District of Columbia*, 801 F.3d 264, 279 (D.C. Cir. 2015) ("*Heller III*") ("[T]he Supreme Court has 'permitted litigants to justify ... restrictions ... based ... on history, consensus, and simple common sense' when the three are conjoined." (internal citation omitted)).

Plaintiffs argue that intermediate scrutiny in the "Second Amendment context does not allow deference to the legislature's findings." ECF 135-1 at 51. But, plaintiffs cite one Second Amendment case in support of this argument: *Duncan v. Becerra*, 970 F.3d 1133, 1166 (9th Cir. 2020), *reh'g granted*, *opinion vacated*, 988 F.3d 1209 (9th Cir. 2021) (en banc).  Of relevance here, the Supreme Court has said that, "[i]n reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of [the legislature].'" *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*"); *accord Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013).  And, the Fourth Circuit has instructed courts to "accord substantial

deference to the predictive judgments of [the legislature]." *Kolbe*, 849 F.3d at 140 (internal citation and quotation omitted); *see Hirschfeld*, 5 F.4th at 448-49.

 Especially in the "context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner I*, 512 U.S. at 665); *accord Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (same).  Significantly, "the Fourth Circuit has urged courts to approach Second Amendment claims with particular caution, giving due respect to the limits of their Article III powers." *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 417 F. Supp. 3d 747, 758 (W.D. Va. 2019), *vacated*, 5 F.4th 407.  In *Masciandaro*, 638 F.3d at 475, for example, the Court said: "To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."

To be sure, even with deference, meaningful review is required. *Hirschfeld*, 5 F.4th at 448-49. As the *Hirschfeld* Court said, *id.* at 448: "It is true that we sometimes give weight to Congress's 'predictive judgments' under *Turner*…. But this does not mean that we should blindly abdicate our obligation to review Congress's actions under heightened scrutiny." (Quoting *Turner I*, 512 U.S. at 665-66); *see Heller II*, 670 F.3d at 1259 ("Although we do accord substantial deference to the predictive judgments of the legislature when conducting intermediate scrutiny, the State is not thereby insulated from meaningful judicial review." (Internal quotations omitted)). But, the court's

role is only "to assure that, in formulating its judgments, [Maryland] has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 195.

### 3.

For starters, defendants' interest in promoting public safety in Maryland is clearly a substantial and compelling interest. *See Hirschfeld*, 5 F.4th at 441 ("To begin, the government's interests in preventing crime, enhancing public safety, and reducing gun violence are 'not only substantial, but compelling.'") (quoting *Kolbe*, 849 F.3d at 139). The Fourth Circuit has expressly found that the State has a substantial interest in providing for public safety and preventing crime. *See Kolbe*, 849 F.3d at 139; *Woollard*, 712 F.3d at 877-78; *see also Masciandaro*, 638 F.3d at 473 (finding that the government has a substantial interest in providing for public safety in national parks). And, plaintiffs do not attempt to argue otherwise.

Rather, plaintiffs argue that Maryland's "purported public safety interests are an unconstitutional pretext for preventing law-abiding Maryland citizens from acquiring and possessing handguns." ECF 135-1 at 37. In their view, the HQL requirements were enacted to "'intimidate' the citizens of Maryland from acquiring handguns." *Id.* (citing ECF 135-6 at 7-9, Tr. 30-31). Further, they claim that the FSA was the culmination of an effort led by former Maryland Attorney General J. Joseph Curran to "'restrict the future sale of handguns to those who can show a real, law enforcement need for one.'" ECF 135-1 at 22-23 (citing Symposium: Guns as a Consumer Product: New Public Health and Legal Strategies to Reduce Gun Violence, 4 J. Health Care L. & Pol'y 1, 5 (2000)).

Former Attorney General Curran did not hold elected office at the time of the passage of the FSA.  Nor does the legislative record indicate that he had any role in the enactment of the FSA. Thus, Curran's views are irrelevant to the law at issue in this case. Moreover, the other evidence

cited by plaintiffs in support of this argument merely supports the idea that defendants intended to limit the sale of handguns to unlawful purchasers.

Plaintiffs also argue that the defendants have no evidence that there are any actual harms associated with handgun purchases and usage in Maryland. ECF 135-1 at 52.  Yet, this contention is belied by the evidence, which establishes that handguns are the firearms most frequently used for criminal activity in Maryland. In 2012, for example, just prior to the passage of the FSA, there were 372 homicides in Maryland. ECF 135-23 at 1.  And, out of 281 homicides by firearm, 271 involved a handgun.  *Id.* In other words, handguns were used in 73 percent of the reported murders in 2012.[14] This powerful evidence indicates the high rate of handgun usage for unlawful purposes and the significant risks associated with inadequate precautions in the sale and distribution of handguns.

Further, the record indicates that background checks conducted by firearm dealers, without fingerprints, are susceptible to fraud. *See*, *e.g.*, ECF 125-3; ECF 125-4. According to defendants' experts, the firearm registration system in place in Maryland prior to passage of the FSA was "especially vulnerable" and resulted in "illegal straw purchases and…individuals using false identification in their applications to purchase regulated firearms." ECF 125-3 at 2 (noting that prospective purchasers could more easily put inaccurate information on their application forms…in order to avoid a denial of the application"); *see* ECF 125-14 (Decl. of Chief Johnson), ¶ 11 (noting that prior to passage of HQL he was "aware of cases in Baltimore County involving straw purchases of handguns for prohibited person"); ECF 140-3 (Webster's Third Supplemental Decl.), ¶ 12 ("Background checks conducted with only identification documents but without the

---

[14] In 2019, there were 543 homicides in Maryland. And, out of 514 homicides by firearm, 462 involved a handgun. *See* ECF 135-23 at 1.

applicant's fingerprints can lead to 'false negatives' – situations in which individuals are cleared to purchase and possess firearms despite having a disqualifying criminal conviction."). The experts' concern as to fraud is consistent with the findings of the GAO Study that background checks conducted by firearm dealers "cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful." ECF 125-4 at 2.

Plaintiffs claim that the GAO Study is inapplicable here because it predates the REAL ID Act, 49 U.S.C. § 30301; 6 C.F.R. § 37.14(a)-(b).  *See* ECF 135-1 at 63. Further, plaintiffs claim that "[b]ecause Maryland is now a REAL ID compliant state, there is no likelihood that false Maryland identification will be used" to purchase a handgun. *Id.* at 29. However, plaintiffs misstate the facts. The U.S. Department of Homeland Security has extended until May 3, 2023, the national deadline for REAL ID compliance. *See* Maryland Dept. of Transportation, https://mva.maryland.gov/Pages/mdotmva-current-operations.aspx#realid (last accessed, July 27, 2021). Moreover, plaintiffs do not provide any evidence that the REAL ID Act would eliminate the problem of false identification in this context. In any event, as discussed, *infra*, the addition of another prevention measure is not dispositive.

The susceptibility to fraud has resulted in actual problems.  Chief Johnson explained in his testimony before the General Assembly, ECF 125-5 at 4: "In law enforcement, we know that criminals prohibited from buying guns attempt to use straw purchasers…. Often, the people recruited to make a straw purchase are intellectually unsophisticated or coerced into straw purchasing attempts. In a recent case in Baltimore County, an intellectually disabled person was used to purchase numerous weapons, some of which were recovered and confirmed as having been used in crimes of violence." *See also* ECF 140-3, ¶ 10 (Webster noting that "one of the most

common ways in which prohibited purchasers obtain firearms" is "through straw purchases or from private unlicensed sellers who purchase firearms from licensed gun dealers and then sell them in the underground gun market to criminals").

Handguns often fall into the wrong hands. Testifying before the General Assembly, then Baltimore City Police Commissioner Batts explained: "Most of the homicides and non-fatal shootings that plague Baltimore are perpetrated by prohibited persons with illegal guns." ECF 125-6 at 2. To illustrate, he stated that in 2012 "79% of all homicide suspects arrested had prior records and approximately 45% had firearms offenses in their criminal histories." *Id.*

In addition, there are risks associated with handgun users who are not properly trained in handgun use and storage. For example, MSP Capt. James Russell averred, ECF 125-13, ¶ 14: "In my experience, prior to taking a training course, the vast majority of firearms safety students lack a sufficient working knowledge of a handgun to handle and operate it safely." And, Chief Johnson testified at his deposition that he was aware of over 100 accidental discharges of handguns during his time in law enforcement in Maryland. *See* ECF 140-5 at 7-8, Tr. 105-106. These accidental discharges, according to Johnson, are often caused by people who mistakenly pulled the trigger, "unaware that there was a round in the chamber" because they thought ejecting the magazine was "sufficient" to render the weapon safe. *Id.* at 8, Tr. 106. And, as to the problem of improper storage, Chief Johnson stated, ECF 125-14, ¶ 15: "I am aware of at least two instances in which minors accessed improperly-stored firearms within the home, brought the weapons to school, and discharged them at school."

Further, under the video training requirement that preceded the FSA, the MSP could not guarantee that prospective purchasers were actually watching the training material. ECF 125-14, ¶ 7 ("A further advantage of classroom training is that an instructor can verify that an individual

attended the training, as opposed to watching a video, which cannot be verified."); ECF 125-13, ¶ 26 (noting that "…students watching a video may leave the room while the video is playing"); ECF 125-5 at 5 (noting that the "current viewing requirement – viewing a 30-minute video—is insufficient").

Based on this evidence, the General Assembly concluded that the risks and challenges associated with the purchase and use of handguns in Maryland required a more robust identification and training requirement, in order to reduce the risks outlined above and to promote public safety. And, it "is beyond cavil that [the State has a] 'substantial, indeed compelling, governmental interest[] in public safety and crime prevention.'" *NYSRPA*, 804 F.3d at 261 (*Kachalsky*, 701 F.3d at 96).

### 4.

The Court must next decide whether the HQL requirements "are a reasonable fit to" the State's interest in public safety. *See Hirschfeld*, 5 F.4th at 441. In particular, I must determine whether the fingerprinting requirement and the firearm safety training are substantially related to the government's interest in promoting public safety.  In addition, I must ascertain whether the requirements impose more burden on the Second Amendment right than necessary to achieve that interest.

As to the fingerprint requirement, defendants posit that it serves "three critical public safety functions," ECF 125-1 at 26: (1) It "enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information"; (2) "a fingerprint record can be used to determine if an HQL licensee is convicted of a disqualifying offense subsequent to passing the initial background investigation"; and (3) the fingerprint

requirement, "through its inherent and lasting reliability, acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes."

Plaintiffs counter that the fingerprint requirement is unnecessary because the preexisting registration requirement already "positively identif[ied] handgun purchasers" and allowed law enforcement "to locate and disarm handgun owners who were subsequently disqualified from handgun ownership." ECF 135-1 at 28. In particular, they point out, ECF 135-1 at 18, that the 77R Handgun Registration application required the prospective purchaser's identifying information, including "name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's [license] or photographic identification soundex number, [and] occupation." *See* Md. Code (2003), P.S. § 442. And, the MSP used this information to conduct a background check on the prospective firearm purchaser. *See* ECF 135-6 at 14, Tr. 73 (Webster noting that prior to the HQL, there was a requirement that MSP conduct a background check on prospective purchasers).

According to plaintiffs, the HQL fingerprint requirement "is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government issued photographic identification of another individual who does not have a criminal record." ECF 135-1 at 29. They assert that defendants "have no evidence that anyone in Maryland has ever attempted to purchase a handgun in such circumstances." *Id.* And, in any event, plaintiffs posit that the "REAL ID" diminishes the "likelihood that false Maryland identification will be used for such a purchase." *Id.* Further, plaintiffs take issue with the evidence that defendants used to establish that the fingerprint requirement is substantially related to serving public safety. *Id.* at 54-58.

Defendants' experts are in agreement that a fingerprint requirement helps to prevent fraud, ensure the identity of gun purchasers, and deter straw purchasers. In particular, two members of law enforcement and Webster provided testimony to the General Assembly as to the benefits of a fingerprinting requirement. *See* ECF 125-3; ECF 125-5; ECF 125-6. Chief Johnson, for example, explained that the fingerprinting requirement would "help law enforcement to identify people involved in gun crimes." ECF 125-5 at 5. And, Commissioner Batts noted that the fingerprint requirement would help "ensur[e] that the applicant is not prohibited from possessing a handgun." ECF 125-6 at 2-3.

In their testimony in support of the FSA, Webster, Johnson, and Batts relied on empirical evidence, in addition to their personal expertise. *See* ECF 125-3; ECF 125-5; ECF 125-6. As noted, during Webster's testimony before the General Assembly, he shared the conclusions of an array of empirical studies as to the benefits of licensing laws that require fingerprinting. *See* ECF 125-3. For instance, Webster explained that five states that require citizens to apply directly with a law enforcement agency and be fingerprinted before they can purchase handguns "have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-2010." *Id.* at 3. Johnson and Batts also referenced research from states with licensing requirements. ECF 125-5 at 4 (noting that "other states with licensing requirements have shown such a reduction"); ECF 125-6 ("States like New York, New Jersey and Massachusetts have shown that licensing will also serve as a deterrent to the straw buyers of a handgun.").

Webster and Johnson reaffirmed and emphasized the benefit of the fingerprint requirement in their expert declarations and deposition testimony for this case. *See Kolbe*, 849 F.3d at 140 n.14 (noting that the court may look to evidence outside of the legislative record in order to confirm the reasonableness of the legislature's predictions). For instance, Chief Johnson averred, ECF 125-14,

¶ 8: "Based on my law enforcement experience and conversations with other law enforcement personnel, it is my opinion that an individual who has to render a set of fingerprints to obtain an HQL will be deterred from falsely identifying him or herself during the application process. In contrast, a background investigation based solely on photographic identification can be defeated with false identification." *See also, e.g., id.* ¶ 9 ("[I]t is my opinion that an individual who knows they have to render a set of fingerprints to obtain an HQL is less likely to engage in a straw purchase on behalf of a disqualified individual."); ECF 135-8 at 2-3 (Dep. of Chief Johnson), Tr. 19-20 ("I believe the fingerprint itself is a more robust element that determines one's true identity. The [previous background check] obviously can be defeated with false identification…."); ECF 140-11, ¶ 12 (Webster explaining that "purchaser licensing systems that use law enforcement agencies and fingerprint verification of an applicant's identity more effectively vet applications to purchase firearms than can be accomplished by gun store owners and clerks who process these applications in the absence of licensing systems or biometric identity markers."). Defendants' witnesses also stressed the importance of the fingerprint requirement to prevent firearms from falling into, or remaining in, the hands of convicted criminals. *See, e.g.*, ECF 125-7 (Decl. of Captain Andy Johnson), ¶¶ 23, 24; ECF 125-11 (Decl. of Webster), ¶ 10.

Plaintiffs counter that, even without the fingerprint requirement, MSP *could have* dispossessed individuals of their registered firearms if they were subsequently disqualified from gun ownership. ECF 135-1 at 28-29. However, before 2013, there was no "systematic or routine reporting" of criminal history record information of registered gun owners. First Sgt. Donald Pickle, Assistant Commander of MSP's Licensing Division, averred, ECF 125-9, ¶ 12: "While it is true that MSP was able to locate and disarm handgun owners prior to the fingerprint requirement when MSP was notified that the individual was subsequently disqualified from handgun

ownership, I am unaware of any systematic or routine reporting of this information from any law enforcement agency, court system, or other criminal justify agency prior to enactment of the Firearm Safety Act and the HQL fingerprint requirement." *See also* ECF 140-2 (Webster Supplemental Decl.), ¶ 6 ("Based on my gun policy research in the State of Maryland, I am aware that there is no such routine reporting of individuals convicted of all disqualifying offenses from local law enforcement agencies to the Maryland State Police.").

The FSA obviates any dependency on reporting by local law enforcement. "Using the fingerprint record generated as part of the HQL application process, DPSCS is able to provide MSP with licensees' updated criminal history information." ECF 125-7 (Decl. of Capt. Andy Johnson), ¶ 23; *see also* ECF 140-2, ¶ 6 (Webster noting that "the reports routinely generated based on the fingerprint records allow the Maryland State Police to track arrests without having to rely on reporting from local law enforcement"); *see* FSA § 5-117.1(f)(7). "This information enables MSP to revoke the HQLs of persons who become ineligible to possess them and to notify the Firearms Enforcement Unit, which is responsible for removing firearms from disqualified individuals. The Firearms Enforcement Unit investigates whether the person is still in possession of firearms and, if so, is responsible for retrieving those firearms." ECF 125-7, ¶ 23. And, as even plaintiffs' expert concedes, it is undeniable that the ability to identify when an HQL licensee subsequently becomes disqualified is beneficial for public safety. ECF 125-15 (Dep. of Kleck) at 3, Tr. 49 (agreeing that there are potential public safety benefits to identifying an HQL licensee who becomes disqualified after receiving an HQL).

Plaintiffs vigorously dispute some of the empirical studies on which defendants have relied. In particular, in his declarations and expert report, Webster argues that empirical evidence from studies conducted about permit-to-purchase firearm laws in Connecticut and Missouri demonstrate

that such laws "are an effective means of reducing (1) the diversion of guns for criminal purposes; (2) firearm homicides; and (3) suicides with firearms." ECF 125-11, ¶ 13; *see id.* ¶¶ 14-16. Plaintiffs, through Kleck, question the methodology and conclusions of Webster's studies. ECF 135-1 at 55-57. Kleck posits, for example, that Webster's conclusions are the result of "data dredging" and that the studies' choice of control variables and control areas were "cherry-pick[ed]." *Id.* at 57; *see* ECF 135-25, ¶¶ 13-23.

In *Heller III*, 801 F.3d at 275-76, the D.C. Circuit upheld a fingerprinting requirement for handgun registration based, in part, on testimony from Webster and another law enforcement expert, as well as the conclusions of the GAO Study.  *Id.* at 275-76. The plaintiffs in *Heller III* argued that "the District [*i.e.*, the defendant] has not experienced a problem with fraud in the registration of firearms" and the problem of fraud "is unlikely to arise, given the increased difficulty of manufacturing fraudulent identification documents today, as compared to 2001, when the GAO concluded its investigation." *Id.* at 276. That argument is similar to the contention advanced here by plaintiffs.

In response to the plaintiffs' argument, the D.C. Circuit reasoned, *id.*: "Even if this is true, however, a prophylactic disclosure measure such as the one at issue here survives intermediate scrutiny if the deterrent value of the measure will materially further an important governmental interest." The *Heller III* Court noted that the "GAO study indicates the fingerprinting requirement would help deter and detect fraud and thereby prevent disqualified individuals from registering firearms," and the experts' testimony affirmed that using fingerprints "'to positively identify an individual is far more effective than relying simply on a name and social security number.'" *Id.* (internal citation omitted). Thus, the court concluded that "the District has adduced substantial evidence from which it reasonably could conclude that fingerprinting…registrants will directly

and materially advance public safety by preventing at least some ineligible individuals from obtaining weapons…." *Id.* at 277.

In the face of these "conflicting views" of Webster's work, the Court need not "put [its] imprimatur" on his research and conclusions. *Turner II*, 520 U.S. at 208. Rather, "'[i]t is the legislature's job," not the job of the Court, "to weigh conflicting evidence and make policy judgments.'" *Kolbe*, 849 F.3d at 140 (quoting *Woollard*, 712 F.3d at 881) (alterations in *Kolbe*). The Court's role is merely to decide whether defendants have provided "substantial evidence" to support the General Assembly "making the judgment that it did." *Turner II*, 520 U.S. at 208; *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (courts should give legislatures "wide discretion to pass legislation in areas where there is ... scientific uncertainty") (collecting cases).

Substantial evidence was presented to the Maryland legislature, from which it was entitled to conclude that the fingerprinting of prospective handgun purchasers would promote public safety. The State relied on expert testimony, empirical evidence, and "simple common sense" to reasonably infer that a fingerprinting requirement would facilitate identification of a gun's owner, both at the time of licensing and upon any subsequent disqualifying activity. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) ("[W]e have permitted litigants to justify ... restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense."). Moreover, the General Assembly was of the view that such a requirement would deter straw purchases.

As the Fourth Circuit stated in *Kolbe*, 849 F.3d at 140, with respect to another FSA provision: "The judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a

court." I am satisfied that the State "adduced substantial evidence" that the fingerprinting requirement will help effectuate public safety by, among other things, preventing fraud and facilitating the removal of firearms from disqualified individuals.

**5.**

With respect to the live training and live-fire requirement, defendants argue that it "will reduce accidental discharges and access of firearms to ineligible persons, including minors." ECF 140 at 34.  In addition to the testimony presented to the General Assembly (ECF 125-3; ECF 125-5; ECF 125-6), defendants primarily rely on affidavits from Capt. Russell and former Chief Johnson to establish that the training requirement is reasonably adapted to achieve the government's purported interests and is superior to the video training required under the earlier registration scheme. ECF 125-13; ECF 125-14.

According to the defense experts, the training requirement creates an additional deterrent because "straw purchasers will [not] sit through a four-hour training program." ECF 125-5 at 5; *see* ECF 125-14, ¶ 11 (noting that straw purchasers would be deterred by "taking a four-hour firearms safety training that included an overview of State firearms law"). Further, the experts opine that the training contemplated by the HQL law promotes safe handling, operation, and storage of firearms which reduces the risk of accidental discharges and access of firearms to minors and criminals. ECF 125-13, ¶¶ 19-21; ECF 125-14, ¶ 14-16. Additionally, a live training course, in contrast with video training, "allows for dialogue…such that students can ask questions," ECF 125-14, ¶ 17, and "receive feedback from the instructor." ECF 125-13, ¶ 26.  Live training also allows an instructor "to verify that an individual attended the training." ECF 125-14, ¶ 17; ECF 125-13, ¶¶ 22-23; *see also* ECF 125-14, ¶ 17.

Plaintiffs maintain that the new training requirement is unnecessary because it is "substantively identical to the 77R Handgun Registration online presentation." ECF 135-1 at 60. If the law is "substantively identical" to the earlier training program, however, then it is difficult to understand the basis of plaintiffs' complaint.  In any event, plaintiffs cite no evidence to support their contention that the four-hour training is identical to the one-hour video training.  In the end, plaintiffs are unhappy with the inconvenience of the requirement. The four-hour classroom requirement for the HQL is a minor inconvenience; it does not violate the Second Amendment.[15]

Both defense experts also stressed the benefits of the live-firing requirement. Capt. Russell, for example, averred that the live-fire requirement "is a significant step toward ensuring responsible and safe gun ownership." ECF 125-13, ¶ 25. According to Chief Johnson, the live fire component of the training could prevent accidental discharges because it would make an individual "accustom[ed] to the mechanism, the operation of the weapon" and the "process of clearing the weapon" to render it safe. ECF 140-5 at 9, Tr. 107; *see* ECF 135-9 at 12, Tr. 107 (Capt. Russell noting that his students say that they "feel so much [more] comfortable with the nomenclature, how to make it safe, and…shooting procedures" after the live-fire training).

As plaintiffs point out, Chief Johnson also stated that he thinks "just firing one round [of live ammunition] is not adequate." ECF 135-8 at 10, Tr. 52. But, just because the requirement does not go as far as it could have or should have does not mean it is unconstitutional. *See Mance v. Sessions*, 896 F.3d 699, 701, 704, 708–09 (5th Cir. 2018) (per curiam) (finding that federal laws

---

[15] Maryland has established training requirements as a condition for licensing in various contexts. To be sure, the training requirements do not always implicate constitutional rights.  But, these requirements reflect the legislative approach to licensing.  For instance, to qualify for a Maryland driver's license for the first time, individuals must participate in 30 classroom hours of instruction and spend six hours behind the wheel. *See* Motor Vehicle Administration (https://mva.maryland.gov/drivers/Pages/rookie-driver-general-learners.aspx) (last accessed, July 22, 2021).

preventing federally licensed dealers from directly selling handguns to out-of-state buyers survived strict scrutiny despite their underinclusivity, as governments "need not address all aspects of a problem in one fell swoop"). Moreover, Chief Johnson also noted, ECF 135-8 at 10, Tr. 52: "I do not think the requirement to show proficiency in discharging a round is unreasonable." Thus, even if he did not think the requirement went far enough, he still thought it was reasonable.

Plaintiffs' primary argument as to the live fire requirement is that it "effectively bans completion of the HQL training in almost all urban areas of Maryland because there is nowhere to legally discharge a firearm except at an established firing range." ECF 150 at 13; *see* ECF 135-3 (Decl. of Pennak), ¶ 22. Although the live firing requirement may present a slight burden on prospective purchasers who live in urban areas, and who therefore must travel outside their immediate neighborhoods to complete the training, the requirement is certainly not the equivalent of a "ban" on the completion of the training. *See Connecticut Citizens Defense League, Inc. v. Lamont*, 465 F. Supp. 3d 56, 73 (D. Conn. 2020) ("The U.S. Constitution permits the States to set out a procedural road to lawful handgun ownership, rather than simply allowing anyone to acquire and carry a gun.... That road may be long.... It may be narrow.... It may even have tolls.") (citations omitted); *Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 754 (N.D. Ill. 2015) ("[A] slight diversion off the beaten path is no affront to ... Second Amendment rights.").

As discussed, despite this requirement, thousands of Maryland citizens have applied for and successfully received HQL licenses since 2013. Moreover, most of plaintiffs' witnesses who were allegedly deterred from purchasing a handgun by the HQL had already taken firearm safety courses or were exempt from the training requirement. *See* ECF 140-8 (Dep. of Clark) at 5, Tr. 15; ECF 140-7 (Dep. of Mr. Miller) at 9, Tr. 20; ECF 135-4 (Dep. of Vizas) at 9, Tr. 37; *but see* ECF 135-5 at 12, Tr. 33 (Ms. Miller noting that she was deterred from taking the training because of

her back problems). For example, Ms. Vizas, one of the named plaintiffs, had already participated in a hunter safety training course in 2016 simply because her children wanted to attend the class. ECF 135-4 at 9, Tr. 37. Thus, the training requirement is hardly the obstacle that plaintiffs suggest.

Plaintiffs make two additional arguments in attempting to demonstrate that the training requirement is unnecessary, ineffective, and illegal. Both are unpersuasive.

First, plaintiffs argue that there is "no evidence that the training courses actually being taught bear any relationship to any of the asserted government interests." ECF 150 at 24. But, plaintiffs do not present any evidence to demonstrate that the substance of the training courses is problematic. And, the Act provides that the safety training *must* cover "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation." P.S. § 5-117.1(d)(3); *see* COMAR, 29.03.01.29 (setting out the "minimum curricula" relating to each statutory subject). Additionally, the MSP provides instructors with a sample lesson plan for the course. ECF 135-7 (Dep. of Johnson) at 8-9, Tr. 68-69; ECF 135-9 (Dep. of Russell) at 5-6, Tr. 70-71; *id.* at 14, Tr. 114 (noting that the MSP recommends instructors use the sample lesson plan, although it is not a requirement). And, instructors must meet certain requirements in order to become qualified to teach the course. *See* COMAR, 29.03.01.37, .38.

Second, plaintiffs assert that the exceptions to the safety course illustrate "the pretextual nature of the Defendants' claimed interest." ECF 135-1 at 39. As noted, the Act does not require HQL training for individuals, for example, who already own registered firearms or have passed hunter safety training. P.S. §§ 5-117.1(e). According to plaintiffs, this indicates that the video training course is sufficient to ensure public safety. ECF 135-1 at 39-40. However, the State's experts specifically disputed that claim. Chief Johnson, for example, stated, ECF 125-14, ¶ 17: "I am aware that prior to the enactment of the HQL requirement, purchasers of handguns were

required to view a video that, in my opinion, did not amount to training on the safe operation and handling of a firearm. Based on my 39-year career in law enforcement, I do not consider merely watching a video to be training…." And, as noted with respect to the live-fire requirement, just because a law does not address every "facet of a problem at once" does not mean it is unconstitutional. *See Hirschfeld*, 5 F.4th at 450.

Additionally, both sides rely on *Heller III*, 801 F.3d 264, to support their contentions as to the training requirement. Plaintiffs' reliance is misplaced.

*Heller III* addressed a challenge to the District's training requirement that mandated a one-hour firearms safety course, available online, and a test about local gun laws. The D.C. Circuit said, *id.* at 278-79: "The District has presented substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms, but has presented no evidence from which it could conclude that passing a test of knowledge about local gun laws does so. The safety training, therefore, is constitutional; the test of legal knowledge is not."

As to the training course requirement, the "District's experts each testified to their belief in the value of training to prevent accidents," and the District "offered anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training." *Id.* at 279 (citation omitted). Thus, even though the District did not present empirical evidence about the benefits of mandatory training, the court was satisfied that the requirement was justified. *Id.* But, as to the "test" requirement, the court found that the District had not presented sufficient evidence to demonstrate that "knowledge of the District's gun laws will promote public safety." *Id.*

Although the HQL training requirement is more extensive than the training requirement in *Heller III*, the D.C. Circuit's reasoning is instructive. Defendants submitted declarations from two law enforcement experts who, speaking from "experience and common sense," and based on "hundreds of conversations with other law enforcement officers regarding their experience," expressed their belief in the value of live training to prevent accidents, among other things. ECF 125-14, ¶ 4; *see* ECF 125-13, ¶¶ 18-21. And, unlike the law at issue in *Heller III*, the HQL training requirement does not require applicants to demonstrate their knowledge of State laws that are unrelated to public safety. Plaintiffs do not contend otherwise.

Therefore, as in *Heller III*, I am satisfied that the expert opinions of the State's witnesses, as well as common sense, comprise substantial evidence that the State's training requirement will help to prevent handgun accidents and deter straw purchasers and thus promote public safety.

**6.**

Overall, plaintiffs argue that the expense and time associated with HQL requirements impose too great a burden on prospective purchasers for its limited benefits. In particular, plaintiffs complain that the HQL requirement is time-consuming because it "imposes an additional statutorily-permissible 30-day waiting period." ECF 135-1 at 24. And, in addition to the 30-day waiting period, plaintiffs complain that "completing an HQL application takes time" and money— at least $200. *Id.* at 24, 26. Specifically, to complete the application, prospective handgun purchasers "must begin an application, find a firearm instructor, complete a half day of firearm instruction in a classroom format, complete the live-fire requirement, locate a live-scan fingerprint vendor, obtain fingerprints, and complete their application online." *Id.*

However, courts have regularly found that "reasonable" fees and waiting periods are constitutional. *See, e.g., Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (noting that "[t]here

is … nothing new in having to wait for the delivery of a weapon" and upholding 10-day waiting period); *Heller III*, 801 F.3d at 278 (finding that "reasonable fees associated with constitutional requirements of registration and fingerprinting are also constitutional"); *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013) (holding constitutional a $340 fee for a license to possess a handgun in one's home); *see also Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (holding, in response to a First Amendment challenge to a parade licensing statute, that a government may impose a fee "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"); *Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) (recognizing, in the firearms licensing context, "that administrative determinations may require a non-trivial amount of time to complete").

In order to demonstrate the significance of the burden, plaintiffs assert that the HQL requirement "discouraged nearly one-quarter of Maryland citizens who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin an HQL application from completing it and obtaining their HQL." ECF 135-1 at 13. However, this claim is based on the number of users who initiated an HQL application on MSP's server but did not complete the application. *Id.* Plaintiffs do not cite to any evidence demonstrating that the applications were not completed *because of* the HQL requirements. As defendants point out, there are many reasons why an application may not be completed. ECF 140 at 11-12; *see* ECF 140-6 (Dep. of Diane Armstrong, supervisor for the Handgun Qualification License Unit); ECF 135-15 (MSP Col. Pallozzi Third Supp. Interrog. Resp.) at 3-4, 8. For example, individuals sometimes inadvertently create multiple accounts and initiate multiple applications on those accounts, but only complete an application on one account. ECF 140-6 at 4, Tr. 8. It is also conceivable that

some applications were not completed because the applicants recognized that they would not qualify, perhaps because of a prior criminal record.

Moreover, plaintiffs claim that the FSA has caused a significant decline in gun sales. They point to Atlantic Guns' average yearly handgun sales for the four-year period before the enactment of the FSA, from 2009 to 2012, and compare those sales to its average yearly handgun sales for the four-year period subsequent to the FSA, from 2014 to 2017. The comparison shows a 20 percent reduction in sales, according to plaintiffs. ECF 135-1 at 43; ECF 84, ¶ 9 [SEALED].

To be clear, the Court does not dispute the fact that Atlantic Guns may have lost sales and revenue as a result of the FSA. *See Maryland Shall Issue*, 971 F.3d at 211-12 (noting that after the FSA took effect, the dealer's handgun sales suffered). However, plaintiffs excluded the sales for 2013 from their calculation. And, in 2013, Atlantic Guns' sales were ███████████████ the yearly average from the preceding four years. *See* ECF 84-1 [SEALED].[16]

Further, the four-year period of 2014-2017 does not tell the whole story. Atlantic Guns' sales data from 2017-2020 indicates that the FSA may not have any long-term effect on sales. In the last year four years, Atlantic Guns sold, on average, ████████████████████ ██████████████████████████████████████ *See* ECF 141-1. And, other than the plaintiffs' witnesses who were purportedly deterred from purchasing handguns, there is no evidence as to whether the law has actually *prevented* any law-abiding, eligible citizens from purchasing handguns.

In addition, throughout their arguments, the parties vigorously dispute whether the Act has actually had the intended effect of promoting public safety. Defendants tout two studies conducted

---

[16] It is plausible that the sizeable increase in gun sales in 2013 might have had an offsetting effect on gun sales in the following years.

by Webster that purport to assess the FSA's impact on (1) the supply of handguns diverted to criminal use in Baltimore and (2) the homicide rate in Maryland. ECF 125-1 at 29-30; *see* ECF 125-11, ¶¶ 17-18. In response, plaintiffs point out everything that they believe is wrong with those studies. ECF 135-1 at 54-55.

The first study, according to Webster, "shows a strong association between the adoption of Maryland's HQL law and a reduction in the number of handguns diverted to criminals in Baltimore." ECF 125-11, ¶ 18 & n.6 (citing Cassandra K. Crifasi et al., *The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore*, 3(5) The Russel Sage Foundation Journal for the Social Sciences 128–40 (2017)) ("2017 Study"). In particular, Webster explained that the "study showed that the FSA with the HQL requirement was associated with a 76 percent reduction in the number of handguns originally sold in Maryland that were (1) recovered by police in connection with a crime within one year of retail sale; and (2) where the person from whom the gun was recovered was not the same as the person who purchased the gun originally."  ECF 125-11, ¶ 18. The study also surveyed probationers and parolees in Baltimore, 40% of whom reported that obtaining a handgun was more difficult after the HQL's enactment. *Id.* ¶ 19.

Relying on Kleck's analysis, plaintiffs take issue with Webster's conclusions, stating, ECF 135-1 at 55: "Although [the 2017 Study] concludes that the FSA caused a reduction in the supply of crime handguns in Baltimore, this conclusion is not based on any actual (or reliable) data on the supply of handguns in Baltimore or anywhere else." According to Kleck, the 2017 Study used firearms trace data, which "cannot legitimately be used to assess the supply of crime guns" because the Bureau of Alcohol, Tobacco, Firearms and Explosives states that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the

54

larger universe of all firearms used by criminals, or any subset of that universe." ECF 135-25, ¶¶ 6, 7. Further, with respect to the survey of Baltimore probationers and parolees, Kleck asserts that the "convenien[t] sample of criminals was not representative of criminals…" and there is no "evidence whatsoever that any of these individuals had actually tried to acquire a gun before or after the FSA went into effect." *Id.* ¶ 11.

Additionally, as to homicide rates, Webster concluded that the HQL requirements were associated with a 48% reduction in firearm homicide rates in Maryland based on data collected from Anne Arundel, Montgomery, and Prince George's counties. ECF 125-11, ¶ 17. Webster purportedly excluded Baltimore City from the statistical model because "the study period included 2015, when firearm homicide rates surge[d] in Baltimore City immediately following the riots over the in-custody death of Freddie Gray, Jr.," so "estimates of the law's impacts in Baltimore or statewide would be biased in the direction of more homicides due to the historical confounder of major riots." *Id.*

Plaintiffs criticize Webster's decision to exclude Baltimore City from his statistical model and emphasize that the HQL requirement is actually associated with an increased homicide rate in Baltimore City, and Maryland as a whole. ECF 135-1 at 30-31; ECF 150 at 20-21. To be sure, it is undisputed that the number of handgun homicides in Maryland has increased overall since 2013. *See* ECF 135-23 at 1. But, the data is not as clear as plaintiffs suggest. The firearm homicide rate decreased immediately following the passage of the FSA in 2013 and only began to rise again in 2015. And, as defendants contend, that rise may be associated with the aftermath of "the death of Freddie Gray and the ensuing unrest." ECF 140 at 14. And, it is also quite plausible that, without the HQL the disturbing number of homicides might have been even greater.

Given the array of variables, it may be impossible to determine the effectiveness of the law at this juncture, or at any juncture. *See Hirschfeld*, 5 F.4th at 451 ("While we recognize that it would be difficult to determine the effectiveness of these laws now…."); *see also id.* at 483 (Wynn, J., dissenting) ("[A]s the majority recognizes, it '[is] difficult to determine the effectiveness of these laws now.'… Given this conceded uncertainty, I would not have this Court stray far beyond its area of expertise to strike down a long-established law because of its perceived ineffectiveness."). In the face of such uncertainty, I would be straying beyond my authority to strike down a law because of its perceived ineffectiveness. *See Masciandaro*, 638 F.3d at 475–76 ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.... If ever there was an occasion for restraint, this would seem to be it.").

In any event, the "Supreme Court has stated explicitly that the government satisfies intermediate scrutiny if its predictions about the effect of a challenged law are rational and based on substantial evidence—it need not establish with certitude that the law *will actually achieve* its desired end." *Heller v. District of Columbia*, 45. F. Supp. 3d 35, 41-42 (D.D.C. 2014) (emphasis added) (citing *Turner I*, 512 U.S. at 666 (stating that, to survive intermediate scrutiny, government must show that "in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence")), *aff'd in part*, 801 F.3d 264 (D.C. Cir. 2015).

## V.    Conclusion

The record demonstrates a reasonable fit between Maryland's HQL law and the State's important interest in promoting public safety. As noted, the evidence indicates that there are real safety risks associated with the misuse of handguns and the possession of handguns by those who are barred under the law from gun possession. And, as discussed above, the fingerprinting and

56

training requirements align directly with the State's need to verify the identity of gun purchasers, deter straw purchasers, and ensure that handgun users have sufficient knowledge about guns, so as to mitigate safety risks.

The fingerprinting and training requirements are reasonably adapted to serve the State's overwhelming interest in protecting public safety. Moreover, the time and expense associated with the requirements are reasonable. *See Heller II*, 670 F.3d at 1249 n.* (noting that "administrative ... provisions incidental to the underlying regime"—which include reasonable fees associated with registration—are lawful insofar as the underlying regime is lawful).  "Simply put, the State has shown all that is required: a reasonable, if not perfect, fit between the FSA and Maryland's interest in protecting public safety." *Kolbe*, 849 F.3d at 140-41. I decline to usurp the legislative role by invalidating the measures that the Maryland General Assembly enacted based on substantial evidence that such measures would promote public safety.

As Judge Wilkinson aptly noted in his concurrence in *Kolbe*, 849 F.3d at 150: "No one really knows what the right answer is with respect to the regulation of firearms," but "the profound ambiguities of the Second Amendment" are not "an invitation to courts to preempt this most volatile of political subjects and arrogate to themselves decisions that have been historically assigned to other, more democratic actors." Further, he stated, *id.*: "Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps. It is their community, not ours. It is their safety, not ours. It is their lives, not ours. To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny—this would deliver a body blow to democracy as we have known it since the very founding of this nation."

For the reasons set forth above, I shall grant Defendants' Motion and deny Plaintiffs' Motion. An Order follows, consistent with this Memorandum Opinion.[17]

Dated:  August 12, 2021                                     _____/s/_____
                                                           Ellen L. Hollander
                                                           United States District Judge

---

[17] The Memorandum Opinion will be filed under seal because it contains confidential business information filed under seal by a party. Therefore, the Court will file a redacted version of the Memorandum Opinion or, alternatively, after consultation with counsel, it will lift the seal. By August 23, 2021, the parties shall advise the Court as to whether they object to the lifting of the seal or, alternatively, whether the Court should file a redacted version, limited to pages 17 and 53. If either side requests the filing of a redacted version, the proposed redaction(s) should be submitted by August 23, 2021.